**RECORD NO. 13-4079**

In The

# United States Court of Appeals

For The Third Circuit

**AMERICAN FARM BUREAU FEDERATION; PENNSYLVANIA FARM BUREAU; THE FERTILIZER INSTITUTE; U.S. POULTRY & EGG ASSOCIATION; NATIONAL PORK PRODUCERS COUNCIL; NATIONAL CORN GROWERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS,**

*Plaintiffs – Appellants*,

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Defendants – Appellees.*

**CHESAPEAKE BAY FOUNDATION; CITIZENS FOR PENNSYLVANIAS FUTURE; DEFENDERS OF WILDLIFE; JEFFERSON COUNTY PUBLIC SERVICE DISTRICT; MIDSHORE RIVERKEEPER CONSERVANCY; NATIONAL WILDLIFE FEDERATION; VIRGINA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC; MARYLAND ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES; NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; PENNSYLVANIA MUNICIPAL AUTHORITIES ASSOCIATION,**

*Intervenors – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

———————

**JOINT APPENDIX
VOLUME II OF V
(Pages 106 – 631)**

———————

(Counsel listed inside cover)

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# RECORD NO. 13-4079

Kirsten L. Nathanson
Richard E. Schwartz
David Y. Chung
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 624-2887

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Amanda J. Lavis
Robert J. Tribeck
RHOADS & SINON LLP
One South Market Square, 12th Floor
Post Office Box 1146
Harrisburg, Pennsylvania 17108
(717) 233-5731

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Marc B. Kaplin
Gregg I. Adelman
William D. Auxer
KAPLIN, STEWART, MELOFF, REITER & STEIN
910 Harvest Drive
Post Office Box 3037
Blue Bell, Pennsylvania 19422
(610) 941-2666

*Counsel for National Association of Home Builders*

Stephen R. Cerutti, II
OFFICE OF UNITED STATES ATTORNEY
220 Federal Building and Courthouse
228 Walnut Street
Post Office Box 11754
Harrisburg, Pennsylvania 17108
(717) 221-4482

*Counsel for Environmental Protection Agency*

John D. Gunter, II
UNITED STATES DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Post Office Box 7415
Washington, D.C. 20044
(202) 514-3785

*Counsel for Environmental Protection Agency*

Kent E. Hanson
UNITED STATES DEPARTMENT OF JUSTICE
Environmental Defense Section
Land and Natural Resources Division
Post Office Box 23986
Washington, D.C. 20026
(202) 514-2327

*Counsel for Environmental Protection Agency*

Jon A. Mueller
THE CHESAPEAKE BAY FOUNDATION
6 Herndon Avenue
Annapolis, Maryland 21403
(443) 482-2162

*Counsel for Chesapeake Bay Foundation;*
*Citizens for Pennsylvanias Future; Defenders of*
*Wildlife; Jefferson County Public Service District;*
*Midshore Riverkeeper Conservancy; and*
*National Wildlife Federation*

Christopher D. Pomeroy
AQUALAW
6 South 5th Street
Richmond, Virginia 23219
(804) 716-9021

*Counsel for Virgina Association of*
*Municipal Wastewater Agencies, Inc.;*
*Maryland Association of Municipal*
*Wastewater Agencies; and*
*National Association of Clean Water Agencies*

Steven A. Hahn
HAMBURG, RUBIN, MULLIN, MAXWELL & LUPIN
375 Morris Road
Post Office Box 1479
Lansdale, Pennsylvania 19446
(215) 661-0400

*Counsel for Pennsylvania Municipal Authorities Association*

# <u>TABLE OF CONTENTS</u>

| Document Description | JA No. |
|---|---|
| **VOLUME I** | |
| Notice of Appeal.<br>    filed October 7, 2013.<br><br>(ECF No. 153) | 1 |
| Memorandum Opinion.<br>    filed September 13, 2013.<br><br>(ECF No. 150) | 5 |
| Judgment.<br>    filed September 17, 2013.<br><br>(ECF No. 151) | 104 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME II** | |
| Civil Docket for Case #1:11-cv-00067-SHR. | 106 |
| Chesapeake Bay Partnership. The Chesapeake Bay Agreement of 1983. Washington, DC.<br>    dated December 9, 1983.<br><br>(AR0005488-AR0005489) | 135 |
| Chesapeake Executive Council. Chesapeake Bay Agreement. Annapolis, MD.<br>    dated December 15, 1987.<br><br>(AR0005481-AR0005487) | 137 |
| EPA Guidance for Water Quality-based Decisions, the TMDL Process.<br>    dated April 1991.<br><br>(ECF No. 100, Exhibit N) | 144 |
| Chesapeake Executive Council. Amendments to the Chesapeake Bay Agreement. Annapolis, MD.<br>    dated August 12, 1992.<br><br>(AR0005478-AR0005480) | 206 |
| Chesapeake Executive Council. Chesapeake Executive Council Directive No. 93  1 Joint Tributary Strategy Statement. Annapolis, MD.<br>    dated December 27, 1993.<br><br>(AR0005476-AR0005477) | 209 |
| Memorandum of Understanding Between the State of Maryland and the U.S. Environmental Protection Agency, Region III, Regarding Section 303(d) and 303(e) of the Clean Water Act.<br>    dated 1998.<br><br>(AR0012622-AR0012636) | 211 |

| Document Description | JA No. |
|---|---|
| U.S. District Court for the Eastern District of Virginia: Consent Decree: American Canoe Association and the American Littoral Society v. U.S. Environmental Protection Agency. C.A. No. 98-979-A.<br>    dated June 11, 1999.<br><br>(AR0012527-12538, AR0012556, AR0012566, AR0012599-AR0012607) | 226 |
| Chesapeake Executive Council. Chesapeake 2000. Chesapeake Bay Program, Annapolis, MD.<br>    dated June 28, 2000.<br><br>(AR0005417-AR0005429) | 249 |
| Sutfin, C.H. Memorandum: EPA Review of 202 Section 303(d) Lists and Guidelines for Reviewing TMDLs under Existing Regulations issues in 1992.<br>    dated May 20, 2002.<br><br>(AR0022597-AR0022605) | 262 |
| Secretary Tayloe Murphy. "Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals." Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariat, Richmond, VA.<br>    dated April 25, 2003.<br><br>(AR0005397-AR0005405) | 271 |
| Chesapeak Executive Council:  Chesapeak Executive Council Directive No. 03-2 Meeting the Nutrient and Sediment Reduction Goals. Annapolis, MD.<br>    dated December 9, 2003.<br><br>(AR0005395-AR0005396) | 280 |

| Document Description | JA No. |
|---|---|
| Virginia Exchange Compliance Plan, and Exhibit B, Comparison of Significant Dischargers in the Potomac-Shenandoah Watershed, Summary of TMDL Appendix Q.<br>    dated July 31, 2007.<br><br>(ECF 122, Ex. A) | 282 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated October 1, 2007.<br><br>(ECF No. 100, Exhibit F) | 295 |
| Scientific and Technical Advisory Committee. Chesapeake Bay Watershed Model Phase V Review. STAC Publication 08-003.<br>    dated February 20, 2008.<br><br>(AR0015010-AR0015022) | 300 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated June 18, 2008 (Draft dated August 22, 2008).<br><br>(ECF No. 110, Exhibit A) | 313 |
| Excerpt from Welsh, D.S., Regional Administrator: Region 3 Letter to Maryland Secretary of Natural Resources John Griffin.<br>    dated September 11, 2008.<br><br>(AR0023296-AR0023299) | 323 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Agenda and Summary.<br>    dated October 23, 2009.<br><br>(ECF No. 100, Exhibits H and I) | 327 |
| Early, William C.: EPA letter to the Principals' Staff Committee.<br>    dated November 3, 2009.<br><br>(AR0023289-AR0023293) | 340 |

| Document Description | JA No. |
|---|---|
| TMDL meeting.<br>    dated December 14, 2009.<br><br>(AR0027828-AR0027866) | 345 |
| TMDL meeting.<br>    dated December 15, 2009.<br><br>(AR0027754-AR0027788) | 384 |
| TMDL meeting.<br>    dated December 15, 2009.<br><br>(AR0027789-AR0027827) | 419 |
| TMDL meeting.<br>    dated December 16, 2009.<br><br>(AR0027710-AR0027753) | 458 |
| TMDL meeting.<br>    dated December 17, 2009.<br><br>(AR0027670-AR0027709) | 502 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated April 28-29, 2010.<br><br>(ECF No. 100, Exhibit J) | 542 |
| McDonnell, R.F.: Letter to EPA Administrator Lisa P. Jackson.<br>    dated June 15, 2010.<br><br>(AR0023269-AR0023272) | 557 |
| Excerpts from U.S. Environmental Protection Agency Region III. Presentation.  "Update on the Bay TMDL and What's Just Around the Corner."<br>    dated September 9, 2010.<br><br>(AR0032981, AR0032994-AR0032996) | 561 |

| Document Description | JA No. |
|---|---|
| Excerpts from U.S. Environmental Protection Agency: Draft Chesapeake Bay TMDL Document.<br>    dated September 24, 2010.<br><br>(AR0023773-AR0023783, AR0023980-AR0023991, AR0024022-AR0024054) | 565 |
| Excerpts from U.S. Environmental Protection Agency Region III. Draft Chesapeake Bay TMDL: Restoring the District District's waterways and Chesapeake Bay. Public Meeting: District of Columbia.<br>    dated September 29, 2010.<br><br>(AR0029336, AR0029358-AR0029360) | 621 |
| Excerpts from Natural Resources Conservation Service. "Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region."<br>    dated October 2010.<br><br>(AR0032818, AR0032832-AR0032837) | 625 |

**TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME III** | |
| TMDL meeting.<br>        dated October 2010.<br><br>(AR0029320-AR0029335) | 632 |
| TMDL meeting.<br>        dated October 4, 2010.<br><br>(AR0029270-AR0029319) | 648 |
| TMDL meeting.<br>        dated October 5, 2010.<br><br>(AR0029119-AR0029167) | 698 |
| TMDL meeting.<br>        dated October 5, 2010.<br><br>(AR0029218-AR0029269) | 747 |
| TMDL meeting.<br>        dated October 6, 2010.<br><br>(AR0029168-AR0029217) | 799 |
| Excerpts from Chesapeake Bay Partnership, Principals' Staff Committee.  Meeting Summary.<br>        dated October 21, 2010.<br><br>(AR0000436) | 849 |
| Excerpts from Virginia Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>        dated November 4, 2010.<br><br>(AR0036755, AR0036801-03, AR0038002, AR0038005, AR0038007, AR0038012, AR0038031-37, AR0038048-49) | 859 |

| Document Description | JA No. |
|---|---|
| Summary of Meetings and Attendees Compiled from TMDL Appendix C, Table C-2, AR0000422-56.<br>        dated November 4, 2010.<br><br>(ECF 105, Ex. E) | 877 |
| Duncansville Municipal Authority Water & Sewer. Comment Letter.<br>        dated November 5, 2010.<br><br>(AR0030500-AR0030502) | 882 |
| Pennsylvania Municipal Authorities Association. Comment Letter.<br>        dated November 5, 2010.<br><br>(AR0031047-AR0031049) | 885 |
| Excerpts from Maryland Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>        dated November 5, 2010<br><br>(AR0031179-82, AR0031187-88) | 888 |
| Virginia Agribusiness Council – Suggested Bay TMDL Talking Points.<br>        dated November 8, 2010.<br><br>(AR0030010-AR0030013) | 894 |
| Excerpts from New York Department of Environmental Conservation.  Comment Letter.<br>        dated November 8, 2010.<br><br>(AR0031947-AR0031951) | 898 |
| West Virginia Department of Environmental Protection and West Virginia Department of Agriculture.  Comment Letter.<br>        dated November 8, 2010.<br><br>(AR0032100-AR0032101) | 903 |

| Document Description | JA No. |
|---|---|
| Pennsylvania Department of Environmental Protection and Department of Agriculture.  Comment Letter.  dated November 8, 2010.  (AR0032667-AR0032670) | 905 |
| Maryland State Builders Association. Comment Letter.  dated November 8, 2010.  (AR0032686-AR0032687) | 909 |
| Public Comment letter.  dated November 8, 2010.  (AR0032705-AR0032731) | 911 |
| Excerpts from Comments on the Draft Chesapeake Bay TMDL by Agricultural Realtors Association, et al.  dated November 8, 2010.  (AR0032758, AR0032767-AR0032772) | 938 |
| Excerpt from County of Lycoming, Pennsylvania. Comment Letter.  dated November 8, 2010.  (AR0033175-AR0033176) | 945 |
| Excerpt from National Association of Clean Water Agencies. Comment Letter.  dated November 8, 2010.  (AR0035411-AR0035415) | 947 |
| Excerpts from Southern Tier Chesapeake Bay TMDL Commenting Coalition, Comment Letter. dated November 8, 2010.  (AR0035941-AR0035944) | 952 |

| Document Description | JA No. |
|---|---|
| Excerpts from National Association of Home Builders. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033704, AR0033720-AR0033721) | 956 |
| National Association of Conservation Districts. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033741-AR0033743) | 959 |
| Excerpts from District of Columbia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0025422-AR0025424, AR0025431-AR0025432, AR0025444-AR0025446, AR0025448, AR0025458, AR0025518-AR0025524) | 962 |
| Excerpts from Pennsylvania Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026393-AR0026414, AR0026416-AR0026422, AR0026443-AR0026444, AR0026451-AR0026460) | 979 |
| Excerpts from Commonwealth of Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026672, AR0026674-AR0026675, AR0026680-AR0026687, AR0026696-AR0026706, AR0026710-AR0026714, AR0026750, AR0026798, AR0026807-AR0026811) | 1020 |

| Document Description | JA No. |
|---|---|
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026813, AR0026815-AR0026816, AR0026818-AR0026822, AR0026828-AR0026830, AR0026833, AR0026835, AR0026837-AR0026838, AR0026840-AR0026842, AR0026847, AR0026855, AR0026867-AR0026869) | 1055 |
| Excerpts from Maryland Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated December 3, 2010<br><br>(AR0025525, AR0025528-AR0025530, AR0025532-AR0025534, AR0025601-AR0025604, AR0025606, AR0025607, AR0025609-10, AR0025698-25701, AR0025787-AR0025789, AR0025791-AR0025795) | 1078 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME IV** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Sections 1-14.<br>    dated December 29, 2010.<br><br>(AR0000001-AR0000366) | 1106 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix A.<br>    dated December 29, 2010.<br><br>(AR0000367-AR0000380) | 1472 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix B.<br>    dated December 29, 2010.<br><br>(AR0000381-AR0000421) | 1486 |

**TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME V** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix C.<br>    dated December 29, 2010.<br><br>(AR0000422-AR0000454) | 1527 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix K.<br>    dated December 29, 2010.<br><br>(AR0000529-AR0000536) | 1560 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix L.<br>    dated December 29, 2010.<br><br>(AR0000537-AR0000564) | 1568 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q.<br>    dated December 29, 2010.<br><br>(AR0000616) | 1596 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R.<br>    dated December 29, 2010.<br><br>(AR0000618) | 1597 |
| Excerpts from Responses to Comments on Chesapeake Bay Total Maximum Daily Load.<br>    dated December 29, 2010.<br><br>(AR0000639, AR0000921-AR0000933, AR0002057, AR0003701) | 1598 |

| Document Description | JA No. |
|---|---|
| Complaint, filed by American Farm Bureau Federation and Pennsylvania Farm Bureau.<br>    dated January 10, 2011.<br><br>(ECF No. 1) | 1627 |
| Amended Complaint, filed by American Farm Bureau Federation, Pennsylvania Farm Bureau,  The Fertilizer Institute, National Pork Producers Council, National Corn Growers Association, National Chicken Council, U.S. Poultry & Egg Association, and National Turkey Federation.<br>    dated April 4, 2011.<br><br>(ECF No. 16) | 1671 |
| Complaint, filed by National Association of Home Builders.<br>dated June 27, 2011.<br><br>(Case #1:11-cv-01213-SHR, ECF No. 1) | 1709 |
| Excerpts from Transcript of Proceedings; Oral Argument.  *AFBF v. EPA*, M.D. Pa. No. 1:11-cv-00067.<br>    on October 4, 2012.<br><br>(Pages 89-92) | 1754 |

**TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME VI (to be filed via CD)** | |
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan; Excel spreadsheets.<br>    dated November 29, 2010.<br><br>(AR0026929-AR0026930<br>AR0026932-AR0026935) | 1760 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000617) | 1766 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000619) | 1767 |

APPEAL,CLOSED,COMPLEX,HBG,LEAD

# United States District Court
## Middle District of Pennsylvania (Harrisburg)
### CIVIL DOCKET FOR CASE #: 1:11-cv-00067-SHR

American Farm Bureau Federation et al v. United States
Environmental Protection Agency
Assigned to: Honorable Sylvia H. Rambo
Cause: 05:702 Administrative Procedure Act

Date Filed: 01/10/2011
Date Terminated: 09/17/2013
Jury Demand: None
Nature of Suit: 893 Environmental
Matters
Jurisdiction: U.S. Government
Defendant

**Plaintiff**

**American Farm Bureau Federation**        represented by **David P. Ross**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2500
Email: dross@crowell.com
*TERMINATED: 09/20/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda J. Lavis**
Rhoads & Sinon LLP
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
717-237-6797
Email: alavis@rhoads-sinon.com
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2500
Email: knathanson@crowell.com
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
Rhoads & Sinon LLP
One South Market Square
P.O. Box 1146
Harrisburg, PA 17108-1146
(717) 233-5731
Email: pbruder@rhoads-sinon.com

*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
202-624-2500
Email: rschwartz@crowell.com
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
Rhoads & Sinon LLP
One South Market Square
Harrisburg, PA 17101-1146
717-237-6701
Fax: 17172316600
Email: rtribeck@rhoads-sinon.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pennsylvania Farm Bureau**          represented by  **David P. Ross**
(See above for address)
*TERMINATED: 09/20/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Fertilizer Institute**          represented by  **Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Chicken Council**          represented by **Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**U.S. Poultry & Egg Association**          represented by **Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Pork Producers Council**  represented by  **Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Corn Growers Association**  represented by  **Amanda J. Lavis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten L. Nathanson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul J. Bruder , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard E. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Tribeck**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Turkey Federation**                  represented by  **Amanda J. Lavis**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Kirsten L. Nathanson**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Paul J. Bruder , Jr.**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Richard E. Schwartz**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Robert J. Tribeck**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**National Association of Home
Builders**                                      represented by  **Gregg I. Adelman**
                                                                Kaplin Stewart Meloff Reiter & Stein
                                                                910 Harvest Drive
                                                                P.O. Box 3037
                                                                Blue Bell, PA 19422
                                                                610-941-2515
                                                                Email: gadelman@kaplaw.com
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Michael P. Coughlin**
                                                                Kaplin Stewart Meloff Reiter & Stein
                                                                P.C.
                                                                910 Harvest Drive
                                                                Blue Bell, PA 19422
                                                                610.941.2456
                                                                Email: mcoughlin@kaplaw.com
                                                                *TERMINATED: 08/23/2011*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **William D. Auxer**
                                                                Kaplin Stewart Meloff Reiter & Stein
                                                                910 Harvest Drive
                                                                P.O. Box 3037
                                                                Blue Bell, PA 19422
                                                                610-941-2519
                                                                Email: wauxer@kaplaw.com
                                                                *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United States Environmental**                represented by    **Kent E. Hanson**
**Protection Agency**                                          U.S. Department of Justice
                                                             P.O. Box 7611
                                                             Washington, DC 20044
                                                             206-220-4198
                                                             Fax: 202-514-8865
                                                             Email: kent.hanson@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Stephen R. Cerutti , II**
                                                             United States Attorney's Office
                                                             228 Walnut Street
                                                             Suite 220
                                                             Harrisburg, PA 17108
                                                             717-221-4482
                                                             Email: Stephen.Cerutti@usdoj.gov
                                                             *ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**Chesapeake Bay Foundation, Inc.**           represented by    **Jon A. Mueller**
                                                             Chesapeake Bay Foundation, Inc.
                                                             6 Herndon Avenue
                                                             Annapolis, MD 21403
                                                             443-482-2162
                                                             Email: jmueller@cbf.org
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lee Ann H. Murray**
                                                             Chesapeake Bay Foundation
                                                             The Old Water Works Building
                                                             614 North Front Street, Suite G
                                                             Harrisburg, PA 17019
                                                             717.234.5550
                                                             Email: lamurray@cbf.org
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Richard A. Parrish**
                                                             Southern Environmental Law Center
                                                             201 West Main Street
                                                             Suite 14
                                                             Charlottesville, VA 22902
                                                             434.977.4090
                                                             Email: rparrish@selcva.org
                                                             *ATTORNEY TO BE NOTICED*

**Amy Elizabeth McDonnell**
Office of the Attorney General for the
District of Columbia
1200 First Street, NE, Seventh Floor
District Department of the Environment

Washington, DC 20002
202-481-3845
Email: amy.mcdonnell@dc.gov
*TERMINATED: 10/05/2011*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Citizens for Pennsylvanias Future**          represented by   **Kurt J. Weist**
Citizens for Pennsylvania's Future
610 North Third Street
Harrisburg, PA 17101
717-214-7925
Email: weist@pennfuture.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian G. Glass**
Warren Glass LLP
975 Mill Road
Millridge Manor House Suite A
Bryn Mawr, PA 19010
484 383 4831
Email: bglass@warrenglasslaw.com
*TERMINATED: 02/12/2013*
*ATTORNEY TO BE NOTICED*

**Jon A. Mueller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Ann H. Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth McDonnell**
(See above for address)
*TERMINATED: 10/05/2011*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Defenders of Wildlife**                    represented by    **Jon A. Mueller**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lee Ann H. Murray**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Richard A. Parrish**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Amy Elizabeth McDonnell**
                                                              (See above for address)
                                                              *TERMINATED: 10/05/2011*
                                                              *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Jefferson County Public Service**          represented by    **Jon A. Mueller**
**District**                                                  (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lee Ann H. Murray**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Richard A. Parrish**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Amy Elizabeth McDonnell**
                                                              (See above for address)
                                                              *TERMINATED: 10/05/2011*
                                                              *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Midshore Riverkeeper Conservancy**          represented by    **Jon A. Mueller**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Lee Ann H. Murray**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Richard A. Parrish**
                                                              (See above for address)
                                                              *ATTORNEY TO BE NOTICED*

                                                              **Amy Elizabeth McDonnell**

(See above for address)
*TERMINATED: 10/05/2011*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**National Wildlife Federation**               represented by    **Jon A. Mueller**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lee Ann H. Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amy Elizabeth McDonnell**
(See above for address)
*TERMINATED: 10/05/2011*
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**VIRGINIA ASSOCIATION OF**           represented by    **Carla S. Pool**
**MUNICIPAL WASTEWATER**                               Aqua Law, PLC
**AGENCIES, INC.**                                     6 South 5th Street
                                                       Richmond, VA 23219
                                                       804.716.9021
                                                       Email: carla@aqualaw.com
                                                       *TERMINATED: 08/16/2013*
                                                       *ATTORNEY TO BE NOTICED*

**Christopher D. Pomeroy**
AquaLaw PLC
6 South 5th Street
Richmond, VA 23219
804-716-9021
Email: chris@aqualaw.com
*ATTORNEY TO BE NOTICED*

**Lisa M. Ochsenhirt**
AquaLaw PLC
6 South 5th Street
Richmond, VA 23219
804-716-9021
Email: lisa@aqualaw.com
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Maryland Association of Municipal**          represented by    **Carla S. Pool**

**Wastewater Agencies**
(See above for address)
*TERMINATED: 08/16/2013*
*ATTORNEY TO BE NOTICED*

**Christopher D. Pomeroy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lisa M. Ochsenhirt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**National Association of Clean Water Agencies**    represented by **Carla S. Pool**
(See above for address)
*TERMINATED: 08/16/2013*
*ATTORNEY TO BE NOTICED*

**Christopher D. Pomeroy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lisa M. Ochsenhirt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Pennsylvania Municipal Authorities Association**    represented by **Steven A Hann**
Hamburg, Rubin, Mullin, Maxwell & Lupin, P.C.
ACTS Center - Blue Bell
375 Morris Road
P. O. Box 1479
Lansdale, PA 19446-0400
215-661-0400
Email: shann@hrmml.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**City of Annapolis, MD**    represented by **Lee Ann H. Murray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Russell B. Stevenson**
Law Office of Russell B. Stevenson, Jr.
733 Dividing Road
Severna Park, MD 21146
202.360.1144
Email: rstevenson@pobox.com

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2011 | 1 | COMPLAINT against United States Environmental Protection Agency ( Filing fee $350, Receipt Number 0314-2073835), filed by American Farm Bureau Federation, Pennsylvania Farm Bureau. (Attachments: # 1 Civil Cover Sheet)(dc) (Entered: 01/10/2011) |
| 01/10/2011 | | Summons Issued as to United States Environmental Protection Agency, U.S. Attorney and U.S. Attorney General (dc) (Entered: 01/10/2011) |
| 01/10/2011 | 2 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Robert J. Tribeck on behalf of American Farm Bureau Federation, Pennsylvania Farm Bureau Attorney Kirsten L. Nathanson is seeking special admission. Filing fee $ 50, receipt number 0314-2074112.. (Tribeck, Robert) (Entered: 01/10/2011) |
| 01/10/2011 | 3 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Robert J. Tribeck on behalf of American Farm Bureau Federation, Pennsylvania Farm Bureau Attorney Richard E. Schwartz is seeking special admission. Filing fee $ 50, receipt number 0314-2074150.. (Tribeck, Robert) (Entered: 01/10/2011) |
| 01/10/2011 | 4 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by American Farm Bureau Federation. (Tribeck, Robert) (Entered: 01/10/2011) |
| 01/10/2011 | 5 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by Pennsylvania Farm Bureau. (Tribeck, Robert) (Entered: 01/10/2011) |
| 01/11/2011 | | DOCKET ANNOTATION: A search of the DC Bar finds Attorney Schwartz in active and good standing. (dc) (Entered: 01/11/2011) |
| 01/11/2011 | | DOCKET ANNOTATION: A search of the DC Bar finds Attorney Nathanson active and in good standing. (dc) (Entered: 01/11/2011) |
| 01/11/2011 | 6 | SPECIAL ADMISSIONS FORM APPROVED as to Kirsten Nathanson, Esq. on behalf of American Farm Bureau Federation and PA Farm BureauSigned by Honorable Sylvia H. Rambo on 01/11/11. (ma, ) (Entered: 01/11/2011) |
| 01/11/2011 | 7 | SPECIAL ADMISSIONS FORM APPROVED as to Richard Schwartz, Esq. on behalf of American Farm Bureau Federation and PA Farm BureauSigned by Honorable Sylvia H. Rambo on 01/11/2011. (ma, ) (Entered: 01/11/2011) |
| 01/12/2011 | 8 | SUMMONS Returned Executed by American Farm Bureau Federation, Pennsylvania Farm Bureau. United States Environmental Protection Agency served on 1/12/2011, answer due 3/14/2011. (Tribeck, Robert) (Entered: 01/12/2011) |
| 02/07/2011 | 9 | SUMMONS Returned Executed by American Farm Bureau Federation, Pennsylvania Farm Bureau. United States Environmental Protection Agency served on 1/18/2011, answer due 3/14/2011. (Nathanson, Kirsten) (Entered: 02/07/2011) |
| 02/07/2011 | 10 | SUMMONS Returned Executed by American Farm Bureau Federation, |

| | | |
|---|---|---|
| | | Pennsylvania Farm Bureau. United States Environmental Protection Agency served on 1/20/2011, answer due 3/14/2011. (Nathanson, Kirsten) (Entered: 02/07/2011) |
| 02/11/2011 | 11 | NOTICE of Appearance by Kent E. Hanson on behalf of United States Environmental Protection Agency (Hanson, Kent) (Entered: 02/11/2011) |
| 02/15/2011 | 12 | NOTICE of Appearance by Stephen R. Cerutti, II on behalf of United States Environmental Protection Agency. (Cerutti, Stephen) (Entered: 02/15/2011) |
| 02/16/2011 | 13 | NOTICE of Hearing:A Case Management Conference has been set for 3/17/2011 @ 9:30 AM before Honorable Sylvia H. Rambo.This conference is by phone. The call is to be initiated by the pltf. A joint case mgmnt plan is to be filed by 03/10/2011 (ma, ) (Entered: 02/16/2011) |
| 02/18/2011 | 14 | NOTICE: The case management conference set for 3/17/11 has been cancelled until further order of court.Signed by Honorable Sylvia H. Rambo on 02/18/11. (ma, ) (Entered: 02/18/2011) |
| 03/14/2011 | 15 | *Defendant's* ANSWER to 1 Complaint by United States Environmental Protection Agency.(Hanson, Kent) (Entered: 03/14/2011) |
| 04/04/2011 | 16 | AMENDED COMPLAINT *(First)* against United States Environmental Protection Agency, filed by Pennsylvania Farm Bureau, American Farm Bureau Federation, The Fertilizer Institute, National Chicken Council, U.S. Poultry & Egg Association, National Pork Producers Council, National Corn Growers Association, National Turkey Federation.(Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 17 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by The Fertilizer Institute. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 18 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by National Pork Producers Council. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 19 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by National Corn Growers Association. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 20 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by National Chicken Council. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 21 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by U.S. Poultry & Egg Association. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/04/2011 | 22 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by National Turkey Federation. (Tribeck, Robert) (Entered: 04/04/2011) |
| 04/21/2011 | 23 | ANSWER to 16 Amended Complaint, by United States Environmental Protection Agency.(Hanson, Kent) (Entered: 04/21/2011) |
| 05/10/2011 | | DOCKET ANNOTATION: Document #24 "Letter" deleted, due to clerical error. (ga, ) (Entered: 05/10/2011) |
| 05/19/2011 | 24 | SCHEDULING ORDER: A Telephone Scheduling Conference is set for 6/28/2011 at 09:15 AM in Chambers before Honorable Sylvia H. Rambo. |

| | | |
|---|---|---|
| | | Signed by Honorable Sylvia H. Rambo on 5/19/11. (pw, ) (Entered: 05/19/2011) |
| 05/25/2011 | 25 | Joint MOTION to Intervene by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (McDonnell, Amy) (Entered: 05/25/2011) |
| 05/25/2011 | 26 | MOTION to Exceed Page Limitation *in Memo to Support Joint Motion to Intervene* by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Proposed Order to Accompany Motion to Exceed Page Limit)(McDonnell, Amy) (Entered: 05/25/2011) |
| 05/25/2011 | 27 | MOTION to Intervene *as Defendants* by VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC., Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies. (Attachments: # 1 Proposed Order)(Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| 05/25/2011 | 28 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Jon A. Mueller on behalf of Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation Attorney Jon Mueller is seeking special admission. Filing fee $ 50, receipt number 0314-2192796.. (Mueller, Jon) (Entered: 05/25/2011) |
| 05/25/2011 | 29 | BRIEF IN SUPPORT re 27 MOTION to Intervene *as Defendants* filed by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.. (Attachments: # 1 Unpublished Opinion(s) Attachment 1 - Memorandum and Order, Sierra Club v. EPA, # 2 Unpublished Opinion(s) Attachment 2 - Order Granting Motion to Intervene, Fowler v. EPA, # 3 Unpublished Opinion(s) Attachment 3 - Koprowski v. Wistar Institute of Anatomy and Biology, # 4 Unpublished Opinion(s) Attachment 4 - CSX Transportation, Inc. v. City of Philadelphia, # 5 Unpublished Opinion(s) Attachment 5 - Corby v. Scranton Housing Authority)(Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| 05/25/2011 | 30 | ANSWER to 16 Amended Complaint, by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC..(Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| 05/25/2011 | 31 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by National Association of Clean Water Agencies. (Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| 05/25/2011 | 32 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by Maryland Association of Municipal Wastewater Agencies. (Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| | | |

| 05/25/2011 | 33 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.. (Ochsenhirt, Lisa) (Entered: 05/25/2011) |
|---|---|---|
| 05/25/2011 | 34 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Lisa M. Ochsenhirt on behalf of Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC. Attorney Christopher Pomeroy is seeking special admission. Filing fee $ 50, receipt number 0314-2192853.. (Ochsenhirt, Lisa) (Entered: 05/25/2011) |
| 05/25/2011 | 35 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Carla S. Pool on behalf of Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC. Attorney Carla Pool is seeking special admission. Filing fee $ 50, receipt number 0314-2192860.. (Pool, Carla) (Entered: 05/25/2011) |
| 05/26/2011 | 36 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Richard A. Parrish on behalf of Defenders of Wildlife Attorney Richard Parrish is seeking special admission. Filing fee $ 50, receipt number 0314-2192963.. (Parrish, Richard) (Entered: 05/26/2011) |
| 05/26/2011 | 37 | ORDER granting Proposed Intervenors' Motion for Leave to File Excess Pages 26 : A supporting memorandum not to exceed 32 pages shall be filed on or before June 2, 2011.Signed by Honorable Sylvia H. Rambo on 05/26/11 (ma, ) (Entered: 05/26/2011) |
| 05/26/2011 | 38 | SPECIAL ADMISSIONS FORM APPROVED as to Richard Parrish on behalf of Proposed Intervenor Defenders of WildlifeSigned by Honorable Sylvia H. Rambo on 05/26/11. (ma, ) (Entered: 05/26/2011) |
| 05/26/2011 | | DOCKET ANNOTATION: Counsel is advised that all motions must be accompanied by a Certificate of Concurrence/Non-Concurrence pursuant to L.R. 7.1. Certificates should be filed for motions #'s 25, 26 & 27 using category: Other Filings/Other Documents; event: Certificate; & link to the respective motion. (dc) (Entered: 05/26/2011) |
| 05/26/2011 | 39 | SPECIAL ADMISSIONS FORM APPROVED as to Jon Mueller on behalf of Chesapeake Bay Foundation, Inc., Citizens for Pennsylvania's Future, National Wildlife Fedration, Midshore Riverkeeper Conservancy, Jefferson County Public Service DistrictSigned by Honorable Sylvia H. Rambo on 05/26/11. (ma, ) (Entered: 05/26/2011) |
| 05/26/2011 | 40 | SPECIAL ADMISSIONS FORM APPROVED as to Christopher Pomeroy on behalf of Maryland Association of Municipal Wastewater Agencies, Inc.; Virginia Association of Municipal Wastewater Agencies, Inc.; National Association of Clean Water Industries.Signed by Honorable Sylvia H. Rambo on 05/26/11. (ma, ) (Entered: 05/26/2011) |
| 05/26/2011 | 41 | SPECIAL ADMISSIONS FORM APPROVED as to Carla Pool on behalf of Maryland Association of Municipal Wastewater Agencies, Inc.; Virginia Association of Municipal Wastewater Agencies, Inc.; National Association of |

| | | |
|---|---|---|
| | | Clean Water Industries.Signed by Honorable Sylvia H. Rambo on 05/26/2011. (ma, ) (Entered: 05/26/2011) |
| 05/26/2011 | 42 | CERTIFICATE of of Concurrence/Non-Concurrence by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation re 25 Joint MOTION to Intervene. (McDonnell, Amy) (Entered: 05/26/2011) |
| 05/26/2011 | 43 | CERTIFICATE of of Concurrence/Non-Concurrence by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation re 37 Order on Motion for Leave to File Excess Pages. (McDonnell, Amy) (Entered: 05/26/2011) |
| 05/26/2011 | 44 | CERTIFICATE of Concurrence/Non-Concurrence by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC. re 27 MOTION to Intervene *as Defendants*. (Ochsenhirt, Lisa) (Entered: 05/26/2011) |
| 06/01/2011 | 45 | Corporate Disclosure Statement by Chesapeake Bay Foundation, Inc.. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/01/2011 | 46 | Corporate Disclosure Statement by Defenders of Wildlife. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/01/2011 | 47 | Corporate Disclosure Statement by Jefferson County Public Service District. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/01/2011 | 48 | Corporate Disclosure Statement by Midshore Riverkeeper Conservancy. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/01/2011 | 49 | Corporate Disclosure Statement by National Wildlife Federation. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/01/2011 | 50 | Corporate Disclosure Statement by Citizens for Pennsylvanias Future. (McDonnell, Amy) (Entered: 06/01/2011) |
| 06/03/2011 | | DOCKET ANNOTATION: COUNSEL is advised that Document 61 filed 6/2/11 is to be REDOCKETED using the event BRIEF IN SUPPORT located under RESPONSES/REPLIES (BRIEFS). (jc) (Entered: 06/03/2011) |
| 06/03/2011 | 52 | BRIEF IN SUPPORT *of Joint Motion to Intervene* re 26 MOTION to Exceed Page Limitation *in Memo to Support Joint Motion to Intervene*, 25 Joint MOTION to Intervene filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) A: Settlement Agreement, Fowler v. EPA) (McDonnell, Amy) (Entered: 06/03/2011) |
| 06/06/2011 | 53 | NOTICE of Appearance by Paul J. Bruder, Jr on behalf of All Plaintiffs (Bruder, Paul) (Entered: 06/06/2011) |
| | | |

| 06/06/2011 | 54 | NOTICE of Appearance by Amanda J. Lavis on behalf of All Plaintiffs (Lavis, Amanda) (Entered: 06/06/2011) |
|---|---|---|
| 06/06/2011 | 55 | Unopposed MOTION to File Consolidated Response and to Exceed Word Limit by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order) (Tribeck, Robert) (Entered: 06/06/2011) |
| 06/07/2011 | 56 | ORDER granting parties' Motion to file consolidated response and exceed word limit 55 . Pltfs shall be permitted to file a Consolidated BrOpp to each Motion for Leave to Intervene (Dkt. 25 and Dkt. 27), not to exceed 12,500 words, which shall be submitted on or before 6/20/11. Proposed Intervenors shall be permitted to file Reply Briefs in support of the respective Motions for Leave to Intervene which do not exceed 6,500 words.Signed by Honorable Sylvia H. Rambo on 06/07/11 (ma, ) (Entered: 06/07/2011) |
| 06/20/2011 | 57 | BRIEF IN OPPOSITION re 27 MOTION to Intervene *as Defendants,* 25 Joint MOTION to Intervene filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association.(Tribeck, Robert) (Entered: 06/20/2011) |
| 06/23/2011 | 58 | CASE MANAGEMENT PLAN *(JOINT)* by United States Environmental Protection Agency. (Hanson, Kent) (Entered: 06/23/2011) |
| 06/27/2011 | 59 | MOTION to Intervene by Pennsylvania Municipal Authorities Association. (Attachments: # 1 Exhibit(s) 1, # 2 Proposed Order, # 3 Certificate of Nonconcurrence)(Hann, Steven) (Entered: 06/27/2011) |
| 06/27/2011 | 60 | DISCLOSURE STATEMENT PURSUANT TO FRCP 7.1 by Pennsylvania Municipal Authorities Association. (Hann, Steven) (Entered: 06/27/2011) |
| 06/27/2011 | 61 | BRIEF IN SUPPORT re 59 MOTION to Intervene filed by Pennsylvania Municipal Authorities Association. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B)(Hann, Steven) (Entered: 06/27/2011) |
| 06/28/2011 | 63 | ORDER OF CONSOLIDATION IT IS HEREBY ORDERED THAT: 1) The captioned actions are consolidated for all purposes. 2) The Clerk of Court is directed to consolidate Civil Number 1:11-CV-1213 into Civil Number 1:11-CV-67 and close the file in 1:11-CV-1213. SEE ORDER FOR COMPLETE DETAILS Signed by Honorable Sylvia H. Rambo on 6/28/11. (jc) (Entered: 06/28/2011) |
| 06/28/2011 | 64 | CONSOLIDATED CASES FILE 1:CV-11-1213 consolidated into 1:CV-11-67. (Attachments: # 1 Disclosure Statement) (jc) (Entered: 06/28/2011) |
| 06/28/2011 | 65 | ORDER - CASE PLACED ON COMPLEX CASE MANAGEMENT TRACK. IT IS ORDERED THAT the following deadlines are established for the management of the caption case: 1) The deadline for joinder of parties and to move for amendment of pleadings is 7/15/11. 2) The Environmental |

| | | |
|---|---|---|
| | | Protection Agency shall electronically file a Certified Index to the Administrative Record no Later than 8/26/11. SEE ORDER FOR COMPLETE DETAILS Signed by Honorable Sylvia H. Rambo on 6/28/11. (jc) (Entered: 06/28/2011) |
| 07/05/2011 | 66 | REPLY BRIEF re 27 MOTION to Intervene *as Defendants* filed by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.. (Attachments: # 1 Unpublished Opinion(s) Attachment 1 - Order Granting Motion to Intervene, Fowler v. EPA, # 2 Exhibit(s) Attachment 2 - Bay TMDL Appendix Q, # 3 Unpublished Opinion(s) Attachment 3 - Memorandum and Order, Sierra Club v. EPA)(Ochsenhirt, Lisa) (Entered: 07/05/2011) |
| 07/07/2011 | 67 | REPLY BRIEF re 25 Joint MOTION to Intervene filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) Declaration C. Foster (CBF), # 2 Exhibit(s) Declaration J. Detweiler (PennF), # 3 Exhibit(s) Declaration P. Reilly (PennF), # 4 Exhibit(s) Declaration J. Pittman (PennF), # 5 Exhibit(s) Declaration J. Lyons (Defenders), # 6 Exhibit(s) Declaration A. Delach (Defenders), # 7 Exhibit(s) Declaration S. Lawton (JCPSD), # 8 Exhibit(s) Declaration D. Koslow (MRC), # 9 Exhibit(s) Declaration A. Caligiuri (NWF), # 10 Exhibit(s) AFBF v. EPA - 2000 Order, # 11 Exhibit(s) CBF Pet. for Review - EAB 2007)(Mueller, Jon) (Entered: 07/07/2011) |
| 07/14/2011 | 68 | BRIEF IN OPPOSITION re 59 MOTION to Intervene filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Unpublished Opinion(s))(Tribeck, Robert) (Entered: 07/14/2011) |
| 07/14/2011 | 69 | CERTIFICATE OF SERVICE by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association re 68 Brief in Opposition, (Tribeck, Robert) (Entered: 07/14/2011) |
| 07/28/2011 | 70 | REPLY BRIEF re 59 MOTION to Intervene filed by Pennsylvania Municipal Authorities Association. (Attachments: # 1 Exhibit(s) Letter from Shawn M. Garvin, Regl Admr, Envtl. Prot. Agency, to Honorable L. Preston Bryant, Secy of Natural Res., Commonwealth of Virginia (Dec. 29, 2009))(Hann, Steven) (Entered: 07/28/2011) |
| 08/22/2011 | 71 | Unopposed MOTION to Amend/Correct 65 Case Management Order - Complex Track, by United States Environmental Protection Agency. (Attachments: # 1 Proposed Order Amending Case Managment Order) (Hanson, Kent) (Entered: 08/22/2011) |
| 08/23/2011 | 72 | ORDER granting the unopposed Motion to Amend the Case Mgmt Order 71 . The case mgmt order is amended by deleting the second sentence of |

| | | |
|---|---|---|
| | | Paragraph 2 andsubstituting for the deleted language the following: The EPA shall provide to the court an electronic copy of the entireadministrative record, except computer models, model-related toolsand related data files, to be mailed on the date of filing of the Noticeof Lodging of the Certified Index. The EPA shall provide to eachparty an electronic copy of the entire administrative record to bemailed or made available on an FTP site on the date of filing of theNotice of Lodging of the Certified Index.Signed by Honorable Sylvia H. Rambo on 08/23/11 (ma, ) (Entered: 08/23/2011) |
| 08/23/2011 | 73 | NOTICE of Appearance by Gregg I. Adelman on behalf of National Association of Home Builders. (Adelman, Gregg) (Entered: 08/23/2011) |
| 08/23/2011 | 74 | NOTICE of Appearance by William D. Auxer on behalf of National Association of Home Builders. (Auxer, William) (Entered: 08/23/2011) |
| 08/23/2011 | 75 | WITHDRAWAL OF ATTORNEY APPEARANCE - Attorney Michael P. Coughlin terminated on behalf of National Association of Home Builders. (Coughlin, Michael) (Entered: 08/23/2011) |
| 08/26/2011 | 76 | NOTICE by United States Environmental Protection Agency *of Lodging of Administrative Record* (Attachments: # 1 Exhibit(s) Certification of Administrative Record, # 2 Exhibit(s) Index to Administrative Record) (Hanson, Kent) (Entered: 08/26/2011) |
| 09/01/2011 | 77 | ADMINISTRATIVE RECORD filed by Dft United States Environmental Protection Agency. Discs 1 & 2 forwarded to chambers for review. (dh) (Entered: 09/01/2011) |
| 09/23/2011 | 78 | Unopposed MOTION to Amend/Correct 65 Case Management Order - Complex Track, by American Farm Bureau Federation, National Association of Home Builders, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order)(Tribeck, Robert) (Entered: 09/23/2011) |
| 09/26/2011 | 79 | ORDER granting the Motion to Amend the Case Management Order 78 . Paragraph 3 of the Case Management Order (Doc.65) is hereby amended to reflect that any issues regarding the scope or content of the Administrative Record shall be presented to the Court by motion, with supporting brief, no later than10/11/11. The remaining provisions of the Case Management Order shall remain in effect.Signed by Honorable Sylvia H. Rambo on 09/26/11 (ma, ) (Entered: 09/26/2011) |
| 10/05/2011 | 80 | WITHDRAWAL OF ATTORNEY APPEARANCE - Attorney Amy E. McDonnell terminated on behalf of. (McDonnell, Amy) (Entered: 10/05/2011) |
| 10/05/2011 | 81 | NOTICE of Appearance by Lee Ann H. Murray on behalf of Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation (Murray, Lee Ann) (Entered: 10/05/2011) |
| 10/11/2011 | 82 | MOTION to Complete the Administrative Record (*filed Jointly with Plaintiff* |

| | | |
|---|---|---|
| | | *National Association of Home Builders)* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order)(Tribeck, Robert) (Entered: 10/11/2011) |
| 10/11/2011 | 84 | Unopposed MOTION to Amend/Correct 65 Case Management Order - Complex Track, *(filed Jointly with Plaintiff National Association of Home Builders)* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order) (Tribeck, Robert) (Entered: 10/11/2011) |
| 10/11/2011 | 85 | BRIEF IN SUPPORT *(CORRECTED) (filed Jointly with Plaintiff National Association of Home Builders)* re 82 MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Exhibit(s) Ex. 1, # 2 Exhibit(s) Ex. 2, # 3 Exhibit(s) Ex. 3, # 4 Exhibit(s) Ex. 4, # 5 Exhibit(s) Ex. 5, # 6 Exhibit(s) Ex. 6, # 7 Exhibit(s) Ex. 7)(Tribeck, Robert) (Entered: 10/11/2011) |
| 10/12/2011 | | DOCKET ANNOTATION: Document 83 deleted and replaced by Document 85. (aaa ) (Entered: 10/12/2011) |
| 10/12/2011 | 86 | ORDER granting pltfs' Motion to Amend the cmo 84 . The parties are hereby ORDERED to follow the within procedure for submission of Addtl Documents (i.e., documents that the parties agree were inadvertently omitted from EPAs 8/26/11 submission) during the remainder of this case:a. Any party citing to any of the Addtl Documents in a motion and/or brief submitted to this Court shall append a copy of such document(s) as anexhibit(s) to the filing.b. Within 14 days of the completion of summary judgment briefing, theparties shall submit a joint appendix (along with an index) that includes all of the Additional Documents cited in the parties briefs. IT IS FURTHER ORDERED that all case management deadlines set forth in the 6/28/11, case management order are suspended pending resolution of Pltfs motion to complete the Administrative Record and will be reset by further order of court.Signed by Honorable Sylvia H. Rambo on 10/12/11 (ma, ) (Entered: 10/12/2011) |
| 10/13/2011 | 87 | MEMORANDUM AND ORDER granting the Motions to Intervene 27 , 25 AND 59 . Theclerk of court shall add each party to the docket and amend the caption accordingly. It is FURTHER ORDERED that Intervening Dfts shall jointlyfile their cross-motions for summary judgment and brsupp in the samemanner as the present motions. Individual briefing will not be permitted. Theddls for Intervening Dfts cross-motions for summary judgment andsupporting briefs will be set by further order of the court.Signed by Honorable Sylvia H. Rambo on 10/13/11 (ma, ) (Entered: 10/13/2011) |
| | | |

| 10/28/2011 | 88 | BRIEF IN OPPOSITION re 82 MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* filed by United States Environmental Protection Agency. (Attachments: # 1 Affidavit of Gary Shenk)(Hanson, Kent) (Entered: 10/28/2011) |
|---|---|---|
| 10/28/2011 | 89 | BRIEF IN OPPOSITION re 82 MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) STAC Report Sept 2011, # 2 Exhibit(s) CBF Letter to EPA Jul 2011, # 3 Exhibit(s) Larry Band Report Aug 2011)(Mueller, Jon) (Entered: 10/28/2011) |
| 10/31/2011 | 90 | CERTIFICATE of of Service (Corrected) by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation re 89 Brief in Opposition,, *to Plaintiffs' Motion to Complete the Administrative Record*. (Mueller, Jon) (Entered: 10/31/2011) |
| 11/14/2011 | 91 | REPLY BRIEF re 82 MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders)* MOTION to Complete the Administrative Record *(filed Jointly with Plaintiff National Association of Home Builders) (filed Jointly with Plaintiff National Association of Home Builders)* filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association.(Tribeck, Robert) (Entered: 11/14/2011) |
| 12/28/2011 | 92 | ORDER - IT IS HEREBY ORDERED that Plaintiff's 82 Motion to complete the administrative record is GRANTED in part and DENIED in part: 1) The motion is GRANTED as to Plaintiffs' exhibits 2,3,6 and 7. (Docs. 85-2, 85-3, 85-6, and 85-7.) 2) The motion is DENIED as to Plaintiffs' exhibits 4 and 5. (Docs. 85-4, 85-5.) 3) Plaintiffs' request for discovery is DENIED. The parties shall provide the court with proposed amended case management deadlines within fourteen (14) days of the issuance of this order.Signed by Honorable Sylvia H. Rambo on 12/28/11. (pjr) (Entered: 12/28/2011) |
| 01/11/2012 | 93 | NOTICE by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association *of Proposed Amended Case Management Deadlines (filed jointly with Plaintiff National Association of Home Builders)* (Tribeck, Robert) (Entered: 01/11/2012) |
| 01/11/2012 | 94 | ORDER: 1) Pltfs initial brsup of their mtn for summary judgment shall be filed no later than 01/27/12.2) Dfts cross-mtn for summary judgment, brsup thereof and in opposition to Pltfs mtn for summary judgment, shall be filed no |

| | | |
|---|---|---|
| | | later than 3/27/12.3) Intervenors shall file their brsup of Dfts cross mtn for summary judgment and in opposition to Pltfs mtn for summary judgment no later than 4/20/12.4) Pltfs shall file a combined reply brief in support of their mtn for summary judgment and in opposition brief to Dfts mtn for summary judgment no later than 5/20/12.5) Dft shall file its reply brief in further support of its cross mtn for summary judgment no later than 6/20/12.6) Intervenors shall file their reply briefs in support of Dfts cross-mtn for summary judgment no later than 7/13/12.7) All other provisions of the original case management order (doc. 65) remain unaltered.Signed by Honorable Sylvia H. Rambo on 01/11/12. (ma, ) (Entered: 01/11/2012) |
| 01/27/2012 | 95 | Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order)(Tribeck, Robert) (Entered: 01/27/2012) |
| 01/27/2012 | 96 | BRIEF IN SUPPORT *(filed jointly with Plaintiffs National Association of Home Builders)* re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)* filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association.(Tribeck, Robert) (Entered: 01/27/2012) |
| 01/27/2012 | 97 | EXHIBIT *filed jointly with the National Association of Home Builders* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association re 96 Brief in Support of Motion for Summary Judgment,,. (Attachments: # 1 Exhibit(s) Exhibit 2 to Plaintiffs' Brief in Support of MSJ, # 2 Exhibit(s) Exhibit 3 to Plaintiffs' Brief in Support of MSJ, # 3 Exhibit(s) Exhibit 4 to Plaintiffs' Brief in Support of MSJ, # 4 Exhibit(s) Exhibit 5 to Plaintiffs' Brief in Support of MSJ)(Tribeck, Robert) (Entered: 01/27/2012) |
| 01/27/2012 | 98 | EXHIBIT *(filed jointly with National Association of Home Builders)* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association re 96 Brief in Support of Motion for Summary Judgment,,. (Attachments: # 1 Exhibit(s) Exhibit 7 to Plaintiffs' Brief in Support of MSJ, # 2 Exhibit(s) Exhibit 8 to Plaintiffs' Brief in Support of MSJ, # 3 Exhibit(s) Exhibit 9 to Plaintiffs' Brief in Support of MSJ, # 4 Exhibit(s) Exhibit 10 to Plaintiffs' Brief in Support of MSJ)(Tribeck, Robert) (Entered: 01/27/2012) |
| 03/27/2012 | 99 | Cross MOTION for Summary Judgment by United States Environmental Protection Agency.(Hanson, Kent) (Entered: 03/27/2012) |
| 03/27/2012 | 100 | BRIEF IN OPPOSITION re 95 Joint MOTION for Summary Judgment *(filed |

| | | |
|---|---|---|
| | | *jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 99 Cross MOTION for Summary Judgment filed by United States Environmental Protection Agency. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J, # 11 Exhibit(s) K, # 12 Exhibit(s) L, # 13 Exhibit(s) M, # 14 Exhibit(s) N) (Hanson, Kent) (Entered: 03/27/2012) |
| 04/11/2012 | 101 | NOTICE by United States Environmental Protection Agency *of Filing of Replacement Copies of Parts of the Administrative Record* (Attachments: # 1 Exhibit(s) AR0029750, # 2 Exhibit(s) AR0029752, # 3 Exhibit(s) AR0029764, # 4 Exhibit(s) AR0029765, # 5 Exhibit(s) AR0029773, # 6 Exhibit(s) AR0029810, # 7 Exhibit(s) AR0029831, # 8 Exhibit(s) AR0029841)(Hanson, Kent) (Entered: 04/11/2012) |
| 04/20/2012 | 102 | BRIEF IN SUPPORT *OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT* re 99 Cross MOTION for Summary Judgment filed by Pennsylvania Municipal Authorities Association. (Attachments: # 1 CERTIFICATE OF COMPLIANCE, # 2 CERTIFICATE OF SERVICE)(Hann, Steven) (Entered: 04/20/2012) |
| 04/20/2012 | 103 | Cross MOTION for Summary Judgment by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.. (Attachments: # 1 Proposed Order)(Pomeroy, Christopher) (Entered: 04/20/2012) |
| 04/20/2012 | 104 | BRIEF IN SUPPORT *of Municipal Associations' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment* re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 103 Cross MOTION for Summary Judgment filed by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC..(Pomeroy, Christopher) (Entered: 04/20/2012) |
| 04/21/2012 | 105 | BRIEF IN OPPOSITION re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)* filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) Ex A - Oct 07 PSC Minutes, # 2 Exhibit(s) Ex B - June 08 PSC Minutes, # 3 Exhibit(s) Ex C - 1987 Bay Agreement, # 4 Exhibit(s) Ex D - 2000 Bay Agreement, # 5 Exhibit(s) Ex E- List of Meetings, # 6 Exhibit(s) Ex F - Jan 05 MS Agenda, # 7 Exhibit(s) Ex G - Memo 3 March 05)(Mueller, Jon) (Entered: 04/21/2012) |
| 04/23/2012 | 106 | MOTION for Extension of Time to Amend 105 Brief in Opposition to Motion |

| | | |
|---|---|---|
| | | for Summary Judgment,,, by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) Amended Motion, # 2 Proposed Order)(Mueller, Jon) (Entered: 04/23/2012) |
| 04/24/2012 | 107 | ORDER: Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, and National Wildlife Federation (collectively Proposed Intervenors), by and through their counsel, have filed a request 106 to file an amended Memorandum in Opposition 105 to Plaintiffs Motion for Summary Judgment 95 . It is hereby ORDERED that this request is GRANTED. Intervenors shall re-file using the proper ECF event.Signed by Honorable Sylvia H. Rambo on 04/24/12 (ma, ) (Entered: 04/24/2012) |
| 04/24/2012 | 108 | BRIEF IN OPPOSITION re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)* filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) Ex A - Oct 07 PSC Minutes, # 2 Exhibit(s) Ex B - June 08 PSC Minutes, # 3 Exhibit(s) Ex C - 1987 Bay Agreement, # 4 Exhibit(s) Ex D - 2000 Bay Agreement, # 5 Exhibit(s) Ex E- List of Meetings, # 6 Exhibit(s) Ex F - Jan 05 MS Agenda, # 7 Exhibit(s) Ex G - Memo 3 March 05)(Mueller, Jon) (Entered: 04/24/2012) |
| 05/21/2012 | 109 | REPLY BRIEF re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 99 Cross MOTION for Summary Judgment, 103 Cross MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)* filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Exhibit(s) Ex. 1, # 2 Exhibit(s) Ex. 2, # 3 Exhibit(s) Ex. 3, # 4 Exhibit(s) Ex. 4, # 5 Exhibit(s) Ex. 5, # 6 Exhibit(s) Ex. 6, # 7 Exhibit(s) Ex. 7, # 8 Exhibit(s) Ex. 8, # 9 Exhibit(s) Ex. 9, # 10 Exhibit(s) Ex. 10, # 11 Exhibit(s) Ex. 11, # 12 Exhibit(s) Ex. 12, # 13 Exhibit(s) Ex. 13, # 14 Exhibit(s) Ex. 14, # 15 Exhibit(s) Ex. 15)(Tribeck, Robert) (Entered: 05/21/2012) |
| 06/20/2012 | 110 | REPLY BRIEF re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 99 Cross MOTION for Summary Judgment filed by United States Environmental Protection Agency. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G)(Hanson, Kent) (Entered: 06/20/2012) |
| 07/10/2012 | 111 | MOTION for Extension of Time to File Brief to 94 Order, Set Motion and R&R Dealines/Hearings,,,,,, filed by Chesapeake Bay Foundation, Inc., |

| | | |
|---|---|---|
| | | Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Proposed Order)(Mueller, Jon) (Entered: 07/10/2012) |
| 07/10/2012 | 112 | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Russell B. Stevenson on behalf of City of Annapolis, MD Attorney Russell Stevenson is seeking special admission. Filing fee $ 50, receipt number 0314-2523837.. (Stevenson, Russell) (Entered: 07/10/2012) |
| 07/10/2012 | | DOCKET ANNOTATION: Petitioning attorney and associate counsel's bar status verified. (aaa ) (Entered: 07/10/2012) |
| 07/10/2012 | 113 | ORDER granting Intevenors' Motion for ExtTm 111 . Intervenors reply brief in support of Dfts crossmotion for summary judgment 99 shall be filed on or before July 20, 2012. Signed by Honorable Sylvia H. Rambo on 07/10/12 (ma, ) (Entered: 07/10/2012) |
| 07/11/2012 | 114 | SPECIAL ADMISSIONS FORM APPROVED as to Russell Stevenson, Esq. on behalf of City of AnnapolisSigned by Honorable Sylvia H. Rambo on 07/11/12. (ma, ) (Entered: 07/11/2012) |
| 07/13/2012 | 115 | REPLY BRIEF re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 99 Cross MOTION for Summary Judgment filed by Pennsylvania Municipal Authorities Association.(Hann, Steven) (Entered: 07/13/2012) |
| 07/13/2012 | 116 | REPLY BRIEF re 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 103 Cross MOTION for Summary Judgment filed by Maryland Association of Municipal Wastewater Agencies, National Association of Clean Water Agencies, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC..(Pomeroy, Christopher) (Entered: 07/13/2012) |
| 07/16/2012 | 117 | MEMORANDUM OF LAW by City of Annapolis, MD . (Attachments: # 1 Exhibit(s) Exhibits to Amicus Curiae Memorandum)(Stevenson, Russell) (Entered: 07/16/2012) |
| 07/18/2012 | 118 | MOTION to Strike 117 Memorandum of Law *(filed Jointly with Plaintiff National Association of Home Builders)* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order)(Lavis, Amanda) (Entered: 07/18/2012) |
| 07/18/2012 | 119 | BRIEF IN SUPPORT *(filed Jointly with Plaintiff National Association of Home Builders)* re 118 MOTION to Strike 117 Memorandum of Law *(filed Jointly with Plaintiff National Association of Home Builders)* filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association.(Lavis, Amanda) (Entered: 07/18/2012) |
| | | |

| | | |
|---|---|---|
| 07/18/2012 | 120 | BRIEF IN OPPOSITION re 118 MOTION to Strike 117 Memorandum of Law *(filed Jointly with Plaintiff National Association of Home Builders)* filed by City of Annapolis, MD. (Attachments: # 1 Affidavit)(Stevenson, Russell) (Entered: 07/18/2012) |
| 07/18/2012 | 121 | ORDER denying pltfs' Motion to Strike 118 Signed by Honorable Sylvia H. Rambo on 7/18/12 (ma, ) (Entered: 07/18/2012) |
| 07/20/2012 | 122 | REPLY BRIEF re 99 Cross MOTION for Summary Judgment filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation. (Attachments: # 1 Exhibit(s) A - ECPlan (July 31, 2007), # 2 Exhibit(s) B- Comparison Tables) (Mueller, Jon) (Entered: 07/20/2012) |
| 08/03/2012 | 123 | MOTION for Hearing re 102 Brief in Support of Motion for Summary Judgment, 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 104 Brief in Support of Motion for Summary Judgment, 99 Cross MOTION for Summary Judgment, 103 Cross MOTION for Summary Judgment, 108 Brief in Opposition to Motion for Summary Judgment,,, *filed jointly w/Plaintiff National Association of Home Builders* by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. (Attachments: # 1 Proposed Order)(Lavis, Amanda) (Entered: 08/03/2012) |
| 08/03/2012 | 124 | BRIEF IN SUPPORT *filed jointly with Plaintiffs National Association of Home Builders* re 123 MOTION for Hearing re 102 Brief in Support of Motion for Summary Judgment, 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 104 Brief in Support of Motion for Summary Judgment filed by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association.(Lavis, Amanda) (Entered: 08/03/2012) |
| 08/10/2012 | 125 | BRIEF IN OPPOSITION re 123 MOTION for Hearing re 102 Brief in Support of Motion for Summary Judgment, 95 Joint MOTION for Summary Judgment *(filed jointly with Plaintiffs National Association of Home Builders)*, 104 Brief in Support of Motion for Summary Judgment filed by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation.(Mueller, Jon) (Entered: 08/10/2012) |
| 08/10/2012 | 126 | ORDER granting pltf's Motion for Hearing 123 . An oral argument will be held on 10/4/12 at 9:30 a.m.in Crtrm #3Signed by Honorable Sylvia H. Rambo on 08/10/12 (ma, ) (Entered: 08/10/2012) |
| 08/28/2012 | 127 | NOTICE by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, |

| | | National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association *(filed jointly with Plaintiff the National Association of Home Builders) of Supplemental Authority* (Attachments: # 1 Exhibit(s) Ex. 1)(Lavis, Amanda) (Entered: 08/28/2012) |
|---|---|---|
| 08/28/2012 | 128 | Letter from EPA *regarding oral argument*. (Hanson, Kent) (Entered: 08/28/2012) |
| 09/18/2012 | 129 | ORDER: The length of the parties oral arguments scheduled for 10/4/12 shall be limited as follows:1. Pltfs argument 1.5 hours2. Dfts response 1.5 hours3. Dft Intervenors 0.5 hour for CBF Group argument 0.5 hour for Municipal Associations Group 0.5 hour for PMAA4. Pltfs rebuttal 1 hour. The parties may jointly amend the time allocations, if needed. If the parties amend the time allocations, or have objections thereto, they shall notify the court no later than 9/25/12. The parties are on notice that the court will not permit more than one day of argument. Signed by Honorable Sylvia H. Rambo on 09/18/12. (ma, ) (Entered: 09/18/2012) |
| 09/21/2012 | 130 | MOTION to Appear Pro Hac Vice - Attorney David Ross is seeking special admission. Filing fee $ 50, receipt number 0314-2586312. by American Farm Bureau Federation, Pennsylvania Farm Bureau.(Tribeck, Robert) (Entered: 09/21/2012) |
| 09/24/2012 | 131 | SPECIAL ADMISSIONS FORM APPROVED as to David Ross, Esq., on behalf of American Farm Bureau Federation and Pennsylvania Farm Bureau.Signed by Honorable Sylvia H. Rambo on 09/24/12. (ma, ) (Entered: 09/24/2012) |
| 10/09/2012 | 133 | Letter from Counsel to Plaintiffs . (Tribeck, Robert) (Entered: 10/09/2012) |
| 10/09/2012 | 134 | ORDER: Parties may submit an additional brief to the court by no later than 10/17/12. The brief shall not exceed (10) pages and shall address only the issue of whether the court should defer to the EPAs interpretation of the Clean Water Act and the applicable TMDL regulations. No background or other information shall be included. Signed by Honorable Sylvia H. Rambo on 10/09/12. (ma, ) (Entered: 10/09/2012) |
| 10/10/2012 | 135 | Letter from EPA *regarding schedule for briefing deference issues*. (Hanson, Kent) (Entered: 10/10/2012) |
| 10/10/2012 | 136 | Letter from Counsel to Plaintiffs to Judge Rambo . (Tribeck, Robert) (Entered: 10/10/2012) |
| 10/10/2012 | 137 | Letter from Environmental Intervenors *to Judge S. Rambo*. (Mueller, Jon) (Entered: 10/10/2012) |
| 10/11/2012 | 138 | ORDER: Upon consideration of the parties letters regarding an extension of time to file additional briefing on the topic of agency deference:1. Pltfs shall submit an addl brief to the court by no laterthan 10/17/12.2. Dft and Dft-Intervenors shall file a response no later than 10/24/12.3. Pltfs may file a reply brief no later than 10/31/12. Any briefs shall not exceed (10) pages and shall address only the issue of whether the court should defer to the EPAs interpretation of the Clean Water Act and the applicable TMDL regulations. |

| | | No background or other information shall be included. Signed by Honorable Sylvia H. Rambo on 10/11/12. (ma, ) (Entered: 10/11/2012) |
|---|---|---|
| 10/17/2012 | | DOCKET ANNOTATION: Document 139 deleted per counsel request. Document to be refiled. (aaa ) (Entered: 10/17/2012) |
| 10/17/2012 | 139 | MEMORANDUM OF LAW by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association *filed jointly with Plaintiffs National Association of Home Builders regarding Supplemental Briefing on Deference*. (Lavis, Amanda) (Entered: 10/17/2012) |
| 10/24/2012 | 140 | MEMORANDUM OF LAW by United States Environmental Protection Agency *regarding deference*. (Hanson, Kent) (Entered: 10/24/2012) |
| 10/24/2012 | 141 | Letter to the Court with Certificate of Service by Pennsylvania Municipal Authorities Association. . (Hann, Steven) (Entered: 10/24/2012) |
| 10/24/2012 | 142 | MEMORANDUM OF LAW by Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Midshore Riverkeeper Conservancy, National Wildlife Federation re 138 Order,, 139 Memorandum of Law, *Regarding Agency Deference*. (Mueller, Jon) (Entered: 10/24/2012) |
| 10/24/2012 | 143 | Letter from National Association of Clean Water Agencies, Maryland Association of Municipal Wastewater Agencies, Inc., and Virginia Association of Municipal Wastewater Agencies, Inc. *to Judge Rambo*. (Pomeroy, Christopher) (Entered: 10/24/2012) |
| 10/31/2012 | 144 | Letter from Pltfs requesting exttm to file their post argument reply brf. (ma) (Entered: 10/31/2012) |
| 10/31/2012 | 145 | ORDER granting the Letter/Request of pltfs 144 . Pltfs shall file their reply brief by 11/2/12.Signed by Honorable Sylvia H. Rambo on 10/31/12. (ma) (Entered: 10/31/2012) |
| 11/02/2012 | 146 | MEMORANDUM OF LAW by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association *(REPLY MEMORANDUM in Support of Plaintiffs' Supplemental Brief on Deference) filed jointly with Plaintiff National Association of Home Builders*. (Lavis, Amanda) (Entered: 11/02/2012) |
| 01/04/2013 | 147 | NOTICE by American Farm Bureau Federation, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association *of Supplemental Authority (filed jointly with the National Association of Home Builders)* (Attachments: # 1 Exhibit(s) Exhibit 1)(Lavis, Amanda) (Entered: 01/04/2013) |
| 02/12/2013 | 148 | Attorney Substitution, Attorney Kurt J. Weist added as counsel for Citizens for Pennsylvania's Future and withdrawing Attorney Brian G. Glass (Weist, |

| | | Kurt) Modified on 2/13/2013 (bg). (Entered: 02/12/2013) |
|---|---|---|
| 08/16/2013 | 149 | WITHDRAWAL OF ATTORNEY APPEARANCE - Attorney Carla S. Pool terminated on behalf of Virginia Association of Municipal Wastewater Agencies, Maryland Association of Municipal Wastewater Agencies, and National Association of Clean Water Agencies. (Pool, Carla) (Entered: 08/16/2013) |
| 09/13/2013 | 150 | MEMORANDUM AND ORDER: 1. Pltfs joint motion for summary judgment 95 isDENIED;2. Dft EPAs cross-motion for summary judgment 99 is GRANTED;3. Dft-Intervenor Municipal Associations Groups crossmotion for summary judgment 103 is GRANTED;4. The clerk of court is directed to enter judgment against Pltfs and in favor of Dft EPA and Dft-Intervenors on all claims.5. The clerk of court is directed to CLOSE this case. Signed by Honorable Sylvia H. Rambo on 09/13/13. (ma) (Entered: 09/13/2013) |
| 09/17/2013 | 151 | JUDGMENT in favor of Chesapeake Bay Foundation, Inc., Citizens for Pennsylvanias Future, Defenders of Wildlife, Jefferson County Public Service District, Maryland Association of Municipal Wastewater Agencies, Midshore Riverkeeper Conservancy, National Association of Clean Water Agencies, National Wildlife Federation, Pennsylvania Municipal Authorities Association, United States Environmental Protection Agency, VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC. against American Farm Bureau Federation, National Association of Home Builders, National Chicken Council, National Corn Growers Association, National Pork Producers Council, National Turkey Federation, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg AssociationSigned by Honorable Sylvia H. Rambo on 09/17/13. (ma) (Entered: 09/17/2013) |
| 09/18/2013 | | DOCKET ANNOTATION: As electronic notification to Atty. Ross has failed, courtesy hard copy of Doc. 151 mailed with instructions for updating ECF account info; if counsel is no longer associated with case, co-counsel or replacement counsel are urged to file praecipe for withdrawal or substitution of attorney.(ep) (Entered: 09/18/2013) |
| 09/20/2013 | 152 | WITHDRAWAL OF ATTORNEY APPEARANCE - Attorney David P. Ross terminated on behalf of American Farm Bureau Federation and Pennsylvania Farm Bureau. (Lavis, Amanda) (Entered: 09/20/2013) |
| 10/07/2013 | 153 | NOTICE OF APPEAL in NON-PRISONER Case as to 151 Judgment, 150 Memorandum & Order, by American Farm Bureau Federation, National Association of Home Builders, National Corn Growers Association, National Pork Producers Council, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & Egg Association. Filing Fee and Docket Fee PAID. Filing fee $ 455 Receipt Number: 111014169 The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (dh) (Entered: 10/08/2013) |
| 10/30/2013 | 154 | TRANSCRIPT PURCHASE ORDER REQUEST by American Farm Bureau Federation, National Corn Growers Association, National Pork Producers Council, Pennsylvania Farm Bureau, The Fertilizer Institute, U.S. Poultry & |

| | | |
|---|---|---|
| | | Egg Association for proceedings held on October 4, 2012 before Judge Rambo, (Tribeck, Robert) (Entered: 10/30/2013) |
| 12/04/2013 | 155 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Oral Argument proceedings held on 10/4/2012 before Judge Rambo. Court Reporter Wendy Yinger, Telephone number 717-440-1535. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/26/2013. Redacted Transcript Deadline set for 1/4/2014. Release of Transcript Restriction set for 3/4/2014. (ctrep7) (Entered: 12/04/2013) |

1983 Chesapeake Bay Agreement



## Chesapeake Bay Program

# 1983 Chesapeake Bay Agreement

We recognize that the findings of the Chesapeake Bay Program have shown an historical decline in the living resources of the Chesapeake Bay and that a cooperative approach is needed among the Environmental Protection Agency (EPA), the State of Maryland, the Commonwealths of Pennsylvania and Virginia, and the District of Columbia (the States) to fully address the extent, complexity, and sources of pollutants entering the Bay. We further recognize that EPA and the States share the responsibility for management decisions and resources regarding the high priority issues of the Chesapeake Bay.

Accordingly, the States and EPA agree to the following actions:

1. A Chesapeake Executive Council will be established which will meet at least twice yearly to assess and oversee the implementation of coordinated plans to improve and protect the water quality and living resources of the Chesapeake Bay estuarine systems. The Council will consist of the appropriate Cabinet designees of the Governors and the Mayor of the District of Columbia and the Regional Administrator of EPA. The Council will be initially chaired by EPA and will report annually to signatories of this Agreement

2. The Chesapeake Executive Council will establish an implementation committee of agency representatives who will meet as needed to coordinate technical matters and to coordinate the development and evaluation of management plans. The Council may appoint such ex officio nonvoting members as deemed appropriate.

3. A liaison office for Chesapeake Bay activities will be established at EPA's Central Regional Laboratory in Annapolis, Maryland, to advise and support the Council and committee.

DATE: December 9, 1983

SIGNERS:

For the Commonwealth of Virginia -- Charles S. Robb, Governor
For the State of Maryland -- Harry Hughes, Governor
For the Commonwealth of Pennsylvania -- Richard Thornburgh, Governor

AR0005488

1983 Chesapeake Bay Agreement

For the District of Columbia -- Marion Barry, Mayor
For the United States of America -- William Ruckleshaus, Administrator, Environmental Protection
Agency

---

Return to top of this document
Return to Home

For more information, contact the Chesapeake Bay Program Office, 410 Severn Avenue, Suite 110,
Annapolis, MD 21403, Tel: (800) YOUR-BAY, Fax: (410) 267-5777.

 *Last modified 4 March 1996*

1987 CHESAPEAKE BAY AGREEMENT

*T*HE CHESAPEAKE BAY IS A NATIONAL TREASURE and a resource of worldwide significance. Its ecological, economic, and cultural importance are felt far beyond its waters and the communities that line its shores. Man's use and abuse of its bounty, however, together with the continued growth and development of population in its watershed, have taken a toll on the Bay system. In recent decades, the Bay has suffered serious declines in quality and productivity. ◊ *REPRESENTING* the Federal government and the States which surround the Chesapeake Bay, we acknowledge our stake in the resources of the Bay and accept our share of responsibility for its current condition. We are determined that this decline will be reversed. In response, all of our jurisdictions have embarked on ambitious programs to protect our shared resource and restore it to a more productive state. ◊ *IN* 1980, the legislatures of Virginia and Maryland established the Chesapeake Bay Commission to coordinate interstate planning and programs from a legislative perspective. In 1985, Pennsylvania joined the Commission. And, in 1983, Virginia, Maryland, Pennsylvania, the District of Columbia, the U.S. Environmental Protection Agency and the Chesapeake Bay Commission formally agreed to a cooperative approach to this undertaking and established specific mechanisms for its coordination. Since 1983, our joint commitment has carried us to new levels of governmental cooperation and scientific understanding. It has formed a firm base for the future success of this long-term program. The extent and complexity of our task now call for an expanded and refined agreement to guide our efforts toward the twenty-first century. ◊ *RECOGNIZING* that the Chesapeake Bay's importance transcends regional boundaries, we commit to managing the Chesapeake Bay as an integrated ecosystem and pledge our best efforts to achieve the goals in this Agreement. We propose a series of objectives that will establish a policy and institutional framework for continued cooperative efforts to restore and protect Chesapeake Bay. We further commit to specific actions to achieve those objectives. The implementation of these commitments will be reviewed annually and additional commitments developed as needed.

## GOALS AND PRIORITY COMMITMENTS

*T*HIS NEW AGREEMENT CONTAINS Goals and Priority Commitments for Living Resources; Water Quality; Population Growth and Development; Public Information, Education and Participation; Public Access; and Governance. ◊ The parties to this 1987 Agreement are the U.S. Environmental Protection Agency representing the Federal government, the District of Columbia, the State of Maryland and the Commonwealths of Pennsylvania and Virginia (hereinafter the "States") and the Chesapeake Bay Commission. This Agreement may be amended and attachments added in the future by unanimous action of the Chesapeake Executive Council.

*1*

AR0005481

### LIVING RESOURCES

GOAL: *PROVIDE FOR THE RESTORATION AND PRO-TECTION OF THE LIVING RESOURCES, THEIR HABITATS AND ECOLOGICAL RELATIONSHIPS.* The productivity, diversity and abundance of living resources are the best ultimate measures of the Chesapeake Bay's condition. These living resources are the main focus of the restoration and protection effort. Some species of shellfish and finfish are of immense commercial and recreational value to man. Others are valuable because they are part of the vast array of plant and animal life that make up the Chesapeake Bay ecosystem on which all species depend. We recognize that the entire natural system must be healthy and productive. We will determine the essential elements of habitat and environmental quality necessary to support living resources and will see that these conditions are attained and maintained. We will also manage the harvest of and monitor populations of commercially, recreationally and ecologically valuable species to ensure sustained, viable stocks. We recognize that to be successful, these actions must be carried out in an integrated and coordinated manner across the whole Bay system.

#### OBJECTIVES:

◊ Restore, enhance, protect and manage submerged aquatic vegetation.

◊ Protect, enhance and restore wetlands, coastal sand dunes, forest buffers and other shoreline and riverline systems important to water quality and habitat.

◊ Conserve soil resources and reduce erosion and sedimentation to protect Bay habitat.

◊ Maintain freshwater flow regimes necessary to sustain estuarine habitats, including, where appropriate, establishing minimum instream flows.

◊ Develop compatible Bay-wide stock assessment programs.

◊ Develop Bay-wide fisheries management strategies and develop complementary state programs and plans to protect and restore the finfish and shellfish stocks of the Bay, especially the freshwater and estuarine spawners.

◊ Provide for the restoration of shellfish stocks in the Bay, especially the abundance of commercially important species.

◊ Restore, enhance and protect waterfowl and wildlife.

#### COMMITMENT:

*TO ACHIEVE THIS GOAL WE AGREE:*

◊ by *January 1988*, to develop and adopt guidelines for the protection of water quality and habitat conditions necessary to support the living resources found in the Chesapeake Bay system, and to use these guidelines in the implementation of water quality and habitat protection programs.

◊ by *July 1988*, to develop, adopt and begin to implement a Bay-wide plan for the assessment of commercially, recreationally and selected ecologically valuable species.

◊ by *July 1988*, to adopt a schedule for the development of Bay-wide resource management strategies for commercially, recreationally and selected ecologically valuable species.

◊ by *July 1989*, to develop, adopt and begin to implement Bay-wide management plans for oysters, blue crabs and American Shad. Plans for other major commercially, recreationally and ecologically valuable species should be initiated by 1990.

◊ by *December 1988*, to develop a Bay-wide policy for the protection of tidal and non-tidal wetlands.

◊ Provide for fish passage at dams, and remove stream blockages wherever necessary to restore natural passage for migratory fish.

*2*

AR0005482

WATER QUALITY

GOAL: *REDUCE AND CONTROL POINT AND NON-POINT SOURCES OF POLLUTION TO ATTAIN THE WATER QUALITY CONDITION NECESSARY TO SUPPORT THE LIVING RESOURCES OF THE BAY.* The improvement and maintenance of water quality are the single most critical elements in the overall restoration and protection of the Chesapeake Bay. Water is the medium in which all living resources of the bay live, and their ability to survive and flourish is directly dependent on it. ◇ To ensure the productivity of the living resources of the Bay, we must clearly establish the water quality conditions they require and must then attain and maintain those conditions. Foremost, we must improve or maintain dissolved oxygen concentrations in the Bay and its tributaries through a continued and expanded commitment to the reduction of nutrients from both point and nonpoint sources. We must do the same for toxics and conventional pollutants. To be effective, we will develop basin-wide implementation plans for the control and reduction of pollutants which are based on our best understanding (including that derived from modeling) of the Bay and its tributaries as an integrated system.

OBJECTIVES:

◇ Provide timely construction and maintenance of public and private sewerage facilities to assure control of pollutant discharges.

◇ Reduce the discharge of untreated or inadequately treated sewage into Bay waters from such sources as combined sewer overflows, leaking sewage systems, and failing septic systems.

◇ Evaluate and institute, where appropriate, alternative technologies for point source pollution control, such as biological nutrient removal and land application of effluent to reduce pollution loads in a cost-effective manner.

◇ Establish and enforce pollutant limitations to ensure compliance with water quality laws.

◇ Reduce the levels of nonpoint sources of pollution.

◇ Reduce sedimentation by strengthening enforcement of existing control regulations.

◇ Eliminate pollutant discharges from recreational boats.

◇ Identify and control toxic discharges to the Bay system, including metals and toxic organics, to protect water quality, aquatic resources and human health through implementation and enforcement of the states' National Pollutant Discharge Elimination System permit programs and other programs.

◇ Reduce chlorine discharges in critical finfish and shellfish areas. Minimize water pollution incidents and provide adequate response to pollutant spills.

◇ Manage sewage sludge, dredged spoil and hazardous wastes to protect the Bay system.

◇ Manage groundwater to protect the water quality of the Bay.

◇ Quantify the impacts and identify the sources of atmospheric inputs on the Bay system.

COMMITMENT:

*TO ACHIEVE THIS GOAL WE AGREE:*

◇ by *July 1988,* to develop, adopt and begin implementation of a basin-wide strategy to equitably achieve by the year 2000 at least a 40 percent reduction of nitrogen and phosphorus entering the main stem of the Chesapeake Bay. The strategy should be based on agreed upon 1985 point source loads and on nonpoint loads in an average rainfall year.

◇ by *December 1991,* to re-evaluate the 40 percent reduction target based on the results of modeling, research, monitoring and other information available at that time.

◇ by *December 1988,* to develop, adopt and begin implementation of a basin-wide strategy to achieve a reduction of toxics consistent with the Water Quality Act of 1987 which will ensure protection of human health and living resources. The strategy will cover both point and nonpoint sources, monitoring protocols, enforcement of pretreatment regulations and methods for dealing with in-place toxic sediments where necessary.

◇ by *July 1988,* to develop and adopt, as required by the Water Quality Act of 1987, a basin-wide implementation strategy for the management and control of conventional pollutants entering the Chesapeake Bay system from point and nonpoint sources.

◇ by *July 1988,* the Environmental Protection Agency, acting for the federal government, will develop, adopt and begin implementation of a strategy for the control and reduction of point and nonpoint sources of nutrient, toxic and conventional pollution from all federal facilities.

3

AR0005483

### POPULATION GROWTH AND DEVELOPMENT

**G**OAL: *PLAN FOR AND MANAGE THE ADVERSE EN-VIRONMENTAL EFFECTS OF HUMAN POPULATION GROWTH AND LAND DEVELOPMENT IN THE CHESA-PEAKE BAY WATERSHED.* There is a clear correlation between population growth and associated development and environmental degradation in the Chesapeake Bay system. Enhancing, or even maintaining, the quality of the Bay while accommodating growth will frequently involve difficult decisions and restrictions and will require continued and enhanced commitment to proper development standards. The states and the federal government will assert the full measure of their authority to mitigate the potential adverse effects of continued growth. ◊ Local jurisdictions have been delegated authority over many decisions regarding growth and development which have both direct and indirect effects on the Chesapeake Bay system and its living resources. The role of local governments in the restoration and protection effort will be given proper recognition and support through state and federal resources. ◊ States will engage in an active partnership with local governments to establish policy guidelines to manage growth and development.

OBJECTIVES:

◊ Designate a state-level office responsible for ensuring consistency with this Agreement among the agencies responsible for comprehensive oversight of development activity, including infrastructure planning, capital budgets, land preservation and waste management activities.

◊ Provide local governments with financial and technical assistance to continue and expand their management efforts.

◊ Consult with local government representatives in the development of Chesapeake Bay restoration and protection plans and programs.

◊ Identify and give public recognition to innovative and otherwise noteworthy examples of local government restoration and protection-related programs.

◊ Assure that government development projects meet all environmental requirements.

◊ Promote, among local, state and federal governments, and the private sector, the use of innovative techniques to avoid and, where necessary, mitigate the adverse impacts of growth.

COMMITMENT:

*TO ACHIEVE THIS GOAL WE AGREE:*

◊ to commission a panel of experts to report, by *December 1988*, on anticipated population growth and land development patterns in the Bay region through the year 2020, the infrastructure requirements necessary to serve growth and development, environmental programs needed to improve Bay resources while accommodating growth, alternative means of managing and directing growth and alternative mechanisms for financing governmental services and environmental controls. The panel of experts will consist of twelve members: three each from Virginia, Maryland and Pennsylvania, and one each from the District of Columbia, Environmental Protection Agency and the Chesapeake Bay Commission.

◊ by *January 1989*, to adopt development policies and guidelines designed to reduce adverse impacts on the water quality and living resources of the Bay, including minimum best management practices for development and to cooperatively assist local governments in evaluating land-use and development decisions within their purview, consistent with the policies and guidelines.

◊ to evaluate state and federal development projects in light of their potential impacts on the water quality and living resources of the Chesapeake Bay, and design and carry out each state and federal development project so as to serve as a model for the private sector in terms of land-use practices.

◊ by *December 1988*, to develop a strategy to provide incentives, technical assistance and guidance to local governments to actively encourage them to incorporate protection of tidal and non-tidal wetlands and fragile natural areas in their land-use planning, water and sewer planning, construction and other growth-related management processes.

4

AR0005484

## PUBLIC INFORMATION, EDUCATION AND PARTICIPATION

G O A L : *PROMOTE GREATER UNDERSTANDING AMONG CITIZENS ABOUT THE CHESAPEAKE BAY SYSTEM, THE PROBLEMS FACING IT AND POLICIES AND PROGRAMS DESIGNED TO HELP IT, AND TO FOSTER INDIVIDUAL RESPONSIBILITY AND STEWARDSHIP OF THE BAY'S RESOURCES.*

G O A L : *PROVIDE INCREASED OPPORTUNITIES FOR CITIZENS TO PARTICIPATE IN DECISIONS AND PROGRAMS AFFECTING THE BAY.* The understanding and support of the general public and interest groups are essential to sustaining the long-term commitment to the restoration and protection of the Chesapeake Bay system and its living resources. Citizens must have opportunities to learn about that system and associated management policies and programs and must be given opportunities to contribute ideas about how best to manage that natural system.

O B J E C T I V E S :

◇ Provide timely information on the progress of the restoration program.

◇ Assure a continuing process of public input and participation in policy decisions affecting the Bay.

◇ Enhance Bay-oriented education opportunities to increase public awareness and understanding of the Bay system.

◇ Provide curricula and field experiences for students.

◇ Promote opportunities to involve citizens directly in Bay restoration efforts.

◇ Coordinate the production and distribution of Bay information and education materials.

C O M M I T M E N T :

*TO ACHIEVE THESE GOALS WE AGREE:*

◇ to conduct coordinated education and information programs to inform the general public, local governments, business, students, community associations and others of their roles, responsibilities and opportunities in the restoration and protection effort, and to promote public involvement in the management and decision-making process.

◇ to provide for public review and comment on all implementation plans developed pursuant to this agreement.

◇ by *March 1988,* to develop state and federal communication plans for public information, education and participation, and by *May 1988,* to develop a unified, Bay-wide communication plan.

◇ to promote Chesapeake Bay restoration efforts by establishing an annual Bay-wide series of Chesapeake Bay Watershed Awareness events, to include a Governor's Cup Fishing Tournament.

## PUBLIC ACCESS

G O A L : *PROMOTE INCREASED OPPORTUNITIES FOR PUBLIC APPRECIATION AND ENJOYMENT OF THE BAY AND ITS TRIBUTARIES.* Interest in and commitment to the Chesapeake Bay and its tributaries are greatly affected by personal contact with that natural system. Consequently, improved opportunities for access to the shores and waters of the system are essential if public awareness and support are to be maintained and increased.

O B J E C T I V E S :

◇ Improve and maintain access to the Bay including public beaches, parks and forested lands.

◇ Improve opportunities for recreational and commercial fishing.

◇ Secure shoreline acreage to maintain open space and provide opportunities for passive recreation.

◇ Secure necessary acreage to protect unique habitat and environmentally sensitive areas.

C O M M I T M E N T :

*TO ACHIEVE THIS GOAL WE AGREE:*

◇ to intensify our efforts to improve and expand public access opportunities being made available by the federal government, the states, and local governments, by developing a strategy, which includes an inventory of current access opportunities by *July 1988,* which targets state and federal actions to secure additional tidal shorefront acres by *December 1990* along the Bay and its tributaries.

◇ by *December 1988,* to prepare a comprehensive guide to access facilities and the natural resource system for the tidal Chesapeake Bay.

5

AR0005485

GOVERNANCE

G O A L :   *SUPPORT AND ENHANCE THE PRESENT COM-
PREHENSIVE, COOPERATIVE AND COORDINATED AP-
PROACH TOWARD MANAGEMENT OF THE CHESAPEAKE
BAY SYSTEM.*

G O A L :   *PROVIDE FOR CONTINUITY OF MANAGE-
MENT EFFORTS AND PERPETUATION OF COMMIT-
MENTS NECESSARY TO ENSURE LONG-TERM RESULTS.*
The cooperation necessary to sustain an effective Chesapeake Bay
restoration and protection effort requires a formal working arrange-
ment involving the states and the federal government. That institu-
tional arrangement must allow for and promote voluntary individual
actions coordinated within a well-defined context of the individual
responsibilities and authorities of each state and the federal govern-
ment. It must also ensure that actions which require a concerted,
Bay-wide approach be addressed in common and without duplication.
One of the principal functions of the coordinating institution is to
develop strategic plans and oversee their implementation, based on
advice from the public, from the scientific community and from user
groups.   ◊   In addition, the coordinating body must exert leadership to
marshal public support, and it must be accountable for progress made
under the terms of this agreement. The coordinating body will continue
to be called the Chesapeake Executive Council. The Chesapeake Execu-
tive Council shall be comprised of the Governors, the Mayor of the
District of Columbia, the Administrator of the Environmental Protec-
tion Agency and the Chairman of the Chesapeake Bay Commission.
The chairmanship of the Council shall rotate annually as determined by
the Council. The term of the Chairman shall be one year. The Adminis-
trator of the Environmental Protection Agency shall represent the fed-
eral government and the Chairman of the Chesapeake Bay Commission
shall represent its members.

O B J E C T I V E S :

◊  Continue to demonstrate strong, regional leadership by convening
   an annual public meeting of the Chesapeake Executive Council.

◊  Continue to support the Chesapeake Executive Council and provide
   for technical and public policy advice by maintaining strong advisory
   committees.

◊  Coordinate Bay management activities and develop and maintain
   effective mechanisms for accountability.

◊  The Chesapeake Bay Liaison Office shall provide staff support to
   the Chesapeake Executive Council by providing analyses and data
   management, and by generating reports related to the overall pro-

gram. The Implementation Committee shall provide guidance to
the CBLO Director in all matters relating to support for the Council
and their supporting committees, subcommittees and work groups
including the development of all plans and other documents asso-
ciated with the Council.

◊  Examine the feasibility of joint funding support of the Chesapeake
   Bay Liaison Office.

◊  Track and evaluate activities which may affect estuarine water
   quality and resources and report at least annually.

◊  Develop and maintain a coordinated Chesapeake Bay data man-
   agement system.

◊  Continue to implement a coordinated Bay-wide monitoring system
   and to develop a Bay-wide living resources monitoring system.

◊  Develop and implement a coordinated Bay-wide research program.

C O M M I T M E N T :

*TO ACHIEVE THESE GOALS WE AGREE:*

◊  to develop an annual Chesapeake Bay work plan endorsed by the
   Chesapeake Executive Council.

◊  to continue to support Bay-wide environmental monitoring and
   research to provide the technical and scientific information neces-
   sary to support management decisions.

◊  to strengthen the Chesapeake Bay Liaison Office by assigning, as
   appropriate, staff persons from each jurisdiction and from partici-
   pating federal agencies to assist with the technical support functions
   of that office.

◊  by *July 1988,* to develop and adopt a comprehensive research plan
   to be evaluated and updated annually to address the technical needs
   of the Chesapeake Bay Program.

◊  by *July 1988,* develop a Bay-wide monitoring plan for selected
   commercially, recreationally and ecologically valuable species.

◊  by *March 1988,* to establish a local government advisory committee
   to the Chesapeake Executive Council and charge that committee to
   develop a strategy for local government participation in the Bay
   program.

◊  to consider and review the feasibility of establishing an independent
   Chesapeake Bay Executive Board.

◊  by *July 1988,* the Environmental Protection Agency, acting for the
   federal government, will develop, a coordinated, federal agency
   workplan which identifies specific federal programs to be integrated
   into a coordinated federal effort to support the restoration of the
   Chesapeake Bay.

6

AR0005486

*B*Y THIS AGREEMENT, we reaffirm our commitment to restore and protect the ecological integrity, productivity and beneficial uses of the Chesapeake Bay system. We agree to report in *January 1989* on progress made in fulfilling the commitments in this agreement, and to consider at that time additional commitments. The implementation strategies which will be developed pursuant to this agreement will be appended as annexes, and annual reports will include an accounting of progress made on each strategy.

December 15, 1987
(Date)

FOR THE COMMONWEALTH OF VIRGINIA

FOR THE STATE OF MARYLAND

FOR THE COMMONWEALTH OF PENNSYLVANIA

FOR THE UNITED STATES OF AMERICA

FOR THE DISTRICT OF COLUMBIA

FOR THE CHESAPEAKE BAY COMMISSION

ACKNOWLEDGEMENTS:

Anonymous / Baltimore Storage Company, Agents for Mayflower Van Lines / Bell Nursery and Creative Plantings / Elizabeth Buckley / Gamler's Restaurant / The Chesapeake Bay Foundation / Citizens Program For The Chesapeake Bay / Crown Central Petroleum Corporation / Faidley's Seafood / A. H. Fetting Company / First National Bank of Maryland / Harbor Court Hotel / Homestead Gardens / Hyatt Regency Hotel / KRS Bronson Sensing (A Kodak Company) / The Maryland Watermen's Association, Inc. / Naval Academy Band Ceremonial Unit / Nick's Seafood / The Word Foundation / F. E. Worthington, Inc.

Document printing sponsored by First National Bank of Maryland. Decorations jointly sponsored by Crown Central Petroleum Corporation and by Bell Nursery and Creative Plantings.

AR0005487

United States
Environmental Protection
Agency

Office of Water
(WH-553)
Washington, D.C. 20460

EPA 440/4-91-001
April 1991

# &EPA  Guidance for Water Quality-based Decisions: The TMDL Process



Exhibit N

# Guidance for Water Quality-based Decisions: The TMDL Process

Assessment and Watershed Protection Division
U.S. Environmental Protection Agency
Washington, D.C. 20460

Exhibit N

This document provides guidance only. It does not establish or affect legal rights or obligations. This guidance may be reviewed and revised periodically to reflect changes in EPA's strategy for the implementation of water quality-based controls, to include new information, or to clarify and update the text. Decisions in any particular case will be made by applying the Clean Water Act and implementing regulations.

Comments are invited and will be considered in future revisions. Comments or inquiries should be directed to :

> Watershed Branch
> Assessment and Watershed Protection Division (WH-553)
> U.S. Environmental Protection Agency
> 401 M St. SW
> Washington, D.C. 20460

Exhibit N

# *FOREWORD*

This document, "Guidance for the Implementation of Water Quality-based Decisions: The TMDL Process," is intended to define and clarify the requirements under section 303(d) of the Clean Water Act. Its purpose is to help State water quality program managers understand the application of total maximum daily loads within the water quality-based approach to establish pollution control limits for waters not meeting water quality standards.

Water quality management has become increasingly more complicated. Problems such as toxic contaminants, sediments, nutrients, and habitat alteration result from a variety of point and nonpoint sources. The TMDL process is established under the Clean Water Act as the mechanism to address these problems in a comprehensive manner in situations where technology-based controls are not adequate.

Through this guidance we hope to reduce the uncertainties associated with TMDLs and to establish the TMDL process as an effective water quality management tool for both point and nonpoint source pollution control.

Martha G. Prothro, Director
Office of Water Regulations and Standards
US Environmental Protection Agency
Washington, D.C.

Exhibit N

# TABLE OF CONTENTS

**Page**

**CHAPTER 1 – INTRODUCTION** ......................................................... 1

Purpose and Summary  ..................................................................... 1
Policies and Principles  ..................................................................... 2
Clean Water Act Section 303(d)  ........................................................ 4
Water Quality Planning and Management Regulation  ............................... 6

**CHAPTER 2 – THE WATER QUALITY-BASED APPROACH TO
               POLLUTION CONTROL** ............................................... 9

Step One: Identification of Water Quality-Limited Waters  ....................... 11
Step Two:  Priority Ranking and Targeting  ......................................... 13
Step Three:  TMDL Development  ..................................................... 14
Step Four:  Implementation of Control Actions  .................................... 16
Step Five:  Assessment of Water Quality-Based Control Actions  ............... 16

**CHAPTER 3 – DEVELOPMENT  AND IMPLEMENTATION OF THE TMDL**  ............ 19

Development of the TMDL  .............................................................. 19
    The TMDL Objective  ................................................................ 19
    The TMDL Process  .................................................................. 19
    Selection of Approach  ............................................................... 20
    The Phased Approach  ............................................................... 22
    Approval of TMDLs by EPA  ....................................................... 23

Implementation of the TMDL  .......................................................... 23
    NPDES Process for Point Sources  ................................................ 23
    State or Local Process for Nonpoint Sources  ................................... 24

Assessment of the TMDL  ............................................................... 25

**CHAPTER 4 – EPA AND STATE RESPONSIBILITIES**  .............................. 27

EPA/State Agreements  .................................................................. 27
State Responsibilities  .................................................................... 27
    Identification of Water Quality-Limited Waters Still Requiring TMDLs  ...... 27
    Identification and Scheduling of Targeted Waterbodies  ....................... 29
    TMDL Development  .................................................................. 29
    Continuing Planning Process  ...................................................... 29
    Water Quality Management Plan  .................................................. 30
    Public Notice and Participation  ................................................... 30
    Reporting  .............................................................................. 31
    Other Specific Responsibilities  .................................................... 31

EPA Responsibilities  .................................................................... 32
    Review of 303(d) lists  .............................................................. 32
    TMDL Review and Approval  ...................................................... 32
    Program Audits  ...................................................................... 33
    Technical Assistance and Training  ................................................ 33
    Guidance Documents and Reports  ................................................ 33
    EPA Headquarters Responsibilities  .............................................. 33
    EPA Regional Responsibilities  .................................................... 33

ii

Exhibit N

Page

APPENDIX A -- RELATIONSHIP TO OTHER GUIDANCE ..................................... 35
    Monitoring Guidance ................................................................. 35
    Cooperative Monitoring/Citizen Volunteer Monitoring Guidance ........................ 35
    Wasteload Allocation Technical Guidance ............................................. 36
    Technical Support Document for Water Quality-Based Toxics Control .................... 36
    Permit Writers Guidance ............................................................. 37
    Nonpoint Source Guidance ............................................................ 37

APPENDIX B -- SUPPORTING PROGRAMS ................................................. 38
    EPA Water Quality Criteria and Standards ............................................ 38
    Section 305(b) -- Water Quality Assessment .......................................... 39
    Section 304(l) -- Impaired Waters ................................................... 40
    Section 319 -- Nonpoint Source Program .............................................. 40
    Section 314 -- Clean Lakes Program .................................................. 41
    Section 320 -- National Estuary Program ............................................. 41
    Monitoring Program .................................................................. 41
    Effluent Limitation Guidelines and Standards ........................................ 41
    NPDES Permits and Individual Control Strategies ..................................... 42
    Marine and Estuarine Waters ......................................................... 42
    Groundwater ......................................................................... 43
    CERCLA .............................................................................. 43
    SARA ................................................................................ 44

APPENDIX  C -- SCREENING CATEGORIES .............................................. 45

APPENDIX D -- SELECTED TECHNICAL CONSIDERATIONS ................................. 48
    Design Conditions ................................................................... 48
    Mathematical Models ................................................................. 48
    Pollutant Allocation Schemes ........................................................ 51
    Multiple Discharges ................................................................. 51
    Allocation Tradeoffs ................................................................ 52
    Persistent and/or Highly Bioaccumulative Toxic Pollutants ........................... 52
    Use of Two-Number Criteria .......................................................... 52
    Sediment Issues ..................................................................... 53

APPENDIX  E -- MATHEMATICAL MODEL SUPPORT ....................................... 54

APPENDIX  F -- GENERAL  EPA/STATE AGREEMENT OUTLINE FOR
                DEVELOPMENT OF TMDLs ................................................ 56

APPENDIX G -- CAUSES AND SOURCES OF POLLUTION .................................. 57

LIST OF ACRONYMS ................................................................. 58

# CHAPTER 1 - INTRODUCTION AND EXECUTIVE SUMMARY

### Purpose and Summary

The purpose of this guidance document is to explain the programmatic elements and requirements of the TMDL process as established by section 303(d) of the Clean Water Act and by EPA's Water Quality Planning and Management Regulations (40 CFR Part 130). A TMDL, or *total maximum daily load*, is a tool for implementing State water quality standards and is based on the relationship between pollution sources and in-stream water quality conditions. The TMDL establishes the allowable loadings or other quantifiable parameters for a waterbody and thereby provides the basis for States to establish water quality-based controls. These controls should provide the pollution reduction necessary for a waterbody to meet water quality standards.

Section 303(d) of the Act establishes the TMDL process to provide for more stringent water quality-based controls when technology-based controls are inadequate to achieve State water quality standards. When implemented according to this guidance, the TMDL process can broaden the opportunity for public participation, expedite water quality-based National Pollutant Discharge Elimination System (NPDES) permitting, and lead to technically sound and legally defensible decisions for attaining and maintaining water quality standards. In addition, the TMDL process provides a mechanism for integrating the management of both the point and nonpoint pollution sources that

together may contribute to a waterbody's impairment.

Chapter Two of this guidance document provides a description of the TMDL process in the context of the water quality-based approach to pollution reductions. This approach includes the identification and priority ranking of water quality-limited waters, the targeting and scheduling of high priority waters, the development of TMDLs, and the implementation of control actions that should result in the attainment of water quality standards. Assessment for water quality standards attainment provides the information needed to identify water quality-limited waters and for the evaluation of the TMDL and control actions.

The development and implementation of the TMDL establishes the link between water quality standards assessment and water quality-based control actions. The third chapter of this document describes how a State should proceed with developing TMDLs once waters are targeted for action and then how to implement them. Special consideration is given to such issues as adequacy of data and information, how to consider nonpoint source contributions, and when to use a modified approach, called the phased approach, that results in a TMDL with special requirements. Implementation of the TMDL is discussed in terms of the mechanisms that are available to reduce both point and nonpoint loads.

The final chapter of this guidance describes the specific roles and responsibilities

Exhibit N  *1*

-150-

that the States and EPA have in implementing CWA section 303(d). EPA review and approval of lists of waters submitted by the States, the priority rankings of these waters, and the TMDLs are set forth in the Water Quality Planning and Management Regulation. This guidance presents a detailed discussion of the submission of lists and TMDLs, and the review and approval processes. The States' responsibility to involve the public in the TMDL process is also highlighted in this chapter. The value and importance of public participation is also emphasized throughout the document.

This guidance focuses on the programmatic aspects rather than the technical issues of the TMDL process. Numerous technical guidance manuals have been developed by EPA to assist States in calculating wasteload allocations (WLA). A list of these manuals can be found in Appendix A along with a description of other relevant guidance documents. A brief description of selected technical considerations can be found in Appendix D and information about EPA supported models can be found in Appendix E. The other appendices provide the reader with useful and relevant information such as descriptions of related water quality programs (Appendix B) and a general outline of an EPA/State agreement for TMDL development (Appendix F).

### Policies and Principles

To achieve the water quality goals of the Clean Water Act, EPA's first objective is to ensure that technology-based controls on point sources are established and maintained. Where such controls are insufficient to attain and maintain water quality standards, water quality-based controls are required. Under the authority of section 303(d) of the Clean Water Act, EPA expects States to develop TMDLs for their water quality-limited waters where technology-based effluent limitations or other legally required pollution control mechanisms are not sufficient or stringent enough to implement the water quality standards applicable to such waters.

More intensive assessments of water quality and an evaluation of pollution sources should be conducted where water quality standard violations occur or where indications of declining water quality or habitat loss are observed. A TMDL should be developed and appropriate control actions taken on all pollution sources and follow-up monitoring should be conducted to assure that water quality standards are met. If follow-up monitoring indicates that water quality standards are not or will not be met, a revised TMDL is required.

Lack of information about certain types of pollution problems (for example, those associated with nonpoint sources or with certain toxic pollutants) should not be used as a reason to delay implementation of water quality-based controls. When developed according to a phased approach, the TMDL can be used to establish load reductions where there is impairment due to nonpoint sources or where there is a lack of data or adequate modeling. EPA regulations provide that load allocations for nonpoint sources may be based on "gross allotments" (40 CFR 130.2(g)) depending on the availability of data and appropriate techniques for predicting loads. In addition, before approving a TMDL in which some of the load reductions are allocated to nonpoint sources in lieu of additional load reductions allocated to point sources, there must be specific assurances that the nonpoint source reductions will in fact occur. Therefore, this guidance provides that in specific situations, the TMDL must include a schedule for the implementation of control mechanisms, monitoring, and assessment of standards attainment. If standards are not attained, a TMDL revision is required. Data collected through monitoring would then be useful in revising the TMDL. While this phased ap-

*2*

Exhibit N

---

## PRINCIPLES

**Biennial Submission of Lists.** Every two years, States will submit their required 303(d) identification of water quality-limited waters still needing TMDLs including a priority ranking of waterbodies to EPA. These lists may be included with a State's biennial 305(b) report or as a separate report submitted at the same time as the 305(b) report. (See page 27.)

**Priority TMDLs.** Along with the biennial submission of 303(d) lists, States will identify high priority waters targeted for TMDL development over the next two years. (See page 29.)

**Approach for TMDL Development.** When specific criteria are met, a TMDL with additional specifications for monitoring and implementation under the phased approach should be developed to provide for immediate pollution reduction and for collection of additional information. (See page 14 and 22.)

**Implementation of Controls Based on TMDLs.** States will continue to improve and maintain point source controls through WLAs and NPDES permits while implementing and maintaining nonpoint source controls through LAs and State or local requirements (see page 23.)

**Nonpoint Source Controls.** LAs for nonpoint sources will be accompanied by a description of nonpoint source load reduction goals and the procedure for reviewing and revising nonpoint source controls. Such descriptions will be referenced in reviewing TMDLs for approval. (See page 24.)

**Time Schedule.** TMDLs will be developed on a schedule negotiated with EPA Regional offices. Time schedules for the review of TMDLs will also be negotiated with EPA Regional offices, but will occur within the statutory requirement of 30 days. (See pages 29 and 32.)

**Geographic Targeting.** States should develop TMDLs that account for both point and nonpoint sources on a geographically targeted waterbody basis. Geographically targeted waterbodies could include segments, basins, and watersheds as defined by the States. (See page 14.)

**Threatened Good Quality Waters.** States are expected to include threatened good quality waters in their identification and prioritization of waters still needing TMDLs. (See page 12.)

**Public Participation.** States are expected to ensure appropriate public participation in the TMDL development and implementation process. (See page 30.)

**Environmental Indicators.** States should measure the effectiveness of control actions by monitoring changes in ambient water quality or biological conditions. Measuring environmental progress or showing environmental results is a critical need and has become a key element in EPA's strategic planning process.

---

proach requires additional monitoring of the waterbody to evaluate the effectiveness of nonpoint source management measures or more stringent effluent limitations, it does not delay the establishment of such control mechanisms where there is a lack of information.

As required by the Clean Water Act, States are to identify and report to EPA their water quality-limited waters. These waters are to be identified according to the provisions established in EPA's Water Quality Management and Planning Regulation at 40 CFR 130.7(b). The identified waters should include those impaired due to point and non-point sources and may include threatened good quality waters. EPA is establishing with this guidance that States should submit to EPA, in conjunction with the 305(b) water quality assessment reports, in April of 1992, the list of water quality-limited waters that still require TMDLs. Every two years thereafter, a State should update its list of 303(d) waters and submit it with the 305(b) report. This guidance describes in detail the identification process and the specific information that should be submitted to EPA.

Exhibit N [3]

As required by the Clean Water Act, States are to rank by priority all waters needing TMDLs. Since each State has a unique organizational arrangement for the protection of water quality, this guidance does not prescribe how a State should set its priorities. However, priority ranking should result in the identification of targeted waterbodies for which immediate TMDL development should be undertaken. In the biennial submission of their updated list of 303(d) waters, EPA expects States to identify the waters targeted for TMDL development in the forthcoming two years.

Historically, the water quality-based pollution control program has focused on reducing the load of chemical contaminants (e.g. nutrients, biochemical oxygen demand, metals) to waterbodies. EPA has defined the terms load, loading capacity, and load allocation in regulations and technical guidance documents so that wasteload allocations can be calculated. Chemical contaminant problems will continue to constitute a major portion of pollution control efforts and the terms "load" and "load reduction" are used throughout this document. However, it is becoming increasingly apparent that in some situations water quality standards -- particularly designated uses and biocriteria -- can only be attained if non-chemical factors such as hydrology, channel morphology, and habitat are also addressed. EPA recognizes that it is appropriate to use the TMDL process to establish control measures for quantifiable non-chemical parameters that are preventing the attainment of water quality standards. Control measures, in this case, would be developed and implemented to meet a TMDL that addresses these parameters in a manner similar to chemical loads. As methods are developed to address these problems, EPA and the States will incorporate them into the TMDL process.

The principles (see page 3) established by EPA in this guidance reflect these policies

and reaffirm the existing regulatory requirements. They are intended to help States manage their surface water quality programs in a manner consistent with the intent and requirements of section 303(d) of the CWA and the Water Quality Planning and Management Regulations in 40 CFR 130. These principles are discussed throughout this guidance.

### Clean Water Act Section 303(d)

Section 303(d) of the Act (see next page) requires States to identify waters that do not or are not expected to meet applicable water quality standards with technology-based controls alone. Waters impacted by thermal discharges are also to be identified. States are required to establish a priority ranking for these waters, taking into account the pollution severity and designated uses of the waters.

Once the identification and priority ranking of water quality-limited waters are completed, States are to develop TMDLs at a level necessary to achieve the applicable State water quality standards. Completed TMDLs must allow for seasonal variations and a margin of safety that accounts for any lack of knowledge concerning the relationship between effluent limitations and water quality.

States are required to submit to EPA the "waters identified and loads established" for review and approval by EPA. If disapproved, EPA will establish the TMDLs at levels necessary to implement the applicable water quality standards. For waters that are not identified under sections 303(d)(1)(A) and (1)(B) as being water quality-limited, States are to estimate TMDLs for information purposes.

Subsections 4(A) and (B) were added to CWA section 303(d) with the 1987 amendments in order to ensure consistency with the water quality standards process for use clas-

4

Exhibit N

# FEDERAL WATER POLLUTION CONTROL ACT
## Section 303(d)

*(1)(A) Each State shall identify those waters within its boundaries for which the effluent limitations required by section 301(b)(1)(A) and section 301(b)(1)(B) are not stringent enough to implement any water quality standard applicable to such waters. The State shall establish a priority ranking for such waters, taking into account the severity of the pollution and the uses to be made of such waters.*

*(B) Each State shall identify those waters or parts thereof within its boundaries for which controls on thermal discharges under section 301 are not stringent enough to assure protection and propagation of a balanced indigenous population of shellfish, fish, and wildlife.*

*(C) Each State shall establish for the waters identified in paragraph (1)(A) of this subsection, and in accordance with the priority ranking, the total maximum daily load, for those pollutants which the Administrator identifies under section 304(a)(2) as suitable for such calculation. Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.*

*(D) Each State shall estimate for the waters identified in paragraph (1)(B) of this subsection the total maximum daily thermal load required to assure protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife. Such estimates shall take into account the normal water temperatures, flow rates, seasonal variations, existing sources of heat input, and the dissipative capacity of the identified waters or parts thereof. Such estimates shall include a calculation of the maximum heat input that can be made into each such part and shall include a margin of safety which takes into account any lack of knowledge concerning the development of thermal water quality criteria for such protection and propagation in the identified waters or parts thereof.*

*(2) Each State shall submit to the Administrator from time to time, with the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 304(a)(2)(D), for his approval the waters identified and the loads established under paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) of this subsection. The Administrator shall either approve or disapprove such identification and load not later than thirty days after the date of submission. If the Administrator approves such identification and load, such State shall incorporate them into its current plan under subsection (e) of this section. If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.*

*(3) For the specific purpose of developing information, each State shall identify all waters within its boundaries which it has not identified under paragraph (1)(A) and (1)(B) of this subsection and estimate for such waters the total maximum daily load with seasonal variations and margins of safety, for those pollutants which the Administrator identifies under section 304(a)(2) as suitable for such calculation and for thermal discharges, at a level that would assure protection and propagation of a balanced indigenous population of fish, shellfish and wildlife.*

*(4) LIMITATIONS ON REVISION OF CERTAIN EFFLUENT LIMITATIONS.--*

*(A) STANDARD NOT ATTAINED.--For waters identified under paragraph (1)(A) where the applicable water quality standard has not yet been attained, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section may be revised only if (i) the cumulative effect of all such revised effluent limitations based on such total maximum daily load or waste load allocation will assure the attainment of such water quality standard, or (ii) the designated use which is not being attained is removed in accordance with regulations established under this section.*

*(B) STANDARD ATTAINED.--For waters identified under paragraph (1)(A) where the quality of such waters equals or exceeds levels necessary to protect the designated use for such waters or otherwise required by applicable water quality standard, any effluent limitation based on a total maximum daily load or other waste load allocation established under this section, or any water quality standard established under this section, or any other permitting standard may be revised only if such revision is subject to and consistent with the antidegradation policy established under this section.*

Exhibit N   5

sification and with the NPDES antibacksliding requirements.

### Water Quality Planning and Management Regulation

EPA's Water Quality Planning and Management Regulation at 40 CFR Part 130 establishes the program and policies that implement CWA section 303(d) requirements. Section 130.7 describes the TMDL process and the State's responsibility for identifying waters still requiring TMDLs, setting priorities and developing TMDLs, submitting the waters identified with priority rankings and the TMDLs to EPA for approval, and the incorporation of the TMDLs into the State's Water Quality Management Plan.

To implement the program, the regulation establishes the following definitions for loading capacity, load allocation, wasteload allocation, total maximum daily load, water quality-limited segments and water quality-limited segments still requiring TMDLs. A definition for margin of safety (MOS) is also provided.

**Loading capacity (LC)** -- The greatest amount of loading that a water can receive without violating water quality standards. (40 CFR 130.2(f))

**Load allocation (LA)** -- The portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources. Load allocations are best estimates of the loading, which may range from reasonably accurate estimates to gross allotments, depending on the availability of data and appropriate techniques for predicting the loading. Wherever possible, natural and nonpoint source loads should be distinguished. (40 CFR 130.2(g))

**Wasteload allocation (WLA)** -- The portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution. WLAs constitute a type of water quality-based effluent limitation. (40 CFR 130.2(h))

**Total maximum daily load (TMDL)** -- The sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background. If a receiving water has only one point source discharger, the TMDL is the sum of that point source WLA plus the LAs for any nonpoint sources of pollution and natural background sources, tributaries, or adjacent segments. TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure that relate to a State's water quality standard. If Best Management Practices (BMPs) or other nonpoint source pollution control actions make more stringent load allocations practicable, then WLAs can be made less stringent. Thus, the TMDL process provides for nonpoint source control tradeoffs. (40 CFR 130.2(i))

*In practice, the terms TMDL and WLA have at times been incorrectly used interchangeably instead of considering both LA and WLA as components of a TMDL. A TMDL, as referenced in this guidance, includes both WLAs and LAs, established in accordance with EPA's regulations.*

**Water quality-limited segments** -- Those water segments that do not or are not expected to meet applicable water quality standards even after the application of technology-based effluent limitations required by sections 301(b) and 306 of the Act. (40 CFR 130.2(j))  Technology-based controls include, but are not limited to, best practicable control technology currently available (BPT) and secondary treatment.

**Water quality-limited segments still requiring TMDLs** -- Segments identified through a process established by paragraph

Exhibit N

130.7(b)(1) of EPA's Water Quality Planning and Management Regulation. Waters need TMDLs when certain specified pollution reduction requirements (identified in the regulation under subparagraphs (b)(1)(i), (ii), and (iii)) are not stringent enough to implement water quality standards for such waters. The specified pollution controls include technology-based effluent limitations required by sections 301(b) and 306 of the Clean Water Act and other appropriate requirements that can provide a more stringent level of treatment than federally-required technology-based effluent limitations. (40 CFR 130.7(b)(1))

*This document contains the terms 303(d) waters and 303(d) lists. These waters (and waters on the 303(d) lists) are those water quality-limited segments that still require TMDLs as defined by the regulation. Thus, a water segment that meets its water quality standards after the implementation of water quality-based control actions would retain its water quality-limited status but would no longer be on a State's 303(d) list of waters still requiring TMDLs.*

**Margin of Safety (MOS)** -- A required component of the TMDL that accounts for the uncertainty about the relationship between the pollutant loads and the quality of the receiving waterbody. (CWA section 303(d)(1)(C)) The MOS is normally incorporated into the conservative assumptions used to develop TMDLs (generally within the calculations or models) and approved by EPA either individually or in State/EPA agreements. If the MOS needs to be larger than that which is allowed through the conservative assumptions, additional MOS can be added as a separate component of the TMDL (in this case, quantitatively, a TMDL = LC = WLA + LA + MOS).

Exhibit N    *7*

# CHAPTER 2 - THE WATER QUALITY-BASED APPROACH TO POLLUTION CONTROL

The Water Quality Planning and Management Regulation (40 CFR 130) links a number of Clean Water Act sections, including section 303(d), to form the water quality-based approach to protecting and cleaning up the nation's waters (diagrammed in Figure 1). This chapter describes the overall approach for the development of TMDLs and subsequent implementation of water quality-based point and nonpoint source pollution control measures based on water quality standards. Other related guidance on various aspects of the water quality-based approach are described in Appendix A.

The water quality-based approach emphasizes the overall quality of water within a waterbody and provides a mechanism through which the amount of pollution entering a waterbody is controlled based on the intrinsic conditions of that body of water and the standards set to protect it. This approach begins with the determination of waters not meeting (or not expected to meet) water quality standards after the implementation of technology-based controls (such as BPT and secondary treatment). Waters identified through this process are considered water quality-limited and must be prioritized. An overall plan to manage the excess pollutants in each waterbody can then be developed. The necessary limitations on the introduction of pollutants to the waterbody are identified through the development of a TMDL under section 303(d).

Previous practices for implementing 303(d) have focused primarily on point sources and wasteload allocations (WLA). All water quality-based permit limits are based on a WLA. The WLA is either reviewed individually by EPA or where there exists a State/EPA technical agreement, is developed consistent with that agreement.[1] In recent years nonpoint source contributions to water quality problems have become better understood and it is now clear that EPA and State implementation of 303(d) must encompass nonpoint source pollution problems and seek to address problems occurring over large geographic areas. As a consequence, this document describes a more rigorous process for implementing 303(d) and reinforces the need to develop TMDLs that include load allocations (LA) as well as wasteload allocations.

As shown in Figure 1, the water quality-based approach contains the following steps:

1. Identification of water quality-limited waters still requiring TMDLs.

2. Priority ranking and targeting.

3. TMDL development.

---

1     USEPA. 1985. Guidance for State Water Monitoring and Wasteload Allocation Program. OW/OWRS, EPA 440/4-85-031. Washington, D.C.

Exhibit N⁹

**Figure 1**
## General Elements of the
## Water Quality-Based Approach



Note: TMDL development for targeted waterbodies is summarized in Figure 2 (p.21)

10

Exhibit N

4. Implementation of control actions.

5. Assessment of water quality-based control actions.

Steps 1, 2, and 3 are addressed by the CWA in section 303(d). Steps 4 and 5 are integral parts of the process and are briefly described in this document.

States are to review and revise water quality standards, as necessary, every three years and NPDES permits are to be re-evaluated and issued every five years. The water quality-based approach links these two processes and is, therefore, an ongoing process of evaluation and modification. In addition to standards and permits revisions, section 319(b) nonpoint source (NPS) management plans can and should be continually updated as well.

### Step One:    Identification of Water Quality-Limited Waters

The water quality-based approach to pollution control begins with the identification of problem waterbodies. State water quality standards form the basis and "yardstick" by which States can assess the waterbody status and implement needed pollution controls. State water quality standards include three elements: designated uses for the water-body, criteria (physical, chemical, and biological) to protect the designated uses, and an antidegradation statement. States need to identify those waters not meeting any one of these components of water quality standards.

EPA's Water Quality Planning and Management Regulation establishes the process for identifying water quality-limited segments still requiring TMDLs. Waters require TMDLs when certain pollution control requirements (see box) are not stringent enough to implement water quality standards for such waters.

---

**Identifying Waters Still Requiring TMDLs: 40 CFR 130.7(b)**

(b)(1) Each State shall identify those water quality segments still requiring WLAs/LAs and TMDLs within its boundaries for which:

(i)  Technology-based effluent limitations required by sections 301(b), 306, 307, or other sections of the act;

(ii)  More stringent effluent limitations (including prohibitions) required by either State or local authority preserved by section 510 of the Act, or Federal authority (e.g., law, regulation, or treaty); and

(iii) Other pollution control requirements (e.g., best management practices) required by local, State, or Federal authority

are not stringent enough to implement any water quality standard applicable to such waters.

---

The most widely applied water pollution controls are the technology-based effluent limitations required by section 301(b) and 306 of the Clean Water Act. In some cases, a State or local authority may establish enforceable requirements beyond technology-based controls. Examples of such requirements may be those that (1) provide more stringent NPDES permit limitations to protect a valuable water resource or (2) provide for the management of certain types of nonpoint source pollution.

To exempt a water quality-limited water from the TMDL process, the pollution control requirements cited in the regulation under 130.7(b)(i),(ii), and (iii) (see box) must be established and enforced by Federal, State, or local laws or regulations and be stringent enough that, when applied, the receiving waterbody will meet water quality standards. These requirements must also be specifically applicable to the particular water quality problem and, if not yet implemented, a schedule for the timely implementation of

*11*

Exhibit N

such requirements must be established. Chapter 4 contains more specific requirements pertaining to identification of water quality-limited waters still requiring TMDLs (see p. 27).

Identification of threatened good quality waters is an important part of this approach. Adequate control of new discharges from either point or nonpoint sources should be a high priority for States to maintain the existing use or uses of these waterbodies. In the identification of threatened waters it is important that the 303(d) process consider the water quality standards program to ensure that a State's antidegradation policies as established in State law are followed.

By identifying threatened good quality waters, States take a more proactive, "pollution prevention" approach to water quality management (see below).

---

### Pollution Prevention Advantages

Consistent with 40 CFR 130.7 (c)(1)(ii) which requires that TMDLs be established for all pollutants that prevent or are expected to prevent water quality standards from being achieved.

Encourages States to maintain and protect existing water quality.

Easier and less costly in the long term to prevent impairments rather than retrofit controls to clean up pollution problems.

Meets EPA objectives to support the State's collection of data on impacted or threatened waters.

---

Each State may have different methods for identifying and compiling information on the status of its waterbodies depending on its specific programmatic or cross-programmatic needs and organizational arrangements. Typically, States utilize both existing information and new data collected from on-

going monitoring programs to assess whether water quality standards are being met, and to detect trends.

States assess their waters for a variety of purposes, including the targeting of cleanup activities, assessing the extent of contamination at potential Superfund sites, and for meeting federally mandated reporting requirements. While the identification of water quality-limited waters may appear to be a major task for the States, a significant amount of this work has already begun or has been completed under sections 305(b), 304(l), 314(a), and 319(a) of the Clean Water Act as amended in 1987. (Appendix B provides a summary of these supporting CWA programs.)

Section 305(b) requires States to prepare a water quality inventory every two years to document the status of waterbodies that have been assessed. Under section 304(l), States identified all surface waters adversely affected by toxic (65 classes of compounds), conventional (such as BOD, total suspended solids, fecal coliform, and oil and grease), and nonconventional (such as ammonia, chlorine, and iron) pollutants from both point and nonpoint sources. Under section 314(a), States identified a list of publicly owned lakes for which uses are known to be impaired by point and nonpoint sources. Section 319 State Assessment Reports identified waters adversely affected by nonpoint sources of pollution. Lists prepared to satisfy requirements under section 305(b), 304(l), 314(a) and 319 should be very useful in preparing 303(d) lists.

Other existing and readily available data and information sources should be utilized in preparing section 303(d) lists. See, for example, Appendix C, which presents screening categories similar to those found in current regulations promulgating the 304(l) requirements.[2] Figure C-1 in the Appendix depicts a sample process for identify-

---

2    40 CFR 130.10 (d)(6)

*12*

Exhibit N

ing 303(d) waters. Other data sources are listed as an appendix of the Final Guidance for Implementation of Requirements Under Section 304(l) of the Clean Water Act as Amended, March 1988. The Toxic Chemical Release Inventory (TRI) developed under Title III, Superfund and Reauthorization Act (SARA) is an important information source as well as any relevant State-run database.

Section 303(d) requires States to identify those water quality-limited waters needing TMDLs. States should regularly update their lists of waters (or the databases which store the information to produce the lists) as assessments are made and report these lists to EPA once every two years. States should include, in their biennial 303(d) lists, information on which waterbodies have been added or deleted from the list and which waterbodies were assessed since the last reporting period. (See page 27 for further details on submission of lists to EPA.)

### Step Two:   *Priority Ranking and Targeting*

Once waters needing additional controls have been identified, a State prioritizes its list of waters using established ranking processes that should consider all water pollution control activities within the State. Priority ranking has traditionally been a process defined by the State and may vary in complexity and design. A priority ranking should enable the State to make efficient use of its available resources and meet the objectives of the Clean Water Act.

The Clean Water Act states that the priority ranking for such waters must take into account the severity of the pollution and the uses to be made of such waters. Several documents (see box) are available from EPA to assist States in priority setting.

---

**Priority Setting Documents**

Setting Priorities: The Key to Nonpoint Source Control (OWRS, July 1987).

Selecting Priority Nonpoint Source Projects: You Better Shop Around (OW and OPPE, August 1989, EPA 506/2-89/003).

The Lake and Reservoir Restoration and Guidance Manual, First Edition (OWRS, EPA 440/5-88-002).

The Lake and Reservoir Restoration and Guidance Manual, Second Edition (OWRS, EPA 440/4-90-006).

State Clean Water Strategies: Meeting the Challenges for the Future (OW, December 1988).

---

According to EPA's State Clean Water Strategy document: "Where all water quality problems cannot be addressed immediately, EPA and the States will, using multi-year approaches, set priorities and direct efforts and resources to maximize environmental benefits by dealing with the most serious water quality problems and the most valuable and threatened resources first."

Targeting high priority waters for TMDL development should reflect an evaluation of the relative value and benefit of waterbodies within the State and take into consideration the following:

- Risk to human health and aquatic life.

- Degree of public interest and support.

- Recreational, economic, and aesthetic importance of a particular waterbody.

- Vulnerability or fragility of a particular waterbody as an aquatic habitat.

*13*

Exhibit N

- Immediate programmatic needs such as wasteload allocations needed for permits that are coming up for revisions or for new or expanding discharges, or load allocations for needed BMPs.

- Waters and pollution problems identified during the development of the section 304(l) "long list."

- Court orders and decisions relating to water quality.

- National policies and priorities such as those identified in EPA's Annual Operating Guidance.

---

**Advantages to Long-range Schedules**

- Encourages integration with the permitting cycle, the water quality standards revisions, and other required water quality management activities.

- Allows for long-term monitoring which may be needed to assess control action.

- Sets consistency in developing TMDLs.

- Establishes a basis for setting overall water quality management priorities.

- Supports a geographic approach for TMDL development for targeted waterbodies.

---

States are required to submit their priority rankings to EPA for review. EPA expects all waters needing TMDLs to be ranked, with "high" priority waters -- targeted for TMDL development within two years following the listing process -- identified. (See page 29 for further details on submission of priorities to EPA.)

In order to effectively develop and implement TMDLs for all waters identified, States should establish multi-year schedules that take into consideration the immediate TMDL development for targeted waterbodies and the long-range planning for addressing all water quality-limited waters still requiring TMDLs. While it would be expected that these schedules would change when a State's priorities change in response to "hot spots" or critical situations at any given time, a long-range schedule provides several advantages to a State (see box).

***Step Three: TMDL Development***

For a water quality-limited water that still requires a TMDL, a State must establish a TMDL that quantifies pollutant sources and allocates allowable loads to the contrib-

uting point and nonpoint sources so that the water quality standards are attained for that waterbody. The development of TMDLs should be accomplished by setting priorities, considering the geographic area impacted by the pollution problem, and, in some cases, using a phased approach to establishing control measures based on the TMDL.

The TMDL is developed using one or a combination of three technical approaches to protect receiving water quality: the chemical specific approach, the whole effluent toxicity approach, and the biocriteria/bioassessment approach. The chemical specific approach is one where loadings are evaluated in terms of the impact on physical-chemical water quality conditions (e.g., dissolved oxygen or toxicant concentrations). While an integrated approach that considers all three techniques is preferred for the protection of aquatic life, the chemical specific approach is usually the one used to address loads that affect those water quality standards which protect human health.

Many water pollution concerns are area-wide phenomena that are caused by multiple dischargers, multiple pollutants (with poten-

*14*

Exhibit N

tial synergistic and additive effects), or non-point sources. Atmospheric deposition and ground water discharge may also result in significant pollutant loadings to surface waters. As a result, EPA recommends that States develop TMDLs on a geographical basis (e.g., by watershed) in order to efficiently and effectively manage the quality of surface waters.

The TMDL process is a rational method for weighing the competing pollution concerns and developing an integrated pollution reduction strategy for point and nonpoint sources. The TMDL process allows States to take a holistic view of their water quality problems from the perspective of instream conditions. Although States may define a waterbody to correspond with their current programs, it is expected that States will consider the extent of pollution problems and sources when defining the geographic area for developing TMDLs. In general, the geographical approach for TMDL development supports sound environmental management and efficient use of limited water quality program resources. In cases where TMDLs are developed on watershed levels, States should consider modifying permitting cycles so that all permits in a given watershed expire at the same time.

For traditional water pollution problems, such as dissolved oxygen depletion and nutrient enrichment, there are well validated models that can predict effects with known levels of uncertainty. This is not true for such non-traditional pollution problems as urban stormwater runoff and pollutants that involve sediment and bioaccumulative pathways. Predictive modeling for these problems therefore uses conservative assumptions, but in many cases the degree of certainty cannot be well quantified until

more data becomes available to develop sensitivity analyses and model comparisons. For TMDLs involving these non-traditional problems, the margins of safety should be increased and additional monitoring required to verify attainment of water quality standards and provide data needed to recalculate the TMDL, if necessary.

EPA regulations provide that load allocations for nonpoint sources and/or natural background "are best estimates of the loading which may range from reasonably accurate estimates to gross allotments..."[3] A phased approach to developing TMDLs may be appropriate where estimates are based on limited information. The phased approach is a TMDL that includes monitoring requirements and a schedule for re-assessing TMDL allocations to ensure attainment of water quality standards. Uncertainties that cannot be quantified may also exist for certain pollutants discharged primarily by point sources. In such situations a large margin of safety and follow-up monitoring is appropriate.

Where nonpoint source controls are involved, the phased approach is also necessary. Under the CWA, the only federally enforceable controls are those for point sources through the NPDES permitting process. In order to allocate loads among both nonpoint and point sources, there must be reasonable assurances that nonpoint source reduction will in fact be achieved. Where there are not reasonable assurances, under the CWA, the entire load reduction must be assigned to point sources. With the phased approach, the TMDL includes a description of the implementation mechanisms and the schedule for the implementation of nonpoint source control measures.

---

3    40 CFR 130.2(g).

Exhibit N

By pursuing the phased approach where applicable, a State can move forward to implement water quality-based control measures and adopt an explicit schedule for implementation and assessment. States can also use the phased approach to address a greater number of waterbodies including threatened waters or watersheds which would otherwise not be managed. Specific requirements relating to the phased approach are discussed in Chapter 3.

### Step Four:  *Implementation of Control Actions*

Once a TMDL or a phased TMDL has been established for a waterbody (or watershed) and the appropriate source loads developed, implementation of control actions should proceed. The State or EPA is responsible for implementation, the first step being to update the water quality management plan. Next, point and nonpoint source controls should be implemented to meet wasteload allocations and load allocations, respectively. Various pollution allocation schemes (i.e., determination of allowable pollution among different pollution sources in the same waterbody) can be employed by States to optimize alternative point and nonpoint source management strategies.

The NPDES permitting process is used to limit effluent from point sources. Chapter 3 provides a more complete description of the NPDES process and how it fits into the water quality-based approach to permitting. Construction decisions regarding publicly owned treatment works (POTWs) and advanced treatment facilities must also be based on the most stringent of technology-based or water quality-based limitations. These decisions should be coordinated so that the facility plan for the discharge is consistent with the limitations in the permit.

In the case of nonpoint sources, both State and local laws may authorize the implementation of nonpoint source controls such as the installation of Best Management Practices (BMPs). Section 319 State management programs can be a useful tool to implement nonpoint source control measures and ensure improved water quality. Many BMPs, however, may be implemented even where regulatory programs do not exist. In such cases, a State needs to document the coordination which may be necessary among State and local agencies, landowners, operators, and managers and then evaluate BMP implementation, maintenance, and overall effectiveness to ensure that load allocations are achieved. Chapter 3 discusses some of the technical issues associated with implementation of nonpoint source control measures.

### Step Five:  *Assessment of Water Quality-Based Control Actions*

Throughout the previous four steps, monitoring is a crucial element of water quality-based decision making. In this step, monitoring provides data for an independent evaluation of whether the TMDL and control actions that are based on the TMDL protect or improve the environment and are sufficient to meet changing waterbody protection requirements such as revised water quality standards or changing pollution sources (e.g., urbanization).

Monitoring programs often begin with baseline monitoring. Such monitoring should not be regarded as a prerequisite to implementing control measures for a waterbody. If monitoring has not yet begun, control measures and monitoring should be implemented simultaneously to assure that pollution abatement activities are not delayed.

In the case of point sources, assessments are facilitated in that dischargers are required to provide reports on compliance

*16*

Exhibit N

with NPDES permit limits. In some in-
stances, dischargers may also be required in
the permit to assess impact of their discharge
on the receiving water. A monitoring re-
quirement can be put into the permit as a
special condition as long as the information
is collected for purposes of writing a permit
limit. States are also encouraged to use in-
novative monitoring programs (e.g., cooper-
ative monitoring[4] and volunteer
monitoring[5]) to provide for adequate point
and nonpoint source monitoring coverage.

States should also ensure that effective
monitoring programs are in place for evalu-
ating nonpoint source control measures.
EPA recognizes monitoring as a high priority
activity in a State's nonpoint source manage-
ment program.[6] To facilitate the im-
plementation and evaluation of NPS
controls States should consult current guid-
ance.[7][8]

---

4     USEPA. 1984. Planning and Managing Cooperative Monitoring Projects. OW/OWRS. EPA
       440/4-84-018. Washington, D.C.
5     USEPA. 1990. Volunteer Water Monitoring: A Guide for State Managers. OW, EPA 440/4-90-010.
       Washington, D.C.
6     55 FR 35262, August 28, 1990.
7     USEPA. February, 1988. Draft Nonpoint Source Monitoring and Evaluation Guide. OW/NPS Branch.
       Washington, D.C.
8     USEPA. September 19, 1989. Nonpoint Source Monitoring and Reporting Requirements for Watershed
       Implementation Grants. OW/NPS Branch. Washington, D.C.

Exhibit N   *17*

# CHAPTER 3 - DEVELOPMENT AND IMPLEMENTATION OF THE TMDL

## Development of the TMDL

The TMDL process is an important element of the water quality-based approach. It links the development and implementation of control actions to the attainment of water quality standards. This chapter expands the discussion introduced in Chapter 2 on how to develop TMDLs and implement controls for water quality-limited waters. Appendix D and E provide supporting information on some important technical considerations and EPA supported models for TMDL development.

### The TMDL Objective

As stated in 40 CFR 131.2, "[water quality] standards serve the dual purposes of establishing the water quality goals for a specific waterbody and serve as the regulatory basis for the establishment of water-quality-based treatment controls and strategies beyond the technology-based levels of treatment required by section 301(b) and 306 of the Act." Standards also contain antidegradation provisions to prevent the degradation of existing water quality.

The objective of a TMDL is to allocate allowable loads among different pollutant sources so that the appropriate control actions can be taken and water quality standards achieved. The TMDL provides an estimate of pollutant loadings from all sources and predicts the resulting pollutant concentrations. The TMDL determines the allowable loads and provides the basis for establishing or modifying controls on pollutant sources.

### The TMDL Process

The total pollutant load to a waterbody is derived from point, nonpoint, and background sources. Pollutant loads may be transported into waterbodies by direct discharge, overland flow, ground water, or atmospheric deposition. The TMDL concept has successfully been applied to develop wasteload allocations for point source discharges in low flow situations where nonpoint sources are not a concern. TMDLs can and should be used, however, to consider the effect of all activities or processes that cause or contribute to the water quality-limited conditions of a waterbody. Activities may relate to thermal changes, flow changes, sedimentation, and other impacts on the aquatic environment. Control measures to implement TMDLs, therefore, are not limited to NPDES authorities but should also be based on State and local authorities and actions to reduce nonpoint source pollution.

An example of how to apply such a TMDL might be in the control of excess sediment which causes loss of a beneficial use of a waterbody. If standards, established to protect against the loss of a beneficial use (e.g., fish spawning), are not met and, if the process causing the problem (i.e., excess sedimentation) can be quantified, then it may be appropriate to use the TMDL process to assess the adverse impacts and potentially set controls on the problem activity. In this

*19*

Exhibit N

example, the activity might be urban development for which effective controls can be implemented to reduce sediment loading to the impacted waterbody.

The TMDL process distributes portions of the waterbody's assimilative capacity to various pollution sources -- including natural background sources and a margin of safety -- so that the waterbody achieves its water quality standards. The analyst may use predictive modeling procedures to evaluate alternative pollution allocation schemes in the same waterbody. By optimizing alternative point and nonpoint source control strategies, the cost effectiveness and pollution reduction benefits of allocation tradeoffs may be evaluated (see Appendix D). The approach normally used to develop a TMDL for a particular waterbody or watershed consists of five activities (see box).

---

**TMDL Development Activities**

● Selection of the pollutant to consider.

● Estimation of the waterbody assimilative capacity.

● Estimation of the pollution from all sources to the waterbody.

● Predictive analysis of pollution in the waterbody and determination of total allowable pollution load.

● Allocation (with a margin of safety) of the allowable pollution among the different pollution sources in a manner that water quality standards are achieved.

---

In developing a TMDL it is important to keep in mind certain constraints on the WLA portion that are imposed by antibacksliding regulatory provisions. The WLA will normally result in new or more stringent water quality-based limits than those contained in a previously issued permit. In a limited number of cases, however, it is conceivable that less stringent water quality-based limits could result. In these cases, permit limits must conform to the antibacksliding provisions contained in section 402(o) of the CWA.

*Selection of Approach*

Figure 2 illustrates the critical decisions and the appropriate steps in the TMDL process for developing load allocations and implementing and evaluating control actions. In some cases, as illustrated by the left side of the diagram, TMDL development can be straight-forward and relatively simple. In other cases, as depicted by the right side of the diagram, a phased approach may be more appropriate. Regardless of which path is followed, the allocation of loads and establishment of control actions should ensure that all water quality-limited waters will meet their standards.

Once a waterbody is selected for action, an analyst must decide if the available data and information about the sources, fate, and transport of the pollutant to be controlled is adequate. The level of effort and scientific knowledge needed to acquire adequate data and perform meaningful predictive analyses is often a function of the pollutant source, pollutant characteristics, and the geographical scale of the pollution problem. As described in Chapter 2, modeling the fate and transport of conventional pollutants (e.g. biochemical oxygen demand) and point source contributions is better developed than modeling for non-traditional pollution problems. For certain non-traditional problems, if there are not adequate data and predictive tools to characterize and analyze the pollution problem with a known level of uncertainty, a phased approach may be necessary.

The phased approach is required when the TMDL involves both point and nonpoint

*20*

**Figure 2  Development of TMDLs for Targeted Waterbodies**

sources and the point source WLA is based on a LA for which nonpoint source controls need to be implemented. There must be assurances that nonpoint source control measures will achieve expected load reductions in order to allocate a wasteload to a point source with a TMDL that also allocates expected nonpoint source load reductions. In this case, a phased approach is required because the TMDL that is developed has additional requirements that provide these assurances.

Despite the additional requirements of the phased approach, States may actually prefer it because the additional data collected can be used to verify expected load reductions, evaluate effectiveness of control measures, and ultimately determine whether a TMDL needs to be revised.

*The Phased Approach*

Under the phased approach, the TMDL has LAs and WLAs calculated with margins of safety to meet water quality standards. The allocations are based on estimates which use available data and information, but monitoring for collection of new data is required. The phased approach provides for further pollution reduction without waiting for new data collection and analysis. The margin of safety developed for the TMDL under the phased approach should reflect the adequacy of data and the degree of uncertainty about the relationship between load allocations and receiving water quality.

The TMDL, under the phased approach, includes (1) WLAs that confirm existing limits or would lead to new limits for point sources and (2) LAs that confirm existing controls or include implementing new controls for nonpoint sources. This TMDL requires additional data to be collected to determine if the load reductions required by the TMDL lead to attainment of water quality standards. Data collection may also be required to more accurately determine as-

similative capacities and pollution allocations.

In addition to the allocations for point and nonpoint sources, a TMDL under the phased approach will establish the schedule or timetable for the installation and evaluation of point and nonpoint source control measures, data collection, the assessment for water quality standards attainment, and, if needed, additional predictive modeling. The scheduling with this approach should be developed to coordinate all the various activities (permitting, monitoring, modeling, etc.) and involve all appropriate local authorities and State and Federal agencies. The schedule for the installation and implementation of control measures and their subsequent evaluations will include descriptions of the types of controls, the expected pollutant reductions, and the time frame within which water quality standards will be met and controls re-evaluated.

Where no monitoring program exists, or where additional assessments are needed, it is necessary for States to design and implement a monitoring plan. The objectives of the monitoring program should include assessment of water quality standards attainment, verification of pollution source allocations, calibration or modification of selected models, calculation of dilutions and pollutant mass balances, and evaluation of point and nonpoint source control effectiveness. In their monitoring programs, States should include a description of data collection methodologies and quality assurance/quality control procedures, a review of current discharger monitoring reports, and be integrated with volunteer and cooperative monitoring programs where possible. If properly designed and implemented, the monitoring program will result in a sufficient data base for assessment of water quality standard attainment and additional predictive modeling if necessary.

22

Exhibit N

*Approval of TMDLs by EPA*

TMDLs developed for all water quality-limited waters are submitted to EPA for review and approval. States are encouraged to coordinate with EPA prior to formal submission of their TMDLs. Chapter 4 explains EPA and State responsibilities for the review and approval process.

## Implementation of the TMDL

After identifying the necessary pollutant load reductions through the development of TMDLs and after approval by EPA, State water quality management plans should be updated and control measures implemented. This section provides a brief review of point and nonpoint source control implementation. Additional guidance is available and is referenced throughout the remainder of this chapter.

*NPDES Process for Point Sources*

Both technology-based and water quality-based controls are implemented through the National Pollutant Discharge Elimination System (NPDES) permitting process. Permit limits based on TMDLs are called water quality-based limits.

Wasteload allocations establish the level of effluent quality necessary to protect water quality in the receiving water and ensure attainment of water quality standards. Once allowable loadings have been developed through WLAs for specific pollution sources, limits are incorporated into NPDES permits. It is important to consider how the WLA addresses variability in effluent quality. On the one hand, allocations for nutri-

ents or bioaccumulative pollutants could be expressed as the required average effluent quality because the total loading of these pollutants is of concern. On the other hand, an allocation for toxic pollutants should be expressed as a shorter-term requirement because the concentration of these pollutants is typically of more concern than the total loading.[9]

As a result of the 1987 Amendments to the Act, Individual Control Strategies (ICSs) were established under section 304(l)(1) for certain point source discharges of priority toxic pollutants. ICSs consist of NPDES permit limits and schedules for achieving such limits, along with documentation showing that the control measures selected are appropriate and adequate (i.e., fact sheets including information on how water quality-based limits were developed, such as total maximum daily loads and wasteload allocations). Point sources with approved ICSs are to be in compliance with those ICSs as soon as possible or in no case later than three years from the establishment of the ICS (typically by 1992 or 1993).

The Clean Water Act (and corresponding State statutes) authorizes imposition of monitoring and data collection requirements on the owner or operator of a point source discharge. Requirements may include ambient and biological assessments, toxicity reduction evaluations, in-plant monitoring, etc. Needed data collection may be initiated through a direct request under Section 308 if there is a reasonable need for the information for EPA to carry out the objectives of the Clean Water Act. The request must also meet the Paperwork Reduction Act requirements. Information may also be

---

9    The reader is referred to the Permit Writer's Guide to Water Quality-based Permitting for Toxic Pollutants (July, 1987) and the Technical Support Document for Water Quality-based Toxics Control (1985) for additional information on deriving actual permit limits.

Exhibit N    23

---

### Examples of Best Management Practices

**AGRICULTURE**
Animal waste management
Conservation tillage
Contour farming
Contour strip cropping
Cover crops
Crop rotation
Fertilizer management
Integrated pest management
Livestock exclusion
Range and pasture management
Sod-based rotations
Terraces

**CONSTRUCTION**
Disturbed area limits
Nonvegetative soil stabilization
Runoff detention/retention
Surface roughening

**URBAN**
Flood storage
Porous pavements
Runoff detention/retention
Street cleaning

**SILVICULTURE**
Ground cover maintenance
Limiting disturbed areas
Log removal techniques
Pesticide/herbicide management
Proper handling of haul roads
Removal of debris
Riparian zone management
Road and skid trial management

**MINING**
Block-cut or haul-back
Underdrains
Water diversion

**MULTICATEGORY**
Buffer strips
Detention/sedimentation basins
Devices to encourage infiltration
Grassed waterway
Interception/diversion
Material ground cover
Sediment traps
Streamside management zones
Vegetative stabilization/mulching

---

collected through permit reporting requirements, or an administrative order. These authorities can be used to collect data from point sources when developing or assessing the effectiveness of a TMDL.

Permit requirements for data collection should be established when longer term data (e.g., for several seasons) are needed. The permit should include a statement that the permit can be modified or revoked and reissued if the data indicate an exceedance of State water quality standards.

*State or Local Process for Nonpoint Sources*

In addition to permits for point sources, nonpoint source controls may be established by implementing Best Management Practices (BMPs) so that surface water quality objectives are met. These controls should be based on LAs developed using the TMDL process. When establishing permits for point sources in the watershed, the record should show that in the case of any credit for future nonpoint source reductions, (1) there is reasonable assurance that nonpoint source controls will be implemented and maintained or (2) that nonpoint source reductions are demonstrated through an effective monitoring program. Assurances may include the application or utilization of local ordinances, grant conditions, or other enforcement authorities. For example, it may be appropriate to provide that a permit may be reopened for a WLA which requires more stringent limits because attainment of non-

*24*

Exhibit N

point source load allocation was not demonstrated.

In order to fully address waterbodies that are impaired or threatened by nonpoint source pollution, States should implement their nonpoint source management programs and ensure adoption of control measures (best management practices) by all contributors of nonpoint source pollution in those watersheds. Example BMPs are listed on the following page. State nonpoint source management programs may include, as appropriate, nonregulatory or regulatory programs for enforcement, technical assistance, financial assistance, education, training, technology transfer, and demonstration projects.

It is difficult to ensure, a priori, that implementing nonpoint source controls will achieve expected load reductions. Nonpoint source control measures may fail to achieve projected pollution or chemical load reductions due to inadequate selection of BMPs, inadequate design or implementation, or lack of full participation by all contributing sources of nonpoint pollution.[10] States should describe nonpoint source load reductions and establish a procedure for reviewing and revising BMPs in TMDL documentation. The key objective for documenting load reduction goals and review procedures is to establish a rational procedure for site-specific evaluation of waterbodies with significant nonpoint source pollution loads. States should consult additional nonpoint source guidance for assistance in developing appropriate monitoring and evaluation approaches.[11] [12]

### Assessment of the TMDL

Once control measures have been implemented, the impaired waters should be assessed to determine if water quality standards have been attained or are no longer threatened. The monitoring program used to gather the data for this assessment should be designed based on the specific pollution problems or sources. For example, past experience has shown that several years of data are necessary from agricultural nonpoint source watershed projects to detect trends (i.e., improvements) in water quality. As a result, long term monitoring efforts must be consistent over time in order to develop a data base adequate for analysis of control actions.

As shown in Figure 2, a TMDL that allocates loads and wasteloads to meet water quality standards must be established. If the waterbody does achieve the applicable State water quality standards, the waterbody may be removed from the 303(d) list of waters still needing TMDLs. If the water quality standards are not met, the TMDL and allocations of load and wasteloads must be modified. This modification should be based on the additional data and information gathered as required by the phased approach for developing a TMDL, where appropriate, as part of routine monitoring activities, and when assessing the waterbody for water quality standards attainment.

---

10  USEPA. July, 1987. Setting Priorities: The Key to Nonpoint Source Control. OW/OWRS, EPA. Washington, D.C.

11  USEPA. February, 1988. Draft Nonpoint Source Monitoring and Evaluation Guide. OW/NPS Branch, Washington, D.C.

12  USEPA. September 19, 1989. Nonpoint Source Monitoring and Reporting Requirements for Watershed Implementation Grants. OW/NPS Branch, Washington, D.C.

Exhibit N  *25*

# *CHAPTER 4 - EPA AND STATE RESPONSIBILITIES*

Effective implementation of water quality-based controls requires an integrated and cooperative partnership between EPA and the States. The main responsibility for water quality management resides with the States in the implementation of water quality standards, the administration of the NPDES program (where the State has received EPA approval to do so), and the management of nonpoint sources of pollution. When the authority to implement nonpoint source control measures is at the local level, interagency and intergovernmental coordination is especially important. The State should take the lead in facilitating and encouraging the cooperation of local authorities. EPA is responsible for ensuring that the Clean Water Act requirements are met through the enactment and enforcement of regulations, issuing program guidance, and providing technical assistance. The partnership developed between States and EPA should be tailored to meet individual State needs while also meeting the requirements of the Clean Water Act. This chapter describes specific State and EPA responsibilities in the partnership.

## *EPA/State Agreements*

EPA and the State should agree on the process to develop TMDLs and this process should be consistent with EPA technical guidance documents unless deviation from the guidance is technically justified. An agreement should be written which describes technical and administrative procedures (i.e., how background data are applied, how and which models are to be used, how TMDLs are developed, how loads should be allocated, etc.). (See Appendix F for a general EPA/State Agreement outline.) This agreement reduces the administrative burden of the EPA review and approval process (see "TMDL Review and Approval," p. 30).

## *State Responsibilities*

### *Identification of Water Quality-Limited Waters Still Requiring TMDLs*

According to section 303(d) of the Clean Water Act and EPA water quality planning and management regulations, States are required to identify waters that do not meet or are not expected to meet water quality standards even after technology-based or other required controls are in place. The waterbodies are considered water quality-limited and require TMDLs.

When a State reports its list of 303(d) waters, it is important that this list contain only those water quality-limited waters that still require TMDLs. Some water quality-limited waters may already have had sufficient controls established for them and currently meet water quality standards. These should not be on the list. In addition, the EPA regulations (40 CFR 130.7(b)) recognize the applicability of other appropriate pollution control requirements that can provide a more stringent level of control than technology-based effluent limitations.

When not listing a water quality-limited water a State must show that the controls specified by 40 CFR 130.7(b) (see p.11) are enforceable, specific to the pollution problems, and stringent enough to meet water

27

Exhibit N

quality standards. If the controls are not yet implemented, a State must provide a schedule for timely implementation.

The waters identified should be reported to EPA in the 305(b) water quality assessment reports due April 1 every even year. If a State prefers, the 303(d) list of waters can be submitted separately at the same time. While initially it may be convenient to build upon the reporting processes described in Chapter 2, the 303(d) list should be updated to reflect the latest monitoring and assessment data available.

To facilitate the reporting of 303(d) waters, the current section 305(b) Waterbody System (WBS), a tool used for reporting 305(b) information, contains fields already designated for this identification. The WBS provides a geographically based framework for entering, documenting, and reporting information on the quality of individual waterbodies as they are defined by each State. The primary function of the WBS is to document water quality assessments and the water quality status of waterbodies, including causes and sources of use impairment. As a convenience to the States, the WBS has been modified and will continue to be updated to include data fields on whether TMDLs are still needed or are in place. The WBS will also provide information to EPA to assist in tracing the development of TMDLs and overall program implementation.

**Identification of Causes and Sources of Pollution** - When identifying the 303(d) waters, the causes of the impairment also should be identified for each segment listed. The Waterbody System has two separate fields that provide further information on a particular water segment: "nonattainment causes" and "nonattainment sources." The "cause" field consists of a list of constituents or conditions that are causing nonattainment of water quality standards by a waterbody. The Waterbody System's Users Guide (third edition, version 2.0) contains 23 standard causes (see Appendix G) and includes such parameters or categories as pesticides, metals, ammonia, and pathogens. States may

develop their own user-defined codes by specifying additional codes under each standard cause.

Similarly, a field exists in the Waterbody System for identifying the sources of the pollutants or conditions that are listed under causes for the nonattainment of uses in the waterbody. Twelve general source categories are identified (see Appendix G) and include such things as industrial point sources, municipal point sources, combined sewer overflow, agriculture, and silviculture. The User's Guide also identifies 45 subcategories. Again the States may develop their own subcategories to describe causes of impairment of each water segment identified with this system. States should consult with the Guidelines for the Preparation of the 305(b) Report (to be issued every odd numbered year) and the Waterbody System User's Guide for guidance in developing and formatting their information.

**Documentation and Rationale for Listing** - Along with the list of 303(d) waters submitted to EPA, adequate documentation to support the listing of waters should be submitted. States have a number of readily available sources of data and information to use when compiling their lists (see pages 12 and 13). These sources, listed in Appendix C, should be used by States to develop their lists of 303(d) waters. However, additional information may be required under certain circumstances.

Documentation for listing should also provide a description of the methodologies used to develop the list, a description of the data and information used to identify water quality-limited waters, and a rationale for any decision to not use any one of the categories listed in Appendix C. It is not expected that each and every waterbody listed by a State be accompanied by the detailed documentation as described.

Adequate public participation should be a part of the listing process to make sure all water quality-limited waters are identified. This will support the State in defending its list of such waters should the need to do so

*28*

Exhibit N

arise, since, in its oversight responsibilities, EPA reserves the right to ask for additional information regarding the State's decision to not list particular waterbodies.

*Identification and Scheduling of Targeted Waterbodies*

Targeted waterbodies scheduled for TMDL development over the next two years are to be identified and reported along with the 303(d) list of waters that are submitted during the 305(b) reporting process. These high priority TMDLs are to be based on State developed priorities that consider the severity of the impact and the uses of the water along with the other considerations described in Chapter 2. State submissions which include the identification of 303(d) targeted waters are subject to review and approval or disapproval by EPA. EPA will expect the States to include public participation in the development of the list of high priority targeted waterbodies. Targeting waterbodies for control action should be a key component of a State's water quality management and planning programs. Waters that are identified in State annual work plans will be compared to the targeted waterbodies and will be considered by EPA during its review and approval of the annual work plans.

*TMDL Development*

Each State develops TMDLs for its water quality-limited waters. The procedure for TMDL approval by EPA is depicted in Figure 3. States should use EPA's technical support document and WLA technical guidance series (see Appendix A) when developing TMDLs. Alternative approaches can be used if they are technically defensible and approved by EPA.

For their TMDL submissions, States should include the proposed TMDLs, WLAs, LAs, and the supporting information that the Region will need to evaluate the State's water quality analysis and determine whether to approve or disapprove the submitted TMDLs. Regions and States should reach an agreement on the specific information needed prior to their submission. For a TMDL developed under the phased approach, States should also submit to EPA a description of the controls to be established, the schedule for data collection, establishment of the control measures, assessment for water quality standards attainment, and additional modeling if needed.

Quality assurance (QA) and quality control (QC) requirements should also be met. Specific technical QA/QC is necessary in the use of environmental data and models. However, when using models, such as wasteload allocation models which involve "real" environmental data as well as parametric and mathematical relationships, model sensitivity studies can help establish the levels of QA/QC required for specific data. For example, the allowable range of uncertainty in the data can be established through model sensitivity studies. This allowable range of uncertainty may indicate, for example, the need for tight limits on precision for a particular pollutant parameter. Further discussion is provided elsewhere.[13][14][15]

*Continuing Planning Process*

Each State is required to establish and maintain a continuing planning process (CPP) as described in section 303(e) of the

---

13   USEPA. September, 1980. Guidelines and Specifications for Preparing Quality Assurance Project Plans. QAMS-004/80. Washington, D.C.

14   USEPA. December, 1980. Interim Guidelines and Specifications for Preparing Quality Assurance Plans. QAMS-005/80. Washington, D.C.

15   USEPA. May, 1984. Guidance for Preparation of Combined Work/Quality Assurance Project Plans for Environmental Monitoring. OWRS QA-1. Washington, D.C.

Exhibit N [29]

**Figure 3  TMDL Development and Approval Procedure**



**Clean Water Act.** A State's CPP contains, among other items, a description of the process that the State uses to identify waters needing water quality-based controls, a priority ranking of these waters, the process for developing TMDLs, and a description of the process used to receive public review of each TMDL. Descriptions may be as detailed as the Regional office and the State determine is necessary to describe each step of the TMDL development process. This process may be included as part of the EPA/State Agreement for TMDL development.

*Water Quality Management Plan*

The State incorporates EPA approved and EPA established TMDLs into its Water Quality Management Plan (WQMP). The Water Quality Management and Planning regulation provides that when EPA approves or establishes a TMDL under section 303(d), the TMDL is automatically incorporated into the State's WQMP.[16]

*Public Notice and Participation*

In accordance with the Water Quality Management and Planning regulation and as

---

16    50 FR 1777, January 11, 1985 and 40 CFR 130.

*30*

Exhibit N

described in a State's CPP, the TMDLs should be made available for public comment. States and involved local communities should participate in determining which pollution sources should bear the treatment or control burden needed to reach allowable loadings. By involving the local communities in decision making, EPA expects that a higher probability of successful TMDL implementation will result.

In the identification of water quality-limited waterbodies, States need to involve the public as part of their review of all existing and readily available data and information. This is especially true in such cases where a waterbody may be perceived as being at risk due to new dischargers and changes in land use. In such cases a waterbody's water quality may be "threatened" and therefore should be given consideration for listing as a 303(d) water. EPA expects States to include public participation in its development of high priority targeted waterbodies that will proceed with TMDL development within two years following the listing process.

In the development of a TMDL, a State should issue a public notice offering an opportunity for a public hearing pertinent to the TMDL under review. It is recommended that this be done in conjunction with public notices and hearings on NPDES permits, construction of municipal wastewater treatment works, water quality standards revisions, and Water Quality Management Plan updates. Each notice should identify TMDLs as part of the subject matter.The State may wish to proceed to issuance of a final TMDL without a hearing once notice is given and there has been little or no response by the public.

Also, if a State determines that the water quality-based controls may be controversial, the State should involve the EPA Regional office, as well as the public, early in the process and continue to involve them throughout the process.

*Reporting*

State submission of a list of waters still needing TMDLs and loads established is required by the Clean Water Act and the Water Quality Planning and Management regulations (40 CFR 130.7). These lists should complement EPA/State Agreements and the CPP, and be incorporated into the WQMP. States should submit the 303(d) lists either as part of or at the same time as the biennial section 305(b) reports. As part of this reporting requirement, States are expected to identify those waters targeted for TMDL development in the next two years. Targeted waterbodies are then scheduled for TMDL development through the annual work plan. In addition, the pollutants or conditions causing violations of water quality standards and the point and nonpoint sources of the pollution causing those conditions should be identified for each waterbody on the 303(d) list (see page 28). States should consult the Section 305(b) Waterbody System's Users Guide (August, 1989) to appropriately categorize sources and causes of pollutants.

*Other Specific Responsibilities*

Other State responsibilities are to

- Ensure that needed environmental data are provided to EPA, including appropriate assessment data; appropriate screening data; and all regulatory data including data needed for approvals of the 303(d) lists and TMDLs, and

- Ensure that appropriate quality assurance/quality control procedures are used for all data used in State decision making and for all data reported to EPA, including data reported by dischargers.

Exhibit N    *31*

## EPA Responsibilities

### Review of 303(d) Lists

Section 303(d) and the Water Quality Planning and Management Regulation (40 CFR 130.7(d)) requires EPA to review and approve or disapprove States' lists of water quality-limited waters and the established pollutant loads. The lists are expected to be submitted biennially and will be approved or disapproved based in part on the State's documentation and rationale for developing such lists as described under the *State Responsibilities* section of this chapter.

If, after reviewing the State lists and documentation, EPA is satisfied that the State has identified and appropriately listed all impaired waters and those targeted for action, EPA will then approve the lists and send a letter approving the submittal to the State. During this approval process, EPA may request a State to provide additional information if there is "good cause" to do so. "Good cause" may include, but is not limited to, more recent or accurate data; more accurate water quality modeling; flaws in the original analysis that led to the water being identified pursuant to 40 CFR 130.7; or changes in conditions (e.g., elimination of discharges).

If the EPA disapproves (via a letter of disapproval to the State) a State's list of waters needing new or revised TMDLs and those targeted for action, the Region (working closely with the State) then identifies those waters where new or revised, and targeted TMDLs are necessary.

### TMDL Review and Approval

Section 303(d) and the Water Quality Planning and Management regulation (40 CFR 130.7(d)) requires EPA to review all TMDLs for approval or disapproval. EPA may tailor its review to what is reasonable and appropriate. For example, where a State has clearly described its TMDL process in its approved CPP (and EPA/State Agreement), EPA may conduct an in-depth review of a sample of the State's TMDLs to determine how well the State is implementing its approved process and conduct a less detailed review of the remaining TMDLs. This in-depth review of samples of the State submissions, in conjunction with a less detailed review of all other TMDLs submitted to EPA by the State, will provide a reasonable basis for EPA approval or disapproval of individual TMDLs. The in-depth sample review may include TMDLs supporting major construction projects and other major control measures. For those States that do not have an approved process, Regions are expected to conduct in-depth reviews of all TMDLs. The Region's review should also consider how well the States are following applicable technical guidance for establishing TMDLs, WLAs, and LAs.

EPA must, at a minimum, determine whether the State's TMDLs are "established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety that takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality."[17] No TMDL will be approved if it will result in a violation of water quality standards.

If the State chooses not to develop the needed TMDLs for appropriate pollutants

---

17   CWA section 303(d)(1)

Exhibit N

on a timely basis or, if the TMDLs are unacceptable to EPA, EPA has a role under the Act to develop the TMDLs in cooperation with the State.[18] This will be done by focusing available EPA resources on the most critical water quality problems.

EPA must either approve or disapprove the State's TMDL within 30 days after submission by the State. Where a TMDL is approved, EPA transmits a letter of such approval. If EPA disapproves a State's submission and the State does not agree to correct the problems, then EPA shall, within 30 days of the disapproval date, establish such TMDLs as necessary to implement the water quality standards. EPA solicits public comment and after considering public comment and making appropriate revisions, EPA transmits the revised TMDL to the State for incorporation in the State's Water Quality Management Plan.[19] EPA prefers to discharge this duty through a cooperative effort with the States.

### Program Audits

EPA expects to measure performance on the basis of environmental results and administrative goals by means of program audits. To achieve this performance measurement, EPA will periodically conduct audits of State water quality programs primarily through Regional visits to the States, review of State toxics control programs, and State action plan summaries of EPA's Surface Water Toxics Control Program.[20] These program audits will serve to determine where additional training or other assistance may be needed and to determine implementation of program objectives.

### Technical Assistance and Training

EPA Headquarters and Regional offices are available to provide technical assistance and advice to the States in developing TMDLs. EPA Headquarters in coordination with the EPA Center for Exposure Assessment Modeling (CEAM) provides for training and assistance on modeling. EPA Headquarters also provides training and technical assistance to users of the Waterbody System (WBS).

### Guidance Documents and Reports

EPA Headquarters is responsible for developing associated program guidance, technical support with assistance from EPA research laboratories, and producing the biennial National Water Quality Inventory Report to Congress developed from the State section 305(b) assessment reports.

### EPA Headquarters Responsibilities

EPA Headquarters is responsible for making sure the CWA mandates regarding TMDLs are carried out, providing oversight of the Regional offices and the States, developing program policy and guidance, supporting the development of computer software for calculating TMDLs, developing technical guidance documents, and providing technical training and assistance. Other responsibilities of EPA Headquarters are summarized on the next page.

### EPA Regional Responsibilities

The EPA Regional offices are responsible for assisting Headquarters in developing policy and guidance, distributing policy and

---

18   See Scott Decision: *Scott v. Hammond*, 741 F.2d 992(7th Cir. 1984)
19   40 CFR 130.7(d)
20   40 CFR 122, 123, 130; Surface Water Toxics Control Program.

Exhibit N   *33*

guidance to the States, awarding grants to the States for developing and implementing water quality-based controls, and providing technical assistance to the States. In addition, the Regional offices are responsible for reviewing and approving or disapproving the following: each State's TMDL process, the annual work program, the list of waters where TMDLs are needed, the list of targeted waters, and specific TMDLs, WLAs, and LAs. The EPA Regional offices are also responsible for reporting on State implementation to Headquarters. Other responsibilities of EPA Regional offices are summarized below.

---

### Other EPA Headquarters Responsibilites

- Prepare guidance and ensure that appropriate technical training and technical assistance is available for monitoring, water quality analysis, and data reporting.

- Perform national assessments and evaluate the national water quality effects of CWA programs.

- Make national data systems more useful for national, regional, and State managers by upgrading and cross-linking the existing systems and developing interactive data retrieval and analysis mechanisms for line managers. Continue support of the River Reach and Industrial Facility Discharge files.

- Ensure that appropriate quality assurance/quality control procedures are used in all national data collection efforts and provide laboratory support for national studies of pollutants requiring special analyses.

- Prepare Headquarters budget requests, and in consultation with the Regions, prepare requests for Regional and State water quality monitoring and analysis programs.

- Peer review major agency program activities involving water monitoring and consult with other program offices on water monitoring activities.

---

### Other EPA Regional Responsibilities

- Ensure that the appropriate regulatory monitoring is performed by the States and dischargers needed for developing and implementing water quality-based controls and identifying needed nonpoint source controls. This includes data required to identify waters needing water quality-based controls, data needed to develop controls, and data needed to assess the effectiveness of controls.

- Provide technical assistance and training to the States on water quality monitoring and analyses. For work involving toxics, provide assistance in both the pollutant specific and the biomonitoring approaches and whole effluent toxicity.

- Ensure that appropriate quality assurance/quality control procedures are used for all Regional and State water quality data and for all data used in Regional decision making including data reported by permittees.

- Perform Regional water quality assessments primarily based on State data, as needed to prepare Environmental Management Reports.

- Ensure that Regional data systems are compatible with and do not unnecessarily duplicate national data systems.

*34*

Exhibit N

# *APPENDIX A - RELATIONSHIP TO OTHER GUIDANCE*

### *Monitoring Guidance*

The Clean Water Act specifies that States and Interstate Agencies, in cooperation with EPA, establish water quality monitoring systems necessary to review and revise water quality standards, calculate TMDLs, assess compliance with permits, and report on conditions and trends in ambient waters. EPA's current program guidance[21] discusses the programmatic relationships of monitoring as an information collection tool for many program needs. NPS pollution concerns are discussed in draft guidance along with some means to monitor and evaluate NPSs.[22] Revised Monitoring Program Guidance is planned for FY 1991.

### *Cooperative Monitoring/Citizen Volunteer Monitoring Guidance*

Cooperative monitoring involves shared efforts by individuals or groups in assessing water quality conditions. Cooperative arrangements are encouraged by the Clean Water Act as referenced in section 104. Cooperative monitoring projects require careful planning and strong management

controls. Current guidance[23] [24] describes the factors to be considered in designing and implementing cooperative and volunteer monitoring projects so that specific provisions are made for the collection and analysis of scientifically valid water quality data, and so that the State water pollution control agencies have the necessary information for final review and approval of all projects.

Cooperative monitoring projects can serve the same usefulness as other monitoring studies; however, they also provide a mechanism to maximize limited resources. In addition to "tapping" additional resources for monitoring, there are other incentives for States and the regulated community to cooperate, such as having more site-specific data from which to develop site-specific, scientifically-based water quality criteria.

Citizen volunteer monitoring involves identifying sources of pollution, tracking the progress of protection and restoration projects, and/or reporting special events such as fish kills and storm damage. For more information on citizen monitoring programs, contact the EPA Office of Water Regulations

21   USEPA. 1985. Guidance for State Water Monitoring and Wasteload Allocation Programs. OW/OWRS, EPA 440/4-85-031. Washington, D.C.

22   USEPA. 1987. Draft Nonpoint Source Monitoring and Evaluation Guide. OW/OWRS, EPA. Washington, D.C.

23   USEPA. 1984. Planning and Managing Cooperative Monitoring Projects. OW/OWRS, EPA 440/4-84-018. Washington, D.C.

24   USEPA. 1990. Volunteer Water Monitoring: A Guide for State Managers. OW, EPA 440/4-90-010. Washington, D.C.

Exhibit N

and Standards (OWRS), Monitoring Branch at 202/382-7056.

### Wasteload Allocation Technical Guidance

Technical guidance manuals prepared by EPA explain how to prepare wasteload allocations (WLAs). These manuals are listed at the right. Those available can be obtained from the OWRS Monitoring Branch at 202/382-7056.

### Technical Support Document for Water Quality-based Toxics Control

The Technical Support Document (TSD) for Water Quality-based Toxics Control[25] presents recommendations to regulatory authorities when they are faced with the task of controlling the discharge of toxic pollutants to the nation's waters. Included in this document are detailed discussions on EPA's recommended criteria for whole effluent toxicity, a screening analysis methodology for effluent characterization, human health risk assessment, the use of exposure assessments for wasteload allocations, and the development of permit requirements and compliance monitoring. The TSD provides guidance for assessing and regulating the discharge of toxic substances. It supports EPA's initiative to control toxic pollution by involving the application of biological and chemical assessment techniques and proposes solutions to complex and site-specific pollution problems. Information on this document can be obtained from EPA's Water Quality and Industrial Permits Branch at 202/475-9537.

---

**Technical Guidance Manuals for Performing Wasteload Allocations**

**Book Title**

I.    General Guidance

II.   Streams and Rivers
- Biochemical Oxygen Demand/Dissolved Oxygen
- Nutrient/Eutrophication
- Toxic Substances
- Simplified Analytical Method for Determining NPDES Effluent Limitations for POTWs Discharging into Low-Flow Streams

III.  Estuaries
- Estuaries and Wasteload Allocation Models
- Application of Estuarine Waste Load Allocation Models
- Use of Mixing Zone Models in Estuarine Waste Load Allocations*
- Critical Review of Estuarine Waste Load Allocation Modeling*

IV.   Lakes and Impoundments
- Biochemical Oxygen Demand/Dissolved Oxygen
- Nutrient/Eutrophication
- Toxic Substances

V.    Technical Support Document for Water Quality-Based Toxics Control

VI.   Design Conditions
- Design Flow
- Design Temperature, pH, Hardness, and Alkalinity

VII.  Permit Averaging

VIII. Screening Manual
- Biochemical Oxygen Demand/Dissolved Oxygen
- Toxic Organics
- Toxic Metals
- Nutrients/Eutrophication

IX.   Innovative Wasteload Allocations*

* not yet available

---

25    USEPA. 1985. Technical Support Document for Water Quality-based Toxics Control. OW/OWRS and OWEP, EPA 440/4-85 Washington, D.C. A revised draft (April 23, 1990) is available and will replace the 1985 Guidance once it is finalized.

*36*

Exhibit N

## Permit Writers Guidance

The Permit Writer's Guide to Water Quality-based Permitting For Toxic Pollutants[26] provides State and Federal NPDES permit writers and water quality management staff with a reference on water quality-based permit issuance procedures. This guidance presents fundamental concepts and procedures in detail and refers to more advanced toxics control procedures, such as dynamic modeling of complex discharge situations, which may not yet be incorporated into many State programs. The guidance explains aspects of water quality-based toxics control in terms of what a permit writer currently needs to know to issue a water quality-based toxics control NPDES permit.

The NPDES permits program is now focused on control of toxic pollutants and the guidance document is directed at supporting these control efforts. Water quality problems related to conventional pollutants, such as those associated with point source contributions to oxygen depletion, are addressed in other guidance documents.

The Permit Writer's guide addresses three areas of toxic effects: aquatic life, human health, and the bioaccumulation of specific chemicals. Each effect must be dealt with on an individual basis using available data and tools. This guidance also catalogues the principal procedures and tools available.

The guidance supports an integrated toxics control strategy using both whole effluent toxicity-based assessment procedures and pollutant-specific assessment procedures. Both procedures are needed to enforce State water quality standards.

## Nonpoint Source Guidance

Section 319 of the Clean Water Act establishes direction and financial assistance for the implementation of State NPS programs. NPS guidance[27] encourages States to develop State Clean Water Strategies for integrating and unifying the States' approach to water quality protection and clean-up. Three steps are identified for this process: comprehensive assessment of impaired or threatened waters, targeted protection of waters, and development of strategic management plans. States are to develop NPS programs which build upon related programs (e.g., Clean Lakes, National Estuaries, Stormwater Permits, Ground Water, Toxics Controls, State Revolving Funds, and Wetlands) and to coordinate their efforts with other federal agencies.

The 1987 amendments to the CWA include provisions to encourage States to accelerate efforts to control nonpoint source pollution. The amendments require States to prepare a Nonpoint Source Assessment Report and a 4-year Management Program. Funds are provided to assist the States in implementing these programs. Information on this guidance can be obtained from EPA's Nonpoint Source Control Branch at 202/382-7085.

---

26   USEPA. 1987. Permit Writer's Guide to Water Quality-based Permitting for Toxic Pollutants. OW/OWEP, EPA 440/4-87-005. Washington, D.C.

27   USEPA. 1987. Nonpoint Source Guidance. OW/OWRS, EPA. Washington, D.C.

Exhibit N$_{37}$

# *APPENDIX B - SUPPORTING PROGRAMS*

### *EPA Water Quality Criteria and Standards*

The water quality standards program, as envisioned in Section 303(c) of the Clean Water Act, is a joint effort between the States and EPA. The States have primary responsibility for setting, reviewing, revising and enforcing water quality standards. EPA develops regulations, policies, and guidance to help States implement the program and oversees States activities to ensure that State adopted standards are consistent with the requirements of the Act and the implementing Water Quality Standards regulation (40 CFR Part 131). EPA has authority to review and approve or disapprove State standards and, where necessary, to promulgate Federal water quality standards.

A water quality standard defines the water quality goals of a waterbody, or portion thereof, by designating the use or uses to be made of the water, by setting criteria necessary to protect the uses, and by preventing degradation of water quality through antidegradation provisions. States adopt water quality standards to protect public health or welfare, enhance the quality of water, and serve the purposes of the Clean Water Act. "Serve the purposes of the Act" (as defined in Sections 101(a), 101(a)(2), and 303(c) of the Act) means that water quality standards should: 1) include provisions for restoring and maintaining chemical, physical, and biological integrity of State waters, 2) provide, wherever attainable, water quality for the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water ("fishable/swimmable"), and 3) consider the use and value of State waters for public water supplies, propagation of fish and wildlife, recreation, agriculture and industrial purposes, and navigation.

In the current Water Quality Standards regulation, section 131.11 encourages States to adopt both numeric and narrative criteria. Criteria protect both short-term (acute ) and long-term (chronic) effects. Numeric criteria are important where the cause of toxicity is known or for protection against pollutants with potential human health impacts or bioaccumulation potential. Numeric water quality criteria may also be the best way to address nonpoint source pollution problems. Narrative criteria can be the basis for limiting toxicity in waste discharges where a specific pollutant can be identified as causing or contributing to the toxicity but there are no numeric criteria in the State standards, or where toxicity cannot be traced to a particular pollutant. Whole effluent toxicity (WET) testing is also appropriate for discharges containing multiple pollutants because WET testing provides a method for evaluating synergistic and antagonistic effects on aquatic life. Biological criteria provide a means to measure aquatic community structure and function. EPA considers a combination approach of narrative, numeric, and biological criteria necessary to protect beneficial uses fully from the broad range of point and nonpoint sources of pollution.

In addition, the Clean Water Act in Section 303(c)(2)(B) requires States to adopt numeric criteria for priority toxic pollutants for which EPA has published criteria guid-

*38*

ance when the discharge or presence of these pollutants could reasonably be expected to interfere with the designated uses in affected waters. States may adopt criteria with State-wide application or site-specific criteria.

EPA's regulation requires each State to adopt, as part of its water quality standards, an antidegradation policy consistent with 30 CFR 131.12. The regulation also requires each State to have implementation methods for its antidegradation policies, i.e., decision criteria for assessing activities that may impact the integrity of a waterbody. Activities covered by the antidegradation policy and implementation methods include both point and nonpoint sources of pollution. Section 131.12 effectively sets out a three-tiered approach for the protection of water quality. "Tier 1" (40 CFR 131.12 (a)(1)) of antidegradation maintains and protects existing uses and the water quality necessary to protect these uses. "Tier II" (section 131.12(a)(2)) protects the water quality in waters whose quality is better than that necessary to protect "fishable/swimmable" uses of the waterbody. Outstanding national resource waters (ONRWs) are provided the highest level of protection under the antidegradation policy ("Tier III").

States may, at their discretion, adopt policies in their standards affecting the application and implementation of standards. EPA specifically recognizes mixing zones, variances, low flow exemptions, and schedules of compliance for water quality-based permit limits. Guidance on these subjects is available from EPA's Office of Water Regulations and Standards, Criteria and Standards Division.

## Section 305(b) -- Water Quality Assessment

Section 305(b)[28] establishes a process for reporting information about the quality of the nation's water resources to EPA and Congress. Each State, Territory, and Interstate Commission develops a program to monitor the quality of its surface and ground waters and report the current status of water quality biennially to EPA. This information is compiled into a biennial report to Congress. The 305(b) report allows EPA to:

- Determine the status of water quality.

- Identify water quality problems and trends.

- Evaluate the causes of poor water quality and the relative contributions of pollution sources.

- Report on the activities underway to assess and restore water quality.

- Determine the effectiveness of control programs.

- Ensure that pollution control programs are focused on achieving environmental results in an efficient manner.

- Determine the workload remaining in restoring waters with poor quality and protecting threatened waters.

- Use information from the lists of waters developed under sections 304(l)

---

28   USEPA. 1989. Guidelines for the Preparation of the 1990 State Water Quality Assessment (section 305(b) Report). OW/OWRS. Washington, D.C.

*39*

Exhibit N

and 319 and continue to maintain and update the statutorily-required lists of waters identified under sections 303(d) and 314.

For each assessed waterbody, information is provided on the water quality-limited status, use nonattainment causes and sources, cause magnitude, and source magnitude. Much of the information from the 305(b) assessments provide useful information for developing lists of water quality-limited segments asked for in section 303(d).

### Section 304(l) -- Impaired Waters

Section 304(l)[29] required lists of impaired waters and sources to be submitted to EPA as a "one time" effort. These lists of waters (known as the short, long, and mini lists) provide three types of designations for impaired waters and source impacts. The mini list (section 304(l)(1)(A)(i)) is a list of waters that the State does not expect to achieve numeric water quality standards for priority pollutants (section 307(a)) after technology-based requirements have been met, due to point or nonpoint source pollution. The long list (section 304(l)(1)(A)(ii)) is a comprehensive list of waters that are not meeting the fishable and swimmable goals of the Act whether due to toxicity or other impairments; point or nonpoint sources; or toxic, conventional, or nonconventional pollutants. A waterbody which meets its designated use criteria and does not meet fishable/swimmable criteria would be listed on the section 304(l) long list but not necessarily on the section 303(d) list of waters needing TMDLs. It would be appropriate for a State to use the information on all waters from its long lists and apply these data in developing the section 303(d) list of wa-

ters that still do not meet applicable water quality standards. The short list (section 304(l)(1)(B)) is a list of State waters that are not expected to meet applicable standards after technology-based controls have been met, due entirely or substantially to discharge of toxic pollutants from point sources. A fourth list is the list of point source dischargers of priority toxic pollutants to waters listed under section 304(l).

### Section 319 -- Nonpoint Source Program

One key initiative of the 1987 Water Quality Act Amendments to the Clean Water Act was the addition of section 319 which established a national program to control nonpoint source pollution. Under this program, States are asked to assess their NPS pollution problems and submit that assessment to EPA. These assessments include a list of "navigable waters within the State which, without additional action to control nonpoint sources of pollution, cannot reasonably be expected to attain or maintain applicable water quality standards or the goals and requirements of this Act." Other paragraphs of section 319 require the identification of categories and subcategories of NPS pollution which contribute to the identification of impaired waters; descriptions of the procedures for identifying and implementing BMPs; control measures for reducing NPS pollution; and descriptions of State and local programs used to abate NPS pollution. Based upon the assessments, State nonpoint source management programs are prepared and presented to EPA for approval. Once these programs are approved, grant funds are made available for the implementation of the program.

---

29  USEPA. March, 1988. Final Guidance for Implementation of Requirements under section 304(l) of the Clean Water Act as Amended. OWRS and OWEP. Washington, D.C.

40

Exhibit N

Section 319 assessments identify waters with impairments due primarily to NPSs for which TMDLs (including LAs) may need to be developed to establish protection of water quality. States are encouraged to use these tools where appropriate to achieve or protect beneficial uses of the water.

### Section 314 -- Clean Lakes Program

Historically, the Clean Lakes Program has been active in awarding grants for the study and restoration of publicly-owned lakes. Under this program, states are encouraged to develop integrated water quality strategies that include lake and reservoir management, restoration, and protection activities. EPA provides financial assistance as available; however, greater emphasis is now on developing technical support material (e.g., a Lake and Reservoir Restoration Guidance Manual).

### Section 320 -- National Estuary Program

Authorized by Congress in 1985, and formally established in 1987 by amendments to the Clean Water Act, the National Estuary Program (NEP) builds upon the lessons of the Chesapeake Bay, Great Lakes, and other earlier programs in a geographic, basin-wide approach to environmental management. The EPA Administrator selects estuaries for NEP participation through State governors' nominations. To be selected estuaries must demonstrate a likelihood of success and evidence of institutional, financial, and political commitment to solve their problems.

Among the environmental problems addressed in the NEP estuaries are the loss of aquatic habitats, toxic contamination of estuarine sediments, increases in nutrient levels, bacterial contamination, and hypoxia. As methods for assessing and successfully managing these estuaries are developed, this national demonstration program aims to communicate its lessons to the more than 150 estuaries located along our coasts.

For approved estuaries, the Administrator convenes management conferences, a grouping of interested Federal, Regional, State, and local governments, affected industries, scientific and academic institutions, and citizen organizations. Management conferences strive for an open, consensus-building approach to defining program goals and objectives, identifying problems to address, and designing pollution prevention/control and resource management strategies to meet each objective. Management conferences are required to create and begin implementation of a Comprehensive Conservation and Management Plan (CCMP) designed to protect and restore the estuary.

### Monitoring Program

Ambient water quality monitoring is a data gathering tool used for almost all water quality assessment. Monitoring programs serve to identify waters needing TMDLs, quantify loads, verify models, and evaluate effectiveness of water quality controls (including BMP effectiveness). Once TMDLs have been established for a given waterbody, follow-up monitoring is recommended to document improvement or lack of improvement. Since the TMDL process is iterative, monitoring data can provide the information for updating and revising current TMDLs. Ambient monitoring is used for setting permit conditions, compliance, and enforcement, and detecting new problems and trends.

### Effluent Limitation Guidelines and Standards

EPA develops effluent limitation guidelines and new source performance standards for industrial dischargers. These are uniform technology-based limitations for indus-

Exhibit N    *41*

trial facilities discharging directly into the nation's waters. EPA also develops pretreatment standards for those facilities which discharge into Publicly Owned Treatment Works (POTWs).

During the effluent guidelines promulgation process, EPA develops a profile of the industry to determine pollutant loadings of untreated wastewater for which effluent limitation guidelines are being developed. Pollutants of concern and technologies for treating them are then identified. EPA then prepares estimates of total investment, operation and maintenance costs of complying with each technology option, and evaluates the regulatory options, both technically and economically, to select a technology as the basis for the guidelines.

Effluent limitations, guidelines, and standards are established for three types of industrial pollutants: conventional, toxic, and nonconventional. Effluent guidelines generally limit the amount of pollutant that can be discharged at an individual facility. The numerical limits in the guidelines are determined using industry-specific production data and the treatability data for the selected technology.

## NPDES Permits and Individual Control Strategies

All discrete sources of wastewater must obtain a National Pollutant Discharge Elimination System (NPDES) permit that regulates the facility's discharge of pollutants. The approach to controling and eliminating water pollution is focused on the pollutants determined to be harmful to receiving wa-

ters and on the sources of such pollutants. Authority for issuing NPDES permits is established under section 402 of the CWA.[30]

Point sources are generally divided into two types: "industrial" and "municipal." Nationwide, there are approximately 50,000 industrial sources which include commercial and manufacturing facilities. Municipal sources, also known as POTWs, number about 15,700 nationwide. Wastewater from municipal sources results from domestic wastewater discharged to POTWs as well as the "indirect" discharge of industrial wastes to sewers.

Section 304(l)(1)(D) required, at a minimum, the development of individual control strategies (ICSs) for point source discharges of priority toxic pollutants to waters identified on the short list. (The short list is composed of State waters for which applicable section 307(a) priority pollutant standards are not expected to be achieved after technology-based controls have been met, due entirely or substantially to point sources.) An ICS consists of NPDES permit limitations and schedules for achieving established limitations, along with other documentation to demonstrate that the controls selected are appropriate and adequate.[31]

## Marine and Estuarine Waters

In January 1990, EPA published its National Coastal and Marine Policy, which establishes EPA's goals for coastal and marine protection. They include:

- Recover full use of the nation's shores, beaches, and water.

---

30   USEPA. 1989. Overview of selected EPA Regulations and Guidance Affecting POTW Management. OW/OMPC, EPA 440/69-89/008. Washington, D.C. (Hotline: 800-424-9346)

31   USEPA. 1987. Permit Writer's Guide to Water Quality-based Permitting for Toxic Pollutants. OW/OWEP, EPA 440/4-87-005. Washington, D.C.

*42*

Exhibit N

- Restore the nation's shell fisheries and salt-water fisheries.

- Minimize the use of coastal and marine water for waste disposal.

- Improve and expand coastal science.

- Support international efforts to protect coastal and marine resources.

EPA's programs to protect ocean and coastal waters and the Great Lakes from nutrient and toxic pollutants emanating from point and nonpoint sources are implemented under the Clean Water Act and the Marine Protection, Research, and Sanctuaries Act (Ocean Dumping Act).

Marine and estuarine waters are, in many cases, the ultimate sink for pollutants which emanate from upland sources. Estuarine and marine waters are particularly complex and it is often difficult to predict pollutant fate and transport. To address the increased complexity and effect on aquatic life, water quality management efforts must increase accordingly. TMDLs can be a useful tool for management of marine and estuarine waters. Technical guidance is currently being revised to support estuarine modeling.[32]

### Groundwater

Contaminated ground water discharge to surface water may be a source of contaminants in water quality-limited surface waters. While ground water and surface water are often treated as separate systems, they are in reality highly interdependent components of the hydrologic cycle. Subsurface interactions with surface waters occur in a variety of ways. In several studies, ground water discharge accounted for as much as 90% or more of stream flow in humid regions. Therefore, the potential pollutant contributions from ground water to surface waters should be investigated when developing TMDLs. Additional information is available from the EPA Office of Ground Water Protection.

### CERCLA

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) or "Superfund" provides broad federal authority to respond directly to releases or threatened releases of hazardous substances. This law also provides for the cleanup of inactive or abandoned hazardous waste sites. Under CERCLA, EPA assesses the nature and extent of contamination at a site, determines the public health and environmental threats posed by a site, analyzes the potential cleanup alternatives, and takes action to clean up the site. In instances where a CERCLA site has impact on a nearby waterbody, the level of cleanup needed to maintain water quality standards of surface waters should have a direct relationship to the TMDL for the affected surface waters. As part of the CERCLA process, all "applicable or relevant and appropriate requirements" of statutes such as the CWA must be followed. Load allocations developed pursuant to section 303(d) may, in appropriate circumstances, be "applicable or relevant and appropriate."

POTWs that discharge CERCLA hazardous substances in effluent at levels that equal or exceed NPDES permit limitations, or for which no specific limitations exist, or in spills or other releases, may be subject to the notification requirements and liability provisions under CERCLA. In addition,

---

32   USEPA. Technical Guidance Manual for Performing Wasteload Allocations, Book III - Estuaries.

43

Exhibit N

POTWs that disposed of sludge in impoundments or landfills that are Superfund sites may be required to pay for cleanup of those sites. At times, POTWs may be requested to accept wastewaters from Superfund cleanup activities. If discharge of CERCLA wastewaters to a POTW is deemed appropriate, the discharger must ensure compliance with substantive and procedural requirements of the national pretreatment program and all local pretreatment regulations before discharging wastewater to the POTW.

The provisions of CERCLA extend well beyond the regulation of POTW discharges. The most common types of Superfund sites governed by CERCLA include abandoned hazardous waste sites and inactive mines, many of which do not discharge to POTWs.

## SARA

The Superfund Amendments and Reauthorization Act (SARA, Hotline 800-

535-0202), which amended CERCLA, also established in Title III a new program to increase the public's knowledge of and access to information on the presence of hazardous chemicals in their communities and releases of these chemicals into the environment. Title III (Community Right to Know Program) requires facilities to notify State and local officials if they have extremely hazardous substances present at their facilities in amounts exceeding certain "threshold planning quantities." If appropriate, the facility must also provide material safety data sheets on hazardous chemicals stored at their facilities, or lists of chemicals for which these data sheets are maintained, and report annually on the inventory of these chemicals used at their facility. The law may also require facilities to submit information each year on the amount of toxic chemicals released by the facilities to all media (air, water, and land), if they fall within Standards Industrial Classification Codes 20 to 39 and meet certain threshold limits.

*44*

Exhibit N

# *APPENDIX C - SCREENING CATEGORIES*

This list of screening categories is based on categories promulgated as the minimum data set a State should consider when developing their list of impaired waters pursuant to section 304(l) of the Clean Water Act. When developing lists pursuant to this guidance and to meet the requirements of section 303(d), a State should, at a minimum, use these categories to identify their water quality-limited waters. States should also consider additional information, such as TRI data, streamflow information collected by USGS, locally available data, and public comments on proposed 303(d) lists.

1.  Waters where fishing or shellfish bans and/or advisories are currently in effect or are anticipated.

2.  Waters where there have been repeated fishkills or where abnormalities (cancers, lesions, tumors, etc.) have been observed in fish or other aquatic life during the last ten years.

3.  Waters where there are restrictions on water sports or recreational contact.

4.  Waters identified by the State in its most recent State section 305(b) report as either "partially achieving" or "not achieving" designated uses.

5.  Waters listed under sections 304(l) and 319 of the CWA.

6.  Waters identified by the State as priority waterbodies. (State Water Quality Management plans often include priority waterbody lists which are those waters that most need water pollution control decisions to achieve water quality standards or goals.)

7.  Waters where ambient data indicate potential or actual exceedances of water quality criteria due to toxic pollutants from an industry classified as a primary industry in Appendix A of 40 CFR Part 122.

8.  Waters for which effluent toxicity test results indicate possible or actual exceedances of State water quality standards, including narrative "free from" water quality criteria or EPA water quality criteria where State criteria are not available.

9.  Waters with primary industrial major dischargers where dilution analyses indicate exceedances of State narrative or numeric water quality criteria (or EPA water quality criteria where state standards are not available) for toxic pollutants, ammonia, or chlorine. These dilution analyses must be based on estimates of discharge levels derived from effluent guidelines development documents, NPDES permits or permit application data (e.g., Form 2C), Discharge Monitoring Reports (DMRs), or other available information.

10. Waters with POTW dischargers requiring local pretreatment programs where dilution analyses indicate exceedances of State water quality criteria (or EPA water quality criteria where State water quality criteria are not available) for

Exhibit N 45

toxic pollutants, ammonia, or chlorine. These dilution analyses must be based upon data from NPDES permits or permit applications (e.g., Form 2C), Discharge Monitoring Reports (DMRs), or other available information.

11. Waters with facilities not included in the previous two categories such as major POTWs, and industrial minor dischargers where dilution analyses indicate exceedances of numeric or narrative State water quality criteria (or EPA water quality criteria where State water quality criteria are not available) for toxic pollutants, ammonia, or chlorine. These dilution analyses must be based upon estimates of discharge levels derived from effluent guideline development documents, NPDES permits or permit application data, Discharge Monitoring Reports (DMRs), or other available information.

12. Waters classified for uses that will not support the "fishable/swimmable" goals of the Clean Water Act.

13. Waters where ambient toxicity or adverse water quality conditions have been reported by local, State, EPA, or other Federal agencies, the private sector, public interest groups, or universities. These organizations and groups should be actively solicited for research they may be conducting or reporting. For example, university researchers, the United States Department of Agriculture, the National Oceanic and Atmospheric Administration, the United States Geological Survey, and the United States Fish and Wildlife Service are good sources of field data and research.

14. Waters identified by the State as impaired in its most recent Clean Lake Assessments conducted under section 314 of the Clean Water Act.

15. Waters identified as impaired by non-point sources in America's Clean Water: The States' Nonpoint Source Assessments 1985 (Association of State and Interstate Water Pollution Control Administrators (ASIWPCA)) or waters identified as impaired or threatened in a nonpoint source assessment submitted by the State to EPA under section 319 of the Clean Water Act.

16. Surface waters impaired by pollutants from hazardous waste sites on the National Priority List prepared under section 105(8)(A) of CERCLA.

*46*

Exhibit N

# APPENDIX D - SELECTED TECHNICAL CONSIDERATIONS

## Design Conditions

When developing a TMDL, design conditions are those critical conditions that must be specified in order to determine attainment of water quality standards. In specifying conditions in the waterbody, an attempt is made to use a reasonable "worst case" condition. For example, stream analysis often uses a low flow (e.g., 7-day low flow, once in 10-years commonly known as $7Q_{10}$ or biologically-based 4-day 3-year flows) high temperature design condition.

In situations where nonpoint source loadings at wet weather flow conditions are more significant than the point source loadings, the use of low flow-related design conditions is inappropriate. Wet weather flow conditions may be appropriate for analysis of nonpoint and intermittent point source discharges such as storm sewers. Other factors such as rainfall intensity and duration, time since previous rainfall, pollutant accumulation rates, and stream flow previous to rainfall should be considered in selecting design conditions for nonpoint source analysis. In some instances (e.g., carcinogenic pollutants), it is appropriate to use the harmonic mean flow to estimate loading capacity.

Often conditions of best management practices may be specified for factors other than physical conditions. For example, assumptions about cropping patterns, logging rates, or grazing practices may be necessary to determine the pollution loading estimates of a waterbody. Design conditions are less standardized for these factors and a reasonable worst case condition often must be developed on a case-by-case basis.

In general, for point sources, continuous discharges present the greatest stress under low flow, dry weather conditions. For pollutants transported in runoff, critical conditions will be rainfall-related, but may occur under a variety of flow conditions. For NPSs or intermittent point sources, generally, high flow, wet weather conditions need to be evaluated. For carcinogenic pollutants, harmonic mean flows may be appropriate. Additional details for selecting design conditions are provided in technical guidance.[33]

## Mathematical Models

When the analyst is calculating a numerical TMDL, several mathematical models can be used to evaluate alternative pollutant loading scenarios. Models supported by the EPA Center for Exposure and Assessment Modeling (CEAM) are summarized in Ap-

---

33   USEPA. 1985. Technical Support Document for Water Quality-based Toxics Control. OW/OWEP and OWRS, EPA 440/4-85-032. Washington, D.C. A revised draft (April 23, 1990) is available and will replace the 1985 Guidance when finalized.

Exhibit N

*47*

pendix E. While it is beyond the scope of this guidance to provide a detailed rationale for model selection, the following briefly presents a discussion on model characteristics and selection.

*Model characteristics*

Models can be characterized in numerous ways such as by their data requirements, ease of application, etc. This section summarizes models based on four categories: temporal characteristics, spatial characteristics, specific constituents and process simulated, and transport processes.

- Temporal characteristics - This includes whether the model is steady-state (inputs and outputs constant over time), time-averaged (for example, tidally-averaged), or dynamic. If the model is dynamic, an appropriate time step needs to be selected. For example, streams may require short time steps (hourly or less) while lakes, which typically have residence times in excess of weeks, can generally be modeled with longer time steps (e.g., daily or more). Similarly, loads from NPS models are often lumped together into event or annual loadings.

- Spatial characteristics - This includes the number of dimensions simulated and the degree of spatial resolution. In most stream models, one-dimensional models are used since typically vertical and horizontal gradients are small. For large lakes and estuaries, two- or three-dimensional models may be more appropriate because both vertical and horizontal concentration gradients commonly occur. Segmented or multiple catchment models may be more appropriate for heterogeneous watersheds, whereas,

lumped single-catchment models are more appropriate for homogeneous or less complex situations.

- Specific constituents and processes simulated - Models vary in the types of constituents and processes simulated and in the complexity of the formulations used to represent each process. For example, simple DO models include only reaeration and BOD decay while more complex models include other processes such as nitrification, photosynthesis, and algal respiration.

- Transport processes - These include advection, dispersion, runoff, interflow, ground water interactions, and the effects of stratification on these processes. Most river models are concerned only with downstream advection and dispersion. Lake and estuary models may include advection and dispersion in one or more dimensions, as well as the effects of density stratification. For toxic modeling, it may be important to use models which account for near-field mixing since many of these pollutants may exert maximum toxicity close to the point of discharge. To incorporate both point and nonpoint sources into TMDLs, it will be important to consider integrated watershed models.

*Model selection*

A model should be selected based on its adequacy for the intended use, for the specific waterbody, and for the critical conditions occurring at that waterbody. While the selection of an appropriate model should be made by a water quality analyst, it is useful for program managers to be familiar with the decisions which must be made. Four basic

*48*

Exhibit N

-194-

steps have been identified that an analyst would go through to select an appropriate model:

- Identify models applicable to the situation.

- Define the appropriate level of analysis.

- Incorporate practical constraints into the selection criteria.

- Select a specific model.

Identify models applicable to the situation. An obvious choice for narrowing the selection of an appropriate model is based on the waterbody type (river, estuary, or lake) and the type of analysis (BOD/DO, toxics, etc.) A preliminary list of models may also be screened by selecting models which consider the appropriate constituents and processes that are important for the pollutant being studied.

Define the appropriate type of analysis. Four types of models are:

- Simple calculator models - These include dilution and mass balance calculations, Streeter-Phelps equations and modifications thereof, analytical solutions to transport equations, steady-state nutrient loading models, regression models, and other simplified modeling procedures that can be performed on desk top calculators.

- Steady state computer models These models compute average spatial profiles of constituents along a river or estuary assuming everything remains constant with time, including loadings, upstream water quality con-

ditions, stream flow rates, meteorological conditions, etc.

- Quasi-dynamic models - These models are a compromise between steady-state models and dynamic models. Quasi-dynamic models assume most of the above factors remain constant, but allow one or more of them to vary with time, for example waste loading rates or stream flow rates. Some of the models hold the waste loading and flow rates constant, but predict effects such as the diurnal variations in dissolved oxygen due to algal photosynthesis and respiration.

- Dynamic models - These models predict temporal and spatial variations in water quality due to varied loadings, flow conditions, meteorological conditions, and internal processes within the watershed or waterbody. Dynamic models are useful for analyzing transient events (e.g., storms and long term seasonal cycles) such as those important in lake eutrophication analyses.

The above model types are listed in order of increasing complexity, data requirements, and cost of application. In addition, lognormal probabilistic models and Monte Carlo simulation techniques have been used to modify some of the above approaches. Probabilistic models use lognormal probability distributions of model inputs to calculate probability distributions of model output. Since this method does not incorporate fate and transport processes, it can only be used to predict the concentration of a substance after complete mixing and before decay or transformation significantly alters the concentration. Monte Carlo simulations combine probabilistic inputs with deterministic models. A fate and transport model is run a large number of times based on ran-

Exhibit N⁹

domly selected input values. The output from these models are then rank ordered to produce a frequency distribution. These frequency distributions may then be compared to instream criteria (e.g., criteria maximum concentration (CMC) and criteria continuous concentration (CCC)) to determine if water quality standards are met.

Incorporate practical constraints. In general, the analyst should consider the data requirements for each level of analysis, the availability of historical data, the modeling effort required for each level of analysis, and available resources. Availability of historical data for calibration and verification is one of the key cost savings considerations.

Select a specific model. The analyst should consider model familiarity, technical support and model availability, documentation quality, application ease, and professional recognition and acceptance of a model.

### Pollutant Allocation Schemes

Individual States use various load allocation schemes appropriate to their needs and may specify that a particular method be used. Methods of allocating loads have been historically applied to point sources. Application of these methodologies to nonpoint sources has not been well studied to date. Three common methods for allocating loads (equal percent removal, equal effluent concentrations, and a hybrid method) are discussed below. Other methods are detailed in another EPA document.[34]

The first method is equal percent removal and exists in two forms. In one, the overall removal efficiencies of the sources are set so they are all equal. In the latter, the incremental removal efficiencies beyond the current discharge are equal. This method is appropriate when the incremental removal efficiencies are relatively small, so that the necessary improvement in water quality can be obtained by minor improvement in treatment at each point source, at little cost.

The second common allocation method specifies equal effluent concentrations. This is similar to equal percent removal if influent concentrations at all sources are approximately the same. However, if one source has substantially higher influent levels, then equal effluent concentrations will require higher overall treatment levels than the equal percent removal approach.

The third commonly used method of allocating loads can be termed a hybrid method. With this method, the criteria for waste reduction may not be the same from one source to the next. One source may be allowed to operate unchanged while another may be required to provide the entire load reduction. More generally, a proportionality rule may be assigned that requires the percent removal to be proportional to the input source loading or flow rate.

### Multiple Discharges

TMDLs are particularly critical for waterbodies when the effect from multiple pollution sources overlap. The key concern associated with multiple point or nonpoint pollution sources is the potential for combined impacts. To perform this analysis, it may be necessary to apply near-field mixing models (mixing zone analysis) in addition to

---

34   USEPA. 1985. Technical Support Document for Water Quality-based Toxics Control. OW/OWEP and OWRS, EPA 440/4-85-032. Washington, D.C. A revised draft (April 23, 1990) is available and will replace the 1985 Guidance when finalized.

a far-field model which considers pollutants from numerous point or nonpoint sources (after the mixing zone). A recommended procedure for evaluating toxicity from multiple discharges is summarized in EPA guidance.[35]

### Allocation Tradeoffs

Where appropriate and technically feasible, certain cost-effective benefits may be gained by making tradeoffs among wasteload allocations. Such a practice is similar to what would be done during the initial considerations of tradeoffs of loads between point and nonpoint sources. In the case of watershed or estuary management, this may be particularly useful to achieve pollution reduction in the most cost-effective manner possible.

The incentive for trading load allocations is to achieve the required level of control by choosing to control one pollutant source over another. Technological feasibility, economic issues, and regulatory authority are all factors to consider when trading allocations. For example, to reduce nutrient loads to a receiving water, nonpoint source controls that can be adequately maintained and enforced, may be much more cost effective than increasing the level of control on a point source discharger.

Pollutant trades are most likely to occur between point and nonpoint sources. However, where effluents from different point source dischargers are comparable, trades may be acceptable so long as water quality standards (including antidegradation regulations and policies) and minimum applicable technology-based controls are met. Simi-

larly, tradeoffs between nonpoint sources are also acceptable.

The Dillon Reservoir (west of Denver, Colorado) is an example of point and nonpoint source phosphorus load tradeoffs. In this example, the cost associated with point source reduction was $1.5 million per year, whereas the cost associated with NPS controls was $0.2 to $1.0 million per year. Because of this cost differential, tradeoffs allowed publicly-owned treatment works to achieve reductions in phosphorus loads to the Dillon Reservoir by controlling NPSs rather than expanding the sewage treatment system.

### Persistent and/or Highly Bioaccumulative Toxic Pollutants

Persistent and/or bioaccumulative toxic pollutants require special attention during analysis of toxicity and TMDL development. The primary concern is that toxic pollutants that enter a waterbody at levels that are nontoxic in the water column may accumulate in sediment or aquatic life. These pollutants may then adversely affect aquatic/wildlife or pose a risk to humans by exposure to hazardous chemicals through consumption of contaminated fish or shellfish. Chemicals that bioaccumulate at high rates include some metals, organic compounds, and organometallic compounds. Current technical guidance for wasteload allocation (see Appendix A) summarize a number of models which are appropriate for modeling the fate and transport of toxics in streams/rivers, lakes, and estuaries. Additional details for assessing and controlling risk have been addressed in technical support documentation.

---

35    USEPA. 1985. Techical Support Document for Water Quality-based Toxics Control. OW/OWEP and OWRS, EPA 440/4-85-032. Washington, D.C. A revised draft (April 23, 1990) is available and will replace the 1985 Guidance when finalized.

Exhibit N

*51*

### Use of Two-number Criteria

Because of inherent variation in effluent and receiving water flows and pollutant concentrations, specifying a concentration that must not be exceeded at any time or place may not be appropriate for the protection of aquatic life. The format usually selected for expressing water quality criteria to protect aquatic life consists of recommendations concerning concentration magnitudes, duration of averaging periods, and average frequencies of allowed excursions. Use of this magnitude-duration-frequency format allows water quality criteria for aquatic life to be adequately protective without being as overprotective as if criteria were expressed using a simpler format. In many cases, these considerations are evaluated during the standards setting process and TMDLs are used to develop controls that result in attainment of applicable water quality standards.

Duration of exposure considers the amount of time organisms will be exposed to toxicants. It is expressed as that period of time over which the instream concentration is averaged for comparison with criteria concentrations. Frequency is defined as how often exposures that exceed the criteria can occur during a given period of time (e.g., once every three years) without unacceptably affecting the community. To account for acute toxic effects, States may adopt acute criteria expressed as the criteria maximum concentration (CMC) occurring in a one-hour averaging period. Similarly, chronic criteria expressed as the criteria continuous concentration (CCC) should be developed as toxicant concentrations which should not be exceeded over longer periods of time. For the purposes of modeling, the ambient concentration should not exceed the CMC more than once every three years. (If the biological community is under stress because of spills, multiple dischargers, or has a low recovery potential, or if a local species

is very important, the frequency should be decreased.)

Although these criteria are mostly used for application to low flow conditions, the toxicological basis for the criteria is equally valid for high flow conditions. It is important for States to protect designated water uses during all flow conditions; therefore, the two-number criteria should be used for all flow conditions unless separate guidance for adopting wet weather criteria is available. However, States should apply duration and frequency parameters to account for the high flow, intermittent nature of nonpoint source loadings.

### Sediment Issues

The problems associated with clean and contaminated sediment are not the same. Clean sediment can impair fish reproduction by silting-up spawning areas, and can increase turbidity. Draft (clean) sediment criteria have been developed in Idaho that include turbidity, inter-gravel dissolved oxygen, and cobble embeddedness. The criteria developed may be most appropriate for salmonid streams, but the framework may have wide application. The major concerns regarding contaminated sediment are pollutant releases to the water column, bioaccumulation, and biomagnification. Sediment criteria being developed by EPA have centered on evaluating and developing an understanding of the principal factors that influence the sediment/contaminant interactions with the water column (Equilibrium Partitioning Approach). (The Science Advisory Board will be reviewing methods for establishing sediment criteria for metal contaminants and procedures for establishing standardized bioassays in 1991.) Through such an understanding, exposure estimates of benthic and other organisms can be made. Chronic water quality criteria, or possibly other toxicological endpoints, can then be used to predict potential biological effects.

Exhibit N

In some cases, sediment criteria alone would be sufficient to identify and to establish clean up levels for contaminated sediments. In other cases, the sediment criteria should be supplemented with biological or other types of analysis before clean-up deci-sions can be made. Additionally, ground water inputs through sediments should be distinguished from inputs from the sediment alone, so that proper control measures are implemented.

Exhibit N     *53*

# APPENDIX E - MATHEMATICAL MODEL SUPPORT

The Center for Exposure Assessment Modeling (CEAM) was established in July, 1987 to meet the water quality and exposure modeling needs of States and EPA program and Regional offices. CEAM provides exposure assessment technology, training, and consultation for analysts and decisions-makers operating under various legislative mandates, including the Clean Water Act.

With support and resources from the Monitoring Branch in the Assessment and Watershed Protection Division, Office of Water Regulations and Standards, CEAM maintains a distribution center for water quality models and databases for the user community. Users are kept up to date through user group meetings, a newsletter, and an electronic bulletin board. For the major wasteload allocations models, CEAM offers 2- to 5-day training courses at EPA Headquarters, Regional sites, and the Athens Environmental Research Laboratory facility. Longer-term "on-the-job" training at CEAM for individuals is also available. Technical assistance and review are provided by CEAM scientists and engineers, as well as by affiliated academics and consultants. Exposure calculations and assessments for especially difficult or unusual discharge situations can be arranged as resources allow.

The center currently distributes 21 simulation models and databases. These can be applied to urban runoff (SWMM4, HSPF9), leaching and runoff from soils (PRZM, HSPF9), transport through soil and ground water (MULTIMED, RUSTIC), conventional pollution of streams (QUAL2E, HSPF9, WASP4), toxic pollution of streams (HSPF9, WASP4, EXAMS2, DYNTOX), toxic pollution of lakes and estuaries (WASP4, EXAMS2), conventional pollution of lakes and estuaries (WASP4), near-field mixing and dilution in rivers, lakes, estuaries, and oceans (CORMIX1), cohesive sediment transport (SED2D-V), river and tidal hydrodynamics (DYNHYD5, RIVMOD, HYDRO2D-V, HYDRO3D), geochemical equilibrium (MINTEQA3), and aquatic food chain bioaccumulation (FGETS). Software and databases distributed to aid in data analysis include ANNIE-IDE, DBAPE, and the CLC Database. Currently available models are summarized below. Those with no version number are available as test code, and will be routinely distributed when fully tested.

| Table E-1 CEAM Supported Models | |
|---|---|
| Model Name | Version No. |
| DYNTOX | 1.0 |
| EXAMSII | 2.94 |
| HSPF | 9.01 |
| MINTEQA3/PRODEFA3 | 3.00 |
| PRZM | 1.00 |
| QUAL2E-UNCAS | 3.11 |
| SWMM | 3.3 |
| WASP4/TOXI/EUTRO | 4.22 |
| DYNHYD5 | 5.02 |
| GCSOLAR | 1.10 |
| FGETS | 1.00 |
| CORMIX1 | 1.00 |
| ANNIE-IDE | 1.11 |
| DBAPE | 1.05 |
| CLC Database | 2.00 |
| RUSTIC | - |
| MULTIMED | - |
| HYDRO2D-V | - |
| SED2D-V | - |
| HYDRO3D | - |
| RIVMOD | - |

*54*

Exhibit N

CEAM operates an Electronic Bulletin Board System (BBS) to meet the increasing demand for supported exposure assessment models. It allows efficient communication between users with modem-equipped computers and CEAM support staff as well as immediate acquisition of models by those under extreme time pressure. The services presently offered are: 1) downloading of CEAM supported models, 2) uploading of user input data sets for staff review and problem solving, 3) a bulletin area listing current CEAM activities and events, such as training courses, helpful hints about the models, and model documentation, and 4) a message area for discussion of computer modeling problems and enhancements. To access the CEAM BBS, a user must call 404/546-3403 or FTS 250-3402 and follow the interactive prompts. The communications parameters are 9600/2400/1200 baud, no parity, 8 data bits, and 1 stop bit.

Information about obtaining the models may be obtained by writing the Center for Exposure Assessment Modeling. U.S. EPA, College Station Road, Athens, GA 30613, or by calling 404-546-3549.

Exhibit N    *55*

# *APPENDIX F - GENERAL EPA/STATE AGREEMENT OUTLINE FOR DEVELOPMENT OF TMDLs*

Since conditions, procedures, and methodologies may vary between EPA Regions and their States, a general outline of an example agreement is provided. This outline can be used in conjunction with the referenced technical guidance documents to prepare EPA/State Agreements.

I.   General
    A.    Purpose, Scope, and Authority
    B.    Statement of Policy

II.  Water Quality Standards Considerations
    A.    General
    B.    Type of Stream Classifications

III. Allocation Procedures and Policies
    A.    Basic Approach for Establishing Boundaries for TMDL Development
    B.    Determination of TMDL, WLA, and LA Using Water Quality Models
    C.    Determination of TMDL, WLA, and LA Using Other Analytical Tools
    D.    Special Case Policies

IV.  Public Participation Process

V.   Approval of TMDL, WLA, and LA

VI.  Incorporation of Allocations into NPDES Permits
    A.    General
    B.    Priority Considerations

Appendix. State Continuing Planning Process (CPP)

Exhibit N

# APPENDIX G - CAUSES AND SOURCES OF POLLUTION

Causes and Sources: Section 305(b) Waterbody System User's Guide, Third Edition (Version 2.0), August 1989, USEPA, Office of Water, Assessment and Watershed Protection Division, pages A-27 through A-31.

## Causes

Causes are the pollutants or conditions that are causing or expected to cause exceedances of water quality standards. One or more of the following categories should be used to identify causes of impairment:

- unknown toxicity    - organic enrichment/
                         DO
- pesticides          - salinity/TDS/chlorides
- priority organics   - thermal modifications
- nonpriority organics - flow alterations
- metals              - other habitat
                         alterations
- ammonia             - pathogens
- chlorine            - radiation
- other organics      - oil and grease
- nutrients           - taste and odor
- pH                  - suspended solids
- siltation           - noxious aquatic plants
- filling and draining - cause unknown

## Sources

Sources are the point and nonpoint sources of the pollution categories that are listed as causes identified above. One or more of the following categories should be used to identify sources of impairment:

- source unknown
- industrial point      - municipal point
  sources                 sources
- combined sewer        - agriculture
  overflow
- silviculture          - construction
- urban runoff/storm    - resource extraction
  sewers
- land disposal         - hydromodification
- habitat modification

Other categories:

- atmospheric deposition - storage tank leaks
- highway maintenance/   - spills
  runoff
- in-place contaminants  - natural
- recreational activities - upstream impound-
                            ments
- salt storage sites

*57*

Exhibit N

# *LIST OF ACRONYMS*

| | |
|---|---|
| ARAR | Applicable or Relevant and Appropriate Requirements |
| AT | Advanced Treatment |
| BAT | Best Available Technology |
| BCT | Best Conventional Technology |
| BMP | Best Management Practice |
| $BOD_5$ | 5-day Biochemical Oxygen Demand |
| BPJ | Best Professional Judgement |
| BPT | Best Practicable Control Technology |
| CCC | Criteria Continuous Concentration |
| CEAM/BBS | Center for Exposure Assessment Modeling/Electronic Bulletin Board System |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| CLP | Clean Lakes Program |
| CMC | Criteria Maximum Concentration |
| CPP | Continuing Planning Process |
| CSO | Combined Sewer Overflow |
| CWA | Clean Water Act |
| DO | Dissolved Oxygen |
| EPA | Environmental Protection Agency |
| FR | Federal Register |
| ICS | Individual Control Strategy |
| LA | Load Allocation |
| LC | Loading Capacity |
| MOS | Margin of Safety |
| NCMP | National Coastal and Marine Policy |
| NEP | National Estuary Program |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | Nonpoint Source |
| POTW | Publicly Owned Treatment Works |
| QA/QC | Quality Assurance/Quality Control |
| SARA | Superfund Amendments and Reauthorization Act |
| TMDL | Total Maximum Daily Load |
| TRE | Toxic Reduction Evaluation |
| TRI | Toxic Release Inventory |
| TSD | Technical Support Document |
| WBS | Waterbody System |
| WLA | Wasteload Allocation |
| WQMP | Water Quality Management Plan |
| WWTP | Wastewater Treatment Plant |

*58*

Exhibit N

# SELECTED OFFICES, DIVISIONS, BRANCHES, AND SECTIONS WITHIN EPA

|        |                                                    | General Contact Phone Number |
|--------|----------------------------------------------------|------------------------------|
| OW     | Office of Water                                    | 382-5700                     |
| OWRS   | Office of Water Regulations and Standards          | 382-5400                     |

|       | Division/Branch/Section                                       | Phone     |
|-------|---------------------------------------------------------------|-----------|
| AED   | Analysis and Evaluation Division                              | 382-5389  |
| ITD   | Industrial Technology Division                               | 382-7120  |
| CSD   | Criteria and Standards Division                              | 382-7301  |
| AWPD  | Assessment and Watershed Protection Division                 | 382-7040  |
|       | Monitoring Branch                                            | 382-7056  |
|       | Monitoring Management Section (TMDLs/WLAs)                   |           |
|       | Monitoring Analysis Section                                 |           |
|       | Water Quality Analysis Branch                               | 382-7046  |
|       | Information Services Section                                |           |
|       | Special Studies Section                                     |           |
|       | Exposure Assessment Section                                 |           |
|       | Nonpoint Source Control Branch                              | 382-7085  |
|       | Clean Lakes Section                                         |           |
|       | Nonpoint Source Control Section (BMPs/LAs)                  |           |

|        |                                                    |          |
|--------|----------------------------------------------------|----------|
| OMEP   | Office of Marine and Estuarine Protection          | 382-7166 |
| OWEP   | Office of Water Enforcement and Permits            | 475-8488 |
| OMPC   | Office of Municipal Pollution Control              | 382-5850 |
| ODW    | Office of Drinking Water                           | 382-5543 |
| OGWP   | Office of Ground Water Protection                  | 382-7077 |
| OWP    | Office of Wetlands Protection                      | 475-7791 |

---

All area codes are 202.

Exhibit N

1992 Amendments to the Chesapeake Bay Agreement

 **Chesapeake Bay Program**

# Chesapeake Bay Agreement: 1992 Amendments

In 1987, Virginia, Maryland, Pennsylvania, the District of Columbia, the Chesapeake Bay Commission and the U.S. Environmental Protection Agency formally agreed to reduce and control point and nonpoint sources of pollution to attain the water quality conditions necessary to support the living resources of the Bay. TO achieve this, we agreed to develop, adopt and begin to implement a strategy to equitably achieve by the year 2000 a 40 percent reduction of nitrogen and phosphorus entering the mainstem Chesapeake Bay. WE also agreed to reevaluate the 40 percent reduction target based on the results of modeling, monitoring and other information available to us.

BASED UPON THE 1991 NUTRIENT REDUCTION REEVALUATION, WE HAVE FOUND THAT:

We have achieved significant improvements in water quality and living resources habitat conditions in the mainstem of Chesapeake Bay.

- There is a clear need to expand our program efforts in the tributaries, since most of the spawning grounds and essential habitat are in the tributaries.
- Intensified efforts to control nonpoint sources of pollution, including agriculture and developed areas, will be needed if we are to meet our 40% nutrient reduction goal.
- We are now able to demonstrate the link between water quality conditions and the survival and health of critically important submerged aquatic vegetation (SAV).

Implementation of the Clean Air Act Amendments will provide additional opportunities to achieve nitrogen reductions.

Achieving a 40 percent nutrient reduction goal, in at least some cases, challenges the limits of current point and nonpoint source control technologies.

**THEREFORE, TO FURTHER OUR COMMITMENTS MADE IN THE 1987 CHESAPEAKE BAY AGREEMENT, WE AGREE:**

- To reaffirm our commitment to achieve an overall 40 percent reduction of nitrogen and phosphorus entering the mainstem Chesapeake Bay by the year 2000 and to maintain at least this level of reduction thereafter.
- To amend the water quality goal of the 1987 Chesapeake Bay Agreement to reflect the critical

AR0005478

importance of the tributaries in the ultimate restoration of Chesapeake Bay: "Reduce and control point and nonpoint sources of pollution to attain the water quality condition necessary to support &e living resources of the Chesapeake Bay **and its tributaries."**

- To develop and begin implementation of tributary-specific strategies by August 1993. These strategies will be designed to:

  1. Meet the mainstem nutrient reduction goals.
  2. Achieve the water quality requirements necessary to restore living resources in both the mainstem and the tributaries.
  3. Incorporate public participation in the development, review and implementation of the strategies, ensuring the broadest possible public involvement.
  4. Advance both cost-effectiveness and equity.

- To use the distribution of submerged aquatic vegetation (SAV) in the Bay and its tidal tributaries, as documented by Baywide and other aerial surveys conducted since 1970, as an initial measure of progress in the restoration of living resources and water quality.

- To incorporate into the Nutrient Reduction Strategies an air deposition component which builds upon the 1990 Amendments to the federal Clean Air Act and explores additional implementation opportunities to further reduce airborne sources of nitrogen entering Chesapeake Bay and its tributaries.

- To continue to explore improved technologies that may be cost-effective in attaining further nutrient reductions.

- To explore cooperative working relationships with the other three basin states (New York/West Virginia/Delaware) in the development of tributary-specific strategies for nutrient reduction.

By this AGREEMENT, we reaffirm our commitments made in the 1987 Chesapeake Bay Agreement to restore and protect the ecological integrity, productivity and beneficial uses of the Chesapeake Bay system. In addition, we the undersigned agree to further our efforts through the commitments made here today which are hereby incorporated into the 1987 Chesapeake Bay Agreement.

DATE: August 12, 1992

SIGNERS:

For the Commonwealth of Virginia--*Lawrence Douglas Wilder, Governor*

For the State of Maryland--*William Donald Shaefer, Governor*

For the Commonwealth of Pennsylvania--*Robert P. Casey, Governor*

For the District of Columbia--*Sharon Pratt Kelly, Mayor*

For the United States of America--*William K. Reilly, Administrator, U.S. Environmental Protection Agency*

For the Chesapeake Bay Commission--*Bernie Fowler, Chairman*

Return to top of this document
Return to Home

AR0005479

1992 Amendments to the Chesapeake Bay Agreement

For more information, contact the Chesapeake Bay Program Office, 410 Severn Avenue, Suite 110, Annapolis, MD 21403, Tel: (800) YOUR-BAY, Fax: (410) 267-5777.

 *Last modified 4 March 1996*

AR0005480

Joint Tributary Strategy Statement

 # Chesapeake Bay Program

**Chesapeake Executive Council**
**Directive No. 93-1**

# Joint Tributary Strategy Statement

Among the most serious problems facing the Chesapeake Bay and its tributaries is an excess of the nutrients, nitrogen and phosphorus, caused by human activities on the land. To alleviate this problem the historic 1987 Chesapeake Bay Agreement set a goal to achieve "by the year 2000 at least a 40 percent reduction of nitrogen and phosphorus entering the main stem of the Chesapeake Bay? THIS REDUCTION IN NUTRIENTS WILL RESULT IN a significant improvement in dissolved oxygen in the waters of the main stem of the Bay. Improved oxygen levels will, in turn, significantly improve conditions for living resources such as crabs, oysters, striped bass, and Bay grasses.

- In 1992, the Chesapeake Executive Council committed their jurisdictions to developing tributary-specific nutrient reduction strategies by August 1993. During the past year, Maryland, Virginia, Pennsylvania, and the District of Columbia have engaged in an unprecedented effort to develop these strategies.

- In the 1992 Amendments, the Executive Council also pledged that the Tributary Strategies would include a permanent cap on nutrient inputs. Thus, despite increased growth in the Chesapeake region, nutrients entering the Bay must remain at a level 40 percent less than they were in 1985, even in the face of increased population and development. This implies that our nutrient reduction techniques must be dynamic and our long-term strategies robust. Equally important, the strategies will require the cooperative effort of every level of government in the watershed, as well as the understanding and participation of all its citizens.

- Because each tributary is different in its geography, hydrography, and ecology, each of the Chesapeake's tributaries requires different solutions; and flexibility is needed as nutrient load reductions are allocated to individual tributaries. In Maryland, Pennsylvania, and northern Virginia, a 40 percent reduction in loadings will not only improve water quality in the tributaries themselves, but will improve conditions for living resources in the main stem of the Bay. In Virginia's southern rivers, however, nutrient reductions which may have little influence on the main stem will still improve local conditions. For this reason, the Chesapeake Bay Program and Virginia will conduct long-term monitoring and computer modeling of these tributaries to determine the level of reduction necessary to improve living resource conditions. Between now and 1997, when this special study is completed, Virginia will implement an interim 40 percent reduction strategy.

- The goals committed to by the Chesapeake Executive Council in the 1987 Agreement and 1992

AR0005476

Amendments can only be met if government, business and citizens work together. A real and lasting partnership must be built if we are to achieve our goal of a clean and bountiful Chesapeake Bay. Today, each jurisdiction will outline specific actions it will take to improve water quality and protect living resources. In addition to these individual actions, we recognize the importance of coordinating our efforts.

**THEREFORE TO FURTHER OUR COMMITMENTS MADE IN THE CHESAPEAKE BAY AGREEMENT, WE WILL:**

- Continue our public participation efforts in each jurisdiction and actively pursue the involvement of local governments, citizens, business, and industry in the final development and implementation of tributary strategies.
- Continue and enhance current nutrient reduction programs in order to meet the 40 percent goal, which is a reduction of 74.0 million pounds of nitrogen and 8.4 phosphorus baywide.
- Complete a draft of the tributary strategies, along with implementation schedules, by December 31, 1993, which can be evaluated to insure that when implemented the 40 percent Baywide goal and the restoration of water quality for living resources will be met.
- Report annually on the progress of the tributary efforts including an analysis of the extent to which plans are being implemented.
- Reexamine each strategy no later than 1997 to insure that the adopted practices will achieve the year 2000 reduction goals and maintain them; and if not, to take additional actions to ensure that our goals are achieved.
- Continue cooperative efforts in the basins we share.

By this DIRECTIVE, we reaffirm our commitments made in the Chesapeake Bay Agreement to restore and protect the ecological integrity, productivity and beneficial uses of the Chesapeake Bay. In recognition of our commitments, we the undersigned agree to further our efforts through this directive which is hereby incorporated into the overall Chesapeake Bay Program. DATE: December 27, 1993 SIGNERS:

For the Commonwealth of Virginia--*Lawrence Douglas Wilder, Governor*

For the State of Maryland--*William Donald Shaefer, Governor*

For the Commonwealth of Pennsylvania--*Robert P. Casey, Governor*

For the District of Columbia--*Sharon Pratt Kelly, Mayor*

For the United States of America--*Carol M. Browner, Administrator, U.S. Environmental Protection Agency*

For the Chesapeake Bay Commission--*Jeffrey W. Coy, Chairman*

Return to top of this document
Return to Home

For more information, contact the Chesapeake Bay Program Office, 410 Severn Avenue, Suite 110, Annapolis, MD 21403, Tel: (800) YOUR-BAY, Fax: (410) 267-5777.

 *Last modified 4 March 1996*

AR0005477

MEMORANDUM OF UNDERSTANDING between
THE STATE OF MARYLAND and
THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION III,
regarding SECTIONS 303(d) AND 303(e) OF THE CLEAN WATER ACT

WHEREAS Section 303(d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d), and the implementing regulations of the United States Environmental Protection Agency ("EPA"), 40 CFR § 130.7(b)-(e), provide for: (1) the biennial submission to EPA of a list (the "303(d) list") which identifies water quality limited segments ("WQLSs") within a state's boundaries still requiring Total Maximum Daily Loads or Total Maximum Daily Thermal Loads (collectively, "TMDLs") for which applicable technology-based effluent limitations and other effluent limitations or controls required by federal, state or local law are not stringent enough to implement water quality standards ("WQSs"); (2) the establishment of a priority ranking for such waters; and (3) the establishment of TMDLs for those WQLSs at levels necessary to attain and maintain the applicable narrative and numerical water quality standards with seasonal variations and a margin of safety;

WHEREAS EPA and the State of Maryland ("Maryland") desire to restore the quality of impaired waters to achieve WQSs pursuant to Section 303(d) of the CWA;

AR0012622

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

WHEREAS Section 303(e) of the CWA, 33 U.S.C. § 1313(e), and EPA's implementing regulations, 40 CFR § 130.5, provide for EPA's review of Maryland's continuing planning process ("CPP") from time to time;

WHEREAS the State of Maryland has primary responsibility for the identification and prioritization of WQLSs still requiring TMDLs and for establishment of TMDLs pursuant to Section 303(d) of the CWA and implementing regulations;

WHEREAS EPA intends to work with Maryland to assure that water quality-based NPDES permits issued by the Maryland Department of the Environment ("MDE") will include limits that are based on WQSs and consistent with the assumptions and requirements of any applicable waste load allocation in accordance with 40 CFR § 122.44(d)(1)(vii)(A) and (B);

NOW, THEREFORE, EPA AND THE STATE OF MARYLAND HAVE PREPARED THIS MEMORANDUM OF UNDERSTANDING ("MOU") AND EACH AGREE TO USE BEST EFFORTS TO ACCOMPLISH THE FOLLOWING:

This MOU is entered into by the Regional Administrator of Region III of EPA and, on behalf of the State of Maryland, the Secretary of MDE. The Maryland Department of Agriculture and the Maryland Department of Natural Resources are non-signing cooperating agencies.

2

AR0012623

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

This MOU sets forth a plan of action for EPA and Maryland to follow through the completion of all of the tasks set forth in Parts II and III herein, regarding the joint fulfillment of obligations set forth under Section 303(d) and (e) of the CWA.

This MOU shall serve as the framework for administering portions of Maryland's water programs. Specifically, it sets forth the respective duties of EPA and Maryland for (1) developing the lists of WQLSs required by CWA Section 303(d), and (2) developing, where necessary, TMDLs for those waters identified on Maryland's 1996 Section 303(d) list approved December 31, 1996, and 1998 303(d) list approved September 28, 1998. It also describes the process by which Maryland will facilitate EPA's review of its CPP. EPA agrees to exercise best efforts to assist Maryland in obtaining additional federal funding for the purpose of carrying out its obligations under the MOU.

I.   Section 303(d) List - Maryland will use best efforts to submit to EPA timely lists of WQLSs requiring TMDLS in accordance with Section 303(d) of the CWA and 40 CFR § 130.7.

3

AR0012624

II.  <u>Establishment of TMDLS for all WQLSs on the 1996 and 1998
      303(d) Lists</u>

   A.    EPA and Maryland agree that the list of WQLSs (set
forth in Exhibit A to this MOU) is Maryland's 1998 303(d) list of
waters approved by EPA in the letter dated September 28, 1998,
which consists of Maryland's 1996 303(d) list approved December
31, 1996, and 58 additional waters.

   B.    EPA and Maryland understand that TMDLS do not need to
be established for any WQLS that are removed from the 1998 303(d)
List of WQLSs contained in Exhibit A, and whose removal is
approved by EPA.  A WQLS may be removed from an approved 303(d)
List for any of a number of reasons including but not limited to:

   (1)   more recent or more accurate monitoring and assessment
         information and/or more sophisticated water quality
         modeling indicates that the WQLS attains WQSs;

   (2)   new information indicates that, as a result of changes
         in conditions, including implementation of technology-
         based pollution controls, the WQLS is expected to
         attain applicable WQSs before April 1 of the next even-
         numbered year as the result of implementation of
         required pollution controls;

4

AR0012625

(3)   new information shows that, upon re-examination, the
       State determines that the original basis for listing
       the WQLS on the 303(d) list was inaccurate;

(4)   Maryland determines for other reasons consistent with
       the law and applicable regulations that the WQLS does
       not need a TMDL pursuant to Section 303(d) of the CWA
       and 40 CFR 130.7, as amended, and EPA approves
       Maryland's determination.

C.    Subject to available resources, MDE will use best
efforts to establish and submit to EPA, on or before December 31,
2008 and in accordance with the Watershed Cycling Strategy
described in pararaph II.D. and the schedule attached hereto as
Exhibit B, TMDLs for each of the WQLSs identified in Maryland's
1996 303(d) list that are not removed from the list pursuant to
section 11.B, above.  For the WQLSs added to Maryland's 303(d)
list in 1998 and subsequent years, MDE will establish TMDLs
within five years of listing for those segments having high
priorities, and within ten years and in accordance with the
Watershed Cycling Strategy described in paragraph II.D. for all
other segments.

5

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

D.    EPA understands that Maryland intends to develop TMDLs
for the WQLSs remaining on the 1998 303(d) list and future 303(d)
lists through a watershed approach, as provided in Exhibit C,
Maryland Department of the Environment Plan for TMDL Watershed
Cycling Strategy ("the Cycling Strategy").

(1)   Five large watersheds have been identified in the
Cycling Strategy, each encompassing approximately 20%
of the State.  See Exhibit C.

(2)   The Cycling Strategy consists of three steps to be
conducted in sequence for each watershed.  The first
step is monitoring.  The second step is modeling and
TMDL development.  The third step, which is outside the
scope of this Agreement, is TMDL implementation and
watershed-based permitting, as appropriate.  Maryland
anticipates that each step will take approximately one
year to complete in each watershed.  Because the five-
year cycle repeats itself, the watershed cycling
strategy establishes a natural evaluation framework as
the cycle is repeated.

6

AR0012627

(3)   Implementation of these three steps will be staggered through the five watersheds and resources for each step focused in one watershed each year.  For example, monitoring will be performed for watershed #1 (the Coastal, Lower Eastern Shore, and Choptank watersheds) in 1998, for watershed #2 (the Upper Western Shore and Upper Eastern Shore watersheds) in 1999, for watershed #3 (the Patapsoco/Back and Lower Western Shore watersheds) in 2000, and so on.  Modeling and TMDLS development will be performed for watershed #1 in 1999, for watershed #2 in 2000, for watershed #3 in 2001, and so on.

E.   EPA will exercise best efforts to provide federal funding, training, and administrative and technical assistance to Maryland to facilitate its efforts to establish TMDLS for WQLSs in accordance with the Cycling Strategy and pursuant to this MOU.

F.   At the request of EPA, Maryland will make available to EPA any existing and readily available water quality-related data which was or could be used to establish TMDLS for all WQLSs on the 1998 303(d) List and on any subsequent list.

7

AR0012628

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

G.    EPA and Maryland agree to produce, on or before
December 31, 1998, and on or before August 1 of each year after
1998 that this MOU is in effect, an annual workplan that (1)
identifies the watersheds that will be the focus of monitoring
and modeling/TMDL development during the following two federal
fiscal years, and (2) identifies the TMDLs to be established by
Maryland in the following federal fiscal year.  This workplan
will be included as part of the annual report described in Part
IV of this MOU.  In order to facilitate good communications
between the parties, Maryland agrees to use best efforts to send
EPA preliminary draft TMDLS well in advance of any deadlines; EPA
agrees to use best efforts to review and provide timely comments
on those preliminary draft TMDLS.

H.    Where TMDLs have been established and approved,
Maryland agrees to reissue existing NPDES permits and issue new
NPDES permits as necessary to comply with the requirements set
forth in 40 CFR § 122.44(d)(1)(vii)(A) and (B).  Maryland
anticipates that this will be accomplished on a watershed basis
through the process established in the Cycling Strategy, as set
forth in Exhibit C.

8

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

III.    <u>Continuing Planning Process</u>

A.    EPA acknowledges that it received Maryland's original CPP prior to November 28, 1975 and approved it.  EPA further acknowledges that Maryland transmitted to EPA a "Continuing Planning Process for Water Quality Management" in 1976 and in 1986.

B.    Maryland and EPA acknowledge that, the week of July 13, 1998, Maryland provided public notice of its intent to revise its CPP and invited public comment thereon.  Maryland agrees to update its CPP and to transmit a document describing its revised CPP to EPA on or before October 1, 1999.  EPA agrees to review and provide to Maryland comments on the revised CPP, in accordance with 40 CFR § 130.5, on or before August 15, 2000. Maryland agrees to consider EPA's comments and recommendations regarding the revised CPP.

IV.  .  <u>Monitoring and Assessment</u>

Maryland will perform chemical and physical monitoring of its waters in accordance with the Cycling Strategy.  With respect to biological monitoring, Maryland agrees to perform the tasks set forth in Exhibit D in accordance with the schedule provided in Exhibit D.  Once a protocol for application of biological data

9

AR0012630

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

is established pursuant to the schedule set forth in Exhibit D, Maryland will conduct biological monitoring in accordance with the Cycling Strategy.  In addition, the Maryland Department of Natural Resources will continue its existing monitoring program.

Maryland will utilize all existing and readily available biological monitoring data, in addition to physical and chemical monitoring data, for the purpose of determining WQLSs for the 2000 303(d) list and all 303(d) lists thereafter.

V.    Funding

A.    The Parties anticipate that in order for Maryland to perform its obligations according to this MOU, it will require additional funding.

B.    EPA agrees to use best efforts to assist Maryland in obtaining additional federal funds to help provide adequate resources for establishing TMDLs according to the Cycling Strategy and related work plans to be developed under the MOU.

C.    EPA further agrees to be flexible to the extent permitted by the applicable law and the terms of existing grant agreements in its oversight of Maryland's grant-related activities in order to accommodate reasonable and  necessary

10

AR0012631

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

changes in Maryland work priorities and other tasks set forth in this MOU.

D.    EPA recognizes that Maryland may not be able to establish TMDLS within the timeframes specified in the Cycling Strategy and work plans provided for under this MOU due to the inability of Maryland to obtain additional funding, a change in priorities resulting from a subsequently approved 303(d) list, or other unforeseen circumstances that are beyond the control of Maryland.  If for any of these reasons, Maryland is unable to establish TMDLs in accordance with the Cycling Strategy and related work plans, then MDE and EPA will attempt to reach agreement on a reasonable extension of time in which Maryland may establish the TMDL.  If upon diligent efforts, MDE and EPA are unable to agree on such an extension, MDE understands that EPA, in the exercise of its discretion, may exercise its has authority to establish those TMDLs pursuant to Section 303(d) of the CWA.

VI.    <u>Reports</u>

On or before August 1 of each year that this MOU is in effect beginning August 1, 1999, Maryland will provide an annual status report to EPA describing progress toward completion of the obligations identified in this MOU including but not limited to

11

AR0012632

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

(1) the Cycling Strategy and workplan described in Part II
Section G, above; (2) current and projected funding available to
Maryland to carry out the obligations identified herein; and (3)
other related issues or problems that prevent or delay
accomplishment of the requirements of this MOU.

VII.    Legal Effect

    A.    This MOU creates no cause of action against EPA or the
State of Maryland beyond those, if any, that may already exist
under State or federal law.    In addition, the execution and
implementation of this MOU does not constitute an explicit or
implicit agreement by the Parties to subject themselves to the
jurisdiction of any State or federal court.    Nor shall this MOU be
construed as an admission by the Parties that they have failed to
implement the requirements of Section 303(d) or (e) of the CWA.
Nor shall this MOU be construed as creating any night or benefit
substantive or procedural, enforceable in law or equity, by any
person or entity against any of the Parties.    This MOU shall not be
construed to create any right to judicial review involving the
compliance or non-compliance with this MOU, nor does it constitute
a determination on the part of EPA that any particular TMDL is
required;

12

AR0012633

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

B.   Nothing in this MOU shall be construed to require actions by the Parties that are inconsistent with or contrary to local, State or federal laws or regulations or any court order.

VIII. <u>Termination</u>

This MOU shall terminate upon the establishment of TMDLs for all WQLSs on the 1998 Section 303 (d) List for which TMDLs are required and the submission of a revised CPP, which Maryland anticipates will be completed by October 1, 2008.

IX. <u>Modification</u>

A.   The Parties recognize that any efforts made by Maryland to implement this MOU are contingent on the availability of funds and other resources.

B.   If circumstances change for such issues including but not limited to resource requirements or underlying legal requirements, the Parties may negotiate appropriate modifications

13

AR0012634

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

to this MOU.  Any modifications signed by the EPA Region III

Regional Administrator and the Secretary of MDE constitute

modifications of this MOU.


DATED this _____ day of _____,1998


UNITED STATED ENVIRONMENTAL PROTECTION AGENCY

By: _____

    W. Michael McCabe
    Regional Administrator
    USEPA Region III


STATE OF MARYLAND


By:_____

    Jane T. Nishida
    Secretary
    Maryland Department of the Environment


14

AR0012635

Memorandum of Understanding between MDE and EPA Region III
regarding Sections 303(d) and 303(e) of the Clean Water Act

to this MOU. Any modifications signed by the EPA Region III

Regional Administrator and the Secretary of MDE constitute

modifications of this MOU.


DATED this _____ day of _____,1998


UNITED STATED ENVIRONMENTAL PROTECTION AGENCY


By: _____
    W. Michael McCabe
    Regional Administrator
    USEPA Region III


STATE OF MARYLAND


By:_____
    Jane T. Nishida
    Secretary
    Maryland Department of the Environment


14

AR0012636

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| AMERICAN CANOE ASSOCIATION, INC., and THE AMERICAN LITTORAL SOCIETY<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, CAROL BROWNER, in her official capacity as the Administrator of the U.S. Environmental Protection Agency, and MICHAEL McCABE, in his official capacity as Regional Administrator of Region III of the U.S. Environmental Protection Agency,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No.<br>) 98-979-A<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

FILE

JUN 1 1 1999

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

## CONSENT DECREE

WHEREAS, on July 9, 1998, Plaintiffs American Canoe Association, Inc., and the American Littoral Society filed this action against Defendants United States Environmental Protection Agency ("EPA"), Carol M. Browner in her official capacity as Administrator of EPA, and W. Michael McCabe in his official capacity as Regional Administrator of EPA Region III (collectively, "EPA").

WHEREAS, Section 303(d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d), and EPA's implementing regulations at 40 C.F.R. § 130.7(b)-(e) require each State to (1) identify those State waters that it expects will fail to achieve applicable water quality standards after application of technology-based effluent limitations and other controls; (2) establish a priority

90-5-14 05/65

AR0012527

ranking for such waters; (3) establish total maximum daily loads ("TMDLs") for pollutants for

which those waters are not in attainment with water quality standards; and (4) estimate total

maximum daily thermal loads ("TMDTLs") for those waters that are not in attainment with water

quality standards related to temperature;

     WHEREAS, Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2), requires EPA to

approve or disapprove a State's Section 303(d) list or TMDL/TMDTL submissions within 30

days of such submission. If EPA disapproves a State's Section 303(d) list or TMDL/TMDTL,

then EPA. must identify such waters in the State or establish the TMDL/TMDTL for such waters

that EPA determines necessary to implement applicable water quality standards;

     WHEREAS, Section 303(e) of the CWA, 33 U.S.C. § 1313(e), and EPA's implementing

regulations at 40 C.F.R. § 130.5 require that each State have an EPA-approved Continuing

Planning Process ("CPP"), and that EPA from time to time review each State's CPP in order to

ensure that it is at all times consistent with the CWA;

     WHEREAS, Section 7(a) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a),

provides for interagency consultation under certain circumstances and for the carrying out of

programs for the conservation of endangered species and threatened species listed pursuant to

Section — of the ESA, 16 U.S.C. § 1533, as well as interagency conferencing under certain

circumstances with respect to species proposed to be listed;

     WHEREAS, Section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706,

provides for judicial review of agency actions that are alleged to be arbitrary or capricious,

contrary to law, or unlawfully delayed or withheld;

     WHEREAS the Commonwealth of Virginia has lead responsibility for the identification

-2-

AR0012528

and prioritization of waters still requiring TMDLs and for establishment of TMDLs pursuant to Section 303(d) of the CWA for Virginia's waters;

WHEREAS, EPA's implementing regulations at 40 C.F.R. § 122.44(d)(1)(vii)(A) provide that, when developing water quality-based effluent limits, the permitting authority shall ensure that "the level of water quality to be achieved by limits on point sources is derived from and complies with all applicable water quality standards";

WHEREAS, EPA's implementing regulations at 40 C.F.R. § 122.44(d)(1)(vii)(B) provide that, when developing water quality-based effluent limits, the permitting authority shall ensure that "effluent limits developed to protect a narrative water quality criterion, a numeric water quality criterion, or both, are consistent with the assumptions and requirements of any available wasteload allocation for the discharge prepared by the State and approved by EPA pursuant to 40 C.F.R. § 130.7";

WHEREAS, EPA intends to work with the Commonwealth of Virginia to assure that National Pollutant Discharge Elimination System ("NPDES") permits under Section 402 of the CWA will be issued in compliance with 40 C.F.R. § 122.44(d)(1)(vii)(A) and (B);

WHEREAS, Plaintiffs reserve their rights under law to challenge NPDES permits issued by the Commonwealth of Virginia or EPA that do not comply with 40 C.F.R. § 122.44(d)(1)(vii)(A) or (B), and EPA reserves any defenses it may have to such challenges;

WHEREAS, CWA Section 303(d)(2) provides that States shall incorporate TMDLs into their current water quality management plans under subsection (e) of Section 303 of the CWA;

WHEREAS, the parties agree the Commonwealth of Virginia intends to establish TMDLs for all waters listed on the 1998 Section 303(d) list in accordance with the schedule set

-3-

AR0012529

forth in the Memorandum of Understanding between EPA and the Commonwealth of Virginia

(as defined below) and that the Commonwealth of Virginia further intends to incorporate into the

schedule any waters listed on subsequent Section 303(d) lists that are due to be submitted to EPA

through December 31, 2004;

WHEREAS, the parties consider this settlement to be a just, fair, adequate and equitable

resolution of the claims raised in this action;

WHEREAS, in order to resolve this lawsuit, the parties also have entered into a

Settlement Agreement, which has been filed separately with the Court for informational purposes

only; its terms are not incorporated into this Decree, and it is not an enforceable order of this

Court;

WHEREAS, it is in the interest of the public, the parties and judicial economy to resolve

the issues in this action without protracted litigation, including a trial;

WHEREAS, the Court finds and determines that this Consent Decree represents a just,

fair, adequate and equitable resolution of the claims raised in this action;

NOW, THEREFORE, it is hereby ordered, adjudged, and decreed as follows:

## I. GENERAL TERMS

1.    The parties to this Consent Decree are Plaintiffs American Canoe Association, Inc., and

American Littoral Society; and Defendants EPA, Carol Browner in her official capacity as

Administrator of EPA, and W. Michael McCabe in his official capacity as Regional

Administrator of EPA Region III.  The parties understand that Carol Browner and W. Michael

McCabe were sued in their official capacities and that the obligations arising under this Decree

are to be performed by EPA and not by Carol Browner or W. Michael McCabe in their individual

-4-

AR0012530

capacities.

2.   This Consent Decree applies to, is binding upon, and inures to the benefit of Plaintiffs (and their successors, assigns, and designees) and Defendants.

3.   Unless otherwise expressly provided, terms used in this Consent Decree that are defined in the CWA and ESA or in their implementing regulations shall have the meaning assigned to them therein. For the purposes of this Decree, the following terms shall have the meanings provided below. All references in this Decree to sections of the U.S. Code ("U.S.C.") and the Code of Federal Regulations ("C.F.R.") are to those sections as of the date of entry of this Consent Decree or as subsequently amended.

A.   "1998 Section 303(d) list" means all waters and pollutants identified on the 1998 Section 303(d) list for Virginia after EPA's final decision on May 10, 1999. The waters and pollutants comprising the "1998 Section 303(d) list" are identified in Attachment A to this Consent Decree. The terms "1998 Section 303(d) list" and "Attachment A" may be used interchangeably herein.

B.   "Attachment A Waters" means all waters and pollutants identified in the "1998 Section 303(d) list." The list of these waters and pollutants is attached to this Consent Decree as Attachment A and consists of approximately 800 waters. The terms "1998 Section 303(d) list" and "Attachment A" may be used interchangeably herein.

C.   "Attachment B Waters" means the list of additional waters and pollutants that Plaintiffs contend should have been included on the 1996 and/or 1998 Section 303(d) lists. They are identified in Attachment B to this Decree. This list consists

-5-

AR0012531

of approximately 200 waters.

D.    "Attachment C Waters" means those waters and pollutants listed on Attachment B that appear on the next Section 303(d) list.

E.    "Category 1 Waters" are a subset of the waters and pollutants identified in Attachment A and are denominated as such on that Attachment. The Category 1 Waters (which appear to be primarily affected by nonpoint source contributions) consist of approximately 240 waters on Part I of Virginia's October 14, 1998 Section 303(d) submission to EPA and approximately 70 additional waters and pollutants identified by EPA in its final decision dated May 10, 1999.

F.    "Category 2 Waters" are a subset of the waters and pollutants identified in Attachment A and are denominated as such on that Attachment. The Category 2 Waters consist of approximately 226 waters on Part II of Virginia's October 14, 1998 § 303(d) submission to EPA and 24 additional waters and pollutants identified by EPA in its final decision dated May 10, 1999. Category 2 Waters also may include a subset of any waters and pollutants as described below that are identified in Attachment C and that are denominated as such on that Attachment. Category 2 Waters are waters that are listed because point sources discharging to the waters either are not subject to water quality-based effluent limitations that are stringent enough to achieve applicable water quality standards, or are subject to such limitations but operate under a compliance schedule that will not lead to attainment of applicable water quality standards by April 1, 2000.

G.    "Category 3 Waters" are a subset of the waters and pollutants identified in

-6-

AR0012532

Attachment A and are denominated as such on that Attachment. Category 3

Waters consist of the 262 waters appearing on the 1998 Section 303(d) list

because of shellfish impairments.

H.    "Category 4 Waters" are a subset of those waters and pollutants, if any, identified

in Attachment C (other than those identified as Category 2 waters) and

denominated as such on that Attachment.

I.    "Complaint" means the complaint filed by the Plaintiffs in Civil Action Number

98-979-A in the U.S. District Court for the Eastern District of Virginia on July 9,

1998, as supplemented on or about June 4, 1999.

J.    "Continuing Planning Process" ("CPP") has the meaning provided in CWA

Section 303(e), 33 U.S.C. § 1313(e), and 40 C.F.R. § 130.5.

K.    "Existing and readily available water quality-related data and information" has the

meaning provided at 40 C.F.R. § 130.7(b)(5).

L.    "Final action" means final agency action EPA takes to approve and/or disapprove

or establish the next Section 303(d) list, any subsequent Section 303(d) list, or any

TMDL for Virginia waters, consistent with Section 303(d) and EPA's

implementing regulations.

M.    "Memorandum of Understanding" or "MOU" means the November 1998

Memorandum of Understanding regarding Sections 303(d) & (e) of the CWA

between EPA and the Commonwealth of Virginia (included with this Decree as

Attachment D for informational purposes only).

N.    "Next Section 303(d) list" means the next Section 303(d) list developed for

-7-

AR0012533

Virginia waters subsequent to its 1998 Section 303(d) list. Regulations in effect as of the date of entry of this Consent Decree require Virginia to submit the next Section 303(d) list by April 1, 2000, but that date is subject to any modifications that may be made to those regulations.

O.    "Section 303(d) list" means the final list of waters developed pursuant to Section 303(d) of the CWA and 40 C.F.R. § 130.7 for Virginia and either approved or established by EPA, or when appropriate, approved in part and established in part by EPA.

P.    "Settlement Agreement" means the Agreement between the parties executed concurrently with this Decree.

Q.    "Subsequent Section 303(d) list" means any Section 303(d) list developed for Virginia waters subsequent to the next Section 303(d) list and due to be submitted to EPA before May 1, 2011.

R.    "Total Maximum Daily Load" ("TMDL") has the meaning provided at CWA Section 303(d)(1)(C) and EPA's implementing regulations at 40 C.F.R. § 130.2(i). For purposes of this Decree, the term "TMDL" includes a "total maximum daily thermal load" ("TMDTL"), and with respect to a TMDTL, the term "establishment" shall refer to "estimation" within the meaning of CWA Section 303(d)(1)(D).

S.    "United States" means the United States of America, including its officers, agencies, departments and instrumentalities.

T.    "Virginia" means the Commonwealth of Virginia and in particular the Virginia

-8-

AR0012534

Department of Environmental Quality and the Virginia Department of

Conservation and Natural Resources, which are the Virginia agencies responsible

for development of TMDLs for Virginia.

U.     "Water Quality Limited Segment" ("WQLS") has the meaning provided at CWA

Section 303(d)(1)(A) and (B) and EPA's implementing regulations at 40 C.F.R.

§ 130.2(j).

V.     "Water Quality Standard" ("WQS") has the meaning provided at 40 C.F.R.

§ 130.2(d).

## II. SECTION 303(d) LISTS

4.    In order to address Plaintiffs' concerns regarding Virginia's 1996 and 1998 Section

303(d) lists, EPA agrees to take the following steps regarding the development and establishment

of Virginia's next Section 303(d) list.



(a) Within 60 days of the entry of this Decree, EPA shall transmit to Virginia the

list of waters and pollutants identified in Attachment B to this Decree for Virginia's

consideration in developing the next Section 303(d) list.  EPA considers Attachment B to be

existing and readily available water quality-related data and information for the next Section

303(d) list, but by entering into this Decree EPA is not making any determination regarding

whether any Attachment B waters and pollutants should be part of that list; rather, EPA is

agreeing only that they must be considered by Virginia and EPA in making that determination.



(b) In addition to the public notice provided by Virginia regarding its proposed

next Section 303(d) list, EPA as soon as possible shall provide notice of availability of that

proposed list in the Federal Register.  In its notice, EPA shall identify Virginia's public comment

-9-

AR0012535

period and the state contact(s) for further information, and shall specify that comments are to be

sent to Virginia. EPA shall coordinate with Virginia with the objective of publishing concurrent

notices.

(c) In reviewing the next Section 303(d) list, EPA shall determine whether the list

includes the Attachment B waters and pollutants. If EPA finds that the next Section 303(d) list

does not include all Attachment B waters or pollutants, then in accordance with 40 C.F.R.

§ 130.7(b) EPA shall either:

> (1) determine that such water(s) and pollutant(s) need to be listed,
> disapprove the omission of such water(s) and pollutant(s), and propose for
> public notice and comment a list that includes such water(s) and
> pollutant(s); or

> (2) determine that such water(s) and pollutant(s) need not be listed and
> approve the omission of such water(s) and pollutant(s).

(d) EPA expects Virginia to provide a waterbody-specific rationale justifying the

omission of any Attachment B water or pollutant. As part of EPA's decision on the next Section

303(d) list, EPA shall provide a waterbody-specific rationale justifying the omission of any

Attachment B water or pollutant, and EPA shall provide a copy of the decision to the Plaintiffs.

(e) Within 30 days of either approving the next Section 303(d) list or identifying

waters to be added to the next Section 303(d) list, whichever is later, EPA shall (1) compile a list

of all Attachment B waters and pollutants, if any, that appear on the next Section 303(d) list, as

approved and, if necessary, supplemented by EPA; (2) specify which are Category 2 Waters and

Category 4 Waters; and (3) file a motion to amend this Consent Decree to include that list

(denominated Attachment C).

-10-

AR0012536

## III. ESTABLISHMENT OF TMDLS

5.    (a) For all waters described below, EPA expects Virginia to develop TMDLs for all pollutants for which each WQLS is identified and to submit those TMDLs to EPA for review and approval or disapproval (or to provide data and information showing that a TMDL is unnecessary) in accordance with the schedule set forth below.  Subject to Paragraph 6(a) below, EPA shall establish TMDLs for each water and pollutant identified in Attachments A and C, according to the deadlines set forth below if Virginia fails to do so.  EPA's commitment does not apply to any other waters or pollutants included in the next Section 303(d) list or any subsequent Section 303(d) list.

(b)  Deadlines

(1) **CATEGORY 1 WATERS.**  These waters are identified in Attachment A.

| Date for State Action | Deadline for EPA Action | Number of Category 1 Waters for Each Deadline | Maximum Number of Category 1 Waters for Which EPA may Invoke Paragraphs 6(a)(3) & 6(a)(4) for each Deadline Herein |
|---|---|---|---|
| 5/1/99 | 5/1/00 | 1 | 0 |
| 5/1/00 | 5/1/01 | 12 | 2 |
| 5/1/02 | 5/1/03 | 30 | 6 |
| 5/1/04 | 5/1/05 | 55 | 11 |
| 5/1/06 | 5/1/07 | 64 | 13 |
| 5/1/08 | 5/1/09 | 69 | 14 |
| 5/1/10 | 5/1/11 | 70 | 14 |

-11-

AR0012537

(2) **CATEGORY 2 WATERS.** These waters are identified in Attachments A and C.

| Percentage of Category 2 Waters from Attachment A | Date for State Action | Deadline for EPA Action |
|---|---|---|
| 50% | 11/9/01 | 11/9/02 |
| 75% | 11/9/02 | 11/9/03 |
| 100% | 11/9/03 | 11/9/04 |

| Percentage of Category 2 Waters from Attachment C | Date for State Action | Deadline for EPA Action |
|---|---|---|
| 100% | 11/9/05 | 11/9/06 |

(3) **CATEGORY 3 WATERS.** These waters are identified in Attachment A.

| Percentage of Category 3 Waters | Date for State Action | Deadline for EPA Action |
|---|---|---|
| 50% | 5/1/06 | 5/1/07 |
| 65% | 5/1/08 | 5/1/09 |
| 100% | 5/1/10 | 5/1/11 |

(4) **CATEGORY 4 WATERS.** These waters are identified in Attachment C.

| Percentage of Category 4 Waters | Date for State Action | Deadline for EPA Action |
|---|---|---|
| 25% | 5/1/04 | 5/1/05 |
| 50% | 5/1/06 | 5/1/07 |
| 75% | 5/1/08 | 5/1/09 |
| 100% | 5/1/10 | 5/1/11 |

-12-

AR0012538

## ORDER

UPON CONSIDERATION OF THE FOREGOING, the Court hereby finds that this Consent Decree is fair and reasonable, both procedurally and substantively, consistent with applicable law, in good faith, and in the public interest. THE FOREGOING Consent Decree is hereby APPROVED and ENTERED AS FINAL JUDGMENT.

SIGNED and ENTERED this _____ day of _____, 1999.

T.S. ELLIS, III
Judge, U.S. District Court
Eastern District of Virginia

A True Copy, Teste:
Norman H. Meyer, Jr., Clerk
By _____
        Deputy Clerk

-30-

AR0012556

## ATTACHMENT A

## CATEGORY 1 WATERS
## Part 2:  WATERS IDENTIFIED by EPA FOR INCLUSION
(including pollutant additions and priority changes)

| Segment | Water | Pollutant |
|---|---|---|
| Chesapeake Bay and tributaries | | |
| The state's water identification code is not available for these waters. However, the narrative provided is sufficient to properly identify the location of the waters being listed. | Chesapeake Bay mainstem from the Maryland - Virginia state line to a line running from the mouth of Back River northeast across the Bay to the mouth of Cherrystone Inlet on Virginia's Eastern Shore. | Nutrients |
| | Mattaponi River tidal portions | Nutrients |
| | Pamunkey River tidal portions | Nutrients |
| | York River from the confluence of the Mattaponi and Pamunkey Rivers to the mouth | Nutrients |
| | Rappahannock River from the Totunskey Creek to the mouth (including the tidal portion of the Corrotoman River | Nutrients |
| | Elizabeth River tidal portions including the Western, Southern, and Eastern Branches. | Nutrients |
| | James River - tidal (James Estuary is already listed by the state for phosphorous as threatened as on Part I as impaired by fecal coliforms.  This action is to include the aquatic life concerns) | Nutrients |
| Waters identified by the state as impaired by natural conditions (Where DO is listed as the pollutant it is the impairment.  Sufficient information is not available to identify the source of the impairment.) | | |
| VAV-B06R | Hogue Creek | Temp |
| VAV-B52R | Cedar Creek | Temp |
| VACB-R01E | Chesapeake Bay - note this water is not only threatened by natural conditions but other sources as well.  This water is included on Part I as impaired by nutrients due to point and non-point sources | DO |
| VAP-E23R | Cat Point Creek | pH |

Page -1-

AR0012566

MEMORANDUM OF UNDERSTANDING

between

THE COMMONWEALTH OF VIRGINIA

and

THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION III,

regarding

§§ 303(d) AND 303(e) OF THE CLEAN WATER ACT


Section 303(d) of the Clean Water Act ("CWA"), 33 U.S.C. § 1313(d), and the implementing regulations of the United States Environmental Protection Agency ("EPA") at 40 CFR § 130.7(b)–(e) provide a process for: (1) identification of water quality limited segments for which applicable technology-based effluent limitations and other controls are not stringent enough to implement water quality standards applicable to the waters (the identified segments are listed in the biennial "§ 303(d) list"); (2) establishing total maximum daily loads ("TMDLs") for the waters identified in the § 303(d) list at a level necessary to implement the applicable water quality standards; and (3) establishing a priority ranking for development of the TMDLs for those waters. Specifically, after a state submits its section 303(d) list(s) and/or TMDL(s), EPA approves or disapproves the listing and/or TMDL(s).

Section 303(e) of the CWA, 33 U.S.C. § 1313(e), and EPA's implementing regulations at 40 CFR § 130.5 also provide for Virginia's submission and EPA's review of the state's continuing planning process ("CPP"). At § 303(d)(2), 33 U.S.C. § 1313(d)(2), the CWA requires that the plans produced by the CPP contain the identifications and loads approved or established by EPA under § 303(d).

Va. Code §§ 62.1-44.15(10) and (13), 62.1-44.17:3, and 62.1-44.19:7 give the Virginia State Water Control Board (the "Board") the duty and authority to adopt TMDLs and to conduct the CPP in Virginia. Under the authority of Va. Code § 10.1-1183, the Virginia Department of Environmental Quality ("DEQ") serves as the administrative arm of the Board. Va. Code § 10.1-104.1 grants to the Virginia Department of Conservation and Recreation ("DCR") the lead responsibility for the Commonwealth's nonpoint source pollution management program. EPA supports Virginia's TMDL and planning activities with grants under the Clean Water Act. Under the authority of the State

AR0012599

Water Control Law and under § 402(b) of CWA, 40 Fed. Reg. 20129 (May 8, 1975), the Board issues National Pollutant Discharge Elimination System ("NPDES") permits in Virginia (where the state-issued permits are known as "VPDES" permits). These permits are subject to EPA's objection, and most are issued for the maximum term of five years. In conformance with the CWA and EPA's implementing regulations at 40 CFR Part 122.44(d)(1)(vii), the Board's regulations require that all VPDES permits ensure that effluent limits be consonant with the wasteload allocations approved by EPA under 40 CFR § 130.7. 9 VAC 25-31-220.D.1.f(2).

Through this Memorandum of Understanding ("MOU"), the Regional Administrator of Region III of EPA, the Director of DEQ, and the Director of DCR adopt their plan of action for the joint fulfillment of obligations imposed by § 303(d) and (e) of the CWA. In particular, this MOU sets forth a schedule for (1) developing the § 303(d) list; (2) developing, as necessary, TMDLs for those waters identified on the § 303(d) list; and (3) the submission of a revised CPP by Virginia and review of the revised CPP by EPA.

## I.    Section 303(d) List

EPA has approved Virginia's 1996 Section 303(d) list. On April 29, 1998 Virginia forwarded to EPA for comment a draft of its proposed 1998 Section 303(d) list. On August 30, 1998, Virginia initiated the public notice and comment process on its proposed 1998 Section 303(d) list. The time period for public notice and comment expired on September 30, 1998. After responding to public comments, Virginia submitted its Section 303 (d) list to EPA for approval on October 15, 1998. EPA will approve or disapprove Virginia's submission within 30 days. Virginia will submit subsequent 303(d) lists to EPA for approval as required by the CWA and its implementing regulations.

## II. Establishment of TMDLs

### A. Short Term TMDL Goals

Section 303(d) requires Virginia, as part of its 303(d) list, to establish a priority ranking for

AR0012600

waters on the list. 40 CFR Part 130.7(b) further specifies that this priority ranking identify the waters targeted for TMDL development in the next two years. The annual workplan described below at Section E, will be derived from the waters identified on the most recently approved Section 303(d) list as waters targeted for TMDL development within two years ("short-term list"). It is contemplated that each annual workplan will contain approximately one half of the waters identified in any then-current short-term list.

## B. Long Term TMDL Goals

The draft of Virginia's proposed 1998 Section 303(d) list identifies approximately 726 water segments as needing TMDLs. These waters fall generally into three categories: (1) Two hundred forty segments which do not meet Virginia's numeric and narrative water quality standards and/or criteria, including EPA's five designated uses. These waters appear to be primarily affected by nonpoint source contributions (although some are affected by point source contributions) and generally appear on Part 1 of the section 303(d) list for Virginia; (2) Two hundred twenty four segments, listed because of the impact of point sources, for which NPDES permits have been issued to those point sources and those permits contain schedules to implement controls at a level necessary to meet water quality standards (although it is expected water quality standards will not necessarily be met within two years of establishment of the section 303(d) list for Virginia). These waters generally appear on Part 2 of the section 303(d) list for Virginia; and (3) Two hundred sixty-two impaired shellfish waters for which the sources of the impairment are not well understood.

Unless specified otherwise below, Virginia will develop and submit for EPA approval by May 2010, TMDLs for (1) all waters identified on the approved 1998 Section 303(d) list (except to the extent EPA approves removal of any segment from the list) and (2) any waters that may be added to Virginia's approved 303(d) list through the year 2004. Except as specified below, as to any water that is added to Virginia's approved 303(d) list after 2004, Virginia will develop and submit to EPA for approval TMDLs for those waters not more than 12 years after that water is added to that section 303(d) list. DEQ will review Virginia's progress toward this goal biennially as part of the adoption of Section 303(d) lists. In keeping with this goal, Virginia anticipates developing and submitting TMDLs to EPA for approval as set forth herein.

AR0012601

The parties recognize that the actual number of TMDLs developed by Virginia and submitted to EPA annually may vary depending on a number of factors including availability of resources, the total number of segments appearing on any then-current Section 303(d) list, the level of complexity of any given TMDL and the number of waters for which TMDLs remain to be developed.

(1) Waters appearing on the approved 1998 section 303(d) list for Virginia which do not meet Virginia's numeric and narrative water quality standards or criteria, including EPA's five designated uses. DCR, in cooperation with DEQ, will be primarily responsible for developing TMDLs for these waters. DCR and DEQ anticipate developing and submitting to EPA for approval TMDLs for these waters as follows:

| 1998-5/1/99 | 1 segment |
| 5/1/99-5/1/2000 | 12 segments |
| 2000-2002 | 30 segments |
| 2002-2004 | 40 segments |
| 2004-2006 | 49 segments |
| 2006-2008 | 54 segments |
| 2008-2010 | 54 segments |

(2) Waters appearing on the approved 1998 section 303(d) list for Virginia, because of the impact of point sources, for which NPDES permits have been issued to those point sources and those permits contain schedules to implement controls at a level necessary to meet water quality standards (although it is expected water quality standards will not necessarily be met within two years of establishment of the section 303(d) list for Virginia). DEQ and EPA believe that the permits issued to the point sources which discharge the pollutants for which these segments are listed, contain compliance schedules and that those schedules will cause implementation of controls at a level necessary to meet water quality standards. Within five years from the execution of this MOU, Virginia will either develop and submit to EPA TMDLs for these segments or will submit to EPA, after the point sources achieve compliance with the schedules in their permits, the information necessary to gain EPA approval to remove these waters from the section 303(d) list. As to any waters that are added to Virginia's section 303(d) list after 1998 for which water quality standards are not expected to be met (within two years of establishment of that particular post-1998 section

AR0012602

303(d) list) with the application of technology based effluent control technology, of secondary treatment and best practicable treatment, Virginia will, within 5 years after those waters are added to the section 303(d) list, either submit to EPA information necessary to gain EPA approval to remove such waters from the section 303(d) list or develop TMDLs for those waters.

(3) TMDLs for impaired shellfish waters.    The 1998 proposed list is the first Virginia 303(d) list to contain impaired shellfish waters.  Virginia intends to meet the 2010 goal for developing and submitting TMDLs for impaired shellfish waters appearing on the approved 1998 section 303(d) list for Virginia.  Because of the current lack of information on the causes and sources of this impairment, Virginia is not yet prepared to adopt a short term goal for proposing those TMDLs.

(4) TMDLs for other waters.  To the extent there are waters of other types that appear on the approved section 303(d) list for Virginia, such as waters for which it is not known whether the effect is due primarily to point sources or to nonpoint sources or waters impacted significantly by both point and nonpoint sources, Virginia will  develop and submit to EPA for approval TMDLs for those segments by the year 2010.

## C. Funding & Training.

EPA will use its best efforts to provide funding, training, and administrative and technical assistance to Virginia to facilitate the adoption of the § 303(d) lists and the development of the TMDLs in accordance with this MOU.

## D. Water Quality Data

Upon request by EPA, Virginia will make available to EPA water quality-related data that EPA deems to be relevant to the establishment of TMDLs, except to the extent the data are privileged.

## E. Annual Workplan

EPA and Virginia will produce an annual workplan, by July 1 of each year beginning in 1999,

AR0012603

setting forth the TMDLs to be developed by Virginia between July 1 of that year, and May 1 of the following year as well as the schedule for development of those TMDLs in accordance with Part II of this MOU, Virginia's TMDL public participation plan (after it has become effective) and the CWA. This schedule will be included as part of the annual report described in Part V of this MOU. The annual workplan shall reflect the priorities of the § 303(d) list then in effect, the goals set forth in this MOU, and the available financial and other resources.

### F. Consultation and Cooperation

The parties will consult informally and cooperate wherever possible toward meeting the requirements of State and federal law and toward achieving the goals of this MOU. In particular, TMDLs, section 303(d) lists and any other documents called for in this MOU will be provided to EPA by DEQ before public notice.

### G. Public Participation

DEQ has reserved primary responsibility for the completion of the public participation elements of the TMDL development process. In keeping with this responsibility, and in cooperation with DCR, DEQ will develop a TMDL public participation plan and will submit a draft of that plan to EPA for comment by November 15, 1998. EPA will comment upon that plan within 30 days, and Virginia will consider EPA's comments and will finalize that plan within 30 days of receiving EPA's comments.

## III. Continuing Planning Process

In 1973 Virginia submitted to EPA and EPA approved Virginia's Continuing Planning Process ("CPP"). The Board plans to develop a document which will describe Virginia's current CPP. Such CPP shall conform with the CWA and 40 CFR Part 130.5 and incorporate, *inter alia*, the framework and schedules in this MOU. Virginia will provide the document describing its CPP to

AR0012604

EPA for review by December 31, 1998. EPA will review the document and will provide comments to Virginia in approximately 150 days. Virginia will consider EPA's comments and finalize the document within 150 days.

## IV.    Funding

In order to perform the work set forth in this MOU, DEQ and DCR may need to redirect available staff and grant resources. Indeed, in order for Virginia to do the work set forth in this MOU according to the schedule established here, Virginia may need to acquire additional funding from EPA and/or other sources.

## V.    Reports

The workplan mentioned in Part II. E. shall include an annual status report to EPA describing progress toward completion of the obligations identified in the workplan and this MOU. The report shall include, without limitation, (1) the TMDL workplan described in Part II. E, above; (2) current and projected funding available to Virginia to carry out the obligations identified herein; and (3) other related issues or problems that may affect accomplishment of the goals identified herein.

## VI.    Monitoring

Virginia is in the process of developing an ambient monitoring strategy, one goal of which will be to increase Virginia's ability to assess a greater number of stream miles within the Commonwealth. EPA supports development of this strategy and will use its best efforts to provide guidance to Virginia in developing the strategy. Virginia anticipates developing the new ambient monitoring strategy and submitting it to EPA for review and comment by December 1999.

AR0012605

## VII.   Legal Effect

This **MOU** is a statement of goals and procedures by which the parties intend to meet their obligations under State and federal law.  This MOU is not a contract.  Nothing in this MOU shall be construed as an admission by EPA or Virginia.  The parties do not intend that this MOU waive any party's sovereign immunity, or that it create or waive any cause of action or third party right of action or any claim to a right or benefit in any judicial or administrative forum.  This MOU shall not be construed to create any right to judicial review involving the compliance or noncompliance with this MOU.  The execution and implementation of this MOU does not constitute an explicit or implicit agreement by the Parties to subject themselves to the jurisdiction of any state or federal court.  This MOU does not purport to authorize or excuse the violation of any applicable law or regulation or the lawful order of any court, nor shall anything in this MOU be construed to require actions by EPA or Virginia that are inconsistent with local, state or federal laws or any regulation or court order.

The parties pledge their best efforts toward meeting the goals stated in this MOU, and toward the end that Virginia's submissions to EPA under § 303(d) be timely and approvable by EPA and that Virginia's CPP conform with section 303(e) and its implementing regulations.

AR0012606

UNITED STATED ENVIRONMENTAL PROTECTION AGENCY

By: _____    Date: 11/9/98

W. Michael McCabe

Regional Administrator

USEPA Region III


COMMONWEALTH OF VIRGINIA

By: _____ Date: 11/3/58

Dennis H. Treacy

Director

Department of Environmental Quality


By: _____    Date: 11/4/98

David G. Brickley

Director

Department of Conservation and Recreation

AR0012607



# CHESAPEAKE 2000

**Chesapeake Bay Program**
*A Watershed Partnership*



The Chesapeake Bay is North America's largest and most biologically diverse estuary, home to more than 3,600 species of plants, fish and animals. For more than 300 years, the Bay and its tributaries have sustained the region's economy and defined its traditions and culture. It is a resource of extraordinary productivity, worthy of the highest levels of protection and restoration.

Accordingly, in 1983 and 1987, the states of Virginia, Maryland, Pennsylvania, the District of Columbia, the Chesapeake Bay Commission and the U.S. Environmental Protection Agency, representing the federal government, signed historic agreements that established the Chesapeake Bay Program partnership to protect and restore the Chesapeake Bay's ecosystem.

For almost two decades, we, the signatories to these agreements, have worked together as stewards to ensure the public's right to clean water and a healthy and productive resource. We have sought to protect the health of the public that uses the Bay and consumes its bounty. The initiatives we have pursued have been deliberate and have produced significant results in the health and productivity of the Bay's main stem, the tributaries, and the natural land and water ecosystems that compose the Chesapeake Bay watershed.

While the individual and collective accomplishments of our efforts have been significant, even greater effort will be required to address the enormous challenges that lie ahead. Increased population and development within the watershed have created ever-greater challenges for us in the Bay's restoration. These challenges are further complicated by the dynamic nature of the Bay and the ever-changing global ecosystem with which it interacts.

In order to achieve our existing goals and meet the challenges that lie ahead, we must reaffirm our partnership and recommit to fulfilling the public responsibility we undertook almost two decades ago. We must manage for the future. We must have a vision for our desired destiny and put programs into place that will secure it.

To do this, there can be no greater goal in this recommitment than to engage everyone — individuals, businesses, schools and universities, communities and governments — in our effort. We must encourage all citizens of the Chesapeake Bay watershed to work toward a shared vision — a system with abundant, diverse populations of living resources, fed by healthy streams and rivers, sustaining strong local and regional economies, and our unique quality of life.

In affirming our recommitment through this new *Chesapeake 2000*, we recognize the importance of viewing this document in its entirety with no single part taken in isolation of the others. This Agreement reflects the Bay's complexity in that each action we take, like the elements of the Bay itself, is connected to all the others. This Agreement responds to the problems facing this magnificent ecosystem in a comprehensive, multifaceted way.

BY THIS AGREEMENT, we commit ourselves to nurture and sustain a Chesapeake Bay Watershed Partnership and to achieve the goals set forth in the subsequent sections. Without such a partnership, future challenges will not be met. With it, the restoration and protection of the Chesapeake Bay will be ensured for generations to come.

AR0005417

 *E COMMIT TO:*

## LIVING RESOURCE PROTECTION AND RESTORATION

The health and vitality of the Chesapeake Bay's living resources provide the ultimate indicator of our success in the restoration and protection effort. The Bay's fisheries and the other living resources that sustain them and provide habitat for them are central to the initiatives we undertake in this Agreement.

We recognize the interconnectedness of the Bay's living resources and the importance of protecting the entire natural system. Therefore, we commit to identify the essential elements of habitat and environmental quality necessary to support the living resources of the Bay. In protecting commercially valuable species, we will manage harvest levels with precaution to maintain their health and stability and protect the ecosystem as a whole. We will restore passage for migratory fish and work to ensure that suitable water quality conditions exist in the upstream spawning habitats upon which they depend.

Our actions must be conducted in an integrated and coordinated manner. They must be continually monitored, evaluated and revised to adjust to the dynamic nature and complexities of the Chesapeake Bay and changes in global ecosystems. To advance this ecosystem approach, we will broaden our management perspective from single-system to ecosystem functions and will expand our protection efforts by shifting from single-species to multi-species management. We will also undertake efforts to determine how future conditions and changes in the chemical, physical and biological attributes of the Bay will affect living resources over time.

### GOAL
Restore, enhance and protect the finfish, shellfish and other
living resources, their habitats and ecological relationships to
sustain all fisheries and provide for a balanced ecosystem.

### Oysters

◆ By 2010, achieve, at a minimum, a tenfold increase in native oysters in the Chesapeake Bay, based upon a 1994 baseline. By 2002, develop and implement a strategy to achieve this increase by using sanctuaries sufficient in size and distribution, aquaculture, continued disease research and disease-resistant management strategies, and other management approaches.

### Exotic Species

◆ In 2000, establish a Chesapeake Bay Program Task Force to:

  1. Work cooperatively with the U.S. Coast Guard, the ports, the shipping industry, environmental interests and others at the national level to help establish and implement a national program designed to substantially reduce and, where possible, eliminate the introduction of non-native species carried in ballast water; and

  2. By 2002, develop and implement an interim voluntary ballast water management program for the waters of the Bay and its tributaries.

AR0005418

◆ By 2001, identify and rank non-native, invasive aquatic and terrestrial species which are causing or have the potential to cause significant negative impacts to the Bay's aquatic ecosystem. By 2003, develop and implement management plans for those species deemed problematic to the restoration and integrity of the Bay's ecosystem.

## Fish Passage and Migratory and Resident Fish

◆ By June 2002, identify the final initiatives necessary to achieve our existing goal of restoring fish passage for migratory fish to more than 1,357 miles of currently blocked river habitat by 2003 and establish a monitoring program to assess outcomes.

◆ By 2002, set a new goal with implementation schedules for additional migratory and resident fish passages that addresses the removal of physical blockages. In addition, the goal will address the removal of chemical blockages caused by acid mine drainage. Projects should be selected for maximum habitat and stock benefit.

◆ By 2002, assess trends in populations for priority migratory fish species. Determine tributary-specific target population sizes based upon projected fish passage, and current and projected habitat available, and provide recommendations to achieve those targets.

◆ By 2003, revise fish management plans to include strategies to achieve target population sizes of tributary-specific migratory fish.

## Multi-species Management

◆ By 2004, assess the effects of different population levels of filter feeders such as menhaden, oysters and clams on Bay water quality and habitat.

◆ By 2005, develop ecosystem-based multi-species management plans for targeted species.

◆ By 2007, revise and implement existing fisheries management plans to incorporate ecological, social and economic considerations, multi-species fisheries management and ecosystem approaches.

## Crabs

◆ By 2001, establish harvest targets for the blue crab fishery and begin implementing complementary state fisheries management strategies Baywide. Manage the blue crab fishery to restore a healthy spawning biomass, size and age structure.

# VITAL HABITAT PROTECTION AND RESTORATION

The Chesapeake Bay's natural infrastructure is an intricate system of terrestrial and aquatic habitats, linked to the landscapes and the environmental quality of the watershed. It is composed of the thousands of miles of river and stream habitat that interconnect the land, water, living resources and human communities of the Bay watershed. These vital habitats–including open water, underwater grasses, marshes, wetlands, streams and forests–support living resource abundance by providing key food and habitat for a variety of species. Submerged aquatic vegetation reduces shoreline erosion while forests and wetlands protect water quality by naturally processing the pollutants before they enter the water. Long-term protection of this natural infrastructure is essential.

AR0005419

In managing the Bay ecosystem as a whole, we recognize the need to focus on the individuality of each river, stream and creek, and to secure their protection in concert with the communities and individuals that reside within these small watersheds. We also recognize that we must continue to refine and share information regarding the importance of these vital habitats to the Bay's fish, shellfish and waterfowl. Our efforts to preserve the integrity of this natural infrastructure will protect the Bay's waters and living resources and will ensure the viability of human economies and communities that are dependent upon those resources for sustenance, reverence and posterity.

## G O A L
Preserve, protect and restore those habitats and natural areas that are vital to the survival and diversity of the living resources of the Bay and its rivers.

## Submerged Aquatic Vegetation

◆ Recommit to the existing goal of protecting and restoring 114,000 acres of submerged aquatic vegetation (SAV).

◆ By 2002, revise SAV restoration goals and strategies to reflect historic abundance, measured as acreage and density from the 1930s to the present. The revised goals will include specific levels of water clarity which are to be met in 2010. Strategies to achieve these goals will address water clarity, water quality and bottom disturbance.

◆ By 2002, implement a strategy to accelerate protection and restoration of SAV beds in areas of critical importance to the Bay's living resources.

## Watersheds

◆ By 2010, work with local governments, community groups and watershed organizations to develop and implement locally supported watershed management plans in two-thirds of the Bay watershed covered by this Agreement. These plans would address the protection, conservation and restoration of stream corridors, riparian forest buffers and wetlands for the purposes of improving habitat and water quality, with collateral benefits for optimizing stream flow and water supply.

◆ By 2001, each jurisdiction will develop guidelines to ensure the aquatic health of stream corridors. Guidelines should consider optimal surface and groundwater flows.

◆ By 2002, each jurisdiction will work with local governments and communities that have watershed management plans to select pilot projects that promote stream corridor protection and restoration.

◆ By 2003, include in the "State of the Bay Report," and make available to the public, local governments and others, information concerning the aquatic health of stream corridors based on adopted regional guidelines.

◆ By 2004, each jurisdiction, working with local governments, community groups and watershed organizations, will develop stream corridor restoration goals based on local watershed management planning.

AR0005420

### Wetlands

◆ Achieve a no-net loss of existing wetlands acreage and function in the signatories' regulatory programs.

◆ By 2010, achieve a net resource gain by restoring 25,000 acres of tidal and non-tidal wetlands. To do this, we commit to achieve and maintain an average restoration rate of 2,500 acres per year basin wide by 2005 and beyond. We will evaluate our success in 2005.

◆ Provide information and assistance to local governments and community groups for the development and implementation of wetlands preservation plans as a component of a locally based integrated watershed management plan. Establish a goal of implementing the wetlands plan component in 25 percent of the land area of each state's Bay watershed by 2010. The plans would preserve key wetlands while addressing surrounding land use so as to preserve wetland functions.

◆ Evaluate the potential impact of climate change on the Chesapeake Bay watershed, particularly with respect to its wetlands, and consider potential management options.

### Forests

◆ By 2002, ensure that measures are in place to meet our riparian forest buffer restoration goal of 2,010 miles by 2010. By 2003, establish a new goal to expand buffer mileage.

◆ Conserve existing forests along all streams and shorelines.

◆ Promote the expansion and connection of contiguous forests through conservation easements, greenways, purchase and other land conservation mechanisms.

## WATER QUALITY PROTECTION AND RESTORATION

Improving water quality is the most critical element in the overall protection and restoration of the Chesapeake Bay and its tributaries. In 1987, we committed to achieving a 40 percent reduction in controllable nutrient loads to the Bay. In 1992, we committed to tributary-specific reduction strategies to achieve this reduction and agreed to stay at or below these nutrient loads once attained. We have made measurable reductions in pollution loading despite continuing growth and development. Still, we must do more.

Recent actions taken under the Clean Water Act resulted in listing portions of the Chesapeake Bay and its tidal rivers as "impaired waters." These actions have emphasized the regulatory framework of the Act along with the ongoing cooperative efforts of the Chesapeake Bay Program as the means to address the nutrient enrichment problems within the Bay and its rivers. In response, we have developed, and are implementing, a process for integrating the cooperative and statutory programs of the Chesapeake Bay and its tributaries. We have agreed to the goal of improving water quality in the Bay and its tributaries so that these waters may be removed from the impaired waters list prior to the time when regulatory mechanisms under Section 303(d) of the Clean Water Act would be applied.

We commit to achieve and maintain water quality conditions necessary to support living resources throughout the Chesapeake Bay ecosystem. Where we have failed to achieve established water quality goals, we will take actions necessary to reach and maintain those goals. We will make pollution prevention a central theme in the protection of water quality. And we will take actions that protect freshwater flow regimes for riverine and estuarine habitats. In pursuing the restoration of vital habitats throughout

AR0005421

the watershed, we will continue efforts to improve water clarity in order to meet light requirements necessary to support SAV. We will expand our efforts to reduce sediments and airborne pollution, and ensure that the Bay is free from toxic effects on living resources and human health. We will continue our cooperative intergovernmental approach to achieve and maintain water quality goals through cost-effective and equitable means within the framework of federal and state law. We will evaluate the potential impacts of emerging issues, including, among others, airborne ammonia and nonpoint sources of chemical contaminants. Finally, we will continue to monitor water quality conditions and adjust our strategies accordingly.

## G O A L
Achieve and maintain the water quality necessary to support the aquatic living resources of the Bay and its tributaries and to protect human health.

### Nutrients and Sediments

◆ Continue efforts to achieve and maintain the 40 percent nutrient reduction goal agreed to in 1987, as well as the goals being adopted for the tributaries south of the Potomac River.

◆ By 2010, correct the nutrient- and sediment-related problems in the Chesapeake Bay and its tidal tributaries sufficiently to remove the Bay and the tidal portions of its tributaries from the list of impaired waters under the Clean Water Act. In order to achieve this:

   1. By 2001, define the water quality conditions necessary to protect aquatic living resources and then assign load reductions for nitrogen and phosphorus to each major tributary;

   2. Using a process parallel to that established for nutrients, determine the sediment load reductions necessary to achieve the water quality conditions that protect aquatic living resources, and assign load reductions for sediment to each major tributary by 2001;

   3. By 2002, complete a public process to develop and begin implementation of revised Tributary Strategies to achieve and maintain the assigned loading goals;

   4. By 2003, the jurisdictions with tidal waters will use their best efforts to adopt new or revised water quality standards consistent with the defined water quality conditions. Once adopted by the jurisdictions, the Environmental Protection Agency will work expeditiously to review the new or revised standards, which will then be used as the basis for removing the Bay and its tidal rivers from the list of impaired waters; and

   5. By 2003, work with the Susquehanna River Basin Commission and others to adopt and begin implementing strategies that prevent the loss of the sediment retention capabilities of the lower Susquehanna River dams.

AR0005422

## Chemical Contaminants

◆ We commit to fulfilling the 1994 goal of a Chesapeake Bay free of toxics by reducing or eliminating the input of chemical contaminants from all controllable sources to levels that result in no toxic or bioaccumulative impact on the living resources that inhabit the Bay or on human health.

◆ By Fall of 2000, reevaluate and revise, as necessary, the "Chesapeake Bay Basinwide Toxics Reduction and Prevention Strategy" focusing on:

1. Complementing state and federal regulatory programs to go beyond traditional point source controls, including nonpoint sources such as groundwater discharge and atmospheric deposition, by using a watershed-based approach; and

2. Understanding the effects and impacts of chemical contaminants to increase the effectiveness of management actions.

◆ Through continual improvement of pollution prevention measures and other voluntary means, strive for zero release of chemical contaminants from point sources, including air sources. Particular emphasis shall be placed on achieving, by 2010, elimination of mixing zones for persistent or bioaccumulative toxics.

◆ Reduce the potential risk of pesticides to the Bay by targeting education, outreach and implementation of Integrated Pest Management and specific Best Management Practices on those lands that have higher potential for contributing pesticide loads to the Bay.

## Priority Urban Waters

◆ Support the restoration of the Anacostia River, Baltimore Harbor, and Elizabeth River and their watersheds as models for urban river restoration in the Bay basin.

◆ By 2010, the District of Columbia, working with its watershed partners, will reduce pollution loads to the Anacostia River in order to eliminate public health concerns and achieve the living resource, water quality and habitat goals of this and past Agreements.

## Air Pollution

◆ By 2003, assess the effects of airborne nitrogen compounds and chemical contaminants on the Bay ecosystem and help establish reduction goals for these contaminants.

## Boat Discharge

◆ By 2003, establish appropriate areas within the Chesapeake Bay and its tributaries as "no discharge zones" for human waste from boats. By 2010, expand by 50 percent the number and availability of waste pump-out facilities.

◆ By 2006, reassess our progress in reducing the impact of boat waste on the Bay and its tributaries. This assessment will include evaluating the benefits of further expanding no discharge zones, as well as increasing the number of pump-out facilities.

AR0005423

# SOUND LAND USE

In 1987, the signatories agreed that "there is a clear correlation between population growth and associated development and environmental degradation in the Chesapeake Bay system." This Agreement reaffirms that concept and recognizes that more must be done.

An additional three million people are expected to settle in the watershed by 2020. This growth could potentially eclipse the nutrient reduction and habitat protection gains of the past. Therefore it is critical that we consider our approaches to land use in order to ensure progress in protecting the Bay and its local watersheds.

Enhancing, or even maintaining, the quality of the Bay while accommodating growth will frequently involve difficult choices. It will require a renewed commitment to appropriate development standards. The signatories will assert the full measure of their authority to limit and mitigate the potential adverse effects of continued growth; each however, will pursue this objective within the framework of its own historic, existing or future land use practices or processes. Local jurisdictions have been delegated authority over many decisions regarding growth and development which have both direct and indirect effects on the Chesapeake Bay system and its living resources. The role of local governments in the Bay's restoration and protection effort will be given proper recognition and support through state and federal resources. States will also engage in active partnerships with local governments in managing growth and development in ways that support the following goal.

We acknowledge that future development will be sustainable only if we protect our natural and rural resource land, limit impervious surfaces and concentrate new growth in existing population centers or suitable areas served by appropriate infrastructure. We will work to integrate environmental, community and economic goals by promoting more environmentally sensitive forms of development. We will also strive to coordinate land-use, transportation, water and sewer and other infrastructure planning so that funding and policies at all levels of government do not contribute to poorly planned growth and development or degrade local water quality and habitat. We will advance these policies by creating partnerships with local governments to protect our communities and to discharge our duties as trustees in the stewardship of the Chesapeake Bay. Finally, we will report every two years on our progress in achieving our commitments to promote sound land use.

## G O A L
Develop, promote and achieve sound land use practices
which protect and restore watershed resources and water quality,
maintain reduced pollutant loadings for the Bay and its tributaries,
and restore and preserve aquatic living resources.

## Land Conservation

- By 2001, complete an assessment of the Bay's resource lands including forests and farms, emphasizing their role in the protection of water quality and critical habitats, as well as cultural and economic viability.

- Provide financial assistance or new revenue sources to expand the use of voluntary and market-based mechanisms such as easements, purchase or transfer of development rights and other approaches to protect and preserve natural resource lands.

- Strengthen programs for land acquisition and preservation within each state that are supported by funding and target the most valued lands for protection. Permanently preserve from development 20 percent of the land area in the watershed by 2010.

AR0005424

◆ Provide technical and financial assistance to local governments to plan for or revise plans, ordinances and subdivision regulations to provide for the conservation and sustainable use of the forest and agricultural lands.

◆ In cooperation with local governments, develop and maintain in each jurisdiction a strong GIS system to track the preservation of resource lands and support the implementation of sound land use practices.

## Development, Redevelopment and Revitalization

◆ By 2012, reduce the rate of harmful sprawl development of forest and agricultural land in the Chesapeake Bay watershed by 30 percent measured as an average over five years from the baseline of 1992-1997, with measures and progress reported regularly to the Chesapeake Executive Council.

◆ By 2005, in cooperation with local government, identify and remove state and local impediments to low impact development designs to encourage the use of such approaches and minimize water quality impacts.

◆ Work with communities and local governments to encourage sound land use planning and practices that address the impacts of growth, development and transportation on the watershed.

◆ By 2002, review tax policies to identify elements which discourage sustainable development practices or encourage undesirable growth patterns. Promote the modification of such policies and the creation of tax incentives which promote the conservation of resource lands and encourage investments consistent with sound growth management principles.

◆ The jurisdictions will promote redevelopment and remove barriers to investment in underutilized urban, suburban and rural communities by working with localities and development interests.

◆ By 2002, develop analytical tools that will allow local governments and communities to conduct watershed-based assessment of the impacts of growth, development and transportation decisions.

◆ By 2002, compile information and guidelines to assist local governments and communities to promote ecologically-based designs in order to limit impervious cover in undeveloped and moderately developed watersheds and reduce the impact of impervious cover in highly developed watersheds.

◆ Provide information to the development community and others so they may champion the application of sound land use practices.

◆ By 2003, work with local governments and communities to develop land-use management and water resource protection approaches that encourage the concentration of new residential development in areas supported by adequate water resources and infrastructure to minimize impacts on water quality.

◆ By 2004, the jurisdictions will evaluate local implementation of stormwater, erosion control and other locally-implemented water quality protection programs that affect the Bay system and ensure that these programs are being coordinated and applied effectively in order to minimize the impacts of development.

◆ Working with local governments and others, develop and promote wastewater treatment options, such as nutrient reducing septic systems, which protect public health and minimize impacts to the Bay's resources.

◆ Strengthen brownfield redevelopment. By 2010, rehabilitate and restore 1,050 brownfield sites to productive use.

◆ Working with local governments, encourage the development and implementation of emerging urban storm water retrofit practices to improve their water quantity and quality function.

AR0005425

### Transportation

◆ By 2002, the signatory jurisdictions will promote coordination of transportation and land use planning to encourage compact, mixed use development patterns, revitalization in existing communities and transportation strategies that minimize adverse effects on the Bay and its tributaries.

◆ By 2002, each state will coordinate its transportation policies and programs to reduce the dependence on automobiles by incorporating travel alternatives such as telework, pedestrian, bicycle and transit options, as appropriate, in the design of projects so as to increase the availability of alternative modes of travel as measured by increased use of those alternatives.

◆ Consider the provisions of the federal transportation statutes for opportunities to purchase easements to preserve resource lands adjacent to rights of way and special efforts for stormwater management on both new and rehabilitation projects.

◆ Establish policies and incentives which encourage the use of clean vehicle and other transportation technologies that reduce emissions.

### Public Access

◆ By 2010, expand by 30 percent the system of public access points to the Bay, its tributaries and related resource sites in an environmentally sensitive manner by working with state and federal agencies, local governments and stakeholder organizations.

◆ By 2005, increase the number of designated water trails in the Chesapeake Bay region by 500 miles.

◆ Enhance interpretation materials that promote stewardship at natural, recreational, historical and cultural public access points within the Chesapeake Bay watershed.

◆ By 2003, develop partnerships with at least 30 sites to enhance place-based interpretation of Bay-related resources and themes and stimulate volunteer involvement in resource restoration and conservation.

## STEWARDSHIP AND COMMUNITY ENGAGEMENT

The Chesapeake Bay is dependent upon the actions of every citizen in the watershed, both today and in the future. We recognize that the cumulative benefit derived from community-based watershed programs is essential for continued progress toward a healthier Chesapeake Bay. Therefore, we commit ourselves to engage our citizens by promoting a broad conservation ethic throughout the fabric of community life, and foster within all citizens a deeper understanding of their roles as trustees of their own local environments. Through their actions, each individual can contribute to the health and well-being of their neighborhood streams, rivers and the land that surrounds them, not only as ecological stewards of the Bay but also as members of watershed-wide communities. By focusing individuals on local resources, we will advance Baywide restoration as well.

We recognize that the future of the Bay also depends on the actions of generations to follow. Therefore, we commit to provide opportunities for cooperative learning and action so that communities can promote local environmental quality for the benefit and enjoyment of residents and visitors. We will assist communities throughout the watershed in improving quality of life, thereby strengthening local

AR0005426

economies and connecting individuals to the Bay through their shared sense of responsibility. We will seek to increase the financial and human resources available to localities to meet the challenges of restoring the Chesapeake Bay.

G O A L

Promote individual stewardship and assist individuals, community-based organizations, businesses, local governments and schools to undertake initiatives to achieve the goals and commitments of this agreement.

## Education and Outreach

◆ Make education and outreach a priority in order to achieve public awareness and personal involvement on behalf of the Bay and local watersheds.

◆ Provide information to enhance the ability of citizen and community groups to participate in Bay restoration activities on their property and in their local watershed.

◆ Expand the use of new communications technologies to provide a comprehensive and interactive source of information on the Chesapeake Bay and its watershed for use by public and technical audiences. By 2001, develop and maintain a web-based clearing house of this information specifically for use by educators.

◆ Beginning with the class of 2005, provide a meaningful Bay or stream outdoor experience for every school student in the watershed before graduation from high school.

◆ Continue to forge partnerships with the Departments of Education and institutions of higher learning in each jurisdiction to integrate information about the Chesapeake Bay and its watershed into school curricula and university programs.

◆ Provide students and teachers alike with opportunities to directly participate in local restoration and protection projects, and to support stewardship efforts in schools and on school property.

◆ By 2002, expand citizen outreach efforts to more specifically include minority populations by, for example, highlighting cultural and historical ties to the Bay, and providing multi-cultural and multi-lingual educational materials on stewardship activities and Bay information.

## Community Engagement

◆ Jurisdictions will work with local governments to identify small watersheds where community-based actions are essential to meeting Bay restoration goals—in particular wetlands, forested buffers, stream corridors and public access and work with local governments and community organizations to bring an appropriate range of Bay program resources to these communities.

◆ Enhance funding for locally-based programs that pursue restoration and protection projects that will assist in the achievement of the goals of this and past agreements.

◆ By 2001, develop and maintain a clearing house for information on local watershed restoration efforts, including financial and technical assistance.

◆ By 2002, each signatory jurisdiction will offer easily-accessible information suitable for analyzing environmental conditions at a small watershed scale.

AR0005427

◆ Strengthen the Chesapeake Bay Program's ability to incorporate local governments into the policy decision making process. By 2001, complete a reevaluation of the Local Government Participation Action Plan and make necessary changes in Bay program and jurisdictional functions based upon the reevaluation.

◆ Improve methods of communication with and among local governments on Bay issues and provide adequate opportunities for discussion of key issues.

◆ By 2001, identify community watershed organizations and partnerships. Assist in establishing new organizations and partnerships where interest exists. These partners will be important to successful watershed management efforts in distributing information to the public, and engaging the public in the Bay restoration and preservation effort.

◆ By 2005, identify specific actions to address the challenges of communities where historically poor water quality and environmental conditions have contributed to disproportional health, economic or social impacts.

## Government by Example

◆ By 2002, each signatory will put in place processes to:

1. Ensure that all properties owned, managed or leased by the signatories are developed, redeveloped and used in a manner consistent with all relevant goals, commitments and guidance of this Agreement.

2. Ensure that the design and construction of signatory-funded development and redevelopment projects are consistent with all relevant goals, commitments and guidance of this Agreement.

◆ Expand the use of clean vehicle technologies and fuels on the basis of emission reductions, so that a significantly greater percentage of each signatory government's fleet of vehicles use some form of clean technology.

◆ By 2001, develop an Executive Council Directive to address stormwater management to control nutrient, sediment and chemical contaminant runoff from state, federal and District owned land.

## Partnerships

◆ Strengthen partnerships with Delaware, New York and West Virginia by promoting communication and by seeking agreements on issues of mutual concern.

◆ Work with non-signatory Bay states to establish links with community-based organizations throughout the Bay watershed.

AR0005428

*B*Y THIS AGREEMENT, we rededicate ourselves to the restoration and protection of the ecological integrity, productivity and beneficial uses of the Chesapeake Bay system. We reaffirm our commitment to previously-adopted Chesapeake Bay Agreements and their supporting policies. We agree to report annually to the citizens on the state of the Bay and consider any additional actions necessary.

DATE  June 28, 2000

FOR THE COMMONWEALTH OF VIRGINIA 

FOR THE STATE OF MARYLAND 

FOR THE COMMONWEALTH OF PENNSYLVANIA 

FOR THE DISTRICT OF COLUMBIA 

FOR THE UNITED STATES OF AMERICA 

FOR THE CHESAPEAKE BAY COMMISSION 

CHESAPEAKE 2000
— 13 —

AR0005429

May 20, 2002

MEMORANDUM

SUBJECT:    EPA Review of 2002 Section 303(d) Lists and
            Guidelines for Reviewing TMDLs under Existing Regulations issued in 1992

FROM:       Charles H. Sutfin /s/
            Director, Assessment and Watershed Protection Division
            Office of Wetlands, Oceans and Watersheds

TO:         Water Quality Branch Chiefs, Regions I-X
            TMDL Coordinators, Regions I-X
            Monitoring Coordinators, Regions I-X
            ORC TMDL Attorneys, Regions I-X

Please find attached two guidance documents for your use as you review the 2002 Section 303(d) lists and review and approve TMDLs. These documents will be made available to the public on EPA's TMDL website. The first document describes the statutory and regulatory requirements for approvable TMDLs. It also sets out additional information generally needed for EPA to determine if a submitted TMDL fulfills the legal requirements for approval under Section 303(d) and EPA regulations. This document is an attempt to summarize and provide guidance regarding currently effective TMDL statutory and regulatory requirements, which were issued in 1985 and amended in 1992.

The second documents provides a recommended framework for EPA approval decisions on the 2002 State Section 303(d) lists. This document is intended to provide materials that will help Regions in preparing their decisions on the State list submissions and promote consistency among those decisions.

We strongly recommend that you work with your States to assess the adequacy of the methodologies they are using to develop the lists, and to identify areas where the State methodologies may need refinements or strengthening.

As we did in the review process for the1998 Section 303(d) lists, we encourage you to work with your Regional Counsel in the development of the decision document. We would like to see a draft of the decision document before you send it to the States. Our intent is to ensure

AR0022597

that we have as complete and supportable documents as possible.

We look forward to working with you.  If you have any questions, please contact Hazel Groman at 202-566-1219, Mike Haire at 202-566-1224, or Susmita Dubey at 202-564-5577.

Attachments

cc:     Water Division Directors, Regions I-X
        Lee Schroer, OGC

AR0022598

# Guidelines for Reviewing TMDLs
## under Existing Regulations issued in 1992

Section 303(d) of the Clean Water Act (CWA) and EPA's implementing regulations at 40 C.F.R. Part 130 describe the statutory and regulatory requirements for approvable TMDLs. Additional information is generally necessary for EPA to determine if a submitted TMDL fulfills the legal requirements for approval under Section 303(d) and EPA regulations, and should be included in the submittal package. Use of the verb "must" below denotes information that is required to be submitted because it relates to elements of the TMDL required by the CWA and by regulation. Use of the term "should" below denotes information that is generally necessary for EPA to determine if a submitted TMDL is approvable. These TMDL review guidelines are not themselves regulations. They are an attempt to summarize and provide guidance regarding currently effective statutory and regulatory requirements relating to TMDLs. Any differences between these guidelines and EPA's TMDL regulations should be resolved in favor of the regulations themselves. *A one-page checklist of the review elements may be found on the last page of this document.*

1. **Identification of Waterbody, Pollutant of Concern, Pollutant Sources, and Priority Ranking**

The TMDL submittal should identify the waterbody as it appears on the State's/Tribe's 303(d) list. The waterbody should be identified/georeferenced using the National Hydrography Dataset (NHD), and the TMDL should clearly identify the pollutant for which the TMDL is being established. In addition, the TMDL should identify the priority ranking of the waterbody and specify the link between the pollutant of concern and the water quality standard (see section 2 below).

The TMDL submittal should include an identification of the point and nonpoint sources of the pollutant of concern, including location of the source(s) and the quantity of the loading, e.g., lbs/per day. The TMDL should provide the identification numbers of the NPDES permits within the waterbody. Where it is possible to separate natural background from nonpoint sources, the TMDL should include a description of the natural background. This information is necessary for EPA's review of the load and wasteload allocations, which are required by regulation.

The TMDL submittal should also contain a description of any important assumptions made in developing the TMDL, such as:

(1) the spatial extent of the watershed in which the impaired waterbody is located;

1

AR0022599

(2) the assumed distribution of land use in the watershed (e.g., urban, forested, agriculture);

(3) population characteristics, wildlife resources, and other relevant information affecting the characterization of the pollutant of concern and its allocation to sources;

(4) present and future growth trends, if taken into consideration in preparing the TMDL (e.g., the TMDL could include the design capacity of a wastewater treatment facility); and

(5) an explanation and analytical basis for expressing the TMDL through *surrogate measures*, if applicable. *Surrogate measures* are parameters such as percent fines and turbidity for sediment impairments; chlorophyl $a$ and phosphorus loadings for excess algae; length of riparian buffer; or number of acres of best management practices.

## 2.    Description of the Applicable Water Quality Standards and Numeric Water Quality Target

The TMDL submittal must include a description of the applicable State/Tribal water quality standard, including the designated use(s) of the waterbody, the applicable numeric or narrative water quality criterion, and the antidegradation policy. (40 C.F.R. §130.7(c)(1)). EPA needs this information to review the loading capacity determination, and load and wasteload allocations, which are required by regulation.

The TMDL submittal must identify a numeric water quality target(s) – a quantitative value used to measure whether or not the applicable water quality standard is attained. Generally, the pollutant of concern and the numeric water quality target are, respectively, the chemical causing the impairment and the numeric criteria for that chemical (e.g., chromium) contained in the water quality standard. The TMDL expresses the relationship between any necessary reduction of the pollutant of concern and the attainment of the numeric water quality target. Occasionally, the pollutant of concern is different from the pollutant that is the subject of the numeric water quality target (e.g., when the pollutant of concern is phosphorus and the numeric water quality target is expressed as Dissolved Oxygen (DO) criteria). In such cases, the TMDL submittal should explain the linkage between the pollutant of concern and the chosen numeric water quality target.

## 3.    Loading Capacity - Linking Water Quality and Pollutant Sources

A TMDL must identify the loading capacity of a waterbody for the applicable pollutant. EPA regulations define loading capacity as the greatest amount of a pollutant that a water can receive without violating water quality standards (40 C.F.R. §130.2(f) ).

The pollutant loadings may be expressed as either mass-per-time, toxicity or other appropriate measure (40 C.F.R. §130.2(i)). If the TMDL is expressed in terms other than a daily load, e.g., an annual load, the submittal should explain why it is appropriate to express the TMDL in the unit of measurement chosen. The TMDL submittal should describe the method used to

2

AR0022600

establish the cause-and-effect relationship between the numeric target and the identified pollutant sources. In many instances, this method will be a water quality model.

The TMDL submittal should contain documentation supporting the TMDL analysis, including the basis for any assumptions; a discussion of strengths and weaknesses in the analytical process; and results from any water quality modeling. EPA needs this information to review the loading capacity determination, and load and wasteload allocations, which are required by regulation.

TMDLs must take into account *critical conditions* for steam flow, loading, and water quality parameters as part of the analysis of loading capacity. (40 C.F.R. §130.7(c)(1) ). TMDLs should define applicable *critical conditions* and describe their approach to estimating both point and nonpoint source loadings under such *critical conditions*. In particular, the TMDL should discuss the approach used to compute and allocate nonpoint source loadings, e.g., meteorological conditions and land use distribution.

**4.       Load Allocations (LAs)**

EPA regulations require that a TMDL include LAs, which identify the portion of the loading capacity attributed to existing and future nonpoint sources and to natural background. Load allocations may range from reasonably accurate estimates to gross allotments (40 C.F.R. §130.2(g) ). Where possible, load allocations should be described separately for natural background and nonpoint sources.

**5.       Wasteload Allocations (WLAs)**

EPA regulations require that a TMDL include WLAs, which identify the portion of the loading capacity allocated to individual existing and future point source(s) (40 C.F.R. §130.2(h), 40 C.F.R. §130.2(i) ). In some cases, WLAs may cover more than one discharger, e.g., if the source is contained within a general permit.

The individual WLAs may take the form of uniform percentage reductions or individual mass based limitations for dischargers where it can be shown that this solution meets WQSs and does not result in localized impairments. These individual WLAs may be adjusted during the NPDES permitting process. If the WLAs are adjusted, the individual effluent limits for each permit issued to a discharger on the impaired water must be consistent with the assumptions and requirements of the adjusted WLAs in the TMDL. If the WLAs are not adjusted, effluent limits contained in the permit must be consistent with the individual WLAs specified in the TMDL. If a draft permit provides for a higher load for a discharger than the corresponding individual WLA in the TMDL, the State/Tribe must demonstrate that the total WLA in the TMDL will be achieved through reductions in the remaining individual WLAs and that localized impairments will not

3

AR0022601

result. All permitees should be notified of any deviations from the initial individual WLAs contained in the TMDL. EPA does not require the establishment of a new TMDL to reflect these revised allocations as long as the total WLA, as expressed in the TMDL, remains the same or decreases, and there is no reallocation between the total WLA and the total LA.

## 6.    Margin of Safety (MOS)

The statute and regulations require that a TMDL include a margin of safety (MOS) to account for any lack of knowledge concerning the relationship between load and wasteload allocations and water quality (CWA §303(d)(1)(C), 40 C.F.R. §130.7(c)(1) ). EPA's 1991 TMDL Guidance explains that the MOS may be implicit, i.e., incorporated into the TMDL through conservative assumptions in the analysis, or explicit, i.e., expressed in the TMDL as loadings set aside for the MOS. If the MOS is implicit, the conservative assumptions in the analysis that account for the MOS must be described. If the MOS is explicit, the loading set aside for the MOS must be identified.

## 7.    Seasonal Variation

The statute and regulations require that a TMDL be established with consideration of seasonal variations. The TMDL must describe the method chosen for including seasonal variations. (CWA §303(d)(1)(C), 40 C.F.R. §130.7(c)(1) ).

## 8.    Reasonable Assurances

When a TMDL is developed for waters impaired by point sources only, the issuance of a National Pollutant Discharge Elimination System (NPDES) permit(s) provides the reasonable assurance that the wasteload allocations contained in the TMDL will be achieved. This is because 40 C.F.R. 122.44(d)(1)(vii)(B) requires that effluent limits in permits be consistent with "the assumptions and requirements of any available wasteload allocation" in an approved TMDL.

When a TMDL is developed for waters impaired by both point and nonpoint sources, and the WLA is based on an assumption that nonpoint source load reductions will occur, EPA's 1991 TMDL Guidance states that the TMDL should provide reasonable assurances that nonpoint source control measures will achieve expected load reductions in order for the TMDL to be approvable. This information is necessary for EPA to determine that the TMDL, including the load and wasteload allocations, has been established at a level necessary to implement water quality standards.

EPA's August 1997 TMDL Guidance also directs Regions to work with States to achieve TMDL load allocations in waters impaired only by nonpoint sources. However, EPA cannot

4

AR0022602

disapprove a TMDL for nonpoint source-only impaired waters, which do not have a demonstration of reasonable assurance that LAs will be achieved, because such a showing is not required by current regulations.

### 9.    Monitoring Plan to Track TMDL Effectiveness

EPA's 1991 document, *Guidance for Water Quality-Based Decisions: The TMDL Process* (EPA 440/4-91-001), recommends a monitoring plan to track the effectiveness of a TMDL, particularly when a TMDL involves both point and nonpoint sources, and the WLA is based on an assumption that nonpoint source load reductions will occur. Such a TMDL should provide assurances that nonpoint source controls will achieve expected load reductions and, such TMDL should include a monitoring plan that describes the additional data to be collected to determine if the load reductions provided for in the TMDL are occurring and leading to attainment of water quality standards.

### 10.    Implementation

EPA policy encourages Regions to work in partnership with States/Tribes to achieve nonpoint source load allocations established for 303(d)-listed waters impaired by nonpoint sources. Regions may assist States/Tribes in developing implementation plans that include reasonable assurances that nonpoint source LAs established in TMDLs for waters impaired solely or primarily by nonpoint sources will in fact be achieved. In addition, EPA policy recognizes that other relevant watershed management processes may be used in the TMDL process. EPA is not required to and does not approve TMDL implementation plans.

### 11.    Public Participation

EPA policy is that there should be full and meaningful public participation in the TMDL development process. The TMDL regulations require that each State/Tribe must subject calculations to establish TMDLs to public review consistent with its own continuing planning process (40 C.F.R. §130.7(c)(1)(ii) ). In guidance, EPA has explained that final TMDLs submitted to EPA for review and approval should describe the State's/Tribe's public participation process, including a summary of significant comments and the State's/Tribe's responses to those comments. When EPA establishes a TMDL, EPA regulations require EPA to publish a notice seeking public comment (40 C.F.R. §130.7(d)(2) ).

Provision of inadequate public participation may be a basis for disapproving a TMDL. If EPA determines that a State/Tribe has not provided adequate public participation, EPA may defer its approval action until adequate public participation has been provided for, either by the State/Tribe or by EPA.

AR0022603

Guidelines for Reviewing TMDLs  under Existing Regulations issued in 1992
May 20, 2002

12.    **Submittal Letter**

A submittal letter should be included with the TMDL submittal, and should specify whether the TMDL is being submitted for a *technical review* or *final review and approval*. Each final TMDL submitted to EPA should be accompanied by a submittal letter that explicitly states that the submittal is a final TMDL submitted under Section 303(d) of the Clean Water Act for EPA review and approval. This clearly establishes the State's/Tribe's intent to submit, and EPA's duty to review, the TMDL under the statute. The submittal letter, whether for technical review or final review and approval, should contain such identifying information as the name and location of the waterbody, and the pollutant(s) of concern.

**13. Administrative Record**

While not a necessary part of the submittal to EPA, the State/Tribe should also prepare an administrative record containing documents that support the establishment of and calculations/allocations in the TMDL. Components of the record should include all materials relied upon by the State/Tribe to develop and support the calculations/allocations in the TMDL, including any data, analyses, or scientific/technical references that were used, records of correspondence with stakeholders and EPA, responses to public comments, and other supporting materials. This record is needed to facilitate public and/or EPA review of the TMDL.

6

AR0022604

**Guidelines for Reviewing TMDLs under Existing Regulations issued in 1992**
**May 20, 2002**

## TMDL Review Checklist

State/Tribe:                                        Date of Submittal:

§303(d) Segment(s):                                 Date of EPA Action:

Pollutant(s):                                        Date Entered into Tracking System:

                                                     EPA Reviewer:

| Review Element | Adequate? | Recommendations/Comments |
|---|---|---|
| Submittal Letter | | |
| Identification of Waterbody, Pollutant of Concern, Pollutant Sources, & Priority Ranking | | |
| Applicable Water Quality Standards & Numeric Targets | | |
| Loading Capacity | | |
| Load Allocations (LAs) | | |
| Wasteload Allocations (WLAs) | | |
| Margin of Safety (MOS) | | |
| Seasonal Variation | | |
| Reasonable Assurances: through NPDES permits or if WLAs depend on LAs | | |
| Public Participation | | |
| Technical Analysis/Supporting Documentation | | |
| Information entered into TMDL Tracking System | | |
| Other Comments | | |

7

AR0022605

To:      Principal Staff Committee Members and Representatives
         of Chesapeake Bay "Headwater" States

From:    W. Tayloe Murphy, Jr., Chair
         Chesapeake Bay Program Principals' Staff Committee

Subject: Summary of Decisions Regarding Nutrient and Sediment Load Allocations
         and New Submerged Aquatic Vegetation (SAV) Restoration Goals

For the past twenty years, the Chesapeake Bay partners have been committed to achieving and maintaining water quality conditions necessary to support living resources throughout the Chesapeake Bay ecosystem. In the past month, Chesapeake Bay Program partners (Maryland, Virginia, Pennsylvania, the District of Columbia, the Environmental Protection Agency and the Chesapeake Bay Commission) have expanded our efforts by working with the headwater states of Delaware, West Virginia and New York to adopt new cap load allocations for nitrogen, phosphorus and sediment.

Using the best scientific information available, Bay Program partners have agreed to allocations that are intended to meet the needs of the plants and animals that call the Chesapeake home. The allocations will serve as a basis for each state's tributary strategies that, when completed by April 2004, will describe local implementation actions necessary to meet the *Chesapeake 2000* nutrient and sediment loading goals by 2010.

This memorandum summarizes the important, comprehensive agreements made by Bay watershed partners with regard to cap load allocations for nitrogen, phosphorus and sediments, as well as new baywide and local SAV restoration goals.

*Nutrient Allocations*

Excessive nutrients in the Chesapeake Bay and its tidal tributaries promote undesirable algal growth, and thereby, prohibit light from reaching underwater bay grasses (submerged aquatic vegetation or SAV) and depress the dissolved oxygen levels of the deeper waters of the Bay.

As a result, Bay watershed states and the District of Columbia, with the concurrence of EPA, agreed to cap annual nitrogen loads delivered to the Bay's tidal waters at 175 million pounds and annual phosphorus loads at 12.8 million pounds. It is estimated that these allocations will require a reduction, from 2000 levels, of nitrogen pollution by 110 million pounds and phosphorus pollution by 6.3 million pounds annually.

The partners agreed upon these load reductions based upon Bay Water Quality Model projections of

AR0005397

attainment of proposed water quality criteria for dissolved oxygen. The model projects these load reductions will eliminate the persistent summer anoxic conditions in the deep bottom waters of the Bay. Furthermore, these reductions are projected to eliminate excessive algae conditions (measured as chlorophyll *a*) throughout the Bay and its tidal tributaries.

The jurisdictions agreed to distribute the baywide cap load for nitrogen and phosphorus by major tributary basin (Table 1) and jurisdiction (Table 2). This distribution of responsibility for load reductions was based on three basic principles:

1.  Tributary basins with the highest impact on Bay water quality would have the highest reductions of nutrients.
2.  States without tidal waters – Pennsylvania, New York and West Virginia – would be provided some relief from Principle 1 since they do not benefit as directly from improved water quality in the Bay and its tidal tributaries.
3.  Previous nutrient reductions would be credited towards achievement of the cap load allocations.

The nine major tributary basins were separated into three categories based upon their impact on water quality in the Bay. Each basin within a category was assigned the same percent reduction of anthropogenic load. Basins with the highest impact on tidal water quality were assigned the highest percentage reduction of anthropogenic load.

After applying the above calculations and Principle 2, New York, Pennsylvania and West Virginia allocations were set at "Tier 3" nutrient load levels. Additionally, allocations for Virginia's York and James River basins were set at previously established tributary strategy nutrient cap load levels since each basin has minimal impact on mainstem Bay water quality conditions, and their influence on tidal water quality is predominantly local.

These rules resulted in shortfalls to the baywide cap load allocation of 12 million pounds of nitrogen and 1 million pounds of phosphorus. EPA committed to pursue the Clear Skies initiative which is estimated to reduce the nitrogen load to Bay tidal waters by 8 million pounds per year. Bay watershed states agreed to take responsibility for the remaining 4 million pounds of nitrogen and 1 million pounds of phosphorus. The nutrient cap load allocations in tables 1 and 2 reflect these agreements.

The allocations for nitrogen and phosphorus were adopted with the concept of "nitrogen equivalents" and a commitment to explore how actions beyond traditional best management practices might help meet Bay restoration goals. A nitrogen equivalent is an action that results in the same water quality benefit as removing nitrogen. The Chesapeake Bay Program will evaluate how to account for tidal water quality benefits from continued and expanded living resource restoration, such as oysters and menhaden, to offset the reductions of watershed based nutrient and sediment loads. Seasonal fluctuations for biological nutrient removal implementation, nutrient reduction benefits from shoreline erosion reductions, implementation of enhanced nutrient removal at large wastewater treatment plants, and trade-offs between nitrogen and phosphorus will also be evaluated.

AR0005398

*Baywide SAV Restoration Goal*

To set new SAV restoration goals, scientists and resource managers from state and federal agencies agreed to use data from the single best year of observed SAV growth to estimate the historical long-term bay grass coverage in Chesapeake Bay. Data were collected from aerial photographs taken between 1938 and 2000. From 3-4 years in the 1938 -1964 period, and more than 20 years of data since 1978, new baywide SAV restoration goal acreage was determined by totaling the single best year acreage from each Chesapeake Bay Program segment.

The states have adopted 185,000 acres as the new baywide SAV restoration goal to be achieved by 2010 – consistent with the goals of *Chesapeake 2000*. The achievement of the baywide goal, as well as the local tributary basin and segment specific restoration goals summarized in Table 3, will be based on the single best year SAV acreage within the most recent three-year record of survey results.  This new acreage goal has been added to the recently adopted strategy to accelerate the protection and restoration of SAV in the Chesapeake Bay; and Maryland and Virginia have agreed to develop an implementation plan for this strategy by April 2004.

*Sediment Allocations*

Sediments suspended in the water column reduce the amount of light available to support healthy and extensive SAV communities. With regards to the sediment allocations, the partners agreed that a primary reason for reducing sediment loads to the Bay is to provide suitable habitat for restoring SAV. The jurisdictions also agreed that nutrient load reductions are critical for SAV restoration as well as improving oxygen levels. As a result, the states linked the establishment of sediment cap load allocations to the proposed water clarity criteria and to the new SAV restoration goals.

Unlike nutrients - where loads from virtually all parts of the Bay watershed affect Bay mainstem water quality - impacts from sediments are predominantly seen at the local level.  For this reason, local SAV acreage goals have been established and sediment allocations are targeted towards achieving those restoration goals.

The partners recognize that the current understanding of sediment sources and their impact on the Bay is not yet complete. We have only a basic understanding of land-based sediments that are carried into local waterways through stream bank erosion and runoff, but a more limited knowledge about near shore sediments that enter the Bay and its tidal rivers directly through shoreline erosion or shallow-water resuspension.  Consequently, sediment allocations are currently focused on land-based sediment cap loads by major tributary basin (Table 1) and jurisdiction (Table 2).

Most land-based best management practices which reduce nonpoint sources of phosphorus will also reduce sediment runoff. Therefore, the jurisdictions agreed to land-based sediment allocations that represent the sediment loading likely to result from implementation management actions required to achieve the phosphorus cap load allocations.

AR0005399

The sediment allocation was set equal to the tier level for phosphorus allocation for each jurisdiction-basin. This is referred to as the 'phosphorus equivalent' land-based sediment reduction. If the 'phosphorus equivalent' land-based sediment reductions were found to be more than necessary to achieve the local SAV acreage goals, then the land-based sediment allocations were raised to that necessary to achieve the SAV goal. The tidal fresh Susquehanna Flats and tidal fresh Potomac River are two examples where this modified approach was applied. If, in the development of their tributary strategies, tributary teams conclude that the land-based sediment allocations need revisions, the tributary teams may identify an alternate land-based allocation working with all the jurisdictions within the effected basin. For example, a jurisdiction may select different nonpoint source management actions than those prescribed in the tier approach to reach the phosphorus goal; the jurisdiction may adjust the sediment goal accordingly so long as SAV restoration and protection is not compromised.

It is likely that reduction in nutrients and land-based sediments alone will not be sufficient to achieve the local SAV goals for many areas of the Bay. In these areas, tributary teams will be asked to further assess varied and innovative methods to achieve SAV re-growth. Such methods may include, but are not limited to SAV planting, offshore breakwaters, shore erosion controls, beach nourishment, establishment of oyster bars, and other actions as appropriate.

### Support to State Tributary Strategies

The partners have agreed to complete their nutrient and sediment reduction strategies by April 2004. To assist in the development of tributary strategies, the Chesapeake Bay Program Office will provide an array of technical analyses, water quality and watershed modeling, cost-effectiveness and economic assessment support to the tributary strategy teams through the states.

The jurisdictions agreed that it is critical to work together to assure the aggregate of control actions recommended within the nutrient and sediment strategies yield the load reductions and the Bay and tidal tributary water quality improvements desired.

### Reevaluation of the Allocations

The nutrient and sediment cap load allocations adopted by the jurisdictions are the best scientific estimates of what will be needed to attain proposed water quality criteria and tidal water designated uses described in guidance published by EPA. Over the next two years, Maryland, Virginia, Delaware and the District of Columbia will promulgate new water quality standards based on the guidance published by EPA.

Although the public process for adopting water quality standards varies among the states, each state's process will provide opportunities for considering and acquiring new information at the local level. States may choose to explore a number of issues during their adoption process, such as the economic impact of water quality standards and specific designated use boundaries.

While the allocations adopted at this time will provide the basis for tributary strategies, these allocations

AR0005400

may need to be adjusted to reflect final state water quality standards. Furthermore, planned Bay model refinements - directed towards estimating water quality benefits from filter feeding resources (e.g., oysters and menhaden) and better understanding the sources and effects of sediments - will increase our understanding of the relationship between nutrient and sediment reductions and living resource responses in the Bay. For these reasons, the states agreed to a reevaluation of these allocations no later than 2007.

As partners, the jurisdictions committed to correcting the nutrient and sediment related problems in the Bay and its tidal tributaries sufficiently to remove them from the list of impaired waters under the Clean Water Act. Although the states agreed to do their utmost to remove the Bay from the federal list of impaired waters by 2010, they recognize that it will be difficult to meet projected water quality standards in all parts of the Bay by that time. A key reason for this difficulty is that once nutrient reduction practices are installed, it may be years or even decades before the Bay benefits from these reductions. The jurisdictions intend to have programs in place and functioning by 2010 such that when fully implemented all parts of the Bay are expected to become eligible for delisting.

I would like to express my appreciation to all the partners in this effort for their hard work and commitment to restoration of the Chesapeake Bay. We have agreed to nutrient and sediment reductions which will result in profound improvements in the water quality, habitat and living resources of the Bay.

Attachments

AR0005401

| Table 1. | | | 4/25/03 |
| Chesapeake Bay Watershed Nitrogen, Phosphorus and Sediment Cap Load Allocations by Major Basin | | | |
| Basin/Jurisdiction | Nitrogen Allocation (million pounds/year) | Phosphorus Allocation (million pounds/year) | Land-Based Sediment Allocation* (million tons/year) |
|---|---|---|---|
| | | | |
| **SUSQUEHANNA** | | | |
| PA | 67.58 | 1.90 | 0.793 |
| NY | 12.58 | 0.59 | 0.131 |
| MD | 0.83 | 0.03 | 0.037 |
| SUSQUEHANNA Total | 80.99 | 2.52 | 0.962 |
| | | | |
| **EASTERN SHORE - MD** | | | |
| MD | 10.89 | 0.81 | 0.116 |
| DE | 2.88 | 0.30 | 0.042 |
| PA | 0.27 | 0.03 | 0.004 |
| VA | 0.06 | 0.01 | 0.001 |
| EASTERN SHORE - MD Total | 14.10 | 1.14 | 0.163 |
| | | | |
| **WESTERN SHORE** | | | |
| MD | 11.27 | 0.84 | 0.100 |
| PA | 0.02 | 0.00 | 0.001 |
| WESTERN SHORE Total | 11.29 | 0.84 | 0.100 |
| | | | |
| **PATUXENT** | | | |
| MD | 2.46 | 0.21 | 0.095 |
| PATUXENT Total | 2.46 | 0.21 | 0.095 |
| | | | |
| **POTOMAC** | | | |
| VA | 12.84 | 1.40 | 0.617 |
| MD | 11.81 | 1.04 | 0.364 |
| WV | 4.71 | 0.36 | 0.311 |
| PA | 4.02 | 0.33 | 0.197 |
| DC | 2.40 | 0.34 | 0.006 |
| POTOMAC Total | 35.78 | 3.48 | 1.494 |
| | | | |
| **RAPPAHANNOCK** | | | |
| VA | 5.24 | 0.62 | 0.288 |
| RAPPAHANNOCK Total | 5.24 | 0.62 | 0.288 |
| | | | |
| **YORK** | | | |
| VA | 5.70 | 0.48 | 0.103 |
| YORK Total | 5.70 | 0.48 | 0.103 |
| | | | |
| **JAMES** | | | |
| VA | 26.40 | 3.41 | 0.925 |
| WV | 0.03 | 0.01 | 0.010 |
| JAMES Total | 26.43 | 3.42 | 0.935 |
| | | | |
| **EASTERN SHORE - VA** | | | |
| VA | 1.16 | 0.08 | 0.008 |
| EASTERN SHORE - VA Total | 1.16 | 0.08 | 0.008 |
| | | | |
| **SUBTOTAL** | 183 | 12.8 | 4.15 |
| **CLEAR SKIES REDUCTION** | -8 | | |
| **BASIN-WIDE TOTAL** | 175 | 12.8 | 4.15 |

\* These land-based sediment allocations will be assessed and, if necessary, revised by the tributary teams as part of a comprehensive strategy of management actions necessary to achieve the nutrient loading caps and local underwater bay grasses restoration goals.

AR0005402

| Table 2. Chesapeake Bay Watershed Nitrogen, Phosphorus and Sediment Cap Load Allocations by Jurisdiction | | | 4/25/03 |
|---|---|---|---|
| Jurisdiction/Basin | Nitrogen Allocation (million pounds/year) | Phosphorus Allocation (million pounds/year) | Land-Based Sediment Allocation* (million tons/year) |
| **PENNSYLVANIA** | | | |
| Susquehanna | 67.58 | 1.90 | 0.793 |
| Potomac | 4.02 | 0.33 | 0.197 |
| Western Shore | 0.02 | 0.00 | 0.001 |
| Eastern Shore - MD | 0.27 | 0.03 | 0.004 |
| PA Total | 71.90 | 2.26 | 0.995 |
| | | | |
| **MARYLAND** | | | |
| Susquehanna | 0.83 | 0.03 | 0.037 |
| Patuxent | 2.46 | 0.21 | 0.095 |
| Potomac | 11.81 | 1.04 | 0.364 |
| Western Shore | 11.27 | 0.84 | 0.100 |
| Eastern Shore - MD | 10.89 | 0.81 | 0.116 |
| MD Total | 37.25 | 2.92 | 0.712 |
| | | | |
| **VIRGINIA** | | | |
| Potomac | 12.84 | 1.40 | 0.617 |
| Rappahannock | 5.24 | 0.62 | 0.288 |
| York | 5.70 | 0.48 | 0.103 |
| James | 26.40 | 3.41 | 0.925 |
| Eastern Shore - MD | 0.06 | 0.01 | 0.001 |
| Eastern Shore - VA | 1.16 | 0.08 | 0.008 |
| VA Total | 51.40 | 6.00 | 1.941 |
| | | | |
| **DISTRICT OF COLUMBIA** | | | |
| Potomac | 2.40 | 0.34 | 0.006 |
| DC Total | 2.40 | 0.34 | 0.006 |
| | | | |
| **NEW YORK** | | | |
| Susquehanna | 12.58 | 0.59 | 0.131 |
| NY Total | 12.58 | 0.59 | 0.131 |
| | | | |
| **DELAWARE** | | | |
| Eastern Shore - MD | 2.88 | 0.30 | 0.042 |
| DE Total | 2.88 | 0.30 | 0.042 |
| | | | |
| **WEST VIRGINIA** | | | |
| Potomac | 4.71 | 0.36 | 0.311 |
| James | 0.03 | 0.01 | 0.010 |
| WV Total | 4.75 | 0.37 | 0.320 |
| | | | |
| **SUBTOTAL** | 183 | 12.8 | 4.15 |
| **CLEAR SKIES REDUCTION** | -8 | | |
| **BASIN-WIDE TOTAL** | 175 | 12.8 | 4.15 |

\* These land-based sediment allocations will be assessed and, if necessary, revised by the tributary teams as part of a comprehensive strategy of management actions necessary to achieve the nutrient loading caps and local underwater bay grasses restoration goals.

AR0005403

**Table 3.**    4/25/03

**Chesapeake Bay Submerged Aquatic Vegetation (SAV) Restoration Goal Acreages by Chesapeake Bay Program Segment**

| Chesapeake Bay Program Segment Name | CBP Segment | SAV Restoration Goal (Acres) |
|---|---|---|
| Northern Chesapeake Bay | CB1TF | 12,908 |
| Upper Chesapeake Bay | CB2OH | 302 |
| Upper Central Chesapeake Bay | CB3MH | 943 |
| Middle Central Chesapeake Bay | CB4MH | 2,511 |
| Lower Central Chesapeake Bay | CB5MH | 14,961 |
| Western Lower Chesapeake Bay | CB6PH | 980 |
| Eastern Lower Chesapeake Bay | CB7PH | 14,620 |
| Mouth of the Chesapeake Bay | CB8PH | 6 |
| Bush River | BSHOH | 158 |
| Gunpowder River | GUNOH | 2,254 |
| Middle River | MIDOH | 838 |
| Back River | BACOH | 0 |
| Patapsco River | PATMH | 298 |
| Magothy River | MAGMH | 545 |
| Severn River | SEVMH | 329 |
| South River | SOUMH | 459 |
| Rhode River | RHDMH | 48 |
| West River | WSTMH | 214 |
| Upper Patuxent River | PAXTF | 5 |
| Western Branch (Patuxent River) | WBRTF | 0 |
| Middle Patuxent River | PAXOH | 68 |
| Lower Patuxent River | PAXMH | 1,325 |
| Upper Potomac River | POTTF | 4,378 |
| Piscataway Creek | PISTF | 783 |
| Mattawoman Creek | MATTF | 276 |
| Middle Potomac River | POTOH | 3,721 |
| Lower Potomac River | POTMH | 10,173 |
| Upper Rappahannock River | RPPTF | 20 |
| Middle Rappahannock River | RPPOH | 0 |
| Lower Rappahannock River | RPPMH | 5,380 |
| Corrotoman River | CRRMH | 516 |
| Piankatank River | PIAMH | 3,256 |
| Upper Mattaponi River | MPNTF | 75 |
| Lower Mattaponi River | MPNOH | 0 |
| Upper Pamunkey River | PMKTF | 155 |
| Lower Pamunkey River | PMKOH | 0 |
| Middle York River | YRKMH | 176 |
| Lower York River | YRKPH | 2,272 |
| Mobjack Bay | MOBPH | 15,096 |
| Upper James River | JMSTF | 1,600 |
| Appomattox River | APPTF | 319 |
| Middle James River | JMSOH | 7 |
| Chickahominy River | CHKOH | 348 |
| Lower James River | JMSMH | 531 |
| Mouth of the James River | JMSPH | 604 |
| Western Branch Elizabeth River | WBEMH | 0 |
| Southern Branch Elizabeth River | SBEMH | 0 |
| Eastern Branch Elizabeth River | EBEMH | 0 |
| Middle Elizabeth River | ELIMH | 0 |
| Lafayette River | LAFMH | 0 |
| Mouth of the Elizabeth River | ELIPH | 0 |
| Lynnhaven River | LYNPH | 69 |
| Northeast River | NORTF | 88 |
| C&D Canal | C&DOH | 0 |
| Bohemia River | BOHOH | 97 |
| Elk River | ELKOH | 1,648 |
| Sassafras River | SASOH | 764 |
| Upper Chester River | CHSTF | 0 |
| Middle Chester River | CHSOH | 63 |
| Lower Chester River | CHSMH | 2,724 |
| Eastern Bay | EASMH | 6,108 |
| Upper Choptank River | CHOTF | 0 |
| Middle Choptank River | CHOOH | 63 |
| Lower Choptank River | CHOMH2 | 1,499 |
| Mouth of the Choptank River | CHOMH1 | 8,044 |
| Little Choptank River | LCHMH | 3,950 |
| Honga River | HNGMH | 7,686 |
| Fishing Bay | FSBMH | 193 |
| Upper Nanticoke River | NANTF | 0 |
| Middle Nanticoke River | NANOH | 3 |
| Lower Nanticoke River | NANMH | 3 |
| Wicomico River | WICMH | 3 |
| Manokin River | MANMH | 4,359 |
| Big Annemessex River | BIGMH | 2,014 |
| Upper Pocomoke River | POCTF | 0 |
| Middle Pocomoke River | POCOH | 0 |
| Lower Pocomoke River | POCMH | 4,092 |
| Tangier Sound | TANMH | 37,965 |
| **TOTAL** | | **184,893** |

AR0005404

| Table 4. | 4/25/03 |
|:---|---:|
| **Chesapeake Bay Submerged Aquatic Vegetation (SAV) Restoration Goal Acreages by Major Basin - Jurisdiction** | |

| Basin/Jurisdiction | SAV Restoration Goal (Acres) |
|:---:|:---:|
| SUSQUEHANNA | 12,856 |
| EASTERN SHORE - MD | 76,193 |
| WESTERN SHORE - MD | 5,651 |
| PATUXENT | 1,420 |
| POTOMAC | |
| VA | 6,320 |
| MD | 12,747 |
| DC | 388 |
| RAPPAHANNOCK | 12,798 |
| YORK | 21,823 |
| JAMES | 3,483 |
| EASTERN SHORE - VA | 31,215 |
| **TOTAL** | 184,893 |

AR0005405



**Chesapeake Bay Program**
*A Watershed Partnership*

CHESAPEAKE EXECUTIVE COUNCIL

𝒟IRECTIVE NO. 03-02

# MEETING THE NUTRIENT AND SEDIMENT REDUCTION GOALS

𝒯n the *Chesapeake 2000* agreement, we stated that "improving water quality is the most critical element in the overall protection and restoration of the Chesapeake Bay and its tributaries." Furthermore, we recognized the importance of integrating cooperative and statutory programs to improve water quality. The agreement committed the signatory jurisdictions to nutrient and sediment reductions that would, "By 2010, correct the nutrient- and sediment-related problems in the Chesapeake Bay and its tidal tributaries sufficiently to remove the Bay and the tidal portions of its tributaries from the list of impaired waters under the Clean Water Act."

TO MEET THIS COMMITMENT, the signatories to *Chesapeake 2000* reached out to Delaware, New York and West Virginia. For the first time, through a Memorandum of Understanding, we have formed a Chesapeake Bay water quality partnership in which all seven jurisdictions in the watershed are engaged.

During 2003, notable progress has been made integrating the cooperative and regulatory programs.

In April 2003, water quality criteria driven by living resource needs were established to guide restoration of the Bay and its tidal tributaries. Each of the jurisdictions with tidal waters has initiated its regulatory process to adopt revised water quality standards based on the criteria. Loading allocations for nutrients and sediments in each of the major river basins were established. Accordingly, we hereby endorse the criteria and allocations as agreed to by the Principals' Staff Committee. The water quality criteria and the allocations of nutrient and sediment reductions serve as the basis for expanded tributary strategies in each jurisdiction. Under the schedule and process we adopted at our October 2002 meeting, we will complete the tributary strategies by April 2004. We remain committed to significant reductions in the nutrient and sediment loadings to the Chesapeake Bay, and direct that the tidal water jurisdictions complete their regulatory processes to revise their Chesapeake Bay and tidal tributary water quality standards as expeditiously as possible, with the assistance and support of the nontidal jurisdictions and the U.S. Environmental Protection Agency.

FURTHERMORE, we reaffirm our commitment to complete the tributary strategies by April 2004, and commit to begin implementation immediately thereafter.

The U.S. Environmental Protection Agency will assist the jurisdictions, working with stakeholders, to develop watershed permitting and contractual tools and strategies to control nutrient loadings to the Chesapeake Bay and its tidal tributaries. These tools and strategies should address cost-effectiveness, including nutrient trading, and promote state-of-the-art technologies wherever possible.

WE FURTHER DIRECT the Chesapeake Bay Program to establish and convene a Chesapeake Bay Watershed Blue Ribbon Panel to consider funding sources to implement the tributary strategies basinwide and to make recommendations regarding other actions at the federal, state and local level to the Executive Council. The Panel will convene its first meeting no later than February 2004, and will provide the Executive Council with a detailed report in October of 2004.

AR0005395

December 9, 2003

## CHESAPEAKE EXECUTIVE COUNCIL

FOR THE COMMONWEALTH OF VIRGINIA          _____

FOR THE STATE OF MARYLAND                 _____

FOR THE COMMONWEALTH OF PENNSYLVANIA      _____

FOR THE DISTRICT OF COLUMBIA              _____

FOR THE UNITED STATES OF AMERICA          _____

FOR THE CHESAPEAKE BAY COMMISSION         _____


FOR THE STATE OF DELAWARE                 _____

FOR THE STATE OF NEW YORK                 _____

FOR THE STATE OF WEST VIRGINIA            _____

AR0005396

**Exhibit A**

# Exchange Compliance Plan



**Submitted to the
Virginia Department of Environmental Quality
July 31, 2007**

**PART I.    NITROGEN SUMMARY FOR TYSON-GLEN ALLEN**

## Tyson-Glen Allen
*UPPER JAMES Trading Basin*

### SUMMARY STATISTICS

| Participates in the Exchange Program? | Yes |
|---|---|
| WLA Design Flow (mgd) | 1.07 |
| WLA Concentration (mg/L) | 6.00 |
| Delivery Factor | 1.00 |
| **Delivered WLA Cap** | **19,552** |
| 2006 Actual Flow (mgd) | 0.79 |
| 2006 Concentration | 32.23 |
| 2006 Delivered Load | 77,533 |
| **Current Year Credit Surplus (Deficit)** | **(57,981)** |
| Grant Funding % | 0% |

### Facility-level Nitrogen Trading & Upgrades
Projected Sales and Purchases of Class A Nitrogen Credits



| Loading & Credit Summary (annual pounds) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Design Flow (mgd) | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 |
| Projected Flow (mgd) | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |
| Projected Avg. Annual Concentration (mg/L) | 36.48 | 36.48 | 36.48 | 36.48 | 5.00 | 5.00 | 5.00 | 5.00 | 5.00 |
| End-of-Pipe Load | 138,878 | 138,878 | 138,878 | 138,878 | 19,035 | 19,035 | 19,035 | 19,035 | 19,035 |
| Delivered Load | 138,878 | 138,878 | 138,878 | 138,878 | 19,035 | 19,035 | 19,035 | 19,035 | 19,035 |
| Delivered WLA Cap | | | | | 19,552 | 19,552 | 19,552 | 19,552 | 19,552 |
| Projected Credit Surplus (Deficit) | | | | | 517 | 517 | 517 | 517 | 517 |
| Transfers In (Out) within Owner Bubble | | | | | 0 | 0 | 0 | 0 | 0 |
| Transfers In (Out) from Private Exchanges | | | | | 0 | 0 | 0 | 0 | 0 |
| WQIF-Held Credits | | | | | 0 | 0 | 0 | 0 | 0 |
| Adjusted Credit Surplus (Deficit) | | | | | 517 | 517 | 517 | 517 | 517 |
| Class A Pledge Percentage (%) | | | | | 0% | 0% | 0% | 0% | 0% |
| Class A Sales (Purchases) | | | | | 0 | 0 | 0 | 0 | 0 |
| Projected Class B Credits | | | | | 517 | 517 | 517 | 517 | 517 |

TYSON-GLEN ALLEN

**PART II.     TOTAL NITROGEN COMPLIANCE**

**A.     2007 Compliance Deadline Statement Required by 9 VAC 25-820-40 A 2**

Compare facility's 2005 discharged TN load to its TN WLA.  Would this facility have complied with its TN WLA for calendar year 2005 if its TN WLA had been in effect for that year?

\_\_x\_\_     NO *(proceed to II.B. Implementation Schedule for TN)*

\_\_\_\_\_     YES *(permittee must check Option 1 or Option 2)*:

    \_\_\_\_\_     Option 1: Permittee hereby requests facility's TN WLA to be effective as of January 1, 2007 (9 VAC 25-820-40 A 2 b) *(PART II Complete; Proceed to PART III. TOTAL PHOSPHORUS COMPLIANCE), or*

    \_\_\_\_\_     Option 2: Permittee declares that an additional capital project(s) is needed to ensure continued compliance with the TN WLA through the applicable compliance schedule deadline for the tributary to which this facility discharges (9 VAC 25-820-40 A 2 a).  Explanation:

    _____

    _____

    _____

    *(proceed to II.B. Implementation Schedule for TN)*

**B.     Implementation Schedule for TN**

1.     Does permittee anticipate requiring TN credit purchase to comply?

    \_\_x\_\_     NO          \_\_\_\_\_     YES (If yes, compliance is required upon expiration of tributary compliance schedule deadline and nitrogen credit availability.  This requirement for compliance also applies if permittee plans to comply by a combination of TN credit purchase and capital project.)

2.     Is permittee implementing a capital project to comply?

    \_\_\_\_\_     NO          \_\_x\_\_     YES.  If YES, compliance is required as soon as possible but no later than the applicable tributary compliance schedule deadline.

3.     Capital Project Milestone Schedule *(specify estimated date for each milestone)*

| | |
|---|---|
| Engineer selection | \_\_\_\_\_2005_____ |
| PER/CER to DEQ | \_\_\_\_\_12/2007_____ |
| Plans & Specifications to DEQ | \_\_\_\_\_3/2008_____ |
| Commence construction | \_\_\_\_\_5/2008_____ |
| Complete construction | \_\_\_\_\_12/2008_____ |
| CTO Request to DEQ (POTWs only) | _____ |

TYSON-GLEN ALLEN

**C.     Tributary Compliance Schedule Deadline Extension**

*If this Basin-Level Compliance Plan recommends a tributary compliance schedule completion deadline later than 2011, the following additional information is required by DEQ for significant discharger facilities that are neither upgrading nor meeting their own facility/owner bubble TN WLA as of 2011.*

1.     Estimate of facility status as of 2011:

___y__     TN WLA Compliant (If Owner Bubble is means of compliance, check
here _____ )

___n___     Upgrade in Progress
_____ At this facility
_____ At another facility bubbled with this facility
_____ Deferred Upgrade Facility (Non-TN WLA Compliant) (i.e., Buyer)

2.     Deferred Upgrade Facility statement (required)

If "Deferred Upgrade Facility" is checked above in this Part II.C.1., permittee confirms that it will identify and implement reasonably-available, cost-effective optimization methods with existing facilities for TN removal beginning in 2011 and continuing until the Deferred Upgrade Facility achieves compliance either individually o through trading. The goal of such optimization is to reduce the discharge of nitrogen to 2005 levels to the extent practicable. Deferred Upgrade Facilities shall specify their planned optimization method in the February 1, 2009 annual compliance plan update, shall initiate optimization no later than January 1, 2011, and shall continue optimization until compliance is achieved. Optimization with existing facilities is not intended to require capital expenditures, and should rely principally on operational or process modifications. However, if an owner of a WQIF eligible facility expends capital dollars, such capital expenditure shall be considered for WQIF grant eligibility in the same manner as other nutrient removal costs incurred prior to the execution of a grant agreement, provided the grant is made pursuant to an executed agreement consistent with the provisions of Chapter 21.1 of the Virginia Code (the Water Quality Improvement Act).

*Continue to Part IV*

**PART III.    PHOSPHORUS SUMMARY FOR TYSON-GLEN ALLEN**

## Tyson-Glen Allen
*UPPER JAMES Trading Basin*

**SUMMARY STATISTICS**

| *Participates in the Exchange Program?* | **Yes** |
|---|---|
| WLA Design Flow (mgd) | 1.07 |
| WLA Concentration (mg/L) | 0.10 |
| Delivery Factor | 1.00 |
| **Delivered WLA Cap** | **326** |
| | |
| 2006 Actual Flow (mgd) | 0.79 |
| 2006 Concentration | 0.10 |
| 2006 Delivered Load | 238 |
| **Current Year Credit Surplus (Deficit)** | **88** |
| | |
| Grant Funding % | 0% |

### Facility-level Phosphorus Trading & Upgrades
Projected Sales & Purchases of Class A Phosphorus Credits



| Loading & Credit Summary (annual pounds) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Design Flow (mgd) | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 | 1.07 |
| Projected Flow (mgd) | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |
| Projected Avg. Annual Concentration (mg/L) | 0.10 | 0.10 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 | 0.09 |
| End-of-Pipe Load | 377 | 377 | 324 | 324 | 324 | 324 | 324 | 324 | 324 |
| Delivered Load | 377 | 377 | 324 | 324 | 324 | 324 | 324 | 324 | 324 |
| Delivered WLA Cap | | | | | 326 | 326 | 326 | 326 | 326 |
| Projected Credit Surplus (Deficit) | | | | | 2 | 2 | 2 | 2 | 2 |
| Transfers In (Out) within Owner Bubble | | | | | 0 | 0 | 0 | 0 | 0 |
| Transfers In (Out) from Private Exchanges | | | | | 0 | 0 | 0 | 0 | 0 |
| WQIF-Held Credits | | | | | 0 | 0 | 0 | 0 | 0 |
| Adjusted Credit Surplus (Deficit) | | | | | 2 | 2 | 2 | 2 | 2 |
| Class A Pledge Percentage (%) | | | | | 0% | 0% | 0% | 0% | 0% |
| Class A Sales (Purchases) | | | | | 0 | 0 | 0 | 0 | 0 |
| Projected Class B Credits | | | | | 2 | 2 | 2 | 2 | 2 |

TYSON-GLEN ALLEN

## PART IV.    TOTAL PHOSPHORUS COMPLIANCE

**A.    2007 Compliance Deadline Statement Required by 9 VAC 25-820-40 A 2**

Compare facility's 2005 discharged TP load to its TP WLA.  Would this facility have complied with its TP WLA for calendar year 2005 if its TP WLA had been in effect for that year?

_____ NO *(proceed to III.B. Implementation Schedule for TP)*

__x____        YES *(permittee must check Option 1 or Option 2):*

      _____ Option 1: Permittee hereby requests facility's TP WLA to be effective as of January 1, 2007 (9 VAC 25-820-40 A 2 b) *(Stop Here/Part III Is Complete)*, or

      __x___ Option 2: Permittee declares that an additional capital project(s) is needed to ensure continued compliance with the TP WLA through the applicable compliance schedule deadline for the tributary to which this facility discharges (9 VAC 25-820-40 A 2 a).  Explanation:

Tyson Foods, Inc.-Glen Allen needs to buffer against a possible flow increase by upgrading a degrading sandfilter system.

      *(proceed to III.B. Implementation Schedule for TP)*

**B.    Implementation Schedule for TP**

1.    Does permittee anticipate requiring TP credit purchase to comply?

    ___x___        NO        _____ YES (If yes, compliance is required upon expiration of tributary compliance schedule deadline and nitrogen credit availability.  This requirement for compliance also applies if permittee plans to comply by a combination of TP credit purchase and capital project.)

2.    Is permittee implementing a capital project to comply?

    _____ NO        __x____        YES.  If YES, compliance is required as soon as possible but no later than the applicable tributary compliance schedule deadline.

3.    Capital Project Milestone Schedule *(specify estimated date for each milestone)*

| | |
|---|---|
| Engineer selection | _____2005_____ |
| PER/CER to DEQ | _____4/2007_____ |
| Plans & Specifications to DEQ | _____4/2007_____ |
| Commence construction | _____6/2007_____ |
| Complete construction | _____12/2007_____ |
| CTO Request to DEQ (POTWs only) | _____ |

TYSON-GLEN ALLEN

C.    **Tributary Compliance Schedule Deadline Extension**

*If this Basin-Level Compliance Plan recommends a tributary compliance schedule completion deadline later than 2011, the following additional information is required by DEQ for significant discharger facilities that are neither upgrading nor meeting their own facility/owner bubble TP WLA as of 2011.*

1.    Estimate of facility status as of 2011:

    __y___    TP WLA Compliant (If Owner Bubble is means of compliance, check here _____ )

    __y___    Upgrade in Progress

        __y___    At this facility

        _____    At another facility bubbled with this facility

    _____    Deferred Upgrade Facility (Non-TP WLA Compliant) (i.e., Buyer)

2.    Deferred Upgrade Facility statement (required)

If "Deferred Upgrade Facility" is checked above in this Part II.C.1., permittee confirms that it will identify and implement reasonably-available, cost-effective optimization methods with existing facilities for TP removal beginning in 2011 and continuing until the Deferred Upgrade Facility achieves compliance either individually o through trading. The goal of such optimization is to reduce the discharge of phosphorus to 2005 levels to the extent practicable. Deferred Upgrade Facilities shall specify their planned optimization method in the February 1, 2009 annual compliance plan update, shall initiate optimization no later than January 1, 2011, and shall continue optimization until compliance is achieved. Optimization with existing facilities is not intended to require capital expenditures, and should rely principally on operational or process modifications. However, if an owner of a WQIF eligible facility expends capital dollars, such capital expenditure shall be considered for WQIF grant eligibility in the same manner as other nutrient removal costs incurred prior to the execution of a grant agreement, provided the grant is made pursuant to an executed agreement consistent with the provisions of Chapter 21.1 of the Virginia Code (the Water Quality Improvement Act).

*End of Facility Appendix*

**PART I.    NITROGEN SUMMARY FOR TYSON FOODS-TEMPERANCEVILLE**

## Tyson Foods-Temperanceville

*EASTERN SHORE Trading Basin*

### SUMMARY STATISTICS

| Participates in the Exchange Program? | Yes |
|---|---|

| | |
|---|---|
| WLA Design Flow (mgd) | 1.25 |
| WLA Concentration (mg/L) | 6.00 |
| Delivery Factor | 1.00 |
| **Delivered WLA Cap** | **22,842** |

| | |
|---|---|
| 2006 Actual Flow (mgd) | 1.05 |
| 2006 Concentration | 35.00 |
| 2006 Delivered Load | 111,924 |
| **Current Year Credit Surplus (Deficit)** | **(89,083)** |

| Grant Funding? | 0% |
|---|---|

### Facility-level Nitrogen Trading & Upgrades
Projected Sales and Purchases of Class A Nitrogen Credits



| Loading & Credit Summary (annual pounds) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Design Flow (mgd) | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |
| Projected Flow (mgd) | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 |
| Projected Avg. Annual Concentration (mg/L) | 35.00 | 35.00 | 25.00 | 15.00 | 6.00 | 6.00 | 6.00 | 6.00 | 6.00 |
| **End-of-Pipe Load** | | | | | | | | | |
| Delivered Load | 117,254 | 117,254 | 83,753 | 50,252 | 20,101 | 20,101 | 20,101 | 20,101 | 20,101 |
| Delivered WLA Cap | 117,254 | 117,254 | 83,753 | 50,252 | 22,842 | 22,842 | 22,842 | 22,842 | 22,842 |
| **Projected Credit Surplus (Deficit)** | | | | | 2,741 | 2,741 | 2,741 | 2,741 | 2,741 |
| Transfers In (Out) within Owner Bubble | | | | | 0 | 0 | 0 | 0 | 0 |
| Transfers In (Out) from Private Exchanges | | | | | 0 | 0 | 0 | 0 | 0 |
| WQIF-Held Credits | | | | | 0 | 0 | 0 | 0 | 0 |
| **Adjusted Credit Surplus (Deficit)** | | | | | 2,741 | 2,741 | 2,741 | 2,741 | 2,741 |
| Class A Pledge Percentage (%) | | | | | NT | NT | NT | NT | NT |
| **Class A Sales (Purchases)** | | | | | NT | NT | NT | NT | NT |
| Projected Class B Credits | | | | | NT | NT | NT | NT | NT |

*NT = No Trading.  Trading does not occur because credit purchase requests exceed committed (Class A) supplies of credits.*

TYSON FOODS (TEMPERANCEVILLE)

## PART II.     TOTAL NITROGEN COMPLIANCE

### A.     2007 Compliance Deadline Statement Required by 9 VAC 25-820-40 A 2

Compare facility's 2005 discharged TN load to its TN WLA. Would this facility have complied with its TN WLA for calendar year 2005 if its TN WLA had been in effect for that year?

___✓___ NO *(proceed to II.B. Implementation Schedule for TN)*

_____ YES *(permittee must check Option 1 or Option 2)*:

    _____ Option 1: Permittee hereby requests facility's TN WLA to be effective as of January 1, 2007 (9 VAC 25-820-40 A 2 b) *(PART II Complete; Proceed to PART III. TOTAL PHOSPHORUS COMPLIANCE)*, or

    _____ Option 2: Permittee declares that an additional capital project(s) is needed to ensure continued compliance with the TN WLA through the applicable compliance schedule deadline for the tributary to which this facility discharges (9 VAC 25-820-40 A 2 a). Explanation:

_____

_____

_____

    *(proceed to II.B. Implementation Schedule for TN)*

### B.     Implementation Schedule for TN

1.     Does permittee anticipate requiring TN credit purchase to comply?

    ___✓___ NO     _____ YES (If yes, compliance is required upon expiration of tributary compliance schedule deadline and nitrogen credit availability. This requirement for compliance also applies if permittee plans to comply by a combination of TN credit purchase and capital project.)

2.     Is permittee implementing a capital project to comply?

    _____ NO     ___✓___ YES. If YES, compliance is required as soon as possible but no later than the applicable tributary compliance schedule deadline.

3.     Capital Project Milestone Schedule *(specify estimated date for each milestone)*

| | |
|---|---|
| Engineer selection | January 2006 |
| PER/CER to DEQ | August 2007 |
| Plans & Specifications to DEQ | June 2008 |
| Commence construction | January 2009 |
| Complete construction | June 2009 |
| CTO Request to DEQ (POTWs only) | _____ |

TYSON FOODS (TEMPERANCEVILLE)

### C.   Tributary Compliance Schedule Deadline Extension

*If this Basin-Level Compliance Plan recommends a tributary compliance schedule completion deadline later than 2011, the following additional information is required by DEQ for significant discharger facilities that are neither upgrading nor meeting their own facility/owner bubble TN WLA as of 2011.*

1.   Estimate of facility status as of 2011:

    ✓ TN WLA Compliant (If Owner Bubble is means of compliance, check here _____ )

    _____ Upgrade in Progress

       _____ At this facility

       _____ At another facility bubbled with this facility

    _____ Deferred Upgrade Facility (Non-TN WLA Compliant) (i.e., Buyer)

2.   Deferred Upgrade Facility statement (required)

If "Deferred Upgrade Facility" is checked above in this Part II.C.1., permittee confirms that it will identify and implement reasonably-available, cost-effective optimization methods with existing facilities for TN removal beginning in 2011 and continuing until the Deferred Upgrade Facility achieves compliance either individually o through trading. The goal of such optimization is to reduce the discharge of nitrogen to 2005 levels to the extent practicable. Deferred Upgrade Facilities shall specify their planned optimization method in the February 1, 2009 annual compliance plan update, shall initiate optimization no later than January 1, 2011, and shall continue optimization until compliance is achieved. Optimization with existing facilities is not intended to require capital expenditures, and should rely principally on operational or process modifications. However, if an owner of a WQIF eligible facility expends capital dollars, such capital expenditure shall be considered for WQIF grant eligibility in the same manner as other nutrient removal costs incurred prior to the execution of a grant agreement, provided the grant is made pursuant to an executed agreement consistent with the provisions of Chapter 21.1 of the Virginia Code (the Water Quality Improvement Act).

*Continue to Part IV*

**PART III.    PHOSPHORUS SUMMARY FOR TYSON FOODS-TEMPERANCEVILLE**

### Tyson Foods-Temperancevil
*EASTERN SHORE Trading Basin*

**SUMMARY STATISTICS**

| Participates in the Exchange Program? | Yes |
|---|---|
| WLA Design Flow (mgd) | 1.25 |
| WLA Concentration (mg/L) | 0.30 |
| Delivery Factor | 1.00 |
| Delivered WLA Cap | 1,142 |
| | |
| 2006 Actual Flow (mgd) | 1.05 |
| 2006 Concentration | 2.00 |
| 2006 Delivered Load | 6,396 |
| Current Year Credit Surplus (Deficit) | (5,254) |
| | |
| Grant Funding % | 0% |



**Facility-level Phosphorus Trading & Upgrades**
Projected Sales & Purchases of Class A Phosphorus Credits

| Loading & Credit Summary (annual pounds) | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|---|---|---|
| Design Flow (mgd) | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 | 1.25 |
| Projected Flow (mgd) | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 | 1.10 |
| Projected Avg. Annual Concentration (mg/L) | 2.00 | 2.00 | 2.00 | 0.50 | 0.30 | 0.30 | 0.30 | 0.30 | 0.30 |
| **End-of-Pipe Load** | 6,700 | 6,700 | 6,700 | 1,675 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Delivered Load | 6,700 | 6,700 | 6,700 | 1,675 | 1,005 | 1,005 | 1,005 | 1,005 | 1,005 |
| Delivered WLA Cap | | | | | 1,142 | 1,142 | 1,142 | 1,142 | 1,142 |
| **Projected Credit Surplus (Deficit)** | | | | | 137 | 137 | 137 | 137 | 137 |
| Transfers In (Out) within Owner Bubble | | | | | 0 | 0 | 0 | 0 | 0 |
| Transfers In (Out) from Private Exchanges | | | | | 0 | 0 | 0 | 0 | 0 |
| WQIF-Held Credits | | | | | 0 | 0 | 0 | 0 | 0 |
| **Adjusted Credit Surplus (Deficit)** | | | | NT | 137 | 137 | 137 | 137 | 137 |
| Class A Pledge Percentage (%) | | | | NT | NT | NT | NT | NT | NT |
| **Class A Sales (Purchases)** | | | | NT | NT | NT | NT | NT | NT |
| Projected Class B Credits | | | | | | | | | |

*NT = No Trading. Trading does not occur because credit purchase requests exceed committed (Class A) supplies of credits.*

EXCHANGE COMPLIANCE PLAN, JULY 31, 2007: PAGE 6-45

TYSON FOODS (TEMPERANCEVILLE)

## PART IV.    TOTAL PHOSPHORUS COMPLIANCE

A.    **2007 Compliance Deadline Statement Required by 9 VAC 25-820-40 A 2**

Compare facility's 2005 discharged TP load to its TP WLA.  Would this facility have complied with its TP WLA for calendar year 2005 if its TP WLA had been in effect for that year?

_____✓_____ NO *(proceed to III.B. Implementation Schedule for TP)*

_____ YES *(permittee must check Option 1 or Option 2):*

    _____ Option 1: Permittee hereby requests facility's TP WLA to be effective as of January 1, 2007 (9 VAC 25-820-40 A 2 b) *(Stop Here/Part III Is Complete)*, or

    _____ Option 2: Permittee declares that an additional capital project(s) is needed to ensure continued compliance with the TP WLA through the applicable compliance schedule deadline for the tributary to which this facility discharges (9 VAC 25-820-40 A 2 a).  Explanation:

    _____

    _____

    *(proceed to III.B. Implementation Schedule for TP)*

B.    **Implementation Schedule for TP**

1.    Does permittee anticipate requiring TP credit purchase to comply?

    __✓__ NO _____ YES (If yes, compliance is required upon expiration of tributary compliance schedule deadline and nitrogen credit availability.  This requirement for compliance also applies if permittee plans to comply by a combination of TP credit purchase and capital project.)

2.    Is permittee implementing a capital project to comply?

    _____ NO __✓__ YES.  If YES, compliance is required as soon as possible but no later than the applicable tributary compliance schedule deadline.

3.    Capital Project Milestone Schedule *(specify estimated date for each milestone)*

| | |
|---|---|
| Engineer selection | January 2006 |
| PER/CER to DEQ | August 2007 |
| Plans & Specifications to DEQ | June 2008 |
| Commence construction | January 2009 |
| Complete construction | June 2009 |
| CTO Request to DEQ (POTWs only) | |

EXCHANGE COMPLIANCE PLAN, JULY 31, 2007: PAGE 6-46

TYSON FOODS (TEMPERANCEVILLE)

**C.     Tributary Compliance Schedule Deadline Extension**

*If this Basin-Level Compliance Plan recommends a tributary compliance schedule completion deadline later than 2011, the following additional information is required by DEQ for significant discharger facilities that are neither upgrading nor meeting their own facility/owner bubble TP WLA as of 2011.*

1.     Estimate of facility status as of 2011:

     ✓  TP WLA Compliant (If Owner Bubble is means of compliance, check here _____ )

     _____ Upgrade in Progress

         _____ At this facility

         _____ At another facility bubbled with this facility

     _____ Deferred Upgrade Facility (Non-TP WLA Compliant) (i.e., Buyer)

2.     Deferred Upgrade Facility statement (required)

If "Deferred Upgrade Facility" is checked above in this Part II.C.1., permittee confirms that it will identify and implement reasonably-available, cost-effective optimization methods with existing facilities for TP removal beginning in 2011 and continuing until the Deferred Upgrade Facility achieves compliance either individually o through trading. The goal of such optimization is to reduce the discharge of phosphorus to 2005 levels to the extent practicable. Deferred Upgrade Facilities shall specify their planned optimization method in the February 1, 2009 annual compliance plan update, shall initiate optimization no later than January 1, 2011, and shall continue optimization until compliance is achieved. Optimization with existing facilities is not intended to require capital expenditures, and should rely principally on operational or process modifications. However, if an owner of a WQIF eligible facility expends capital dollars, such capital expenditure shall be considered for WQIF grant eligibility in the same manner as other nutrient removal costs incurred prior to the execution of a grant agreement, provided the grant is made pursuant to an executed agreement consistent with the provisions of Chapter 21.1 of the Virginia Code (the Water Quality Improvement Act).

*End of Facility Appendix*