# Penn Laird, VA Chesapeake Bay TMDL Public Meeting Summary

December 16, 2009

**Spotswood High School**
**368 Blazer Drive**
**Penn Laird, VA 22846**

Agenda ................................................................................................... page 2

Attendee Details.................................................................................... page 3

Power Point Presentation....................................................................... page 4

Questions Answered............................................................................... page 32

Questions Submitted.............................................................................. page 34

Comments............................................................................................. page 37

1

AR0027710

**Agenda**

➢ **Welcome, introductions, and meeting logistics – Russ Perkinson, VADCR (5 minutes)**

➢ **EPA presentation on the Chesapeake Bay TMDL and EPA expectations – Richard Batiuk and Bob Koroncai, EPA (40 minutes)**

➢ **Next steps – Al Pollock, VADEQ (15 minutes)**

➢ **Public comments, questions and answers – Panel moderated by Russ Perkinson (60 minutes)**

➢ **Adjourn**

2

AR0027711

## Attendee Detail

**Total Live Attendees: 205**

**Registration Question:**

How did you hear about this Meeting?

- Other (52)
  - Farm Bureau (16)
  - Word of Mouth (6)
  - Radio (4)
  - Pilgrims Pride (2)
  - Work (2)
  - DEQ (2)
  - VA SWDC
  - Rivanna Basin Community
  - VACPA
- E-mail/Listserve (39)
- Other Web Site _____ (17)
  - DEQ (3)
  - DCR (3)
  - VCN
- U. S. EPA Web Site (14)
- Newspaper (10)



AR0027712

**-460-**

# THE CHESAPEAKE BAY TMDL: Restoring Waters of Virginia and the Chesapeake Bay

**Bay TMDL Public Meeting**
**December 16, 2009**
**Harrisonburg, VA**

**Richard Batiuk and Bob Koroncai**
**U.S. EPA Region III**

# AGENDA

➢ Welcome, introductions, and meeting logistics **– Russ Perkinson, VADCR (5 minutes)**

➢ EPA presentation on the Chesapeake Bay TMDL and EPA expectations **– Richard Batiuk and Bob Koroncai, EPA (40 minutes)**

➢ Next Steps **– Al Pollock, VADEQ (15 minutes)**

➢ Public comments, questions and answers – **Panel moderated by Russ Perkinson (60 minutes)**

➢ Adjourn

AR0027713

**Panel to Address Public Comments**

➤ VA Department of Conservation and Recreation: Russ Perkinson, Moderator

➤ EPA: Richard Batiuk

➤ EPA: Bob Koroncai

➤ VA Department of Environmental Quality: Al Pollock



AR0027714





AR0027715





7

AR0027716

-464-



# Special Case: James River

- The dissolved oxygen standards in the Bay and its tidal rivers are the basis for the working nutrient target loads being used to develop Watershed Implementation Plans in each Virginia river basin.
- However, the target loads in the James basin do not yet account for what will be needed to also meet the


chlorophyll standards, which were adopted due to high algae levels in the tidal James River.

8

AR0027717





AR0027718



## Chesapeake Bay Watershed-
### By the Numbers

- Largest U.S. estuary
- Six-states and DC, 64,000 square mile watershed
- 10,000 miles of shoreline (longer then entire U.S. west coast)
- Over 3,600 species of plants, fish and other animals
- Average depth: 21 feet
- $750 million contribution annually to local economies
- Home to 17 million people (and counting)
- 77,000 principally family farms
- Declared "national treasure" by President Obama

Source: www.chesapeakebay.net

## Nutrient Loads by State

**Nitrogen***
WV 3% | DE 3% | DC 1% | MD 20% | NY 6% | PA 41% | VA 26%

**Phosphorus**
WV 4% | DE 2% | DC 1% | MD 19% | NY 5% | PA 24% | VA 45%

*EPA estimates a nitrogen load of 284 million lbs nitrogen in 2008. EPA assumes a reduction of 7 million lbs due to the Clean Air Act. This leaves 77 millions lbs to be addressed through the TMDL process.

AR0027719





AR0027720





Summary: 2008 Bay Health Assessment
Restored Bay
Priority Areas
Percent of Goal Achieved
0 10 20 30 40 50 60 70 80 90 100
Water Quality
21% of Goals Achieved
Dissolved Oxygen 16
Mid-Channel Clarity 14
Chlorophyll a 27
Chemical Contaminants 28
Habitats & Lower Food Web
45% of Goals Achieved
Bay Grasses 42
Phytoplankton 53
Bottom Habitat 42
Tidal Wetlands
Not quantified in relation to a goal
Fish & Shellfish
48% of Goals Achieved
Blue Crab 60
Oyster 9
Striped Bass 100
Shad 23
Juvenile Menhaden
Not quantified in relation to a goal
Data and Methods: www.chesapeakebay.net/status_bayhealth.aspx

Low to no dissolved oxygen in the Bay every summer
2007 Summer Mean Dissolved Oxygen (bottom)
N

AR0027721

## The Chesapeake Bay TMDL

- EPA sets pollution diet to meet states' Bay clean water standards
- Caps on nitrogen, phosphorus and sediment loads for all 6 Bay watershed states and DC
- States set load caps for point and non-point sources



# The Bay science supports local pollution diets…



**Phase 4 Bay Watershed Model (2000-2008)**

**Phase 5 Bay Watershed Model (2009- )**

13

AR0027722





AR0027723

## What are the Target Pollutant Cap Loads for the Bay Watershed?

**Current** model estimates are that the states' Bay water quality standards can be met at basinwide loading levels of:

- 200 million pounds nitrogen per year
- 15 million pounds phosphorus per year

**(Sediment target cap load under development-will be available by spring 2010)**

## Dividing the Basinwide Target Loading

AR0027724

-472-



AR0027725

# Current State Target Loads

| Nitrogen | | | | Phosphorus | | |
|---|---|---|---|---|---|---|
| State | Tributary Strategy | Target Load | | State | Tributary Strategy | Target Load |
| DC | 2.12 | 2.37 | | DC | 0.10 | 0.13 |
| DE | 6.43 | 5.25 | | DE | 0.25 | 0.28 |
| MD | 42.37 | 41.04 | | MD | 2.54 | 3.04 |
| NY | 8.68 | 10.54 | | NY | 0.56 | 0.56 |
| PA | 73.48 | 73.64 | | PA | 3.10 | 3.16 |
| VA | 56.75 | 59.21 | | VA | 6.41 | 7.05 |
| WV | 5.93 | 5.71 | | WV | 0.43 | 0.62 |
| Total | 195.75 | 197.76 | | Total | 13.39 | 14.84 |

All loads are in millions of pounds per year.



# Virginia's Past, Present and Future Estimated Loads

Nitrogen          Phosphorus

All scenarios run through Phase 5.2 Watershed Model

17

AR0027726

# Target Load Refinements

- **If States' Bay Water Quality Standards can still be achieved…**
  - **The State may exchange nitrogen and phosphorus target loads within a basin; and/or**
  - **The State may exchange nitrogen and phosphorus loads from one basin to another within the State.**



Pollution Diet for Each Tidal Water Segment

18

AR0027727





AR0027728

-476-



## Example: Projected Nitrogen Delivery from Major Basin in Each Jurisdiction by Source Sector

- Also divide jurisdiction load by 303(d) segment drainage area and, by November 2011, local area
- Attain jurisdiction-wide load reductions by the interim target, or justify why can still meet final target
- Jurisdiction would determine desired 2-year schedule to meet interim and final target loads
- EPA first evaluates milestones based on consistency with jurisdiction target load. EPA accepts shifts among source sectors, basins, segment drainages, and local areas if jurisdiction target load is met and local and Bay water quality goals are achieved

## Federal Consequences

- Directed at states not achieving expectations
- Will be outlined in an EPA letter this fall. May include:
  - Assigning more stringent pollution reductions to regulated point sources (e.g., wastewater, stormwater, CAFOs)
  - Objecting to state-issued NPDES permits
  - Limiting or prohibiting new or expanded discharges (e.g., wastewater, stormwater) of nutrients and sediment
  - Withholding, conditioning or reallocating federal grant funds

## Bay TMDL- Presidential Executive Order Connections

- Create Federal Leadership Committee
- Create the Performance and Accountability Framework
- Expand regulatory tools for CAFO's and urban and suburban runoff
- Improve nutrient and sediment controls on federal lands and roads
- Target farm conservation measures at high priority areas



AR0027730

## Bay TMDL: Bottom-line

- **Actions will clean and protect local waters in VA thereby supporting the local economy**
- **Restore a thriving Chesapeake Bay**
- **Federal, state, local officials and agencies will be fully accountable to the public**
- **Consequences for inaction, lack of progress**



## Further Information

- **Chesapeake Bay TMDL web site**
  - **www.epa.gov/chesapeakebaytmdl**
- **U.S. EPA Region 3 Contacts**
  - **Water Protection Division**
    - **Bob Koroncai**
      - 215-814-5730; koroncai.robert@epa.gov
    - **Jennifer Sincock (sincock.jennifer@epa.gov)**
  - **Chesapeake Bay Program Office**
    - **Rich Batiuk**
      - 410-267-5731; batiuk.richard@epa.gov
    - **Katherine Antos (antos.katherine@epa.gov)**

AR0027731



# Virginia's Approach to Developing the Chesapeake Bay TMDL Watershed Implementation Plan

Department of Conservation and Recreation
Department of Environmental Quality
Secretary of Natural Resources
Commonwealth of Virginia

December 2009

## A Challenged Bay

➢ Loss of shellfish and finfish
➢ Habitat loss
➢ Annual dead zones
➢ Poor water clarity

AR0027732

## Successes to Date

➢ Much has been done using voluntary, incentive based, and regulatory programs

➢ 1985 Loads
  ➢ 102 million pounds Nitrogen
  ➢ 12.4 million pounds Phosphorus

➢ 2008 Estimated Loads
  ➢ 72.8 million pounds Nitrogen
  ➢ 7.2 million pounds Phosphorus



## The Challenge Ahead

➢ To meet water quality standards in the Chesapeake Bay and its tidal rivers, **there is more to do**

➢ Low hanging fruit – mostly gone

➢ Future reductions will be harder

➢ We all have a role

AR0027733

## What We Need to Achieve (and Maintain)

Virginia Bay Draft Initial Target Loads

➤ 59.2 million pounds Nitrogen

➤ 7.05 million pounds Phosphorus

➤ These targets are very likely to change

## Load Uncertainties

➤ Initial draft target loads provided by EPA based on dissolved oxygen **only**

➤ Impacts on target loads from water quality standards for bay grasses, water clarity and other localized issues not yet determined

➤ Will be spring 2010 before target loads are adjusted for these factors

AR0027734

## Vision for Virginia's Watershed Implementation Plan

➤ Focuses on "how" as well as the "how much"

➤ Equity between sectors

➤ Is relevant locally

➤ Uses adaptive management

## Actively engage stakeholders and the public

➤ Virginia Bay TMDL Webinar (October 2009)

➤ Initial EPA Public Meetings (December 2009)

➤ Go to Individual stakeholder meetings (2010)

➤ Stakeholder Advisory Group (early 2010)

➤ Use Interactive web-based tools (Ongoing)

➤ EPA Public Comment Period (Aug. – Oct. 2010)

➤ Additional outreach as necessary

AR0027735

## A Challenging Timeframe

EPA deadlines:

Phase I – Draft allocations and state strategies
➢ June 1, 2010 - Preliminary phase I plan by source sector and impaired segment drainage area
➢ August 1, 2010 – Draft phase I plan
➢ November 1, 2010 – Final phase I plan

Phase II – Local target loads and action plans
➢ June 1, 2011 – Draft phase II plan
➢ November 1, 2011 – Final phase II plan submitted to EPA

## Phase I – Draft Allocations by Source Sector and State Strategies

➢ State staff to consult with sector experts, then staff will develop projected BMP coverage levels
➢ Draft reviewed and refined following input by Stakeholder Group
➢ Used to derive potential nutrient and sediment load reductions and develop State strategies




27

AR0027736

## Phase I – Draft Allocations by Source Sector and State Strategies

Source Sectors
- Municipal and Industrial Wastewater
- Non-Significant Wastewater
- Municipal Combined Sewer Overflows [3 systems in VA]
- Industrial Stormwater
- Construction Stormwater
- MS4 Stormwater
- Non-MS4 Stormwater
- Confined Animal Feeding Operations (CAFOs)
- Agriculture – non CAFO
- Forest
- Atmospheric
- Onsite / septic systems

## Phase I – Draft Allocations Made to Individual Watershed Segments

- State agency staff will distribute the allowable loads into the various impaired segments and among the various sources

- Land use data (cropland, developed land, etc.) along with BMP coverage projections and resulting load reductions will be used

- Draft reviewed and refined following input by Stakeholder Group



Virginia's 35 Bay Watershed Segments

28

AR0027737

## Phase II - Local Target Loads and Action Plans

➢ Will work closely with local stakeholders to identify specific controls and practices to be implemented

➢ Agencies will initiate work later in 2010

➢ Due by November 2011



York River Segments and Jurisdictions

## 2-Year Milestone Process

➢ Biennial Milestones –Use adaptive management; identify specific actions needed to maintain schedule

➢ Continue to engage stakeholders and public

➢ Monitor and evaluate progress

➢ Next milestone period – January 1, 2012 to December 31, 2013 to be completed with phase II plan

AR0027738

## Want to find out more?

**EPA**

http://www.epa.gov/chesapeakebaytmdl/

**VA-DEQ**

http://www.deq.virginia.gov/tmdl/chesapeakebay.html

**VA-DCR**

http://www.dcr.virginia.gov/soil_and_water/baytmdl.shtml



AR0027739



AR0027740

-488-

# Questions Answered

**Questions Answered (in the order in which they were asked):**

*Note: The letter indicates the source of each question. An "A" indicates that the question was submitted by the live audience. The cards were pre-numbered to easily identify the question once they were submitted. These questions are in the order in which they were asked. Some questions were rewritten for clarity.*

A82: How exactly are "all previous reductions in nutrient loads" credited towards achieving final reductions? Does this mean that existing BMPs have a credit associated with them? If so, how have BMP data been collected and where did the data come from? And is it complete/well representative data?

A45: We produce more phosphorus in our area than we can use, as you know. We are now required to extract P2O5 from our WWTP effluent, effective 2011. Are there grants or loans to help us export this to nutrient deficient areas? (John Harless, Shenandoah Environmental Services, LLC)

A106: Please describe the science indicated how nitrogen, phosphorus, and sediment from farmland in the Shenandoah Valley find its way to the Bay? How did you come up with 40% of nitrogen load and 50% of phosphorus load comes from agriculture?

A79: Are the areas where the most nitrogen is being put into the Bay from the heavily populated areas and not where the most agriculture is being done, mostly homeowners? (Wayne Tatum, Madison County)

A134: How will progress be measured/evaluated at the end of the two-year milestones? Will it be based on in-stream monitoring (stations) or on reported new BMPs and modeling? (Thanh Dang, City of Harrisonburg)

A80: Financing is critical for monitoring and maintenance to ensure that urban stormwater BMPs are working. Local staff will have to monitor to ensure BMPs continue to function as designed. How do U.S. EPA and Virginia propose to finance or help finance long-term monitoring and maintenance programs? (Thanh Dang, City of Harrisonburg)

A65: What are the plans to control nutrients from Pennsylvania?

A92: Is EPA/DEQ working on new water quality standards for nitrogen and phosphorus? If so, what will be the schedule for adoption? Will new standards be used in developing watershed implementation plans for Bay TMDLs?

A67: When will compliance begin and when will full compliance be expected?

A23: Will air pollution reductions by municipalities and education of citizens be encouraged/measured/credited? For example, energy reduction measures, etc. Deposition of air pollutants is mentioned often when talking about water quality. Much of it comes from the Tennessee Valley (coal-fired plants) and a lot of energy demand comes from "us". (Thanh Dang, City of Harrisonburg)

AR0027741

A70: What safeguards are being put in place to protect farming from unfunded mandates such as streamline fencing? Are funds going to be guaranteed to help farmers comply?

A144: If farmers are required to fence out cattle, can there be a repeal of taxes for all unused land from that time on?

A60: Are there any plans to lower the threshold for CAFOs (i.e. reduce the number of animal units that qualify an operation as a CAFO)?

A120: When the annual cap is finalized ("next spring") how long will it remain constant? Will it keep changing and therefore changing the goals?

A19: How can farmers be given credit for voluntary programs they have implemented on their farms without cost share programs or formal farm plans?

A57: It's a proven fact that urban home owners and lawn services apply fertilizers and chemicals at egregiously higher pounds (tons) per acre than rural agriculture. Why are you not addressing the greater problem instead of trying to break the back of the family farmers who have been stewards of the land for generations?

A69: While wastewater treatment plants and development only accounts for slightly more pollution contribution how were the annual models and pollutant loads from farming calculated?

A12: Where is all the documentation coming from that states farmers are not doing above and beyond what they should be doing? (Jim Lemke)

A14: Could population be our problem, not the American farmer?

A13: Why is this process being accelerated at such a pace, without even taking into consideration how much voluntary efforts are being made by all farmers such as grass waterways, grass strips along waterways and the practice of no till cropping that is continuously increasing every year but is not taken into account or given credit for? (Wayne Tatum, Madison County)

A33: If EPA intends to require the geographic areas which contribute the most nitrogen and phosphorus to reduce the most, are the greatest contributors of nitrogen and phosphorus also going to be targeted for the biggest reductions? I.e. agriculture contributes the greatest amount of nitrogen and phosphorus so is agriculture going to be required to reduce the most? If so, what would be required?

AR0027742

## Questions Submitted

**Questions Submitted (but not answered):**

A35: Why is the process being accelerated when the court order allowed for an extra year?

A54: It was determined years ago that homeowners, lawns, etc. provide more chemical runoff than farmers. How will EPA monitor and enforce the new regulations in a fair way and in a manner that does not over burden farmers?

A22: If an industrial facility with a NPDES/stormwater permit from DEQ has polluted stormwater entering into a locality's MS4 system, how will or how should that be addressed? Who is responsible for reducing that pollutant load? (Thanh Dang, City of Harrisonburg)

A26: Why are we expected to meet a two year milestone in 2011 when most of the time will be spent developing the TMDL and implementation plan?

A108: How do you accurately measure the nitrogen and phosphorus going into the Bay and how accurate is this method?

A133: Everyone is worried about how much it's going to cost to clean up the Bay. Has the cost of not cleaning up the Bay been calculated? How much is it going to cost if our groundwater becomes polluted? How much revenue is lost per fish kill due to insufficient oxygen? How much revenue has been lost due to the oyster and crab population crash? The Bay provides numerous natural resource services, how much revenue do they represent? It is time to protect our environment! What price could be put on cleaning up the Bay and the pride the six states would feel at accomplishing the goals together? What tourist dollars could be gained from people travelling to see and experience a healthy, vibrant Chesapeake Bay, not to mention cleaner healthier headwater areas like the Shenandoah Watershed?

A132: Why are the federal consequences aimed only at point sources when there are other sources of nutrients to the Chesapeake Bay?

A32: How much cost is enough? How many businesses must go out of business because they can't afford to meet these standards? (David Beahm)

A34: One river you didn't mention was the Elizabeth River. I know the military dumped everything during the sixties in that river from Portsmouth MS4 on up to Sewells Point. What is being done there?

A100: The government is pushing ethanol as a renewable fuel source. Corn production results in more runoff than just about any other crop. Why not ban corn production destined for ethanol production in the Bay watershed allowing farmers to produce corn for a feed or food only.

A38: Why is the farmer the one that everyone is going after when streets and household fertilizers are a big cause?

AR0027743

A24: There needs to be a standardized method/mechanism to collect urban BMP data (type, size, quantities, etc.) on a statewide basis for comparison, monitoring, crediting, tracking, etc. This would also help with the state TMDL implementation programs. (Thanh Dang, City of Harrisonburg)

A7: Has there been any research to address the potential of loss of industry in the Chesapeake Bay watershed due to these new regulations? (Jerry P. Turner)

A8: Given the fact that the research on global warming is not true, how can we trust that the research done in the Chesapeake Bay and tributaries is based on unbiased research? (Jerry P. Turner)

A31: Whose science is correct? Information now from EPA is different from what Virginia Governor just signed. Is this correct or tomorrow's or yesterday's, local, state or federal? Doing something wrong can be just as devastating as doing nothing. (Davis Beahm)

A133: Why isn't air deposition included as a source of pollution to the Chesapeake Bay?

A44: Our WWTP food grade sludge is highly regulated by the VPA for land application in Virginia (as fertilizer). We understand food waste in Maryland is not really regulated. This is surprising. Could you explain? (John Harless, Miller Coors Brewing)

A51: What is the impact on development of traditional drain fields after implementation of the TMDLs? Will it reduce or change the ability to construct traditional water treatment systems (septic tank and drain fields)? How will you control population growth?

A29: If you regulate the farmer, why don't you regulate every home owner also? I can put fertilizer once every 2-years but the homeowner can have chemicals put on their lawns 2-to 5 times a year and wash directly into the local creeks and water systems. Are you going to regulate everyone?

A81: I have come to understand that an expectation of the Chesapeake Bay TMDL urban source pollution reduction is going to require substantial stormwater BMP retrofits. For example, dry ponds to extended detention basins or wetlands. However, access to most areas that would be served by a retrofit is not publically owned, but rather on private property. What tools, or mandates will U.S. EPA or Virginia establish to accomplish BMP retrofits? (Thanh Dang, City of Harrisonburg)

A48: In the past, programs have been very much a one plan fits all even though there are different terrain, different crops, and different practices. What will be done to make it a practical program for Rockingham, Clarke, King George, and Goochland County farmers? It needs to be usable and practical for each farm without being overly burdensome.

A58: In your TMDL model, have you included agricultural contributions that are voluntary and BMPs that haven't been funded? Is it true that the Bay was dredged excessively in the early 1900's and then diseases almost wiped out the oysters?

A61: Where is all the money coming from to regulate all the new regulations?

AR0027744

A83: What BMPs have been/are included in the models and given credit? Have the following been included: Urban – local street sweeping, vacuuming debris/pollutants from storm sewer systems, public education, illicit discharge elimination (MS4 program)? Will these types of actions be creditable? (Thanh Dang, City of Harrisonburg)

A95: Do you plan to offer grants to help up implement these changes?  Who would receive the grant money? Who can apply for them?

A88a: Your sources of nutrients (38% nitrogen and 50% phosphorus) in the Chesapeake from Virginia contributed to agriculture differs from numbers published by other organizations. How are those number derived and why do they differ? (Kevin K. Craun)

A88b: How does overfishing contribute to the decline of aquatic life in the Chesapeake Bay? (Kevin K. Craun)

A103: Under the Tributary Strategy Initiative, load allocations were established effective January 1, 2011 for each major watershed. Lots of effort/work went in to establishing allocations. How will these allocations be changed when January 1, 2011 is not even here?

A105: How do you plan on regulating home owners in suburban areas on their nutrient output? (Adam Bowman)

A62: Does the EPA consider domestic food production a beneficial use of our natural resources?

AR0027745

## Comments

*The comments below have been paraphrased and are not a full transcription.*

J.B. Reeves, Member of Friends of the Shenandoah River Head Quarters, Winchester, Virginia

HELP! Volunteer, watershed groups (friends of) are often too strained during the current recession. Many friends groups, especially Friends of the Shenandoah River, have met good QC standards for water sampling, testing and reporting to public/users, but many need a life line to sustain efforts. The Chesapeake Bay Program could leverage government money by 5-15 times via reasonable funds to approved volunteer groups to sustain/enhance critical water quality monitoring. Such targeted funding will be essential to track all initiatives toward the 2025 and each 2-year milestone goals.

A74: How is innovation going to be encouraged? Copy "best practices" used to stimulate innovation/experimenting. Try offering some significant cash prizes and recognition. Detail desired goal/achievement and how results must be measured:

- Riparian buffers – results per variable (width/angles/etc.)
- Nitrogen and phosphorus reductions achieved via AQUA-culture systems/idea for oysters, clams, mussels, etc. (VIMS studies, etc.)
- Nitrogen and phosphorus credit trading and its verifications
- Also results from cutting edge ideas like algae culturing, genetically modified bacteria make isobutanol or bio-fuels
- Combine initiatives to treat nitrogen and phosphorus wastes with idea to change waste carbon sources into biochar/pyrolisproducts and sequestering of actual/potential $CO_2$ into soil enhancement
- Whole range of academic studies needs encouragement

Hobey Bauhan, Virginia Poultry Federation

Thanks to all of the farmers for coming tonight. It reflects the concern in the agricultural community for what is going on. Farmers care about water quality and the Chesapeake Bay and most are doing the right thing and implementing BMPs. Farmers operate on thin margins. We are in the middle of an economic downturn but there is a court-ordered process that is impacting our timelines. We are taking a flexible process and turning it on its head with a top-down, regulatory process that will affect the bottom line. This could put farmers out of business. We work with a variety of partners based on good science and economic sense. Farmers are worried about what this means to them and how it will impact their ability to farm.

Kurt Christiansen, Tree farmer from Culpepper County, Virginia

Who in the audience approves giving the feds the ability to regulate water on your private land? Folks here in the audience are land owners and it is important to note that the panel chooses not to answer the question of how much land do they own and where is it owned. Farmers have been participating in a voluntary BMP program with the Department of Forestry and this system is a win-win. There do not need to be more regulations issued from federal bureaucrats.

AR0027746

Last week EPA said that they plan to regulate carbon dioxide. This means the gases produced by your cattle, horses, poultry and other livestock.

EPA regulation will cause us to need permits for customary practices that include burns, tree planting, timber harvesting and many other things. I am land rich and cash poor. When times are good, developers wish to buy and develop my land. With new regulations, folks like me will be forced into an unprofitable situation. This could push me to a tipping point that forces folks like me to sell my land and it will be made into impervious surface.


Patrick Felling, Potomac Conservancy

The Potomac Conservancy works to protect the Potomac River and its tributaries such as the Shenandoah River. For the last 40 years, the nation has tried to find the right balance between society and clean water. I think that we've seen more success recently, especially with agricultural BMPs being applied and wastewater treatment. Success is not being seen with urban and suburban runoff. These are the fasted growing sources of pollution. Virginia recently passed regulations to bring this under control and I hope this will help meet the targets. It is time for Virginia and other states to learn what the goal is that needs to be met and stop degrading the waterways. I support EPA's collaborative efforts with the state, industry, communities to set the goal and strive to reach it.


Robert Strickler

The food industry is very complicated. It is a complex organization. I don't know about consequences, but I am concerned about the future of our food supply. Everything we do has a cost. Plans that you hear tonight have a cost and in my opinion, they could be in the billions. Washington, DC spends trillions. Someone has to pay for this stuff. I haven't heard who will pay and what will be the cost. We work local and think global. I worry that we will violate state's rights. We have a national agenda to feed our country at the least cost. We may drive up the cost of food by 20% and the US consumer will suffer. We produce food for the world at the least cost for the world. I am concerned that they are running the program very quickly.


Robert Canova, Roanoke (comment also submitted)

Mr. Pollock summarized what Virginia is spending to reduce $1.2B in capital costs and the water quality improvement program supports this. There is significant effort on the part of the Virginia and its citizens to address nutrients from wastewater treatment. There is also significant effort from the agricultural community with no till farming and other BMPs. The Farm Bill includes money for the agricultural community to implement BMPs. There are few incentives to encourage the agricultural community to request and use these funds. In previous farm bills, there was a cooperation program to encourage local and regional partnerships to assist the agricultural community to address nonpoint source runoff limitations. To achieve restoration, all sectors need to participate and an opportunity to enable the agricultural and municipal community to meet further reductions is to encourage wastewater treatment and agricultural communities to partner.

AR0027747

**Kyle Leonard, Dairy Farmer in Augusta County, Virginia**

I was reading an article recently that described how Michigan had lowered phosphate levels in the watershed by curtailing turf grass fertilization. The story stuck with me. A good friend of mine in central Virginia is in the turf grass business. I have never once heard him discuss rules and regulations that he needs to follow. His business is very lucrative. I don't feel like there is a level playing field with this industry. Within the past 25 years, agriculture has reduced its nutrient loads into the bay. Homeowners continue to abuse nutrient loads over the past 25 years. I think that more progress can be made by addressing that in the short term instead of curtailing agriculture.

**Mac Williams, Beef and poultry farmer in Augusta County, Virginia**

I question the science that says that nitrogen and phosphorus is getting into our waters. We use nitrogen and phosphorus and therefore we are viewed as the problem. The problem is urbanization. The current administration preaches green industries and we are the first and best green industry. All efforts should be focused on Northern Virginia and the urbanization. Leave the farmers alone. We made the Chesapeake Bay the national treasure that it is.

Comments below were submitted by:

1. Robert F. Canova, PE, AAEE, Water Supply and Wastewater Certified

2. Bob Threewitts

AR0027748

CHESAPEAK BAY TMDL

## PRESENTATION TO USEPA PUBLC MEETING
### Commonwealth of Virginia Activities to Reduce Nutrient Discharge to Chesapeake Bay
### Harrisonburg, Virginia
### December 16, 2009

Robert F. Canova, PE, AAEE
Water Supply and Wastewater Certified
Roanoke, Virginia

**Regional Cooperation**

The Commonwealth of Virginia is committed to restoration of the Chesapeake Bay. Virginia, along with Pennsylvania, Maryland, Washington, D.C., the Chesapeake Bay Commission, and the U.S. Environmental Protection Agency, was a founding partner in the Chesapeake Bay Agreement of 1983 to affect and direct restoration of the Chesapeake Bay. In 1987 Virginia committed to quantified water quality goals, including at least a 40 percent reduction of nitrogen and phosphorus entering the main stem of the Bay by 2000, and scheduled periodic re-assessment of the strategies, technologies and enforcement requirements. Virginia is also a stakeholder in the Chesapeake 2000 Agreement, which details nearly one hundred commitments important to Chesapeake Bay restoration.

**Commonwealth of Virginia Activities**

Chesapeake Bay restoration efforts by the Commonwealth of Virginia, specifically efforts to reduce nitrogen and phosphorus discharge to the Bay tributaries, have been significant during the past ten years. The Virginia Department of Environmental Quality has capped current and future nitrogen and phosphorus discharges to Chesapeake Bay tributaries from wastewater treatment plants. An estimated $1.2 billion in wastewater treatment plant upgrade and expansion construction is currently underway within the Chesapeake Bay watershed of Virginia. Through the Water Quality Improvement Fund Program, the Commonwealth of Virginia has committed $614 million in cost-share for nutrient reduction technology upgrades at 49 treatment plants. Additionally, there are another 10 wastewater treatment plant upgrade projects ready to proceed to final design and construction, at an additional $160 million in construction cost and $80 million in Water Quality Improvement Fund cost-share. Additional upgrade projects will be implemented as needed to maintain the nutrient waste load allocation caps; therefore, these amounts will increase further in the future.

Within 50 miles of this Public Meeting site in Harrisonburg, there are at least 7 wastewater treatment plant upgrades currently under construction. These projects have a total cost of $262 million and are being partially funded by $77 million in Water Quality Improvement Fund cost-share. These 7 projects are scheduled for construction completion and operational start-up between January 2010 and May 2011.

Within the agricultural sector, Soil and Water Conservation Districts throughout Virginia are working with agricultural producers to implement conservation practices on their land; in Chesapeake Bay Preservation Areas, implementation of these practices is mandatory. Cost share and other programs are being utilized to encourage conservation practices in other areas. Agriculture has introduced no-till methods and other methods to preserve the soil, reducing both sediment and phosphorus loads to Virginia rivers. Additionally, the agriculture sector is making great strides to reduce fertilizer and pesticide usage to match crop nutrient uptake, thereby reducing

AR0027749

nutrient runoff. Additional funding and resources are needed to continue to address nutrient runoff from point source, non-point source, and agricultural sources. However, each of these sectors has made substantial progresss, at significant cost, to address nutrient pollution sources.

