# Today's Agenda

➢ **EPA presents draft TMDL**

- Rich Batiuk, Chesapeake Bay Program Associate Director for Science

- Bob Koroncai, Chesapeake Bay TMDL Manager

- Jeff Corbin, Senior Advisor to Regional Administrator

➢ **Virginia presents WIP**

- Anthony Moore, Assistant Secretary for Chesapeake Bay Restoration

➢ **Question & Answer**

➢ **More information**
www.epa.gov/chesapeakebaytmdl

# First…The Bottom Line

www.epa.gov/chesapeakebaytmdl

AR0029220

# Lack of progress triggered TMDL



AR0029221

# Lack of progress triggered TMDL



AR0029222

# TMDL is a "pollution diet"



AR0029223

# For your streams, creeks and rivers



AR0029224

# Blend of **state actions and federal measures**



  

   

AR0029225



**Accountability for results**

AR0029226

# Task not easy but essential



AR0029227

# What is a TMDL?

# And Why Does it Matter?

www.epa.gov/chesapeakebaytmdl

AR0029228

# Clean Water Act requires TMDL for waters that don't meet state standards



AR0029229

# TMDL = Total Maximum Daily Load
## Defines amount of pollution a water body can handle and be healthy



AR0029230

# Bay and tributaries are polluted by nitrogen, phosphorus, sediment



AR0029231

# Rivers, streams, & creeks contribute to Bay, so included in TMDL



AR0029232



AR0029233



**Legal obligation** to get it done

**Clean Water Act, Chesapeake 2000, consent decrees, settlement**

AR0029234

# Part of strategy to meet a Presidential Executive Order



AR0029235

# **Clean water matters to your community**



AR0029236

# **Clean water matters to your community**



AR0029237

# Clean water matters to your community



AR0029238

# Clean water matters to your community



AR0029239

# **Setting the Pollution Diet**

www.epa.gov/chesapeakebaytmdl

AR0029240

# Impact of Pollution





AR0029241



# Nitrogen Loads by Sector and Scenario—CBP Watershed Model P5.3

Draft allocation for atmospheric deposition is 15.7 million pounds, which will be achieved by federal air regulations through 2020.

www.epa.gov/chesapeakebaytmdl                                              25

AR0029242



AR0029243

-772-



**Model Simulated Sediment Loads by Scenario Compared with the Draft Sediment Allocations (billions of pounds per year as TSS)**

www.epa.gov/chesapeakebaytmdl

AR0029244



VA Nitrogen Loads by Sector and Scenario—CBP Watershed Model P5.3

AR0029245



AR0029246



AR0029247



AR0029248



AR0029249

# TMDL Goals

## 2 year milestones

## 60 percent by 2017

## 100 percent by 2025

www.epa.gov/chesapeakebaytmdl

AR0029250



AR0029251

# Accountability for Results

Establish Bay TMDL

Develop Watershed Implementation Plans

Set 2-Year Milestones

Monitor Progress

Adaptive Management

Employ Federal Actions or Consequences

www.epa.gov/chesapeakebaytmdl

35

AR0029252

# **Meeting the Pollution Diet**

www.epa.gov/chesapeakebaytmdl

AR0029253

# Watershed Implementation Plan

## The how, when and where of attaining the TMDL diet

www.epa.gov/chesapeakebaytmdl

AR0029254

# Overall Draft WIP Evaluation

➢ 7 jurisdictions provided Draft WIPs in early September

➢ WIPs must:
- achieve pollution targets

- provide reasonable assurance

38

AR0029255

# Do WIPs meet the allocations?

| Jurisdiction | Nitrogen | Phosphorus | Sediment |
|---|---|---|---|
| DC | ✔ | ✔ | |
| DE | | | ✔ |
| MD | ✔ | ✔ | ✔ |
| NY | | | ✔ |
| PA | ✔ | | |
| VA | | | ✔ |
| WV | | ✔ | |

AR0029256

# Draft Virginia WIP Evaluation

➢ Did not meet nitrogen (6 percent over)

➢ Did not meet phosphorus (7 percent over)

➢ Met sediment (12 percent under)

AR0029257

# Overall Draft WIP Evaluation

**None of the WIPs provided adequate assurance**

➢ Inadequate strategy for filling program gaps

➢ Limited enforceability/accountability

➢ Few dates for key actions

41

AR0029258

# Federal Backstops

➢ All jurisdictions require some level of backstop to:

  · Meet the pollution allocations

  · Provide a high level of assurance

➢ Backstop allocations focus on federal authority

  • Additional reductions from regulated point sources (wastewater treatment plants, CAFO, MS4s)

  • Finer scale allocations for headwater states

42

AR0029259

# Federal Backstops

## ➤ Backstop allocation adjustments

- Minor - adjust load allocations to equal targets

- Moderate -
  - Stronger CAFO/MS4 requirements
  - Significant WWTPs: N @ 4 mg/l, P @ 0.3 mg/l

- High Backstop –
  - Stronger CAFO/MS4 requirements
  - Significant WWTPs: N @ 3 mg/l, P @ 0.1 mg/l

43

AR0029260

# Backstops by Jurisdiction

➢ Maryland, DC – Minor Backstop

➢ Virginia – Moderate Backstop

➢ Delaware, Pennsylvania, New York and West Virginia – High Backstop

➢ Headwater States (PA, NY, WV)
- EPA assigning finer scale wasteload and load allocations

44

AR0029261

-790-

# Draft Virginia WIP Evaluation

## For Virginia: moderate backstop

➢ Proposes nutrient reductions through expanded Nutrient Credit Exchange, but key deficiencies in this strategy exist

➢ Does not include legislative and regulatory changes that would support high implementation rates

➢ Does not meet nitrogen and phosphorus allocations in James River

AR0029262

# Draft VA WIP Evaluation

## For Virginia: moderate backstop

- Wastewater facilities: 4 mg/L TN and .3 mg/L TP and design flow

- MS4s: 50% of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50% of unregulated land treated as regulated

- Construction: Erosion and sediment control on all lands subject to Construction General Permit

- CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits EXCEPT no feed management on dairies; designation as necessary

- Additional adjustments to agriculture nonpoint sources as necessary to exactly nutrient and sediment allocations

AR0029263

# In Summary

➢ Hybrid TMDL is blend of jurisdiction WIPs and EPA backstop allocations

➢ Final WIPs need to address deficiencies

➢ EPA prefers to use jurisdiction WIPs and not backstop in final TMDL

47

AR0029264

# Opportunities for Improvement

➢ Jurisdictions can enhance their WIP submissions by the November 29 deadline

- EPA will engage jurisdictions in discussions

- EPA will evaluate the final WIPs

- Final TMDL will be informed by final WIPs

48

AR0029265



# **Next Steps**

www.epa.gov/chesapeakebaytmdl

AR0029266

# Next Steps

➢ Hold 18 public meetings in six states, D.C.

➢ Public comment period until November 8

➢ States, D.C. submit final WIPs on November 29

➢ TMDL will be established by December 31

www.epa.gov/chesapeakebaytmdl

AR0029267

# Submit Your Comments

➢ Public comment period until November 8

- Electronically, visit:
  www.regulations.gov
  Docket ID No. EPA-R03-OW-2010-0736

- In writing, mail to:
  Water Docket, EPA, Mailcode: 2822T
  1200 Pennsylvania Ave., NW.,
  Washington, D.C., 20460.

- By hand, drop off from 8:30 a.m. - 4:30 p.m.:
  EPA Docket Center Public Reading Room,
  EPA Headquarters West, Room 3340,
  1301 Constitution Ave., NW, Washington, D.C.

www.epa.gov/chesapeakebaytmdl

AR0029268



# www.epa.gov/chesapeakebaytmdl

AR0029269

AR0029168

# Today's Agenda

## ➤ EPA presents draft TMDL
- Rich Batiuk, Chesapeake Bay Program Associate Director for Science
- Bob Koroncai, Chesapeake Bay TMDL Manager
- Jeff Corbin, Senior Advisor to Regional Administrator

## ➤ Virginia presents WIP
- Anthony Moore, Assistant Secretary for Chesapeake Bay Restoration

## ➤ Question & Answer

## ➤ More information
www.epa.gov/chesapeakebaytmdl

www.epa.gov/chesapeakebaytmdl

AR0029169

# First…The Bottom Line

www.epa.gov/chesapeakebaytmdl

AR0029170

# Lack of progress triggered TMDL



AR0029171

# TMDL is a "pollution diet"



AR0029172



For your streams, creeks and rivers

www.epa.gov/chesa

AR0029173

# Blend of **state actions and federal measures**












AR0029174



AR0029175

# Task not easy but essential



AR0029176

# What is a TMDL?

# And Why Does it Matter?

www.epa.gov/chesapeakebaytmdl

AR0029177

# Clean Water Act requires TMDL for waters that don't meet state standards



AR0029178

# TMDL = Total Maximum Daily Load
# Defines amount of pollution a water body can handle and be healthy



AR0029179

# Bay and tributaries are polluted by nitrogen, phosphorus, sediment



AR0029180

# Rivers, streams, & creeks contribute to Bay, so included in TMDL



AR0029181



AR0029182



**Legal obligation** to get it done

**Clean Water Act, Chesapeake 2000, consent decrees, settlement**

AR0029183

# Part of strategy to meet a Presidential Executive Order



AR0029184



AR0029185



AR0029186



# Clean water matters to your community

AR0029187

# Setting the Pollution Diet

www.epa.gov/chesapeakebaytmdl

AR0029188

# Impact of Pollution





AR0029189



AR0029190



AR0029191



**Model Simulated Sediment Loads by Scenario Compared with the Draft Sediment Allocations (billions of pounds per year as TSS)**

AR0029192



VA Nitrogen Loads by Sector and Scenario—CBP Watershed Model P5.3

AR0029193

-824-



AR0029194

-825-



AR0029195



**Pollution Diet by State**

Note: There is also an Atmospheric Deposition Allocation of 15.70 million pounds/year.

AR0029196



AR0029197

# TMDL Goals

2 year milestones

60 percent by 2017

100 percent by 2025

www.epa.gov/chesapeakebaytmdl

AR0029198



AR0029199



AR0029200

# Meeting the Pollution Diet

www.epa.gov/chesapeakebaytmdl

AR0029201

# Watershed Implementation Plan

## The how, when and where of attaining the TMDL diet

www.epa.gov/chesapeakebaytmdl

AR0029202

# Overall Draft WIP Evaluation

➤ 7 jurisdictions provided Draft WIPs in early September

➤ WIPs must:
- achieve pollution targets

- provide reasonable assurance

36

AR0029203

# Do WIPs meet the allocations?

| Jurisdiction | Nitrogen | Phosphorus | Sediment |
|---|---|---|---|
| DC | ✓ | ✓ | |
| DE | | | ✓ |
| MD | ✓ | ✓ | ✓ |
| NY | | | ✓ |
| PA | ✓ | | |
| VA | | | ✓ |
| WV | | ✓ | |

AR0029204

# Draft Virginia WIP Evaluation

➢ Did not meet nitrogen (6 percent over)

➢ Did not meet phosphorus (7 percent over)

➢ Met sediment (12 percent under)

AR0029205

# Overall Draft WIP Evaluation

**None of the WIPs provided adequate assurance**

➢ Inadequate strategy for filling program gaps

➢ Limited enforceability/accountability

➢ Few dates for key actions

39

AR0029206

# Federal Backstops

➢ All jurisdictions require some level of backstop to:

- Meet the pollution allocations

- Provide a high level of assurance

➢ Backstop allocations focus on federal authority

- Additional reductions from regulated point sources (wastewater treatment plants, CAFO, MS4s)

- Finer scale allocations for headwater states

40

AR0029207

# Federal Backstops

## ➢ Backstop allocation adjustments

- Minor - adjust load allocations to equal targets

- Moderate -
  - Stronger CAFO/MS4 requirements
  - Significant WWTPs: N @ 4 mg/l, P @ 0.3 mg/l

- High Backstop –
  - Stronger CAFO/MS4 requirements
  - Significant WWTPs: N @ 3 mg/l, P @ 0.1 mg/l

41

AR0029208

# Backstops by Jurisdiction

➢ Maryland, DC – Minor Backstop

➢ Virginia – Moderate Backstop

➢ Delaware, Pennsylvania, New York and West Virginia – High Backstop

➢ Headwater States (PA, NY, WV)
- EPA assigning finer scale wasteload and load allocations

42

AR0029209

# Draft Virginia WIP Evaluation

## For Virginia: moderate backstop

➢ Proposes nutrient reductions through expanded Nutrient Credit Exchange, but key deficiencies in this strategy exist

➢ Does not include legislative and regulatory changes that would support high implementation rates

➢ Does not meet nitrogen and phosphorus allocations in James River

AR0029210

# Draft VA WIP Evaluation

## For Virginia: moderate backstop

- Wastewater facilities: 4 mg/L TN and .3 mg/L TP and design flow

- MS4s: 50% of urban MS4 lands meet aggressive performance standard through retrofit/ redevelopment; 50% of unregulated land treated as regulated

- Construction: Erosion and sediment control on all lands subject to Construction General Permit

- CAFO production areas: Waste management, barnyard runoff control, mortality composting. Precision feed management for all animals. Same standards apply to AFOs not subject to CAFO permits EXCEPT no feed management on dairies; designation as necessary

- Additional adjustments to agriculture nonpoint sources as necessary to exactly nutrient and sediment allocations

AR0029211

# In Summary

➢ Hybrid TMDL is blend of jurisdiction WIPs and EPA backstop allocations

➢ Final WIPs need to address deficiencies

➢ EPA prefers to use jurisdiction WIPs and not backstop in final TMDL

45

AR0029212

# Opportunities for Improvement

➢ Jurisdictions can enhance their WIP submissions by the November 29 deadline

- EPA will engage jurisdictions in discussions

- EPA will evaluate the final WIPs

- Final TMDL will be informed by final WIPs

46

AR0029213



**Next Steps**

www.epa.gov/chesapeakebaytmdl

AR0029214

# Next Steps

➢ Hold 18 public meetings in six states, D.C.

