## Virginia Agribusiness Council - Suggested Bay TMDL Talking Points

**Environmental Progress By Agribusiness**

- We (farmers, foresters, green industry, agribusiness suppliers, processors, etc.) are committed to environmental stewardship. Clean water and good soil are fundamental to our businesses. We have been doing our part- and will continue to do so in order to help create a healthy Chesapeake Bay and local waters. Specifically:

  o Agriculture has met 52% of reduction goals for Nitrogen and 50% for Phosphorus and Sediment—all through a voluntary, incentive based program in Virginia. This doesn't even count the actions farmers are taking on their own without funding.

  o According to the Virginia Department of Forestry, 83% of logging jobs use the proper combination of best management practices

  o University studies have shown that turfgrass, when maintained properly, serves as an excellent filter for stormwater runoff, can be a carbon sink, and captures sediment.

- We have been willing partners in making environmental progress—and have proven it with our actions, time and time again.

  o Virginia has put over $80 million into Agricultural Best Management Practice (Ag BMP) Cost-Share program since 2006. Farmers have matched this spending with $0.60 of every dollar, and are lined up at the door to do more. Annually, willing participants are turned away due to lack of adequate funds at the state and federal level.

  o Even without cost-share funding, agriculture is taking action. Virginia farmers fence cattle from streams, practice conservation tillage, use proper nutrient management practices, and install buffers along waterways- without federal or state funds- and without being "counted" by EPA.

  o Without regulatory pressure, the turfgrass/green industry requested that the state create an Urban Nutrient Management Program so that their professionals can have plans specifically tailored for their businesses.

  o Lawncare operators have supported and signed Voluntary Water Quality Agreements with the state. Major home lawn fertilizer companies have signed agreements to reduce and/or eliminate phosphorus from maintenance fertilizers by 2012.

  o Virginia's golf industry is developing a Best Management Handbook covering water quality, pesticide use, and water supply issues for their industry to implement.

**Bay Model Accuracy- Needs Revisions Prior to Costly EPA Mandates**

- The Chesapeake Bay Model, the basis for nutrient and sediment reductions required by EPA, has been shown to have extensive flaws in the data it utilizes. EPA even acknowledges this fact. EPA should not move ahead with costly mandates based upon flawed modeling and data. Examples:

  o In 2010, Virginia Cooperative Extension conducted a field observation study in the Coastal Plain. They found that 90% of crop acres were planted in no-till. Only 15% of the acres are enrolled in DCR's no-till program.

  o Is the model fully accounting for practices that are already mandated by state permitting programs? (ex: mortality control for poultry facilities)

  o The model is currently "throwing out" actual, ground-truthed data from Virginia because it does not meet the "modeled" land use data. This is unfair when the practices are meeting all requirements set forth by EPA.

- Federal actions must be based on accurate information. No additional regulations or penalties should be put on states or industries until the science and data have been proven.

*Page 1*

AR0030010

**Cost of Compliance and Current Economy**

- The Bay TMDL, which requires Virginia to develop a Watershed Implementation Plan (WIP), will have a high cost for compliance for all sectors. While we agree that there is a benefit of clean waters within the Bay and local watersheds, the economic costs for compliance must be balanced, and water quality programs cannot be developed in a vacuum without considering economic impacts to the economy.

- Before moving forward with a finalized Bay TMDL, EPA must conduct a non-biased economic impact analysis. Experts from land-grant universities from across the watershed could be called upon to evaluate the actual costs of meeting water quality standards for businesses, citizens, localities, states, and the federal government.

- Agriculture has the benefit of estimating some expenses based on existing data on cost of implementing AgBMPs through current state and federal programs.

  o Virginia estimates that just one practice (cattle fencing) could cost more than $800 million to implement. Fencing cattle from streams, putting in crossings, providing alternative watering, etc. costs on average $30,000 for a Virginia cattle farmer.

  o Virginia's Natural Resources Commitment Fund says Ag BMP cost-share funds will need to be $63.2 million annually from 2025 in order to get 60% NPS reduction goals from agriculture. This is only cost-share funding from the state- doesn't account for federal government's traditional share of funding or the money that comes from farmers.

  o Current funding estimates are just based upon the cost of installing the practice, they do not account for costs like loss of productive land, replacing practices when weather damages occur, fluctuations in markets, etc.

- Economic conditions (lack of profits, increased input costs, additional credit not an option) means that extra money to meet regulations is non-existent.

- Due to long-term devastating economic conditions for agriculture (like other sectors), federal backstops alone (mandatory permitting of small dairies, requiring some ag processing plants to do more) will be enough to drive some farmers out of business.

- EPA's federal backstops requiring more unregulated lands to meet MS-4 (urban lands) requirements may cause significant economic hardship for urban landowners, including the green and turfgrass industries.

- Cost share funding will be critical to meeting demands of EPA. Agriculture, lawn care, turfgrass, forestry, have all seen depressed profits, just as the State and local governments have been facing historic deficits. Individual businesses, farmers, and the State cannot meet this unfunded mandate from EPA without significant federal funding.


**No to Federal Backstops**

- Virginia's Watershed Implementation Plan (WIP) reflects some practices for both agriculture and turfgrass that we strongly believe, given proper implementation and funding, will result in significant water quality improvements.

  o Agricultural Resource Management or Conservation Plans to meet the individual conservation needs of each farm will result in progress without mandating a "one-size-fits-all approach".

  o We support working with the turfgrass/green industry to make progress through utilizing nutrient management plans, amending the content of certain fertilizer products, and educating homeowners, while carefully balancing the costs and unintended consequences of under-managed or under-fertilized turfgrass.

- EPA does not need to substitute its version of heavy-handed, government regulation if the state chooses to build off of the incentive-based practices and programs that have resulted in progress over the decades.

- EPA's "backstop" measures put in the TMDL will certainly result in more costs for permitted facilities, such as large animal feeding operations, processing facilities, and urban landscapes.

AR0030011

- We question the "reasonable assurance" offered by EPA's backstops, as current regulatory authority and details on new requirements are both unclear.

- Instead of forcing states to regulate their way out of "backstops," we urge EPA to allow Virginia to implement its own plans for achieving clean water goals—without costly, burdensome regulations.

## West Virginia Department of Agriculture & West Virginia Conservation Agency - Suggested Bay TMDL Talking Points

*(The general information posted by the Virginia Agribusiness Council also applies to West Virginia.)*

- WV boasts over 20 years of successful implementation with voluntary programs being delivered in cooperation with a strong educational message. This is reflected with the success of the Potomac Headwaters Land Treatment Program (PL534) which was a partnership between federal, state and local governments resulting in over $14 million in water quality improvements practices being placed on over 300 farms in the headwater West Virginia counties of Pendleton, Grant, Hardy, Hampshire and Mineral. Voluntary participation has resulted in the reduction of in-stream measured fecal bacteria and nitrates resulting in the de-listing of impaired streams under the Clean Water Act- *Reference: Diamond of the East Potomac Headwaters- USDA NRCS*

- WV farmland is being alarmingly lost to urbanization in the Eastern Panhandle. Based upon WV's Phase 1 WIP, the land area for agriculture production in WV has been reduced by thousands of acres between 1997 and 2007.

- There is concern within WV that 8 counties out of 55 are being pressed to spend additional funds to upgrade their operations , potentially putting them at a marketing disadvantage further reducing profit margins.

- West Virginia is seeing increased funding through the Farm Bill but little augmentation of technical staff to deliver the programs.

- The Bay states are being unjustly challenged to identify and correct Bay model deficiencies. WV has very little full-time staff dedicated to the Bay Program. This information should be scientifically "truthed" before being added.

- Agricultural deficiencies identified by WV have included, but not limited to : inaccuracies in land use, nutrient management crediting, phytase reductions, etc.

- WV challenges:
    - The complexity of getting new BMPs accepted by the Bay Model for nutrient and sediment credit.
    - Also, riparian buffers should be credited at a reduced efficiency if they do not meet the Bay width requirements.
    - The constant reduction and recalculation of BMP efficiencies- always a moving target making these practices a hard sell to agricultural producers.
    - The unrealistic timeline being handed to the State for Watershed Plan Implementation (WIP).

- It is known that WV farmers continue to, and have historically installed BMPs without cost-share assistance. The State will be working over the next year to begin capturing these practices to gain credit. Farmers are encouraged to participate in this endeavor.

*Page 3*

AR0030012

- We adamantly agree that the threat of the heavy-handed Backstop will not be conducive to this process.

**FY10 Farm Bill Programs**

- Obligated $273,625 in 21 AMA contracts on 819 acres; paid $128,801 in AMA funds; average contract value $13,030
- Obligated $2,110,080 in 55 CBWI contracts on 4,311 acres; paid $335,957 in CBWI funds; average contract value $38,365
- Obligated $753,520 in 178 CSP contracts on 49,166 acres; average contract value $4,233
- Obligated $5,772,823 in 287 EQIP contracts on 23,114 acres; paid $1,050,556 in EQIP funds; average contract value $20,114
- Obligated $858,100 in 75 contracts on 9,968 acres; paid $103,595 in WHIP funds; average contract value $11,441

AR0030013



DAVID A. PATERSON
GOVERNOR

PETER M. IWANOWICZ
ACTING COMMISSIONER

STATE OF NEW YORK
DEPARTMENT OF ENVIRONMENTAL CONSERVATION
ALBANY, NEW YORK 12233-1010

NOV 0 8 2010

### Comments on the Chesapeake Bay Draft TMDL
### Docket #: EPA-R03-oW-2010-0736

On behalf of the State of New York I am submitting the enclosed comments on the Draft Total Maximum Daily Load (TMDL) for Chesapeake Bay. New York appreciates the challenge US Environmental Protection Agency (EPA) faces in developing the TMDL, given the fact that it encompasses multiple States with drastically different circumstances in relation to land use/pollutant loadings, non-tidal tributary water quality, and uses of the impaired Chesapeake Bay and its tidal tributaries. New York's objective in submitting these comments underscores its strong desire to continue to assist in the restoration of the Chesapeake Bay, while at the same time ensuring a fair and effective means to do so. In recognition of the precedence of established TMDLs, and the way in which the Chesapeake Bay TMDL may affect economic opportunities in the Southern Tier region of New York, it is imperative that the State of New York fully identify its concerns over certain aspects of the Draft TMDL.

As drafted, New York's primary concern with the TMDL is that EPA applied an overall uniform approach that does not fully take into account the unique circumstances found in the New York portion of the watershed, and the changes that have occurred throughout the watershed since 1985 when Bay impairments became widely known. As a result, the Draft TMDL requires a disproportionate and inequitable amount of pollution reduction from New York. Given this State's lack of formal involvement in the Bay program and the fact that New York was not a party to the various federal investigations and court orders spurring development of the Chesapeake Bay TMDL, the accountability framework that EPA has proposed seems inequitable.

New York recognizes the importance of the Chesapeake Bay restoration, the interrelation of nutrient and sediment pollution sources above and below the fall line and within the Bay itself, and the large volume of fresh water the Susquehanna River discharges to the Bay. New York honors its time-tested obligation to protect water resources within its borders, as well as water quality downstream, and it will continue to voluntarily implement a Bay restoration program to improve water quality in the Bay. New York is not opposed to entering into a future agreement with EPA to formalize its efforts to restore the Bay, but New York cannot agree to the allocations in this Draft TMDL. New York looks forward to cooperating with EPA and the Bay States in a fair and equitable partnership to protect the Chesapeake Bay.

Thank you for the opportunity to submit public comments on the draft TMDL.

Sincerely,

Peter M. Iwanowicz


years of stewardship 1970-2010

AR0031947

New York State Department of Environmental Conservation
Comments on the Chesapeake Bay draft TMDL
Docket #: EPA-R03-OW-2010-0736
November 8, 2010

**Executive Summary**

- **EPA does not demonstrate legal authority to bind NY as part of the Bay TMDL**

  o In the Bay watershed,  NY has no stream impairments due to nutrients on EPA's approved impaired waters list.

  o EPA has failed to demonstrate how the CWA authorizes it to compel NY to comply with a TMDL established with respect to a water body located almost 400 miles away from and entirely outside of NY.

  o NY is participating voluntarily as a good neighbor state pursuant to the 2000 MOU, a document that does not bind NY to a particular course of action to be mandated by EPA.

  o EPA is deviating from the criteria approved in establishing the LI Sound TMDL.

- **New York Waters are Already Clean**

  o If the bay had the same water quality as the water leaving NY, then the Bay would not be nutrient impaired.

  o NY's Clean Water Act program (CAFO, MS4, construction stormwater) already exceeds the standards established by the Federal government and many States.

  o NY is a national leader in the implementation of Clean Air Act programs.

  o Nitrogen air deposition from NY sources is already at minimal levels.

- **EPA's Proposed Allocation Formula is Grossly Unfair to New York**

  o Rewards significant population growth in MD & VA since 1985 and ignores NY for its population decline in the same time period.

  o Rewards significant growth in AFO/CAFOs in ND, PA, & VA since 1985, without recognizing that NY's farming population has declined by 30%.

  o Since 1985, the growth of baseline nutrient levels in Bay States exceeds the total levels attributable to NY in the watershed.

  o Fails to recognize that since 1985, the baseline "no action" nutrient level in NY has declined by 2.44 million pounds of nitrogen.

  o Treats all nutrient discharge technology to the Bay as worth the same, which is a bias against NY.  EPA ignores the fact that reductions from NY are much harder to accomplish than reductions from other States given that NY's waters at issue are already clean.

1 | P a g e

AR0031948

o Establishes the same implementation deadlines for all jurisdictions, yet the Bay states have participated in the Chesapeake Bay Program since 1983.

• **EPA's Stormwater Proposal is Excessive**
  o Requires vast retrofits to only a few urban areas at a cost of $400 million-2 billion
  o Would require almost a zero discharge of runoff, which is stricter than any existing regulatory requirement (CWA, regulations, and permits)

• **EPA's Agricultural Proposal for NY Would Hurt Farms**
  o Would necessitate that NY farms engage in interstate trading to offset nutrient loading. This would involve small farms buying credits from large WWTPs in MD & VA, which is only a paper loading reduction and no real benefit to the Bay.
  o Treats 40 head farm like a permitted Large CAFO (700+ dairy cows) by requiring strict implementation of costly management practices.
  o Fails to account for a 30% decrease in farm animals in the Southern Tier since 1985.
  o Incorrectly assumes that NY does not have enough land to support existing manure management from farms.
  o Reliance on source reductions means that farms will go out of business in order for NY to meet its proposed allocation.

• **EPA's Nitrogen Limits for Wastewater Provide Little Benefits to the Bay**
  o For NY wastewater treatment plants, 50-90% of nitrogen in the effluent does not reach the Bay due to natural in-stream processing
  o EPA's requirements will result in additional treatment in NY plants and the reconstruction of entire facilities at a cost that could reach as high as $500 million with little benefits to the Bay.

• **All Three Models Used By EPA in this Proposed TMDL have Serious Deficiencies**
  o Air modeling

    • Outdated and not well calibrated to ammonia
  o Bay Watershed modeling

    • Seriously underestimates urban land, especially to the benefit of MD, VA and D.C.
    • Relies on estimates the tidal loads discharged below the fall line to the Bay by MD, VA, and D.C.
    • Use of county scale information for assessing farming data is problematic and does not work in NY.
    • Variations in river delivery factors that EPA cannot explain or justify scientifically.

**2** | P a g e

AR0031949

    o  Bay Water Quality, Sediment Transport Model
- Unexplained variations in recent results.
- Not enough runs were conducted near cap load.
- Not enough effort to determine sensitivity to Phosphorus vs. Nitrogen. reductions, particularly for the Susquehanna River.
- Sediment sheds were never analyzed as originally planned.
- Inadequate for processing nutrients within small tidal rivers.
- No workable component to account for the benefits of filter feeders.

## Legal Authority

I.      **EPA Appears to Lack the Requisite Authority to <u>Require</u> New York to Take Measures to Assist the Chesapeake Bay Border States in Meeting the TMDL for the Bay**

EPA has acknowledged at numerous points during this process the uniqueness of the Chesapeake Bay watershed and the complicating factors surrounding establishment of a TMDL for the Bay.  <u>See</u> Draft TMDL at iv ("Chesapeake Bay TMDL is unique because of [its] extensive measures . . ."); <u>id.</u> at 1-1 ("this TMDL is distinguished by the magnitude of the watershed it addresses . . ").  This appears to be the very first time in the long history of the Clean Water Act ("CWA") that EPA is <u>mandating</u> that a State implement pollution reduction measures (i) with respect to pollution inputs into an in-state water body <u>where no nutrient impairments exist</u> and (ii) to assist in attaining a TMDL that EPA has established with respect to a water body <u>located entirely outside of that State's jurisdiction</u>. , It is incumbent on EPA to fully explain how the CWA provides it with the authority to act under the unique and novel circumstances at issue here.  Stated another way, EPA cannot expect New York and its municipalities to spend billions of dollars in the midst of the current economic climate to implement the stringent measures required under the draft TMDL without a full understanding of the agency's authority to require such expenditures.  As discussed below, EPA's general assertions of authority, <u>see</u> Draft TMDL at 1-2 to 1-17, do not meet the basic threshold.

      A.      **EPA Has Not Adequately Demonstrated How the CWA Provides It With Authority To Compel New York To Comply with the Chesapeake Bay TMDL**

          1.   *CWA § 117, Which Appears To Set Forth The Sole Process Under the CWA to Restore Water Quality To The Bay, Is Inapplicable to New York.*

EPA asserts that the CWA provides it "with ample authority to establish the Chesapeake Bay TMDL" for all of the States within the Bay watershed, including New York.  Draft TMDL at 1-13.  In support of this proposition, EPA points first to CWA § 117(g)(1), but that section applies only to "members of the Chesapeake Bay Commission [CEC]," as EPA itself acknowledges.  Draft TMDL at 1-13.  Although New York has sought to work cooperatively

AR0031950

with the CEC for several years, it has never been a member of the CEC and thus is not bound in any way by the requirements of § 117(g). On a related note, EPA acknowledges that § 117(g)(1) requires the CEC to develop a management plan "to achieve and maintain [among other things] the nutrient goals . . . for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed . . ." Id. EPA concludes that the Chesapeake Bay TMDL represents "such a management plan." Id. Again, because New York is not a member of the CEC, it cannot be required to comply with a any plan developed under § 117(g) -- whether characterized as a TMDL or management plan.[1]

Not only must § 117(g) be read as inapplicable to New York, that provision appears to provide the primary, if not exclusive, process for restoring the Chesapeake Bay to health. The legislative history makes clear that, when it added § 117(g) to the CWA by amendment on November 7, 2000, (i) the States of Virginia, Maryland, Pennsylvania, Washington, D.C. (collectively, "the Bay States"), and EPA had already entered into four Chesapeake Bay Agreements, each of which had the stated aim of restoring water quality to the Bay, (ii) Congress understood that the "Bay watershed covers 64,000 square miles including areas of . . . New York," and (iii) New York had entered into a Memorandum of Understanding ("MOU"), agreeing to cooperate with EPA and the Bay States to reach targets set for 2010. See P.L. 106-457, Estuaries & Clean Water Act of 2000, House Conf. Rep. No. 106-995, at 32. Despite its knowledge of the circumstances surrounding restoration efforts with respect to the Bay, however, Congress specifically did not require New York's involvement in that process. To the contrary, § 117(b), also added in 2000, requires EPA to "continue the Chesapeake Bay Program," a program of which New York was not a participant at that time.

Congress' decision to require only the Bay States to participate in restoring the Bay should not be surprising considering that all of the Bay States (i) border the Chesapeake Bay and thus will benefit economically from its restoration, and (ii) have for decades been in violation of water quality standards for the Bay, as well as the tributaries that flow directly into it. By contrast, the waters of the Susquehanna and Chemung Rivers when leaving New York are about 400 miles away from the Chesapeake Bay, and thus restoration of the Bay will provide zero economic benefit to New York. Additionally, all of New York's segments of the Susquehanna and Chemung Rivers are not nutrient impaired. Given the complicated economic, geographical, allocational, and compliance issues associated with assessing each of the State's roles in restoring the Bay and Congress' clear understanding of those issues when it added § 117(g), Congress' decision not to require New York's participation in the Bay's restoration must be seen as intentional. Indeed, EPA's determination to assert sole authority to make these complicated decisions for New York, and over New York's objections, appears to be well beyond the providence of EPA's authority. In sum, EPA cannot now defy Congress' intent in enacting § 117(g) by mandating that New York take a specific course of action with respect to restoring the Bay.

    2.  *The Requirements Specified Under CWA § 303(d) Are Tied Solely To The States Where The Impaired Water Is Located.*

---

[1] New York notes its disagreement with EPA's assertion that the TMDL itself is a management plan for the Bay.

**4 |** P a g e

AR0031951

# PUBLIC SUBMISSION

**As of:** November 09, 2010
**Received:** November 08, 2010
**Status:** Posted
**Posted:** November 09, 2010
**Tracking No.** 80b84aa6
**Comments Due:** November 08, 2010
**Submission Type:** Web

**Docket:** EPA-R03-OW-2010-0736
Draft Chesapeake Bay Total Maximum Daily Load

**Comment On:** EPA-R03-OW-2010-0736-0001
Clean Water Act Section 303(d): Notice for the Public Review of the Draft Total Maximum Daily Load (TMDL) for the Chesapeake Bay

**Document:** EPA-R03-OW-2010-0736-0408
Comment submitted by Teresa Koon on behalf of West Virginia Department of Environmental Protection and West Virginia Department Agriculture

## Submitter Information

**Submitter's Representative:** Teresa Koon
**Organization:** West Virginia Department of Environmental Protection and West Virginia Department Agriculture
**Government Agency Type:** State
**Government Agency:** West Virginia Department of Environmental Protection and West Virginia Department Agriculture

## General Comment

WV Comments on draft CB TMDL

It is difficult for West Virginia to comment on the TMDL as we do not currently have a clear understanding of where we stand related to a working scenario that meets West Virginia's allocation. Over the past year, West Virginia has consistently expressed our concerns with many of the decisions and outcomes related to the development of the Chesapeake Bay TMDL. Our technical concerns are well known by EPA, however, we feel the need to provide formal comment and adamantly oppose the imposition by EPA of the backstop TMDL as outlined in the draft TMDL for the following reasons.

Allocation – While West Virginia participated in the meetings and conference calls related to the development of the allocation methodology, our positions were consistently not supported. The result is that the allocation methodology for the cap loads to states and jurisdictions favored states that have been developing and increasing the capacity of their wastewater treatment plants and that have been increasing their developed / urban lands. Rural, largely forested states such as West Virginia were not fairly represented in the model or allocation resulting in a smaller cap load allocation and less of an actionable load with which to work. If the Bay were all loaded like West Virginia, the Chesapeake Bay would meet water quality standards.

Changing Delivery Factors – Throughout the process, we have experienced numerous changes in delivery factors. It is not clear to West Virginia how delivery factors are calculated and it is frustrating to see that our delivered load increases as we install best management practices (BMPs) over time. We seem to be chasing after an ever moving target.

file:///R|/...L%20Response%20to%20Comments/letters/07batch110910/batch%207/EPA-R03-OW-2010-0736-0408-cp.html[11/10/2010 12:06:12 PM]

AR0032100

-903-

Model – EPA acknowledges that the model has certain flaws yet states are required to continue watershed implementation planning using this flawed model. West Virginia spent a great deal of time developing realistic implementation scenarios with substantive associated pollutant reductions to only be forced to "play the model game" to address incorrect and inaccurate information in the model.

EPA declared the model frozen at the April 2010 Principals Staff Committee meeting. In addition, on the September 22, 2010 conference call EPA stated, when asked about issues with the model, that no changes would be made prior to the final TMDL coming out and that any corrections or updates would be handled in the phase II process. Yet between West Virginia's 4th and 5th scenario run the model was altered resulting in a change in delivery factors that were detrimental to West Virginia, a change in the way the cafo/afo land use was being loaded and a change to the credit for certain BMPs, making it impossible for West Virginia to meet our allocation. At the Principals Staff Committee meeting on October 20, West Virginia expressed guarded confidence in our ability to meet our cap based on our scenario 4 model run. Then we received our scenario 5 output and had lost considerable ground toward reductions. EPA explanations did not make sense. EPA expresses their desire to work with West Virginia to prevent implementation of the backstop TMDL, however, the EPA actions above do not support this commitment.

Timeline - EPA did not honor deadlines to states yet held the states to strict and unworkable time frames. EPA did not deliver nutrient cap loads to states until July 1, 2010 and sediment allocations until August 13 2010, yet states were still required to submit draft WIPs by September 1, 2010. This did not allow adequate time to run scenarios through the model or to develop a sound implementation plan. In addition, in the haste to work with states to run scenarios, errors were often made by EPA causing additional delays for the states. Miscalculations and misunderstandings about how BMPs should be represented were an ongoing challenge between EPA and West Virginia that could have been avoided had more time been available. We are currently in the 9th hour without a successful scenario model run and have limited ability to modify our WIP.

Public comment period - The public meetings and public comment period did not allow adequate time for West Virginia residents to become informed and comment on the TMDL. The shortened public comment period resulted in the public meetings being squeezed into a very tight timeframe. West Virginia's public meetings were 2 working days prior to the deadline for public comments. While we recognize that we requested to have our meetings at the end of the process, had original time frames been adhered to by EPA or had EPA extended the TMDL deadline to May 2011 as requested by states during the process, this crunch would not have occurred.

file:///R|/...L%20Response%20to%20Comments/letters/07batch110910/batch%207/EPA-R03-OW-2010-0736-0408-cp.html[11/10/2010 12:06:12 PM]

AR0032101

-904-

## Commonwealth of Pennsylvania

DEPARTMENT OF
AGRICULTURE

DEPARTMENT OF
ENVIRONMENTAL PROTECTION

November 8, 2010

**Via regulations.gov**

Water Docket
U.S. Environmental Protection Agency
Mailcode: 28221T
1200 Pennsylvania Ave., NW
Washington, DC 20460

Attention: Docket ID No. EPA-R03-OW-2010-0736

Re:     EPA-R03-OW-2010-0736
        Draft Chesapeake Bay Total Maximum Daily Load

Dear Sir or Madam:

The Pennsylvania Department of Environmental Protection and Department of Agriculture
(Pennsylvania) appreciate the opportunity to provide comment on the U.S. Environmental Protection
Agency's (EPA's) Draft Chesapeake Bay Total Maximum Daily Load (TMDL). Pennsylvania has been
an integral partner in Chesapeake Bay restoration efforts since 1983. This leadership derives from the
Commonwealth's set of agricultural stewardship firsts, including:

- The first mandatory farm nutrient management plans;
- The first nutrient management program to regulate nitrogen and phosphorus;
- The first EPA-approved regulatory program for concentrated animal feeding operations (CAFOs);
- The first Chesapeake Bay state to permanently preserve 20% (more than 3 million acres) of land in
  the watershed;
- The first Chesapeake Bay state to meet its goal to plant 3,736 miles of forest buffers by the year
  2010. The state has planted a total of 3,894 miles of forest buffers along waterways since 2002; and
- The Commonwealth is home to the largest Conservation Resource Enhancement Program (CREP) in
  the entire nation. Pennsylvania's CREP delivers more than $50 million in state and federal
  assistance and targets key edge-of-stream best management practices (BMPs) to maximize water
  quality.

While Pennsylvania has been a leader in agricultural stewardship, we also believe that the Chesapeake
Bay TMDL must recognize and respect co-equal goals of clean water and economically viable farms;
we cannot have one without the other. The TMDL must recognize the reality of the economic hardship
that the state and many of its farms (and especially dairy farms) have experienced over the past
three years and that are projected to continue to experience over the next one to two years.

AR0032667

In addition, Pennsylvania has provided leadership in programs to reduce nutrient loadings from municipal and industrial wastewater treatment facilities. Pennsylvania's Chesapeake Bay Compliance Plan was developed in 2006 in response to the adoption of new water quality standards established for the Chesapeake Bay. The plan sets forth how almost 200 of the largest point source facilities will achieve reductions based on their contribution to the overall load going to the Chesapeake Bay. Significant wastewater treatment plants, over 0.4 million gallons per day (MGD), were divided into phases by Total Nitrogen (TN) load. The facilities in Phase 1 (63 plants) have 85 percent of the load, those in Phase 2 (47 plants) have 10 percent of the load, and those in Phase 3 (73 plants) have 5 percent of the load.

Significant progress has been made in the implementation of the point source portions of the Compliance Plan. All of the 63 Phase 1 National Pollutant Discharge Elimination System (NPDES) permits are already issued. Forty-three of the facilities will be in compliance by 2011, another 13 will be in compliance by 2012, and the remaining 7 will be in compliance by 2015. NPDES permits for Phase 2 facilities will be issued by the end of this year or early next year. In March 2010, Section 92.8a planning letters were sent to Phase 3 facilities.

As a result of these and other efforts to control the delivery of nutrients and sediment to the Chesapeake Bay from point sources and nonpoint sources, progress has been made to reduce nitrogen and phosphorus pollution of the local waters in the Pennsylvania watershed. According to EPA's current watershed model, the Commonwealth has achieved 28 percent of the total nitrogen reductions needed and 46 percent of the total phosphorus reductions needed. This progress has been made despite the significant amount of nitrogen deposition that occurs, as described in Section 4 of the draft TMDL. Pennsylvania has concerns about this nitrogen source and its inability to address this load because a significant amount of this is generated outside the borders of Pennsylvania.

Pennsylvania will shortly submit a Final Phase 1 Chesapeake Watershed Implementation Plan (WIP) that will provide the necessary reasonable assurance, separate and apart from the TMDL, that the Commonwealth's nutrient and sediment allocations for the Chesapeake Bay will be met. This WIP is being developed with the input of over 150 stakeholders and reflects an equitable cost-effective approach to meeting Pennsylvania's allocations.

In general, Pennsylvania is concerned that EPA's approach to the Draft Chesapeake Bay TMDL is neither practical, equitable, nor cost-effective and could reverse progress in meeting our water quality goals. Although we will provide additional detail to further identify the rationale for our concerns with the draft TMDL, our key issues also include:

- The revised WIP that is being submitted to EPA shows that the Commonwealth gives reasonable assurances that it can meet load allocations at the border. As a non-tidal state, Pennsylvania disagrees with the imposition of "federal backstop measures" in the draft Chesapeake Bay TMDL, including the establishment of individual waste load allocations (WLAs) for all significant point sources, aggregate WLAs for other entities regulated by the NPDES, and aggregate load allocations (LAs) for nonpoint source sectors.

AR0032668

EPA-R03-OW-2010-0736                    -3-                    November 8, 2010

- The primary method of the Commonwealth's efforts to provide reasonable assurances is the continued call for a technology project fund of $100 million annually that would place innovative projects such as manure to energy digesters on the ground. This project would be funded by the Chesapeake Bay states and the federal government and will provide the necessary assurance that the reductions necessary will be made. Efforts such as this were not adequately considered in the draft TMDL.

- Reasonable assurance is further supported by recent regulatory initiatives, including:

  o Chapter 102, Erosion and Sediment Control regulations to regulate animal heavy use areas and establish requirements for greater than 25 percent cover within 100 feet of a stream;
  o Increased environmental requirements in the Manure Management Manual;
  o A Water Quality Initiative to provide regional compliance and inspection actions for CAFO, stormwater, and agricultural regulatory programs.

- The WLAs proposed in the draft TMDL for wastewater treatment plants would result in a 6 percent additional reduction in TN at an additional cost to Pennsylvania citizens of over $1 billion. Individual WLAs for all significant point sources will be ineffective.

- The WLAs proposed in the draft TMDL for stormwater sources are not appropriate. The approach of requiring treatment of 100 percent of all urban land with either impervious reductions or retrofits is not practicable or attainable particularly for many older generation towns and cities. The feasibility and cost to attain such reductions is far in excess of the local communities' resources and makes the cost/benefit ratio questionable at best.

- Pennsylvania also has concerns regarding the designation of all unregulated stormwater to be covered by an NPDES permit. For Pennsylvania, expansion of the Municipal Separate Storm Sewer System (MS4) permitting area would mean over 900 new MS4 NPDES permits. The administrative workload for this far exceeds the federal resources currently allocated to Pennsylvania for MS4 stormwater.

- Pennsylvania does not agree with EPA's definition of "urban MS4 lands." Pennsylvania utilizes the definition of "urbanized area" and "MS4" from the federal regulations. Pennsylvania disagrees that the MS4 system includes all lands within in a designated urbanized area.

- Pennsylvania does not agree with the designation of large numbers of animal feeding operations (AFOs) as CAFOs. There are sufficient regulations in place now; what is needed is federal funding and compliance efforts.

- Pennsylvania is concerned with any mandatory requirement for a precision feed management program for dairy operations of any size.

AR0032669

EPA-R03-OW-2010-0736                    -4-                    November 8, 2010

- Pennsylvania disagrees with requirements for predetermined list of specific BMPs on all types of farming operations as a baseline to meet the TMDL.

- Pennsylvania is concerned that there are significant deficiencies in EPA's Chesapeake Bay Watershed Model and Scenario Builder. These problems relate to nutrient management, continuous no-till, and urban acres issues. The model used to establish the draft TMDL does not take into account all of the agricultural BMPs that have been installed, including those that have not been reported and those that have been under-reported.

- EPA needs to support Pennsylvania's nutrient and sediment trading program, which is now supported by state regulations. It would be counterproductive for EPA to transform Pennsylvania's existing state trading program into EPA's ideal of a program. Pennsylvania maintains that flexibility is important and questions the appropriateness of including definitions and common elements of offset and trading programs as an appendix to a TMDL. If, nonetheless, the appendix remains in the final TMDL, EPA should remove references to sector allocations, more clearly define and use the terms "credit" and "offset," clarify what is meant by "water chemistry variations" and "intermediary segments," replace "sold" with "used" regarding offset or credit tracking, and reconsider the expectation that a state agency or other institutional entity would anticipate annual increased pollutant loading from nonpoint and unpermitted point sources and acquire offsets to cover them.

Pennsylvania remains a committed partner in the restoration of the Chesapeake Bay. Given the appropriate flexibility, time, and tools, Pennsylvania is confident that we can help develop a WIP that will make sense to Pennsylvania stakeholders and restore Pennsylvania's local waters and the Chesapeake Bay. The Final Chesapeake Bay TMDL should be consistent with Pennsylvania's final WIP submission and provide gross WLAs and gross LAs for each major basin in the state. Pennsylvania looks forward to a continued dialogue as we move towards achieving our goals of a restored Chesapeake Bay. We appreciate the opportunity to provide comments.

Sincerely,                                        Sincerely,

Michael Pechart                              John T. Hines
Deputy Secretary                             Deputy Secretary
Office of Marketing and Economic Development  Office of Water Management
Department of Agriculture                    Department of Environmental Protection

AR0032670



# MARYLAND STATE BUILDERS ASSOCIATION
### 204 Duke of Gloucester Street Annapolis, Maryland 21401

**(410) 263-0070 phone  (410) 263-0078 fax**
**katmaloney@verizon.net**

Via U.S. Mail and Regulations.gov

November 8, 2010

Water Docket
Environmental Protection Agency
Mail code: 2822T
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

RE: TMDL for the Chesapeake Bay Watershed
(Docket ID No. EPA-R03-OW-2010-0736)

Dear Sir or Madam:

We are pleased to present our comments on the draft Chesapeake Bay Watershed
TMDL. We believe that a TMDL which is fair and equitable and cost effective will provide the greatest
level of reasonable assurance of a successful program results to clean up the Chesapeake Bay by 2025.

Additionally, we are very optimistic that there are substantive desires across the board for all of the
sectors, and our political leadership to find practicable solutions that can achieve the Bay goals.

We respectfully submit the following comments on the draft TMDL:

1. EPA should rectify the Chesapeake Bay Model based on the Phase 5.3mod urban acreages and
   reassess the TMDL load allocations based on the corrected output before issuing the TMDLs.
2. EPA should restate the goal of retrofit based upon acreage so that any substantive change in the
   amount of impervious due to the corrected BayShed model that does not balloon the States'
   retrofit obligations.
3. No revenues have been identified to undertake these massive obligations. This is particularly
   crucial in our current state of the economy, the massive unemployment and related state and
   local government fiscal constraints.
4. EPA's hurry-up mode of developing the TMDL and the very short public comment period cannot
   lead to a well-thought-out program; and likewise with the lack of stakeholder input as the
   TMDL was developed. Clearly unintended consequences will arise.
5. Beginning in 2011, for construction projects, every new structure in the Bay watershed will need
   to offset its potential impact on the Bay by purchasing credits from trading and offset
   programs that have yet to be developed.

EASTERN SHORE BUILDING INDUSTRY ASSOCIATION    FREDERICK COUNTY BUILDERS ASSOCIATION    HOMEBUILDERS ASSOCIATION OF MARYLAND

HOMEBUILDERS ASSOCIATION OF WESTERN MARYLAND    MARYLAND NATIONAL CAPTIAL BUILDING INDUSTRY ASSOCIATION

AR0032686

6. The TMDL has been set up so that increases in population are not going to have the same levels of new housing available to them, increased pricing and in turn, limit the many financial benefits of new development.

We would welcome the opportunity to share our concerns with the EPA in greater detail.

Sincerely,

Thomas M. Farasy
President

AR0032687



November 8, 2010

The Honorable Lisa P. Jackson
Administrator
U. S. Environmental Protection Agency
Water Docket, Mailcode: 28221T
1200 Pennsylvania Ave., NW
Washington, DC 20460

Re: Chesapeake Bay TMDL -- Docket no. EPA-R03-OW-2010-0736

Dear Administrator Jackson:

On behalf of the members of the Choose Clean Water Coalition (Coalition) listed below,
we would like to thank you for the opportunity to comment on the Draft Chesapeake Bay Total
Maximum Daily Load (TMDL). The Coalition brings together more than 130 organizations
from Pennsylvania, New York, Maryland, Delaware, Virginia, West Virginia and the District of
Columbia, working together to help everyone in the region choose clean water.

The Chesapeake Bay is an iconic national treasure and an over $1 trillion resource.[1] Right
now is our best opportunity in a generation to restore the Bay and all the waters that feed it.
While we have made progress on a number of fronts, we simply have not done enough thus far to
stem pollution to our waterways. Now, as the U.S. Environmental Protection Agency (EPA) and
the Bay states collaborate, we formally express our strong support to finalize and implement the
Bay-wide TMDL.

We have a moral and legal imperative to protect these local waters upon which 17 million
people rely. The Clean Water Act, three major Bay Agreements and scores of minor ones, three
consent decrees, dozens of Memoranda of Agreement/Understanding (MOA/MOU) and a
Presidential Executive Order all require development of a Bay-wide TMDL. It is not only legally
required, but perfectly logical, appropriate and fair for EPA to develop this TMDL. Moreover,
EPA has used this authority wisely, engaging in a highly transparent public process developing
the TMDL (and seeking comments on the draft), providing states ample opportunity to prepare
and revise draft Watershed Implementation Plans, (WIPs), and seeking to implement allocations
that are substantially equivalent to those the states have had since 2003.

We respectfully submit these comments in support of the TMDL.

I.    **Background on Restoration of the Chesapeake Bay**

The decline of this ecological national treasure stems from human activity that has altered
the landscape throughout the Bay's 64,000 square mile watershed comprised of parts of
Maryland, Virginia, Pennsylvania, Delaware, New York, West Virginia and all of the District of

---

[1] 2004 Chesapeake Bay Watershed Blue Ribbon Finance Panel Report, "Saving a National Treasure: Financing the
Cleanup of the Chesapeake Bay"."

AR0032705

Columbia ("Bay states"). The population in the watershed has doubled since 1950 (now around 17 million), and much of this growth and development – leveling trees, forests and wetlands and replacing farms with subdivisions and malls — has taken place close to the Bay or to its sensitive tributaries, harming natural filters that are critical to a healthy ecosystem.

The Chesapeake has historically been America's great protein factory – once producing 25 million bushels of oysters annually and, until recently, 50% of the nation's blue crabs. The Bay is the spawning and nursery grounds for up to 90% of the Atlantic stocks of striped bass. But, the most recent harvest of oysters was down to 200,000 bushels – far below historic levels – – and only about a third of the nation's blue crabs now come from the Chesapeake. These populations are down because of overharvest, poor water quality and loss of critical habitat.

The most critical measure of the Bay's health is water quality. A healthy and productive Bay must be safe for people and support abundant aquatic life, such as oysters, fish and crabs. The water should be clear enough for underwater grasses a critical habitat for these species to thrive. The Bay's primary water quality problem is caused by excessive amounts of nutrients, specifically nitrogen and phosphorus, and sediment that flow from tributaries and lead to murky water and algae blooms. Excess algae cloud the water and block sunlight from reaching the Bay grasses on the bottom. Decaying algae create low oxygen levels for aquatic life throughout the Bay. The latest indicators of Bay health from EPA in 2009, showed the Bay to be meeting only 24% of its water quality goals.[2]

The predominant sources of the nitrogen, phosphorus, and sediment loads are well known. For nitrogen, the principal sources are agriculture, wastewater treatment plants, polluted stormwater from developed areas and air deposition. Phosphorus is mainly the result of agriculture, wastewater and stormwater from development. Sediment comes mostly from agriculture, stormwater from development, or from stream beds and banks eroding due to increased flows caused by runoff from impervious land covers.

Origins of Chesapeake Bay Management and Restoration – The Science-Based Voluntary Approach

In 1972, Tropical Storm Agnes exacerbated the decline of the Bay, which led U.S. Senator Charles "Mac" Mathias (R-Md) to set out on a lengthy tour of the Bay in the summer of 1973. This, and subsequent trips, led him to introduce legislation directing the EPA to embark on a major research project to determine the Bay's problems and make recommendations on how to solve them.

In 1976 Congress directed EPA to undertake a comprehensive study of the Bay focused on its water quality and living resources. Six years and $27 million later, the EPA finished the comprehensive study and, in September 1983, released a lengthy report, *Chesapeake Bay: A Framework for Action*. The report identified nutrient pollution as the greatest threat to the Bay, and recognized that the problem could not be solved without addressing the entire watershed –

---

[2] Bay Barometer: A Health and Restoration Assessment of the Chesapeake Bay and Watershed in 2009, EPA 2010

2

AR0032706

not just the tidal Bay states of Maryland and Virginia. The report also provided an innovative blueprint for the intergovernmental, inter-jurisdictional "Chesapeake Bay Program" that was formed in December when the *Chesapeake Bay Agreement of 1983* was signed by a group that would be known as the Chesapeake Executive Council – the governors of Maryland, Pennsylvania and Virginia, the Mayor of the District of Columbia, and the Administrator of the EPA. The organized and institutional voluntary effort to restore the Bay had begun.

In February, 1987 Congress overrode President Reagan's veto, and passed the reauthorization of the Clean Water Act[3] (CWA), which included a new section entitled "Chesapeake Bay". This provision, known as Section 117, basically codified the Chesapeake Bay Program and authorized Congress to continue funding the restoration effort at $13 million annually.[4]

In December 1987, the Chesapeake Executive Council, now expanded to include the chair of the Chesapeake Bay Commission, signed the *1987 Chesapeake Bay Agreement*, which for the first time included specific quantitative goals and commitments. The centerpiece of the *Agreement* was a goal to reduce nutrient pollution to the Bay by 40% by 2000. The *1992 Amendments to the Chesapeake Bay Agreement* was signed by the Council and "capped" the 40% reduction goal after 2000. In addition, the 1992 *Amendments* recognized the need to reduce nutrients in the tributaries, and called for the states to develop "tributary-specific strategies" on how to meet the nutrient reduction goal. The states all drafted tributary strategies in the late 1990's which were not required to be reviewed or approved by anyone outside of each state's government. The *Amendments* also recognized the need for "intensified efforts to control nonpoint sources of pollution, including agriculture and developed areas…", as well as the need to engage Delaware, New York and West Virginia in the efforts to reduce nutrients in the tributaries.

<u>Voluntary to Regulatory Shift Begins</u>

In 1998, a lawsuit filed by the American Canoe and American Littoral Society against EPA, discussed in more detail below, alleged Virginia was not timely and complete in listing its Clean Water Act Section 303(d) impaired waters and preparing TMDLs for those waters, and that EPA failed in its non-discretionary duty under the Clean Water Act to take over when the state had failed to do so.

Virginia submitted an incomplete list of impaired waters in 1996. That list, which included Virginia's portion of the Chesapeake Bay, was partially approved by EPA in 1998. The lawsuit was settled with a consent agreement in the Federal Eastern District of Virginia court on June 11, 1999. Under the terms of the court agreement, EPA would ensure that Virginia completed its listing of impaired waters and developed TMDLs for all waters on the 1998 list by May 1, 2010. If Virginia did not do so, EPA would complete them no later than May 1, 2011. If

---

[3] Water Quality Act of 1987
[4] In 2000, Congress passed a reauthorization of Section 117 of the Clean Water Act, which did not substantially alter the approach or make up of the Chesapeake Bay Program, but did increase the authorization level to $40 million annually.

3

AR0032707

waters met water quality standards any time up to May 1, 2011, they would be removed from the list and there would be no need for TMDLs for those waters.

The *Chesapeake 2000* Agreement and Setting of 2010 Cleanup Goals

In 1998, the Chesapeake Executive Council adopted Directive 98-2, which directed the Bay Program to develop a new Chesapeake Bay agreement for 2000, and to present a draft set of options and recommendations to the Council in 1999.

At the 1999 annual meeting of the Chesapeake Executive Council, a new draft agreement was released for public review. The language in that draft, which was retained in the final agreement a year later, made the intent to meld the voluntary and regulatory approaches clear. In attempts to avoid the imposition of a TMDL regulatory approach, the Virginia delegation encouraged the following language that was adopted:

> Recent actions taken under the Clean Water Act resulted in listing portions of the Chesapeake Bay and its tidal rivers as 'impaired waters.' These actions have emphasized the regulatory framework of the Act along with the ongoing cooperative efforts of the Chesapeake Bay Program as the means to address the nutrient enrichment problems within the Bay and its rivers. In response, we have developed, and are implementing, a process for integrating the cooperative and statutory programs of the Chesapeake Bay and its tributaries. We have agreed to the goal of improving water quality in the Bay and its tributaries so that these waters may be removed from the impaired waters list prior to the time when regulatory mechanisms under Section 303(d) of the Clean Water Act would be applied.

The Chesapeake Executive Council signed the *Chesapeake 2000* agreement on June 28, 2000. Although the 40% nutrient reduction goal from 1987 was still not met, the Chesapeake Bay Program adopted new stronger goals, and set up a clear path of regulatory and voluntary actions designed to ensure that the 2010 clean up goals would be met. In 2000, both Delaware and New York signed an MOU with the other Chesapeake Bay Program partners and agreed to adopt the Water Quality goals of the *Chesapeake 2000* agreement – West Virginia followed suit in 2002.

In accordance with the commitments in *Chesapeake 2000,* EPA and its Bay Program partners used their best scientific understanding of the Chesapeake Bay ecosystem, including an extensive body of research and monitoring, to develop the water quality criteria. The criteria were published in *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll-a for the Chesapeake Bay and Its Tidal Tributaries* in April 2003. The criteria recognized that not every cubic foot of water in the Bay required the same level of protection – some, such as upstream spawning and nursery areas or "habitat zones" needed high levels of protection, especially during spawning and nursery seasons, other areas, such as the Bay's deep trench, where few living resources ever resided, needed less. EPA also developed water clarity criteria in order to protect and restore critical underwater Bay grasses. These criteria were then coupled with site-specific Bay grass acreage, which were incorporated in the new water quality standards that were being developed.

4

AR0032708

EPA and its Bay Program partners also agreed to control excess algae by developing both narrative and numerical criteria for chlorophyll-*a*. The numerical criteria were necessary in state standards for areas where achievement of dissolved oxygen criteria would not solve algal water quality impairments. The new EPA criteria and "habitat zoning" required revising aquatic use designations. EPA, working with all of its state partners including the District of Columbia and the headwaters states, published its *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability* in August 2003. The *Technical Support Document* showed how changes in the aquatic use zones for dissolved oxygen were justified, and that the old standards, because of both natural and manmade reasons, were unattainable. The document provided extensive guidance on how states should determine the geographical extent of the aquatic habitat use zones and associated water quality criteria in revising their water quality standards. It also provided support for the states to conduct their use attainability analyses, following specific decision criteria in the federal water quality standards regulations.[5]

To assess the potential attainability of the new designated uses and criteria, EPA and its state partners organized the technological and cost information into hypothetical tiers of nutrient and sediment controls, which were modeled to estimate dissolved oxygen criteria attainment in the newly-designated habitat zones. Stakeholder experts representing the wastewater treatment, agriculture, and urban stormwater sectors were involved in the work groups which established the tiers and assessed the results. "Screening-level" economic analyses assessed whether there were any areas where achieving the new standards might cause "substantial and widespread economic and social impact," exceeding the decision criteria in the federal regulations[6].

The Bay states with tidal waters (Delaware, District of Columbia, Virginia and Maryland) completed the process of revising their Chesapeake Bay tidal water quality standards in 2004-2005. The EPA analyses noted above, along with state-specific information, allowed the states to show in their water quality standards adoption processes that the revised water quality criteria and use designations would satisfy the federal water quality standards regulations by protecting "existing" tidal aquatic life uses, would be attainable, and would not lead to "substantial and widespread economic or social impact[s]." [See, for example, Maryland's Use Attainability Analyses supporting adoption and refinement of its water quality standards for various tidal waters.]

As each state completed its adoption process, EPA approved the revised state water quality standards, and the states updated their section 303(d) listings for Chesapeake Bay and tidal tributary waters according to the new standards. Since 2003 EPA has published several amendments to the criteria and supporting procedures, in partnership with the states. As EPA has outlined in its draft TMDL report, states have completed or proposed minor modifications of the state standards, including further measures to address use attainability issues in specific geographic areas. After the EPA water quality criteria guidance report was completed in April 2003, EPA used its Chesapeake Bay models and multi-state allocations workgroup to develop nutrient and sediment load allocations for all river basins and states in the Bay watershed. These allocations were to guide subsequent revision or development of state tributary strategies. On April 25, 2003, Virginia's Secretary of Natural Resources Tayloe Murphy, who was also chair of

---

[5] 40 CFR § 131.10(g)).
[6] 40 CFR § 131.10(g)6.

AR0032709

the Chesapeake Bay Program's Principals' Staff Committee,[7] sent a memorandum to all of the Bay Program partners, including the Bay states. The Memorandum, *Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals*, clearly laid out the allocations which were to guide the development of state specific tributary strategies by 2004. *See* Chesapeake Executive Council Directive 03-02. These allocations were "TMDL-like", and are very similar to EPA's proposed TMDL nutrient allocations released earlier this year and again as part of this draft TMDL.[8]

All of the Bay states developed updated tributary-specific strategies, most final in 2004. These tributary strategies used the allocations that were contained in the Tayloe Murphy *Summary of Decisions* Memorandum. For the past seven years all of the Bay states have known what their load reduction allocations would be, and have developed strategies to meet them.

As part of this overall process, EPA, the U.S. Geological Survey, all of the Bay states and two river basin commissions signed a MOU, on *Cooperative Efforts for Monitoring and Assessing Water Quality in the Streams and Rivers of the Chesapeake Bay Watershed* in September 2004. This MOU was crafted to improve the reliability of water quality monitoring throughout the Bay watershed, and outlined a common monitoring strategy and expanded network.

Technical work on the TMDL actually began in 2005 with the convening of the Chesapeake Bay Reevaluation Steering Committee (now known as the Water Quality Goal Implementation Team) whose initial focus was on updating and revising the watershed and water quality models. And since 2005, there have been regular meetings of this committee, all public, all open to stakeholder participation, and whose actions, discussions, and decisions have been fully documented on the Chesapeake Bay Program's web page.[9]

The Regulatory Approach Becomes Formal – The Chesapeake Bay TMDL

At the 2007 Chesapeake Executive Council meeting, Maryland's Governor Martin O'Malley, chair of the Chesapeake Executive Council, formally announced that the Chesapeake Bay Program would not meet its water quality goals by 2010 when he stated:

> We are at a key crossroads in our Bay restoration efforts. With the alignment of political leadership, public will, and good science, we have the moral imperative to turn back the decline in the Bay's health that has been decades in the making. We have made significant progress in many areas over the last 25 years; however, we must also acknowledge that based on the current pace we will not meet our 2010 nutrient and sediment reduction goals. But today we have pledged to accelerate our efforts and to have any and all programs and policies in place by the end of calendar year 2010 to meet

---

[7] Representatives from all six Bay watershed states, DC, EPA and the Chesapeake Bay Commission http://www.chesapeakebay.net/committee_psc_info.aspx?menuitem=46326.

[8] Using the Phase 5.3 Watershed Model, implementation of the Tributary Strategies is expected to result in annual loads of 189.7 million pounds of total nitrogen, 14.25 million pounds of total phosphorus and 6.4 billion pounds of sediment compared to the draft TMDL caps of 187.4 million pounds, 12.5 million pounds and 6.3 billion pounds, respectively.

[9] http://www.chesapeakebay.net/wq_git_info.aspx?menuitem=47174

6

AR0032710

our nutrient and sediment reduction goals. We also pledge our best efforts to continue to seek any necessary additional funding consistent with overall fiscal and economic conditions.

Removing the Bay from the Section 303(d) list would have avoided the need for development of a TMDL for the Bay. The failure to meet that deadline triggered the court ordered obligations found in the *American Canoe* and *Kingman Park* consent decrees and the MOU with Maryland to develop a Bay TMDL discussed in further detail below.

This failure to meet the 2010 restoration goals was acknowledged again in 2008 at the annual Council meeting, when EPA revealed that the current restoration pace would not meet the nitrogen goals until 2034 and the phosphorus goals until 2050. In June 2008, the Principals' Staff Committee of the Chesapeake Bay Program formally requested that EPA accelerate the Bay TMDL so it takes effect no later than December 31, 2010 – not May 1, 2011.[10] EPA agreed to the request from its partners and pledged to finalize the Bay TMDL by the end of 2010.

The Federal Commitment to Restoration of the Chesapeake Bay

Congress and the Administration have increased commitments of financial and agency support for restoration and protection of the Chesapeake Bay watershed since the 1980s. There has been a considerable amount of federal support to states, local governments, farmers and others to implement on-the-ground practices that will be needed to succeed. This funding support has been increasing over the years as the TMDL has gotten closer.

EPA has also provided implementation funds, $100,000 annually beginning in Fiscal Year 2002, to the three Headwater states of Delaware, New York and West Virginia after they signed the Water Quality MOU. That has incrementally increased to $500,000 this year. In Fiscal Year 2005 EPA began a new annual grants program for implementation activities in the Chesapeake Bay watershed, primarily targeting nutrient and sediment reduction. The program was funded at $7.8 million the first year and the amount has fluctuated in the years since. EPA has also been providing additional funds to all of the states to hire or retain staff in regulatory programs in order to help develop and implement the TMDL and the state WIPs. New Chesapeake Bay watershed-specific grant programs have been developed over the past decade by the National Oceanic and Atmospheric Administration and USDA's Natural Resources Conservation Service (NRCS). In the 2008 Farm Bill, Congress allocated $188 million over six years in mandatory spending for agricultural conservation practices on farms in the Chesapeake Bay watershed portion of the six states. This is a critical source of substantial funding for farmers to implement practices to support efforts to meet the requirements of the TMDL and their state WIPs.

In May 2009, President Obama issued Executive Order 13508 "Chesapeake Bay Protection and Restoration," which aligned the Federal government with efforts necessary to restore the Bay's water quality and other restoration and protection goals. This historic effort will ensure unprecedented Federal support for efforts to restore the Bay and to meet the TMDL. In September 2009, USDA Secretary Vilsack announced that there would be $638 million over

---

[10] PSC Meeting minutes June 18-19, 2008

AR0032711

five years from various USDA programs devoted to Chesapeake Bay restoration activities –
though this is not all directly for water quality. EPA's Chesapeake Bay Program budget
increased from $31 million in FY 2009 to $50 million in FY 2010, and the President proposed
$63 million for FY 2011 – all unprecedented amounts. EPA's Clean Water State Revolving
Fund (SRF), a national program with a set formula for dissemination of money to the states, went
from $689 million in FY 2009 to $2.1 billion in FY 2010 and the President's FY 2011 budget
request is $2.0 billion.

As part of the President's Executive Order, on September 30, 2010 the Obama
Administration recently announced that it is providing a substantial amount of funding support
from more than a dozen Federal agencies – proposing over $490 million in funding support for
Chesapeake Bay in Fiscal Year 2011, which has just begun. Some funding highlights from this
effort to target water quality specifically in the Chesapeake Bay watershed include EPA
programs, such as the Clean Water SRF ($169.51 million); Section 319 non-point source grants
to the states ($10.37 million); $5.89 million in Section 106 Water Pollution Control grants to the
Bay states; and $4.7 million to support state tidal monitoring programs. NRCS is targeting $72
million in financial and technical assistance to help farmers in high-priority watersheds. In
addition, through the newly established Chesapeake Bay Regulatory and Accountability Program
and State Implementation Grants, EPA will provide more than $20 million directly to the Bay
states to help them develop and implement the Chesapeake Bay TMDL and the state WIPs.

<u>Conclusion</u>

The EPA, along with the Bay states, has worked for decades in a cooperative manner
through a transparent and public process to reduce pollution leading to the Chesapeake Bay.
Unfortunately, water quality goals set in the 1980s and in 2000 have not been met, triggering the
development of the TMDL. In addition there is a clear and lengthy record of EPA, and the Bay
states, going to considerable lengths to ensure that both technical and economic attainability
were addressed during this process. The new Chesapeake Bay tidal water quality standards are
both scientifically valid and protective under the Clean Water Act, and at the same time, are
economically and technically attainable. It is important to note that since the 1999 court
agreement with EPA over the listing of Virginia's Bay waters as impaired, there has been
ongoing progress by EPA and the federal government to follow that agreement, the *Chesapeake
2000* agreement and ultimately the development of the Chesapeake Bay TMDL. This progress,
though sometimes delayed by technical issues, continued unabated through the administrations
of Presidents Bill Clinton, George W. Bush, and Barack Obama.


**II.      EPA is Legally Obligated to Develop a Bay Wide TMDL**

While the history of the Chesapeake Bay restoration effort illustrates decades of work to
address water quality issues, the legal history demonstrates EPA's obligation to develop the
TMDL in the absence of the Bay states' ability to meet water quality goals. EPA has accurately
set forth the statutory and regulatory basis for its proposed TMDL in Section 1.4 of the draft
TMDL entitled "Legal Framework for the Chesapeake Bay TMDL" as well as relevant consent
decrees issued by federal courts in Virginia, the District of Columbia and Delaware, an MOU
with respect to the TMDL for Maryland's portion of the Chesapeake Bay and its tidal tributaries

8

and a Settlement Agreement resolving litigation with the Chesapeake Bay Foundation seeking issuance of a Bay-wide TMDL. The Clean Water Act, three major Bay Agreements and scores of minor ones, three consent decrees, dozens of Memoranda of Agreement/Understanding and a Presidential Executive Order all require development of a Bay-wide TMDL.

Section 303(d) of the Clean Water Act

EPA's statutory authority to develop the Bay-wide TMDL is derived from Section 303(d) of the Clean Water Act.

> The CWA required each state, …, to submit by June 28, 1979 (no more than 180 days after the EPA identified certain pollutants, pursuant to § 1314(a)(2)(D)) the first of its TMDL calculations to the Administrator of the EPA. Within thirty days after this submission, the Administrator must take one of two actions. She may approve the TMDL, in which case it becomes binding on the states. If, however, she disapproves it, the Administrator must devise her own binding TMDL for the state within thirty days of disapproval. CWA § 303(d)(2), 33 U.S.C. § 1313(d)(2).

*Kingman Park Civic Ass'n v EPA*, 84 F.Supp. 2d 1, 2 (D.D.C. 1999).

Thus, Section 303(d) of the Clean Water Act requires states, in the first instance, to identify impaired waters and develop "TMDLs." 40 C.F.R. § 130.7(d). If a state clearly indicates through inaction or otherwise that it will not be able to develop the TMDL, then the duty to prepare the TMDL shifts to EPA. *See, e.g., Scott v. Hammond*, 741 F. 2d 992 (7th, Cir. 1984) (holding that lengthy inaction on the part of a state can constitute a "constructive submittal" of an inadequate TMDL, thereby transferring the duty to prepare to EPA); *Kingman Park*, 84 F.Supp. 2d 1, 2; *American Canoe Ass'n, Inc. v. United States Envtl. Protection Agency*, 30 F. Supp. 2d 908, 919--22 (E.D. Va. 1998) ("*American Canoe I*") (holding that EPA must take action to develop TMDLs for states that fail to do so); *Alaska Ctr. for the Env't v. Reilly*, 762 F. Supp. 1422, 1426--29 (W.D. Wa. 1991) ("Congress intended that EPA's affirmative duties be triggered upon a state's failure to submit a list or any TMDL at all."); *cf Miccosukee Tribe of Indians v. United States Envtl. Protection Agency*, 105 F.3d 599, 602--03 (11th Cir. 1997) (holding that, despite the lack of an actual submission from Florida indicating that it had changed the water-quality standards, EPA's nondiscretionary duty under 33 U.S.C. § 1313(d)(4)(B) would be triggered if Florida had actually altered its water-quality standards).

The line of decisions stemming from *Scott v. Hammond*, 741 F. 2d 992 (7th Cir. 1984), clearly established that the duty to develop TMDLs for impaired waters transfers to EPA through the mechanism of a "constructive submittal" when a state fails to timely submit a TMDL. *See, e.g. Kingman Park*, 84 F.Supp. 2d 1-2; *American Canoe I*, 30 F. Supp. 2d at 919-22; *Alaska Ctr. for the Env't*, 762 F. Supp. at 1426-29. Otherwise, a state could ignore its duty to prepare restoration plans for impaired waters forever, so long as it did not actively submit inadequate plans to EPA for review and approval, clearly not what Congress intended in enacting the Clean Water Act. As the court in *Kingman Park* recognized, Congress could not have meant for EPA

9

AR0032713

to sit idly by for more than a decade while states failed to carry out their statutory mandates. *Kingman Park*, 84 F.Supp. 2d at 7.

Here, not only have none of the Bay states developed TMDLs for either their portions of the Bay (Maryland and Virginia) or their tributaries to the Bay, but they have affirmatively asserted that they were not able to develop the TMDL on their own, and invited EPA to assume the lead and take over developing the Bay TMDL.[11] Further, states agreed that a "state by state" approach to develop the TMDLs was scientifically and administratively less desirable than continuing to use a regional approach as they did with the water quality criteria. The well established doctrine of "constructive submission" of an inadequate TMDL by a state, which triggers EPA's duty to take over, coupled with the states' express request in this case that EPA take the lead in developing the Bay wide TMDL, provide ample authority for EPA's action in doing so.

In addition to the request of the states and EPA's legal obligation under the constructive submission doctrine, there is a compelling and logical reason for EPA to manage or coordinate the development of the Bay TMDL. The Bay watershed includes portions of six states, and all of the District of Columbia, and it would be impossible for one state to develop a TMDL to address more than a small part of the problem. No matter how firm Maryland and Virginia are with polluters or dischargers in their states, they could not fix the problems alone and could not order polluters or dischargers in upstream states, Pennsylvania or New York, for example, to cut back on their discharges.

Further, EPA often takes the lead role in developing TMDLs for interstate waters. *See Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517 (9th Cir. 1995) (OR, WA and ID listed the Columbia River as impaired by a toxic compound, dioxin, but decided against developing TMDLs on their own. "Instead, after consultation and involvement in the development of the draft TMDL, the states requested the EPA to issue the proposed and final TMDL as a federal action under the authority of sec. 1313(d)(2)." The Columbia River TMDL for dioxin was upheld in the face of challenges filed by both environmentalists and industries. Rivers that form borders between states, such as the Savannah River, or that flow from one state to another, such as the Arkansas, or bays that receive pollutants from numerous states, such as the Chesapeake, are good candidates for EPA-developed TMDLs.

Prior TMDL Litigation and Agreements

As discussed above, Section 303(d) of the Clean Water Act requires states to identify water quality limited segments of water bodies within their borders and to establish the TMDL of pollutants that each water quality limited segment can assimilate, 33 U.S.C. § 1313(d)(1)(C)); this duty transfers to EPA, however, when the states fail to act. In 1997, EPA was sued because

---

[11] This decision was formalized at the meeting of the Principals' Staff Committee (PSC) on October 1, 2007. It was agreed that the Bay watershed TMDLs would be developed jointly between the six Bay watershed states, the District of Columbia and EPA, and then established by EPA. It was further agreed that the Water Quality Steering Committee would draft nutrient and sediment cap load allocations by tributary basin and jurisdiction, and the Principals' Staff Committee would formally adopt these allocations.

10

AR0032714

it did not act when Virginia failed to develop TMDLs for impaired water bodies. *American Canoe I.* That matter was settled via a consent decree approved by the federal court. *American Canoe v. EPA*, 54 F. Supp. 2d 621 (E.D. Va. 1999) ("*American Canoe II*").

EPA was also sued for failing to ensure that the District of Columbia identify impaired bodies of water within its jurisdiction and developed TMDLs for those waters. *Kingman Park Civic Association v EPA*, 84 F. Supp. 2d 1 (D. DC 1999). Like *American Canoe*, that matter was settled via consent decree which set deadlines for listing impaired water bodies and developing TMDLs for them. Those bodies of water are all tributaries to the Chesapeake Bay.

In addition, in 1996 the American Littoral Society and the Sierra Club sued EPA to ensure that TMDLs were developed for impaired waters on Delaware's Section 303(d) list which included a tidal Bay segment, the Upper Nanticoke River. *American Littoral Society, et al. v. EPA, et al.*, No. 96-330 (D. Del.).The parties entered a consent decree in 1997 which required EPA to develop TMDLs if Delaware failed to do so. While Delaware adopted some TMDLs, it does not have in place a TMDL to meet the current water quality standards for the tidal Bay segment, effectively leaving that task to EPA.

EPA was also sued for failing to require Pennsylvania to identify impaired bodies of water and establishing TMDLs for those waters. *American Littoral Society, et al. v. EPA*, No. 96-489 (E.D. Pa.). That matter was resolved via consent decree on April 9, 1997. Under the terms of the consent decree, EPA was to develop TMDLs for over 570 listed waters if Pennsylvania did not.

Another TMDL suit was filed against EPA in West Virginia. *Ohio Valley Environmental Coalition, Inc., et al. v. Carol Browner, et al.*, No. 2:95-0529 (S.D.W.VA.). Like the other matters, this case was resolved by consent decree in 1997. In that decree, EPA agreed to develop TMDLs for over 500 listed waters if West Virginia did not.

A similar claim was brought concerning Maryland's portion of the Bay. That claim was resolved via a MOU between Maryland and EPA in 1998. Like the *American Canoe* and *Kingman Park* consent decrees, this MOU required EPA to develop a TMDL for Maryland's portion of the Chesapeake Bay if Maryland failed to do so by 2010. Maryland did not develop such a TMDL.

Thus, EPA's Bay wide TMDL complies with its legal authority and commitment to prepare TMDLs for all of the Bay segments covered by these various consent decrees and MOUs. *See* Draft TMDL § 2.2.4.

Section 117(g) of the Clean Water Act

EPA's authority to issue the Bay wide TMDL is also supported by Section 117 of the Clean Water Act, which provides:

> (g) Chesapeake Bay Program
>     (1) Management strategies

11

AR0032715

> The Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain –
>> (A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed.
>> (B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem; …[12]

33 U.S.C. § 1267(g)(1)(A)-(g)(1)(B).[13]  Use of the word "shall" makes the Administrator's obligation mandatory. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The mandatory 'shall,' ... normally creates an obligation impervious to judicial discretion").  Thus, EPA was required to develop a management plan to comply with the nutrient reduction goals of the *Chesapeake 2000* agreement – 40% nutrient reduction and removal of the Bay from the Section 303(d) list. The proposed Chesapeake Bay TMDL is the most appropriate such '"plan" to "achieve and maintain …the nutrient goals…and water quality requirements" referred to in Section 117(g) because it is tailored to achieving compliance with the water quality standards for nutrients and sediment.  It is the principal tool provided in the Clean Water Act for this purpose, and therefore is precisely what Congress intended that EPA should do in implementing Sections 303(d) and 117(g).

*Fowler v. EPA* Settlement Agreement - Requires TMDL by December 31, 2010

In addition to the statutory requirements that EPA develop a Bay-wide TMDL, EPA is also required to take this action pursuant to the consent decree in the Fowler case.  In that case, EPA was sued for failing to comply with Section 117(g) and the Bay Agreements. *Fowler v. EPA*, Case No. 09-cv-00005-CKK, D. D.C., January 5, 2009.  That matter was settled by agreement between the parties.  The agreement provides that EPA will develop a Bay wide TMDL "[b]y December 31, 2010, pursuant to 33 U.S.C. §§ 1313(d) and 1267..." Settlement Agreement Section III.A.1.  That agreement set forth a number of other deadlines for submission and completion of state watershed implementation plans.  Thus, EPA is also required pursuant to the settlement agreement in *Fowler* to develop a Bay wide TMDL.

The May 12, 2009 Executive Order

On May 12, 2009, President Obama issued an Executive Order 13508[14] concerning restoration and protection of the Chesapeake Bay.  The Order directed seven agencies of the federal government to develop recommendations for restoring the Chesapeake Bay.  With oversight from the EPA Administrator, those agencies were to develop a final strategy for Bay

---

[12] There are three other goals identified by the CWA: toxics reduction; habitat restoration and wetlands protection, and; restoration for living resources, *e.g.,* oysters and grasses.  The majority of these goals have not been met.
[13] This section was re-codified as part of the Estuaries and Clean Water Act of 2000, Title II Chesapeake Bay Restoration.  One of the explicit purposes of the Restoration title was "to achieve the goals established in the Chesapeake Bay Agreement."  Pub.L. 106-457, Title II, Sec. 202(b)(2), Nov. 7, 2000, 114 Stat. 1967.
[14] http://executiveorder.chesapeakebay.net/page/About-the-Executive-Order.aspx

12

AR0032716

restoration and protection. On May 12, 2010, such a strategy was issued. One of the goals of the strategy was for EPA to develop a Bay wide TMDL by December 2010 with full implementation by 2025.[15] The proposed TMDL, and its finalization by December 31, 2010, will implement this important goal of the Executive Order and restoration strategy.

EPA Has Properly Included "Backstop" Allocations in its TMDL

In its TMDL document EPA describes, thoroughly and accurately, the lengthy history leading to its development of the draft TMDL, including the legal framework (Sections 1 – 3), much of which has been summarized above. In Section 8, it describes the development by the states of their Watershed Implementation Plans, EPA's evaluation of them, and the use by EPA of "backstop" allocations which EPA developed, based on its exhaustive modeling and data-gathering efforts, to ensure that, where the WIPs fail to demonstrate eventual achievement of the loading caps, the "backstop" allocations will do so.

Over the course of more than two decades EPA has worked closely with the Bay states to develop effective strategies to restore the water quality of the Bay and to achieve compliance with water quality standards. The framework which allows each Bay state to develop a WIP, in which the state may establish allocations for sources within its boundaries which will achieve water quality standards for each segment before EPA applies backstop allocations (only if needed), is part of that joint effort. In its WIP each state must also provide assurance that it has and will use the authority and resources necessary to ensure that its allocations will be fully implemented so as to achieve eventual compliance with water quality standards.

As discussed above, EPA is legally required to establish the TMDLs on its own under Sections 303(d) and 117(g) of the Clean Water Act. However, allowing the states the "first shot" at prescribing effective loading allocations for sources within their jurisdictions lets them determine which combination of point and nonpoint source controls will provide, from their perspective, the most cost-effective or preferable approach to achieve water quality goals, provided each segment's overall loading cap is satisfied. As EPA stated in Section 8.3: "Backstop allocations were established to fill a loading shortfall in the jurisdiction's draft Phase 1 WIP or to increase the level of reasonable assurance that the overall TMDL pollutant cap will be achieved." To the extent that a WIP does not provide a combination of load and wasteload allocations to sources and categories of sources which is sufficient to satisfy the TMDL requirements which EPA provided to the states during the summer of 2010, based on its modeling results, for any segment within its jurisdiction, EPA's "backstop" allocations were applied so as to reasonably assure compliance, as EPA is required to do under Clean Water Act Sections 303(d) and 117(g). Given the serious deficiencies in most of the draft Phase 1 WIPs it was necessary for EPA to make substantial use of the backstops.

The result of this approach is that EPA is holding itself ultimately accountable for ensuring that the resulting allocations meet the requirements of Section 303(d) while allowing the states to propose allocations of their own through their WIPs. For the reasons described above, this strategy, and EPA's implementation of it, are fully supported by the Clean Water Act.

---

[15] Strategy for Protecting and Restoring the Chesapeake Bay Watershed, May 12, 2010, p. 24. http://executiveorder.chesapeakebay.net/file.axd?file=2010%2f5%2fChesapeake+EO+Strategy%20.pdf .

13

AR0032717

Conclusion about Legal Authority to Develop (and Implement) the Bay TMDL

As stated above, in order to meet its legal obligation, EPA must develop a Bay-wide TMDL. In addition, it is logical, appropriate and fair for EPA to take this action. Consistent with the statutory scheme, binding judicial agreements, and at the request of the Bay states, EPA has taken the lead in developing and proposing the TMDL, based on years of discussions and hard work with representatives of the Bay states, the scientific community, members of the public, local officials and other stakeholders. Given the multi-jurisdictional nature of the water quality problems in the Bay, it also makes immense practical sense for EPA to take the lead. EPA's lead role in developing the TMDL and the final deadlines of December 2010 and 2025, for implementation, are further supported by the final strategies developed pursuant to the President's May 12, 2009 Executive Order.

### III.    Chesapeake Bay Program Computer Models

Computer models play an important role in helping to simulate complex ecosystems. As one of the largest estuaries in the world, with a watershed that extends 64,000 square miles, the Chesapeake Bay is a place where models can help demonstrate where and how water pollution begins and moves. Over the history of the Chesapeake Bay clean-up, managers and scientists have relied on a series of computer models to predict changes in water quality, better understand where pollution is coming from and look at what management practices applied on the land do to impact water quality. These models have been continuously updated and improved. In fact, the first Bay model was a two-dimensional hydraulic model constructed on several acres on Kent Island, Maryland, by the U.S. Army Corps of Engineers in 1976. This model was soon replaced by computer models in the early 1980s.

What is commonly referred to as "the Bay model" is actually a series of linked three-dimensional models. The centerpiece of this set of models is the Chesapeake Bay Watershed Model, which measures all the sources of nutrient and sediment pollution in the watershed, and determines the loadings to the Bay. The suite of Chesapeake Bay models has been developed through an extensive peer reviewed scientific process over the past 20 to 30 years, with broad-based collaboration among federal, state, academic and private partners. Over the years these models have improved significantly in precision, scope, complexity and accuracy. The Watershed Model, for example, has been refined considerably over the past six years. The segments in the model have expanded more than twentyfold from 94 in the Phase 4 model to 2,000 in the current Phase 5 model, providing data at the watershed, county and conservation district level. The model is calibrated with monitoring stations throughout the Bay watershed, but those stations have expanded from 20 to 296. The types of land uses that can be fed into the Phase 5 model is now 25, up from the previous 9, and the simulation is now run over a 20 year period, rather than 10 years, providing more accurate results.

These models are used by scientists and managers, in conjunction with other tools, such as monitoring and research. The models play a significant, but not an exclusive role, in the decision by policymakers to establish nutrient and sediment allocations. In 2003, the model simulations and other data pointed toward a nitrogen allocation of 175 million pounds annually.

14

AR0032718

Federal and state decision makers ultimately allocated 183 million pounds of nitrogen to the seven Bay watershed jurisdictions, each of which developed Tributary Strategies, which were blueprints on how to meet each state's nutrient and sediment allocation. EPA 2003, Setting and Allocating the Chesapeake Bay Basin Nutrient and Sediment Loads, EPA 903-R-03-007. Additional information, including a newer Phase 5 model led to a very similar allocation in 2010 of 187.44 million pounds of nitrogen to the seven jurisdictions. The allocations in 2010 for the TMDL were very close to those that the states were given six years earlier. The state Tributary Strategies were available to form the base for the Final Phase I WIPs that each Bay state needs to develop by November 29, 2010.

Background on Bay Program Models

The Chesapeake Bay Program uses five primary models. In use since 1982, the Chesapeake Bay Watershed Model simulates nutrient and sediment loads delivered to the Chesapeake Bay. Water quality data are collected from federal and state agencies as well as universities. The current, Phase 5, Watershed Model is open source,[16] in the public domain and has been extensively peer reviewed.[17] The Bay Program has employed an extensive stakeholder participation process in addition to placing the Watershed Model source code and data on the web.[18] The second model, known as the Estuary Model, looks at the effects of pollution loads generated by the Watershed Model on Bay water quality. The Bay is represented by 57,000 cells in this model and simulates the mixing of waters in the Bay and its tidal tributaries. The third, Scenario Builder Model simulates changes in the ecosystem due to changes in population, landuse, or pollution management. This model is also in the public domain with documentation available online.[19] The Airshed Model uses information about nitrogen emissions into the atmosphere and deposits them into the Watershed Model. The Land Change Model analyzes and predicts land changes in the watershed.

The Phase 5 Watershed Model has almost 100 collaborators and partners led by EPA, Virginia Department of Conservation and Recreation, Interstate Commission on the Potomac River Basin, University System of Maryland. Maryland Department of the Environment, U.S. Geological Survey, Chesapeake Research Consortium, and Virginia Polytechnic Institute. Special attention has been paid to the agricultural assumptions in the model with specific input from the Bay Program's Agricultural Nutrient and Sediment Reduction Workgroup.[20] In addition, the Bay Program partnership recently funded University of Maryland's Mid-Atlantic Water Program to complete a 2-year study to update the effectiveness estimates of every best management practice in the model which resulted in a 900 page report that summarizes for each practice, all data evaluated, the technical experts involved in developing the recommendation, and all accounting of discussions and decisions made.

Peer Review and Awards

---

[16] An approach to the design, development, and distribution of software, offering practical accessibility to a software's source code.
[17] http://www.chesapeakebay.net/committee_msc_projects.aspx?menuitem=16525#peer.
[18] http://ches.communitymodeling.org/models/CBPhase5/index.php#partners.
[19] http://archive.chesapeakebay.net/pubs/SB_Documentation_Final_V22_9_16_2010.pdf.
[20] http://www.chesapeakebay.net/committee_agworkgroup_info.aspx?menuitem=16731.

15

AR0032719

The models developed by the Bay Program have extensively been peer reviewed and follow guidance developed by EPA's Science Advisory Board.[21]  In addition the models have won numerous awards beginning in 1990 (Appendix A).  The Bay Program models are regularly cited as the best of their kind.  In its April 2007 report, *Taking Environmental Protection to the Next Level*[22], the National Academy of Public Administration stated that:

> EPA's Chesapeake Bay Program has led the way in developing a comprehensive water monitoring and assessment program that tracks and compiles the water quality conditions throughout the Bay.  Based on the monitoring data, the CBP has developed sophisticated Chesapeake Bay watershed and airshed models that have enhanced the understanding of the complex problem of nutrient pollution and its effects on the Bay waters.  This watershed-wide understanding provided the foundation for the 1987 Chesapeake Bay Agreement and helped to coordinate and assign responsibility among the Bay states for achieving water quality goals.

Science and Model Criticism

Over the last several months we have seen wild accusations about the soundness of the models and the science behind it; however, there is nothing to support these claims.  The Bay Program partners have been extremely transparent and open about the modeling process and sought input from hundreds of stakeholders including agricultural specialists.  The one criticism raised in the 2006 Government Accountability Office (GAO) report was that the credibility of Bay Program reports on Bay health "tended to downplay the deteriorated conditions of the bay" and "projected a rosier picture of the health of the bay than may have been warranted."[23]  While serious, the GAO's criticism points to the fact that the Bay models, if anything, were over-reporting the nutrient and sediment—reducing value of practices on the land.  This criticism also focused more on the use, or misuse, of modeled data, rather than the model itself.  In 2008, a follow-up GAO report concluded that the Bay program had made important progress in addressing their concerns and providing better management of the Bay restoration effort.

Another public criticism of the model has been that many practices, particularly agricultural ones, implemented voluntarily, are not being accounted for in the model.  While this statement is true, in reality, it is not a flaw of the model, but rather a failure to collect the proper input information to feed into the model.  The solution to this problem is to provide better accounting, not to change any of the model parameters.  In addition, this under-counting of implemented practices does not affect the TMDL load allocations to the states which were based on the relative difference between maximum implementation of practices and no-action.

---

[21] http://www.epa.gov/spc/pdfs/modelpr.pdf.  Peer review guidance developed by the Ecological Society of America and endorsed by the *American College of Preventive Medicine, American Fisheries Society, American Institute of Biological Sciences, American Public Health Association, American Society of Agronomy, American Society of Limnology and Oceanography, Association of Teachers of Preventive Medicine, Crop Science Society of America, Ecological Society of America, Estuarine Research Federation, Institute of Food Technologists, Soil Science Society of America, Society for Conservation Biology.*

[22] 2007. National Academy of Public Administration. "Taking Environmental Protection to the Next Level: An Assessment of the U.S. Environmental Services Delivery System" 2048

[23] Government Accountability Office Report (GAO-06-614T) "Chesapeake Bay Program: Improved Strategies Needed to Better Guide Restoration Efforts" (July 13, 2006).

16

AR0032720

Use of the Model and TMDL Calculation Decisions

The calculation/modeling decisions which EPA made in developing the draft TMDL allocations, documented in section 6 of the TMDL report, are sound, reasonable, and well-based on the available information. These decisions also reflect an exemplary degree of consultation with the Bay states through the Water Quality Goal Implementation Team, using input from the Chesapeake Bay Program's expert work groups. We support EPA's decisions on the model parameters, such as hydrologic period and critical conditions (section 6.1), and the procedures for determining attainment with water quality standards, which reflect use of Chesapeake Bay science (section 6.2). We agree with EPA's rationale for using the "implicit" Margin of Safety for the nutrient allocations. We applaud the transparency with which EPA has outlined the allocation "rules" and methodology in section 6.3, and note that the "Principles and Guidelines" are not only sound but reflect the seven years of experience (since the 2003 allocations) which EPA and the Bay state partners have in making allocation decisions together. Including air deposition in the TMDL load allocations, as described, make sense.

Finally, we reviewed carefully the discussion and rationale for basing the TMDL on proposed revisions to the water quality standards which have not yet been finalized in all jurisdictions. If these standards can be duly established by the states and approved by EPA before the TMDL is published in December 2010, we agree that the TMDL should be so based. This is, in fact, continuing evidence of the commitment of EPA and the states to evaluate the attainability of the tidal water standards, while continuing to ensure that they are protective of aquatic life uses.

As essential as TMDLs are to establish responsibility for water quality cleanup actions, they are also a flexible tool. EPA can propose modifications at any time based on changes in water quality standards and improvement of modeling and analytical tools. This is an important feature of TMDLs. We noted that EPA will evaluate modifications of the Chesapeake Bay TMDL as early as 2011 based on improvements in the state WIPs and other factors. There is a general commitment to continuous evaluation and improvement in the Bay Program.

Some might argue that EPA should wait to establish the Bay TMDL until all the WIPs are done, new agricultural information has been completed for the model (such as accounting for voluntary practices), etc. We emphatically disagree that EPA should delay in establishing the TMDL. This essential legal framework must be established now. As comparison of the 2003 allocations and 2010 draft TMDL has shown, the basic information is well known. Changes in the TMDL allocations which may be envisioned will only be marginal. Bay cleanup will only get harder and more expensive with delays.

Conclusions

EPA, in cooperation with its Bay state partners and after years of allocation experience, has established sound, supportable rules and methods for establishing the Bay TMDL. The Chesapeake Bay Program models are a critical tool in the adaptive management framework currently employed by the EPA and the Bay states to identify a path forward for restoration of

17

AR0032721

the Chesapeake Bay. While water quality data and the actual living resources in the Chesapeake Bay will ultimately determine when we have restored a clean Bay, the Chesapeake Bay Program models help us develop a scientifically valid path to our goals.

## IV.    The Economic Argument for a Clean Bay

Congress has recognized that the Chesapeake Bay is a "national treasure and resource of worldwide significance."[24] Valued at over 1 trillion dollars, a restored and protected Chesapeake Bay is essential for a healthy and vibrant regional economy. Failure to "save the Bay" threatens this economic driver and, in fact, economic losses have already occurred due to water quality degradation throughout the watershed. More importantly, investing in clean water technology creates jobs, generates economic activity, and can save money in the long run.

The Bay supports Important Commercial and Recreational Fisheries that Have Been Degraded by Poor Water Quality

Perhaps no other creature better exemplifies the Chesapeake Bay than the blue crab, *Callinectes sapidus*. For more than a half century, the blue crab has been at the apex of the Bay's commercial fisheries. Over one-third of the nation's blue crab harvest comes from the Chesapeake Bay. The average annual commercial harvest in Maryland and Virginia between 1999 and 2008 was about 55 million pounds.[25] The dockside value of the blue crab harvest Bay-wide in 2008 was approximately $ 70 million.[26] The recreational fishery also provides a significant financial off-set for Bay residents – the cost of catching crabs is far less than having to buy them.

The overall trend, however, since the 1990's has been a decrease in landings despite increased crabbing effort. [27] In addition, the number of crabs one year and older dropped from 276 million in 1990 to 131 million in 2008.[28] When the broader impact on restaurants, crab processors, wholesalers, grocers, and watermen is added up, the decline of crabs in the Bay meant a cumulative loss to Maryland and Virginia of about $640 million between 1998 and 2006.[29]

As a result of the low population level, in 2008, Maryland and Virginia issued severe crabbing restrictions, in an attempt to restore the population. These restrictions placed severe economic hardship on Chesapeake Bay crabbers. In response, members of Congress from Maryland and Virginia requested federal disaster relief for Bay crab fishermen. In September, 2008, the Secretary of Commerce determined that the Chesapeake Bay soft shell blue crab fishery had undergone a commercial failure as defined under the Magnuson-Stevens Fishery

---

[24] Chesapeake Bay Restoration Act of 2000, Nov. 7, 2000, P.L. 106-457, Title II, § 202, 114 Stat. 1967.
[25] NOAA 2008. 2008 Fisheries Economics of the U.S.
http://www.st.nmfs.noaa.gov/st5/publication/econ/2008/MA_ALL_Econ.pdf.
[26] NOAA Fisheries: Office of Science & Technology, Annual Commercial Landing Statistics Website,
http://www.st.nmfs.noaa.gov/st1/commercial/landings/annual_landings.html
[27] Tom Horton. 2003. Turning the Tide: Saving the Chesapeake Bay. Second Edition. Island Press. Washington, D.C. 2003.
[28] Chesapeake Bay Program. 2010. http://www.chesapeakebay.net/status_bluecrab.aspx?menuitem=19683
[29] Unpublished data. Dr. James Kirkley, Virginia Institute of Marine Science.

18

AR0032722

Conservation and Management Act (16 USC § 1861). In January 2009, the Department of Commerce allocated $10 million of disaster relief to each state. This was a substantial taxpayer expense that will not be needed in the future if the Bay is restored to its former health.

In 2009, the number of spawning-age crabs rebounded to 223 million.[30] Nonetheless, poor water quality continues to limit crab populations in the Chesapeake Bay. On average, over the last 10 years, more than 75% of the Chesapeake Bay and its tidal rivers have had insufficient levels of dissolved oxygen.[31] Low oxygen levels drive blue crabs from their preferred habitat and kill many of the small bottom organisms on which the blue crabs feed.[32] The low dissolved oxygen conditions caused by excess nutrients are the primary reason large sections of the Bay have become unsuitable as blue crab habitat. In addition, a study by the University of Maryland demonstrated that decreases in dissolved oxygen can reduce crab harvests and revenue to watermen.[33]

Poor water clarity also has impacted crab populations. Poor water clarity has reduced the amount of underwater grasses necessary to protect juvenile crabs, molting crabs, and adults from predation. Studies have shown that crabs living in areas with little or no underwater grasses suffer higher mortality.[34] Water clarity in the Bay has been decreasing since the 1990s and in 2009, only 26% of the Bay had acceptable water clarity. Until water quality improves, the blue crab population will not fully recover.[35]

Another critical Bay species, commercially, recreationally, and as an important part of the Bay ecosystem, is the oyster. From the 1800s to the mid-1900s, the commercial oyster industry employed thousands of people catching, selling, shucking, and shipping oysters to market. Hundreds of skipjacks, sail powered dredges, plied the waters of the Bays in search of the delectable oyster. The industry generated millions of dollars a year to the Bay economy. Until the mid-1980s, the oyster was the leading commercial fishery in the Bay. Like the blue crab, Bay oysters spawned a rich cultural heritage.

In addition to their commercial and recreational value, oysters improve water quality because they are filter feeders. An individual oyster pumps over 50 gallons of water a day through its gills which strains out food, chemicals, nutrients, and sediment. In addition, oyster reefs provide valuable habitat for countless Bay creatures, most notably finfish, and serve as popular fishing areas.

Unfortunately, a combination of overharvesting, disease, and poor water quality has decimated the oyster populations in the Chesapeake Bay to around 1% of historic levels. Silt washed by rain from urban areas and agricultural fields can bury oyster beds, particularly those

---

[30] Chesapeake Bay Program. 2010. http://www.chesapeakebay.net/status_bluecrab.aspx?menuitem=19683

[31] http://www.chesapeakebay.net/status_dissolvedoxygen.aspx?menuitem=19647

[32] Diaz, R.J. and R. Rosenberg. 2008. Spreading Dead Zones and Consequences for Marine Ecosystems. *Science.* Vol. 321.

[33] Mistiaen, J.A., I.E. Strand, and D. Lipton. 2003. Effects of environmental stress on blue crab (*Callinectes sapidus*) harvest in Chesapeake Bay tributaries. *Estuaries* Vol. 26:316-322

[34] http://www.chesapeakebay.net/crabs.aspx?menuitem=14700.

[35] http://www.mdsg.umd.edu/issues/chesapeake/blue_crabs/about//.

19

AR0032723

that have been flattened by dredges.[36] Extended periods of zero oxygen conditions can be fatal to oysters.[37] In addition, recent studies have indicated that low oxygen levels can stress the immune systems of oysters, making them more susceptible to disease.[38] Pollution has also resulted in the closure of shellfish beds to commercial harvesting. Threats from sewage and bacteria forced Maryland and Virginia to close or restrict oyster harvesting in 223,864 acres of the Bay and its tributaries in 2008, about 8 % of the total shellfish beds.[39] The decline of the Bay oyster over the last 30 years has meant a loss of more than $4 billion for Maryland and Virginia.[40]

The rockfish (also known as striped bass) has been and remains the most popular commercial and recreational fish in the Bay, generating roughly $500 million of economic activity related to fishing expenditures, travel, lodging, etc.[41] Faced with a catastrophic collapse in the fishery, commercial and recreational fishing for rockfish were banned in the Maryland portion of the Bay from 1985-89 and in Virginia during 1989.[42] The dramatic decline of the population was due to several factors including overfishing and low dissolved oxygen in deeper parts of the Bay. Today, the rockfish population is at its highest in decades. However, scientists are concerned about the high prevalence of disease which has been attributed to poor water quality and limited availability of its preferred prey.[43]

In its entirety, the fisheries industry is a significant part of local economies. The *2008 Fisheries Economics of the U.S.* report by the National Oceanic and Atmospheric Administration (NOAA) indicates that commercial seafood industry in Maryland and Virginia contributed $2 billion in sales, $1 billion in income, and more than 41,000 jobs to the local economy.[44] In addition there are indirect benefits to the economy in terms of jobs and work created for those who sell fishing tackle, maintain and repair boats and equipment and provide other related goods and services.

The economic benefits of saltwater recreational fishing are equally as impressive, contributing $ 1.6 billion in sales which in turn contributed to more than $ 800 million of additional economic activity and roughly 13,000 jobs.[45] The majority (90 - 98%) of the commercial and recreational saltwater landings in this region come from the Chesapeake Bay.[46]

[36] U.S. Army Corps of Engineers. 2008. Oyster Environmental Impact Statement. http://www.nao.usace.army.mil/OysterEIS/FINAL_PEIS/homepage.asp.
[37] Chesapeake Bay Foundation. 2010. On the Brink: Chesapeake's Native Oysters. What it will take to bring them back.
[38] .R.S. Anderson. 1988. Effects of tributyltin and hypoxia on the progression of *Perkinsus marinus* infections and host defense mechanisms in the oyster, Crassostrea virginica. *Journal of Fish Disease*. Vol. 21:371-379.
[39] Data from Departments of Health in Virginia and Maryland cited On the Brink: Chesapeake's Native Oysters. What it will take to bring them back.
[40] Chesapeake Bay Foundation. 2010. On the Brink: Chesapeake's Native Oysters. What it will take to bring them back.
[41] Southwick Associates. 2005. The Economics of Recreational and Commercial Striped Bass Fishing. www.southwickassociates.com/freereports/default.aspx.
[42] http://www.chesapeakebay.net/stripedbass.aspx?menuitem=19389.
[43] http://www.chesapeakebay.net/stripedbassharvest.aspx?menuitem=15316.
[44] NOAA 2008. 2008 Fisheries Economics of the U.S (see 24)
[45] NOAA 2008. 2008 Fisheries Economics of the U.S (see 24)
[46] Lellis-Dibble, K.A., K.E. McGlynn, and T.E. Bigford. 2008. Estuarine Fish and Shellfish Species in U.S. Commercial and Recreational Fisheries: Economic value as an incentive to protect and restore estuarine habitat. NOAA Technical Memorandum. http://spo.nwr.noaa.gov/tm/TM90.pdf

AR0032724

The economic losses associated with the decline in fisheries resources in the Bay are substantial. Between 1994 and 2004 the value of Virginia's seafood harvest decreased by 30% [47] with Maryland's commercial landings exhibiting a similar decline during that time.[48] Further, between 1993 and 2009 the number of Bay watermen declined from around 14,000 to 1,500.[49][50]

A 2001 study compared the 1996 water quality of the Bay with what it would have been without the Clean Water Act. Results indicated that benefits of water quality improvements to annual recreational boating, fishing, and swimming ranged from $357.9 million to $1.8 billion.[51] Fisheries declines since the 1990s indicates that early progress reducing pollution hasn't been sustained – we must reverse this trend.

These economic impacts are not restricted to the tidal regions of the Bay watershed. According to the Pennsylvania Fish and Boat Commission (PFBC), nearly 2 million people go fishing in Pennsylvania each year, contributing over $ 1.6 billion to the economy. Among the most popular species for anglers are smallmouth bass and coldwater species, such as brook trout. The PFBC recently passed a proposal to be enacted January 1 that mandates total catch-and-release of smallmouth bass in certain areas of the Susquehanna River because of population declines associated with water quality problems. Degraded stream habitat has restricted brook trout to a mere fraction of its historical distribution.

Virginia, and to a lesser extent Maryland, also support significant freshwater recreational fisheries, with roughly 1 million anglers participating and contributing millions to local economies.[52] By way of example, a fish kill in the Shenandoah River watershed in 2005, likely caused by a variety of factors including poor water quality, resulted in roughly a $700,000 loss in retail sales and revenues.[53]

If pollution to the Bay is left unabated, we will see more continued decline of the region's fisheries and the resulting economic impacts. In short, we cannot afford *not* to clean up the Bay. The comparatively modest up-front investments in doing so will pay enormous long term dividends to the entire watershed and its 17 million residents.

Unhealthy Waters Hurt Public Health and Local Economies

---

[47] Kirkley, et al. 2005. Economic Contributions of Virginia's Commercial Seafood and Recreational Fishing Industries: A User's Manual for Assessing Economic Impacts. Virginia Institute of Marine Science Report No. 2005-9.

[48] NOAA 2008. 2008 Fisheries Economics of the U.S (see 24)

[49] Environment Virginia, Research and Policy Center. 2009. Watermen Blues: Economic, Cultural, and Community Impacts of Poor Water Quality in the Chesapeake Bay.

[50] Tom Horton. 2003 (see 26)

[51] Morgan, et al. 2001. Benefits of water quality policies: the Chesapeake Bay. *Ecological Economics*. Vol. 39: 271-284.

[52] U.S. Department of the Interior, Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. 2006 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.

[53] Papadakis, M. 2006. The Economic Impact of the 2005 Shenandoah Fish Kill: A preliminary economic assessment. James Madison University. www.dep.state.va.us/export/sites/default/info/documents/fishkillReport-final.pdf.

21

AR0032725

Unhealthy waters increase public health burdens associated with consuming tainted fish or shellfish or exposure to waterborne infectious disease while recreating. For example, one study estimated the cost associated with exposure to polluted recreational marine waters to be $37 per gastrointestinal illness, $38 per ear ailment, and $27 per eye ailment due to lost wages and medical care.[54] Furthermore, although closing a beach is meant to prevent illness, it directly and indirectly results in an economic loss for local businesses and the county where the beach is located. For example, a study by NOAA indicated that a one day beach closure in Huntington Beach, California was expected to result in thousands of dollars of lost income for local communities.[55] There are hundreds of beach closures in the bay region each year,[56] potentially resulting in hundreds of thousands of dollars of lost income for local economies.

Nature Based Recreation: Vital Economic Drivers for the Bay Region

Roughly 8 million wildlife watchers spent $ 636 million, $960 million and $1.4 billion in Maryland, Virginia and Pennsylvania, respectively in 2006 on trip-related expenses and equipment.[57] These estimates do not include other economic benefits of these expenditures such as job creation and the multiplier effect on local economies. Improvements to water quality, as well as the implementation of actions, such as afforestation, land preservation, and wetlands restoration, that will lead to improved water quality, will increase and enhance wildlife populations. A study in the Great Lakes indicates there would be substantial improvement in wildlife watching opportunities and associated economic benefits by improvements to wildlife habitat.[58]

Recreational boating is also a strong economic driver in Maryland, Pennsylvania and Virginia. The total impact on the Maryland economy from recreational boating is estimated to be about $2.03 billion and 35,025 jobs.[59] Similarly, Pennsylvania residents spend $1.7 billion on boating annually. The average expenditure per recreational boater is $274. Of this amount, roughly $113 a year is spent in direct boating-related expenses and $161 is spent on trip-related expenses, including: auto fuel, meals, lodging and admission/entrance fees.[60]

A recent study in Hampton, Virginia found that resident and non-resident boaters were responsible for $55.0 million in economic impact to this city. This impact represents $32.5 million in new value added, $22.2 million in incomes and 698 jobs.[61] The majority of expenditures were by out-of-region boating-visitors which represents an inflow of "new" capital

---

[54] R. H. Dwight, et al. 2005. Estimating the economic burden from illnesses associated with recreational coastal water pollution - a case study in Orange County, California. *Journal of Environmental Management.* Vol:95-103.
[55] http://stateofthecoast.noaa.gov/coastal_economy/beacheconomics.html.
[56] NRDC. 2010. Testing the Waters: A guide to water quality at vacation beaches.
http://www.nrdc.org/water/oceans/ttw/ttw2010.pdf.
[57] U.S. Department of the Interior, Fish and Wildlife Service, and U.S. Department of Commerce, U.S. Census Bureau. 2006 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation.
[58] Austin, J.C. et al. 2007. America's North Coast: A Benefit-Cost Analysis of a Program to Protect and Restore the Great Lakes. Brookings Institute, Great Lakes Economic Initiative.
[59] Lipton, D. 2007. *Economic Impact of Maryland Boating in 2007.* University of Maryland Sea Grant Program.
[60] http://www.fish.state.pa.us/promo/funding/fact_economic_impact.htm.
[61] Virginia Institute of Marine Science. 2009. Assessment of the Economic Impacts of Recreational Boating in the City of Hampton. http://web.vims.edu/adv/econ/MRR2009_2.pdf.

22

AR0032726

into the community. The study also indicated that "water quality, fishing quality and other environmental factors" ranked among the most important, in terms of factors that influence a boater's decision on where to keep his/her boat.

<u>Investment in Clean Water Technologies Stimulates Local Economies.</u>

A study by the University of Virginia found that implementation of the agricultural practices such as livestock stream exclusion, buffers, and cover crops, would generate significant economic impacts.[62] Every $1 of state and/or federal funding invested in agricultural best management practices would generate $1.56 in economic activity in Virginia. Implementing agricultural practices, in Virginia, to the levels necessary to restore the Bay would create nearly 12,000 jobs of approximately one year duration.

A recent analysis of the value of investing in water and sewer infrastructure concluded that these investments typically yield greater returns than most other types of public infrastructure.[63] For example, one dollar of water and sewer infrastructure investment increases private output (Gross Domestic Product) in the long-term by $6.35. Furthermore, adding 1 job in water and sewer creates 3.68 jobs to support that job.

More specifically, upgrading sewage treatment plants across the watershed has created hundreds of construction jobs, and will create perhaps thousands more as the program begins to grow. Also, upgrading individual septic systems has employed installers, electricians and others involved in the business. These upgrades have pumped millions of dollars into the local economy. A real life example is Mayer Brothers, Inc. in Elkridge, MD.[64] This company staved off significant layoffs this year when the small manufacturing company won a contract from the Maryland Department of Environment to help supply new septic technology throughout Maryland.

On the flip side, cuts to funding programs for clean water infrastructure will lead to job losses. Carter B. McCamy says he will probably have to lay off over 20 workers from his Arbutus, Maryland company if the Maryland legislature cuts the Chesapeake and Atlantic Coastal Bays 2010 Trust Fund.[65] McCamy is CEO of Environmental Quality Resources, LLC, an environmental construction company that specializes in stream restoration, wetland mitigation, reforestation, shoreline stabilization and storm water management. The firm has received significant contracted work through the Trust Fund. He employs 115 full-time workers, and also supports an additional 100 subcontractors who provide trucking materials, concrete, paving and fencing required for stormwater mitigation projects.

<u>Clean Waterways Increase Property Values</u>

---

[62] Rephann, T.J. 2010. Economic Impacts of Implementing Agricultural Best Management Practices to Achieve Goals Outlined in Virginia's Tributary Strategy. Weldon Cooper Cneter for Public Service, University of Virginia. www.coopercenter.org/sites/default/files/publications/BMP_paper_final.pdf.
[63] Krop, R.A., C. Hernick, and C. Frantz. 2008. Local Government Investment in Water and Sewer Infrastructure: Adding Value to the National Economy. The U.S. Conference of Mayors, Mayors Water Council.
[64] http://www.supportgoodmdjobs.com//.
[65] Lipton, D. 2007 (see 58)

23

AR0032727

An EPA study indicated that clean water can increase the value of single family homes up to 4,000 feet from the water's edge by up to 25%.[66] A 2000 study concluded that improvements in water quality along Maryland's western shore to levels that meet state bacteria standards could raise property values 6%.[67] High water clarity was shown to increase average housing value by 4 to 5% or thousands of dollars.[68][69] Homes situated near seven California stream restoration projects had 3 to 13% higher property values than similar homes located on damaged streams.[70] A study by the Brookings Institute projected a 10% increase in property values for homes that would about a proposed $26 billion Great Lakes restoration project.[71] The City of Philadelphia estimates that installation of green stormwater infrastructure in the city will raise property values 2 to 5 percent generating $390 million over the next 40 years in increased values for homes near green spaces.[72]

<u>Pollution Reductions Lower Drinking Water and Utility Costs</u>

Reducing pollution inputs from pipes and land-based sources can reduce locality costs to treat drinking water sources to safe standards. New York City's expenditure of $1 billion over the last decade to protect the watersheds north of the city that supply its drinking water avoided the need to build a $6 billion treatment plant.[73] An EPA study of drinking water source protection efforts concluded that for every $1 spent on source water protection, an average of $27 is saved in water treatment costs.[74] Similarly, a study by the Brookings Institute suggested that a 1% decrease in sediment loading will lead to a 0.05% reduction in water treatment costs.[75]

Proactive efforts to lessen stormwater flows today reduce future public costs needed to maintain navigation channels, remediate pollution and hazard flooding, and repair infrastructure and property damage caused by excessive runoff. Philadelphia estimates that after 40 years their installation of green infrastructure will create more than $2 in benefits for every dollar invested,

---

[66] EPA. 1973. Benefit of Water Pollution Control on Property Values. EPA-600/5-73-005. http://yosemite.epa.gov/ee/epa/eermfile.nsf/vwAN/EE-0009.pdf/$file/EE-0009.pdf.

[67] C. G. Leggett, et al. 2000. Evidence of the effects of water quality on residential land prices. *J. Environ. Econ. Manag.* Vol. 39:121–144.

[68] Jentes Banicki, J. 2006. Hot Commodity: Cleaner Water Increases Lake Erie Property Values. *Twineline.* Vol 28, No. 3-4. Ohio Sea Grant, Ohio State University. http://ohioseagrant.osu.edu/documents/twineline/v28i4.pdf.

[69] Poor, J.P. et al. 2007. Exploring the hedonic value of ambient water quality: A local watershed-based study. *Ecological Economics,* Vol. 60: 797–806.

[70] Streiner, C. et al. 1996. *Estimating the Benefits of Urban Stream Restoration Using the Hedonic Price Method--a thesis in partial fulfillment of the requirements for the Degree of Master of Science.* Dept. of Agriculture and Resource Economics. CSU.

[71] http://stateofthecoast.noaa.gov/coastal_economy/beacheconomics.html.

[72] Philadelphia Water Department. 2009. Green City, Clean Waters: The City of Philadelphia's Program for Combined Sewer Overflow Control—A Long Term Control Plan Update. Summary Report. www.phillywatersheds.org/ltcpu/LTCPU_Summary_LoRes.pdf.

[73] DePalma, A. 2006. New York's Water Supply May Need Filtering. *New York Times.* June 20, 2006. www.nytimes.com/2006/07/20/nyregion/20water.html?_r=1&hp&ex=1153454400&en=2be183debc88eac7&ei=5094&partner=homepage&oref=slogin.

[74] U.S. EPA. *Economics and Source Water Protection.* Presentation by Eric Winiecki,.

[75] http://stateofthecoast.noaa.gov/coastal_economy/beacheconomics.html.

24

AR0032728

generating $500 million in economic benefits, $1.3 billion in social benefits, and $400 million in environmental benefits.[76]

Conclusion

Efforts to delay implementation of the Bay TMDL will only exacerbate the economic impacts this region has already experienced due to poor water quality. Furthermore, a recent poll in Virginia found that an overwhelming majority believe the state can protect water quality and still have a strong economy.[77] Eighty percent of respondents agreed with the statement, "we can protect the water quality in rivers, creeks and the Chesapeake Bay and have a strong economy with good jobs for Virginians, without having to choose one over the other." Of those polled, 92% believe the Bay is "important for Virginia's economy." Implementation of the TMDL will result in clean water, a healthy Bay and a strong regional economy.

## V.    Conclusions

The voluntary, cooperative efforts to restore the Bay, which began in earnest in 1983, did not succeed in meeting any significant water quality improvement goals, with only 24% of the Bay's water quality goals met in 2009. The latest estimate for meeting the nutrient reductions necessary to restore the Bay, at the current pace of the voluntary programs, is in 2050. That would be 67 years from when the Bay Program was first formed.

The *1987 Chesapeake Bay Agreement* was very specific, laying out the purpose of this first historic water quality goal for the Chesapeake, "To ensure the productivity of the living resources of the Bay, we must clearly establish the water quality conditions they require and must then attain and maintain those conditions. Foremost, we must improve or maintain dissolved oxygen concentration in the Bay and its tributaries through a continued and expanded commitment to the reduction of nutrients from both point and nonpoint sources." For the first time in 23 years this water quality goal has a chance of being met because the Chesapeake Bay TMDL will address everything that was laid out in 1987; the establishment of new dissolved oxygen water quality standards for the Bay and its tidal tributaries, and nutrient and sediment reduction allocations to the states, which will have to address both point and nonpoint sources of pollution. The court sanctioned Virginia consent agreement in 1999 established the requirement and deadlines for the Chesapeake Bay TMDL and was the trigger for the water quality section in the *Chesapeake 2000* agreement. This fact should rule out any reasonable argument that there has not been enough notice that there would be a Chesapeake Bay TMDL. Eleven years of consideration is sufficient. Moreover, EPA has no choice but to develop a TMDL because the states have failed to do so. This action by EPA is required by the CWA and an abundance of other legally binding agreements.

Given the very nature of the Chesapeake Bay Watershed, the Bay TMDL must be significantly more complex than virtually all of the over-40,000 TMDLs developed across the

---

[76] Poor, J.P. et al. 2007. Exploring the hedonic value of ambient water quality: A local watershed-based study. *Ecological Economics*, Vol. 60: 797–806.
[77] http://www.cbf.org/Document.Doc?id=562

AR0032729

country to date. Given the size and complexity of the system and the failure of "voluntary" efforts to restore the Bay, the kind of TMDL proposed by EPA is consistent with the legislative recognition by the Bay states and absolutely essential. The regional commitment to restoring the Bay, and the efforts undertaken pursuant to the Executive Order, give us some hope that this suite of TMDLs will be more successful in restoring water quality than previous efforts. There were a variety of reasons for prior failures, including inadequate data, failure to update plans when progress lagged, and most especially, the failure to connect to a real and enforceable, approved implementation plan. We expect that a well implemented TMDL will provide what we have been lacking: strong science and implementation plans built on principles of adaptive management that can and will be enforced. If you have any questions, please contact Coalition Director Hilary Harp Falk (falkh@nwf.org) at 443-759-3406.

Respectfully submitted,

Accokeek Foundation
Adkins Arboretum
American Canoe
American Rivers
Anacostia Riverkeeper
Anacostia Watershed Society
Audubon Maryland/DC
Audubon Naturalist Society
Audubon Society of Northern Virginia
Baltimore Water Alliance
Chapman Forest Foundation
Chesapeake Bay Foundation
Chester River Association
Choptank River Eastern Bay Conservancy
Citizens for a Fort Monroe National Park
Citizens for Pennsylvania's Future (PennFuture)
Clean Water Action
Conservation Voters of Pennsylvania
Corsica River Conservancy
Defenders of Wildlife
Delaware Nature Society
Eastern Pennsylvania Coalition for Acid Mine Reclamation
Environment America
Environment Maryland
Environment Virginia
Float Fishermen of Virginia
Friends of Dyke Marsh
Friends of the Rappahannock
Friends of the Rivers of Virginia
James River Association
Lynnhaven River NOW

26

AR0032730

Maryland League of Conservation Voters
Maryland Stormwater Consortium
Mattawoman Watershed Society
National Aquarium
National Parks Conservation Association
National Wildlife Federation
Nature Abounds
Partnership for Smarter Growth, Richmond
Peachbottom Concerned Citizens Group
PennEnvironment
Pennsylvania Chapter Sierra Club
Pennsylvania Council of Churches
Potomac Conservancy
Potomac Riverkeeper
Prince William Conservation Alliance
Savage River Watershed Association
Shenandoah Riverkeeper
Shenandoah Valley Network
Southern Environmental Law Center
Virginia Conservation Network
Virginia League of Conservation Voters
West Virginia Rivers Coalition
Wetlands Watch
Wicomico Environmental Trust

27

AR0032731

**Comments on the Draft Chesapeake Bay TMDL**
**Docket ID No. EPA-R03-OW-2010-0736**
**November 8, 2010**

Submitted by:

Agricultural Retailers Association
American Farm Bureau Federation
American Meat Institute
CropLife America
Delaware Maryland Agribusiness Association
Empire State Forest Products Association
Maryland Grain Producers Association
Mosaic
National Alliance of Forest Owners
National Cattlemen's Beef Association
National Corn Growers Association
National Cotton Council
National Council of Farmer Cooperatives
National Farmers Union
National Milk Producers Federation
National Pork Producers Council
National Sorghum Producers
National Turkey Federation
Responsible Industry for a Sound Environment
South Dakota Agri-Business Association
The Fertilizer Institute
United Egg Producers
USA Rice Federation
U.S. Cattlemen's Association
U.S. Poultry & Egg Association
Virginia Agribusiness Council
Virginia Farm Bureau
Virginia Forestry Association
Virginia Grain Producers Association
Virginia Poultry Federation

AR0032758

**Fifth, the Draft TMDL, if implemented, would result in substantial and widespread economic and social impact.** The Draft TMDL relied on E3 scenarios (Everything, by Everyone, Everywhere) to achieve the pollutant reductions called for in its backstop allocations even though EPA admits that the E3 scenarios are not realistic and are not constrained by economic or technical feasibility. As a result, EPA has proposed pollutant reductions that are not realistic. In fact, EPA had previously determined that the water quality standards for the Chesapeake Bay were not attainable and a use attainability analysis (UAA) was needed. This action would have followed the recommendation of the National Research Council of the National Academy of Sciences (NAS) in its 2001 report: "Assessing the TMDL Approach to Water Quality Management" (NAS 2001). In that report, the NAS recommended that states or EPA first determine whether water quality standards are attainable, before developing a TMDL. NAS 2001, at 94. Unfortunately, EPA abandoned its UAA for the Chesapeake Bay. If it establishes a final TMDL without going through this analysis, EPA will be issuing a TMDL that cannot meet water quality standards, and therefore cannot meet the requirements of the statute.

To date, for the Chesapeake Bay, EPA has only considered changes to water quality standards when modeling has showed the standards are not achievable even if EPA could turn the clock back to the 1600s and impose complete reforestation on the Chesapeake Bay watershed. However, EPA should allow watershed jurisdictions to look at economic and social feasibility as well. For example, the Draft TMDL would result in significant adverse impacts on agricultural production, with significant impacts on the availability of affordable food.

We are not advocating that watershed jurisdictions walk away from water quality improvements. However, a watershed jurisdiction may determine that achieving water quality standards for all three pollutants in 92 segments all the time would cause substantial and widespread economic and social impacts, but that water quality standards could be met in most areas most of the time with far less impact. This analysis is critical to the development of the Chesapeake Bay TMDL.

I.    **AGRICULTURE AND FORESTRY HAVE MADE AND CONTINUE TO MAKE SIGNIFICANT CONTRIBUTIONS TO IMPROVEMENTS TO WATER QUALITY IN THE CHESAPEAKE BAY.**

Modern agricultural and forestry practices have significantly reduced agriculture's and forestry's environmental footprint. Agriculture has improved our overall environmental

6

AR0032767

efficiencies and the use of crop inputs is declining. No-till farming has lessened soil erosion and stored carbon in the soil. Farmers produce more milk today from far fewer cows. Farmers are also producing more meat on less feed from the same number or fewer animals. Nitrogen use efficiencies have consistently improved. Agriculture and forestry best management practices (BMPs) are reducing runoff. In state after state, our track record is one everyone should be proud of.

The Natural Resources Conservation Service (NRCS) of the US Department of Agriculture recently released a review draft of a report evaluating agriculture's conservation and natural resource performance in the Chesapeake Bay. *See* "Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region," October 2010, NRCS (hereinafter NRCS 2010) (attachment 1). The report offers an abundance of data and analysis about agriculture and the Bay. It found that farmers have adopted a wealth of conservation practices on the region's 4.6 million acres of cropland and, as a result, have reduced dramatically the nitrogen, phosphorous and sediment loads to the rivers and streams in the watershed and the Bay itself.

For example, NRCS found that farmers were actively implementing erosion control and nutrient management practices on about 96 percent of the cropland acres in production over the 2003 to 2006 period. These practices included various forms of erosion control involving no-till or minimum tillage, and structural and vegetative management practices like contour farming, grass waterways and filter strips. Nutrient use is being actively managed by farmers who are complying with important elements of standard nutrient management planning. As a result of these practices being used on 96 percent of the cropland acres in production, the NRCS found that sediment pollution of the region's rivers and streams is being reduced by 64 percent, nitrogen pollution by 36 percent, and phosphorous by 43 percent. The resultant loadings to the Bay were being reduced by 14 percent for sediment, 15 percent for phosphorus, and 15 percent for nitrogen. NRCS 2010, at 9.

The region's farmers are to be applauded for this enormous, proactive effort largely undertaken through voluntary, incentive-based programs and their own initiatives. This does not mean, however, that more work is not needed; it clearly is, as the NRCS report indicates. But the fact is that farmers have made an enormous commitment to adopting proper practices on farmland and as a result have made a major contribution to protecting the Bay. There is every reason to expect these efforts will continue and grow with or without the Draft TMDL.

7

AR0032768

For example, New York livestock farms are at the forefront of water quality protection. For over a decade larger livestock farms have implemented one of the most comprehensive water quality protection programs in the nation. These efforts have moved forward on the initiative of the agricultural industry. In fact, it was New York farmers that first requested the development of a concentrated animal feeding operation (CAFO) general permit by the New York State Department of Environmental Conservation (DEC). Today these efforts continue forward with farmers spending significant resources to install and establish BMPs. These efforts have not just been undertaken by large livestock farms but also by smaller farms as well. Under New York's Agricultural Environmental Management programs, thousands of smaller farms within the Chesapeake Bay Watershed and across the state are implementing important environmental BMPs to improve water quality. Indeed New York farms of all sizes continually request more funding than is made available from federal and state grants to install water quality protection BMPs. New York state recognizes the tremendous progress that agriculture and forestry have made in improving the water quality of the Chesapeake Bay. As noted in the Draft New York Watershed Implementation Plan: "The DEC has been working with both environmental and farming stakeholders in New York State for over a decade to achieve environmental compliance for all of New York State agriculture" and "[t]he success of the New York Program is clear." Draft New York WIP, at 13.

Similarly, Virginia's poultry industry has been a responsible and proactive environmental steward on a voluntary basis and through compliance with existing government regulations. Virtually all of the state's poultry farms implement nutrient management plans. At least 80 percent of poultry producers in the Shenandoah Valley have constructed sheds for storing poultry litter before it is utilized and those with or without sheds must store litter according to state regulatory criteria. The use of phytase in poultry feed has resulted in a more than 25 percent, on average, reduction in phosphorus in Virginia poultry litter. In its Draft WIP, the Commonwealth of Virginia recognizes the progress made by all agriculture and forestry organizations in Virginia. "Significant progress has been achieved to date through a variety of programs detailed in section 6.1 and specific initiatives." Draft Virginia WIP, at 57.

The state of Delaware also acknowledges the progress made by the agriculture and forestry communities. As noted in the Draft Delaware WIP: "Since the baseline period, the agriculture

8

AR0032769

community in Delaware has reduced a significant amount of nonpoint source nitrogen and phosphorus loading, leading the efforts to curtail nonpoint source nutrient loadings." Draft Delaware WIP, at 76.

Pennsylvania's Draft WIP is replete with examples of actions that the agricultural and forestry communities are undertaking to protect water quality. Draft Pennsylvania WIP, at section 8.

Maryland also recognizes the tremendous progress that agriculture and forestry have made in improving the water quality of the Chesapeake Bay. As noted in the Draft Maryland WIP: "Maryland agriculture loads to the Bay have been reduced significantly over the last 15 years. Implementation progress through 2009 shows a 50% decline in agricultural loads for nitrogen and a 34% decline in phosphorus loads…." Draft Maryland WIP, at 5-33.

Finally, in its Draft WIP West Virginia notes that the agriculture industry has a significant incentive to reduce runoff:

> Unseen to most observers is the intimate linkage that exists between on farm natural resources and a farmer's need to conserve and recycle resources on the farm to maintain sustainability. The agricultural producer has the most to lose by allowing nutrients, sediment, and other resources on the farm to leave the farm in runoff, thus changing on-farm resources or assets, to pollutants, or liabilities that affect the waters of the state. On the obverse, the farmer has the most to gain by keeping nutrient and soil resources on the farm and cycling through his production process, which will ultimately affect his bottom line and the sustainability of his or her operation. Draft West Virginia WIP, at 56.

As a result, "An impressive voluntary, incentive-based, agriculture nutrient management program has been underway in West Virginia for many years and should be encouraged to continue." Draft West Virginia WIP, at 48.

Forestry activities in the United States also are now conducted under a comprehensive program of BMPs. Since the enactment of the CWA, all states with significant forest management activities have developed either regulatory or non-regulatory BMP programs under sections 208, 319, and 404 of the CWA to achieve water quality goals.

9

AR0032770

Studies have shown that nationally, the overall BMP implementation rate is 89 percent, and has been increasing steadily.[2] There are literally hundreds of paired watershed studies and other controlled experiments that have tested or are testing the effectiveness of contemporary forest practices and BMPs.[3] Some of these, such the Piedmont Watershed Studies,[4] the Alto Watershed Study in East Texas,[5] and the Alsea Watershed Study and Watersheds Research Cooperative in Oregon,[6] have measured or are measuring improvements in water quality from managed forests for contemporary practices compared to historic impacts.

Today the greatest threat of deforestation comes from the conversion of forests to non-forest uses that produce a higher economic value. The families, businesses and individuals that own nearly 60 percent of our nation's forests depend on the returns they get from the products their forests produce to make additional investments in sound, long-term forest management. When existing markets for their products are strong, or when new markets like energy emerge, they provide forest owners the means to keep their land forested by keeping their forests economically competitive with other uses. However, when regulatory costs are imposed, this reduces the ability to maintain the land as forested and at some point will tip the balance in favor of the non-forest use.

As partners with agriculture and forestry, all the states in the Chesapeake Bay watershed acknowledge the contributions of these communities improving water quality in the Chesapeake Bay. Even EPA's data show that since 1985 the agriculture community has reduced phosphorus

---

[2] Ice, G.G., E.B. Schilling, and J. Vowell. 2010. Trends for forestry best management practices implementation. Journal of Forestry 108(6):267-273.

[3] Ice, G. 2004. History of innovative Best Management Practice development and its role in addressing water quality limited waterbodies. Journal of Environmental Engineering 130(6):684-689; Ice, G.G. and J.D. Stednick. 2004. A century of forest and wildland watershed lessons. Bethesda, MD: Society of American Foresters; Ice, G.G., E.B. Schilling, and J. Vowell. 2010. Trends for forestry best management practices implementation. Journal of Forestry 108(6):267-273.

[4] Williams, T.M., Hook, D.D., Lipscomb, D.J., Zeng, X., and Albiston, J.W. 1999. Effectiveness of best management practices to protect water quality in the South Carolina Piedmont. 271-276 in Haywood, J.D. (ed.). *Proceedings of the Tenth Biennial Southern Silvicultural Research Conference*, Shreveport, LA, February 16-18, 1999. General Technical Report SRS-30. Asheville, NC: USDA Forest Service, Southern Research Station. 618 p.

[5] McBroom, M.W., R.S. Beasley, and M. Chang. 2008. Water quality effects of clearcut harvesting and forest fertilization with best management practices. Journal of Environmental Quality 37:114-124.

[6] Oregon Forest Resources Institute (OFRI). 2009. *Watershed science at work in Oregon's forests*. Special report. Portland, OR: Oregon Forest Resources Institute. http://library.state.or.us/repository/2009/200906251557084/.

AR0032771

loadings by over 21 percent, nitrogen loadings by over 27 percent and sediment loadings by over 24 percent from 1985.[7]  Based on that information, EPA believes that the agriculture community has achieved half of the reductions it needs to make to allow the Chesapeake Bay to meet water quality standards.

Unfortunately, the Draft TMDL does not acknowledge or accurately account for contributions of agriculture and forestry to water quality.  As discussed below, many of the agriculture and forestry programs discussed in the state WIPs are not accounted for in the models that led to the development of EPA's Draft TMDL.  Thus, the Draft TMDL does not give agriculture and forestry credit for the reductions they have achieved.  EPA also fails to acknowledge that agriculture and forestry reductions have been achieved largely through state regulatory and voluntary programs, without federal regulation.

Instead of letting states build on that success, EPA is attempting to impose a top-down, federal regulatory approach on the agriculture and forestry communities.  Thus, it appears that EPA's proposals are attempts to drive livestock and agricultural operations out of the Chesapeake Bay region through unnecessary and overly burdensome regulation. In fact, by attacking efficient practices, such as increasing crop yields by using nutrients or increasing animal production efficiencies, EPA may impede agriculture's progress as a steward of the environment.

## II.    EPA HAS PROVIDED INADEQUATE NOTICE OF AND OPPORTUNITY TO COMMENT ON THE DRAFT TMDL.

As noted above, many of the undersigned organizations, as well as others, have asked EPA to extend the period of time available to comment on the Draft TMDL. Forty-five days is simply insufficient to provide meaningful public review of the Draft TMDL.  However, it is not only the length of the comment period that is inadequate.  EPA also has failed to provide the public with sufficient information to make meaningful comments.

### A.    Forty-Five Days is an Inadequate Comment Period for the Draft TMDL.

As noted above, EPA acknowledges that the "Chesapeake Bay TMDL is the largest, most complex TMDL in the country, covering a 64,000-square-mile area in seven jurisdictions."

---

[7] *See* EPA Presentation at the September 29, 2010 public meeting on the Draft TMDL in the District of Columbia, at 23-25 (available at http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/dcpublicmeetingrakmods.pdf ).

AR0032772







Commissioners:

**REBECCA A. BURKE**
*Chairperson*

**ERNEST P. LARSON**
*Vice-Chairman*

**JEFF C. WHEELAND**
*Secretary*

Telephone: (570) 320-2124
Fax: (570) 320-2127

48 WEST THIRD STREET
WILLIAMSPORT PA 17701

**ANN M. GEHRET**
*Interim*
*Chief Clerk*
*Director of Administration*

**THOMAS C. MARSHALL**
*Solicitor*

www.lyco.org
county.commissioners@lyco.org

**November 8, 2010**

Water Docket
Environmental Protection Agency
Mail code: 2822T
1200 Pennsylvania Ave., NW.
Washington, D.C., 20460

**Comments Sent via Web Form**

Re:    Comments on the Chesapeake Bay TMDL

## Introduction

Lycoming County appreciates the opportunity to review and provide comments on the United
States Environmental Protection Agency's (EPA) draft Total Maximum Daily Load (TMDL).
Since 2007, the County has proactively worked to develop and implement a county-based
nutrient management strategy designed to implement at the local level the goals and objectives of
Pennsylvania's Chesapeake Bay Tributary Strategy. Lycoming County, working along with the
Pennsylvania Departments of Environmental Protection and Community and Economic
Development and other state and federal organizations, has invested more than $600,000 in
developing and implementing this strategy. Current public funding support committed to this
effort to date stands at almost $1.5 Million. The County supports EPA's efforts to implement the
TMDL and DEP's efforts to develop a viable WIP to cost-effectively implement the TMDL.
However, the County is extremely concerned about EPA's strategy to include a "Backstop
TMDL" in the current process. We believe this will be detrimental to the County's efforts to
implement its Chesapeake Bay Nutrient Management Strategy as well as impose significant
burdens on it residents, businesses, other sectors, and wastewater treatment plants.

While contingency planning is always appropriate, the Backstop TMDL should not be
introduced in this process until the Phase 2 WIPs are submitted in November of 2011. The
Backstop TMDL that ramps up the treatment requirements for wastewater treatment plants and
enforces more regulatory actions on other sectors could bring into question the validity of all

AR0033175

voluntary actions taken by Lycoming County in implementing its Chesapeake Bay Nutrient Management Strategy during the past two years. The county has invested substantial resources while participating in the process and maintaining close coordination with both DEP and EPA in order to help us meet DEP and EPA expectations. We have worked aggressively to "do the right thing." We are concerned that at this critical moment in time, the Backstop TMDL will bring into question: "What is the right thing?" The threat of punitive backstop measures has also strained the positive relationships that have been built across source sectors at both the state and local levels. We need to get through the Phase II WIP process before we start questioning our strategies to make progress in cleaning up the Chesapeake Bay.

The County is very concerned about actions of other levels of government compromising the proactive efforts of our local government. The County hopes that the comments below provide EPA with a better understanding of the County's concerns and comments regarding the draft TMDL and its resolve to successfully implement the goals, objectives, and strategic actions associated with its local-developed Chesapeake Bay Nutrient Management Strategy. These comments incorporate input received from local stakeholders, including members of the County's Chesapeake Bay Tributary Strategy Advisory Committee.

## Comments

Comment #1 – As part of the County's Strategy, it was estimated that there are $225 million of needed WWTP improvements to respond to the Bay requirements and wet weather compliance, and many of these improvements are already underway. This has resulted in a significant increase in the sewer treatment costs and rates in the County. If the backstop TMDL is implemented, it will result in a dramatic increase in this cost. If it is implemented while some of the improvements to the facilities are under construction and/or design, it would significantly increase the cost to the facilities and the rate-payers. Lycoming County has been working very hard for the past several years to meet the requirements of the Chesapeake Bay agreement and the possibility of EPA imposing a backstop TMDL is of great concern to the County, the wastewater treatment plants, residents, agriculture community, and all of the stakeholders that have assisted with the development of our strategy.

The financial impact to the citizens of the County is of great concern because Lycoming County qualifies as an area that is "economically distressed" as defined by Section 301 of the Public Works and Economic Development Act of 1965. Lycoming's per capita income is $17,224 and is 79.8% of the national average[1] of $21,587.

Comment #2 – The County's approach to addressing the requirements of the Chesapeake Bay agreement and the development of its Chesapeake Bay Nutrient Management Strategy is to bring stakeholders, made up of both point source and non-point source representatives, together

---

[1] The source of this information is ESRI and U.S. Census Bureau

AR0033176



**EXECUTIVE COMMITTEE**
PRESIDENT
**Jeff Theerman**
*Executive Director*
Metropolitan St. Louis
Sewer District
*Saint Louis, MO*

VICE PRESIDENT
**David R. Williams**
*Director of Wastewater*
East Bay Municipal
Utility District
*Oakland, CA*

TREASURER
**Suzanne E. Goss**
*Government Relations Specialist*
JEA (Electric, Water & Sewer)
*Jacksonville, FL*

SECRETARY
**Julius Ciaccia, Jr.**
*Executive Director*
Northeast Ohio Regional
Sewer District
*Cleveland, OH*

PAST PRESIDENT
**Kevin L. Shafer**
*Executive Director*
Milwaukee Metropolitan
Sewerage District
*Milwaukee, WI*

EXECUTIVE DIRECTOR
**Ken Kirk**

November 8, 2010

Water Docket
Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460
Submitted via *www.regulations.gov*

Re: Docket ID EPA-R03-OW-2010-0736

The National Association of Clean Water Agencies (NACWA) appreciates the opportunity to comment on the draft Chesapeake Bay Total Maximum Daily Load (TMDL). NACWA's public wastewater treatment agency members, including many facilities within the Chesapeake Bay, treat and reclaim a majority of the wastewater generated each day nationwide. In addition to wastewater treatment, many NACWA members have responsibility for implementing municipal separate stormwater sewer system (MS4) programs, which are permitted under the MS4 National Pollutant Discharge Elimination System (NPDES) program, and for some communities management of combined sewer overflows (CSOs) remains an important consideration. NACWA members recognize the potential impacts of these discharges on the Chesapeake Bay and are committed to addressing their relative contributions toward improving Bay water quality equitably with other sources.

Publicly owned treatment works (POTWs), most of which have already made significant strides in reducing their contribution of nutrients, and MS4 utilities will be most directly affected by the proposed TMDL. At its foundation, EPA's approach to the Bay promises a more holistic program capable of looking across the watershed to address the variety of sources impacting the bay. However, effective TMDLs require fair and cost-effective allocations to all sources and must not over-burden municipal dischargers simply because the authority to address the other sources is lacking. However, achievement of the load reductions in EPA's proposed TMDL falls squarely, and inequitably, on the backs of the POTWs and MS4s in the Bay watershed.

Clearly more work is needed to improve the health of the Chesapeake Bay, but EPA's arbitrary deadlines and aggressive schedules are setting up the process for failure. Underlying all the debate about allocations, reasonable assurance, and

**National Association of
Clean Water Agencies**
1816 Jefferson Place, NW
Washington DC 20036-2505

p 202.833.2672  f 202.833.4657
www.nacwa.org · info@nacwa.org



AR0035411

backstops is a complex model and volumes of data which stakeholders and the public have simply not had enough time or opportunity to review. EPA should provide the public with more time to review the models and the draft TMDL in order to interact with EPA and support the development of meaningful comment on the TMDL. A 45-day comment deadline is not sufficient for such a complex watershed and TMDL. Although EPA is not under any legal obligation to finalize the TMDL by its December 31, 2010 deadline, the Agency denied the many requests it received for an extension of the comment deadline. It will also be difficult, if not impossible, for EPA to carefully consider comments and make revisions to the TMDL by the end of the year. Given the enormous regional and national implications of the TMDL, EPA should allow more time for public comment and more time for itself to consider public input.

While POTWs, MS4s, and other stakeholders in the Bay watershed are more closely following EPA's TMDL development and can provide the best perspectives on how the Agency's actions will impact the clean water community, elements of the TMDL demand attention from a national level. NACWA is concerned about the unknown accuracy and precision in the science underlying the TMDL, EPA's requirement for providing reasonable assurance, the load reductions imposed on POTWs and MS4s in contrast to other significant sources, the regulatory instability that results from EPA's threats of future reductions, and the lack of consideration for cost-effectiveness and available funding in the TMDL. These concerns are detailed below.

## Modeling Framework
The Chesapeake Bay TMDL is based on complex models that simulate nutrient and sediment pollutant load sources and the associated water quality and biological responses. EPA has not provided the public with a thorough explanation of how the models work, the degree of reliability associated with the model output and how the model's limitations impact the TMDL. In fact, EPA has not made all of the models themselves available for sufficient review by the regulated community. As EPA admits in the TMDL, "the models produce estimates, not perfect forecasts. Hence, they reduce, but do not eliminate, uncertainty in environmental decision making." (p. 5-15) Despite the effort EPA has made to calibrate the models with monitoring data, EPA has not quantifiably qualified the limitations in the modeled results for the incredibly complex ecosystem of the 4,480-square-mile Chesapeake Bay and its 64,000-square-mile watershed. Therefore it is unknown whether the reliability of the models is acceptable for developing such a TMDL. Since the TMDL will affect so many entities and will be extremely expensive to implement, EPA must clarify the limitations of the model (accuracy, precision, etc.) and its outputs and provide a complete analysis of how these limitations could affect the nutrient and sediment allocations and the costs of implementing the TMDL and how these limitations are quantifiably addressed in the TMDL.

## Reasonable Assurance Requirements
The Agency is on tenuous legal footing with its approach to ensuring the TMDL is implemented. Implementation plans associated with a TMDL are not part of the TMDL itself and, thus, are not subject to EPA approval. Pursuant to EPA's own regulations, a TMDL is the sum of the wasteload and load allocations that allow a body of water to meet water quality standards. 40 C.F.R. § 130.2(i). Section 303(d)(2) of the Clean Water Act (CWA) requires states to incorporate approved TMDLs into the water quality management plans that the states maintain under section 303(e). This framework is carried through in EPA's existing TMDL regulations as well as its 1997 guidance document on TMDL implementation. *See* 40 C.F.R. § 130.7(a) and "New Policies for Establishing and Implementing Total Maximum Daily Loads" (1997 Guidance). The 1997 Guidance does not suggest that implementation plans are subject to EPA approval or that the Agency has

AR0035412

authority to require reasonable assurance. The courts have consistently held that, under current CWA authority, the states have primary responsibility for implementing TMDLs, not EPA.

EPA seems to rely on CWA Section 117(g) (from the "Chesapeake Bay Restoration Act of 2000,"enacted as Title II of the Estuaries and Clean Waters Act of 2000 (P.L. 106-457)) to claim authority over implementation plans. In the case of the Bay, EPA is asserting authority over the Watershed Implementation Plans (WIPs) that EPA has required each Bay state to submit to the Agency, outlining how the necessary load reductions will be achieved. These WIPs were required to provide "reasonable assurance" that nonpoint source loading reductions will be achieved to meet the TMDL. EPA bootstraps "reasonable assurance," a concept created by EPA in its 1997 Guidance, into a legal rationale for judging states' WIPs.

"Reasonable assurance" is a concept that does not exist in either the CWA or EPA regulations. Under its 1997 guidance EPA wanted "reasonable assurances" that load allocations will be met if relied upon to establish point source wasteload allocations, and encouraged submission of implementation plans to EPA. The 1997 Guidance does not purport to make implementation plans subject to EPA approval or to give EPA authority to require reasonable assurance. Despite these limits, in the draft Bay TMDL, EPA goes even further than its 1997 Guidance and asserts that a TMDL <u>must</u> provide "reasonable assurance that the TMDL's LAs will be achieved," which "depends on whether practices capable of reducing the specified pollutant load (1) exist; (2) are technically feasible at a level required to meet allocations; and (3) have a high likelihood of implementation within a given period."

NACWA believes that EPA must acknowledge that the states, under current CWA authority, have the lead on TMDL implementation and that EPA's expectations for "reasonable assurance" must better reflect the legal and political realities of the Bay states. The states must have sufficient time to develop the programs and legislation necessary to put the needed controls in place. Further, the Bay TMDL is using two year "milestones" for each state to track progress; this should be sufficient reasonable assurance that the states will not significantly deviate from their plans and goals. The backstop measures imposed by EPA on the states also ignore local conditions and requirements and, in some cases, may lead to degradation of local waters. This contradicts the restoration goals of the TMDL, and therefore EPA backstops should not override the states' implementation of the TMDL that more appropriately considers local conditions.

<u>Allocations for POTWs</u>
Wasteload allocations (WLAs) for POTWs must be stable to avoid repeated, extremely expensive upgrades to wastewater treatment plants that present an unreasonable burden to ratepayers. Under the current tributary strategies for reducing nutrient loads to the Bay, POTWs have already made significant investments to upgrade treatment facilities to meet these load reduction requirements. As stated in EPA's Section 202a report, *The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay*, issued in response to Executive Order 13508, "Over 90 percent of nutrient reductions needed to reach the wastewater treatment facilities' basinwide loading caps are expected to be achieved by 2010." The report also acknowledges that "it would be very expensive to further reduce loadings from municipal and industrial wastewater dischargers below the established facility-specific cap loads in the tributary strategies."

EPA has not only proposed to reduce WLAs for POTWs in the initial TMDL, but also could "require additional reductions of loadings from point sources [by] revising the final December 2010 Chesapeake Bay TMDL to reallocate additional load reductions from nonpoint to point sources of nutrient and sediment pollution, such

AR0035413

as wastewater treatment plants," to ensure that "jurisdictions develop and implement appropriate WIPs, attain appropriate 2-year milestones of progress, and provide timely and complete information to an effective accountability system for monitoring pollutant reductions." (p. 7-11) This continued threat of additional nutrient controls does not provide the regulatory stability that the Bay community needs. It is wasteful and inappropriate to expect frequent modification or reconstruction of major facilities, absent a major new health or ecological risk that needs to be urgently addressed. A major modification at a POTW should bring 10 or 20 years of stability prior to different or incompatible upgrade requirements being imposed.

These additional point source reductions will have very little environmental benefit while presenting tremendous financial burdens on POTWs and their communities to add additional nutrient controls to facilities that were recently upgraded. Furthermore, as nutrient control approaches the limits of technology, the consumption of energy and chemicals increases dramatically and concerns emerge regarding offsetting environmental impacts overall such as greenhouse gas emissions. Severe limits on POTWs will also encourage increased reliance on on-site disposal systems, such as septic systems, that are far less efficient than centralized treatment, and drive population growth and development away from existing urban areas with advanced centralized treatment, leading to more environmental problems.

<u>Lack of Available Funding</u>
The TMDL does not consider the cost-effectiveness of various nutrient and sediment controls and largely ignores the enormous cost to implement the proposed nutrient reductions. Combined with the aggressive schedule for meeting the TMDL goals, the cost burden on Bay watershed communities for meeting their load reductions will no doubt push beyond the limits of affordability. Combined with the other regulatory mandates these communities must meet, the TMDL simply does not reflect economic reality.

For stormwater, even EPA's own estimates put the cost of retrofitting at close to $8 billion annually for the Bay watershed. The actual costs will likely be significantly higher than that, particularly because EPA's backstop for stormwater calls for cities to meet aggressive new performance standards for 50 percent of urban lands through redevelopment requirements and retrofits. The requirement for retrofits is particularly concerning to NACWA, as the costs to cities to replace existing stormwater management infrastructure will be severe and will be on top of significant sums already being spent to meet combined sewer overflow and sanitary sewer overflow consent decrees.

Improved water quality in the Bay can and must be achieved in a more cost-effective manner by controlling nonpoint sources, particularly agriculture. As stated in the draft TMDL, "agriculture is the largest single source of nitrogen, phosphorus, and sediment loading to the Bay through applying fertilizers, tilling croplands, and applying animal manure. Agricultural activities are responsible for approximately 44 percent of nitrogen and phosphorus loads delivered to the Bay and about 65 percent of sediment loads delivered to the Bay." (p. 4-32) Air sources are also significant sources of nitrogen, contributing "about one-third of the total nitrogen loads delivered to the Chesapeake Bay by depositing directly onto the tidal surface waters of Chesapeake Bay and onto the surrounding Bay watershed." (p. 4-35) Forest lands are also significant contributors of nutrients and sediments. These nonpoint sources must be controlled in proportion to their contributions to pollution in the Bay. Neglecting proportionate controls on nonpoint sources while requiring continued reductions from POTWs and MS4s will place an unfair burden on municipal dischargers and result in a major waste of increasingly limited municipal resources.

AR0035414

NACWA Comments, Docket ID EPA-R03-OW-2010-0736
November 8, 2010
Page 5 of 5

*       *       *

Thank you for your consideration of NACWA's comments on the draft TMDL for the Chesapeake Bay.  Please contact Cynthia Finley at 202/296-9836 or *cfinley@nacwa.org* if you have any questions.

Sincerely,

Ken Kirk
Executive Director

AR0035415

file:///R|/Project/Chesapeake%20Bay%20TMDL%20Response%20to%...nts/letters/14batch112210/EPA-R03-OW-2010-0736-0745-cp.html

# PUBLIC SUBMISSION

**As of:** November 22, 2010
**Received:** November 17, 2010
**Status:** Posted
**Posted:** November 19, 2010
**Tracking No.** 80b98f8d
**Comments Due:** November 08, 2010
**Submission Type:** Paper
**Number of Items Received:** 20

**Docket:** EPA-R03-OW-2010-0736
Draft Chesapeake Bay Total Maximum Daily Load

**Comment On:** EPA-R03-OW-2010-0736-0001
Clean Water Act Section 303(d): Notice for the Public Review of the Draft Total
Maximum Daily Load (TMDL) for the Chesapeake Bay

**Document:** EPA-R03-OW-2010-0736-0745
Mass Comment Campaign sponsored by Chesapeake Bay Foundation (20)

---

## Submitter Information

**Organization:** Chesapeake Bay Foundation

---

## General Comment

This is a mass letter campaign. The comments received are identical in content and
format. A total of 20 on-time comments have been received to date. A sample PDF has
been provided for review.

---

## Attachments

**EPA-R03-OW-2010-0736-0745:** Mass Comment Campaign sponsored by
Chesapeake Bay Foundation (20)

file:///R|/Project/Chesapeake%20Bay%20TMDL%20Res.../14batch112210/EPA-R03-OW-2010-0736-0745-cp.html [11/22/2010 1:03:20 PM]

AR0035941

-952-

# *Southern Tier Chesapeake Bay TMDL*
# *Commenting Coalition*

November 8, 2010

Water Docket
Environmental Protection Agency
Mail code: 2822T
1200 Pennsylvania Ave., NW
Washington, DC 20460

        Re:      Comments on the Draft Chesapeake Bay TMDL
                    Docket ID: EPA-R03-OW-2010-0736

To Whom It May Concern:

This letter and its Attachment B contains the comments of the Southern Tier Chesapeake Bay TMDL Commenting Coalition (Southern Tier Coalition) a unique, loosely formed coalition representing many of the major New York stakeholders who will be impacted by, and have to pay for, the severe nitrogen, phosphorus and sediment reductions which the Draft Chesapeake Bay TMDL (Draft TMDL) is proposing be imposed on the New York portion of the Bay. As shown on Attachment A, our members represent both point and non-point agricultural sources, as well as municipal and industrial point sources, including dischargers of urban stormwater. Members of the Coalition have three things in Common:

1. We are committed to continuing to be responsible, environmental stewards within our watersheds and within the larger Chesapeake Bay watershed.

2. We object to the artificially low, inequitable and unfair nitrogen, phosphorus allocations which have been assigned to New York in the Draft TMDL.

3. We emphatically state for the record that the cost of achieving the proposed nutrient reductions cannot primarily be paid for by local, or even New York dollars.

As is demonstrated time and time again in the attached Coalition comments, the Bay TMDL as proposed, without significant changes especially to the State-level allocations, is not approvable by EPA and not adoptable by New York and the other Bay States[1] because:

- The Draft TMDL is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. As an initial matter, the TMDL violates the plain language of the Clean Water Act and contradicts Congress' intentions regarding promulgation and implementation of TMDLs.

---

[1]    For simplicity sake, this letter includes the District of Columbia in the term "Bay States."

13229494.1

AR0035942

# Southern Tier Chesapeake Bay TMDL Commenting Coalition

- The New York allocations included in the Draft TMDL are arbitrary, capricious, and an abuse of discretion.

  o They fail to account for the decades of responsible stewardship that reduced the nutrient and sediment contributions of the New York Southern Tier while it rewards states who increased contributions to the Chesapeake Bay watershed.

  o New York, and particularly the residents of its Southern Tier, cannot afford to pay the costs which would be necessary to achieve the draft New York allocations. Because of this and fact that most of the environmental and other benefits that would accrue from these actions would occur outside New York State, approval of the Draft TMDL would be arbitrary and capricious unless most of the capital and increased O&M costs for upgraded municipal and industrial wastewater treatment, whose benefit will largely be experienced by people living outside New York, is paid for by non-New York sources.

  o The allocation methodology inappropriately favors states with newer, excess municipal WWTP capacity.

  o Allocations based on generated load rather than delivered load would recognize that both geographic proximity and natural processes play an important role in nutrient-related impacts on the Bay.

  o There are non-arbitrary and capricious methods through which to allocate the required reductions.

- The final TMDL must be adopted by each Bay State, and without substantive changes, it would be arbitrary, capricious and an abuse of discretion for New York State to adopt it.

- The Final TMDL should not include any federal Backstops.

- The draft TMDL assumes unachievable Levels of Technology for both municipal and industrial WWTPs and hence is arbitrary and capricious

- Assumptions made in the Draft TMDL with respect to agricultural loadings and what constitutes achievable further nutrient reductions are arbitrary and capricious and must be changed.

  o The Draft TMDL's overall agricultural-related allocation will drive many small and medium size farms out of business.

  o The attachment to NY's draft WIP, entitled *A Nonpoint Component to the New York CB WIP – Suggestions for Agricultural and Wetland Best Management Practice Implementation to Reduce Nutrients and Sediment Load* (2010), must be considered an integral part of the draft NY WIP but its implementation must be limited to voluntary actions.

AR0035943

# *Southern Tier Chesapeake Bay TMDL Commenting Coalition*

- New York's stormwater contributions to the Bay Watershed are de minimus, and cannot be realistically be reduced. Hence the Final TMDL should not assume that measurable additional reductions are cost-feasible.

Each of the above points is supported by more detail in Attachment B. As spokespersons for the Southern Tier Chesapeake Bay Commenting Coalition, the undersigned will serve as the point of contact should you have any comments or questions with respect to the matters discussed in these comments. The members of the Coalition look forward to continuing to work with USEPA and the New York State Department of Environmental Conservation as the TMDL is finalized and as we continue our on-going efforts to further reduce New York's already low nutrient and sediment contribution to the Chesapeake Bay Watershed, through reasonable cost-effective measures.

Respectfully submitted,

Jimmie Joe Carl, P.E, Director,
Chemung Co. Stormwater Coalition
607-796-2216

Mark Watts,
Chemung County Soil & Water Conservation District
607-796-2216

cc:   Southern Tier Commenting Coalition (see Attachment A)
      Ron Entringer, NYSDEC
      Peter Freehafer, NYSDEC
      Libby Ford, QEP, Sr. Env. Health Engineer

13229494.1                         - 3 -

AR0035944

**National Association of Home Builders**

1201 15th Street NW
Washington, DC 20005

T 800 266 8862
F 202 266 8056
grountree@nahb.org
www.nahb.org

NAHB Advocacy Group



November 8, 2010

Water Docket
U.S. Environmental Protection Agency
Mail Code: 2822T
1200 Pennsylvania Avenue, NW
Washington, DC 20460

**Re:    NAHB Comments on the proposed Chesapeake Bay TMDL**
**Docket ID No. EPA-R03-OW-2010-0736**

This document contains the comments of the National Association of Home Builders
(NAHB) on the U.S. Environmental Protection Agency's (EPA) proposed Total
Maximum Daily Load (TMDL) for the Chesapeake Bay, the availability of which was
announced in the Federal Register on Sept. 22, 2010. Our comments are supplied in the
spirit of addressing the challenges in this proposed regulatory program.

NAHB is a trade association representing more than 175,000 members involved in home
building, remodeling, multifamily construction, property management, subcontracting,
design, housing finance, building product manufacturing and other aspects of residential
and light commercial construction. Known as "the voice of the housing industry,"
NAHB is affiliated with over 800 state and local home builders associations around the
country. NAHB's builder members will construct about 80 percent of the new housing
projected for 2010. Because of the nature of their work, most of our builder members
must obtain and operate pursuant to National Pollutant Discharge Elimination System
(NPDES) permits for controlling the stormwater discharges from their construction sites.
The Chesapeake Bay TMDL's requirements will become a part of the stormwater permits
issued for homebuilding projects in the Bay watershed.

Throughout the development of the TMDL, NAHB and its affiliated home building
associations and members operating within the watershed have consistently voiced

AR0033704

rulemaking, courts have not hesitated to consider an agency pronouncement issued without meeting every APA requirement a rule.[34]

The Code of Federal Regulations at 40 CFR § 130.6 requires the state's water quality management plan ("WQMP") to include TMDLs, economic analysis, "the financial and institutional measures necessary for implementing recommending solutions", and a fiscal analysis regarding stormwater. The Bay TMDL augments the six Bay states and District of Columbia Water Quality Management Plans, yet nothing in the Bay TMDL, or any of its supporting documentation, discusses the financial and institutional measures for achieving the Bay TMDL. As noted above, the impacts will be severe and significant. As such, **NAHB urges EPA to conduct a comprehensive economic assessment and RFA analysis to ensure that the final TMDL is economically workable and affordable**.

2.  <u>Impact on The Residential Construction Industry and Housing</u>
    The costs of the TMDL will be borne by the construction industry in the form of land, planning, and carrying costs; installation and maintenance of BMPs; and, in affected states that have no pollutant allocation set aside for future growth, the requirement to offset all pollutant loadings from new construction activities. These will ultimately be felt in the market as a combination of higher prices and lower output for the construction industry. As output declines and jobs are lost in the construction industry, other sectors of the economy that buy from or sell to the construction industry will also contract and lose jobs. Builders and developers already are being crippled by the economic downturn and the ability of the home-buying public to absorb significant new costs and the TMDL will further exacerbate these challenges. Further, because compliance costs are incurred prior to the home sales, builders and developers will be required to pay carrying costs, which add additional cost to projects. Because the vast majority of our membership consists of small businesses, even moderate cost increases or variations between regulatory options can have dramatic and significant negative market impacts.

The costs associated with the TMDL will keep thousands of potential home buyers out of the market and is likely to lead to increased unemployment and very hard choices for the limited funds available to the affected states. We also note

---

[34] *See* Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 417 F.3d 1272, 1284 (D.C. Cir. 2005).

AR0033720

that if EPA proceeds with the hiring of an "Independent Evaluator" (though this initiative was completely unaddressed in the proposal) the Evaluator will have the power to punish states for not raising sufficient funds to meet the TMDL's goals for that state, but the Evaluator will have no responsibility for considering the state's other needs to ensure that the schools continue to function, police and fire protection are afforded the populace, and that the poor are fed.

This rulemaking also promises significant consequences for commercial builders, contractors, proponents of public infrastructure projects, and virtually any facility operator that is contemplating expansion. There will be serious ramifications and unintended negative consequences for state and local governments responsible for completing their own construction projects, while also overseeing the implementation of the TMDL through the state and local permitting programs.

3. Impact on State and Local Governments
It is uncertain how much of the cost burden will fall on state and local governments, but preliminary estimates suggest compliance costs in the tens of billions of dollars[35]. In addition, state and local government employee time required to implement the proposed regulation has not yet been estimated credibly by EPA. It is expected that the administrative burden to State and local governments for implementation and enforcement will approach a million hours per year, requiring the equivalent of approximately 500 new full-time staff. This significant new manpower requirement comes at a time when State and local governments are having extreme difficulty in finding funds to continue paying their current staff.

We refer you to the comments of Ms. Penelope A. Gross, submitted on Oct. 14, 2010 to the TMDL docket (comment number 0052):

> For most local governments, the most direct impact is MS4 permits, combined stormwater permits where the TMDL may require retrofits, but says nothing about how local governments will pay for them. EPA needs to tell the states that they have an obligation to provide funding if they require major retrofits at the local level. For that matter, EPA says nothing about federal funding to help meet requirements of the TMDL. They do not understand the implications that local governments may,

---

[35]Maryland Association of Counties estimate cited in the November 2, 2010 NAHB webinar on "Stormwater Requirements vs. Smart Growth," see www.nahb.org/stormwaterwebinar.

AR0033721



**National Association of Conservation Districts**

Comments on the EPA Draft Chesapeake Bay TMDL (Docket ID No. EPA-R03-OW-2010-0736)

The National Association of Conservation Districts (NACD) represents 3,000 local conservation districts across the country and on the Pacific Islands. These districts are local units of government established under state law to carry out natural resource management programs at the local level. Seventeen thousand conservationists serve on their governing boards. Conservation districts work with state and local governments, agricultural producers, forest landowners, homeowners and developers to carry out conservation programs that protect our streams, rivers and lakes.

As conservationists, we fully support the common goal of a cleaner, healthier Chesapeake Bay watershed. We are working with landowners at the ground level to prevent pollutants from reaching waterways. Landowners have already implemented many environmental best management practices (BMPs), which have significantly reduced nutrient and sediment loadings in the Chesapeake Bay watershed over the past 25 years. These conservation and agronomic measures have enabled farmers to responsibly manage nutrients from fertilizer and manure and minimize soil loss from farmland.

NACD is concerned that the Draft TMDL fails to acknowledge this success. In order to encourage continued progress in the Bay, the TMDL should accurately reflect agriculture's contribution to conservation in the Bay. To encourage continued progress, watershed jurisdictions should work closely with producers and landowners to ensure they have the resources necessary for success – rather than imposing federal mandates.

USDA's recent draft report, "Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region," underscores the fact that producers are indeed making good progress. Out of the region's actively-cropped 4.3 million acres, it found that farmers were actively implementing erosion control and nutrient management practices on more than 4.1 million acres, or 96 percent of the total. As a result, the region's rivers and streams have seen a 64 percent reduction in sediment pollution, a 36 percent reduction in nitrogen pollution and a 43 percent reduction in phosphorus pollution.

The draft report also indicated that work remains to be done to reduce nonpoint sources of pollution and improve water quality in the Bay. Landowners are eager to work with the Bay states, the Environmental Protection Agency (EPA), conservation districts and other stakeholders to continue improving management of all nutrient sources. To encourage additional best management practices, these efforts should be voluntary, locally-led and incentive-based.

**National Headquarters**
**509 Capitol Court, NE, Washington, DC 20002**
**Phone: (202) 547-6223 Fax: (202) 547-6450**
**www.nacdnet.org**

AR0033741

The fact that more conservation practices are needed to achieve their full potential is a reflection of the unique challenges of farming in the region – challenges that are quite similar to those the Bay faces as a result of its 16.6 million and growing population. This does not reflect a lack of commitment and conservation effort on the part of farmers.

While we continue to look for ways to improve, misguided federal regulation will ultimately do more harm than good. Forcing producers to comply with unattainable and unfunded mandates, based on faulty information about agriculture's actual contribution to the Bay, will only cause frustration, and result in significant economic and social impacts. To truly move forward, EPA needs a plan that is attainable, provides realistic benchmarks and funding and takes into account the unique, demographic pressures of the region.

EPA acknowledges that the "Chesapeake Bay TMDL is the largest, most complex TMDL in the country, covering a 64,000-square-mile area in seven jurisdictions." EPA is proposing allocations for three pollutants in 92 water-body segments. Even EPA admits that this extraordinarily complex TMDL is based on a flawed model, and has indicated it plans to make changes to the model in 2011. Even so, EPA plans to issue a TMDL that will have significant regulatory consequences.

EPA is relying upon an untested and highly imperfect model of the Bay, including incomplete and incorrect information about agricultural practices in the region and their water quality performance. EPA's model fails to acknowledge BMPs employed by the agriculture community outside of cost-share programs. Since the pollution reductions and the costs associated with meeting them will be based on these model outputs, the accuracy of these numbers has very real consequences on the livelihood of producers and landowners in the region.

To address this deficiency, NACD is working closely with state governments to develop an accurate data collection system, which will capture the large number of farmers and landowners voluntarily implementing conservation practices in the Bay region. NACD encourages EPA to support this effort and incorporate this data into the EPA Bay model.

We are concerned that EPA has proposed pollutant reductions that are not realistic nor economically or technically feasible, and has failed to quantify the associated costs and benefits. Before establishing a final TMDL, the agency should consider the economic and social impacts, providing transparent information regarding the cost of proposed water quality standards. The EPA should not move forward with a TMDL that is bound to fail due to unrealistic costs. NACD encourages the EPA to set achievable water quality standards and to fully take into account the economic and technical feasibility of reaching these goals.

The Clean Water Act (CWA) clearly requires states to establish TMDLs for impaired waters, and only in the absence of an acceptable state TMDL may EPA directly establish one. EPA is exceeding its authority by proposing to establish a TMDL without first waiting for state action, and is encroaching on state authority by doing so. EPA has asserted it has the authority to issue a

**National Headquarters**
**509 Capitol Court, NE, Washington, DC 20002**
**Phone: (202) 547-6223 Fax: (202) 547-6450**
**www.nacdnet.org**

AR0033742

-960-

TMDL over the objections of a state. However, the CWA requires EPA to go through a formal process to disapprove a state's TMDL, and EPA has failed to do this.

Nothing in the CWA gives EPA the authority to approve, disprove or change state watershed implementation plans (WIPs). Despite the fact that EPA does not have this authority, the agency has already rejected several Bay region states' TMDL implementation plans for failing to meet specific requirements. Through the use of backstop allocations in the Draft TMDL, the EPA attempts to force TMDL implementation measures on states by "assuming" them.

We're extremely concerned by EPA's attempts to eliminate the important role of state and local governments in the TMDL process. States – rather than the federal government – are best equipped to determine the best methods of reaching water quality standards and effectively implement TMDLs at the local level.

NACD is also concerned by EPA's efforts to pressure states into compliance through the use of backstop actions, including the redirecting of EPA grants. This is a troubling departure from the state and federal cooperation envisioned by the CWA. Under the CWA, states are responsible for carrying out CWA programs, and EPA does not dictate how water quality standards are met.

We strongly oppose EPA's top-down, regulatory approach and its counter-productive restrictions that would not only limit opportunities for agriculture operations, but threaten to put many out of business. It is important that EPA gives locally-led efforts an opportunity to succeed. EPA's focus should be to provide resources and tools—including financial and technical assistance— needed for successful state and local Chesapeake Bay watershed efforts. NACD encourages EPA to work collaboratively with local communities and stakeholders, instead of relying solely on regulatory and enforcement tools. This investment—along with appropriate conservation incentives—will provide for the most successful implementation of conservation strategies and best management practices to accomplish these vital goals.

Conservation districts are committed to making a difference in the Chesapeake Bay. With 121 districts covering the Bay watershed, our ability to work with landowners and local communities to implement conservation practices and address both rural and urban nonpoint source issues is unrivaled. NACD and our members look forward to providing leadership and support toward ongoing Chesapeake Bay restoration efforts.

Sincerely,

Steve Robinson
President

**National Headquarters**
**509 Capitol Court, NE, Washington, DC 20002**
**Phone: (202) 547-6223 Fax: (202) 547-6450**
**www.nacdnet.org**

AR0033743

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Department of the Environment

**Office of the Deputy Director**



November 29, 2010

Mr. Reginald Parrish
U.S. EPA Coordinator
District of Columbia Chesapeake Bay Watershed Implementation Plan
410 Severn Ave Suite 109
Annapolis, MD 21403

Dear Mr. Parrish: Reggie

Pursuant to the EPA letter of November 9, 2009 to the Chesapeake Bay Program's
Principals' Staff Committee in support of the development of the Chesapeake Bay TMDL and
Clean Water Act Section 117(g)(1), please find enclosed for your review the Chesapeake Bay
TMDL Watershed Implementation Plan (WIP) for the District of Columbia. The document is
titled as:

"*Chesapeake Bay TMDL Watershed Implementation Plan, District of Columbia Department
of the Environment, November 29, 2010*"

As shown in the WIP, the District expects to meet the interim and final target loads for
Nitrogen, Phosphorous and Sediment. The District appreciates the coordination and support
provided by EPA for the development of the WIP. If you have any clarifying questions, please
contact Dr. Monir Chowdhury at (202) 535-2990.

Sincerely,

Hamid Karimi, PhD
Deputy Director
Natural Resources Administration

Enclosures

cc:    Christophe A. G. Tulou, Acting Director, DDOE
       Monir Chowdhury, DDOE
       Robert Koroncai, Water Protection Division, EPA Region 3

1200 First Street, N.E., 5th Floor, Washington, D.C. 20002  Tel: (202) 535-1600  Facsimile: (202) 535-1613

AR0025422

# Chesapeake Bay TMDL
# Watershed Implementation Plan





District of Columbia

Department of the Environment

November 29, 2010

AR0025423

District of Columbia Watershed Implementation Plan
for the Chesapeake Bay Total Maximum Daily Load
November 2010

Acknowledgements

The District Department of the Environment (DDOE) would like to acknowledge and thank the following groups who assisted DDOE in preparing its Watershed Implementation Plan. We are thankful to: DC Water, USEPA Region III, EPA's Chesapeake Bay Program Office; EPA's contractor Tetra Tech for help in preparing the plan; and Metropolitan Washington Council of Governments for help in presenting the plan to stakeholders.

We would also like to thank our District and Federal stakeholders, such as dedicated staff in DDOE, DC Water, and our many sister agencies (such as DDOT, DPW, among others) whose cooperation is critical in carrying out the many implementation activities. We also acknowledge the participation and role of our Federal agency partners without whose cooperation going forward, we cannot fully implement the terms of this ambitious suite of stormwater and other water quality-related activities necessary to comply with the terms of the Bay-wide Total Maximum Daily Load. The District acknowledges that it can best accomplish the path of TMDL compliance by working in tandem with our many District and Federal partners and the development community. We look to each of these sectors to take ownership of the goals in this Implementation Plan and underlying the TMDL – the restoration of the Chesapeake Bay.

One complicating factor *at this time* is that the Federal Government has chosen to withhold payment of the District's Stormwater Fee (GAO letter of September 29, 2010: *Use of GAO's Appropriations to Pay the District of Columbia Stormwater Fee).* Unfortunately, the current DDOE Stormwater Management Plan, the 2007 Letter of Agreement and other related planning efforts are based on consideration of environmental factors, implementation costs, scheduling, and technical factors. A decrease in the fees collected will result in a reduction of funds available to us, and therefore would significantly impact and reduce the number and scope of management practices that the District could implement. We submit this Final Phase I WIP with this reality underlying our commitments. And, until this issue is fully resolved, EPA would do well to consider this predicament when issuing backstops in a situation where the jurisdiction lacks control or the requisite fiscal resources. While surely there are possible resolutions to this difficult situation, the District is limited in the interim until it is resolved. As previously stated, we remain guided by stringent regulatory, legislative, and policy approaches to managing stormwater.

Stakeholder Meetings Held

November 16, 2009 at MWCOG
August 19, 2010 (webinar)
August 25, 2010 at MWCOG
September 29, 2010 at National Zoo
Available on DDOE website at:
http://ddoe.dc.gov/ddoe/frames.asp?doc=/ddoe/lib/ddoe/information2/public.notices/District_Draft_WIP_Bay_TMDL_Sept_1_2010.pdf

District Contacts: Dr. Monir Chowdhury at Monir.chowdhury@dc.gov and Ms. Sarah Sand Sarah.sand@dc.gov.

AR0025424

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

## 2   Development of the WIP

The District's 2004 Nutrient and Sediment Tributary Strategy outlined the collaborative partnerships in which the District Department of the Environment (previously part of the District Department of Health) participates. It is through these partnerships that watersheds are managed and water quality is improved. These are long-standing partnerships that are still relevant through the implementation of the Chesapeake Bay TMDL. The partnerships and how they are important to the improvement of the Anacostia River, Potomac River and the Chesapeake Bay, as described in the 2004Nutrient and Sediment Tributary Strategy, are outlined below (DCDOH 2004).

> "The District participates in numerous regional water quality protection efforts because it is part of several major watersheds that are the focus of regional organizations: the Chesapeake Bay watershed, the Potomac watershed, and the Anacostia watershed. In addition, the major point source of nutrients in the District's portion of the Potomac is Blue Plains Wastewater Treatment Facility, managed by the DC WASA and Sewer Authority (DC WATER, prior to mid-2010 it was known as DC WASA). DC WASA is a *regional* agency, serving the District, Maryland and Virginia. The District has worked closely with DC WASA over several years to address nutrient discharges, particularly nitrogen.
>
> The D.C. Watershed Protection Division…works with several regional organizations such as the USEPA Chesapeake Bay Program, the Interstate Commission on the Potomac River Basin (ICPRB) and the Metropolitan Washington Council of Governments (MWCOG) to address shared environmental concerns. Some of the issues addressed with these organizations include toxics management, nutrient reduction, habitat restoration, best management practices, and combined sewer overflow.
>
> *The Chesapeake Bay watershed*
>
> The Chesapeake Bay Program, with representatives from Maryland, Virginia, Pennsylvania, the Chesapeake Bay Commission, the USEPA and the District of Columbia, coordinates and supports activities related to the Bay and its tributaries. The District's association with the Chesapeake Bay Program has resulted in coordination and development of the *Special Tributary Strategy for Federal Lands* in the District of Columbia, the *Anacostia River Toxics Management Action Plan*, the *Tributary Nutrient Reduction Strategy* and the *Biennial Workplan for the Anacostia River Watershed*.
>
> *The Potomac River watershed*
>
> Research in conjunction with the ICPRB has advanced District and regional understanding of the toxics problems of the District's waterways. The ICPRB, with commissioners that represent West Virginia, Virginia, Pennsylvania, Maryland, the Federal Government and the District of Columbia Government, works to protect, enhance and conserve the Potomac River and its tributaries.
>
> *The Anacostia River watershed*
>
> The Anacostia Watershed Restoration Committee [now known as the Anacostia Watershed Restoration Partnership] comprises representatives from the USEPA, the State of Maryland, the counties of Prince Georges and Montgomery, US Army Corps of Engineers (ACoE) , MWCOG, ICPRB and the District of Columbia. The Committee, managed by MWCOG, works to restore

4

AR0025431

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

the Anacostia Watershed's water quality, wetlands, forest cover, ecological integrity, fish habitat and public participation. In addition to the committee, the effort to restore the watershed involves participation by about 60 organizations that include the US Fish and Wildlife Service, the US Department of Agriculture, US National Park Service, Washington Metropolitan Area Transit Authority, and Maryland-National Capital Parks and Planning Commission.

*Federal Agencies*

The federal government owns approximately [30] percent of the land area in the District of Columbia and is a key stakeholder in any effort to improve water quality. DDOE has held multiple meetings (in 2009 and 2010) with its key federal partners, including Department of Defense, General Services Administration, EPA, and the Navy. The District looks to its federal partners to fully engage with us as they implement the Energy Independence and Security Act (section 438) which has strong requirements for managing stormwater runoff from all federal facilities. DDOE is quite eager to continue exploring ways to creatively implement EISA on our partners whose footprint comprises fully one-third of the city's area.

# 3  Water Quality

## 3.1  District of Columbia Water Quality Criteria and Standards

The District of Columbia does not have numeric water quality standards for nutrients and sediment. Numeric criteria do exist for dissolved oxygen, secchi depth and chlorophyll – *a*. Reducing nutrients and sediment will allow water quality to improve such that the numeric criteria for these associated constituents will be met.

The text of the District of Columbia's Water Quality Standards can be found in the District of Columbia Municipal Regulations Title 21, Chapter 11.

The District of Columbia has defined the following designated uses, summarized in Table 1; and numeric criteria applicable to the Chesapeake Bay TMDL and this Watershed Implementation Plan are shown in Table 2.

Table 1. DC designated uses

| Class of Water | Description |
|---|---|
| A | Primary contact recreation |
| B | Secondary contact recreation and aesthetic enjoyment |
| C | Protection and propagation of fish, shellfish and wildlife |
| D | Protection of human health related to consumption of fish and shellfish |
| E | Navigation |

Table 2. Numeric criteria for the District of Columbia

| Constituent | Criteria | Temporal Application | Designated Use |
|---|---|---|---|
| Dissolved Oxygen | 7-day mean $\geq$ 6.0 mg/l<br>Instantaneous Minimum $\geq$ 5.0 mg/l<br><br>30-day mean $\geq$ 5.5 mg/l<br><br>7-day mean $\geq$ 4.0 mg/l<br>Instantaneous minimum $\geq$ 3.2 mg/l<br>(At temperatures greater than 29°C, in tidally influenced waters, an instantaneous minimum dissolved oxygen concentration of 4.3 mg/L shall apply) | February 1 – May 31<br><br>June 1 – January 31 | C |

5

AR0025432

facilities are included with the nonpoint source load calculations and primarily consist of Federal facilities, such as Washington Navy Yard, Joint Base Anacostia-Bolling and National Park Service properties.

# 5   Interim and Final Nutrient and Sediment Loads

This section addresses Element 1 of the WIP Elements: Interim and Final Nutrient and Sediment Target Loads. EPA expects the states and the District to "commit to meet the interim and final target loads" and subdivide those targets by the pollutant source sector within each of the 92 areas draining to Section 303(d) tidal water segments" (USEPA 2009a). The "amount and location of loads from individual (where possible) or, as necessary, aggregate point sources" must also be identified (USEPA 2009a).

In July 2010 EPA announced the nitrogen and phosphorus draft allocations to the jurisdictions and major basins. In August the sediment draft allocations were provided as a range. These allocations may be modified based on refinements to the Phase 5.3 Chesapeake Bay Watershed Model in 2011. The draft allocations were developed to meet the water quality standards currently proposed for adoption by Maryland, Virginia, Delaware and the District of Columbia. Chesapeake Bay watershed-wide the total nitrogen draft allocation is 203.14 million pounds per year, the total phosphorus draft allocation is 12.52 million pounds per year, and the sediment allocation is 6,066-6,673 million pounds per year.

The District of Columbia draft allocations for its portion of the Potomac Basin are 2.32 million pounds per year total nitrogen, 0.12 million pounds per year total phosphorus, and 11.16 million pounds per year of sediment. The District must meet these nutrient and sediment targets fully by 2025. This WIP further divides the total District allocation among the impaired segment-sheds within the District (POTTF_DC, POTTF_MD, ANATF_DC and ANATF_MD). The 2017 interim target is defined as removal of 60 percent of the necessary nutrient and sediment reductions compared to current loads. Table 3 summarizes the 2009 loads and the anticipated 2017 and 2025 loads for each impaired segment-shed. Although there is a 2017 interim target load representing a 60 percent reduction from the total required reduction, these reductions were not made uniformly across the four impaired segment-sheds in the District. Because most of the loading is from point sources, there is a disproportionate reduction from the impaired segment-sheds containing significant point sources. In Table 3 the segment-shed loads for 2017 and 2025 represent the anticipated loads from each of the segment-sheds, as well as the segment allocations. A District Reserve Load is available to accommodate potential future increases in loading.

It should be noted that throughout this report the total 2009 loads for the District are different than the 2009 loads indicated in the Chesapeake Bay Watershed Model Phase 5.3. This is because there were additional nonsignificant industrial facilities that were not originally included in the model. Their presence is represented in subsequent model runs; however, the 2009 scenario was not rerun with the inclusion of these facilities. The 2009 loads throughout this report account for the additional load estimated from these facilities.

17

AR0025444

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

Table 3. Current Loads and Interim and Final Target Loads by Impaired Segment-shed.

| | Total Nitrogen (lb/yr) | Total Phosphorus (lb/yr) | Sediment (lb/yr) |
|---|---|---|---|
| **Current Load (2009)[1]** | **2,872,860** | **146,928** | **34,050,653** |
| POTTF_DC | 2,522,467 | 95,975 | 10,612,493 |
| POTTF_MD | 202,140 | 21,442 | 18,042,219 |
| ANATF_DC | 132,491 | 26,738 | 4,775,248 |
| ANATF_MD | 15,763 | 2,773 | 620,693 |
| **2017 Interim Target (60%) [2,3]** | **2,533,544** | **131,499** | **19,419,053** |
| **Anticipated 2017 Load** | **2,223,060** | **130,287** | **14,877,654** |
| POTTF_DC | 2,060,706 | 102,463 | 9,600,614 |
| POTTF_MD | 19,728 | 809 | 597,798 |
| ANATF_DC | 128,045 | 24,853 | 4,200,604 |
| ANATF_MD | 14,582 | 2,162 | 478,638 |
| **2025 Final Target [2]** | **2,320,432** | **121,213** | **11,158,120** |
| **Total overall percent reduction from 2009 levels[3]** | **19%** | **18%** | **67%** |
| POTTF_DC | 2,143,763 | 98,089 | 8,148,526 |
| POTTF_MD | 18,450 | 686 | 490,768 |
| ANATF_DC | 57,320 | 8,813 | 2,093,373 |
| ANATF_MD | 13,401 | 1,551 | 336,583 |
| District Reserve | 87,498 | 12,074 | 88,870 |
| **Anticipated 2025 Load** | **2,320,432** | **121,213** | **11,158,120** |

[1] 2009 Loads are based on the current capacities for TP and TSS in the permit limits. Actual TP loadings are lower.

[2] 2017 interim target load and 2025 target load based on the CBPO Watershed Model allocations. 2017 interim target adjusted for current TP permit limits.

[3] 2017 and 2025 percent reductions based on 2009 loading capacities for TP and TSS in the permit limits

Element 8 of the EPA WIP Guidance (Appendix with Detailed Targets and Schedule) requires detailed targets and schedules for load reductions. "EPA expects this appendix to include a reduction schedule comprising the two-year target loads at the scale of each major basin within a State or the District" (USEPA 2009a). Appendix I satisfies this requirement and provides further details on the load reductions discussed in Table 3.

Nearly the entirety of the District is covered as part of a regulated point source; therefore, source sector allocations were assigned based on the anticipated loading reductions from planned upgrades at various point source facilities, or on existing loads at facilities where no upgrades or changes in permit conditions are planned. The Blue Plains Outfall 001/CSO system is wet-weather driven, and therefore has a performance based allocation. The allocation is based on the expected average loading as determined by the hydrology of the years 1991-2000.

Nutrient and sediment load allocations for the MS4 and Others Area are based on anticipated loading reductions to these areas from implementation of BMPs, erosion and sediment control and a 1.2", 24-hour storm retention standard, as determined by the Chesapeake Bay Watershed Model Phase 5.3. Table 4 summarizes the waste load and load allocations for the nutrient and sediment sources in the District of Columbia.

18

AR0025445

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

Table 4. Nutrient and Sediment Allocations in the District of Columbia.

| | Sector | Permit | Bay Segment | TN (lb/yr) | TP (lb/yr) | TSED (lb/yr) |
|---|---|---|---|---|---|---|
| Target Allocation | | | | 2,320,432 | 121,213 | 11,158,120 |
| District Reserve | | | | 87,498 | 12,074 | 88,870 |
| Waste Load Allocation | Blue Plains Outfall 002[1] | DC0021199 | POTTF_DC | 1,929,827 | 88,389 | 2,197,421 |
| Waste Load Allocation | Blue Plains Outfall 001 | DC0021199 | POTTF_DC | 134,073 | 4,304 | 354,556 |
| Waste Load Allocation | CSOs | DC0021199 | Total | 3,809 | 810 | 87,724 |
| | | | ANATF_DC | 1,223 | 260 | 28,169 |
| | | | POTTF_DC | 2,586 | 550 | 59,555 |
| Waste Load Allocation | MS4 | DC0000221 | Total | 106,388 | 11,452 | 6,204,500 |
| | | | ANATF_DC | 41,517 | 6,498 | 1,682,470 |
| | | | ANATF_MD | 10,424 | 1,444 | 314,421 |
| | | | POTTF_DC | 39,427 | 2,975 | 3,843,847 |
| | | | POTTF_MD | 15,019 | 536 | 363,762 |
| Waste Load Allocation | Non-significant Industrial Wastewater Dischargers | Aggregate | Total | 24,291 | 1,275 | 247,491 |
| | | | ANATF_DC | 3,286 | 595 | 34,190 |
| | | | ANATF_MD | 2,361 | 66 | 12,100 |
| | | | POTTF_DC | 17,694 | 507 | 111,096 |
| | | | POTTF_MD | 950 | 107 | 90,105 |
| Load Allocation | Others (nonpoint sources and forest) | Aggregate | Total | 34,546 | 2,907 | 1,977,557 |
| | | | ANATF_DC | 11,293 | 1,459 | 348,544 |
| | | | ANATF_MD | 616 | 41 | 10,062 |
| | | | POTTF_DC | 20,156 | 1,365 | 1,582,051 |
| | | | POTTF_MD | 2,481 | 42 | 36,900 |

[1]Note: The loads allocated to Outfall 002 will cover any growth and/or additional flows originating in the District.

Total Sediment allocations for Blue Plains were derived from the TSS allocations assigned to the facility. The formula applied to convert from TSS loads to TSED was based on methodology provided by the Chesapeake Bay Program and is as follows:

**TSED concentration = TSS concentration - (BOD concentration*0.505)**

The TSS allocations for Blue Plains are summarized in Table 5. Remaining facilities were assumed to have no BOD contribution and therefore the TSS load and TSED would be identical.

Table 5. Summary of TSS Allocations for Blue Plains

| Sector | TSS (lb/yr) Waste Load Allocation |
|---|---|
| Blue Plains Outfall 002 | 3,437,306 |
| Blue Plains Outfall 001 | 438,634 |
| CSO | 105,350 |

19

AR0025446

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

Hansen, 1989), and *A Feasibility Study for Biological Nutrient Removal at the Blue Plains Wastewater Treatment Plant* (McNamee, Porter and Seeley, 1990).

Nitrogen removal costs from these studies were summarized in a report by the Interstate Commission on the Potomac River Basin (Camacho, 1992), and updated in a study by Engineering Science, Inc (1993) prepared for the Metropolitan Washington Council of Governments. Based on various engineering studies, three options were evaluated for the nutrient reduction strategy of the District of Columbia. They were three-stage biological nitrogen removal (BNR), five-stage BNR, and implementing the limits of technology in nitrogen removal.

After extensive research, three-stage BNR was selected as a technological upgrade for Blue Plains. With this technology, BNR is obtained by retrofitting the existing nitrification tanks to create an anoxic zone for denitrification. Methanol is added in the fourth pass in the existing nitrification reactors as a carbon source to achieve biological denitrification. It was the implementation of BNR that enabled the District to achieve its 40 percent reduction of nitrogen goal.

This technology was installed first as a pilot in 1996, treating about half of Blue Plains' total flow. In 2000, the plant applied BNR to its entire flow. A study by ICPRB found that ambient nitrate levels have significantly declined in the tidal Potomac when BNR is operating. Before and after comparisons indicate nitrogen concentrations decreased between 22 and 63 percent, depending on season and flow in the upper half of the tidal Potomac after full BNR implementation (Potomac Basin Reporter, Vo. 58 No. 6 November/December 2002)."

Similarly, the 2004 Tributary Strategy discusses Phase I of the CSO abatement efforts (DC DOH 2004):

"Historical efforts to manage wastewater and stormwater in the District of Columbia were primarily concerned with the transport of stormwater and sanitary sewage to nearby waterways for disposal. This "combined system" carries both domestic wastes and rainwater in a common sewer to the treatment plant. At the beginning of the CSO abatement program, one third of the District, approximately 12,500 acres, was served by a combined system that can overflow to waterways during rainstorms.

Although these overflows have significant impacts on all three receiving streams in the District (the Anacostia, the Potomac, and Rock Creek), the Anacostia receives a disproportionate share. The combined sewers overflow at 13 sites along the Anacostia south of RFK Stadium, accounting for 63 percent of the combined overflow in the District. The most serious results of combined sewer overflow are fecal contamination and low dissolved oxygen caused by high levels of biological waste. Storm events regularly cause violations of the official water contact recreation standards using fecal coliform bacteria. The Anacostia River also is subject to frequent fish kills and elimination of game fish species due to severe dissolved oxygen depletion. The effects of overflows have included immediate depletions of dissolved oxygen following the discharges. These oxygen depletions are sometimes so extreme that they result in large kills even of hardy carp and catfish populations, and long-term buildup of oxygen-demanding materials in bottom sediments. Another effect is the aesthetic degradation due to the discharge of combined system overflow suffered by all three streams.

In 1983 it was estimated that under normal precipitation conditions, the combined system would allow overflows 85, 80, and 17 times a year on the Anacostia, the Potomac, and Rock Creek, respectively. At that time, the District undertook a program for abatement of pollution from the combined sewer overflows. It consisted of increasing pumping capacity to direct more of the combined sewer flow to Blue Plains for treatment, increasing temporary storage of storm flows, separating combined systems in some areas, and treating CSOs at the points of discharge. The largest single investment, at a cost of $18 million ($14.5 million federal, the remaining, D.C.), of

21

AR0025448

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

ability to dewater the tunnels system to the new ECF and discharge ECF effluent to complete treatment for discharge at Outfall 002 or for discharge at Outfall 001."

The Blue Plains Total Nitrogen Removal/Wet Weather Plan describes the operation of the recommended plan during a typical rain event (DC WASA 2007):

- "As rain occurs in the collection system, flows to Blue Plains will exceed 511 mgd, triggering the start of CSSF conditions.

- For the first four hours, flows up to 555 mgd will be conveyed to complete treatment and be discharged at Outfall 002. Flows in excess of 555 mgd that are conveyed by the collection system (up to 1076 mgd) will overflow to the tunnel. In accordance with the LTCP, CSOs on the Anacostia River will also be captured by the tunnel up to the diversion capacity specified in the NPDES Permit. The tunnel dewatering pumping station will pump up to 225 mgd to ECF for treatment and discharge at Outfall 001.

- If the storm lasts long enough, the amount conveyed to complete treatment will be reduced from 555 mgd for the first four hours and 511 mgd thereafter. The difference between the available complete treatment capacity and the flow conveyed by the collection system will overflow to the tunnel.

- If the storm is large enough, the tunnel system may fill up and then it will overflow to the receiving waters.

- When the storm recedes, flows from the collection system will decline. If flows from the collection system drop below the available complete treatment capacity (555 mgd for the first four hours and 511 mgd thereafter), a portion of the flow from ECF will be diverted to complete treatment to maintain the flow through complete treatment at its design capacity. The balance of the flow from ECF will be disinfected and discharged at Outfall 001. This approach maximizes the flow receiving complete treatment."

Specific activities outlined in the LTCP and the LTCP Consent Decree were modified to reflect the Total Nitrogen / Wet Weather Plan. These included (DC WASA 2007):

- Increase the Anacostia Projects tunnel storage capacities
- Adjust the work included for the Poplar Point Pumping Station
- Delete the Blue Plains Excess Flow improvements, including the four additional primary clarifiers
- Add the new tunnel to Blue Plains
- Add the new ECF and pumping complex at Blue Plains

The Enhanced Nitrogen Removal (ENR) facilities will provide complete treatment for the flow rates listed above (555 MGD for the first 4 hours and 511 MGD thereafter) and will meet the new nitrogen effluent limit at Outfall 002. According to DC WASA, ENR facilities are to be placed into operation by July 14, 2014 and will begin compliance with the TN effluent limit by January 1, 2015 (Siddique 2010). Table 8 provides a summary of the milestones for this upgrade. Resulting effluent limits were derived based on the 2010 permit and information provided by DC Water. Figure 10 shows the planned upgrades at Blue Plains, including an illustration of the new tunnels that will be constructed, the consolidation of CSOs and the flow scheme leading to Outfall 001 and Outfall 002. The most recent estimated capital cost for this project is about $977 million.

Table 8. Summary of Blue Plains and Long Term Control Plan Schedule of Upgrades and Water Quality Improvements

| Outfall | Activity | Date | Resulting effluent limit |
|---------|----------|------|--------------------------|
| 002 – ENR upgrade to Complete Treatment | Award Contract for Design | June 1, 2009 | No change |
| 002 – ENR upgrade to Complete Treatment | Award Contract for construction | December 31, 2011 | No change |
| 002 – ENR upgrade to Complete Treatment | Place ENR in operation | July 14, 2014 | Begin effluent reductions |
| 002 – ENR upgrade to Complete Treatment | Compliance with TN Effluent Limit | January 2, 2015 | 3.89 mg/L TN at Outfall 002 |

31

AR0025458

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

**Appendix A**

**Table B2 breakdown of loads by segment-shed and source sector as required by Element 8**

91

AR0025518

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

*Table B2: Total Nitrogen Allocation and 2-Year Milestones*

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load[1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/TMDL |
|-----|-----------|---------------------------|---------------|------|--------------|----------|--------------|------|------|------|---------------------|------|------|------|------------------------|
| DC | Potomac | ANATF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_DC | CSO/ Stormwater | Ind. WLA | DC0021199 | 278 | 67,502 | 67,502 | 67,502 | 67,502 | 67,502 | 1,223 | 1,223 | 1,223 | 1,223 |
| DC | Potomac | ANATF_DC | **Total Sig Municipal** | | | | 67,502 | 67,502 | 67,502 | 67,502 | 67,502 | 1,223 | 1,223 | 1,223 | 1,223 |
| DC | Potomac | ANATF_DC | Wastewater: Non-sig Indus. | Agg. WLA | DC0000094, DC0000035 DC0000141 DC0000345 | | 3,286 | 3,286 | 3,286 | 3,286 | 3,286 | 3,286 | 3,286 | 3,286 | 3,286 |
| DC | Potomac | ANATF_DC | **Subtotal: Wastewater** | | | | 70,788 | 70,788 | 70,788 | 70,788 | 70,788 | 4,509 | 4,509 | 4,509 | 4,509 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 8,188 | 47,130 | 46,429 | 45,727 | 45,026 | 44,324 | 43,623 | 42,921 | 42,220 | 41,517 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 2,531 | 14,573 | 14,163 | 13,753 | 13,343 | 12,933 | 12,523 | 12,113 | 11,703 | 11,293 |
| DC | Potomac | ANATF_DC | **Subtotal: Urb/Suburb** | | | | 61,703 | 60,592 | 59,480 | 58,369 | 57,257 | 56,146 | 55,034 | 53,923 | 52,810 |
| **DC** | **Potomac** | **ANATF_DC** | **Total** | | | | 132,491 | 131,380 | 130,268 | 129,157 | 128,045 | 60,655 | 59,543 | 58,432 | 57,320 |
| DC | Potomac | ANATF_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | CSO/ Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | **Total Sig Municipal** | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | Wastewater: Non-sig Indus. | Agg. WLA | DC0000175 | | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 |
| DC | Potomac | ANATF_MD | **Subtotal: Wastewater** | | | | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 | 2,361 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 1,772 | 12,617 | 12,343 | 12,069 | 11,794 | 11,520 | 11,246 | 10,972 | 10,697 | 10,424 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 110 | 786 | 765 | 744 | 722 | 701 | 680 | 659 | 637 | 616 |
| DC | Potomac | ANATF_MD | **Subtotal: Urb/Suburb** | | | | 13,402 | 13,108 | 12,813 | 12,516 | 12,221 | 11,926 | 11,631 | 11,334 | 11,040 |
| **DC** | **Potomac** | **ANATF_MD** | **Total** | | | | 15,763 | 15,469 | 15,174 | 14,877 | 14,583 | 14,287 | 13,992 | 13,695 | 13,402 |
| DC | Potomac | POTTF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 2,418,240 | 2,418,240 | 2,418,240 | 1,960,149 | 1,960,149 | 2,030,606 | 2,030,606 | 2,030,606 | 2,063,900 |
| DC | Potomac | POTTF_DC | CSO/ Stormwater | Ind. WLA | DC0021199 | 12,118 | 19,610 | 19,610 | 19,610 | 19,610 | 19,610 | 19,610 | 19,610 | 19,610 | 2,586 |

1

-973-

AR0025519

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load [1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/ TMDL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | Potomac | POTTF_DC | Total Sig Municipal | | | | 2,437,850 | 2,437,850 | 2,437,850 | 1,979,759 | 1,979,759 | 2,050,216 | 2,050,216 | 2,050,216 | 2,066,486 |
| DC | Potomac | POTTF_DC | Wastewater: Non-sig Indus | Agg. WLA | DC0000337 DC0000361 | | 17,694 | 17,694 | 17,694 | 17,694 | 17,694 | 17,694 | 17,694 | 17,694 | 17,694 |
| DC | Potomac | POTTF_DC | Subtotal: Wastewater | | | | 2,455,544 | 2,455,544 | 2,455,544 | 1,997,453 | 1,997,453 | 2,067,910 | 2,067,910 | 2,067,910 | 2,084,180 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 8,005 | 42,011 | 41,688 | 41,365 | 41,042 | 40,719 | 40,396 | 40,073 | 39,750 | 39,427 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 4,747 | 24,912 | 24,318 | 23,723 | 23,129 | 22,534 | 21,940 | 21,345 | 20,751 | 20,156 |
| DC | Potomac | POTTF_DC | Subtotal: Urb/Suburb | | | | 66,923 | 66,006 | 65,088 | 64,171 | 63,253 | 62,336 | 61,418 | 60,501 | 59,583 |
| **DC** | **Potomac** | **POTTF_DC** | **Total** | | | | **2,522,467** | **2,521,550** | **2,519,715** | **2,061,624** | **2,060,706** | **2,130,246** | **2,129,328** | **2,128,411** | **2,143,763** |
| DC | Potomac | POTTC_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | CSO/ Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Total Sig Municipal | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Wastewater: Non-sig Indus | Agg. WLA | DC0000019 | | 182,085 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 |
| DC | Potomac | POTTC_MD | Subtotal: Wastewater | | | | 182,085 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 1,183 | 18,288 | 17,880 | 17,471 | 17,063 | 16,654 | 16,246 | 15,837 | 15,429 | 15,019 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 114 | 1,766 | 1,856 | 1,945 | 2,035 | 2,124 | 2,214 | 2,303 | 2,393 | 2,481 |
| DC | Potomac | POTTC_MD | Subtotal: Urb/Suburb | | | | 20,055 | 19,736 | 19,416 | 19,098 | 18,778 | 18,460 | 18,140 | 17,822 | 17,500 |
| **DC** | **Potomac** | **POTTC_MD** | **Total** | | | | **202,140** | **20,686** | **20,366** | **20,045** | **19,727** | **19,410** | **19,090** | **18,772** | **18,450** |
| DC | Potomac | | **District Reserve** | | | | | | | | | | | | 87,498 |
| DC | Potomac | | **Total** | | | | 2,872,861 | 2,689,082 | 2,686,439 | 2,225,704 | 2,223,060 | 2,224,595 | 2,221,951 | 2,219,307 | 2,320,432 |

[1] CBWSM Phase 5.3 erroneously placed CSS acres/load in ANATF_MD that are actually located in ANATF_DC

-974-

AR0025520

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

Table B2: Total Phosphorus Allocations and 2-Year Milestones.

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load [1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/TMDL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | Potomac | ANATF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_DC | CSO/Stormwater | Ind. WLA | DC0021199 | 278 | 14,415 | 14,415 | 14,415 | 14,415 | 14,415 | 260 | 260 | 260 | 260 |
| DC | Potomac | ANATF_DC | Total Sig Municipal | | | | 14,415 | 14,415 | 14,415 | 14,415 | 14,415 | 260 | 260 | 260 | 260 |
| DC | Potomac | ANATF_DC | Wastewater: Non-sig Indus. | Agg. WLA | DC0000094, DC0000035, DC0000141, DC000345 | | 595 | 595 | 595 | 595 | 595 | 595 | 595 | 595 | 595 |
| DC | Potomac | ANATF_DC | Subtotal: Wastewater | | | | 15,010 | 15,010 | 15,010 | 15,010 | 15,010 | 855 | 855 | 855 | 855 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 8,188 | 8,958 | 8,651 | 8,343 | 8,036 | 7,728 | 7,421 | 7,113 | 6,806 | 6,498 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 2,531 | 2,770 | 2,606 | 2,443 | 2,279 | 2,115 | 1,951 | 1,788 | 1,624 | 1,459 |
| DC | Potomac | ANATF_DC | Subtotal: Urb/Suburb | | | | 11,728 | 11,257 | 10,786 | 10,315 | 9,843 | 9,372 | 8,901 | 8,430 | 7,957 |
| DC | Potomac | ANATF_DC | Total | | | | 26,738 | 26,267 | 25,796 | 25,325 | 24,852 | 10,227 | 9,756 | 9,285 | 8,812 |
| DC | Potomac | ANATF_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | CSO/Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | Total Sig Municipal | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | Wastewater: Non-sig Indus. | Agg. WLA | DC0000175 | | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| DC | Potomac | ANATF_MD | Subtotal: Wastewater | | | | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 1,772 | 2,549 | 2,411 | 2,273 | 2,134 | 1,996 | 1,858 | 1,720 | 1,581 | 1,444 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 110 | 159 | 144 | 130 | 115 | 100 | 85 | 71 | 56 | 41 |
| DC | Potomac | ANATF_MD | Subtotal: Urb/Suburb | | | | 2,707 | 2,555 | 2,403 | 2,249 | 2,096 | 1,943 | 1,791 | 1,637 | 1,485 |
| DC | Potomac | ANATF_MD | Total | | | | 2,773 | 2,621 | 2,469 | 2,315 | 2,162 | 2,009 | 1,857 | 1,703 | 1,551 |
| DC | Potomac | POTTF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 85,333 | 85,333 | 85,333 | 92,627 | 92,627 | 92,672 | 92,672 | 92,672 | 92,693 |
| DC | Potomac | POTTF_DC | CSO/Stormwater | Ind. WLA | DC0021199 | 12,118 | 4,183 | 4,183 | 4,183 | 4,183 | 4,183 | 4,183 | 4,183 | 4,183 | 550 |

3

AR0025521

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load[1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/TMDL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | Potomac | POTTF_DC | Total Sig Municipal | | | | 89,516 | 89,516 | 89,516 | 96,810 | 96,810 | 96,855 | 96,855 | 96,855 | 93,243 |
| DC | Potomac | POTTF_DC | Wastewater: Non-sig Indus | Agg. WLA | DC0000337 DC0000361 | | 507 | 507 | 507 | 507 | 507 | 507 | 507 | 507 | 507 |
| DC | Potomac | POTTF_DC | Subtotal: Wastewater | | | | 90,023 | 90,023 | 90,023 | 97,317 | 97,317 | 97,362 | 97,362 | 97,362 | 93,750 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 3,005 | 3,736 | 3,641 | 3,546 | 3,450 | 3,355 | 3,260 | 3,165 | 3,069 | 2,975 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 4,747 | 2,215 | 2,109 | 2,003 | 1,896 | 1,790 | 1,684 | 1,578 | 1,471 | 1,365 |
| DC | Potomac | POTTF_DC | Subtotal: Urb/Suburb | | | | 5,951 | 5,750 | 5,549 | 5,346 | 5,146 | 4,944 | 4,743 | 4,540 | 4,339 |
| DC | Potomac | POTTF_DC | Total | | | | | 95,373 | 95,172 | 102,263 | 102,463 | 101,906 | 101,705 | 101,502 | 98,090 |
| DC | Potomac | POTTC_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | CSO/ Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Total Sig Municipal | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Wastewater: Non-sig Indus | Agg. WLA | DC0000019 | | 20,617 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 |
| DC | Potomac | POTTC_MD | Subtotal: Wastewater | | | | 20,617 | 107 | 107 | 107 | 107 | 107 | 107 | 107 | 107 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | L183 | 753 | 726 | 699 | 672 | 645 | 618 | 591 | 564 | 536 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 114 | 73 | 69 | 65 | 61 | 57 | 53 | 49 | 45 | 42 |
| DC | Potomac | POTTC_MD | Subtotal: Urb/Suburb | | | | 826 | 795 | 764 | 733 | 702 | 671 | 640 | 609 | 578 |
| DC | Potomac | POTTC_MD | Total | | | | 21,443 | 902 | 871 | 840 | 809 | 778 | 747 | 716 | 685 |
| DC | Potomac | | District Reserve | | | | | | | | | | | | 12,076 |
| DC | Potomac | | Total | | | | 146,930 | 125,563 | 124,706 | 131,143 | 130,286 | 115,321 | 114,464 | 113,607 | 121,213 |

[1] CBWSM Phase 5.3 erroneously placed CSS acres/load in ANATF_MD that are actually located in ANATF_DC

4

AR0025522

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

Table B2: Total Suspended Sediments Allocations and 2-Year Milestones.

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load [1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/ TMDL |
|-----|-----------|--------------------------|---------------|------|-------------|---------|-----------|------|------|------|---------------------|------|------|------|--------------------------|
| DC | Potomac | ANATF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_DC | CSO/ Stormwater | Ind. WLA | DC0021199 | 278 | 1,560,755 | 1,560,755 | 1,560,755 | 1,560,755 | 1,560,755 | 28,169 | 28,169 | 28,169 | 28,169 |
| DC | Potomac | ANATF_DC | Total Sig Municipal | | | | 1,560,755 | 1,560,755 | 1,560,755 | 1,560,755 | 1,560,755 | 28,169 | 28,169 | 28,169 | 28,169 |
| DC | Potomac | ANATF_DC | Wastewater: Non-sig Indus | Agg. WLA | DC0000094, DC0000035, DC0000141, DC000345 | | 34,190 | 34,190 | 34,190 | 34,190 | 34,190 | 34,190 | 34,190 | 34,190 | 34,190 |
| DC | Potomac | ANATF_DC | Subtotal: Wastewater | | | | 1,594,945 | 1,594,945 | 1,594,945 | 1,594,945 | 1,594,945 | 62,359 | 62,359 | 62,359 | 62,359 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 8,188 | 2,429,170 | 2,335,833 | 2,242,495 | 2,149,158 | 2,055,820 | 1,962,483 | 1,869,145 | 1,775,808 | 1,682,470 |
| DC | Potomac | ANATF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 2,531 | 751,133 | 700,809 | 650,486 | 600,162 | 549,838 | 499,514 | 449,191 | 398,867 | 348,544 |
| DC | Potomac | ANATF_DC | Subtotal: Urb/Suburb | | | | 3,180,303 | 3,036,642 | 2,892,981 | 2,749,319 | 2,605,658 | 2,461,997 | 2,318,336 | 2,174,674 | 2,031,014 |
| DC | Potomac | ANATF_DC | Total | | | | 4,775,248 | 4,631,587 | 4,487,926 | 4,344,264 | 4,200,604 | 2,524,356 | 2,380,695 | 2,237,033 | 2,093,372 |
| DC | Potomac | ANATF_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | CSO/ Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | Total Sig Municipal | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | ANATF_MD | Wastewater: Non-sig Indus | Agg. WLA | DC0000175 | | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 |
| DC | Potomac | ANATF_MD | Subtotal: Wastewater | | | | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 | 12,100 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 1,772 | 572,918 | 540,606 | 508,294 | 475,982 | 443,670 | 411,358 | 379,046 | 346,734 | 314,421 |
| DC | Potomac | ANATF_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 110 | 35,675 | 32,473 | 29,272 | 26,070 | 22,868 | 19,666 | 16,465 | 13,263 | 10,062 |
| DC | Potomac | ANATF_MD | Subtotal: Urb/Suburb | | | | 608,593 | 573,079 | 537,566 | 502,052 | 466,538 | 431,024 | 395,511 | 359,997 | 324,483 |
| DC | Potomac | ANATF_MD | Total | | | | 620,693 | 585,179 | 549,666 | 514,152 | 478,638 | 443,124 | 407,611 | 372,097 | 336,583 |
| DC | Potomac | POTTF_DC | Wastewater: POTW | Ind. WLA | DC0021199 | | 2,236,612 | 2,236,612 | 2,236,612 | 2,417,926 | 2,417,926 | 2,508,960 | 2,508,960 | 2,508,960 | 2,551,977 |
| DC | Potomac | POTTF_DC | CSO/ Stormwater | Ind. WLA | DC0021199 | 12,118 | 452,502 | 452,502 | 452,502 | 452,502 | 452,502 | 452,502 | 452,502 | 452,502 | 59,555 |

5

AR0025523

District of Columbia Chesapeake Bay TMDL Watershed Implementation Plan

| St. | Maj. Basin | Impaired Segment Drainage | Source Sector | Type | NPDES Permit | 2010 Ac. | 2009 Load[1] | 2011 | 2013 | 2015 | 2017 Interim Target | 2019 | 2021 | 2023 | 2025 Final Target/TMDL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | Potomac | POTTF DC | Total Sig Municipal | | | | 2,689,114 | 2,689,114 | 2,689,114 | 2,870,428 | 2,870,428 | 2,961,462 | 2,961,462 | 2,961,462 | 2,611,532 |
| DC | Potomac | POTTF_DC | Wastewater: Non-sig Indus | Agg. WLA | DC0000337 DC0000361 | | 111,096 | 111,096 | 111,096 | 111,096 | 111,096 | 111,096 | 111,096 | 111,096 | 111,096 |
| DC | Potomac | POTTF_DC | Subtotal: Wastewater | | | | 2,800,210 | 2,800,210 | 2,800,210 | 2,981,524 | 2,981,524 | 3,072,558 | 3,072,558 | 3,072,558 | 2,722,628 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 8,005 | 4,904,197 | 4,771,653 | 4,639,110 | 4,506,566 | 4,374,022 | 4,241,478 | 4,108,935 | 3,976,391 | 3,843,847 |
| DC | Potomac | POTTF_DC | Urb/Suburb Runoff: Non-MS4 | LA | | 4,747 | 2,908,086 | 2,742,332 | 2,576,577 | 2,410,823 | 2,245,068 | 2,079,314 | 1,913,599 | 1,747,805 | 1,582,051 |
| DC | Potomac | POTTF_DC | Subtotal: Urb/Suburb | | | | 7,812,283 | 7,513,985 | 7,215,687 | 6,917,388 | 6,619,090 | 6,320,792 | 6,022,494 | 5,724,195 | 5,425,897 |
| DC | Potomac | POTTF_DC | Total | | | | 10,612,493 | 10,314,195 | 10,015,897 | 9,898,912 | 9,600,614 | 9,393,350 | 9,095,052 | 8,796,753 | 8,148,526 |
| DC | Potomac | POTTC_MD | Wastewater: POTW | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | CSO/ Stormwater | Ind. WLA | DC0021199 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Total Sig Municipal | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DC | Potomac | POTTC_MD | Wastewater: Non-sig Indus | Agg. WLA | DC0000019 | | 17,427,496 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 |
| DC | Potomac | POTTC_MD | Subtotal: Wastewater | | | | 17,427,496 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 | 90,105 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: MS4 | Ind. WLA | DC0000221 | 1,183 | 560,577 | 535,975 | 511,374 | 486,772 | 462,170 | 437,568 | 412,967 | 388,365 | 363,762 |
| DC | Potomac | POTTC_MD | Urb/Suburb Runoff: Non-MS4 | LA | | 114 | 54,146 | 51,990 | 49,835 | 47,679 | 45,523 | 43,367 | 41,212 | 39,056 | 36,900 |
| DC | Potomac | POTTC_MD | Subtotal: Urb/Suburb | | | | 614,723 | 587,966 | 561,208 | 534,451 | 507,693 | 480,936 | 454,178 | 427,421 | 400,663 |
| DC | Potomac | POTTC_MD | Total | | | | 18,042,219 | 678,071 | 651,313 | 624,556 | 597,798 | 571,041 | 544,283 | 517,526 | 490,767 |
| DC | Potomac | | District Reserve | | | | | | | | | | | | 88,871 |
| DC | Potomac | | Total | | | | 34,050,654 | 16,209,032 | 15,704,801 | 15,381,884 | 14,877,654 | 12,931,870 | 12,427,639 | 11,923,409 | 11,158,120 |

[1] CBWSM Phase 5.3 erroneously placed CSS acres/load in ANATF_MD that are actually located in ANATF_DC

6

AR0025524

# Pennsylvania Chesapeake Watershed Implementation Plan

## Prepared by the
## Pennsylvania Department of Environmental Protection

## November 29, 2010

**Edward G. Rendell, Governor**
**Commonwealth of Pennsylvania**

**John Hanger, Secretary**
**Department of Environmental Protection**

AR0026393

**Pennsylvania Chesapeake Watershed Implementation Plan**

**May be obtained from:**

**Pennsylvania Department of Environmental Protection**
**Water Planning Office**
**P.O. Box 2063**
**Harrisburg, PA 17105-2063**

**Telephone:  717-772-4785**

**For more information, visit DEP's Web site at <u>www.dep.state.pa.us</u>**

**DISCLAIMER:**

The policies and procedures outlined in this document are intended to supplement existing requirements. Nothing in the policies or procedures shall affect different statutory or regulatory requirements.

The policies and procedures herein are not an adjudication or a regulation. There is no intent on the part of the Department of Environmental Protection (DEP) to give these rules that weight or deference. This document establishes the framework within which DEP will exercise its administrative discretion in the future. DEP reserves the discretion to deviate from this policy statement if circumstances warrant.

Nothing contained in this document shall be construed to establish a legal requirement on the part of the Commonwealth of Pennsylvania to appropriate funds, or to require the Commonwealth or any agency thereof to take actions not authorized by law.

AR0026394

*Section 1.*
# Table of Contents

Section. 1.  Table of Contents ............................................................ i

Section 2.   Executive Summary ....................................................... 1

Section 3.   Introduction .................................................................. 11

Section 4.   Development of Phase 1 Watershed Implementation Plan
             and Public Participation .................................................. 19

Section 5.   Nutrient and Sediment Load Targets .............................. 22

Section. 6.  Accounting for Growth .................................................. 50

Section 7.   Wastewater .................................................................. 54

Section 8.   Agriculture ................................................................... 64

Section 9.   Urban/Suburban Stormwater ......................................... 120

Section 10.  Onsite Wastewater ...................................................... 152

Section 11.  Forestry ...................................................................... 154

Section 12.  Resource Extraction ..................................................... 174

Section 13.  Multiple Sector Strategies ............................................ 179

Section 14.  Reasonable Assurance and Pennsylvania's Blueprint for Success ... 193

Section 15.  Pennsylvania's Unfinished Business .............................. 211

Appendix 1.  Pennsylvania Chesapeake Registry FY 09 - 10 Report ... 216

Appendix 2.  Bradford County BMP Study ........................................ 219

Appendix 3.  Lancaster County BMP Study ....................................... 244

Appendix 4.  Chesapeake Bay Commission – An Introduction to Pennsylvania's
             Implementation of the Chesapeake Bay TMDL, October 28, 2010 ... 252

Appendix 5.  Pennsylvania's Proposed Chesapeake Bay Agricultural Water
             Quality Initiative ............................................................ 254

AR0026395

Appendix 6.  Manure Management Manual Revision – Land Application of Manure          265

Appendix 7.  Table B2.  Target Load and Reduction Tables by Source Segment
             for 2017 and 2025                                                       274
             To be provided as an Excel spreadsheet attachment

AR0026396

## Pennsylvania's Major Watersheds



AR0026397

# *Section 2.*
# Executive Summary

## Background

Pennsylvania's Chesapeake Watershed Implementation Plan (WIP) – Phase 1 was prepared to address the U.S. Environmental Protection Agency's (EPA's) expectations for the Chesapeake Bay Total Maximum Daily Load (TMDL), scheduled for publication in December 2010. A TMDL is the sum of the individual waste load allocations and load allocations plus a margin of safety. The wasteload allocation (WLA) represents the total pollutant loading allocated to point sources. The load allocation (LA) represents the total pollutant loading allocated to non-point sources.

For Pennsylvania and other headwater states, it is expected that the TMDL will include an aggregate wasteload and load allocation for each of the major basins. For the tidal water states, the TMDL will include individual wasteload allocations for individual NPDES permitted facilities.

As noted above, DEP anticipates that the Final Bay TMDL will include aggregate nutrient and sediment wasteload and load allocations for each of Pennsylvania's major basins that discharge to impaired waters of Chesapeake Bay. These include the Susquehanna, Potomac and Gunpowder Rivers and the Northeast and Elk Creeks. EPA draft allocations for nutrients and sediments issued in July and August of 2010 defined the Gunpowder River as the Western Shore watershed and the North East and Elk and Creeks as the Eastern Shore watershed. Consequently, Pennsylvania's major basins in the Chesapeake Bay TMDL are identified as the Susquehanna, Potomac, Eastern Shore and Western Shore. These basins are referred to as Pennsylvania's Chesapeake watershed, Chesapeake TMDL watersheds, or similar terms throughout this document.

EPA Region III outlined their expectations for state WIP's in November 4, 2009 correspondence. EPA expects the states to have controls in place by 2017 that would achieve at least 60 percent of the necessary reductions (interim target level), and to have all the controls in place by 2025 (final target level). In its correspondence, EPA established a three phase planning process to develop and refine the WIP.

EPA established a September 1, 2010 deadline for submission of the Draft Phase 1 WIP, and a November 29 deadline for the final plan. The Phase 1 WIP divides nutrient and sediment loads by source sector (e.g. agriculture, stormwater, wastewater treatment plants, etc.), NPDES permit loads, and major drainage basin. Pennsylvania has five drainage basins in the Chesapeake watershed. They include the Susquehanna, Potomac, Northeast, Elk and Gunpowder Rivers. The nutrient and sediment loads were generated by EPA's Phase 5.3 watershed model.

EPA also directed the states to develop a Phase 2 WIP which will further subdivide the loads by local area (county). It established a June 1, 2011 deadline for submission of the Draft Phase 2 WIP, and a November 1 deadline for the final plan. These will not be regulatory allocations to

- 1 -

AR0026398

the county. Rather, they are to inform local implementers (e.g. municipal elected officials and planning agency personnel, county conservation districts and planning commissions) of the nutrient and sediment loads generated by their geographical area so they can help implement or plan appropriate actions to reduce the target loads. Local implementation efforts should focus on compliance with existing rules and regulations, as well as seeking opportunities for additional management actions. EPA expects the Phase 2 WIP to contain greater detail about the first stage of implementation, which will last from when EPA establishes the TMDL in December 2010 until 2017. EPA expects to modify the Bay TMDL, if necessary, by December 15, 2011.

The second stage of implementation will extend from 2018 to 2025, when controls are implemented to reduce loads from the interim to final target levels. EPA established a June 1, 2017 deadline for submission of the Draft Phase 3 WIP, and a November 1 deadline for the final plan. Similar to the Phase 2 WIP, the Phase 3 plan will subdivide the loads by county level. EPA expects to modify the Bay TMDL, if necessary, by December 15, 2017.

EPA issued nitrogen and phosphorous draft allocations to the states on July 1, 2010. Sediment draft allocations were issued on August 15, 2010. The draft allocations represent the maximum amount of pollutant loading identified by EPA through the Chesapeake Bay TMDL. EPA proposed a range for sediment allocations. The range represents loads expected to be achievable through full implementation of nutrient management practices necessary to attain the draft nitrogen and phosphorous allocations. Pennsylvania draft allocations are described in the below Table.

| Phase 5.3 Watershed Model Nitrogen and Phosphorus in Millions Pounds per Year Sediment in Million Tons per Year | | | |
|---|---|---|---|
| | Nitrogen | Phosphorous | Sediment |
| 2009 Progress | 106.4 | 3.96 | 1.28 |
| Draft Allocation | 76.77 | 2.74 | 0.95 – 1.05 |
| Remaining Reductions | 29.53 | 1.21 | 0.23 – 0.33 |

Pennsylvania is committed to protecting and enhancing our streams and watersheds. The efforts here at home will in turn help in further restoring the Chesapeake Bay by 2025. Over the years, significant progress has been made to reduce nitrogen and phosphorus pollution of the local waters in the Pennsylvania watershed. According to EPA's current watershed model, when compared to 1985 Pennsylvania has achieved 28 percent of the nitrogen reductions, 46 percent of the phosphorus reductions, and 38 to 46 percent of the sediment reductions needed to reach its allocations. This is real progress, but more needs to be done. When compared to current 2009 progress, Pennsylvania needs to achieve an additional 29.53 million pound reduction in nitrogen, 1.21 million pound reduction in phosphorous, and 472 to 662 million pound reduction in sediment by 2025.

All sectors have been contributing to the progress made in Pennsylvania. For example, agriculture has played a major role in achieving Pennsylvania's nutrient reductions. According to EPA's model, agriculture land uses contribute 56 percent of Pennsylvania's nitrogen loadings

- 2 -

AR0026399

to the Bay, yet they account for 80 percent of the nitrogen reductions.  Agriculture Best Management Practices (BMPs) are among the most cost effective tools to restore water quality. EPA's most recent calculations show Pennsylvania farmers can proudly lay claim to 41 percent of all the nitrogen reductions made by agriculture in the multi-state watershed. This leadership derives from the Commonwealth's set of agricultural stewardship firsts, including:

o  The first mandatory farm nutrient management plans;

o  The first nutrient management program to regulate nitrogen and phosphorus;

o  The first EPA-approved regulatory program for concentrated animal feeding operations;

o  The first Bay state to permanently preserve 20 percent (more than 3 million acres) of land in the watershed.

o  The first Bay state to meet its goal to plant 3,736 miles of forest buffers by the year 2010. The state has planted a total of 3,894 miles of forest buffers along waterways since 2002; and

o  Pennsylvania is home to the largest Conservation Resource Enhancement Program (CREP) in the entire nation. The CREP program delivers more than $50 million in state and federal assistance and targets key edge-of-stream BMPs to maximize water quality.

To meet the 2025 goal, our approach is based on three core elements.  Those elements are:  1) milestone implementation and tracking; 2) supporting the implementation of advanced technologies and nutrient trading; and 3) enhancing common sense compliance efforts.  These elements will provide the foundation for the development of Pennsylvania's Chesapeake Watershed Implementation Plan as required by the EPA.

To guide the development of the plan, The Department of Environmental Protection (DEP) engaged stakeholders in a process similar to that undertaken in 2006 to refine our Chesapeake Bay Tributary Strategy. A Watershed Implementation Plan Management Team was convened and supported by three workgroups focused on wastewater, agriculture and urban/suburban/rural topics.  Stakeholders include representatives from wastewater treatment facilities, agriculture, land development, municipal officials, environmental and conservation groups, and the legislature.  DEP will continue to work with these groups after publication by EPA of the Final Bay TMDL.

## Milestone Implementation and Tracking

The first key element of the strategy for reaching Pennsylvania's nutrient reduction goals involves the development of challenging, but attainable 2-year milestones. The milestones project the nutrient and sediment reductions that will occur over a two year period resulting from BMP implementation and facility upgrades. Progress in meeting the milestones is reported annually and measured by the Chesapeake Bay watershed model. These milestones will help focus program efforts and provide for short-term accountability for meeting Pennsylvania's goals. Simply put, these milestones are the means to measure incremental improvement and they provide a roadmap of changes needed to be made in this process.

- 3 -

AR0026400

The first milestone period is actually three years, 2009 through 2011. It was estimated that the management practices targeted for implementation during this period would reduce nitrogen loads to Chesapeake Bay by 7.3 million pounds per year and phosphorus loads by 300,000 pounds per year. In August 2010, DEP requested EPA to modify Pennsylvania's 2011 milestone due to an over-estimate of nutrient management implementation levels. Regardless of any change to the milestone, attainment of the reductions will require a collective effort of agriculture, land development, and wastewater treatment facilities. Pennsylvania will use these 2-year milestones through 2025 as part of the required Watershed Implementation Plan.

Again, some significant progress has already been made. As previously mentioned, as of 2009, Pennsylvania agriculture has generated about 41 percent of all the nitrogen reductions credited to agriculture for all of the states in the Chesapeake watershed. Similarly by 2011, 40 wastewater treatment facilities are scheduled to have completed nutrient reduction upgrades. Bottom line, Pennsylvania is making progress.

An important component of demonstrating to EPA that Pennsylvania is reaching the TMDL allocations will be accounting for all best management practices that are implemented within Pennsylvania's Chesapeake Bay watershed. Nearly all reported BMPs to date are associated primarily with a federal or state grant program.

Currently, information on BMP implementation is acquired from 13 state programs, four federal programs and one advocacy group (American Farmland Trust). There is no established mechanism for reporting privately funded BMPs. Privately funded BMPs could represent a potentially significant source of unaccounted practices, particularly for agriculture. What this means to Pennsylvania is that the Chesapeake Bay Model may only be reflecting a portion of what is happening on the ground.

At this time, DEP has funded BMP tracking pilot projects with Lancaster and Bradford County Conservations Districts to explore the possibility of doing county "sweeps" for BMP information. Methods to increase BMP tracking include: on-the-job farm visits; targeted farm visits; distributing questionnaires at agriculture events; phone surveys; and aerial surveys. It is anticipated that results of these pilot projects will be transferable to the other conservation districts in Pennsylvania.

The DEP and the State Conservation Commission are also working with the United States Department of Agriculture's National Agricultural Statistics Service (NASS) to better account for cover crops and no-tillage farming within Pennsylvania. Efforts are focused on adding additional questions to NASS' county estimates yearly questionnaire. NASS' statistical accuracy and creditability will add to the validity of the results.

DEP has developed a non-point source BMP repository to store all the non-point source BMP information that will be collected. This repository will include all information on agricultural and development BMPs not associated with wastewater treatment facilities. DEP is in the process of populating the repository with information from state programs. The repository has been structured so that individuals or environmental groups will be able to enter BMP information

AR0026401

which they privately implement apart from state or federal programs. The repository is connected to an internet node that will allow BMP implementation data to be electronically transferred to EPA. The EPA has indicated that it will only accept electronically transferred data starting with the 2010 data call in November.

To summarize, the Watershed Implementation Plan must fully account for what Pennsylvanians are achieving on the ground. DEP will work with our Pennsylvania partners to find solutions to track and report our activities beyond the federal and state cost share dollars.

## New Technology and Nutrient Trading

The second key element of the strategy for reaching Pennsylvania's nutrient reduction goals involves the implementation of new technologies. We are supporting efforts to implement both new technologies and established BMPs through the sale of environmental credits and the advancement of environmental markets.

DEP is working with the Pennsylvania Department of Agriculture and a number of companies looking to install various technologies such as manure treatment, methane digesters and electrical co-generation on dairy, poultry and hog operations. Many of these technologies can produce electricity and marketable soil amendments; reduce methane and ammonia emissions; and generate renewable energy, nutrient reduction and carbon credits that can then be sold. Projects of this nature can support three priorities in the Chesapeake Bay region: maintaining a vibrant farming economy; restoring and protecting the water quality of Pennsylvania streams and the Chesapeake Bay; and providing crucial economic development benefits to rural businesses and communities.

DEP is promoting the establishment of manure-to-energy projects that digest manure, produce electricity and substantially reduce nutrients reaching Pennsylvania waters and the Chesapeake Bay. While digesters alone will not substantially change the nutrient content of manure, Pennsylvania is looking more closely at versions with enhanced technology and supplemental systems (solids separation, flocculation, etc.) to help ensure overall nutrient reductions are acheived. Manure-to-energy projects are just the first of many promising technologies that advance broad based environmental benefits.

Regardless of the many benefits these advanced technologies can produce, there is one limiting factor for all - financing. Depending on the project, some estimates indicate that up to approximately $50 million in construction costs could be needed for a single facility, with operational expenses being paid mostly by the revenue generated from the sale of multiple environmental credits and other activities such as biosolids collection. The federal government must play a constructive role in advancing these new technologies and tools. DEP has recommended that a Technology Fund be created to support development of manure to energy technologies, septic system de-nitrification technologies, and other innovative technologies. The suggested amount for this fund is $100 million with 50% being provided by the Bay jurisdictions and 50% being provided by the federal government.

- 5 -

AR0026402

A fund of this magnitude could install potentially 4 to 8 projects each year with each project having the potential to remove close to 1 million pounds of nitrogen from the Chesapeake Bay. Pennsylvania believes that the federal government, Bay jurisdictions, and other key stakeholders must play a constructive role in advancing new technologies and tools.

While implementing manure-to-energy and other new technologies is a key element of Pennsylvania's WIP, DEP and EPA have come to recognize the nutrient reduction capability of these technologies is not adequately reflected in Chesapeake Bay watershed model results. It has cooperatively been agreed to that over the next twelve months, DEP will work with EPA to create a BMP efficiency that will better account for the potential reductions. DEP also agrees to verify the reductions with EPA over the two-year milestone periods to assure the anticipated reductions are occurring. If it is found that the technology projects are not providing the anticipated reductions, DEP agrees to work with EPA to assess where additional nonpoint source reductions may be generated.

Concurrently, DEP continues to work with Pennsylvania stakeholders to enhance the Nutrient Trading program. With the assistance of the DEP's partners, Pennsylvania has been able to build a model program that has generated interest across the country. DEP has been receiving calls from federal legislative and executive branch staff that are interested in using the Pennsylvania program as a model for a regional interstate trading program. A regional program would have the potential to further open the trading market, which would be of great interest to the Commonwealth

A key component for ensuring sustainability and transparency for the Nutrient Trading program has been the promulgation of regulations in 25 Pa. Code, Chapter 96, "Water Quality Standards Implementation." The Nutrient Trading Program regulations are found in Section 96.8, "Use of offsets and tradable credits from pollution reduction activities in the Chesapeake Bay Watershed." They were published in the *Pennsylvania Bulletin* and became effective on October 9, 2010. *See*, 40 Pa. B. 5790.

Pennsylvania's Nutrient Credit Trading Program is built upon the core elements described by EPA for a valid trading program as outlined by EPA in EPA's National Trading Policy in 2003. For example, credits can only be generated for nutrient reductions above and beyond those required for regulatory compliance. There are also caps on the total tradable credits generated by nonpoint sources at the excess level available in the watershed from best management practices (BMPs) beyond those needed to meet compliance goals.

To help facilitate the nutrient trading market, the Pennsylvania Infrastructure Investment Authority (PENNVEST) is implementing a component of Pennsylvania's Nutrient Trading program to encourage the trading of nutrient credits in the Susquehanna and Potomac watersheds. To reduce risks to market participants and to ensure a stable marketplace, PENNVEST will serve as a Clearinghouse for nutrient credit trading transactions. In this context, credit buyers and sellers will be contracting with PENNVEST rather than directly with each other.

- 6 -

AR0026403

There has been on-going participation in the program, with nine contracts having been signed. PENNVEST completed the first credit auctions on October 28 and 29 and November 4 and 5, 2010. As a result PENNVEST will enter into six contracts to purchase credits and two contracts to sell credits. While these are excellent examples of the effectiveness of the Nutrient Trading program, DEP is interested in continuing to promote its utilization and increase participation in the program.

## Compliance

DEP is developing a nonpoint source compliance effort focused on two major sectors: agriculture and stormwater. DEP is addressing agriculture first through development of an agricultural water quality initiative that is composed of four elements:

o  Expand outreach and technical assistance:  An objective of this initiative is to bring farmers into baseline regulatory compliance through the enhancement of efforts to better inform farmers of their regulatory obligations and the ramifications of noncompliance.

o  Continue Existing Regulatory Programs: This piece continues the identification, permitting and inspections of Concentrated Animal Feeding Operations (CAFOs) and the inspection of concentrated animal operations (CAOs) and the necessary follow-up to ensure compliance. In addition, the DEP and county conservations districts will continue to respond to complaints, spills and accidents, as appropriate.

o  Evaluate and modify regulatory or administrative tools as needed: DEP will continue to look for ways to fill agricultural compliance gaps if needed. Two key examples of this are the revisions to our Chapter 102 Erosion and Sedimentation Control regulations and revisions to the Manure Management Manual.  Another may be the development of an offsetting-trading program for stormwater under which agricultural operations may receive funding from other affected stakeholders to implement BMPs that would generate the nutrient reductions necessary to achieve overall compliance.

o  Targeted Watershed Approach to achieve agricultural compliance:  This component consists of identification of small manageable sized watersheds that are impaired by agriculture. The approach will utilize an individual farm assessment protocol to identify the current status of operations on that farm, as well as gaps in compliance with regulatory requirements and other water quality degrading conditions. DEP and other partners such as EPA, State Conservation Commission and County Conservation Districts will evaluate these assessments and implement the most appropriate course of action to achieve compliance in a timely manner. Financial assistance as well as compliance and technical assistance resources will be prioritized by DEP and partner agencies to achieve compliance.

An example of this effort has been conducted in the Watson Run watershed in Lancaster County. EPA has conducted the farm assessments and now the DEP, EPA, and the Lancaster County Conservation District are working to implement the next steps to achieve compliance.

- 7 -

AR0026404

As for stormwater, DEP is moving on several fronts to strengthen compliance. First, construction and post-construction stormwater management is being addressed in the recently adopted revisions to Chapter 102, erosion and sedimentation regulations. The DEP is also developing the next-generation general permit for Municipal Separate Storm Sewer System (MS4) communities. The permit will have enhanced BMP requirements for MS4 communities that discharge to impaired waters covered under a TMDL.

On the point source side of the equation, Pennsylvania's Chesapeake Bay Tributary Strategy, published in December 2004, called for the majority of reductions to be achieved by the implementation of nonpoint source BMPs. The strategy called for 86 percent of the nitrogen and 78 percent of the phosphorus reductions to be achieved through agricultural and urban BMPs. Point sources, such as municipal wastewater treatment plants and industrial facilities, generated 14 percent of the nitrogen load and 22 percent of the phosphorous load. The strategy assigned the point sources to be responsible for achieving reductions based on their contribution to the overall load going to the Chesapeake Bay.

To achieve targeted point source reductions to the Bay, DEP formed a Point Source Workgroup with the Pennsylvania Municipal Authorities Association as the co-chair. The workgroup proposed an allocation strategy to determine individual cap loads for the 183 largest point source sewage discharges in the Bay watershed.

DEP ultimately adopted this allocation and permitting strategy. The primary concept in the strategy was to create a level playing field for all of the municipalities. This was done by having Most facilities meet cap loads based on their design flow with a total nitrogen concentration of 6 milligrams per liter (mg/L) and total phosphorus concentration of 0.8 mg/L. There have been some concerns raised on Pennsylvania being forced to the limit of technology with our sewage treatment plants. We will stand behind the strategy we agreed to in the past. We think it is the most cost effective and reasonable approach.

A Compliance Plan for Industrial Waste Discharges to the Chesapeake Bay was developed in January, 2010 after DEP held three meetings with the 30 significant industrial dischargers from October 2007 through February 2008. The plan for these facilities was to keep them at their current load plus a 10 percent margin for future growth.

## Next steps

This WIP was developed with input from a variety of stakeholders. Over 125 individuals representing a broad range of organizations volunteered to participate on workgroups that provided on-going input throughout the development of the Phase 1 WIP. The hours of effort from these workgroup members demonstrate the commitment of Pennsylvanians to help protect and restore the Chesapeake Bay. The short timeframe allotted for development of the WIP did not allow for full analysis of all the comments provided by the workgroups, so it is the intent of DEP to continue to work with these groups, and all interested individuals, on further analysis of ideas and suggestions.

- 8 -

AR0026405

Following publication of the EPA Chesapeake Bay TMDL in December 2010, states are expected to develop their Phase 2 WIP which will further subdivide the loads by local area (county). This work cannot be initiated until EPA completes revisions to the Phase 5.3 Chesapeake Bay watershed model. EPA expects to complete this work by March 31, 2011. Upon completion of the Phase 5.3 model, DEP will re-convene the Chesapeake Watershed Implementation Plan Management Team and its workgroups to consider the Phase 2 WIP. EPA established a June 1, 2011 deadline for submission of the Draft Phase 2 WIP, and a November 1 deadline for the final plan. EPA expects the Phase 2 WIP to contain greater detail about the first stage of implementation, which would last from when EPA established the TMDL until 2017. The Chesapeake Bay Program's Principal Staff Committee has had discussions with EPA regarding an extension on the date for submission of the Phase 2 WIP. Clearly, two months is not sufficient time to develop a more detailed plan with a revised model and to seek public input during its development.

While DEP is engaging with the WIP Management Team on the Phase 2 WIP, it will prioritize milestone implementation. These activities will include funding a "Million Pound Project." DEP is interested in funding projects located within the Chesapeake Bay watershed that result in documented quantitative load reductions of nitrogen, phosphorus and sediment. The goal is to achieve 1 million pounds of reduction through funding sources such as the nonpoint source funding program operated by PENNVEST and the Growing Greener Grant Program operated by DEP.

DEP intends to utilize innovative approaches that demonstrate improvements in stormwater management and resulting water quality. These approaches include watershed permitting, integrated stormwater management planning and the development of trading/offsetting program that include stormwater components.

And finally, DEP will continue to implement its *Chesapeake Bay Point Source Compliance Plan.* The approximately 183 significant domestic wastewater facilities and 30 industrial facilities are expected to comply by 2016.

## Conclusion

The Pennsylvania's commitment and investments are paying off. With funding assistance from DEP, the Susquehanna River Basin Commission has been monitoring nutrient and sediment loads at sites within the Susquehanna River basin. Flow adjusted trend analysis of the data collected between 1985 and 2008 generally indicate significant decreases in nutrients and sediment at these sites. Here are two examples of this success story:

o Susquehanna River at Marietta: This station includes 95 percent of the Susquehanna River Basin. Nitrogen is down an average of 28 percent, phosphorous is down an average of 23 percent and sediment is down an average of 40 percent.

o Conestoga River: Nitrogen is down an average of 20 percent, phosphorus is down an average of 50 percent and sediment is down an average of 70 percent.

AR0026406

These results demonstrate the Commonwealth's commitment to restore Pennsylvania's waters and, consequently, the Chesapeake Bay.

Although EPA deadlines for the completion of the Chesapeake Bay TMDL and state Watershed Implementation Plans are aggressive, DEP is committed to engage with Pennsylvania stakeholders to develop a plan that equitably distributes the responsibility for meeting our cap load allocations. Ultimately, it is up to all of us to take those actions necessary to protect and restore Pennsylvania streams and rivers and the Chesapeake Bay.

- 10 -

AR0026407

# Section 3.
# Introduction

## EPA's Legal Framework for the Chesapeake Bay TMDL

The source for information in this Legal Framework section is drawn directly from the Draft Chesapeake Bay Total Maximum Daily Load, August 2010, U.S. Environmental Protection Agency and Draft Federal Register Public Notice. This section summarizes the statements by EPA regarding its legal authority.

EPA is establishing the Chesapeake Bay TMDL pursuant to a number of authorities, including the Clean Water Act (CWA), and Consent Decrees requiring EPA to address certain impaired Bay and tidal tributary waters in Virginia and the District of Columbia.

The establishment of the Chesapeake Bay TMDL will satisfy the requirements of the Virginia TMDL Consent Decree settling the lawsuit American Canoe Association, Inc. and the American Littoral Society v. EPA, Civil No. 98-979-A (E.D. Va). Portions of the Chesapeake Bay and its tidal tributaries were identified as impaired for aquatic life uses and exceedance of the numeric criteria for dissolved oxygen caused by nutrient and sediment pollutants on Virginia's 1998 section 303(d) list of impaired waters. Other Bay and tidal tributary segments impaired by nutrients and sediment have been identified on Maryland and the District of Columbia section 303(d) lists.

Under the Virginia TMDL Consent Decree, EPA is obligated to establish a TMDL for the Bay's waters identified on the 1998 Virginia list including those aquatic life use impairments caused by the nutrient and sediment pollutants by no later than May 1, 2011, if those waters are not previously removed from the list or if Virginia has not already developed a TMDL for those waters. EPA must establish a TMDL covering the listed Virginia Bay tidal waters by May 1, 2011 because the Virginia segments of the Chesapeake Bay and its tidal tributaries remain on Virginia's 2008 section 303(d) list. Virginia has requested that EPA establish the TMDL for those waters pursuant to the Virginia Consent Decree schedule.

In addition to the Virginia segments identified above, the Potomac River is listed on the District of Columbia's section 303(d) impaired waters list for low pH. The water quality standards exceedances for pH in the Potomac River are the result of algal impacts from excess nutrients. Establishment of a Potomac River pH TMDL is directly linked to the establishment of the Chesapeake Bay TMDL because of their common impairing pollutants (nutrients) and hydrologic connection. Like Virginia, EPA is under a consent decree obligation to establish a pH TMDL for the Potomac by May 1, 2011 if the District of Columbia does not develop that TMDL (Kingman Park Civic Association, et al. v. U.S. Environmental Protection Agency, et al., No. 1:98CV00758 (D.D.C.)). Like Virginia, the District of Columbia has asked EPA to establish the Potomac River pH TMDL.

Finally, Maryland has also requested that EPA develop TMDLs on the same schedule to address Maryland's Chesapeake Bay and tidal tributary waters identified on its current section 303(d) list as impaired for aquatic life uses caused by nutrient and sediment pollutants.

AR0026408

The President's Executive Order for the Chesapeake Bay established an accelerated schedule for EPA to complete the Chesapeake Bay TMDL by December 31, 2010. EPA collected public comments on the Draft TMDL between September 24 and November 8, 2010. EPA will establish the Final TMDL by December 31, 2010.

EPA is establishing a federal TMDL for segments of the Chesapeake Bay and its tidal tributaries and embayments that are impaired from the discharge of nutrients (nitrogen and phosphorus) and sediment and listed on the jurisdictions' respective CWA 2008 Section 303(d) list of impaired waters. The TMDL allocates loadings of nitrogen, phosphorus, and sediment to all jurisdictions in the Bay watershed (Delaware, the District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia). The Chesapeake Bay TMDL is the largest, most complex TMDL in the country, covering a 64,000 square mile area in the seven jurisdictions.

The scope of Chesapeake Bay TMDL includes nutrient and sediment loads delivered to the Chesapeake Bay from all sources throughout the watershed and atmospheric deposition of nitrogen to the watershed and tidal waters from air emission sources within and outside the watershed. The Chesapeake Bay TMDL addresses only the restoration of aquatic life uses for the Bay and its tributaries that are impaired from excess nutrients and sediment.

Several previously approved TMDLs have been established to protect local waters across the Chesapeake Bay watershed. While some were based on reducing nutrient and sediment, many were for other pollutants. In contrast, the Chesapeake Bay TMDL will be based on protecting the Bay and its tidal waters from excessive nitrogen, phosphorus, and sediment loading. For watersheds and waterbodies that have both local TMDLs and Chesapeake Bay TMDLs for nitrogen, phosphorus, and sediment, the more stringent of the TMDLs will apply. In some cases, the reductions required to meet local conditions shown in existing TMDLs may be more stringent than those needed to meet Bay requirements, and vice versa.

The pollutants of concern for this TMDL are nutrients—nitrogen and phosphorus—and sediment. Excessive nutrients in the Chesapeake Bay and its tidal tributaries promote a number of undesirable water quality conditions such as excessive algal growth, low dissolved oxygen, and reduced water clarity (Smith et al. 1992; Kemp et al. 2000). The effect of nutrient loads on water quality and living resources tends to vary considerably by season and region.

Sediments suspended in the water column reduce the amount of light available to support healthy and extensive SAV or underwater grass communities (Dennison et al. 1993; Kemp et al. 2004). The relative contribution of suspended sediment and algae that cause poor light conditions varies with location in the Bay tidal waters (Gallegos 2001).

## Sources of Nutrients and Sediment to the Chesapeake Bay

Nitrogen, phosphorus, and sediment loads originate from many sources in the Bay watershed. Point sources of nutrient and sediment include municipal wastewater facilities, industrial discharge facilities, combined sewer overflows (CSOs), sanitary sewer overflows (SSOs), NPDES permitted stormwater (municipal separate storm sewer system [MS4] and construction

- 12 -

AR0026409

and industrial sites), and concentrated animal feeding operations (CAFOs). Nonpoint sources include agricultural lands (animal feeding operations [AFOs], cropland, hay land, and pasture), atmospheric deposition, forest lands, on-site treatment systems, stormwater runoff, streambanks and tidal shorelines, tidal resuspension, the ocean, wildlife, and natural background. Unless otherwise specified, the loading estimates presented in this section are based on results of the Phase 5.3 Chesapeake Bay Watershed Model (P5.3). Estimates of existing loading conditions are based on the 2009 Progress scenario of the P5.3 (P5.3 2009 Progress).

- 13 -

AR0026410

**Jurisdiction Loading Contributions**

Analysis of monitoring data and computer modeling results shows that Pennsylvania provides the largest proportion of nitrogen loads delivered to the Bay and is second to Virginia in the proportion of phosphorous and sediment delivered to the Bay. The table below lists the proportions of nitrogen, phosphorous and sediment delivered by the Jurisdictions to Chesapeake Bay.

**Comparison of 2009 Nutrient and Sediment Loads by Jurisdiction**
**Source: EPA Phase 5.3 Watershed Model**

| State | Nitrogen (lbs/yr) | Percent |
|---|---|---|
| Pennsylvania | 106,413,000 | 44% |
| Virginia | 65,303,000 | 27% |
| Maryland | 49,421,000 | 20% |
| New York | 10,541,000 | 4% |
| West Virginia | 5,774,000 | 2% |
| Delaware | 4,180,000 | 2% |
| District of Columbia | 2,853,000 | 1% |
| Totals | 244,485,000 | |

| State | Phosphorous (lbs/yr) | Percent |
|---|---|---|
| Virginia | 7,168,000 | 44% |
| Pennsylvania | 3,965,000 | 24% |
| Maryland | 3,304,000 | 20% |
| West Virginia | 833,000 | 5% |
| New York | 801,000 | 5% |
| Delaware | 316,000 | 2% |
| District of Columbia | 86,400 | 1% |
| Totals | 16,473,400 | |

| State | Sediment (tons/yr) | Percent |
|---|---|---|
| Virginia | 1,616,000 | 40% |
| Pennsylvania | 1,283,000 | 32% |
| Maryland | 693,000 | 17% |
| West Virginia | 188,000 | 5% |
| New York | 164,000 | 4% |
| Delaware | 32,300 | 1% |
| District of Columbia | 15,900 | 0% |
| Totals | 3,992,200 | |

- 14 -

AR0026411

### Sources of Pennsylvania's Nutrient and Sediment Loads to Chesapeake Bay

According to water quality data and supported by computer analysis, agriculture is considered the leading source of nitrogen, phosphorous and sediment loadings to Chesapeake Bay. The second leading source of nitrogen loads is forest land. Pennsylvania is fortunate in that about 60 percent of the Chesapeake Bay watershed in the Commonwealth remains forested. This accounts for the quantity of nutrient and sediment attributed to forests. After forest lands, the remaining sources, in order of estimated nutrient and sediment loads, are point sources, urban/developed land and septic systems. The estimated nutrient and sediments loads for each sector are summarized on the table below.

**Pennsylvania 2009 Nutrient and Sediment Loads Delivered to Chesapeake Bay**
**Source: EPA Phase 5.3 Watershed Model**

| Sector | Nitrogen (lbs/yr) | Phosphorous (lbs/yr) | Sediment (tons/yr) |
|---|---|---|---|
| Agriculture | 59,864,000 | 1,755,000 | 895,000 |
| Forest | 22,684,000 | 617,000 | 249,000 |
| Point Source | 12,792,000 | 1,174,000 | 8,300 |
| Urban/Developed | 6,704,000 | 378,000 | 131,000 |
| Septic | 3,290,000 | 0 | 0 |
| Air Deposition to Water | 1,079,000 | 41,000 | 0 |
| Totals | 106,413,000 | 3,965,000 | 1,283,300 |

Under the TMDL requirements, watersheds that discharge nutrients and sediment to any one or more of the 92 Chesapeake Bay segments that are listed as impaired will be required to reduce the loads discharged to the Bay. In Pennsylvania there are five watersheds that fall under this requirement. These include Pennsylvania's portion of the Susquehanna River and of the Potomac River, Elk Creek and Northeast Creek in southern Chester County which drain to the Eastern Shore of Chesapeake Bay, and the headwaters of the Gunpowder River in York County which drains to the Western Shore of Chesapeake Bay. The Susquehanna River accounts for 92 percent and the Potomac for 7 percent of Pennsylvania's Bay drainage area. Elk Creek, Northeast Creek the Gunpowder River account for the remaining 1 percent of the watershed.

AR0026412

The table below lists the estimated nitrogen, phosphorous and sediment loads discharged to the Bay by each of these watersheds.

**Pennsylvania's Estimated 2009 Delivered Nutrient and Sediment Loads by Watershed**
**Source:  EPA Phase 5.3 Watershed Model**

| | Nitrogen (lbs/year) | Phosphorus (lbs/year) | Sediment (tons/year) |
|---|---|---|---|
| **Susquehanna River Basin** | | | |
| Agriculture | 55,123,000 | 1,390,000 | 762,000 |
| Forest | 21,639,000 | 544,000 | 224,000 |
| Point Source | 12,559,000 | 1,099,000 | 8,000 |
| Urban/Developed | 6,365,000 | 334,000 | 119,000 |
| Septic | 3,076,000 | 0 | 0 |
| Air Deposition to Water | 1,071,000 | 39,900 | 0 |
| Totals | 99,833,000 | 3,406,900 | 1,113,000 |
| **Potomac River Basin** | | | |
| Agriculture | 4,442,000 | 353,000 | 119,000 |
| Forest | 994,000 | 71,500 | 23,700 |
| Urban/Developed | 300,000 | 41,600 | 10,400 |
| Point Source | 205,000 | 70,100 | 180 |
| Septic | 163,000 | 0 | 0 |
| Air Deposition to Water | 7,600 | 860 | 0 |
| Totals | 6,111,600 | 537,060 | 153,280 |
| **Eastern Shore of Chesapeake Bay** | | | |
| Agriculture | 274,000 | 11,500 | 14,000 |
| Septic | 49,300 | 0 | 0 |
| Forest | 49,200 | 1,250 | 680 |
| Urban/Developed | 36,700 | 1,820 | 1,150 |
| Point Source | 28,700 | 4,960 | 30 |
| Air Deposition to Water | 200 | 10 | 0 |
| Totals | 438,100 | 19,540 | 15,860 |
| **Western Shore of Chesapeake Bay** | | | |
| Agriculture | 24,800 | 910 | 340 |
| Urban/Developed | 1,900 | 90 | 11 |
| Forest | 1,810 | 60 | 10 |
| Septic | 1,350 | 0 | 0 |
| Air Deposition to Water | 12 | 1 | 0 |
| Point Source | 0 | 0 | 0 |
| Totals | 29,872 | 1,061 | 361 |
| | | | |
| Grand Total (rounded) | 106,413,000 | 3,965,000 | 1,283,300 |

- 16 -

AR0026413

**Watershed Implementation Plans**

A major element of EPA's plan to demonstrate reasonable assurance for this TMDL is the development of Watershed Implementation Plans (WIPs) by each of the Bay jurisdictions. The WIPs are part of the accountability framework, which is the method of implementing the TMDL but is not part of the Chesapeake Bay TMDL itself. In essence, the WIPs represent the roadmap for how the jurisdictions, in partnership with federal and local governments, plan to achieve and maintain the Chesapeake Bay TMDL nitrogen, phosphorus, and sediment allocations.

WIPs are expected to identify a schedule for accomplishing reductions in nutrient and sediment loads needed to attain Water Quality Standards (WQS) and will be developed over three Phases. Draft Phase 1 WIPs were developed and submitted to EPA on September 1, 2010 to support the Draft TMDL. The jurisdictions submitted their Final Phase 1 WIPs to EPA by November 29, 2010 for consideration in the Final TMDL. The jurisdictions, after working with local partners, are to submit their Phase 2 WIPs in draft and final form to EPA by June 1 and November 1, 2011, respectively. This work cannot be initiated until EPA completes revisions to the Phase 5.3 Chesapeake Bay watershed model. EPA expects to complete this work by March 31, 2011. The Chesapeake Bay Program's Principal Staff Committee has had discussions with EPA regarding an extension on the date for submission of the Phase 2 WIP. Clearly, two months is not sufficient time to develop a more detailed plan with a revised model and to seek public input during its development.

Finally, the jurisdictions, after working with local partners, are to submit their Phase 3 WIPs to EPA by 2017 describing refined actions and controls to be implemented between 2018 and 2025 to achieve WQS. With each successive WIP, the detail at which allocations are made is to become increasingly specific, as described in the following table.

**Comparison of elements within the Chesapeake Bay TMDL and Phase 1, 2, and 3 Watershed Implementation Plans**

|  | Bay TMDL | Phase 1 WIP | Phase 2 WIP | Phase 3 WIP |
|---|---|---|---|---|
| Individual or Aggregate WLAs and LA to Tidal States | X |  |  |  |
| Gross WLAs and LAs for Non-tidal if those states submit WIPs that meet EPA expectations | X |  |  |  |
| Loads for individual significant point sources, or where appropriate, aggregate point sources |  | X | X | X |
| Loads for nonpoint source sectors |  | X | X | X |
| Proposed actions and, to the extent possible, specific controls to achieve point source and nonpoint source targets |  | X | X | X |
| Point source and nonpoint source loads by local area |  | X | X | X |
| Specific controls and practices to be implemented by 2017 |  |  | X |  |

AR0026414

## Section 4.
# Development of Phase 1 Watershed Implementation Plan and Public Participation

DEP made it a priority to effectively involve the public in the development of the Phase I Watershed Implementation Plan (WIP). As defined in DEP's policy on public participation, the public includes citizens, interest groups, local governments, business, industry associations, and any individual or group who may be affected by a proposed project or activity and shows an interest in participating. Involving the public provides increased opportunities for more informed decision making, particularly related to processes and documents within the broad scope addressed in the Pennsylvania WIP.

To effectively engage the public during the development of the WIP, DEP utilized various means to encourage and allow input and comments, including:

o Participated in meetings of local government, associations, and other organizations;
o Facilitated discussions at meetings of DEP's standing advisory committees;
o Participated in EPA's public meetings on the TMDL; and
o Posted draft documents and summaries to DEP's website during WIP development.

To further allow for detailed discussions of the policy and technical issues addressed in the WIP, a structure was established that mirrored the approach taken for DEP's most recent Chesapeake Bay Tributary Strategy. Discussions were held with DEP's Chesapeake Bay Advisory Committee (CBAC), along with a Management Team and three workgroups, all of which are further described in the following sections.

A public comment period for the draft WIP was published in the *PA Bulletin* (Volume 40, page 5387), extending from September 24 to November 8, 2010. DEP received comments from close to 300 commentators which were considered as the WIP was finalized.

The remainder of this section provides additional details on the involvement of the public in the development of the WIP.

## Chesapeake Watershed Implementation Plan Management Team

To help obtain input on the extensive number of issues and technical matters that needed to be addressed in the WIP, DEP employed a structure created in response to a suggestion made at a March 31, 2010 public meeting. The structure was similar to a process utilized to review DEP's most recent Chesapeake Bay Tributary Strategy.

A Management Team was formed, and was composed primarily of organizations from the CBAC. Members included representatives of agriculture, wastewater, development, municipalities, business and environmental organizations. The Management Team worked through the products of the various workgroups and focused on analyzing the WIP for the benefit of the Commonwealth and the represented sector or organization. Three workgroups were also

- 19 -

AR0026416

formed in order to consider topics in more detail: Wastewater; Urban/Suburban/Rural; and Agriculture. Each of these workgroups focused on issues pertinent to that sector, identified areas of concern and offered solutions to advance the WIP. The workgroups were also vital in reviewing the content of the WIP as it was drafted.

Membership on the workgroups was open to any interested group or individual. Meetings were open to the public, and dates were published on DEP's website at http://www.portal.state.pa.us/portal/server.pt/community/chesapeake_bay_program/10513.

## Chesapeake Bay Advisory Committee (CBAC)

The primary purpose of the CBAC is to provide guidance to DEP regarding Pennsylvania's work on its Chesapeake Bay goals. CBAC was initially created by the Secretary, Department of Environmental Resources (now Department of Environmental Protection), acting as the Chairman of the State Conservation Commission (the Commission). The Advisory Committee was reorganized in 1996 as a result of the restructuring of DEP and the Commission. The Advisory Committee was again reorganized in 2001.

CBAC is composed of individuals representing the State Conservation Commission, local governments, environmental organizations, county conservation districts, state and federal agencies, educational institutions, agricultural organizations, businesses, watershed organizations and other groups as deemed appropriate by the Secretary. Advisory Committee membership is not limited to a specific number, but is determined through discussions with CBAC and formalized through approval by DEP.

CBAC met on May 3, 2010, where the Management Team and workgroup structure were discussed in detail. CBAC also meet on October 4, 2010 where an update was provided on the draft WIP and the comments that EPA provided were discussed.

CBAC meeting materials are available on the DEP's website at http://www.dep.state.pa.us/dep/subject/advcoun/chesbay/chesbay.htm .

## Presentations to Interest Groups

As resources allowed and in response to invitations, DEP made presentations at meetings of interest groups, local governments, business, industry associations and other groups. Through these meetings, DEP discussed the approach to WIP development, answered questions pertaining to the drafting and implementation of the WIP, and listened to comments and suggestions.

## EPA Webinars and Public Meetings

EPA is the lead agency responsible for the Chesapeake Bay TMDL. EPA employed several approaches to publicize the TMDL and obtain public input. Throughout the process, EPA publicized information pertaining to the TMDL and public input on the Chesapeake Bay TMDL website (http://www.epa.gov/chesapeakebaytmdl/).

- 20 -

AR0026417

**EPA Webinars**

As the Chesapeake Bay Total Maximum Daily Load was developed in 2010, EPA hosted a series of monthly webinars to provide updates on this "pollution diet" for the watershed.

The webinar series was a key feature of a concentrated outreach effort to provide transparency and collaboration in the establishment of EPA's largest and most complex TMDL to date. The webinars were designed to help demystify the process and allow interaction between officials designing the TMDL and the general public, particularly interested stakeholders.

Each of the webinars featured a non-EPA special guest and a lengthy question and answer session.

**EPA Public Meetings**

A team of EPA Region 3 employees conducted an intense, seven-week outreach campaign in the fall of 2009 to exchange information on the Chesapeake Bay TMDL. A number of the public meetings were also broadcast to a live online audience. EPA estimates that 3,000 people were part of the outreach effort Chesapeake Bay-wide, which was further covered by print, radio and television media.

In Pennsylvania, EPA held four meetings that were well attended. The meeting dates were:
o November 17, 2009: Ashley, PA (Wilkes-Barre area)
o November 18, 2009: Williamsport, PA
o November 19, 2009: State College, PA
o November 23, 2009: Lancaster, PA

In addition, EPA held four public meetings in Pennsylvania during the TMDL public review period. These meetings were also well attended. The meeting dates were:
o October 18, 2010: Lancaster, PA
o October 19, 2010: State College, PA
o October 20, 2010: Williamsport, PA
o October 21, 2010: Ashley, PA (Wilkes- Barre area)

Presentations and meeting materials are available at:
http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/CalendarOfEvents_2009.html?tab1=1&tab3=2 .

- 21 -

AR0026418

## *Section 5.*
## Nutrient and Sediment Load Targets

### Nutrient and Sediment Load Targets

This section describes the process for developing target loads in Pennsylvania's Chesapeake Watershed by source sector and basin.

Based on computer analysis, EPA has determined that Pennsylvania must collectively reduce total nitrogen loads to 76.77 million pounds per year, total phosphorous loads to 2.74 million pounds per year and total sediment loads by at least 2,093 million pounds per year in order to have Chesapeake Bay waters conform to water quality standards established for the Chesapeake Bay by Maryland.

Pennsylvania is committed to to developing a Chesapeake Watershed Implementation Plan (WIP) that will meet the nutrient and sediment cap loads established for Pennsylvania. Pennsylvania does not, however, agree with the approach outlined in EPA's Draft Chesapeake Bay TMDL. In comments submitted to EPA on November 8, 2010, Pennsylvania objected to the imposition of "federal backstop measures" in the Draft Bay TMDL, including the establishment of individual wasteload allocations (WLAs) for all significant point sources, aggregate WLAs for other entities regulated by the NPDES, and aggregate load allocations (LAs) for nonpoint source sectors. If EPA is asserting that it has the legal authority to promulgate WLAs and LAs in the non-tidal states, it should establish gross WLAs and gross LAs for each major basin in the non-tidal states in the Bay TMDL, consistent with language in EPA Region III's correspondence dated November 4, 2009:

> "At a minimum, EPA Region III intends to establish gross WLAs and gross LAs for each major basin in the non-tidal states in the Bay TMDL. These gross allocations would be based upon the point and nonpoint controls identified in the respective state tributary strategy. EPA recognizes that tributary strategies prepared by our partner states should provide the needed transparency on the planned controls by the state to achieve their aggregate allocated loading. It will be necessary for each non-tidal state to provide ... a detailed draft tributary strategy containing information on allocations to a level of detail similar to the tidal states. The Bay models will be utilized to confirm that the allocation of loadings is sufficient to attain water quality standards."

As a non-tidal state, it is Pennsylvania's position that individual or aggregate WLAs and LAs should not be required for individual point sources or sectors in the Bay TMDL. DEP has revised the terminology for sub-basin loads in WIP Table B2, and TMDL Appendix Q should be revised accordingly for the non-tidal states. It is DEP's position that the following terminology is appropriate for the non-tidal states:

A. Replace the WLA terminology with WTL for Waste Target Load (representing point source target load) and replace the LA terminology with NTL for Nonpoint source Target Load (representing non-point source target load).

- 22 -

AR0026419

- Individual WTL are appropriate for the following sectors: Significant POTW's; Significant Industrial
- Aggregate WTL are appropriate for the following sectors: CAFO, Insignificant Wastewater, MS4, Industrial Stormwater, Construction Stormwater, NPDES Resource Extraction
- Aggregate NTL are appropriate for the following sectors: Non-CAFO Agriculture; Onsite septic; Non-MS4 Urban/Suburb Runoff, Forest, Non-NPDES Resource Extraction

B.  For each major basin, include a row in Table B2 that adds all of the WTL's into an aggregate WLA and adds all of the NTL into an aggregate LA for placement into the TMDL.

DEP anticipates that the Final Bay TMDL will include aggregate nutrient and sediment wasteload and load allocations for each of Pennsylvania's major basins that discharge to impaired waters of Chesapeake Bay. These include the Susquehanna, Potomac and Gunpowder Rivers and the Northeast and Elk Creeks. On July 1, 2010, EPA issued nitrogen and phosphorous draft allocations to the states. On, August 13, 2010, EPA issued sediment draft allocation to the states. These draft allocations defined the Gunpowder River as the Western Shore watershed and the North East and Elk and Creeks as the Eastern Shore watershed. Consequently, Pennsylvania's major basins in the Chesapeake Bay TMDL are identified as the Susquehanna, Potomac, Eastern Shore and Western Shore, also referred to as Chesapeake TMDL watersheds in this section. The draft allocations and a comparison to 2009 Progress numbers from EPA Phase 5.3 watershed model are listed in the below table. It should be noted that figures in subsequent tables may slightly differ due to rounding.

### Comparison of 2009 Loads to Draft Allocations

Total Nitrogen - Million pounds per year

| Watershed | 2009 Progress | Draft Allocation | Remaining Reductions |
|---|---|---|---|
| Susquehanna | 99.83 | 71.74 | 28.09 |
| Potomac | 6.11 | 4.72 | 1.39 |
| Eastern Shore | 0.438 | 0.28 | 0.158 |
| Western Shore | 0.03 | 0.02 | 0.01 |
| Totals | 106.408 | 76.76 | 29.648 |

Total Phosphorous - Million pounds per year

| Watershed | 2009 Progress | Draft Allocation | Remaining Reductions |
|---|---|---|---|
| Susquehanna | 3.41 | 2.31 | 1.1 |
| Potomac | 0.537 | 0.42 | 0.117 |
| Eastern Shore | 0.0195 | 0.01 | 0.0095 |
| Western Shore | 0.00106 | 0.001 | 0.00006 |
| Totals | 3.96756 | 2.741 | 1.22656 |

- 23 -

AR0026420

Total Sediment - Million pounds per year

| Watershed | 2009 Progress | Draft Allocation | Remaining Reductions |
|---|---|---|---|
| Susquehanna | 2,226 | 1,826 | 400 |
| Potomac | 307 | 243 | 64 |
| Eastern Shore | 31.62 | 23 | 8.62 |
| Western Shore | 0.727 | 0.41 | 0.31700 |
| Totals | 2,565.347 | 2,092.41 | 472.937 |

EPA Region III's November 4, 2009 guidance for WIP development directed the states to sub-divide the watershed draft allocations to the major load generating sectors within each watershed. The major load sectors in Pennsylvania are agriculture, forest, wastewater treatment facilities, urban/developed, septic systems, resource extraction and air deposition to open water.

The draft allocations were split-out to the major sectors using the projected 2009 sector loads estimated by EPA using the Phase 5.3 watershed model. The first step was to assign the existing NPDES permit cap loads to the wastewater facilities, also known as point sources. These allocations were developed for the 2006 Pennsylvania Chesapeake Bay Point Source Compliance Plan. The point source allocations were based on the percentage of the nutrient loads attributable to the point sources at the time the 2005 Chesapeake Bay Tributary Strategy was developed. These allocations were the basis for the individual cap loads that were assigned in the NPDES permits issued to each significant discharge facility in the Bay watershed. Retaining these point source cap loads maintains continuity with the permits and the implementation plans submitted to DEP to attain the required point source allocations.

In Pennsylvania's Draft WIP, after accounting for the point source loads, the allocations for the other major sectors were based on the remaining percentage of the 2009 projected loads contributed by each sector, and applying that same percentage to the reductions necessary to meet Pennsylvania's draft allocations for nutrient and sediment. This methodology was based on input received from DEP's Chesapeake WIP Management Team, which included representatives of the major load sectors. The rationale behind this approach was that each sector should only be responsible for the percentage of reductions which equate to the percentage of their contribution of loads. The Draft WIP Table B2 was constructed based on this premise. (The methodologies used to develop the 2009 sectors loads are described later in this sections.)

Pennsylvania's Final WIP takes an alternative approach to sub-dividing major sector loads, with the exception being the point sources addressed in the 2006 Point Source Compliance Plan. The 2006 Point Source Compliance Plan remains in effect. The approach for other major sectors was revised in response to EPA comments that Pennsylvania must "correct discrepancies between PA's Table B2 and the WIP (watershed model) input deck." A result of EPA's finding was the imposition of the "high-level federal backstop Draft TMDL."

In an effort to address EPA's comments and urge EPA to remove the federal backstop Draft TMDL, DEP worked with stakeholders to strengthen its watershed model input deck and to

- 24 -

AR0026421

revise Table B2 to be reflective of the input deck. DEP also factored in concerns that EPA expressed regarding reasonable assurance and BMPs in the watershed model input deck. Sector target loads are no longer based on their percentage of contributing loads. Instead, sector target loads are based on Pennsylvania's Final WIP watershed model input deck, which reflects implementation of the most cost-effective BMPs and new technologies currently accepted by EPA's Phase 5.3 Watershed Model.

Air deposition presented a challenge. As stated in EPA's Draft TMDL, approximately 25 to 28 percent of nitrogen delivered to the Bay is due to nitrogen deposition. Although Pennsylvania has some ability to address air deposition, the ability to address nitrogen in sectors like forest and air deposition to water is very limited.

Intensive stakeholder involvement was engaged to determine the maximum level of BMP implementation that could be reasonably expected for the various major sectors under current regulations and existing or projected funding levels and EPA input. The Final WIP watershed model input deck reflected the input of numerous workgroup meetings. The Waste Target Loads (WTL) and Nonpoint source Target Loads (NTL) included in the revised Table B2 were developed directly from that watershed model input deck.

Tables listing the Year 2009 major sector loads and the Year 2017 and 2025 Waste Target Loads (WTL) and Nonpoint source Target Loads (NTL) are below. EPA should use these target loads as a basis for establishing the WLAs and LAs for Pennsylvania's major basins in the Final Chesapeake Bay TMDL Appendix Q.

NOTE: Below Tables will be completed after DEP develops its Final WIP watershed model input deck. A revised input deck was submitted to EPA on November 29.

**Pennsylvania Chesapeake Watershed**
**2009 Sector Load and Projected 2017 & 2015**
**Waste Target Load (WTL) and Nonpoint source Target Load (NTL)**
**Total Nitrogen Delivered (lbs/year)**

| Sector | 2009 | Percent of Total Load | 2017 Total Target Load | 2017 WTL | 2017 NTL | 2025 Total Target Load | 2025 WTL | 2025 NTL | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| Sector | | | | | | | | | |
| Agriculture | | | | | | | | | |
| CAFOs | | | | | | | | | |
| Forest | | | | | | | | | |
| Point Source | | | | | | | | | |
| Septic | | | | | | | | | |
| Urban | | | | | | | | | |
| MS4 Permits | | | | | | | | | |
| Construction | | | | | | | | | |

- 25 -

AR0026422

Pennsylvania has 353 CAFOs under permit, 317 of these in the Chesapeake Bay watershed. Currently all CAFOs are carrying out the updates for meeting the revised 2005 CAFO and 2006 Nutrient Management Program regulations revisions. These updates include increased management and monitoring of exported manure and phosphorous levels, increasing implementation of streamside buffers or manure application setbacks, and extension of CAFO requirements to a large portion of the state's poultry operations.

Coordination work with supporting agencies and other stakeholders was finished in 2007 for the document titled *Implementation Guidance for NPDES CAFO Permits*. This document along with other guidance is available on the DEP website at: http://www.portal.state.pa.us/portal/server.pt?open=514&objID=554279&mode=2 DEP continues its ongoing program outreach efforts for agency, private and farmer participants.

CAFOs have a setback requirement from surface waters, stockpiling restrictions, Pollution Prevention Control (PPC) Plan requirements and significant recordkeeping and reporting requirements. CAFOs with greater than 1000 AEUs must obtain a state Water Quality Management Permit for new or expanded manure storage facilities. DEP inspects these facilities once each year.

Pennsylvania considers CAFOs as "zero discharge" facilities. This will be simulated in the Chesapeake Bay model as 100 percent implementation of all relevant BMPs.

**Wastewater Facilities**

The major focus of Pennsylvania's wastewater point source nutrient control program in the Chesapeake Bay watershed is the regulation of 183 significant domestic wastewater facilities and 30 industrial facilities through nutrient load limits in NPDES permits. For Pennsylvania's Chesapeake Bay Program, a significant point source is defined as a domestic wastewater treatment plant with a design flow of 0.4 million gallons per day (mgd) or greater or an industrial discharge with greater than either 75 lbs/day of Total Nitrogen (TN) or 25 lbs/day Total Phosphorus (TP). Collectively, these significant sources account for approximately 95 percent of the total point source nutrient load. Most of the reduction for the point source sector is expected to be achieved by these significant facilities nutrient reduction efforts. Those point sources not meeting the definition of a "significant" source constitute less than 0.55 percent of Pennsylvania's overall nutrient load.

<u>Program Elements</u>

The program is implemented through a point source strategy that establishes annual TN and TP load limits for the wastewater dischargers. Specific permitted loads for each of the significant dischargers are based on achieving 6 milligrams per liter (mg/l) TN at design flow. Annual load limits for TP are based upon achieving a 0.8 mg/l discharge concentration at design flow, except for any facilities causing in-stream, near-field impacts from their TP discharges. These few dischargers will require a specific locally-driven refinement of the annual TP load limit and a concentration limit. As noted again later in this document, a few facilities already accepted NPDES permit renewals based on achieving 8.0 mg/l TN and 1.0 mg/l TP at 2010 projected

- 46 -

AR0026443

flows, voluntarily, and they will not be required to achieve lower cap loads based on the alternate approach.

Approximately thirty (30) significant industrial waste (IW) facilities were allocated loads based upon their current loadings with an additional margin for growth.

The point source discharge TN and TP cap loads will be enforced through individual or watershed-based NPDES permits. Any increase in the discharge volume will necessarily result in a commensurate reduction in the nutrient concentration in order to stay below the annual load allocation.

Point sources that can reliably and consistently treat to below their permitted cap loads, would be eligible to submit the reductions to the Commonwealth's Nutrient Trading Program to be reviewed for certification of nutrient reduction credits. Those facilities unable to achieve and maintain their established cap loads may opt to purchase available nutrient credits. These types of trading activities would be administered through the trading program, which is further described in other portions of this document.

Beyond the cap loads established for existing significant point source dischargers, similar cap loads will be established for new systems and existing small systems when flows are projected to grow above 0.4 mgd. These new significant sources will be required to offset their nutrient loads through nutrient reduction treatment technology, the purchase of nutrient credits, or documented septic system retirement offsets. Point sources with flows below 0.4 mgd will, if needed, also receive an annual nutrient load cap. These will be based upon design flow and existing performance or 7306 lbs/yr of TN and 974 lbs/yr of TP, whichever is less.

Specific Program Elements

All significant and some non significant point source dischargers in the Chesapeake Bay watershed will have nutrient monitoring and reporting requirements incorporated into their NPDES permits.
Further, the sewage facilities planning program will be strengthened to document the septic system relief offset that must be captured and tracked. This creates a TN reduction opportunity for those point sources that relieve these systems. Revisions to the Pennsylvania Sewage Facilities Plan Update regulatory requirements are also under consideration.

**Resource Extraction**

The resource extraction activities subject to NPDES permitting in the Bay watershed include coal mining, noncoal mining and the earth disturbance related to abandoned mine reclamation activities. Oil and Gas development activities are not subject to NPDES permitting.

Coal Mining

Coal mining permits are typically accompanied by an NPDES permit. Most coal mining permit areas include erosion and sedimentation controls that are permitted stormwater outfalls under an

- 47 -

AR0026444

## *Section 7.*
## WASTEWATER

### Current Programs and Capacity

Pennsylvania's 2006 *Chesapeake Bay Point Source Compliance Strategy* for permitting wastewater treatment facilities in the Chesapeake Bay Watershed is described below. Pennsylvania has already accounted for reductions in nutrient loads from its non-significant facilities through reductions from its significant facilities. The non-significant facilities are capped at their existing loads, and any future increase in load proposed must be completely offset by reductions at the plant or elsewhere in the watershed.   The current estimated load (Table B-2 of the September 1 draft WIP) from non-significant sewage facilities is: TN = 2,198,406 lbs = 2,532,726 lbs x 0.868 adr (average delivery ratio) and TP = 185,967 lbs = 400,790 lbs x 0.464 adr.  The current estimated load from non-significant industrial facilities is: TN = 690,664 lbs = 795,696 lbs x 0.868 adr and TP = 225,105 lbs = 485,141 lbs x 0.464 adr.  An allocation for these amounts should be secured in the TMDL for those categories.  Any proposed expansion by these non-significant facilities will result in a cap load being placed in their permit maintaining their existing load.  This will ensure that the non-significant categories will not exceed their allocation.

### I.    Sewage Discharges

Permitting for existing significant sewage discharges is being implemented by revoking and reissuing permits using a phased approach, initially imposing TN and TP cap loads for significant sewage dischargers. The phased approach did not prevent any facilities from opting for an earlier implementation schedule if they so chose, and provided flexibility where appropriate.  The implementation schedule is as follows:

A. Phase 1 – significant point source sewage dischargers (design annual average daily flow on August 29, 2005 greater than or equal to 0.4 mgd):  cap loads were placed in permits with effective dates for some facilities beginning October 1, 2010.  Draft permits were issued as quickly as possible.  Dischargers were notified of their proposed cap loads based on concentrations of 6.0 mg/l TN and 0.8 mg/l TP at design annual average daily flow. For the facilities in this phase:

- 28 facilities have effluent limits based on the phased approach reflected in permits starting October 2010.
- 44 will have effluent limits based on the phased approach reflected in permits starting October 2011.
- All 63 will have effluent limits based on the phased approach reflected in permits starting October 2015.

B. Phase 2 –  significant point source sewage dischargers (design annual average daily flow on August 29, 2005 greater than or equal to 0.4 mgd):  cap loads were placed in permits and most will become effective on October 1, 2012, and final permits with cap loads were mostly

- 54 -

AR0026451

issued by January 31, 2010. Dischargers were allocated a cap load based on concentrations of 6.0 mg/l TN and 0.8 mg/l TP at design annual average daily flow. For the facilities in this phase:

- 10 facilities have effluent limits based on the phased approach reflected in permits starting October 2010.
- 29 will have effluent limits based on the phased approach reflected in permits starting October 2012.
- All 47 will have effluent limits based on the phased approach reflected in permits starting October 2015.

C. Phase 3 – significant point source sewage dischargers (design annual average daily flow on August 29, 2005 greater than or equal to 0.4 mgd): cap loads were placed in permits to become effective on October 1, 2013, and final permits with cap loads are planned to be issued no later than December 31, 2010. Dischargers will be allocated a cap load based on concentrations of 6.0 mg/l TN and 0.8 mg/l TP at design annual average daily flow. For facilities within this phase:

- 4 facilities have effluent limits based on the phased approach reflected in permits starting October 2010.
- 4 should have effluent limits based on the phased approach reflected in permits starting October 2013.
- All 73 should have effluent limits based on the phased approach reflected in permits starting October 2016.

D. Phase 4 – non-significant point source sewage dischargers (design annual average daily flow on August 29, 2005 greater than or equal to 0.2 mgd but less than 0.4 mgd):

1. These facilities will begin monitoring and reporting for TN and TP. These monitoring requirements will be placed in NPDES permits as they come up for renewal. These data will provide a basis for future cap load limitations as part of a Phase 4. Monitoring for TN and TP will be required for a period of two years, beginning on the effective date of the new permit.

2. Implementation of Phase 4 cap loads will start after Phases 1 through 3 are completed. DEP's plan is that Phase 4 permits will be revoked and reissued to establish annual mass load limits for TN and TP based upon the lesser of existing performance levels at design annual average daily flow on August 29, 2005, or loads equivalent to 6 mg/l TN and 0.8 mg/l TP at 0.4 mgd (7306 lbs. TN and 974 lbs. TP).

3. DEP's plan is that any facility in this phase that undergoes an expansion prior to Phase 4 implementation will be immediately subject to the requirements shown for Phase 4, i.e. no net increase in loading, based on design annual average flow on August 29, 2005 and existing nutrient concentrations, but in no case shall this load exceed 7306 pounds of TN and 974 pounds of TP, annually.

- 55 -

AR0026452

E. Phase 5 – smaller dischargers (design annual average daily flow on August 29, 2005 less than 0.2 mgd and greater than 0.002 mgd):

    1. DEP's plan is that these facilities will be given the choice to monitor levels of TN and TP in their discharge for two years when their permit is up for renewal or in a subsequent permit renewal, for the purpose of data collection and possibly assigning cap loads under Phase 5, occurring after the implementation of Phases 1 through 4.

    2. DEP's plan is that any facility in this phase that undergoes an expansion prior to Phase 5 implementation will be immediately subject to the requirements shown for Phase 5, i.e. no net increase in loading, based on design annual average flow on August 29, 2005, and existing nutrient concentrations, but in no case will this load exceed 7306 pounds of TN and 974 pounds of TP, annually.
        Where data for existing concentrations do not exist, default values for the type of technology in place may be used.

    3. Implementation dates will be determined after completion of the first four phases.

F. Any sewage dischargers that have already accepted NPDES permit renewals based on achieving 8.0 mg/l TN and 1.0 mg/l TP at 2010 projected flows voluntarily, will not be required to achieve lower cap loads based on the alternate approach. These facilities are listed below.

| Permit No. | Permittee | County |
|---|---|---|
| PA0026743 | Lancaster City | Lancaster |
| PA0026921 | Greater Hazelton Joint Sewer Authority | Luzerne |
| PA0027405 | Ephrata Borough Authority | Lancaster |
| PA0028142 | PA National Guard – Fort Indiantown Gap | Lebanon |
| PA0087181 | Ephrata Borough Authority | Lancaster |
| PA0032051 | Granville TWP | Mifflin |
| PA0081574 | Salisbury Township | Lancaster |
| PA0084026 | Northwestern Lancaster County Authority | Lancaster |
| PA0247391 | North Codorus TWP Sewer Authority | York |
| PA0028631 | Mid-Cameron Authority | Cameron |
| PA0113298 | Elkland Borough Authority | Tioga |

G. Any sewage discharger will be able to meet its cap load by achieving an annual loading equivalent to other TN and TP concentrations at design annual average daily flow, or by purchasing nutrient credits or generating an offset to achieve its allocated cap load. For example, a discharger may elect to install treatment technology designed to achieve a

AR0026453

concentration limit of 12 mg/l TN and 1 mg/l TP and purchase the remaining load reduction in credits to meet their cap load.

H.  DEP's plan is that all dischargers proposing to expand the capacity of their facilities beyond design annual average daily flows on August 29, 2005, will be held to the effluent cap load limits calculated using the design annual average daily flows on August 29, 2005, and the requirements of the phase in which that flow places the facility.  The design annual average daily flows for all sewage facilities will include those design annual average daily flows approved as part of any final Act 537 official sewage facilities plan approval on or before August 29, 2005.

## II.    Industrial Wastewater Discharges

Pursuant to the NPDES regulations at 25 Pa. Code Chapter 92, DEP developed an allocation that was used to address the nutrient loads originating from significant industrial wastewater sources as part of its efforts to ensure compliance with the water quality standards related to the Chesapeake Bay. This allocation is expressed as annual cap loads of TN and TP that DEP plans to incorporate into NPDES permits for those sources.

Based on data available for loadings in 2002, and adding a 10 percent reserve, 1.9 million lbs/year of TN and 66,348 lbs/year of TP were allocated to the significant industrial wastewater point sources as a group.

The determination of cap loads for each industrial wastewater facility involved dividing the facilities into five categories. First are those facilities that had reductions before the 2002 loads were calculated; second are those facilities that submitted a Nutrient Reduction Evaluation (NRE) and reduced their nutrient loads between 2002 and 2009; third are those facilities that submitted an NRE and are planning to reduce nutrient loads through upgrades for operation or construction of their treatment plants; fourth are those facilities that are already at low levels of nutrient discharge loads; and fifth are those facilities that did not submit an NRE or submitted an NRE but did not plan to reduce nutrient loads. The loads for these categories are shown below with first through fifth shown as 1 through 5 respectively.

1.  The cap loads for the first category are the 2002 load or current load whichever is greater plus 10 percent.
2.  The cap loads for the second category are the current load plus 10 percent.
3.  The cap loads for the third category are the loads they plan to reduce to in their NRE. The permit will be written such that those facilities will have a compliance schedule to give them time to complete their operation or construction upgrades before DEP would expect them to meet the more stringent loadings.
4.  The cap loads for the fourth category will be their current loads.
5.  The cap loads for the fifth category will be their current loads reduced by 33 percent.

After applying the loads as outlined above, the phosphorus load still exceeded the allowable total load for significant Industrial Wastewater Facilities of 66,348 lbs/year of TP. Therefore the phosphorus loadings were reduced by an equal percentage basis for all facilities above 0.5 mg/l

AR0026454

in their discharge with no one expected to achieve reductions below 0.5 mg/l unless already doing so.

Note that in some cases EPA may have established nutrient Effluent Limitation Guidelines (ELGs) for several types of industries. If a significant industrial discharger in the Chesapeake Bay Watershed is required to meet an ELG, then the load limit for nutrients will be based on the lesser of the ELG or the load from the previous paragraph.

Several of the Significant Industrial Dischargers noted that they withdrew water from the same water body to which they discharged. These dischargers requested that DEP consider the background nutrient level of the water that was withdrawn and get an offset for the background nutrient load, i.e. their cap loads would be established using a net load approach. DEP considered this request and will allow an offset for background loads if the discharger can demonstrate what the annual average daily background nutrient level is, and document that its water is withdrawn from the same stream for the industrial process to which the treated water is discharged. No offset will be given for water withdrawn from wells.

The proposed cap loads for the significant industrial facilities in the Chesapeake Bay Watershed, based on the allocation methodology described above when applying these cap loads will result in a loading of 1,428,977 lbs/yr for TN and a loading of 62,807 lbs/yr for TP to the Chesapeake Bay. These loads will provide a reserve of 519,142 lbs/yr for TN and reserve of 3,541 lbs/yr for TP. These cap loads are part of DEP's overall compliance plan to address the downstream water quality standards in Maryland and Virginia that Pennsylvania needs to meet.

<u>Allocation of the Reserve</u>

DEP included a reserve within its allocation in consideration of future economic growth in the watershed, and plans to apply several criteria to its use of this reserve. First, new and expanding industrial dischargers in the Pennsylvania portion of the Chesapeake Bay Watershed will need to provide a report on how they will address any associated increase in nutrient loadings. The report will consist of a review of non-discharge alternatives followed by a discussion of enhanced treatment. Second, if DEP determines, based on a review of this report, that part of the reserve for either TN or TP should be allocated, a maximum of 5 percent of the initial amount of the reserve, if available, can be allocated to any single new or expanding discharge. Any nutrient load the discharger needs beyond that allocation will need to be addressed through offsets or the purchase of credits pursuant to DEP's nutrient trading program.

Publicly Owned Treatment Works (POTWs) that treat new sources of industrial waste may be able to obtain offsets from the reserve allocation, if available, for treating that wastewater. A new source in this context is a source of wastewater from an industrial facility that did not discharge to any POTW prior to September 1, 2009. The offset will be based on the following formulas. Note that the POTW must have an industrial waste pretreatment program, approved by EPA in accordance with 40 CFR Part 403, to obtain such an offset. The offset will in no case be greater than 5 percent of the initial reserve for either TN or TP.

AR0026455

The POTW will be assigned an offset to be added to its nutrient cap loads based on the following formula:

- Offsets for TN = (IW nutrient concentration after pretreatment (mg/l) – 6 mg/l) x 8.34 x IW flow in MGD x 365 days.
- Offsets for TP = (IW nutrient concentration after pretreatment (mg/l) – 0.8 mg/l) x 8.34 x IW flow in MGD x 365 days.

When the reserve has been exhausted, new industrial dischargers will need to obtain offsets and/or purchase credits equal to 100 percent of their proposed nutrient loads. From that point forward, expanding discharges will be limited to their existing cap load.

DEP reserves the option to reallocate loads in the future, and to revise this approach as appropriate.

<u>Procedure to Implement Cap Loads</u>

DEP, through its regional offices, sent out notification letters under Section 92.8a of DEP's regulations requesting that the significant industrial users receiving proposed nutrient cap loads provide a report or plan and schedule for complying with those cap loads as required under that regulation. DEP will review the reports and/or plans and schedules to establish compliance schedules through the permitting process, if necessary, in the same manner that it did for the Phase 1 sewage dischargers.

<u>Non Significant Industrial Dischargers and Non-Contact Cooling</u>

Water Dischargers.  A design flow based monitoring requirement has been published for facilities in the Compliance Plan for Industrial Waste Dischargers on the DEP's Chesapeake Bay program webpage. Semiannual monitoring of source water is recommended for these dischargers. These monitoring requirements will be placed in their NPDES permits as they come up for renewal.

| Facility / Wastewater Type | Design Flow | Effluent N Series & TP Monitoring Frequency* |
|---|---|---|
| Non-Contact Cooling Water with No Chemical Additives | All Flows | 1/year |
| Non-Contact Cooling Water with Chemical Additives | < 0.1 MGD | 1/year |
|  | > 0.1 MGD | 1/quarter |
| Agricultural and Related Products (SIC Codes 0111-0989 and 2011-2141) | < 0.1 MGD | 1/month |
|  | 0.1 – 1 MGD | 2/month |
|  | > 1 MGD | 1/week |
| Textile Mill and Related Products (SIC Codes 2211-2399) | < 0.1 MGD | 1/month |
|  | > 0.1 MGD | 2/month |
| Lumber, Paper and Allied Products (SIC Codes 2411-2679) | < 0.1 MGD | 1/quarter |
|  | > 0.1 MGD | 1/month |
| Chemicals, Plastics, Pharmaceuticals and | < 0.1 MGD | 1/quarter |

- 59 -

AR0026456

| Facility / Wastewater Type | Design Flow | Effluent N Series & TP Monitoring Frequency* |
|---|---|---|
| Allied Products (SIC Codes 2812-2899) | > 0.1 MGD | 1/month |
| Primary and Fabricated Metals Products (SIC Codes 3312-3510) | < 0.1 MGD | 1/month |
|  | > 0.1 MGD | 2/month |
| Electric Services (Coal Pile Runoff and Other Wastewaters) (SIC Code 4911) | All Flows | 1/month |
| Water Treatment Facilities (SIC Code 4941) | All Flows | 1/quarter |
| Groundwater Cleanup Operations (Various SIC Codes) | All Flows | 1/quarter |
| Landfill Leachate (SIC Code 4953) | < 0.1 MGD | 1/quarter |
|  | 0.1 – 1 MGD | 1/month |
|  | > 1 MGD | 1/week |
| N or P-Contaminated Storm Water | All Flows | 1/quarter |
| All Other Wastewaters | < 1 MGD | 1/quarter |
|  | > 1 MGD | 1/month |

* More frequent monitoring may be required based on professional judgment.

### III.    Compliance Schedules

Most permittees submitted plans for compliance with the new cap loads in response to a notice sent under the requirements of 25 Pa. Code §92.8a. When a permittee's plan indicated, and the DEP agreed, that compliance with the new cap loads could not be achieved prior to these new limits becoming effective, a compliance schedule was placed in the new permit.  In accordance with federal regulations, this compliance schedule contains milestones designed to document progress toward compliance in intervals of no less than one year.  The final end point of the schedule is compliance with a water quality-based cap load (an allocation of the larger water quality-based cap load assigned to Pennsylvania by EPA).

### IV.    Trading

As outlined in other sections of the WIP, for facilities subject to meeting limits for nitrogen, phosphorus and sediment, the Nutrient Trading program provides a cost-effective means to meet those limits by working with other facilities or with nonpoint sources, or both. The Nutrient Trading program helps the Commonwealth achieve its Chesapeake Bay nutrient reduction goals from the agriculture sector and provides a source of revenue to farmers and other property owners while advancing the restoration and protection of the water quality of the Chesapeake Bay.

- 60 -

AR0026457

**V.    Adaptive Management**

DEP will continue to consider the potential development of a Watershed NPDES Permit approach in order to facilitate implementation of the Chesapeake Bay Compliance/Watershed Implementation Plan.

**VI.    Permitted CSOs**

Nutrient contributions from CSOs with approved Long Term Control Plans (LTCP), will be excluded from the nutrient cap at that particular facility.

## Laws, Regulations, Funding, Staffing and Technical Capacity

The DEP relies upon various state laws, such as the Pennsylvania Clean Streams Law, and the Federal Clean Water Act in its implementation of requirements to control pollutants. More recently, the Pennsylvania Phosphate Reduction Act was enacted in 2008. It mandated that dishwashing detergent contain virtually no phosphate by July 1, 2010.

The DEP has regulations promulgated to address the required nutrient credit trading, construction, operation and treatment technologies to control pollution. Funding for these various programs are derived from Federal Grants, Federal State Revolving Loan funds, Commonwealth bonds, and Commonwealth General Funds.

Current staffing is available in the 6 regional offices as well as the Bureaus in the Office of Water Management. However, additional staff will be needed if work above normal operational duties is expected by the EPA.

Some information is available on the total need for capital funding. The 2008 EPA Clean Watersheds Needs Survey listed statewide point source needs at $11.9 billion. It is not known how much of that need is in the Chesapeake Bay drainage area. The *Chesapeake Bay Tributary Strategy Compliance Cost Study* completed in November 2008 estimated nutrient removal costs for Pennsylvania as $1.40 billion, and total project costs as $1.96 billion. A report issued by the Governor's Task Force on Sustainable Water Infrastructure described statewide wastewater capital needs at $25 billion. It is clear that point source needs are substantial, but funding is available for Chesapeake Bay-related work.

Pennsylvania's State Revolving Fund (SRF) program awards approximately $200 million per year for traditional wastewater projects. In 2009, far more was invested because of funding associated with the American Recovery and Reinvestment Act (ARRA). A substantial portion of the total was for nutrient control. The program is managed through a joint effort of the Pennsylvania Infrastructure Investment Authority (PENNVEST) and DEP. A key feature of the PENNVEST process is that it ties the level of subsidy to the local affordability of the project. Projects with high user charges and low median household incomes are offered loans at lower interest rates. The effect is to get more work done overall.

- 61 -

AR0026458

The Pennsylvania Legislature approved $1.2 billion in infrastructure funding in 2008. The majority of that funding is for wastewater work, an important part of which is nutrient control in the Chesapeake Bay drainage area.

DEP's role in the processing of this funding represented an enormous effort. In 2009 DEP reviewed 360 applications for ARRA funding which resulted in 169 awards totaling $772 million. An additional 752 applications for the $1.2 billion in state funding were also reviewed, which resulted in awards of $480 million. These reviews represented about four times the normal flow of work without any increase in staffing. The second round of 722 applications seeking $1.9 billion was reviewed by DEP in the summer of 2010. Decisions on the award of those funds are pending.

Other funding sources that are important to Chesapeake Bay cleanup are Environmental Stewardship Funding ($12 million / year), EPA projects ($9.9 million / year), Community Development Block Grants ($42 million / year), USDA Rural Utilities Service funding ($60.5 million) and Appalachian Region Commission funding ($3 million / year). Local funding sources, involving a pay-as-you-go basis with bonds or other forms of loans, are also substantial, but totals are not available.

DEP is a national leader in the promotion of sustainable principles. The Task Force on Sustainable Water Infrastructure promoted concepts that were proposed in legislation in the fall of 2010. That legislation would, among other things, require all wastewater systems in the state to practice asset management. No other state in the country, to our knowledge, has pursued a comparable goal. DEP has also piloted "gap" financing concepts which EPA is applying in the 2012 Clean Watersheds Needs Survey. Pennsylvania's work in sustainable infrastructure is expected to have a long-term beneficial impact on wastewater treatment in the Commonwealth.

However, the Commonwealth's ability to meet its targets under this plan depends on adequate funding, which is not being legally committed to in this document.

## Accounting for Growth

New needs for sewage discharges from industry as well as domestic sources will be assigned a zero nutrient load for the Chesapeake Bay and therefore will be expected to find credits and/or offsets to address the nutrient needs. Point source growth may be addressed by the purchase of nutrient credits, by the use of offsets from the elimination of less efficient sewage treatment facilities, or by another no-discharge alternative such as employing recycle and re-use technology or land application.

## Gap Analysis

Due to the development of Pennsylvania's *Point Source Allocation Strategy* in 2006 with the involvement of numerous stakeholders, the wastewater point sources will achieve their allocated reductions. No gap is anticipated.

AR0026459

## Contingencies

DEP will continue to consider the potential development of a Watershed NPDES Permit approach in order to facilitate implementation of the *Chesapeake Bay Point Source Compliance Strategy* and WIP.  DEP reserves the option to reallocate loads in the future, and to revise this approach as appropriate.

## Tracking and Reporting Protocols

The tracking of point source data will be accomplished semi-annually as currently provided for in the ICIS reporting to EPA pursuant to the Pennsylvania DEP 106 grant agreement.

- 63 -

AR0026460



# *COMMONWEALTH of VIRGINIA*

## Chesapeake Bay TMDL
## Phase I Watershed Implementation Plan

*Revision of the Chesapeake Bay Nutrient
and Sediment Reduction Tributary Strategy*

## November 29, 2010

i

AR0026672

## PREAMBLE TO VIRGINIA'S PHASE I WATERSHED IMPLEMENTATION PLAN

The Chesapeake Bay is a national treasure and an ecological wonder. As Virginians, we are committed to ensuring a clean and vibrant Chesapeake Bay for future generations to cherish. We strongly believe a clean Bay is good for the economic well being of the State.

Since the submission of our draft plan on September 3, and EPA's response to the draft, we have been involved, along with EPA, in various stakeholder and public comment meetings across the state. During these sessions groups expressed their opinions and feedback on our draft plan. As a result, we have made substantial changes to the draft Plan after consultation with EPA, many stakeholders, and the public.

We have now crafted a good, amended plan that addresses the issues raised by EPA, and allows us to achieve pollution reductions absent "backstops" from EPA. However, the unexpected results of the most recent model run received from EPA on Tuesday, November 23 that showed a surprising allocation gap of more than a million pounds of nitrogen, force us to submit this plan as only an "initial submission." With only 14 work hours before the November 29 deadline we could not fully react to this very late data, although working through much of the holiday weekend we have been able to devise changes increasing the Wastewater Treatment load reduction significantly. Per discussions between Chuck Fox, EPA Senior Advisor to the Administrator for the Chesapeake Bay, and Martin Kent, the Governor's Chief of Staff, Virginia and EPA will continue to work to modify this plan over the next 7 to 10 days. These extra days will allow for additional model runs to identify ways to close this unexpected gap in the plan.

As we did in our draft plan, we must reiterate Virginia's concerns about the process, cost, legality, allocations, and compressed timing in the development of this plan. EPA asserts that it must develop the Bay TMDL by December 31, 2010 pursuant to the requirements of the Consent Decree entered in the case American Canoe Association et al. v. the United States EPA, 54 F. Supp. 2d 621 (E.D. Va. 1999). We note, again, that Virginia was not a party to that case, and the Consent Decree established a deadline of May 1, 2011 for the EPA to establish TMDLs for certain identified Virginia waters and pollutants if Virginia had not done so itself. This rush to completion has caused concerns in local governments and industry as well.

It is important to emphasize again that this plan is being developed during the worst economy in generations. Virginians have already invested billions of dollars in Chesapeake Bay water quality improvement to date. Full implementation of this plan will likely cost more than $7 billion new dollars which would be another federal unfunded mandate on the state, localities, private industries, and homeowners. In addition to the new health care law and other new regulatory burdens, it is placing enormous new fiscal stress on state budgets. However as a show of good faith, the Governor will include $36.4 million new dollars in our Water Quality Improvement Fund in his 2011 budget amendments. In these austere times, we cannot guarantee what additional funding will be provided by our General Assembly. It is our position that the success of the WIP may be subject to the provision of sufficient federal funding to assist in covering these massive new unfunded mandates.

iii

AR0026674

As we indicated before, Virginia will move forward with the implementation of this plan with a clear focus on flexibility and cost effectiveness. For instance, it is our belief that an expanded nutrient credit exchange program will afford the same approach to other sectors, particularly urban stormwater and septic systems, and it will allow for decisions to be made across sectors in an orderly and cost-effective manner. Therefore Virginia will rely on principles of adaptive management taking advantage of new technology and low cost methods that may become available in the next 15 years to achieve our goals.

Again, Virginia must state its significant concerns with the nearly absolute reliance on management by computer model. While the Bay model has seen years of development it continues to experience flaws that call its outcomes into question. We are especially concerned that level of precision expected is far beyond what the model is capable of and fails to consider the economic consequences of its actions.

I would also call your attention to our proposed approach for the James River watershed. Because of its geographic location, the James has less impact on the water quality of the mainstem of the Chesapeake Bay than any other river. The James also is unique because of the chlorophyll standards that were adopted in 2005 with the concurrence of EPA. We believe that because sufficient new information is available for the James River, we should take the time necessary to review the James River numeric chlorophyll standards to ensure that they reflect the best science and regulatory approaches. Therefore, we have included a detailed plan to accomplish this review and amend standards if necessary prior to the scheduled revision of the TMDL in 2017. We will also consider developing a local chlorophyll-based TMDL for the James River. Our plan demonstrates that we will meet the 2017 target loads prescribed by EPA in all basins, including the James.

Based on all these issues, Virginia again reserves the right to adjust this plan based on new information such as conservation efforts currently implemented but not accounted for in the model, adverse economic impacts on business, funding availability from federal and other sources, and improved scientific methodologies.

We understand that our work will not end with the submission of our Watershed Implementation Plan. We will continue to work with EPA, stakeholders, and the public to ensure that our implementation improves water quality in a manner that is sensible, fair and cost effective as this process unfolds over the next 15 years. The Governor is fully supportive of all reasonable efforts to improve this great natural resource in conjunction with the leaders of the other Bay states.

Douglas W. Domenech
Secretary of Natural Resources
November 29, 2010
Richmond, Virginia

AR0026675

# SECTION 1: VIRGINIA'S PLAN: OVERVIEW

The Phase I Watershed Implementation Plan (WIP) has been developed by the Commonwealth of Virginia as required by the U.S. Environmental Protection Agency (EPA) as an implementation plan for the Chesapeake Bay Total Maximum Daily Load (TMDL).

## 1.1 Background and Approach to WIP Development

The Chesapeake Bay TMDL WIP can become a continuation of work begun with Virginia's Tributary Strategies in 2005. Adoption of the tributary strategies resulted in significant progress in a number of areas of point and nonpoint pollution control including:

- o Establishment of first in the Chesapeake Bay watershed cap on nutrient loads from significant point source dischargers.
- o Establishment of a nutrient credit exchange program that has been successful in ensuring orderly and cost-effective upgrades of sewage treatment plants.
- o Expansion of nutrient management on a wide variety of land uses.
- o Accelerated and focused agricultural cost-share program, including special emphasis given to "priority practices."
- o Consolidated and strengthened stormwater management program
- o Improved oversight and implementation of local erosion and sediment control and Chesapeake Bay Preservation Act programs
- o Improved reporting of agricultural best-management programs to ensure full credit is given
- o Improved reporting of stormwater management practices.

This plan charts out actions necessary to achieve the Chesapeake Bay TMDL allocations between now and 2025 with the greatest emphasis on actions planned between now and 2017. It incorporates the principles of adaptive management so that the success or failures of actions can be evaluated and adjustments to programs and strategies are made. This plan incorporates the experience of tributary strategy development along with new knowledge and new tools.

The WIP acknowledges shortcomings in available data or in our ability to analyze data where this is an issue. The actions proposed will be based on the best available science and data, but we expect the base of knowledge and information to expand and to make adjustments accordingly in consultation with affected stakeholders and the Environmental Protection Agency (EPA). Virginia is also bound by the provisions of state law that require cost evaluations along with a benefit analysis for implementation plans. Adjustments to this plan will be considered based on cost effectiveness and other key factors.

Although the Chesapeake Bay TMDL is often discussed and thought of conceptually as a single TMDL, it is comprised of 92 segments. Virginia contributes drainage to 39 segments within the watershed. All 39 segments are listed as impaired for excessive nutrients and sediments.

AR0026680

The WIP contains pollution loads allocated or assigned to different source sectors of nitrogen, phosphorus and suspended solids. These sectors include wastewater treatment plants, agriculture, forest, urban stormwater, onsite/septic and air sources that contribute to the nutrient and sediment (also referred to as total suspended solids or "TSS") problems of the Chesapeake Bay. The plan also provides broad strategies proposed to meet those allocations. In accordance with federal expectations, those strategies and contingencies included in the plan are intended to meet reasonable assurance requirements for the Chesapeake Bay TMDL. However, we acknowledge that this is a plan and does not confer any additional budgetary, regulatory or legal authority to governmental agencies. Any programs or strategies that are not currently authorized by state law or regulation may be pursued through the legislative process or through the Virginia Administrative Process Act.

## 1.2 Guiding Principles for Virginia's Watershed Implementation Plan

- Equity: This plan seeks to approach each sector with significant but achievable actions in a way that all sectors share in meeting TMDL allocations.

- Cost-effectiveness: This plan charts out actions and timeframes in a manner that emphasizes cost effective practices. It plans actions in a step-wise fashion over time to allow for less costly actions to be taken first, before more expensive actions are conducted. This plan also proposes an expanded use of the Nutrient Credit Exchange or other offset mechanisms to allow for flexibility in meeting reduction targets and TMDL allocations.

- Credit Past Progress: Nutrient and sediment reduction in the Chesapeake Bay watershed does not begin with this plan. Nutrient reduction has been taking place in a significant fashion for more than a decade. This plan recognizes the significant progress made and the relative progress among sectors.

- Reasonableness and Feasibility to Implement: This plan attempts to set high expectations for practices that are likely to be implemented across all sectors, not simply those that are theoretically possible but are not reasonable to expect given significant technical, legal or financial barriers.

- Meeting EPA's Reasonable Assurance: EPA has advised that any plans submitted must meet the so-called "reasonable assurance" test. While there is some uncertainty to the meaning of that term, this plan includes necessary references to existing authority and means of implementation. For example, in cases where action requires additional legal authority, Virginia will chart a path for seeking such authority.

- Incorporating Future Actions: Allocations will be set at a level that presumes expected reductions from new and enhanced programs with the recognition that if such programs fail, the plan will be revisited and alternatives pursued.

- Course Correction in 2017: The plan is written knowing that new information and technologies will be available in the future, especially post-2017. EPA has established 2017

2

AR0026681

as an important date on the path to full implementation by 2025. It will be an opportunity to evaluate the significant actions that have taken place and re-evaluate the TMDL allocations based on changing conditions, new science and new technology. Therefore, this plan is less specific for actions in the post 2017 timeframe.

- <u>Determine Best Use of Trading, Credits and Nutrient Exchanges</u>: EPA has encouraged the states to consider exchanges of allocations between basins, and Nitrogen and Phosphorus exchanges within a basin to provide a more reasonable, cost-effective WIP for the Commonwealth. We have therefore included the use of the existing Nutrient Credit Exchange program to ensure that targets are met over the 15 year implementation period of the TMDL. A full description of the process to develop a more expansive program is contained later in this section.

- <u>High Expectation for Federal Lands</u>: Federal facilities in Virginia have made great strides in Chesapeake Bay protection. This plan presumes, as articulated in Executive Order 13508, that federal lands will receive treatment at extremely high levels.

---

3

AR0026682

## 1.3 Use and Limitations of the Chesapeake Bay Model

The TMDL is developed using the Chesapeake Bay model which allows for evaluation of implemented and proposed actions. While meeting the requirements of the model are important in order to meet the technical elements of the TMDL, our focus is on implementing practices and programs that result in real environmental improvement. We will use the model as a management tool, but we will tailor our actions within real scientific, economic, social and political frameworks.

The Chesapeake Bay watershed model is not a perfect representation of actual conditions on the landscape. Rather, it is a rough approximation. As such, we will continue to work with EPA to improve the model and use an adaptive management approach to adjust strategies as necessary based on those improvements. EPA has already committed to fix two known flaws that could result in changes to the strategies articulated in this document. We will also continue to provide EPA with our best information to ensure that the proper uses and limitations of the model are understood by citizens and stakeholders.

## 1.4 Stakeholder Engagement and the Stakeholder Advisory Group

The Secretary of Natural Resources formed an advisory group to assist in developing Virginia's plan to implement the Chesapeake Bay TMDL. The Stakeholder Advisory Group (SAG) provides a forum for discussion during the development of the Chesapeake Bay TMDL and the WIP. Virginia's approach to engaging a wide variety of interested parties through the SAG resulted in critical feedback on the model inputs, outputs, and the abilities to implement a host of practices across Virginia's bay watershed. The SAG met on December 17, 2009 and February 26, June 15, August 24, and November 16, 2010. Members reviewed and advised on sector pollutant load reductions and the sector allocations that will be used to meet the interim and final goals.

Significant numbers of public comments were received by the end of the comment period on November 8. This plan has been revised based on comments received and the comments will continue to be evaluated as implementation actions take place.

## 1.5 Summary of Source Sector Strategies

### *Wastewater*

Allocation: TMDL waste load allocations (WLAs) for Significant Municipal and Industrial Facilities are set in two existing regulations: Water Quality Management Planning Regulation (9 VAC 25-720) and Chesapeake Bay Watershed General Permit Regulation (9 VAC 25-820). These are enforceable provisions that "cap" the dischargers' total nitrogen (TN) and total

---

4

AR0026683

phosphorus (TP), and allow for nutrient credit exchange to achieve compliance with regulatory requirements. These existing requirements are supplemented by an additional 1.6 million pound reduction of nitrogen and 200,000 lb reduction of phosphorus in the James River prior to 2017 and an additional reduction of 1.0 million pounds of nitrogen and 250,000 pound reduction in phosphorus in the James river post-2017

As described in the James River strategy, the additional nitrogen and phosphorus reductions established for the James River necessary to achieve current standards for chlorophyll "a" have been allocated in the aggregate to the basin beyond 2017 pending planning and technical assessment by significant discharges and a concurrent analysis of the chlorophyll standard. This is fully described in the James River strategy section of this plan.

Allocations for sediment loads will be set at technology levels since wastewater is an insignificant portion of the sediment load. Nutrient WLAs for Non-significant Municipal and Industrial Facilities will be set at levels consistent with the procedure outlined in the Code of Virginia, which establishes the 2005 loads as the levels that cannot be exceeded in the future. Combined Sewer System allocations should be set for communities with combined sewer systems (CSS) at Long Term Control Plan (LTCP) levels with adjustments for future urban stormwater management actions that may reduce the amount of loadings from CSS.

- 2010 – 2011 - Continue Existing Water Quality Management Planning Regulation (9 VAC 25-720) and Chesapeake Bay Watershed General Permit Regulation (9 VAC 25-820) with current loading allocations with additional pre-2017 reduction in the James River.
- Seek legislative changes necessary to require offsets for nutrient loads of less than 1000 gpd either as separate legislation or as a component of amendments to the Nutrient Credit Exchange.
- Seek legislative changes to establish requirement for offsetting loads for discharger that expand to less than 40,000 gpd.

## *Onsite/Septic*

Allocation: This plan attempts to reduce the rate of growth in this sector through regulatory actions and proposes to offset some loads through an expansion of the Nutrient Credit Exchange Program.

- Implement amendments to Virginia Department of Health regulations for alternative systems. The proposed amendments require a minimum 50% reduction in delivered N for all new small alternative onsite systems in the Chesapeake Bay watershed resulting in an effective delivered load to the edge of the project boundary of 4.5 lbs TN/person/year. All large alternative onsite systems will demonstrate compliance with <3 mg/l TN at the project boundary.

AR0026684

- As a component of the revisions to the Nutrient Credit Exchange law proposed in 2012, allow for increased loads from onsite/septic to be aggregated at a jurisdictional level and available for offsets

- Seek revisions to the Code of Virginia will be considered to require all new and replacement systems in the Chesapeake Bay watershed to utilize either (1) "shallow-placed" systems capable of reducing nitrogen loss or (2) denitrification technology to reduce nitrogen loss and consider requirements for additional nitrogen reducing technologies in certain defined sensitive areas.

- Seek revisions to the Code of Virginia that will promote the use of community onsite systems which provide a greater reduction of TN.

- Seek legislative changes necessary to establish 5 year pumpout requirements for   septic tanks in jurisdictions within Virginia's Chesapeake Bay watershed (this mirrors the existing requirement for septic tanks within Chesapeake Bay Preservation Act areas).

- Seek legislative changes necessary to establish tax credits for upgrade/replacement of existing conventional systems with nitrogen reducing systems.

- Encourage the use of currently authorized "Betterment Loans" for repairs to existing systems and explore other financial incentives or relief to encourage the upgrade of existing systems especially for low and moderate income households.

### Agriculture

Allocations: Allocations are set for unregulated agricultural operations at levels resulting from significantly expanded implementation of conservation and nutrient management plans addressing the application of nutrients, tillage methods, cover crops, retention or establishment of buffers and exclusion of livestock from streams. It is the expectation of this plan that these practices will be widely implemented on agricultural lands. WLA allocations for Concentrated Animal Feeding Operations (CAFOs) are set according to EPA guidance and adjusted to reflect Virginia data with the WLA based on full implementation of practices such as adequate waste storage and barnyard runoff controls.

- Implement resource management plans on most agricultural acres which may include:

    35 foot grass or forest buffers between cropland and perennial surface waters; stream exclusion of livestock over time; implemented nutrient management plans.

- Improve tracking of voluntary agricultural and forestry BMPs.

- Account for all current mandated practices in Concentrated Animal Feeding Operations (CAFO) and permits required for certain poultry operations.

- Provide cost-share funding to achieve implementation of incentive based practices.

AR0026685

## *Urban Stormwater*

Loads from stormwater will be expressed as both waste load allocations (for regulated activities) and load allocations (for unregulated stormwater). Allocations for newly developed land will be set at a level that results in no increase above allowable 2025 average nutrient loads per acre from previous land uses; unless offsets are obtained in the event on-site controls will not fully achieve allowable loads. Allocation for existing urban areas is based on high levels of implementation of management practices described below.

- Revise Virginia's Stormwater Management Regulations to prevent loads increases from new development (currently under revision).
- Additional BMPs on existing pervious and impervious lands through future permits and wider adoption of stormwater utility fees or other funding mechanisms.
- Restrictions for application of non-agricultural fertilizers and voluntary reporting from "for-hire" applicators.
- Municipal/county owned nonagricultural lands receiving nutrients to develop, implement and maintain nutrient management plans.
- Golf courses implement nutrient management plans.
- Controls on certain do-it-yourself non-agricultural lawn and turf fertilizers.
- Incorporate requirements within Virginia's Stormwater Management Regulations (under revision) that redevelopment meets reductions in nutrient and sediment loads.

## 1.6 James River Strategy

This plan proposes a different approach for the James River given its unique qualities and the chlorophyll standards that apply only to the James.

In 2005 the State Water Control Board adopted several regulations to address the nutrient and sediment impairments in Virginia's portion of the Chesapeake Bay and its tidal rivers, including the James River. In March 2005, the State Water Control Board adopted water quality standards to protect the Chesapeake Bay and tidal rivers; these standards included five new designated uses, numeric criteria for dissolved oxygen, submerged aquatic vegetation and water clarity, and a narrative chlorophyll criterion. Action on numeric chlorophyll criteria for the tidal James River was delayed to give further consideration to public comments and to develop nutrient loading and cost alternative analyses. The Board considered the James River chlorophyll criteria at their June 2005 meeting, and adopted criteria at their November 2005 meeting.

Concurrent with these actions, the Board also amended the Virginia Water Quality Management regulation to include nitrogen and phosphorus allocations for 125 significant wastewater dischargers throughout the Bay watershed that would, along with needed actions by non-point sources, achieve all of the new water quality standards.

AR0026686

Determining the appropriate numeric chlorophyll criteria for the tidal James River was particularly challenging and the rulemaking process included an additional step of using consideration of attainability to help determine the proper criteria since the other lines of evidence did not clearly point to specific and defensible criteria levels. EPA worked with Virginia on these regulations and approved them as meeting the requirements of the Clean Water Act. Virginia immediately began an aggressive program to implement nutrient reductions from point and nonpoint sources, including expenditures and commitments to add nutrient removal facilities at wastewater treatment plants, alone exceeding $1.5 billion. Of this amount, over $400 million has been directed to the James River basin. Localities and industries in the James River basin have developed their regulatory compliance plans and made long-term funding commitments based on the approved regulations.

Recent determinations by EPA during the Chesapeake Bay TMDL development process call into question the conclusions and agreements reached during Virginia's 2005 rulemaking process for the chlorophyll criteria. The draft nutrient allocations for the James River basin issued by EPA on July 1, 2010 are <u>significantly more stringent</u> than the levels that formed the basis for the state regulatory actions taken in 2005 for the chlorophyll criteria and the wastewater treatment plant allocations. Achieving these more stringent allocations would require estimated additional expenditures of between $0.5 to 1.0 billion to the restoration costs in the James basin. In addition, technological advancements since 2005 in field monitoring for the chlorophyll parameter provide a much greater understanding of the concentrations and variability of chlorophyll in the tidal James River. These advancements include "data-flow" monitoring which provides thousands of data points during a single monitoring cruise. Additional scientific research has since taken place, providing a greater understanding of the impact of algae blooms on aquatic life. Also, EPA has recently issued criteria to protect against Harmful Algal Blooms that should be evaluated for application in the tidal James River.

The Commonwealth views the draft nutrient allocations included in EPA's July 1, 2010 letter for the James River basin to be at the lower end of a range of nutrient loads allocations needed to protect the aquatic life uses in the tidal James River. The Commonwealth concludes that additional scientific study is needed to provide a more precise and scientifically defensible basis for setting the final nutrient allocations.

- New information must be evaluated to ensure the Commonwealth's chlorophyll criteria for the tidal James River are appropriately protective of the river's designated uses and are based on the best scientific information and data currently available. This new information includes: application of Harmful Algae Bloom criteria; analysis of data-flow monitoring information to better understand the size and duration of algal bloom events; scientific research; and other information supplied by citizens and stakeholders.

- In order to conduct a thorough review of available information, and to allow sufficient time for the collection of additional data-flow information in the tidal James River during various hydrologic seasons, a three-year time period is needed to complete this study.

- In response to creditable findings from the three-year study, DEQ will ask the State Water Control Board by 2015 to begin the rulemaking process under the Virginia Administrative Process Act to consider amending the chlorophyll criteria in the Water Quality Standards [9

---

8

AR0026687

# SECTION 2: INTERIM LOAD TARGETS AND FINAL NUTRIENT AND SEDIMENT ALLOCATIONS

The following tables show the proposed TMDL allocations by source sector and river basin for the year 2025 and the target loads for the year 2017 which represent 60% of the 2025 allocations.

## Table 2.1: VIRGINIA CHESAPEAKE BAY TMDL ALLOCATIONS: NITROGEN - 2025 [Million Pounds/Year]

**THESE SECTOR ALLOCATIONS WILL BE REVIEWED/ADJUSTED IN 2017**

| Source Sector | Potomac | Rappahannock | York | James | Eastern Shore | VA TOTAL |
|---|---|---|---|---|---|---|
| Agriculture | 6.359 | 2.515 | 1.404 | 4.253 | 0.890 | 15.421 |
| Urban Runoff[4] | 2.635 | 0.403 | 0.445 | 2.534 | 0.050 | 6.067 |
| Wastewater[1] | 3.743 | 0.640 | 1.201 | 12.491 | 0.087 | 18.162 |
| On-Site[1] | 0.597 | 0.322 | 0.487 | 0.923 | 0.076 | 2.405 |
| Forest | 4.197 | 1.886 | 1.782 | 6.048 | 0.162 | 14.076 |
| Non-Tidal Dep | 0.103 | 0.073 | 0.089 | 0.320 | 0.032 | 0.617 |
| Total | 17.634 | 5.839 | 5.409 | 26.569 | 1.297 | 56.748 |
| **Basin Allocations** | 17.464[2] 17.634 | 5.840 | 5.410 | 23.480[4] | 1.210[3] 1.297 | 53.662[4] |

[1]Allocations for these source sectors can be attained through expansion of the VA Nutrient Credit Exchange Program
[2]For Potomac, a portion of the TP allocation is transferred to the TN allocation using 1:5 ratio [added 170,000 lbs/yr of TN]
[3]For E Shore, a portion of the TP allocation is transferred to the TN allocation using 1:5 ratio [added 90,695 lbs/yr of TN]

[4]Refer to James River Strategy section of the WIP for Virginia's approach to conform with EPA's draft July 1 TMDL allocations by 2025; 3.3 MPY will be included in the TMDL as an aggregated allocation for reduction in the wastewater sector; adjustments in sector allocations will be made, as warranted, in 2017 following completion of scientific review of chlorophyll standards

17

AR0026696

## Table 2.2: VIRGINIA CHESAPEAKE BAY TMDL ALLOCATIONS: PHOSPHORUS - 2025 [Million Pounds/Year]

**THESE SECTOR ALLOCATIONS WILL BE REVIEWED/ADJUSTED IN 2017**

| Source Sector | Potomac | Rappahannock | York | James | Eastern Shore | VA TOTAL |
|---|---|---|---|---|---|---|
| Agriculture | 0.674 | 0.533 | 0.157 | 0.622 | 0.111 | 2.097 |
| Urban Runoff[1] | 0.273 | 0.094 | 0.090 | 0.528 | 0.009 | 0.994 |
| Wastewater[1] | 0.278 | 0.079 | 0.155 | 0.967 | 0.008 | 1.487 |
| On-Site[1] | 0 | 0 | 0 | 0 | 0 | 0 |
| Forest | 0.205 | 0.183 | 0.126 | 0.543 | 0.015 | 1.072 |
| Non-Tidal Dep | 0.008 | 0.007 | 0.009 | 0.030 | 0.002 | 0.056 |
| Total | 1.438 | 0.896 | 0.538 | 2.690 | 0.145 | 5.707 |
| **Basin Allocations** | **1.472[2]** **1.439** | **0.900** | **0.540** | **2.340[4]** | **0.163[3]** **0.145** | **5.357[4]** |

[1] Allocations for these source sectors can be attained through expansion of the VA Nutrient Credit Exchange Program

[2] For Potomac Basin, a portion of the TP allocation is transferred to the TN allocation using 1:5 ratio [removed 34,000 lbs/yr from TP]

[3] For E Shore, a portion of the TP allocation is transferred to the TN allocations using 1:5 ratio [removed 18,139 lbs/yr from TP]

[4] Refer to James River Strategy section of the WIP for Virginia's approach to conform with EPA's draft July 1 TMDL allocations by 2025; 0.35 MPY will be included in the TMDL as an aggregated allocation for reduction in the wastewater sector; adjustments will be made, as warranted, in 2017 following completion of scientific review of chlorophyll standards

AR0026697

## Table 2.3: VIRGINIA CHESAPEAKE BAY TARGET LOADS: NITROGEN - 2017 [Million Pounds/Year]

| Source Sector | Potomac | Rappahannock | York | James | Eastern Shore | VA TOTAL |
|---|---|---|---|---|---|---|
| Agriculture | 7.379 | 3.021 | 1.754 | 4.728 | 1.102 | 17.984 |
| Urban Runoff[1] | 2.733 | 0.426 | 0.475 | 2.700 | 0.054 | 6.388 |
| Wastewater[1, 3] | 3.312 | 0.515 | 0.977 | 11.382 | 0.078 | 16.264 |
| On-Site[1] | 0.614 | 0.333 | 0.508 | 0.962 | 0.078 | 2.495 |
| Forest | 4.118 | 1.876 | 1.773 | 6.021 | 0.161 | 13.349 |
| Non-Tidal Dep | 0.102 | 0.072 | 0.089 | 0.316 | 0.031 | 0.610 |
| Total | 18.258 | 6.243 | 5.576 | 26.109 | 1.504 | 57.690 |
| **Target Loads[2]** | **18.624** | **6.291** | **5.789** | **26.109** | **1.538** | **58.352** |

[1]Allocations for these source sectors can be attained through expansion of the VA Nutrient Credit Exchange Program

[2]Draft Target Loads for each basin set at 60% of 2025 Allocations; each sector may vary.

[3]Wastewater loads are expected to be below 2025 allocations which will aid in meeting the Commonwealth's 2017 target loads

AR0026698

## Table 2.4: VIRGINIA CHESAPEAKE BAY TARGET LOADS:
### PHOSPHORUS - 2017 [Million Pounds/Year]

| Source Sector | Potomac | Rappahannock | York | James | Eastern Shore | VA TOTAL |
|---|---|---|---|---|---|---|
| Agriculture | 0.796 | 0.604 | 0.194 | 0.761 | 0.131 | 2.486 |
| Urban Runoff[1] | 0.292 | 0.100 | 0.098 | 0.573 | 0.009 | 1.072 |
| Wastewater[1, 3] | 0.254 | 0.060 | 0.142 | 0.775 | 0.005 | 1.236 |
| On-Site[1] | 0 | 0 | 0 | 0 | 0 | 0 |
| Forest | 0.203 | 0.182 | 0.128 | 0.554 | 0.013 | 1.080 |
| Non-Tidal Dep | 0.009 | 0.008 | 0.009 | 0.030 | .001 | 0.057 |
| Total | 1.554 | 0.954 | 0.571 | 2.693 | 0.159 | 5.931 |
| **Target Loads[2]** | **1.643** | **0.974** | **0.574** | **2.720** | **0.159** | **6.070** |

[1] Allocations for these source sectors can be attained through expansion of the VA Nutrient Credit Exchange Program

[2] Draft Target Loads for each basin set at 60% of 2025 Allocations; each sector may vary.

[3] Wastewater loads are expected to be below 2025 allocations which will aid in meeting the Commonwealth's 2017 target loads

AR0026699

# SECTION 3: ALLOCATION PROCESS

## 3.1. Process for Developing Wasteload Allocations (WLAs) and Load Allocation (LAs)

This Section describes the process by which LAs and WLAs were established by Virginia for the TMDL.

### 3.1.1. Municipal Separate Storm Sewer Systems (MS4s)

Waste load allocations for Phase II MS4 programs in Virginia were developed based the calculated acreage for each urban land classification and further classified by land river segment, segment–shed, U.S. Census Bureau Urbanized Areas, city or county. The proxy for the MS4 WLA is equal to the accumulated land area multiplied by the treated load/acre (treatment efficiencies defined by land classification) within a U.S. Census Bureau-defined urbanized area but discounted by the industrial stormwater WLA. The proxy for the MS4 load allocation is equal to the acres of low intensity pervious urban land multiplied by the treated load/acre discounted by the industrial stormwater LA, plus the remainder of the area in the defined urbanized area. Barren land WLA is transferred to the construction general permit.

In counties where there are presently no MS4s except for Virginia Department of Transportation (VDOT) roadways, use VDOT impervious area plus pervious area. VDOT's load share for counties with other MS4s can be estimated using the same methodology as above, if necessary in future phases. All extractive land use goes to the Department of Mines, Minerals and Energy (DMME) permit WLA. Disturbed land use goes to Erosion and Sediment Control (E&S) WLA.

### 3.1.2. Industrial Stormwater

There are 889 facilities with industrial activity stormwater discharges in the Chesapeake Bay watershed that are provided permit coverage under the VPDES Industrial Stormwater General Permit. In addition there are 2 facilities with individual VPDES permits regulating only industrial activity stormwater discharges. Very limited individual data on facility size, urban land use, and nutrient and sediment loadings is known. Physical location, receiving stream and the primary SIC code are the only information known for each facility. The EPA contractor Tetra Tech assisted the VADEQ with facility area estimations.

Tetra Tech developed loading estimates based on estimated facility acreage derived from GIS delineations of selected industrial stormwater facilities. The VADEQ supplied Tetra Tech with a list of 87 selected facilities. Tetra Tech delineated 29 facilities at random (one urban and one rural for each SIC code grouping) to determine the average acreage of industrial stormwater facilities by SIC code grouping. DEQ supplemented this data with actual facility acreage data supplied by 120 facilities with their storm water general permit applications.

Where there was no delineation for a particular SIC grouping, Tetra Tech and DEQ used an average for the first digit of the SIC groups that had been estimated. For those SIC groups with

AR0026700

no common first digit (i.e., no data for a SIC group at all) Tetra Tech and DEQ averaged all 149 delineations and applied it to these remaining facilities (2 facilities).

The industrial stormwater loads are aggregate. Aggregate loads are appropriate because actual facility data was not used to develop the entire individual facility loading, and these industrial stormwater discharges have low nutrient and sediment loadings.

Virginia's Bay watershed Industrial Stormwater VPDES facilities are as follows:

**Table 3.1.1: Number of Industrial Stormwater VPDES facilities**

| Basin | Number of Facilities |
|-------|----------------------|
| Shen.-Potomac | 253 |
| Rappahannock | 68 |
| York | 87 |
| James | 473 |
| Eastern Shore | 10 |
| Total | 891 |

Aggregate loadings for industrial stormwater VPDES permits will be included as part of the local load allocation for regulated MS4s.

### 3.1.3. Construction General Permit

The proxy for the barren land WLA is developed as a component of the process defined in section 5.2.1. This regulated pollution load functions in a transient nature as countless components of the load are being issued or retired as site-by-site development occurs and permits for each site are issued or closed. Authority for permitting is granted to the Virginia Stormwater Management Program and Erosion and Sediment Control Program. Permit issuance must be consistent with the assumptions used in the development of the WLA for regulated construction activities.

### 3.1.4. Confined Animal Feeding Operations

The Chesapeake Bay Program Watershed Model (WSM) will be used to estimate current nutrient and sediment loads associated with the production area of animal feeding operations (AFOs) (refer to EPA's guidance outlined in "A Guide for EPA's Evaluation of Phase I Watershed Implementation Plans" dated April 2, 2010). In order to comply with this element, on November 29, 2010 Virginia submitted a revised input deck for the WSM. The input deck includes the number of animals by type and county associated with 100 percent of the AFO and CAFO operations.

AR0026701

All AFOs and CAFOs are currently covered by VPA permits, with CAFOs that discharge or propose to discharge being converted to VPDES permit coverage over the next 18 months. Currently, Virginia has 898 AFOs/ CAFOs covered by a VPA permit in the Chesapeake Bay Watershed. Of the 898 facilities, 116 operations are EPA defined Large CAFOs. The table below indicates the number and type of permits along with estimates for future permit coverage in the Bay watershed.

| CURRENT PERMIT COVERAGE | ESTIMATED NO. OF VPA SIZE FACILITIES | ESTIMATED NO. OF VPDES SIZE (LARGE) FACITILIES | TOTAL FACILITIES IN BAY WATERSHED |
|---|---|---|---|
| VPA GP AFO | 55 | 15 | 70 |
| VPA GP POULTRY | 727 | 101 | 828 |

### 3.1.5. Significant Wastewater Facilities

Enforceable nutrient waste load allocations have been adopted under state law and regulations promulgated in 2005-06 for Virginia's bay wastewater treatment facilities, covering both municipal and industrial plants. Implementation is ongoing to comply with these requirements. Individual WLA were assigned to each of Virginia's 125 bay watershed Significant Dischargers, and an allowance ("Permitted Design Capacity") for the Nonsignificant Discharger's was included in 2005 legislation establishing the Nutrient Credit Exchange Program (VA Code §62.1-44.19:12). Further reductions are proposed from the significant dischargers in the James for total nitrogen and total phosphorus, and for total phosphorus in the York through more stringent treatment requirements. These modifications will be reflected in the Watershed General Permit.

### 3.1.6. Non-significant Municipal Facilities

Non-significant municipal discharges with individual VPDES Permits have coverage under the Chesapeake Bay Nutrient Watershed general permit. The WLAs for non-significant municipal facilities are based upon the 2005 permitted design capacity. The watershed general permit controls the non-significant municipal facilities as follows:

- Existing smaller facilities that propose to expand up to a design flow of 0.039 MGD are allowed and no GP registration is or offset is required.
- Existing non-significant municipal facilities that expand to a design of 0.04 MGD or more are required to register under the GP and offset any increase in TN or TP load.
- New municipal facilities with a design flow greater than 1,000 gpd are required to register under the GP and offset their entire nutrient load.

**Non-significant Discharges with Coverage under the Domestic Discharges less than 1,000 GPD VPDES General Permit**

AR0026702

Domestic Discharges less than 1,000 GPD do not have coverage under the Chesapeake Bay Nutrient Watershed general permit. WLAs for Virginia's general permit for domestic discharges less than 1,000 gpd are based upon the 1,000 gpd flow authorized by the permit and effluent concentrations of 18.7 mg/l TN and 2.5 mg/l TP. Actual flows from these facilities are typically about one third of the permitted capacity, creating ample excess allocation to accommodate new dischargers in this category for the foreseeable future.

### 3.1.7. Non-significant Industrial Facilities

**Non-significant Industrial Discharges with Individual VPDES Permits**
Non-significant industrial discharges with individual VPDES Permits have coverage under the Chesapeake Bay Nutrient Watershed general permit. The WLAs for non-significant industrial facilities are estimates of current loads using limited Discharge Monitoring Report data and typical effluent concentrations established by Standard Industrial Classification (SIC) codes. The industrial non-significant estimates are considered to be very conservative and the Commonwealth expects actual loads to be considerably less. The watershed general permit controls the non-significant industrial facilities as follows:

- Existing smaller facilities that propose to expand and increase loading up to 2,300 pounds of TN and 300 pounds P per year are allowed and no GP registration or offset is required.
- Existing non-significant industrial facilities with that expand to loadings greater than 2,300 pounds of TN or300 pounds of TP per year are required to register under the GP and offset any increase in nutrient load.
- New non-significant industrial facilities with loadings greater than 2,300 pounds of TN or 300 pounds of TOP are required to register under the GP and offset all nutrient loads.

**Non-significant Industrial Discharges with Coverage under a Car Wash, Concrete, Cooling Water, and Nonmetallic Mineral Mining VPDES General Permit**
Facilities with coverage under a Car Wash, Concrete, Cooling Water, and Nonmetallic Mineral Mining VPDES General Permit do not have coverage under the Chesapeake Bay Nutrient Watershed general permit. WLAs for these discharges were based upon conservative assumptions (design flow, 365 days/yr operations, etc.) so the existing non-significant dischargers are expected to discharge less than their aggregate WLA.

## 3.2. Table of Target Loads by Sector and Watershed

**Final Nutrient and Sediment Target Loads**
Final, enforceable nutrient WLA have been adopted under state law and regulations promulgated in 2005-06 for Virginia's bay wastewater treatment facilities, covering both municipal and industrial plants, and implementation is ongoing to comply with these requirements. Individual WLA were assigned to each of Virginia's 125 Bay watershed Significant Dischargers, and an allowance ("Permitted Design Capacity") for the Non-significant Dischargers was included in 2005 legislation establishing the Nutrient Credit Exchange Program (VA Code §62.1-44.19:12).

AR0026703

In summary, the discharged and delivered nutrient and sediment load caps for Virginia's Bay watershed wastewater plants are as follows:

**Table 3.2.1: Significant Dischargers' Discharged and Delivered Total Nitrogen WLA**

**(NOTE: Delivered loads will be added based on EPA model results)**

| Basin | TN WLA Discharged (million lbs/yr) | TN WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 5.22 | |
| Rappahannock | 0.60 | |
| York | 1.06 | |
| James | 12.65 | |
| Eastern Shore | 0.04 | |
| Total | 19.57 | |

**Table 3.2.2: Significant Dischargers' Discharged and Delivered Total Phosphorus WLA**

| Basin | TP WLA Discharged (million lbs/yr) | TP WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 0.255 | |
| Rappahannock | 0.045 | |
| York | 0.123 | |
| James | 0.942 | |
| Eastern Shore | 0.002 | |
| Total | 1.367 | |

**Table 3.2.3 Significant Dischargers' Discharged and Delivered Total Suspended Solids WLA**

| Basin | TSS WLA Discharged (million lbs/yr) | TSS WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 36.66 | |
| Rappahannock | 4.71 | |
| York | 16.51 | |
| James | 75.05 | |
| Eastern Shore | 0.19 | |
| Total | 133.12 | |

**Table 3.2.4: Non-significant Dischargers' Discharged and Delivered Total Nitrogen WLA**

| Basin | TN WLA Discharged (million lbs/yr) | TN WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 0.931 | |
| Rappahannock | 0.303 | |

AR0026704

| | | |
|---|---|---|
| York | 0.385 | |
| James | 1.190 | |
| Eastern Shore | 0.047 | |
| Total | 2.856 | |

**Table 3.2.5 Non-significant Dischargers' Discharged and Delivered Total Phosphorus WLA**

| Basin | TP WLA Discharged (million lbs/yr) | TP WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 0.146 | |
| Rappahannock | 0.049 | |
| York | 0.061 | |
| James | 0.207 | |
| Eastern Shore | 0.006 | |
| Total | 0.469 | |

**Table 3.2.6: Non-significant Dischargers' Discharged and Delivered Total Suspended Solids WLA**

| Basin | TSS WLA Discharged (million lbs/yr) | TSS WLA Delivered (million lbs/yr) |
|---|---|---|
| Shen.-Potomac | 6.136 | |
| Rappahannock | 0.911 | |
| York | 3.872 | |
| James | 7.695 | |
| Eastern Shore | 0.071 | |
| Total | 18.685 | |

**Aggregate Wasteload Allocations for Non-significant Individual VPDES Permits -** The non-significant TN and TP wasteload allocations contained in this WIP are considered aggregate allocations and will not be included in individual VPDES permits. This approach has been approved by EPA in instances where a class of dischargers is included in a general permit. All non-significant dischargers with individual permits in existence as of July 1, 2005 are covered by rule under the watershed general permit. New or expanding non-significant facilities that trigger the offset requirements established under the Code of Virginia will be required to register under the watershed general permit and will be assigned individual wasteload allocations consistent with the permitted design capacity and/or offsets provided.

The TSS wasteload allocations included in the WIP are also considered to be aggregate WLAs. TSS limits will be included in individual VPDES permits as required by technology-based requirements of the Clean Water Act. However as long as the aggregated TSS permitted loads for all dischargers is less than the aggregate TSS load in the WIP, the individual VPDES permit will be considered to be consistent with the TMDL.

**Aggregate Wasteload Allocations for Non-significant Discharges with Coverage under the Domestic Discharges less than 1,000 GPD VPDES General Permit**

AR0026705

The non-significant TN and TP wasteload allocations contained in this WIP are considered aggregate allocations and will not be included in Domestic Discharges less than 1,000 GPD VPDES General Permit. Actual flows from these facilities are typically about one third of the permitted capacity, creating ample excess allocation to accommodate new dischargers in this category for the foreseeable future. At the time of reissuance of this general permit regulation Virginia will determine if additional requirements will be needed for new discharges to meet for Stage II of requirements of the TMDL.

### Non-significant Industrial Discharges with Coverage under a Car Wash, Concrete, Cooling Water, and Nonmetallic Mineral Mining VPDES General Permit

The non-significant TN and TP wasteload allocations contained in this WIP are considered aggregate allocations and will not be included in these Industrial general permits. WLAs for these discharges were based upon conservative assumptions (design flow, 365 days/yr operations, etc.) so the existing non-significant dischargers are expected to discharge less than their aggregate WLA. Should the reserve capacity inherent in the WLAs prove to be inadequate to accommodate growth in this sector, Virginia will determine if additional requirements will be needed during the reissuance of each general permit regulation to address new discharges to meet for Stage II of requirements of the TMDL.

## *Combined Sewer Systems*

Table 4.2.7: Combined Sewer System Discharged and Delivered WLAs

| Locality[1] | CSS WLA Discharged | | | CSS WLA Delivered | | |
|---|---|---|---|---|---|---|
| | TN (lbs/yr) | TP (lbs/yr) | TSS (lbs/yr) | TN (lbs/yr) | TP (lbs/yr) | TSS (lbs/yr) |
| Alexandria CSO[2] | 5,201 | 690 | 62,355 | 5,201 | 690 | 62,355 |
| Alexandria Sanitation Authority CS-C[3] | 7,309 | 329 | 54,820 | 7,309 | 329 | 54,820 |
| Richmond Aggregate CSS[2],[3] | 409,557 | 31,642 | 3,396,550 | 409,557 | 31,642 | 3,396,550 |
| Lynchburg Aggregate CSS[2],[3] | 58,575 | 5,677 | 677,741 | | | |

Notes: (1)  Richmond, Lynchburg, and ASA dry weather flow waste load allocations are based on permitted dry weather design capacity of 45 mgd, 22 mgd, and 54 mgd, respectively.

(2)  The combined sewer overflow (CSO) portion of the Aggregate CSS WLA is based on the annual average CSO volume for the period 1991 through 2000 multiplied by TN, TP, and TSS concentrations of 8.0 mg/L, 1.0 mg/L, and 130 mg/L, respectively, for Richmond and Lynchburg; and TN, TP, and TSS concentrations of 5.88 mg/L, 0.78 mg/L, and 70.5 mg/L, respectively, for Alexandria.

(3)  The combined sewage captured (CS-C) portion of the Aggregate CSS WLA is based on the annual average CS-C volume for the period 1991 through 2000 multiplied by TN, TP, and TSS wet weather concentrations of 8.0 mg/L, 0.4 mg/L, and 30 mg/L, respectively, for Richmond and Lynchburg; and TN, TP, and TSS wet weather concentrations of 4.0 mg/L, 0.18 mg/L, and 30 mg/L, respectively, for ASA.

AR0026706

# SECTION 4 WASTEWATER

## 4.1. Current Programs and Capacity

As previously described, the basis for the wastewater facilities' WLAs is contained in Virginia Code (§62.1-44.19:12) and two regulations: the Water Quality Management Planning Regulation (9 VAC 25-720) and the General VPDES Watershed Permit Regulation for Total Nitrogen and Total Phosphorus Discharges and Nutrient Trading in the Chesapeake Bay Watershed in Virginia (9 VAC 25-820), commonly referred to as the watershed general permit or nutrient trading regulation. These are enforceable provisions that "cap" the dischargers' TN and TP loads, and allow for nutrient credit exchange to achieve compliance. Additional reductions, below the current allocations in State regulations, are proposed from the significant dischargers in the James for total nitrogen and total phosphorus, and for total phosphorus in the York through more stringent treatment requirements. These modifications will be reflected in the Watershed General Permit and are further detailed after Table 4.1.1.

For the purpose of assigning nutrient WLAs, the bay wastewater facilities are designated either as "Significant" or "Nonsignificant Dischargers". These two classifications include both municipal and industrial facilities and are defined in state regulation as follows:

"Significant discharger" means (i) a point source discharger to the Chesapeake Bay watershed with a design capacity of 0.5 million gallons per day or greater, or an equivalent load; (ii) a point source discharger to the Chesapeake Bay watershed downstream of the fall line with a design capacity of 0.1 million gallons per day or greater, or an equivalent load; (iii) a planned or newly expanding point source discharger to the Chesapeake Bay watershed that is expected to be in operation by 2010 with a permitted design of 0.5 million gallons per day or greater, or an equivalent load; or (iv) a planned or newly expanding point source discharger to the Chesapeake Bay watershed downstream of the fall line with a design capacity of 0.1 million gallons per day or greater, or an equivalent load, that is expected to be in operation by 2010. (9 VAC 25-720-10)

"Non-significant discharger" means (i) a sewage treatment works discharging to the Chesapeake Bay watershed downstream of the fall line with a design capacity of less than 0.1 million gallons per day, or less than an equivalent load discharged from industrial facilities, or (ii) a sewage treatment works discharging to the Chesapeake Bay watershed upstream of the fall line with a design capacity of less than 0.5 million gallons per day, or less than an equivalent load discharged from industrial facilities. (9 VAC 25-820-10)

Under the watershed general permit, the Non-significant Dischargers with an individual VPDES permit were given a "Permitted Design Capacity", which is defined as follows:

"Permitted design capacity" or "permitted capacity" means the allowable load (pounds per year) assigned to an existing facility that is a nonsignificant discharger, that does not have a waste load allocation listed in 9VAC25-720-50 C, 9VAC25-720-60 C, 9VAC25-720-70 C, 9VAC25-720-110 C, and 9VAC25-720-120 C of the Water Quality Management Planning

AR0026710

Regulation. The permitted design capacity is calculated based on the design flow and installed nutrient removal technology (for sewage treatment works, or equivalent discharge from industrial facilities) at a facility that has either commenced discharge, or has received a Certificate to Construct (for sewage treatment works, or equivalent DEQ approval for discharges from industrial facilities) prior to July 1, 2005. This mass load is used for (i) determining whether the expanding facility must offset additional mass loading of nitrogen and phosphorus and (ii) determining whether the facility must acquire credits at the end of a calendar year. For the purpose of this regulation, facilities that have installed secondary wastewater treatment (intended to achieve BOD and TSS monthly average concentrations equal to or less than 30 milligrams per liter) are assumed to achieve an annual average total nitrogen effluent concentration of 18.7 milligrams per liter and an annual average total phosphorus effluent concentration of 2.5 milligrams per liter. Permitted design capacities for facilities that, before July 1, 2005, were required to comply with more stringent nutrient limits shall be calculated using the more stringent values. (9 VAC 25-820-10)

When Virginia's point source nutrient discharge control regulations were adopted in late 2005, the annual TN and TP WLA for Significant Dischargers were based on a combination of total design flow and stringent nutrient removal technology (NRT). The level of NRT applied to the regions of the Bay tributaries varied somewhat, in consideration of:

- delivery factors affecting loads discharged above the fall line and reaching tidal waters
- modeled water quality response and compliance with tidal water quality standards
- the combined size of the discharges and resulting loads
- available technology
- equivalent treatment in terms of comparable "level of effort" between municipal and industrial facilities

32

AR0026711

These assumed TN and TP annual average effluent concentrations were primarily* used to calculate WLA for Significant Dischargers in the Water Quality Management Planning Regulation (9 VAC 25-720) adopted in 2005 with subsequent amendments and the Chesapeake Bay Watershed General Permit Regulation (9 VAC 25-820) adopted in 2006:

**Table 4.1.1: VA Basin Effluent Concentrations (mg/l) in Current Regulations**

| Bay Tributary Region | Effluent TN Conc. (mg/l) | Effluent TP Conc. (mg/l) |
|---|---|---|
| Shenandoah and Potomac AFL | 4.0 | 0.3 |
| Potomac BFL | 3.0 | 0.3 |
| Rappahannock | 4.0 | 0.3 |
| York | 6.0 | 0.7 |
| James AFL | 6.0 | 0.5 |
| James Tidal Fresh | 5.0 | 0.5 |
| Lower James | 12.7 | 1.0 |
| Eastern Shore | 4.0 | 0.3 |

Notes:  "AFL" = above fall line; "BFL" = below fall line
* - existing, more stringent permit limits were unaffected, and there were exceptions (e.g., Combined Sewer System localities, individual considerations for industrials)

Additional nitrogen reductions of about 2.6 mp/y are proposed in this Plan for the significant dischargers in the lower James basin, with an aggregate WLA for the Hampton Roads Sanitation District facilities based on an annual average TN concentration of 6.0 mg/l. An additional 0.45 mp/y phosphorus reduction will be required from the James' significant dischargers that are publicly owned treatment plants based on an annual average TP concentration of 0.4 mg/l.

In the York basin, phosphorus loads are proposed to be further reduced from the significant dischargers that are publicly owned treatment plants based on an annual average TP concentration of 0.4 mg/l, along with an additional 20% reduction in the loads from significant industrial dischargers.

The current wastewater loading baseline, with earlier years presented to demonstrate progress achieved since the inception of the Chesapeake Bay Program, is presented in the following:

**Table 4.1.2: VA Basin Loads – Wastewater Sector Delivered Nitrogen Loads (million lbs/year)**

| Basin | 1985 TN Load | 2002 TN Load | 2009 TN Load | TN WLA |
|---|---|---|---|---|
| Shen.-Potomac | 9.78 | 7.93 | 4.29 | 3.286 |
| Rappahannock | 0.61 | 0.58 | 0.39 | 0.475 |
| York | 1.43 | 1.21 | 1.17 | 0.957 |
| James | 24.72 | 16.09 | 14.09 | 13.565 |

33

AR0026712

| | | | | |
|---|---|---|---|---|
| Eastern Shore | 0.35 | 0.21 | 0.22 | 0.04 |
| Total | 36.90 | 26.02 | 20.16 | 18.324 |

**Table 4.1.3: VA Basin Loads – Wastewater Sector Delivered Phosphorus Loads (million lbs/year)**

| Basin | 1985 TP Load | 2002 TP Load | 2009 TP Load | TP WLA |
|---|---|---|---|---|
| Shen.-Potomac | 0.58 | 0.42 | 0.260 | 0.195 |
| Rappahannock | 0.20 | 0.10 | 0.043 | 0.042 |
| York | 0.46 | 0.17 | 0.106 | 0.157 |
| James | 4.17 | 1.73 | 0.953 | 1.088 |
| Eastern Shore | 0.05 | 0.03 | 0.004 | 0.003 |
| Total | 5.46 | 2.45 | 1.306 | 1.485 |

Virginia has adopted and implemented two permitting regulations to control wastewater nutrient discharges applicable to the Bay TMDL:

1. Nutrient Trading Regulation - 9 VAC 25-820-10 et seq
   General VPDES Watershed Permit Regulation for Total Nitrogen and Total Phosphorus Discharges and Nutrient Trading in the Chesapeake Bay Watershed in Virginia

   The so-called "Nutrient Trading" Regulation or "watershed general permit" requires that all significant dischargers and any new or expanding non-significant discharger with an individual VPDES permit and a design flow of 0.04 MGD or more must register under the watershed general permit and meet an annual load limitation. These loads are capped and any expansion beyond the current wasteload allocation must be offset in accordance with the terms of the permit. This permit allows point sources to exchange TN and TP credits at the end of every calendar year as an extra measure to ensure compliance. New and expanding facilities may acquire wasteload allocations from other point sources or acquire non-point source offsets to accommodate future growth. 125 significant dischargers and 41 non-significant dischargers are currently included in the watershed general permit.

   As described in the overview of Virginia's plan at the beginning of this document, the enabling legislation also authorized the formation of the Virginia Nutrient Credit Exchange Association. Membership in The Exchange is voluntary and its role is to facilitate trading under the watershed general permit. To date, 46 Exchange member facilities have signed contracts guaranteeing TN and TP trades beginning in 2011. The combination of nutrient trading in a watershed general permit, the formation of The Exchange and an unprecedented investment in wastewater infrastructure has resulted in a robust market that will allow Virginia to meet its TN and TP aggregate wasteload allocation for the wastewater sector beginning in 2011. In addition, this existing

   Virginia has a critical need under the TMDL to maintain the ability of dischargers to exchange or trade nutrient credits to comply with their WLA, as authorized under State law (VA Code §62.1-44.19:12). Trades are allowed among dischargers only within the

AR0026713

same basin with one exception. The 2010 General Assembly amended the credit exchange law to allow facilities on the Eastern Shore to acquire credits from dischargers in the Potomac and Rappahannock basins. TMDL implementation must recognize that trades among segment-shed TMDLs within each river basin are permitted, so long as local water quality is protected and the basin's total WLA is achieved.

2. Technology Regulation - 9 VAC 25-40-10 et seq
   Regulation for Nutrient Enriched Waters and Dischargers within the Chesapeake Bay Watershed

   The so-called "Technology" Regulation requires the installation of minimum nutrient treatment technologies at new or expanding facilities in the Chesapeake Bay watershed and compliance with an annual concentration limitation in the permittee's individual VPDES permit. Existing facilities that are not expanding are not required to install treatment however any facility that does install nutrient removal (to meet annual load limitations in the watershed general permit discussed above) is required to meet an annual concentration limitation consistent with the technology installed. These technology-based annual concentration limits serve to maximize the return on investments in wastewater treatment infrastructure as well as ensure a steady supply of credits under the watershed general permit.

100% of the significant dischargers are registered under the watershed general permit and are subject to final WLAs as of January 1, 2011. Existing non-significant facilities with individual VPDES permits are covered by rule under the watershed general permit until such time as they expand. The watershed general permit currently includes 41 non-significant dischargers. All other non-significant facilities have coverage under the appropriate VPDES general permit (e.g. domestic discharges less than 1,000 gpd, Car Wash, Concrete, Cooling Water, Nonmetallic Mineral Mining)

Details on DEQ's inspections (http://www.deq.virginia.gov/vpdes/checklist.html) and enforcement (http://www.deq.virginia.gov/enforcement/homepage.html) programs are available on DEQ's website.

### *Combined Sewer System*

Portions of three Virginia localities -- Alexandria, Lynchburg and Richmond -- are served by a CSS (sewer pipes conveying both domestic wastewater and storm water). Under rainfall-induced high flow conditions, these systems may overflow with a combination of sanitary wastewater and storm water discharged into streams and rivers. CSS nutrient and sediment loads in the CSO must be accounted for in the Bay TMDL. This includes both the discharges from CSO outfalls and the portion of combined sewer flow above the dry-weather design capacity that is conveyed and treated at the wastewater plant. CSS communities must strike a balance between: (1) treating the maximum amount of combined flow at their wastewater plant to avoid overflows that could cause bacterial contamination of surface waters; and (2) not overloading the plant with dilute wastewater that could have long-term impacts on treatment efficiency.

AR0026714

recordkeeping of land application activities and poultry waste transactions. In addition, the amendments include the option to require a poultry waste end-user or poultry waste broker to obtain a permit if they are found to be non-compliant with the requirements of the regulation.

**VPDES CAFO Regulation - (9VAC25-31)**

Concentrated Animal Feeding Operations (CAFOs), as defined by the EPA CAFO Rule, are regulated in Virginia under the VPDES Permit Program. A CAFO which discharges or proposes to discharge has a duty to apply for coverage under a VPDES general or individual permit. In response to the changes to the EPA CAFO Rule which became effective in December 2008, Virginia amended the VPDES Regulation effective March 3, 2010. In a letter dated June 14, 2010, EPA approved these VPDES CAFO Regulatory provisions. Permit requirements mirror those found in the EPA 2008 CAFO Rule, and also include additional Virginia regulatory requirements pertinent to the type of operation. For instance, VPDES CAFO permits covering poultry operations would also contain the requirements related to poultry waste transfers in accordance with the amendments to VPA Regulation and General Permit for Poultry Waste Management.

The following sections address the questions, issues and types of information organized in the eight elements as described in A Guide for EPA's Evaluation of Phase I Watershed Implementation Plans dated April 2, 2010:

### 5.7.1: Final Nutrient and Sediment Target Loads

Final nutrient and sediment target loads will be estimated using the Chesapeake Bay Program Watershed Model. Virginia is waiting to receive this information based on results of Element 2.

### 5.7.2 Current Loading Baseline and Program Capacity

The Chesapeake Bay Program Watershed Model (WSM) will be used to estimate current nutrient and sediment loads associated with the production area of animal feeding operations (refer to EPA's guidance outlined in "A Guide for EPA's Evaluation of Phase I Watershed Implementation Plans" dated April 2, 2010). In order to comply with this element, on November 29, 2010 Virginia submitted a revised input deck for the WSM. The input deck includes the number of animals by type and county associated with 100 percent of the AFO and CAFO operations.

All AFOs and CAFOs are currently covered by VPA permits, with CAFOs that discharge or propose to discharge being converted to VPDES permit coverage over the next 18 months. Currently, Virginia has 898 AFOs/ CAFOs covered by a VPA permit in the Chesapeake Bay Watershed. Of the 898 facilities, 116 operations are EPA defined Large CAFOs. The table below indicates the number and type of permits along with estimates for future permit coverage in the Bay watershed.

AR0026750

# APPENDIX 1– TARGET LOAD AND REDUCTION TABLES BY SOURCE-SEGMENT FOR 2017 AND 2025

Development of the final source-segment target load tables for TN, TP and TSS require output from the Chesapeake Bay Watershed Model runs of the final Virginia input deck that was submitted to EPA on November 29, 2010.

AR0026798

# APPENDIX 3: DEVELOPMENT OF PHASE I WATERSHED IMPLEMENTATION PLANS AND PUBLIC PARTICIPATION

## 3.1. Webinars and Public Meetings

### Webinars

The EPA hosted a webinar on October 2, 2009 to introduce the Chesapeake Bay TMDL process to stakeholders in the Commonwealth of Virginia. More than 400 people participated, either in person at six Virginia Department of Environmental Quality offices or on online, in the October 2 orientation meeting. They heard EPA and state officials discuss efforts to develop a Chesapeake Bay TMDL report and implementation plan. EPA and state staff answered questions and received comments from attendees.

Starting in February 2010, EPA hosted seven webinars on roughly a monthly basis. These webinars were open to the public throughout the bay watershed. Virginia staff presented an update of their efforts in the February session.

### Public Meetings

During the week of December 14-17, 2010, more than 600 people attended Virginia meetings held by the EPA to address the Chesapeake Bay TMDL process. Meetings were held at the following dates and locations:

- December 14 —Falls Church, VA
- December 15 —Chesapeake, VA
- December 15 —Williamsburg, VA
- December 16 —Penn Laird, VA
  - December 17 —Fredericksburg, VA

## 3.2. Expert Panels

As a part of developing components of Virginia's Phase I WIP, state agency staff convened expert panels comprised of subject matter and program delivery experts in three sectors: agricultural conservation, urban stormwater, and onsite/septic to develop Virginia's Enhanced Program Implementation Levels (EPIL). The EPIL was the first attempt to develop a Watershed Model scoping run and was used as a starting point or straw proposal with the Stakeholder Advisory Group and other stakeholder groups.

During panel meetings, the members were presented information on Chesapeake Bay Program Watershed Model structure, calibration, scenarios, segmentation, and outputs. Members were presented the available land for implementing a pollution mitigating BMP, and the current treatment level for that practice by source sector.

AR0026807

Individual panel members were asked to review each practice and associated information to determine, based on their professional experience, how much implementation for each practice could increase. Use of the panels revealed the need for additional BMPs not currently utilized in the Watershed Model for agriculture and onsite/septic.

Although the draft allocations demanded that much higher rates of implementation be considered, this initial process was beneficial in several ways. The EPIL served as an outreach tool to engage stakeholders and illustrated the opportunities and barriers across programs and pollution source sectors. It provided an initial state level pollution reduction strategy allowing a better understand of the ability to meet draft pollution targets. It also provided a framework for distributing Virginia's bay drainage WLA and the Load Allocation (LA). Lastly, it provided sector interest groups and others a clearer understanding of accomplishments needed to meet the Chesapeake Bay TMDL pollutant targets.

## 3.3. Stakeholder Advisory Group

Late in 2009, the Virginia Secretary of Natural Resources, with input from DCR and DEQ, established the SAG. This group provides a forum for discussion during the development of the Chesapeake Bay TMDL and the WIP. The current administration continued and expanded the SAG to provided additional representation from key stakeholders. The SAG includes representatives from local government, regional planning districts, conservation groups, academia, and other special interests. It offers new, creative approaches to meeting the milestones established in the Chesapeake Bay TMDL. An outside facilitator was contracted to keep the group on task during the meetings and encourage the balanced participation of SAG members.

In its initial meetings the SAG reviewed and evaluated the work of the expert panels. They have also advised on sector pollutant load reductions and the sector allocations that will be used to meet the interim and final goals. They commented on current programs' abilities to meet these allocations and evaluated program expansion or new program development needed to meet current and future pollution reductions by sector. It is anticipated the SAG's will also play a role in Phase 2 in addressing allocations at a more local scale

AR0026808

SAG Members:

| | |
|---|---|
| VIRGINIA ASSOCIATION OF MUNICIPAL WASTEWATER AUTHORITIES | CBP LOCAL GOVERNMENT ADVISORY COMMITTEE VA MEMBER |
| VIRGINIA MANUFACTURERS ASSOCIATION | VIRGINIA SEAFOOD COUNCIL |
| NAVY – DEPARTMENT OF DEFENSE | VIRGINIA WATERMEN'S ASSOCIATION |
| HOMEBUILDERS OF VIRGINIA | VIRGINIA ASSOCIATION OF SOIL AND WATER CONSERVATION DISTRICTS |
| VIRGINIA MUNICIPAL STORMWATER ASSOCIATION | CHESAPEAKE BAY COMMISSION |
| JAMES RIVER GREEN BUILDERS COUNCIL | CBP CITIZEN'S ADVISORY COMMITTEE VA MEMBER |
| VIRGINIA ASSOCIATION OF PLANNING DISTRICT COMMISSIONS | CBP SCIENTIFIC AND TECHNICAL ADVISORY COMMITTEE VA MEMBER |
| VIRGINIA ASSOCIATION OF COMMERCIAL REAL ESTATE | CDM |
| VIRGINIA CHAMBER OF COMMERCE | PBS&J |
| FOUNTAINHEAD ALLIANCE | WETLAND STUDIES AND SOLUTIONS |
| VIRGINIA AGRIBUSINESS COUNCIL | CHESAPEAKE BAY FOUNDATION |
| VIRGINIA FARM BUREAU FEDERATION | JAMES RIVER ASSOCIATION |
| VIRGINIA POULTRY FEDERATION | FRIENDS OF THE RAPPAHANNOCK |
| VIRGINIA STATE DAIRYMEN'S ASSOCIATION | SOUTHERN ENVIRONMENTAL LAW CENTER |
| VIRGINIA SMALL GRAIN PRODUCERS | SHENANDOAH RIVERKEEPER |
| VIRGINIA FORESTRY ASSOCIATION | WETLANDS WATCH |
| NRCS | VIRGINIA MUNICIPAL LEAGUE |
| RIVANNA RIVER BASIN COMMISSION | VIRGINIA ASSOCIATION OF COUNTIES |
| | RAPPAHANNOCK RIVER BASIN COMMISSION |

The SAG met on December 17, 2009 and February 26, June 15, August 24, and November 16, 2010. In addition to these meetings of the entire group, three sector working groups held multiple meetings in July. A steering committee comprised of the chairs of those sector work groups met twice in August. The sectors covered by the working groups were agriculture, wastewater treatment, urban/suburban stormwater and onsite/septic.

AR0026809

In addition to SAG members, working group membership was supplemented with additional individuals with particular sector experience and expertise. They evaluated additional scoping scenario inputs and model results and discussed and proposed various approaches to further address the allocations for agriculture, urban sources, septic systems and wastewater. Their findings were evaluated by the SAG steering committee and presented to the full group for consideration during their Aug. 24 meeting. For more details on the SAG go to http://www.dcr.virginia.gov/soil_and_water/baytmdlsag.shtml.

## 3.4. Websites and Technology Based Outreach

Three main Web sites have been developed to inform stakeholders and the public of the Bay TMDL:

EPA's Bay TMDL Web site: http://www.epa.gov/chesapeakebaytmdl/

DCR's Bay TMDL Web site: http://www.dcr.virginia.gov/soil_and_water/baytmdl.shtml

DEQ's Bay TMDL Web site: http://www.deq.state.va.us/tmdl/chesapeakebay.html

The sites provide information on upcoming meetings and meeting recaps after the fact. They also feature numerous EPA guidance documents and pages explaining elements of the planning effort including:

- The planning timeframe; and the revised timeframe
- The announcement of draft loading targets
- The EPA "consequences" letter
  - Identification and explanation of the tidal water segments

These websites serve as the primary information portal for the process in Virginia. However, since websites are such a passive form of communication, several more interactive informational tools were developed.

In September 2009, DCR developed a Virginia Bay TMDL listserv to help inform stakeholders of nonpoint source related elements of the TMDL and WIP process. DCR staff pulled together and supplemented existing constituent e-mail lists to develop a listserv of more than 600 names.

To be added to the listserv, interested parties can write to VABAYTMDL@dcr.virginia.gov.

To better elicit comments and feedback on drafts and concepts to be used in the allocation distribution process and in developing the WIP, DCR also worked with the Chesapeake Watershed Network to develop a private VABAYTMDL group discussion area. The group area was created in March.

All members of the VABAYTMDL listserv were notified of the group site and encouraged to join. The discussion area is private from the rest of Chesapeake Network. While everyone on the VABAYTMDL site can see everyone else's comments, the existence of the group nor its

131

AR0026810

discussions are visible to any other Chesapeake Network members. Initially 125 signed up for the group discussion area.

AR0026811

# APPENDIX 4 AGENCY CONTACT INFORMATION

Send inquiries to:  VABAYTMDL@dcr.virginia.gov

For More Information, please contact:

Anthony Moore
Assistant Secretary of Natural Resources
804-786-0044
Anthony.moore@governor.virginia.gov
http://www.naturalresources.virginia.gov/

Matt Conrad
Deputy Secretary of Agriculture and Forestry
804-692-2511
Matt.conrad@governor.virginia.gov
http://www.ag-forestry.virginia.gov/

Russ Baxter, Chesapeake Bay Coordinator
Virginia Department of Environmental Quality
804-698-4000
Russ.baxter@deq.virginia.gov
http://www.deq.virginia.gov/

Russ Perkinson, Assistant Division Director for Nonpoint Source Programs
Virginia Department of Environmental Quality
804-786-4382
Russ.perkinson@dcr.virginia.gov
http://www.dcr.virginia.gov/

AR0026812

# West Virginia's
## Chesapeake Bay TMDL Watershed Implementation Plan

### A product of the
### West Virginia WIP Development Team



### In cooperation with the
### WV Department of Environmental Protection
### WV Conservation Agency
### WV Department of Agriculture

Submitted to the Chesapeake Bay Program

November 29, 2010

WV Phase I Chesapeake Bay Watershed Implementation Plan      11/29/2010    1 of 116

AR0026813

## SECTION 2.  EXECUTIVE SUMMARY

The Chesapeake Bay is a national and local treasure, and an important source of livelihood, recreation and cultural heritage for the region.  However, after receiving pollution from the surrounding landscape for many years, the Bay is in trouble.  The states in the Chesapeake Bay watershed – Delaware, Maryland, New York, Pennsylvania, Virginia and West Virginia – along with the District of Columbia and the U.S. Environmental Protection Agency are working together to find solutions to the Bay's problems.  They determined that the key to restoring the Bay's health entails reducing the flow of nutrients (nitrogen and phosphorus) and sediment flowing from the Bay states into the Bay, and have set maximum amounts for nitrogen, phosphorus and sediment, known as Cap Load Allocations (hereafter referred to as CLAs or Cap Loads), for each of the jurisdictions.

In 2004, Bay Program Partners developed and began to implement cooperative and voluntary Tributary Strategies to reduce current pollutant loads to the CLA levels by the year 2010.  The Chesapeake Bay Program determined that load reductions of 33% for nitrogen, 35% for phosphorus, and 6% for sediment were required of West Virginia.  It was understood that, if this effort was not successful, the U.S. Environmental Protection Agency would begin developing a Total Maximum Daily Load (TMDL) for the Chesapeake Bay, a process that would place significant additional restrictions on pollution sources in all the Bay States.  A TMDL sets forth a pollution budget for a watershed that allocates the amount each pollutant source is allowed to release while still attaining water quality standards.

In 2008, in recognition that pollution reduction goals were not being met, the federal and state governments determined that shorter-term milestones would improve accountability, accelerate pollution reductions, and increase the likelihood of meeting pollution reduction targets.  The first milestones were announced in May 2009.  Plans to meet these commitments were laid out over the three years between January 1, 2009 and December 31, 2011.

In May 2009, President Obama issued an Executive Order that substantially expanded the federal commitment to the Chesapeake Bay region.  Many of the federal actions will directly support restoration efforts by local governments, nonprofit groups and citizens.  The Order also requires that federal lands and facilities lead by example in environmental stewardship.  Integral to the Order was the decision for the EPA to proceed with the Chesapeake Bay TMDL, which would expand regulation of urban and suburban stormwater and concentrated animal feeding operations and increase enforcement activities and funding for state regulatory programs.   Finally, the Order gives the EPA enforcement authority if states miss established goals.

The Order required the six watershed states and the District of Columbia to develop and submit **Watershed Implementation Plans** (WIP) as a key element of this approach.

AR0026815

This document is the **Phase I Watershed Implementation Plan (WIP)**, which was required to be developed and submitted to EPA November 29, 2010 for inclusion in the final Chesapeake Bay TMDL. It begins the process of defining how West Virginia, in partnership with federal and local governments, will achieve the pollution load reductions required of the state of West Virginia to support the TMDL.

WIP strategies are directed to have controls in place by 2025 that would achieve target loads, and by 2017 that would result in 60% of necessary nutrient and sediment reductions compared to current loads. The WIP strategies address existing as well as new or expanded sources of nutrients and sediment.

West Virginia developed an incomplete draft Phase I WIP on September 1, 2010 that was advertised by EPA concurrently with the draft TMDL. In contrast to the draft, this revised Phase I WIP is based upon allocation scenarios that the Chesapeake Bay Watershed Model (CBWM) predicts will achieve 2017 and 2025 goals for West Virginia. The CBWM uses mathematical models to simulate changes in the Bay ecosystem due to changes in population, land use, or pollution management. These simulations are not the same as actual conditions, but represent the best scientific estimate of what average loadings are likely to be. The revised WIP also includes more detailed descriptions of planned actions and contingencies necessary to demonstrate reasonable assurance that proposed pollutant reductions will be achieved.

A Phase II WIP, due to be completed by November 2011, will follow CBWM revisions to correct known deficiencies and include more detailed, local information. Future CBWM refinement and reassessment are again planned in 2017. At that time, the jurisdictions will develop Phase III WIPs to ensure attainment of Cap Loads by 2025.

This document provides a preliminary review of the strategies to be undertaken in West Virginia's major load sectors: Wastewater, Developed Lands and Industrial, Agriculture, Forest, and Other (see Appendix C). Some of these sectors are regulated and some are not.

Wastewater
- Significant Municipal Facilities
- Nonsignificant Municipal Facilities
- Combined Sewer Overflows
- Significant Industrial Facilities
- Nonsignificant Industrial Facilities
- Negligible Industrial Wastewater Discharges

Developed Lands & Industrial
- Regulated Sectors – Stormwater - Associated with Industrial Activity
- Regulated Sectors – Stormwater - Mining Discharges
- Regulated Sectors – Stormwater - Construction Stormwater General Permit
- Regulated Sectors – Stormwater - Municipal Separate Storm Sewer Systems (MS4s)
- Non-regulated Sectors – Developed Lands

AR0026816

# SECTION 3.  INTRODUCTION

The Chesapeake Bay is a national and local treasure, and an important source of livelihood, recreation and cultural heritage for the region.  However, after receiving pollution from the surrounding landscape for many years, the Bay is in trouble.  The states in the Chesapeake Bay watershed – Delaware, Maryland, New York, Pennsylvania, Virginia and West Virginia – along with the District of Columbia and the U.S. Environmental Protection Agency have come together to find solutions to the Bay's problems.  They have determined that the key to restoring the Bay's health entails reducing the flow of nutrients (nitrogen and phosphorus) and sediment flowing from the Bay states into the Bay, and have set maximum amounts for nitrogen, phosphorus and sediment, known as Cap Load Allocations (hereafter referred to as CLAs or Cap Loads), for each of the jurisdictions.

West Virginia's role in this process began when Governor Bob Wise signed the Chesapeake Bay Program Water Quality Initiative Memorandum of Understanding on June 18, 2002, making West Virginia, along with New York and Delaware, a Headwaters Partner in the Chesapeake Bay Program.  With the agreement, West Virginia gained a seat at the Chesapeake Executive Council, a voice in deciding how best to achieve the Program's goals, and demonstrated its intent to significantly improve water quality by establishing and implementing strategies to meet voluntary goals and objectives to reduce nutrient and sediment loads.

Bay Program partners agreed at that time to develop and carry out cooperative and voluntary Tributary Strategies to reduce existing pollutant loads to the CLA levels by the year 2010.  The Chesapeake Bay Program determined that load reductions of 33% for nitrogen, 35% for phosphorus, and 6% for sediment would be required of West Virginia.

It was understood that failure to achieve the necessary reductions by 2010 would lead the U.S. Environmental Protection Agency to begin developing a Total Maximum Daily Load (TMDL) for the Chesapeake Bay, a process that would place significant additional restrictions on pollution sources in all the Bay States, including headwaters states like West Virginia.  A TMDL sets forth a pollution budget for a watershed that allocates the amount each pollutant source is allowed to release while still attaining water quality standards.

The West Virginia Potomac Tributary Strategy was developed in 2003-2004 using a Potomac Basin stakeholder process.  Anyone with a "stake" in the outcome was invited to take part, and individuals representing counties, municipalities, industry, agriculture, developers, environmental organizations, and state and regional governments all participated.  This Tributary Strategy provided the framework for a comprehensive planning process to equitably reduce the flow of nutrients and sediment loads to the Potomac River, and ultimately to the Chesapeake Bay.  The WV Potomac Tributary Strategy document also provided substantial background information that is not repeated in this document; it is available for download at: http://www.wvca.us/bay/documents.cfm.  The implementation deck associated with the strategy included pollution reduction practices implemented from 1985 through those

AR0026818

expected to be implemented by 2010.

Following development of West Virginia's Strategy document and proposed implementation deck, the WV Potomac Tributary Strategy Team moved into an implementation phase designed to refine the original proposal, begin actively implementing the Tributary Strategy, and enhance support for and input on the process through a series of public meetings.  One result of that public process was the WV Potomac Tributary Strategy Implementation Plan, first submitted to the USEPA in December 2005, and last revised in June 2007.  The Implementation Plan summarized actions to be taken from 2004 through 2010 to meet West Virginia's Cap Load, plus a "Cap maintenance strategy" that explains how Cap loads will continue to be honored in the face of population growth and other expected changes in the region.

In 2008, in recognition that pollution reduction goals were not being met, the federal and state governments determined that shorter-term milestones would improve accountability, accelerate pollution reductions, and increase the likelihood of meeting pollution reduction targets.  The first milestones were announced in May 2009.  Plans to meet these commitments were laid out over the three years between January 1, 2009 and December 31, 2011.

In May 2009, President Obama issued an Executive Order that ushered in a new era of shared federal leadership, action and accountability.  The Order expanded the federal commitment to the Chesapeake region in a move that led agencies to dedicate unprecedented resources to the effort, targeting actions where they can have the most impact.  Many of the federal actions will directly support restoration efforts by local governments, nonprofit groups and citizens.  The Order also requires that federal lands and facilities lead by example in environmental stewardship.  Integral to the Order was the decision for the EPA to proceed with the Chesapeake Total Maximum Daily Load, which would expand regulation of urban and suburban stormwater and concentrated animal feeding operations and increase enforcement activities and funding for state regulatory programs.   Finally, the Order gives the EPA enforcement authority if states miss established goals.

The Order highlighted the need for acceleration of progress, sharpened emphasis on explicit actions, and required greater transparency and accountability in these efforts.  The six watershed states and the District of Columbia were required to develop and submit **Watershed Implementation Plans** (WIP) as a key element of this approach and in support of the development of the draft and final Chesapeake Bay Total Maximum Daily Load (Bay TMDL). The WIPs will show how the states and the District, in partnership with federal and local governments, will achieve and maintain the Bay TMDL nitrogen, phosphorus, and sediment allocations necessary to meet Bay water quality standards.

The six Chesapeake Bay watershed states and the District of Columbia developed draft Phase I WIPs that were submitted to the USEPA by September 1, 2010. In combination with the two-year milestones and follow-up progress reports to the public, these plans respond to the heightened expectation within Executive Order 13508: Chesapeake Bay Protection and

AR0026819

Restoration to create a new accountability framework that guides local, state and federal water quality restoration efforts.

WIP strategies are directed to have controls in place by 2025 that will achieve target loads, and by 2017 that will result in 60% of necessary nutrient and sediment reductions compared to current loads. The WIP strategies address existing as well as new or expanded sources of nutrients and sediment.

West Virginia submitted an incomplete draft Phase I WIP on September 1, 2010 that was advertised by EPA concurrently with the Draft TMDL.  In contrast to the draft, this revised Phase I WIP is based upon allocation scenarios that the Chesapeake Bay Watershed Model (CBWM) predicts will achieve 2017 and 2025 goals for West Virginia.  The CBWM uses mathematical models to simulate changes in the Bay ecosystem due to changes in population, land use, or pollution management.  These simulations are not the same as actual conditions, but represent the best scientific estimate of what average loadings are likely to be.  The revised WIP also includes more detailed descriptions of planned actions and contingencies necessary to demonstrate reasonable assurance that proposed pollutant reductions will be achieved.

A Phase II WIP, due to be completed by November 2011, will follow CBWM revisions to correct known deficiencies and will represent a refinement of Phase I that will include more detailed, local information. Future CBWM refinement and reassessment are again planned in 2017. At that time, the jurisdictions will develop Phase III WIPs to ensure attainment of Caps loads by 2025.

AR0026820

## SECTION 4.   DEVELOPMENT OF PHASE I WATERSHED IMPLEMENTATION PLANS

The WV WIP Development Team (WV-WIPDT) is comprised primarily of representatives from WV Department of Environmental Protection (WVDEP), WV Department of Agriculture (WVDA), WV Conservation Agency, WV Division of Forestry, Cacapon Institute, and The Conservation Fund's Freshwater Institute.  This core group has been directing the development and implementation of strategies since the first Potomac Tributary Strategy was completed in 2005. While the entire WV-WIPD Team was responsible for developing the Watershed Implementation Plan in cooperation with other organizations in the state, the creation of the "input deck" that outlines WV's responsibilities for reducing and maintaining their Cap Load was the responsibility of WVDEP along with WVDA and related agricultural organizations. WVDEP's Potomac Basin Coordinator led this effort and was responsible for coordinating outreach to all the sectors impacted by the WIP.

Along with all of the other jurisdictions with waters flowing into the Chesapeake Bay, WV has been assigned a Cap load (see Figures 1, 2 & 3).  The combined Cap Load for all the jurisdictions represents an overall pollution "diet" that the Chesapeake Bay requires to become healthy again.  WV's Cap Load is a budget for nitrogen, phosphorus, and sediment limits for WV's portion of the Potomac Basin.  For each of these pollutants WV has to develop a strategy to reduce the current pollutant load down to the level of the Cap Load as well as derive a strategy on how that Cap Load will be maintained.  To do this, we must first know what the current load is (2009 Progress), what the future loads will be, and which pollutant sources are responsible for generating those loads.



**Figure 1.  Nitrogen loads delivered to the Chesapeake Bay from West Virginia.**
**2010 No Action is the nitrogen load that would have been delivered to the Bay by West Virginia without past and current programs. 2009 Progress is the progress made by West Virginia in reducing nitrogen loads through 2009.  2025 Cap is the target delivered load.**

AR0026821



**Figure 2. Phosphorus loads delivered to the Chesapeake Bay from West Virginia.**
2010 No Action is the phosphorus load that would have been delivered to the Bay by West Virginia without past
and current programs. 2009 Progress is the progress made by West Virginia in reducing phosphorus loads
through 2009. 2025 Cap is the target delivered load.



**Figure 3. Sediment loads delivered to the Chesapeake Bay from West Virginia.**
2010 No Action is the sediment load that would have been delivered to the Bay by West Virginia without past
and current programs. 2009 Progress is the progress made by West Virginia in reducing sediment loads through
2009. 2025 Cap is the target delivered load.

Current and future pollutant load estimates are generated by the Chesapeake Bay Watershed
Model (CBWM) and broken down into land uses (sources) and locations. Examples of land use
are pasture and developed land. Each of these land uses has a pollution load associated with it.
The location part of the equation can best be thought of as a watershed. The CBWM breaks the
Potomac Basin down into numerous watersheds each having their own unique characteristics
that reflect how they impact the Bay.

The pollutant sources which are responsible for generating loads are grouped into "sectors."
For the purposes of this document, the major load sectors in West Virginia are Wastewater,
Developed Lands and Industrial, Agriculture, Forest, and Other (see introductions to Sections 6-
9, and Appendix C). Some of these sectors are regulated and some are not. Furthermore, some

AR0026822

## SECTION 5.  Point and Nonpoint Sources

Pollution is usually described as coming from either a point source or a nonpoint source.  Point source pollution comes from an easily identifiable place - like a factory or a sewage treatment plant, and enters the environment at a clearly identifiable location – like a pipe or a smokestack.  The flow of pollutants from point sources is regulated by the state and federal governments by means of National Pollutant Discharge Elimination System (NPDES) permits, is fairly constant and predictable, and control measures can be applied at the source.

Nonpoint sources of pollution are more difficult to control and assess than point sources because they are everywhere - they include streets, parking lots, lawns, farm fields, barnyards, and construction sites.  The flow of pollutants from nonpoint sources is less predictable than point sources, and mostly occurs when rain and snowmelt wash the surface of the land and carry pollutants via surface runoff and groundwater paths to streams, rivers, lakes, and oceans.

Within this TMDL, wasteload allocations must be granted for the pollutant loads associated with the WV/NPDES permitted point source discharges from a myriad of activities, including:

- Individual WV/NPDES permits for the effluents of sewage treatment facilities and authorized collection system overflows
- Individual WV/NPDES permits for discharges from industrial facilities with potential  to discharge nitrogen and phosphorus
- Individual and general WV/NPDES permits (and associated SMCRA based permits) for discharges from mining activity
- Registrations under General WV/NPDES permits for small sewage treatment facilities
- Registrations under the Multi-Sector Stormwater General Permit (stormwater associated with industrial activity)
- Registrations under the Construction Stormwater General Permit (stormwater associated with construction activity)
- Registrations under the MS4 General Permit (stormwater associated with Municipal Separate Storm Sewer Systems)
- Individual permits for discharges from the production areas of Concentrated Animal Feeding Operations (CAFO)

The following sections provide a description of the various permit types, TMDL allocations and implementation approaches to reduce both point and nonpoint nutrient and sediment sources from West Virginia that impact the Chesapeake Bay.

AR0026828

## SECTION 6.  Wastewater

### Wastewater Section at a Glance

For the purposes of this document, "wastewater" refers to the wastewater from municipal and industrial point sources that is controlled via National Pollutant Discharge Elimination System (NPDES) permits.  It includes: Significant Municipal Facilities; Nonsignificant Municipal Facilities, Combined Sewer Overflows (CSO), Significant Industrial Facilities, Nonsignificant Industrial Facilities, and Negligible Industrial Wastewater Discharges.

According to the Chesapeake Bay Watershed Model, the "wastewater" sector is responsible for five percent of the total delivered nitrogen load and fifteen percent of the total delivered phosphorus load.



### Summary Actions:

Wastewater- Allocation
- Significant facilities reduce to loads based upon existing design flow and 5 mg/l N and 0.5 mg/l P (Apps. A.1 and B.1)
- Significant facility implementation via individual wasteload allocation
- Nonsignifcant facilities held to existing loads (Apps. A.4 and B.2); implementation via grouped wasteload allocation
- Eliminate anhydrous ammonia use as a treatment chemical by mining sources (App. B.4)
- 85% Combined Sewer Overflows reduction (App. A.5)

Wastewater - Accounting for growth

AR0026829

- 100% offset for all new loads for permitted facilities of any size
- Can offset by:
  - Better treatment of existing source
  - Assimilation of other sources
  - Other mechanisms under future trading/offset program

Tracking and Reporting
- Significant facilities compliance status via Discharge Monitoring Reports through Permit Compliance System (PCS)
- Existing nonsignificant compliance status assumed = baseline condition, simply verify a component wasteload allocation at reissuance and report baseline condition
- All new/increased facilities' compliance status individually tracked
- CSO via number of overflows in annual reports
  - 0 = 100% reduction from 2010NA
  - < 6 = 85% reduction from 2010NA
  - 6 = 0% reduction

# SECTION 6A.  Significant Municipal Facilities

Significant municipal facilities are those sewage treatment systems with existing permitted flows greater than or equal to 0.4 million gallons per day (MGD).  Appendix A.1 provides a list of facilities and includes all pertinent location, loading and Bay delivery information.  Individual, edge-of stream, average annual, wasteload allocations are prescribed based upon each facility's current permitted discharge flow and total nitrogen and total phosphorus effluent concentrations of 5 mg/l and 0.5 mg/l, respectively.

## 6A.a.  Current Programs and Capacity

In 2005, WVDEP began imposing permit conditions in WV/NPDES permits as dictated by the provisions of West Virginia's Potomac Tributary Strategy.  For significant municipal facilities, the TMDL wasteload allocations are equal to the Tributary Strategy expectations.  As such, facilities in this category are currently subject to permit requirements that are generally consistent with the prescribed wasteload allocations. WVDEP will continue implementation of established NPDES permitting, compliance assessment and enforcement protocols to compel compliance with the wasteload allocations.  Compliance will be required in the shortest time possible but not later than 2017.

Appendix A.2 provides an assessment of the compliance status of significant individual facilities in 2009.  Because wasteload allocations are average annual loads, some facilities are currently attaining compliance without application of targeted nitrogen and phosphorus treatment technologies.  Even though effluent nitrogen and phosphorus concentrations exceed those used to calculate wasteload allocations, compliance is being achieved because wastewater flows are less than current permitted flow.  This is acceptable, but positive future growth will increase wastewater flows and jeopardize compliance if additional treatment is not provided.  Under

AR0026830

**SECTION 6B.** Nonsignificant Municipal Facilities

Nonsignificant municipal facilities are those sewage treatment systems with existing permitted flows less than 0.4 MGD. Appendix A.4 displays the nonsignificant municipal facilities in the Chesapeake Bay watershed and provides pertinent location, loading and delivery information. Grouped, edge-of-stream, annual average wasteload allocations are prescribed at the county scale for non-significant municipal facilities. The grouped wasteload allocations are based upon the summation of individual facility loads at current permitted flow. For the majority of facilities, the total nitrogen and total phosphorus default concentrations of the "2010 No Action" (2010NA) model scenario (18 mg N/l and 3 mg P/l) were used in the individual facility load calculations. Total nitrogen and total phosphorus concentrations of 5 mg/l and 0.5 mg/l, respectively, were used in the individual facility load calculations for nine facilities. Those facilities were initially permitted after WVDEP began Tributary Strategy implementation and their initial WV/NPDES permits included mass limitations based upon those concentrations and required installation and operation of treatment facilities necessary to achieve them. Pollutant reductions are not prescribed by the wasteload allocations for any existing facilities in this subcategory.

**6B.a.    Current Programs and Capacity**

A small number of facilities in this subcategory operate pursuant to individual WV/NPDES permits. The remaining facilities, representing the vast majority of sources, are regulated under two General WV/NPDES permits. General Permit WV0103110 regulates small, privately owned sewage treatment plants ("package plants") that have a design flow of less than 50,000 gpd and General Permit WV0107000 regulates home aeration units (HAUs), with typical design flows less than 1000 gpd.

WVDEP performed a detailed evaluation of the existing permitted facilities meeting the nonsignificant municipal definition and provided wasteload allocations that are intended to allow continued permitting of those existing sources without pollutant reductions. TMDL implementation will simply be accomplished through the verification of an Appendix A.4 component loading for existing discharges at the time of permit reissuance. During the public comment period for the draft TMDL, WVDEP determined two facilities were mistakenly omitted in the draft Phase I WIP and has subsequently updated Appendix A.4 to include wasteload allocations for them. The combined, additional delivered loads associated with the wasteload allocations for the omitted permits (1230 #N/yr and 160 #P/yr) do not jeopardize attainment of 2017 or 2025 goals. Those wasteload allocations will be formally included in the model input deck associated with the Phase II WIP.

The level of performance associated with the wasteload allocations for nonsignificant municipal facilities is different than Tributary Strategy expectations for existing facilities sized between 0.05 MGD and 0.4 MGD. Nitrogen and phosphorus effluent limitations have been imposed in existing permits for a subset of those facilities based upon Tributary Strategy implementation.

AR0026833

### 6C.a.  Current Programs and Capacity

WVDEP implements the national Combined Sewer Overflow Control Policy and the state Combined Sewer Overflow Strategy to control discharges from CSOs. Under those protocols, facilities must ultimately implement controls to ensure that CSOs do not cause or contribute to any violation of water quality standards.  The policies recognize that comprehensive CSO control may require significant resources and provide mechanisms for permitting an extended period of time to accomplish necessary controls.  All facilities are required to implement six "minimum controls" and to develop Long Term Control Plans that lead to compliance.  Many facilities pursue an "assumptive approach" with interim goals of 85% CSO reduction and/or controls that result in less than six overflows per year.  After attainment of interim goals, facilities assess water quality impacts and pursue further controls if necessary.

The subject facilities have implemented significant CSO controls and all are recently reporting activity at less than six overflows per year.  Only maintenance of existing conditions is necessary pursuant to Chesapeake Bay TMDL implementation.

### 6C.b.  Accounting for Growth

Not applicable as CSO loading will only decrease in the future.  WVDEP will not authorize construction of combined collection systems nor permit overflows from newly constructed systems.

### 6C.f.  Tracking and Reporting Protocols

WV/NPDES permits require the submission of quarterly reports regarding CSO control performance and overflow activity that may be used for tracking and reporting.  Because of the episodic nature of overflows and lack of flow monitoring capability, measurement of actual CSO loadings is not practical.  Reporting will be based upon an assumption that control that achieves less than six overflows per year is commensurate with an 85% reduction of CSO load. Facilities that report less than six overflows per year will be reported at 15% of 2010NA edge of stream loads.  Zero loads will be reported if a facility reports zero overflows.  2010NA loads will be reported if more than six overflows are reported.

## SECTION 6D.  Significant Industrial Facilities

Significant industrial facilities are those estimated in the 2010NA scenario to discharge more than 27,000 lb/yr nitrogen or more than 3,800 lb/yr phosphorus.  Appendix B.1 provides a list of facilities and includes all pertinent location, loading and Bay delivery information.  Individual, edge-of stream, average annual wasteload allocations are prescribed based upon 2010NA flows and total nitrogen and total phosphorus effluent concentrations of 5 mg/l and 0.5 mg/l, respectively.

AR0026835

developed and is described at http://wvwri.nrcce.wvu.edu/programs/pwqb/index.cfm.  Policy application in the Bay watershed will require consideration of the final TMDL and definition of baseline requirements for credit generation from the agricultural and urban stormwater sectors.  In the document prepared pursuant to Senate Bill 715, the WVDEP will explore and define additional offset mechanisms that are consistent with the definitions and common elements described in Appendix S of the TMDL, and will coordinate with EPA to ensure program acceptability. The WVDEP's future trading and offset implementation plans will be described in detail in the Phase II WIP.

### 6D.f.  Tracking and Reporting Protocols

WVDEP has historically used the Permit Compliance System to assess the performance of NPDES permittees with respect to effluent limitations.  PCS will facilitate efficient and transparent tracking and reporting of significant industrial facility performance pursuant to this effort.  Although the intended federal mechanisms for reporting Chesapeake Bay TMDL implementation progress are incomplete at this time, it is assumed that significant industrial facility tracking will incorporate entry of Discharge Monitoring Report data by WVDEP into PCS and the uploading of PCS data into the system ultimately established.  Compliance will be assessed simply and regularly by comparing individual facility performance to effluent limitations that are consistent with the prescribed individual wasteload allocations.

Where WVDEP must pursue administrative enforcement actions to compel compliance, that information will also be entered into PCS.  This will allow transparent tracking of compliance schedule interim milestones and the attainment of compliance.

### 6D.g.  Compliance

Appendix A.2 provides anticipated compliance dates for all significant facilities.  Certain facilities will be compliant upon TMDL issuance and others have projects underway such that compliance is expected in the near future.  Upon issuance of the final TMDL, the WVDEP intends to universally evaluate the compliance status of all significant facilities and to initiate administrative enforcement actions to compel noncompliant facilities to pursue corrective actions.  Under such actions, compliance will be expected in the shortest time possible but not later than December 31, 2015.   Appendix A.2 also displays aggregated loading reductions expected from significant municipal and industrial facilities expected to be accomplished by December 31st of each odd numbered year through 2017.

## SECTION 6E.  Nonsignificant Industrial Facilities

Nonsignificant industrial facilities are those estimated to discharge non-negligible loads of nitrogen and phosphorus less than the thresholds defining significant industrial facilities. Appendix B.2 provides a list of facilities and includes all pertinent location, loading and Bay delivery information. Grouped, edge-of-stream, annual average wasteload allocations are

AR0026837

prescribed at the county scale for non-significant industrial facilities. The grouped wasteload allocations are based upon the summation of individual facility loads. Individual facility loads are equal to 2010NA representation except where, based upon the judgment of permitting staff, the existing condition is substantively different from 2010NA representation. Pollutant reductions are not prescribed by the wasteload allocations for any existing facilities in this subcategory.

## 6E.a.  Current Programs and Capacity

Some facilities in this subcategory operate pursuant to individual WV/NPDES permits and others are registered under general WV/NPDES permits. WVDEP performed a detailed evaluation of the existing permitted facilities and provided wasteload allocations that are intended to allow continued permitting of those existing sources without pollutant reductions. TMDL implementation will simply be accomplished through the verification of an Appendix B.2 component loading for existing discharges at the time of permit reissuance.

## 6E.b.  Accounting for Growth

No wasteload allocations are provided for new or expanded discharges from industrial facilities of any size. Except as provided in the Negligible Industrial Sources section, all new sources must offset 100% of new loadings and WV/NPDES permits must include enforceable provisions to implement offsets. Offsets may be secured by improved treatment of existing discharges and/or by other mechanisms that may be available upon the development and approval of a trading and offset program.  All offsets should be based upon delivered loads rather than edge of stream loads to ensure accurate accounting.

## 6E.f.  Tracking and Reporting Protocols

Because existing facilities are provided wasteload allocations that do not require pollutant reductions, individual facility performance tracking and load reporting is not generally intended. Without expansion, all facilities will be assumed to be contributing loadings authorized by the wasteload allocations and reported as such. If new or expanded non-negligible sources are permitted in the future, they will be classified as significant facilities and subjected to individual tracking and reporting consistent with the provisions for existing significant facilities. Upon the request of permittees or future trading partners, existing individual nonsignificant industrial facilities may be classified and tracked as significant industrial facilities, provided that acceptable flow measurement and nutrient self-monitoring capability is demonstrated. If existing sources are reclassified or eliminated through assimilation by another facility, then their component loads will no longer be included in reported nonsignificant industrial facility loadings.

AR0026838

## SECTION 7. Developed Lands & Industrial

### Developed Lands & Industrial Section at a Glance

For the purposes of this document, Developed Lands & Industrial constitutes that portion of the load from developed lands that does not include the "wastewater" load described in Section 6. It includes stormwater from regulated sources subject to NPDES permits, including: industrial, mining, construction stormwater General Permit, Municipal Separate Storm Sewer Systems (MS4s). It also includes non-regulated loads delivered from developed lands, including residential lawns and septic tanks.

According to the Chesapeake Bay Watershed Model, the "developed lands & industrial" sector is responsible for eleven percent of the total delivered nitrogen load and six percent of the total delivered phosphorus load.



**Summary Actions:**

Regulated Stormwater
- Stormwater Associated with Industrial Activity (App. B.3)
  - N/P loads similar to urban/residential landuse (because of SWPP, GPP, SPCC permit requirements)
  - Obtained location, area, % pervious/impervious info from permitting staff
  - Cropped appropriate areas from urban pervious and urban impervious modeled land uses
  - Allocations = 2010 NA - No reduction required
- Mining NPDES permits (App. B.5)

AR0026840

- o Reconfigured model landuse to accurately portray existing permitted area (surface coal mines and quarries)
  - o Loading reductions from "No Action" commensurate w/ existing permit requirements
  - o Eliminate anhydrous ammonia use as a treatment chemical by mining sources (App. B.4)
- Construction Stormwater (App. B.6)
  - o Reconfigured model landuse to accurately portray existing permitted area
  - o Loading reductions from "No Action" commensurate w/BMPs associated with existing permit requirements
  - o Decreased acreage overtime (2 yr milestones)
- Municipal Separate Storm Sewer Systems (MS4)
  - o Existing = Martinsburg, Berkeley County, WVDOH
  - o Allocations for existing MS4s = 2010 NA loads - No reduction required
  - o Rainfall capture requirements for new and redevelopment expected to offset new urban stormwater loads from development w/in MS4 and elsewhere in Potomac watershed
  - o Future (depending upon 2010 census) – maybe Ranson, Charles Town, Shepherdstown, Jefferson County will be MS4s

Non-regulated Developed Lands

- Allocations = 2010 NA - No reduction required
- Future growth anticipated to be offset by required MS4 controls and voluntary BMPs in non-regulated areas – No net increase from 2010NA from urban lands in Potomac watershed
- LID encouraged in Construction Stormwater General Permit review
- Track area, location, pre-development landuse and BMPs associated w/ new/redevelopment by MS4 annual reports and by CSGP program
- Contingencies (if "no net increase" not achieved; 2015 assessment)
  - o Use Residual Designation Authority for MS4 in Jefferson County if 2010 census doesn't require
  - o Pursue statewide Stormwater Management Program with post construction requirements if EPA Nationwide regulations not finalized
  - o Required retrofits for MS4
  - o Modify CSGP to require post-construction controls in Bay watershed
- WV WIP provides "menu" of strategies to be prioritized on the community level, including for:
  - Local governments
  - Homeowners
  - Septic systems
  - Institutions
  - West Virginia seeks input from the community on these strategies for Phase II WIP development

AR0026841

## SECTION 7A.  Regulated Sectors – Stormwater - Associated with Industrial Activity

Point source discharges of stormwater associated with industrial activity are regulated by the Multi-Sector Stormwater General Permit (WV011457) and by individual WV/NPDES permits issued to industrial facilities.  Whether individually permitted or controlled by registration under the general permit, industrial facilities are required to develop and implement Groundwater Protection Plans, Stormwater Pollution Prevention Plans and Spill Prevention Control and Countermeasures Plans.   Proper implementation renders stormwater discharges of quality similar to urban stormwater.

The 2010NA model scenario inappropriately categorized loadings from an incomplete list of industrial stormwater sources in the input deck for the wastewater sector.  WVDEP permitting staff provided detailed information for all Chesapeake Bay drainage facilities registered under the Multi-Sector Stormwater General Permit and for the stormwater components of individually permitted industrial facilities. Appendix B.3 displays the industrial facilities in the Chesapeake Bay watershed with stormwater regulated by an NPDES permit and provides location and drainage area information and land cover characteristics. At the county scale, WVDEP has assigned appropriate areas of urban pervious and urban impervious land uses to industrial stormwater sources.  Grouped, edge-of-stream, annual average wasteload allocations are provided for the stormwater discharges of all facilities identified in Appendix B.3.  Pollutant reductions are not prescribed by the wasteload allocations for any existing facilities in this subcategory.

### 7A.b. Accounting for Growth

Significant growth in this category is not expected.  During construction, new stormwater loads would be controlled via the Construction Stormwater General Permit area allowances.   No wasteload allocations are provided for new post-construction loads.  Depending upon the pre-development land use, offsets may be required.  Alternatively, permits may require new sources to maintain pre-development volume/velocity characteristics.  All new discharges in MS4 jurisdictions will be subject to the one inch capture and onsite management requirements (see Section 7D).

### 7A.f. Tracking and Reporting Protocols

DEP will annually report areas of industrial stormwater sources in the format of Appendix B.3.

AR0026842

## SECTION 7D. Regulated Sectors – Stormwater - Municipal Separate Storm Sewer Systems (MS4s)

West Virginia has an established NPDES program that governs discharges of waste into waters of the state. West Virginia's Municipal Separate Storm Sewer System (MS4) program is funded through NPDES permit fees and regulates small MS4s under a General Permit reissued on June 22, 2009, and effective July 22, 2009. The MS4 General Permit represents a strong effort to address existing and potential water quality issues.

There are no Phase I MS4 municipalities in West Virginia. The MS4 General Permit regulates three MS4s in the Chesapeake Bay watershed: the City of Martinsburg, Berkeley County and the West Virginia Division of Highways. Data from the 2010 U.S. Census will likely trigger the designation of several additional MS4 operators in the Chesapeake Bay Watershed moving heretofore non-regulated urban stormwater sectors into the regulated arena. These possible areas include the City of Ranson, the City of Charles Town, the Town of Shepherdstown, and Jefferson County. However, quantifiable details on new designations will not be available until after the census data is released. Upon designation, any future MS4 entities will be granted an offset equal to 2010 No Action (NA) loadings for all areas that will be subject to MS4 regulation.

WVDEP is not prescribing pollutant reductions from existing urban stormwater sources, but intends to control new development and redevelopment in MS4 areas to counter increased urban stormwater loads from growth throughout the watershed.

### 7D.a. Current Programs and Capacity

Statewide Program

West Virginia's MS4 General Permit requires that MS4s develop and submit stormwater management programs (SWMPs) to WVDEP for approval no later than January 22, 2011. The SWMP must include minimum control measures in each of six categories outlined in the Federal Phase II stormwater rule [40 CFR § 122.32(a)], along with measurable goals and milestones for each measure. The minimum control measure categories are public education and outreach, public involvement and participation, illicit discharge detection and elimination, controlling runoff from construction sites, controlling runoff from new development and redevelopment, and pollution prevention and good housekeeping for municipal operations. MS4s must be fully implementing their SWMPs by 2015.

EPA has recognized that West Virginia's MS4 General Permit is particularly progressive with regard to its post construction requirements. The post construction minimum control of the General Permit directs MS4s to develop ordinances requiring all new development and redevelopment of one acre or greater to capture and manage the first one inch of rainfall by utilizing runoff reduction stormwater practices. Runoff reduction practices include: canopy interception, soil amendments, evaporation, rainfall harvesting, engineered infiltration,

AR0026847

## SECTION 7E.  Non-regulated Sectors – Developed Lands

The land uses and sources (considered by the Chesapeake Bay Watershed Model (CBWM)) considered in this section include high- and low-intensity pervious urban, high- and low-intensity impervious urban, and septic systems.  Successful reduction of priority pollutants from the non-regulated sector of developed lands depends on voluntary adoption of new land use practices, adoption of new laws and ordinances by state and local governments and an increase in both personnel and financial resources to enable implementation and enforcement.  As this non-regulated sector has limited capacity to either deliver programs or enforce actions, we are not calling for a reduction from it at the current time.  This section of the WIP will stress holding the line, i.e. no net increase in nutrients generated by new development.  However, the need to reduce loads from this sector to meet our Cap Load obligations may necessitate a move from voluntary to mandatory practices in the future, effectively moving some non-regulated lands into the regulated arena.  Actions that will be taken in the event that the non-regulated developed lands sector fails to meet the "no net increase" goal are discussed below in the Contingencies section.  Any reductions made by this sector on existing developed lands will help offset loads from future development, ultimately aiding in meeting the "no net increase" goal.

West Virginia is well suited to enable success through voluntary action.  It is very effective at building partnerships across the spectrum of government and non-government organizations.  The relative small size of the WV Potomac Basin facilitates outreach as well.  Outreach efforts made, for example, at one high school, will, in many cases, reach that age group and many of their families for an entire county.

### 7E.a. Current Programs and Capacity

*Laws and Regulations*

West Virginia's Land Use Planning regulations provide for regional planning entities that cross jurisdictional boundaries.  Regular updates of Comprehensive Plans are required as well by these regulations. The counties in the Eastern Panhandle have a limited number of regulations designed to protect water quality.  Only Morgan, Berkeley, and Hampshire Counties have stormwater ordinances.

*Staffing & Technical Capacity*

The WIP is being developed and will be implemented by professional staff from a wide range of state and local governments and NGOs.  These will include: WVDEP, West Virginia Conservation Agency (WVCA), West Virginia Department of Agriculture (WVDA), Cacapon Institute, Freshwater Institute, as well as county/municipality planning & engineering staff.   Within state agencies, staff dedicated to the WIP effort include:

AR0026855

## SECTION 8. Agriculture

### Agriculture Section at a Glance

For the purposes of this document, Agriculture constitutes the load from all agricultural activities in the Potomac Basin of West Virginia. It includes regulated sources (CAFOs/AFOs) and non-regulated sources of nonpoint nutrients and sediment.

According to the Chesapeake Bay Watershed Model, the "agriculture" sector is responsible for fifty percent of the total delivered nitrogen load and fifty-seven percent of the total delivered phosphorus load.



**Summary Actions:**
- Focus on tracking and reporting previously unreported or "non cost-share" BMPs
- Goal is for agriculture to have a voluntary plan
- Poultry Litter Transfer
  - By 2025, West Virginia plans to transfer 1/3 of produced poultry litter out of the Chesapeake Bay Watershed.
  - A Poultry Litter Transfer Program is available with incentives that pay $10 per ton to the generator of poultry litter to move it out of the Chesapeake Bay watershed. This is an extremely effective nutrient reducing BMP for the watershed and allows farmers in the central part of West Virginia to improve their soil.
- Nutrient Management
  - The State of West Virginia is committed to increase the number of acres covered under Nutrient Management Plans. This effort includes targeting of the two counties that have the highest nitrogen delivery factor to the Chesapeake Bay. Those counties,

AR0026867

**-1075-**

Berkeley and Jefferson, will have 95% of agricultural acres under Nutrient Management Plans by 2025.

- o   Although there will be a significant focus on these two counties, the remaining counties in the Chesapeake Bay watershed will also increase number of planned acres to help reduce nitrogen and phosphorous inputs.

- Stream Fencing: West Virginia is committed to increasing the number of acres of pastures fenced.  The goal is to have 40% of pastures fenced by 2025.
- AFO/CAFO Regulations: The State of West Virginia plans to work with animal feeding operations that fall under the definition of a large or medium CAFO or that are designated as a CAFO to help comply with NPDES/CAFO rules.
- Natural Stream Restoration: Natural Stream Restoration (NSR) will be used in WV to restore conditions that will allow natural fluvial processes to create streams that are both stable and complex.  It allows a stream system to naturally "heal" itself by allowing more efficient water and sediment transport within the channel to reduce bank erosion problems.  NSR technology will have significant impact upon reducing sediment loading to the Chesapeake Bay.
- Agricultural Education: By working together, farmers and support agencies enable agriculture to remain competitive and profitable, thus ensuring the sustainability of the family farms in West Virginia.  Through continued support by USDA-NRCS, USDA-FSA, Conservation Districts, WVDA, WVCA, FSA, WVDEP, WVU Extension and agricultural organizations, West Virginia has and will continue to have a strong educational initiative for agricultural producers throughout West Virginia's Potomac Basin.
- Efforts will also be increased on Buffers, Cover Crops and Conservation Tillage


## Introduction

The West Virginia agriculture community is committed to the implementation of voluntary Best Management Practices (BMPs) that will reduce nutrients and sediment, to fulfill its obligations under the Chesapeake Bay Total Maximum Daily Load (TMDL) and to protect the waters of West Virginia.

An impressive voluntary, incentive based, agriculture nutrient management program has been underway in West Virginia for many years and much progress has been made.  Much of this progress has been documented and credited toward Chesapeake Bay nutrient and sediment reduction goals, but much of it has not.  The State of West Virginia is fully committed to documenting as many of the non cost share BMPs that have been implemented by agricultural producers as possible over the next 15 years.  The State is also committed to working with universities, other researchers and agricultural experts to strengthen the science of BMP implementation and effectiveness as it relates specifically to West Virginia.

West Virginia farmers have collectively voiced their opinions and concerns about the Chesapeake Bay TMDL process and what it means to their livelihood.  West Virginia farmers have been the leading profession in ensuring that they keep valuable nutrients from running into their local streams and rivers.  This allows farmers the ability to have high yields and keep costs to a minimum. West Virginia's farmers have a proven history of being good stewards of

AR0026868

the land and have stated publicly during recent EPA TMDL meetings that they are willing to make changes to their farming operations if they are presented with reliable, credible data on which to base decisions. This effort requires much more than model based assumptions, estimates and extrapolations. It requires straightforward, transparent, easily understandable water quality data that shows impairments and progress made as BMPs are installed.

To develop and accomplish the goals of the agricultural portion of West Virginia's WIP, a team of agricultural experts and decision makers was formed. This group includes representatives from:

> USDA Natural Resources Conservation Service
> USDA Farm Service Agency
> West Virginia Department of Agriculture
> West Virginia Conservation Agency
> West Virginia Department of Environmental Protection
> West Virginia University Extension Service
> Tetra Tech

With top decision makers as members of this group, quick decisions and plans are able to be made to carry out WIP goals. One example of the effectiveness of this group is a Poultry Litter Transfer Program that designed and implemented during the time that this document was being written. West Virginia **now** has an incentive program that pays $10 per ton to the generator of poultry litter to move it out of the watershed. This group will continue to coordinate, implement, track and adapt the agricultural portion of West Virginia's WIP through 2025.

Because of the agricultural community's past successes and its current level of cooperation and commitment, the State of West Virginia has a high level of confidence that it can accomplish the goals that are laid out in this document and in the "input deck," or scenario, that details the programs that will be used to accomplish West Virginia's goals.

West Virginia has an implementation scenario that meets our 2025 Cap Load and achieves 60% of the Cap Load by 2017. These scenarios include a variety of agriculture BMPs including nutrient management, animal waste storage, barnyard runoff and mortality composting for AFOs and CAFOs, litter transfer, cover crops, conservation tillage, pasture management and limiting livestock access to streams. Given continued targeted funding to federal and state partners for the Chesapeake Bay Program, it is our estimate at the current time that the technical and financial resources will be available to install and/or document the needed practices through 2017.

West Virginia submitted the draft WIP on September 1, 2010 with a scenario that included the practices that we have determined are feasible between now and 2017. While this scenario did meet our goal of 60% by 2017, we did not meet our 2025 Cap Load. As we had not included

AR0026869

   

1800 Washington Boulevard • Baltimore MD 21230 • 410-537-3000 • 1-800-633-6101

Martin O'Malley
Governor

Anthony G. Brown
Lieutenant Governor

Shari T. Wilson
Richard E. Hall
John R. Griffin
Earl F. Hance

December 3, 2010

Mr. Shawn M. Garvin
Regional Administrator
U.S. Environmental Protection Agency, Region 3
1650 Arch Street (Mail Code: 3RA00)
Philadelphia, PA 19103-2029

Dear Administrator Garvin:

On behalf of Governor Martin O'Malley and the citizens of the State of Maryland, we are pleased to submit Maryland's Final Phase I Watershed Implementation Plan (the Plan) to reduce nutrient and sediment pollution to restore the Chesapeake Bay pursuant to the direction and guidance of the Environmental Protection Agency.

With the realization that a restored Chesapeake Bay is finally within our sights, we move forward today with cautious optimism. We are confident in our process based on the significant public participation we have received, the positive results we have achieved and our strong resolve to devise cost-effective solutions to implement the Plan.

### Introduction

Our Plan to reduce nutrient and sediment pollution provides a series of proposed strategies that exceed Maryland's 2017 target – 70% of the total reductions needed to meet Maryland accelerated deadline of 2020. The Plan commits to work hand-in-hand with all Marylanders, including local governments, stakeholder organizations, farmers, and scientists, to develop the most practical, cost effective means of implementation. In these difficult economic times, it is imperative that we make choices that are mindful both of our citizens and the enormous benefit a restored Chesapeake Bay will bring to Maryland.

In 2008, Maryland committed to ambitious 2-year milestones to accelerate on-the-ground efforts to meet nutrient reduction goals by 2020 – five years earlier than the 2025 end date agreed to by you and the other Bay jurisdictions. We used our BayStat process to develop these milestones and put Maryland on track to meet our ultimate Bay restoration goals by 2020. We are happy to report that this first set of 2-year milestones will be completed by December 31, 2011. These milestones will be followed by subsequent 2-year milestones until we achieve our goals.

### Plan Characteristics

*Economic Benefits:* The actions needed to clean up Maryland's waterways will benefit our economy as well as our environment. Upgrading wastewater treatment plants, retrofitting septic or stormwater

---



www. mde.state.md.us

AR0025525

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

**EXECUTIVE SUMMARY**

Since 1972, Section 303(d) of the federal Clean Water Act has required states to identify waters that do not meet water quality standards and publicly report them on a list published every two years. For each of the listed waters, states are to determine the maximum amount of pollution that the waters can withstand and still meet standards. This maximum amount of pollution is called a Total Maximum Daily Load (TMDL).

In 1996, the U.S. Environmental Protection Agency (EPA) listed certain sections of the Virginia portion of the Chesapeake Bay as "impaired." That is, water quality, most notably dissolved oxygen, was insufficient to fully support aquatic life. Recognizing the low dissolved oxygen in portions of the Upper Bay, Maryland listed all of the upper Chesapeake Bay tidal water segments as not meeting standards for phosphorus, nitrogen (nutrients) and sediments.

In 2000, the Bay watershed partners signed the Chesapeake 2000 Agreement to clearly identify the actions needed to achieve water quality standards. With this Agreement came the understanding that if the voluntary actions taken were not successful in reaching the water quality goals, EPA would complete a TMDL by the end of 2010. Although much progress has been accomplished, it has not been enough to reach the pollution reduction goals. For the past several years, EPA has led a process to develop TMDLs for the Chesapeake Bay.

A multi-jurisdictional TMDL on the scale of the Chesapeake Bay watershed has never been completed before. There will actually be 294 TMDLs, one for each of the three pollutants (nitrogen, phosphorus and sediment) for 98 impaired Bay segments (Maryland drains to 58 of the segments and will be subject to 174 TMDLs).

In recognition of the complexity and scope of this set of TMDLs, EPA determined that the part of the TMDL known as "reasonable assurance of implementation" needed to be significantly enhanced. "Reasonable assurance" is a demonstration that achieving the load reductions required by the TMDL can reasonably be met, that is, current or anticipated resources and commitments are expected to be sufficient.

This Watershed Implementation Plan (Plan), to be referenced by EPA's TMDL for Chesapeake Bay, supports the reasonable assurance of implementation for Maryland's part of the TMDL.

It contains, consistent with EPA guidance, the following elements:

1. Interim and Final Nutrient and Sediment Target Loads
2. Current Baseline Loading and Program Capacity
3. Account for Growth in Loads
4. Gap Analysis
5. Commitment & Strategy to Fill Gaps
6. Tracking and Reporting Protocols
7. Contingencies for Slow or Incomplete Implementation
8. Detailed Tables of Interim and Final Nutrient and Sediment Target Loads

ES-1

AR0025528

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

The Final Plan submitted to EPA has been developed and finalized based on consideration of the public's comments and recommendations. Through a transparent and broad series of public meetings and outreach efforts, comments were solicited, carefully reviewed and evaluated. Final recommendations for strategy selection were further evaluated and selected through the Governor's BayStat process, which brings together all of the State agencies that are involved with the Bay TMDL. Maryland's Plan incorporates the strategies to restore and maintain the Bay.

Given significant time constraints and limitations of current data and models, it is almost certain that the TMDL allocations associated with this Phase I Plan will change during Phase II. This Plan serves as a starting point for finer scale planning during the Phase II process and identifies the implementation strategies needed to achieve a healthy Bay for our families and for future generations.

This Executive Summary provides the context for the Phase I Watershed Implementation Plan (Plan), several "Key Highlights" and brief synopses of the seven elements that make up the Plan.

**Purpose of Phase I Watershed Implementation Plan**

In general, TMDLs set pollutant limits for all sources by dividing, or "allocating," the maximum allowable pollutant loads among those sources.

As a means of gathering allocation information from states for the Bay TMDLs, EPA has requested that states develop Watershed Implementation Plans (Plans). A key function of the Plan is to identify final target loads to be achieved by various pollution source sectors and in different geographic areas. The final target loads will be used by EPA in setting TMDL allocations.

As noted above, the states' Plans also help to provide "reasonable assurance" that sources of pollution will be cleaned up, which is a basic requirement of all TMDLs. In addition, the Plans are part of a new "accountability framework" that EPA is establishing to ensure the TMDL goals are reached in a reasonable timeframe.

**A Three-Phased Planning Process**

EPA has laid out a three-phased planning process designed to ensure the involvement of interested parties and offer multiple opportunities to refine the Plan over time.

EPA's primary guidance to the states came in the form of two letters to the Chair of the Chesapeake Bay Principal's Staff Committee, comprised of the state agencies responsible for Bay related restoration programs. The first, "Expectations Letter," signed November 4, 2009, laid out EPA's expectations for the three-phased planning process, including the eight elements of the Phase I Plan. The second, "Consequences Letter," signed December 29, 2009, laid out the key actions and deadlines for the states to meet and the regulatory and other consequences that could be triggered if they are not met.

AR0025529

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

The Phase I Plan is to be developed at the same time as the Bay TMDLs, which are to be completed by December 31, 2010. In addition to setting final target loads that provide EPA the necessary information to establish TMDL allocations, the Plan also sets "interim target loads." EPA has set the year 2017 to achieve 60% of the needed implementation and 2025 as the deadline for achieving final target loads. Maryland committed to achieve the final target loads by 2020. Consistent with this accelerated implementation date, Maryland's Plan is designed to achieve 70% of the Final Target by 2017, which is reflected in this Phase I Plan. It is recognized that the pollutant reductions and full benefits to the Bay from many of those controls, such as tree plantings, will likely not occur until some time after 2017.

A Phase II Plan, to be developed in 2011, will refine the details of the Phase I Plan by providing more geographic specificity regarding target loads. The Phase II Plan will also include greater detail about pollution controls that the State and partners will implement by the end of 2017. The time allotted for the Phase II planning process will allow significantly more interaction between the State and interested partners to refine the Phase I Plan. As part of the Phase II planning process, EPA will allow states to revise the TMDL allocations established in the Phase I Plan, subject to public review.

A Phase III Plan will be developed in 2017 and will address reductions needed from 2018 to 2020 in Maryland. The TMDL allocations may again be revised to reflect better data, a greater understanding of the natural systems and to make use of enhanced analytical tools, such as updated watershed and water quality models.

**Key Components**

Maryland's Phase I Plan builds on its precedent setting programs to date. Maryland has been the leader in the Bay restoration. Since 1985 we have reduced nitrogen pollution by 33% and phosphorous pollution by 38%. These reductions were realized, even as a 29% increase in population (1.28 million) occurred in the State between 1985 and 2009. Maryland continues to be a leader – the first State to require nutrient management plans on all farms, the first to commit to implement state-of-the-art technology on all of the State's 69 largest wastewater treatment plants, accounting for 95% of our wastewater flow, and the first State to place stringent air pollution controls on power plants required by Maryland's nationally groundbreaking Healthy Air Act, reducing nitrogen emissions by over 75% from coal fired power plants by 2013.

Over the past four years, Maryland has continued its leadership. We have committed to accomplish Maryland's nutrient reduction goals by 2020 and initiated the switch to measuring progress on the Bay in two year increments instead of once a decade. To ensure that progress is transparent, we have established BayStat to measure this progress in real time – allowing all Marylanders to monitor the restoration of the Chesapeake Bay. We were the first state in the watershed to receive federal approval for our Concentrated Animal Feeding Operation program that meets the new EPA regulations and requires comprehensive nutrient management on poultry farms for the first time. Maryland is also the first State in the watershed to require nutrient removal technology for new and failing septic systems in its Critical Area – the land within 1000 feet of the Bay. Maryland created the Chesapeake Bay 2010 Trust Fund to fund cost-effective projects to reduce non-point source pollution with required monitoring that tracks

ES-3

AR0025530

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

to nonpoint trades, were initiated in September 2010. In addition, the State proposes integrating that framework with broader trading of "ecological services."

- **Public Comment:** The final selection of strategies and contingencies was based on the public comments on the Draft Phase I Plan. Maryland's Draft Phase I Plan presented a list of strategy options for consideration and discussion during the public comment period which closed on November 8th 2010. A large number of organizations and individuals representing sectors ranging from the Building Association to elementary school children submitted 113 sets of comments. Additionally, over 100 e-mails sent from multiple sources, and 100 letters from students and parents were delivered. Two Petitions with over 1,000 citizen signatures were also submitted. Each of the comments has been reviewed and catalogued. The comments focused generally on cost, the need for additional detail regarding implementation, whether the strategies demonstrated reasonable assurance, the challenges associated with Bay restoration and support for the Chesapeake Bay restoration. The comments were enormously instructive and informative regarding the changes needed to the Draft Plan submitted in September. The comments have informed each of the changes made in this Final Plan. Responses to the comments will be compiled in a formal document which will be published prior to December 31, 2010.

- **Strategy for Achieving the 2017 Interim Target:** The Plan lists strategies that will achieve a 70% reduction of the final target load by 2017. These strategies encompass extensions of current 2-year Milestone commitments and additional proposed strategies. Based on public comments, a subset of strategies that were proposed in the Draft Phase I Plan has been selected to meet the Interim Target and are now reflected in the final Phase I Plan.

- **Strategy for Achieving the Final Target**: Three approaches are proposed for achieving the final target by 2020:

  - Develop new technology and approaches prior to 2017. Examples of innovations might include development of seeds and crops that require less fertilizer and processes to reduce ammonia released from poultry manure.
  - Increase the scope of implementation of existing strategies. Examples include upgrading additional small WWTPs, increasing acres retrofitted with stormwater controls; and more efficient urban runoff controls.
  - Improve regulatory requirements to increase reductions achieved.

- **Sediments:** The Chesapeake Bay TMDL requires both nutrient and sediment reductions. Maryland developed its gap closing strategies with the expectation that reduction practices designed to meet the phosphorus target would also likely meet the sediment target. Phosphorous from nonpoint source runoff binds strongly to sediments and, therefore a percentage reduction in one correlates strongly with the other. EPA validated this approach through its determination that Maryland's draft strategy met both the 2017 Interim Target and the 2020 Final Target for sediment.

The remainder of this Executive Summary presents highlights of the seven key sections of the Plan.

AR0025532

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

**Element 1:  Interim and Final Target Loads**

Based on analyses conducted by the EPA Chesapeake Bay Program, in consultation with the states and other interested parties, nutrient and sediment load limits have been set that are intended to meet water quality standards. These loads have been divided among the Bay states with the understanding that the states will, in turn, allocate them geographically and among source sectors, such as waste water treatment plants, agricultural sources, septic systems and storm water from developed land.

Maryland has used a similar process to divide the loads among regions and source sectors. Briefly, the allocation process first set waste water treatment plant load allocations at levels equal to Maryland's Enhanced Nutrient Removal Strategy for major wastewater treatment plants (and five of the largest minor plants), and caps set in the 2004 Tributary Strategies for minor facilities. Then, nonpoint sources were reduced by equal percentages between "no action" loads and maximum-feasible-reduction loads.  In addition, sources closest to the Bay must achieve greater reductions than sources further away   This is more cost effective, because the control of sources closer to the Bay has a greater beneficial impact on Bay water quality.

The allocations described above are referred to as "initial" allocations because the models used by EPA are undergoing significant revision this year, which is likely to influence the distribution of loads among source sectors.

The following tables summarize the statewide interim and final target loads for nitrogen, phosphorus, and sediment by major source sector.  Interim target loads were developed subsequent to Bay model verification that the reduction strategies selected by Maryland following the public comment process meet the 2017 goal.  The Interim Targets presented will meet the 70% goal.

**Total Nitrogen Interim and Final Target Loads by Source Sector**

| Total Nitrogen - By Sector (Million lbs/yr) | | | | | |
|---|---|---|---|---|---|
| **Sector** | **2009 Progress** | **Final Target Load** | **% Reduction from 2009 Progress** | **Interim Target Load** | **% Reduction from 2009 Progress** |
| UrbanReg | 5.098 | 4.184 | 18% | 4.650 | 9% |
| UrbanNonReg | 0.551 | 0.444 | 19% | 0.591 | -7% |
| Agriculture | 17.713 | 13.653 | 23% | 16.606 | 6% |
| CAFO | 0.080 | 0.070 | 12% | 0.064 | 20% |
| Septic | 4.007 | 2.454 | 39% | 2.975 | 26% |
| Forest | 7.133 | 7.133 | 0% | 7.149 | 0% |
| Air | 0.691 | 0.686 | 1% | 0.698 | -1% |
| WWTP & CSO | 14.148 | 10.462 | 26% | 8.587 | 39% |
| *Total* | **49.421** | **39.086** | **21%** | **41.319** | **16%** |

ES-6

AR0025533

Maryland Phase I Watershed Implementation Plan – Executive Summary
Submitted Final 12/03/10

### Total Phosphorus Interim and Final Target Loads by Source Sector

| Total Phosphorus  By Sector (Million lbs/yr) | | | | | |
|---|---|---|---|---|---|
| Sector | 2009 Progress | Final Target Load | % Reduction from 2009 Progress | Interim Target Load | % Reduction from 2009 Progress |
| UrbanReg | 0.581 | 0.383 | 34% | 0.513 | 12% |
| UrbanNonReg | 0.091 | 0.056 | 39% | 0.095 | -4% |
| Agriculture | 1.364 | 1.196 | 12% | 1.320 | 3% |
| CAFO | 0.007 | 0.004 | 31% | 0.005 | 28% |
| Forest | 0.349 | 0.349 | 0% | 0.348 | 0% |
| Air | 0.041 | 0.040 | 2% | 0.042 | -1% |
| WWTP & CSO | 0.871 | 0.686 | 21% | 0.571 | 34% |
| *Total* | **3.304** | **2.715** | **18%** | **2.892** | **12%** |

### Total Sediment Interim and Final Target Loads by Source Sector

| Total Suspended Solids  By Sector (Million lbs/yr) | | | | | |
|---|---|---|---|---|---|
| Sector | 2009 Progress | Final Target Load | % Reduction from 2009 Progress | Interim Target Load | % Reduction from 2009 Progress |
| UrbanReg | 382 | 240 | 37% | 307 | 20% |
| UrbanNonReg | 18 | 9 | 49% | 20 | -11% |
| Agriculture | 787 | 700 | 11% | 670 | 15% |
| CAFO | 0.11 | 0.04 | 66% | 0.10 | 8% |
| Forest | 191 | 191 | 0% | 187 | 2% |
| WWTP & CSO | 8 | 78 | -889% | 62 | -677% |
| *Total* | **1,387** | **1,218** | **12%** | **1,246** | **10%** |

Perhaps the most important element of the Phase I Plan is the set of control strategies and associated Interim Target Loads. The control strategies are estimated to be sufficient to achieve the 2017 Interim Target, i.e., 70% of the Final Target load. The strategies to meet the interim target loads are summarized in Element 5 of this Executive Summary.

**Element 2:  Current Baseline Loading and Program Capacity**

The Phase I Plan is required to identify the current baseline loads, the current capacity to reduce pollution and, while accounting for future growth in loads, determine the "gap" in capacity needed to attain the interim and final target loads.

AR0025534

SUBMITTED FINAL 12/03/10

**MARYLAND'S PHASE I**

**WATERSHED IMPLEMENTATION PLAN**

**FOR THE CHESAPEAKE BAY**

**TOTAL MAXIMUM DAILY LOAD**

**Date:**
**December 3, 2010**

    

AR0025562

**1.0  INTERIM AND FINAL NUTRIENT AND SEDIMENT TARGET LOADS**

In November 2009, EPA announced the allocation of preliminary basin-wide target loads of nitrogen and phosphorus that when achieved, would meet water quality standards throughout the Chesapeake Bay and its tidal tributaries. These draft basin-wide loads, based on data from the Chesapeake Bay Program (CBP) Watershed Model current at the time (Phase 5.2), were allocated to eight major tributary basins by jurisdiction (the six Bay watershed states and District of Columbia). Maryland received initial target loads for five major basins: the Potomac River, the Patuxent River, the Western Shore, the Susquehanna River, and the Eastern Shore.

Element 1 of the Watershed Implementation Plan (Plan), "Interim and Final Nutrient and Sediment Target Loads," requires the determination of target loads of nitrogen, phosphorus, and sediment by source sector for each Bay segment-shed (the area draining to a Bay water quality segment), and the identification of the amount and location of loads from individual or aggregate point sources. Specifically, per EPA's "expectations letter" of November 4, 2009 to the Principals' Staff Committee detailing the Agency's expectations for the Phase I Plans, the jurisdictions are expected to *"subdivide those [major basin] targets by the pollutant source sector within each of the 92 areas draining to Section 303(d) tidal water segments."* Interim targets are to be met by 2017 and final targets by 2025.[2]

Additionally, *"EPA expects the final target loads to be consistent with loads needed to achieve the water quality standards in the Bay. Assuming they are, EPA will consider this information when it establishes draft (by August 15, 2010) and final (by December 31, 2010) wasteload allocations [WLAs] for point sources and load allocations [LAs] for nonpoint sources within each of the 92 303(d) segments of the Bay and its tidal tributaries and embayments in the Bay TMDL."*

The Maryland Department of the Environment (MDE) undertook the development of an "initial target loads sub-allocation process" to address the key task of Element 1: the distribution of Maryland's five major basin target loads of nitrogen, phosphorus, and sediment to the finer geographic scale of 58 Maryland segment-sheds by pollutant source sector. This was a critical task, because the segment-shed target loads form the basis for the WLAs and LAs in the Bay TMDL, which is comprised of individual TMDLs for each tidal Bay water quality segment listed as impaired by nutrients and/or sediment on the Bay states' and District's "303(d)" lists of impaired waters. In Maryland, this list is found under Category 5 of the 2008 *Integrated Report of Surface Water Quality in Maryland.*

Thus, the Bay TMDL is expected to address the water quality impairments due to nutrients and sediment in all of Maryland's main Bay and tidal Bay tributary waters listed on the State's 2008 *Integrated Report* as impaired by those pollutants.

Maryland's sub-allocation process was first developed using CBP Phase 5.2 Watershed Model output available at the time (November 2009-March 2010). The finalized process used output

---

[2] Maryland has chosen to accelerate its efforts and meet the final target loads by 2020.

AR0025601

from the updated CBP Phase 5.3 Watershed Model, revised major basin nutrient target loads and draft sediment target loads issued by EPA to the states and DC on July 1 and August 15, 2010, respectively, and certain principles of distribution, or decision rules, similar to those that guided EPA's allocation of basin-wide loads to the major basins by jurisdiction.

Adjustments to the source sector allocations were made as warranted. Information based on the refined target loads was then run through the Bay model to verify that the sub-allocation results would achieve water quality standards. The Bay model then distributed the validated target loads by source sector to Maryland's fifty-eight Bay segment-sheds. In this manner, Maryland met its obligation to *"subdivide ... [major basin] targets by the pollutant source sector within each of the 92 areas draining to Section 303(d) tidal water segments."*

Appendix A, "Sub-allocation Process for the Chesapeake Bay TMDL" provides a detailed explanation of the development of Maryland's sub-allocation process, and the methodology it applies to address this component of Element 1 of the Phase I Watershed Implementation Plan.

Appendix B1, "Detailed Targets and Reduction Schedule," provides interim and final target loads for Maryland's segment-sheds by source sector, and a state-wide annual load reduction schedule. The interim target loads were developed subsequent to Bay model verification that the reduction strategies selected by Maryland following the public comment process meet the 2017 goal. The selected strategies are presented in Section 5 of this report. The final target loads reflect the results of Maryland's sub-allocation process and its subsequent refinement by the Bay Workgroup and Bay Cabinet. The final point source and nonpoint source target loads provided in Appendix B1 meet the EPA targets at the state-wide level and meet water quality standards. Appendix B2 provides a set of maps detailing Maryland's Bay segment-sheds.

EPA's expectations for Element 1 further state: *"Jurisdictions must also identify the amount and location of loads from individual (where possible) or, as necessary, aggregate point sources, with their Watershed Implementation Plans submitted in 2010...EPA also expects Phase I Watershed Implementation Plans to include information for permit writers to issue permits for point sources that are consistent with individual, aggregated, or gross wasteload allocations, as follows. For significant wastewater facilities, EPA expects States and the District to include loads from individual facilities based on design flow and effluent limits. For nonsignificant municipal facilities, EPA expects States and the District to include effluent limits applicable to facilities in different ranges of design flow."* [EPA notes that in Maryland a significant wastewater discharger is defined as a "facility treating domestic wastewater and the design flow is greater than or equal to 0.5 Millions gallons per day (MGD).]

The EPA letter continues: *"For nonsignificant industrial facilities, EPA expects jurisdictions to include appropriate effluent limits and/or loading limits for nutrients and sediment. EPA encourages States and the District to estimate loads from individual MS4 areas, sites with industrial stormwater permits, and CAFOs. Where such estimates are not possible, EPA expects the States and the District to identify practices that it expects these permittees to implement so that a permit writer can incorporate into an MS4, industrial stormwater, construction, or Concentrated Animal Feeding Operations (CAFO) permit."*

AR0025602

SUBMITTED FINAL 12/03/10
*Chapter 1 – Interim and Final Nutrient and Sediment Target Loads*

Appendix C, "NPDES Dischargers in the Maryland Bay Watershed," provides a comprehensive list of significant and non-significant municipal and industrial wastewater facilities within the State's Bay watershed area, with locations and available permit information on these point sources. The individual or aggregate point source target loads for these facilities are included in Appendix B1, "Detailed Targets and Reduction Schedule."

For individual MS4 areas, sites with industrial stormwater permits, and CAFOs, MDE was not able to provide separate estimated loads for these permitted entities in the Phase I Plan. MDE has provided *aggregate* NPDES-regulated stormwater target loads, encompassing all NPDES-regulated stormwater dischargers. MDE has identified stormwater management practices required as conditions of the applicable stormwater permit categories, in order to be consistent with the wasteload allocations of the TMDL.

Looking beyond Phase I to the Phase II Watershed Implementation Plan (draft due by June 1, 2011, final by November 1, 2011), EPA notes that States and the Districts are expected to *"divide nonpoint source load allocations and any wasteload allocations for aggregate point sources among small geographic areas and facilities or sources where appropriate."* MDE's sub-allocation process will allow the State to define finer scale allocations within the segment-sheds, both by county-segment-shed area (the portion of a segment-shed within the geographic boundaries of a county) and by a county's geographic boundaries (as a sum of the portions of multiple segment-sheds that lie within those boundaries).[3] It is expected that the disaggregation of aggregate stormwater loads for distribution to the various NPDES-regulated stormwater permit categories may be accomplished as part of the State's Phase II Plan.

The following tables summarize the statewide interim and final target loads for nitrogen, phosphorus, and sediment by major source sector. Interim target loads were developed subsequent to Bay model verification that the reduction strategies selected by Maryland following the public comment process meet the 2017 goal.

---

[3] During the Phase II Plan process, as the scale becomes more refined, the interests of municipalities will also be considered with respect to the sub-allocation process.

AR0025603

SUBMITTED FINAL 12/03/10
*Chapter 1 – Interim and Final Nutrient and Sediment Target Loads*

**Table 1.1 Total Nitrogen Final Target Load by Source Sector**

| Total Nitrogen - By Sector (Million lbs/yr) | | | | | |
|---|---|---|---|---|---|
| Sector | 2009 Progress | Final Target Load | % Reduction from 2009 Progress | Interim Target Load | % Reduction from 2009 Progress |
| UrbanReg | 5.098 | 4.184 | 18% | 4.650 | 9% |
| UrbanNonReg | 0.551 | 0.444 | 19% | 0.591 | -7% |
| Agriculture | 17.713 | 13.653 | 23% | 16.606 | 6% |
| CAFO | 0.080 | 0.070 | 12% | 0.064 | 20% |
| Septic | 4.007 | 2.454 | 39% | 2.975 | 26% |
| Forest | 7.133 | 7.133 | 0% | 7.149 | 0% |
| Air | 0.691 | 0.686 | 1% | 0.698 | -1% |
| WWTP & CSO | 14.148 | 10.462 | 26% | 8.587 | 39% |
| *Total* | **49.421** | **39.086** | **21%** | **41.319** | **16%** |

**Table 1.2 Total Phosphorus Final Target Load by Source Sector**

| Total Phosphorus  By Sector (Million lbs/yr) | | | | | |
|---|---|---|---|---|---|
| Sector | 2009 Progress | Final Target Load | % Reduction from 2009 Progress | Interim Target Load | % Reduction from 2009 Progress |
| UrbanReg | 0.581 | 0.383 | 34% | 0.513 | 12% |
| UrbanNonReg | 0.091 | 0.056 | 39% | 0.095 | -4% |
| Agriculture | 1.364 | 1.196 | 12% | 1.320 | 3% |
| CAFO | 0.007 | 0.004 | 31% | 0.005 | 28% |
| Forest | 0.349 | 0.349 | 0% | 0.348 | 0% |
| Air | 0.041 | 0.040 | 2% | 0.042 | -1% |
| WWTP & CSO | 0.871 | 0.686 | 21% | 0.571 | 34% |
| *Total* | **3.304** | **2.715** | **18%** | **2.892** | **12%** |

AR0025604

SUBMITTED FINAL 12/03/10

*Chapter 2 – Current Capacity*

## 2.0 CURRENT CAPACITY

In terms of the eight elements of a Phase I Plan defined in EPA guidance, this section addresses Element 2: "Current Loading Baseline and Program Capacity."

### 2.1 Current Loading Baseline

EPA has provided estimates of nutrient and sediment 2009 baseline loads and allocated load limits to the Bay watershed jurisdictions that are predicted to meet water quality standards in the Chesapeake Bay, as shown in Table 2.1.

**Table 2.1 Maryland's 2009 Baseline Compared to Draft Allocations**

|  | Nitrogen | | | Phosphorus | | |
|---|---|---|---|---|---|---|
|  | 2009 Progress | Draft Allocation | % Reduction | 2009 Progress | Draft Allocation | % Reduction |
| Eastern Shore | 12.38 | 9.71 | 22% | 1.17 | 1.09 | 7% |
| Potomac | 18.51 | 15.70 | 15% | 1.01 | 0.90 | 11% |
| Susquehanna | 1.52 | 1.08 | 29% | 0.06 | 0.05 | 22% |
| Western Shore | 13.94 | 9.74 | 30% | 0.77 | 0.46 | 40% |
| Patuxent | 3.05 | 2.85 | 7% | 0.29 | 0.21 | 27% |
| MD Total | 49.42 | 39.09 | 21% | 3.30 | 2.72 | 18% |

The current (2009) loading baseline information was used to determine the reduction in loadings needed to attain the target allocations, after accounting for anticipated future growth.

A note regarding Maryland's air allocation is warranted: EPA has separated the nitrogen deposition into two categories: 1) deposition occurring on the land; and 2) deposition occurring directly onto the tidal waters of the Bay. Atmospheric deposition directly to the land and non-tidal waters is considered contained within the allocated loads presented above in Table 2.1 because the nitrogen atmospheric deposition becomes mixed with the nitrogen loadings from the land-based sources. Once it is land deposited, it is to be managed as part of BMPs for other sources. Direct deposition to tidal waters will be addressed by implementing state requirements and federal policies and requirements under the Clean Air Act (CAA).

### 2.2 Program Capacity

"Program Capacity" is defined as the current legal, regulatory, programmatic, financial, staffing and technical capacity available to meet the target loads. For the purposes of this element, program capacity has been reviewed with respect to two broad areas:

2.2.1   Statewide Programmatic Capacity and Interagency Coordination,
2.2.2   Capacity Related to Individual Source Sectors

AR0025606

The evaluation in Phase I focuses primarily on the State's capacity; however, where information is readily available it is referenced for local government, federal government, and private sector capacities.

The gap analysis, Section 4, provides another useful measure of program capacity. It compares the pollutant reductions that can be achieved with current capacity to the reductions needed to achieve the interim and final target loads.

A description of each area demonstrating "Program Capacity" follows in Section 2.2.1.

### 2.2.1   Statewide Programmatic Capacity and Interagency Coordination

In the "Expectations Letter" from EPA, dated November 4, 2009, states are urged to "consider whether additional reductions could be achieved with existing capacity" (Element 2, p. 26). Maryland has made considerable progress in accelerating current capacity by developing 2-year Milestones to achieve additional reductions of nutrients and sediment.  For Maryland, the first 2-Year Milestones consist of a suite of 34 specific and accelerated actions that will result in an additional reduction of 3.75 million pounds of nitrogen and 193,000 pounds of phosphorus from reaching the Bay by the end of 2011.  The Milestones represent reductions beyond those realized with current capacity and independent of the strategies proposed in this Plan to meet the allocations.

It is important to underscore that these efforts were made in coordination with and through the Chesapeake Bay Program Executive Council.  They represent a significant acceleration of the reduction strategy to meet Bay goals.

To date, Maryland has been the leader in the Bay restoration and has thus developed significant capacity. Since 1985 Maryland has reduced nitrogen pollution by 33% and phosphorous pollution by 38%.  These reductions were realized, even as a 29% increase in population (1.28 million) occurred in the State between 1985 and 2009.  Maryland continues to be a leader – the first State to require nutrient management plans on all farms, the first to commit to implement state-of-the-art technology on the State's 67 largest wastewater treatment plants, accounting for 95% of our wastewater flow, and the first State to place stringent air pollution controls on power plants required by Maryland's nationally groundbreaking Healthy Air Act, reducing nitrogen emissions by over 75% from coal fired power plants by 2013.

Maryland has committed to accomplish the needed pollution reductions by 2020 and initiated the switch to measuring progress on the Bay in two year increments instead of once a decade. To ensure that progress is transparent, we have established BayStat to measure this progress in real time – allowing all Marylanders to monitor the restoration of the Chesapeake Bay. Maryland was the first state in the watershed to receive federal approval for our Concentrated Animal Feeding Operation program that meets the new EPA regulations and requires comprehensive nutrient management plan implementation by poultry farms for the first time.  Maryland is the first State to require nutrient removal technology on new and failing septic systems in the Critical Area (land within 1,000 feet of tidal waters, see MDE website for the complete definition).  The State created the Chesapeake Bay 2010 Trust Fund to fund cost-effective projects to reduce non-point

AR0025607

SUBMITTED FINAL 12/03/10

1) Marylanders Grow Oysters - provides opportunities for waterfront landowners to grow young oysters in protected cages off their docks until they are large enough to be relocated to nearby oyster sanctuaries (www.oysters.maryland.gov );

2) Marylanders Grow Trees - encourages citizen landowners to purchase, plant, and register on-line trees on their properties with a goal of 50,000 trees planted annually. Coupons for $25 off trees at participating nurseries can be downloaded from the website. Homeowners can also calculate the monetary benefits afforded by planting different types of trees on their property. (www.trees.maryland.gov); and,

3) Partnership for Children in Nature - Children are a proven catalyst for getting adults to change behavior, and this program implements a variety of actions to engage children with nature, not only for their own benefit, but their parents' and the Bay's as well. These and other programs are described on the Maryland Smart, Green, and Growing website (www.green.maryland.gov).

### 2.2.2   Capacity Related to Individual Source Sectors

MDE issues permits to protect Maryland's water resources by controlling industrial and municipal wastewater discharges. Surface water discharges are regulated through combined State and federal permits under the National Pollutant Discharge Elimination System (NPDES). Groundwater discharges are regulated through State issued groundwater permits. Also related to the protection of groundwater is the coordination with all local health departments for the regulation of individual wells and septic systems.

The stormwater pollutant discharges are regulated by the Maryland's NPDES municipal stormwater permit program. Municipal stormwater permits require the jurisdictions to develop comprehensive programs to reduce storm drain system pollution to the maximum extent practicable and show reduction of pollutants pursuant to EPA approved TMDLs, and to improve water quality. The summaries are provided in narrative form to describe programmatic highlights specific to Maryland. These summaries are arranged by source sector.

### 2.2.2.1    Municipal Wastewater Treatment Plants

### Major (Significant) Municipal Wastewater Treatment Plants:

Maryland classifies municipal wastewater treatment plants (WWTPs) with a design flow capacity[4] of 500,000 gallons per day or greater (0.5 million gpd) to be "major" or "significant" plants. The combined flow of these plants comprises more than 95% of the total sewage flow generated in Maryland.

---

[4] Design capacity for significant facilities shall meet the following two conditions:

(1)  A discharge permit was issued based on the plant capacity, or the Maryland Department of the Environment (MDE) issued a letter to the jurisdiction with design effluent limits based on the new capacity as of April 30, 2003.
(2)  Planned capacity was either consistent with the MDE-approved County Water and Sewer Plan as of April 30, 2003, or shown in the locally-adopted Water and Sewer Plan Update or Amendment to the County Water and Sewer Plan, which were under review by MDE as of April 30, 2003 and subsequently approved by MDE.

AR0025609

MDE currently has in place an Enhanced Nutrient Removal (ENR) Cap Strategy that allows flow increases at major sewage treatment plants to design capacity, while establishing a nutrient loading cap. According to Maryland's Chesapeake Bay Tributary Strategies Statewide Implementation Plan, the Point Source Strategy is a two-part plan to (1) upgrade significant WWTPs to state of the art ENR technology to meet concentrations of 4.0 mg/l or less total nitrogen and 0.3 mg/l or less total phosphorus and (2) maintain the nutrient load caps for all point sources.

The Bay Restoration Fund (BRF) provides up to 100 percent grant funding for the eligible portion of ENR upgrade of 67 major WWTPs. The BRF is a dedicated fund, financed by wastewater treatment plant users. Part of the fee is paid by septic system users and is utilized to upgrade onsite systems and to subsidize the implementation of cover crops on agricultural land each year to reduce nitrogen loading to the Bay.

The State's current financial capacity to reduce loads from major WWTPs is reflected in the schedule of plant upgrades and current revenue projections for the BRF maintained by MDE's Engineering and Capital Projects Program, within the Office of Budget and Infrastructure Financing. The Bay Restoration Fund Advisory Committee is charged with evaluating the adequacy of fees. The Advisory Committee projected a deficit beginning in FY 2012 and will finalize a recommendation to close this deficit in December of 2010. Maryland is able to fund the planned construction schedule in FY2012.

In addition to ENR upgrades, some major WWTPs require enhancements not eligible for BRF funding, but are a necessary part of the overall formula for successful nutrient reductions. These include measures to address excessive inflow and infiltration (I/I), additional or expanded pumping stations and other needs. These activities can receive funds from a variety of sources that are described in Section 2.2.2.12 on "Additional Resources."

In addition to the commitments made in this Plan, the Department of the Environment will continue to work during the Phase II planning process to identify and advance other suitable funding sources to achieve nutrient reduction from point sources.

**Minor (Non-significant) Municipal Wastewater Treatment Plants**

The term "minor" refers to those wastewater treatment plants with design capacity of less than 500,000 gallons per day. According to Maryland's Chesapeake Bay Tributary Strategies Statewide Implementation Plan, annual nutrient load goals for minor facilities are based on design capacity or projected 2020 flow, whichever is less, and effluent concentration limits of 18 mg/l total nitrogen and 3 mg/l total phosphorus. The 2020 projected flows are based on the county growth rates provided by the Maryland Department of Planning. Expanding non-significant facilities cannot exceed 6,100 lbs/ year in nitrogen and 457 lbs/year in phosphorus.

The set of strategies that demonstrate the ability to make reductions beyond the interim target loads includes a determination of the feasibility of upgrading five of the largest minor WWTPs.

AR0025610

SUBMITTED FINAL 12/03/10

*Chapter5 – Potential Options to Fill Gap*

**5.2 State Plan to Meet Target Allocations: Identified Gap Closers**

The sections below elaborate on the key strategies in Table 5.1 and provide additional detail on funding and potential pound reductions. The units specified in the table are what are entered in the Bay Model in a form called an "input deck." The model then calculates the loading reductions based on agreed upon BMP efficiencies, accounting for the use of multiple BMPs on the same acre of land, delivery factors, and in some cases slopes and types of soils.

**5.2.1   Municipal and Industrial Wastewater**

Options to decrease and maintain loads from major and minor municipal and industrial wastewater treatment plants (WWTP) are described below.

**Base Programs that Provide Annual Reductions**

The following list of practices is included in Maryland's 2009-2011 Milestone. Additional strategy and funding details for annual reduction practices are described in Element 2.

**A) Continue ENR Retrofits at 69 Major Municipal Wastewater Treatment Plants (>0.500 MGD)**

There are a total of 69 Major Municipal Wastewater Treatment Plants (WWTPs) with flow of >0.5 million gallons per day (MGD). Two facilities, Boonsboro and Piney Orchard, were added to the original list of 67 for a total of 69 major WWTPs. The 69 WWTPs include Maryland's portion of the Blue Plains facility.

In accordance with NPDES permits, both Boonsboro and Piney Orchard, are required to upgrade to ENR. However these facilities are not eligible for BRF funding. Boonsboro, became a major due to expansion to design capacity of more than 0.5 MGD, and Piney Orchard, is a privately owned WWTP.

MDE included these two facilities in the major category based on the design flow criteria, and accounted for the projected reductions from these facilities. Boonsboro WWTP has been upgraded; no additional funding is needed. Cost estimates for upgrading Piney Orchard are not included in BRF estimates.

Blue Plains is described separately. It's a multijurisdictional facility and BRF costs will be cost-shared with other jurisdictions, including DC and Virginia. The description, cost and load reductions below reflect information that pertains to all 67 publicly owned facilities including Blue Plains. In addition, individual cost estimates are provided for Blue Plains below.

<u>2009-2011 Milestone</u>:

- Upgrade 14 wastewater treatment plants to enhanced nutrient removal (ENR) technology.

5-21

AR0025698

SUBMITTED FINAL 12/03/10

*Chapter5 – Potential Options to Fill Gap*

Anticipated Load Reductions 2009-2011 Milestone
780,000 lbs/year of nitrogen reduced

- Enhance BNR facilities at the Blue Plains Wastewater Treatment Plant.

Maryland has funded a capital BNR upgrade project that was substantially completed with remaining punch list items in early 2011.

Anticipated Load Reductions 2009-2011 Milestone
190,000 lbs/yr of nitrogen reduced

**2012-2017 Strategy**

**Maryland plans to upgrade 67 Public Major WWTPs by 2017 to Enhanced Nutrient Removal (ENR).**

24 of the 67 public plants will be operational by June 30, 2011. The 67 are expected to be upgraded by 2017, including Maryland's portion of Blue Plains.

Projected Load Reductions (2009-2017)
4,849,466 lbs of TN reduced - 68 majors
874,900 lbs/yr of TN reduced  - Blue Plains
5,724,366 lbs of TN reduced -69 Majors

Funding of 67 Major WWTPs

The total cost of the ENR upgrades at 67 facilities is: $2.86 billion, i.e., $2.46 billion for the 66 public major facilities plus $0.402 billion for the Maryland portion of Blue Plains. 36 facilities have not been upgraded yet and will need funding commitments for an estimated amount of $1.186 billion  This estimate includes two privatized plants (Piney Orchard and Boonsboro), however it does not Blues Plains.

Total cost includes the cost of planning, design and construction, including state and local shares. Local share may include the cost of additional upgrades. The eligible portion of ENR upgrade of the major wastewater treatment plants is funded by the Maryland's Bay Restoration Fund. Other funding sources include the Biological Nutrient Removal (BNR) Grant, Supplemental Assistance, State Revolving Loan Fund, local or community funding or match, USDA Rural Development Funds, and other federal funding.

| | |
|---|---|
| Estimated ENR eligible BRF cost: | $1.482 billion |
| Projected BRF funding available: | $0.945 billion |
| Projected BRF need: | $0.537 billion |

Currently, the State provides 100 percent of eligible cost for the ENR upgrades. The ENR capital upgrades at the 67 public major WWTPs and the Maryland portion of Blue Plains are eligible for a total of $1.482 billion. Full funding is available for implementation of the 2011 Milestone, but a state funding gap is projected after 2012.

AR0025699

SUBMITTED FINAL 12/03/10

*Chapter 5 – Potential Options to Fill Gap*

If the State continues to provide 100 percent grant funding for these upgrades using the Bay Restoration Fund, the program can fund $945 million out of the eligible BRF total of $1.482 billion, leaving a funding shortfall of about $537 million starting in FY 2012.

Implementation Commitments:
December 2010: Maryland's Bay Restoration Fund Advisory Committee will finalize a report outlining a recommended option to fill the projected deficit.
January 2011: Propose budget that covers projected cash requirements funding to meet current construction schedule for FY2012 projects.

January 2011: Charge Bay Restoration Advisory Committee to identify range of options to restructure fee to raise the needed revenue to fully fund remaining projects including fee based on consumption, income or other criteria and by December 2011 recommend fee structure to be implemented by July 1, 2013.

January 2012: Propose amendment to Bay Restoration Fund statute to change fee to generate the necessary revenue to complete the ENR strategy commitment.

Continual:
ENR discharge limits are incorporated into the NPDES permit renewals to ensure ENR implementation.

Contingency:
If the Bay Restoration Fund statute is not changed in 2012 to generate the necessary revenue to complete the ENR strategy commitment, all funding for ENR projects will be reduced from 100% grant to provide partial grant funds for each remaining project. Local governments would be responsible for the balance of the necessary funding. State low interest loan funds would be available to assist.

Additional Discussion:
This contingency is not anticipated to be necessary. During the 2010 legislative session, the Maryland General Assembly acknowledged the Bay Restoration Deficit and provided that it is the intent of the committees that the Bay Restoration Fund Advisory Committee work in consultation with the Maryland Department of the Environment and the Department of Budget and Management during the 2010 legislative interim on a plan to eliminate the deficit for funding the upgrade of the State's 67 major wastewater treatment plants to enhanced nutrient removal technology. In addition, it is the intent of the committees that this funding plan be implemented during the 2011 legislative session

The Strategy outlined above includes work in 2011 to restructure the fee to ensure that the necessary revenue to complete projects is raised while also ensuring that the structure is equitable. By assessing options including consumption based, income based and other alternatives, greater equity can be achieved in the fee system.

AR0025700

SUBMITTED FINAL 12/03/10

*Chapter 5 – Potential Options to Fill Gap*

Other funding sources include the State Revolving Loan Fund, local or community funding or match, USDA Rural Development Funds, federal funding, and revenues from offset requirements or trading programs.

Sector Additional Need
10 additional FTEs for enforcement and verification at a cost of $4.2 M over 6 years. These additional FTEs are for all sectors under municipal and industrial wastewater in addition to Major Municipal WWTPs.

In 2011 MDE will evaluate sector requests, all available staff resources, opportunities for reassignment of existing staff, funding sources, including availability of federal funding and legislative approaches to address additional sector needs.

**B) Blue Plains Upgrades**

The Blue Plains Wastewater Treatment Plant is the largest advanced wastewater treatment plant in the world, with a capacity of 370 MGD and a peak capacity of 1.076 billion gallons per day. Maryland's portion of the Blue Plains flow is 169.6 MGD. It is one of 67 facilities included in ENR Strategy and eligible for BRF grant funding.

Strategy

Upgrade Blue Plains to ENR by 2015.

Anticipated Load Reductions by 2017 (delivered)
874,900 lbs/yr of TN reduced

Estimated Cost
The cost to upgrade Maryland's portion of Blue Plains to ENR is estimated at:
    a) Total Cost:        $402 Million
    b) ENR eligible cost:  $203 Million, of which $22 million authorized in FY2011;
    c) Annual O&M cost:  $21 M/yr

Implementation Commitments:

As part of Maryland's commitment to installing ENR at the largest 67 facilities, Maryland will contribute about $203 million to the Washington Suburban Sanitation Commission (WSSC) share of the upgrade at the Blue Plains facility. Other funding sources include the Biological Nutrient Removal (BNR) Grant, Supplemental Assistance, State Revolving Loan Fund, local or community funding or match, USDA Rural Development Funds, and other federal funding.

The implementation commitments discussed above for Maryland's ENR program also are applicable for this facility.

5-24

AR0025701

| STEP | SECTOR | ASSUMPTIONS |
|---|---|---|
| 1 | Forest | 2009 Progress |
| 2 | Atmospheric Deposition to Non-tidal Streams | Federal Programs |
| 3 | Major Municipal | ENR Cap Strategy |
| 3 | Major Industrial | TS Cap Strategy |
| 3 | Minor Municipal | TS Nutrient Reductions Goal* |
| 3 | Minor Industrial | 23.5% Reduction** |
| 4 | Urban | Based on Reducible Load (NA to E3) and Relative effectiveness – Equitable reductions |
| 4 | Agricultural | Based on Reducible Load (NA to E3) and Relative effectiveness – Equitable reductions |
| 4 | Septics | Based on Reducible Load (NA to E3) and Relative effectiveness – Equitable reductions |

*Aggregate Target includes ENR upgrades for five largest minor plants
**Based on MDE preliminary evaluation of technical feasibility

As the table indicates, the sub-allocation procedure that distributes loads based on an equitable level of effort is applied to those source sectors indicated in Step 4, as one part of the State's overall approach to determining how the 2020 final target loads are assigned.

Step 1 accounts for loads from forested land use areas, assigning a portion of the allocated load to forested land, based on current levels as reflected in the Bay Model 2009 Progress scenario run.

Step 2 accounts for the load from atmospheric deposition of nitrogen to Maryland's non-tidal streams, based on expected reduced levels of nitrogen from this source as a result of the implementation of federal regulations to reduce air deposition of nitrogen to the tidal waters of the Bay.

Step 3 accounts for the point source category of wastewater treatment plants (WWTPs), including all significant (major) and non-significant (minor) municipal and industrial facilities discharging treated wastewater within the Maryland Bay watershed. These point sources are assigned target loads based on existing State programs and strategies, since they are geographic specific and identifiable sources of pollutant discharge that have permit requirements by which achievable load reductions can be calculated based on permit effluent limits, State policy requirements for Enhanced Nutrient Reduction (ENR) for all significant plants, and reported discharge flows.

Step 4 - After target loads are set for all the sources in Steps 1 through 3, the remaining portion of the allocated load is distributed to the remaining sources using an operation based on

AR0025787

achieving reduction targets through equitable levels of effort and relative effectiveness, as described herein. As the method for assigning loading targets to the agricultural, urban, and septic system sources, Step 4 is a critical stage in the overall assignment of target loads to all source sectors.

**Decision Rules for Maryland's Initial Target Loads Sub-allocation Process**
The technical operation for making the calculations to determine the load distributions at the heart of the sub-allocation process involves a spreadsheet analysis that uses data provided by the Phase 5.3 Watershed Model output. The data provide loading results at the land-river segment scale under various model scenarios runs: 2010 No Action, E3, Tributary Strategies, and 2009 Progress. The spreadsheet analysis allows a comparison of the resulting loads under each scenario. For example, comparing E3 loads to No Action loads shows the theoretical maximum load reductions that would obtain by doing "everything everywhere by everybody" (E3, or the limit of technical feasibility applied globally) as opposed to doing nothing at all (No Action). Thus, the development of an "allocation scenario" at the same scale would provide a set of target loads that identify the *additional* load reductions that are needed to meet water quality goals, relative to those achieved under other scenarios, most critically the 2009 Progress scenario loads which indicate the "current" average annual nutrient and sediment levels thus far achieved, based on the most recent reported implementation data included in the Phase 5.3 Model.

Four key principles guided the formulation of certain decision rules that were applied in the spreadsheet analysis to determine the way the major basin loads are distributed to the segment-sheds by source sector:

1. Maintaining **equity** in assigning required levels of effort among source sectors;
2. Giving **credit for existing actions** - account for all nutrient and sediment reductions achieved to date;
3. Consideration of **relative effectiveness** - optimize results by increasing effort in areas that have the greatest impact on water quality in the Bay;
4. Consideration of the **opportunity for reductions** - evaluate the overall "reducible load" available in each segment-shed.

**Equity among Sources**
In order to develop an allocation scenario that achieves these goals, the sub-allocation process estimates a "reducible load" for each nonpoint source sector or associated land use, defined as the difference between No Action and E3, based on generally accepted assumptions as to what constitutes E3 for a given source sector. A target for each land-river segment is then determined as that fraction of the overall reducible load, equivalent for all source sectors within that segment, required to obtain the necessary water quality response. The level of effort needed to achieve that percentage of the total reducible load is then adjusted on the basis of the "relative effectiveness" of the segment, i.e., the impact nutrient reductions from that drainage area are expected to have on dissolved oxygen levels in the main Bay (and, similarly, the impact of sediment reductions on water clarity and submerged aquatic vegetation (SAV)). It is also constrained to assure that the allocation will not be greater than the current loads. This approach allows an equitable distribution of the major basin loads, with a fixed range in the "level of effort" between the least and most effective segments. The goal is to produce a fair, efficient,

AR0025788

and effective allocation of loads to achieve the necessary water quality response with the least amount of effort overall.



**Credit for Existing Actions**

Actual baseline loads, however, are not determined by the No Action scenario, but rather by the "current condition" of the 2009 Progress scenario. By determining and applying the load reductions *already* achieved from all previous and existing actions, based on the most recent available data input to the Phase 5.3 watershed model, it is possible to set a "current" average annual baseline load from which to determine the additional reductions required to meet the target loads of the allocation scenario. In other words, the required reduction is not from the No Action load to the Allocation load, but rather from the Current Condition load to the Allocation (i.e., the *remaining* fraction of the reducible load still to be achieved after crediting all previous reported actions).

AR0025789



## Opportunity for Reductions

To further refine the delineation of the areas where optimal changes in water quality response in the Bay may be obtained by the *least* nutrient and sediment reductions, it is necessary to also consider where there is the greatest opportunity to make these highly effective load reductions. Based on the reduction rates for predominant source sectors in the land-river segments that comprise each Bay water quality segment drainage area, it is possible to rank the segment-sheds by the degree to which their land use and source sector composition offers the maximum opportunity to achieve effective reductions.

## Addressing Specific Pollutant Source Sectors in the Sub-allocation Process

The land-based sources contributing to the excessive nutrient and sediment loads that have resulted in the impairment of water quality in the Chesapeake Bay and its tidal tributaries can be divided into two main categories: point sources and nonpoint sources. Strictly speaking, point sources are those sources of pollutants that are discharged to surface waters from an identifiable "point," e.g., a pipe or an outfall. The most common type of point source is a municipal or industrial wastewater treatment plant (WWTP). Such point sources are subject to assignment of wasteload allocations (WLAs) in TMDLs. However, EPA also considers such sources as mining operations, dredge material placement sites, and stormwater discharges regulated by National Pollution Discharge Elimination System (NPDES) permits as point sources and therefore also subject to assignment of WLAs in TMDLs. Nonpoint sources are all those other sources whose

AR0025791

pollutant discharges are diffuse, such as runoff from farm land. Nonpoint sources are subject to assignment of a Load Allocation (LA) in TMDLs.

For the purposes of developing 2020 final target loads using MDE's sub-allocation process, the pollutant source sectors are delineated in a somewhat different manner, for reasons that will be explained herein. There are two main categories of source sectors considered in the sub-allocation process: 1) municipal and industrial WWTPs; and 2) all other land-based sources of nutrient and sediment discharges. These two categories reflect a decision to assign target loads to the WWTPs on a different basis than that which drives the sub-allocation of loads to the other sources (with the exception of forest and atmospheric deposition sources, as explained below).

<u>Significant Municipal and Industrial WWTPs</u>

Because WWTPs have known geographic locations and discharge points, with specific discharge permit limits and design flows by which to calculate loading rates, it is a fairly straightforward matter to assign target loads to these facilities, particularly in the case of the "significant" municipal and industrial WWTPs, those with design flows equal or greater than 0.5 million gallons per day (MGD). For significant municipal facilities, the State is implementing an Enhanced Nutrient Reduction (ENR) Cap Strategy. It requires upgrades of major WWTPs to the state of the art ENR technology, which enables them to meet concentration limits of 4 mg/l or less total nitrogen TN and 0.3 mg/l or less total phosphorus. The Cap Strategy requires all WWTPs to maintain established nutrient load caps. For the Phase I Watershed Implementation Plan, the nutrient target loads for these significant WWTPs are based on the ENR Cap Strategy requirements and their design flow capacity[26]. For significant industrial facilities, target loads were established on a case-by-case basis with consideration of load reductions relative to the 1985 baseline (i.e., reductions already achieved) and additional load reduction potential. Target loads for two dredged material placement facilities are based on approved TMDLs.

Nutrient or sediment information is not available for every NPDES permittee in Maryland's Chesapeake Bay watershed who was discharging under a permit at the time of the EPA Bay TMDL. To the extent that such discharges were occurring during the model calibration process, they are indirectly included in the results and therefore assumed to be included in the total load assigned in the TMDL. However, due to lack of specific information, these discharges have been assigned wasteload allocations in the input deck based on default assumptions (where available) regarding flow and concentrations. These facilities should provide, at a minimum, nutrient and/or TSS monitoring data with their next NPDES permit renewal application. Renewed NPDES permits for these discharges will require monitoring to verify existing loads and to either (1) verify that these loads do not contribute to any exceedance of the WLAs (determination of no reasonable potential to contribute to an exceedance of local WQS and/or

---

[26] Design capacity for significant facilities shall meet the following two conditions:
(1)  A discharge permit was issued based on the plant capacity, or the Maryland Department of the Environment (MDE) issued a letter to the jurisdiction with design effluent limits based on the new capacity as of April 30, 2003.
(2)  Planned capacity was either consistent with the MDE-approved County Water and Sewer Plan as of April 30, 2003, or shown in the locally-adopted Water and Sewer Plan Update or Amendment to the County Water and Sewer Plan, which were under review by MDE as of April 30, 2003 and subsequently approved by MDE.

AR0025792

Bay TMDL WLA) or (2) incorporate an effluent limit consistent with the local WQS and /or Bay
TMDL WLA (where monitoring data shows reasonable potential to contribute to an exceedance
of local WQS and/or Bay TMDL WLA).  As a result, Maryland may include more specific
information on these facilities in future phases of its watershed implantation plan that may be
used to initiate modifications to the TMDL wasteload allocations.  For the facility specific notes
that are currently available see Appendix B1.

Non-significant Municipal WWTPs

For non-significant municipal treatment plants (i.e., plants with design flows less than 0.50
MGD), aggregate target loads were assigned based on Maryland's Tributary Strategies annual
nutrient loading caps for minor facilities.  The original Tributary Strategies loading caps
were based on design capacity or projected 2020 flow, whichever is less, and effluent
concentration limits of 18 mg/l TN and 3 mg/l TP.  The final target loads are generally consistent
with the Tributary Strategy goals, with the exception that five of the largest such facilities were
assigned loads based on ENR upgrades.

Non-significant Industrial WWTPs

Aggregate target loads of nutrients for non-significant industrial treatment plants are based on a
preliminary evaluation by MDE of the potential for reductions from subcategories of minor
industrial sources based on an understanding of technical feasibility.  The preliminary evaluation
suggests a nutrient reduction potential from 2009 loads of approximately 23.5% by 2020.
Aggregate target loads reflect Maryland's correction of Bay Program data (see Minor Industrial
Treatment Plants in Section 2 of this report).

Combined Sewer Overflows/Sanitary Sewer Overflows

Target loads for CSOs/SSOs were based on continuing CSO separation/elimination through
enforcement of existing consent orders. The assigned allocation of 35,000 pounds per year of TN
was estimated based on the anticipated completion of CSO separation in Cambridge,
Federalsburg, and Baltimore City by 2017, but assumes the elimination of remaining CSOs in
other communities will not be completed until after the final target year of 2020.

Forest

For forested land use areas the target load is based on current loading rates as reflected in the
Bay Model 2009 Progress scenario run.

Atmospheric Deposition

For atmospheric deposition of nitrogen to Maryland's non-tidal streams the target load is, based
on expected reduced levels of nitrogen from this source as a result of the implementation of
federal regulations to reduce air deposition of nitrogen to the tidal waters of the Bay.

AR0025793

**Source Sectors with Targets Based on Reducible Load**

Target loads for the last four source sector categories below have been assigned through the sub-allocation process described above. Using Phase 5.3 Watershed Model output, each of the source sectors within each land-river segment is assigned a certain percentage of its reducible load (from "No Action" to "E3"), adjusted by a factor based on the relative effectiveness and opportunity for reduction of that particular segment, in order to meet a target load determined as necessary to obtain the required water quality response. The additional effort needed from each sector to meet a given target load depends upon how far the No Action load has already been reduced in that sector by all previous credited actions to date, as reflected by the current loading of the 2009 Progress Scenario run. This additional effort may be expressed as a percentage of reduction from the current load needed to achieve the target load.

The target loads for each source sector are aggregated up from the land-river model segment scale to the TMDL segment-shed scale to obtain the initial target loads for each of the land areas in Maryland that drain to specific impaired Bay water quality segments. Along with the target loads assigned by different methods for the sources described above, these segment-shed target loads that provide the basis for the wasteload and load allocations established in the Chesapeake Bay TMDL.

Regulated Urban (NPDES Regulated Stormwater Discharges)

NPDES regulated stormwater discharges are assigned an aggregate point source target load based on urban land use areas in counties with Phase I and Phase II Municipal Separate Storm Sewer System (MS4) permits. In addition to the county Phase I or Phase II permits, the aggregate target loads include stormwater discharges from other NPDES regulated entities such as Phase II municipality MS4s, the State Highway Administration MS4, industrial stormwater, and other state and federal permitted entities within the Phase I and Phase II jurisdictions.

Non-regulated Urban (Non-NPDES Regulated Stormwater Discharges)

This category assigns a nonpoint source target load to stormwater discharges from sources in counties that are not currently regulated by NPDES Phase I or Phase II MS4 permits, based on the urban land use areas in those counties. Target loads are based on the reducible load from this source and are assigned as part of the Load Allocation (LA) in the TMDL.

Septics (Onsite Sewage Disposal Systems (OSDS))

Target loads for septic systems are assigned based on the reducible load determined for this source and on information on the number and location of OSDS installations in the State's portion of the Chesapeake Bay watershed.

Agriculture

The target loads for Agriculture include the land use categories of crop, pasture, animal feeding operations (AFOs), and concentrated animal feeding operations (CAFOs). Targets for

AR0025794

agricultural sources were assigned based on the reducible load determined for this sector through application of the sub-allocation process. CAFOs followed the same process, but the production areas were allocated separately from other agricultural sources because technically they are a regulated source and must be placed in the wasteload allocation; the other agricultural sources are included in the load allocation.

The 2020 final target loads of nitrogen, phosphorus, and sediment allocated to Maryland's segment-sheds by source sector are provided in Appendix B1, which also includes interim target loads developed to achieve 70% of the final targets by 2017, and a state-wide load reduction schedule.

AR0025795