**Nutrient Sources**

The following table of total annual nitrogen and total annual phosphorus sources (average annual load for a 10-year hydrologic period), from the current Chesapeake Bay model, using 2008 land use and point source conditions. Note that wastewater treatment plant point source discharges represent 26% of Virginia's nitrogen contribution and 18% of Virginia's phosphorus contribution to the total nutrient load. Whereas, agricultural runoff represents 38% of Virginia's nitrogen contribution and 50% of Virginia's phosphorus contribution to the total nutrient load.

Chesapeake Bay Watershed Nutrient Sources

| Source | Nitrogen | | | Phosphorus | | |
|---|---|---|---|---|---|---|
| | Entire Basin | VA Contribution | | Entire Basin | VA Contribution | |
| | Tons/Year | Tons/Year | % | Tons/Year | Tons/Year | % |
| Agriculture | 130,752,481 | 27,611,918 | 38 | 7,768,671 | 3,590,764 | 50 |
| Urban Runoff | 44,340,094 | 11,658,146 | 16 | 3,069,460 | 1,329,702 | 18 |
| Wastewater | 51,773,472 | 19,014,235 | 26 | 3,385,522 | 1,277,925 | 18 |
| Septic | 14,691,823 | 2,884,977 | 4 | 0 | 0 | 0 |
| Forest | 40,420,398 | 11,341,009 | 15 | 1,986,235 | 958,433 | 13 |
| Non-Tidal Water Deposition | 1,730,198 | 305,472 | 1 | 90,010 | 27,434 | 1 |
| All Sources | 283,708,466 | 72,815,756 | 100 | 16,299,899 | 7,184,258 | 100 |

**Proposed Federal Initiatives**

On May 12, 2009 President Obama issued Executive Order 13508—Chesapeake Bay Protection and Restoration. The preamble to the Executive Order states that "despite significant efforts by Federal, State, and local governments and other interested parties, water pollution in the Chesapeake Bay prevents the attainment of existing State water quality standards and the "fishable and swimmable" goals of the Clean Water Act. At the current level and scope of pollution control within the Chesapeake Bay's watershed, restoration of the Chesapeake Bay is not expected for many years. The pollutants that are largely responsible for pollution of the Chesapeake Bay are nutrients, in the form of nitrogen and phosphorus, and sediment. These pollutants come from many sources, including sewage treatment plants, city streets, development sites, agricultural operations, and deposition from the air onto the waters of the Chesapeake Bay and the lands of the watershed."

In documents related to the Chesapeake Bay TMDL, the Environmental Protection Agency has indicated possible "consequences" for the failure of states to achieve nutrient load reduction goals from all source sectors. These consequences include further reductions in point source nutrient allocations and the denial of new NPDES permits. Unfortunately, this approach would amount to shifting the burden onto the most successful sector—wastewater treatment plant point sources.

AR0027750

### State Approach to Chesapeake Bay TMDL

Virginia, Pennsylvania, Maryland, and Washington, D.C. already have stringent regulations in place to limit nutrient loads to the Chesapeake Bay from wastewater treatment plant point source discharges. Most major wastewater treatment plants in Maryland and Virginia have either already upgraded to advanced nutrient removal technology, or are well into the design and construction phases of upgrades. The Virginia Department of Environmental Quality has indicated its intention to use existing point source regulations to implement the Chesapeake Bay TMDL, rather than making further reductions in wastewater treatment plant discharge allocations. This approach would be critical to providing a stable regulatory environment, protecting public investments, and accommodating sustainable economic growth.

Nutrient reduction from all sources are the key to achieving Chesapeake Bay water quality goals. It is widely acknowledged that existing programs, regulations, and funding sources are insufficient to achieve the necessary load reductions from the nonpoint sectors such as agriculture and atmospheric deposition. Implementation of the TMDL is likely to require new approaches for dealing with these sectors.

### Agricultural Runoff Control Activities

The Food, Conservation and Energy Act of 2008 includes the Chesapeake Bay Watershed Conservation Program that allocates funds to "assist (agricultural) producers in implementing conservation activities on agricultural lands in the Chesapeake Bay Watershed, improve water quality and quantity through agreements with producers". The allocation is $23 million in FY2009, $43 million in FY2010, $72 million in FY2011, $50 million in FY2012. These allocations are modest, but a commendable opportunity to fund conservation activities that result in reduced nutrient runoff from agricultural lands.

The agricultural sector presently has few incentives to request and expend the Chesapeake Bay Watershed Conservation Program funds. One approach discussed by congress would enable the agricultural sector to cooperate with owners of publicly-owned wastewater treatment facilities to develop cost-effective agricultural runoff controls, runoff reduction from agricultural lands. This approach could further enhance nutrient discharge reduction to the Chesapeake Bay.

### Conclusion

To achieve Chesapeake Bay restoration, it is critical that all nutrient source sectors participate in efforts to reduce nutrient discharge. In Virginia, due to considerable expenditure by the Commonwealth of Virginia and by citizens of the Commonwealth, required nutrient reduction from wastewater treatment plants will be achieved within the next two to three years. Further nutrient reduction by this sector may not be technically feasible and will clearly not be cost effective.

Greater expenditure by the agricultural community, through the Chesapeake Bay Watershed Conservation Program fund, combined with agricultural sector cooperation with owners of publicly-owned wastewater treatment facilities, appear to be the greatest opportunity to achieve further near-term, cost effective nutrient reduction. This cooperative approach to nutrient reduction is consistent with the Chesapeake Bay TMDL.

AR0027751

Our agriculture sector is under as much financial stress as it has ever been under. '09 was terrible for the dairy sector; far below production cost. Beef farmers have at least $100 less income per calf sold than last year and realistically that's below production and improvement cost. Poultry margins are fair at best and if you look at the infrastructure cost they don't exist.

Mandatory implementation of TMDL's-without common sense understanding of the aspects that present themselves daily in both animal and crop production-will destine a misunderstanding and distrust. My conditions at the western base of the Massanutten Mountains are quite different than the dairy farmer in Montezuma (that's here in Rockingham), much less than the corn and soybean grower in King George County. How will we individually be viewed?

Implementation of voluntary conservation practices has made tremendous significance in the reduction of run-off and general water quality. Cooperative efforts through the NRC Service, programs through the Department of Conservation and Recreation and Best Management Practices Cost Share programs have been effective.

In past years programs seemed to have been strictly written with little practical knowledge of how they could be implemented. I know-I investigated seriously about 8 years ago. I live on Mountain Valley Road-that should help understand my terrain-spring and winding stream configuration and odd field shape. The program must have been written for a nice flat-square cornered-straight stream- etc. location. Well, seven years later some flexibility and a private funded cost-share program came along and an effective clean-water project is in place.

My biggest fear is that there's a rush to create one set of rules for Rockingham, Clarke, Chesterfield and Middlesex counties and won't effectively fit any of these areas.

Effective implementation of practices is not financially possible without cost-share assistance. The front-end cost of compliance is just not feasible for most in today's agricultural market. If these programs are rushed, implementation mandated to all without a cooperative cost-share approach we are doomed to spotty compliance and vacant land.

AR0027752

Good agricultural land management can be accomplished with a cooperative effort of all our strength's and assets.

The idea that the 17 million people who live off the farms in the watershed and effectively will bear no individual responsibility will be made whole by the 87,000 farms in the watershed who try their darndest to supply the cleanest, safest, best and cheapest food supply in the world is short-sighted.

Please have the foresight to work with the agricultural diversity of each locality and maintain a cooperative and cost-share assistance in the implementation of improvements.

I hope you don't feel the same rush to judgment that's going on in our health care system. The last thing we need is a poorly thought thru and written "Program" that requires more time interpreting, revising, and correcting than a practical implementation "Program" seeking cooperation.

Bob Threewitts

AR0027753

# Fredericksburg, VA Chesapeake Bay TMDL Public Meeting Summary

**December 17, 2009**

**Wingate Inn**
**20 Sandford Drive**
**Fredericksburg, VA 22406**

Agenda ...................................................................................... page 2

Attendee Details..................................................................…… page 3

Power Point Presentation......................................................... page 4

Questions Answered............................................................….. page 33

Questions Submitted................................................................ page 35

Comments.................................................................………….. page 37

1

AR0027670

**Agenda**

➢ **Welcome, introductions, and meeting logistics – Russ Perkinson, VADCR (5 minutes)**

➢ **EPA presentation on the Chesapeake Bay TMDL and EPA expectations – Richard Batiuk and Bob Koroncai, EPA (40 minutes)**

➢ **Next steps – Al Pollock, VADEQ (15 minutes)**

➢ **Public comments, questions and answers – Panel moderated by Russ Perkinson (60 minutes)**

➢ **Adjourn**

AR0027671

## Attendee Detail

**Total Live Attendees: 105**

**Registration Question:**

How did you hear about this Meeting?

- Other (30)
    - Farm Bureau (10)
    - Word of Mouth (3)
    - DCR
    - Friends of Stafford Creek
    - Letters
    - S.S.
    - VAMWA
- E-mail/Listserve (26)
- U. S. EPA Web Site (12)
- Newspaper (11)
- Other Web Site _____ (4)
    - Ascevirginia.org



AR0027672

**-504-**





# THE CHESAPEAKE BAY TMDL: Restoring Waters of Virginia and the Chesapeake Bay

**Bay TMDL Public Meeting**
**December 16, 2009**
**Harrisonburg, VA**

**Richard Batiuk and Bob Koroncai**
**U.S. EPA Region III**

- Click the double arrow to show or hide your control panel

- Type your questions here.
  *(Indicate organization)*

  Note: Because of the large audience, not all questions will be answered, but they will be saved, and your questions will help drive future events and could contribute to a FAQ.



**Technical Issues?**

Contact:
- Citrix Global Customer Support
    1-800-263-6317

**AGENDA**

➢ Welcome, introductions, and meeting logistics — **Russ Perkinson, VADCR (5 minutes)**

➢ EPA presentation on the Chesapeake Bay TMDL and EPA expectations — **Richard Batiuk and Bob Koroncai, EPA (40 minutes)**

➢ Next Steps — **Al Pollock, VADEQ (15 minutes)**

➢ Public comments, questions and answers — **Panel moderated by Russ Perkinson (60 minutes)**

➢ Adjourn

5

**Panel to Address Public Comments**

➢ VA Department of Conservation and Recreation: Russ Perkinson, Moderator

➢ EPA: Richard Batiuk

➢ EPA: Bob Koroncai

➢ VA Department of Environmental Quality: Al Pollock



6

AR0027675



**Local Water Quality Issues**



# Virginia's Chesapeake Bay Watershed River Basins

• About 34% of the Bay watershed is within Virginia - over 13.8 million acres

• Over 50% of Virginia drains to the Bay

• Five VA River Basins:
  - Potomac (3.6 million acres, 8.8%)
  - Rappahannock (1.7 million acres, 4.1%)
  - York (1.9 million acres, 4.7%)
  - James (6.4 million acres, 15.7%)
  - Eastern Shore (0.2 million acres, 0.5%)

• Virginia Land Uses
  Agriculture – 22%
  Urban – 12 %
  Forest – 66%

7

AR0027676





8

AR0027677



## Special Case: James River

- The dissolved oxygen standards in the Bay and its tidal rivers are the basis for the working nutrient target loads being used to develop Watershed Implementation Plans in each Virginia river basin.
- However, the target loads in the James basin do not yet account for what will be needed to also meet the



chlorophyll standards, which were adopted due to high algae levels in the tidal James River.

9

AR0027678





AR0027679

## Chesapeake Bay Watershed-
### By the Numbers

- Largest U.S. estuary
- Six-states and DC, 64,000 square mile watershed
- 10,000 miles of shoreline (longer then entire U.S. west coast)
- Over 3,600 species of plants, fish and other animals
- Average depth: 21 feet
- $750 million contribution annually to local economies
- Home to 17 million people (and counting)
- 77,000 principally family farms
- Declared "national treasure" by President Obama



Source: www.chesapeakebay.net

# Nutrient Loads by State



Nitrogen*

Phosphorus

*EPA estimates a nitrogen load of 284 million lbs nitrogen in 2008. EPA assumes a reduction of 7 million lbs due to the Clean Air Act. This leaves 77 millions lbs to be addressed through the TMDL process.

11

AR0027680





AR0027681





Summary: 2008 Bay Health Assessment
Restored Bay
Priority Areas
Percent of Goal Achieved
0 10 20 30 40 50 60 70 80 90 100
Water Quality
21% of Goals Achieved
Dissolved Oxygen 16
Mid-Channel Clarity 14
Chlorophyll a 27
Chemical Contaminants 28
Habitats & Lower Food Web
45% of Goals Achieved
Bay Grasses 42
Phytoplankton 53
Bottom Habitat 42
Tidal Wetlands
Not quantified in relation to a goal
Fish & Shellfish
48% of Goals Achieved
Blue Crab 60
Oyster 9
Striped Bass 100
Shad 23
Juvenile Menhaden
Not quantified in relation to a goal
Data and Methods: www.chesapeakebay.net/status_bayhealth.aspx

Low to no dissolved oxygen in the Bay every summer
2007 Summer Mean
Dissolved Oxygen (bottom)

AR0027682

# The Chesapeake Bay TMDL

- EPA sets pollution diet to meet states' Bay clean water standards
- Caps on nitrogen, phosphorus and sediment loads for all 6 Bay watershed states and DC
- States set load caps for point and non-point sources





14

AR0027683





AR0027684

## What are the Target Pollutant Cap Loads for the Bay Watershed?

**Current** model estimates are that the states' Bay water quality standards can be met at basinwide loading levels of:

- 200 million pounds nitrogen per year
- 15 million pounds phosphorus per year

**(Sediment target cap load under development-will be available by spring 2010)**

## Dividing the Basinwide Target Loading

16

AR0027685



AR0027686

## Current State Target Loads

| | Nitrogen | | | | Phosphorus | |
| --- | --- | --- | --- | --- | --- | --- |
| State | Tributary Strategy | Target Load | | State | Tributary Strategy | Target Load |
| DC | 2.12 | 2.37 | | DC | 0.10 | 0.13 |
| DE | 6.43 | 5.25 | | DE | 0.25 | 0.28 |
| MD | 42.37 | 41.04 | | MD | 2.54 | 3.04 |
| NY | 8.68 | 10.54 | | NY | 0.56 | 0.56 |
| PA | 73.48 | 73.64 | | PA | 3.10 | 3.16 |
| VA | 56.75 | 59.21 | | VA | 6.41 | 7.05 |
| WV | 5.93 | 5.71 | | WV | 0.43 | 0.62 |
| Total | 195.75 | 197.76 | | Total | 13.39 | 14.84 |

All loads are in millions of pounds per year.



## Virginia's Past, Present and Future Estimated Loads

All scenarios run through Phase 5.2 Watershed Model

18

AR0027687

## Target Load Refinements

- **If States' Bay Water Quality Standards can still be achieved...**
  - **The State may exchange nitrogen and phosphorus target loads within a basin; and/or**
  - **The State may exchange nitrogen and phosphorus loads from one basin to another within the State.**



**Pollution Diet for Each Tidal Water Segment**

19

AR0027688





20

AR0027689



**Example: Projected Nitrogen Delivery from Major Basin in Each Jurisdiction by Source Sector**

- Also divide jurisdiction load by 303(d) segment drainage area and, by November 2011, local area
- Attain jurisdiction-wide load reductions by the interim target, or justify why can still meet final target
- Jurisdiction would determine desired 2-year schedule to meet interim and final target loads
- EPA first evaluates milestones based on consistency with jurisdiction target load. EPA accepts shifts among source sectors, basins, segment drainages, and local areas if jurisdiction target load is met and local and Bay water quality goals are achieved.

## Federal Consequences

- Directed at states not achieving expectations

- Will be outlined in an EPA letter this fall. May include:

  – Assigning more stringent pollution reductions to regulated point sources (e.g., wastewater, stormwater, CAFOs)

  – Objecting to state-issued NPDES permits

  – Limiting or prohibiting new or expanded discharges (e.g., wastewater, stormwater) of nutrients and sediment

  – Withholding, conditioning or reallocating federal grant funds

21

AR0027690

## Bay TMDL- Presidential Executive Order Connections

- Create Federal Leadership Committee
- Create the Performance and Accountability Framework
- Expand regulatory tools for CAFO's and urban and suburban runoff
- Improve nutrient and sediment controls on federal lands and roads
- Target farm conservation measures at high priority areas



22

AR0027691

## Bay TMDL: Bottom-line

- **Actions will clean and protect local waters in VA thereby supporting the local economy**
- **Restore a thriving Chesapeake Bay**
- **Federal, state, local officials and agencies will be fully accountable to the public**
- **Consequences for inaction, lack of progress**



## Further Information

- **Chesapeake Bay TMDL web site**
  - **www.epa.gov/chesapeakebaytmdl**
- **U.S. EPA Region 3 Contacts**
  - **Water Protection Division**
    - **Bob Koroncai**
      - 215-814-5730; koroncai.robert@epa.gov
    - **Jennifer Sincock (sincock.jennifer@epa.gov)**
  - **Chesapeake Bay Program Office**
    - **Rich Batiuk**
      - 410-267-5731; batiuk.richard@epa.gov
    - **Katherine Antos (antos.katherine@epa.gov)**

23

AR0027692



# Virginia's Approach to Developing the Chesapeake Bay TMDL Watershed Implementation Plan

Department of Conservation and Recreation
Department of Environmental Quality
Secretary of Natural Resources
Commonwealth of Virginia

December 2009

# A Challenged Bay

- Loss of shellfish and finfish
- Habitat loss
- Annual dead zones
- Poor water clarity





24

AR0027693



## Successes to Date

➢ Much has been done using voluntary, incentive based, and regulatory programs

➢ 1985 Loads
  ➢ 102 million pounds Nitrogen
  ➢ 12.4 million pounds Phosphorus

➢ 2008 Estimated Loads
  ➢ 72.8 million pounds Nitrogen
  ➢ 7.2 million pounds Phosphorus

## The Challenge Ahead

➢ To meet water quality standards in the Chesapeake Bay and its tidal rivers, **there is more to do**

➢ Low hanging fruit – mostly gone

➢ Future reductions will be harder

➢ We all have a role

25

AR0027694

## What We Need to Achieve (and Maintain)

Virginia Bay Draft Initial Target Loads

➢ 59.2 million pounds Nitrogen

➢ 7.05 million pounds Phosphorus

➢ These targets are very likely to change

## Load Uncertainties

➢ Initial draft target loads provided by EPA based on dissolved oxygen **only**

➢ Impacts on target loads from water quality standards for bay grasses, water clarity and other localized issues not yet determined

➢ Will be spring 2010 before target loads are adjusted for these factors

26

AR0027695

## Vision for Virginia's Watershed Implementation Plan

➢ Focuses on "how" as well as the "how much"
➢ Equity between sectors
➢ Is relevant locally
➢ Uses adaptive management

## Actively engage stakeholders and the public

➢ Virginia Bay TMDL Webinar (October 2009)
➢ Initial EPA Public Meetings (December 2009)
➢ Go to Individual stakeholder meetings (2010)
➢ Stakeholder Advisory Group (early 2010)
➢ Use Interactive web-based tools (Ongoing)
➢ EPA Public Comment Period (Aug. – Oct. 2010)
➢ Additional outreach as necessary

27

AR0027696

## A Challenging Timeframe

EPA deadlines:

Phase I – Draft allocations and state strategies

➢ June 1, 2010 - Preliminary phase I plan by source sector and impaired segment drainage area
➢ August 1, 2010 – Draft phase I plan
➢ November 1, 2010 – Final phase I plan

Phase II – Local target loads and action plans

➢ June 1, 2011 – Draft phase II plan
➢ November 1, 2011 – Final phase II plan submitted to EPA

## Phase I – Draft Allocations by Source Sector and State Strategies

➢ State staff to consult with sector experts, then staff will develop projected BMP coverage levels
➢ Draft reviewed and refined following input by Stakeholder Group
➢ Used to derive potential nutrient and sediment load reductions and develop State strategies



28

## Phase I – Draft Allocations by Source Sector and State Strategies

Source Sectors
- Municipal and Industrial Wastewater
- Non-Significant Wastewater
- Municipal Combined Sewer Overflows [3 systems in VA]
- Industrial Stormwater
- Construction Stormwater
- MS4 Stormwater
- Non-MS4 Stormwater
- Confined Animal Feeding Operations (CAFOs)
- Agriculture – non CAFO
- Forest
- Atmospheric
- Onsite / septic systems

## Phase I – Draft Allocations Made to Individual Watershed Segments

- State agency staff will distribute the allowable loads into the various impaired segments and among the various sources

- Land use data (cropland, developed land, etc.) along with BMP coverage projections and resulting load reductions will be used

- Draft reviewed and refined following input by Stakeholder Group



Virginia's 35 Bay Watershed Segments

29

AR0027698

## Phase II - Local Target Loads and Action Plans

➢ Will work closely with local stakeholders to identify specific controls and practices to be implemented

➢ Agencies will initiate work later in 2010

➢ Due by November 2011

York River Segments and Jurisdictions



## 2-Year Milestone Process

➢ Biennial Milestones –Use adaptive management; identify specific actions needed to maintain schedule

➢ Continue to engage stakeholders and public

➢ Monitor and evaluate progress

➢ Next milestone period – January 1, 2012 to December 31, 2013 to be completed with phase II plan

30

AR0027699

## Want to find out more?

**EPA**

http://www.epa.gov/chesapeakebaytmdl/

**VA-DEQ**

http://www.deq.virginia.gov/tmdl/chesapeakebay.html

**VA-DCR**

http://www.dcr.virginia.gov/soil_and_water/baytmdl.shtml

---

# Further Information

- **Chesapeake Bay TMDL web site**
  - **www.epa.gov/chesapeakebaytmdl**
- **U.S. EPA Region 3 Contacts**
  - **Water Protection Division**
    - **Bob Koroncai**
      - 215-814-5730; koroncai.robert@epa.gov
    - **Jennifer Sincock (sincock.jennifer@epa.gov)**
  - **Chesapeake Bay Program Office**
    - **Rich Batiuk**
      - 410-267-5731; batiuk.richard@epa.gov
    - **Katherine Antos (antos.katherine@epa.gov)**

56

31

AR0027700





AR0027701

## Questions Answered

**Questions Answered (in the order in which they were asked):**

*Note: The letter indicates the source of each question. An "A" indicates that the question was submitted by the live audience. The cards were pre-numbered to easily identify the question once they were submitted. These questions are in the order in which they were asked. Some questions were rewritten for clarity.*

A1: Has the science and model assumption used been truth tested, actually on the ground tested? If not, why not?

A2: For 20 years we have heard that agriculture contributes 50% of the nutrient load to the bay. During those 20 years, countless BMPs have become common practice on Virginia farms. How can production agriculture still be contributing 50%? How and where is this load being measured?

A19: Why is it that Virginia, the major stakeholder and neighbor of the Bay, has been the major tail dragger and obfuscator concerning Bay cleanup? Pennsylvania and New York have done far more to recognize and mitigate pollution.

A4: What stakeholders were involved in establishing the nutrient and sediment limits? Were there any agriculture representatives involved? How are TMDLs being developed?

A5: How will the $1.51 billion to assist local governments for reducing stormwater pollution be allocated and used? (Charles Sydnor)

A22: Lots of plans, regulations, and strategies have been developed recently for the protection and restoration of the Bay. What economic impact or analysis has been conducted and, more importantly, where are the resources (funds, manpower, etc.) coming from to support these efforts?

A10b: Why doesn't the Bay model capture more of the voluntary BMPs on farms? (Bill Latane)

A25: On the progress of reducing nitrogen toward the target, the "developed" source appears to be the only usage that is growing instead of lessening. Assuming this is non-wastewater treatment development, how will individual property owners and non-regulated development usage (i.e. golf courses) be monitored and regulated?

A24: What is a "living resource" goal?

A7: How will the load from every bag of Scotts Turf Builder sold at Lowes and Home Depot not penalize Virginia agriculture and watermen?

A12: In previous meetings, representatives from VDEQ, NRCS, and DCR have all confessed that much of the data that they use to determine nutrient and sediment sources are estimates at best. They claim to not have the resources to obtain better data. How can we possibly develop an effective plan to clean up the Bay when we are only guessing at actual nutrient sources? Why are we rushing to develop a

AR0027702

management plan without first developing better data so that an effective plan can be developed? (Jim Miller, Orange County Farm Bureau)

A17: How can we "cap" nutrient/pollutant sources from out of state sources, i.e. power plants?

A14: Estimates are that the Chesapeake Bay water level is dropping at a rate of one foot per ten years, exposing rich soil to run off into the Bay, allowing sunlight to reach farther into what was previously the "depths" of the Bay, etc. How is the drop in water level factored into the health and degradation of the Bay? (George Goodwin)

A13: Will this mean soil samples will be useless, that farmers will be told what they can use even if it is not sufficient for maximum production of the land?

A17: How often will the TMDLs be evaluated for an individual watershed? Is there a research component to this regulation to see if what is implemented works? How is this enforced, through inspection? Is there an offset component to this? If somebody fixes an old problem, can it count towards a credit to a new load source? The DCR guideline on stormwater runoff for developed land is 0.45 pounds per year of phosphorus. Is it possible that a TMDL could have a phosphorus load limit higher than 0.45 pounds per year of phosphorus? If so, will DCR consider that?

A32: How was it determined that the challenges affecting the Bay are not naturally occurring? For example – we have been "polluting" the Bay since the 1600's, and on a large scale. Can we do a before/after on the TMDL loading on the Bay?

A27: "Agriculture" is depicted as a major contributor to nitrogen and to greater extent phosphorus in the Bay. Yet, all farms are not equal contributors. How does the agricultural contribution breakdown by the type and density of the operations? For example, there are an increasing number of sod farms and the nature of the operation requires a large amount of water for irrigation. The nitrogen and phosphorus has almost no setback gone to pass through to reach the water source. This is a totally different agricultural operation than a low density cattle operation.

34

AR0027703

**Questions Submitted**

**Questions Submitted (but not answered):**

A14: Why do you want to bankrupt production agriculture with your potential TMDLs and make production responsible for all of the problems facing the Bay? (Ted Haberland, Farmer in Orange and Madison Counties, Virginia)

A10a: Agriculture and forestry have decreased their nutrient contributions to the Bay. Urban and suburban contributions have increased or at best held their own. With populations increasing, how can we reduce nonpoint, non-agricultural nutrients? (Bill Latane)

A34: Given that profitable agricultural production is second only to forest land to protect the Bay, how could we possibly be proposing TMDLs that will affect agriculture with little to no direct contact with the vast number of broad thinking innovative producers? Communication responsibility is a two way challenge. Mr. Koroncai related that home builders, municipal representatives were involved! (Dan Brann)

A111: What stakeholders were involved in establishing the nutrient and sediment limits? What are the consequences for failure to comply?

A112: What stakeholders were involved in establishing the nutrient and sediment limits? What are the consequences of failure to develop the TMDL? What are the consequences of failure to comply?

A11: Has anyone told the consumer/tax payer they are going to pay the bill for this in the end by higher food prices, or unsafe, imported food? As a dairy farmer, we can't afford any more expenses. Our farm milk price is just too low. Fuel, fertilizer, and feed are too expensive. (Josh Colvin, Dairy Farmer, Calverton, Maryland)

A9: Forestry operations are generally exempt for erosion and sediment control regulations in Virginia. If you are imposing stricter requirements on development and agriculture activities, are forestry operations going to be subject to the new requirements also? If not, why not? Forestry operations are a major source of sediment to rural rivers.

A18: How will wildlife populations be managed to reduce nitrates and bacteria in the Chesapeake Bay? No mention was made of waterfowl or deer population problems as contributors.

A23: Is there a relationship between the size of the dead zones and human population up stream of the dead zone? What ensures that achievement of assigned load reductions will, in fact, restore the health of state waters and the Bay?

A16: If the phosphorus TMDL is lower in Virginia than the Tributary Strategy loads according to current modeling, why has Virginia adopted more stringent phosphorus runoff rules for residential/commercial/industrial development?

AR0027704

A26: Partners involved with reductions in Virginia are DCR for most nonpoint source reductions and DEQ with most point source reductions. Nothing has been said about Virginia Department of Health and reductions that need to be achieved for neither septic systems nor the loading potential. How will septics be addressed?

A18: What is the baseline or initial load level time frame? (Dan Brann)

A100: Rain fall is never the same.  What numbers in the models are we using to show the sources to the mouth of the Rappahannock River? (Woody Hynoun, Westmoreland County)

36

AR0027705

# Comments

*The comments below have been paraphrased and are not a full transcription.*

A110: Remember that the highest use of nitrogen and phosphorus is residential areas (suburban) not farms. Keep the state and local agencies implementing this clean up. Keep in mind big industry runoff.

A12: For local governments, load reductions cost money and consequences for not meeting reductions cost money. The TMDL is one of many unfunded mandates placed upon local government. Similar to your rational behind apportioning the load, each jurisdiction must prioritize which of the unfunded mandates they may be able to fund, and to what level. As a result, all unfunded mandates ultimately fail.

A23: Thanks for being here and for doing all possible to actively enforce the law and put compliance ahead of shortsighted economic gain/status quo.


Jennifer Allen, Friends of the Rappahannock

I fully support the Bay TMDL process. I also encourage EPA to stay strong in this process, in fully using its regulatory and enforcement authority under the Clean Water Act. I will have full faith in the EPA's commitment to the Bay where the EPA implements consequences to any states that do not meet their 2-year milestones. I am concerned on how the states can work effectively with localities and with local citizens to achieve results.


Linda Dort, Realtor, Friends of the Rappahannock

I support the EPA's effort to create an achievable plan to bring back the Bay. It is commendable that you are holding meetings such as these, that bring together farmers, developers, environmentalists, and the general public to discuss and negotiate compromises that, when enacted, will provide a sustainable and healthy Chesapeake for our descendants. As a realtor, I have a chance to hear the concerns of many residents and prospective buyers and I would urge you to recognize that programs which encourage low impact development, walkable communities, and building with trees, all of which will help reduce sediment additions to the watershed, are what buyers today, want.


Rebecca Hanmer

My name is Rebecca Hanmer. I am a resident of Fredericksburg, Virginia, a member of the Friends of the Rappahannock, and I also would like to speak tonight to support the development of the Chesapeake TMDL by the U.S. EPA. And as you have heard, the Agency is doing this in cooperation with the states. Now the Bay science is probably the best estuary science in the world, and the decline of the Bay and its natural resources is well documented. You talk about oysters that are down to one or two percent of

AR0027706

their previous abundance. Everywhere we see decline. The causes are also very well understood and documented. Establishment of the TMDL allocations is based on that best Bay science, which demonstrates conclusively the overload of nutrients and the discharge of sediments that pollute the Bay and also the tidal tributaries, such as the Rappahannock. So I think the Chesapeake TMDL is targeting the right pollutants that need to be controlled in the right amounts. Before retiring in 2007, I worked at the U.S. EPA and I was the director of the Chesapeake Bay Program Office from 2002 to 2007. Why do I mention this? Well, while at the Bay Office, I worked with the EPA staff and the states to establish new water quality standards. These standards were actually easier to meet than the standards that were on the books from the old days. Those old standards were completely unachievable. So we worked very hard with our Bay science to do something to rationalize the standards to make them not only scientifically sound, but also standards that could be achieved. As you heard, we targeted dissolved oxygen, removing the dead zones in both the tidal rivers and the Bay, and also restoring underwater Bay grass, which is essential habitat. Now EPA published these criteria in 2003 after a multi-year process in which a number of stakeholders were involved, and we did an economic analysis at that time. It had to be based on theoretical state implementation plans, since we didn't have real ones. But when we did that economical and tactile analysis, we determined that the standards were attainable. In fact, we had to do that to meet our own regulations. And while there are challenges, it's not an impossible job. The states' standards were based on the EPA criteria document, and they were adopted in 2004 and 2005. So the TMDLs don't establish anything new. The TMDL is based on an allocation process to determine what is fair, equitable, and most efficient way to meet the water quality standards. So that's why I support the development of the TMDL. It is necessary. If we could have done it voluntarily, that would have been great, but we didn't. Thank you.