➢ Public comment period until November 8

➢ States, D.C. submit final WIPs on November 29

➢ TMDL will be established by December 31

www.epa.gov/chesapeakebaytmdl

AR0029215

# Submit Your Comments

➢ Public comment period until November 8

- Electronically, visit:
  www.regulations.gov
  Docket ID No. EPA-R03-OW-2010-0736

- In writing, mail to:
  Water Docket, EPA, Mailcode: 2822T
  1200 Pennsylvania Ave., NW.,
  Washington, D.C., 20460.

- By hand, drop off from 8:30 a.m. - 4:30 p.m.:
  EPA Docket Center Public Reading Room,
  EPA Headquarters West, Room 3340,
  1301 Constitution Ave., NW, Washington, D.C.

www.epa.gov/chesapeakebaytmdl

AR0029216



www.epa.gov/chesapeakebaytmdl

AR0029217

**DRAFT 10/26/2010**



CHESAPEAKE BAY PARTNERSHIP
PRINCIPALS' STAFF COMMITTEE
MEETING
OCTOBER 21ST
BALTIMORE ROWING CLUB
BALTIMORE, MD

## I.    ATTENDEES

### *Members in Attendance*

| Organization | Name | E-mail | Phone |
|---|---|---|---|
| | | | |
| EPA Region 3 Administrator | Shawn Garvin | Garvin.shawn@epa.gov | 215-814-2900 |
| Office of the Secretary of Natural Resources | Anthony Moore rep. Doug Domenech | Doug.domenech@governor.virginia.gov | 804-786-0044 |
| VA Dept of Environmental Quality | David Paylor | David.paylor@deq.virginia.gov | 804-698-4020 |
| VA Dept of Conservation and Recreation | David Johnson | | |
| VA Secretary of Agriculture and Forestry | Matt Conrad rep. Todd Haymore | todd.haymore@governor.virginia.gov | 804-692-2511 |
| DC Dept of Environment | Christophe Tulou | | |
| PA Dept of Environmental Protection | John Hines rep. John Hanger | jhanger@state.pa.us | 717-787-2814 |
| PA Dept of Agriculture | Karl Brown rep. Russell Redding | rredding@state.pa.us | 717-787-4737 |
| NY Dept of Environmental Conservation | James M. Tierney | jmtierne@gw.dec.state.ny.us | |
| MD Dept of Natural Resources | John Griffin | jgriffin@dnr.state.md.us | 410-260-8101 |
| MD Dept of Environment | Bob Summers rep. Shari T Wilson | stwilson@mde.state.md.us | 410-537-3084 |
| MD Dept of Agriculture | Buddy Hance | hanceef@mda.state.md.us | 410-841-8550 |
| MD Department of Planning | Jason Dubow rep. Richard Hall | | |
| DE Dept of Natural Resources and Env Control | Kathy Bunting-Howarth | Katherine.Howarth@state.de.us | 302-739-9949 |
| DE Dept of Agriculture | Ed Kee | edwin.kee@state.de.us | 302-698-4500 |
| DE Dept of Natural Resources and Environmental Control | Kathy Bunting-Howarth rep. Collin O'Mara | | |
| WV Dept of Environmental Protection WV | Teresa Koon rep. Randy Huffman Matt Monroe | teresa.m.koon@wv.gov | 304-926-0499x.1020 |
| Chesapeake Bay Commission | Ann Swanson | aswanson@chesbay.us | 410-263-3420 |
| U.S. Fish & Wildlife Service | Mike Slattery rep. Marvin Moriarty | marvin_moriaty@fws.gov | 413-253-8300 |
| U.S. Geological Survey | Scott Phillips rep. David Russ | druss@usgs.gov | 703-648-6660 |
| U.S. EPA CBPO | Jim Edward | | |
| USDA NRCS | Leonard Jordan | leonard.jordan@wdc.usda.gov | 202-690-2196 |
| Army Corps of Engineers | Amy Guise rep. Col. David E | david.e.anderson.col@usace.army.mil | 410-962-7608 |

2

**-850-**

| Department of Defense | Anderson Christine Porter | christine.porter@navy.mil | 757-445-6399 |
|---|---|---|---|

## *Other Attendees*

| Name | Organization | E-mail | Phone |
|---|---|---|---|
| Jeff Corbin | EPA Region 3 | corbin.jeffrey@epa.gov | 215-667-9304 |
| Charley ????? | CAC | | |
| Royden Powell | MD Dept of Ag | powellrn@mda.state.md.us | 410-841-5865 |
| Beth McGee | CBF | bmcgee@savethebay.cbf.org | 410-268-8816 |
| Pat Buckley | PA DEP | pbuckley@state.pa.us | 717-772-1675 |
| Russ Baxter | VA | | |
| Rick Parrish | So. Environmental Law Center | rparrish@selcva.org | |
| Liz Van Dolah | STAC-CRC | vandolahe@si.edu | 410-798-1283 |
| Jessica Blackburn | CAC | jblackburn@acb-online.org | 443-622-4404 |
| Rob McAfee | NRCS | Robert.McAfee@md.usda.gov | 717-237-2203 |
| Richard Eskin | MDE | Mde@tate.gov | |
| Carin Bisland | EPA CBPO | Bisland.carin@epa.gov | 410-267-5732 |
| Peter Marx | Choose Clean Water | | |
| Karl Blankenship | Bay Journal | bayjournal@earthlink.net | 717-428-2819 |
| Rob Wood | CBP- EPA | | |
| Diane Davis | DC Dept of Environment | Diane.davis2@dc.gov | 202-741-0847 |
| Jon Capacasa | EPA Region III | Capacasa.jon@epa.gov | 215-814-5422 |
| Chuck Fox | EPA | | |
| Peter Freehafer | NY | | |
| Hamid Karimi | DC | | |
| Bruce Michael | MD DNR | | |
| Leslie Middleton | Rivanna River | | |
| Dan Ryan | EPA | | |
| Sarah Diebel | DOD | | |
| Charles Wilson | DOD | | |
| Lewis Linker | EPA | | |
| Matt Johnson | STAC | | |
| Denise Wardrop | STAC | dhwllo@psu.edu | 814-863-1005 |
| Jeff Horan | Md/DNR | jhoran@DNR.STATE.MD.US | |
| Travis Loop | | | |
| Bevin | CBC-MD | | |
| Maurel Raub | CBC-PA | | |
| Mario De | EPA region 2 | | |
| Jon Hall | USDA-NRCS | | |
| Joshua Goldman | | | |

3

II.      **ACTION ITEMS**

A.  **Two Year Milestones and the Bay Barometer:**
   i.  PSC agrees with the Management Board recommendation that The Bay Barometer should not be the vehicle for reporting progress toward meeting 2 year milestones.
   ii.  Management Board will bring back a recommendation in January for delivering 2-year milestone progress in Spring 2011.  MB will consider ChesapeakeStat as one of the options.

B.  **Under WIP and TMDL Schedule**
   i.  November 13th: Last Date for Receipt of Input Decks for processing and feedback before Nov 29

C.  **Under Phase II Watershed Implementation Plan Schedule:**
   i.  Based on conversation today, EPA will consider changing deadlines for Phase II WIPs
   ii.  Don't have to do final Phase I WIPs prior to completing next round of 2 year milestones.
   iii.  Schedule for WIP II no later than January, maybe December

D.  **Under Executive Order Action Plan**
   i.  Final funding numbers from the Federal Agencies will be available within a few weeks
   ii.  The PSC is interested in seeing different cuts of the funding, including:
      1.  Old versus new dollars.
      2.  Grants versus loans
      3.  What is specifically available for funding within the watershed?

E.  **Under Model Refinements**
   i.  EPA will look into how to provide training or workshops for the public on how to interact with Scenario Builder

---

III.      **Meeting Summary**

A.  **Introduction and Welcome**

**Shawn Garvin** (EPA Region 3 Administrator) welcomed everyone to the Baltimore Rowing Club. He explained that this PSC meeting, unlike ones before, would be open for more discussion rather than discussing detailed technical issues

B.  **Chesapeake Bay Program Updates and Management Board Action Items**

**Jim Edward** (CBP Acting Director) presented a decision of the Management Board for approval by the PSC regarding the 2 year milestones and the Bay Barometer. The Executive Council asked that a team be formed to look at the possibility of incorporating the 2 year milestones into the Bay Barometer. This team comprised of the CBP Communications Workgroup and the Scientific, Technical Analysis and Reporting

4

(STAR) team, presented three recommendations to the Management Board at their September 22 meeting. From these recommendations, the Management Board decided to not include 2 year milestones in the Bay Barometer, but find a different vehicle for producing these results each year. The team's next step will be to explore the different avenues that could be taken, which includes ChesapeakeStat.

The PSC approved the Management Board's decision, and will hear back from the Management Board on this topic at the next PSC meeting in January.

Jim Edward also presented a funding breakdown showing what each jurisdiction will receive from EPA, NRCS, NOAA and NPS as a result from the Action Plan of the Executive Order. The numbers that were presented represented all funding that a jurisdiction would be receiving, not just financial assistance for Chesapeake Bay related projects. A more precise breakdown showing more detail of the funding will be available within the coming weeks.

   **Discussion:**

- CBC: Interested in looking at what the amount of new money will be coming from the Action Plan.
   - EPA: The Bay Program Budget has almost doubled in the past 2 fiscal years as a result of administration adds, congressional adds, and the Farm Bill. NOAA and FWS have new money as well for areas like monitoring.
- NRCS: At this point, could not determine the exact amount that would be dedicated to the Bay.
   - NY: Glad that there was clarification on where the numbers are coming from because it looks as though NY is receiving far more money for Bay Restoration than it actually is.
   - VA: Needs realistic numbers in order to be presented accurately to our General Assembly.


## C. Phase I WIPs and TMDL Schedule

**Jon Capacasa** (EPA Region 3) presented for discussion the TMDL/WIP schedule for the remainder of 2010, including the timing of input deck submissions from the jurisdictions and scenario runs. Public comment period on the Draft TMDL began on September 24th and will run until November 8th. EPA is currently conducting 18 public meetings across the watershed in encourage public engagement. They are also meeting with stakeholder groups and legislative sessions in order to make sure they comment on the TMDL.

Half day briefing sessions have been arranged with the states and the EPA to walk through what the comments mean, and clarify what was meant during the WIP review. These sessions have been very productive and allowed the lines of communication between the states to remain open during this process.

By October 22nd, the states were asked to identify any cross-basin exchanges or nitrogen/phosphorus exchanges you would be considering as part of your final WIP. It takes time to run the model to determine if those changes will still meeting water quality standards. The water quality leads for each state will be sending a short summary of how

5

far along EPA thinks they are on certain items, and what the critical issues are that need to be addressed. November 29th the final WIPs are submitted and the WIP evaluation process will begin within EPA. States are strongly encouraged to share draft input decks to EPA before November 12th, so that any issues can be addressed in advance.


**Discussion:**
- VA: Wondered if they didn't meet their allocations the first time because they were unaware they would have to identify cross-basin exchanges of nitrogen and phosphorus.


## D. Reactions and Feedback from the Partners on Phase I WIPs

**Discussion:**

- MD: Expressed concern about the time frames being extremely tight, and that they could become worse with all the issues related to the models. When it comes to Phase II, if there are changes in allocations, they will need extensions that commensurate with those changes and timing of changes. MD was also concerned about funding; especially federal contributions.

- MD has been holding public meetings prior to the ones put on by the EPA on the TMDL. They felt that these meeting were very informational and there has been recognition that this will take a lot of work from all the stakeholders involved. Appreciated all the work being done by the EPA team, and remains committed to meet 70% by 2017.

- CBC: Sponsored meetings in MD, PA, and VA with EPA and the state legislators when they weren't in session and were able to focus.  During these meetings, there was a sense from the legislators that they all want to work with the EPA, but want to do it in a way that works with the best for the state. Leadership at these meetings were heartened by the EPA's ability to be flexible and open to discussion.

- DC: There is a 30% federal presence in DC and will need to have a lot of help from and coordination with the federal agencies.  Need to make sure agencies understand that our success is based on their willingness to work with DC.
  - EPA: Through the Executive Order, there is a focus on federal agencies having two year milestones, and more importantly, having them be helpful to meeting the states two year milestones.

- NY: Has had very good and productive meetings with EPA on the WIPs. NY took steps to go beyond EPA programs in their WIPS and they still were seen as seriously deficient. NY has been asked to do everything in the backstops which includes extreme levels of technology. They are unable to think of any

6

other way to come under compliance, than maybe heating up sewage or retrofitting forests.

Nitrogen and phosphorus amounts diminish as you move down the watershed, so trading is not an option either. The area of NY in the Chesapeake Bay Watershed has lost 30,000 people, and is not considered a high income area. 20% of dairy production has been lost in the state over the last 10 years as well. Since 1985, nitrogen levels have decreased, but this was not counted.

    o  EPA: Would like to continue to work with NY since it obviously is in an unique situation.

- PA: Also had a good meeting with EPA last week, but believe that if these meetings had taken place earlier, the process may have been easier. PA felt that there were two terms that needed to be kept in mind during the duration of the TMDL creation process, clarity and intent. A lack of both has had a negative impact on public engagement.

  PA's WIPs were also seen as seriously deficient, but they made their nitrogen requirement. PA was off by 1% on sediment and 11% on phosphorus, and the question from the public on this was "what is the margin of error of the model?" PA asked that there be clarification on this. They also need to know "what is meeting baseline TMDL compliance?" The trading program in place has substantial investment and business decisions are being made that will be impacted by baseline decisions.

  PA has also found that they are currently only counting about 15% of no till happening in the watershed. Need to have more participation from other agencies within USDA other than NRCS. FSA and NAS have data collection abilities that are essential in collecting accurate estimates of practices happening on the ground. They are also looking into $100 million fund to get manure to energy projects off the ground.

  Had a question from a legislator about the consequences for federal agencies not meeting their two year milestones. EPA could only answer for themselves saying that the Administrator of the EPA is holding EPA accountable, but there needs to be clarification on how the government as a whole or each individual agency will be held responsible.

- WV: Desperately does not want the federal backstops, and are guardedly optimistic about meeting their allocations. For the Phase I draft, WV did not have their model run numbers in yet, and are still waiting on a successful run through the model. There are two things that WV needs to continue to work on with EPA in order to close the gaps and that is the nitrogen and phosphorus exchange and sediment.