Kandy Hillard

I am really excited to see that the EPA is going forward with actual regulations.  Having worked in a number of organizations, where water quality as an issue (Potomac Watershed Round Table, an advisor to the Chesapeake Bay, local officials, LGAC); one of the issues that has been a great concern is the inability, or any way to actually enforce the proposed regulations.  I have children, no grandchildren yet, but I would very much like to take my children to spend time in the water and not worry about whether they are going to have sores.  My son loves to fish, but we would not eat any of the fish we caught because sometimes when the fish are caught they have lesions on them.  I do not want to wonder the seafood coming from the Chesapeake Bay is safe for consumption.  I do not want to wonder if the people who are going fishing in the area where I live are going to come out with sores all over them. When the waters are so impacted that you have a major sewer spill and they do not warn the neighborhood that a sewer spill has occurred (which has happened in Aquia Harbour this summer), we have a real problem.  I am thrilled that EPA is going forward with these regulations and I highly encourage them to be implemented as soon as possible. Thank you.

AR0027707

Josh Colvin

Has anyone told the consumer/tax payer they are going to pay the bill for this in the end by higher food prices, or unsafe imported food? As a dairy Farmer we can't afford any more expense our farm milk price is just too low. Fuel, fertilizer and feed is too expensive.

Rita Girard

I support the EPA's efforts to establish land limits for all sectors in an effort to restore the Chesapeake Bay. I believe we need to be responsible stewards of the Earth and take measures to hold all of us accountable and stop thinking of individual, short –sighted, self serving goals! Although it will cost some stakeholders more than others - initially – I believe it is the only morally responsible actions! Again, I support the EPA's efforts.

Kurt Christensen

Thank you very much; I am Kurt Christensen, a dairy farmer from the Richardson area. First of all, I would just like to ask the audience to stand if they are for giving the federal government more power to regulate water quality on your private land. I would like that record to show that about 2/3 of the audience is against more federal regulations. Thank you very much for that.

Water quality for forestry in the Commonwealth of Virginia is regulated by voluntary best management practices, developed and implemented by the Virginia Department of Forestry. This is a system that is working very well, you know the old saying: if it ain't broke, don't fix it. We do not need a new layer of federal regulation by unelected bureaucrat with the EPA, in Washington, DC. Let's remember, last week, the EPA came up with the idea that they are going to regulate carbon dioxide as a pollutant. How many people have heard of Climategate? There is a scandal in the scientific community where the pro regulation people have purposely kept away science from global warming skeptics. The Environmental Protection Agency – insult to injury – in the heat of all this, said now is the time that we want to regulate Carbon Dioxide. What does that mean? The EPA is estimating that about 18 percent of methane comes from your livestock - your cattle, your horses, your poultry, and other livestock. EPA has expensive PHDs and lab coats – which you are paying the salaries of - they are going out there measuring the flatulence of the cattle.

In short, experts in the forestry community have looked at this TMDL and they have concluded that federal permits would be required for each of the following forestry activities, which are very customary to the Commonwealth of Virginia. Federal permits can be required for tree planting, prescribed burns, herbicide and fertilizer, road building and road maintenance. Like most land owners, I am land rich, and cash poor. When times are good, I get contacted about once a month by a realtor or developer wanting to buy my land. I have resisted it because I want to keep the trees, but we are in a very precarious point right now, where forestry and agriculture are increasingly not profitable. Taxation and regulations are

39

AR0027708

part of a big part of this. Wouldn't be ironic if a regulation to protect the environment forces a landowner to sell their land to developers? This is something for you to think about, there are perverse sanctions to what you do and no good deed goes unpunished. Thank you very much.

40

AR0027709

**DRAFT 5/5/2010**



Chesapeake Bay Program
*A Watershed Partnership*

CHESAPEAKE BAY PARTNERSHIP
PRINCIPALS' STAFF COMMITTEE
MEETING
APRIL 28-29
WILLOW VALLEY
LANCASTER, PA

Exhibit J

## I.     ATTENDEES

### Members in Attendance

| Organization | Name | E-mail | Phone |
|---|---|---|---|
| EPA Region 3 Administrator | Shawn Garvin | Garvin.shawn@epa.gov | 215-814-2900 |
| Office of the Secretary of Natural Resources | Doug Domenech | Doug.domenech@governor.virginia.gov | 804-786-0044 |
| VA Dept of Environmental Quality | David Paylor | David.paylor@deq.virginia.gov | 804-698-4020 |
| VA Dept of Conservation and Recreation | Russ Baxter | russ.baxter@dcr.virginia.gov | 804-786-2123 |
| VA Secretary of Agriculture and Forestry | Todd Haymore | todd.haymore@governor.virginia.gov | 804-692-2511 |
| VA Department of Forestry | Brad Williams | Brad.williams@dof.virginia.gov | 434-977-6555 |
| DC Dept of Environment | Hamid Karimi | Hamid.Karimi@dc.gov | 202-741-0847 |
| PA Dept of Environmental Protection | John Hanger | jhanger@state.pa.us | 717-787-2814 |
| PA Dept of Agriculture | Russell Redding | rredding@state.pa.us | 717-787-4737 |
| NY Dept of Environmental Conservation | James M. Tierney | jmtierne@gw.dec.state.ny.us | |
| MD Dept of Natural Resources | John Griffin | jgriffin@dnr.state.md.us | 410-260-8101 |
| MD Dept of Environment | Shari T Wilson | stwilson@mde.state.md.us | 410-537-3084 |
| MD Dept of Agriculture | Buddy Hance | hanceef@mda.state.md.us | 410-841-8550 |
| DE Dept of Natural Resources and Env Control | Kathy Bunting-Howarth | Katherine.Howarth@state.de.us | 302-739-9949 |
| DE Dept of Agriculture | Ed Kee | edwin.kee@state.de.us | 302-698-4500 |
| WV Dept of Environmental Protection | Teresa Koon | teresa.m.koon@wv.gov | 304-926-0499x.1020 |
| Chesapeake Bay Commission | Ann Swanson | aswanson@chesbay.us | 410-263-3420 |
| Chesapeake Bay Commission | Marel Raub | mraub@chesbay.us | 717-772-3651 |
| U.S. Fish & Wildlife Service | Marvin Moriarty | marvin_moriaty@fws.gov | 413-253-8300 |
| U.S. Geological Survey | David Russ | druss@usgs.gov | 703-648-6660 |
| U.S. EPA CBPO | Jeff Lape | Lape.jeff@epa.gov | 410-267-5709 |
| USDA NRCS | Leonard Jordan | leonard.jordan@wdc.usda.gov | 202-690-2196 |
| Army Corps of Engineers | Col. David E Anderson | david.e.anderson.col@usace.army.mil | 410-962-7608 |
| Department of Defense | Christine Porter | christine.porter@navy.mil | 757-445-6399 |
| NOAA | Peyton Robertson | Peyton.Robertson@noaa.gov | 410-267-5652 |
| National Park Service | John Maounis | jmaounis@chesapeakebay.net | 410-260-2471 |

2

Exhibit J

*Other Attendees*

| Name | Organization | E-mail | Phone |
|------|-------------|--------|-------|
| Jeff Corbin | EPA Region 3 | corbin.jeffrey@epa.gov | 215-667-9304 |
| Jim Elliot | CAC | jelliot@hunton.com | 202-361-8215 |
| Royden Powell | MD Dept of Ag | powellrn@mda.state.md.us | 410-841-5865 |
| Mary Ann Lisanti | LGAC | malisanti@harfordcountymd.gov | 410-638-3526 |
| Jack Frye | VA DCR | jack.frye@dcr.virginia.gov | 804-786-6523 |
| Frank Dawson | MD DNR | fdawson@dnr.state.md.us | 410-260-8110 |
| Beth McGee | CBF | bmcgee@savethebay.cbf.org | 410-268-8816 |
| Normand Goulet | NVRC | Ngoulet@novaregion.org | |
| Pat Buckley | PA DEP | pbuckley@state.pa.us | 717-772-1675 |
| Katherine Antos | EPA CBPO | Antos.katherine@epa.gov | 410-295-1358 |
| Rick Parrish | So. Environmental Law Center | rparrish@selcva.org | |
| Liz Van Dolah | STAC-CRC | vandolahe@si.edu | 410-798-1283 |
| Jessica Blackburn | CAC | jblackburn@acb-online.org | 443-622-4404 |
| Rob McAfee | NRCS | Robert.McAfee@md.usda.gov | 717-237-2203 |
| Richard Eskin | MDE | Mde@tate.gov | |
| Carin Bisland | EPA CBPO | Bisland.carin@epa.gov | 410-267-5732 |
| Peter Marx | NWF | marxp@nwf.org | 443-759-3404 |
| Karl Blankenship | Bay Journal | bayjournal@earthlink.net | 717-428-2819 |
| Robert Koroncai | EPA Region III | koroncai.robert@epa.gov | 215-814-5730 |
| Diane Davis | DC Dept of Environment | Diane.davis2@dc.gov | 202-741-0847 |
| Jon Capacasa | EPA Region III | Capacasa.jon@epa.gov | 215-814-5422 |
| Jennifer Guerrero | U.S. Navy | jennifer.l.guerrero@navy.mil | 757-887-4707 |
| Rich Batiuk | EPA CBPO | Batiuk.richard@epa.gov | 410-267-5731 |
| Rick Keister | LGAC | rkeister@acb-online.org | 410-377-6270 |
| Linda Miller | EPA | Miller.Linda@epa.gov | 215-814-2064 |
| Ellen Gilinsky | VA DEQ | Ellen.gilinsky@deq.virginia.gov | |
| Tomm Damm | EPA | Damm.thomas@epa.gov | 215-814-5560 |
| Jason Dubow | MDP | jdubow@mdp.state.md.us | 410-767-3370 |
| John Surrick | CBF | jsurrick@cbf.org | 443-482-2045 |
| Pat Bradley | Limno Tech | pbradley@limno.com | 202-853-9140 |
| Cathy Myers | PA DEP | Cathy.myers@state.pa.us | |
| Denise Wardrop | STAC | dhwllo@psu.edu | 814-863-1005 |
| Jeff Horan | Md/DNR | jhoran@DNR.STATE.MD.US | |
| Robert Koroncai | USEPA Region 3 WPD | koroncai.robert@epa.gov | 215-814-5730 |

3

Exhibit J

## II.     ACTION ITEMS

**A. Under "Getting from Here to December 2010 and Bay Water Quality Responses to Simulated Nutrient and Sediment Load Reductions: Findings and Recommendations", the PSC agreed to move forward on:**

    i.  Working with the states to resolve issues that have to deal with the larger Bay allocations

    ii.  EPA will look for an opportunity to fine tune the schedule and share with jurisdictions, but it will not change the December 2010 deadline.

    iii.  Focus in with individual states on resolving the remaining non-attaining segments.

    iv.  Recognized concerns expressed by NY and WV about limited staff resources would limit they availability to work with EPA on resolving these issues.  EPA committed to work to provide additional resources to both states to help address their staffing limitations.

**B. Under "Draft Air Deposition Target Loads":**

    i.  EPA will provide the PSC with the assumptions that went into the CAIR rule calculation

---

## III.     Meeting Summary – Friday, October 23rd, 2009

### A. Introduction and Welcome

- **Shawn Garvin** (EPA Region 3 Administrator) welcomed everyone to Willow Valley Resort. He laid out the decisions that would be requested during the meeting:

  Regional Administrator Garvin also announced that Jeff Lape, Director of the Chesapeake Bay Program, has taken a position as Deputy Director in the Office of Science and Technology in the Office of Water. He thanked him for his three years of leadership and accomplishments that have been made under his direction. Deputy Director, Jim Edward has agreed to fill the position of Acting Director beginning May 23rd.

### B. Executive Council Meeting Planning

**Jeff Corbin** (EPA Region III) gave a presentation on the progress being made on the planning of the Executive Council (EC) meeting on June 3rd. An EC planning group with representatives from the Chesapeake Bay Program (CBP) partners meets every Wednesday at 10 am via a conference call to discuss the logistics of the meeting. The EC meeting has been set for June 3rd from 11-3 pm in Baltimore City, MD. The venue for the event is currently being discussed after members of the CBP communications team visited possible sites in Baltimore. Their recommendations are currently being discussed and will be passed along to Administrator Jackson for review. Invitations have been drafted, and will be sent soon to the EC members from the Administrator.
The theme of the meeting will be "Action and Accountability" which would be highlighted by the Federal Executive Order, State milestones and WIP actions, an onsite

4

Exhibit J

restoration activity with a local government or watershed group, and the unveiling of version one of ChesapeakeStat.

The States, District and the CBC have all submitted draft outlines of the restoration highlights and updates that will be presented by the Governor's and included in the press packets at the EC meeting. Brief outlines of these restoration highlights were presented during the PSC meeting.

The communications team is also putting together a montage video containing images from across the six States and the District, showing various watershed organizations, schools, communities and individuals working to improve their local waterways and/or the Bay. Videos are being accepted until May 14th, at which time pieces of all the submitted videos will be compiled into one 5-8 minute video to be shown at the EC meeting. For more information please contact CBP Multimedia Associate, Matt Rath: Mrath@chesapeakebay.net

**C. ChesapeakeStat**

**Doreen Vetter** (EPA, CBPO) outlined the design and anticipated elements of the initial version of ChesapeakeStat that will be unveiled at the Executive Council meeting. EPA Administrator Jackson announced at the last EC meeting that an accountability and decision making tool would be created in order to help guide the Partnerships goals. ChesapeakeStat will take the data that has already been collected across the Partnership, and compile it in one place where it is easily accessible to our decision-making bodies, implementers and the public.

The ChesapeakeStat website that will be demonstrated at the EC meeting in June will be version one and the website will change and adapt in later versions depending on feedback. There are three parts of ChesapeakeStat that will be highlighted during the EC meeting. Part one will be a public demonstration of local watershed groups uploading information (pictures, videos) during a restoration event that will be displayed on a map by Administrator in public session. In part two ChesapeakeStat will be introduced by the Administrator during the public session with a demonstration of key features, including local information from restoration event, and inviting input to improve for Version 2 of ChesapeakeStat. The last part will be during the private session, when Administrator Jackson and Governor O'Malley will lead a discussion on how ChesapeakeStat can be used to evaluate progress and re-align action as needed in the Bay Program Partnership.

**Discussion:**

- DC was concerned about the consistency and the different levels of quality of the data from across all the jurisdictions.
- USFWS felt the ChesapeakeStat vision was correct, and will facilitate future conversations about collaboration between federal agencies farther down the road.
- VA, NY and PA all raised concerns that ChesapeakeStat would change the data expectations of the states and having to submit data to another database.
  - This data will come from information that has already been submitted, or that will be submitted through existing means (ie:

5

Exhibit J

ChesapeakeRegistry and Scenario Builder.) They will be linked together.

- STAC felt that there needed to be a process laid out moving ChesapeakeStat towards adaptive management. Public expectations also need to be managed and context and synthesis of data need to be included on the site.
- VA was concerned that EPA's development of and maintaining this site in the future was diverting funds from other efforts.
- CAC asked about the role of the Bay Barometer and the Chesapeake Registry in relation to ChesapeakeStat.
    - The Bay Barometer is just a snapshot of what has occurred over the course of a year. ChesapeakeStat is showing real time information that is changing more frequently and is being updated through the Chesapeake Registry.
- MD felt that the priority for the ChesapeakeStat website should be what we are committing to do in relation to our milestones and what our progress is, and then packaging this in a way that the public understands. Tracking and accountability should be first and adding local information should be discussed in a later version.
- CAC was given a presentation of ChesapeakeStat at their last meeting, and showed similar concerns that Maryland. What is the tool? What is it expected to do?

**Decisions**

- PSC members unanimously approved the approach and roll out for the Executive Council meeting in June.

**D. Executive Order Final Strategy for Release on May 12**

**Jim Edward** (EPA, CBPO) **and Peyton Robertson** (NOAA, CBPO) gave an update on the overall content, development and timing of the EO strategy, discussed Federal 2-year milestones, how Federal actions could support state 2-year milestones, and preliminary ideas for how Federal agencies will be held accountable. They also presented the proposed Implementation approach and sought agreement on the process for aligning FLC and CBP goals and functions.

**Jim Edward** first walked through the progress that has been made since the meeting of State Secretaries in Shepherdstown, WV. The three key follow-up actions stemming from the meeting were to draft the strategy goals framework, refine key actions implementing the strategy, and the roll out for the strategy. He then walked through the final version of the strategy and what goals were to be included, and showed an example of what the final formatted strategy document would look like.

**Discussion:**

- VA asked if USDA would be taking the lead on the agriculture portion of the strategy, which brought up the question from other partners if all the goals reflect only federal spending.

6

Exhibit J

- Agriculture is the only goal that is completely funded by a federal agency; the other goals represent a combined state and federal effort.
- STAC was interested in what the Chesapeake Monitoring Alliance and Data Enterprise was.
  -
- VA felt that the overriding comments from Shepherdstown from the states asked that these goals focus on the task at had, which is reducing phosphorus and nitrogen loadings into the Bay. Goals like increasing public access, and climate change, although important, are not foundational to that, and VA would not be able to adopt those goals since they divert time and money from the main goal.
  - The goals were added because of input during the public comment period, where people felt that it would be important to include these factors.
  - LGAC also strongly disagreed with the comment made by VA. They feel that public access is important for public support, which in turn provides funding for the projects and goals that the states are trying to accomplish.
- NY was very pleased to see that book trout was included, since this is an issue that NY residents care about in the headwater state. Suggested that flood control be considered and maybe included in the Environmental Markets section of the strategy.
- DE was skeptical that there was a serious economic study done on the affect that this strategy would have on agriculture, and they need help making the case that this will actually help agriculture.

**Peyton Robertson** presented the proposed Implementation approach and the process for aligning FLC and CBP goals. The FLC and EC have convened a small group representing state, District and Federal partners to develop and recommend steps for coordinating and potentially integrating the goals, outcomes and actions of Chesapeake Bay Program partners with the goals, outcomes, and actions described in this strategy. Peyton walked through the "Steps to Be Taken" as outlined by this small group, to align the FLC with CBP, and asked for approval of the approach.

**Discussion:**

- WV and NY both felt that the Annual Action plan that is called for in the Executive Order. The highlighted the fact that they both have limited resources and that it distracts from the creation of the WIPs and implementation.
- CBC felt that the issue of two separate leadership groups (the FLC and EC) as leaders in the restoration effort needed to be resolved as soon as possible. They also wanted to know if these goals were draft or final.
  ○
- MD felt that this does not capture all of the commitments made in Chesapeake 2000. Would like to see land use planning included.

7

Exhibit J

- STAC asked that under the first "step to be taken" in the second bullet point that the tracking be expanded from just the Bay Barometer to include_____
- PA felt that wording to be included in the Executive Order should outline a more general approach to reconciling the issue. It needs to be worded in a way that does not create more work for the States. (Action Plan)

**Decisions:**

- The PSC unanimously agreed to the following approach shown below, amended on April 30th, 2010.


The process for aligning Federal, State, and local actions has begun through the consultation steps called for in the Executive Order and carried out in recent months. In the preceding chapters, this strategy highlights a partial list of examples of state programs that play key roles in achieving the strategy's goals.

However, the FLC and the EC acknowledge the need to more clearly define the role of the Chesapeake Bay Program partnership in implementing the actions set forth in this strategy. This work will continue in the coming months. The FLC and EC have convened a small group representing state, District and Federal partners to develop and recommend steps for coordinating and potentially integrating the goals, outcomes and actions of Chesapeake Bay Program partners with the goals, outcomes, and actions described in this strategy.

The group's recommendations will have the aim of producing the most efficient, coordination mechanisms feasible that encompass the following principles:
- Mechanisms for reporting information on planned and completed actions should not require multiple entries of the same data in different systems;
- There should be a coordinated, consistent mechanism for reporting progress to the public;
- There should be a consistent, coordinated adaptive management process for making changes to goals or outcomes that includes all partners; and
- The systems should be mutually beneficial to partner agencies.

This group will take the following steps:

1. Review vision, goals and outcomes identified in this strategy with the goals and commitments of the Chesapeake Bay Program Partnership.
- Identify issues and make specific recommendations for aligning EO goals and outcomes with existing CBP commitments.
- Review indicators of health, restoration and protection currently used in the Bay Barometer and recommend appropriate changes for purposes of tracking progress and assessing success.  Review existing monitoring information and other data sources currently utilized in the CBP and assess their alignment with the goals and objectives resulting from the above.
2.  Review the means to coordinate and integrate Federal, State, and local actions

Exhibit J

- Include examples of state programs in this strategy for each major goal area
- Review the pros and cons of using the annual federal action plan called for in Section 205 to incorporate state and local annual actions.
- Determine whether the Chesapeake Registry (see description under "Annual Action Plan" below) or modified Chesapeake Registry could be used to collect actions for the annual action plan.
  3.  Recommend options to clarify the operational relationship between the FLC and the EC.
- Identify issues with and propose solutions to the current CBP structure related to implementing, monitoring, and supporting the integrated approach identified above; identify potential changes to the current CBP Governance document.
  4.  The Chesapeake Bay Executive Council and Federal Leadership Committee will make a joint decision on the above recommendations no later than May 12, 2011.

**E. Framing the Key TMDL Issues - Introduction to Day 2**
  **Robert Koroncai** (EPA) gave a presentation providing background information for decision making to occur on Day 2 of the PSC meeting:
  - Review the past year to remind everyone how we have arrived at this point
  - Introduce the specific topics and issues to be discussed on Friday, with a focus on the decisions requested
  - Frame the concerns expressed by the jurisdictions regarding the status of finalizing the Bay models, target loads, and development of state Watershed Implementation Plans
  - Walk through a series of WQ Goal Implementation Team recommendations described in the Bay TMDL issues briefing paper—sediments behind the Susquehanna dams, filter feeders, and Bay WQ standards adoptions by MD, VA, DE and DC
  - Review the important role of Watershed Implementation Plans and summarize key highlights of WIP expectations
  - Outline initial scope and timing for development of a transparent TMDL tracking and accountability system
  - Highlight the current Bay TMDL schedule, the challenges we are facing and preview of the options for how the partnership could proceed forward from here

  <u>Discussion:</u>

  - PA is being allocated about half of the reduction being requested from all of the jurisdictions. PA cannot accomplish half of the load reduction with only 10-20% of the federal funding. Money should flow based on the expectations for the level of reduction. (Sum total of federal funds coming into the Bay watershed for the purposes of reducing nutrients and sediments, not talking about transportation funds, etc.)
    - DE agreed on the same point. MD and DE have more of the reduction given the proportionally more effect on tidal water quality that they have. MD and DE farmers will need proportionally more federal cost share funds.
  - VA feels that there is a credibility issue with the model and concerns were raised that the model does not accurately reflect what is happening on the landscape. Concerns need to be addressed so that the model numbers can be locked in.

9

Exhibit J

- NY felt that the model was overly parameterized because of the changes that occurred in NY between Phase 5.2 and Phase 5.3 models. NYDEC staff has been asked to focus on developing the WIPs. They feel the model is starting to hurt the process by diverting attention away from the WIP planning.

### F. Getting from Here to December 2010 and Bay Water Quality Responses to Simulated Nutrient and Sediment Load Reductions: Findings and Recommendations

**Robert Koroncai** (EPA) gave a presentation on reviewing the process and timing for developing the Bay TMDL by December 2010. Based on changes that need to be made to the 5.3 model, the schedule for developing the Bay TMDL has been altered slightly. Koroncai also presented the results of simulated nutrient and sediment load reductions. In this presentation, he showed that with current load reductions, there would still be segments of Chesapeake Bay tributaries that would not attain the desired Dissolved Oxygen levels. These non-attainment segments would have to be addressed on a more local scale to bring them to an attaining status. The jurisdictions nutrient allocations will be delivered by July 1 and the sediment allocations by August 15.

**Discussion:**

- PA could not agree to the decision rule to keep all the manure generated within a county in that county unless a state provides manure transport data to CBPO.
  - MD stated that the Agriculture secretaries did not agree to the decision rule to strictly keep all the manure generated within a county in that county unless a state provides manure transport data to CBPO. The states would still like the opportunity to report manure transport and at the same time include decision rules in the models that include some level of assumed manure transports without specific reporting by the states.
- NY was concerned about the change in their target load for total nitrogen between the Phase 5.2 and Phase 5.3 models. They want to be assured that the model will be fixed by July, so the nutrient allocation can be decided upon.
  - WV also had a similar issue since their phosphorous loading increased by 6 times as much between the two models. They would like to know why that occurred.
- VA wondered why the Bay model needed to be rerun at all for the Phase II WIPs. Koroncai explained that the model needed to be rerun to account for states' changes in allocation of the loads by geography or source sector.
- NY asked if the states would be able to change the state allocations afterward July 1st. Chair Shawn Garvin explained that as part of our Phase II WIPs, the states can propose changes to their state allocations if necessary based on running the revised Phase 5.3 and developing their Phase II WIPs. Or the states can stay with their state allocations established by December 2010.
- VA felt that the science will always keep changing the numbers, and at some point, it needs to be locked in so the states have something to focus on.

10

Exhibit J

- Chair Shawn Garvin clarified that the "safety factor" included in the TMDL was there to ensure the states do not have to go back to their source sectors and drastically change their numbers.
- CBC asked if a TMDL could be set addressing 60% reduction up until 2017, and then work towards filling in the ultimate loads needed.
  - Legally that can not be done since the CWA requires loads that meet all the Bay water quality standards in the TMDL.
- DE felt that they would be able to work with the 5.3 model, as long as the numbers did not continue to change. Safety factor is to get us through the next 18-24 months. Let's set that number and balance that with some level of flexibility but not make significant changes to undercut our implementation efforts.
- DC is unique that it has no agricultural lands, etc.  DC can't do anything more than allowed by its existing developed lands and its share of Blue Plains.  DC does not have much room to change its allocations and what it can reduce.  All its loads are regulated—CSO, MS4s, wastewater NPDES permitted loads.  A lot of the MS4s loads are coming from federal buildings and facilities.
- Chair Shawn Garvin wanted to reiterate that this was EPA's plan, and that there was nothing on the table for a vote. EPA would be taking jurisdiction input, but ultimately it was EPA's responsibility to publish the TMDL by December 2010.
- VA felt that the steps laid out made sense, but that they would need six weeks for a proper review. VA proposed a 60 day public comment period with final WIPs by December 1, 2010. Took away the 30 days away from EPA's review of the state WIPs to add 30 days to the public comment period. Need the six weeks to consult with the stakeholder groups to get their input. Need time to run a series of model scenarios based on reaction/feedback from the stakeholders.
  - EPA needs time to transfer the WIPs allocations and to confirm that the draft WIPs address reasonable assurance and provide EPA the opportunity to adjust the allocations as needed to address reasonable assurance
- NY felt that the allocations were fundamentally unfair since it does not take into account population changes and economic value that certain states receive from the Bay.
- WV would like to see trading as an option between the states with more resources, ability to pay and more to gain.
- MD asked what was meant by reasonable assurance
  - Reasonable assurance applied directly to the nonpoint sources components of the loads where there are not specific regulatory requirements in place.  Getting a high degree of confidence that the state nonpoint source load reductions can and will be achieved.
- DE and DC had questions about dealing with non-attainment segments

- A narrative of the proposed approach was drawn up and presented to the group:

**EPA's Plan for the Bay TMDL and Watershed Implementation Plans**

11

Exhibit J

EPA will have a 3-step process for establishing the Chesapeake Bay TMDL that facilitates implementation of nutrient and sediment reduction practices. Under Step 1, EPA will establish the Bay TMDL by December 31, 2010. The 2010 TMDL will use the existing Phase 5.3 of the Watershed Model and will include a safety factor and an interim allocation based on the goal of practices in place by 2017 that would result in 60% of necessary load reductions. Concurrently in 2010, EPA will update Phase 5.3 for use in Step 2. Under Step 2, EPA will provide updated jurisdiction-level nutrient and sediment loads and remove the safety factor. As part of the Phase II WIP development process, jurisdictions can propose modifications to the Bay TMDL allocations. Under Step 3, EPA and the jurisdictions will evaluate new information and consider whether to update the models. Jurisdictions may again propose modifications to the Bay TMDL allocations as part of their Phase III WIP development process.

Step 1: December 2010
- o Based on existing Phase 5.3 of the Watershed Model + safety factor
- o Final nutrient basin-jurisdiction targets + safety factor: 7/1/2010
- o Final sediment basin-jurisdictions targets + safety factor: 8/15/2010
- o Jurisdictions submit draft Phase I WIPs by 9/1/2010
- o EPA distributes the Bay TMDL for public comment 10/1/2010 – 11/1/2010[1]
- o Jurisdictions submit final Phase I WIPs by 11/29/2010
- o EPA establishes the Phase I Bay TMDL by December 31, 2010. Includes interim allocation based on goal of practices in place by 2017 that would result in 60% of necessary load reductions

Step 2: December 2011
- o Based on updated Phase 5.3 of the Watershed Model
  - o EPA updates Phase 5.3 of the Watershed Model in 2010
  - o State-level loads would be modified and the safety factor would be removed
- o Jurisdictions submit draft Phase II WIPs: June 1, 2011
- o Jurisdictions submit final Phase II WIPs and Bay TMDL allocation modification document for 30-day public comment period: November 1, 2011
- o EPA modifies the Phase II Bay TMDL: by December 31, 2011. Includes interim allocation based on goal of practices in place by 2017 that would result in 60% of necessary load reductions

Step 3: December 2017
- o Reevaluated based on best available science and decision-support tools. Will consider whether updated models should be developed to support the Phase III WIPs and potential Bay TMDL allocation modifications
- o Jurisdictions submit draft Phase III WIPs: June 1, 2017
- o Jurisdictions submit final Phase III WIPs and Bay TMDL allocation modification document for 30-day public comment period: November 1, 2017
- o EPA modifies the Phase III Bay TMDL: by December 31. 2017. No longer includes interim allocation goal of 60% of necessary load reductions; focus is 100% practices in place by 2025.

[1] Public comment period can be extended from 30 to 45 days, from 9/23 – 11/7/2010, and jurisdictions would submit draft Phase I WIPs by 8/23/2010.

**Discussion Continued:**

_____

Exhibit J

- VA felt that no accommodation was made to request VA's request for more time for WIP development and increase the public comment period.
- PA thought that EPA had said they would agree to interim allocations by December 2010 and final allocations by December 2011
  - Not exactly, but it will provide the opportunity to make adjustments to allocations with the modifications to the Bay model in 2011.
- PA also wanted to better understand why it would take 2 months to make modifications to the Bay watershed model and when they would have access to the numbers needed to support work on the Phase II WIPs
- Responses to Chair Shawn Garvin's request for input from the jurisdictions on where they stood with the EPA outlined approach:
  - VA felt that the longer term plan looks good, but was most concerned with the December 2010 deadline. Specifically, they are concerned about the 30 day comment period and the time between the receipt of the final state and major basin allocations and the draft WIP submission.
  - NY will focus on their pollution reduction plan and will abstain from only approval/disapproval from this point forward. They would also like EPA to revisit the accounting for growth issue
  - DE will move forward as the schedule calls for
  - MD said they would do the best they can given the schedule since they had asked for the December 2010 deadline previously.
  - PA will move forward on developing their WIP. They are disappointed that they can't take a week or month to resolve the issues with the model.
  - DC should be fine with coming up with their WIP by the proposed schedule.

**Agreement:**
The PSC agreed to move forward on:
1) Working with the states to resolve issues that have to deal with the larger Bay allocations
2) EPA will look for an opportunity to fine tune the schedule and share with jurisdictions, but it will not change the December 2010 deadline.
3) Focus in with individual states on resolving the remaining non-attaining segments.
4) Recognized concerns expressed by NY and WV about limited staff resources would limit they availability to work with EPA on resolving these issues.  EPA committed to work to provide additional resources to both states to help address their staffing limitations.