- DE: Is optimistic they can reach their allocation, but only time will tell. DE has a 99% focus on agriculture, which impacts their major industry in state. CAFO requirements give no benefit in the model and it boils down to a resource issue. Communities are willing to do more, but do not have the resources.

7

They are trying to count all the pracitices on the ground, which will require incorporating NAS. When approached, NAS said that they were lacking the funding. DE is also interested in new technologies like PA's biofuel project, but DE manure is poultry and they have restrictions on air emissions.

- VA: Has concerns on allocations on the James River. Have a hard time justifying putting the numbers together when they know that they will change next year based on the model modifications. VA hopes to resolve any remaining issues in the next couple of weeks.

  VA wanted to know if the public comment period would be extended and the response was that the EPA did not feel it would be necessary to extend the comment period.

- COE: Offers a 75% cost-share program that serves all jurisdictions within the Chesapeake Bay Watershed. This has historically been used for wetland and stream restoration projects, but would be willing to work with states who are interested in looking into biofuels. Please contact Amy Guise or Heather Caesar if you are interested.

**E. Looking Back and Ahead: Phase II WIPs and 2 Year Milestones Discussion**
**Leslie Middleton,** (Executive Director, Rivanna River basin Commission) gave a presentation on the lessons learned from the Rivanna River pilot in Virginia

**Discussion:**
- MD: Do all watersheds have commissions, and if not, how did yours come about? What is your biggest obstacle with Phase II of the TMDL?
  - Not all watersheds have a commission. The Rivanna commission came about through a local upwelling of interest from residents. Biggest obstacle would be funding.

Other Pilot Projects:
- MD: Has 24 jurisdictions, and focused on 2, Ann Arundel County and Caroline County. Used these as a template to guide other jurisdictions and has helped MD better understand how much time it will take. The number one issue with the pilots has been resources.
- DC: Does not have good news to share about their pilots. They have had poor working relationships with the federal agencies in DC. GSA hasn't been helpful, the Smithsonian replied that they are not a federal agency, and NCPC is unresponsive.

**Gary Shenk**, (EPA), reviewed the schedule and timing for planned Phase 5.3 Bay Watershed Model refinements. Changes that have been approved by the jurisdictions include land use urban classification, nutrient management in agriculture, and no longer automatically transferring manure transport unless it is reported by the jurisdiction. Modifications to the watershed model and scenario builder are currently being made, and should be completed by the beginning of January. In early 2011, there will be a recalibration of the 5.3 watershed model

8

which should take about 6 weeks. The management scenarios will then be rerun. At the end of the first quarter, all new work ups of the model should be complete.

**Discussion:**

- CBC: Early 2011 for calibration of the model, and we talked about better tracking of BMPs earlier that will not be done until 2012, so this information will not be part of this recalibration. Is there a timeline for that process?
  - There will be opportunity to put new information into the model that do not affect the calibrations. New BMPs are being put in from the WIPs. Voluntary data would have to be submitted during a future phase of calibration.
- MD: Change in land use will be reflected in the model, will it be reflected in the allocations?
  - Unsure, but if there is a different model with a different calibration, that is something we will have to look at. This was where the temporary reserve came into play.
- PA: Had questions about whether the EPA would be willing to have a workshop on the scenario builder to explain to the public how it was constructed. A member of our watershed technical workgroup has asked for a similar workshop so that the states can better understand the changes to the 5.3 model and scenario builder.
  - EPA would be open to something like that, and the hope is that scenario builder would be open to the states and partners so that jurisdictions could do their own scenario runs, but that will not be available until Phase 2.
- STAC: Worried about the potential implication of climate change on the load allocations. We have been running scenarios through the model to see what the magnitude of those implications could be. There have been successful legal challenges to TMDLs because they have not taken into account climate change.
- VA: On December 31st, are you submitting that to a judicial body to satisfy a consent decree?
  - Yes, and then bring it back to the President to satisfy the Executive Order.
- VA: If we are able to modify our plan later, then why should we worry about including the 5% reserve?
  - Did not evaluate that on the draft WIPS, but looked at the "contingencies" that could have possibly made up your 5% reserve.
- VA: Do we have a date for when we will get our recalibrated numbers? Do we know when we will have a date?
  - We have a general time frame but not an exact date.

**Jim Edward** (CBP, Acting Director) discussed the expectations for finer scale of Phase II WIPs and potential tools and support needed from EPA, other Federal agencies and Advisory Committees, and the schedule for the development of jurisdiction's 2-year milestones for 2012-13 and the role of the National Academies of Science's Independent Evaluation.

9

**Discussion:**
- PA : Are local allocations binding and reflected in TMDL?
  - They are local "targets" and are to be used for planning purposes only. They do not need to be separate allocations within the Bay TMDL.
- MD: Does not want a slippage in schedule with changes to Phase II. Permits, two year milestones… etc will continue as planned. Just want a reasonable amount of time to work with the local governments.
- WV: In Phase I WIP are we required to lay out every two years what we are going to propose from now until 2017?
- PA: Error in PA 2 year milestones has not been amended.


## G. Review Actions and First Look at Next PSC Meeting

**Shawn Garvin (EPA Region 3 Administrator, Chair)** reviewed the action items from the meeting and discussed possible days for the next PSC meeting.

10

## Wastewater Treatment Improvements



63% of the Point Source Nitrogen Reduction Goal Has Been Achieved

Nitrogen loads delivered to the Bay from municipal and industrial wastewater facilities declined 30.4 million lbs/yr 1985 - 2004 as a result of industrial reductions and installment of nutrient reduction technology (NRT) technology.

80% of the Point Source Phosphorus Reduction Goal Has Been Achieved

Phosphorus loads delivered to the Bay from municipal and industrial wastewater facilities declined 4.9 million lbs/yr between 1985 and 2004 as a result of improved treatment capability and implementation of phosphate detergent bans (MD: 1985, DC: 1986, VA: 1988, PA: 1990).

These reductions occurred in spite of a 20% increase in population 1985-2003.

AR0036755

## Chapter 3
### Obtaining Additional Nutrient Reductions from Wastewater Facilities Not Cost Effective or Practical

Although EPA and its Bay partners could obtain additional nutrient reductions from significant municipal wastewater treatment facilities to compensate for other sources not meeting 2010 goals, these additional reductions are not cost effective or practical. Obtaining these additional reductions would require justifying additional expenditures, recalculating wasteload allocations, and reopening and modifying permits already being put in place. At this point, EPA has no plans to require additional reductions from wastewater treatment facilities.

## Limited Additional Reductions

### Municipal Facilities – Additional Reductions Possible but Not Cost Effective

Potential additional nutrient reductions from municipal wastewater treatment facilities can be obtained beyond their cap load allocations if all significant municipal facilities operated with state-of-the-art nutrient removal technology. Facilities in the District of Columbia, Maryland, Pennsylvania, and Virginia could reduce the nutrients delivered to the Bay by up to 9.9 million pounds per year for nitrogen and 1 million pounds for phosphorus. This equates to approximately 14 and 20 percent, respectively, of the overall reductions needed by the non-point nutrient sources to meet the Chesapeake Bay nutrient goals. Based on our methodology (see Appendix E), our estimate represents the upper reaches.

However, these additional reductions may not be cost effective or practical. Funding the estimated $3.4 billion needed to install the nutrient removal technology to meet current goals still remains a challenge for most communities. Installing enhanced nutrient removal technology will substantially increase costs even further. The 2003 *Chesapeake Futures* report estimates that improving technology to reduce total nitrogen from 6 to 3 mg/l would increase costs 4-to-10-fold. This incremental upgrade from regular to state-of-the-art technology is less cost-effective than other measures to reduce additional nutrients. Certain agricultural best management practices in particular may provide a more justifiable means for nutrient reduction.

Seeking additional reductions would require resetting wasteload allocations. The Bay partners have already begun to include nitrogen and phosphorus discharge limits in significant facilities' NPDES permits, which are issued for a period of up to 5 years. Some facilities have already begun the capital-intensive process of

16

AR0036801

upgrading their plant technologies to meet these current limits. Amending current permits because of the regulatory process would not be an easy task

### *Industrial Facilities – Ability to Reduce Nutrients Should Be Reviewed*

EPA and its Bay partners may be able to obtain additional nutrient reductions from industrial wastewater treatment facilities beyond current cap load allocations. Most industries do not have technology-based limits for nitrogen and phosphorous. Since the technology-based limits are developed on a national basis, those permits with technology-based limits may not be as stringent as permit limits driven by Chesapeake Bay water quality standards. EPA and its State partners have the authority under the Clean Water Act to require stricter nutrient limits than the technology-based limits. However, during the *Chesapeake 2000* nutrient allocation process, most States in the Chesapeake Bay watershed opted not to require stricter nutrient limits for industrial facilities, even though many municipal facilities were given near state-of-the-art technology allocations to meet the sector nutrient reduction quota.

The OIG did not estimate the additional nutrient reductions available from industrial facilities. These facilities have different wastewater streams than municipal systems. Therefore, additional reductions cannot be calculated in the same manner. Also, industrial facilities operate on widely variant production and nutrient removal processes, with no universal state-of-the-art nutrient discharge concentration. For example, in 2005, average nutrient discharge concentrations of significant industrial facilities in the Chesapeake Bay watershed ranged from 0.4 mg/l to 210 mg/l for nitrogen and 0.01 mg/l to 14.6 mg/l for phosphorus; one outlier facility reported an average total nitrogen concentration of 2,754 mg/l. Because some of these concentrations appear high, EPA and its Bay partners should work with industrial facilities to gain additional nutrient reductions.

### *Equity with Other Sectors*

The concept of "fair and equitable" nutrient allocations among the various partners underlined the collaborative process used to derive the final 2010 nutrient allocation commitments. It has been largely credited for the progress the Chesapeake Bay program has made to date. Resetting nutrient wasteload allocations for municipal or industrial wastewater facilities as a result of other sectors not delivering on their commitments could undermine the agreement achieved by the States amongst themselves and with their nutrient sources. Maintaining the momentum gained thus far should be foremost in the goal of improving the Chesapeake Bay water quality. This would involve building on the effort and progress made by the Bay partners so far. If the wastewater treatment community perceives that non-point source sectors have not followed through in the partnership of "shared sacrifice," they may challenge any requirements for additional reductions.

AR0036802

## Potential Additional Wastewater Reductions Cannot Compensate for Other Sectors' Missed Goals

Additional reductions from the wastewater treatment community, both municipal and industrial, are not large enough to compensate for shortfalls from the agricultural and developed land sectors. As of 2005, the agricultural sector needed to reduce nitrogen by more than 50 million pounds per year, nearly five times the total additional reductions that could be gained by imposing an Enhanced Nutrient Removal goal on all significant municipal wastewater treatment facilities. Phosphorus needs to be reduced by 3.3 million pounds per year, or over three times. Gains from industrial facilities are also limited. Based on previous progress, the agricultural sector will have a significant shortfall in meeting its nutrient reduction goals, but wastewater treatment facilities could make up only a small portion of this gap.

## Conclusions

Although the wastewater treatment community could achieve additional nutrient reductions beyond existing cap load allocations, such an effort would not promote equity or be the most cost-effective track. While EPA and its Bay partners should review industrial facility operations for potential additional reductions, these reductions will not compensate for shortfalls from other sectors. EPA and the Bay partners' primary focus should be on overcoming the present challenges and reaching the current nutrient reduction goals. The success of the Chesapeake Bay program and the health of the bay depend on the efforts of all the partners sharing the responsibility to reduce loads.

## Recommendation

We recommend that the EPA Region 3 Regional Administrator:

3-1    Work with NPDES-delegated States to complete current efforts, related to industrial discharges, to: (a) characterize current nutrient discharge levels; (b) refine nutrient cap loads, where appropriate; and (c) issue permits reflecting modified cap loads.

## Agency Response and OIG Comments

EPA concurred with our recommendation. A complete copy of the Agency's response can be found in Appendix C and our detailed comments in Appendix D.

AR0036803

VAMWA Comments
November 4, 2010
Page 11


VAMWA expands on its comments below.

## II.    EPA'S "BACKSTOPS" JEOPARDIZE VIRGINIA'S HIGHLY-EFFECTIVE POINT SOURCE REGULATIONS, RELATED $2 BILLION INVESTMENT, AND NATIONALLY-RECOGNIZED NUTRIENT EXCHANGE PROGRAM

On January 30, 2009, EPA sent a letter to the Director of VADEQ regarding Virginia's current regulatory approach with regard to existing nutrient cap loadings.[3]  EPA's letter included clear support for Virginia's current program, and a confirmation that the cap loads were properly designed to meet Bay water quality requirements:

> Virginia developed the Virginia Chesapeake Bay Watershed General NPDES Permit, and an associated trading program to specifically address the point source allocations for each Virginia watershed in the Chesapeake Bay.  EPA's Chesapeake Bay Program verified that those cap loadings were sufficient to achieve Bay water quality.  Based on the assignment of wasteload allocations and EPA evaluation of the applicable cap load, EPA found that the General Permit ensured that individual point source discharges would not cause or contribute to an exceedance of the applicable Bay water quality standards.[4]

Inexplicably, 21 months later, EPA proposes to radically alter Virginia's regulatory regime and thus negatively impact the associated $2 billion construction program and an established trading program.  EPA's actions in its Draft TMDL are irresponsible and cannot be reconciled with any reasoned approach to TMDL development.

VAMWA supports the embodiment of the Virginia approach to POTW wasteload allocations from Virginia law and regulations into its WIP, and urges EPA to accept this element of Virginia's WIP.  The wasteload allocations ("WLAs") found in Virginia's Draft WIP are derived primarily from Virginia's Water Quality Management Planning ("WQMP") Regulation (9VAC25-720), Virginia's Chesapeake Bay Watershed General Permit Regulation (9VAC25-820), and "all SWCB-approved amendments" to those regulations. VAMWA supports an approach the recognizes the need for this regulatory stability.[5]

---

[3] Attached hereto as Appendix 2.

[4] January 30 Letter at p. 2.  In this letter, EPA also confirmed that it sent a letter on December 14, 2006 in which it "reported 'no objection' to the General Permit…"

[5] VAMWA has consistently advocated regulatory stability throughout this process.  For example, VAMWA provided recommendations on regulatory stability to the Chesapeake Bay Wastewater Treatment Working Group on June 9, 2009 (attached hereto as Appendix 3).  See also December 11, 2008 Memorandum from VAMWA/MAMWA Chesapeake Bay Team to CBP Water Quality Steering Committee (Representation of VA and MD POTW Loads in Model Scenarios) (attached hereto as Appendix 4).