### G. Draft Air Deposition Target Loads
**Robert Koroncai (EPA)** presented a recommended approach to allocating air deposition loads between EPA and the states. Koroncai explained that the airshed for the Bay goes

13

Exhibit J

well beyond the watershed and that air deposition onto land is credited to land loadings, while air deposition to tidal waters is credited to the air allocation. The proposed air allocation for Total Nitrogen Deposition is 15.7 million pounds by 2020 in tidal waters. Jurisdictions will receive credit for any ammonia emissions reduced that result in reductions in delivered, direct deposition or indirect, loads to the Bay. They can also get credit for any NOx emissions reduced beyond the 2020 CMAQ Scenario.

**Discussion:**

- MD and VA wanted to know if states would be getting credit through CAIR, since they do not know exactly what total NOx reductions they are getting from CAIR with the new version not coming out until next month.
  - EPA will provide the states with a more comprehensive description of the full array of programs captured within the 2020 scenario
- PA wondered that if states are going to get credit from NOx and ammonia reductions, where does this quantification of air emission reduction fit within the WIPS.
  - MD also had a question about this since they have regulations that go beyond the federal Clean Air Act regulations.
- NY asked if there were BMPs for reducing ammonia emissions from agricultural operations
  - BMPs can be implemented through feed modification, operational and structural changes that can reduce ammonia emissions. EPA is working with a limited set of agricultural operations across the country in gathering data on emissions from agricultural operations

**Action Items:**

- EPA will provide the PSC with the assumptions that went into the CAIR rule calculation
- The decision requested to agree to an approach for developing the air deposition target loads has been put on hold until more clarification can be provided

### H. Policy Issues with Offsetting New N & P Discharges

**Jon Capacasa** made a presentation that highlighted the expectations of the WIP guide and requirements of the proposed TMDL to offset growth in loadings. The TMDL will require that jurisdictions account for growth upfront or out "offset programs" in place for nitrogen, phosphorus and sediment.

**Discussion:**

- WV and DC are considering setting aside target loads for future growth
- EPA will be asking the states for a contact to work with EPA on the development of the offset and trading guidance appendix to the Bay TMDL
- WV wanted to know how the EPA will define the baseline above which tradable credits can be generated
  - As part of the offsite program, EPA will be applying more specific expectations for the states. A state can define the baseline through its WIPs under the BAY TMDL

14

Exhibit J

- VA stated that all significant facilities in VA are capped at 3 mg/L TN times design flow. If there is a new waste water treatment plant, they have to offset their eventual new load.

Exhibit J



## COMMONWEALTH of VIRGINIA

### Office of the Governor

Robert F. McDonnell
Governor

June 15, 2010

The Honorable Lisa P. Jackson, Administrator
United States Environmental Protection Agency
Ariel Rios Building – Mail Code: 1101 A, Room 3000
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

RE: Virginia's Concerns with the Chesapeake Bay TMDL Process

Dear Administrator Jackson:

I found the opportunity to attend my first annual meeting of the Chesapeake Bay Executive Council a valuable experience in working together with other Bay state leaders to restore and maintain the Chesapeake Bay, a true national treasure. I am sorry that other, and certainly more pressing, matters prevented your attendance. I look forward to the continued close cooperation with Council members during the coming years.

I am committed to improving Virginia's efforts to restore the Chesapeake Bay. It is one of my top environmental commitments along with the conservation of 400,000 additional acres of land much of which is in the Bay watershed. I can assure you that Virginia will work diligently to set and achieve appropriate milestones in the restoration of the Bay. We must ensure that continued progress is maintained in improving the water quality of the Bay as we develop the Total Maximum Daily Load (TMDL) for the Chesapeake Bay and its tidal rivers. A strong basis of this effort will be to establish a shared commitment with Virginia's stakeholders based on sound science and reasonable goals.

This brings me to the main purpose of this letter.

At the Executive Council meeting I spoke briefly with Deputy Administrator Bob Perciasciepe, and shared with him some concerns about the on-going TMDL development process. Of paramount importance is the perceived lack of transparency to the stakeholders as evidenced by the short time frames and opportunities for public review and comment by the very citizens and affected constituencies who will be responsible for reducing nutrient and sediment pollution to the Bay. I am also troubled by the continually changing pollution reduction goals as

Patrick Henry Building • 1111 East Broad Street • Richmond, Virginia 23219
(804) 786-2211 • TTY (800) 828-1120
www.governor.virginia.gov

AR0023269

The Honorable Lisa P. Jackson, Administrator
June 15, 2010
Page 2

modifications are made to the Bay model, and want to be sure we have sound science supporting the requirements being imposed on the states.

Outlined below are my key concerns with the TMDL development process:

- **TMDL Deadlines** – Despite significant delays in providing promised data to the states, EPA is holding firm to the December 2010 deadline for the TMDL and state Watershed Implementation Plans (WIP's). Virginia has worked diligently over the past decade with EPA to develop TMDLs in accordance with the schedule contained in the June 1999 federal court consent decree which requires EPA to have final numbers by May 2011. We remain disappointed that EPA is not utilizing the available time allowed under the consent decree to better ensure this highly complex TMDL is technically sound, and the citizens of Virginia are provided sufficient time to both understand the implications of the TMDL on their lives and offer constructive comment.

- **TMDL "Reasonable Assurance" Not Defined by EPA** – The states are being compelled by EPA to provide reasonable assurance that the nutrient loadings are achieved. However, EPA has failed in two efforts to adopt a regulation that would officially define how that standard can be met. This places the states in an untenable position of developing WIR's without knowing how this standard may be met. This is particularly troublesome given EPA's newly developed accountability system and list of consequences that can be imposed on the states if they do not meet an undefined standard. It is a mandate we are being required to enforce without adequate standards to hold regulants accountable. In essence, neither the enforcer nor regulant knows precisely what is required of them.

- **Transparency with Public** – In spite of numerous Bay Program meetings, the current process does not result in proper communication to the states, stakeholders and citizens of how key decisions are being made. Improved documentation is needed to explain the basis for decisions, and these decisions need to be peer reviewed so the public confidence is sufficient to support the decisions.

- **Public Comment Process** – EPA expects to provide, at most, 45 days for the public to provide comments on the TMDL and WIPs. Given the complexity of these materials and the magnitude of the costs involved and other potential impacts, this time period is inadequate. In addition, EPA expects to review the anticipated extensive public comment, and make appropriate adjustments in response to this comment, within 60 days. Given our experience with highly complex regulatory issues, these timeframes only communicate to the public that their input will not be considered in any reasonable way.

- **Model Elements Are Flawed** – EPA acknowledge the model version being used for the 2010 TMDL is flawed since it does not properly account for common pollution reduction

AR0023270

The Honorable Lisa P. Jackson, Administrator
June 15, 2010
Page 3

practices employed by the states and does not accurately reflect levels of impervious surface. These current shortcomings are undermining the confidence the public and stakeholders will have in the Watershed Implementation Plans developed by the states. In addition, EPA is applying the results of the water quality model in a manner that many believe overestimates the precision of the model. This approach is resulting in much lower nutrient loading caps that are not justified by the resulting high costs and disruption to society.

- **James River is Unique** – It has long been known that the James River has a relatively minimal impact on the water quality problems of the Bay. The assignment of nutrient loading caps by EPA for the James should reflect this minimal impact. However, there are nutrient related problems within the tidal James River. Therefore in 2005, Virginia, EPA and stakeholders agreed upon a solution to address those problems, resulting in adoption of unique chlorophyll standards for the James estuary. Recent EPA modeling is threatening to undermine the basis for those unique standards and the progress being achieved in cleaning the river. The agreed upon solution should remain intact under the Bay TMDLs EPA is developing. However, if EPA believes the 2005 solution needs to be revisited, then Virginia should retain its entitlement under the Clean Water Act to develop a James River TMDL for this issue under a reasonable schedule.

- **Unfairness of EPA Consequences** -- EPA threatens to impose harsh consequences on certain source sectors if other sectors are falling behind, such as removing allocation from wastewater treatment plants or making development more expensive if unregulated agricultural sources do not achieve expected reductions. This appears to violate fundamental principles of fairness. Any regulatory consequences need to be targeted to the source sector lagging behind, and not on others that are working diligently to keep in compliance with state and federal mandates.

- **Funding** – Given current economic conditions, federal funding sources will need to dramatically increase to address additional federal responsibilities required of the states. Doing this without further increasing the federal deficit could be problematic.

- **Federal Executive Order** – Some states are concerned that elements of the President's Chesapeake Bay Executive Order will mandate additional work by the states for activities that should be the responsibility of federal agencies. For instance, EPA is creating a new tracking system which will call for local governments to track voluntary practices over a 64,000 square mile area. This can represent a significant effort and is simply another reporting system layered on top of those that already exist. It may also divert federal resources from our primary water quality objectives.

- **Use of Offsets** – Clear direction from the EPA is needed regarding the use of offsets in achieving reductions, particularly those associated with Virginia's Stormwater Construction General Permit.

AR0023271

The Honorable Lisa P. Jackson, Administrator
June 15, 2010
Page 4

- **Federal Reduction Commitments by Jurisdiction** – Federal agencies are ramping up reduction activities on federal lands and in some cases such as the Natural Resources Conservation Service (NRCS) have been receiving significantly more funding. In a four year period, NRCS will implement agricultural BMPs through the EQIP program with an additional $43 million targeted to the Chesapeake Bay watershed within Virginia. EPA needs to be coordinating federal reduction activities and commitments and then crediting that reduction against the goals set for each jurisdiction.

- **EPA Enforcement Measures in the Valley of Virginia** – On June 3, 2010, EPA issued orders for two farms in the Shenandoah Valley to cease and desist discharge and pollutants into local waterways. We understand that EPA has also taken the unprecedented step of expanding the definition of point source pollution to include common agricultural practices. Many are very concerned that this is an over reach of EPA's authority. We believe the EPA's time and energy would be better spent in Virginia educating farmers on best practices and positive actions they should be undertaking to help restore the Chesapeake Bay, rather than expanding the scope of its regulatory authority through enforcement measures. We were delighted to learn at the annual meeting that USDA will soon release a report of agricultural BMPs that are working around the country.

I hope that you will give serious consideration to these issues. It is not too late for mid-course corrections that would result in a fairer outcome for the states and a better bay clean up program.

Sincerely,

Robert F. McDonnell

RFM/dd
cc:    Virginia Congressional Delegation
       The Honorable Patricia Smith Ticer
       The Honorable Harvey B. Morgan
       The Honorable Kenneth T. Cuccinelli
       The Honorable Martin L. Kent
       The Honorable Douglas W. Domenech
       The Honorable Todd P. Haymore

AR0023272

# Update on the Bay TMDL and What's Just Around the Corner

Jeff Corbin

Senior Advisor to the Regional Administrator

U.S. EPA Region 3

AR0032981



Nitrogen Loads by Sector and Scenario - CBP Watershed Model p5.3

\* Note: This is land based allocated load. Air allocation is an additional 15.7 mpy N

AR0032994



Phosphorus Loads by Sector and Scenario - CBP Watershed Model p5.3

AR0032995



AR0032996

## EXECUTIVE SUMMARY
## DRAFT CHESAPEAKE BAY TMDL

**Introduction**

The U.S. Environmental Protection Agency has released the draft Chesapeake Bay Total Maximum Daily Load (TMDL), a "pollution diet" that will compel sweeping actions to restore the Chesapeake Bay and its vast network of streams, creeks and rivers.

The TMDL was prompted by insufficient restoration progress over the last several decades in the Bay. The TMDL is required under federal law and responds to consent decrees in Virginia and D.C. dating back to the late 1990s. It is also a keystone commitment of a federal strategy to meet President Obama's Executive Order to restore and protect the Bay.

The draft TMDL – the largest ever developed by EPA – includes pollution limits to meet water quality standards in the Bay and its tidal rivers. The TMDL is designed to ensure that all pollution control measures to fully restore the Bay and its tidal rivers are in place by 2025, with 60 percent of the actions completed by 2017. The final TMDL will be established December 31.

On July 1, EPA set draft Bay watershed limits for nitrogen and phosphorus at 187.4 million and 12.5 million pounds per year, respectively, and on Aug. 13 set a range of allowable sediment pollution levels at between 6.1 and 6.7 billion pounds per year. These pollution limits were further divided by jurisdiction and major river basin based on state-of-the-art modeling tools, extensive monitoring data, peer-reviewed science, and close interaction with state partners.

The TMDL is supported by accountability measures to ensure cleanup commitments are met, including short-and long-term benchmarks, a tracking and accounting system, and additional federal backstop measures, if necessary, to spur progress.

EPA incorporated federal backstop measures into the draft TMDL because of deficiencies in the majority of draft pollution reduction plans submitted by the states and District of Columbia in early September. Most of these draft Watershed Implementation Plans (WIPs) did not identify programs to sufficiently reduce pollution to meet TMDL allocations and provide assurance the programs could be implemented. As a result, EPA's backstop measures focus on tightening controls on federally permitted point sources of pollution, such as wastewater treatment plants, large animal agriculture operations and municipal stormwater systems.

EPA proposed more extensive backstop allocations for Pennsylvania, Virginia, New York, Delaware and West Virginia. Only minor changes were made to the plans for Maryland and the District of Columbia. The jurisdictions will have the opportunity to revise and strengthen their plans before final versions are due on November 29. During this time, EPA will engage jurisdictions to share best approaches from the WIPs across the jurisdictions and provide EPA guidance on the most effective pollution controls. When those final WIPs are submitted, EPA will again evaluate the plans to determine if EPA backstop allocations can be replaced with sufficiently improved state commitments.

The release of the draft TMDL begins a 45-day public comment period that will include 18 public meetings in all six watershed states and the District of Columbia. The public meeting

1

schedule, including registration links for webinars, is at http://www.epa.gov/chesapeakebaytmdl. The website provides instructions for accessing the draft TMDL and providing comments.

**TMDL Background**

The Clean Water Act sets as a goal that all waters in the United States be "fishable" and "swimmable," and requires states and the District of Columbia to establish water quality standards to measure the health of water bodies relative to these primary environmental goals. The Clean Water Act also requires jurisdictions to develop a list of waterways that are impaired by pollutants and do not meet water quality standards. A Total Maximum Daily Load (TMDL) must be developed for certain waterways on the impaired list. A TMDL is essentially a "pollution diet" that identifies the maximum amount of a pollutant the waterway can receive and still meet water quality standards.

Most of the Chesapeake Bay and its tidal waters are listed as impaired because of excess nitrogen, phosphorus and sediment. These pollutants cause algae blooms that consume oxygen and create "dead zones" where fish and shellfish cannot survive, block sunlight that is needed for underwater grasses, and smother aquatic life on the bottom. The high levels of nitrogen, phosphorus and sediment enter the water from agricultural operations, urban and suburban runoff, wastewater facilities, air pollution and other sources, including septic systems. Despite some reductions in pollution during the past 27 years of restoration due to extensive efforts by federal, state and local governments; non-governmental organizations; and stakeholders in the agriculture, urban/suburban and wastewater sectors, there has been insufficient progress toward meeting the water quality goals for the Chesapeake Bay and its tidal waters.

Since 2000, the seven jurisdictions in the Chesapeake Bay watershed (Delaware, District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia) and the U.S. Environmental Protection Agency, who along with the Chesapeake Bay Commission are partners in the Chesapeake Bay Program, have been planning for a Chesapeake Bay TMDL.

Since September 2005, the seven jurisdictions have been actively involved in decision-making to develop the TMDL. In the October 2007 meeting of the Chesapeake Bay Program's Principals' Staff Committee, the jurisdictions and EPA agreed that EPA would establish the TMDL. Since 2008, EPA has sent official letters to the jurisdictions detailing all facets of the TMDL, including: schedules for developing the TMDL and pollution reduction plans, EPA's expectations and evaluation criteria for jurisdiction plans to meet the TMDL pollution limits, reasonable assurance for controlling nonpoint source pollution, and backstop actions that EPA could take to ensure progress.

The TMDL also resolves commitments made in a number of consent decrees, Memos of Understanding, and settlement agreements dating back to the late 1990s that address certain waters identified as impaired in the District of Columbia, Delaware, Maryland and Virginia.

Additionally, President Obama issued Executive Order 13508 on May 12, 2009, which directed the federal government to lead a renewed effort to restore and protect the Chesapeake Bay and its watershed. The Chesapeake Bay TMDL is a keystone commitment in the strategy developed by federal agencies to meet the President's Executive Order.

More than 40,000 TMDLs have been completed across the United States, but the Chesapeake Bay TMDL will be the largest and most complex thus far – it is designed to achieve significant

2

reductions in nitrogen, phosphorus and sediment pollution throughout a 64,000-square-mile watershed that includes the District of Columbia and large sections of six states. The TMDL is actually a combination of 92 smaller TMDLs for individual Chesapeake Bay tidal segments and includes pollution limits that are sufficient to meet state water quality standards for dissolved oxygen, water clarity, underwater grasses and chlorophyll-*a*, an indicator of algae levels. It is important to note that the pollution controls employed to meet the TMDL will also have significant benefits for water quality in the tens of thousands of streams, creeks and rivers throughout the region. EPA will establish the final Chesapeake Bay TMDL, after considering public comments and additional input from the jurisdictions, by December 31, 2010.

**Developing the Chesapeake Bay TMDL**
Development of the Chesapeake Bay TMDL required knowledge of the stream flow characteristics of the watershed, sources of pollution, distribution and acreage of the various land uses, appropriate best management practices, the transport and fate of pollutants, precipitation data and many other factors. The TMDL uses a series of models, calibrated to decades of water quality and other data, and refined based on input from dozens of Chesapeake Bay scientists. Modeling is an approach that uses observed and simulated data to replicate what is occurring in the environment, and was a critical and valuable tool to develop the Chesapeake Bay TMDL.

The development of the TMDL consisted of three major steps.
1. EPA provided allocations to the jurisdictions and major basins for nitrogen, phosphorus and sediment.
2. Jurisdictions developed draft Phase 1 Watershed Implementation Plans to achieve those basin-jurisdiction allocations. In these WIPs, jurisdictions made decisions on how to further sub-allocate the basin-jurisdiction loadings to various individual point sources and a number of point and nonpoint source sectors.
3. EPA evaluated the draft WIPs and where deficiencies existed, EPA provided backstop allocations in the draft TMDL that consisted of a hybrid of the jurisdiction WIP allocations modified by EPA allocations for some source sectors to fill gaps in the WIPs.

These draft TMDL loadings to the basin-jurisdictions are provided in table ES-1. These loadings were determined using the best peer-reviewed science and through extensive collaboration with the jurisdictions and informed by the Watershed Implementation Plans.

3

**Table ES-1. Chesapeake Bay TMDL watershed nutrient and sediment draft allocations by jurisdiction and by major river basin [proposed standards]**

| Jurisdiction | Basin | Nitrogen draft allocations (million lbs/year) | Phosphorus draft allocations (million lbs/year) | Sediment draft allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 71.74 | 2.31 | 1,758.20 |
| | Potomac | 4.72 | 0.42 | 233.93 |
| | Eastern Shore | 0.28 | 0.01 | 21.12 |
| | Western Shore | 0.02 | 0.001 | 0.37 |
| | PA Total | 76.77 | 2.74 | 2,013.62 |
| Maryland | Susquehanna | 1.08 | 0.05 | 62.94 |
| | Eastern Shore | 9.71 | 1.09 | 169.70 |
| | Western Shore | 9.74 | 0.46 | 170.38 |
| | Patuxent | 2.85 | 0.21 | 90.12 |
| | Potomac | 15.70 | 0.90 | 682.33 |
| | MD Total | 39.09 | 2.72 | 1,175.47 |
| Virginia | Eastern Shore | 1.21 | 0.16 | 10.91 |
| | Potomac | 17.46 | 1.47 | 810.07 |
| | Rappahannock | 5.84 | 0.90 | 688.51 |
| | York | 5.41 | 0.54 | 107.09 |
| | James | 23.48 | 2.34 | 852.77 |
| | VA Total | 53.40 | 5.41 | 2,469.35 |
| District of Columbia | Potomac | 2.32 | 0.12 | 11.16 |
| | DC Total | 2.32 | 0.12 | 11.16 |
| New York | Susquehanna | 8.23 | 0.52 | 292.96 |
| | NY Total | 8.23 | 0.52 | 292.96 |
| Delaware | Eastern Shore | 2.95 | 0.26 | 57.82 |
| | DE Total | 2.95 | 0.26 | 57.82 |
| West Virginia | Potomac | 4.67 | 0.74 | 248.11 |
| | James | 0.02 | 0.01 | 16.65 |
| | WV Total | 4.68 | 0.75 | 264.76 |
| Total Basin/Jurisdiction Draft Allocation | | 187.44 | 12.52 | 6,285.14 |
| Atmospheric Deposition Draft Allocation | | 15.70 | -- | -- |
| Total Basinwide Draft Allocation | | 203.14 | 12.52 | 6,285.14 |

a. Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by federal air regulations through 2020.

Since nitrogen and phosphorus loadings from all parts of the Bay watershed have an impact on most segments of the Bay, it was necessary for EPA to allocate the nitrogen and phosphorus loadings in an equitable manner to the states and basins. There were 3 basic guides that were used to divide these loads.

- Allocated loads should protect living resources of the Bay and its tidal tributaries and result in all segments of the Bay mainstem, tidal tributaries and embayments meeting

4

water quality standards for dissolved oxygen, chlorophyll a, water clarity and underwater grasses.

- Tributary basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound per pound basis).
- All tracked and reported reductions in nitrogen, phosphorus and sediment loads are credited toward achieving final assigned loads.

In addition, EPA is committing to reducing air deposition of nitrogen to the tidal waters of the Chesapeake Bay to 15.7 million pounds per year. The reductions will be achieved through implementation of federal air regulations during the coming years.

To insure that these pollutant loadings will attain and maintain water quality standards, the TMDL calculations were developed to account for critical environmental conditions a waterway would face, future growth, and seasonal variation. An implicit margin of safety was also included in the TMDL.

The TMDL is designed to ensure that by 2025 all practices necessary to fully restore the Bay and its tidal river are in place, with 60 percent of the actions taken by 2017.
As mentioned above, a TMDL must be based on achieving established state water quality standards. In the case of the Bay TMDL, as the TMDL is being developed, the state water quality standards are being proposed for modification. So the loadings allocated to the states as identified above and the state WIPs are based on loadings to achieve the proposed state standards.

However, the Chesapeake Bay TMDL document also provides allocations for attaining the current water quality standards. In order to achieve the current standards, the allocations happen to be more stringent that the allocations identified above. This set of TMDL allocations are important if the state standards are not modified before the completion of the Bay TMDL.

Furthermore, this TMDL provides information on the pollution control levels for a full backstop TMDL, in case such controls are needed in the final TMDL.

EPA expects that the water quality standards and state WIPs are likely to change before this TMDL is finalized. So offering information on possible TMDL loadings under each of these options provides EPA with the flexibility, informed by the final WIPs and public comment, to finalize this TMDL based on the relevant information at the time the TMDL is finalized. And the final TMDL allocations could range from full WIP based loads to full backstop loads, depending on the strength of the final state WIPs.

**Accountability and Goals**
The Chesapeake Bay TMDL is unique because of the extensive measures included to ensure accountability for reducing pollution and meeting deadlines for progress.  The TMDL will be implemented using an accountability framework that includes Watershed Implementation Plans (WIPs), two-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal backstop actions if the jurisdictions do not meet their commitments. The accountability framework is being established in part to provide demonstration of the reasonable assurance provisions of the Chesapeake Bay TMDL pursuant to both the Clean Water Act and the Chesapeake Bay Executive Order, but is not part of the TMDL itself.

5

When EPA establishes or approves a TMDL that allocates pollutant loads to both point and nonpoint sources, it determines whether there is a "reasonable assurance" that the nonpoint source load allocations will be achieved and water quality standards will be attained. Reasonable assurance for the Chesapeake Bay TMDL is provided by the numerous federal, state and local regulatory and non-regulatory programs identified in the accountability framework that EPA believes will result in the necessary point and nonpoint source controls and pollutant reduction programs. The most prominent program is the CWA's National Pollutant Discharge Elimination System (NPDES) permit program that regulates point sources throughout the nation. Many nonpoint sources are not covered by a similar federal permit program; as a result, financial incentives and other voluntary programs are used to achieve nonpoint source reductions. These federal tools are supplemented by a variety of state regulatory and voluntary programs and other commitments of the federal government set forth in the Executive Order strategy and identified in the accountability framework discussed above.

Beginning in 2012, jurisdictions (including the federal government) are expected to develop two-year milestones to track progress toward reaching the TMDL's goals.  In addition, the milestones will demonstrate the effectiveness of the jurisdictions' WIPs by identifying specific near-term pollutant reduction controls and a schedule for implementation (see next section for further description of WIPs). EPA will review these two-year milestones and evaluate whether they are sufficient to achieve necessary pollution reductions and, through the use of a Bay Tracking and Accountability System, determine if milestones are met.

If a jurisdiction's plans are inadequate or its progress is insufficient, EPA can invoke a suite of backstop actions to ensure pollution reductions. These include expanding coverage of NPDES permits to sources that are currently unregulated, increasing oversight of state-issued NPDES permits, requiring additional pollution reductions from point sources such as wastewater treatment plants, increasing federal enforcement and compliance in the watershed, prohibiting new or expanded pollution discharges, redirecting EPA grants, and revising water quality standards to better protect local and downstream waters.

**Watershed Implementation Plans**
The cornerstone of the accountability framework is the jurisdictions' development of Watershed Implementation Plans (WIPs), which serve as roadmaps for how and when a jurisdiction plans to meet its pollution allocations under the TMDL. In their draft Phase I WIPs, the jurisdictions were expected to subdivide the Bay TMDL allocations among pollutant sources; evaluate their current legal, regulatory, programmatic and financial tools available to implement the allocations; identify and rectify potential shortfalls in attaining the allocations; describe mechanisms to track and report implementation activities; provide alternative approaches; and outline a schedule for implementation.

EPA provided the jurisdictions with detailed expectations for WIPs in November 2009 and April 2010. To assist with WIP preparation, EPA provided considerable technical and financial assistance. Also last year, EPA announced target loads to allow the jurisdictions to begin developing WIPs. EPA worked with the jurisdictions to evaluate various "what if" scenarios – combinations of practices and programs that could achieve their pollution allocations.

6

After the draft Phase I WIP submittal deadline of September 1, a team of EPA sector experts conducted an intense evaluation process, comparing the submissions with EPA expectations. Two goals were paramount in the EPA WIP review: achieving the basin-jurisdiction pollution allocations and providing a high level of assurance that reductions would be achieved, particularly for non-permitted sources like runoff from agricultural lands and currently unregulated stormwater from urban and suburban lands.

The EPA evaluation concluded that the pollution controls identified in two of the seven jurisdictions' WIPs could meet nitrogen and phosphorus allocations and five of the seven jurisdictions' WIPs could meet sediment allocations for the jurisdiction as a whole. The evaluation by jurisdiction is:

- **Maryland:** Some deficiencies – Meets overall statewide allocations for nitrogen (at allocation), phosphorus (at allocation) and sediment (0 percent under), but several individual river basins exceed the allocations for nitrogen, phosphorus or sediment.
- **District of Columbia:** Some deficiencies – Meets allocation for nitrogen (5 percent under) and phosphorus (3 percent under), but does not meet the sediment allocation (25 percent over).
- **Delaware:** Serious deficiencies – Does not meet allocations for nitrogen (17 percent over) and phosphorus (8 percent over), but does meet allocations for sediment (20 percent under).
- **New York:** Serious deficiencies – Does not meet allocations for nitrogen (15 percent over) and phosphorus (14 percent over), but does meet allocations for sediment (17 percent under.
- **Pennsylvania:** Serious deficiencies – Does not meet allocations for nitrogen (0 percent under) and phosphorus (11 percent over), but does meet allocations for sediment (1 percent over).
- **Virginia:** Serious deficiencies – Does not meet allocations for nitrogen (6 percent over) and phosphorus (7 percent over), but does meet allocations for sediment (12 percent under).
- **West Virginia:** Serious deficiencies – Does not meet allocation for nitrogen (18 percent over) or sediment (38 percent over), but does meet the allocation for phosphorus (6 percent under).

The EPA evaluation also concluded that none of the seven WIPs provided sufficient reasonable assurance that pollution controls identified could actually be implemented to achieve the nitrogen, phosphorus and sediment reduction targets by 2017 or 2025. The shortfalls of the WIPs, which varied by jurisdiction, included:

- Vague or no strategy for filling recognized program or resources gaps
- Few enforceable or otherwise binding commitments
- Discrepancies between implementation levels in model input decks and strategies described in WIP
- Reliance on pollution trading programs but no commitment to adopt critical trading drivers such as new regulations
- Few dates for key actions and program-building milestones

7

**EPA Backstop Allocations**

Once EPA evaluated a WIP and found shortfalls in pollution loading reductions and/or assurance that reductions would be achieved, EPA included only the parts of the WIP that it determined to be adequate and appropriate in its TMDL allocation. EPA then determined how to make up that shortfall and/or insufficient amount of reasonable assurance for the remainder of the allocation. EPA considered varying levels of federal backstop allocations that adjusted loads delivered to the Bay to ensure water quality standards are met. The result is a draft TMDL that merges jurisdictions' WIP allocations with varying degrees of federal backstop allocations in all seven jurisdictions, as well identification of additional federal actions that EPA is prepared to take if jurisdictions do not achieve milestones on schedule. For the most part in making the hybrid allocations, EPA decreased the allocations to the point sources (over which EPA has or could assert regulatory control) and increased the load allocations to unregulated nonpoint sources. EPA identified backstop allocations at three levels:

- **Minor:** EPA adjusted WIP pollution sector allocations to achieve the jurisdiction's overall and major river basin nitrogen, phosphorus and sediment allocations.
- **Moderate:** WIP aggregate point source allocations for stormwater and animal agriculture (CAFO) sectors were adjusted to equate to the best approach that was proposed and determined adequate in other jurisdiction WIPs. More stringent wasteload allocations were applied to point source wastewater sources (regulated via federal programs); other nonpoint source allocations increased as feasible if there was insufficient assurance that reductions would be achieved.
- **High:** WIP aggregate allocations for point source stormwater and animal agriculture sectors were adjusted downward to equate to the best approach that was proposed and determined adequate in other jurisdiction WIPs; Very stringent wastewater allocations were applied to point source wastewater sources based on limit of technology concentrations (regulated via federal programs); other nonpoint source allocations increased as feasible if there was insufficient assurance that reductions would be achieved.

Backstop allocations focus on areas where EPA has the federal authority to control pollution allocations through NPDES permits. These backstops involve substituting a jurisdiction's proposed point source allocations with more stringent EPA "backstop allocations" for point sources including wastewater treatment plants, stormwater permits, and animal agriculture operations. The draft TMDL reflects the following level of backstops for each jurisdiction:

- **Maryland**: **Minor-level backstop allocations** primarily for Maryland's nonpoint source load allocations to meet nitrogen, phosphorus and sediment allocations in each major basin within Maryland. No changes to point source wasteload allocations that would affect NPDES permit conditions.

- **District of Columbia: Minor-level backstop allocations** to District of Columbia's wasteload allocations for urban stormwater so that the District meets upper range of sediment allocation. EPA will ensure that all allocations, including sediment, are met through the NPDES permits issued within the District.

8

- **Virginia: Moderate-level backstop allocations** for Virginia point sources
  o Wastewater treatment plants: 4 mg/L TN and .3 mg/L TP and design flow for significant municipal plants consistent with most aggressive WIP proposal (Maryland ENR Strategy).
  o MS4s: 50 percent of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50 percent of unregulated land treated as regulated, so that 25 percent of unregulated land meets aggressive performance standard; designation as necessary.
  o Construction: Erosion and sediment control on all lands subject to Construction General Permit.
  o CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permit except no feed management on dairies; designation as necessary.
  o Additional adjustments to agriculture nonpoint sources as necessary to exactly meet nitrogen, phosphorus and sediment allocations.