AR0038002

**VAMWA Comments**
**November 4, 2010**
**Page 14**

> *need for these facilities and a matter of fiduciary responsibility and public trust.*
> Therefore, EPA considers requiring further point source upgrades to the limits of
> technology as an option of last resort and is avoidable if the Bay partners use our
> creative   energies   to   deliver   sufficient   nonpoint   pollutant   reduction
> commitments.[14]

In addition, the Office of Inspector General has also agreed that allocations for significant
wastewater treatment facilities should remain unchanged:

> Although EPA and its Bay partners could obtain additional nutrient reductions
> from significant municipal wastewater treatment facilities…, these additional
> reductions are not cost effective or practical.   Obtaining these additional
> reductions would require justifying additional expenditures, recalculating
> wasteload allocations, and reopening and modifying permits already being put in
> place.   At this point, EPA has no plans to require additional reductions from
> wastewater treatment facilities.[15]

Indeed, according to the latest Phase 5.3 model runs, wastewater represented 21 and 25 percent
of the average annual nitrogen and phosphorus load, respectively, to the Chesapeake Bay under
the 2009 progress scenario.   Under the critical 3-year condition for the TMDL (1993-1995),
wastewater would represent an even lower proportion of the nutrient load with existing controls.

Moreover, wastewater treatment plants lead all sectors in nutrient load reduction. For example,
the estimated 2008 wastewater loads represent a 45-percent reduction from 1985 levels and a 62-
percent reduction from "no action" levels.   Wastewater treatment plants are still in the process of
completing major upgrades and are the only sector predicted to achieve tributary strategy loads
shortly after 2010.   With current levels of nonpoint source controls, the wastewater cap loads
will represent only about 15-percent of the average annual nitrogen load to the Bay, and even
less under critical hydrologic conditions.

Although the wastewater sector is proud of its progress in nutrient load reduction, most treatment
plants are allocated at close to limit-of-technology levels, and there is almost no benefit to further
reductions in point source allocations.   Non-point source reduction will remain the primary
means to achieve the overall loading caps.

In contrast, the Susquehanna River basin alone contributes 44 percent of the total nitrogen load
to the Bay.   This value actually underestimates the impact of the Susquehanna basin, because it is
among the most "effective" basins at impacting hypoxia in the mainstem Bay.   When relative
effectiveness is considered, the Susquehanna River basin accounts for more than 60 percent of

---

[14] Letter dated Sept. 11, 2008, from Donald S. Welsh, EPA Region III, to John Griffin, Maryland DRN, Enclosure A
at 4 (attached hereto as Appendix 11).

[15] 2008 EPA Office of Inspector General's Report (08-P-0049) (attached hereto as Appendix 12).

AR0038005

VAMWA Comments
November 4, 2010
Page 16

Draft TMDL and Appendix Q-2.

For many of Virginia's POTWs, the concentration levels based upon the "moderate" backstop are significantly lower than the concentration levels used to derive the WLAs in the Virginia Regulations and now in Virginia's Draft WIP. As a result, EPA's "moderate" backstop reduces POTW WLAs in order to satisfy EPA's desire for additional reasonable assurance.

EPA's Draft TMDL puts Virginia's POTWs at risk that additional dollars will be needed to complete additional upgrades that will comply with EPA's WLAs, or, even worse, that upgrades that have been completed or are well underway will be stranded in place. This is completely unjustifiable based upon EPA's earlier remarks, and is unwarranted based upon the minimal impact wastewater has on Bay water quality as compared to other sectors. In addition, as explained below, EPA's rejection of Virginia's Draft WIP is legally objectionable. The Clean Water Act does not give EPA the authority to review and/or approve WIPs, or to direct their specific terms. EPA's decision to overwrite Virginia's Draft WIP is unlawful per the Clean Water Act.

In addition, EPA's backstops set a universal technology standard on POTWs across Virginia. This is inconsistent with Virginia's more scientifically defensible site-specific approach in the Virginia Regulations. Virginia's allocations recognize that (1) the James and York River basins do not contribute to the mid-Bay impairments and instead are regulated differently for local quality objectives, and (2) a number of Virginia plants have valid site-specific needs for the allocations alternative allocations. As to the second point, for example, UOSA's allocation reflects the unique drinking water considerations of its immediate receiving water, the Occoquan Reservoir. EPA's backstop WLA would endanger the water quality of the Reservoir, and, in turn, drinking water for to up to a million Northern Virginia residents. Other POTWs with particular WLAs under Virginia law include the City of Hopewell's POTW (80% industrial flow which is far higher than a typical municipal facility) and Virginia's CSO communities (City of Lynchburg and City of Richmond). EPA's failure to consider these important issues in its Draft TMDL is unreasonable.

Not only are allocations under the Virginia Regulations and Draft WIP more appropriate than those of the Draft TMDL for technical reasons and the above-stated policy reasons, but at some point the relentless regulatory pressure to increase wastewater rates must be considered. According to Draper Aden Associates' most recent annual water and wastewater rate report, Virginia wastewater rates rose an average of 5% last year and 67% over the last decade. Many VAMWA members have reported double-digit rate increases for multiple years. This comes at a time when unemployment levels are very high (currently at 9.6%). Consideration should be given to the impact of the higher costs that EPA is forcing on Virginia's families and businesses.

For these reasons above, VAMWA objects to EPA's determination to "backstop" Virginia's Draft WIP for wastewater and supports the Virginia Regulations incorporated into the Draft WIP. EPA's backstops must be eliminated before EPA issues its final TMDL.

AR0038007

VAMWA Comments
November 4, 2010
Page 21

> Except as expressly provided in this Act, nothing in this Act shall (1) preclude or deny the right of any state or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.")[37]

Federal law clearly gives Virginia the authority to develop its own requirements and programs, so long as they are not less stringent than those established under the Act.[38]  Because EPA has no statutory authority to establish WIPs, it is impossible for Virginia's Draft WIP to be less stringent.

For these reasons, Virginia should have the discretion to establish its own WIP, without EPA passing judgment and usurping what is rightfully the state's role in this process.

## IV.   EPA's BACKSTOPS WILL NEGATIVELY IMPACT SMART GROWTH & ECONOMIC DEVELOPMENT

### A.   Smart Growth

Most major POTWs in the Chesapeake Bay watershed currently have allocations that were calculated using design flows and a TN concentration between 4 and 6 mg/L.  In comparison, secondary treatment POTWs may discharge at a concentration of approximately 25 mg/L TN plus or minus.  The generally-agreed upon limit of technology (LOT) for nitrogen removal at POTWs is 3 mg/L; thus, treatment at the 4-6 mg/L level is about 85%-to 95% of the maximum technically feasible reduction.

After making these major reductions, what remains is only limited capacity for POTWs to serve future growth in wastewater flows in the environmentally beneficial manner of using these advanced treatment facilities rather than to less effective on-site disposal systems ("OSDSs").  In contrast, the reductions reflected in EPA's TMDL could increase net (POTW+OSDS) nitrogen

---

[37] 33 U.S.C. 1370.

[38] Virginia law (Chesapeake Bay and Virginia Waters Clean-Up and Oversight Act) includes a provision for the development of a Bay clean-up plan.  Va. Code 62.1-44.117.

AR0038012

VAMWA Comments
November 4, 2010
Page 40

**H.    The TMDL does not acknowledge and accept Virginia's proposal to revise the chlorophyll standards and improve the modeling framework**

Appendix 2 of Virginia's WIP contains a Draft James River Chlorophyll-*a* study plan. VAMWA concurs with and supports the need for the stated tasks. Successful completion of this study plan is considered essential to address the stated deficiencies of the standard and the associated modeling framework that are referenced in these comments. EPA has ignored the importance or implications of this study in the Chesapeake Bay TMDL. The existing allocations listed in the EPA TMDL for the James River based on chlorophyll-*a* (23.48 mpy TN, and 2.340 mpy TP) should be replaced with allocations consistent with Tributary Strategies. EPA's TMDL should include the chlorophyll-*a* study in the TMDL. However, EPA must clearly state the level of unreliability that exists with the present chlorophyll-*a* standard and the modeling results in the TMDL document.

**I.    Filter feeders and menhaden offer another means to address chlorophyll-*a* compliance on the James River**

We support EPA's efforts to consider the role of Atlantic menhaden in relation to management of chlorophyll-*a*. Recent modeling work has shown that their migration into the tributaries and associated consumption of algae has the potential to affect chlorophyll-*a* and associated compliance with the standards. We agree with the statement included in TMDL Appendix U "Although the influence of menhaden on water quality is estimated to be less than that of oyster filter feeders, even a small percentage of nutrient assimilation or chlorophyll reduction in the Chesapeake Bay would ease the pressure in meeting 2-year milestones." Menhaden stocks do not dramatically reduce chlorophyll as long term averages but their incremental effects are considered comparable to nutrient reduction.

VAMWA recommends that additional analyses be conducted to evaluate menhaden effects on seasonal peaks and/or worst years in the record. Further, additional modeling enhancements need to address menhaden migration and residence time variability according to a food gradient. A number of papers indicate that menhaden consumption of algae increases in areas with higher chlorophyll-*a*. This is logical because the species would remain longer in an area with greater availability of food. Because the model does not presently capture these foraging effects the available reductions in chlorophyll due to menhaden (especially during bloom conditions) would be under-estimated.

**VII.    EPA'S BAY MODEL IS FLAWED**

**A.    EPA Should Correct A Number of Modeling Issues**

EPA expects VAMWA members (and others) to comply with an extraordinarily expensive clean-up plan. However, EPA itself has not fulfilled its obligation to ensure that its modeling framework is adequate to support its TMDL and the accompanying WLAs and LAs. If EPA presses forward with finalizing the TMDL over the objections of Bay dischargers and interested

AR0038031

**VAMWA Comments**
**November 4, 2010**
**Page 41**

stakeholders, despite the faulty model that it has put forth in support of its TMDL, its decision to do so will be arbitrary and capricious.

Like any model, EPA's Bay model is a highly imperfect representation of reality. Over time, EPA has inappropriately shifted to using it in ways that are beyond its capabilities (e.g., predicting D.O. concentrations and non-attainment rates in specific segments to the single percentage point level under far-reaching management scenarios). This has resulted in wide swings in predicted loads and goals with each major model version. VAMWA believes that this instability will continue to occur in the future as the model is periodically modified.

VAMWA objects to overreliance on unstable models to the single percentage point of output, such that environmental policies are undermined with each new model run. Following are examples of problematic modeling issues that should cause EPA to shy away from major disruptions to state regulations/policy on the basis of single-digit shifts in model output:

1. *Lack of full model validation and peer review*: The Scientific and Technical Advisory Committee (STAC) has placed a strong emphasis on the need for model validation (STAC, 2006), calling validation "an essential and a required step in model development, particularly if the model is to be used for TMDL development purposes" (STAC, 2008b).[67] Although the watershed model (WSM) appears to have been subjected to some kind of validation, the public documentation of the validation is very poor. Moreover, it is unclear if the Water Quality and Sediment Transport Model (WQSTM) has been validated in any manner. VAMWA scientists were unable to locate any record of WQSTM validation in Chesapeake Bay Program materials. It also appears that the STAC reviews of the WQSTM have focused on the sediment, clarity, and SAV components, and there may not have been a complete peer review of the latest version of the full eutrophication and DO simulation.

2. *The model is being extrapolated beyond the observed range of management controls and living resources*: The model framework has been calibrated using data from years with widely varying hydrologic conditions. However, none of the calibration data are representative of management controls or living resources that being called for as part of the Bay TMDL and related goals. Therefore, there is simply no way to verify that the Bay system will respond precisely as predicted. The model predictions of attainment are best characterized as rough approximations rather than highly precise predictions.

3. *An estimate of model uncertainty should be used to determine the essential equivalence of model scenarios*: EPA was correct to implement an interpretive rule (the "1% rule") by which model-predicted non-attainment is considered indistinguishable from zero. However, the one-percent magnitude underestimates the model error and overestimates the precision of both the model and monitoring data. Based on the analysis of Bell

---

[67] Attached hereto as Appendix 37.

AR0038032

**VAMWA Comments**
**November 4, 2010**
**Page 42**

(2010b), segments that are close to attainment would require spatial D.O. violation rates that differ by 4% or more before they would be statistically distinguishable from one another. EPA's justification for the 1% magnitude was not based on calibration or validation statistics, but by an analysis of the sensitivity of simulated to DO attainment to simulated load reductions.[68] It is recommended that the EPA further evaluate the statistical power of the model and monitoring to distinguish between non-attainment rates of differing magnitude. With the information in hand, VAMWA concludes that the "1% rule" should be a "4% rule" at minimum.

4. *Inaccuracy of groundwater inputs*: The model handles groundwater inputs/loads in a very simplistic manner that is dissimilar to physical reality. Or as stated by STAC (2008a), "the model does not represent the full coupling of the groundwater to the surface water system on a regional scale." Considering that 50% of the total freshwater flow to the Bay is derived from groundwater (Bachman and others, 1998), this is a major model limitation and source of uncertainty for management scenarios.

5. *Lack of criteria for acceptance of model predictions*: Predictions of dissolved oxygen and chlorophyll-*a* in some segments are characterized by anomalies (e.g., counterintuitive trends with decreasing loads). EPA recognized many of the most obvious problems, and used poor model behavior as a justification for not using DO or chlorophyll-*a* attainment in many segment-seasons (e.g., Keisman, 2010a; Keisman 2010b).[69] However, in most of these cases, the underlying cause(s) were not identified, and full implications of these problems for the model were not explored. The same problems that caused obviously poor model behavior in some segment-seasons might be also causing more widespread but less obvious problems in other segment-seasons. We see no evidence that the CBPO developed objective criteria for the acceptance or rejection of model results in these circumstances. Poor behavior of the James River chlorophyll-*a* model is discussed in more detail in Section VI.

6. *Poor chlorophyll-a calibration*: The chlorophyll-*a* calibration is obviously very poor in many segments (e.g., tidal freshwater James), and EPA has not demonstrated that the model is a useful predictor of annual changes in chlorophyll-*a* in other key segment-seasons. This comment is discussed in more detail in Section VI.