- **Delaware: High-level backstop allocations** for Delaware point sources
  o Wastewater treatment plants: limit of technology (3 mg/L TN and .1 mg/L TP) and design flow for significant municipal plants.
  o MS4s: 50 percent of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50 percent of unregulated land treated as regulated, so that 25 percent of unregulated land meets aggressive performance standard; designation as necessary.
  o Construction: Erosion and sediment control on all lands subject to Construction General Permit.
  o CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits except no feed management on dairies; designation as necessary.
  o Additional reductions from agricultural nonpoint sources necessary to meet nitrogen and phosphorus allocations that EPA will ensure occurs through additional federal backstop actions.

- **New York: High-level backstop allocations** for New York point sources
  o Wastewater treatment plants: limit of technology (3 mg/L TN and .1 mg/L TP) and design flow for significant municipal plants.
  o MS4s: 50 percent of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50 percent of unregulated land treated as regulated, so that 25 percent of unregulated land meets aggressive performance standard; designation as necessary.
  o Construction: Erosion and sediment control on all lands subject to Construction General Permit.
  o CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits except no feed management on dairies; designation as necessary.

9

- o Additional reductions from agricultural nonpoint sources necessary to meet nitrogen, phosphorus and sediment allocations that EPA will ensure occurs through additional federal backstop actions.
- o Finer scale wasteload and load allocations (same level of detail as tidal states) to ensure NPDES permits will be consistent with Chesapeake Bay TMDL wasteload allocations.

- **Pennsylvania: High-level backstop allocations** for Pennsylvania point sources
  - o Wastewater treatment plants: limit of technology (3 mg/L TN and .1 mg/L TP) and design flow for significant municipal plants.
  - o MS4s: 50 percent of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50 percent of unregulated land treated as regulated, so that 25 percent of unregulated land meets aggressive performance standard; designation as necessary.
  - o Construction: Erosion and sediment control on all lands subject to Construction General Permit.
  - o CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits except no feed management on dairies; designation as necessary.
  - o Load from point source reductions redistributed to forest, septic, and agriculture sources as possible while still meeting nitrogen, phosphorus and sediment allocations.
  - o Finer scale wasteload and load allocations (same level of detail as tidal states) to ensure NPDES permits will be consistent with Chesapeake Bay TMDL wasteload allocations.

- **West Virginia: High-level backstop allocations** for West Virginia point sources
  - o Wastewater treatment plants: limit of technology (3 mg/L TN and .1 mg/L TP) and design flow for significant municipal plants.
  - o MS4s: 50 percent of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50 percent of unregulated land treated as regulated, so that 25 percent of unregulated land meets aggressive performance standard; designation as necessary.
  - o Construction: Erosion and sediment control on all lands subject to Construction General Permit.
  - o CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits except no feed management on dairies; designation as necessary.
  - o Additional reductions from agricultural nonpoint sources necessary to meet July 1 and August 13 nitrogen, phosphorus and sediment allocations that EPA will ensure occurs through additional federal backstop actions.
  - o Finer scale wasteload and load allocations (same level of detail as tidal states) to ensure NPDES permits will be consistent with Chesapeake Bay TMDL wasteload allocations.

10

The jurisdictions are encouraged to revise and strengthen their draft Phase I WIPs before final versions are due November 29 to meet the basin-state pollution allocations and provide reasonable assurance the allocations will be achieved. During this time, EPA will engage jurisdictions to share best approaches from the WIPs across the jurisdictions and provide EPA guidance on the most effective pollution controls. When final Phase I WIPs are submitted, EPA will again evaluate the plans to determine if EPA backstop allocations can be replaced with sufficiently improved state commitments.

In 2011, the jurisdictions are expected to submit Phase II WIPs that allocate the pollutant loads on a geographically smaller scale. Phase III WIPs in 2017 are expected to be designed to provide additional detail of restoration actions beyond 2017 and ensure that the 2025 goals are met.

**Public Participation**

The release of the draft Chesapeake Bay TMDL on September 24, 2010 began a 45-day public comment period that concludes on November 8, 2010. During the public comment period, there are 18 public meetings in all six watershed states and the District. A full public meeting schedule, including registration links for an online broadcast in each jurisdiction, is available at http://www.epa.gov/chesapeakebaytmdl. The website also provides a link for accessing and formally commenting on the draft TMDL.

The TMDL is available for viewing at EPA Region III, 1650 Arch Street, Philadelphia, PA 19103 with arrangements made in advance with the Region 3 library (215-814-5254 or library-reg3@epa.gov), EPA Chesapeake Bay Program Office at 410 Severn Avenue Suite 112, Annapolis, MD 21403 (Contact Debbie Embleton 410-267-9856 or Embleton.debbie@epa.gov) or EPA Docket Center, EPA/DC, EPA West, Room 3334, 1301 Constitution Ave., NW., Washington, DC (Docket Number EPA-R03-OW-2010-0736 and reading room phone number (202) 566-1744).

Options for comment are:

- Electronically, visit: www.regulations.gov. Docket ID No. EPA-R03-OW-2010-0736
- In writing, mail to: Water Docket, EPA, Mail code: 2822T, 1200 Pennsylvania Ave., NW., Washington, D.C., 20460.
- By hand, drop off from 8:30 a.m. - 4:30 p.m.: EPA Docket Center Public Reading Room, EPA Headquarters West, Room 3340, 1301 Constitution Ave., NW, Washington, D.C.

11

established to assure the attainment of all applicable water quality standards in each of the 92 tidal segments.

In addition to the maximum daily load provided for each of the 92 tidal segments in Section 9, the reader can readily calculate a daily maximum load expressed in seasonal terms for any segment, WLA, or LA of interest. This seasonal expression reflects a temporally variable target because the various pollutant sources (point and nonpoint) vary significantly by month and by season.  Additionally, a daily maximum load expressed in seasonal terms for each segment is also informative because the recently adopted water quality standards are also expressed with a degree of temporal specificity. For example, the Migratory Fish Spawning and Nursery designated uses require a 7 day mean dissolved oxygen value of 6 mg/L, with an instantaneous minimum of 5 mg/L in the time period February 1 through May 31.

The expression of maximum daily loads for individual wasteload and load allocations proposed in this draft TMDL represent EPA's best efforts to date to calculate nitrogen, phosphorus, and sediment allocations, informed by the jurisdictions' watershed implementation plans and other elements of the TMDL accountability framework, necessary to implement all applicable Bay water quality standards with seasonal variations, considering critical conditions and with a margin of safety.  EPA invites comment on this approach or alternative approaches for calculating daily maximum load values.

## 6.3  Establishing Allocation Rules

An early step in the process for developing the Bay TMDL, especially for nutrients, is to determine the allowable loading from jurisdictions and major basins draining to the Bay. There are limitless combinations of loadings from the various jurisdictions and basins that would achieve this objective. As a result, an equitable approach must be employed to apportion the allowable loading among the jurisdictions. This subsection describes the process used for this purpose in the Bay TMDL.

### 6.3.1    Nutrient Allocation Methodology

Nutrients from sources well up within the Chesapeake Bay watershed affect the condition of local receiving waters and affect tidal water quality conditions far downstream, hundreds of miles away in some cases. For example, the middle part of the mainstem Chesapeake Bay is affected by nutrients from all parts of the Bay watershed. A key objective of the nutrient LA methodology was to find a process, based on some expression of an equitable distribution of loads for which the basinwide load for nutrients could be distributed among the basin-jurisdictions. This section describes the specific processes involved in allocating the nutrients loads necessary to meet the jurisdictions' Chesapeake Bay DO and chlorophyll *a* WQS. While many alternative processes were explored (see Appendix K), only the processes determined to be appropriate by EPA and agreed upon by five of the seven Bay watershed jurisdictional partners are described here.

## Principles and Guidelines

The nutrient basin-jurisdiction allocation methodology was developed to be consistent with the following guidelines adopted by the partnership:

- The allocated loads should protect the living resources of the Bay and its tidal tributaries and result in all segments of the Bay mainstem, tidal tributaries, and embayments meeting WQS for DO, chlorophyll a, and water clarity.
- Major river basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound per pound basis).
- All tracked and reported reductions in nutrient loads are credited toward achieving final assigned loads.

A number of critical concepts are important in understanding the major river basin by jurisdiction nutrient allocation methodology. They include the following:

- Accounting for the geographic and source loading influence of individual major river basins on tidal water quality termed relative effectiveness
- Determining the controllable load
- Relating *controllable load* to *relative effectiveness* to determine the allocations of the basinwide loads to the basin-jurisdictions

The following subsections further describe the above concepts and how they directly affect the Chesapeake Bay TMDL.

## Accounting for Relative Effectiveness of the Major River Basins on Tidal Water Quality

*Relative effectiveness* accounts for the role of geography on nutrient load changes and, in turn, Bay water quality. Because of various factors such as in-stream transport and nutrient cycling in the watershed, a given management measure will have a different level of effect on water quality in the Bay depending on the location of its implementation (USEPA 2003b). For example, the same control applied in Williamsport, Pennsylvania, will have less of an effect than one applied in Baltimore, Maryland.

A relative effectiveness assessment evaluates the effects of both estuarine transport (location of discharge/runoff loading to the Bay) and riverine transport (location of the discharge/runoff loading in the watershed). EPA determined the relative effectiveness of each contributing river basin in the overall Bay watershed on DO in several mainstem Bay segments and the lower Potomac River by using the Bay Water Quality Model to run a series of *isolation* runs and using the watershed model to estimate attenuation of load through the watershed.

From the relative estuarine effectiveness analysis, several things are apparent. Northern, major river basins have a greater relative influence than southern major river basins, because of the general circulation patterns of the Chesapeake Bay (up the eastern shore, down the western shore). Water and nutrients from the most southern river basins of the James and York rivers have relatively less influence on mainstem Bay water quality because of their proximity to the mouth of the Bay. The counter-clockwise circulation of the lower Bay also tends to wash nutrient loads from these larger southern river basins out of the Bay mouth, because they are on the

western side of the Bay. That same counter-clockwise circulation tends to sweep loads from the lower Eastern Shore northward.

River basins whose loads discharge directly to the mainstem Bay, like the Susquehanna, tend to have more effect on the mainstem Bay segments than basins with long riverine estuaries (e.g., the Patuxent and Rappahannock rivers). The long riverine estuaries provide nutrient attenuation (burial and denitrification) before the waters reaching the mainstem Chesapeake Bay. The size of a river basin is uncorrelated to its relative influence, though larger river basins, with larger loads, have a greater absolute effect. The upper tier of relative effect in the three mainstem segments includes the largest (Susquehanna) and the smallest (Eastern Shore Virginia) river basins, both directly discharging into the Bay without intervening river estuaries to attenuate loads, and both *up current* to the deep-channel region of the mainstem Chesapeake Bay, again, given the Bay circulation pattern that moves water up the Eastern Shore, and down the Western Shore.

The estuarine effectiveness is estimated by running a series of Bay Water Quality Model scenarios holding one major river basin at E3 loads and all other major river basins at calibration levels. For each scenario, the increase in the 25th percentile DO concentration during the summer criteria assessment period in the critical segments CB3MH, CB4MH, and CB5MH for deep-channel and CB3MH, CB4MH, CB5MH, and POTMH for deep-water was recorded. The 25th percentile was selected as the appropriate metric as indicative of a change in low DO. The riverine effectiveness is calculated as the fraction of load produced in the watershed that is delivered to the estuary. It is estimated as an output of the watershed model. For more details on this method, see Appendix M.

Absolute estuarine effectiveness accounts for the role of both total loads and geography on pollutant load changes to the Bay. The absolute estuarine effectiveness of a contributing river basin, measured separately both above and below the fall line, is the change in 25th percentile DO concentration that results from a single basin changing from calibration conditions to E3. For example, if the 25th percentile DO in the deep water of the lower Potomac River segment POTMH moves from 5 mg/L to 5.3 mg/L from a change in loads from calibration to E3 in the Potomac above fall line basin, the absolute estuarine effectiveness is 0.3 mg/L. Comparing the absolute estuarine effectiveness among basins helps to identify which major river basins have the greatest effect on WQS.

Relative estuarine effectiveness is defined as absolute estuarine effectiveness divided by the total load reduction, delivered to tidal waters, necessary to gain that water quality response. For example, if the load reduction in the Potomac above fall line basin was 30 million pounds of pollutant to get a 0.3 mg/L change in DO concentration, the relative estuarine effectiveness is 0.01 mg/L per million pounds. The higher the relative estuarine effectiveness, the less reduction required to achieve the change in status. The relative estuarine effectiveness calculation is an attempt to isolate the effect of geography by normalizing the load on a per pound basis. Comparing the relative estuarine effectiveness among the major river basins shows the resulting gain in attainment from performing equal pound reductions among the major river basins.

Riverine attenuation also has an effect on overall effectiveness. Loads are naturally attenuated or reduced as they travel through long free-flowing river systems, making edge-of-stream loads in

headwater regions less effective on a pound-for-pound basis than edge-of-stream loads that take place nearer tidal waters in the same river basin. The watershed model calculates delivery factors as the fraction of edge-of-stream loads that are delivered to tidal waters. The units of riverine attenuation are delivered pound per edge-of-stream pound.

Multiplying the estuarine relative effectiveness (measured as DO increase per delivered pound reduction) by the riverine delivery factor (measured as delivered pound per edge-of-stream pound) gives the overall relative effectiveness in DO concentration increase per edge-of-stream pound. The relative estuarine effectiveness is the same for nitrogen or phosphorus, while the riverine delivery is different, so the overall relative effectiveness is calculated separately for nitrogen and phosphorus. **Error! Reference source not found.** gives the overall relative effectiveness for nitrogen and phosphorus for the watershed jurisdictions by major river basin for above and below the fall line.

The relative effectiveness numbers are separate for wastewater treatment plants and all other sources. The distinction is made because the allocation method treats them separately. The difference in relative effectiveness is due to the geographic location of the sources. For example, in the Maryland western shore basin, the majority of the wastewater treatment load is discharged directly to tidal waters, whereas a significant fraction of all other sources are upstream, including areas that are above reservoirs with very low delivery factors.

**Table 6-5. Relative effectiveness (measured as DO concentration per edge-of-stream pound reduced) for nitrogen and phosphorus for watershed jurisdictions by major river basin and above and below the fall line**

| Jurisdiction | Basin | WWTP Nitrogen | All Other Nitrogen | WWTP Phosphorus | All Other Phosphorus |
|---|---|---|---|---|---|
| District of Columbia | Potomac above Fall Line | 6.09 | 6.09 | 3.08 | 3.08 |
| District of Columbia | Potomac below Fall Line | 6.17 | 5.15 | 6.17 | 5.62 |
| Delaware | Lower East Shore | 7.93 | 7.30 | 7.97 | 7.46 |
| Delaware | Middle East Shore | 4.13 | 4.74 | 5.51 | 5.83 |
| Delaware | Upper East Shore | 6.75 | 6.75 | 7.10 | 7.10 |
| Maryland | Lower East Shore | 7.88 | 7.37 | 7.89 | 7.55 |
| Maryland | Middle East Shore | 6.91 | 6.49 | 6.92 | 6.71 |
| Maryland | Patuxent above Fall Line | 1.89 | 1.25 | 1.66 | 1.58 |
| Maryland | Patuxent below Fall Line | 6.38 | 6.20 | 6.38 | 6.10 |
| Maryland | Potomac above Fall Line | 3.32 | 3.25 | 2.99 | 2.99 |
| Maryland | Potomac below Fall Line | 6.17 | 4.86 | 6.12 | 5.75 |
| Maryland | Susquehanna | 9.39 | 8.68 | 9.11 | 8.77 |
| Maryland | Upper East Shore | 7.49 | 7.27 | 7.49 | 7.40 |
| Maryland | West Shore | 7.83 | 4.98 | 7.68 | 6.13 |
| New York | Susquehanna | 5.60 | 4.58 | 4.25 | 4.11 |
| Pennsylvania | Potomac above Fall Line | 2.10 | 1.98 | 3.08 | 3.08 |
| Pennsylvania | Susquehanna | 6.99 | 6.44 | 4.38 | 4.58 |
| Pennsylvania | Upper East Shore | 5.50 | 5.95 | 6.12 | 6.47 |
| Pennsylvania | West Shore | 2.23 | 2.23 | 2.61 | 2.61 |

| Jurisdiction | Basin | WWTP Nitrogen | All Other Nitrogen | WWTP Phosphorus | All Other Phosphorus |
|---|---|---|---|---|---|
| Virginia | East Shore VA | 5.72 | 5.72 | 5.72 | 5.72 |
| Virginia | James above Fall Line | 0.23 | 0.25 | 0.33 | 0.31 |
| Virginia | James below Fall Line | 0.79 | 0.61 | 0.79 | 0.70 |
| Virginia | Potomac above Fall Line | 1.45 | 1.97 | 3.08 | 3.08 |
| Virginia | Potomac below Fall Line | 5.54 | 3.54 | 5.49 | 4.62 |
| Virginia | Rappahannock above Fall Line | 1.05 | 0.83 | 2.10 | 2.10 |
| Virginia | Rappahannock below Fall Line | 4.48 | 4.41 | 4.48 | 4.47 |
| Virginia | York above Fall Line | 0.37 | 0.31 | 0.43 | 0.40 |
| Virginia | York below Fall Line | 1.85 | 1.77 | 1.85 | 1.82 |
| West Virginia | James above Fall Line | 0.06 | 0.06 | 0.34 | 0.34 |
| West Virginia | Potomac above Fall Line | 1.34 | 1.72 | 2.12 | 2.89 |

Figure 6-4 illustrates graphically the relative effectiveness scores for nitrogen of the major river basins provided in **Error! Reference source not found.** in descending order.



Source: Table 6-5.

**Figure 6-4. Relative effectiveness for nitrogen for the watershed jurisdictions and major rivers basins, above and below the fall line, in descending order.**

Figure 6-5 and Figure 6-6 provide additional graphical illustration of the relative effectiveness concept for all the basins in the watershed related to nitrogen and phosphorus loading,

DRAFT Chesapeake Bay TMDL

respectively. The figures illustrate that, on a per pound basis, a large disparity exists among basin loads on the effect of DO concentrations in the Bay. Generally, the Northern and Eastern river basins have a greater effect on water quality.



DRAFT Chesapeake Bay TMDL



**Figure 6-5. Relative effectiveness illustrated geographically by subbasins across the Chesapeake Bay watershed for nitrogen.**



**Figure 6-6. Relative effectiveness for illustrated geographically by subbasins across the Chesapeake Bay watershed for phosphorus.**

## Determining Controllable Load

Modeling in support of developing the Chesapeake Bay TMDL employs two theoretical scenarios that help to illustrate the load reductions in the context of a *controllable* load.

The *No Action* scenario is indicative of a theoretical *worst case* loading situation in which no controls exist to mitigate nutrient and sediment loads from any sources. It is specifically designed to support equity among basin-jurisdiction allocations in that the levels of all control technologies and BMP and program implementation are at *baseline* conditions.

The E3 scenario represents a *best case* possible situation, where all possible BMPs and available control technologies are applied to land given human and animal populations and wastewater treatment facilities are represented at highest technologically achievable levels of treatment regardless of costs. Again, it considers equity among the allocations in that the levels of control technologies and practice and program implementation are the same across the entire watershed.

The gap between the No Action scenario and the E3 scenario represents the maximum theoretical controllable load reduction that is achievable under the control technologies covered under the E3 scenario. These and other key reference scenarios are defined and documented in detail in Appendix J.

Each scenario can be run with any given year's land use representation. The year 2010 was selected as the base year because it represents conditions at the time the Bay TMDL is developed. Thus, the 2010 No Action scenario represents loads resulting from the mix of land uses and point sources present in 2010 with no effective controls on loading, while the 2010 E3 scenario represents the highest technically feasible treatment that could be applied to the mix of land use-based sources and permitted point sources in 2010 (Table 6-6).

The anthropogenic, *controllable* load is determined by subtracting the basinwide E3 load from the basinwide No Action load. Model scenarios run to show results of various loading reduction management options can be expressed as a percentage of E3 to compare and contrast the relative level of effort between scenarios.

**Table 6-6. Pollutant sources as defined for the No Action and E3 model scenarios**

| Model source | Scenario | |
| --- | --- | --- |
| | No Action | E3 = Everyone Everything Everywhere |
| Land uses | No BMPs applied to the land | All possible BMPs applied to land given current human and animal population and land use |
| Point sources | Significant municipal WWTPs<br>Flow = design flows<br>TN = 18 mg/L<br>TP = 6 mg/L<br>BOD = 30 mg/L<br>DO = 4.5 mg/L<br>TSS = 15 mg/L<br><br>Significant industrial dischargers<br>Flow = design flows<br>TN = highest recorded<br>TP = highest recorded<br>BOD = 30 mg/L<br>DO = 4.5 mg/L<br>TSS = 15 mg/L<br><br>Non-significant municipal WWTPs<br>Flow = existing flows<br>TN = 18 mg/L<br>TP = 6 mg/L<br>BOD = 30 mg/L<br>DO = 4.5 mg/L<br>TSS = 15 mg/L | Significant municipal WWTPs<br>Flow = design flows<br>TN = 3 mg/L<br>TP = 0.1 mg/L<br>BOD = 3 mg/L<br>DO = 6 mg/L<br>TSS = 5 mg/L<br><br>Significant industrial dischargers<br>Flow = design flows<br>TN = 3 mg/L<br>TP = 0.1 mg/L<br>BOD = 3 mg/L<br>DO = 6 mg/L<br>TSS = 5 mg/L<br><br>Non-significant municipal WWTPs<br>Flow = existing flows<br>TN = 8 mg/L<br>TP = 2 mg TP/l<br>BOD = 5 mg/L<br>DO = 5 mg/L<br>TSS = 8 mg/L |
| CSOs | Flow = 2003 base condition flow<br>TN = 18 mg/L<br>TP = 6 mg/L<br>BOD = 200 mg/L<br>DO = 4.5 mg/L<br>TSS = 45 mg/L | Full storage and treatment of CSOs |
| Atmospheric deposition | 1985 Air Scenario | 2030 Air Scenario, max reductions |

Source: Appendix J
Note: BOD = biological oxygen demand; DO = dissolved oxygen; TN = total nitrogen; TP = total phosphorus; TSS = total suspended solids

### Relating Relative Impact to Needed Controls (Allocations)

To apply the allocation methodology, loads from each major river basin were divided into two categories—wastewater and all other sources (Figure 6-7). The rationale for this separate accounting is the higher likelihood of achieving greater load reductions for the wastewater sector than for other source sectors (Appendix K). In addition there was a wide disparity between basin and jurisdictions on the fraction of the load coming from the wastewater sector as opposed to other sectors. So, this disparity is addressed in having a separate accounting for the wastewater sector from the other sectors in the allocation methodology. Wastewater loads included all major and minor municipal, industrial and CSO discharges. Then lines were drawn for each of the two

source categories such that the addition of the two lines would add up to the basinwide nutrient loading targets for nitrogen and phosphorus.

Using the general methodology described above, the Bay Program partners considered many different combinations of wastewater and *other source'* controls and slopes of the lines on that allocation graph (Appendix K). After discussing these options at length, the following graph specifications were generally accepted by the partners and determined to be appropriate by EPA.

The wastewater line was set first and would be a *hockey stick* shape with load reductions increasing with relative effectiveness until a maximum percent controllable load was reached.

- For nitrogen
  - The maximum percent controllable load was 90 percent, corresponding to an effluent concentration of 4.5 mg/L.
  - The minimum percent controllable load was 67 percent, corresponding to an effluent concentration of 8 mg/L.
- For phosphorus
  - The maximum percent controllable load was 96 percent, corresponding to an effluent concentration of 0.22 mg/L.
  - The minimum percent controllable load was 85 percent, corresponding to an effluent concentration of 0.54 mg/L.
- For the nitrogen and phosphorus wastewater lines, any relative effectiveness value that was at least half as large as the maximum was given the maximum percent controllable. The minimum value was assigned to a relative effectiveness of zero, and all values of relative effectiveness between zero and half of the maximum value were assigned interpolated percentages (Figure 6-7).

The *other sources* line was set at a level that was necessary to achieve the basinwide load needed for achieving the DO standards in the middle mainstem Bay and lower tidal Potomac River. This line was set at a slope such that there was a 20 percent overall slope, ranging from 56 percent of controllable loads for basins with low relative effectiveness to 76 percent of controllable loads for basins with high relative effectiveness for nitrogen (Figure 6-7).

For each category—wastewater and all other sources—loads are aggregated by major basin and reductions are assigned according to the specific river basin's relative effectiveness. The graph in Figure 6-7 illustrates the methodology for the total nitrogen target load of 190 million lbs per year.



**Figure 6-7. Allocation methodology example showing the *hockey stick* and straight line reductions approaches, respectively, to wastewater (red line) and all other sources (blue line) for nitrogen.**

### 6.3.2    Sediment Allocation Methodology

The methodology used for allocating sediment loads to major river basins and jurisdictions for sediment was much different than the methodology used for nutrients. That is because sediment has a much more localized effect than nutrients and, therefore, for sediment, the immediate subbasin (i.e., the Chester River) has a large influence on the water clarity and SAV growth in that subbasin. So for sediment, the allocated load is driven primarily from the local subbasin that is contributing sediment to the local Bay segment and, therefore, a methodology is not needed to further suballocate the loading to contributing jurisdictions or neighboring basins.

Building from the basin-jurisdiction nutrient allocations described above, the following key steps were taken:

- Assessed water clarity/SAV criteria attainment across all Bay segments containing the shallow-water bay grass designated use under the proposed basinwide nutrient cap loads and the corresponding phosphorus-based sediment loads allocated by major river basin by jurisdiction (Note: For most non-point source controls for phosphorus, there is a co-benefit of also reducing sediment)

- Identified those individual Bay segments still not attaining their applicable water clarity/SAV WQS at the allocated basinwide nutrient cap loads and the corresponding phosphorus-based sediment loads, and addressed the remaining non-attaining segments

# SECTION 7.  REASONABLE ASSURANCE AND ACCOUNTABILITY FRAMEWORK

When EPA establishes or approves a TMDL that allocates pollutant loads to both point and nonpoint sources, it determines whether there is reasonable assurance that the LAs will be achieved and WQS will be attained. EPA does that to be sure that the LAs established in the TMDL are not based on overly generous assumptions regarding the amount of nonpoint source pollutant reductions that will occur.

This is necessary because the WLAs for point sources are determined, in part, on the basis of the expected contributions to be made to pollutant reductions by nonpoint sources. If the reductions embodied in LAs are not fully achieved because of a failure to fully implement needed nonpoint source pollution controls, the collective reductions from all sources will not result in attainment of WQS. As a result, EPA evaluates whether a TMDL provides reasonable assurance that nonpoint source controls will achieve expected load reductions.

For the Chesapeake Bay TMDL, numerous elements combine to provide that reasonable assurance, of which the primary mechanism is the Accountability Framework described in Section 7.2. EPA has provided a demonstration of reasonable assurance by evaluating each of the jurisdictions' Draft WIPs to determine if any WIP falls short of achieving the basin loading or lacks sufficient reasonable assurance that allocations can be achieved. Section 8 also describes the federal gap filling actions EPA is proposing to provide as sufficient assurance that the remaining allocations are achieved.

## 7.1  Reasonable Assurance

CWA section 303(d) requires that a TMDL be "established at a level necessary to implement the applicable water quality standard." Federal regulations define a TMDL as "the sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background" [40 CFR 130.2(i)]. Documenting adequate reasonable assurance increases the probability that regulatory and voluntary mechanisms will be applied such that it achieves the pollution reduction levels specified in the TMDL and therefore attains WQS.

When a TMDL is developed for waters impaired by point sources only, the existence of the NPDES regulatory program and the issuance of an NPDES permit(s) provide the reasonable assurance that the WLAs in the TMDL will be achieved. That is because federal regulations implementing the CWA require that effluent limits in permits be consistent with "the assumptions and requirements of any available [WLA]" in an approved TMDL [40 CFR 122.44(d)(1)(vii)(B)].

Where a TMDL is developed for waters impaired by both point and nonpoint sources, reasonable assurance that the TMDL's LAs will be achieved depends on whether practices capable of reducing the specified pollutant load (1) exist; (2) are technically feasible at a level required to meet allocations; and (3) have a high likelihood of implementation within a given period. Where there is a demonstration that nonpoint source load reductions can and will be achieved, a TMDL writer can determine that reasonable assurance exists and, on the basis of that reasonable assurance, allocate greater loadings to point sources. Without a demonstration of reasonable

assurance that nonpoint source allocations will be met, a TMDL would have to assign all necessary reductions to the point sources.

For the Chesapeake Bay TMDL, reasonable assurance that nonpoint source load reductions will be achieved is based, in large part, on the new accountability framework EPA is developing for this TMDL, including the Bay jurisdictions' WIPs. As discussed below and in the *Strategy for Protecting and Restoring the Chesapeake Bay Watershed* (Federal Strategy), the goal for installing all controls necessary to achieve the Bay's DO, water clarity, SAV, and chlorophyll *a* criteria is 2025. EPA is therefore making its evaluation of reasonable assurance according to that time horizon. EPA has provided an interim goal that 60 percent of the reductions to achieve water quality standards occur by no later than 2017. The goal is primarily directed at achieving the more difficult reductions from nonpoint sources.

Since 2008, EPA Region 3 has communicated its heightened expectations for reasonable assurance in the Chesapeake Bay watershed and its basis for expecting WIPs to assist in its demonstration. The September 11, 2008, and November 4, 2009, letters and the April 2, 2010, *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* provide extensive information on what EPA expects the jurisdictions to include in their WIPs to help demonstrate reasonable assurance (USEPA 2008b, 2009c, 2010e), including

- Develop WIPs that identify how point and nonpoint sources will reduce nitrogen, phosphorus, and sediment loads sufficient to meet WQS for DO, chlorophyll a, SAV, and water clarity in the tidal waters of the Chesapeake Bay and its tidal tributaries
- Commit to set and meet specific 2-year milestones for implementing practices to achieve load reductions

EPA has also stated its intention to take additional federal actions, as necessary, to ensure implementation of the Bay TMDL (see Section 7.2.4). As part of that demonstration of reasonable assurance, EPA provides an analysis of the jurisdictions' WIPs in Section 8 in which EPA determines if a jurisdiction's WIP falls short or lacks sufficient reasonable assurance. Section 8 also describes the federal actions EPA is proposing to provide as a partial backstop for additional assurance that the remaining LAs are achieved.

In addition to the new Bay-specific accountability framework, reasonable assurance for the Chesapeake Bay TMDL is based on the existence and implementation of numerous existing federal, state, and local programs that provide for both point and nonpoint source controls. While not all these programs provide funding or apply to all sources, together they contribute to EPA's belief that reasonable assurance exists that the Chesapeake Bay TMDL's allocations will be met.

President Obama signed Executive Order 13508 on May 12, 2009. That order directs federal agencies to "define environmental goals for the Chesapeake Bay and describe milestones for making progress toward attainment of these goals." In the Federal Strategy, the federal agencies focused on achieving four essential priorities to restore and maintain a healthy Chesapeake ecosystem: restore clean water; recover habitat; sustain fish and wildlife; and conserve land and increase public access (FLCCB 2010). The Federal Strategy articulates 12 key environmental outcomes that will be achieved through federal actions and ongoing state activities. The commitments and actions described in the Federal Strategy are a unique and powerful tool to

achieve the Bay's water quality goals and provide additional support for reasonable assurance in this TMDL.

The Bay TMDL, along with the jurisdictions' WIPs, are key elements of the strategy because together they provide a set of numeric pollutant reduction targets and implementation plans to guide and assist achievement of the Goal to Restore Clean Water. Under the Federal Strategy, EPA is also creating a system to track and report TMDL/WIP reduction goals and 2-year milestones for federal and state agencies (see Section 7.2.3). The tracking system provides additional reasonable assurance that the TMDL's allocations will be met by clearly charting ongoing progress and, if there are shortfalls, informing EPA and other stakeholders, including the public, about the need for additional state and federal actions.