7. *Instability and inaccuracy in urban land use assumptions*: The watershed model suffers from questions regarding accuracy of the urban land use acreages. Urban land use breakdowns have been very unstable between model versions and even subversions, varying with different derivation methods and assumptions. For example, the urban land

---

[68] Batiuk, R. and Shenk, G., 2010. Technical Rationale for Documenting Attainment for 1% Non-attainment Dissolved Oxygen Criteria Values. Attachment C2 for State/District Co-Regulators June 14, 2010 Conference Call (attached to Appendix 41).

[69] Attached hereto as Appendix 38; see also Appendix 31.

AR0038033

**VAMWA Comments**
**November 4, 2010**
**Page 43**

use breakdown varied by millions of acres between model version 5.2 and 5.3.[70] It is unclear that the latest version is accurate or has been adequately ground-truthed. Urban stormwater loads and implementation costs are highly sensitive to the assumptions regarding urban land use breakdown.

8. *Missing point sources*: It is our understanding the current version of the model framework does not include 139 active Virginia point sources. Further, EPA is aware of this error, however it has not been corrected due to a lack of time until EPA's self-imposed December 31, 2010 deadline.

9. *Inappropriate application of watershed model to local level*. In their review of the Phase 5 watershed model, STAC (2008) clearly stated that the model was not appropriate for use at the local level, and would need recalibration/resegmentation for this application. It is unclear, then, why the Bay Program is continuing to promote the application of the model to determine local-level loads and allocations, and why EPA is calling for such values in the Phase II WIPs.

10. *Overparamterized modeling framework*: The model combined modeling framework is so complex and highly parameterized that there are no unique calibration solutions; it is easy to obtain the "right" answer for the "wrong" reason. Calibration also relies on regional calibration factors that act as "black box" knobs, divorcing the model result from physical understanding of the processes. While necessary for calibration, these factors introduce yet another source of uncertainty into model predictions.

11. *Inconsistent watershed model results*: We understand that a consultant retained by another stakeholder has run the watershed model has obtained widely different results on different computers. If true, this brings into question which is the "correct" result, and undermines the entire basis of the TMDL allocations. We encourage the Bay Program to fully investigate the reasons and implications of this finding.

**B.    EPA's Critical Period Is Appropriate**

VAMWA concurs with EPA's decision to use 1993-95 as the critical period for the nutrient TMDL.[71] This period had relatively high winter-spring inflows, but not so extreme that the TMDL would be based on an extremely rare hydrologic event. A TMDL based on 1993-95 hydrology will be protective under the great majority of hydrologic conditions.

---

[70] See Appendix 39.

[71] See July 16, 2009 Technical Memorandum from C. Bell to C. Pomeroy (Analysis of January-May Inflows to the Chesapeake Bay during the 1996-98 Period) and follow-up materials (attached hereto as Appendix 40).

AR0038034

VAMWA Comments
November 4, 2010
Page 44


C.    EPA's Use of An Implicit Margin of Safety Is Appropriate

The Draft TMDL depends on a very complex framework of water quality standards, assessment methodologies, and models to derive allocations; each with its own environmental conservatism. This combined framework results in a sum level of conservatism reflecting all of the contributing sources of conservatism.

For example, the water quality criteria themselves are conservative, as stated in the original criteria document (EPA CBPO, 2003): "...these criteria were developed with conservative (protective) assumptions, allowing a small percentage of circumstances in which the criteria may be exceeded will still fully protect the tidal-water designated uses."

The assessment methodology includes several conservative elements, such as the fact that any exceedance of the cumulative frequency distribution ("CFD") reference curve is considered a potential violation, even if the segment being assessed has a lower total violation rate in time-space (*i.e.*, area under the CFD curve) than the reference condition.  The use of the default 10-percent reference curve for some criteria is also conservative in that Bay sites that are believed to be complying with standards are being found not to be in compliance based on conservative assumptions of the TMDL.  The fact that the TMDL is developed for a critical 3-year condition, instead of average conditions, provides another layer of conservatism.

Furthermore, although the model is not designed to be explicitly conservative, a review of the UMD/MAWP Year 1 and Year 2 BMP efficiency reports revealed many examples of where conservatively low BMP efficiencies were selected for use with the Phase 5 watershed model. For example:

| BMP | Conservative Assumption from Year 1 & 2 BMP Efficiency Reports |
|---|---|
| Riparian buffers | "...a 20% reduction in the effectiveness values is applied to efficiencies from literature sources..." |
| Urban wet ponds and wetlands | "The uncertainty in how improper maintenance will adjust BMP efficiencies supports the recommendation to use a more conservative percent removal estimate." |
| Dry detention basins | "...effectiveness estimates for Dry Detention Ponds/Basins and Hydrodynamic Structures were not changed based on the recommendation of the USWG. However...the available literature does suggest somewhat higher removal rates..." |
| Bioretention | "The 10% TN concentration reduction [is] a conservative judgment..." |
| Vegetated open channel | "A more conservative value from the CWP estimate was selected..." |
| Permeable pavement | "...a conservative approach is taken to estimating permeable pavement and paver performance." |
| Infiltration basins | "...a 15% reduction in TN is used here for systems with sand |

AR0038035

**VAMWA Comments**
**November 4, 2010**
**Page 45**

| and trenches | or vegetation, and 0% TN removal for systems without sand and/or vegetation, to be consistent with the other infiltration and filtration BMPs in this report and to be conservative." |
| Off-stream watering | "…we proposed values close to the conservative literature base…" |

The Bay Program Office has identified specific sources of environmental conservatism that are built into the analysis that justify an implicit margin of safety for the TMDL:

- The fact that allocations to achieve D.O. standards are driven by a relatively small area in the Bay (segment CB4), and that most of the rest of the Bay system would achieve DO standards under higher nutrient loading levels.

- The fact that 100% of point sources are assumed in model scenarios to operate at their maximum permissible loading levels, which is highly unlikely to ever occur.

Given the multiple layers of conservatism in the TMDL allocation process, VAMWA supports EPA's decision to use an implicit margin of safety.

**D.      EPA's Failure to Recognize Essential Equivalency in Its Target Load Options Is Unreasonable**

In the determination of basin nutrient loadings (190 TN and 12.7 TP) EPA utilized the 1% rule to determine compliance (with the exception of certain problem segments).    Bell (2010b) performed a statistical "power analysis" to evaluate the minimum difference in D.O. that would be statistically detectable in the Chesapeake Bay Monitoring Program.[72]  Based on the results of this analysis, segments that are close to attainment would require spatial D.O. violation rates that differ by 4% or more before they would be statistically distinguished from one another.  The management implications are that Bay model D.O. scenario results with differences less than 4% should be considered "essentially equivalent."  This is not the case in the current TMDL.  Based on the above referenced "power analysis," the scenario associated with Target load Option A produces results that are "essentially equivalent" to EPA's recommended basin target loads of 190 mpy/yr TN and 12.7 mpy/yr TP (Bell, 2010a).  At this level of nutrient loading the key Bay segments of CB4MH, CB5MH, MD5MH, and VA5MH are predicted to be in attainment or be within 2% of attainment.  It is recognized that Target load Option A would not immediately address attainment in some of the side segments.  However, effectively addressing these side segments would require separate, locally oriented modeling analysis with tools better adapted to evaluating local conditions.  The Target Load Option A to comply with D.O. standards in the main bay is essentially equivalent to the more stringent and costly to attain allocations associated with 190 TN and 12.7 T and the TMDL; this must be recognized in the TMDL.

---

[72] Attached hereto as Appendix 41.

AR0038036

VAMWA Comments
November 4, 2010
Page 46

### E.    EPA Should Assume Better Design, Installation, Operation and Maintenance for Modeled BMPs

It is well known that historically many non-point BMPs have not been accompanied by programs or methods to ensure proper design, installation, operation, or maintenance. It is reasonable that model calibration scenarios should assume, at a minimum, historical "average" management conditions. Any other approach—including the use of conservatively low values—would make the model less accurate and force management decisions that may be more costly and/or provide less benefit. However, it is not necessary for forward-looking management scenarios to retain the assumption of historically-average BMP management. Rather, improvements in the way BMPs are installed, operated, and maintained are a viable implementation component. Modeled TMDL allocations scenarios should reflect the manner in which BMPs *should* be designed, operated, and maintained, not necessarily how they have historically been managed.

One example of where EPA and the Bay States have assumed a high level of nutrient removal performance is for wastewater treatment plants. The performance expected and used in the model is based on properly installed, operated and maintained facilities. The standard for performance relative to design of any nutrient removal strategy (wastewater plants, BMPs, filter feeders, etc.) used in the Bay model should not be different.[73]

These actions would improve the effectiveness of BMPs to reduce loads and improve reasonable assurance of reductions from these sectors.

### VIII.  EPA'S BACKSTOPS ELIMINATE PLANNED AGRICULTURAL LOAD REDUCTIONS DESPITE THOSE CONTROLS BEING AMONG THE MOST COST-EFFECTIVE MEASURES FOR IMPROVEMENT

Section 6 of the Draft TMDL document describes EPA's allocation method for relating relative impact to needed controls. The methodology recognizes that nonpoint sources cannot attain the same levels of control as point sources, and calls for 55-75% of E3 nitrogen controls from nonpoint sources such as agriculture. However, EPA's "backstop" allocations appear to have been accompanied by increases in allocations to nonpoint sources, such that agriculture in many basins fall well short of the intended level of nitrogen control. In so doing, EPA has dispensed with the fairness/equity concepts developed by its own TMDL work group, and shifted implementation away from the most cost-effective, environmentally beneficial practices.

Overall, EPA's Draft TMDL appears to put Virginia agriculture at a 48% level of nitrogen control (relative to E3), well below the 55-75% level indicated by the relative-effectiveness allocation methodology and far short of controls called for in both Virginia's Tributary Strategy and Draft WIP (Figure 5). This is partly driven by the lower levels of effort in the Potomac River Basin (51%), but primarily driven by an extraordinarily low (17%) level of effort for the

---

[73] See VAMWA Chesapeake Bay Team Memo re BMP Efficiencies to VAMWA and MAMWA Boards of Directors, January 21, 2009 (attached hereto as Appendix 42).

AR0038037

**VAMWA Comments**
**November 4, 2010**
**Page 57**



Figure 11: Knee-of-the-Curve Analysis for James River Chlorophyll-a WQS

Figure 11 shows that the cost of the Tributary Strategy is approximately $9 Billion. In addition, the Figure shows the estimated capital costs of attaining the chlorophyll-a criteria against the percent attainment rate. The capital costs include estimates for basin-wide wastewater treatment plant upgrades, agricultural BMPs, and urban runoff controls necessary to meet the allocations identified by EPA for the scenarios identified in Figure 11. The wastewater treatment plant capital costs are a function of design flows and level of treatment (biological nutrient removal, enhanced nutrient removal and limit of technology). Agricultural capital costs are based on BMP unit cost per acre and the BMP assumptions used in the Phase 5.3 Model. The urban runoff capital costs[89] are based on the performance associated with the runoff reduction method for an estimated amount of retrofit controls that could be installed in a locality, which represents only a portion of the urban runoff costs. The costs for the remainder of the urban runoff reductions needed to meet the allocations would be achieved with stormwater capture/storage and reuse. The estimated capital costs were prepared for the following EPA Scenarios:

- '91-'00 Base Scenario: Point "A" represents the James River TN and TP loading of 36.9 and 3.3 million pounds per year, respectively.

- EPA's Tributary Strategy: Point "B" represents the James River TN and TP portion of the Bay-wide loading, which is 27.5 and 3.3 million pounds per year, respectively.

---

[89] Urban nutrient management was not included. The capital costs are based on meeting the waste load allocation for the Urban Runoff identified in Appendix Q-1 of the Draft TMDL.

AR0038048

VAMWA Comments
November 4, 2010
Page 58

- EPA's James Chl-a Compliance:  Point "C" represents the James River TN and TP loading of 23.5 and 2.35 million pounds per year, respectively.  EPA has selected this scenario as the basis for compliance with the James River chlorophyll-a criteria.  EPA also refers to this scenario as "James Level of Effort at ½ Potomac".  In the Draft TMDL (Appendix J), EPA states "In the James, the nutrient loads are equivalent to the level of effort half way between Virginia's portion of the Potomac and the James for the 190/12 Loading Scenario."  In other words, EPA is referring to a new theoretical scenario that is more stringent than the Virginia Regulations as to the James River but not quite as stringent as Virginia's Regulations require for the Potomac River, which have a far greater impact on Bay water quality.

- E3 (Everything, Everywhere, by Everybody):  Point "D" represents the James River TN and TP loading of 16.1 and 1.5 million pounds per year, respectively.  EPA considers this to be the "theoretical maximum levels of managed controls on all pollutant load sources".  There are no cost and few physical limitations to implementing controls for point and nonpoint sources that are recognized in the E3 scenario. This scenario is used with the No-Action scenario to define the "controllable" loads, i.e., the difference between No-Action and E3 loads." See Draft TMDL at Appendix J.

The knee-of-the-curve analysis determines where the increment of pollution reduction achieved in the receiving water diminishes compared to the increased costs. There is a **steep inflection** at Point "B" that represents the knee-of-the-curve.  Any reduction beyond Point "B" lacks a viable cost-to-benefit ratio and does not reflect a reasonable benefit.  EPA has selected Point "C" as the basis for the James River compliance with the chlorophyll-a criteria, which is about half way between Point "B" and EPA's E3 scenario (Point "D").   If one assumes that the model predictions are accurate (about which there is substantial doubt), at Point "B", the James River would be 93 to 94 percent compliant with chlorophyll-a criteria compared to 99 percent at Point "C."  However, the true difference in chlorophyll-a model output between Points "B" and "C" is only 2 to 3 μg/L (three parts in a billion).  Additionally, the sampling and testing accuracies for physical water measurements is 1 to 3 μg/L.  In other words, even if the loadings between Points "B" and "C" were achieved, it is unlikely that the difference in James River chlorophyll-*a* concentrations could be measured.  The difference in the estimated cost of achieving the loadings between Points "B" and "C," on the other hand, is over $10 billion- a sum that cannot only be measured, but will be paid by Virginians, if EPA's Draft TMDL is adopted as is on this issue.