The CWA authorizes EPA to provide funding to the Bay watershed jurisdictions through various sources, including but not limited to Chesapeake Bay Implementation grants, Nonpoint Source Control grants, Section 106 grants for water pollution control programs, the Clean Water State Revolving Loan Fund, the American Recovery and Reinvestment Act, and various grant programs targeting Chesapeake Bay restoration. The funding will help the jurisdictions meet their pollutant reduction targets.

In addition, significant USDA funds and cost share programs are available through the Farm Bill, which recently were increased through the Chesapeake Bay Watershed Initiative. USDA administers the funds and target priority watersheds in the Chesapeake Bay. The Federal Strategy describes how USDA is working with producers to apply new, more effective conservation practices on the highest priority watersheds in the Chesapeake Bay and its tidal tributaries. Along with an increase in federal cost share dollars, USDA is bringing an unprecedented focus on targeted efforts in the watersheds that contribute the most reductions to nutrient and sediment pollutants. That will substantially help the states meet their respective LAs, watershed implementation plans and 2-year milestones (FLCCB 2010 pp. 34–45). USDA is also leading efforts to accelerate development of new conservation technologies and contributing to the system of accountability for tracking and reporting conservation practices. Finally, USDA is working to streamline conservation planning and sponsoring a number of showcase projects to test and monitor the benefits of a focused outreach on a number of small watersheds (30,000–40,000 acre).

USGS, NOAA, and other federal agencies will work with EPA and the states to improve the water quality monitoring and tracking of management actions and restoration activities. Part of that effort includes expanding and improving the NOAA Chesapeake Bay Interpretive Buoy System and improving the monitoring of tidal river and upland stream conditions. Many other agencies will undertake other actions to conserve land, sustain fish and wildlife, and recover habitat.

The strategy also outlines specific tools to promote transparency and accountability in the implementation and coordination of the activities. Those tools include Federal Two-Year Milestones (starting in calendar years 2012-13) where the federal agencies identify and track their actions toward meeting water quality milestones and other strategy outcomes. Other tools outlined in the strategy include an annual federal action plan, an annual progress report and providing for an independent evaluation of both federal and state progress on meeting the goals set forth in section 206 of the Executive Order.

While the strategy and associated activities are not a federal TMDL implementation plan and are not directly part of the TMDL, the additional resources, accountability, oversight and coordination provided by EPA and other federal agencies add to the reasonable assurance that the TMDL LAs will be implemented. EPA also reserves its authority to take additional federal actions, including modification or replacement of the TMDL as determined to be appropriate.

EPA also has the discretionary authority to increase oversight of NPDES permits proposed and issued by the Bay watershed jurisdictions. As discussed in EPA's December 29, 2009, letter, pursuant to EPA-jurisdiction NPDES program agreements, EPA can expand its oversight review of draft permits in the Bay watershed and can object to permits that do not meet CWA requirements, including NPDES effluent limits that are inconsistent with the Bay TMDL's WLAs (USEPA 2009d). EPA also could use its discretionary residual designation authority to increase the number of sources, operations, or communities regulated under the NPDES permit program.

Finally, the reasonable assurance for the reductions in loadings from air deposition is based on the air emission reductions that will occur by regulation under the CAA through 2020, as discussed in more detail in Section 6.4.1.1.

Those combined elements, including the WIP evaluation and EPA backstop actions described in Section 8, together with the accountability framework described in greater detail below, collectively provide reasonable assurance that the Chesapeake Bay TMDL nutrient and sediment allocations can and will be achieved.

## 7.2   Accountability Framework

The Chesapeake Bay Protection and Restoration Executive Order 13508 directs EPA and other federal agencies to build a new accountability framework that guides water quality restoration of the Chesapeake Bay. In addition to the federal components described above as set forth in the Federal Strategy, the Chesapeake Bay TMDL accountability framework has four elements:

- The Bay jurisdictions' development of WIPs as described in Section 7.2.1

- The Bay jurisdictions' development of 2-year milestones to demonstrate restoration progress

- EPA's commitment to track and assess the jurisdictions' progress, by way of developing and implementing a Chesapeake Bay TMDL Tracking and Accountability System (BayTAS)

- EPA's commitment to take appropriate federal actions if the jurisdictions fail to develop sufficient WIPs, effectively implement their WIPs or fulfill their 2-year milestones

The accountability framework, including the jurisdictions' WIPs and 2-year milestones, will help ensure implementation of the Chesapeake Bay TMDL but is not itself an *approvable* part of the TMDL. In its September 11, 2008, letter to the CBP's PSC (USEPA 2008b), EPA outlined the following expectations for each of the Bay watershed jurisdictions as part of the Bay TMDL accountability framework:

1. Identify the controls needed to achieve the allocations identified in the Bay TMDL through revised tributary strategies.

2. Identify the current state and local capacity to achieve the needed controls (i.e., an assessment of current funding programs for point source permitting/treatment upgrades and nonpoint source controls, programmatic capacity, regulations, legislative authorities).

3. Identify the gaps in current programs that must be filled to achieve the needed controls (i.e., additional incentives, state or local regulatory programs, market-based tools, technical or financial assistance, new legislative authorities).

4. A commitment from each jurisdiction to work to systematically fill the identified gaps. As part of this commitment, the jurisdictions would agree to meet specific, iterative, and short-term (1-2 year) milestones demonstrating increased levels of implementation or nutrient and sediment load reduction.

5. A commitment to continue efforts underway to expand monitoring, tracking, and reporting directed to assessing the effectiveness of implementation actions and to use the data to drive adaptive decision making and redirect management actions.

6. Agree that if the jurisdictions do not meet the commitments, additional measures will be necessary.

Letters sent by EPA to the jurisdictions on November 4, 2009, and December 29, 2009, further developed this accountability framework (USEPA 2009c, 2009d). In his July 1, 2010, and August 13, 2010, letters to the jurisdictions setting out the draft nutrient and sediment allocations, respectively, Regional Administrator Shawn Garvin further communicated key aspects of the accountability framework (USEPA 2010f, 2010h).

### 7.2.1   Watershed Implementation Plans

A major element of EPA's demonstration of reasonable assurance for the Chesapeake Bay TMDL is developing WIPs by each of the Bay jurisdictions. The WIPs have informed, and will continue to inform, EPA's development of the Bay TMDL and its setting of WLAs and LAs. In essence, the WIPs are the roadmap for how the jurisdictions, in partnership with federal and local governments, will achieve and maintain the Chesapeake Bay TMDL nitrogen, phosphorus, and sediment allocations.

EPA's November 4, 2009, letter outlined expectations for the WIPs, including that they address the eight elements summarized in Table 7-1 below.

**Table 7-1. Eight elements of the jurisdictions' WIPs**

| Element | Description |
|---|---|
| Interim and Final Nutrient and Sediment Target Loads | WIPs are expected to subdivide interim and final target loads by pollutant source sector within each of the 92 areas draining to section 303(d) tidal water segments and identify the amount and location of loads from individual or aggregate point sources and nonpoint source sectors. |
| Current Loading Baseline and Program Capacity | WIPs are expected to include evaluation of current legal, regulatory, programmatic, financial, staffing, and technical capacity to deliver the target loads established in the TMDL. |
| Account for Growth | WIPs are expected to describe procedures for estimating additional loads due to growth and provide EPA with information to inform additional pollution load reductions that are at least sufficient to offset the growth and development that is anticipated in the watershed between 2011 and 2025. |
| Gap Analysis | WIPs are expected to identify gaps between current capacity (Element 2) and the capacity needed to fully attain the interim and final nutrient and sediment target loads for each of the 92 drainage areas for impaired segments of the Bay TMDL (Element 1). |
| Commitment and Strategy to Fill Gaps | WIPs are expected to include a proposed strategy to systematically fill the gaps identified in Element 4. |
| Tracking and Reporting Protocols | WIPs are expected to describe efforts underway or planned to improve transparent and consistent monitoring, tracking, reporting, and assessment of the effectiveness of implementation actions. |
| Contingencies for Slow or Incomplete Implementation | If the proposed strategies outlined in Element 5 are not implemented, WIPs are expected to provide for alternative measures resulting in equivalent reductions and an indication of what such contingencies might entail. |
| Appendix with Detailed Targets and Schedule | WIPs are expected to include detailed interim and final load targets for each tidal Bay segment drainage area, source sector, and local area (after November 2011) in an appendix, with a reduction schedule comprising the 2-year target loads at the scale of each major basin within a jurisdiction.<br><br>The 2-year target loads allow EPA to assess whether future 2-year milestones are on schedule to meet interim and final water quality goals. |

Source: USEPA 2009c

### Three Phases of Watershed Implementation Plans

The jurisdictions are expected to develop WIPs over three Phases. Draft Phase I WIPs were to be developed and submitted to EPA on or around September 1, 2010. EPA used them to support the development of specific allocations in the draft Bay TMDL. Draft Phase I WIPs for each of the seven Chesapeake watershed jurisdictions are at www.epa.gov/chesapeakebaytmdl.

The jurisdictions are expected to submit their final Phase I WIPs to EPA by November 29, 2010, for consideration in the final Bay TMDL. After working with local partners, the jurisdictions are expected to submit their Phase II WIPs in draft and final form to EPA by June 1 and November 1, 2011, respectively. Finally, the jurisdictions are expected to submit their Phase III WIPs to EPA by 2017 describing refined actions and controls to be implemented between 2018 and 2025 to achieve WQS.

With each successive WIP, the jurisdictions are expected to suballocate the allocations provided in the Bay TMDL at an increasingly finer scale (Table 7-2). During Phases II and III of the WIP process, EPA will consider whether modifications to the Chesapeake Bay TMDL are necessary and appropriate on the basis of developments or changes in the jurisdictions' WIPs.

**Table 7-2. Comparison of elements within the Chesapeake Bay TMDL and Phase I, II, and III WIPs**

| Element | Bay TMDL | Phase I WIP | Phase II WIP | Phase III WIP |
|---|---|---|---|---|
| Individual or Aggregate WLAs and LAs to Tidal Jurisdictions | ✓ | | | |
| Gross WLAs and LAs for Non-Tidal Jurisdictions if those Jurisdictions Submit WIPs that meet EPA Expectations | ✓ | | | |
| WLAs for individual significant point sources, or, where appropriate, aggregate point sources | | ✓ | ✓ | ✓ |
| LAs for nonpoint source sectors | | ✓ | ✓ | ✓ |
| Proposed actions and, to the extent possible, specific controls to achieve point source and nonpoint source target loads | | ✓ | ✓ | ✓ |
| Point source and nonpoint source loads by local area | | | ✓ | ✓ |
| Specific controls and practices to be implemented by 2017 | | To the extent possible | ✓ | |
| Refined point source and nonpoint source loads | | | | ✓ |
| Specific controls and practices to be implemented by 2025 | | | | ✓ |

Source: USEPA 2009c

## Evaluation of Phase I Watershed Implementation Plans

EPA provided the jurisdictions with a *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* in April 2010 detailing how it would evaluate the adequacy of jurisdictions' WIPs (EPA 2010e). EPA provided feedback and technical support to each jurisdiction on elements of its draft Phase I WIP that it submitted informally before September 1.

Upon receiving the jurisdictions' draft Phase I WIPs, EPA evaluated the WIPs to determine whether they met EPA's expectations as described in the April 2010 guide and in EPA's November 4, 2009 letter (USEPA 2009c, 2010e). EPA's WIP evaluation process involved a systematic review of the contents of the eight elements of each jurisdiction's draft Phase I WIP (see Section 8).

The draft Phase I WIPs were to include the Bay jurisdictions' proposed allocations to sources and sectors and a demonstration of reasonable assurance that the allocations can be achieved and maintained. The draft Chesapeake Bay TMDL incorporates the allocations where they enable the jurisdictions to meet the overall loadings necessary to meet WQS and where EPA found sufficient demonstration of reasonable assurance.

Where the allocations provided by the jurisdictions in their draft Phase I WIPs did not meet the overall loadings necessary to meet WQS or where EPA found insufficient demonstration of reasonable assurance, EPA established alternative WLAs and LAs, and supported them, where necessary, with potential federal actions identified in EPA's December 29, 2009, letter to the jurisdictions (see Section 7.2.4 and Section 8) (USEPA 2009d).

Because the draft WIP submissions of the upstream states of New York, Pennsylvania, and West Virginia do not meet EPA's expectations, EPA is not providing those states with gross LAs and WLAs (Section 8). Instead, consistent with previous letters, EPA is providing each of those states with individual WLAs to each significant point source and aggregate allocations to other point and nonpoint sources on a scale consistent with state with tidal waters.

## 7.2.2    Two-Year Milestones

EPA will measure the jurisdictions' progress toward reaching the TMDL's ultimate nutrient and sediment reduction goals against 2-year milestones by which the jurisdictions are expected to, with contingencies, identify and commit to implement specific pollutant-reduction controls and actions in each of their successive 2-year milestone periods (USEPA 2009c). Starting in calendar years 2010–2013, the federal government will also be providing 2-year milestones.

Before the start of each milestone period, EPA will evaluate whether the 2-year commitments are sufficient to achieve necessary reductions identified in the WIPs for the associated 2-year milestone period and whether the jurisdictions have fulfilled their previous milestone commitments. As discussed above in the Federal Strategy, an independent evaluation will be made of progress toward achieving the water quality restoration goal in accordance with section 206 of the Executive Order.

When assessing 2-year milestone commitments, EPA will evaluate whether proposed actions, controls, and practices would result in estimated loads at the jurisdiction scale that meet the jurisdiction's 2-year milestone targets (USEPA 2009c). If EPA determines that the jurisdictions would not achieve the milestone loads identified, EPA may identify which source sectors, basins, and local areas would not achieve reductions on schedule to meet that jurisdiction's interim and final target loads. EPA will then be in a position to decide what appropriate action to take (see Section 7.2.4) (USEPA 2009d). At the end of a milestone period, EPA expects that model-estimated nutrient and sediment loads resulting from reported implementation would be at or below target loads at the jurisdiction scale (Figure 7-1). Note that the 2009 load includes nitrogen delivered to the Bay from atmospheric deposition on the watershed. EPA estimates that delivered nitrogen loads will be reduced by 3.4 million pounds by 2025 through implementation of rules and standards under the CAA. The graph does not include the 17.4 million pounds of atmospheric nitrogen deposited directly to tidal waters of the Bay, of which approximately 1.7 million pounds per year will be reduced by 2025 through implementation of rules and standards under the CAA.



Source: USEPA 2009c

**Figure 7-1. Relationship between WIPs and 2-year milestones.**

In comparison to past Bay restoration efforts, the WIPs and 2-year milestones are expected to contain greater specificity of source sector and geographic load reduction, more rigorous assurances that load reductions will be achieved, and more detailed and transparent reporting to the public (USEPA 2008b, 2009c, 2010f).

### 7.2.3    Chesapeake Bay TMDL Accountability Tracking System

To determine whether sufficient progress toward the TMDL and interim milestones are being made, EPA will rely on the jurisdictions to monitor, verify and report their progress. EPA will use the reported tracking data and the Phase 5.3 watershed model along with Chesapeake Bay tidal and watershed water quality monitoring data (including contributions from other federal agencies including NOAA, USGS, COE, and USDA) to assess progress toward the milestone commitments.

While the jurisdictions will continue to report annually to EPA on BMP and other pollution control implementations within their respective jurisdiction, existing tracking and reporting mechanisms must be enhanced to fully measure progress toward the TMDL. As EPA stated in its December 29, 2009, letter, where jurisdictions do not provide verification that reported practices and controls have been properly installed and maintained, EPA may not fully or partially credit these actions in its assessment of annual progress and 2-year milestones (USEPA 2009d).

EPA will track the jurisdictions' progress toward achieving the gap-filling strategies proposed in their WIPs and their TMDL allocations through the jurisdictions' 2-year milestone commitments

and implementations by way of a transparent BayTAS that EPA is designing in consultation with the jurisdictions.

BayTAS is a centralized system that combines data from EPA and the jurisdictions to

- Track the WLAs and LAs established in the TMDL
- Track progress relative to the milestones identified by jurisdictions in their WIPs
- Record the baseline nutrient and sediment control practices reported in the Bay jurisdictions' WIPs and track progress against those baselines

Executive Order 13508 called for developing such a tracking and accountability system. In addition, implementation of the system is a commitment of EPA under the May 12, 2010, Settlement Agreement between Chesapeake Bay Foundation and EPA. BayTAS is being implemented contemporaneously with the TMDL to provide EPA, the Bay Watershed jurisdictions, and the public with information about LAs and WLAs established in the Chesapeake Bay TMDL, and the jurisdictions' respective progress toward implementing the strategies expected to be outlined in their WIPs.

EPA expects to refine and adjust BayTAS as the jurisdictions submit their Phase II and Phase III WIPs, which is expected to occur in 2011 and 2017, respectively. As it is refined, the BayTAS is expected to enable higher levels of monitoring of jurisdiction pollution-control programs than currently exist. For example, using the system jurisdictions may use the NPDES program to closely time permit renewals to aid in assuring consistency with the TMDL WLAs. The BayTAS is also expected to provide better accounting for nonpoint source implementation, pollutant trades among point and nonpoint sources, and offsets that are relied on to achieve WLAs and LAs.

During implementation of the TMDL, EPA will continue to work with the Bay jurisdictions and local governments in the ongoing design and implementation of BayTAS. BayTAS is expected to incorporate multiple existing reporting databases and frameworks and brings in new data that are not now available through existing database frameworks. Because EPA uses the Bay Watershed Model to assess the impacts of jurisdictions' implementation efforts, BayTAS will function to tie together the jurisdictions' databases and the Bay Watershed Model.

One critical system that will facilitate the exchange of information between the jurisdictions and the Bay Watershed Model is the National Environmental Information Exchange Network (NEIEN).[1] NEIEN is a partnership among the jurisdictions and EPA that facilitates exchange of environmental information. Partners in the NEIEN share data efficiently and securely over the Internet.

The jurisdictions have received EPA resources to develop NEIEN schema for reporting nutrient and sediment controls on sources other than wastewater treatment plants and began to submit annual implementation data to the Chesapeake Bay Program using the NEIEN format after October 2010 (USEPA 2010b). As the WIP development and evaluation process proceeds, EPA expects that the data-sharing relationships and practices among the jurisdictions and EPA will

---

[1] http://www.epa.gov/Networkg/info/index.html.

rely heavily on NEIEN to support the BayTAS. In fact, BMPs may be incorporated into BayTAS only if they are reported through NEIEN.

### 7.2.4    Federal EPA Actions

In its December 29, 2009, letter to the jurisdictions, EPA listed various federal actions that EPA may take if a jurisdiction fails to demonstrate progress toward meeting required nutrient and sediment load reductions (USEPA 2009d). EPA may take action if a jurisdiction fails to do the following:

- Develop and submit Phase I, II, and III WIPs consistent with the expectations and schedule described in EPA's letter of November 4, 2009, and the amended schedule described in EPA's letter of June 11, 2010

- Develop 2-year milestones consistent with the expectations, load reductions, and schedule described in EPA's letter of November 4, 2009, and the amended schedule described in EPA's letter of June 11, 2010

- Achieve each successive set of 2-year milestones and their respective target loads by having appropriate controls in place pursuant to the strategies identified in the jurisdiction's WIP and 2-year milestones

- Develop and propose sufficiently protective NPDES permits consistent with the CWA and the Chesapeake Bay TMDL WLAs

- Develop appropriate mechanisms to ensure that nonpoint source LAs are achieved

Following is the list of potential actions EPA may take to ensure that jurisdictions develop and implement appropriate WIPs, attain appropriate 2-year milestones of progress, and provide timely and complete information to an effective accountability system for monitoring pollutant reductions:

- Expand NPDES permit coverage to unregulated sources: For example, using residual designation authority to increase the number of sources, operations or communities regulated under the NPDES permit program

- NPDES program agreements: Expanding EPA oversight review of draft permits (major and minor) in the Bay watershed and objecting to inadequate permits that do not meet the requirements of the CWA (including NPDES effluent limits that are not consistent with the Chesapeake Bay TMDL WLAs)

- Require net improvement offsets: For new or increased loadings, requiring net improvement offsets that do more than merely replace the anticipated new or increased loadings

- Establish finer-scale WLAs and LAs in the Chesapeake Bay TMDL: Establishing more specific allocations in the final December 2010 Chesapeake Bay TMDL than those proposed by the jurisdictions in their Phase I WIPs

- Require additional reductions of loadings from point sources: Revising the final December 2010 Chesapeake Bay TMDL to reallocate additional load reductions from nonpoint to point sources of nutrient and sediment pollution, such as wastewater treatment plants

- Increase and target federal enforcement and compliance assurance in the watershed: That could include both air and water sources of nutrients and sediment

DRAFT Chesapeake Bay TMDL

- Condition or redirect EPA grants: Conditioning or redirecting federal grants; incorporating criteria into future Requests for Proposals based on demonstrated progress in meeting WIPs or in an effort to yield higher nutrient or sediment load reductions

- Federal promulgation of local nutrient WQS: Initiating promulgation of federal standards where the jurisdiction's WQS do not contain criteria that protect designated uses locally or downstream



# SECTION 8.  WATERSHED IMPLEMENTATION PLAN EVALUATION AND DRAFT BACKSTOP ALLOCATIONS

This section describes the process by which EPA applied the basinwide and jurisdiction-wide allocations described in Section 6 and developed draft segment-specific or sector-specific allocations. This section specifically describes the methodology that EPA used to evaluate the draft Phase I WIPs, the process EPA used to develop the backstop allocations, the results of EPA's evaluation of the draft Phase I WIPs, and the resultant jurisdiction-specific allocations. Links to each jurisdiction's draft Phase I WIP can be found at www.epa.gov/chesapeakebaytmdl.

The overall process of developing the Chesapeake Bay TMDL had four steps:

1. EPA defined 19 major river basin and jurisdictional loading allocations—July 1, 2010 for nitrogen and phosphorus; August 13, 2010 for sediment. The methodology that EPA used in defining these allocations is described in detail in Section 6.

2. Each jurisdiction developed a draft Phase I WIP that described how it would achieve the target allocations for nitrogen, phosphorus, and sediment assigned to the jurisdictions and basins in step 1.

    a. Using data submitted by the jurisdictions either as input decks or spreadsheets that EPA processed through Scenario Builder and the Chesapeake Bay Watershed Model, each jurisdiction developed suballocations to assign to individual, significant wastewater treatment plant (WWTP) point sources; aggregate nonsignificant WWTPs, stormwater, and CAFO point sources; and nonpoint source sectors draining to each of the 92 segments of the Chesapeake Bay and its tidal tributaries.
    b. Within their WIPs, jurisdictions also proposed strategies and permit conditions to achieve the suballocations, consistent with the expectations that EPA communicated in its letters of September 11, 2008, November 4, 2009, and December 29, 2009, as well as the *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* issued April 2, 2010. Those expectations are further described in Section 7.
    c. The jurisdiction's proposed allocations and strategies formed the basis of its draft Phase I WIP delivered to EPA on September 1, 2010 (September 3 for Virginia).

3. EPA evaluated the jurisdictions' suballocations and draft Phase I WIPs to determine whether they met the jurisdiction-wide and major river basin allocations, included adequate detail to ensure that NPDES permits are consistent with the assumptions of the WLAs, and provided sufficient reasonable assurance that nonpoint source reductions could be achieved and maintained through credible and "enforceable or otherwise binding" strategies. That evaluation and its results are described in detail here in Section 8.

4. EPA considered the results of the evaluation in its decision to establish an allocation scenario to complete a draft Chesapeake Bay TMDL for public review, including allocations for each of the 92 Bay segments, using suballocations provided in the draft Phase I WIPs, alternative EPA backstop allocations, or a combination of the two. Tables showing the 92 Bay segment-specific and sector-specific allocations of the Chesapeake Bay TMDL are in Section 9.

Because of significant deficiencies in the draft Phase I WIPs to identify and resolve gaps in authority, staff, funding, and accountability systems, EPA determined that none of the jurisdictions' draft Phase I WIPs provided sufficient reasonable assurance that programs would be implemented to achieve the necessary pollutant load reductions. Six of the seven jurisdictions did not reach their jurisdiction-wide allocation targets for nitrogen, phosphorus, and sediment (only Maryland met the jurisdiction-wide target allocations for all three pollutants); no jurisdiction met its target allocations for each pollutant for each major basin within its jurisdiction.

Therefore, consistent with its December 29, 2009, letter to the jurisdictions, EPA is establishing draft backstop allocations that incorporate those parts of the jurisdictions' draft Phase I WIP allocation proposals determined to be acceptable and replace some allocations proposed by jurisdictions; EPA is also providing a finer level of detail for allocations in headwater jurisdictions; and finally, EPA is making additional point source reductions and, in some cases, nonpoint source reductions, as necessary to achieve Bay TMDL nitrogen, phosphorus, and sediment allocations.

This section describes the methodology by which EPA evaluated the jurisdictions' draft Phase I WIPs, the process for developing the backstop allocations, the WIP evaluation findings and the resulting backstop allocations EPA established for each jurisdiction.

## 8.1   WIP Evaluation Methodology

A team of EPA source sector experts, together with the EPA staff assigned to each of the seven watershed jurisdictions, conducted a rigorous, systematic evaluation of each jurisdiction's draft Phase I WIP. EPA evaluated each draft Phase I WIP on the basis of how well the jurisdiction met the expectations articulated in EPA's November 4, 2009, WIP expectations letter and how well the jurisdiction addressed each of the eight elements set out in the April 2, 2010, *Guide for Evaluation of Phase I Watershed Implementation Plans*.

In conducting the evaluations, EPA addressed two primary questions: (1) did the jurisdiction meet its target allocations for nitrogen, phosphorus, and sediment both jurisdiction-wide and in each of the major river basins to ensure attainment of each of the Chesapeake Bay WQS in all 92 segments of the Bay and its tidal tributaries; and (2) did the jurisdiction provide sufficient reasonable assurance that it would implement a comprehensive approach to achieve necessary nutrient and sediment reductions, including documentation that nonpoint source controls will be achieved and maintained and permitting programs will result in point source reductions, with emphasis on achieving a 60 percent reduction in loadings by 2017.

To evaluate the first question and determine whether a jurisdiction met its nitrogen, phosphorus, and sediment target allocations, EPA evaluated whether a jurisdiction met all three allocation targets in all basin-jurisdictions in the jurisdiction, and, if the jurisdiction missed them, EPA considered the degree to which it missed them. Table 8-1 summarizes the thresholds of the four evaluation tiers.

**Table 8-1. Thresholds for four evaluation tiers for assessing whether a jurisdiction met its nitrogen, phosphorus, and sediment target allocations**

| | Tier 1. Met all target allocations | Tier 2. Met most target allocations | Tier 3. Met some target allocations | Tier 4. Met few target allocations |
|---|---|---|---|---|
| Threshold | Draft Phase I WIP is at or below target allocations for all three pollutants both jurisdiction-wide and in all basins | Draft Phase I WIP met jurisdiction-wide target allocations for all three pollutants but did not meet basinwide target allocations for at least one pollutant in at least one basin; or Draft Phase I WIP did not meet the jurisdiction-wide target for one or more pollutants but not to such a degree as would cause a violation of WQS | Draft Phase I WIP did not meet jurisdiction-wide target allocations for one or more pollutants but exceeded the target by less than 10% | Draft Phase I WIP did not meet jurisdiction-wide target allocations for one or more pollutants and exceeded the target(s) by more than 10% |

To evaluate the second question and determine whether a jurisdiction provided sufficient reasonable assurance through enforceable or otherwise binding commitments to implement necessary controls, EPA evaluated each major pollutant source sector on a number of criteria, including those factors set out in the April 2, 2010, WIP guide. Table 8-2 summarizes the thresholds for placing a major pollutant source sector—wastewater, stormwater, and agriculture—in one of four tiers.

**Table 8-2. Thresholds for the four Phase I WIP evaluation tiers for the reasonable assurance assessment**

| | Tier 1. Met all expectations | Tier 2. Met most expectations | Tier 3. Met some expectations | Tier 4. Met few expectations |
|---|---|---|---|---|
| Threshold | Addresses all the major reasonable assurance categories identified in the November 4, 2009, letter and the April 2, 2010, WIP evaluation guide. | Identifies and provides reasons for current gap. Spells out numbers/percent of inspections and results. Schedule provided for potential actions. Evidence of or commitment to clear permit conditions. Contingencies in place for high risk/ highly improbable actions. Proposals for attaining additional resources. Schedule to further flesh out details over time. | If any of the following occur: Does not address known, significant programmatic shortfalls and gaps. No discussion of compliance. No schedule for potential actions. Does not inform permit conditions. Proposals not feasible or do not address significant gaps. No commitment/ schedule to develop details over time. Major discrepancies between type and extent of practices in WIP document and input deck. | If many of the following occur: Does not address known, significant programmatic shortfalls and gaps. No discussion of compliance. No schedule for potential actions. Does not inform permit conditions. Proposals not feasible or do not address significant gaps. No commitment/ schedule to develop details over time. Major discrepancies between type and extent of practices in WIP document and input deck. |

After evaluating the two key issues, EPA applied a uniform process to determine whether, and if so, to what degree, to apply backstop allocations. In developing the backstop allocations, EPA fully considered the following:

- The jurisdiction's tier placement resulting from EPA's evaluation of whether and to what extent the jurisdiction met its target allocations for nitrogen, phosphorus, and sediment.

- The jurisdiction's tier placement resulting from EPA's evaluation of whether and to what extent the jurisdiction demonstrated sufficient reasonable assurance.

- Whether the proposed WLAs in the jurisdiction's draft Phase I WIP were consistent with EPA's definition of point source loads and could be achieved through implementation of a permitting program.

- EPA's own internal reasonable assurance that the Agency could ensure achievement of the backstopped point source reductions through enhanced program oversight, permit objections, compliance assurance, and enforcement actions.

## 8.2   WIP Evaluation Results

Where EPA determined that a jurisdiction did not meet its allocation target, EPA applied an allocation-target-based backstop allocation. Where EPA determined that a jurisdiction met its allocation target but did not provide adequate reasonable assurance, EPA applied a reasonable assurance-based backstop allocation. Where EPA determined that a jurisdiction neither met its target allocation nor provided adequate reasonable assurance, EPA applied both forms of

backstop allocation. After applying all backstop allocations that EPA determined were necessary, EPA ran the combination of specific practices and allocations through the Scenario Builder, Watershed Model and WQSTM to ensure that the allocations provided in the Chesapeake Bay TMDL would result in the attainment of WQS.

## 8.2.1    Target Nutrient/Sediment Allocation Gaps

Each watershed jurisdiction with the exception of Maryland failed to meet at least one of its jurisdiction-wide nitrogen, phosphorus, and sediment target allocations. Maryland failed to meet its target allocations for some major river basins, however. Other jurisdictions also failed to meet their target allocations for nitrogen, phosphorus, and sediment for some river basins. Table 8-3 shows whether each jurisdiction met its jurisdiction-wide target allocations for nitrogen, phosphorus, and sediment. Table 8-4 shows whether each jurisdiction met its basinwide target allocations for nitrogen, phosphorus, and sediment.

**Table 8-3. Comparison of the nitrogen, phosphorus, and sediment jurisdiction-wide allocations in the jurisdictions' draft Phase I WIPs with the target allocations for each pollutant**

| Juris. | TN (mpy) | | | TP (mpy) | | | TSS (mpy) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | WIP | Target[a] | % off target | WIP | Target | % off target | WIP | Target - low end of range | Target - high end of range | % off target[b] |
| DC | 2.20 | 2.32 | -5% | 0.12 | 0.12 | -3% | 13.99 | 10.14 | 11.16 | 25% |
| DE | 3.44 | 2.95 | 17% | 0.28 | 0.26 | 8% | 50.92 | 57.82 | 63.61 | -20% |
| MD | 39.09 | 39.09 | 0% | 2.72 | 2.72 | 0% | 1,222.49 | 1,116.16 | 1,227.78 | 0% |
| NY | 9.48 | 8.23 | 15% | 0.60 | 0.52 | 14% | 269.07 | 292.96 | 322.26 | -17% |
| PA | 76.66 | 76.77 | 0% | 3.03 | 2.74 | 11% | 2,117.24 | 1,902.51 | 2,092.76 | 1% |
| VA | 56.58 | 53.40 | 6% | 5.79 | 5.41 | 7% | 2,374.61 | 2,446.14 | 2,690.75 | -12% |
| WV | 5.51 | 4.68 | 18% | 0.70 | 0.75 | -6% | 366.67 | 240.68 | 264.75 | 38% |

a. Target numbers are based on proposed amended WQS.
b. Calculated on the basis of the high end of the range
c. Any discrepancy is from rounding figures.