In summary, it is incumbent upon EPA to reconsider the basis for the James River allocations considering the magnitude of the costs of attaining levels of load reductions required to produce a difference in modeled chlorophyll-a concentrations so small that they cannot be reliably measured.  Further, it is incumbent upon EPA to consider these staggering costs as it finalizes its TMDL.  At a minimum, EPA should not pass the knee-of-the-curve identified at Point "B" of the above graph.  Assuming there is any real water quality improvement beyond Point "B," it would not be cost effective, could not be physically measured, and could not be reasonably attained. The only reasonable response is to set James River basin allocations based on the Tributary Strategy allocations.

AR0038049



**COMMENTS OF THE
VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.
REGARDING U.S. EPA'S DRAFT CHESAPEAKE BAY TMDL AND
VIRGINIA'S DRAFT CHESAPEAKE BAY TMDL WIP**

**NOVEMBER 4, 2010**

## I.    INTRODUCTION & EXECUTIVE SUMMARY

On September 3, 2010, the Commonwealth of Virginia ("Virginia") submitted a Chesapeake Bay TMDL Phase I Watershed Implementation Plan ("Draft WIP" or "Virginia's WIP") to the United States Environmental Protection Agency ("EPA"). On September 22, 2010, EPA issued a Notice of Availability of the Draft TMDL and request for public review and comment on the Draft TMDL in the *Federal Register* regarding the development of a total maximum daily load ("TMDL") for the Chesapeake Bay Watershed. On September 24, 2010, EPA issued a DRAFT Chesapeake Bay Total Maximum Daily Load ("Draft TMDL" or "EPA's TMDL"). Virginia Association of Municipal Wastewater Agencies, Inc. ("VAMWA") hereby submits the following comments in response to EPA's *Federal Register* Notice, EPA's Draft TMDL, and Virginia's Draft WIP.

VAMWA is a statewide association that includes the owners and operators throughout Virginia of municipal wastewater treatment plants, which the Clean Water Act ("CWA") refers to as publicly owned treatment works ("POTWs"). Many VAMWA members' facilities clean and discharge highly-treated wastewater within the Chesapeake Bay watershed pursuant to state-issued National Pollutant Discharge Elimination System ("NPDES") permits known as VPDES permits. As owners and operators of highly-regulated pollutant removing facilities, VAMWA's members have a direct stake in the development of the Bay TMDL and in its implementation. Indeed, VAMWA members are currently completing a Bay-leading treatment upgrade program with an investment of approximately $1.5 billion to $2 billion to implement the Bay TMDL.

VAMWA submitted comments on December 18, 2009, in response to EPA's September 19, 2009 Notice and Initial Request for Public Input regarding the development of a Chesapeake Bay

AR0037992

Exhibit E

**Summary of Meetings on Model Development and Attendees**
**Compiled from Appendix C to the Bay TMDL AR0000422-56**

July 20, 2009 meeting of Water Quality Steering Committee (WQSC)(representatives of  MDA, Va DCR, DE MD Agribusiness, USDA, Northern Virginia Regional Commission, HRSD, PA Conservation Authority, PA Homebuilders, etc.).  Discussed various protocols and methodologies for the Model (*e.g.*, discussion of SAV representation in Model, with MDE representative querying the tracking of SAV areas being implemented over a 10 year time span for the model).  TMDL, App. C, Table C-2, C-11.

October 27, 2009.  Urban Stormwater Implementation Workgroup (USIWG) conference call (representatives from VA, MD, WVA, etc.).  Updating information from the states concerning the wasteload allocations.  *E.g.*, VA DCR representative said VA does not have the data that MD had so VA will seek locality input.  VA has not decided to_go with EPA local numbers if provided.  Decision made to hold a separate call with VA to get its update on WLA process. "Discussion with VA was left at VA provided preferences." TMDL, App. C, Table C-2, C-12.

November 18, 2009. Wastewater Workgroup (WWWG). Face to Face meeting to "finalize inputs to Model." Included presentation by WVU of its final report on the septic system study project, Evaluation of Nutrient-Reducing Onsite Wastewater Treatment Systems.  Workgroup requested approval to incorporate study findings into Phase 5.3 Model calibration. TMDL, App. C, Table C-2, C-13.

December 8, 2009, Urban Stormwater Workgroup Conference Call.  Discussed MDE's proposal for changing reporting of
stormwater management implementation to the Chesapeake Bay Program (CBP), for potential use in CBP model and TMDL analysis.  TMDL, App. C, Table C-2, C-13.

March 29, 2010 Agricultural Workgroup meeting ((representatives of  MDA, Va DCR, DE MD Agribusiness, USDA, PA Conservation Authority, etc.).  Included discussion with Modeling Team on issues re Model recalibration, Model's treatment of numerous agricultural issues (e.g., use of agriculture census data, growth rates for different crops, nutrient management concerns, excess nutrients and state variability in use, etc.). TMDL, App. C, Table C-2, C-14.

1

April 5, 2010, Water Quality Goal Implementation Team meeting.  Addressed "Nutrient Management in the CBP Watershed Model Phase 5.3 and Scenario Builder." WQGIT approved the Agricultural Workgroup recommendations to correct Nutrient Management in the long term, but the majority would accept a placeholder solution to prevent delaying the TMDL. TMDL, App. C, Table C-2, at C-14.

April 27, 2010, Agriculture Workgroup meeting (with participants including representatives of VA DCR and others) where attendees discussed "Model concerns" and developed "Summary of Model Recommendations" concerning nutrient management.  TMDL, App. C, Table C-2, at C-14.

May 27, 2010, Agriculture Workgroup Meeting where attendees (representatives of  MDA, Va DCR, DE MD Agribusiness, USDA, PA Conservation Authority, etc.) discussed and developed a list of recommendations to the Water Quality Goal Implementation Team for addressing Ag issues, including individual state guidance on distribution of excess manures to address application of agricultural inorganic and organic nutrients in Phase 5.3 model. TMDL, App. C, AR0000435. http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10862&DefaultView=all&RequestDate=05/26/2010 ;

*See also* U.S. Br. Exhibits A, C, and E.

Ex. A Chesapeake Bay Program, Joint Watershed Technical Workgroup and Agricultural Nutrient and Sediment Reduction Workgroup: Highlights and Action Items (December 11, 2008) p 1-2 - Joint Technical Workgroup and Ag Nutrient/Sediment - decisions on approving use of Ag census data and Scenario Builder parameters including some Ag BMPs  (discussed in 15 pp following) - list of attendees including MDA, VA DCR, NRCS on pp. 16-17.

Ex. C. Chesapeake Bay Program, Water Quality Steering Committee: Summary of Decisions, Issues, and Actions (April 15-16, 2009) - pp 9-10 recording decisions approving use of Phase 5.x of model and 5.3 model enhancements to include BMPs; attendees on 37-38 including state representatives.

Ex. E.  Chesapeake Bay Program, Water Quality Goal Implementation Team: Summary of Decisions, Actions Items and Recommendations (April 5-6, 2010) page 13 approving Ag Workgroup recommendations to correct Nutrient Management in long term but approving placeholder for TMDL.

2

2009 public meetings in VA

- AR0027670:  Fredericksburg VA, Ches Bay TMDL Public Meeting
  Summary, Dec. 17, 2009.  105 attendees total/10 attendees heard via Farm
  Bureau (FB).  (Agenda items:  EPA presentation on TMDL and EPA
  expectations, next steps, public comments).
- AR0027710: Penn Laird VA, Ches Bay TMDL Public Meeting Summary,
  Dec. 16, 2009.  205 attendees total/16 heard via FB.  (Agenda items:  EPA
  presentation on TMDL and EPA expectations, next steps, public comments).
- AR0027754: Chesapeake Bay VA, Ches Bay TMDL Public Meeting
  Summary, Dec. 15, 2009.  110 attendees total/FB and Home Builders
  Association (HBA) among the sources listed under "Other" for way 30
  people heard about meeting (no specific head count).  (Agenda items:  EPA
  presentation on TMDL and EPA expectations, next steps, public comments).
- AR0027789:  Williamsburg VA, Ches Bay TMDL Public Meeting
  Summary, Dec. 15, 2009.  110 attendees total/HBA Va among the sources
  listed under "Other" for way 25 people heard about meeting (no specific
  head count) (Agenda items:  EPA presentation on TMDL and EPA
  expectations, next steps, public comments).
- AR0027828:  Falls Church VA, Ches Bay TMDL Public Meeting Summary,
  Dec. 14, 2009.  80 attendees total/ FB Govt Relations Dept among the
  sources listed under "Other" for way 14 people heard about meeting (no
  specific head count) (Agenda items:  EPA presentation on TMDL and EPA
  expectations, next steps, public comments).

2010 public meetings in VA

- AR0029119: Hampton VA, EPA Region 3, Draft Ches Bay TMDL, Oct. 5,
  2010.  (Agenda items:  EPA presents draft TMDL, VA presents WIP,
  Q&A). (No info on attendees).
- AR0029168:  Richmond VA, EPA Region 3, Draft Ches Bay TMDL, Oct. 6,
  2010. (Agenda items:  EPA presents draft TMDL, VA presents WIP, Q&A).
  (No info on attendees).
- AR0029218:  Annandale VA, EPA Region 3, Draft Ches Bay TMDL, Oct.
  5, 2010. (Agenda items:  EPA presents draft TMDL, VA presents WIP,
  Q&A). (No info on attendees).
- AR0029270:  Harrisonburg VA, EPA Region 3, Draft Ches Bay TMDL,
  Oct. 4, 2010. (Agenda items:  EPA presents draft TMDL, VA presents WIP,
  Q&A). (No info on attendees).

3

- AR0029320:  <u>Richmond VA</u>, Commonwealth of VA, Draft Ches Bay
  TMDL, Oct. 7, 2010. (Agenda items:  Priorities, development of plan, WIP
  overview, etc). (No info on attendees).

In addition, the following CBP committee/workgroup and stakeholder meetings
took place between 2008-2010 where the Bay TMDL was a principal topic of the
meeting.  These represent meetings at which the apparent host was either the FB or
the HBA:

- Nov. 18, 2008:  Harrisburg Homebuilders (Harrisburg PA)
- Oct. 21, 2009:  Lancaster County Agriculture Forum (Bird in Hand PA)
- Nov. 4, 2009:  Eastern Panhandle Home Builders Association (Martinsburg
  WV)
- Nov. 18, 2009:  Pennsylvania Builders Association (Lemoyne PA)
- Dec. 10, 2009:  Delaware and Maryland Homebuilders (Grasonville MD)
- Dec. 10, 2009:  Delaware and Maryland agricultural representatives at
  Delaware Poultry Industry office (Georgetown DE)
- Dec. 15, 2009:  Virginia Farm Bureau and other agricultural organizations
  (Williamsburg VA)
- Dec. 17, 2009:  Homebuilders Association of Virginia (Richmond VA)
- Mar. 22, 2010:  Bay TMDL Webinar for the Agricultural Community
  (Washington DC)
- Mar 29-30, 2010:  Farm Pilot Project Coordination (FPPC) Regional
  Summit (Annapolis MD)
- Jul 21, 2010:  Industry coffee with EPA HQs (Washington DC)
- Sept. 30, 2010:  EPA Fed Advisory Cmte on Agriculture (Washington DC)
- Sept. 30, 2010:  PA Agriculture Stakeholder Workgroup meeting
  (Harrisburg PA)
- Oct. 4, 2010:  Virginia Agriculture Stakeholders (Harrisonburg VA)
- Oct. 5, 2010:  Virginia Developers and Homebuilders (Fairfax VA)
- Oct. 6, 2010:  Virginia Developers and Homebuilders (Richmond VA)
- Oct. 11, 2010:  Delaware Agriculture Stakeholders (Georgetown DE)
- Oct. 11, 2010:  Delaware Developers and Homebuilders (Seaford DE)
- Oct. 13, 2010:  Maryland Developers and Homebuilders (Annapolis MD)
- Oct. 14, 2010:  Maryland Agriculture Stakeholders (Frederick MD)
- Oct. 18, 2010:  Pennsylvania Agriculture Stakeholders (Lancaster PA)
- Oct. 19, 2010:  Pennsylvania Agriculture Stakeholders (State College PA)
- Oct. 20, 2010:  Pennsylvania Builders Association (Williamsport PA)
- Oct. 27, 2010:  New York Farm Bureau (Apalachin, NY)

4

- Nov. 3, 2010:  West Virginia Developers and Homebuilders (Martinsburg WV)
- Nov. 4, 2010:  West Virginia Agriculture Stakeholders (Romney WV)
- Nov. 4, 2010:  West Virginia Developers and Homebuilders (Romney WV)

**Duncansville Municipal Authority Water & Sewer**
**Duncansville, Pennsylvania 16635**

Water & Sewer Dept.
**R. CHARLENE DAVIS, Billing Clerk**
Borough Building
1146 Third Avenue
P.O. Box 308
Duncansville, Pa 16635

Office Hours:
8:00 a.m. to 4:30 p.m.
Monday thru Friday

Phone: (814) 695-0354
Fax: (814) 695-4105

November 5, 2010

Water Docket
Environmental Protection Agency
Mailcode: 28221T
1200 Pennsylvania Ave., NW.
Washington, DC 20460

**Docket EPA R03-OW-2010-0736**

**RE: Chesapeake Bay TMDL's**
**Proposed Backstop TMDL's for Wastewater Treatment Plants in Pennsylvania**
**Susquehanna River Watershed -**

Dear Sir;

The Duncansville Municipal Authority in Blair County, Pennsylvania has just completed a $11 million dollar project to upgrade and expand its wastewater treatment plant. Construction was completed in July 2010. A large portion of this project was undertaken because the Authority had been issued a new NPDES permit in September 28, 2007. That permit required the removal of total nitrogen (TN) and total phosphorous (TP) down to much lower levels than the previous plant had been capable of achieving. The new levels include annual cap loads for TN and TP and are summarized below:

|  | Previous Permit Limits | Sept. 28, 2007 Permit Limits |
|---|---|---|
| Design Flow | 1.217 mgd | 1.75 mgd |
| $CBOD_5$ | 25 mg/l | 25 mg/l |
| TSS | 30 mg/l | 30 mg/l |
| $NH_3$-N (Nov-Oct) | 3.5 mg/l | 3.5 mg/l |
| $NH_3$-n (Nov-April) | 9.0 mg/l | 9.0 mg/l |
| TN | NA Monitor/Report | 6.0 mg/l* |
| TP | NA Monitor/Report | 0.8 mg/l* |
| Annual Cap Load TN | NA | 22,228 lbs/yr |
| Annual Cap Load TP | NA | 2,963 lbs/yr |
| TN @ 1.75 mgd | NA | 4.17 mg/l |
| TP @ 1.75 mgd | NA | 0.55 mg/l |

*Based on cap load limits @ 1.217 mgd

The Authority constructed chemical addition facilities, dentrification filter and an effluent pump station to ensure that the plant had TN and TP removal capabilities to the levels required to meet the annual cap loads contained in the September 28, 2007 permit.