**Table 8-4. Comparison of the nitrogen, phosphorus, and sediment basinwide allocations in the jurisdictions' draft Phase I WIPs with the basinwide target nutrient (in millions of pounds per year [mpy]) and sediment allocations (mpy) for 2025**

| Major river basin | Juris. | TN (mpy) | | | TP (mpy) | | | TSS (mpy) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | WIP | Target[a] | % off target | WIP | Target | % off target | WIP | Target | % off target[b] |
| Potomac | DC | 2.20 | 2.32 | -5% | 0.12 | 0.12 | -3%[c] | 13.99 | 11.16 | 25% |
| Eastern Shore | DE | 3.44 | 2.95 | 17% | 0.28 | 0.26 | 8% | 50.92 | 63.61 | -20% |
| Eastern Shore | MD | 10.26 | 9.71 | 6% | 1.02 | 1.09 | -7% | 169.70 | 182.47 | -7% |
| Patuxent | MD | 2.81 | 2.85 | -1% | 0.24 | 0.21 | 13% | 106.69 | 90.12 | 18% |
| Potomac | MD | 15.67 | 15.70 | 0% | 0.90 | 0.90 | 0% | 682.33 | 718.97 | -5% |
| Susquehanna | MD | 1.18 | 1.08 | 10% | 0.05 | 0.05 | 1% | 62.94 | 65.83 | -4% |
| Western Shore | MD | 9.16 | 9.74 | -6% | 0.51 | 0.46 | 10% | 200.83 | 170.38 | 18% |
| Susquehanna | NY | 9.48 | 8.23 | 15% | 0.60 | 0.52 | 14% | 269.07 | 322.26 | -17% |
| Eastern Shore | PA | 0.27 | 0.28 | -3% | 0.01 | 0.01 | -48% | 23.62 | 23.25 | 2% |
| Potomac | PA | 4.51 | 4.72 | -4% | 0.39 | 0.42 | -8% | 254.71 | 243.22 | 5% |
| Susquehanna | PA | 71.86 | 71.74 | 0% | 2.63 | 2.31 | 14% | 1,838.50 | 1,825.88 | 1% |
| Western Shore | PA | 0.02 | 0.02 | 0% | 0.00 | 0.00 | 0% | 0.41 | 0.41 | 0% |
| Eastern Shore | VA | 1.29 | 1.21 | 7% | 0.14 | 0.16 | -14% | 10.54 | 12.00 | -12% |
| James | VA | 27.20 | 23.48 | 16% | 2.85 | 2.34 | 22% | 840.93 | 920.23 | -9% |
| Potomac | VA | 17.09 | 17.46 | -2% | 1.31 | 1.47 | -11% | 741.21 | 891.08 | -17% |
| Rappahannock | VA | 5.88 | 5.84 | 1% | 0.91 | 0.90 | 2% | 683.58 | 749.64 | -9% |
| York | VA | 5.13 | 5.41 | -5% | 0.57 | 0.54 | 6% | 98.33 | 117.80 | -17% |
| James | WV | 0.02 | 0.02 | 19% | 0.01 | 0.01 | 38% | 28.00 | 16.65 | 68% |
| Potomac | WV | 5.48 | 4.67 | 18% | 0.69 | 0.74 | -7% | 338.68 | 248.11 | 37% |
| TOTAL | | 192.97 | 187.45 | | 13.23 | 12.52 | | 6,415 | 6,673 | |

a. Target numbers are based on proposed amended WQS.
b. Calculated on the basis of the high end of the range
c. Any discrepancy is from rounding figures.

## 8.2.2    Insufficient Reasonable Assurance

Because of significant deficiencies in plans presented to resolve gaps in authority, staff, funding and accountability systems, and on the basis of the criteria discussed below and EPA's best professional judgment, EPA determined that none of the seven watershed jurisdictions' draft Phase I WIPs provided adequate reasonable assurance that programs would be implemented to achieve reduction targets, including where significant reductions are projected in the regulated source sectors. The top reasons for insufficient reasonable assurance are the following:

- No strategy for filling recognized staff, funding, legislative, or regulatory gaps.

- Very few enforceable or otherwise binding commitments to achieve reductions from agricultural and stormwater pollutant source sectors. Specific examples include

    - No changes to state technical standards

    - No specific and enforceable commitments to building into MS4 permits and stormwater programs

    - No mention of requiring retrofits despite committing to reduce stormwater loads

- Discrepancies between programs and strategies described in the draft Phase I WIP and the specific level of practices committed to in the detailed WIP input deck (used for running the WIP practices through Scenario Builder and the Chesapeake Bay Watershed Model to determine the resultant nutrient and sediment loads delivered to the Bay).

- Heavy reliance on trading to finance reductions and offset growth, but no commitment to adopt critical trading components such as clear baselines, liability, enforceability, tracking, and regulatory drivers.

- No dates for key actions and program-building milestones.

### 8.2.3    Summary of Results of EPA Evaluation of Draft Phase I WIPs

The results of EPA's evaluation of the jurisdictions' draft Phase I WIPs can be summarized as follows:

**Delaware:**
- Target Allocations: Tier 4—nitrogen 17 percent over target; phosphorus 8 percent over target; sediment 20 percent under target
- Reasonable Assurance: Tier 3—Met Some Expectations

**District of Columbia**
- Target Allocations: Tier 2—nitrogen 5 percent under target; phosphorus 3 percent under target; sediment 25 percent over target
- Reasonable Assurance: Tier 2—Met Most Expectations

**Maryland**
- Target Allocations: Tier 2—nitrogen and phosphorus 0 percent under target statewide, though over and under in particular major river basins; sediment 0 percent under target
- Reasonable Assurance: Tier 2—Met Most Expectations

**New York**
- Target Allocations: Tier 4—nitrogen 15 percent over target; phosphorus 14 percent over target; sediment 17 percent under target
- Reasonable Assurance: Tier 3—Met Some Expectations

**Pennsylvania**
- Target Allocations: Tier 3—after adjusting for Bay Watershed Model and draft Phase I WIP discrepancies in the onsite wastewater treatment systems and forest lands source sectors—nitrogen 40 percent under target; phosphorus 11 percent over target; sediment 1 percent over target
- Reasonable Assurance: Tier 3—Met Some Expectations

**Virginia**
- Target Allocations: Tier 3—nitrogen 6 percent over target; phosphorus 7 percent over target; sediment 12 percent under target
- Reasonable Assurance: Tier 3—Met Some Expectations

**West Virginia**

- Target Allocations: Tier 4—nitrogen 18 percent over target; phosphorus 6 percent under target; sediment 38 percent over target

- Reasonable Assurance: Tier 3—Met Some Expectations

Table 8-5 shows the results of EPA's evaluation of both key aspects of the jurisdictions' draft Phase I WIPs in table format.

**Table 8-5. Draft Phase I WIP evaluation ratings by jurisdiction by the three major pollutant loading source sectors**

| Jurisdiction | | Reasonable assurance for gap-filling strategies | | | | 2025 WIP allocation numbers |
| --- | --- | --- | --- | --- | --- | --- |
| | | Tier 1: Met all expectations | Tier 2: Met most expectations | Tier 3: Met some expectations | Tier 4: Met few expectations | |
| DC | SW | | Tier 2 | | | Tier 2 |
| | WW | | Tier 2 | | | |
| | Overall | | Tier 2 | | | |
| DE | Ag | | | Tier 3 | | Tier 4 |
| | SW | | | Tier 3 | | |
| | WW | | Tier 2 | | | |
| | Overall | | | Tier 3 | | |
| MD | Ag | | Tier 2 | | | Tier 2 |
| | SW | | Tier 2 | | | |
| | WW | | Tier 2 | | | |
| | Overall | | Tier 2 | | | |
| NY | Ag | | | Tier 3 | | Tier 4 |
| | SW | | | Tier 3 | | |
| | WW | | | Tier 3 | | |
| | Overall | | | Tier 3 | | |
| PA | Ag | | | Tier 3 | | Tier 4 |
| | SW | | | | Tier 4 | |
| | WW | | | Tier 3 | | |
| | Overall | | | Tier 3 | | |
| VA | Ag | | | Tier 3 | | Tier 3 |
| | SW | | | Tier 3 | | |
| | WW | | Tier 2 | | | |
| | Overall | | | Tier 3 | | |
| WV | Ag | | | Tier 3 | | Tier 4 |
| | SW | | Tier 2 | | | |
| | WW | | | Tier 3 | | |
| | Overall | | | Tier 3 | | |

## 8.3   Draft Backstop Allocations

EPA established backstop allocations in which EPA determines that the draft Phase I WIP did not achieve the jurisdiction basin target allocation or where the draft Phase I WIP did not provide adequate reasonable assurance that the LA reductions can be achieved by the nonpoint sources.

Backstop allocations are established to fill a loading shortfall in the jurisdiction's draft Phase I WIP or to increase the level of reasonable assurance that the overall TMDL pollutant cap will be achieved.

## 8.3.1    Methodology for Backstop Allocations

Where EPA determined that a jurisdiction did not meet its target allocations or did not provide adequate reasonable assurance, EPA calculated that jurisdiction's draft backstop allocations by relying on the adequate portion(s) of the jurisdiction's draft Phase I WIP, where possible, and supplementing any remaining shortfall or insufficient amount of reasonable assurance with its allocation adjustments and determinations of reasonable assurance to achieve the necessary reductions.

EPA determined each jurisdiction's backstop allocation for sediment on the basis of whether and to what extent the jurisdiction met the target allocation range for sediment provided on August 13, 2010. EPA ran the BMPs assumed within the backstop allocations through Scenario Builder and the Chesapeake Bay Program Watershed Model. EPA then compared the sediment outputs from that scenario run to the target allocation range for sediment that it communicated to the jurisdictions on August 13, 2010. Where a jurisdiction more than met the target allocation (i.e., came in under the low end of the target range), EPA assigned that jurisdiction the low end of the target allocation range. Where a jurisdiction did not meet its target allocation (i.e., came in above the high end of the target range), EPA assigned that jurisdiction the high end of the target allocation range. Where a jurisdiction met its target allocation (i.e., fell within the low and high ends of the target range), EPA assigned that jurisdiction the amount that resulted from its draft Phase I WIP.

Although a number of backstop options existed, EPA primarily relied on decreasing the WLAs to the point sources. EPA did that because point sources are the pollutant discharging source sector for which the CWA gives EPA the clearest authority to ensure implementation of needed controls. Because EPA has determined that the jurisdictions' draft Phase I WIPs do not achieve the target allocations or do not provide adequate reasonable assurance, EPA is establishing draft backstop allocations that reduce the point source loadings as necessary to compensate for the deficiencies EPA identified in the reasonable assurance components of the jurisdictions' draft Phase I WIPs addressing nonpoint source reductions.

Another aspect of the backstop allocations that EPA established for the nontidal jurisdictions of Pennsylvania, New York, and West Virginia is to make finer-scale allocations than those included in the draft Phase I WIPs provided by the nontidal jurisdictions. EPA stated in its November 4 and December 29, 2009, letters to the jurisdictions that it would do so by establishing draft individual and aggregate, rather than gross, WLAs and LAs for the nontidal jurisdictions if their draft Phase I WIPs did not provide adequate reasonable assurance. That finer-scale allocation sets individual WLAs for the significant municipal and industrial wastewater discharging facilities and sector-specific aggregate WLAs for stormwater, CAFOs, and nonsignificant municipal and industrial wastewater discharging facilities. EPA is establishing the finer-scale draft allocations to provide permit writers with enough information to issue and renew NPDES permits consistent with the Chesapeake Bay TMDL WLAs. Those

allocations are at the same scale as those made to the tidal jurisdictions of Delaware, Maryland, Virginia, and the District of Columbia.

In part on the basis of the assumptions described in Section 8.3.2 below, EPA developed four levels of backstop allocations (Table 8-6). The allocations are based on assumed future EPA actions regarding regulated point source discharges over which EPA has current CWA legal authority (e.g., permitting and enforcement) certain assumptions regarding certain unregulated stormwater and animal feeding operations, and additional appropriate adjustments to nonpoint source loads necessary to meet the jurisdictions' target nitrogen, phosphorus, and sediment allocations. In some cases, the backstop allocations increase the LAs for nonpoint source sectors for which the jurisdictions provided insufficient demonstrations of reasonable assurance.

For purposes of making allocations to stormwater and AFO/CAFO sources not regulated by the NDPES permit program but that could become NPDES regulated facilities (either through residual designation authority or other mechanisms), EPA has included those categories of sources in the draft WLA portion of the TMDL consistent with EPA guidance, *Establishing Total Maximum Daily Loads (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs*, dated November 22, 2002 (EPA 11/22/2002). EPA has authority to designate such nonregulated stormwater sources as regulated by NPDES authorities. See section 402(p)(2)(E) and (6) and 40 CFR 122.26(a)(9)(i)(C)(D). EPA also has authority to designate AFOs as CAFOs as set forth in 40 CFR 122.23(c).

For stormwater, EPA has decided to include in its draft WLA allocation the unregulated stormwater point sources along with NPDES regulated sources. For point sources already covered by NPDES permits, reasonable assurance is provided through EPA's authority to issue or oversee NPDES permitting that adequately assures implementation of the additional water-quality-based controls on those sources necessary to achieve the levels of pollutant reduction specified in Table 8-6. For those sources not currently regulated by NPDES permits, EPA establishes this backstop allocation on the basis of two assumptions: (1) currently unregulated sources will become regulated under the NPDES permit program through appropriate designation/rulemaking/ permits; and (2) the aggregate projected load reductions (based on NPDES effluent controls consistent with the WLA) will result in those needed reductions. Additional controls for currently unregulated sources could be imposed only after the source is *designated* and after a final NPDES permit is issued to cover the source with the added controls. The inclusion of currently unregulated sources in the WLA by itself does not constitute a designation or regulatory action to include such sources in the NPDES program. The TMDL is a plan, not a regulatory determination to change a source's legal status. As with any NPDES permitting or rulemaking decision, applying new controls or designations must be consistent with applicable procedural and substantive requirements.

For the Bay TMDL, EPA believes that the assumptions underlying its backstop allocations are reasonable according to EPA's existing authority under the CWA and EPA's commitment to ensure and track implementation of actions necessary to restore the Bay by 2025 consistent with Executive Order 13508 (FLCCB 2010). EPA has described in the Federal Strategy and elsewhere, including in its May 2010 settlement agreement resolving the Chesapeake Bay Foundation's lawsuit, its plans for rulemaking addressing nutrient and sediment pollution in the

Bay from both the stormwater and CAFO sectors and for tracking and ensuring progress in meeting the TMDL's nutrient and sediment targets.

The same rationale described above also applies to making backstop allocations to the AFO/CAFO sector. For those CAFO facilities already under NPDES permit coverage, EPA has broad authority to ensure that the necessary controls are included to implement the Bay TMDL. As with stormwater point sources, in its backstop allocations EPA has included currently unregulated AFOs in the WLA portion of the TMDL. For such sources, EPA's draft backstop allocation is based on two assumptions: (1) currently unregulated sources will become regulated under the NPDES permit program some day through appropriate designation/rulemaking/permits; and (2) the projected sector wasteload reductions (based on NPDES effluent controls consistent with the WLA) will result in those needed reductions. Additional controls would be imposed only after the source is *designated* and after it is given a permit with the added controls. The inclusion of currently unregulated sources in the WLA by itself does not constitute a designation or regulatory action to include such sources in the NPDES program. The TMDL is a plan, not a regulatory determination to change a source's legal status. As with any NPDES permitting or rulemaking decision, applying new controls or designations must be consistent with applicable procedural and substantive requirements.

**Table 8-6. Definitions of the backstop allocation options that EPA considered to replace jurisdictions' WIP point source allocations**

| Option | Source category | | |
|--------|------|------------|------|
| Backstop | WWTP | Stormwater | AFO Production Area |
| None | As proposed in jurisdiction's draft Phase I WIP | | |
| Minor | No changes to point source WLAs that would change assumed NPDES permit conditions. Adjustments to allocations, primarily nonpoint source LAs, to meet July 1 and August 13 nutrient and sediment allocations. | | |
| Moderate - Similar to most aggressive jurisdiction's WIP proposal for a sector | Effluent concentrations of 4 mg/L TN, 0.3 mg/L TP at design flow. | Construction: 100% Erosion & Sediment Control MS4: 50% of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50% of unregulated land treated as regulated, so that 25% of unregulated land meets aggressive performance standard; designation as necessary. | Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to currently unregulated AFOs not subject to CAFO permits EXCEPT no feed management on dairies; designation as necessary. |
| High | Limit of Technology concentrations of 3 mg/L N and 0.1 mg/L P at design flow. | Same as Moderate. | Same as Moderate. |
| Full | Limit of Technology concentrations of 3 mg/L N and 0.1 mg/L P at current flow. | Same as Moderate. | Same as Moderate. |

### 8.3.2        Assumptions Supporting the Draft Bay TMDL Backstop Allocations

EPA has established draft WLAs for point sources and draft LAs for nonpoint sources based in part upon the assumption that certain nutrient and sediment controls are implemented on a certain percentage of available land. Over time, implementing nutrient and sediment controls could involve a combination of (a) different practices; (b) implementation in different locations; or (c) implementation at different implementation rates so long as an equivalent or greater nutrient and sediment reduction occurs within the portion of the watershed draining to a particular tidal segment of the Chesapeake Bay.

This section summarizes the assumptions that are incorporated into the Chesapeake Bay TMDL allocations, and the allocations proposed by the seven watershed jurisdictions in their draft Phase I WIPs and the full backstop allocations that EPA might apply in the final Chesapeake Bay TMDL. EPA regulations require that NPDES permits be consistent with requirements and assumptions of WLAs. 40 CFR 122.44(d)(1)(vii)(B). The jurisdictions' draft Phase I WIPs and EPA's full backstop allocations *bookend* EPA proposed draft backstop allocations featured in the Bay TMDL.

#### Nonpoint Sources

The draft Phase I WIPs provided the starting point for EPA's consideration and development of allocation scenarios. EPA assumed for purposes of the evaluation that jurisdictions will implement the practices that will result in the same or greater nutrient and sediment controls as provided in their draft Phase I WIP scenario input decks and as evaluated by the Bay model outputs. EPA also evaluated whether the controls provided an adequate demonstration of reasonable assurance that the load reductions would be achieved. As necessary, such as where necessary to satisfy the requirements of reasonable assurance, EPA has adjusted the nonpoint source allocations to ensure attainment of the nitrogen, phosphorus, and sediment allocations within the 19 basin-jurisdictions in the Chesapeake Bay watershed. EPA will assess jurisdictions' progress toward meeting those LAs through the final Phase I WIPs, the Phase II and Phase III WIPs, and the 2-year milestones. EPA also will consider whether to take appropriate federal backstop actions, as detailed in its letter of December 29, 2009, to the Chesapeake Bay watershed jurisdictions, to ensure that adequate progress is made toward achieving and maintaining the nonpoint source load reductions.

#### Point Sources—Minor Backstop Allocations (Maryland, District of Columbia)

EPA is establishing minor backstop allocations for certain Maryland point sources in the wastewater, stormwater, and CAFO sectors, and it established minor backstop allocations for the District of Columbia in the wastewater and urban stormwater sectors. This means that EPA is making smaller WLAs to those sectors and will require some adjustment to NPDES permit effluent controls.

##### Maryland

Maryland's draft Phase I WIP had only minor deficiencies for demonstrating reasonable assurance that it could meet its nutrient and sediment allocations. Therefore, EPA determined that point source allocations in Maryland's draft Phase I WIP were adequate and appropriate as

described below. EPA's backstop allocation for Maryland follows the draft Phase I WIP allocation scheme for point sources.

### Wastewater

Maryland's WLAs for WWTPs are based on

- Significant Municipal WWTPs: implementation of Enhanced Nutrient Removal standards that treat wastewater to 4 mg/L TN and 0.3 mg/L TP

- Significant Industrial WWTPs: continued retrofits and optimization to meet Maryland's Tributary Load cap for such facilities

- Nonsignificant Municipal WWTPs: implementation of Maryland's Tributary Strategy nutrient reduction goals

- Nonsignificant Industrial WWTPs: reduce nutrient loads by 26 percent by 2017

### Stormwater

Maryland's draft Phase I WIP provides that 50 percent of the state's urban acres developed before 1985 in Phase I MS4 jurisdictions will be redeveloped or retrofit by 2020 to a 25 percent stormwater efficiency. Forty percent of the state's urban acres developed before 1985 in Phase II MS4 jurisdictions and smaller, non-MS4 areas will be redeveloped or retrofit by 2020 to a 25 percent stormwater efficiency. If those retrofit and redevelopment requirements are not sufficient to have practices in place by 2020 to meet Maryland's stormwater WLAs, EPA assumes that Maryland will increase these retrofit and redevelopment requirements accordingly.

### CAFOs

Maryland's draft Phase I WIP provides that permitted CAFOs will fully implement comprehensive nutrient management plans that include both nutrient management and soil and water conservation plans. Maryland's draft Phase I WIP also indicates that state and federal cost-share dollars will be used to implement heavy-use poultry area concrete pads, livestock and poultry waste structures, manure transport, runoff control systems, phytase additions to diet to manage nutrient levels in manure, and mortality composters at rates specified in the draft Phase I WIP. If cost-share programs do not achieve those implementation rates, EPA assumes that Maryland will revise its technical standards and CAFO comprehensive nutrient management plan requirements to require those controls. Depending on EPA's review of Maryland's CAFO technical standards that is underway, EPA may require additional changes to the standards to ensure that they are protective of water quality in the tidal waters of Chesapeake Bay and its tributaries and nontidal local waters.

### District of Columbia

Almost all sources of nutrients and sediment in the District of Columbia are covered by NPDES permits issued by EPA. Because the jurisdiction's draft Phase I WIP does not meet the District of Columbia's target sediment allocation, EPA is making a smaller sediment allocation that will ensure protection of WQS. EPA's NPDES permit authority and the requirement that NPDES effluent limits be consistent with the WLAs provide reasonable assurance that the smaller allocations will be met. The following section describes the nutrient and sediment controls that

are assumed within the District of Columbia's WLAs. Compliance with effective NPDES permit effluent limits is assumed.

### Wastewater

WLAs for wastewater in the District of Columbia are based on the assumption that limits in NPDES permits issued by EPA for Blue Plains WWTP and nonsignificant industrial wastewater dischargers are consistent with the WLAs in the TMDL and that DC WASA's Long Term Control Plan for the CSS in the District of Columbia is fully implemented.

### Urban Stormwater

WLAs for urban stormwater are based on the assumption that limits, controls and conditions in NPDES permits for municipal stormwater (the DC MS4 permit), industrial stormwater, and construction activities are consistent with the TMDL WLA and are implemented.

### Point Sources—Moderate Backstop Allocations (Virginia)

### Wastewater

The WLAs for WWTPs receiving a moderate backstop allocation are based on the assumption that significant municipal WWTPs discharge loads equal to [(design flow) × (concentration)], where concentration is the lesser of Tributary Strategy concentrations, or 4 mg/L TN and 0.3 mg/L TP. The maximum allowable concentration of 4 mg/L TN and 0.3 mg/L TP is equal to the most aggressive statewide WWTP commitment included in any of the jurisdictions' draft Phase I WIPs. The WLAs for industrial WWTPs and nonsignificant WWTPs are assumed at the same level as the Virginia draft Phase I WIP allocations. Facilities may achieve these WLAs through appropriate upgrades or by purchasing credits from an offset or trading program established and operated consistent with the CWA, the Bay TMDL, and EPA guidance.

### Urban Stormwater

In the urban lands covered by MS4 permits, the TMDL WLAs for jurisdictions receiving a moderate backstop (Virginia) make an assumption that the MS4 permit has controls sufficient to implement a performance standard equal to the nutrient and sediment reductions that would result from the following practices:

- Regions with karst topography (low permeability); Coastal Plain Lowlands (groundwater).
  - 50 percent of area—impervious cover reduction, e.g., cisterns and collections systems to capture rainwater for reuse
  - 30 percent of area—filtering practices *e.g., sand filters, bioretention, dry wells,* designed to reduce nitrogen by 40 percent, phosphorus by 60 percent, and sediment by 80 percent from a pre-BMP condition.
  - 20 percent of area—infiltration practices e.g., infiltration trenches and basins, designed to reduce nitrogen by 85 percent, phosphorus by 85 percent, and sediment by 95 percent from a pre-BMP condition.
- Ultra-urban regions—defined as high- and medium-intensity land cover
  - 50 percent of area—impervious cover reductions, e.g., cisterns and collections systems to capture rainwater for reuse.
  - 30 percent of area—filtering practices, e.g., sand filters, bioretention, dry wells, *designed to reduce nitrogen by 40 percent, phosphorus by 60 percent, and sediment by 80 percent from a pre-BMP condition*.

- o  20 percent of area—infiltration practices, e.g., infiltration trenches and basins, *designed to reduce nitrogen by 85 percent, phosphorus by 85 percent, and sediment by 95 percent from a pre-BMP condition.*
- Other urban/suburban regions
  - o  10 percent of area—impervious cover reduction.
  - o  30 percent of area—filtering practices, e.g., sand filters, bioretention, *designed to reduce nitrogen by 40 percent, phosphorus by 60 percent, and sediment by 80 percent from a pre-BMP condition*.
  - o  60 percent of area—infiltration practices *designed to reduce nitrogen by 85 percent, phosphorus by 85 percent, and sediment by 95 percent from a pre-BMP condition*.

EPA assumes that the applicable MS4 performance standard applies to 50 percent of urban lands through a combination of retrofit and redevelopment requirements. Jurisdictions may meet the WLA assumptions by: (a) applying a different set of practices that would result in equivalent nutrient and sediment reductions, (b) applying a more aggressive performance standard on a smaller percentage of urban lands included within the WLA, or (c) apply a less aggressive performance standard on a larger percentage of urban lands as long as the total nutrient and sediment reduction from the urban lands assumed to be within the WLA are equal to or greater than the reductions that are assumed within the WLA compared to a pre-BMP condition.

The stormwater WLA also assumes that 50 percent of urban lands that are not covered by MS4 permits are treated like MS4 areas, meaning that 25 percent of unregulated stormwater (i.e., 50 percent of 50 percent) is assumed to meet the performance standard for nutrient and sediment reductions described above. Before imposing such controls, it is assumed that (1) unregulated sources will someday be regulated under the NPDES permit program through appropriate designation/rulemaking/permits; and (2) the categories' projected load reductions (based on NPDES effluent controls consistent with the WLA) will result in those needed reductions. As explained above in Section 8.3.1, additional controls would be imposed only after the source is *designated* or otherwise regulated by an NPDES permit, and after an effective NPDES permit coverage is established.

Finally, the stormwater WLA assumes that all areas subject to a construction general NPDES permit will implement erosion and sediment control practices that would result in a 25 percent reduction in nitrogen, a 40 percent reduction in phosphorus and sediment compared to a pre-BMP condition on bare, construction land.

If a jurisdiction's draft Phase I WIP identifies that urban nutrient management or street sweeping will be implemented on urban lands, EPA assumes that these practices will also be applied to urban lands that contribute stormwater loads to the TMDL WLA, and these practices will be incorporated into MS4 permits, stormwater management plans, and ordinances as appropriate.

<u>CAFOs</u>

The CAFO WLA assumes that all AFO production areas are regulated with an NPDES permit with controls sufficient for a full *treatment train* of waste management, barnyard runoff control, and mortality composting. These practices are assumed to result in approximately 80 percent decrease in nutrient loads from production areas compared to a pre-BMP condition. Further, the

CAFO permitted facilities are assumed to have a control that all animals subject to CAFO permit conditions must receive feed management. EPA also assumes that all animals except dairies (e.g., poultry and swine) on AFOs that are not subject to CAFO permit conditions are assumed to receive feed management. Poultry phytase is assumed to result in a 32 percent reduction in phosphorus content in manure compared to a pre-feed management condition; swine phytase is assumed to result in a 17 percent reduction in phosphorus content in manure compared to a pre-feed management condition. Dairy feed management is assumed to result in a 24 percent reduction in nitrogen content and a 28 percent reduction in phosphorus content in manure compared to a pre-feed management condition.

Jurisdictions may meet the WLA assumptions by: (a) applying a different set of practices that would result in equivalent nutrient and sediment reductions, or (b) applying a more aggressive performance standard on a smaller percentage of AFO production areas as long as the total nutrient and sediment reduction from AFO production areas assumed to be within the WLA are equal to or greater than the reductions that are assumed within the WLA compared to a pre-BMP condition.

### Point Sources—High Level Backstop Allocations (Delaware, New York, Pennsylvania, West Virginia)

<u>Wastewater</u>

EPA's backstop WLAs for WWTPs receiving a high level backstop allocation are based on the assumptions that significant municipal WWTPs loads are equal to [(design flow) × (concentration)], where concentration is the current limit of technology, or 3 mg/L TN and 0.1 mg/L TP; and nonsignificant municipal WWTPs discharge loads equal to existing flows (design or current flows if design flow are not available) with TN at 8 mg/L and TP at 2 mg/L. The WLAs for industrial WWTPs make the assumption that the loads are reduced below the loads identified in the jurisdiction's draft Phase I WIP at a rate equivalent to significant municipal WWTPs going from the WIP loading level to an E3 loading level (down to 3 mg/L TN and 0.1 mg/L TP). The WLAs for nonsignificant industrial WWTPs make the assumption that the loads are reduced below those identified in the jurisdiction's draft Phase I WIP at a rate equivalent to taking the significant municipal facilities from a No Action loading level to an E3 loading level—reducing TN from 18 to 3 mg/L and TP from 3 to 0.1 mg/L. NPDES permits for those types of facilities should be consistent with these assumptions. Facilities may achieve these WLAs through appropriate upgrades or by purchasing offsets from an offset or trading program established and operated consistent with the CWA, the Bay TMDL, and EPA guidance.

<u>Urban Stormwater</u>

The same assumptions as those described above for *moderate backstop* allocations for stormwater apply to a *high level backstop* WLAs for urban stormwater and the associated MS4 permits.

<u>CAFOs</u>

The same assumptions as those described above for *moderate backstop* allocations for CAFO and AFO production areas are equally applicable to NPDES permits subject to a *high level backstop* WLA for CAFOs.

**Full Backstop Allocations**

Although no jurisdiction received a full backstop allocation in the draft Chesapeake Bay TMDL, EPA is reserving the option to apply the full backstop allocations as described below in any of the seven watershed jurisdictions if EPA determines that a jurisdiction's final Phase I WIP is weaker than its draft Phase I WIP and requires additional backstop actions to ensure that point and nonpoint source reductions sufficient to meet WLAs and LAs are achieved and maintained. Some, but not necessarily all, of EPA's potential full backstop actions are described below.

<u>Wastewater</u>

The WLAs for WWTPs under a full backstop allocation might assume that the loading for a significant municipal WWTPs is set equal to [(current flow) × (concentration)], where concentration is the limit of technology, or 3 mg/L TN and 0.1 mg/L TP. The assumption would be that current flow is calculated as the average current flow from 2007 to 2009. For facilities having no current flow data, the WLA would assume that the flows identified in the draft Phase I WIP flows would be adjusted by the average current flow adjustment rates by jurisdiction, which are calculated on the basis of facilities with current flows by jurisdiction and their total current flows/total WIP flows.