The Authority had to increase the billed rates to its customers significantly as a result of this project. The monthly sewer bill had been $37 per month before this project. As a result of the project, a typical monthly residential sewer bill (4,000 gallons per month) has increased to $62 per month. This is a 67% increase above

AR0030500

the previous monthly sewer rate. Customers using more than 4,000 gallons per month are paying even higher monthly charges.

These rates would be much higher had the Authority not received substantial grant funds to help reduce costs to the local customers.

The Authority is now aware that the U.S. EPA is considering levying "backstop TMDLs" on the Duncansville plant that will reduce its annual cap load to 4,695 pounds per year for TN and 97 pounds per year for TP. At these annual loadings, the average daily flow concentration for TN and TP has to be as follows:

| Parameter | Proposed Backstop TMDL | Avg. Concentration @ 1.75 mgd | Current Limit of Technology | Comparison with Technology Limits |
|---|---|---|---|---|
| TN | 4,695 lbs/yr | 0.88 mg/l | 3.0 mg/l | 3.4 times less |
| TP | 97 lbs/yr | 0.018 mg/l | 0.1 mg/l | 5.5 times less |

Our newly constructed plant upgrade cannot meet the proposed "Backstop TMDL" limits at the plant design flow of 1.75 mgd. Since we have infiltration and inflow (I/I) in our sewer system, wet weather flows exceed our daily design flow capacity and the presence of TMDLs as low as the ones proposed only accentuates the problem of meeting a daily limit for TN and TP.

If the Backstop TMDL limits become part of our NPDES permit, then we will be forced to construct yet another plant upgrade and incur additional costs, which would have to be passed on to our sewer customers. We find the prospect of embarking on yet another plant upgrade so soon after completing the present upgrade to be infeasible. Our community is not a wealthy community by any means. Increasing sewer rates even more, particularly in these difficult economic times, is not a situation we want to face.

Questions and Comments

1.  The EPA admits that the current limit of technology is 3.0 mg/l for TN and 0.1 mg/l for TP. Since that is the case, why is Duncansville being asked to do what current technology cannot achieve?

2.  Why isn't Duncansville's cap load limits based on current technology limits?

3.  Why is Duncansville being asked to achieve these lower limits when we just completed a very expensive plant upgrade to achieve annual cap loads for the Chesapeake Bay's protection?

4.  The newly constructed plant upgrades cannot achieve the proposed new TMDL backstop levels. The denitrification filter system is designed to remove TN using methanol. Overdosing with methanol does not guarantee further reductions in TN without causing other operational difficulties and effluent degradation. For example, overdosing of methanol could lead to excess methanol in the effluent which adds $CBOD_5$ in the effluent. Also this is wasteful of an expensive chemical. Furthermore the on-line continuous nitrate monitoring system cannot measure down to the levels needed to accurately and reliably prevent overdosing. Excess methanol also triggers production of sulfide reducing bacteria and this then begins causing $H_2S$ gas generation. Effluent quality would drop due to presence of higher TSS. Odor generation requires odor treatment, yet another expense to deal with.

    Further downstream unit processes would be needed to remove additional TN and TP down to the levels under the capabilities of the present new denitrification system. And as U.S. EPA admits, current technology cannot reliably get effluents below 3.0 and 0.1 mg/l for TN and TP respectively.

5.  If Backstop TMDL's become official, 100% grant funding and assistance with operation and maintenance costs increases is needed. Will the Federal government step up and provide this? Where will these funds come from? Further taxes on the general population to pay for this is merely squeezing the same Duncansville sewer customer as a sewer rate increase.

AR0030501

6. In Pennsylvania, we are facing significant electric power and natural gas rate increases in January 2011. These will drastically impact our annual treatment plant operational expenses and require sewer rates to rise just due to that. Furthermore our sewer customers will see these same electric and gas rate increases on their own home and business utility bills.

7. We think that the dredging dams on the Susquehanna River to remove sediments and entrained phosphorous is an excellent idea and should be funded and handled by the Federal Government via the US Army Corps of Engineers.

8. We think the State and U.S. EPA should look to other sources of nitrogen and phosphorous contributing to the Chesapeake Bay to do their fair share of TN and TP removal. This would spread the cost over the entire general population and should include other Bay States as well as Pennsylvania.

9. Targeting Bay watershed communities and businesses in Pennsylvania to remove 55% of incoming TN and TP to the Bay puts these affected portions of Pennsylvania at a severe economic disadvantage compared to businesses and communities that are outside the Bay watershed, even in Pennsylvania. Sewage treatment costs have already risen and will continue to rise for these communities and businesses while competitors outside of the Bay watershed are unaffected.

Please allow time for the Chesapeake Bay Tributary Strategy, developed by the Commonwealth of Pennsylvania, to be implemented and to serve as the Commonwealth's plan for addressing the Chesapeake Bay water quality issues. Our biggest fear is that all of this money will be spent and it will end up having no measurable impact to water quality in the Bay due to impacts and forces not currently known or recognized as contributors to the Bay problems. Thank you.

Sincerely,
The Duncansville Municipal Authority


Robert V. Hazenstab, Chairman


cc:  DEP Water Planning Office
     US Senator Robert Casey, Jr.
     Congressman Bill Shuster
     State Senator John Eichelberger, Jr.
     State Representative Jerry Stern
     Duncansville Borough Council
     Blair County Planning Commission
     Blair County Commissioners

AR0030502



# PENNSYLVANIA MUNICIPAL AUTHORITIES ASSOCIATION

1000 North Front Street, Suite 401   Wormleysburg, PA 17043
717-737-7655  •  717-737-8431(Fax)
www.municipalauthorities.org  •  info@municipalauthorities.org

*11-5-10*

## Comments from the Pennsylvania Municipal Authorities Association
## To the Proposed EPA TMDL for the Chesapeake Bay Watershed

The Pennsylvania Municipal Authorities Association (PMAA) represents many of the sewage treatment plants in Pennsylvania that are mandated to meet nutrient limits to facilitate improvement to the Chesapeake Bay.

In response to the 2005 DEP Chesapeake Bay Tributary Strategy, PMAA worked with DEP and other interested stakeholders to address nutrient reductions from sewage treatment plants. These Point Source Workgroup stakeholders included: sewage treatment plant managers, engineers, and attorneys from PMAA; staff from DEP central and regional offices, and EPA; representatives from agriculture and the conservation districts; municipal government associations; the PA Builders and Harrisburg Area Builders Associations; and the Chesapeake Bay Foundation.

Numerous meetings of the Point Source Workgroup over the course of several months resulted in an equitable solution that allowed the largest 184 plants to come into compliance for nutrient removal in a three-phased schedule. This approach set uniform nutrient reduction limits of 6 mg/l TN and 0.8 mg/l TP for all plants based on their design flow. These limits will result in the point source sector achieving their share of reduction in Pennsylvania as early as 2011, and maintaining that reduction into the future. Actually, it is estimated that many sewage treatment plants will exceed their required nutrient reductions and have nutrient credits available for trading.

Given the expected success of the point source sector to surpass compliance goals, it is inconceivable that EPA would require the more draconian measures of 3 mg/l TN and 0.1 mg/l TP included in their TMDL "backstop" measures. This is especially troubling when it actually amounts to a penalty for meeting and exceeding existing goals simply to pass additional point source reductions on to sectors that have not been able to present clear evidence of compliance to meet their own reductions. This point was made very clear in EPA's *PA WIP Deficiency Letter*, September, 2010: ***Load from point source reductions redistributed to forest, septic, and agriculture sources as possible while still meeting nitrogen, phosphorus and sediment allocations.***

Equally troubling is that the amount of additional reduction from point sources that may <u>now</u> be required to treat to "limit-of-technology" essentially nets a fraction of the needed reductions from Pennsylvania. This mere fraction however carries a huge financial burden, basically more than doubling the $1.4 billion* treatment plants have already invested in Bay nutrient reduction upgrades. From a public policy perspective, this represents a dubious planning and fiscal approach to actually achieving a successful strategy for compliance, forcing the rate-paying public to fund projects with little return on that investment.
*(\* Metcalf and Eddy report. Six-month study commissioned by the Pennsylvania State Legislature released in November 2008. Report available at:  <u>http://lbfc.legis.state.pa.us</u> )*

What makes the entire Bay nutrient reduction effort unconscionable is that EPA is foisting the responsibility for correcting nearly all non-compliance onto the states. Non-point source contributors to sediment and nutrient loads remain largely uncaptured by federal law. This lack of oversight through a federal statutory program is glaring in its omission, both for the Bay and other impacted watersheds nationwide. To exacerbate that situation by excessively targeting those sectors it can exert control over, even if the resulting reductions are de minimus, amounts to nothing more than an accounting process for the sake of showing some activity is occurring, even if it amounts to little in the result column.

AR0031047

*SPECIFIC CONCERNS*

1. **PMAA endorses the currently recognized PA DEP limits of 6 mg/l N and 0.8 mg/l P for POTWs**
   As noted above, the compliance plan created by the Point Source Workgroup, and accepted by DEP and EPA, should remain in its present form. It represents the most equitable and efficient solution that allows the largest 184 plants, and hundreds of smaller dischargers, to come into phased compliance while removing nutrients based on their design flow. This plan will exceed the reductions initially attributed to point sources.

2. **Delivery Ratios**
   It is imperative that states receive the most up-to-date delivery ratio model from EPA so they can incorporate it <u>immediately</u> into provisions of the their Watershed Implementation Plans (WIP). This delivery ratio must be realistic and workable so states can deal with sector reductions, permits, trading, upgrades, and plan implementation. Lack of a viable delivery ratio spreadsheet <u>BEFORE</u> the state WIPs and EPA TMDL become final is irresponsible and detrimental to sound decision-making.

3. **Trading**
   Nutrient Credit trading will be impacted by the delivery ratio issue raised above. Current and future trades may be suspect if delivery ratios change during the trading process. The EPA Bay TMDL and accompanying documents must lay out a clear program for interstate and intrastate trading programs so that uniform protocol can be applied. Also, EPA needs to ensure that oversight is in place so that it is guaranteed that agricultural credits surpass baseline and threshold (or whatever EPA recognizes as a compliance trigger) on a continuing basis in order to trade.

   EPA should also consider how to make trading more beneficial between credit producers and credit buyers. This would include more EPA-state involvement in accepted BMP reductions, the approval of unique and innovative trading opportunities (such as oyster bed creation, planting of submerged grass beds, etc.), and extension of the life of a credit beyond the currently limited one-year lifespan.

4. **Compliance by Other Sectors**
   PMAA recognizes the difficulty in achieving timely compliance from the non-point source sectors. We encourage EPA and the states to work together to develop methodologies for these sectors that will merge both voluntary and mandatory requirements to allow reductions to be met in a scheduled timeframe. These methodologies should be delineated to the fullest extent possible in the final WIP submission of each state and the final TMDL from EPA.

   In particular, EPA should recognize the existing statutory and regulatory authority that DEP has through the Pennsylvania Clean Streams Law. This compliance tool seems to be totally overlooked by EPA in their comments to the Pennsylvania WIP. EPA should work with DEP so that all inspection, compliance, and/or enforcement options available under this Act are fully incorporated in the WIP, including specific provisions for the successful implementation of activities that ensure compliance from all non-point source sectors.

5. **Funding**
   EPA recognizes the need for more federal financial assistance to all states and impacted entities to address their Bay reductions. EPA should <u>recommend</u> to Congress, in a delineated report, the amount of funding necessary to cover both financial and technical assistance to all impacted sectors. The Blue Ribbon Finance Panel, convened by the Commission in 2004, made numerous recommendations that have virtually been ignored over the years. It is imperative that this funding shortfall be addressed.

AR0031048

**6. New Technologies**

EPA needs to partner with scientific and technical experts to develop new technologies that can be implemented in the various sectors contributing to the nutrient and sediment load. They need to encourage pilot programs and offer funding for new and innovative solutions to reductions. These efforts can be in conjunction with other federal agencies such as the Department of Agriculture, Department of Energy, USGS, etc. They should also be in conjunction with state agencies, local governments, and "vetted" providers of new technologies.

**Conclusion**

It appears that the EPA critique of the state WIPs and the release of the draft TMDL and "backstop" provisions centered everyone's attention on the fact that cleanup of the Chesapeake Bay was a national priority, with consequences for non-achievement. The current strong focus of attention on this situation by many federal, state, and local policy makers should initiate the actions necessary to restore the Bay. EPA must seize the current opportunity, keep all stakeholders engaged, lobby for funding, and spearhead the efforts to achieve results. *A fair and equitable approach that involves commitment from all sectors is paramount to that effort.*

Please call John Brosious at 717-737-7655, or e-mail at brosious@municipalauthorities.org for any additional information or if there are any questions.

Sincerely,

John W. Brosious
Deputy Director, PMAA

AR0031049



**MARYLAND ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.**

**COMMENTS OF THE**
**MARYLAND ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC.**
**REGARDING U.S. EPA'S DRAFT CHESAPEAKE BAY TMDL AND**
**MARYLAND'S DRAFT CHESAPEAKE BAY TMDL PHASE I WIP**

**NOVEMBER 5, 2010**

## I.    INTRODUCTION & EXECUTIVE SUMMARY

On September 1, 2010, the State of Maryland ("State" or "Maryland") issued a Phase I Watershed Implementation Plan for the Chesapeake Bay Total Maximum Daily Load ("Draft WIP").[1] On September 22, 2010, the United States Environmental Protection Agency ("EPA") issued a notice of availability and request for public review and comment in the *Federal Register* regarding the development of a total maximum daily load for the Chesapeake Bay Watershed. On September 24, 2010, EPA issued a Draft Chesapeake Bay Total Maximum Daily Load ("Draft TMDL"). The Maryland Association of Municipal Wastewater Agencies, Inc. ("MAMWA") respectfully submits the following comments in response to the EPA *Federal Register* Notice and Draft TMDL and Maryland's Draft WIP.