The WLAs for nonsignificant WWTPs could be set equal to current or adjusted flows with TN at 8 mg/L and TP at 2 mg/L. The WLAs for industrial WWTPs could be calculated at a level where the reduction rates for significant industrial WWTPs by jurisdiction are equivalent to the significant municipal WWTP reduction from WIP to E3 (3 mg/L TN and 0.1 mg/L TP) and the reduction rates for nonsignificant industrial plants are equivalent to municipal reduction from No Action to E3 (TN from 18 to 3 mg/L and TP from 3 to 0.1 mg/L). The WLAs also could assume that the calculated industrial loads would then be adjusted by their current flows over WIP flows to get the full backstop allocations for industrial WWTPs. Facilities may achieve these WLAs through appropriate upgrades or by purchasing offsets from an offset or trading program established and operated consistent with the CWA, the Bay TMDL, and EPA guidance.

<u>Stormwater</u>

The same assumptions as those described above for *moderate backstop* allocations for stormwater would apply to a *full backstop* allocations for urban stormwater.

<u>CAFOs</u>

The same assumptions as those described above for *moderate backstop* allocations for CAFO and AFO production areas would apply to a *full backstop* allocation scenario for CAFOs.

### 8.3.3    Summary of Backstop Allocations

On the basis of EPA's evaluations of the three major pollution source sectors combined with the nitrogen, phosphorus, and sediment allocation gaps illustrated in Tables 8-3 and 8-4, EPA assigned a draft backstop allocation according to the assumptions detailed above for each of the seven watershed jurisdictions (Table 8-7).

The draft Phase I WIP submissions contained enough of the expected information that no jurisdiction received a full backstop allocation; however, EPA reserves its authority to apply full backstop allocations if EPA determines that a jurisdiction's final Phase I WIP is weaker than its

draft Phase I WIP or otherwise fails to meet expectations. By contrast, if EPA determines that the jurisdictions' final Phase I WIPs meet all target allocations and demonstrate adequate reasonable assurance, EPA may decide to reduce or eliminate backstop allocations.

In its December 29, 2009, letter to the jurisdictions, EPA outlined additional possible federal actions it could take (USEPA 2009d) (see Section 7.2.4). In correspondence directed individually to each jurisdiction providing detailed feedback on the evaluation of the draft Phase I WIPs, EPA will communicate its intent to pursue additional federal actions if EPA determines that the respective jurisdiction's final Phase I WIP, Phase II WIP, and 2-year milestones do not provide sufficient reasonable assurance that implementation will occur as described their plans.

**Table 8-7. Summary of backstop allocations applied to the seven watershed jurisdictions in developing the draft Bay TMDL WLAs and LAs**

| Jurisidiction | Minor | Moderate | High | Full |
|---|---|---|---|---|
| Delaware | | | ■ | |
| District of Columbia | ■ | | | |
| Maryland | ■ | | | |
| New York | | | ■ | |
| Pennsylvania | | | ■ | |
| Virginia | | ■ | | |
| West Virginia | | | ■ | |

**Delaware:**
- Nitrogen: 2.95 mpy; phosphorus 0.26 mpy; sediment 57.82 mpy.
- It is not possible to meet Delaware's nitrogen allocation by implementing the most aggressive point source controls. Therefore, EPA assumed additional nonpoint source reductions from the agriculture sector and will ensure that the reductions are achieved through additional federal backstop actions, as described in EPA's letter of December 29, 2009, as necessary.
- High-level backstop allocations for Delaware point sources.

**District of Columbia**
- Nitrogen: 2.32 mpy; phosphorus 0.12 mpy; sediment 11.16 mpy.
- Minor backstop allocation to meet sediment allocation. EPA can ensure that all allocations, including sediment, are met through the NPDES permits issued in the District.

**Maryland**
- Nitrogen: 39.09 mpy; phosphorus 2.72 mpy; sediment 1,175.47 mpy.
- Minor backstop allocations to meet and nitrogen, phosphorus, and sediment allocations in each of Maryland's five major river basins.

**New York**
- Nitrogen: 8.23 mpy; phosphorus 0.52 mpy; sediment 292.96 mpy.
- High level backstop allocations for New York point sources.

- It is not possible to meet New York's nitrogen allocation by implementing the most aggressive point source controls. Therefore, EPA assumed additional nonpoint source reductions from the agriculture sector and will ensure that the reductions are achieved through additional federal backstop actions, as described in EPA's letter of December 29, 2009, as necessary.

- Finer-scale WLAs and LAs (same level of detail as the tidal jurisdictions) to help ensure that NPDES permits will be consistent with Chesapeake Bay TMDL WLAs.

**Pennsylvania**
- Nitrogen: 76.77 mpy; phosphorus 2.74 mpy; sediment 2,013.62 mpy.

- High-level backstop allocations for Pennsylvania point sources.

- Finer-scale WLAs and LAs (same level of detail as tidal jurisdictions) to help ensure that NPDES permits will be consistent with Chesapeake Bay TMDL WLAs. Excess loads from reducing WWTP allocations distributed back to forest, onsite wastewater treatment systems and agriculture source sectors.

**Virginia**
- Nitrogen: 53.40 mpy; phosphorus 5.41 mpy; sediment 2,469.35 mpy.

- Moderate backstop allocations for Virginia point sources. Excess loads from reducing WWTP allocations distributed back to urban stormwater, onsite wastewater treatment systems, and agriculture source sectors.

**West Virginia**
- Nitrogen: 4.68 mpy; phosphorus 0.75 mpy; sediment 264.76 mpy.

- High-level backstop allocations for West Virginia point sources.

- It is not possible to meet West Virginia's nitrogen and sediment allocations by implementing the most aggressive point source controls. Therefore, EPA assumed additional nonpoint source reductions from the agriculture sector and will ensure that those reductions are achieved through additional federal backstop actions, as described in EPA's letter of December 29, 2009, as necessary.

- Finer-scale WLAs and LAs (same level of detail as tidal jurisdictions) to help ensure that NPDES permits will be consistent with Chesapeake Bay TMDL WLAs.

The draft proposed backstop allocations for nitrogen, phosphorus, and sediment listed above, which are based on proposed amended WQS, also are presented in Table 8-8 at both the jurisdiction and major river basin scales for each of the jurisdictions. These draft allocations are further sub-allocated to the 92 Bay segment watersheds by draft individual and aggregate WLAs and LAs in Section 9.

**Table 8-8. Chesapeake Bay watershed nutrient and sediment draft backstop allocations by jurisdiction and by major river basin to achieve the proposed amended Chesapeake Bay WQS**

| Jurisdiction | Basin | Nitrogen draft allocations (million lbs/year) | Phosphorus draft allocations (million lbs/year) | Sediment draft allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 71.74 | 2.31 | 1,758.20 |
| | Potomac | 4.72 | 0.42 | 233.93 |
| | Eastern Shore | 0.28 | 0.01 | 21.12 |
| | Western Shore | 0.02 | 0.001 | 0.37 |
| | PA Total | 76.77 | 2.74 | 2,013.62 |
| Maryland | Susquehanna | 1.08 | 0.05 | 62.94 |
| | Eastern Shore | 9.71 | 1.09 | 169.70 |
| | Western Shore | 9.74 | 0.46 | 170.38 |
| | Patuxent | 2.85 | 0.21 | 90.12 |
| | Potomac | 15.70 | 0.90 | 682.33 |
| | MD Total | 39.09 | 2.72 | 1,175.47 |
| Virginia | Eastern Shore | 1.21 | 0.16 | 10.91 |
| | Potomac | 17.46 | 1.47 | 810.07 |
| | Rappahannock | 5.84 | 0.90 | 688.51 |
| | York | 5.41 | 0.54 | 107.09 |
| | James | 23.48 | 2.34 | 852.77 |
| | VA Total | 53.40 | 5.41 | 2,469.35 |
| District of Columbia | Potomac | 2.32 | 0.12 | 11.16 |
| | DC Total | 2.32 | 0.12 | 11.16 |
| New York | Susquehanna | 8.23 | 0.52 | 292.96 |
| | NY Total | 8.23 | 0.52 | 292.96 |
| Delaware | Eastern Shore | 2.95 | 0.26 | 57.82 |
| | DE Total | 2.95 | 0.26 | 57.82 |
| West Virginia | Potomac | 4.67 | 0.74 | 248.11 |
| | James | 0.02 | 0.01 | 16.65 |
| | WV Total | 4.68 | 0.75 | 264.76 |

Although the draft Phase I WIPs were evaluated based on proposed amended WQS, it is possible that the proposed amendments will not be completed before December 31, 2010 and that, as a result, the final TMDL allocations will need to be made based on current WQS. Table 8-9 lists the draft proposed allocations for nitrogen, phosphorus, and sediment based on current WQS at both the jurisdiction and major river basin scales. Just as with the allocations based on proposed amended WQS, these draft allocations are further sub-allocated to the 92 Bay segment watersheds by draft individual and aggregate WLAs and LAs in Section 9.

**Table 8-9. Chesapeake Bay watershed nutrient and sediment draft allocations by jurisdiction and by major river basin to achieve the current Chesapeake Bay water quality standards.**

| Jurisdiction | Basin | Nitrogen draft allocations (million lbs/year) | Phosphorus draft allocations (million lbs/year) | Sediment draft allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 56.89 | 1.76 | 1,756.80 |
| | Potomac | 3.50 | 0.33 | 233.93 |
| | Eastern Shore | 0.20 | 0.01 | 21.12 |
| | Western Shore | 0.01 | 0.001 | 0.17 |
| | PA Total | 60.59* | 2.10 | 2,012.03 |
| Maryland | Susquehanna | 0.87 | 0.04 | 63.72 |
| | Eastern Shore | 7.18 | 0.83 | 51.13 |
| | Western Shore | 5.99 | 0.25 | 81.81 |
| | Patuxent | 2.03 | 0.13 | 91.83 |
| | Potomac | 11.42 | 0.63 | 659.64 |
| | MD Total | 27.49 | 1.88 | 948.13 |
| Virginia | Eastern Shore | 0.79 | 0.12 | 10.86 |
| | Potomac | 13.31 | 0.98 | 802.13 |
| | Rappahannock | 4.39 | 0.60 | 688.29 |
| | York | 3.83 | 0.35 | 106.95 |
| | James | 16.44 | 1.55 | 848.89 |
| | VA Total | 38.77 | 3.60 | 2,457.13 |
| District of Columbia | Potomac | 1.47 | 0.05 | 11.37 |
| | DC Total | 1.47 | 0.05 | 11.37 |
| New York | Susquehanna | 6.39 | 0.43 | 289.02 |
| | NY Total | 6.39 | 0.43 | 289.02 |
| Delaware | Eastern Shore | 2.22 | 0.19 | 54.50 |
| | DE Total | 2.22 | 0.19 | 54.50 |
| West Virginia | Potomac | 3.61 | 0.37 | 263.22 |
| | James | 0.02 | 0.01 | 22.95 |
| | WV Total | 3.63 | 0.38 | 286.17 |

* Any discrepancies in totals are due to rounding.

# Draft CHESAPEAKE BAY TMDL
## Restoring the District's waterways and Chesapeake Bay

**Public Meeting**
**District of Columbia**
**September 29, 2010**

www.epa.gov/chesapeakebaytmdl

AR0029336



# Nitrogen Loads by Sector and Scenario—CBP Watershed Model P5.3

Draft allocation for atmospheric deposition is 15.7 million pounds, which will be achieved by federal air regulations through 2020.

www.epa.gov/chesapeakebaytmdl                                              23

AR0029358

-622-



# Setting the Diet

## Phosphorus Loads by Sector and Scenario—CBP Watershed Model P5.3

AR0029359



Model Simulated Sediment Loads by Scenario Compared with the Draft Sediment Allocations (billions of pounds per year as TSS)

AR0029360

## Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region

### Summary of Findings

The Chesapeake Bay is the largest estuary in the United States. The Bay is about 200 miles long, and the Bay and its tributaries cover about 4,500 square miles of open water. The Chesapeake Bay watershed covers about 68,500 square miles in parts of six states (Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia) and the District of Columbia (fig. 1).

Agricultural land makes up less than 30 percent of the area of the watershed (10 percent cultivated cropland, and 18 percent pasture and hayland,). Forest land covers about 59 percent and urban land about 8 percent of the watershed. The balance of the area is in wetlands or is open water. The focus of the CEAP Chesapeake Bay study is on the 10 percent of the watershed that is cultivated cropland.

**Figure 1.** The Chesapeake Bay watershed



AR0032818

**Review Draft—October 2010**

**Assessment of the Effects of Conservation Practices on
Cultivated Cropland in the Chesapeake Bay region**

**Executive Summary**

Good progress has been made on reducing sediment, nutrient, and pesticide losses from farm fields through conservation practice implementation in the Chesapeake Bay region, but a significant amount of conservation treatment remains to be done to reduce nonpoint agricultural sources of pollution.

- Use of soil erosion control practices is widespread, with most acres receiving some form of erosion control treatment. Nevertheless, about 26 percent of the cultivated cropland acres still have excessive sediment loss from fields and require additional erosion control practices.
- Complete and consistent use of nutrient management (proper rate, form, timing, *and* method of application) is generally lacking throughout the region. About 81 percent of the cultivated cropland acres require additional nutrient management to reduce the loss of nitrogen or phosphorus from fields.
- The most critical conservation concern in the region is loss of nitrogen through subsurface loss pathways, most of which eventually contribute to surface water loads. About 65 percent of cropped acres require additional nutrient management to address excessive levels of nitrogen loss in subsurface flow pathways, including surface and subsurface drainage systems. About 28 percent of cropped acres need treatment *only* for nitrogen loss in subsurface flows.
- About half of the cropped acres are critically under-treated, usually requiring treatment for multiple natural resource problems. These are the most vulnerable and/or under-treated acres with the highest losses in the region.
- Model simulations of additional conservation treatment show that nutrient loss from fields is within acceptable levels when soil erosion control practices are paired with management of rate, form, timing, and method of nutrient application that maximizes the availability of nutrients for crop growth while minimizing environmental losses.
- Treatment of erosion alone can exacerbate the nitrogen loss problem because reducing surface water increases infiltration and, therefore, movement of soluble nitrogen into subsurface flow pathways. A *suite* of practices that includes both soil erosion control and consistent nutrient management is required to simultaneously address soil erosion *and* nutrient loss.
- Conservation practices in the region have also been effective in reducing pesticide residues lost from fields as well as the associated environmental risk.

Cultivated cropland represents only about 10 percent of the land base in the Chesapeake Bay watershed. With the current level of conservation treatment, cultivated cropland delivers a disproportionate amount of sediment and nutrients to rivers and streams and ultimately to the Bay. Of the total loads <u>delivered to rivers and streams</u> from all sources, cultivated cropland is the source for 25 percent of the sediment, 27.5 percent of the phosphorus, and 32 percent of the nitrogen.

Conservation practices in use on cultivated cropland within the watershed are responsible for reducing total loads <u>delivered to the Bay</u> (all sources) by 14 percent for sediment, 15 percent for phosphorus, and 15 percent for nitrogen.

If all the under-treated acres (81 percent of cropped acres) were fully treated with the appropriate soil erosion control and/or nutrient management practices, total loads <u>delivered to the Bay</u> (all sources) would be reduced from current levels by 7 percent for sediment (bringing loads from cultivated cropland down very close to "background levels,") 17 percent for phosphorus, and 16 percent for nitrogen.

AR0032832

## Review Draft—October 2010

This study was designed to quantify the effects of conservation practices commonly used on cultivated cropland in the Chesapeake Bay region, evaluate the need for additional conservation treatment in the region, and estimate the potential gains that could be attained with additional conservation treatment.

For purposes of this report, cultivated cropland includes land in row crops or close-grown crops (such as small grains), hay and pasture in rotation with row crops and close-grown crops, and cropland in long-term conserving cover. The Chesapeake Bay region has about 4.38 million acres of cultivated cropland—4.28 million cropped acres and about 0.1 million acres in long-term conserving cover. Acres enrolled in the General Signup of the Conservation Reserve Program (CRP) were used to represent land in long-term conserving cover.

A simulation model was used to estimate the effects of conservation practices that were in use during the period 2003 to 2006. The National Resources Inventory, a statistical survey of conditions and trends in soil, water, and related resources on U.S. non-Federal land conducted by USDA's Natural Resources Conservation Service, provides the statistical framework. Information on farming activities and conservation practices was obtained from a farmer survey and other sources. Using those data, conservation practice effects were evaluated in terms of—
* reductions in losses of sediment, nutrients, and pesticides from fields;
* enhancement of soil quality through increases in soil organic carbon in the field; and
* reductions in instream loads of sediment, nutrients, and pesticides in the region's rivers and streams.

The CEAP sample (771 sample points for cropped acres and 61 sample points for CRP General Signup) was designed to allow reporting of results for the four major subbasins (4-digit Hydrologic Unit Code) within the region. The sample size is too small, in most cases, for reliable and defensible reporting of results for areas below the subbasin level. (A much larger sample would be required to obtain a reliable result for areas smaller than the subbasin level.)

The physical process models used in this study are mathematical representations of the real world designed to simulate complex and varying environmental events and conditions. To estimate the effects of conservation practices, model simulation results were used to make *relative comparisons* between two model runs—one that includes conservation practices and one that excludes conservation practices. All other aspects of the input data and the model parameters are held constant in the two model runs.

The assessment includes conservation practices in use regardless of how or why they came to be in use. It is not restricted to only those practices associated with Federal conservation programs; the assessment also includes the conservation efforts of States, independent organizations, and individual landowners and farm operators.

## The Baseline Conservation Condition

The first Federal conservation efforts on cropland were focused primarily on water management and soil erosion control. Structural practices such as waterways, terraces, and diversions were installed along with supporting practices such as contour farming and stripcropping. Conservation tillage emerged in the 1960s and 1970s as a key management practice for enhancing soil quality and further reducing soil erosion. The conservation compliance provisions in the 1985 Farm Bill sharpened the focus to treatment of the most erodible acres—highly erodible land. This legislation created the CRP as a mechanism for establishing long-term conserving cover on the most erodible cropland through multi-year contracts with landowners. More recently, the focus has shifted from soil conservation and sustainability to a broader goal of reducing all pollution impacts associated with agricultural production. Prominent among new concerns are the environmental effects of nutrient and pesticide export from farm fields.

The application of conservation practices in the Chesapeake Bay region closely reflects this history of Federal conservation programs and technical assistance. An assessment of the extent of conservation practice use in the Chesapeake Bay region for the period 2003–06, representing the "baseline conservation condition," found the following:

* Structural practices for controlling water erosion are in use on 46 percent of Chesapeake Bay region cropped acres, including 63 percent of the highly erodible land.
* About 88 percent of the acres meet tillage intensity criteria for no-till (48 percent) or mulch till (40 percent). However, only 38 percent of cropped acres meet these tillage criteria *and* are gaining soil organic carbon. An additional 36 percent of cropped acres are considered to be "maintaining" soil organic carbon (average annual loss less than 100 pounds per acre).

AR0032833

**Review Draft—October 2010**

- Producers use residue and tillage management practices, structural practices, or both, on nearly all (96 percent) cropped acres in the region.
- Appropriate rates of nitrogen application (including manure) are in use on about 32 percent of the acres receiving nitrogen for all crops in the rotation.
- Appropriate timing of nitrogen application (including manure) is in use on about 54 percent of the acres receiving nitrogen for all crops in the rotation.
- Good nitrogen management practices (rate, timing, *and* method) are in use on only about 12 percent of the acres receiving nitrogen for all crops during every year of production.
- Good phosphorus management practices (rate, timing, *and* method) are in use on 19 percent of the acres receiving phosphorus for all crops during every year of production.
- While most acres have evidence of some nitrogen or phosphorus management, the majority of the acres in the region lack consistent use of appropriate rates *and* timing *and* method of application, including nearly all of the acres receiving manure.
- Land in long-term conserving cover, as represented by enrollment in the CRP General Signup, consists of 100,000 acres in the region (2 percent of cultivated cropland acres), of which 67 percent is highly erodible land.

## Effects of Conservation Practices for the Baseline Conservation Condition

Model simulation results show that, for cropped acres in the region, *on average* conservation practices have—

- reduced surface water flow from farm fields by 17 percent, re-routing the water to subsurface flow pathways;
- reduced sediment loss from fields by 62 percent;
- reduced total nitrogen loss (volatilization, denitrification, surface runoff, and subsurface flow losses) from fields by 30 percent:
  - reduced nitrogen lost with surface runoff (attached to sediment and in solution) by 42 percent,
  - reduced nitrogen loss in subsurface flows by 32 percent;
- reduced total phosphorus loss from fields by 43 percent;
- reduced pesticide loss from fields to surface water, resulting in a 34-percent reduction in edge-of-field pesticide risk for aquatic ecosystems and a 30-percent reduction in edge-of-field pesticide risk for humans (all pesticides combined); and
- decreased the percentage of acres that are losing soil organic carbon from 72 percent to 60 percent.

The relatively smaller reduction in nitrogen loss in subsurface flows results from a combination of incomplete nutrient management and the re-routing of surface water runoff to subsurface flows by water erosion control practices on some acres in the region. On 15 percent of the cropped acres, nitrogen loss in subsurface flows increased as a result of conservation practices. Structural erosion control practices, residue management practices, and reduced tillage slow the flow of surface water runoff and allow more of the water to infiltrate into the soil. This re-routing of surface water to subsurface flows not only re-directs the dissolved nitrogen into subsurface flows but also can extract additional nitrogen from the soil as the water passes through the soil profile. On about 12 percent of the acres, the re-routing of surface water runoff to subsurface flow pathways results in enough additional nitrogen being leached from the soil to more than offset the reductions in nitrogen lost with surface runoff and produce a net increase in total nitrogen loss. Model simulation of additional conservation treatment shows that pairing effective nutrient management practices (consistent use of proper rate, form, timing, *and* method of application) with water erosion control practices reduces nitrogen loss in subsurface flows to acceptable levels for most acres in the region.

For land in long-term conserving cover (100,000 acres), soil erosion and sediment loss have been almost completely eliminated. Compared to a cropped condition without conservation practices, total nitrogen loss has been reduced by 90 percent, total phosphorus loss has been reduced by 96 percent, and soil organic carbon has been increased by an average of more than 333 pounds per acre.

These reductions in field-level losses due to conservation practices, including land in long-term conserving cover, translate into improvements in water quality in streams and rivers in the region. Transport of sediment, nutrients, and pesticides from farm fields to streams and rivers involves a variety of processes and time-lags, and not all of the potential pollutants leaving fields contribute to instream loads. Loads from cultivated cropland delivered to rivers and streams in the watershed have been reduced by—

- 64 percent for sediment,
- 43 percent for phosphorus,

AR0032834

**Review Draft—October 2010**

- 36 percent for nitrogen, and
- 31 percent for atrazine.

When considered along with loads from all other sources, conservation practices in use on cultivated cropland within the watershed are responsible for reducing total loads <u>delivered to the Bay</u> (all sources) by—
- 14 percent for sediment,
- 15 percent for phosphorus,
- 15 percent for nitrogen, and
- 26 percent for atrazine.

If the current level of conservation practice use is not maintained, some of these gains in water quality will be lost.

## Evaluation of Conservation Treatment Needs

This study also determined that the *combination* of practices in use was often inadequate to address excessive losses of sediment *and* nutrients. Adequate conservation treatment consists of combinations of conservation practices that treat the specific inherent vulnerability factors associated with each field for *both* sediment and nutrient loss. Not all acres require the same level of conservation treatment because of differences in climate and inherent soil vulnerabilities. The evaluation of conservation treatment needs was conducted by identifying acres that were inadequately treated with respect to the soil runoff or soil leaching potential.

The evaluation of treatment needs for the Chesapeake Bay region determined that—
- 3.5 million acres (81 percent of cropped acres) are under-treated for one or more of sediment loss, nitrogen or phosphorus lost with surface runoff, and nitrogen loss in subsurface flows:
  - Nearly all under-treated acres require additional treatment for either nitrogen or phosphorus loss,
  - 28 percent of cropped acres require additional treatment *only* for nitrogen loss in subsurface flows,
  - 16 percent of cropped acres require additional treatment for sediment loss, nitrogen and phosphorus runoff, *and* nitrogen leaching;
- Of the 3.5 million under-treated acres, 2.0 million acres (47 percent of cropped acres) are "critical" under-treated acres that consist of the most vulnerable acres in the region, most of which require treatment for multiple resource concerns; and
- 0.8 million acres (19 percent) are adequately treated relative to their degree of vulnerability.

Conservation treatment needs for further reducing the loss of pesticide residues were not estimated.

## Simulation of Additional Conservation Treatment

Additional conservation treatment was simulated for (1) the 2.0 million critical under-treated acres in the region, and (2) all 3.5 million under-treated acres. Two levels of treatment were simulated for each set of acres:
- *Treatment with additional erosion control practices*, which consisted of adding in-field practices to control overland flow (terraces, contouring, or stripcropping) for acres without overland flow control practices and having a slope of more than 2 percent, and adding edge-of-field buffering or filtering practices to all acres without edge-of-field practices.
- *Treatment with nutrient management in addition to erosion control practices*, which was modeled by adjusting the commercial fertilizer and manure applications to simulate the appropriate rate of application, the appropriate timing of application, and use of the appropriate application method.

Model simulation demonstrated that sediment and nutrient losses with surface runoff could be effectively controlled in the region by treating the 2.0 million most vulnerable under-treated acres with additional erosion control practices. At this level of treatment, model simulations showed the following for the region as a whole:
- Sediment loss from farm fields would average 0.4 ton per acre per year, compared to the baseline conservation condition average of 1.4 ton per acre per year (a 74-percent reduction).
- Nitrogen lost from the field with surface runoff (attached to sediment and in solution) would average 4.2 pounds per acre per year, compared to the baseline conservation condition average of 9.7 pounds per acre per year (a 57-percent reduction).
- Total phosphorus loss, most of which is lost to surface water, would average 2.4 pounds per acre per year, compared to 3.9 pounds per acre per year for the baseline conservation condition (a 39-percent reduction).

AR0032835

### Review Draft—October 2010

However, model simulations also showed that a portion of these nutrient savings was re-routed to subsurface loss pathways, most of which is eventually delivered to lakes, streams, and rivers through seepage, artificial drainage systems, and groundwater return flow. Treatment with nutrient management practices *in addition to* soil erosion control practices is required to effectively control the loss of soluble nitrogen and phosphorus from farm fields in the Chesapeake Bay region. Treatment at this level of all 3.5 million under-treated acres, compared to the baseline conservation condition, for the region as a whole would reduce nitrogen loss in subsurface flows from an average of 34.2 pounds per acre to an average of 23.0 pounds per acre (a 33-percent reduction). Total nitrogen loss (all loss pathways) would be reduced 35 percent. Total phosphorus loss would be reduced to about 1.7 pounds per acre per year, on average, representing a 55-percent reduction from the baseline conservation condition.

Model simulations further showed that the additional reductions in field-level losses would be expected to provide the following improvements in water quality within the region, compared to the baseline conservation condition.

**Percent reductions of instream loads delivered to the Chesapeake Bay
due to additional erosion control and nutrient management**

| Environmental outcome | Treatment of the 2.0 million most vulnerable under-treated acres | Treatment of all 3.5 million under-treated acres |
|---|---|---|
| Sediment reduction | 5% | 7% |
| Nitrogen reduction | 12% | 16% |
| Phosphorus reduction | 13% | 17% |
| Atrazine reduction | 10% | 11% |

The nutrient management treatment level simulated in this study represents feasible and proven conservation practices that can be successfully applied using today's technology. There are, however, emerging conservation technologies that have the potential to further reduce nutrient loss from farm fields and provide even greater conservation benefits once the technologies become more widespread. These include—
- variable rate technology for precise nutrient application rates and placement methods;
- nitrogen use efficiency enhancers (time release and ammonia loss inhibitors);
- water control management which reduces late fall and early spring flushes of nitrate-laden drainage water; and
- constructed wetlands that receive surface water runoff from fields prior to discharge to streams and rivers.

Not all acres get the same benefit from conservation treatment. The more vulnerable acres, such as highly erodible land and soils prone to leaching, inherently lose more sediment and/or nutrients, and therefore greater benefit can be attained with conservation treatment. The gains in efficiency by treating the more vulnerable acres first are demonstrated in the table below using results from the treatment simulations:

**Average annual per-acre reductions in loss from treatment of designated acres
with additional erosion control and nutrient management**

| Resource concern | 2.0 million critical under-treated acres | 1.5 million non-critical under-treated acres | Remaining 0.8 million acres |
|---|---|---|---|
| Sediment loss at edge of field due to water erosion (tons/acre) | 2.2 | 0.5 | 0.4 |
| Total nitrogen loss for all pathways (pounds/acre) | 40 | 28 | 3 |
| Loss of nitrogen with surface runoff, including waterborne sediment (pounds/acre) | 12 | 4 | 2 |
| Loss of nitrogen in subsurface flows (pounds/acre) | 24 | 20 | <1 |
| Total phosphorus loss for all pathways (pounds/acre) | 5.0 | 2.1 | 0.5 |

AR0032836

**Review Draft—October 2010**

---

### Chesapeake Bay Region Has Greater Potential for Sediment and Nutrient Loss from Fields than Upper Mississippi River Basin

Vulnerability factors related to the loss of sediment and nutrients from cropped acres are greater in the Chesapeake Bay region (CB) than in the Upper Mississippi River Basin (UMRB), resulting in larger per-acre losses, on average, and a higher proportion of cropped acres that need additional conservation treatment. The Chesapeake Bay region has—

- Higher annual precipitation, averaging 8 more inches per year than in the UMRB.
- Higher percentage of cropped acres with slopes greater than 2 percent (60 percent compared to 42 percent for the UMRB)
- Higher percentage of cropped acres that are Highly Erodible Land (HEL) (44 percent compared to 18 percent for the UMRB).
- Higher percentage of cropped acres with a "high" soil runoff potential--soils prone to surface water runoff (23 percent compared to 13 percent for the UMRB).
- Higher percentage of cropped acres with a "high" or "moderately high" soil leaching potential—soils prone to leaching (46 percent compared to 9 percent for the UMRB).

Other important differences include—

- The CB has a lower percentage of cultivated cropland within the region (10 percent of the land area compared to 50 percent in the UMRB), which moderates the impact of cultivation on water quality in the region compared to the UMRB.
- The CB has twice the percentage of cropped acres with manure applied (38 percent for the CB compared to 18 percent for the UMRB).

The overall level of conservation practice use is about the same in both regions—

- The proportion of cropped acres with water erosion control structural practices is 46 percent in the CB, compared to 45 percent in the UMRB.
- Most of the cropped acres in both regions meet tillage criteria for either no-till or mulch till (88 percent of cropped acres in the CB compared to 91 percent in the UMRB). However, the UMRB has a higher percentage of cropped acres that are enhancing (gaining) soil organic carbon (75 percent for the UMRB compared to 40 percent for the CB).
- Use of nitrogen management practices (rate, timing, method of application) is the same—36 percent of cropped acres in each region have a "high" or "moderately high" level of nitrogen management.
- Use of phosphorus management practices (rate, timing, method of application) is proportionately higher in the UMRB than in the CB—39 percent of cropped acres in the CB have a "high" or "moderately high" level of phosphorus management compared to 57 percent in the UMRB.
- The Chesapeake Bay has a lower percentage of cropland in the Conservation Reserve Program General Signup (2 percent for the CB in 2003 compared to 5 percent for the UMRB).

Because of the higher vulnerability factors, the Chesapeake Bay region has higher average annual losses of sediment, nitrogen, and phosphorus from fields than the UMRB. For the baseline conservation condition—

- Sediment loss from fields averages 1.4 tons per acre in the CB compared to 1.0 tons per acre in the UMRB.
- Total nitrogen loss from fields averages 53 pounds per acre in the CB compared to 41 pounds per acre in the UMRB.
- Total phosphorus loss from fields averages 3.8 pounds per acre in the CB compared to 3.0 pounds per acre in the UMRB.

Consequently, 81 percent of the cropped acres in the Chesapeake Bay region need additional conservation treatment, compared to 62 percent in the UMRB. About half of the cropped acres in the Chesapeake Bay region are critically under-treated, compared to only 15 percent in the UMRB.

AR0032837