MAMWA is a statewide association that includes the owners and operators throughout Maryland of municipal wastewater treatment plants ("WWTPs"), which the Clean Water Act refers to as publicly owned treatment works ("POTWs"). Many MAMWA members' facilities clean and discharge highly treated wastewater within the Chesapeake Bay watershed pursuant to state-issued National Pollutant Discharge Elimination System ("NPDES") permits. As owners and operators of highly-regulated pollutant removing facilities, MAMWA's members have a direct stake in the development of the Bay TMDL and in its implementation. Indeed, MAMWA members are currently in the midst of a treatment upgrade program with an investment of approximately $1.5 billion to implement the Bay TMDL.

As point source dischargers to the Chesapeake Bay, MAMWA's members have a strong interest in the development of the Bay TMDL and in its implementation at the state and local level. Maryland's POTWs have dramatically reduced their loads from 1985 levels – more than any other sector contributing nutrients to the Bay. As EPA and Maryland move forward with the important task of finalizing these groundbreaking documents, we ask that you consider MAMWA's views, concerns and recommendations.

MAMWA previously submitted comments (on December 18, 2009) in response to EPA's September 19, 2009 Notice and Initial Request for Public Input regarding the development of a

---

[1] On September 24, 2010, Maryland issued a corrected Draft WIP.

AR0031179

MAMWA Comments
November 5, 2010
Page 2

Chesapeake Bay TMDL.[2]  In addition to laying out a number of Guiding Principles MAMWA felt strongly must be considered by EPA as it developed the TMDL, MAMWA also commented extensively on the need for regulatory stability for POTWs (*i.e.*, retaining the existing approach to POTW nutrient upgrades) and made a number of recommendations regarding the development of the TMDL.

Generally speaking, EPA's Draft TMDL and Maryland's Draft WIP appropriately are consistent with and meet MAMWA's request for regulatory stability relative to the Tributary Strategies.[3] MAMWA supports this aspect of both the Draft TMDL and Draft WIP.  However, MAMWA has noted a few issues in both documents that warrant further comment and revisions prior to the issuance of a final TMDL and WIP.  Our comments regarding these issues are set forth below.

## II.    MARYLAND'S DRAFT WIP

### A.    MAMWA Supports the State's Approach to Major Municipal Treatment Plants

The State has determined that it will continue Enhanced Nutrient Removal ("ENR") upgrades at 67 of the State's largest POTWs.[4]  According to the Draft WIP, "[a]t the current rate of implementation, 24 plants will be operational by June 30, 2011, accounting for an estimated 780,000 lbs/year reduction in nitrogen.  To date, 14 plants have been completed; 17 plants are in construction; 22 plants are in design, and 14 plants are in planning."[5]

Maryland's Chesapeake Bay Tributary Strategy Statewide Implementation Plan (Jan. 24, 2008) ("Tributary Strategy Implementation Plan") addresses major WWTPs as follows:

> Significant wastewater treatment plants are those with design* capacity of 500,000 gallons per day or greater.  Annual nutrient load caps are based on an annual average concentration of 4.0 mg/l total nitrogen and 0.3 mg/l total phosphorus and the approved design capacity of the plant.  The combined flow of these facilities comprises more than 95% of the total sewage flow generated in Maryland.[6]

---

[2] MAMWA's December 18, 2009 Comments are incorporated by reference to these comments.  Additionally, MAMWA incorporates by reference all EPA files or documents, no matter the form, and all materials from EPA Chesapeake Bay committees or subcommittees pertaining to Bay clean-up efforts.

[3] Draft TMDL ES-8; 8-13; Draft WIP at ES-14; 5-19.

[4] Draft WIP at ES-14; 5-19.

[5] Draft WIP at 5-19.

[6] Tributary Strategy Implementation Plan at 7.  Design capacity is defined to mean: "(1) A discharge permit was issued based on the plant capacity, or the Maryland Department of the Environment (MDE) issued a letter to the jurisdiction with design effluent limits based on the new capacity as of April 30, 2003;  (2) Planned capacity was either consistent with the MDE-approved County Water and Sewer Plan as of April 30, 2003, or shown in the locally-adopted Water and Sewer Plan Update or Amendment to the County Water and Sewer Plan, which were under review by MDE as of April 30, 2003 and subsequently approved by MDE."

AR0031180

MAMWA Comments
November 5, 2010
Page 3


This approach is incorporated into the Draft TMDL and Draft WIP, and MAMWA supports this aspect of both drafts. As MAMWA explained in its December 2009 Comments, there are compelling reasons to continue and adopt this particular approach in Maryland and not consider attempting to reduce POTW wasteload allocations further.

First, the POTW wasteload allocations are set at or very near limit-of-technology levels. For example, most plants will have reduced from approximately 20 to 30 mg/L total nitrogen to less than 4 mg/L, and from approximately 6 to 10 mg/L total phosphorus to less than 0.3 mg/L.[7] This also represents a dramatic reduction from 1985 levels – more than any other sector contributing nutrients to the Bay – and this will continue as ENR projects continue to be constructed in accordance with the Point Source Strategy.

Second, an estimated total investment of $1.5 billion has very recently been made, or is in the process of being made, to design and construct specific ENR capital projects to implement the proposed POTW WLAs. This is above and beyond earlier upgrades to BNR levels. Any deviation at this late date would be terribly disruptive and wasteful of current efforts and investment.

Third, because the proposed POTW WLAs are so stringent, there is limited capacity available to concentrate smart growth in existing urban areas. What limited amount that does exist must be preserved to enable smart growth[8] and economic development in the State.[9]

Fourth, under the proposed POTW WLAs, POTWs have very little ability to design and construct a facility capable of producing a regulatory compliance "cushion" to help ensure compliance despite operational variability.

Fifth, also on the subject of compliance, several upgraded POTWs in the State are already struggling to comply with ENR treatment levels. None have experience operating in compliance with such limits at a fully loaded facility. Time is required to determine how successful these newly upgraded facilities will be in meeting ENR treatment levels under various conditions.

---

[7] Additionally, according to EPA's model runs, wastewater represented a relatively small percentage of the average annual nitrogen and phosphorus load to the Chesapeake Bay. Under the critical 3-year condition for the TMDL (1993-1995), wastewater would represent an even lower proportion of the nutrient load with existing controls.

[8] POTWs play a critical role in enabling economic development and smart growth. POTWs are far superior in nitrogen removal to even the most efficient on-site disposal system option. Nutrient removing on-site systems are estimated to deliver approximately 20 mg/L in total nitrogen as compared to 3 mg/L for POTWs at ENR levels. The math is compelling. Allowing for development on POTW systems in already developed areas is far preferable for the health of the Bay to developing in greenfields, using septic systems.

[9] Adequate POTW allocations based upon adequate levels of sewer capacity is a critical part of future economic growth.

AR0031181

MAMWA Comments
November 5, 2010
Page 4

Sixth, any marginal reductions in POTW WLAs would not be cost-effective (due to markedly higher costs and the obviously diminishing benefits compared to the current program to reach ENR levels). Further, those scant reduction benefits would certainly be accompanied by adverse environmental impacts due to increased chemical production, transportation and use; increased energy production and use; and increased greenhouse gas emissions.

Lastly, although the State has been working to establish a nutrient trading program, offsets are not widely available. Nonpoint source offset trading is in its infancy Bay-wide. Even if it were viable – and MAMWA sees no clear evidence that offsetting is a viable strategy for acquiring additional nutrient allocations – it would certainly be extremely expensive. In the absence of a reliable trading program with reasonable costs, it is imperative that EPA and the State maintain sufficient POTW WLAs to serve future growth.

We appreciate that EPA generally agrees with MAMWA's position on the critical issue of regulatory stability for POTWs relative to their recently-established WLAs:

> ...the large scale public investments (estimated at over $4 billion) that are now being carried out throughout the watershed to upgrade and reduce nutrient discharges from point sources. **A stable regulatory environment is a priority need for these facilities and a matter of fiduciary responsibility and public trust.** Therefore, EPA considers requiring further point source upgrades to the limits of technology as an option of last resort and is avoidable if the Bay partners use our creative energies to deliver sufficient nonpoint pollutant reduction commitments.[10]

Despite MAMWA's support for this approach, we must note that funding has been and remains a critical issue for ENR upgrades. The State's Draft WIP recognizes this critical issue:

> Upgrade of the major wastewater treatment plants is funded by Maryland's Bay Restoration Fund ["BRF"]. Full funding is available for implementation of the 2011 Milestone, but a funding gap is projected after 2012. Maryland's Bay Restoration Fund Advisory Committee has projected a deficit beginning in FY 2012 and has begun developing options to close this deficit.[11]

As the State considers how to address this funding shortfall, MAMWA urges the State to do so in a manner that fully funds all of the 67 major ENR projects.

---

[10] Letter dated Sept. 11, 2008, from Donald S. Welsh, EPA Region III, to John Griffin, MDNR, Enclosure A at 4 (emphasis added).

[11] Draft WIP at 5-19.

AR0031182

MAMWA Comments
November 5, 2010
Page 9

C.    **EPA's Refusal to Consider Essential Equivalency in Target Loads Is Unreasonable**

In the determination of basin nutrient loadings (190 TN and 12.7 TP) EPA utilized the so-called "1% rule" to determine compliance (with the exception of certain problem segments).  Bell (2010b) performed a statistical "power analysis" to evaluate the minimum difference in D.O. that would be statistically detectable in the Chesapeake Bay Monitoring Program.  Based on the results of this analysis, segments that are close to attainment would require spatial D.O. violation rates that differ by 4% or more before they would be statistically distinguished from one another.  The management implications are that Bay model D.O. scenario results with differences less than 4% should be considered "essentially equivalent."  However, this is not recognized in the Draft TMDL.

Based on the above referenced "power analysis," the scenario associated with "Target Load Option A" (200 mpy TN and 15 mpy TP) produces results that are "essentially equivalent" to EPA's recommended basin target loads in the Draft TMDL of 190 mpy TN and 12.7 mpy TP (Bell, 2010a).  At this level of nutrient loading the key Bay segments of CB4MH, CB5MH, MD5MH, and VA5MH are predicted to be in attainment or be within 2% of attainment.

It is recognized that Target Load Option A would not immediately address attainment in some of the side segments; however, effectively addressing these side segments would require separate, locally-oriented modeling analysis with tools better adapted to evaluating local conditions.

The "Target Load Option A" TN and TP targets to comply with D.O. standards in the main bay is essentially equivalent to the more stringent and costly-to-attain cap loads associated with 190 TN and 12.7 TP in the TMDL.  Therefore, it would be unreasonable for the final TMDL to opt for the higher cost alternative of these two equivalent compliance scenarios.

D.    **EPA's Approach to Modeled BMPs Should Be Improved**

EPA's decision to model BMPs for forward-looking management scenarios based upon historically-average BMP management is inadequate.  It is well known that historically many nonpoint source BMPs have not been accompanied by programs or methods to ensure proper design, installation, operation, or maintenance.  It is reasonable that model calibration scenarios should assume, at a minimum, historical "average" management conditions.  Any other approach—including the use of conservatively low values—would make the model less accurate and force management decisions that may be more costly and/or provide less benefit.  However, it is neither necessary nor reasonable for forward-looking management scenarios to retain the assumption of historical averages, *i.e.*, simply accept poor performance of the past.  Rather, improvements in the way BMPs are installed, operated, and maintained should be considered and incorporated in the TMDL and underlying modeling.  In other words, modeled TMDL allocations scenarios should reflect the manner in which BMPs *should* be designed, operated, and maintained, not necessarily how they have historically been managed.

One example of where EPA and the Bay States have assumed a high level of nutrient removal performance is for wastewater treatment plants.  The performance expected and used in the

AR0031187

MAMWA Comments
November 5, 2010
Page 10

model is based on properly installed, operated and maintained facilities. The standard for performance relative to design of other nutrient removal strategies (e.g., BMPs, filter feeders, etc.) used in the Bay model should not be allowed to drop to a lesser standard.

For these reasons, MAMWA requests that EPA revise its modeling approach to incorporate this suggestion.

### E.    EPA Should Revise the Discussion of Daily Loads

EPA has not appropriately addressed daily loads in the Bay TMDL. Existing Chesapeake Bay programs were built on the concept of annual load goals. A correct approach on this point is critical for cost-effectiveness and attainability.

It is well established that daily nutrient load variations are environmentally insignificant to the Bay. Furthermore, EPA agreed in a 2004 Memorandum (cited by EPA at Draft TDML, 4-9) that *annual* limits are appropriate in CWA permitting. EPA has stated that:

- The exposure period of concern for nutrient loadings to the Bay and its tidal tributaries is very long;
- The area of concern is far-afield (as opposed to the immediate vicinity of the discharge); and
- The average pollutant load rather than the maximum pollutant load is of concern.

Based on modeling, EPA concluded that "Chesapeake Bay and its tidal tributaries in effect integrate variable point source monthly loads over time, so that as long as a particular annual total load of nitrogen and phosphorous is met, constant or variable intra-annual load variation from individual point sources has no effect on water quality in the main bay."[19]    According to EPA, "[e]ven a simply steady-state model for permit development such as dividing the annual limit by 12 and establishing that value as the monthly limit is therefore not appropriate."[20]

EPA has repeated its 2004 message in the Draft TMDL:

> Numerous Chesapeake studies show that annually based wastewater treatment nutrient reductions are sufficient to protect Chesapeake Bay water quality (Linker 2003, 2005). The seasonal aspects of the jurisdictions' Chesapeake Bay WQS are due to the presence of the living resources being protected, but annual nutrient and sediment load reductions are most important to achieve and maintain the seasonal water quality criteria, some of which span multiple seasons—open-water, shallow-water bay grass, migratory spawning and nursery… [21]

---

[19] 2004 Memorandum at 3.

[20] Id. at 5.

[21] Bay TMDL at 6-6.

AR0031188