**RECORD NO. 13-4079**

In The

# United States Court of Appeals

### For The Third Circuit

**AMERICAN FARM BUREAU FEDERATION; PENNSYLVANIA FARM BUREAU; THE FERTILIZER INSTITUTE; U.S. POULTRY & EGG ASSOCIATION; NATIONAL PORK PRODUCERS COUNCIL; NATIONAL CORN GROWERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS,**

*Plaintiffs – Appellants*,

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Defendants – Appellees.*

**CHESAPEAKE BAY FOUNDATION; CITIZENS FOR PENNSYLVANIAS FUTURE; DEFENDERS OF WILDLIFE; JEFFERSON COUNTY PUBLIC SERVICE DISTRICT; MIDSHORE RIVERKEEPER CONSERVANCY; NATIONAL WILDLIFE FEDERATION; VIRGINA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC; MARYLAND ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES; NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; PENNSYLVANIA MUNICIPAL AUTHORITIES ASSOCIATION,**

*Intervenors – Appellees.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

————————

**JOINT APPENDIX**
**VOLUME IV OF V**
**(Pages 1106 – 1526)**

————————

(Counsel listed inside cover)

# RECORD NO. 13-4079

Kirsten L. Nathanson
Richard E. Schwartz
David Y. Chung
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2887

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Amanda J. Lavis
Robert J. Tribeck
RHOADS & SINON LLP
One South Market Square, 12th Floor
Post Office Box 1146
Harrisburg, Pennsylvania  17108
(717) 233-5731

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Marc B. Kaplin
Gregg I. Adelman
William D. Auxer
KAPLIN, STEWART, MELOFF, REITER & STEIN
910 Harvest Drive
Post Office Box 3037
Blue Bell, Pennsylvania  19422
(610) 941-2666

*Counsel for National Association of Home Builders*

Stephen R. Cerutti, II
OFFICE OF UNITED STATES ATTORNEY
220 Federal Building and Courthouse
228 Walnut Street
Post Office Box 11754
Harrisburg, Pennsylvania  17108
(717) 221-4482

*Counsel for Environmental Protection Agency*

John D. Gunter, II
UNITED STATES DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Post Office Box 7415
Washington, D.C.  20044
(202) 514-3785

*Counsel for Environmental Protection Agency*

Kent E. Hanson
UNITED STATES DEPARTMENT OF JUSTICE
Environmental Defense Section
Land and Natural Resources Division
Post Office Box 23986
Washington, D.C.  20026
(202) 514-2327

*Counsel for Environmental Protection Agency*

Jon A. Mueller
THE CHESAPEAKE BAY FOUNDATION
6 Herndon Avenue
Annapolis, Maryland  21403
(443) 482-2162

*Counsel for Chesapeake Bay Foundation;*
*Citizens for Pennsylvanias Future; Defenders of*
*Wildlife; Jefferson County Public Service District;*
*Midshore Riverkeeper Conservancy; and*
*National Wildlife Federation*

Christopher D. Pomeroy
AQUALAW
6 South 5th Street
Richmond, Virginia  23219
(804) 716-9021

*Counsel for Virgina Association of*
*Municipal Wastewater Agencies, Inc.;*
*Maryland Association of Municipal*
*Wastewater Agencies; and*
*National Association of Clean Water Agencies*

Steven A. Hahn
HAMBURG, RUBIN, MULLIN, MAXWELL & LUPIN
375 Morris Road
Post Office Box 1479
Lansdale, Pennsylvania  19446
(215) 661-0400

*Counsel for Pennsylvania Municipal Authorities Association*

## <u>TABLE OF CONTENTS</u>

| Document Description | JA No. |
|---|---|
| **VOLUME I** | |
| Notice of Appeal.<br>    filed October 7, 2013.<br><br>(ECF No. 153) | 1 |
| Memorandum Opinion.<br>    filed September 13, 2013.<br><br>(ECF No. 150) | 5 |
| Judgment.<br>    filed September 17, 2013.<br><br>(ECF No. 151) | 104 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME II** | |
| Civil Docket for Case #1:11-cv-00067-SHR. | 106 |
| Chesapeake Bay Partnership. The Chesapeake Bay Agreement of 1983. Washington, DC.<br>    dated December 9, 1983.<br><br>(AR0005488-AR0005489) | 135 |
| Chesapeake Executive Council. Chesapeake Bay Agreement. Annapolis, MD.<br>    dated December 15, 1987.<br><br>(AR0005481-AR0005487) | 137 |
| EPA Guidance for Water Quality-based Decisions, the TMDL Process.<br>    dated April 1991.<br><br>(ECF No. 100, Exhibit N) | 144 |
| Chesapeake Executive Council. Amendments to the Chesapeake Bay Agreement. Annapolis, MD.<br>    dated August 12, 1992.<br><br>(AR0005478-AR0005480) | 206 |
| Chesapeake Executive Council. Chesapeake Executive Council Directive No. 93  1 Joint Tributary Strategy Statement. Annapolis, MD.<br>    dated December 27, 1993.<br><br>(AR0005476-AR0005477) | 209 |
| Memorandum of Understanding Between the State of Maryland and the U.S. Environmental Protection Agency, Region III, Regarding Section 303(d) and 303(e) of the Clean Water Act.<br>    dated 1998.<br><br>(AR0012622-AR0012636) | 211 |

| Document Description | JA No. |
|---|---|
| U.S. District Court for the Eastern District of Virginia: Consent Decree: American Canoe Association and the American Littoral Society v. U.S. Environmental Protection Agency. C.A. No. 98-979-A.<br>    dated June 11, 1999.<br><br>(AR0012527-12538, AR0012556, AR0012566, AR0012599-AR0012607) | 226 |
| Chesapeake Executive Council. Chesapeake 2000. Chesapeake Bay Program, Annapolis, MD.<br>    dated June 28, 2000.<br><br>(AR0005417-AR0005429) | 249 |
| Sutfin, C.H. Memorandum: EPA Review of 202 Section 303(d) Lists and Guidelines for Reviewing TMDLs under Existing Regulations issues in 1992.<br>    dated May 20, 2002.<br><br>(AR0022597-AR0022605) | 262 |
| Secretary Tayloe Murphy. "Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals." Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariat, Richmond, VA.<br>    dated April 25, 2003.<br><br>(AR0005397-AR0005405) | 271 |
| Chesapeak Executive Council: Chesapeak Executive Council Directive No. 03-2 Meeting the Nutrient and Sediment Reduction Goals. Annapolis, MD.<br>    dated December 9, 2003.<br><br>(AR0005395-AR0005396) | 280 |

| Document Description | JA No. |
|---|---|
| Virginia Exchange Compliance Plan, and Exhibit B, Comparison of Significant Dischargers in the Potomac-Shenandoah Watershed, Summary of TMDL Appendix Q.<br>    dated July 31, 2007.<br><br>(ECF 122, Ex. A) | 282 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated October 1, 2007.<br><br>(ECF No. 100, Exhibit F) | 295 |
| Scientific and Technical Advisory Committee. Chesapeake Bay Watershed Model Phase V Review. STAC Publication 08-003.<br>    dated February 20, 2008.<br><br>(AR0015010-AR0015022) | 300 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated June 18, 2008 (Draft dated August 22, 2008).<br><br>(ECF No. 110, Exhibit A) | 313 |
| Excerpt from Welsh, D.S., Regional Administrator:  Region 3 Letter to Maryland Secretary of Natural Resources John Griffin.<br>    dated September 11, 2008.<br><br>(AR0023296-AR0023299) | 323 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Agenda and Summary.<br>    dated October 23, 2009.<br><br>(ECF No. 100, Exhibits H and I) | 327 |
| Early, William C.: EPA letter to the Principals' Staff Committee.<br>    dated November 3, 2009.<br><br>(AR0023289-AR0023293) | 340 |

| Document Description | JA No. |
|---|---|
| TMDL meeting.<br>    dated December 14, 2009.<br><br>(AR0027828-AR0027866) | 345 |
| TMDL meeting.<br>    dated December 15, 2009.<br><br>(AR0027754-AR0027788) | 384 |
| TMDL meeting.<br>    dated December 15, 2009.<br><br>(AR0027789-AR0027827) | 419 |
| TMDL meeting.<br>    dated December 16, 2009.<br><br>(AR0027710-AR0027753) | 458 |
| TMDL meeting.<br>    dated December 17, 2009.<br><br>(AR0027670-AR0027709) | 502 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated April 28-29, 2010.<br><br>(ECF No. 100, Exhibit J) | 542 |
| McDonnell, R.F.: Letter to EPA Administrator Lisa P. Jackson.<br>    dated June 15, 2010.<br><br>(AR0023269-AR0023272) | 557 |
| Excerpts from U.S. Environmental Protection Agency Region III. Presentation.  "Update on the Bay TMDL and What's Just Around the Corner."<br>    dated September 9, 2010.<br><br>(AR0032981, AR0032994-AR0032996) | 561 |

| Document Description | JA No. |
|---|---|
| Excerpts from U.S. Environmental Protection Agency: Draft Chesapeake Bay TMDL Document.<br>    dated September 24, 2010.<br><br>(AR0023773-AR0023783, AR0023980-AR0023991, AR0024022-AR0024054) | 565 |
| Excerpts from U.S. Environmental Protection Agency Region III. Draft Chesapeake Bay TMDL: Restoring the District District's waterways and Chesapeake Bay. Public Meeting: District of Columbia.<br>    dated September 29, 2010.<br><br>(AR0029336, AR0029358-AR0029360) | 621 |
| Excerpts from Natural Resources Conservation Service. "Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region."<br>    dated October 2010.<br><br>(AR0032818, AR0032832-AR0032837) | 625 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME III** | |
| TMDL meeting.<br>    dated October 2010.<br><br>(AR0029320-AR0029335) | 632 |
| TMDL meeting.<br>    dated October 4, 2010.<br><br>(AR0029270-AR0029319) | 648 |
| TMDL meeting.<br>    dated October 5, 2010.<br><br>(AR0029119-AR0029167) | 698 |
| TMDL meeting.<br>    dated October 5, 2010.<br><br>(AR0029218-AR0029269) | 747 |
| TMDL meeting.<br>    dated October 6, 2010.<br><br>(AR0029168-AR0029217) | 799 |
| Excerpts from Chesapeake Bay Partnership, Principals' Staff Committee.  Meeting Summary.<br>    dated October 21, 2010.<br><br>(AR0000436) | 849 |
| Excerpts from Virginia Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>    dated November 4, 2010.<br><br>(AR0036755, AR0036801-03, AR0038002, AR0038005, AR0038007, AR0038012, AR0038031-37, AR0038048-49) | 859 |

| Document Description | JA No. |
|---|---|
| Summary of Meetings and Attendees Compiled from TMDL Appendix C, Table C-2, AR0000422-56.<br>    dated November 4, 2010.<br><br>(ECF 105, Ex. E) | 877 |
| Duncansville Municipal Authority Water & Sewer. Comment Letter.<br>    dated November 5, 2010.<br><br>(AR0030500-AR0030502) | 882 |
| Pennsylvania Municipal Authorities Association. Comment Letter.<br>    dated November 5, 2010.<br><br>(AR0031047-AR0031049) | 885 |
| Excerpts from Maryland Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>    dated November 5, 2010<br><br>(AR0031179-82, AR0031187-88) | 888 |
| Virginia Agribusiness Council – Suggested Bay TMDL Talking Points.<br>    dated November 8, 2010.<br><br>(AR0030010-AR0030013) | 894 |
| Excerpts from New York Department of Environmental Conservation.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0031947-AR0031951) | 898 |
| West Virginia Department of Environmental Protection and West Virginia Department of Agriculture.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032100-AR0032101) | 903 |

| Document Description | JA No. |
|---|---|
| Pennsylvania Department of Environmental Protection and Department of Agriculture.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032667-AR0032670) | 905 |
| Maryland State Builders Association. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032686-AR0032687) | 909 |
| Public Comment letter.<br>    dated November 8, 2010.<br><br>(AR0032705-AR0032731) | 911 |
| Excerpts from Comments on the Draft Chesapeake Bay TMDL by Agricultural Realtors Association, et al.<br>    dated November 8, 2010.<br><br>(AR0032758, AR0032767-AR0032772) | 938 |
| Excerpt from County of Lycoming, Pennsylvania. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033175-AR0033176) | 945 |
| Excerpt from National Association of Clean Water Agencies. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0035411-AR0035415) | 947 |
| Excerpts from Southern Tier Chesapeake Bay TMDL Commenting Coalition, Comment Letter.<br>dated November 8, 2010.<br><br>(AR0035941-AR0035944) | 952 |

| Document Description | JA No. |
|---|---|
| Excerpts from National Association of Home Builders. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033704, AR0033720-AR0033721) | 956 |
| National Association of Conservation Districts. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033741-AR0033743) | 959 |
| Excerpts from District of Columbia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0025422-AR0025424, AR0025431-AR0025432, AR0025444-AR0025446, AR0025448, AR0025458, AR0025518-AR0025524) | 962 |
| Excerpts from Pennsylvania Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026393-AR0026414, AR0026416-AR0026422, AR0026443-AR0026444, AR0026451-AR0026460) | 979 |
| Excerpts from Commonwealth of Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026672, AR0026674-AR0026675, AR0026680-AR0026687, AR0026696-AR0026706, AR0026710-AR0026714, AR0026750, AR0026798, AR0026807-AR0026811) | 1020 |

| Document Description | JA No. |
|---|---|
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026813, AR0026815-AR0026816, AR0026818-AR0026822, AR0026828-AR0026830, AR0026833, AR0026835, AR0026837-AR0026838, AR0026840-AR0026842, AR0026847, AR0026855, AR0026867-AR0026869) | 1055 |
| Excerpts from Maryland Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated December 3, 2010<br><br>(AR0025525, AR0025528-AR0025530, AR0025532-AR0025534, AR0025601-AR0025604, AR0025606, AR0025607, AR0025609-10, AR0025698-25701, AR0025787-AR0025789, AR0025791-AR0025795) | 1078 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME IV** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Sections 1-14.<br>    dated December 29, 2010.<br><br>(AR0000001-AR0000366) | 1106 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix A.<br>    dated December 29, 2010.<br><br>(AR0000367-AR0000380) | 1472 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix B.<br>    dated December 29, 2010.<br><br>(AR0000381-AR0000421) | 1486 |

**TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME V** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix C.<br>    dated December 29, 2010.<br><br>(AR0000422-AR0000454) | 1527 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix K.<br>    dated December 29, 2010.<br><br>(AR0000529-AR0000536) | 1560 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix L.<br>    dated December 29, 2010.<br><br>(AR0000537-AR0000564) | 1568 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q.<br>    dated December 29, 2010.<br><br>(AR0000616) | 1596 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R.<br>    dated December 29, 2010.<br><br>(AR0000618) | 1597 |
| Excerpts from Responses to Comments on Chesapeake Bay Total Maximum Daily Load.<br>    dated December 29, 2010.<br><br>(AR0000639, AR0000921-AR0000933, AR0002057, AR0003701) | 1598 |

| Document Description | JA No. |
|---|---|
| Complaint, filed by American Farm Bureau Federation and Pennsylvania Farm Bureau.<br>    dated January 10, 2011.<br><br>(ECF No. 1) | 1627 |
| Amended Complaint, filed by American Farm Bureau Federation, Pennsylvania Farm Bureau,  The Fertilizer Institute, National Pork Producers Council, National Corn Growers Association, National Chicken Council, U.S. Poultry & Egg Association, and National Turkey Federation.<br>    dated April 4, 2011.<br><br>(ECF No. 16) | 1671 |
| Complaint, filed by National Association of Home Builders.<br>dated June 27, 2011.<br><br>(Case #1:11-cv-01213-SHR, ECF No. 1) | 1709 |
| Excerpts from Transcript of Proceedings; Oral Argument. *AFBF v. EPA*, M.D. Pa. No. 1:11-cv-00067.<br>    on October 4, 2012.<br><br>(Pages 89-92) | 1754 |

## **TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME VI (to be filed via CD)** | |
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan; Excel spreadsheets.<br>    dated November 29, 2010.<br><br>(AR0026929-AR0026930<br>AR0026932-AR0026935) | 1760 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000617) | 1766 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000619) | 1767 |

# CHESAPEAKE BAY TMDL EXECUTIVE SUMMARY

## INTRODUCTION

The U.S. Environmental Protection Agency (EPA) has established the Chesapeake Bay Total Maximum Daily Load (TMDL), a historic and comprehensive "pollution diet" with rigorous accountability measures to initiate sweeping actions to restore clean water in the Chesapeake Bay and the region's streams, creeks and rivers.

Despite extensive restoration efforts during the past 25 years, the TMDL was prompted by insufficient progress and continued poor water quality in the Chesapeake Bay and its tidal tributaries. The TMDL is required under the federal Clean Water Act and responds to consent decrees in Virginia and the District of Columbia from the late 1990s. It is also a keystone commitment of a federal strategy to meet President Barack Obama's Executive Order to restore and protect the Bay.

The TMDL – the largest ever developed by EPA – identifies the necessary pollution reductions of nitrogen, phosphorus and sediment across Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia and the District of Columbia and sets pollution limits necessary to meet applicable water quality standards in the Bay and its tidal rivers and embayments. Specifically, the TMDL sets Bay watershed limits of 185.9 million pounds of nitrogen, 12.5 million pounds of phosphorus and 6.45 billion pounds of sediment per year – a 25 percent reduction in nitrogen, 24 percent reduction in phosphorus and 20 percent reduction in sediment. These pollution limits are further divided by jurisdiction and major river basin based on state-of-the-art modeling tools, extensive monitoring data, peer-reviewed science and close interaction with jurisdiction partners.

The TMDL is designed to ensure that all pollution control measures needed to fully restore the Bay and its tidal rivers are in place by 2025, with at least 60 percent of the actions completed by 2017. The TMDL is supported by rigorous accountability measures to ensure cleanup commitments are met, including short-and long-term benchmarks, a tracking and accountability system for jurisdiction activities, and federal contingency actions that can be employed if necessary to spur progress.

Watershed Implementation Plans (WIPs), which detail how and when the six Bay states and the District of Columbia will meet pollution allocations, played a central role in shaping the TMDL. Most of the draft WIPs submitted by the jurisdictions in September 2010 did not sufficiently identify programs needed to reduce pollution or provide assurance the programs could be implemented. As a result, the draft TMDL issued September 24, 2010 contained moderate- to high-level backstop measures to tighten controls on federally permitted point sources of pollution.

A 45-day public comment period on the draft TMDL was held from September 24 to November 8, 2010. During that time, EPA held 18 public meetings in all seven Bay watershed jurisdictions, which were attended by about 2,500 citizens. EPA received more than 14,000 public comments and, where appropriate, incorporated responses to those comments in developing the final TMDL.

After states submitted the draft WIPs, EPA worked closely with each jurisdiction to revise and strengthen its plan. Because of this cooperative work and state leadership, the final WIPs were significantly improved. Examples of specific improvements include:

- Regulated point sources and non-regulated nonpoint sources of nitrogen, phosphorus, and sediment are fully considered and evaluated separately in terms of their relative contributions to water quality impairment of the Chesapeake Bay's tidal waters.

- Committing to more stringent nitrogen and phosphorus limits at wastewater treatment plants, including on the James River in Virginia. (Virginia, New York, Delaware)

- Pursuing state legislation to fund wastewater treatment plant upgrades, urban stormwater management and agricultural programs. (Maryland, Virginia, West Virginia)

- Implementing a progressive stormwater permit to reduce pollution. (District of Columbia)

- Dramatically increasing enforcement and compliance of state requirements for agriculture. (Pennsylvania)

- Committing state funding to develop and implement state-of-the-art-technologies for converting animal manure to energy for farms. (Pennsylvania)

- Considering implementation of mandatory programs for agriculture by 2013 if pollution reductions fall behind schedule. (Delaware, Maryland, Virginia)

These improvements enabled EPA to reduce and remove most federal backstops, leaving a few targeted backstops and a plan for enhanced oversight and contingency actions to ensure progress. As a result, the final TMDL is shaped in large part by the jurisdictions' plans to reduce pollution, which was a long-standing priority for EPA and why the agency always provided the jurisdictions with flexibility to determine how to reduce pollution in the most efficient, cost-effective and acceptable manner.

Now the focus shifts to the jurisdictions' implementation of the WIP policies and programs that will reduce pollution on-the-ground and in-the-water. EPA will conduct oversight of WIP implementation and jurisdictions' progress toward meeting two-year milestones. If progress is insufficient, EPA is committed to take appropriate contingency actions including targeted compliance and enforcement activities, expansion of requirements to obtain NPDES permit coverage for currently unregulated sources, revision of the TMDL allocations and additional controls on federally permitted sources of pollution, such as wastewater treatment plants, large animal agriculture operations and municipal stormwater systems.

In 2011, while the jurisdictions continue to implement their WIPs, they will begin development of Phase II WIPs, designed to engage local governments, watershed organizations, conservation districts, citizens and other key stakeholders in reducing water pollution.

## TMDL BACKGROUND

The Clean Water Act (CWA) sets an overarching environmental goal that all waters of the United States be "fishable" and "swimmable." More specifically it requires states and the District of Columbia to establish appropriate uses for their waters and adopt water quality standards that are protective of those uses. The CWA also requires that every two years jurisdictions develop – with EPA approval – a list of waterways that are impaired by pollutants and do not meet water

quality standards. For those waterways identified on the impaired list, a TMDL must be developed. A TMDL is essentially a "pollution diet" that identifies the maximum amount of a pollutant the waterway can receive and still meet water quality standards.

Most of the Chesapeake Bay and its tidal waters are listed as impaired because of excess nitrogen, phosphorus and sediment. These pollutants cause algae blooms that consume oxygen and create "dead zones" where fish and shellfish cannot survive, block sunlight that is needed for underwater Bay grasses, and smother aquatic life on the bottom. The high levels of nitrogen, phosphorus and sediment enter the water from agricultural operations, urban and suburban stormwater runoff, wastewater facilities, air pollution and other sources, including onsite septic systems. Despite some reductions in pollution during the past 25 years of restoration due to efforts by federal, state and local governments; non-governmental organizations; and stakeholders in the agriculture, urban/suburban stormwater, and wastewater sectors, there has been insufficient progress toward meeting the water quality goals for the Chesapeake Bay and its tidal waters.

More than 40,000 TMDLs have been completed across the United States, but the Chesapeake Bay TMDL will be the largest and most complex thus far – it is designed to achieve significant reductions in nitrogen, phosphorus and sediment pollution throughout a 64,000-square-mile watershed that includes the District of Columbia and large sections of six states. The TMDL is actually a combination of 92 smaller TMDLs for individual Chesapeake Bay tidal segments and includes pollution limits that are sufficient to meet state water quality standards for dissolved oxygen, water clarity, underwater Bay grasses and chlorophyll-$a$, an indicator of algae levels (Figure ES-1). It is important to note that the pollution controls employed to meet the TMDL will also have significant benefits for water quality in tens of thousands of streams, creeks, lakes and rivers throughout the region.

Since 2000, the seven jurisdictions in the Chesapeake Bay watershed (Delaware, District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia), EPA and the Chesapeake Bay Commission, which are partners in the Chesapeake Bay Program, have been planning for a Chesapeake Bay TMDL.

Since September 2005, the seven jurisdictions have been actively involved in decision-making to develop the TMDL. During the October 2007 meeting of the Chesapeake Bay Program's Principals' Staff Committee, the Bay watershed jurisdictions and EPA agreed that EPA would establish the multi-state TMDL. Since 2008, EPA has sent official letters to the jurisdictions detailing all facets of the TMDL, including: nitrogen, phosphorus and sediment allocations; schedules for developing the TMDL and pollution reduction plans; EPA's expectations and evaluation criteria for jurisdiction plans to meet the TMDL pollution limits; reasonable assurance for controlling nonpoint source pollution; and backstop actions that EPA could take to ensure progress.

The TMDL also resolves commitments made in a number of consent decrees, Memos of Understanding, the Chesapeake Bay Foundation settlement agreement of 2010, and settlement agreements dating back to the late 1990s that address certain tidal waters identified as impaired in the District of Columbia, Delaware, Maryland and Virginia.



**Figure ES-1. A nitrogen, phosphorus and sediment TMDL has been developed for each of the 92 Chesapeake Bay segment watersheds.**

Additionally, President Obama issued Executive Order 13508 on May 12, 2009, which directed the federal government to lead a renewed effort to restore and protect the Chesapeake Bay and its watershed. The Chesapeake Bay TMDL is a keystone commitment in the strategy developed by 11 federal agencies to meet the President's Executive Order.

## DEVELOPING THE CHESAPEAKE BAY TMDL

Development of the Chesapeake Bay TMDL required extensive knowledge of the stream flow characteristics of the watershed, sources of pollution, distribution and acreage of the various land uses, appropriate best management practices, the transport and fate of pollutants, precipitation data and many other factors. The TMDL is informed by a series of models, calibrated to decades of water quality and other data, and refined based on input from dozens of Chesapeake Bay scientists. Modeling is an approach that uses observed and simulated data to replicate what is occurring in the environment to make future predictions, and was a critical and valuable tool to develop the Chesapeake Bay TMDL.

The development of the TMDL consisted of several steps:

1. EPA provided the jurisdictions with loading allocations for nitrogen, phosphorus and sediment for the major river basins by jurisdiction.

2. Jurisdictions developed draft Phase I WIPs to achieve those basin-jurisdiction allocations. In those draft WIPs, jurisdictions made decisions on how to further sub-allocate the basin-jurisdiction loadings to various individual point sources and a number of point and nonpoint source pollution sectors.

3. EPA evaluated the draft WIPs and, where deficiencies existed, EPA provided backstop allocations in the draft TMDL that consisted of a hybrid of the jurisdiction WIP allocations modified by EPA allocations for some source sectors to fill gaps in the WIPs.

4. The draft TMDL was published for a 45-day public comment period and EPA held 18 public meetings in all six states and the District of Columbia. Public comments were received, reviewed and considered for the final TMDL.

5. Jurisdictions, working closely with EPA, revised and strengthened Phase I WIPs and submitted final versions to EPA.

6. EPA evaluated the final WIPs and used them along with public comments to develop the final TMDL.

Since nitrogen and phosphorus loadings from all parts of the Bay watershed have an impact on the impaired tidal segments of the Bay and its rivers, it was necessary for EPA to allocate the nitrogen and phosphorus loadings in an equitable manner to the states and basins. EPA used three basic guides to divide these loads.

- Allocated loads should protect living resources of the Bay and its tidal tributaries and should result in all segments of the Bay mainstem, tidal tributaries and embayments meeting water quality standards for dissolved oxygen, chlorophyll $a$, water clarity and underwater Bay grasses.

- Tributary basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound-per-pound basis) (Figure ES-2).

- All tracked and reported reductions in nitrogen, phosphorus and sediment loads are credited toward achieving final assigned loads.

December 29, 2010



**Figure ES-2. Sub-basins across the Chesapeake Bay watershed with the highest (red) to lowest (blue) pound for pound nitrogen pollutant loading effect on Chesapeake Bay water quality.**

In addition, EPA has committed to reducing air deposition of nitrogen to the tidal waters of the Chesapeake Bay from 17.9 to 15.7 million pounds per year. The reductions will be achieved through implementation of federal air regulations during the coming years.

To ensure that these pollutant loadings will attain and maintain applicable water quality standards, the TMDL calculations were developed to account for critical environmental conditions a waterway would face and seasonal variation. An implicit margin of safety for nitrogen and phosphorus, and an explicit margin of safety for sediment, also are included in the TMDL.

Ultimately, the TMDL is designed to ensure that by 2025 all practices necessary to fully restore the Bay and its tidal waters are in place, with at least 60 percent of the actions taken by 2017.

Chesapeake Bay TMDL

The TMDL loadings to the basin-jurisdictions are provided in Table ES-1. These loadings were determined using the best peer-reviewed science and through extensive collaboration with the jurisdictions and are informed by the jurisdictions' Phase I WIPs.

**Table ES-1. Chesapeake Bay TMDL watershed nitrogen, phosphorus and sediment final allocations by jurisdiction and by major river basin.**

| Jurisdiction | Basin | Nitrogen allocations (million lbs/year) | Phosphorus allocations (million lbs/year) | Sediment allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 68.90 | 2.49 | 1,741.17 |
| | Potomac | 4.72 | 0.42 | 221.11 |
| | Eastern Shore | 0.28 | 0.01 | 21.14 |
| | Western Shore | 0.02 | 0.00 | 0.37 |
| | **PA Total** | **73.93** | **2.93** | **1,983.78** |
| Maryland | Susquehanna | 1.09 | 0.05 | 62.84 |
| | Eastern Shore | 9.71 | 1.02 | 168.85 |
| | Western Shore | 9.04 | 0.51 | 199.82 |
| | Patuxent | 2.86 | 0.24 | 106.30 |
| | Potomac | 16.38 | 0.90 | 680.29 |
| | **MD Total** | **39.09** | **2.72** | **1,218.10** |
| Virginia | Eastern Shore | 1.31 | 0.14 | 11.31 |
| | Potomac | 17.77 | 1.41 | 829.53 |
| | Rappahannock | 5.84 | 0.90 | 700.04 |
| | York | 5.41 | 0.54 | 117.80 |
| | James | 23.09 | 2.37 | 920.23 |
| | **VA Total** | **53.42** | **5.36** | **2,578.90** |
| District of Columbia | Potomac | 2.32 | 0.12 | 11.16 |
| | **DC Total** | **2.32** | **0.12** | **11.16** |
| New York | Susquehanna | 8.77 | 0.57 | 292.96 |
| | **NY Total** | **8.77** | **0.57** | **292.96** |
| Delaware | Eastern Shore | 2.95 | 0.26 | 57.82 |
| | **DE Total** | **2.95** | **0.26** | **57.82** |
| West Virginia | Potomac | 5.43 | 0.58 | 294.24 |
| | James | 0.02 | 0.01 | 16.65 |
| | **WV Total** | **5.45** | **0.59** | **310.88** |
| **Total Basin/Jurisdiction Draft Allocation** | | **185.93** | **12.54** | **6,453.61** |
| **Atmospheric Deposition Draft Allocationa** | | **15.7** | **N/A** | **N/A** |
| **Total Basinwide Draft Allocation** | | **201.63** | **12.54** | **6,453.61** |

[a] Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by federal air regulations through 2020.

## ACCOUNTABILITY AND GOALS

The Chesapeake Bay TMDL is unique because of the extensive measures EPA and the jurisdictions have adopted to ensure accountability for reducing pollution and meeting deadlines for progress. The TMDL will be implemented using an accountability framework that includes WIPs, two-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal contingency actions if the jurisdictions do not meet their commitments. This accountability framework is being established in part to provide demonstration of the reasonable assurance provisions of the Chesapeake Bay TMDL pursuant to both the Clean Water Act (CWA) and the Chesapeake Bay Executive Order, but is not part of the TMDL itself.

When EPA establishes or approves a TMDL that allocates pollutant loads to both point and nonpoint sources, it determines whether there is a "reasonable assurance" that the point and nonpoint source loadings will be achieved and applicable water quality standards will be attained. Reasonable assurance for the Chesapeake Bay TMDL is provided by the numerous federal, state and local regulatory and non-regulatory programs identified in the accountability framework that EPA believes will result in the necessary point and nonpoint source controls and pollutant reduction programs. The most prominent program is the CWA's National Pollutant Discharge Elimination System (NPDES) permit program that regulates point sources throughout the nation. Many nonpoint sources are not covered by a similar federal permit program; as a result, financial incentives, other voluntary programs and state-specific regulatory programs are used to achieve nonpoint source reductions. These federal tools are supplemented by a variety of state and local regulatory and voluntary programs and other commitments of the federal government set forth in the Executive Order strategy and identified in the accountability framework.

Beginning in 2012, jurisdictions (including the federal government) are expected to follow two-year milestones to track progress toward reaching the TMDL's goals. In addition, the milestones will demonstrate the effectiveness of the jurisdictions' WIPs by identifying specific near-term pollutant reduction controls and a schedule for implementation (see next section for further description of WIPs). EPA will review these two-year milestones and evaluate whether they are sufficient to achieve necessary pollution reductions and, through the use of a Bay TMDL Tracking and Accountability System, determine if milestones are met.

If a jurisdiction's plans are inadequate or its progress is insufficient, EPA is committed to take the appropriate contingency actions to ensure pollution reductions. These include expanding coverage of NPDES permits to sources that are currently unregulated, increasing oversight of state-issued NPDES permits, requiring additional pollution reductions from point sources such as wastewater treatment plants, increasing federal enforcement and compliance in the watershed, prohibiting new or expanded pollution discharges, redirecting EPA grants, and revising water quality standards to better protect local and downstream waters.

### Watershed Implementation Plans

The cornerstone of the accountability framework is the jurisdictions' development of WIPs, which serve as roadmaps for how and when a jurisdiction plans to meet its pollutant allocations under the TMDL. In their Phase I WIPs, the jurisdictions were expected to subdivide the Bay TMDL allocations among pollutant sources; evaluate their current legal, regulatory,

programmatic and financial tools available to implement the allocations; identify and rectify potential shortfalls in attaining the allocations; describe mechanisms to track and report implementation activities; provide alternative approaches; and outline a schedule for implementation.

EPA provided the jurisdictions with detailed expectations for WIPs in November 2009 and evaluation criteria in April 2010. To assist with WIP preparation, EPA provided considerable technical and financial assistance. EPA worked with the jurisdictions to evaluate various "what if" scenarios – combinations of practices and programs that could achieve their pollution allocations.

The two most important criteria for a WIP is that it achieves the basin-jurisdiction pollution allocations and meets EPA's expectations for providing reasonable assurance that reductions will be achieved and maintained, particularly for non-permitted sources like runoff from agricultural lands and currently unregulated stormwater from urban and suburban lands.

After the draft Phase I WIP submittals in September 2010, a team of EPA sector experts conducted an intense evaluation process, comparing the submissions with EPA expectations. The EPA evaluation concluded that the pollution controls identified in two of the seven jurisdictions' draft WIPs could meet nitrogen and phosphorus allocations and five of the seven jurisdictions' draft WIPs could meet sediment allocations. The EPA evaluation also concluded that none of the seven draft Phase I WIPs provided sufficient reasonable assurance that pollution controls identified could actually be implemented to achieve the nitrogen, phosphorus and sediment reduction targets by 2017 or 2025.

In response to its findings, EPA developed a draft TMDL that established allocations based on using the adequate portions of the jurisdictions' draft WIP allocations along with varying degrees of federal backstop allocations in all seven jurisdictions. Backstop allocations focused on areas where EPA has the federal authority to control pollution allocations through NPDES permits, including wastewater treatment plants, stormwater permits, and animal feeding operations.

## *Public Participation*

The draft Chesapeake Bay TMDL was developed through a highly transparent and engaging process during the past two years. The outreach effort included hundreds of meetings with interested groups; two rounds of public meetings, stakeholder sessions and media interviews in all six states and the District of Columbia in fall of 2009 and 2010; a dedicated EPA website; a series of monthly interactive webinars; notices published in the Federal Register; and a close working relationship with Chesapeake Bay Program committees representing citizens, local governments and the scientific community.

The release of the draft Chesapeake Bay TMDL on September 24, 2010 began a 45-day public comment period that concluded on November 8, 2010. During the comment period EPA conducted 18 public meetings in all six states and the District of Columbia. More than 2,500 people participated in the public meetings. Seven of these meetings were also broadcast live online. During the six weeks that EPA officials traveled around the watershed, they also held dozens of meetings with stakeholders, including local governments, agriculture groups, homebuilder and developer associations, wastewater industry representatives and environmental

organizations. EPA received more than 14,000 comments – most of which supported the TMDL – and the Agency's response to those comments is included as an appendix to the TMDL.

## *Final Watershed Implementation Plans and TMDL*

Since submittal of the draft WIPs and release of the draft TMDL in September 2010, EPA worked closely with each jurisdiction to revise and strengthen its plan. Because of this cooperative work and state leadership, the final WIPs were significantly improved. Examples of specific improvements include:

- Committing to more stringent nitrogen and phosphorus limits at wastewater treatment plants, including on the James River in Virginia. (Virginia, New York, Delaware)

- Pursuing state legislation to fund wastewater treatment plant upgrades, urban stormwater management and agricultural programs. (Maryland, Virginia, West Virginia)

- Implementing a progressive stormwater permit to reduce pollution. (District of Columbia)

- Dramatically increasing enforcement and compliance of state requirements for agriculture. (Pennsylvania)

- Committing state funding to develop and implement state-of-the-art-technologies for converting animal manure to energy for farms. (Pennsylvania)

- Considering implementation of mandatory programs for agriculture by 2013 if pollution reductions fall behind schedule. (Delaware, Maryland, Virginia)

These improvements enabled EPA to reduce and remove most federal backstops, leaving a few targeted backstops and a plan for enhanced oversight and contingency actions to ensure progress.

### Backstop Allocations, Adjustments, and Actions

Despite the significant improvement in the final WIPs, one of the jurisdictions did not meet all of its target allocations and two of the jurisdictions did not fully meet EPA's expectations for reasonable assurance for specific pollution sectors. To address these few remaining issues, EPA included in the final TMDL several targeted backstop allocations, adjustments and actions. As a result of the jurisdictions' significant improvements combined with EPA's backstops, EPA believes the jurisdictions are in a position to implement their WIPs and achieve the needed pollution reductions. This approach endorses jurisdictions' pollution reduction commitments, gives them the flexibility to do it their way first, and signals EPA's commitment to fully use its authorities as necessary to reduce pollution.

New York Wastewater – Backstop Allocation

- EPA closed the numeric gap between New York's WIP and its modified allocations by establishing a backstop that further reduces New York's wasteload allocation for wastewater. EPA is establishing an aggregate wasteload allocation for wastewater treatment plants.

- EPA calculated this backstop WLA using the nitrogen and phosphorus performance levels that New York committed to, but assumes that significant wastewater treatment plants (WWTPs) are at current flow rather than design flow.

- EPA understands that New York plans to renew and/or modify WWTP permits upon completion of its Phase II WIP, consistent with the applicable TMDL allocations at that time. New York is reviewing engineering reports from WWTPs and, in its Phase II WIP, will provide information to support individual WLAs for these plants.

Pennsylvania Urban Stormwater – Backstop Adjustment

- EPA transferred 50 percent of the stormwater load that is not currently subject to NPDES permits from the load allocation to the wasteload allocation. The TMDL allocation adjustment increases reasonable assurance that pollution allocations from urban stormwater discharges will be achieved and maintained by signaling that EPA is prepared to designate any of these discharges as requiring NPDES permits. Urban areas would only be subject to NPDES permit conditions protective of water quality as issued by Pennsylvania upon designation. EPA will consider this step if Pennsylvania does not demonstrate progress toward reductions in urban loads identified in the WIP. EPA may also pursue designation activities based on considerations other than TMDL and WIP implementation.

- EPA will maintain close oversight of general permits for the Pennsylvania stormwater sector (PAG-13 and PAG-2) and may object if permits are not protective of water quality standards and regulations. Upon review of Pennsylvania's Phase II WIP, EPA will revisit the wasteload allocations for wastewater treatment plants, including more stringent phosphorus limits, in the event that Pennsylvania does not reissue PAG-13 and PAG-2 general permits for Phase II MS4s and construction that are protective of water quality by achieving the load reductions called for in Pennsylvania's Phase I WIP.

West Virginia Agriculture – Backstop Adjustment

- EPA shifted 75 percent of West Virginia's animal feeding operation (AFO) load into the wasteload allocation and assumed full implementation of barnyard runoff control, waste management and mortality composting practices required under a CAFO permit on these AFOs. The shift signals that any of these operations could potentially be subject to state or federal permits as necessary to protect water quality. AFOs would only be subject to NPDES permit conditions as issued by West Virginia upon designation. EPA will consider this step if West Virginia does not achieve reductions in agricultural loads as identified in the WIP. EPA may also pursue designation activities based upon considerations other than TMDL and WIP implementation.

- Based upon West Virginia's ability to demonstrate near-term progress implementing the agricultural section of its WIP, including CAFO Program authorization and permit applications and issuance, EPA will assess in the Phase II WIP whether additional federal actions, such as establishing more stringent wasteload allocations for wastewater treatment plants, are necessary to ensure that TMDL allocations are achieved.

## Enhanced Oversight and Contingencies

While final WIPs were significantly improved and the jurisdictions deserve credit for the efforts, EPA also has minor concerns with the assurance that pollution reductions can be achieved in certain pollution sectors in Pennsylvania, Virginia and West Virginia. EPA has informed these jurisdictions that it will consider future backstops if specific near-term progress is not demonstrated in the Phase II WIP.

Pennsylvania Agriculture

- Based on Pennsylvania's ability to demonstrate near-term progress implementing the agricultural section of its WIP, including EPA approval for its CAFO program and enhanced compliance assurance with state regulatory programs, EPA will assess in the Phase II WIP whether additional federal actions, such as shifting AFO loads from the load allocation to the wasteload allocation or establishing more stringent wasteload allocations for WWTPs, are necessary to ensure that TMDL allocations are achieved.

Pennsylvania Wastewater

- EPA established individual wasteload allocations for wastewater treatment plants in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the wasteload allocation. Individual allocations do not commit wastewater plants to greater reductions than what the state has proposed in its WIP. Provisions of the TMDL allow, under certain circumstances, for modifications of allocations within a basin to support offsets and trading opportunities.

- EPA will assess Pennsylvania's near-term urban stormwater and agriculture program progress and determine whether EPA should modify TMDL allocations to assume additional reductions from wastewater treatment plants.

Virginia Urban Stormwater

- If the statewide rule and/or the Phase II WIP do not provide additional assurance regarding how stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment reductions proposed in the final Phase I WIP and assumed within the TMDL allocations, EPA may shift a greater portion of Virginia's urban stormwater load from the load allocation to the wasteload allocation. This shift would signal that substantially more stormwater could potentially be subject to NPDES permits issued by the Commonwealth as necessary to protect water quality.

West Virginia Urban Stormwater

- If stormwater rules and/or the Phase II WIP do not provide additional assurance regarding how urban stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment allocations proposed in the final Phase I WIP and assumed within the TMDL load allocations, EPA may shift a greater portion of West Virginia's urban stormwater load from the load allocation to the wasteload allocation. The shift would signal that substantially more urban stormwater could potentially be subject to state permit coverage and/or federal Clean Water Act permit coverage as necessary to protect water quality.

West Virginia Wastewater

- EPA established individual wasteload allocations for significant wastewater treatment plants in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the wastewater wasteload allocation. Individual allocations do not commit wastewater plants to greater reductions than what the state has proposed in its WIP. Provisions of this TMDL allow, under certain circumstances, for modifications of allocations within a basin to support offsets and trading opportunities.

- EPA will assess West Virginia's near-term agriculture program progress and determine whether additional federal actions consistent with EPA's December 29, 2009 letter, such as modifying TMDL allocations to assume additional reductions from wastewater treatment plants, are necessary to ensure that TMDL allocations are achieved.

### Ongoing oversight of Chesapeake Bay jurisdictions

EPA will carefully review programs and permits in all jurisdictions. EPA's goal is for jurisdictions to successfully implement their WIPs, but EPA is prepared to take necessary actions in all jurisdictions for insufficient WIP implementation or pollution reductions. Federal actions can be taken at any time, although EPA will engage particularly during two-year milestones and refining the TMDL in 2012 and 2017. Actions include:

- Expanding coverage of NPDES permits to sources that are currently unregulated

- Increasing oversight of state-issued NPDES permits

- Requiring additional pollution reductions from federally regulated sources

- Increasing federal enforcement and compliance

- Prohibiting new or expanded pollution discharges

- Conditioning or redirecting EPA grants

- Revising water quality standards to better protect local and downstream waters

- Discounting nutrient and sediment reduction progress if jurisdiction cannot verify proper installation and management of controls

# FINAL TMDL

As a result of the significantly improved WIPs and the removal and reduction of federal backstops, the final TMDL is shaped in large part by the jurisdictions' plans to reduce pollution. Jurisdiction-based solutions for reducing pollution was a long-standing priority for EPA and why the agency always provided the jurisdictions with flexibility to determine how to reduce pollution in the most efficient, cost-effective and acceptable manner.

Now, the focus shifts to jurisdictions' implementation of the WIP policies and programs designed to reduce pollution on-the-ground and in-the-water. EPA will conduct oversight of WIP implementation and jurisdictions' progress toward meeting two-year milestones. If progress is insufficient, EPA will utilize contingencies to place additional controls on federally permitted sources of pollution, such as wastewater treatment plants, large animal agriculture operations and municipal stormwater systems, as well as target compliance and enforcement activities.

Federal agencies will greatly contribute to restoration of the Chesapeake Bay watershed, particularly through implementation of the new federal strategy created under President Obama's Executive Order. Eleven federal agencies have committed to a comprehensive suite of actions and pursuit of critical environmental goals on the same 2025 timeline as the TMDL. Additionally, federal agencies will be establishing and meeting two-year milestones, with the specific charge of taking actions that directly support the jurisdictions in reducing pollution and restoring water quality.

The jurisdictions are expected to submit Phase II WIPs that provide local area pollution targets for implementation on a smaller scale; the timeframe for these Phase II WIPs will be determined in early 2011. Phase III WIPs in 2017 are expected to be designed to provide additional detail of restoration actions beyond 2017 and ensure that the 2025 goals are met.

# Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment

December 29, 2010

U.S. Environmental Protection Agency
Region 3
Water Protection Division
Air Protection Division
Office of Regional Counsel
Philadelphia, Pennsylvania

U.S. Environmental Protection Agency
Region 3
Chesapeake Bay Program Office
Annapolis, Maryland

*and*

U.S. Environmental Protection Agency
Region 2
Division of Environmental Planning and Protection
New York, New York

*in coordination with*

U.S. Environmental Protection Agency
Office of Water
Office of Air and Radiation
Office of General Counsel
Office of the Administrator
Washington, D.C.

*and in collaboration with*

Delaware, the District of Columbia, Maryland, New York,
Pennsylvania, Virginia, and West Virginia

# CHESAPEAKE BAY TMDL EXECUTIVE SUMMARY

## INTRODUCTION

The U.S. Environmental Protection Agency (EPA) has established the Chesapeake Bay Total Maximum Daily Load (TMDL), a historic and comprehensive "pollution diet" with rigorous accountability measures to initiate sweeping actions to restore clean water in the Chesapeake Bay and the region's streams, creeks and rivers.

Despite extensive restoration efforts during the past 25 years, the TMDL was prompted by insufficient progress and continued poor water quality in the Chesapeake Bay and its tidal tributaries. The TMDL is required under the federal Clean Water Act and responds to consent decrees in Virginia and the District of Columbia from the late 1990s. It is also a keystone commitment of a federal strategy to meet President Barack Obama's Executive Order to restore and protect the Bay.

The TMDL – the largest ever developed by EPA – identifies the necessary pollution reductions of nitrogen, phosphorus and sediment across Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia and the District of Columbia and sets pollution limits necessary to meet applicable water quality standards in the Bay and its tidal rivers and embayments. Specifically, the TMDL sets Bay watershed limits of 185.9 million pounds of nitrogen, 12.5 million pounds of phosphorus and 6.45 billion pounds of sediment per year – a 25 percent reduction in nitrogen, 24 percent reduction in phosphorus and 20 percent reduction in sediment. These pollution limits are further divided by jurisdiction and major river basin based on state-of-the-art modeling tools, extensive monitoring data, peer-reviewed science and close interaction with jurisdiction partners.

The TMDL is designed to ensure that all pollution control measures needed to fully restore the Bay and its tidal rivers are in place by 2025, with at least 60 percent of the actions completed by 2017. The TMDL is supported by rigorous accountability measures to ensure cleanup commitments are met, including short-and long-term benchmarks, a tracking and accountability system for jurisdiction activities, and federal contingency actions that can be employed if necessary to spur progress.

Watershed Implementation Plans (WIPs), which detail how and when the six Bay states and the District of Columbia will meet pollution allocations, played a central role in shaping the TMDL. Most of the draft WIPs submitted by the jurisdictions in September 2010 did not sufficiently identify programs needed to reduce pollution or provide assurance the programs could be implemented. As a result, the draft TMDL issued September 24, 2010 contained moderate- to high-level backstop measures to tighten controls on federally permitted point sources of pollution.

A 45-day public comment period on the draft TMDL was held from September 24 to November 8, 2010. During that time, EPA held 18 public meetings in all seven Bay watershed jurisdictions, which were attended by about 2,500 citizens. EPA received more than 14,000 public comments and, where appropriate, incorporated responses to those comments in developing the final TMDL.

After states submitted the draft WIPs, EPA worked closely with each jurisdiction to revise and strengthen its plan. Because of this cooperative work and state leadership, the final WIPs were significantly improved. Examples of specific improvements include:

- Regulated point sources and non-regulated nonpoint sources of nitrogen, phosphorus, and sediment are fully considered and evaluated separately in terms of their relative contributions to water quality impairment of the Chesapeake Bay's tidal waters.

- Committing to more stringent nitrogen and phosphorus limits at wastewater treatment plants, including on the James River in Virginia. (Virginia, New York, Delaware)

- Pursuing state legislation to fund wastewater treatment plant upgrades, urban stormwater management and agricultural programs. (Maryland, Virginia, West Virginia)

- Implementing a progressive stormwater permit to reduce pollution. (District of Columbia)

- Dramatically increasing enforcement and compliance of state requirements for agriculture. (Pennsylvania)

- Committing state funding to develop and implement state-of-the-art-technologies for converting animal manure to energy for farms. (Pennsylvania)

- Considering implementation of mandatory programs for agriculture by 2013 if pollution reductions fall behind schedule. (Delaware, Maryland, Virginia)

These improvements enabled EPA to reduce and remove most federal backstops, leaving a few targeted backstops and a plan for enhanced oversight and contingency actions to ensure progress. As a result, the final TMDL is shaped in large part by the jurisdictions' plans to reduce pollution, which was a long-standing priority for EPA and why the agency always provided the jurisdictions with flexibility to determine how to reduce pollution in the most efficient, cost-effective and acceptable manner.

Now the focus shifts to the jurisdictions' implementation of the WIP policies and programs that will reduce pollution on-the-ground and in-the-water. EPA will conduct oversight of WIP implementation and jurisdictions' progress toward meeting two-year milestones. If progress is insufficient, EPA is committed to take appropriate contingency actions including targeted compliance and enforcement activities, expansion of requirements to obtain NPDES permit coverage for currently unregulated sources, revision of the TMDL allocations and additional controls on federally permitted sources of pollution, such as wastewater treatment plants, large animal agriculture operations and municipal stormwater systems.

In 2011, while the jurisdictions continue to implement their WIPs, they will begin development of Phase II WIPs, designed to engage local governments, watershed organizations, conservation districts, citizens and other key stakeholders in reducing water pollution.

## TMDL BACKGROUND

The Clean Water Act (CWA) sets an overarching environmental goal that all waters of the United States be "fishable" and "swimmable." More specifically it requires states and the District of Columbia to establish appropriate uses for their waters and adopt water quality standards that are protective of those uses. The CWA also requires that every two years jurisdictions develop – with EPA approval – a list of waterways that are impaired by pollutants and do not meet water

quality standards. For those waterways identified on the impaired list, a TMDL must be developed. A TMDL is essentially a "pollution diet" that identifies the maximum amount of a pollutant the waterway can receive and still meet water quality standards.

Most of the Chesapeake Bay and its tidal waters are listed as impaired because of excess nitrogen, phosphorus and sediment. These pollutants cause algae blooms that consume oxygen and create "dead zones" where fish and shellfish cannot survive, block sunlight that is needed for underwater Bay grasses, and smother aquatic life on the bottom. The high levels of nitrogen, phosphorus and sediment enter the water from agricultural operations, urban and suburban stormwater runoff, wastewater facilities, air pollution and other sources, including onsite septic systems. Despite some reductions in pollution during the past 25 years of restoration due to efforts by federal, state and local governments; non-governmental organizations; and stakeholders in the agriculture, urban/suburban stormwater, and wastewater sectors, there has been insufficient progress toward meeting the water quality goals for the Chesapeake Bay and its tidal waters.

More than 40,000 TMDLs have been completed across the United States, but the Chesapeake Bay TMDL will be the largest and most complex thus far – it is designed to achieve significant reductions in nitrogen, phosphorus and sediment pollution throughout a 64,000-square-mile watershed that includes the District of Columbia and large sections of six states. The TMDL is actually a combination of 92 smaller TMDLs for individual Chesapeake Bay tidal segments and includes pollution limits that are sufficient to meet state water quality standards for dissolved oxygen, water clarity, underwater Bay grasses and chlorophyll-*a*, an indicator of algae levels (Figure ES-1). It is important to note that the pollution controls employed to meet the TMDL will also have significant benefits for water quality in tens of thousands of streams, creeks, lakes and rivers throughout the region.

Since 2000, the seven jurisdictions in the Chesapeake Bay watershed (Delaware, District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia), EPA and the Chesapeake Bay Commission, which are partners in the Chesapeake Bay Program, have been planning for a Chesapeake Bay TMDL.

Since September 2005, the seven jurisdictions have been actively involved in decision-making to develop the TMDL. During the October 2007 meeting of the Chesapeake Bay Program's Principals' Staff Committee, the Bay watershed jurisdictions and EPA agreed that EPA would establish the multi-state TMDL. Since 2008, EPA has sent official letters to the jurisdictions detailing all facets of the TMDL, including: nitrogen, phosphorus and sediment allocations; schedules for developing the TMDL and pollution reduction plans; EPA's expectations and evaluation criteria for jurisdiction plans to meet the TMDL pollution limits; reasonable assurance for controlling nonpoint source pollution; and backstop actions that EPA could take to ensure progress.

The TMDL also resolves commitments made in a number of consent decrees, Memos of Understanding, the Chesapeake Bay Foundation settlement agreement of 2010, and settlement agreements dating back to the late 1990s that address certain tidal waters identified as impaired in the District of Columbia, Delaware, Maryland and Virginia.



**Figure ES-1. A nitrogen, phosphorus and sediment TMDL has been developed for each of the 92 Chesapeake Bay segment watersheds.**

Additionally, President Obama issued Executive Order 13508 on May 12, 2009, which directed the federal government to lead a renewed effort to restore and protect the Chesapeake Bay and its watershed. The Chesapeake Bay TMDL is a keystone commitment in the strategy developed by 11 federal agencies to meet the President's Executive Order.

## DEVELOPING THE CHESAPEAKE BAY TMDL

Development of the Chesapeake Bay TMDL required extensive knowledge of the stream flow characteristics of the watershed, sources of pollution, distribution and acreage of the various land uses, appropriate best management practices, the transport and fate of pollutants, precipitation data and many other factors. The TMDL is informed by a series of models, calibrated to decades of water quality and other data, and refined based on input from dozens of Chesapeake Bay scientists. Modeling is an approach that uses observed and simulated data to replicate what is occurring in the environment to make future predictions, and was a critical and valuable tool to develop the Chesapeake Bay TMDL.

The development of the TMDL consisted of several steps:

1. EPA provided the jurisdictions with loading allocations for nitrogen, phosphorus and sediment for the major river basins by jurisdiction.

2. Jurisdictions developed draft Phase I WIPs to achieve those basin-jurisdiction allocations. In those draft WIPs, jurisdictions made decisions on how to further sub-allocate the basin-jurisdiction loadings to various individual point sources and a number of point and nonpoint source pollution sectors.

3. EPA evaluated the draft WIPs and, where deficiencies existed, EPA provided backstop allocations in the draft TMDL that consisted of a hybrid of the jurisdiction WIP allocations modified by EPA allocations for some source sectors to fill gaps in the WIPs.

4. The draft TMDL was published for a 45-day public comment period and EPA held 18 public meetings in all six states and the District of Columbia. Public comments were received, reviewed and considered for the final TMDL.

5. Jurisdictions, working closely with EPA, revised and strengthened Phase I WIPs and submitted final versions to EPA.

6. EPA evaluated the final WIPs and used them along with public comments to develop the final TMDL.

Since nitrogen and phosphorus loadings from all parts of the Bay watershed have an impact on the impaired tidal segments of the Bay and its rivers, it was necessary for EPA to allocate the nitrogen and phosphorus loadings in an equitable manner to the states and basins. EPA used three basic guides to divide these loads.

- Allocated loads should protect living resources of the Bay and its tidal tributaries and should result in all segments of the Bay mainstem, tidal tributaries and embayments meeting water quality standards for dissolved oxygen, chlorophyll *a*, water clarity and underwater Bay grasses.

- Tributary basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound-per-pound basis) (Figure ES-2).

- All tracked and reported reductions in nitrogen, phosphorus and sediment loads are credited toward achieving final assigned loads.



**Figure ES-2. Sub-basins across the Chesapeake Bay watershed with the highest (red) to lowest (blue) pound for pound nitrogen pollutant loading effect on Chesapeake Bay water quality.**

In addition, EPA has committed to reducing air deposition of nitrogen to the tidal waters of the Chesapeake Bay from 17.9 to 15.7 million pounds per year. The reductions will be achieved through implementation of federal air regulations during the coming years.

To ensure that these pollutant loadings will attain and maintain applicable water quality standards, the TMDL calculations were developed to account for critical environmental conditions a waterway would face and seasonal variation. An implicit margin of safety for nitrogen and phosphorus, and an explicit margin of safety for sediment, also are included in the TMDL.

Ultimately, the TMDL is designed to ensure that by 2025 all practices necessary to fully restore the Bay and its tidal waters are in place, with at least 60 percent of the actions taken by 2017.

The TMDL loadings to the basin-jurisdictions are provided in Table ES-1. These loadings were determined using the best peer-reviewed science and through extensive collaboration with the jurisdictions and are informed by the jurisdictions' Phase I WIPs.

**Table ES-1. Chesapeake Bay TMDL watershed nitrogen, phosphorus and sediment final allocations by jurisdiction and by major river basin.**

| Jurisdiction | Basin | Nitrogen allocations (million lbs/year) | Phosphorus allocations (million lbs/year) | Sediment allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 68.90 | 2.49 | 1,741.17 |
| | Potomac | 4.72 | 0.42 | 221.11 |
| | Eastern Shore | 0.28 | 0.01 | 21.14 |
| | Western Shore | 0.02 | 0.00 | 0.37 |
| | **PA Total** | **73.93** | **2.93** | **1,983.78** |
| Maryland | Susquehanna | 1.09 | 0.05 | 62.84 |
| | Eastern Shore | 9.71 | 1.02 | 168.85 |
| | Western Shore | 9.04 | 0.51 | 199.82 |
| | Patuxent | 2.86 | 0.24 | 106.30 |
| | Potomac | 16.38 | 0.90 | 680.29 |
| | **MD Total** | **39.09** | **2.72** | **1,218.10** |
| Virginia | Eastern Shore | 1.31 | 0.14 | 11.31 |
| | Potomac | 17.77 | 1.41 | 829.53 |
| | Rappahannock | 5.84 | 0.90 | 700.04 |
| | York | 5.41 | 0.54 | 117.80 |
| | James | 23.09 | 2.37 | 920.23 |
| | **VA Total** | **53.42** | **5.36** | **2,578.90** |
| District of Columbia | Potomac | 2.32 | 0.12 | 11.16 |
| | **DC Total** | **2.32** | **0.12** | **11.16** |
| New York | Susquehanna | 8.77 | 0.57 | 292.96 |
| | **NY Total** | **8.77** | **0.57** | **292.96** |
| Delaware | Eastern Shore | 2.95 | 0.26 | 57.82 |
| | **DE Total** | **2.95** | **0.26** | **57.82** |
| West Virginia | Potomac | 5.43 | 0.58 | 294.24 |
| | James | 0.02 | 0.01 | 16.65 |
| | **WV Total** | **5.45** | **0.59** | **310.88** |
| **Total Basin/Jurisdiction Draft Allocation** | | **185.93** | **12.54** | **6,453.61** |
| **Atmospheric Deposition Draft Allocation[a]** | | **15.7** | **N/A** | **N/A** |
| **Total Basinwide Draft Allocation** | | **201.63** | **12.54** | **6,453.61** |

[a] Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by federal air regulations through 2020.

## ACCOUNTABILITY AND GOALS

The Chesapeake Bay TMDL is unique because of the extensive measures EPA and the jurisdictions have adopted to ensure accountability for reducing pollution and meeting deadlines for progress. The TMDL will be implemented using an accountability framework that includes WIPs, two-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal contingency actions if the jurisdictions do not meet their commitments. This accountability framework is being established in part to provide demonstration of the reasonable assurance provisions of the Chesapeake Bay TMDL pursuant to both the Clean Water Act (CWA) and the Chesapeake Bay Executive Order, but is not part of the TMDL itself.

When EPA establishes or approves a TMDL that allocates pollutant loads to both point and nonpoint sources, it determines whether there is a "reasonable assurance" that the point and nonpoint source loadings will be achieved and applicable water quality standards will be attained. Reasonable assurance for the Chesapeake Bay TMDL is provided by the numerous federal, state and local regulatory and non-regulatory programs identified in the accountability framework that EPA believes will result in the necessary point and nonpoint source controls and pollutant reduction programs. The most prominent program is the CWA's National Pollutant Discharge Elimination System (NPDES) permit program that regulates point sources throughout the nation. Many nonpoint sources are not covered by a similar federal permit program; as a result, financial incentives, other voluntary programs and state-specific regulatory programs are used to achieve nonpoint source reductions. These federal tools are supplemented by a variety of state and local regulatory and voluntary programs and other commitments of the federal government set forth in the Executive Order strategy and identified in the accountability framework.

Beginning in 2012, jurisdictions (including the federal government) are expected to follow two-year milestones to track progress toward reaching the TMDL's goals. In addition, the milestones will demonstrate the effectiveness of the jurisdictions' WIPs by identifying specific near-term pollutant reduction controls and a schedule for implementation (see next section for further description of WIPs). EPA will review these two-year milestones and evaluate whether they are sufficient to achieve necessary pollution reductions and, through the use of a Bay TMDL Tracking and Accountability System, determine if milestones are met.

If a jurisdiction's plans are inadequate or its progress is insufficient, EPA is committed to take the appropriate contingency actions to ensure pollution reductions. These include expanding coverage of NPDES permits to sources that are currently unregulated, increasing oversight of state-issued NPDES permits, requiring additional pollution reductions from point sources such as wastewater treatment plants, increasing federal enforcement and compliance in the watershed, prohibiting new or expanded pollution discharges, redirecting EPA grants, and revising water quality standards to better protect local and downstream waters.

### *Watershed Implementation Plans*

The cornerstone of the accountability framework is the jurisdictions' development of WIPs, which serve as roadmaps for how and when a jurisdiction plans to meet its pollutant allocations under the TMDL. In their Phase I WIPs, the jurisdictions were expected to subdivide the Bay TMDL allocations among pollutant sources; evaluate their current legal, regulatory,

programmatic and financial tools available to implement the allocations; identify and rectify potential shortfalls in attaining the allocations; describe mechanisms to track and report implementation activities; provide alternative approaches; and outline a schedule for implementation.

EPA provided the jurisdictions with detailed expectations for WIPs in November 2009 and evaluation criteria in April 2010. To assist with WIP preparation, EPA provided considerable technical and financial assistance. EPA worked with the jurisdictions to evaluate various "what if" scenarios – combinations of practices and programs that could achieve their pollution allocations.

The two most important criteria for a WIP is that it achieves the basin-jurisdiction pollution allocations and meets EPA's expectations for providing reasonable assurance that reductions will be achieved and maintained, particularly for non-permitted sources like runoff from agricultural lands and currently unregulated stormwater from urban and suburban lands.

After the draft Phase I WIP submittals in September 2010, a team of EPA sector experts conducted an intense evaluation process, comparing the submissions with EPA expectations. The EPA evaluation concluded that the pollution controls identified in two of the seven jurisdictions' draft WIPs could meet nitrogen and phosphorus allocations and five of the seven jurisdictions' draft WIPs could meet sediment allocations. The EPA evaluation also concluded that none of the seven draft Phase I WIPs provided sufficient reasonable assurance that pollution controls identified could actually be implemented to achieve the nitrogen, phosphorus and sediment reduction targets by 2017 or 2025.

In response to its findings, EPA developed a draft TMDL that established allocations based on using the adequate portions of the jurisdictions' draft WIP allocations along with varying degrees of federal backstop allocations in all seven jurisdictions. Backstop allocations focused on areas where EPA has the federal authority to control pollution allocations through NPDES permits, including wastewater treatment plants, stormwater permits, and animal feeding operations.

## *Public Participation*

The draft Chesapeake Bay TMDL was developed through a highly transparent and engaging process during the past two years. The outreach effort included hundreds of meetings with interested groups; two rounds of public meetings, stakeholder sessions and media interviews in all six states and the District of Columbia in fall of 2009 and 2010; a dedicated EPA website; a series of monthly interactive webinars; notices published in the Federal Register; and a close working relationship with Chesapeake Bay Program committees representing citizens, local governments and the scientific community.

The release of the draft Chesapeake Bay TMDL on September 24, 2010 began a 45-day public comment period that concluded on November 8, 2010. During the comment period EPA conducted 18 public meetings in all six states and the District of Columbia. More than 2,500 people participated in the public meetings. Seven of these meetings were also broadcast live online. During the six weeks that EPA officials traveled around the watershed, they also held dozens of meetings with stakeholders, including local governments, agriculture groups, homebuilder and developer associations, wastewater industry representatives and environmental

organizations. EPA received more than 14,000 comments – most of which supported the TMDL – and the Agency's response to those comments is included as an appendix to the TMDL.

## *Final Watershed Implementation Plans and TMDL*

Since submittal of the draft WIPs and release of the draft TMDL in September 2010, EPA worked closely with each jurisdiction to revise and strengthen its plan. Because of this cooperative work and state leadership, the final WIPs were significantly improved. Examples of specific improvements include:

- Committing to more stringent nitrogen and phosphorus limits at wastewater treatment plants, including on the James River in Virginia. (Virginia, New York, Delaware)

- Pursuing state legislation to fund wastewater treatment plant upgrades, urban stormwater management and agricultural programs. (Maryland, Virginia, West Virginia)

- Implementing a progressive stormwater permit to reduce pollution. (District of Columbia)

- Dramatically increasing enforcement and compliance of state requirements for agriculture. (Pennsylvania)

- Committing state funding to develop and implement state-of-the-art-technologies for converting animal manure to energy for farms. (Pennsylvania)

- Considering implementation of mandatory programs for agriculture by 2013 if pollution reductions fall behind schedule. (Delaware, Maryland, Virginia)

These improvements enabled EPA to reduce and remove most federal backstops, leaving a few targeted backstops and a plan for enhanced oversight and contingency actions to ensure progress.

### Backstop Allocations, Adjustments, and Actions

Despite the significant improvement in the final WIPs, one of the jurisdictions did not meet all of its target allocations and two of the jurisdictions did not fully meet EPA's expectations for reasonable assurance for specific pollution sectors. To address these few remaining issues, EPA included in the final TMDL several targeted backstop allocations, adjustments and actions. As a result of the jurisdictions' significant improvements combined with EPA's backstops, EPA believes the jurisdictions are in a position to implement their WIPs and achieve the needed pollution reductions. This approach endorses jurisdictions' pollution reduction commitments, gives them the flexibility to do it their way first, and signals EPA's commitment to fully use its authorities as necessary to reduce pollution.

New York Wastewater – Backstop Allocation

- EPA closed the numeric gap between New York's WIP and its modified allocations by establishing a backstop that further reduces New York's wasteload allocation for wastewater. EPA is establishing an aggregate wasteload allocation for wastewater treatment plants.

- EPA calculated this backstop WLA using the nitrogen and phosphorus performance levels that New York committed to, but assumes that significant wastewater treatment plants (WWTPs) are at current flow rather than design flow.

- EPA understands that New York plans to renew and/or modify WWTP permits upon completion of its Phase II WIP, consistent with the applicable TMDL allocations at that time. New York is reviewing engineering reports from WWTPs and, in its Phase II WIP, will provide information to support individual WLAs for these plants.

Pennsylvania Urban Stormwater – Backstop Adjustment

- EPA transferred 50 percent of the stormwater load that is not currently subject to NPDES permits from the load allocation to the wasteload allocation. The TMDL allocation adjustment increases reasonable assurance that pollution allocations from urban stormwater discharges will be achieved and maintained by signaling that EPA is prepared to designate any of these discharges as requiring NPDES permits. Urban areas would only be subject to NPDES permit conditions protective of water quality as issued by Pennsylvania upon designation. EPA will consider this step if Pennsylvania does not demonstrate progress toward reductions in urban loads identified in the WIP. EPA may also pursue designation activities based on considerations other than TMDL and WIP implementation.

- EPA will maintain close oversight of general permits for the Pennsylvania stormwater sector (PAG-13 and PAG-2) and may object if permits are not protective of water quality standards and regulations. Upon review of Pennsylvania's Phase II WIP, EPA will revisit the wasteload allocations for wastewater treatment plants, including more stringent phosphorus limits, in the event that Pennsylvania does not reissue PAG-13 and PAG-2 general permits for Phase II MS4s and construction that are protective of water quality by achieving the load reductions called for in Pennsylvania's Phase I WIP.

West Virginia Agriculture – Backstop Adjustment

- EPA shifted 75 percent of West Virginia's animal feeding operation (AFO) load into the wasteload allocation and assumed full implementation of barnyard runoff control, waste management and mortality composting practices required under a CAFO permit on these AFOs. The shift signals that any of these operations could potentially be subject to state or federal permits as necessary to protect water quality. AFOs would only be subject to NPDES permit conditions as issued by West Virginia upon designation. EPA will consider this step if West Virginia does not achieve reductions in agricultural loads as identified in the WIP. EPA may also pursue designation activities based upon considerations other than TMDL and WIP implementation.

- Based upon West Virginia's ability to demonstrate near-term progress implementing the agricultural section of its WIP, including CAFO Program authorization and permit applications and issuance, EPA will assess in the Phase II WIP whether additional federal actions, such as establishing more stringent wasteload allocations for wastewater treatment plants, are necessary to ensure that TMDL allocations are achieved.

## Enhanced Oversight and Contingencies

While final WIPs were significantly improved and the jurisdictions deserve credit for the efforts, EPA also has minor concerns with the assurance that pollution reductions can be achieved in certain pollution sectors in Pennsylvania, Virginia and West Virginia. EPA has informed these jurisdictions that it will consider future backstops if specific near-term progress is not demonstrated in the Phase II WIP.

Pennsylvania Agriculture

- Based on Pennsylvania's ability to demonstrate near-term progress implementing the agricultural section of its WIP, including EPA approval for its CAFO program and enhanced compliance assurance with state regulatory programs, EPA will assess in the Phase II WIP whether additional federal actions, such as shifting AFO loads from the load allocation to the wasteload allocation or establishing more stringent wasteload allocations for WWTPs, are necessary to ensure that TMDL allocations are achieved.

Pennsylvania Wastewater

- EPA established individual wasteload allocations for wastewater treatment plants in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the wasteload allocation. Individual allocations do not commit wastewater plants to greater reductions than what the state has proposed in its WIP. Provisions of the TMDL allow, under certain circumstances, for modifications of allocations within a basin to support offsets and trading opportunities.

- EPA will assess Pennsylvania's near-term urban stormwater and agriculture program progress and determine whether EPA should modify TMDL allocations to assume additional reductions from wastewater treatment plants.

Virginia Urban Stormwater

- If the statewide rule and/or the Phase II WIP do not provide additional assurance regarding how stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment reductions proposed in the final Phase I WIP and assumed within the TMDL allocations, EPA may shift a greater portion of Virginia's urban stormwater load from the load allocation to the wasteload allocation. This shift would signal that substantially more stormwater could potentially be subject to NPDES permits issued by the Commonwealth as necessary to protect water quality.

West Virginia Urban Stormwater

- If stormwater rules and/or the Phase II WIP do not provide additional assurance regarding how urban stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment allocations proposed in the final Phase I WIP and assumed within the TMDL load allocations, EPA may shift a greater portion of West Virginia's urban stormwater load from the load allocation to the wasteload allocation. The shift would signal that substantially more urban stormwater could potentially be subject to state permit coverage and/or federal Clean Water Act permit coverage as necessary to protect water quality.

West Virginia Wastewater

- EPA established individual wasteload allocations for significant wastewater treatment plants in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the wastewater wasteload allocation. Individual allocations do not commit wastewater plants to greater reductions than what the state has proposed in its WIP. Provisions of this TMDL allow, under certain circumstances, for modifications of allocations within a basin to support offsets and trading opportunities.

- EPA will assess West Virginia's near-term agriculture program progress and determine whether additional federal actions consistent with EPA's December 29, 2009 letter, such as modifying TMDL allocations to assume additional reductions from wastewater treatment plants, are necessary to ensure that TMDL allocations are achieved.

### Ongoing oversight of Chesapeake Bay jurisdictions

EPA will carefully review programs and permits in all jurisdictions. EPA's goal is for jurisdictions to successfully implement their WIPs, but EPA is prepared to take necessary actions in all jurisdictions for insufficient WIP implementation or pollution reductions. Federal actions can be taken at any time, although EPA will engage particularly during two-year milestones and refining the TMDL in 2012 and 2017. Actions include:

- Expanding coverage of NPDES permits to sources that are currently unregulated
- Increasing oversight of state-issued NPDES permits
- Requiring additional pollution reductions from federally regulated sources
- Increasing federal enforcement and compliance
- Prohibiting new or expanded pollution discharges
- Conditioning or redirecting EPA grants
- Revising water quality standards to better protect local and downstream waters
- Discounting nutrient and sediment reduction progress if jurisdiction cannot verify proper installation and management of controls

# FINAL TMDL

As a result of the significantly improved WIPs and the removal and reduction of federal backstops, the final TMDL is shaped in large part by the jurisdictions' plans to reduce pollution. Jurisdiction-based solutions for reducing pollution was a long-standing priority for EPA and why the agency always provided the jurisdictions with flexibility to determine how to reduce pollution in the most efficient, cost-effective and acceptable manner.

Now, the focus shifts to jurisdictions' implementation of the WIP policies and programs designed to reduce pollution on-the-ground and in-the-water. EPA will conduct oversight of WIP implementation and jurisdictions' progress toward meeting two-year milestones. If progress is insufficient, EPA will utilize contingencies to place additional controls on federally permitted sources of pollution, such as wastewater treatment plants, large animal agriculture operations and municipal stormwater systems, as well as target compliance and enforcement activities.

Federal agencies will greatly contribute to restoration of the Chesapeake Bay watershed, particularly through implementation of the new federal strategy created under President Obama's Executive Order. Eleven federal agencies have committed to a comprehensive suite of actions and pursuit of critical environmental goals on the same 2025 timeline as the TMDL. Additionally, federal agencies will be establishing and meeting two-year milestones, with the specific charge of taking actions that directly support the jurisdictions in reducing pollution and restoring water quality.

The jurisdictions are expected to submit Phase II WIPs that provide local area pollution targets for implementation on a smaller scale; the timeframe for these Phase II WIPs will be determined in early 2011. Phase III WIPs in 2017 are expected to be designed to provide additional detail of restoration actions beyond 2017 and ensure that the 2025 goals are met.

# Contents

**SECTION 1.   Introduction** .................................................................................................. **1-1**

**1.1   TMDLs and the CWA** .................................................................................................. **1-2**

**1.2   History of the Chesapeake Bay TMDL** ...................................................................... **1-3**
    1.2.1   Regulatory and Management Initiatives .................................................................. 1-3
    1.2.2   Partnership Commitment to Develop the Chesapeake Bay TMDL ............................ 1-8
    1.2.3   President's Chesapeake Bay Executive Order ...........................................................1-10

**1.3   Bay TMDL Process, Partner Coordination and Responsibilities** ......................... **1-11**
    1.3.1   CBP Partnership and Organizational Structure .......................................................1-11

**1.4   Legal Framework for the Chesapeake Bay TMDL** .................................................. **1-15**
    1.4.1   What is a TMDL? ...................................................................................................1-15
    1.4.2   Why is EPA establishing this TMDL? .....................................................................1-16

**SECTION 2.   Watershed and Impairment Description** .................................................... **2-1**

**2.1   General Watershed Setting** .......................................................................................... **2-1**

**2.2   Chesapeake Bay TMDL Scope** .................................................................................... **2-6**
    2.2.1   Pollutants of Concern ............................................................................................. 2-7
    2.2.2   Chesapeake Bay Program Segmentation Scheme ..................................................... 2-7
    2.2.3   Jurisdictions' 2008 303(d) Listings.........................................................................2-14
    2.2.4   2008 303(d) Listing Segments Compared to Consent Decree and MOU Segments ...................2-15

**SECTION 3.   Chesapeake Bay Water Quality Standards** ................................................ **3-1**

**3.1   Chesapeake Bay Water Quality Criteria and Designated Uses** ................................. **3-2**
    3.1.1   Tidal Water Designated Uses .................................................................................. 3-4
    3.1.2   Dissolved Oxygen Criteria ...................................................................................... 3-9
    3.1.3   Chlorophyll a Criteria ...........................................................................................3-11
    3.1.4   Water Clarity/Underwater Bay Grasses Criteria .....................................................3-11

**3.2   Jurisdictions' Current Chesapeake Bay Water Quality Standards Regulations** .............**3-15**
    3.2.1   Delaware ...............................................................................................................3-15
    3.2.2   District of Columbia...............................................................................................3-15
    3.2.3   Maryland ...............................................................................................................3-16
    3.2.4   Virginia .................................................................................................................3-17

**3.3   Assessing Attainment of Chesapeake Bay Water Quality Standards** ..................... **3-18**
    3.3.1   Defining Total Exceedances ...................................................................................3-18
    3.3.2   Defining Allowable Exceedances ............................................................................3-20
    3.3.3   Assessing Criteria Attainment ...............................................................................3-22

**SECTION 4.   Sources of nitrogen, phosphorus and Sediment to the Chesapeake Bay** .......... **4-1**

**4.1   Jurisdiction Loading Contributions** ........................................................................... **4-1**

**4.2   Major River Basin Contributions** .............................................................................. **4-3**

**4.3   Pollutant Source Sector Contributions** ...................................................................... **4-5**

**4.4   Regulated Point Sources** ............................................................................................. **4-6**
    4.4.1   Significant and Nonsignificant Municipal and Industrial Facilities ......................... 4-7
    4.4.2   Basinwide NPDES Permitting Approach.................................................................. 4-8

**4.5   Regulated Point Source Load Summaries** .................................................................. **4-9**

4.5.1    Municipal Wastewater Discharging Facilities ................................................ 4-9
4.5.2    Industrial Discharge Facilities ....................................................................... 4-13
4.5.3    Combined Sewer Overflows .......................................................................... 4-17
4.5.4    Sanitary Sewer Overflows ............................................................................. 4-21
4.5.5    NPDES Permitted Stormwater ....................................................................... 4-22
4.5.6    Concentrated Animal Feeding Operations ..................................................... 4-25

**4.6    Nonpoint Sources ..................................................................................... 4-28**
4.6.1    Agriculture ...................................................................................................... 4-29
4.6.2    Atmospheric Deposition ................................................................................. 4-33
4.6.3    Forest Lands .................................................................................................... 4-36
4.6.4    On-site Wastewater Treatment Systems ........................................................ 4-37
4.6.5    Nonregulated Stormwater Runoff .................................................................. 4-38
4.6.6    Oceanic Inputs ................................................................................................ 4-39
4.6.7    Streambank and Tidal Shoreline Erosion ...................................................... 4-41
4.6.8    Tidal Resuspension ......................................................................................... 4-42
4.6.9    Wildlife ........................................................................................................... 4-43
4.6.10   Natural Background ......................................................................................... 4-44

***SECTION 5.   Chesapeake Bay Monitoring and Modeling Frameworks ................. 5-1***

**5.1    Technical Monitoring and Modeling Requirements ................................. 5-1**

**5.2    Bay Monitoring Framework Overview ...................................................... 5-2**
5.2.1    Partnership's Chesapeake Bay Tidal Monitoring Network ............................ 5-3
5.2.2    Partnership's Watershed Monitoring Network ............................................... 5-12
5.2.3    Data Quality and Access ................................................................................. 5-14
5.2.4    Data Submission and Quality Assurance ........................................................ 5-16
5.2.5    Monitoring Applications in Chesapeake Bay TMDL Development ............... 5-18

**5.3    Modeling Framework Overview ................................................................ 5-18**

**5.4    Chesapeake Bay Airshed Model ................................................................ 5-21**

**5.5    Chesapeake Bay Land Change Model ....................................................... 5-24**
5.5.1    Motivations for Developing Future Land Use Estimates ............................... 5-24
5.5.2    Scale of Chesapeake Bay Land Change Model Future Land Use Estimates ... 5-24
5.5.3    Components of Chesapeake Bay Land Change Model Future Land Use Estimates ... 5-26

**5.6    Chesapeake Bay SPARROW Model .......................................................... 5-27**

**5.7    Chesapeake Bay Scenario Builder ............................................................. 5-28**

**5.8    Phase 5.3 Chesapeake Bay Watershed Model ........................................... 5-30**
5.8.1    Bay Watershed Model Segmentation .............................................................. 5-30
5.8.2    Bay Watershed Model Setup ........................................................................... 5-32
5.8.3    Pollutant Source Representation ..................................................................... 5-37
5.8.4    Calibration ....................................................................................................... 5-38

**5.9    Chesapeake Bay Water Quality and Sediment Transport Model ........... 5-38**
5.9.1    Nonpoint Source Loads ................................................................................... 5-41
5.9.2    Point Source Loads .......................................................................................... 5-41
5.9.3    Atmospheric Loads .......................................................................................... 5-41
5.9.4    Bank Loads ...................................................................................................... 5-42
5.9.5    Wetlands .......................................................................................................... 5-42
5.9.6    Model Setup ..................................................................................................... 5-42

**5.10   Chesapeake Bay Criteria Assessment Program ....................................... 5-43**

**5.11   Climate Change Simulation ....................................................................... 5-43**

*SECTION 6.*   *Establishing the Allocations for the Basin-Jurisdictions* .................................. **6-1**

**6.1**    **Establishing the Overall Model Parameters** ........................................................ **6-2**
     6.1.1    Hydrologic Period ......................................................................................... 6-2
     6.1.2    Seasonal Variation ....................................................................................... 6-3
     6.1.3    Daily Loads ................................................................................................... 6-5

**6.2**    **Establishing the Nitrogen and Phosphorus Related Model Parameters** ........................ **6-8**
     6.2.1    Critical Conditions ....................................................................................... 6-8
     6.2.2    Assessment Procedures for DO and Chlorophyll a Standards ................................... 6-9
     6.2.3    Addressing Reduced Sensitivity to Load Reductions at Low Nonattainment Percentages .......... 6-10
     6.2.4    Margin of Safety .......................................................................................... 6-13

**6.3**    **Methodology for Establishing the Basin-Jurisdiction Allocations for Nitrogen and Phosphorus** ............................................................................................................. **6-16**
     6.3.1    Accounting for Relative Effectiveness of the Major River Basins on Tidal Water Quality ......... 6-17
     6.3.2    Determining Controllable Load .......................................................................... 6-20
     6.3.3    Relating Relative Impact to Needed Controls (Allocations) ........................................ 6-24

**6.4**    **Establishing the Basin-Jurisdiction Allocations for Nitrogen and Phosphorus** .............. **6-25**
     6.4.1    Setting the Atmospheric Nitrogen Deposition Allocation ........................................... 6-26
     6.4.2    Determining the Basinwide Nitrogen and Phosphorus Target Load Based on Dissolved Oxygen ............................................................................................................. 6-28
     6.4.3    Allocating Nitrogen and Phosphorus Loads to Jurisdictions within the Bay Watershed ........... 6-30
     6.4.4    Resolving Dissolved Oxygen and Chlorophyll a Nonattaining Bay Segments ....................... 6-32
     6.4.5    Allocation Considerations for the Headwater Jurisdictions (New York and West Virginia) ........ 6-38
     6.4.6    Nitrogen-to-Phosphorus Exchanges .................................................................... 6-39

**6.5**    **Establishing the Sediment-Related Model Parameters** ........................................... **6-41**
     6.5.1    Critical Conditions for Water Clarity and SAV ...................................................... 6-41
     6.5.2    Assessment Procedures for the Clarity and SAV Standards ....................................... 6-42
     6.5.3    Addressing Reduced Sensitivity to Load Reductions at Low Nonattainment Percentages .......... 6-43
     6.5.4    Explicit Margin of Safety for Sediment .............................................................. 6-44

**6.6**    **Establishing the Basin-Jurisdiction Allocations for Sediment** ................................... **6-44**
     6.6.1    Methodology for Determining Sediment Allocations ................................................ 6-45
     6.6.2    Addressing Water Clarity/SAV Nonattaining Segments ............................................ 6-45

**6.7**    **Basin-Jurisdiction Allocations to Achieve the Bay WQS** ......................................... **6-48**
     6.7.1    Basin-Jurisdiction Allocations Tables .............................................................. 6-48
     6.7.2    Correction of the West Virginia Sediment Allocation ............................................. 6-48

**6.8**    **Attainment of the District of Columbia pH Water Quality Standard** ............................ **6-49**

*SECTION 7.*    *Reasonable Assurance and Accountability Framework* .............................. **7-1**

**7.1**    **Reasonable Assurance** ................................................................................... **7-1**
     7.1.1    Overview of the Accountability Framework ........................................................... 7-2
     7.1.2    Federal Strategy .......................................................................................... 7-3
     7.1.3    Funding ...................................................................................................... 7-4
     7.1.4    Air Emission Reductions. ................................................................................ 7-4

**7.2**    **Accountability Framework** .............................................................................. **7-4**
     7.2.1    Watershed Implementation Plans ...................................................................... 7-6
     7.2.2    Two-Year Milestones ..................................................................................... 7-8
     7.2.3    Chesapeake Bay TMDL Tracking and Accountability System ..................................... 7-10
     7.2.4    Federal EPA Actions...................................................................................... 7-11

***SECTION 8.   Watershed Implementation Plan Evaluation and Resultant Allocations......... 8-1***

**8.1   WIP Evaluation Methodology** ......................................................................................**8-3**
8.1.1   Quantitative Evaluation of the Final Phase I WIPs .................................................... 8-3
8.1.2   Qualitative Evaluation of the Final Phase I WIPs ...................................................... 8-4

**8.2   WIP Evaluation Results** ..............................................................................................**8-5**
8.2.1   Target Allocation Attainment ................................................................................... 8-5
8.2.2   Reasonable Assurance .............................................................................................. 8-9

**8.3   Allocation Methodology** ..............................................................................................**8-9**
8.3.1   Backstop Allocation Methodology ...........................................................................8-10
8.3.2   Backstop Adjustment (Allocation Shift) Methodology...............................................8-10
8.3.3   Assumptions Supporting the Allocations ..................................................................8-12

**8.4   Allocations by Jurisdiction** .......................................................................................**8-17**
8.4.1   Delaware ................................................................................................................8-17
8.4.2   District of Columbia ................................................................................................8-19
8.4.3   Maryland ................................................................................................................8-20
8.4.4   New York ................................................................................................................8-22
8.4.5   Pennsylvania ..........................................................................................................8-24
8.4.6   Virginia ..................................................................................................................8-27
8.4.7   West Virginia ..........................................................................................................8-30

**8.5   Allocation Summary Chart**........................................................................................**8-33**

***SECTION 9.   Chesapeake Bay TMDLs*** ............................................................................... **9-1**

**9.1   Bay Segment Annual and Daily Allocations to Meet WQS**...............................................**9-1**

***SECTION 10. Implementation and Adaptive Management*** .................................................... **10-1**

**10.1  Future Growth** ..........................................................................................................**10-1**
10.1.1  Designating Target Loads for New or Increased Sources ..........................................10-1
10.1.2  Offset Programs .....................................................................................................10-1
10.1.3  Additional Offset Program Features .........................................................................10-2
10.1.4  EPA's Oversight Role of Jurisdictions' Offset Programs ............................................10-3

**10.2  Water Quality Trading** ..............................................................................................**10-3**

**10.3  Future Modifications to the Chesapeake Bay TMDL** .....................................................**10-4**

**10.4  Federal Facilities and Lands**......................................................................................**10-5**

**10.5  Factoring in Effects from Continued Climate Change**....................................................**10-7**

**10.6  Sediment behind the Susquehanna River Dams** ...........................................................**10-7**

**10.7  Filter Feeders** ..........................................................................................................**10-8**

***SECTION 11. Public Participation*** ...................................................................................... **11-1**

**11.1  Stakeholder and Local Government Outreach and Involvement** ......................................**11-1**
11.1.1  Open Collaboration with Stakeholders .....................................................................11-1
11.1.2  Outreach to Local Governments and Elected Officials................................................11-1
11.1.3  Local Pilots ............................................................................................................11-2

**11.2  Public Outreach** .......................................................................................................**11-2**
11.2.1  Public Meetings ......................................................................................................11-2
11.2.2  Webinars to Expand Audiences ...............................................................................11-4
11.2.3  Chesapeake Bay TMDL Website ...............................................................................11-5
11.2.4  Public Notices ........................................................................................................11-5

**11.3  Responses to Public Comments** ............................................................................**11-5**

**11.4  Interaction with States, D.C. on Watershed Implementation Plans** ..................**11-6**

*SECTION 12. References* ......................................................................................... *12-1*

*SECTION 13. Glossary* ............................................................................................ *13-1*

*SECTION 14. Abbreviations*.................................................................................... *14-1*

## Appendices

Appendix A    Chesapeake Bay TMDL Contributors

Appendix B    Index of Documents Supporting the Chesapeake Bay TMDL

Appendix C    Record of Chesapeake Bay TMDL Related Chesapeake Bay Program Committee, Team and Workgroup and Partner/Stakeholder Meetings

Appendix D    Evaluation of the Most Protective Chesapeake Bay Dissolved Oxygen Criteria

Appendix E    Summary of Initial Climate Change Impacts on the Chesapeake Bay Watershed Flows and Loads

Appendix F    Determination of the Hydrologic Period for Model Application

Appendix G    Determination of Critical Conditions for the Chesapeake Bay TMDL

Appendix H    Criteria Assessment Procedures using Model Scenario Output with Bay Monitoring Data

Appendix I    Documentation of the Reduced Sensitivity to Load Reductions at Low Nonattainment Percentages

Appendix J    Key Chesapeake Bay TMDL Reference and Management Model Scenarios: Definitions and Descriptions

Appendix K    Allocation Methodology for Relating Relative Impact to Needed Controls

Appendix L    Setting the Chesapeake Bay Atmospheric Nitrogen Deposition Allocations

Appendix M    Chesapeake Bay Water Quality/Sediment Transport Model Management Scenario Attainment Assessment Results and 2008 303(d) Chesapeake Bay List Assessment Results

    Appendix M-1    Chesapeake Bay Dissolved Oxygen Criteria Attainment Assessment Results

    Appendix M-2    Chesapeake Bay Chlorophyll *a* Criteria Attainment Assessment Results

    Appendix M-3    Chesapeake Bay Water Clarity/SAV Criteria Attainment Assessment Results

    Appendix M-4    Chesapeake Bay Segments 2008 303(d) List Assessment Results

Appendix N    Resolution of Segments Failing to Attain the Applicable Criteria

Appendix O    Setting the Chlorophyll *a* Criteria-Based Nutrient Allocations for the James River Watershed

Appendix P    Setting the Water Clarity/SAV Criteria-Based Sediment Allocations

Appendix Q    Detailed Annual Chesapeake Bay TMDL WLAs and LAs

Appendix R    Chesapeake Bay TMDL Daily WLAs and LAs

Appendix S    Offsets for New or Increased Loadings of Nitrogen, Phosphorus and Sediment to the Chesapeake Bay Watershed

Appendix T    Sediment behind the Susquehanna Dams Technical Documentation

Appendix U    Accounting for the Benefits of Filter Feeder Restoration Technical Documentation

Appendix V    Best Management Practice (BMP) Implementation Rates for Final Scenarios

Appendix W    Responses to Public Comments Received on the September 24, 2010, Draft Chesapeake Bay TMDL

Appendix X    Staged Implementation Approach for Wastewater Treatment Facilities in the Virginia James River Basin

# Tables

Table ES-1. Chesapeake Bay TMDL watershed nitrogen, phosphorus and sediment final allocations by jurisdiction and by major river basin. ...............................................ES-7

Table 1-1.  URLs for accessing the seven Chesapeake Bay watershed jurisdictions' tributary strategies. ................................................................................................. 1-7

Table 1-2.  Summary of Chesapeake Bay TMDL relevant actions agreed to by the CBP's Principals' Staff Committee during its October 1, 2007, meeting .............. 1-9

Table 1-3.  Virginia consent decree (CD) waters impaired for dissolved oxygen (DO) and/or nutrients addressed by the Chesapeake Bay TMDL................................... 1-18

Table 1-4.  District of Columbia consent decree (CD) waters impaired for pH addressed by the Chesapeake Bay TMDL.................................................................................. 1-19

Table 2-1.  The Chesapeake Bay 303(d) tidal segments with consent decree (CD)/memorandum of understanding (MOU) and 303(d) listing status by major river basin and jurisdiction ................................................................... 2-10

Table 2-2.  Comparison of consent decree/MOU segments with total number of Bay segments................................................................................................................. 2-15

Table 3-1.  Chesapeake Bay water quality criteria and designated use related documentation and addenda................................................................................. 3-2

Table 3-2.  Five Chesapeake Bay tidal waters designated uses .................................................. 3-4

Table 3-3.  Current tidal water designated uses by Chesapeake Bay segment .......................... 3-6

Table 3-4.  Current Chesapeake Bay DO criteria. ...................................................................... 3-10

Table 3-5.  Summary of Chesapeake Bay water clarity criteria for application to shallow-water Bay grass designated use habitats .................................................. 3-12

Table 3-6.  Chesapeake Bay SAV restoration acreage goals and application depths .............. 3-12

Table 3-7.  Links for accessing the current waters quality standards (WQS) regulations for Delaware, the District of Columbia, Maryland, and Virginia.......................... 3-15

Table 3-8.  District of Columbia designated uses for surface waters....................................... 3-16

Table 3-9.  Numeric criteria for the District of Columbia's tidally influenced waters ........... 3-16

Table 3-10. Segment-specific chlorophyll *a* criteria for Virginia's tidal James River waters .......................................................................................................................... 3-17

Table 3-11. Estimated percent spatial criteria exceedances and associated cumulative probabilities............................................................................................................. 3-19

Table 4-1.  Percentage of total nitrogen delivered to the Bay from each jurisdiction by pollutant source sector ........................................................................................... 4-5

Table 4-2.  Percentage of total phosphorus delivered to the Bay from each jurisdiction by pollutant source sector ...................................................................................... 4-5

Table 4-3.  Percentage of sediment delivered to the Bay from each jurisdiction by pollutant source sector ........................................................................................... 4-6

Table 4-4.  Jurisdiction-specific definitions of significant municipal and industrial wastewater discharge facilities ............................................................................. 4-7

Table 4-5.  Significant and nonsignificant municipal and industrial wastewater discharging facilities by jurisdiction as of December 2010.................................... 4-8

Table 4-6.  Nitrogen and phosphorus permit tracking summary under the Basinwide NPDES Wastewater Permitting Approach, through December 2010 ................... 4-9

Table 4-7.  Municipal wastewater facilities by jurisdiction .................................................... 4-10

Table 4-8.    Model estimated 2009 municipal wastewater loads by jurisdiction delivered
              to Chesapeake Bay................................................................................. 4-10
Table 4-9.    Model estimated 2009 municipal wastewater loads by major river basin
              delivered to Chesapeake Bay ............................................................... 4-10
Table 4-10.   Industrial wastewater facilities .............................................................. 4-14
Table 4-11.   2009 Load estimates of industrial facility discharges............................. 4-14
Table 4-12.   2009 Flow, total nitrogen, and total phosphorus load estimates of industrial
              wastewater facility discharges by major river basin ............................. 4-14
Table 4-13.   Combined sewer system communities in the Bay watershed ................. 4-18
Table 4-14.   NPDES stormwater permittees by jurisdiction and in the Chesapeake Bay
              watershed, summer 2009 ....................................................................... 4-25
Table 4-15.   Federal numeric thresholds for small, medium, and large CAFOs........ 4-26
Table 4-16.   Estimated number of state or federal permitted CAFOs........................ 4-28
Table 4-17.   Estimated portion of deposited NOx loads on the Chesapeake  watershed
              from four source sectors—EGUs, mobile sources, industry,  and all other
              sources in 1990 and 2020........................................................................ 4-36
Table 4-18.   Chesapeake Bay Water Quality and Sediment Transport Model -simulated
              SAV acres under a range of sediment scoping scenarios compared with the
              2010 Tributary Strategy scenario........................................................... 4-44
Table 5-1.    Modeling tools supporting development of the Chesapeake Bay TMDL ............. 5-20
Table 5-2.    Phase 5.3 Chesapeake Bay Watershed Model land uses ..................... 5-33
Table 6-1.    ADM for calculating daily maximum loads ......................................... 6-7
Table 6-2.    Different approaches available under the explicit and implicit MOS types .......... 6-14
Table 6-3.    Relative effectiveness (measured as DO concentration per edge-of-stream
              pound reduced) for nitrogen and phosphorus for watershed jurisdictions by
              major river basin and above and below the fall line ............................. 6-19
Table 6-4.    Pollutant sources as defined for the No Action and E3 model scenarios ............. 6-23
Table 6-5.    Chesapeake Bay designated use segments showing percent nonattainment of
              the applicable Bay DO WQS under the basinwide nitrogen and phosphorus
              target loadings (million pounds per year) ............................................ 6-33
Table 6-6.    Tributary strategy scenario and nitrogen and phosphorus-based allocation
              scenario's total suspended solids loads (millions of pounds) by watershed
              jurisdiction ........................................................................................... 6-43
Table 6-7.    Chesapeake Bay watershed nitrogen and phosphorus and sediment
              allocations by major river basin by jurisdiction to achieve the Chesapeake
              Bay WQS ............................................................................................... 6-50
Table 6-8.    Chesapeake Bay watershed nitrogen and phosphorus and sediment
              allocations by jurisdiction by major river basin to achieve the Chesapeake
              Bay WQS ............................................................................................... 6-51
Table 7-1.    Eight elements of the jurisdictions' Watershed Implementation Plans ...... 7-6
Table 7-2.    Comparison of elements within the Chesapeake Bay TMDL and Phase I, II,
              and III WIPs........................................................................................... 7-7
Table 8-1.    Comparison between nitrogen, phosphorus, and sediment jurisdiction-wide
              allocations and final Phase I Watershed Implementation Plans, in millions of
              pounds per year ..................................................................................... 8-6

Table 8-2.    Comparison between the nitrogen, phosphorus, and sediment basin-
            jurisdiction allocations and final Phase I Watershed Implementation Plans, in
            million pounds per year ........................................................................................ 8-7
Table 8-3.    Percent reductions in edge-of-stream loads to achieve urban stormwater
            WLAs ................................................................................................................. 8-14
Table 8-4.    EPA backstop allocations, adjustments, and actions based on assessment of
            final Phase I WIPs ............................................................................................. 8-16
Table 8-5.    Chesapeake Bay watershed nitrogen, phosphorus, and sediment allocations
            by jurisdiction and by major river basin, in millions of pounds per year ............. 8-33
Table 9-1.    Chesapeake Bay TMDL total nitrogen (TN) annual allocations (pounds per
            year) by Chesapeake Bay segment to attain Chesapeake Bay WQS ...................... 9-2
Table 9-2.    Chesapeake Bay TMDL total phosphorus (TP) annual allocations (pounds
            per year) by Chesapeake Bay segment to attain for the proposed amended
            Chesapeake Bay WQS ........................................................................................... 9-7
Table 9-3.    Chesapeake Bay TMDL sediment (TSS) annual allocations (pounds per
            year) by Chesapeake Bay segment to attain Chesapeake Bay WQS .................... 9-12
Table 9-4.    Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted
            dischargers to meet TMDLs to attain the Chesapeake Bay WQS ........................ 9-17

# Figures

Figure ES-1. A nitrogen, phosphorus and sediment TMDL has been developed for each of the 92 Chesapeake Bay segment watersheds.....................................................ES-4
Figure ES-2. Sub-basins across the Chesapeake Bay watershed with the highest (red) to lowest (blue) pound for pound nitrogen pollutant loading effect on Chesapeake Bay water quality..............................................................................ES-6
Figure 1-1. CBP's organizational structure. ......................................................................... 1-12
Figure 2-1. The Chesapeake Bay watershed with major rivers and cities................................ 2-2
Figure 2-2. Hydrogeomorphic regions of the Chesapeake Bay watershed. ............................. 2-3
Figure 2-3. Chesapeake Bay watershed land cover................................................................. 2-5
Figure 2-4. Reported and projected human population growth in the Chesapeake Bay watershed 1950–2030. ......................................................................................... 2-6
Figure 2-5. The 92 Chesapeake Bay segments....................................................................... 2-8
Figure 2-6. The 92 Chesapeake Bay segment watersheds....................................................... 2-9
Figure 3-1. Conceptual illustration of the five Chesapeake Bay tidal water designated use zones. ................................................................................................................... 3-5
Figure 3-2. Dissolved oxygen concentrations (mg/L) required by different Chesapeake Bay species and biological communities. .................................................................. 3-9
Figure 3-3. Example cumulative frequency distribution (CFD) curve..................................... 3-19
Figure 3-4. Default reference curve used in the attainment assessment of Chesapeake Bay water quality criteria for which biologically based reference curves have not yet been derived.............................................................................................. 3-21
Figure 3-5. Example reference and assessment curves showing allowable and non-allowable exceedances. .......................................................................................... 3-21
Figure 3-6. Direct model assessment of open water (a), and deep water and deep channel (b) criteria............................................................................................................. 3-24
Figure 4-1. Modeled estimated total nitrogen loads delivered to the Chesapeake Bay by jurisdiction in 2009. ............................................................................................. 4-1
Figure 4-2. Model estimated total phosphorus loads delivered to the Chesapeake Bay by jurisdiction in 2009. ............................................................................................. 4-2
Figure 4-3. Model estimated total sediment loads delivered to the Chesapeake Bay by jurisdiction in 2009. ............................................................................................. 4-2
Figure 4-4. Model estimated total nitrogen loads delivered to the Chesapeake Bay by major tributary in 2009. ......................................................................................... 4-3
Figure 4-5. Model estimated total phosphorus loads delivered to the Chesapeake Bay by major tributary in 2009. ......................................................................................... 4-4
Figure 4-6. Model estimated total sediment loads delivered to the Chesapeake Bay by major tributary in 2009. ......................................................................................... 4-4
Figure 4-7. Significant wastewater treatment facilities in the Chesapeake Bay watershed. .... 4-11
Figure 4-8. Nonsignificant municipal wastewater treatment facilities in the Chesapeake Bay watershed............................................................................................................. 4-12
Figure 4-9. Significant industrial wastewater discharge facilities in the Chesapeake Bay watershed............................................................................................................. 4-15
Figure 4-10. Nonsignificant industrial wastewater discharge facilities in the Chesapeake Bay watershed....................................................................................................... 4-16
Figure 4-11. CSO communities in the Chesapeake Bay watershed. .......................................... 4-20

Figure 4-12. Phase I and II MS4s in the Chesapeake Bay watershed. ....................................... 4-24
Figure 4-13. 1985 and 2009 modeled total nitrogen, phosphorus, and sediment loads from
agricultural lands across the Chesapeake Bay watershed. ................................... 4-30
Figure 4-14. 2007 Chesapeake Bay watershed poultry populations by jurisdiction. ................. 4-31
Figure 4-15. 2007 Chesapeake Bay watershed livestock populations by jurisdiction. .............. 4-32
Figure 4-16. Principle area of NOX emissions (outlined in blue) that contribute nitrogen
deposition to the Chesapeake Bay and its watershed (solid blue fill) (the Bay
airshed)............................................................................................................... 4-34
Figure 4-17 Trend of estimated average nitrate and ammonia deposition concentrations in
the Phase 5 Model domain from 1984 to 2005. .................................................. 4-35
Figure 4-18. Estimated 2001 annual total deposition of nitrogen (kg/ha) to North America
and adjacent coastal ocean. ................................................................................ 4-40
Figure 4-19. Relative estimates of sources of erosion from land sources (crop, forest, or
construction) or bank sources banks and ditch beds)........................................... 4-41
Figure 4-20. Sources of total suspended solids in the Chesapeake including the two
components of shoreline erosions, fastland and nearshore erosion. ..................... 4-42
Figure 4-21. Estimated tidal sediment inputs for 1990 from the Chesapeake Bay
watershed and from shore erosion. Shoreline sediment inputs (here labeled
bank load) are estimated to be about equal to watershed inputs (here labeled
as nonpoint source). ........................................................................................... 4-43
Figure 5-1.   Tidal Chesapeake Bay water quality monitoring network stations. ...................... 5-4
Figure 5-2.   Shallow-water monitoring illustrating segment completion and latest rotation
for Maryland. ....................................................................................................... 5-7
Figure 5-3.   2003-2008 Chesapeake Bay stratified random benthic sampling sites used to
estimate habitat impairment through benthic community condition
assessment............................................................................................................ 5-8
Figure 5-4.   Flightlines for the annual Chesapeake Bay SAV Aerial Survey. ........................... 5-9
Figure 5-5.   Illustration of mapped SAV beds, individual bed coding, bed density
estimates, and species identification (from ground surveys). .............................. 5-10
Figure 5-6.   Chesapeake Bay watershed monitoring network.................................................. 5-13
Figure 5-7.   Chesapeake Bay tidal and watershed water quality monitoring networks'
participants arrayed by their role in sample collection, laboratory analysis,
and/or data reporting. ........................................................................................ 5-17
Figure 5-8.   Chesapeake Bay TMDL modeling framework. .................................................... 5-19
Figure 5-9.   Atmospheric deposition monitoring stations used in the Chesapeake Bay
airshed nitrogen wet deposition regression model................................................ 5-22
Figure 5-10. The Community Multiscale Air Quality Model's 12 km grid over the Phase
5.3 Chesapeake Bay Watershed Model county segmentation. .............................. 5-23
Figure 5-11. 2006 Land cover conditions in the Chesapeake Bay watershed and
intersecting counties............................................................................................ 5-25
Figure 5-12. An example of the Chesapeake Bay SPARROW Model output showing
delivered yields of total nitrogen in the Chesapeake Bay watershed.................... 5-28
Figure 5-13. Scenario Builder conceptual process. .................................................................. 5-29
Figure 5-14. Segmentation and reach simulation of the Phase 5.3 Chesapeake Bay
Watershed Model.................................................................................................. 5-31

December 29, 2010

Figure 5-15. Phase 5.3 Chesapeake Bay Watershed Model hydrology (upper panel) and water quality (lower panel) monitoring calibration stations overlaid on the Phase 5.3 Bay Watershed Model's river segments. ............................................... 5-39

Figure 5-16. The detailed 57,000 cell grid of the Chesapeake Bay Water Quality and Sediment Transport Model. ...................................................................................... 5-40

Figure 6-1.  Graphic comparison of allowable exceedance compared to actual exceedance. ...................................................................................................... 6-11

Figure 6-2.  Example of DO criteria nonattainment results from a wide range of nitrogen and phosphorus load reduction model scenarios. ................................................ 6-12

Figure 6-3.  Example of a James River segment's spring chlorophyll a WQS nonattainment results from a wide range of TN loading Chesapeake Bay Water Quality Model scenarios. .............................................................................. 6-13

Figure 6-4.  Relative effectiveness for nitrogen for the watershed jurisdictions and major rivers basins, above and below the fall line, in descending order ........................ 6-20

Figure 6-5.  Relative effectiveness illustrated geographically by subbasins across the Chesapeake Bay watershed for nitrogen ............................................................... 6-21

Figure 6-6.  Relative effectiveness for illustrated geographically by subbasins across the Chesapeake Bay watershed for phosphorus ........................................................ 6-22

Figure 6-7.  Allocation methodology example showing the hockey stick and straight line reductions approaches, respectively, to wastewater (red line) and all other sources (blue line) for nitrogen. ........................................................................ 6-25

Figure 6-8.  Principal areas of nitrogen oxide (blue line) and ammonia (red line) emissions that contribute to nitrogen deposition to the Chesapeake Bay and its watershed (dark blue fill). ............................................................................... 6-27

Figure 6-9.  Chesapeake Bay water quality model simulated DO criteria attainment under various TN and TP loading scenarios. ................................................................ 6-29

Figure 6-10.Example allocation methodology application for phosphorus ............................. 6-31

Figure 6-11.Example allocation methodology application for nitrogen ................................... 6-31

Figure 6-12.Potomac River chlorophyll a monitoring data compared with the District's summer seasonal mean chlorophyll a water quality criteria. .................................. 6-36

Figure 6-13.Tidal James River monitoring data for chlorophyll a at station TF5.5 (in the upper tidal James River near Hopewell, Virginia) compared to Virginia's James River segment-season specific chlorophyll a criteria. ................................. 6-37

Figure 6-14.James River nonattainment of the chlorophyll a WQS at various load scenarios ............................................................................................................. 6-38

Figure 6-15.TN:TP exchanges based on anoxic volume days and varying TP loads ............... 6-40

Figure 6-16.TN: TP exchanges based on chlorophyll a concentrations and varying TP loads. .................................................................................................................. 6-40

Figure 6-17.Chesapeake Bay SAV/Water Clarity WQS attainment from monitoring data assessment .......................................................................................................... 6-46

Figure 6-18.Model simulated sediment loads by scenario compared with the range of sediment allocations (billions of pounds per year as total suspended sediment) ............................................................................................................. 6-49

Figure 6-19.District of Columbia's Roosevelt Island station pH versus chlorophyll a monitoring data regression ................................................................................... 6-52

Figure 7-1.  Relationship between WIPs and 2-year milestones ............................................. 7-9

# Foreword

This document describes the technical, legal, and policy underpinnings of the Chesapeake Bay Total Maximum Daily Load (TMDL). While EPA Regions 2 and 3 are establishing this TMDL, it represents the product of decades of scientific research, monitoring, assessment, and model application, and years of focused dialogue and analysis among EPA, our six watershed state partners and the District of Columbia, and numerous stakeholders. This document has benefited from the input of thousands of professionals and citizens dedicated to the restoration of the Chesapeake Bay. In accordance with the Clean Water Act and Executive Order 13508 (signed by President Obama on May 12, 2009), the Chesapeake Bay TMDL provides a critical plan to restore and maintain the living resources of the Chesapeake Bay.

A TMDL is required by the Clean Water Act for waters that are on state lists identifying waters that are impaired – i.e., not attaining state adopted and EPA approved water quality standards. Most of the waters of the Chesapeake Bay and its tidal tributaries and embayments are on the three states' (Maryland, Virginia, and Delaware) and the District's lists of impaired waters because of excess nitrogen, phosphorus, and sediment pollution. The Chesapeake Bay TMDL identifies the loadings of nitrogen, phosphorus, and sediment that are necessary to achieve the applicable jurisdiction's water quality standards for the Bay and its tidal tributaries and embayments for dissolved oxygen, chlorophyll *a* (an indicator of algae), water clarity, and submerged aquatic vegetation (SAV, or underwater Bay grasses). For this reason, the Chesapeake Bay TMDL has been described as a pollution diet defining the pollutant loadings necessary to attain water quality standards and restore the aquatic life resources of the Chesapeake Bay.

The Chesapeake Bay receives waters from thousands of streams and rivers within seven jurisdictions in the mid-Atlantic region of the United States: Delaware, the District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia. These waters drain to the Chesapeake Bay and, therefore, contribute pollutant loadings to the Bay. The Chesapeake Bay TMDL also establishes total maximum daily loads from these watersheds and jurisdictions for each of the 92 impaired segments that comprise the waters of the Chesapeake Bay and its tidal tributaries and embayments. Thus, the Chesapeake Bay TMDL is actually an assemblage of 276 TMDLs: individual TMDLs for each of the 3 pollutants— nitrogen, phosphorus, and sediment— for each of the 92 segments (3 x 92 = 276).

The purpose of the Chesapeake Bay TMDL is to identify the pollutant loading reductions needed to meet the applicable Bay water quality standards. The TMDL, thus, allocates loads to all pollutant source sectors in all parts of the Bay's 64,000 square mile watershed. Because of the watershed-wide nature of these loading reductions, the water quality benefits from these reductions will not be limited to the Bay and its tidal tributaries and embayments. In fact, the watershed's headwaters from the location the pollutant reductions are made to the point they enter the Bay or its tidal tributaries should benefit from some measure of improved water quality. The controls necessary to reduce nitrogen, phosphorus, and sediment also are likely to reduce other pollutants like bacteria and chemical contaminants.

While the Chesapeake Bay TMDL establishes the pollutant loadings for nitrogen, phosphorus, and sediment needed to restore and maintain a healthy Bay, the TMDL is essentially an

information and planning tool that does not, by itself, implement the needed controls. Implementation mechanisms available under other provisions of the Clean Water Act, Clean Air Act, state laws, and federal and state regulations, and local ordinances, as well as appropriate levels of funding, are needed to achieve these loading targets. The Bay TMDL will be implemented using an accountability framework that includes the seven jurisdictions' Watershed Implementation Plans (WIPs), two-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal actions if the Bay watershed jurisdictions do not meet their targets and commitments. Although not itself an element of the Chesapeake Bay TMDL, the accountability framework is being established pursuant to both section 117(g)(1) of the Clean Water Act and Executive Order 13508, in part, to demonstrate reasonable assurance that the Chesapeake Bay TMDL allocations for nitrogen, phosphorus, and sediment and the jurisdictions' water quality standards are met.

An executive summary provides an overview of the TMDL, highlighting its more important aspects. For more specific information, readers should consult the main document, which describes each aspect of the Chesapeake Bay TMDL in detail. Finally, for additional background and supportive material, the reader is referred to the references contained in the main document and numerous appendices.


Shawn M. Garvin, Regional Administrator
U.S. Environmental Protection Agency Region 3


Judith A. Enck, Regional Administrator
U.S. Environmental Protection Agency Region 2

# Acknowledgements

This document was developed through the collaborative efforts of the U.S. Environmental Protection Agency (EPA) and its seven Chesapeake Bay watershed partners—Delaware, the District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia—principally through the Chesapeake Bay Program's (CBP) Water Quality Goal Implementation Team (WQGIT) (formerly the Water Quality Steering Committee), its principal workgroups, and the former Nutrient Subcommittee. The CBP's Principals' Staff Committee made decisions on behalf of the partnership and provided policy direction to the WQGIT. Advice, direction, and independent peer review were provided by the CBP's Scientific and Technical Advisory Committee (STAC), the Local Government Advisory Committee (LGAC), and the Citizen's Advisory Committee (CAC). Comments and recommendations gathered through the November–December 2009 public meetings/webinars, the monthly webinars scheduled during 2010, and the September—November 2010 public comment period were instrumental in ensuring that the published allocations provide the most benefits to local streams and rivers and still achieve the jurisdictions' Chesapeake Bay water quality standards.

The document resulted from the collaborative expertise, input, feedback, and formal comments of thousands of individuals from the multitude of CBP partnering agencies and institutions, local governments, nongovernmental organizations, businesses, many other involved stakeholders, and the general public. Their individual and collective contributions are hereby acknowledged.

Special acknowledgment is made to past and present members the following CBP committees: WQGIT, Principals' Staff Committee, Management Board, STAC, LGAC, CAC, Agriculture Workgroup, Forestry Workgroup, Sediment Workgroup, Urban and Suburban Stormwater Workgroup, Wastewater Treatment Workgroup, Watershed Technical Workgroup, TMDL Workgroup (formerly Reevaluation Technical Workgroup), the former Nutrient Subcommittee, Scientific and Technical Analysis and Reporting Team, Criteria Assessment Procedures Workgroup, Modeling Workgroup, Nontidal Water Quality Workgroup, Tidal Monitoring and Analysis Workgroup, Analytical Methods and Quality Assurance Workgroup, and former Monitoring and Analysis Subcommittee. Appendix A provides a detailed member listing of these committees, teams, and workgroups who were instrumental in completing the Chesapeake Bay total maximum daily load (TMDL).

Special acknowledgement is also made to the following individuals (in alphabetical order) for their contributions to the development of the Bay TMDL, support of the development of the jurisdictions' Phase I Watershed Implementation Plans (WIPs), evaluation of the draft and final Phase I WIPs, supporting public and stakeholder outreach, responding to thousands of public comments, and publication of this document: Greg Allen, EPA Region 3 CBP Office; Katherine Antos, EPA Region 3 CBP Office; Cheryl Atkinson, EPA Region 3 Water Protection Division (WPD); Seth Ausubel, EPA Region 2 Division of Environmental Planning and Protection; Michael Barnes, Chesapeake Research Consortium/CBP Office; Greg Barranco, EPA Region 3 CBP Office; Richard Batiuk, EPA Region 3 CBP Office; Benita Best-Wong, EPA Office of Water; Carin Bisland, EPA Region 3 CBP Office; Ross Brennan, EPA Office of Water; Kevin Bricke, EPA Region 2 Division of Environmental Planning and Protection; Chris Brosch, University of Maryland/CBP Office; Brian Burch, EPA Region 3 CBP Office; Jon Capacasa, EPA Region 3 WPD; Ann Carkhuff, EPA Region 3 WPD; Peter Claggett, U.S. Geological

Survey (USGS)/CBP Office; Jeff Corbin, EPA Region 3 Office of the Regional Administrator; James Curtin, EPA Office of General Counsel; Thomas Damm, EPA Region 3 WPD; Christopher Day, EPA Region 3 Office of Regional Counsel; Kevin DeBell, EPA Region 3 CBP Office; Robin Dennis, NOAA/EPA Office of Research and Development; Helene Drago, EPA Region 3 WPD; Mark Dubin, University of Maryland/CBP Office; Jim Edward, EPA Region 3 CBP Office; Judith Enck, EPA Region 2 Regional Administrator; Leo Essenthier, EPA Region 3 WPD; Barbara Finazzo, EPA Region 2 Division of Environmental Planning and Protection; Katie Foreman, University of Maryland/CBP Office; Kristin Foringer, Chesapeake Research Consortium/CBP Office; Debra Forman, EPA Region 3 WPD; J. Charles Fox, EPA Office of the Administrator; Michael Fritz, EPA Region 3 CBP Office; Elizabeth Gaige, EPA Region 3 WPD; Angie Garcia, EPA Region 3 WPD; Shawn Garvin, EPA Region 3 Regional Administrator; Kelly Gable, EPA Region 3 Office of Regional Counsel; Patricia Gleason, EPA Region 3 WPD; Peter Gold, EPA Region 3 WPD; Aaron Gorka, Chesapeake Research Consortium/CBP Office; Michelle Gugger, EPA Region 3 WPD; Michael Haire, EPA Office of Water; Denise Hakowski, EPA Region 3 WPD; Suzanne Hall-Trevena, EPA Region 3 WPD; James Hanlon, EPA Office of Water; Rachel Herbert, EPA Office of Water; Sara Hilbrich, EPA Office of Water; Amie Howe, EPA Region 3 Office of State and Congressional Relations; Nan Ides, EPA Region 3 WPD; Fred Irani, USGS/CBP Office; Ruth Izraeli, EPA Region 2 Division of Environmental Planning and Protection; Jackie Johnson, Interstate Commission on the Potomac River Basin/CBP Office; Jeni Keisman, University of Maryland/CBP Office; Victoria Kilbert, Chesapeake Research Consortium/CBP Office; Robert Koroncai, EPA Region 3 WPD; Caitlin Kovelove, EPA Office of Water; Amelia Letnes, EPA Office of Water; Mary Letzkus, EPA Region 3 WPD; Lewis Linker, EPA Region 3 CBP Office; Felix Locicero, EPA Region 2 Division of Environmental Planning and Protection; Travis Loop, EPA Region 3 CBP Office; Michael Mallonee, Interstate Commission on the Potomac River Basin/CBP Office; Lori Mackey, EPA Region 3 CBP Office; David McGuigan, EPA Region 3 WPD; Evelyn MacKnight, EPA Region 3 WPD; Mike Mason, EPA Office of Water; Larry Merrill, EPA Region 3 WPD; Linda Miller, EPA Region 3 Office of State and Congressional Relations; Jenny Molloy, EPA Region 3 CBP Office/WPD; Francis Mulhern EPA Region 3 WPD; Elizabeth Ottinger, EPA Region 3 WPD; Andrew Parker, Tetra Tech; Reggie Parrish, EPA Region 3 CBP Office; Jeffrey Potent, EPA Office of Water; Lucinda Power, EPA Region 3 CBP Office; Andrew Prugar, EPA Office of Environmental Information; Teresa Rafi, Tetra Tech; Pravin Rana, EPA Office of Water; Sucharith Ravi, University of Maryland/CBP Office; Bill Richardson, EPA Region 3 WPD; Robert Rose, EPA Office of Water; Jennifer Sincock, EPA Region 3 WPD; Mike Shapiro, EPA Office of Water; Gary Shenk, EPA Region 3 CBP Office; Kelly Shenk, EPA Region 3 CBP Office; Rachel Streusand, Chesapeake Research Consortium/CBP Office; Jeff Strong, Tetra Tech; Fred Suffian, EPA Region 3 WPD; Gwen Supplee, EPA Region 3 WPD; Jeff Sweeney, University of Maryland/CBP Office; Nita Sylvester, EPA Region 3 CBP Office; Peter Tango, U.S. Geological Survey/CBP Office; Renee Thompson, USGS/CBP Office; Brian Trulear, EPA Region 3 WPD; Randy Waite, EPA Office of Air and Radiation; Tom Wall, EPA Office of Water; Ping Wang, University of Maryland/CBP Office; Howard Weinberg, University of Maryland/CBP Office; Steve Whitlock EPA Office of Water; Julie Winters, EPA Region 3 CBP Office; John Wolf, USGS/CBP Office; Robert Wood, EPA Region 3 CBP Office; Jing Wu, University of Maryland/CBP Office; Guido Yactayo, University of Maryland/CBP Office; Ning Zhou, Virginia Polytechnical and State University/CBP Office; Kyle Zieba, EPA Region 3 WPD; and Hank Zygmunt, EPA Region 3 WPD.

Special acknowledgement of the policy direction and guidance provided by Lisa Jackson, EPA Administrator; Robert Perciasepe, EPA Deputy Administrator; and Robert Sussman, Counselor to the Administrator.



**Members of the Chesapeake Bay Program's Water Quality Goal Implementation Team gather in Lancaster, Pennsylvania, in April 2009 to discuss development of the Chesapeake Bay TMDL.**

# SECTION 1.  INTRODUCTION

This document establishes total maximum daily loads (TMDLs) for nitrogen, phosphorus, and sediment for the Chesapeake Bay and its tidal tributaries and embayments as required by section 303(d) of the Clean Water Act (CWA) and its implementing regulations at Title 40 of the *Code of Federal Regulations* (CFR) section 130.7. This TMDL represents the culmination of decades of collaboration among many partners and stakeholders and is the result of an analysis of water quality pollution and its solution on an unprecedented geographic, scientific, programmatic, and political scale. While all TMDLs are unique, this TMDL is distinguished by the magnitude of the watershed it addresses and the wealth of science synthesized, data developed, and analyses conducted over the course of the past decades that support its conclusions.

In an effort to keep the Chesapeake Bay TMDL (Bay TMDL) document as clear and succinct as possible, discussion of the technical analyses and modeling that support the pollutant allocations are reasonably summarized in nature with links provided to the more detailed technical support documentation. Because of the large size of the watershed and the many individual sources, load allocations (LAs) and wasteload allocations (WLAs) summarized in Section 9 are presented in greater detail in supporting appendices.

This document is organized into 11 sections as follows:

- Section 1: Clean Water Act and regulatory, statutory, and historical background of the Chesapeake Bay TMDL
- Section 2: Description of the Chesapeake Bay watershed, the Bay, and its impaired segments
- Section 3: The jurisdictions' Chesapeake Bay water quality standards
- Section 4: The major sources of nutrients and sediment in the Bay, its watershed, and its airshed
- Section 5: The modeling tools used to develop the WLAs and LAs
- Section 6: How the TMDL was developed, including the allocation methodology and related considerations
- Section 7: Discussion of reasonable assurance, Bay TMDL implementation, and the Bay TMDL accountability framework
- Section 8: The evaluation of jurisdictions' Watershed Implementation Plans
- Section 9: The individual nitrogen, phosphorus, and sediment TMDLs for each of the 92 Bay tidal segments
- Section 10: Adaptive management approach to Bay TMDL implementation
- Section 11: Documentation of public participation, comments, and responses

This document also contains three additional sections providing: a list of references (Section 12), a glossary (Section 13), and a list of abbreviations (Section 14) and 24 Appendices.

Additional supporting information that is not part of this document or its appendices, can be found as follows:

- Technical documentation for each of the Chesapeake Bay TMDL models and supporting tools—Bay airshed, land change, Scenario Builder, SPARROW, Bay watershed, Bay water quality and sediment transport, oyster filter feeder, and menhaden filter feeder—are provided via URL links in Section 5.

- Access to each of the jurisdictions' final Phase I Watershed Implementation Plans (WIPs) is provided via URL in Section 7. The WIPs are part of the accountability framework meant to implement the Bay TMDL, but they are not an element of the Bay TMDL itself. EPA reviewed the Phase I WIPs as part of the information used to inform its allocation decisions.

- Publicly accessible agreements, documents, reports, papers, meeting summaries, correspondence, and data sets developed during the decades and more recent years leading up to the Chesapeake Bay TMDL, which were instrumental in setting the scientific, programmatic, policy, and legal foundation on which the Bay TMDL is built, are listed in Appendix B with electronic access to all through the provided URLs.

## 1.1    TMDLS AND THE CWA

Section 303(c) of the 1972 Clean Water Act (CWA) requires states, including the District of Columbia, (collectively referred to as jurisdictions) to establish water quality standards (WQS) that identify each waterbody's designated uses and the criteria needed to support those uses. The CWA establishes a rebuttable presumption that all waters can attain beneficial aquatic life uses, i.e., fishable and recreational (i.e., swimmable) uses.

Section 303(d) of the CWA requires states, including the District of Columbia, to develop lists of impaired waters that fail to meet WQS set by jurisdictions even after implementing technology-based and other pollution controls. EPA's regulations for implementing CWA section 303(d) are codified in the Water Quality Planning and Management Regulations at 40 CFR Part 130. The law requires that jurisdictions establish priority rankings and develop TMDLs for waters on the lists of impaired waters (40 CFR 130.7).

A TMDL specifies the maximum amount of a pollutant that a waterbody can receive and still meet applicable WQS. A mathematical definition of a TMDL is written as the sum of the individual wasteload allocations (WLAs) for point sources, the load allocation (LAs) for nonpoint sources and natural background, and a margin of safety (MOS)[CWA section 303(d)(1)(C)]:

$$TMDL = \Sigma WLA + \Sigma LA + MOS$$

where

$WLA$ = wasteload allocation, or the portion of the TMDL allocated to existing and/or future point sources.

$LA$ = load allocation, or the portion of the TMDL attributed to existing and/or future nonpoint sources and natural background.

$MOS$ = margin of safety, or the portion of the TMDL that accounts for any lack of knowledge concerning the relationship between effluent limitations and water quality, such as uncertainty about the relationship between pollutant loads and receiving water quality, which can be provided implicitly by applying conservative analytical assumptions or explicitly by reserving a portion of loading capacity.

The process of calculating and documenting a TMDL involves a number of tasks and—especially for a large, complex, and multijurisdictional waterbody with multiple impairments—can require substantial effort and resources. Major tasks involved in the TMDL development process include the following:

- Characterizing the impaired waterbody and its watershed

- Identifying and inventorying the relevant pollutant source sectors

- Applying the appropriate WQS

- Calculating the loading capacity using appropriate modeling analyses to link pollutant loads to water quality

- Identifying the required source allocations

The Bay TMDL report presents the results of numerous analyses and model simulations designed to calculate the Bay and its tidal tributaries and embayments' pollutant loading capacity and documents the informational elements described above. Because the Chesapeake Bay watershed is so large, and the analysis required for developing the Bay TMDL so extensive, the Chesapeake Bay TMDL and its supporting documentation consists of this report and additional supporting materials in the numerous appendices referenced throughout the report. The Bay TMDL is also supported by an extensive list of significant documents (Appendix B).

## 1.2    HISTORY OF THE CHESAPEAKE BAY TMDL

The Chesapeake Bay watershed has been inhabited for thousands of years, but the population started to increase significantly with the arrival of European settlers in the 1600s. Settlers began clearing forests for timber and to make room for expanding agricultural activities, increasing soil erosion and nutrient delivery to the Bay and its tributaries (Curtin et al. 2001; Rountree et al. 2007). As early as 1900, the oyster population began to decline. Throughout the 20th century, urban development and agricultural activities increased throughout the watershed. In the late 1970s, Maryland Senator Charles Mathias sponsored a congressionally funded, 5-year study to analyze the rapid loss of aquatic life that was affecting the Bay. That study identified excess nitrogen and phosphorus pollution as the main source of the Bay's degradation (USEPA 1982, 1983a, 1983b, 1983c, 1983d).

### 1.2.1    Regulatory and Management Initiatives

In response to the Bay's decline, various regulatory and management initiatives have been undertaken aimed at Bay restoration, ranging from cooperative agreements among surrounding jurisdictions to new regulatory programs and policies. Through the years, the agreements and alliances have become more formalized and inclusive to address the multitude of factors

contributing to the deterioration in Chesapeake Bay water quality. The following paragraphs outline the major policy, legislative, and programmatic events that have led to the development of the Bay TMDL, including the management agreements and statutory and regulatory requirements that form the underpinning of the Bay TMDL.

### 1983 Chesapeake Bay Agreement

In 1983 the governors of Maryland, Virginia, and Pennsylvania; the mayor of the District of Columbia; the chairman of the Chesapeake Bay Commission; and EPA's Administrator signed the first Chesapeake Bay Agreement. In that agreement, the signatories acknowledged the decline in living resources of the Chesapeake Bay and agreed to establish the Chesapeake Executive Council (CEC) to "assess and oversee the implementation of coordinated plans to improve and protect the water quality and living resources of the Chesapeake Bay estuarine systems" (Chesapeake Bay Partnership 1983).

### 1987 Chesapeake Bay Agreement

Faced with the need to take a more comprehensive and coordinated approach to restoring water quality and living resources of the Chesapeake Bay, the signatories to the 1983 agreement entered into the 1987 Chesapeake Bay Agreement (CEC 1987). The 1987 Chesapeake Bay Agreement set priority goals and commitments, of which a key goal was to "reduce and control point and nonpoint sources of pollution to attain the water quality condition necessary to support the living resources of the Bay." To achieve that goal, signatories to the 1987 Bay Agreement committed to reduce the controllable nitrogen and phosphorus loads delivered to the mainstem of the Chesapeake Bay by 40 percent by 2000 and to develop a Bay-wide implementation strategy to achieve those reductions (CEC 1987).

### CWA Section 117 and the Chesapeake Bay Program (CBP)

In the 1987 amendments to the CWA, Congress—in section 117—authorized the formation and funding of the Chesapeake Bay Program (CBP) within EPA Region 3. Congress directed the CBP to collect and disseminate information related to the environmental quality of the Bay, to "coordinate state and federal efforts to improve Bay water quality, to evaluate sediment impacts on the Bay, and to determine the impact of natural and human-induced environmental changes on the living resources of the Bay."[1]

### 1991 Reevaluation

A 1991 reevaluation of progress made toward achievement of the 1987 Bay Agreement's 40 percent nutrient reduction goal led to a detailed quantification of the original narrative goal. Each major river basin by jurisdiction received a "tributary nutrient load allocation" as a "40% controllable load reduction" for both nitrogen and phosphorus as the principal outcome of the reevaluation (Secretary Robert Perciasepe 1992). The 1991 reevaluation also introduced several concepts still applicable in the Bay TMDL: tributary strategies (WIPs), limit of technology (everything by everyone everywhere or E3 scenario), recognition of air deposition (air load allocation to tidal surface waters), and geographic-based allocations (relative effectiveness-based allocation methodology).

---

[1] Clean Water Act section 117 (33 United States Code [U.S.C.] 1267).

### 1992 Amendments to the Chesapeake Bay Agreement

The 1991 reevaluation led to several amendments to the 1987 Chesapeake Bay Agreement in 1992, including an increased focus on the importance of the tributaries in the Bay's restoration. The parties to the 1987 Chesapeake Bay Agreement were to begin by 1993 to develop and implement tributary-specific strategies to meet mainstem nutrient reduction goals, to improve water quality, and to restore living resources to the mainstem and tributaries (CEC 1992). The amendments also established a goal of expanding the distribution of submerged aquatic vegetation (SAV) as an initial measure of progress toward the water quality and living resource goals of the 1987 Agreement.

### 1997 Reevaluation

In 1997 the CBP conducted a year-long evaluation to assess what progress had been made toward the goal set in the 1987 Chesapeake Bay Agreement of a 40 percent reduction by 2000 in nitrogen and phosphorus delivered to the Bay (CEC 1997). The 1997 reevaluation found that between 1985 and 1996 phosphorus loads delivered to the Bay declined by 6 million pounds annually, and nitrogen loads delivered to the Bay declined by 29 million pounds annually. By 1996 phosphorus loads from wastewater dischargers had been reduced by 51 percent in the participating jurisdictions as a result of implementing effluent standards, upgrading wastewater treatment plants, and banning phosphate laundry detergents. Wastewater nitrogen loads were reduced by 15 percent by implementing biological nutrient removal at some major municipal wastewater treatment facilities and by upgrading certain industrial wastewater treatment facilities. Implementation of nutrient reduction best management practices (BMPs) reduced nonpoint source loadings of nitrogen and phosphorus to the Bay by 7 and 9 percent, respectively. There was no clear trend in Bay dissolved oxygen (DO) levels, however. Although progress was made, the 1997 reevaluation report stated, "we must accelerate our efforts to close the gap on the year 2000 goal, maintain those reduced loading levels into the future and if necessary adjust the nutrient goals to help us achieve the water quality improvements needed to sustain living resources in the Bay" (CBP 1997).

### 1999 Integration of Cooperative and Statutory Programs

In September 1999, senior water quality program managers representing the Bay watershed jurisdictions and EPA outlined the *Process for Integrating the Cooperative and Statutory Programs of the Chesapeake Bay and its Tributaries—Continuing the Watershed Partnership to Restore the Chesapeake Bay* (CBP 1999). That consensus document laid the groundwork for the water quality goals and commitments within the Chesapeake 2000 Agreement. A decade in advance, it set the partnership on a course that culminated in the Bay TMDL.

### Chesapeake 2000 Agreement

In June 2000 the governors of Maryland, Virginia, and Pennsylvania; the mayor of the District of Columbia; the Administrator of EPA; and the chairman of the Chesapeake Bay Commission signed the Chesapeake 2000 Agreement (CEC 2000). To meet the goal of "achieving and maintaining the water quality necessary to support the aquatic living resources of the Bay and its tributaries and to protect human health," the signatories committed to specific actions, including:

"Continue to achieve and maintain the 40 percent nutrient reduction goal agreed to in 1987.

By 2010, correct nutrient- and sediment-related problems in the Chesapeake Bay and its tidal tributaries sufficiently to remove the Bay and the tidal portions of its tributaries from the list of impaired waters under the Clean Water Act. In order to achieve this:

1. By 2001, define the water quality conditions necessary to protect aquatic living resources and then assign load reductions for nitrogen and phosphorus to each major tributary;

2. By 2001, using a process parallel to that established for nutrients, determine the sediment load reductions necessary to achieve the water quality conditions that protect aquatic living resources, and assign load reductions for sediment to each major tributary;

3. By 2002, complete a public process to develop and begin implementation of revised Tributary Strategies to achieve and maintain the assigned loading goals;

4. By 2003, jurisdictions with tidal waters use their best efforts to adopt new or revised WQS consistent with the defined water quality conditions. Once adopted by the jurisdictions, EPA will expeditiously review the new or revised standards, which are used as the basis for removing the Bay and its tidal rivers from the list of impaired waters; and

5. By 2003, work with the Susquehanna River Basin Commission and others to adopt and begin implementing strategies that prevent the loss of the sediment retention capabilities of the lower Susquehanna River dams."

## 2000 Six-Jurisdiction Memorandum of Understanding

In the fall of 2000, EPA, Delaware, the District of Columbia, Maryland, New York, Pennsylvania, and Virginia signed a Memorandum of Understanding (MOU) (Chesapeake Bay Watershed Partners 2000), with West Virginia joining as a signatory in June 2002, agreeing to the following:

- Work cooperatively to achieve the nutrient and sediment reduction targets necessary to achieve the goals of a clean Chesapeake Bay by 2010, thereby allowing the Chesapeake Bay and its tidal tributaries to be removed from the list of impaired waters.

- Provide for an inclusive, open and comprehensive public participation process.

- Collaborate on the development and use of innovative measures such as effluent trading, cooperative implementation mechanisms, and expanded interstate agreements to achieve the necessary reductions.

The signatories also agreed to report annually on progress toward achieving the goals of the agreement.

## 2003 Nutrient and Sediment Cap Load Allocations

In 2003 EPA and its seven watershed jurisdictional partners established nitrogen, phosphorus, and sediment cap loads based on Bay water quality model projections of attainment of the then EPA-proposed dissolved oxygen water quality criteria under long-term average hydrologic conditions (Secretary Tayloe Murphy 2003). Reaching those cap loads was expected to eliminate

the summer no-oxygen conditions in the deep waters of the Bay and excessive algal blooms throughout the Bay, tidal tributaries and embayments (USEPA 2003c).

EPA and its watershed jurisdiction partners allocated the nitrogen and phosphorus cap loads among the major river basins by jurisdiction. Those jurisdictions with the highest impact on Bay water quality were assigned the highest nutrient reductions, while jurisdictions without tidal waters received less stringent reductions because they would not realize a direct benefit from the improved water quality conditions in the Bay (USEPA 2003c). Sediment allocations were based on the phosphorus-equivalent allocations to each major river basin by jurisdiction (USEPA 2003c).

Although not original signatories of the Chesapeake 2000 Agreement, New York, Delaware, and West Virginia signed on as partners in implementing the cap loads; thus, all seven Bay watershed jurisdictions were assigned allocations (Chesapeake Bay Watershed Partners 2000; USEPA 2003c). The final total basinwide cap loads agreed to by EPA and the seven watershed jurisdictions were 175 million pounds of nitrogen per year and 12.8 million pounds of phosphorus per year delivered to the tidal waters of the Bay (USEPA 2003c). The basinwide upland sediment cap load was 4.15 million tons per year (USEPA 2003c).

### 2004–2006 Tributary Strategies

To achieve the nitrogen, phosphorus, and sediment cap loads, the seven watershed jurisdictions developed what became known as the Chesapeake Bay Tributary Strategies (Table 1-1) (Secretary Tayloe Murphy 2003). The tributary strategies outlined river basin-specific implementation activities to reduce nitrogen, phosphorus, and sediment pollutant loads from point and nonpoint sources sufficient to remove the Chesapeake Bay and its tidal tributaries and embayments from the Bay jurisdictions' respective impaired waters lists. Many of the policies and procedures used in developing the Chesapeake Bay TMDL originated with the development of the 2003 nutrient and sediment cap loads and subsequent development of tributary strategies.

**Table 1-1. URLs for accessing the seven Chesapeake Bay watershed jurisdictions' tributary strategies**

| Jurisdiction | Tributary strategy URL link |
|---|---|
| Delaware | http://www.chesapeakebay.net/watershedimplementationplantools.aspx?menuitem=52044 |
| District of Columbia | http://www.chesapeakebay.net/watershedimplementationplantools.aspx?menuitem=52044 |
| Maryland | http://www.dnr.state.md.us/bay/tribstrat/implementation_plan.html |
| New York | http://www.dec.ny.gov/docs/water_pdf/cbaystratfinal.pdf |
| Pennsylvania | http://www.chesapeakebay.net/watershedimplementationplantools.aspx?menuitem=52044 |
| Virginia | http://www.chesapeakebay.net/watershedimplementationplantools.aspx?menuitem=52044 |
| West Virginia | http://www.wvca.us/bay/files/bay_documents/8_9657_WV_Potomac_Tributary_Strategy_FINAL_from_web.pdf |

### 2004–2005 Jurisdiction Adoption of Chesapeake Bay Water Quality Standards

In continued efforts to coordinate activities to address nitrogen, phosphorus, and sediment-based pollution in the Bay, the tidal jurisdictions of Maryland, Virginia, Delaware, and the District of Columbia adopted into their respective WQS regulations the EPA-published Chesapeake Bay water quality criteria for dissolved oxygen, water clarity, SAV, and chlorophyll *a*, along with criteria attainment assessment procedures and refined tidal water designated uses (for details, see Section 3) (USEPA 2003a, 2003d). EPA approved those four jurisdictions' WQS regulations modifications pursuant to CWA section 303(c).

### 2007 Reevaluation

Secretary Tayloe Murphy's 2003 memorandum summarized the comprehensive set of agreements made by Bay watershed partners with regard to cap loads for nitrogen, phosphorus, and sediment; new Bay-wide and local SAV restoration goals; and a commitment to reevaluate the allocations in 2007 (Secretary Tayloe Murphy 2003). The initiation of that reevaluation at a partnership sponsored workshop in September 2005 laid the institutional groundwork for the collaborative work on the Bay TMDL (Chesapeake Bay Reevaluation Steering Committee 2005).

EPA and the seven watershed jurisdictions reevaluated the nutrient and sediment cap loads in 2007, in response to the four Bay jurisdictions revising their WQS regulations for the Chesapeake Bay, its tidal tributaries and embayments in 2004-2005 (Secretary Tayloe Murphy 2003). The 2007 reevaluation found that sufficient progress had not been made toward improving water quality to a level that indicated the mainstem Chesapeake Bay and its tidal tributaries and embayments were no longer impaired by nitrogen, phosphorus, and sediment pollution (Chesapeake Bay Reevaluation Steering Committee 2005).

## 1.2.2    Partnership Commitment to Develop the Chesapeake Bay TMDL

Throughout the Bay TMDL development process, EPA has worked in close and open partnership with all seven watershed jurisdictions, sharing decision making with the jurisdictions via the CBP structure described in Section 1.3. While EPA established the Bay TMDL, the seven watershed jurisdictions were essential partners in the initiative, providing critical input and participating in deliberations and making key decisions affecting the development process. The seven Bay watershed jurisdictions and EPA had been building the foundation for the Chesapeake Bay TMDL since signing the Chesapeake 2000 Agreement, which laid out the steps necessary to put in place an appropriate framework for a future Bay TMDL, including consistent jurisdictional Chesapeake Bay WQS (CEC 2000).

From the September 2005 reevaluation workshop to the publication of the Bay TMDL in December 2010, the seven watershed jurisdictions were actively involved in developing the Bay TMDL through participation in the CBP's Principals' Staff Committee (PSC), Water Quality Goal Implementation Team (WQGIT), and other decision-making committees, teams, and technical workgroups (see Section 1.3.1). The full records of the meetings and conference calls of those committees, teams, and workgroups are accessible via the Internet—see Appendix C.

At the October 1, 2007 meeting of the PSC, the seven watershed jurisdictions and EPA reached consensus that EPA would establish the Bay TMDL on behalf of the seven jurisdictions with a target date of 2025 when all necessary pollution control measures would be in place (CBP PSC 2007). Consensus within the Principals' Staff Committee means that all parties present have either agreed on this as a course of action and/or that no party objected to it. Table 1-2 summarizes that and the other Bay TMDL-relevant consensus agreements reached by the partners during that meeting.

**Table 1-2. Summary of Chesapeake Bay TMDL relevant actions agreed to by the CBP's Principals' Staff Committee during its October 1, 2007, meeting**

- The Bay watershed TMDLs will be developed jointly between the six Bay watershed states, the District, and EPA and then established by EPA.
- The Water Quality Steering Committee (WQSC) will draft nutrient and sediment cap load allocations by tributary basin by jurisdiction, and the PSC will formally adopt these allocations.
- The watershed states and the District would have responsibility for further assigning loads — WLAs and LAs—to sources consistent with EPA regulations and guidance.
- These state/District suballocations (WLA/LA) would become part of the overall Bay watershed TMDLs report.
- The final publication would contain all the required documentation supporting the EPA Bay watershed TMDLs in a single, integrated publication with extensive appendices.
- EPA will provide the technical resources/analyses required to support development of the Bay watershed TMDLs through the CBP Office staff and EPA-funded contractor support.
- The Bay watershed TMDLs must be completed and established by EPA no later than May 1, 2011.
- The CBP partners will engage stakeholders and the public in a more extensive structured dialogue about the tributary strategy implementation challenges before us.
- The CBP partners will focus on getting the programs in place by 2010 that we believe are required to achieve our water quality goals.
- The CBP partnership's public announcement of initiation of work on the Bay watershed TMDLs will occur following the states' submission and EPA approval of the 2008 303(d) lists in the spring 2008 time frame.
- Eight principles will guide the reevaluation efforts by the WQSC and its workgroups (see Attachment A for more detailed version):
  - Shared urgency to restore the Bay;
  - Clear communication and common message;
  - Focus and accelerate implementation (do no harm);
  - Engage the public about the implementation challenge;
  - Legal obligations will be met;
  - Improving and applying the latest science;
  - Flexibility of the sub-allocations within the major basins; and
  - Keep healthy waters healthy.
- The WQSC will proceed forward with the responsibility for carrying out the necessary preparation work following these eight guiding principles.
- The state/EPA Reevaluation Technical Workgroup (RTWG) will be reconvened and operate under the direction of the WQSC.
- The RTWG was charged with responsibility for resolving the existing technical issues in light of the desire to accelerate implementation at all scales. The WQSC will convene a parallel Implementation Workgroup and charge this group with the responsibility for ensuring that the reevaluation and TMDL development process results in acceleration of ongoing tributary strategy implementation.

Source: CBP PSC 2007

### 1.2.3    President's Chesapeake Bay Executive Order

On May 12, 2009, President Barack Obama issued the Chesapeake Bay Protection and Restoration Executive Order 13508, which calls for the federal government to lead a renewed effort to restore and protect the Chesapeake Bay and its watershed. Critical among its directives were:

- Establish a Federal Leadership Committee to oversee the development and coordination of reporting, data management and other activities by agencies involved in Bay restoration.

- Require involved agencies to prepare and submit reports with recommendations on a wide range of Bay issues (EPA-HQ-OW-2009-0761; FRL-8978-8).

- Require the Federal Leadership Committee to develop a *Strategy for Protecting and Restoring the Chesapeake Bay* by May 2010 (http://executiveorder.chesapeakebay.net/).

- Require the Federal Leadership Committee to publish an annual *Chesapeake Bay Action Plan* describing how federal funding proposed in the President's budget will be used to protect and restore the Chesapeake Bay during the upcoming fiscal year.

- Require federal agencies to consult extensively with Bay watershed jurisdictions in preparing their reports.

Pursuant to the Executive Order, on May 12, 2010, the Federal Leadership Committee—led by the EPA Administrator and secretaries from the Departments of Agriculture, Commerce, Defense, Homeland Security, Interior, Transportation, and others—issued its coordinated strategy for restoring the Chesapeake Bay (FLCCB 2010). That strategy sets measurable goals for improving environmental conditions in the Bay for the following:

- Clean water
- Habitat
- Fish and wildlife
- Land and public access

Other supporting strategies address citizen stewardship, climate change, science, and implementation and accountability. A key element of the approach for meeting water quality goals was the development of this TMDL for the Chesapeake Bay (FLCCB 2010).

Parallel to the issuance of the Executive Order, the jurisdictions and the federal government committed to implement all necessary measures for restoring water quality in the Bay by 2025 and to meet specific milestones every 2 years (FRL-8955-4; Clean Water Act section 303(d): Preliminary Notice of Total Maximum Daily Load (TMDL) Development for the Chesapeake Bay). To that end, EPA is developing an accountability framework to guide the overall restoration effort and to link it to implementation of the Chesapeake Bay TMDL. The accountability framework, which is discussed in more detail in Section 7, includes four elements:

- Watershed Implementation Plans (WIPs)
- Two-year milestones to demonstrate restoration progress
- EPA's commitment to track and assess progress

- Federal actions if the Bay watershed jurisdictions fail to meet expectations such as developing sufficient WIPs, effectively implementing their WIPs, and/or fulfilling their 2-year milestones

## 1.3    BAY TMDL PROCESS, PARTNER COORDINATION AND RESPONSIBILITIES

EPA Region 3 is the lead federal office responsible for developing the Chesapeake Bay TMDL, with the Water Protection Division (WPD) having the lead responsibility within the Regional Office. In developing this TMDL, WPD coordinated efforts with the Chesapeake Bay Program Office, Air Protection Division, Office of Regional Counsel, Office of State and Congressional Relations, Office of Public Affairs, and Office of the Regional Administrator (all within EPA Region 3), EPA Region 2 (Division of Environmental Planning and Restoration and Office of the Regional Administrator), and EPA Headquarters (Office of Water, Office of General Counsel, Office of Air and Radiation, and Office of the Administrator). Throughout the Bay TMDL development process, EPA worked in close and open partnership with all seven watershed jurisdictions, numerous federal agency partners, and a diverse array of other partners and stakeholders through the CBP partnership. This section describes the different elements of the CBP organizational structure and provides additional descriptions of the roles and responsibilities of the various entities and stakeholders involved in developing the Chesapeake Bay TMDL.

### 1.3.1    CBP Partnership and Organizational Structure

The CBP is a unique regional partnership that includes Maryland, Pennsylvania, Virginia, the District of Columbia, the Chesapeake Bay Commission, EPA, federal agencies, and participating advisory groups. The headwater states of Delaware, New York, and West Virginia participate as full partners on issues related to water quality. Each of the CBP partners agrees to use its own resources to implement projects and activities that advance Bay and watershed restoration.

The partnership defines its collective actions through formal, voluntary agreements and provides general policy direction through consensus documents, typically called directives. The CBP works through a series of Goal Implementation Teams with oversight provided by the CBP's Management Board. Extensive documentation of the CBP structure and governance is provided in *Chesapeake Bay Program Governance—Managing the Partnership for a Restored and Protected Watershed and Bay* (CBP 2009). Figure 1-1 shows the CBP organizational chart.



Source: CBP 2009

**Figure 1-1. CBP's organizational structure.**

## Chesapeake Executive Council

The top executive of each of the signatories of the Chesapeake 2000 Agreement (state governors, the District of Columbia mayor, EPA Administrator, and Chesapeake Bay Commission Chair), form the Chesapeake Executive Council (CEC), which meets annually to set basinwide policies and the future directions for the CBP. Delaware, New York, and West Virginia participate in CEC meetings and have full input status on all water quality-related matters. Principals' Staff Committee (PSC) members serve as advisors to their respective CEC members. The CEC has played a pivotal role in developing the Bay TMDL by signing the Chesapeake 2000 Agreement and subsequent directives and by setting the partnership on a well-defined, 10-year path directly supporting development of the Bay TMDL (CEC 2000, 2003, 2005).

## Federal Leadership Committee

To bring the full weight of the federal government to address the Chesapeake's challenges, President Obama issued Executive Order 13508 on Chesapeake Bay Protection and Restoration and established the Federal Leadership Committee, which is chaired by the Administrator of the U.S. Environmental Protection Agency and includes senior representatives from the departments of Agriculture, Commerce, Defense, Homeland Security, Interior, and Transportation.

## Principals' Staff Committee

The Principals' Staff Committee (PSC) provided policy and programmatic direction to the Management Board on the development and adoption of the Chesapeake Bay nutrient and sediment targets and allocations for the Bay TMDL (Figure 1-1). The PSC is composed of cabinet-level representatives from each of the seven watershed jurisdictions, EPA Region 3's Regional Administrator, senior federal agency executives, the Chesapeake Bay Commission executive director, and the director of the CBP Office. The Regional Administrator of EPA Region 3 currently chairs the PSC. The Citizens, Local Governments, and the Scientific and Technical advisory committees all advise the PSC.

## Management Board

PSC members provided policy and program direction to the Management Board which, in turn, provided strategic planning, priority setting, and operational guidance and direction to the Water Quality Goal Implementation Team (WQGIT) during the development of the Bay TMDL (Figure 1-1). The Management Board is composed of senior policy representatives from the seven watershed jurisdictions, the Chesapeake Bay Commission, the nine core federal agency partners,[2] and the chairs of the Citizens, Local Governments, and the Scientific and Technical advisory committees. The Management Board directs and coordinates the efforts of the six Goal Implementation Teams and Action Teams. The director of the CBP Office chairs the Management Board, and the CBP Office provides for the staff to support the work of all the Goal Implementation Teams and workgroups. Staffing for the three advisory committees is supported by EPA through cooperative agreements with nonprofit organizations.

## Water Quality Goal Implementation Team

The WQGIT's purpose is to support efforts to reduce and cap the nitrogen, phosphorus, and sediment loads entering the Bay and to ensure that such reductions are maintained over time. It is composed of the members of the former Water Quality Steering Committee and the former Nutrient Subcommittee. The WQGIT provided advice and guidance to EPA related to the draft target loads and allocations before they were brought to the PSC. The WQGIT consists of senior water program managers from each of the seven Bay watershed jurisdictions, EPA Headquarters and Regions 2 and 3, the Chesapeake Bay Commission, the Susquehanna River Basin Commission, and the Interstate Commission on the Potomac River Basin. The WQGIT provided technical direction to the Watershed Technical, Agriculture, Forestry, Wastewater Treatment, Sediment, and Urban Stormwater workgroups.

## Watershed Technical Workgroup

The Watershed Technical Workgroup was created to provide a forum for communication among the Bay watershed jurisdictions and other CBP participants on technical issues originally related to tributary strategy development, tracking and reporting. Members of the Watershed Technical Workgroup include technical staff and mid-level managers from the seven watershed jurisdictions, EPA, and point source and environmental stakeholder groups. For the Chesapeake

---

[2] The Natural Resources Conservation Service, U.S. Forest Service, National Oceanic and Atmospheric Administration, U.S. Geological Survey, National Park Service, U.S. Fish and Wildlife Service, U.S. Army Corps of Engineers, U.S. Department of Defense, and EPA.

Bay TMDL, the workgroup provided review and oversight in regards to application of the Bay Watershed Model.

## Pollutant Source Workgroups

The Agricultural Workgroup coordinated and evaluated agricultural nutrient and sediment reduction measures throughout the jurisdictions and resolved issues related to tracking, reporting, and crediting conservation practices.

The Forestry Workgroup provided information on the effectiveness of different riparian forest buffer restoration and other forest management practices.

The Wastewater Treatment Workgroup provided a formal means of communication among federal agencies, state agencies/jurisdictions, and wastewater treatment facility owner/operators.

The Sediment Workgroup provided technical and policy-related assistance to the CBP partners in setting the sediment allocations.

The Urban Stormwater Workgroup provided input related to all aspects of stormwater nutrient and sediment loads and management practices.

## Science, Technical Analysis, and Reporting Team—Criteria Assessment Protocols Workgroup

The Criteria Assessment Protocols Workgroup had the lead responsibility for ensuring coordinated assessment of all Chesapeake Bay, tidal tributary and embayment waters related to the four Bay jurisdictions' listing and delisting under CWA section 303(d). The workgroup also had the lead in developing, reviewing, and recommending to the WQGIT amendments to the original 2003 Chesapeake Bay water quality criteria published by EPA.

## Science, Technical Analysis, and Reporting Team—Modeling Workgroup

The Modeling Workgroup, formerly the Modeling Subcommittee and now under the Science, Technical Analysis, and Reporting (STAR) team, oversaw the development, calibration, verification, and management application of the suite of computer-based Bay models that supported the development of the Bay TMDL. The models allowed managers to estimate the pollutant load reductions needed to achieve WQS and to assess the potential of different management scenarios to achieve the needed pollutant load reductions.

## Scientific and Technical Advisory Committee

The Scientific and Technical Advisory Committee (STAC) is composed of scientists representing a diverse range of disciplines from federal agencies and academic institutions in the seven watershed jurisdictions. STAC provides scientific and technical guidance and independent scientific peer review to the CBP on measures to restore and protect the Chesapeake Bay. STAC activities related to the Bay TMDL included independent scientific peer reviews of all the Bay models (watershed, land change, estuarine water quality, estuarine sediment transport, estuarine filter feeder), Bay criteria assessment procedures, and land use data, and reviewing and commenting on the draft Bay TMDL.

**Local Governments Advisory Committee**

The Local Governments Advisory Committee (LGAC) is a body of locally elected officials appointed by the governors of Maryland, Pennsylvania, Virginia, and the mayor of the District of Columbia. The LGAC was established to promote the role of local governments in Bay restoration efforts and develop strategies that ultimately broaden local government participation in the CBP. The LGAC was directly involved in developing the Bay TMDL in the following ways: ensured the direct involvement of local elected officials in the decision-making processes, helped establish the local Watershed Implementation Plan (WIP) pilots in 2010 (before development of the Phase II WIPs starting in 2011), and helped inform the thousands of local governments across the watershed about the Bay TMDL.

**Citizen's Advisory Committee**

The Citizens Advisory Committee (CAC) provides advice to the CEC, the PSC, the Management Board, and all the Goal Implementation Teams as needed in implementing the Chesapeake Bay Agreement. The CAC directly assisted the Bay TMDL development process by providing detailed recommendations on how to engage the nongovernmental components of the larger Bay watershed community and placing a strong focus on ensuring full accountability during the development and throughout the long-term implementation of the Bay TMDL.

Appendix A provides the membership lists of all the above described committees, teams, and workgroups at the time of publication of the Bay TMDL, fully acknowledging their individual and collective contributions.

# 1.4    LEGAL FRAMEWORK FOR THE CHESAPEAKE BAY TMDL

## 1.4.1    What is a TMDL?

As discussed more fully in Section 1.1, a TMDL specifies the maximum amount of a pollutant that a waterbody can receive and still meet applicable WQS. Allocations to point sources are called wasteload allocations or WLAs, while allocations to nonpoint sources are called load allocations or LAs. A TMDL is the sum of the WLAs (for point sources), LAs (for nonpoint sources and natural background) (40 CFR 130.2), and a margin of safety (CWA section 303(d)(1)(C)). Section 303(d) requires that TMDLs be established for impaired waterbodies "at a level necessary to implement the applicable [WQS]."[3]

TMDLs are "primarily informational tools" that "serve as a link in an implementation chain that includes federally regulated point source controls, state or local plans for point and nonpoint source pollutant reduction, and assessment of the impact of such measures on water quality, all to the end of attaining water quality goals for the nation's waters."[4]  Recognizing a TMDL's role as a vital link in the implementation chain, federal regulations require that effluent limits in NPDES permits be "consistent with the assumptions and requirements of any available WLA" in an approved TMDL.[5]

---

[3] 33 U.S.C. 1313(d)(1)(C).
[4] Pronsolino v. Nastri, 291 F.3d 1123, 1129 (9th Cir. 2002).
[5] 40 CFR 122.44(d)(1)(vii)(B).

In addition, before EPA establishes or approves a TMDL that allocates pollutant loads to both point and nonpoint sources, it determines whether there is reasonable assurance that the nonpoint source LAs will, in fact, be achieved and WQS will be attained (USEPA 1991b). If the reductions embodied in LAs are not fully achieved, the collective reductions from point and nonpoint sources will not result in attainment of the WQS.

The Bay TMDL will be implemented using an accountability framework that includes the jurisdictions' WIPs, 2-year milestones, EPA's tracking and assessment of restoration progress and, as necessary, specific federal actions if the Bay jurisdictions do not meet their commitments. The accountability framework is being established, in part, to demonstrate that the Bay TMDL is supported by reasonable assurance. The accountability framework is also being established pursuant to CWA section 117(g)(1). Section 117(g) of the CWA directs the EPA Administrator to "ensure that management plans are developed and implementation is begun...to achieve and maintain...the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed, [and] the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem."[6]  In addition, Executive Order 13508 directs EPA and other federal agencies to build a new accountability framework that guides local, state, and federal water quality restoration efforts. The accountability framework is designed to help ensure that the Bay's nitrogen, phosphorus, and sediment goals, as embodied in the Chesapeake Bay TMDL, are met. While the accountability framework informs the TMDL, section 303(d) does not require that EPA "approve" the framework *per se*, or the jurisdictions' WIPs that constitute part of that framework.

## 1.4.2    Why is EPA establishing this TMDL?

In 1998, data showed the mainstem and tidal tributary waters of the Chesapeake Bay to be impaired for aquatic life resources. EPA determined that the mainstem and tidal tributary waters of the Chesapeake Bay must be placed on Virginia's section 303(d) list. EPA therefore added the mainstem of the Chesapeake Bay to Virginia's final section 303(d) list. As described in Section 2, each tidal river, tributary, embayment, and other tidal waterbody that is part of the Chesapeake Bay TMDL is included on a jurisdiction's section 303(d) list.

EPA established the Chesapeake Bay TMDL pursuant to a number of existing authorities, including the CWA and its implementing regulations, judicial consent decrees requiring EPA to address certain impaired Chesapeake Bay and tidal tributary and embayment waters, a settlement agreement resolving litigation brought by the Chesapeake Bay Foundation, the 2000 Chesapeake Agreement, and Executive Order 13508. In establishing the Bay TMDL, EPA acted pursuant to the consensus direction of the Chesapeake Executive Council's PSC and in partnership with each of the seven Chesapeake Bay watershed jurisdictions.

The CWA provides EPA with ample authority to establish the Chesapeake Bay TMDL. CWA section 117(g)(1) provides that "[t]he Administrator, in coordination with other members of the [CEC], shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain [among other things] the

---

[6] Clean Water Act section 117(g)(1)(A)-(B), 33 U.S.C. 1267(g)(1)(A)-(B).

nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed [and] the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem." Because it establishes the Bay and tidal tributaries' nutrient and sediment loading and allocation targets, the Chesapeake Bay TMDL is itself such a "management plan." In addition, the Bay TMDL's loading and allocation targets both inform and are informed by a larger set of federal and state management plans being developed for the Bay, including the Bay watershed jurisdictions' WIPs and the May 2010 *Strategy for Protecting and Restoring the Chesapeake Bay* (FLCCB 2010).

CWA section 303(d) requires jurisdictions to establish and submit TMDLs to EPA for review. Under certain circumstances, EPA also has the authority to establish TMDLs. The circumstances of this TMDL do not necessarily identify the outer bounds of EPA's authority. However, where – as here – impaired waters have been identified on jurisdictions' section 303(d) lists for many years, where the jurisdictions in question decided not to establish their own TMDLs for those waters, where EPA is establishing a TMDL for those waters at the direction of, and in cooperation with, the jurisdictions in question, and where those waters are part of an interrelated and interstate water system like the Chesapeake Bay that is impaired by pollutant loadings from sources in seven different jurisdictions, CWA section 303(d) authorizes EPA to establish that TMDL.[7]

On May 12, 2009, President Barack Obama signed Executive Order 13508—*Chesapeake Bay Protection and Restoration*. The Executive Order's overarching goal is "to protect and restore the health, heritage, natural resources, and social and economic value of the Nation's largest estuarine ecosystem and the natural sustainability of its watershed." The Executive Order says the federal government "should lead this effort" and acknowledges that progress in restoring the Bay "will depend on the support of state and local governments." To that end, the Executive Order directs the lead federal agencies, including EPA, to work in close collaboration with their state partners. To protect and restore the Chesapeake Bay and its tidal tributaries, the President directed EPA to "make full use of its authorities under the [CWA]." In establishing the Bay TMDL, EPA is doing no more—or less—than making full use of its CWA authorities to lead a collaborative and effective federal and state effort to meet the Bay's nutrient and sediment goals.

A number of consent decrees, memoranda of understanding (MOUs), and settlement agreements provide additional support for EPA's decision to establish the Chesapeake Bay TMDL addressing certain waters identified as impaired on the Maryland, Virginia, and the District of Columbia's 1998 section 303(d) lists and on the Delaware 1996 section 303(d) list. EPA established the Chesapeake Bay TMDL consistent with those consent decrees, MOUs, and settlement agreements, described below.

### Virginia–EPA Consent Decree

The American Canoe Association, Inc., and the American Littoral Society filed a complaint against EPA for failing to comply with the CWA, including section 303(d), regarding the TMDL program in the Commonwealth of Virginia. A consent decree signed in 1999 resolved the litigation.[8] The consent decree includes a 12-year schedule for developing TMDLs for impaired

---

[7] *Dioxin/Organochlorine Center v. Clarke*, 57 F.3d 1517 (9th Cir. 1995); *Scott v. City of Hammond*, 741 F.2d 992 (7th Cir. 1984); *American Canoe Assn. v EPA*, 54 F.Supp.2d 621 (E.D.Va. 1999).
[8] *American Canoe Association v. EPA*, 98cv979 (June 11, 1999).

segments identified on Virginia's 1998 section 303(d) list. The consent decree requires EPA to establish TMDLs for those waters, by May 1, 2011, if Virginia fails to do so according to the established schedule. Virginia has requested that EPA establish TMDLs for the nutrient- and sediment-impaired tidal portions of the Chesapeake Bay and its tributaries and embayments in accordance with the Virginia consent decree schedule (CBP PSC 2007). Table 1-3 provides a list of the Virginia consent decree waters that were addressed by the Chesapeake Bay TMDLs for nitrogen, phosphorus, and sediment.

**Table 1-3. Virginia consent decree (CD) waters impaired for dissolved oxygen (DO) and/or nutrients addressed by the Chesapeake Bay TMDL**

| Waterbody Name | CD Segment ID | Chesapeake Bay Segment ID | CD Impairment |
|---|---|---|---|
| Bailey Bay, Bailey Creek – Tidal | VAP-G03E | JMSTF1 | DO |
| Broad Creek | VAT-G15E | ELIPH, WBEMH,SBEMH, EBEMH | DO |
| Chesapeake Bay Mainstem | Narrative [a] | CB5MH, CB6PH, CB7PH | Nutrients |
| Chesapeake Bay Mainstem | VACB-R01E | CB5MH, CB6PH, CB7PH | DO |
| Elizabeth River – Tidal | Narrative [b] | ELIPH, WBEMH,SBEMH, EBEMH | Nutrients |
| Hungars Creek | VAT-C14R | CB7PH | DO |
| James River – Tidal | Narrative [c] | JMSTF2, JMSTF1, JMSOH, JMSMH, JMSPH | Nutrients |
| King Creek | VAT-F27E | YRKPH | DO |
| Mattaponi River – Tidal | Narrative [d] | MPNTF, MPNOH | Nutrients |
| Messongo Creek | VAT-C10E | POCMH | DO |
| North Branch Onancock Creek | VAT-C11E | CB7PH | DO |
| Pagan River | VAT-G11E | JMSMH | DO |
| Pamunkey River – Tidal | Narrative [e] | PMKTF, PMKOH | Nutrients |
| Queen Creek | VAT-F26E | YRKMH | DO |
| Rappahannock River | Narrative [f] | RPPMH | Nutrients |
| Rappahannock River | VAP-E25E | RPPMH | Nutrients |
| Rappahannock River | VAP-E25E | RPPMH | DO |
| Rappahannock River | VAP-E26E | RPPMH | Nutrients |
| Rappahannock River | VAP-E26E | RPPMH | DO |
| Thalia Creek | VAT-C08E | LYNPH | DO |
| Williams Creek | VAN-A30E | POTMH | DO |
| York River | Narrative [g] | YRKMH, YRKPH | Nutrients |
| York River | VAT-F27E | YRKPH | DO |

Source: *American Canoe Association v. EPA*, 98cv979 (June 11, 1999).
Notes:
a = Chesapeake Bay Mainstem (VACB-R01E) impaired for nutrients
b = Elizabeth River (VAT-G15E) impaired for DO, nutrients
c = James River (VAP-G01E, VAP-G03E, VAP-G02E, VAP-G04E, VAP-G11E, and VAP-G15E) impaired for nutrients
d = Mattaponi River (VAP-F24E and VAP-F25E) impaired for nutrients
e = Pamunkey River (VAP-F13E and VAP-F14E) impaired for DO, nutrients
f = Rappahannock River (VAP-E24E) impaired for DO
g = York River (VAT-F26E) impaired for nutrients

December 29, 2010

## District of Columbia–EPA Consent Decree

In 1998 Kingman Park Civic Association and others filed a similar suit against EPA.[9]  The lawsuit was settled through the entry of a consent decree requiring EPA to, among other things, establish TMDLs for the District of Columbia's portions of the tidal Potomac and tidal Anacostia rivers if not established by the District of Columbia by a certain date.

The impairment of the District of Columbia's portion of the upper tidal Potomac River by low pH is directly related to the Chesapeake Bay water quality impairments because the low pH is a result of excess nutrients causing algal blooms in the tidal river. Establishing a tidal Potomac River pH TMDL is directly linked to establishing the Chesapeake Bay TMDL because of their common impairing pollutants (nitrogen and phosphorus) and the hydrologic connection between the District's portion of the tidal Potomac River and the Chesapeake Bay. EPA and the Kingman Park plaintiffs jointly sought, and received on February 12, 2008, a formal extension of the District of Columbia TMDL Consent Decree so that EPA could complete the Potomac River pH TMDL on the same schedule as the Chesapeake Bay TMDL.[10] The District of Columbia requested that EPA establish the pH TMDL for the District's portion of the tidal Potomac River (CBP PSC 2007). Table 1-4 provides a list of the District's consent decree waters that were addressed by the Chesapeake Bay TMDLs for nitrogen, phosphorus, and sediment.

In addition, Anacostia Riverkeeper and Friends of the Earth filed suit against EPA challenging more than 300 TMDLs for the District of Columbia, including the Anacostia River TMDLs, because the TMDLs were not expressed as daily loads. On May 25, 2010, the District Court for the District of Columbia ordered the vacatur of the District of Columbia's TMDL for pH for the Washington Ship Channel, with a stay of vacatur until May 31, 2011.[11] With publication of the Bay TMDL, the Washington Ship Channel pH impairment has been addressed and the pH TMDL for the Ship Channel approved by EPA on December 15, 2004 has been superseded.

**Table 1-4. District of Columbia consent decree (CD) waters impaired for pH addressed by the Chesapeake Bay TMDL**

| Waterbody Name | CD Segment ID | Chesapeake Bay Segment ID | CD Impairment |
|----------------|---------------|---------------------------|---------------|
| Washington Ship Channel | DCPWC04E_00 | POTTF_DC | pH |
| Middle Potomac River | DCPMS00E | POTTF_DC | pH |

Source: *Kingman Park Civic Association v EPA*, 98cv00758 (June 13, 2000).

## Delaware–EPA Consent Decree

In 1996 the American Littoral Society and the Sierra Club filed a suit against EPA to ensure that TMDLs were developed for waters on Delaware's 1996 section 303(d) list, one of which is a tidal Bay segment (Upper Nanticoke River). The parties entered into a consent decree resolving the lawsuit.[12]  The consent decree required EPA to establish TMDLs if Delaware failed to do so within the 10-year TMDL development schedule. Although Delaware established TMDLs for the

---

[9] *Kingman Park Civic Association v EPA*, 98cv00758 (June 13, 2000).
[10] *Kingman Park Civic Association v. EPA*, 98cv00758 (Order February 12, 2008).
[11] *Anacostia Riverkeeper et al v. Jackson*, 1:2009cv00098 (D.DC)( Mem. and Order May 25, 2010)
[12] *American Littoral Society, et al. v EPA, et al.*, 96cv591 (D.Del. 1997).

one listed tidal Bay segment (DE DNREC 1998), the TMDLs were established to meet prior
WQS and are insufficient to attain Chesapeake Bay WQS.

## Maryland–EPA MOU

In 1998 Maryland and EPA Region 3 entered into an MOU that, among other things, established
a 10-year schedule for addressing waters on Maryland's 1998 section 303(d) list, with
completion by 2008 (MDE 1998). Because of funding constraints, the complexity of some
TMDLs, and limited staff resources, Maryland determined that it would not be able to address all
1998 listed waters by 2008. Further, the Chesapeake 2000 Agreement established a goal of
meeting water quality standards in the Chesapeake Bay by 2010 (CEC 2000). Many of the waters
on Maryland's 1998 section 303(d) list were open waters of the Bay or tidal tributaries and
embayments to the Bay. Maryland determined that developing TMDLs for those tidal waters
before the deadline established by the MOU, as would be required under the schedule established
in 1998, "would undermine the spirit of the agreement" because of a lack of integration between
the CBP partnership and Maryland efforts (MDE 2004). Therefore, Maryland decided to
postpone development of TMDLs for Maryland's listed Chesapeake Bay and its tidal tributary
and embayment waters until the two programs could coordinate efforts.

In September 2004, Maryland and EPA Region 3 entered into a revised MOU that extended the
schedule for TMDL development to 13 years (by 2011) (MDE 2004). Although neither
Maryland nor EPA is under a consent decree for establishing TMDLs for Maryland waters, the
state has requested that EPA develop the TMDLs for the Maryland portion of the Chesapeake
Bay and tidal tributaries and embayments impaired by excess nitrogen, phosphorus, and
sediment as recognized in the MOU between Maryland and EPA (CBP PSC 2007).

## Chesapeake Bay Foundation Settlement Agreement

In January 2009, the Chesapeake Bay Foundation and others filed suit against EPA in U.S.
District Court for the District of Columbia (1:09-cv-00005-CKK) alleging, among other things,
that EPA had failed to carry out nondiscretionary duties under CWA section 117(g) designed to
restore and preserve the Chesapeake Bay. In May 2010, EPA signed a settlement agreement with
the plaintiffs promising to take a number of actions to restore and preserve the Bay. In particular,
EPA promised that by December 31, 2010, it would establish a TMDL for those segments of the
Chesapeake Bay impaired by nitrogen, phosphorus, and sediment. EPA is establishing this
TMDL, in part, to meet that commitment.

# SECTION 2.  WATERSHED AND IMPAIRMENT DESCRIPTION

This section provides a general description of the watershed and the impairments addressed in the Chesapeake Bay TMDL. Section 2.1 provides a description of the basic history, geography, land uses, and recent development patterns and trends. Section 2.2 presents the scope of the Bay TMDL including the parameters of concern, the specific impairment listings addressed, and the Bay TMDL segmentation.

## 2.1   GENERAL WATERSHED SETTING

The Chesapeake Bay watershed includes parts of six states—Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia—and the entire District of Columbia (collectively, the jurisdictions). The Chesapeake Bay proper is approximately 200 miles long, stretching from Havre de Grace, Maryland, to Norfolk, Virginia. It varies in width from about 3.4 miles near Aberdeen, Maryland, to 35 miles near the mouth of the Potomac River. The easternmost boundary of the Chesapeake Bay with the Atlantic Ocean is represented by a line between Cape Charles and Cape Henry. Including its tidal tributaries and embayments, the Chesapeake Bay encompasses approximately 11,684 miles of shoreline, a length longer than the entire West Coast of the United States.

About half of the Bay's water volume consists of saltwater from the Atlantic Ocean. The other half is freshwater that drains into the Bay from its 64,000-square-mile watershed (Figure 2-1). Ninety percent of the freshwater is delivered from five major rivers: the Susquehanna (which is responsible for about 50 percent), Potomac, James, Rappahannock, and York rivers. In all, the watershed contains more than 10,000 streams and rivers that eventually flow into the Bay.

Runoff from the Bay's enormous watershed flows into an estuary with a surface area of 4,500 square miles resulting in a land-to-water ratio of 14 to 1. That large ratio is one of the key factors in explaining why the drainage area has such a significant influence on water quality in the Bay.

Although the Chesapeake Bay is entirely within the Atlantic Coastal Plain, its watershed includes parts of the Piedmont and Appalachian provinces. The waters that flow into the Bay have different chemical characteristics, depending on the geology from which they originate (Figure 2-2).



Figure 2-1. The Chesapeake Bay watershed with major rivers and cities.

Chesapeake Bay TMDL



Source: USGS WRIR 00-424

**Figure 2-2. Hydrogeomorphic regions of the Chesapeake Bay watershed.**

December 29, 2010

The Atlantic Coastal Plain is a flat, lowland area with a maximum elevation of about 300 feet. It is supported by a bed of crystalline rock, covered with southeasterly dipping wedge-shaped layers of relatively unconsolidated sand, clay, and gravel. Water passing through the loosely compacted mixture dissolves many of the minerals. The most soluble elements are iron, calcium, and magnesium. The coastal plain extends from the edge of the continental shelf, to the east, to a fall line that ranges from 15 to 90 miles west of the Chesapeake Bay. The fall line, which is the location where free flowing streams enter tidal waters, forms the boundary between the Piedmont Plateau and the coastal plain. Waterfalls and rapids clearly mark this line, which is close to Interstate 95. At the fall line, the elevation rises to 1,100 feet.

The Piedmont Plateau extends from the fall line in the east to the Appalachian Mountains in the west. The area is divided into two geologically distinct regions by Parrs Ridge, which traverses Carroll, Howard, and Montgomery counties in Maryland and adjacent counties in Pennsylvania. Several types of dense, crystalline rock—including slates, schists, marble, and granite—compose the eastern side of the Piedmont Plateau. That variety results in a very diverse topography. Rocks of the Piedmont tend to be impermeable, and water from the eastern side is low in calcium and magnesium salts. The western side of the Piedmont consists of sandstones, shales, and siltstones, layered over by limestone. The limestone bedrock contributes calcium and magnesium to its water, making it hard. Waters from the western side of Parrs Ridge flow into the Potomac River, one of the Chesapeake Bay's largest tributaries.

The Appalachian Province covers the western and northern part of the watershed and is rich in coal and natural gas deposits. Sandstone, siltstone, shale, and limestone form the bedrock. Water from that province flows to the Chesapeake Bay mainly via the Susquehanna River.

Earliest evidence of human inhabitants in the Bay watershed is of hunter-gatherers as long as 10,000 years ago. Native Americans began cultivating crops and settling in villages throughout the area around 1,000 years ago. European settlement less than 500 hundred years ago began a period of transformation of forests into farmland, while today many of those lands are undergoing retransformations into urban and suburban lands.

Over the past hundreds of years, forest clearing and urban development have resulted in the following land use breakdown in the watershed: 69 percent wooded/open, 22 percent agriculture, 7 percent developed, and 2 percent open water and extractive (Figure 2-3).

From 1950 through 2008, the Bay watershed's population doubled, increasing from 8.3 million to 16.8 million. The 8-year period from 2000 to 2008 witnessed population growth of approximately 7 percent from 15.7 million. Today, nearly 17 million people live in the watershed. According to census data, the watershed's population is growing by about 157,000 per year. Projections through 2030 are for the population to reach approximately 20 million (Figure 2-4).



Source: Irani and Claggett 2010

**Figure 2-3. Chesapeake Bay watershed land cover.**



Source: CBP Office Bay Barometer 2009

**Figure 2-4. Reported and projected human population growth in the Chesapeake Bay watershed 1950–2030.**

## 2.2   CHESAPEAKE BAY TMDL SCOPE

The Chesapeake Bay TMDL is the largest, most complex TMDL in the country, covering a 64,000-square-mile area across seven jurisdictions. EPA established a federal TMDL for the tidal segments of the Chesapeake Bay and its tidal tributaries and embayments that are impaired for aquatic life uses due to excessive loads of nutrients (nitrogen and phosphorus) and sediment and listed on the four tidal Bay jurisdictions' respective CWA 2008 section 303(d) lists of impaired waters. The Bay TMDL also allocates loadings of nitrogen, phosphorus, and sediment to sources contributing those pollutants in all seven jurisdictions in the Bay watershed—Delaware, the District of Columbia, Maryland, New York, Pennsylvania, Virginia, and West Virginia.

As described more fully in Section 2.2.1 below, the Chesapeake Bay TMDL addresses only the restoration of aquatic life uses for the Bay and its tidal tributaries and embayments that are impaired from excess nitrogen, phosphorus, and sediment pollution. If Bay segments are impaired for other pollutants, EPA expects that the Bay watershed jurisdictions will develop separate TMDLs to address those pollutants.

Thousands of previously approved TMDLs have been established to protect local waters across the Chesapeake Bay watershed. While many addressed other pollutants, some addressed nitrogen, phosphorus, and/or sediment. For watersheds and waterbodies where both local TMDLs and Chesapeake Bay TMDLs have already been developed or established for nitrogen, phosphorus, and sediment, the more stringent of the TMDLs will apply. In some cases, the reductions required to meet local conditions shown in existing TMDLs may be more stringent than those needed to meet Bay requirements, and vice versa.

### 2.2.1    Pollutants of Concern

The pollutants of concern for this TMDL are nutrients—nitrogen and phosphorus—and sediment. Excessive nitrogen and phosphorus in the Chesapeake Bay and its tidal tributaries promote a number of undesirable water quality conditions such as excessive algal growth, low DO, and reduced water clarity (Smith et al. 1992; Kemp et al. 2005). The effect of nitrogen and phosphorus loads on water quality and living resources can vary considerably by season and region.

Sediment suspended in the water column reduces the amount of light available to support healthy and extensive SAV or underwater Bay grass communities (Dennison et al. 1993; Kemp et al. 2004). The relative contribution of suspended sediment and algae that causes poor light conditions varies with location in the Bay tidal waters (Gallegos 2001).

Sediment also can contain other pollutants. For example, certain bacteria (e.g., *Escherichia coli*) often cling to sediment. By reducing sediment, reductions in phosphorus delivered to the Bay (and possibly other pollutants such as *E. coli*) also will occur. However, EPA is not providing allocations for *E. coli* or other additional pollutants in this TMDL.

If Bay segments are impaired for other pollutants, EPA expects that the Bay watershed jurisdictions will develop separate TMDLs to address those pollutants. Because of the actions taken to achieve the Chesapeake Bay TMDL, direct benefits to local water quality conditions in surface waters throughout the Chesapeake Bay watershed also will occur.

### 2.2.2    Chesapeake Bay Program Segmentation Scheme

For 27 years, the CBP partners have used various versions of a basic segmentation scheme to organize the collection, analysis, and presentation of environmental data relating to the Chesapeake Bay. The *Chesapeake Bay Program Segmentation Scheme: Revisions, Decisions and Rationales* provides documentation of the spatial segmentation scheme of the Chesapeake Bay and its tidal tributaries and the later revisions and changes over almost thirty years (USEPA 1983b, 2004b, 2005, 2008a).

Segmentation is the compartmentalization of the estuary into subunits on the basis of selection criteria (USEPA 2008a). Generally, segments reflect certain unique physical, chemical or biological characteristics of a portion of a waterbody (e.g., salinity, influence of pollutant sources, etc.). The 92-segment scheme used in the Chesapeake Bay was derived from the 2004 published 78-segment scheme with additional jurisdictional boundary lines imposed to create 89 segments (USEPA 2004b, 2008a). The scheme includes only the split segments[1] agreed to by the CBP partnership for the tidal James and Potomac rivers for a total of 92 segments (Figure 2-5) (Table 2-1) (USEPA 2008a). The 92 individual watersheds that drain directly into one of the 92 Chesapeake Bay segments are referred to in this document as Bay segment watersheds (Figure 2-6).

---

[1] A split segment refers to when an established tidal Bay segment was fully bisected for purposes of applying different water quality criteria specific to two different portions of the same segment—in the case of the James River, or different assessments of attainment of the same applicable criteria separately from the main river segment—in the case of the Potomac River.



Source: USEPA 2008a

**Figure 2-5. The 92 Chesapeake Bay segments.**

Chesapeake Bay TMDL



Source: USEPA 2008a

**Figure 2-6. The 92 Chesapeake Bay segment watersheds.**

Chesapeake Bay TMDL

Table 2-1 lists the eight major river basins draining to the Chesapeake Bay and their associated Bay segments with information related to each Bay segment's 2008 section 303(d) list status and whether the Bay segment is addressed by a consent decree or MOU. The 303(d) Integrated Report listing categories are as follows:

- Category 1—attaining all WQS

- Category 2—attaining some WQS

- Category 3—insufficient information to determine if WQS are attained

- Category 4—impaired or threatened waters that do not need or already have completed a TMDL

  – 4a—TMDL has been completed

  – 4b—Other pollution control requirements are reasonably expected to result in the attainment of the WQS in the near future

  – 4c—Impairment is not caused by a pollutant

- Category 5—impaired or threatened water that requires a TMDL

Most Bay segments are listed as category 5 (impaired for most/all designated uses); exceptions are noted in Table 2-1.

**Table 2-1. The Chesapeake Bay 303(d) tidal segments with consent decree (CD)/ memorandum of understanding (MOU) and 303(d) listing status by major river basin and jurisdiction**

| Major river basin | Jurisdiction | Chesapeake Bay 303(d) segment | Segment ID | CD/MOU | 2008 list status[a] |
|---|---|---|---|---|---|
| Eastern Shore | MD | Big Annemessex River | BIGMH | -- | 5 |
| | MD | Bohemia River | BOHOH | MD MOU | 4a for TN and TP |
| | DE | C&D Canal, DE | C&DOH_DE | -- | 5 |
| | MD | C&D Canal, MD | C&DOH_MD | MD MOU | 5 |
| | MD | Eastern Bay | EASMH | MD MOU | 5 |
| | VA | Eastern Lower Chesapeake Bay | CB7PH | VA CD | 5 |
| | MD | Elk River | ELKOH | MD MOU | 5 |
| | MD | Fishing Bay | FSBMH | MD MOU | 4a for TN and TP |
| | MD | Honga River | HNGMH | MD MOU | 5 |
| | MD | Little Choptank River | LCHMH | MD MOU | 5 |
| | MD | Lower Chester River | CHSMH | MD MOU | 5 |
| | MD | Lower Choptank River | CHOMH2 | MD MOU | 5 |
| | MD | Lower Nanticoke River | NANMH | -- | 5 |
| | MD | Lower Pocomoke River, MD | POCMH_MD | MD MOU | 5 |
| | VA | Lower Pocomoke River, VA | POCMH_VA | VA CD | 5 |
| | MD | Manokin River | MANMH | MD MOU | 4a for TN and TP |
| | MD | Middle Chester River | CHSOH | MD MOU | 4a for TN and TP |

| Major river basin | Jurisdiction | Chesapeake Bay 303(d) segment | Segment ID | CD/MOU | 2008 list status[a] |
|---|---|---|---|---|---|
| | MD | Middle Choptank River | CHOOH | MD MOU | 5 |
| | MD | Middle Nanticoke River | NANOH | MD MOU | 5 |
| | MD | Middle Pocomoke River, MD | POCOH_MD | MD MOU | 5 |
| | VA | Middle Pocomoke River, VA | POCOH_VA | -- | 5 |
| | MD | Mouth of Choptank River | CHOMH1 | MD MOU | 5 |
| | MD | Northeast River | NORTF | MD MOU | 4a for TN and TP |
| | MD | Sassafras River | SASOH | MD MOU | 4a for TP |
| | MD | Tangier Sound, MD | TANMH_MD | MD MOU | 5 |
| | VA | Tangier Sound, VA | TANMH_VA | -- | 5 |
| | MD | Upper Chester River | CHSTF | MD MOU | 4a for TN and TP |
| | MD | Upper Choptank River | CHOTF | MD MOU | 5 |
| | DE | Upper Nanticoke River, DE | NANTF_DE | DE CD finished | 5 |
| | MD | Upper Nanticoke River, MD | NANTF_MD | MD MOU | 5 |
| | MD | Upper Pocomoke River | POCTF | MD MOU | 5 |
| | MD | Wicomico River | WICMH | MD MOU | 5 |
| James | VA | Appomattox River | APPTF | -- | 5 |
| | VA | Chickahominy River | CHKOH | -- | 5 |
| | VA | Eastern Branch Elizabeth River | EBEMH | VA CD | 5 |
| | VA | Lafayette River | LAFMH | -- | 5 |
| | VA | Lower James River | JMSMH | VA CD | 5 |
| | VA | Lynnhaven River | LYNPH | VA CD | 5 |
| | VA | Middle James River | JMSOH | VA CD | 5 |
| | VA | Mouth of Chesapeake Bay | CB8PH | -- | 5 |
| | VA | Mouth of James River | JMSPH | VA CD | 5 |
| | VA | Mouth to mid-Elizabeth River | ELIPH | VA CD | 5 |
| | VA | Southern Branch Elizabeth River | SBEMH | VA CD | 5 |
| | VA | Upper James River - Lower | JMSTF1 | VA CD | 5 |
| | VA | Upper James River - Upper | JMSTF2 | VA CD | 5 |
| | VA | Western Branch Elizabeth River | WBEMH | VA CD | 5 |
| Patuxent | MD | Lower Patuxent River | PAXMH | MD MOU | 5 |
| | MD | Middle Patuxent River | PAXOH | MD MOU | 5 |
| | MD | Upper Patuxent River | PAXTF | MD MOU | 5 |

| Major river basin | Jurisdiction | Chesapeake Bay 303(d) segment | Segment ID | CD/MOU | 2008 list status[a] |
|---|---|---|---|---|---|
| | MD | Western Branch Patuxent River | WBRTF | MD MOU | BOD TMDL completed for DO impairments; 4a for BOD |
| Potomac | DC | Anacostia River, DC | ANATF_DC | DC CD | 3 for DO; 4a for BOD, TN, TP and TSS |
| | MD | Anacostia River, MD | ANATF_MD | MD MOU | 4a for BOD, TN, TP and TSS |
| | VA | Lower Central Chesapeake Bay, VA [b] | CB5MH_VA [b] | VA CD | 5 |
| | MD | Lower Potomac River, MD | POTMH_MD | MD MOU | 5 |
| | VA | Lower Potomac River, VA | POTMH_VA | VA CD | 5 |
| | MD | Mattawoman Creek | MATTF | MD MOU | 5 |
| | MD | Middle Potomac River, MD - Mainstem | POTOH1_MD | MD MOU | 5 |
| | MD | Middle Potomac River, MD - Nanjemoy Creek | POTOH2_MD | MD MOU | 5 |
| | MD | Middle Potomac River, MD - Port Tobacco River | POTOH2_MD | MD MOU | 4a for TN and TP |
| | VA | Middle Potomac River, VA | POTOH_VA | -- | 3 for DO in Migratory Spawning and Nursery (MSN); 2 for SAV and DO in open water |
| | MD | Piscataway Creek | PISTF | MD MOU | 5 |
| | DC | Upper Potomac River, DC | POTTF_DC | DC CD | 3 for DO, 5 for pH |
| | MD | Upper Potomac River, MD | POTTF_MD | MD MOU | 5 |
| | VA | Upper Potomac River, VA | POTTF_VA | -- | 3 for DO in Migratory Spawning and Nursery; 2 for SAV and DO in open water |
| Rappa-hannock | VA | Corrotoman River | CRRMH | -- | 5 |
| | VA | Lower Rappahannock River | RPPMH | VA CD | 5 |

| Major river basin | Jurisdiction | Chesapeake Bay 303(d) segment | Segment ID | CD/MOU | 2008 list status[a] |
|---|---|---|---|---|---|
| | VA | Middle Rappahannock River | RPPOH | -- | 3 for DO in Migratory Spawning and Nursery; 2 for SAV and DO in open water |
| | VA | Upper Rappahannock River | RPPTF | -- | 5 |
| | VA | Western Lower Chesapeake Bay[b] | CB6PH[b] | VA CD | 5 |
| Susque-hanna | MD | Northern Chesapeake Bay[b] | CB1TF[b] | MD MOU | 5 |
| Western Shore | MD | Back River | BACOH | MD MOU | 4a for TN and TP |
| | MD | Bush River | BSHOH | MD MOU | 5 |
| | MD | Gunpowder River | GUNOH | MD MOU | 5 |
| | MD | Lower Central Chesapeake Bay, MD[b] | CB5MH_MD[b] | MD MOU | 5 |
| | MD | Magothy River | MAGMH | MD MOU | 5 |
| | MD | Middle Central Chesapeake Bay[b] | CB4MH[b] | MD MOU | 5 |
| | MD | Middle River | MIDOH | MD MOU | 5 |
| | MD | Patapsco River | PATMH | MD MOU | 5 |
| | MD | Rhode River | RHDMH | MD MOU | 5 |
| | MD | Severn River | SEVMH | MD MOU | 5 |
| | MD | South River | SOUMH | MD MOU | 5 |
| | MD | Upper Central Chesapeake Bay[b] | CB3MH[b] | MD MOU | 5 |
| | MD | Upper Chesapeake Bay[b] | CB2OH[b] | MD MOU | 5 |
| | MD | West River | WSTMH | MD MOU | 5 |
| York | VA | Lower Mattaponi River | MPNOH | VA CD | 5 |
| | VA | Lower Pamunkey River | PMKOH | VA CD | 5 |
| | VA | Lower York River | YRKPH | VA CD | 5 |
| | VA | Middle York River | YRKMH | VA CD | 5 |
| | VA | Mobjack Bay | MOBPH | -- | 5 |
| | VA | Piankatank River | PIAMH | -- | 5 |
| | VA | Upper Mattaponi River | MPNTF | VA CD | 5 |
| | VA | Upper Pamunkey River | PMKTF | VA CD | 5 |

Sources: American Canoe Association v. EPA; American Littoral Society, et al. v. EPA, et al.; DC DOH 1998; DC DOE 2008; DE DNREC 1996; DE DNREC 2008; Kingman Park Civic Association, et al. vs. EPA; MDE 1998, 2004, 2008; USEPA 2008 a; VA DEQ 1998; VA DEQ 2008
a. BOD = biological oxygen demand; DO = dissolved oxygen; TN = total nitrogen; TP = total phosphorus; TSS = total suspended solids
b. More than one river basin flows into this tidal segment

### 2.2.3    Jurisdictions' 2008 303(d) Listings

The Chesapeake Bay TMDL is based on the most recent EPA-approved tidal Bay jurisdictions'
section 303(d) lists, which are the 2008 303(d) listings.[2]  Those section 303(d) lists identify 89 of
the 92 Chesapeake Bay segments as impaired on either Category 4a (impaired, TMDL has been
developed) or Category 5 (impaired, needs TMDL) because of various factors, including low DO
levels, insufficient SAV, excess chlorophyll *a*, biological/nutrient indicators, total nitrogen, total
phosphorus, total suspended solids (TSS), biological oxygen demand (BOD), and pH (caused by
excessive nitrogen and phosphorus fueling algal blooms) (DC DOE 2008; DE DNREC 2008;
MDE 2008; VADEQ 2008).

Three Chesapeake Bay segments are not listed in Category 4a or 5 on Virginia's 2008 integrated
report:

- Upper Potomac River (POTTF_VA)
- Middle Potomac River (POTOH_VA)
- Middle Rappahannock River (RPPOH)

Those three segments are listed as either Category 2 (some uses met, other uses have insufficient
information to determine impairment) or Category 3 (insufficient information to determine if
impaired) (VA DEQ 2008). Because their listing status raises a reasonable possibility that they
are impaired, and because those segments are tidally interconnected with other impaired Bay
segments, it is appropriate that they also be addressed by the Chesapeake Bay TMDL.

The first segment, Virginia's Upper Potomac River (POTTF_VA), encompasses a series of small
tidal embayments that are tidally interconnected with Maryland's Upper Potomac River
(POTTF_MD) segment and the District of Columbia's Upper Potomac River (POTTF_DC)
segment (USEPA 2008a), both of which are listed as Category 5 of Maryland's and the District
of Columbia's respective 2008 integrated reports (DCDOE 2008; MDE 2008). Loads originating
in the watershed that drains directly to Virginia's Upper Potomac River segment influence the
water quality in the two adjacent Maryland and District of Columbia impaired tidal segments and
other down-tide segments.

The second segment, Virginia's Middle Potomac River (POTOH_VA), also encompasses a
series of small tidal embayments that are tidally interconnected with Maryland's Middle
Potomac River (POTOH_MD) segment (USEPA 2008a), which is listed as Category 5 on
Maryland's 2008 integrated report (MDE 2008). Loads originating in the watershed that drains
directly to Virginia's Middle Potomac River segment influence the water quality in the adjacent
Maryland impaired tidal segment and other down-tide impaired segments.

The third segment, Virginia's Middle Rappahannock River (RPPOH), is tidally interconnected
with both the Lower Rappahannock River (RPPMH) and the Upper Rappahannock River
(RPPTF) segments (USEPA 2008a), both of which are listed as Category 5 on Virginia's 2008
integrated report (VADEQ 2008). Loads originating in the watershed that drains directly to

---

[2] At the time EPA applied the Bay models for development of the allocations starting in 2009, the 2008 section
303(d) lists were the most recent approved lists. Although EPA subsequently received 2010 section 303(d) lists for
approval from all tidal jurisdictions, EPA used the approved 2008 lists in establishing the Bay TMDL to have a
consistent basis for the TMDL.

Virginia's Middle Rappahannock River segment influence the water quality in the adjacent Virginia impaired tidal segments and other down-tide segments.

As detailed in Section 9, TMDLs have been completed as part of the Chesapeake Bay TMDL for all 92 Chesapeake Bay segments listed in Table 2-1 (see Section 9). These include TMDLs for the above described three Virginia Bay segments because they flow into impaired tidal Bay segments, and reductions in nitrogen, phosphorus, and sediment loadings from their respective watersheds, therefore, are necessary to achieve the Bay jurisdictions' Chesapeake Bay WQS.

## 2.2.4    2008 303(d) Listing Segments Compared to Consent Decree and MOU Segments

To ensure that EPA established TMDLs for all necessary Bay segments—all 2008 listed segments, all Virginia, Delaware, and the District of Columbia TMDL consent decree segments, and all Maryland MOU segments—EPA compared the 2008 listed segments with those included on those consent decrees and MOUs (Table 2-1). In total, 77 segments are addressed by the Virginia and District of Columbia consent decrees and the Maryland MOU: 22 segments are on the Virginia TMDL consent decree; 2 segments are on the Delaware TMDL consent decree; 2 segments are on the District of Columbia TMDL consent decree; and 51 segments are on the Maryland TMDL MOU (Table 2-2). The evaluation found that all segments of the Virginia consent decree, Delaware consent decree, the District of Columbia consent decree, and Maryland MOU are included in the list of 92 Chesapeake Bay segments for which nitrogen, phosphorus, and sediment TMDLs have been established under the Bay TMDL.

**Table 2-2. Comparison of consent decree/MOU segments with total number of Bay segments**

| Jurisdiction | Consent decree or MOU segments | Chesapeake Bay segments |
|---|---|---|
| Virginia | 22 | 35 |
| District of Columbia | 2 | 2 |
| Maryland | 51 | 53 |
| Delaware | 2[a] | 2 |
| Total | 77 | 92 |

Source: Adapted from Table 2-1.
a. Two consent decrees affect one Bay segment in Delaware, but TMDLs have already been established for both waterbodies.

# SECTION 3.  CHESAPEAKE BAY WATER QUALITY STANDARDS

WQS consist of four basic elements: designated uses, water quality criteria, an antidegradation policy (to maintain and protect existing uses and high-quality waters), and general policies (addressing implementation issues such as low flows, variances, and mixing zones). Designated uses are a jurisdiction's goals and expectations for each of the individual surface waters (e.g., coldwater fisheries, public water supply, and primary contact recreation). EPA's WQS regulation defines designated uses as the "uses specified in WQS for each waterbody or segment, whether or not they are being attained" (40 CFR 131.3). Water quality criteria may be numeric or narrative, and represent a quality of water that supports a particular use. When water quality criteria are met, water quality is expected to protect its designated use. Numeric water quality criteria are generally chemical-specific and reflect specific levels of pollutants that, if found in the waterbody, do not impair its designated uses (e.g., physical or chemical characteristics like temperature, minimum concentration of DO, and the maximum concentrations of toxic pollutants).

Starting in 1986, EPA and its CBP partners embarked on a process to synthesize scientific evidence on the water quality requirements of hundreds of aquatic species and biological communities inhabiting Chesapeake Bay and its tidal tributaries and embayments. The 1987 Chesapeake Bay Agreement included a commitment to "develop and adopt guidelines for the protection of water quality and habitat conditions necessary to support the living resources found in the Chesapeake Bay system, and to use these guidelines in the implementation of water quality and habitat quality programs" (CEC 1987). The CBP partnership initially published two syntheses of the available scientific findings supporting establishment of habitat requirements for 31 target species (CBP 1987; Funderburk et al. 1991). Those efforts spawned development and publication of synthesis documents focused on DO requirements (Jordan et al. 1992) and underwater Bay grasses habitat requirements (Batiuk et al. 1992, 2000). On the basis of that work, in part, EPA published as guidance the Chesapeake Bay water quality criteria (USEPA 2003a) and the Chesapeake Bay refined aquatic life designated uses and attainability (USEPA 2003d) documents.

Guided by those efforts, Delaware, the District of Columbia, Maryland, and Virginia adopted jurisdiction-specific Chesapeake Bay WQS regulations in 2004–2005 consistent with the EPA published guidance. EPA then reviewed and approved the four tidal Bay jurisdictions' WQS submissions pursuant to CWA section 303(c).

Since 2005, Delaware, Maryland, Virginia, and the District of Columbia each has proposed and adopted very specific amendments to its respective Chesapeake Bay WQS regulations. Each jurisdiction's process for amending its existing Chesapeake Bay WQS regulations requires full public notice, public review and comment, and response to public comments before submission to EPA Region 3 for final EPA review and approval.

## 3.1   CHESAPEAKE BAY WATER QUALITY CRITERIA AND DESIGNATED USES

The above described DO, underwater Bay grasses, and Bay habitat requirements documents (Batiuk et al. 1992, 2000; CBP 1987; Funderburk et al. 1991; Jordan et al. 1991), supplemented by additional scientific research findings, provided the basis for developing the applicable water quality criteria guidance for the Chesapeake Bay. The criteria assessment guidance is documented within EPA's Bay criteria (USEPA 2003a), designated uses/attainability (USEPA 2003d), and Bay segmentation (USEPA 2004b) documents and the subsequent seven addenda (USEPA 2004a, 2004e, 2005, 2007a, 2007b, 2008a, 2010a). EPA Region 3 published those documents as guidance in accordance with CWA sections 117(b) and 303 to derive water quality criteria specifically for addressing the critical nutrient and sediment enrichment parameters necessary to protect designated aquatic life uses in the Bay (Table 3-1). These criteria serve as surrogate numeric criteria for nitrogen, phosphorus, and sediment.

**Table 3-1. Chesapeake Bay water quality criteria and designated use related documentation and addenda**

| Document title | Month/year published | Document content and description |
|---|---|---|
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries.* EPA 903-R-03-002. [USEPA 2003a] | April 2003 | Original Chesapeake Bay water quality criteria document. |
| *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability.* EPA 903-R-03-004. [USEPA 2003d] | October 2003 | Original Chesapeake Bay tidal waters designated uses document. |
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2004 Addendum.* EPA 903-R-03-002. [USEPA 2004a] | October 2004 | Addresses endangered species protection, assessment of DO criteria, derivation of site-specific DO criteria, pycnocline boundary delineation methodology, and updated water clarity criteria/SAV restoration acreage assessment procedures. |
| *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability—2004 Addendum.* EPA 903-R-04-006. [USEPA 2004e] | October 2004 | Addresses refinements to Bay tidal waters designated use boundaries, segmentation boundaries, and Potomac River jurisdictional boundaries; documents SAV no-grow zones, restoration goal, and shallow-water acreages. |
| *Chesapeake Bay Program Analytical Segmentation Scheme: Revisions, Decisions and Rationales 1983–2003.* EPA 903-R-04-008. CBP/TRS 268-04. [USEPA 2004b] | October 2004 | Details documentation on the history of the segmentation schemes and provides coordinates, georeferences, and narrative descriptions of the 2003 segmentation scheme. |

| Document title | Month/year published | Document content and description |
|---|---|---|
| *Chesapeake Bay Program Analytical Segmentation Scheme: Revisions, Decisions and Rationales 1983–2003: 2005 Addendum.* EPA 903-R-05-004. CBP/TRS 278-06. [USEPA 2005] | December 2005 | Addresses methods used to subdivide the segments by jurisdiction and provides coordinates, georeferences, and narrative descriptions for those subdivided segments. |
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2007 Addendum.* EPA 903-R-07-003. CBP/TRS 285-07. [USEPA 2007a] | July 2007 | Addresses refinements to the Bay water quality DO, water clarity/SAV, and chlorophyll a criteria assessment methodologies and documents the framework for Bay tidal waters 303(d) list decision making. |
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2007 Chlorophyll Criteria Addendum.* EPA 903-R-07-005. CBP/TRS 288/07. [USEPA 2007b] | November 2007 | Publishes a set of numerical chlorophyll a criteria for Chesapeake Bay and the supporting criteria assessment procedures. |
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2008 Technical Support for Criteria Assessment Protocols Addendum.* EPA 903-R-08-001. CBP/TRS 290-08. [USEPA 2008a] | September 2008 | Addresses refinements to the Bay water quality DO, water clarity/SAV and chlorophyll a criteria assessment methodologies and documents the 2008 92-segment scheme for Bay tidal waters. |
| *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2010 Technical Support for Criteria Assessment Protocols Addendum.* EPA 903-R-10-002. CBP/TRS 301-10. [USEPA 2010a] | May 2010 | Addresses refinements to procedures for defining designated uses, procedures for deriving biologically based reference curves for DO criteria assessment and chlorophyll a criteria assessment procedures. |

Before adoption into each Bay jurisdiction's WQS regulations, each set of criteria, criteria assessment procedures, designated uses, and proposed WQS were subject to extensive scientific, programmatic, and public review.

The original 2003 water quality criteria, assessment procedures, and designated uses all went through independent scientific peer reviews sponsored by the CBP's STAC and public review. The CBP's Water Quality Steering Committee's water quality criteria and designated use teams then reviewed and approved them. Finally, the CBP's Water Quality Steering Committee reviewed and approved them for EPA publication on behalf of the partnership.

Since the publication of the original Chesapeake Bay water quality criteria document (USEPA 2003a), Chesapeake Bay designated uses and attainability document (USEPA 2003d), and Chesapeake Bay segmentation document (USEPA 2004b), EPA has published enhancements to the criteria assessment procedures, designated use boundaries, and Bay segmentation scheme. Specifically, EPA has published five addenda—USEPA 2004a, 2007a, 2007b, 2008a, 2010a—to the original 2003 Bay criteria document (USEPA 2003a), one addendum—USEPA 2004e—to

the original 2003 Bay designated use/attainability document (USEPA 2003d), and one addendum—USEPA 2005—to the original Bay segmentation document (USEPA 2004b) (see Table 3-1).

Those revisions have undergone independent scientific peer reviews, sponsored by the CBP's STAC, before review and approval by the CBP's Criteria Assessment Protocols Workgroup and then the Water Quality Steering Committee/Water Quality Implementation Team for EPA publication on behalf of the partnership. Examples include the cumulative frequency distribution approach (STAC 2006) and the biological reference curves (STAC 2009).

### 3.1.1    Tidal Water Designated Uses

EPA and its seven watershed jurisdiction partners agreed on five refined aquatic life designated uses reflecting the habitats of an array of recreationally, commercially, and ecologically important species and biological communities (USEPA 2003d, 2004e, 2010a). The five tidal Bay designated uses are applied, where appropriate, consistently across Delaware, the District of Columbia, Maryland, and Virginia's portions of the Chesapeake Bay and its tidal tributary and embayment waters. The vertical and horizontal breadth and temporal application of the designated use boundaries are based on a combination of natural factors, historical records, physical features, hydrology, bathymetry, and other scientific considerations (USEPA 2003d, 2004e, 2010a). Table 3-2 outlines the Chesapeake Bay tidal water designated uses, which are illustrated in Figure 3-1.

**Table 3-2. Five Chesapeake Bay tidal waters designated uses**

| Tidal water designated use | Chesapeake Bay habitats and communities protected |
|---|---|
| Migratory fish spawning and nursery | Migratory and resident tidal freshwater finfish during the late winter/spring spawning and nursery season in tidal freshwater to low-salinity habitats. |
| Shallow-water Bay grass | Underwater Bay grasses and fish and crab species that depend on the shallow-water habitat provided by underwater Bay grass beds. |
| Open-water fish and shellfish | Diverse populations of sport fish, including striped bass, bluefish, mackerel and sea trout, as well as important bait fish such as menhaden and silversides in surface water habitats within tidal creeks, rivers, embayments, and the mainstem Chesapeake Bay year-round. |
| Deep-water seasonal fish and shellfish | Animals inhabiting the deeper transitional water column and bottom habitats between the well-mixed surface waters and the very deep channels during the summer months (e.g., bottom-feeding fish, crabs and oysters, as well as other important species, including the Bay anchovy). |
| Deep-channel seasonal refuge | Bottom-sediment-dwelling worms and small clams that serve as food for bottom-feeding fish and crabs in the very deep channels in summer. |

Sources: USEPA 2003d, 2004e

# Refined Designated Uses for the Bay and Tidal Tributary Waters



### A. Cross Section of Chesapeake Bay or Tidal Tributary



### B. Oblique View of the "Chesapeake Bay" and its Tidal Tributaries

Source: USEPA 2003d

**Figure 3-1. Conceptual illustration of the five Chesapeake Bay tidal water designated use zones.**

Table 3-3 lists the designated uses for each of the 92 Chesapeake Bay segments pursuant to Delaware, the District of Columbia, Maryland, and Virginia's existing WQS regulations. Amended based on USEPA 2010a, Table 3-3 was originally published as Table V-1 on pages 51–53 of the *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries 2007 Addendum* (USEPA 2007a), which is an updated version of Table IV-3 originally published on pages 62–63 of the 2003 *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability* (USEPA 2003d). The absence of an X in the shallow-water Bay grass designated use column indicates that the Bay segment has been entirely delineated as an SAV no-grow zone and, therefore, the shallow-water Bay grass designated use does not apply to that Bay segment (USEPA 2004e).

**Table 3-3. Current tidal water designated uses by Chesapeake Bay segment**

| CB segment name | CB segment | Juris. | Migratory fish spawning & nursery<br>Feb. 1–May 31 | Open water fish & shellfish<br>Year-round | Deep water seasonal fish & shellfish<br>June 1–Sept. 30 | Deep channel seasonal refuge<br>June 1–Sept. 30 | Shallow water Bay grasses<br>SAV growing season |
|---|---|---|---|---|---|---|---|
| Northern Chesapeake Bay | CB1TF | MD | X | X | | | X |
| Upper Chesapeake Bay | CB2OH | MD | X | X | | | X |
| Upper Central Chesapeake Bay | CB3MH | MD | X | X | X | X | X |
| Middle Central Chesapeake Bay | CB4MH | MD | X | X | X | X | X |
| Lower Central Chesapeake Bay , MD | CB5MH_MD | MD | | X | X | X | X |
| Lower Central Chesapeake Bay, VA | CB5MH_VA | VA | | X | X | X | X |
| Western Lower Chesapeake Bay | CB6PH | VA | | X | X | | X |
| Eastern Lower Chesapeake Bay | CB7PH | VA | | X | X | | X |
| Mouth of the Chesapeake Bay | CB8PH | VA | | X | | | X |
| Bush River | BSHOH | MD | X | X | | | X |
| Gunpowder River | GUNOH | MD | X | X | | | X |
| Middle River | MIDOH | MD | X | X | | | X |
| Back River | BACOH | MD | X | X | | | X |
| Patapsco River | PATMH | MD | X | X | X | | X |
| Magothy River | MAGMH | MD | X | X | X | | X |
| Severn River | SEVMH | MD | X | X | X | | X |
| South River | SOUMH | MD | X | X | X | | X |
| Rhode River | RHDMH | MD | X | X | | | X |
| West River | WSTMH | MD | X | X | | | X |
| Upper Patuxent River | PAXTF | MD | X | X | | | X |
| Western Branch Patuxent River | WBRTF | MD | X | X | | | X |
| Middle Patuxent River | PAXOH | MD | X | X | | | X |
| Lower Patuxent River | PAXMH | MD | X | X | X | | X |
| Upper Potomac River, DC | POTTF_DC | DC | X | X | | | X |
| Upper Potomac River, MD | POTTF_MD | MD | X | X | | | X |
| Upper Potomac River, VA | POTTF_VA | VA | X | X | | | X |
| Anacostia River, DC | ANATF_DC | DC | X | X | | | X |
| Anacostia River, MD | ANATF_MD | MD | X | X | | | X |
| Piscataway Creek | PISTF | MD | X | X | | | X |
| Mattawoman Creek | MATTF | MD | X | X | | | X |

Chesapeake Bay TMDL

| CB segment name | CB segment | Juris. | Migratory fish spawning & nursery<br>Feb. 1– May 31 | Open water fish & shellfish<br>Year-round | Deep water seasonal fish & shellfish<br>June 1– Sept. 30 | Deep channel seasonal refuge<br>June 1– Sept. 30 | Shallow water Bay grasses<br>SAV growing season |
|---|---|---|---|---|---|---|---|
| Middle Potomac River, MD-Mainstem | POTOH1_MD | MD | X | X | | | X |
| Middle Potomac River, MD-Nanjemoy Creek | POTOH2_MD | MD | X | X | | | X |
| Middle Potomac River, MD-Port Tobacco River | POTOH3_MD | MD | X | X | | | X |
| Middle Potomac River, VA | POTOH_VA | VA | X | X | | | X |
| Lower Potomac River, MD | POTMH_MD | MD | X | X | X | X | X |
| Lower Potomac River, VA | POTMH_VA | VA | X | X | X | X | X |
| Upper Rappahannock River | RPPTF | VA | X | X | | | X |
| Middle Rappahannock River | RPPOH | VA | X | X | | | X |
| Lower Rappahannock River | RPPMH | VA | X | X | X | X | X |
| Corrotoman River | CRRMH | VA | X | X | | | X |
| Piankatank River | PIAMH | VA | | X | | | X |
| Upper Mattaponi River | MPNTF | VA | X | X | | | X |
| Lower Mattaponi River | MPNOH | VA | X | X | | | |
| Upper Pamunkey River | PMKTF | VA | X | X | | | X |
| Lower Pamunkey River | PMKOH | VA | X | X | | | |
| Middle York River | YRKMH | VA | X | X | | | X |
| Lower York River | YRKPH | VA | | X | X | | X |
| Mobjack Bay | MOBPH | VA | | X | | | X |
| Upper James River-Lower | JMSTF1 | VA | X | X | | | X |
| Upper James River-Upper | JMSTF2 | VA | X | X | | | X |
| Appomattox River | APPTF | VA | X | X | | | X |
| Middle James River | JMSOH | VA | X | X | | | X |
| Chickahominy River | CHKOH | VA | X | X | | | X |
| Lower James River | JMSMH | VA | X | X | | | X |
| Mouth of the James River | JMSPH | VA | | X | | | X |
| Western Branch Elizabeth River | WBEMH | VA | | X | | | |
| Southern Branch Elizabeth River | SBEMH | VA | | X | | | |
| Eastern Branch Elizabeth River | EBEMH | VA | | X | | | |
| Lafayette River | LAFMH | VA | | X | | | |
| Mouth of the Elizabeth River | ELIPH | VA | | X | X | X | |

December 29, 2010

Chesapeake Bay TMDL

| CB segment name | CB segment | Juris. | Migratory fish spawning & nursery<br><br>Feb. 1–May 31 | Open water fish & shellfish<br><br>Year-round | Deep water seasonal fish & shellfish<br><br>June 1–Sept. 30 | Deep channel seasonal refuge<br><br>June 1–Sept. 30 | Shallow water Bay grasses<br><br>SAV growing season |
|---|---|---|---|---|---|---|---|
| Lynnhaven River | LYNPH | VA | | X | | | X |
| Northeast River | NORTF | MD | X | X | | | X |
| C&D Canal, DE | C&DOH_DE | DE | X | X | | | X |
| C&D Canal, MD | C&DOH_MD | MD | X | X | | | X |
| Bohemia River | BOHOH | MD | X | X | | | X |
| Elk River | ELKOH | MD | X | X | | | X |
| Sassafras River | SASOH | MD | X | X | | | X |
| Upper Chester River | CHSTF | MD | X | X | | | X |
| Middle Chester River | CHSOH | MD | X | X | | | X |
| Lower Chester River | CHSMH | MD | X | X | X | X | X |
| Eastern Bay | EASMH | MD | | X | X | X | X |
| Upper Choptank River | CHOTF | MD | X | X | | | |
| Middle Choptank River | CHOOH | MD | X | X | | | X |
| Lower Choptank River | CHOMH2 | MD | X | X | | | X |
| Mouth of the Choptank River | CHOMH1 | MD | X | X | | | X |
| Little Choptank River | LCHMH | MD | | X | | | X |
| Honga River | HNGMH | MD | | X | | | X |
| Fishing Bay | FSBMH | MD | X | X | | | X |
| Upper Nanticoke River, MD | NANTF_MD | MD | X | X | | | |
| Upper Nanticoke River, DE | NANTF_DE | DE | X | X | | | X |
| Middle Nanticoke River | NANOH | MD | X | X | | | X |
| Lower Nanticoke River | NANMH | MD | X | X | | | X |
| Wicomico River | WICMH | MD | X | X | | | X |
| Manokin River | MANMH | MD | X | X | | | X |
| Big Annemessex River | BIGMH | MD | X | X | | | X |
| Upper Pocomoke River | POCTF | MD | X | X | | | |
| Middle Pocomoke River, MD | POCOH_MD | MD | X | X | | | |
| Middle Pocomoke River, VA | POCOH_VA | VA | X | X | | | |
| Lower Pocomoke River, MD | POCMH_MD | MD | X | X | | | X |
| Lower Pocomoke River, VA | POCMH_VA | VA | X | X | | | X |
| Tangier Sound, MD | TANMH_MD | MD | | X | | | X |
| Tangier Sound, VA | TANMH_VA | VA | | X | | | X |

Sources: USEPA 2003d, 2004e, 2007a, 2010a

December 29, 2010

### 3.1.2    *Dissolved Oxygen Criteria*

Oxygen is one of the most essential environmental constituents supporting life. In the Chesapeake Bay's deeper waters, there is a natural tendency toward reduced DO conditions because of the Bay's physical morphology and estuarine circulation. The Chesapeake Bay's highly productive shallow waters, coupled with strong density stratification (preventing reaeration); long residence times (weeks to months); low tidal energy; and tendency to retain, recycle, and regenerate nutrients from the surrounding watershed all set the stage for low DO conditions.

Against that backdrop, EPA worked closely with its seven watershed partners and the larger Bay scientific community to derive and publish a set of DO criteria to protect specific aquatic life communities and reflect the Chesapeake Bay's natural processes that define distinct habitats (Figure 3-2) (USEPA 2003a; Batiuk et al. 2009). Working with the National Marine Fisheries Service, EPA also ensured that the DO criteria were protective of the shortnose sturgeon, a species listed as endangered by the Endangered Species Act (NMFS 2003; USEPA 2003b).



Source: USEPA 2003a

**Figure 3-2. Dissolved oxygen concentrations (mg/L) required by different Chesapeake Bay species and biological communities.**

Criteria for the migratory fish spawning and nursery, shallow-water Bay grass and open-water fish and shellfish designated uses were set at levels to prevent impairment of growth and to protect the reproduction and survival of all organisms living in the open-water column habitats (Table 3-4) (USEPA 2003a). Criteria for deep-water seasonal fish and shellfish designated use habitats, during seasons when the water column is significantly stratified, were set at levels to protect juvenile and adult fish, shellfish, and the recruitment success of the Bay anchovy. Criteria for deep-channel seasonal refuge designated use habitats in summer were set to protect the survival of bottom sediment-dwelling worms and clams.

**Table 3-4. Current Chesapeake Bay DO criteria**

| Designated use | Criteria concentration/duration | Protection provided | Temporal application |
|---|---|---|---|
| Migratory fish spawning and nursery use | 7-day mean ≥ 6 mg/L (tidal habitats with 0–0.5 ppt salinity) | Survival and growth of larval/juvenile tidal-fresh resident fish; protective of threatened/endangered species | February 1–May 31 |
| | Instantaneous minimum ≥ 5 mg/L | Survival and growth of larval/juvenile migratory fish; protective of threatened/endangered species | |
| | Open-water fish and shellfish designated use criteria apply | | June 1–January 31 |
| Shallow-water Bay grass use | Open-water fish and shellfish designated use criteria apply | | Year-round |
| Open-water fish and shellfish use | 30-day mean ≥ 5.5 mg/L (tidal habitats with 0–0.5 ppt salinity) | Growth of tidal-fresh juvenile and adult fish; protective of threatened/endangered species | Year-round |
| | 30-day mean ≥ 5 mg/L (tidal habitats with >0.5 ppt salinity) | Growth of larval, juvenile, and adult fish and shellfish; protective of threatened/endangered species | |
| | 7-day mean ≥ 4 mg/L | Survival of open-water fish larvae | |
| | Instantaneous minimum ≥ 3.2 mg/L | Survival of threatened/endangered sturgeon species[a] | |
| Deep-water seasonal fish and shellfish use | 30-day mean ≥ 3 mg/L | Survival and recruitment of Bay anchovy eggs and larvae | June 1–September 30 |
| | 1-day mean ≥ 2.3 mg/L | Survival of open-water juvenile and adult fish | |
| | Instantaneous minimum ≥ 1.7 mg/L | Survival of Bay anchovy eggs and larvae | |
| | Open-water fish and shellfish designated use criteria apply | | October 1–May 31 |
| Deep-channel seasonal refuge use | Instantaneous minimum ≥ 1 mg/L | Survival of bottom-dwelling worms and clams | June 1–September 30 |
| | Open-water fish and shellfish designated use criteria apply | | October 1–May 31 |

Source: USEPA 2003a
Notes: mg/L = milligrams per liter; ppt = parts per thousand salinity
a. At temperatures considered stressful to shortnose sturgeon (> 29 degrees Celsius), DO concentrations above an instantaneous minimum of 4.3 mg/L will protect survival of this listed sturgeon species.

### 3.1.3    Chlorophyll a Criteria

EPA's 2003 Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries (USEPA 2003a) describes the applicable narrative criteria for chlorophyll a:

"Concentrations of chlorophyll *a* in free-floating microscopic aquatic plants (algae) shall not exceed levels that result in ecologically undesirable consequences—such as reduced water clarity, low dissolved oxygen, food supply imbalances, proliferation of species deemed potentially harmful to aquatic life or humans or aesthetically objectionable conditions—or otherwise render tidal waters unsuitable for designated uses."

In 2007 EPA published numeric chlorophyll *a* criteria guidance protective of open-water designated use impairment by harmful algal blooms and provided recommended reference chlorophyll *a* concentrations for historic chlorophyll *a* levels, and DO and water clarity impairments (USEPA 2007b).

Delaware, the District of Columbia, Maryland, and Virginia all adopted EPA's narrative chlorophyll *a* criteria. Additionally, the District of Columbia and Virginia adopted numeric chlorophyll *a* criteria for certain tidal waters as detailed in Sections 3.2.2 and 3.2.7, respectively.

### 3.1.4    Water Clarity/Underwater Bay Grasses Criteria

Underwater bay grass beds create rich animal habitats that support the growth of diverse fish and invertebrate populations. Underwater bay grasses, also referred to as submerged aquatic vegetation (SAV), help improve tidal water quality by retaining nitrogen and phosphorus as plant material, stabilizing bottom sediment (preventing their resuspension) and reducing shoreline erosion. The health and survival of such underwater plant communities in the Chesapeake Bay and its tidal tributaries and embayments depend on suitable environmental conditions (Dennison et al. 1993; Kemp et al. 2004).

The loss of SAV from the shallow waters of the Chesapeake Bay, which was first noted in the early 1960s, is a widespread, well-documented problem (Orth and Moore 1983; Orth et al. 2010b). The primary causes of the decline of SAV are nutrient over-enrichment, increased suspended sediment in the water, and associated reductions in light availability (Kemp et al. 2004). To restore the critical habitats and food sources, enough light must penetrate the shallow waters to support the survival, growth, and repropagation of diverse, healthy, SAV communities (Dennison et al. 1993).

EPA, working closely with its seven watershed partners and the larger Bay scientific community, derived and published Chesapeake Bay water clarity criteria to establish the minimum level of light penetration required to support the survival, growth, and continued propagation of SAV (USEPA 2003a). Chesapeake Bay-specific water clarity criteria were derived for low and higher salinity habitats using a worldwide literature synthesis, an evaluation of Chesapeake Bay-specific field study findings, and application model simulations and diagnostic tools (Table 3-5).

The water clarity criteria, applied only during the SAV growing seasons, are presented in terms of the percent ambient light at the water surface extending through the water column and the

equivalent Secchi depth by application depth (Table 3-5). The recommended percent light-through-water criteria can be directly measured using a Secchi disk or a light meter. A specific application depth is required to apply and determine attainment of the water clarity criteria (Table 3-6).

SAV restoration acreage goals and water clarity application depths were developed based on historic and recent data on the distribution of SAV (USEPA 2003d). Detailed analyses using that data—including historical aerial photographs—were undertaken to map the distribution and depth of historical SAV beds in the Chesapeake Bay and its tidal tributaries and embayments. The analyses led to the adoption of the single best year method that considers historical SAV distributions from the 1930s through the early 1970s and more recent distributions since 1978 to the present mapped through annual SAV aerial surveys of the Bay's shallow-water habitats. Using that method, the EPA and its watershed partners established a Bay-wide SAV restoration goal of 185,000 acres and Bay segment-specific acreage goals (Table 3-6) (USEPA 2003d).

**Table 3-5. Summary of Chesapeake Bay water clarity criteria for application to shallow-water Bay grass designated use habitats**

| Salinity regime[b] | Water clarity criteria (percent light-through-water) | Water clarity criteria as Secchi depth[a] | | | | | | | | Temporal application |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Water clarity criteria application depths (meters) | | | | | | | | |
| | | 0.25 | 0.5 | 0.75 | 1.0 | 1.25 | 1.5 | 1.75 | 2.0 | |
| | | Secchi depth for above criteria application depth (meters) | | | | | | | | |
| Tidal-fresh | 13% | 0.2 | 0.4 | 0.5 | 0.7 | 0.9 | 1.1 | 1.2 | 1.4 | April 1–Oct 31 |
| Oligohaline | 13% | 0.2 | 0.4 | 0.5 | 0.7 | 0.9 | 1.1 | 1.2 | 1.4 | April 1–Oct 31 |
| Mesohaline | 22% | 0.2 | 0.5 | 0.7 | 1.0 | 1.2 | 1.4 | 1.7 | 1.9 | April 1–Oct 31 |
| Polyhaline | 22% | 0.2 | 0.5 | 0.7 | 1.0 | 1.2 | 1.4 | 1.7 | 1.9 | March 1–May 31 Sept 1–Nov 30 |

Source: USEPA 2003a
a. Based on application of the Equation IV-1 published in USEPA 2003a, PLW = 100exp(-$K_d$Z), where the appropriate percent light through water (PLW) criterion value and the selected application depth (see Table 3-6) are inserted and the equation is solved for $K_d$. The generated $K_d$ value is then converted to Secchi depth (in meters) using the conversion factor $K_d$ = 1.45/Secchi depth.
b. Tidal fresh = 0-0.5 ppt salinity; oligohaline = >0.5-5 ppt salinity; mesohaline = >5-18 ppt salinity; polyhaline = >18 ppt salinity

**Table 3-6. Chesapeake Bay SAV restoration acreage goals and application depths**

| Segment description | State | Segment designator | SAV acreage restoration goal (acres) | Application depth (meters) |
|---|---|---|---|---|
| Northern Chesapeake Bay | MD | CB1TF2 | 12,149 | 2.0 |
| Northern Chesapeake Bay | MD | CB1TF1 | 754 | 1.0 |
| Upper Chesapeake Bay | MD | CB2OH | 705 | 0.5 |
| Upper Central Chesapeake Bay | MD | CB3MH | 1,370 | 0.5 |
| Middle Central Chesapeake Bay | MD | CB4MH | 2,533 | 2.0 |
| Lower Chesapeake Bay | MD | CB5MH_MD | 8,270 | 2.0 |
| Lower Central Chesapeake Bay | VA | CB5MH_VA | 7,633 | 2.0 |
| Western Lower Chesapeake Bay | VA | CB6PH | 1,267 | 1.0 |

| Segment description | State | Segment designator | SAV acreage restoration goal (acres) | Application depth (meters) |
|---|---|---|---|---|
| Eastern Lower Chesapeake Bay | VA | CB7PH | 15,107 | 2.0 |
| Mouth of Chesapeake Bay | VA | CB8PH | 11 | 0.5 |
| Bush River | MD | BSHOH | 350 | 0.5 |
| Gunpowder River-Upper | MD | GUNOH2 | 572 | 2.0 |
| Gunpowder River-Lower | MD | GUNOH1 | 1,860 | 0.5 |
| Middle River | MD | MIDOH | 879 | 2.0 |
| Back River | MD | BACOH | 30 | 0.5 |
| Patapsco River | MD | PATMH | 389 | 1.0 |
| Magothy | MD | MAGMH | 579 | 1.0 |
| Severn River | MD | SEVMH | 455 | 1.0 |
| South River | MD | SOUMH | 479 | 1.0 |
| Rhode River | MD | RHDMH | 60 | 0.5 |
| West River | MD | WSTMH | 238 | 0.5 |
| Upper Patuxent River | MD | PAXTF | 205 | 0.5 |
| Middle Patuxent River | MD | PAXOH | 115 | 0.5 |
| Lower Patuxent River | MD | PAXMH1 | 1,459 | 2.0 |
| Lower Patuxent River | MD | PAXMH2 | 172 | 0.5 |
| Lower Patuxent River | MD | PAXMH4 | 1 | 0.5 |
| Lower Patuxent River | MD | PAXMH5 | 2 | 0.5 |
| Upper Potomac River | MD | POTTF_MD | 2,142 | 2.0 |
| Piscataway Creek | MD | PISTF | 789 | 2.0 |
| Mattawoman Creek | MD | MATTF | 792 | 1.0 |
| Middle Potomac River | MD | POTOH1 | 1,387 | 2.0 |
| Middle Potomac River | MD | POTOH2 | 262 | 1.0 |
| Middle Potomac River | MD | POTOH3 | 1,153 | 1.0 |
| Lower Potomac River | MD | POTMH_MD | 7,088 | 1.0 |
| Upper Potomac River | VA | POTTF_VA | 2,093 | 2.0 |
| Middle Potomac River | VA | POTOH_VA | 1,503 | 2.0 |
| Lower Potomac River | VA | POTMH_VA | 4,250 | 1.0 |
| Upper Rappahannock River | VA | RPPTF | 66 | 0.5 |
| Middle Rappahannock River | VA | RPPOH | 4 | 0.5 |
| Lower Rappahannock River | VA | RPPMH | 1,700 | 1.0 |
| Corrotoman River | VA | CRRMH | 768 | 1.0 |
| Piankatank River | VA | PIAMH | 3,479 | 2.0 |
| Upper Mattaponi River | VA | MPNTF | 85 | 0.5 |
| Upper Pamunkey River | VA | PMKTF | 187 | 0.5 |
| Middle York River | VA | YRKMH | 239 | 0.5 |
| Lower York River | VA | YRKPH | 2,793 | 1.0 |
| Mobjack Bay | VA | MOBPH | 15,901 | 2.0 |
| Upper James River-Upper | VA | JMSTF2 | 200 | 0.5 |
| Upper James River-Lower | VA | JMSTF1 | 1,000 | 0.5 |
| Appomattox River | VA | APPTF | 379 | 0.5 |
| Middle James River | VA | JMSOH | 15 | 0.5 |

| Segment description | State | Segment designator | SAV acreage restoration goal (acres) | Application depth (meters) |
|---|---|---|---|---|
| Chickahominy River | VA | CHKOH | 535 | 0.5 |
| Lower James River | VA | JMSMH | 200 | 0.5 |
| Mouth of the James River | VA | JMSPH | 300 | 1.0 |
| Lynnhaven River | VA | LYNPH | 107 | 0.5 |
| Northeast River | MD | NORTF | 89 | 0.5 |
| Chesapeake & Delaware Canal | MD | C&DOH_MD | 7 | 0.5 |
| Bohemia River | MD | BOHOH | 354 | 0.5 |
| Elk River | MD | ELKOH1 | 1,844 | 2.0 |
| Elk River | MD | ELKOH2 | 190 | 0.5 |
| Sassafras River | MD | SASOH1 | 1,073 | 2.0 |
| Sassafras River | MD | SASOH2 | 95 | 0.5 |
| Upper Chester River | MD | CHSTF | 1 | 0.5 |
| Middle Chester River | MD | CHSOH | 77 | 0.5 |
| Lower Chester River | MD | CHSMH | 2,928 | 1.0 |
| Eastern Bay | MD | EASMH | 6,209 | 2.0 |
| Middle Choptank River | MD | CHOOH | 72 | 0.5 |
| Lower Choptank River | MD | CHOMH2 | 1,621 | 1.0 |
| Mouth of Choptank River | MD | CHOMH1 | 8,184 | 2.0 |
| Little Choptank River | MD | LCHMH | 4,076 | 2.0 |
| Honga River | MD | HNGMH | 7,761 | 2.0 |
| Fishing Bay | MD | FSBMH | 197 | 0.5 |
| Middle Nanticoke River | MD | NANOH | 12 | 0.5 |
| Lower Nanticoke River | MD | NANMH | 3 | 0.5 |
| Wicomico River | MD | WICMH | 3 | 0.5 |
| Manokin River | MD | MANMH1 | 4,294 | 2.0 |
| Manokin River | MD | MANMH2 | 59 | 0.5 |
| Big Annemessex River | MD | BIGMH1 | 2,021 | 2.0 |
| Big Annemessex River | MD | BIGMH2 | 22 | 0.5 |
| Lower Pocomoke River | MD | POCMH_MD | 877 | 1.0 |
| Lower Pocomoke River | VA | POCMH_VA | 4,066 | 1.0 |
| Tangier Sound | MD | TANMH1_MD | 24,683 | 2.0 |
| Tangier Sound | MD | TANMH2_MD | 74 | 0.5 |
| Tangier Sound | VA | TAHMH_VA | 13,579 | 2.0 |

Sources: USEPA 2003d, 2004e; Code of Maryland Title 26 Subtitle 08, Chapter 2, Section 3; Code of Virginia 9 62.1-44.15 3a; VAC 25-260-185; 7 Delaware Code section 6010; 7 Delaware Administrative Code 7401; District of Columbia Municipal Regulations Title 21, Chapter 11.
Notes: This table contains additional split segments beyond the 92 Chesapeake Bay segments listed in Table 3-3 strictly for purposes of applying separate water clarity criteria application depths within the same Bay segment (USEPA 2004e). If a Bay segment was listed in Table 3-3, but it is not listed here, that entire Bay segment has been delineated as a SAV no-grow zone and the shallow-water bay grass does not apply (USEPA 2004e).

## 3.2    JURISDICTIONS' CURRENT CHESAPEAKE BAY WATER QUALITY STANDARDS REGULATIONS

Delaware, the District of Columbia, Maryland, and Virginia each has adopted WQS consistent with EPA's published Chesapeake Bay water quality criteria, assessment procedures, and tidal water designated uses in its respective WQS regulations (Table 3-7). In some cases, a jurisdiction also adopted jurisdiction-specific designated uses or criteria or both; those cases are briefly described below.

**Table 3-7. Links for accessing the current waters quality standards (WQS) regulations for Delaware, the District of Columbia, Maryland, and Virginia**

| Jurisdiction | WQS regulations URL address |
|---|---|
| Delaware | 7 Delaware Code Section 6010; 7 Delaware Administrative Code 7401 <http://www.epa.gov/waterscience/standards/wqslibrary/de/de_3_wqs.pdf> |
| District of Columbia | DC Municipal Regulations Title 21, Chapter 11 <http://www.epa.gov/waterscience/standards/wqslibrary/dc/dc_3_register.pdf> |
| Maryland | Code of Maryland Title 26 Subtitle 08, Chapter 2 <http://www.epa.gov/waterscience/standards/wqslibrary/dsd.state.md/md-ch2-quality-20051130.pdf.us/comar/subtitle_chapters/26_Chapters.htm> |
| Virginia | Code of Virginia 9 62.1-44.15 3a; VAC 25-260 Virginia WQSs <http://www.deq.virginia.gov/wqs/>  OR <http://epa.gov/waterscience/standards/wqslibrary/va/va_3_wqs.pdf> |

### 3.2.1    Delaware

Delaware has adopted all the EPA-published Chesapeake Bay criteria, assessment procedures, designated use documents, and subsequent addenda listed in Table 3-1 by reference into its WQS regulations. The EPA-published Chesapeake Bay criteria, assessment procedures, and designated use documents and subsequent addenda apply to the tidal Nanticoke River and Broad Creek in Delaware, both of which are subject to this Chesapeake Bay TMDL (see Table 2-1). Delaware has also adopted EPA's narrative chlorophyll *a* water quality criteria.

### 3.2.2    District of Columbia

The District of Columbia has adopted all the EPA-published Chesapeake Bay criteria, assessment procedures, designated use documents, and subsequent addenda listed in Table 3-1 by reference into its WQS regulations. Table 3-8 summarizes the District of Columbia's designated uses for its surface waters. The District of Columbia has adopted EPA's narrative chlorophyll *a* water quality criteria but also adopted the numeric chlorophyll *a* water quality criteria shown in Table 3-9 with respect to the District of Columbia's tidal Class C waters (those designated for the protection and propagation of fish, shellfish, and wildlife). Those numeric chlorophyll *a* criteria are subject to this Chesapeake Bay TMDL (see Table 2-1).

**Table 3-8. District of Columbia designated uses for surface waters**

| Class of water | Description |
|---|---|
| A | Primary contact recreation |
| B | Secondary contact recreation and aesthetic enjoyment |
| C | Protection and propagation of fish, shellfish, and wildlife |
| D | Protection of human health related to consumption of fish and shellfish |
| E | Navigation |

Source: District of Columbia Municipal Regulations Title 21, Chapter 11

**Table 3-9. Numeric criteria for the District of Columbia's tidally influenced waters**

| Constituent | Numeric criteria | Temporal application | Designated use |
|---|---|---|---|
| Dissolved oxygen | 7-day mean ≥ 6.0 mg/L<br>Instantaneous minimum ≥ 5.0 mg/L | February 1–May 31 | C |
| | 30-day mean ≥ 5.5 mg/L | June 1–January 31 | |
| | 7-day mean ≥ 4.0 mg/L<br>Instantaneous minimum ≥ 3.2 mg/L<br>(At temperatures > 29 °C, in tidally influenced waters, an instantaneous minimum DO concentration of 4.3 mg/L will apply) | | |
| Secchi depth | 0.8 m (seasonal segment average) | April 1–October 31 | C |
| Chlorophyll *a* | 25 µg/L (season segment average) | July 1–September 30 | C |

Source: District of Columbia Municipal Regulations Title 21, Chapter 11
Note: µg/L = micrograms per liter

### 3.2.3    Maryland

Maryland has adopted into its WQS regulations all the EPA-published Chesapeake Bay criteria, assessment procedures, and designated uses documents, and subsequent addenda listed in Table 3-1. These WQS apply to all Chesapeake Bay, tidal tributary and embayment waters of Maryland, all of which are subject to this Chesapeake Bay TMDL (see Table 2-1). Maryland has also adopted EPA's narrative chlorophyll *a* water quality criteria.

Several tidal Bay segment-specific applications of DO criteria are unique to Maryland. In the middle-central Chesapeake Bay segment (CB4MH), restoration variances[1] of 7 and 2 percent apply to the application of the deep-water and deep-channel designated use DO criteria, respectively. In the Patapsco River segment (PATMH), a restoration variance of 7 percent applies to the application of the deep-water designated use DO criteria. In the lower Chester River segment (CSHMH), a restoration variance of 14 percent applies to the application of the deep-channel designated use DO criterion (COMAR 26.08.02.03-3(c)(8)(e)(vi). These restoration variances are consistent with EPA-published guidance (USEPA 2003d) and were

---

[1] A restoration variance is the percentage of allowable exceedance of a WQS based on water quality modeling incorporating the best available data and assumptions. The restoration variances are temporary and will be reviewed at a minimum every 3 years, as required by the CWA and EPA regulations. The variances could be modified on the basis of new data or assumptions incorporated into the water quality model. COMAR 26.08.02.03-3(C)(8)(h).

approved by EPA on August 29, 2005 in the case of the two mainstem Bay and Patapsco River segments and December 27, 2010 in the case of the lower Chester River segment.

In the tidal upper and middle Pocomoke River segments (POCTF, POCOH_MD), because of the seasonal lower DO concentration from the natural oxygen-depleting processes present in the extensive surrounding tidal wetlands, Maryland adopted a site-specific criterion of greater than or equal to 4 mg/L 30-day mean DO, consistent with the EPA-published criterion (USEPA 2004a), and approved by EPA on December 27, 2010.

### 3.2.4    Virginia

Virginia has adopted into its WQS regulations all the EPA-published Bay criteria, assessment procedures, designated uses documents, and subsequent addenda listed in Table 3-1. These WQS apply to all Chesapeake Bay, tidal tributary and embayment waters of Virginia, all of which are subject to this Chesapeake Bay TMDL. The narrative chlorophyll *a* criteria guidance published by EPA (USEPA 2003a) was adopted by Virginia for application to Virginia's Bay tidal waters. Virginia also adopted the segment-specific numeric chlorophyll *a* criteria for the tidal James River listed in Table 3-10 into its WQS regulations. The criteria are based on various scientific lines of evidence published in the original EPA 2003 Bay criteria document (USEPA 2003a) with additional river-specific considerations (VADEQ 2004). EPA approved Virginia's WQS regulations on June 27, 2005 and approved additional amendments on December 28, 2010.

**Table 3-10. Segment-specific chlorophyll *a* criteria for Virginia's tidal James River waters**

| Designated use | Chlorophyll *a* criterion (µg/L) | Chesapeake Bay segment | Temporal application |
|---|---|---|---|
| Open-Water | 10 | Upper James River-Upper (JMSTF2) | March 1–May 31 |
| | 15 | Upper James River-Lower (JMSTF1) | |
| | 15 | Middle James River (JMSOH) | |
| | 12 | Lower James River (JMSMH) | |
| | 12 | Mouth of the James River (JMSPH) | |
| | 15 | Upper James River-Upper (JMSTF2) | July 1–September 30 |
| | 23 | Upper James River-Lower (JMSTF1) | |
| | 22 | Middle James River (JMSOH) | |
| | 10 | Lower James River (JMSMH) | |
| | 10 | Mouth of the James River (JMSPH) | |

Source: Code of Virginia 9 section 62.1-44.15 3a; VAC 25-260
Note: µg/L = micrograms per liter

Virginia has additional site-specific DO and chlorophyll *a* criteria. In the tidal Mattaponi (MPNTF, MPNOH) and Pamunkey (PMKTF, PMKOH) river segments, because of the seasonal lower DO concentration from the natural oxygen-depleting processes present in the surrounding extensive tidal wetlands, Virginia adopted a site-specific criterion of greater than or equal to 4 mg/L 30-day mean DO (9 VAC 25-260-185), consistent with the EPA-published criterion (USEPA 2004a) and approved by EPA on June 27, 2005.

## 3.3    ASSESSING ATTAINMENT OF CHESAPEAKE BAY WATER QUALITY STANDARDS

The Bay criteria assessment approach is designed to protect the living resources as defined by the designated uses (USEPA 2003a). The criteria levels themselves were largely based on scientific studies performed in laboratory settings or under controlled field conditions. The criteria establish the level of a given habitat condition that living resources need for survival. They do not account for many other environmental factors that could affect survival.

For all four tidal jurisdictions, attainment of each jurisdiction's Chesapeake Bay WQS is determined by applying the same set of assessment procedures published in the original 2003 Chesapeake Bay criteria document (USEPA 2003a) and subsequent published addenda (USEPA 2004a, 2007a, 2007b, 2008a, 2010a) (see Table 3-1). Those consistent sets of criteria assessment procedures were formally adopted into each jurisdiction's WQS regulations by reference.

### 3.3.1    Defining Total Exceedances

Criteria attainment for DO, water clarity, and chlorophyll *a* is assessed in terms of the spatial and temporal extent of criterion exceedances—what volume or surface area of the Bay segment exceeds a given criterion and for how much time during the assessment period (USEPA 2003a, 2004a). The allowable frequency with which criteria can be violated without a loss of the designated use is also considered. For each listing cycle, assessments are based on monitoring data collected over a 3-year period in each spatial assessment unit. Spatial assessment units are defined by Chesapeake Bay segments and applicable designated uses. Such assessment of the criteria as further described below is designed to provide reliable protection for the associated refined aquatic life use.

The spatial exceedances of criteria are determined using a grid cell-based data interpolation software application that enables estimation of water quality values for the entire Bay using monitored data at specific points (USEPA 2003a, 2007a). The interpolated data are compared to water quality criteria on a cell by cell basis, and the percent of surface area or volume exceeding the criterion in each spatial assessment unit is calculated. The percent spatial exceedances for each assessment unit are then compiled for each monitoring event conducted during the 3-year monitoring period.

The temporal extent of exceedances is determined by calculating the probability that an observed percent exceedance will be equaled or exceeded. To calculate that probability, the percent of spatial exceedances are sorted and ranked, and a cumulative probability is calculated for each spatial exceedance value (USEPA 2003a). An example is shown in Table 3-11.

The spatial and temporal exceedances can be graphically illustrated by plotting the cumulative frequency distribution (CFD) curve, which is a plot of the temporal exceedance values on the Y-axis versus the spatial exceedance values (in area or volume) on the X-axis (Figure 3-3) (USEPA 2003a, 2007a; STAC 2006).

**Table 3-11. Estimated percent spatial criteria exceedances and associated cumulative probabilities**

| Period of data | Percent area/volume exceeding criteria (spatial) | Rank | Cumulative probability [rank / (n + 1)] (temporal) |
|---|---|---|---|
| | 100 | | 0.00% |
| June 1998 | 75 | 1 | 7.69% |
| March 1998 | 72 | 2 | 15.38% |
| May 1999 | 67 | 3 | 23.08% |
| May 1998 | 65 | 4 | 30.77% |
| April 1998 | 55 | 5 | 38.46% |
| June 2000 | 50 | 6 | 46.15% |
| March 1999 | 49 | 7 | 53.85% |
| April 2000 | 39 | 8 | 61.54% |
| May 2000 | 35 | 9 | 69.23% |
| Apr 1999 | 34 | 10 | 76.92% |
| June 1999 | 25 | 11 | 84.62% |
| March 2000 | 20 | 12 | 92.31% |

Source: USEPA 2003a



Source: USEPA 2003a

**Figure 3-3. Example cumulative frequency distribution (CFD) curve.**

### 3.3.2    Defining Allowable Exceedances

EPA developed reference curves for each water quality criterion (DO, water clarity, and chlorophyll *a*) to provide a scientifically based, direct measure of the time and space during which a particular criterion can be allowably exceeded – i.e., without resulting in harm to the designated uses(s) (USEPA 2003a). Those allowable exceedances are defined to be those that last a short enough time or cover a small enough volume/surface area to have no adverse effects on the designated use. It is assumed that the designated uses can be attained even with some limited level of criteria exceedances and, thus, the reference curves define those criteria exceedances deemed to be allowable—chronic in time but over small volumes/surface areas, or infrequent occurrences over large volumes/surface areas. Exceedances that occur over large areas of space and time would be expected to have significant detrimental effects on biological communities, which would imply nonattainment of designated uses.

For assessment purposes, EPA developed two types of reference curves: a biological reference curve and a 10 percent default reference curve for use when a biological reference curve is unavailable.

Biological reference curves are CFDs developed for a given criterion in areas for which monitoring data are available and in which healthy aquatic communities exist (USEPA 2003a). They represent the range of conditions that can reasonably be expected in a healthy community. As a result, the biological reference curve can be used to provide an understanding of what level of criteria exceedances are allowable without losing support of the designated use. Given the Bay's nutrient-enriched status, however, appropriate reference sites are limited. Biological reference curves have been published for and are used to assess allowable exceedances for the deep-water DO criteria (USEPA 2010a) and the water clarity criteria (USEPA 2003a).

In some cases, developing a biologically based reference curve is not possible because of a lack of data describing the health of the relevant species or biological communities and lack of appropriate reference sites. In those cases, EPA used a 10 percent default reference curve (USEPA 2007a). The 10 percent default reference curve is defined as a hyperbolic curve that encompasses no more than 10 percent of the area of the CFD graph (percent of space multiplied by percent of time) (USEPA 2007a, page 13, Figure II-4 and Equation 1) (Figure 3-4).

Once the CFD curve for a spatial assessment unit is developed from monitoring data (also referred to as the assessment curve), it is compared to the appropriate reference curve. The area on the graph above the reference curve (blue line) and below the assessment curve (red line) is considered a non-allowable exceedance. The area below the reference curve (yellow) is considered an allowable exceedance (Figure 3-5).

Chesapeake Bay TMDL



Source: USEPA 2007a

**Figure 3-4. Default reference curve used in the attainment assessment of Chesapeake Bay water quality criteria for which biologically based reference curves have not yet been derived.**



Source: USEPA 2003a

**Figure 3-5. Example reference and assessment curves showing allowable and non-allowable exceedances.**

### 3.3.3    Assessing Criteria Attainment

#### Dissolved Oxygen Criteria Assessment

EPA published DO criteria protective of migratory fish spawning and nursery, open-water fish and shellfish, deep-water seasonal fish and shellfish, and deep-channel seasonal refuge designated use habitats. DO criteria were established for the Chesapeake Bay that varied in space and time to provide levels of protection for different key species and communities (Table 3-4). The criteria also were designed around several lengths of time to reflect the varying oxygen tolerances for different life stages (e.g., larval, juvenile, adult) and effects (e.g., mortality, growth, behavior) (USEPA 2003a).

The DO criteria include multiple components, including the target DO concentration, the duration of time over which the concentration is averaged, the designated use area where the criterion applies, the protection provided, and the time of year when the criterion applies (USEPA 2003a, 2003d). The four tidal Bay jurisdictions adopted these DO criteria into their respective WQS regulations.

Assessing DO criteria attainment is challenging because of the complexity of both the criteria and the Bay itself. To fully assess all the criteria components, data needed to be collected at a spatial intensity that adequately represents the four designated use habitats of Chesapeake Bay tidal waters at different times of the year (USEPA 2003c, 2004e). Similarly, data were collected during all the applicable seasons and at frequencies sufficient to address the various criteria duration components.

The different DO criteria apply to different designated use areas and multiple criteria apply to the same designated use area. The DO criteria components also apply over different periods to protect species during critical life stages or during particularly stressful times of the year. To fully assess each DO component in each designated use habitat over the appropriate periods will require an extensive monitoring program and a detailed assessment methodology. The CBP conducts extensive water quality and living resource monitoring throughout the Bay tidal waters (CBP 1989a, 1989b; MRAT 2009). The existing Bay water quality monitoring was not sufficient to cover all the criteria components, however, and some details in the assessment methodology remain unresolved (USEPA 2007a; MRAT 2009).

The DO criteria include 30-day, 7-day, and 1-day means along with an instantaneous minimum. The CBP partners have the capacity (data, published assessment methodology) to assess only the 30-day mean open-water and deep-water DO criteria and, in the case of the deep-channel use, the instantaneous minimum DO criteria (USEPA 2003a, 2004a, 2007a, 2008a, 2010a). The remaining DO criteria were not assessed because the existing water quality monitoring programs and the published assessment methodologies are not yet adequate for full assessment.

Evaluation of the Chesapeake Bay Water Quality and Sediment Transport Model's outputs have provided clear evidence that the 30-day mean open-water and deep-water and the instantaneous minimum deep-channel DO criteria are the criteria driving determination of nutrient loadings supporting attainment all the open-water (30-day mean, 7-day mean, instantaneous minimum), deep-water (30-day mean, 1-day and instantaneous minimum), and deep-channel (instantaneous minimum) DO criteria.

For both open-water and deep–water designated uses, the 30-day mean criteria had the highest nonattainment in all three scenarios illustrated in Figure 3-6. The 30-day mean open-water and deep-water criteria are, therefore, protective of the other non-assessed DO criteria (open-water 7-day and instantaneous minimum, deep-water 1-day mean and instantaneous minimum) on average for the mainstem Bay segments. The deep–channel designated use has only one DO criterion, and it is currently assessed using monitoring data. The deep-channel criterion is also more protective, based on the levels of nonattainment recorded in Figure 3-6, than the deep-water and open-water criteria. The analyses documented in Appendix D provide clear evidence the 30-day mean open-water, 30-day mean deep-water DO criteria, and the deep-channel instantaneous minimum criterion are the most protective criteria across all Bay segments and designated uses.

## Chlorophyll *a* Criteria Assessment

The procedures described in USEPA 2007b, and further refined in USEPA 2010a, apply to assessing Virginia's tidal James River and the District of Columbia's tidal waters numeric chlorophyll *a* criteria.

To assess attainment of the Virginia and the District of Columbia's adopted numerical chlorophyll *a* concentration-based criteria, it was necessary to establish a reference curve for use in the CFD criteria assessment (USEPA 2003a, 2007a). In the case of the numerical chlorophyll *a* criteria where a biologically based reference curve is not available (USEPA 2007b), EPA recommends—and Virginia and the District of Columbia adopted—using the 10 percent default reference curve originally described in USEPA 2007a and illustrated in Figure 3-4.

The jurisdiction-adopted, concentration-based chlorophyll *a* criteria values are threshold concentrations that should be exceeded infrequently (< 10 percent) because a low number of naturally occurring exceedances occur even in a healthy phytoplankton population (USEPA 2007b). The assessment of chlorophyll *a* criteria attainment, therefore, uses the CFD-based assessment method described earlier that applies the 10 percent default reference curve. Such concentration-based Chesapeake Bay chlorophyll *a* criteria apply only to those seasons and salinity-based habitats for which they were defined to protect against applicable human health and aquatic life impairments (USEPA 2007b). Each season—Spring (March 1–May 31) and Summer (July 1–September 30)—was assessed separately to evaluate chlorophyll *a* criteria attainment.

The chlorophyll *a* criteria are based on seasonal means of observed chlorophyll data. The observed data are first transformed by taking the natural logarithm and then interpolated spatially to equally spaced points (representing interpolator cells) within the designated use area for each monitoring cruise. The interpolated value of each cell is averaged in time across the entire season, and then the spatial violation rate is calculated as the fraction of interpolator cells in a designated use area that fails the appropriate criterion (USEPA 2010a).

Chesapeake Bay TMDL





Source: Appendix D

**Figure 3-6. Direct model assessment of open water (a), and deep water and deep channel (b) criteria.**

## SAV/Water Clarity Criteria Assessment

Water clarity criteria and SAV restoration acreages are used to define attainment of the shallow-water Bay grass designated use in the Chesapeake Bay, its tidal tributaries and embayments (USEPA 2003a, 2003d). EPA published three measures for assessing attainment of the shallow-water SAV designated use for a Chesapeake Bay segment (USEPA 2007a):

1. Measure SAV acreage in the Bay segment from overflight data mapping analysis and compare with the SAV restoration goal acreage for that Bay segment (USEPA 2003d).

2. Measure water clarity acreage on the basis of routine water quality mapping using data from the Chesapeake Bay shallow-water monitoring program and, combined with measured acres of SAV, compare with the calculated water clarity acres for that segment (USEPA 2007a).

3. Measure water clarity criteria attainment on the basis of the CFD assessment methodology, again, using shallow-water monitoring program data (USEPA 2003a, 2003d, 2007a, 2008a).

Without sufficient shallow-water monitoring data to determine the available water clarity acres (measurement 2 above) or to assess water clarity criteria attainment using the CFD-based procedure (measurement 3 above), EPA recommends that the jurisdictions assess shallow-water Bay grass designated use attainment using the acres of mapped SAV (measurement 1 above) (USEPA 2003a, 2003d, 2007a, 2008a).

# SECTION 4. SOURCES OF NITROGEN, PHOSPHORUS AND SEDIMENT TO THE CHESAPEAKE BAY

Nitrogen, phosphorus, and sediment loads originate from many sources in the Bay watershed. Point sources of nitrogen, phosphorus, and sediment include municipal wastewater facilities, industrial discharge facilities, CSOs, SSOs, NPDES permitted stormwater (MS4s and construction and industrial sites), and CAFOs. Nonpoint sources include agricultural lands (AFOs, cropland, hay land, and pasture), atmospheric deposition, forest lands, on-site treatment systems, nonregulated stormwater runoff, streambanks and tidal shorelines, tidal resuspension, the ocean, wildlife, and natural background. Unless otherwise specified, the loading estimates presented in this section are based on results of the Phase 5.3 Chesapeake Bay Watershed Model (Bay Watershed Model). For a description of the Bay Watershed Model, see Section 5.8. Estimates of existing loading conditions are based on the 2009 scenario run through the Bay Watershed Model.

## 4.1 JURISDICTION LOADING CONTRIBUTIONS

Analysis of 2009 monitoring data and estimated modeling results shows that Pennsylvania provided the largest proportion of nitrogen loads delivered to the Bay (44 percent), followed by Virginia (27 percent), Maryland (20 percent), New York (4 percent), Delaware (2 percent) and West Virginia (2 percent), and the District of Columbia (1 percent) (Figure 4-1). Delivered loads are the amount of a pollutant delivered to the tidal waters of the Chesapeake Bay or its tributaries from an upstream point. Delivered loads differ from edge-of-stream loads becauese of in-stream processes in free-flowing rivers that naturally remove nitrogen and phosphorus from the system.



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-1. Modeled estimated total nitrogen loads delivered to the Chesapeake Bay by jurisdiction in 2009.**

Chesapeake Bay TMDL

The model estimated phosphorus loads delivered to the Bay were dominated by Virginia (43 percent), followed by Pennsylvania (24 percent), Maryland (20 percent), New York (5 percent), West Virginia (5 percent), Delaware (2 percent), and the District of Columbia (1 percent) (Figure 4-2).



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-2. Model estimated total phosphorus loads delivered to the Chesapeake Bay by jurisdiction in 2009.**

Similar to the phosphorus loads, 2009 model estimated sediment loads delivered to the Bay are dominated by Virginia (41 percent), followed by Pennsylvania (32 percent), Maryland (17 percent), West Virginia (5 percent), New York (4 percent), Delaware (1 percent), and the District of Columbia (< 1 percent) (Figure 4-3).



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-3. Model estimated total sediment loads delivered to the Chesapeake Bay by jurisdiction in 2009.**

## 4.2  MAJOR RIVER BASIN CONTRIBUTIONS

The major river basins' model-estimated contributions of total nitrogen loads delivered to the Bay in 2009 are illustrated in Figure 4-4. The Susquehanna River basin, draining parts of New York, Pennsylvania, and Maryland, is estimated to be responsible for almost half of the nitrogen loads delivered to the Bay (46 percent). The next major contributor, at 22 percent, is the Potomac River Basin, draining the entire District of Columbia and parts of Maryland, Pennsylvania, Virginia, and West Virginia. The James River Basin (draining parts of Virginia and West Virginia) contributes 12 percent of the nitrogen loads to the Bay; the Eastern Shore Basin (draining parts of Delaware, Maryland, and Virginia) contibutes 8 percent of the nitrogen loads to the Bay; and the Western Shore Basin (draining parts of Maryland) is estimated to be responsible for 6 percent of the nitrogen loading to the Bay. Smaller portions, 3 percent, 2 percent, and 1 percent are contributed by the Rappahannock (Virginia), the York (Virginia) and the Patuxent (Maryland) river basins, respectively (Figure 4-4).



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-4. Model estimated total nitrogen loads delivered to the Chesapeake Bay by major tributary in 2009.**

The major river basins' model estimated contributions to total phosphorus loads to the Bay in 2009 are illustrated in Figure 4-5. Three river basins—the Potomac (27 percent), the Susquehanna (26 percent), and the James (20 percent)—are estimated to account for about three-quarters of the total phosphorus loading to the Bay. The Eastern Shore contributes 10 percent of the total phosphorus load, while the balance is provided by the Rappahannock (6 percent), the Western Shore (5 percent), the York (4 percent), and the Patuxent (2 percent) river basins (Figure 4-5).

The major river basins' model estimated contributions to total sediment loads to the Bay in 2009 are illustrated in Figure 4-6. The Susquehanna (33 percent) and Potomac (32 percent) river basins are estimated to contribute the majority of the total sediment loads delivered to the Chesapeake Bay, followed by the James (16 percent) and the Rappahannock (9 percent) river

basins. The Eastern Shore (4 percent), Western Shore (3 percent), York (2 percent) and Patuxent (1 percent) river basins each contribute relatively small total sediment loads (Figure 4-6).



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-5. Model estimated total phosphorus loads delivered to the Chesapeake Bay by major tributary in 2009.**



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-6. Model estimated total sediment loads delivered to the Chesapeake Bay by major tributary in 2009.**

## 4.3   POLLUTANT SOURCE SECTOR CONTRIBUTIONS

Table 4-1 and Table 4-2 provide model estimates of major pollutant sources of nitrogen and phosphorus, respectively, delivered to the Bay by each jurisdiction and by each major pollutant source sector. Nontidal deposition refers to atmospheric deposition direct to nontidal surface waters (e.g., streams, rivers). Table 4-3 provides estimates of major sediment sources by jurisdiction and by major pollutant source sector and represents the portion of sediment that is from land-based sources. Stream erosion is also a significant source of watershed sediment delivered to the Bay. Sufficient data do not exist to accurately quantify the portion of the total sediment load specifically from stream erosion.

**Table 4-1. Percentage of total nitrogen delivered to the Bay from each jurisdiction by pollutant source sector**

| Jurisdiction | Agriculture | Forest | Stormwater runoff | Point source | Septic | Nontidal deposition |
|---|---|---|---|---|---|---|
| Delaware | 3% | 1% | 1% | 0% | 2% | 1% |
| District of Columbia | 0% | 0% | 1% | 5% | 0% | 0% |
| Maryland | 16% | 14% | 28% | 27% | 36% | 27% |
| New York | 4% | 7% | 3% | 3% | 5% | 5% |
| Pennsylvania | 55% | 46% | 33% | 25% | 30% | 42% |
| Virginia | 20% | 27% | 33% | 39% | 24% | 25% |
| West Virginia | 3% | 4% | 2% | 1% | 2% | 1% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario
Note: Nontidal deposition refers to atmospheric deposition direct to nontidal surface waters.

**Table 4-2. Percentage of total phosphorus delivered to the Bay from each jurisdiction by pollutant source sector**

| Jurisdiction | Agriculture | Forest | Stormwater runoff | Point source | Septic | Nontidal deposition |
|---|---|---|---|---|---|---|
| Delaware | 4% | 1% | 1% | 0% | 0% | 0% |
| District of Columbia | 0% | 0% | 1% | 2% | 0% | 0% |
| Maryland | 19% | 14% | 28% | 21% | 0% | 27% |
| New York | 5% | 7% | 3% | 5% | 0% | 5% |
| Pennsylvania | 24% | 25% | 16% | 28% | 0% | 27% |
| Virginia | 42% | 45% | 50% | 42% | 0% | 38% |
| West Virginia | 6% | 7% | 2% | 3% | 0% | 2% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario
Note: Nontidal deposition refers to atmospheric deposition direct to nontidal surface waters. Although the percentage contribution of phosphorus from nontidal deposition is provided here, the overall amount of phosphorus contributed from nontidal deposition is considered to be insignificant.

**Table 4-3. Percentage of sediment delivered to the Bay from each jurisdiction by pollutant source sector**

| Jurisdiction | Agriculture | Forest | Stormwater runoff | Point source | Septic | Nontidal deposition |
|---|---|---|---|---|---|---|
| Delaware | 1% | 0% | 1% | 0% | -- | -- |
| District of Columbia | 0% | 0% | 1% | 27% | -- | -- |
| Maryland | 15% | 13% | 32% | 11% | -- | -- |
| New York | 3% | 8% | 4% | 3% | -- | -- |
| Pennsylvania | 35% | 34% | 21% | 23% | -- | -- |
| Virginia | 41% | 40% | 39% | 35% | -- | -- |
| West Virginia | 5% | 5% | 3% | 1% | -- | -- |
| Total | 100% | 100% | 100% | 100% | -- | -- |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario
Note: Only land-based sources of sediment were included in this table. Septic sources discharge to groundwater and nontidal deposition refers to atmospheric deposition direct to nontidal surface waters.

The following sections provide additional details regarding the major pollutant source sectors, including descriptions of the extent/magnitude of the pollutant source, geographic distribution, and long-term trends relevant to the source sector. The significance of the source sector in terms of loading to the Bay relative to other sources is also discussed.

## 4.4   REGULATED POINT SOURCES

Point sources are defined as any "discernable, confined, and discrete conveyance, including...any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, or vessel or other floating craft, from which pollutants are or may be discharged" [CWA section 502(14), 40 CFR 122.2]. That definition does not include agricultural stormwater discharges or return flows from irrigated agriculture, which are exempt from the definition of point source under the CWA. The NPDES program, under CWA sections 318, 402, and 405, requires permits for the discharge of pollutants from point sources.

Two issues that directly affect modeling of the regulated point sources in the Bay watershed are the size of facility flows and permitted discharge limits. For purposes of the Chesapeake Bay TMDL analysis and modeling, regulated point sources in the Chesapeake Bay watershed have been evaluated under the following categories[1]:

- Municipal wastewater facilities
- Industrial wastewater facilities
- CSOs
- NPDES permitted stormwater (MS4s, industrial, and construction)
- NPDES permitted CAFOs

---

[1] The universe of regulated point sources may change over time due to such actions as designation, compliance evaluation, or new permitting activities.

The remainder of this section outlines the distinctions between significant and nonsignificant municipal and industrial wastewater discharge facilities in the Bay watershed, explains how the facilities were addressed in modeling, discusses the effect of the basinwide nitrogen and phosphorus permitting approach on point source modeling for the TMDL, and provides a summary of model-estimated loads associated with each of the regulated point source categories of nitrogen, phosphorus, and sediment to the Bay. Appendix Q includes the regulated point sources accounted for in the Bay TMDL.

## 4.4.1    Significant and Nonsignificant Municipal and Industrial Facilities

Municipal and industrial wastewater discharge facilities are categorized as significant or nonsignificant primarily on the basis of permitted or existing flow characteristics and comparable loads in the case of industrial discharge facilities. The Bay jurisdictions define significant facilities as outlined in Table 4-4.

**Table 4-4. Jurisdiction-specific definitions of significant municipal and industrial wastewater discharge facilities**

| Jurisdiction | Municipal wastewater facilities (million gallons per day) | Industrial wastewater facilities (estimated loads, pounds per year) |
|---|---|---|
| Delaware | Design flow ≥ 0.4 | |
| District of Columbia | Blue Plains WWTP | |
| Maryland | Design flow ≥ 0.5 | |
| New York | Design flow ≥ 0.4 | ≥ 3,800 total phosphorus or ≥ 27,000 total nitrogen |
| Pennsylvania | Existing flow ≥ 0.4 | |
| Virginia | Design flow ≥ 0.5[a]  Design flow ≥ 0.1[b]  New facilities ≥ 0.04[c] | |
| West Virginia | Design flow ≥ 0.4 | |

Source: USEPA 2010b
Notes: a. Above the fall line/tidal line; b. Below the fall line/tidal line; c. Also includes expansion of flows ≥ 0.04 mgd.

Jurisdictions also may identify specific facilities as significant in their WIPs (USEPA 2009c). Facilities not meeting the above criteria, and not otherwise identified in the jurisdictions' WIPs, are considered nonsignificant facilities. Table 4-5 provides a jurisdictional breakdown of municipal and industrial discharging facilities in the Chesapeake Bay watershed.

For the TMDL, facilities were represented using various flow and discharge concentrations depending on their status as significant or nonsignificant. Significant facilities received individual WLAs, except for New York and the Virginia James River Basin, which received an aggregate WLA. The New York WLA for wastewater is discussed further in Section 8.4.4, and the James River Basin WLA is discussed further in Appendix X. Nonsignificant facilities were generally included in the aggregate WLAs by Bay segment watershed (USEPA 2009c) and are discussed further in Section 8.3.3.

**Table 4-5. Significant and nonsignificant municipal and industrial wastewater discharging facilities by jurisdiction as of December 2010**

| Jurisdiction | Significant facility | | | Nonsignificant facility | | | Total Facilities |
|---|---|---|---|---|---|---|---|
| | Municipal | Industrial | Total | Municipal | Industrial | Total | |
| DC[a] | 1 | 0 | 1 | 1 | 9 | 10 | 11 |
| DE | 3 | 1 | 4 | 1 | 1 | 2 | 6 |
| MD | 75 | 12 | 87 | 163 | 477 | 640 | 727 |
| NY | 26 | 2 | 28 | 26 | 45 | 71 | 99 |
| PA | 183 | 30 | 213 | 1246 | 409 | 1655 | 1868 |
| VA | 101 | 24 | 125 | 1618 | 639 | 2257 | 2382 |
| WV[b] | 13 | 7 | 20 | 125 | 23 | 148 | 168 |
| Total | **402** | **76** | **478** | 3180 | 1603 | 4783 | 5261 |

Source: Facilities identified in the final phase 1 WIPs
Notes:
a. Blue Plains WWTP serves DC and parts of MD and VA, but is only counted once.
b. Multiple facilities (4) share one NPDES permit in West Virginia.

## 4.4.2    Basinwide NPDES Permitting Approach

In 2004 EPA and the Bay watershed jurisdictions agreed to take a consistent approach to permitting all the significant municipal and industrial wastewater discharging facilities contributing nitrogen and phosphorus to the Chesapeake Bay watershed (USEPA 2004d). As part of that approach and on the basis of the jurisdictions' revised Chesapeake Bay WQS, permits are to be reissued with nitrogen and phosphorus limits that are sufficient to achieve Bay WQS and that are consistent with the jurisdictions' tributary strategies. The basinwide permitting approach also contains additional specific provisions for permitting of nitrogen and phosphorus in the Bay watershed, including the following:

- Annual load limits—Unless such expressions would be impracticable, EPA's regulations require NPDES permits for non-publicly owned treatment works to express effluent limits as maximum daily and average monthly limits [40 CFR 122.45(d)(1)] and require NPDES permits for POTWs to express effluent limits as average weekly and average monthly limits [40 CFR 122.45(d)(2)]. In the case of the Chesapeake Bay permitting for nitrogen and phosphorus, EPA has determined that because of the long hydraulic durations in the Bay, and the fact that the control of annual loading levels of nitrogen and phosphorus from wastewater treatment plants is much more relevant and appropriate in terms of the effect of nitrogen and phosphorus on Bay water quality criteria than daily maximums or weekly or monthly averages, expression of nitrogen and phosphorus effluent limits in short periods is impracticable and that, therefore, such effluent limits may be expressed as an annual load (USEPA 2004c).

- Compliance Schedules—Compliance schedules that are consistent with jurisdiction tributary strategies may be incorporated into permits, where such compliance schedules are needed, appropriate, and allowable under jurisdiction WQS and federal NPDES requirements (USEPA 2004d).

- Watershed permits/trading—Watershed permits, which may accommodate nitrogen and phosphorus trading, may be used if such an approach would ensure protection of applicable

jurisdiction WQS and would be consistent with existing EPA policy regarding trading (USEPA 2004d).

In 2005 the seven Bay jurisdictions began implementing the new permitting approach. As of June 2010, the permits for the significant nitrogen and phosphorus sources have been issued with nitrogen and phosphorus limits consistent with the Tributary Strategy allocations (described in Section 1.2.1) (some of which may include compliance schedules) to 64 percent of the significant wastewater treatment facilities (305 out of the total 478), accounting for 74 percent of the total design flow, 76 percent of the total nitrogen loads and 91 percent of the total phosphorus loads from significant facilities (Table 4-6).

By the end of 2011, EPA expects all 478 significant wastewater treatment facilities in the Bay watershed to have annual nitrogen and phosphorus load limits in place in their permits (some of which may have compliance schedules as well).

**Table 4-6. Nitrogen and phosphorus permit tracking summary under the Basinwide NPDES Wastewater Permitting Approach, through December 2010**

| Jurisdiction | Significant facility NPDES | Permits drafted | Permits issued | Design flow of facilities permits issued | Percent of design flow for permits issued/significant facilities |
|---|---|---|---|---|---|
| DC[a] | 1 | 1 | 1 | 152.5 | 100% |
| DE | 4 | 4 | 4 | 3.3 | 100% |
| MD | 87 | 72 | 51 | 357.7 | 42% |
| NY | 28 | 1 | 1 | 20.0 | 22% |
| PA | 213 | 141 | 103 | 434.1 | 67% |
| VA | 125 | 125 | 125 | 1,253.5 | 100% |
| WV[b] | 20 | 16 | 16 | 27.737 | 100% |
| Total | 478 | 364 | 305 | 2,259.7 | 74% |

Source: USEPA Region 3, Region 2, Facilities identified in the final Phase 1 WIPs
Notes:
Some industrial design flows are not available or not comparable and not listed in the database. Some permits may contain compliance schedules.
a. Blue Plains WWTP serves DC and parts of MD and VA, but is only counted once.
b. Multiple facilities (4) share one NPDES permit in West Virginia.

## 4.5 REGULATED POINT SOURCE LOAD SUMMARIES

This section presents load estimates for each major point source sector.

### 4.5.1 Municipal Wastewater Discharging Facilities

A municipal wastewater facility is defined as a facility discharging treated wastewater from municipal or quasi-municipal sewer systems. EPA identified 3,582 NPDES permitted facilities as discharging municipal wastewater into the Chesapeake Bay watershed. Table 4-7 provides a summary of municipal wastewater facilities by jurisdiction; a complete list is available in Appendix Q.

Table 4-8 and Table 4-9 summarize modeled 2009 municipal wastewater loading estimates by jurisdiction and major river basin, respectively, for total nitrogen and phosphorus loads delivered to the Chesapeake Bay. Modeled sediment loads for those facilities are not presented because wastewater discharging facilities represent a *de minimis* source of sediment (i.e., less than 0.5 percent of the 2009 total sediment load). In 2009 municipal wastewater treatment facilities contributed an estimated 17 percent of the total nitrogen and 16 percent of the total phosphorus loads delivered to Chesapeake Bay.

**Table 4-7. Municipal wastewater facilities by jurisdiction**

| Jurisdiction | Significant | Nonsignificant |
|---|---|---|
| DC | 1 | 1 |
| DE | 3 | 1 |
| MD | 75 | 163 |
| NY | 26 | 26 |
| PA | 183 | 1246 |
| VA | 101 | 1618 |
| WV | 13 | 125 |
| Total | 402 | 3180 |

Source: EPA Region 3, EPA Region 2
Note: Blue Plains wastewater treatment plant serves DC and portions of Maryland and Virginia but is counted once in this table as a DC plant.

**Table 4-8. Model estimated 2009 municipal wastewater loads by jurisdiction delivered to Chesapeake Bay**

| Jurisdiction | Flow (mgd) | Total nitrogen delivered (lb/yr) | Total phosphorus delivered (lb/yr) |
|---|---|---|---|
| DC | 140 | 2,387,918 | 20,456 |
| DE | 2 | 42,529 | 4,984 |
| MD | 563 | 11,928,717 | 568,905 |
| NY | 62 | 1,360,684 | 159,096 |
| PA | 335 | 9,391,741 | 740,397 |
| VA | 585 | 16,926,806 | 1,047,998 |
| WV | 13 | 188,137 | 62,674 |
| Total | 1,698 | 42,226,535 | 2,604,509 |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Table 4-9. Model estimated 2009 municipal wastewater loads by major river basin delivered to Chesapeake Bay**

| Basin | Flow (mgd) | Total nitrogen delivered (lbs/yr) | Total phosphorus delivered (lbs/yr) |
|---|---|---|---|
| Susquehanna River | 383 | 10,556,831 | 835,426 |
| MD Eastern Shore | 25 | 696,872 | 70,540 |
| MD Western Shore | 254 | 7,279,406 | 331,362 |
| Patuxent River | 58 | 640,507 | 61,948 |
| Potomac River | 635 | 9,475,644 | 412,464 |
| Rappahannock River | 23 | 376,453 | 46,463 |
| York River | 20 | 691,550 | 45,012 |
| James River | 299 | 12,494,335 | 798,615 |
| VA Eastern Shore | < 1 | 14,937 | 2,679 |
| Total | 1,698 | 42,226,535 | 2,604,509 |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

Chesapeake Bay TMDL

Figure 4-7 and Figure 4-8 illustrate the prevalence and locations of significant and nonsignificant municipal wastewater discharge facilities, respectively, across the watershed.



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-7. Significant wastewater treatment facilities in the Chesapeake Bay watershed.**

Chesapeake Bay TMDL



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-8. Nonsignificant municipal wastewater treatment facilities in the Chesapeake Bay watershed.**

Data related to municipal and industrial facilities are in the Bay Watershed Model point source database maintained by the CBP and include information for the 478 significant industrial, municipal, and federal facilities discharging directly to the surface waters in the watershed. The wastewater data used to calibrate the Bay Watershed Model cover the 1984 to 2005 time frame and are updated annually as data become available. Data are largely supplied by the seven watershed

jurisdictions but are also obtained from NPDES permit databases, including EPA's Permit Compliance System (PCS) and jurisdiction discharge monitoring reports (DMRs). For each facility outfall, the database includes monthly flow and monthly average concentrations for total nitrogen, ammonia, nitrate and nitrite, total organic nitrogen, total phosphorus, orthophosphate, total organic phosphorus, total suspended solids, biological oxygen demand, and DO.

Because the Bay jurisdictions are required to submit monthly concentration and flow data to EPA for only significant dischargers, the Bay Watershed Model point source database does not include comprehensive information useful for characterizing the nonsignificant facilities (especially nonsignificant industrials) for the Bay TMDL. For nonsignificant municipal facilities, all Bay jurisdictions conducted a one-time data collection in 2008 for the nitrogen and phosphorus discharge data, and estimates are based on any available data sources and default values recommended in *Chesapeake Bay Watershed Model Application and Calculation of Nutrient and Sediment Loadings – Appendix F: Phase IV Chesapeake Bay Watershed Model Point Source Load* (CBP 1998). EPA supplemented this information by querying the Integrated Compliance Information System database (ICIS) for jurisdictions that have migrated to ICIS as of 2009 (District of Columbia, Maryland, Pennsylvania, and New York), querying the PCS database for jurisdictions that have not yet migrated to ICIS (Delaware, Virginia and West Virginia), and obtaining Maryland and Virginia facility information directly from Maryland Department of the Environment (MDE) and Virginia Department of Environmental Quality (VADEQ), respectively.

For more information regarding the data used to represent municipal wastewater discharge facilities and how they were incorporated into modeling for the TMDL, see Section 7 of the Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169

Appendix Q provides facility-specific information including NPDES ID, location, and more for all wastewater dischargers accounted for in the Bay TMDL.

### 4.5.2    Industrial Discharge Facilities

Industrial discharge facilities are facilities discharging process water, cooling water, and other contaminated waters from industrial or commercial sources. EPA identified 1,679 NPDES permitted facilities discharging industrial wastewaters in the Chesapeake Bay watershed (Table 4-10, Appendix Q), with 76 significant facilities (Figure 4-9) and 1,603 nonsignificant facilities (Figure 4-10). In 2009 industrial wastewater discharging facilities contributed an estimated 7.3 million pounds of the total nitrogen and 1.27 million pounds of the total phosphorus loads delivered to Chesapeake Bay (Table 4-11 and Table 4-12) an estimated 3 percent and 8 percent, respectively, of all nitrogen and phosphorus loads delivered to the Chesapeake Bay.

Table 4-12 summarizes modeled wastewater nitrogen and phosphorus loading estimates using 2009 loading conditions. Modeled sediment loads for industrial or commercial facilities are not presented because their wastewater discharges represent a *de minimis* source of sediment (i.e., less than 0.5 percent of the 2009 total sediment load).

Chesapeake Bay TMDL

**Table 4-10. Industrial wastewater facilities**

| Jurisdiction | Significant | Nonsignificant |
|---|---|---|
| DC | 0 | 9 |
| DE | 1 | 1 |
| MD | 12 | 477 |
| NY | 2 | 45 |
| PA | 30 | 409 |
| VA | 24 | 639 |
| WV | 7 | 23 |
| Total | 76 | 1,603 |

Source: USEPA Region 3, Region 2

**Table 4-11. 2009 Load estimates of industrial facility discharges**

| Jurisdiction | Flow (mgd) | Total nitrogen delivered (lbs/yr) | Total phosphorus delivered (lbs/yr) |
|---|---|---|---|
| DC | 13 | 183,490 | 20,433 |
| DE | < 1 | 95,438 | 71 |
| MD | 48 | 1,989,243 | 267,093 |
| NY | 7 | 126,897 | 19,971 |
| PA | 179 | 2,010,639 | 260,140 |
| VA | 160 | 2,883,828 | 649,266 |
| WV | 14 | 55,213 | 53,592 |
| Total | 422 | 7,344,748 | 1,270,566 |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Table 4-12. 2009 Flow, total nitrogen, and total phosphorus load estimates of industrial wastewater facility discharges by major river basin**

| Basin | Flow (mgd) | Total nitrogen delivered (lbs/yr) | Total phosphorus delivered (lbs/yr) |
|---|---|---|---|
| Susquehanna River | 184 | 2,171,197 | 281,922 |
| MD Eastern Shore | 5 | 302,210 | 45,626 |
| MD Western Shore | 21 | 1,369,383 | 105,100 |
| Patuxent River | 3 | 50,615 | 38,689 |
| Potomac River | 71 | 779,885 | 420,997 |
| Rappahannock River | 5 | 78,006 | 36,039 |
| York River | 81 | 478,892 | 81,675 |
| James River | 51 | 1,979,297 | 259,331 |
| VA Eastern Shore | 1 | 135,211 | 1,160 |
| Total | 422 | 7,344,697 | 1,270,539 |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

Chesapeake Bay TMDL



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-9. Significant industrial wastewater discharge facilities in the Chesapeake Bay watershed.**



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario.

**Figure 4-10. Nonsignificant industrial wastewater discharge facilities in the Chesapeake Bay watershed.**

Discharge Monitoring Report (DMR) data from the population of industrial facilities were used to derive loadings where available. The majority of nonsignificant industrial facilities do not have DMR data for nitrogen and phosphorus. However, the default values from typical pollutant concentrations (Tetra Tech 1999) were used to estimate the loads where DMR data are not available, except for power plants and other facilities with high flows.

Industrial facilities, such as power plants, petroleum refineries, and steel mills, that were not on the significant facility list were considered as high-flow, nonsignificant facilities in the evaluation. Nitrogen and phosphorus loads resulting from the use of flue gas desulfurization units, effluent from coal ash ponds and biocide applications at high-flow facilities were estimated from available databases. Data sets queried include EPA's PCS and ICIS permit systems, 316(b) cooling water intake structure regulation data, U.S. Department of Energy's Energy Information Administration data, and EPA's eGrid database.

Thirty-two power plants were identified as being in the Chesapeake Bay watershed. Eight of those facilities use cooling towers as part of their cooling system. Of the 32 facilities, 18 use coal as a fuel source; 7 use a flue gas desulfurization, and 13 use ash ponds. Eighty-nine other high-flow industrial sites were identified in the watershed and represent a variety of industrial activities.

Pollutant loads were estimated for the eight facilities that use cooling towers. The PCS and ICIS databases were queried for blowdown flows, and cooling tower chemical vendors were consulted to estimate water quality conditions in the towers. Facility use rates were then obtained from EPA's eGrid database to characterize utilization routines and variability in blowdown events. Similarly, flue gas desulfurization and ash pond loads were estimated using data obtained from the PCS and ICIS databases.

### 4.5.3    Combined Sewer Overflows

Combined sewer systems (CSS) are sewers that are designed to collect rainwater runoff, domestic sewage, and industrial wastewater in the same pipe. Normally, the systems transport wastewater to a treatment plant, where it is treated and discharged to surface waters. However, during heavy rainfall or snowmelt, flow volumes in a CSS can exceed the capacity of the sewer system or treatment plant. To avoid situations where excess flows overwhelm the sewer network or the treatment capacity of the treatment system, CSSs are designed to overflow during times of high volume, discharging untreated excess wastewater directly to nearby streams, rivers, or other waterbodies.

Such overflows, called combined sewer overflows (CSOs), contain stormwater and untreated human and industrial waste, toxic materials, and debris. There are 64 CSO communities in the Chesapeake Bay watershed (Table 4-13 and Figure 4-11).

**Table 4-13. Combined sewer system communities in the Bay watershed**

| Jurisdiction | River basin | NPDES ID | Facility name |
|---|---|---|---|
| DC | Potomac | DC0021199 | Washington, District of Columbia |
| DE | Eastern Shore | DE0020265 | Seaford Waste Treatment Plant |
| MD | Eastern Shore | MD0020249 | Federalsburg WWTP |
| MD | Eastern Shore | MD0021571 | City of Salisbury WWTP |
| MD | Potomac | MD0021598 | Cumberland WWTP |
| MD | Patapsco | MD0021601 | Patapsco WWTP |
| MD | Eastern Shore | MD0021636 | Cambridge WWTP |
| MD | Eastern Shore | MD0022764 | Snow Hill Water & Sewer Department |
| MD | Potomac | MD0067384 | Westernport CSO |
| MD | Potomac | MD0067407 | Allegany County CSO |
| MD | Potomac | MD0067423 | Frostburg CSO |
| MD | Potomac | MD0067547 | Lavale Sanitary Commission CSO |
| NY | Susquehanna | NY0023981 | Johnson City (V) Overflows |
| NY | Susquehanna | NY0024406 | Binghamton (C) CSO |
| NY | Susquehanna | NY0035742 | Chemung Co Elmira SD STP |
| PA | Susquehanna | PA0020940 | Tunkhannock Boro Municipal Authority |
| PA | Susquehanna | PA0021237 | Newport Boro STP |
| PA | Susquehanna | PA0021539 | Williamsburg Municipal Authority |
| PA | Susquehanna | PA0021571 | Marysville Borough WWTP |
| PA | Susquehanna | PA0021687 | Wellsboro WWTP |
| PA | Susquehanna | PA0021814 | Mansfield Boro WWTP |
| PA | Susquehanna | PA0022209 | Bedford WWTP |
| PA | Susquehanna | PA0023248 | Berwick Area Joint Sewer Authority WWTP |
| PA | Susquehanna | PA0023558 | Ashland WWTP |
| PA | Susquehanna | PA0023736 | Tri-Boro Municipal Authority WWTP |
| PA | Susquehanna | PA0024341 | Canton Boro Auth. WWTP |
| PA | Susquehanna | PA0024406 | Mount Carmel WWTF |
| PA | Susquehanna | PA0026107 | Wyoming Valley Sanitary Authority WWTP |
| PA | Susquehanna | PA0026191 | Huntingdon Borough WWTP |
| PA | Susquehanna | PA0026310 | Clearfield Mun. Auth. WWTP |
| PA | Susquehanna | PA0026361 | Lower Lackawanna Valley Sanitary Authority WWTP |
| PA | Susquehanna | PA0026492 | Scranton Sewer Authority WWTP |
| PA | Susquehanna | PA0026557 | Sunbury City Municipal Authority WWTP |
| PA | Susquehanna | PA0026743 | Lancaster City WWTP |
| PA | Susquehanna | PA0026921 | Greater Hazelton Joint Sewer Authority WWTP |
| PA | Susquehanna | PA0027014 | Altoona City Auth. - Easterly WWTP |
| PA | Susquehanna | PA0027022 | Altoona City Auth. - Westerly WWTF |
| PA | Susquehanna | PA0027049 | Williamsport Sanitary Authority – West Plant |
| PA | Susquehanna | PA0027057 | Williamsport Sanitary Authority – Central Plant |
| PA | Susquehanna | PA0027065 | LRBSA - Archbald WWTP |
| PA | Susquehanna | PA0027081 | LRBSA - Clinton WWTP |
| PA | Susquehanna | PA0027090 | LRBSA - Throop WWTP |
| PA | Susquehanna | PA0027197 | Harrisburg Advanced WWTF |
| PA | Susquehanna | PA0027324 | Shamokin Coal Twp Joint Sewer Authority |
| PA | Susquehanna | PA0028631 | Mid-Cameron Authority |

| Jurisdiction | River basin | NPDES ID | Facility name |
|---|---|---|---|
| PA | Susquehanna | PA0028673 | Gallitzin Borough Sewer and Disposal Authority |
| PA | Susquehanna | PA0036820 | Galeton Borough Authority WWTP |
| PA | Susquehanna | PA0037711 | Everett Area WWTP |
| PA | Susquehanna | PA0038920 | Burnham Borough Authority WWTP |
| PA | Susquehanna | PA0043273 | Hollidaysburg STP |
| PA | Susquehanna | PA0046159 | Houtzdale Boro Municipal Sewer Authority |
| PA | Susquehanna | PA0070041 | Mahanoy City Sewer Authority WTP |
| PA | Susquehanna | PA0070386 | Shenandoah Municipal Sewer Authority WWTP |
| PA | Susquehanna | PAG062202 | Lackawanna River Basin Sewer Authority. |
| PA | Susquehanna | PAG063501 | Steelton Boro Authority |
| VA | James | VA0063177 | Richmond |
| VA | James | VA0024970 | Lynchburg |
| VA | James | VA0025542 | Covington Sewage Treatment Plant |
| VA | Potomac | VA0087068 | Alexandria |
| WV | Potomac | WV0020150 | City of Moorefield |
| WV | Potomac | WV0021792 | City of Petersburg |
| WV | Potomac | WV0023167 | City of Martinsburg |
| WV | Potomac | WV0024392 | City of Keyser |
| WV | Potomac | WV0105279 | City of Piedmont |

CSOs are considered point sources and are assigned WLAs in this TMDL. EPA's *CSO Control Policy* is the national framework for implementing controls on CSOs through the NPDES permitting program. The policy resulted from negotiations among EPA, municipal organizations, environmental groups, and state agencies. It provides guidance to municipalities and state and federal permitting authorities on how to meet the CWA's pollution control goals as flexibly and cost-effectively as possible. The CSO policy was published in the *Federal Register* (FR) (59 FR 18688, April 19, 1994). CSO communities are required to develop Long-Term Control Plans (LTCPs), detailing steps necessary to achieve full compliance with the CWA.

EPA relied on various sources of information to characterize the prevalence of CSOs in the Bay watershed and to quantify their loads for the Bay TMDL. There are 64 CSO communities in the Bay watershed (Table 4-13). Overflow volume and pollutant loading from CSO communities are heavily dependent on the service area or catchment area of the combined system. Service area data obtained from the communities were used to calculate the loading from each community during high-flow events. Precipitation data observations were also obtained from weather monitoring stations proximate to each community to derive runoff volumes. Estimates of overflows and associated pollutant loads from CSO communities were then developed using various sources of water quality data including monitoring data and literature values.

Chesapeake Bay TMDL



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-11. CSO communities in the Chesapeake Bay watershed.**

For four of the largest CSO communities in the watershed—Alexandria, Virginia; Lynchburg, Virginia; Richmond, Virginia; and the District of Columbia—EPA relied heavily on readily available and relatively detailed LTCPs to characterize overflows. In addition, EPA ran simulations of existing sewer models for those communities to support developing overflow and water quality estimates. EPA used the District of Columbia's CSS model to develop loading estimates for the CSOs. For the Alexandria, Richmond, and Lynchburg CSSs, various versions of EPA's Storm Water Management Model (SWMM) were used to estimate overflows. CSO discharge monitoring data were available for the Alexandria and Richmond CSSs, but no samples were available from Lynchburg because the LTCP calls for complete separation of this system (i.e., separation of the storm sewers from sanitary sewers).

Information related to loading from the other 60 CSO communities in the watershed includes spatial data collected as a result of a direct survey of the communities to support the TMDL, limited water quality and overflow data from some of the CSO communities in the watershed, and representative water quality concentrations available in the literature. For further information regarding the data used to estimated CSO loads, see Section 7 of the Chesapeake Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

To avoid the difficulty of measuring LTCP implementation progress with weather-dominated CSO loading estimates, EPA used the 10-year average CSO loads for 1991–2000, which correlates with the hydrologic period selected for the TMDL (see Section 6.1.1). The loads from that 10-year period were used as the baseline to assess CSO progress and WLAs. Any CSO implementation progress will be tracked and input in the model as a reduction factor to represent a reduction achieved from the baseline. Thus, any reduction will be from management actions only and not from climate variation. The CSS land use will be changed to urban area for stormwater simulation in the model if there is CSS separation in the implementation plan and the separation acreage is reported with the reduction factor for implementation progress tracking.

### 4.5.4   Sanitary Sewer Overflows

Properly designed, operated, and maintained sanitary sewer systems are meant to collect and transport all the sewage that flows into them to a WWTP. SSOs are illegal discharges of raw sewage from municipal sanitary sewer systems. Frequent SSOs are indicative of problems with a community's collection system and can be due to multiple factors:

- Infiltration and inflow contributes to SSOs when rainfall or snowmelt infiltrates through the ground into leaky sanitary sewers or when excess water flows in through roof drains connected to sewers, broken pipes, or badly connected sewer service lines. Poor service connections between sewer lines and building service lines can contribute as much as 60 percent of SSOs in some areas.

- Undersized systems contribute to SSOs when sewers and pumps are too small to carry sewage from newly developed subdivisions or commercial areas.

- Pipe failures contribute to SSOs as a result of blocked, broken, or cracked pipes; tree roots growing into the sewer; sections of pipe settling or shifting so that pipe joints no longer match; and sediment and other material building up causing pipes to break or collapse.

- Equipment failures contribute to SSOs because of pump failures or power failures.

SSOs represent a source of nitrogen and phosphorus to the Chesapeake Bay; however, information available to characterize their contribution to the overall nitrogen and phosphorus loads delivered to the Bay is limited largely because of their illegality and infrequency. Although the Bay Watershed Model does not specifically account for SSOs, the nitrogen and phosphorus load contributions from SSOs are part of the background conditions incorporated into the Phase 5.3 watershed model and, therefore, such loads are accounted for in the data used for calibration of the Bay Watershed Model. Because SSOs are illegal, however, the Chesapeake Bay TMDL assumes full removal of SSOs and makes no allocation to them.

## 4.5.5 NPDES Permitted Stormwater

Urban and suburban stormwater discharges contain nitrogen, phosphorus, and sediment from sources such as pet wastes, lawn fertilizers, construction activity, impervious surfaces, and air contaminants. The in-stream bank and bed scouring caused by increased volumes and durations of stormwater discharges contribute additional sediment and nitrogen and phosphorus loads to the Bay and its tributaries. Those nitrogen, phosphorus, and sediment loads affect local water quality, habitats, and the Bay downstream and represent a significant proportion of nitrogen, phosphorus, and sediment loads to Bay. The CBP estimates that in 2009 stormwater from urban and suburban development contributed to 16 percent of the sediment loadings, 15 percent of the phosphorus loadings, and 8 percent of the nitrogen loadings to the Bay (Bay Watershed Model 2009 Scenario).

Under the federal stormwater regulatory program, three broad categories of stormwater discharges are regulated (see 40 CFR 122.26, CFR 122.30-37):

- Stormwater discharges from medium and large Municipal Separate Storm Sewer Systems (MS4s) and small MS4s in Census Bureau defined urbanized areas

- Stormwater discharges associated with construction activity 1 acre and larger

- Stormwater discharges associated with specified categories of industrial activity

In addition, EPA established a process for designating and requiring NPDES permit coverage for additional stormwater discharges, implementing section 402(p)(2)(E). This *residual designation authority* (RDA) of section 402(p)(2)(E) is in 40 CFR 122.26(a)(9)(i)(C) and (D). EPA retains additional authority in CWA section 402(p)(5) and (6) to designate additional point sources of stormwater.

EPA's intent in creating the MS4 Stormwater Program was to regulate stormwater discharges by requiring the municipalities to develop management programs to control stormwater discharging via the MS4, i.e., stormwater collected by the MS4 from throughout its service area.

CWA section 402(p) establishes the framework for EPA to address stormwater discharges. In Phase I, EPA established NPDES permit requirements for stormwater discharges associated with

- Industrial activity, including construction activity disturbing 5 acres or greater, including sites smaller than 5 acres if they are associated with a common plan of development or sale that is at least 5 acres in size

- Discharges from MS4s serving populations of 100,000 or more

In Phase II, EPA established permit requirements for stormwater discharges from

- Construction activity disturbing 1 to 5 acres, including sites smaller than 1 acre if they are associated with a common plan of development or sale that is at least 1 acre in size
- Small MS4s serving populations of fewer than 100,000 in urbanized areas

With respect to Phase II MS4s, EPA considers stormwater discharges from within the geographic boundary of the urbanized area (and designated areas) served by small MS4s to be regulated (64 FR 68722, 68751-52 and 68804, Appendix 2, December 8, 1999). The reason for regulating small MS4s in urbanized areas was based on the correlation between the degree of development/ urbanization and adverse water quality impacts from stormwater discharged from such areas.

EPA can and has designated additional stormwater discharges, such as those from impervious surfaces above a certain size threshold, using its residual designation authority under 40 CFR 122.26(a)(9)(i)(C) and (D). At the discretion of the NPDES permitting authority, stormwater dischargers that require NPDES permits can either obtain individual permits or, with the exception of medium and large MS4s, obtain coverage under general permits (see 40 CFR 122.28). Also, EPA has additional authority in CWA section 402(p)(5) and (6) to designate additional point sources of stormwater.

Figure 4-12 shows the locations of Phase I and II MS4s in the Bay watershed.

Unless stormwater discharges are identified in EPA's Phase I or Phase II regulations or are designated pursuant to CWA section 402(p)(2)(E) or 402(p)(6), the discharges are not regulated under CWA section 402. As explained in EPA guidance, "stormwater discharges that are regulated under Phase I or Phase II of the NPDES stormwater program are point sources that must be included in the WLA portion of a TMDL" (USEPA 2002). Appendix Q includes the stormwater permits subject to this Bay TMDL.

It is estimated that existing NPDES MS4 areas contributed approximately 7,027,362 lbs total nitrogen, 900,868 lbs total phosphorus, and 287,295 tons of sediment annually in 2009. That compares to the total load delivered annually to the Bay of 251,040,081 lbs total nitrogen, 16,619,332 lbs total phosphorus and 4,000,118 tons sediment by all sources (Bay Watershed Model 2009 Scenario).

The contribution from industrial stormwater discharges subject to NPDES permits has been estimated on the basis of data submitted by jurisdictions in their Phase I WIPs, including the number of industrial stormwater permits per county and the number of urban acres regulated by industrial stormwater permits. For the Bay TMDL, the permitted industrial stormwater load is subtracted from the MS4 load when applicable. Table 4-14 provides an accounting of the current individual and general stormwater NPDES permits issued within the Chesapeake Bay watershed.



Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario

**Figure 4-12. Phase I and II MS4s in the Chesapeake Bay watershed.**

**Table 4-14. NPDES stormwater permittees by jurisdiction and in the Chesapeake Bay watershed, summer 2009**

| Jurisdiction | | NPDES Stormwater permit type | | | | | |
|---|---|---|---|---|---|---|---|
| | | MS4 Phase I | MS4 Phase II | Industrial | Construction | Total | % Permittees in the Bay |
| DC | Baywide | 1 | 0 | 60 | 212 | 273 | 1.6% |
| | Districtwide | 1 | 0 | 60 | 212 | 273 | |
| DE | Baywide | 1 | 0 | 48 | NA* | 49 | 0.3% |
| | Statewide | 14 | 3 | 337 | 1,375 | 1,729 | |
| MD | Baywide | 11 | 82 | 1,578 | 8,300 | 9,971 | 57.6% |
| | Statewide | 11 | 82 | 1,578 | 8,332 | 10,003 | |
| NY | Baywide | 0 | 34 | 122 | 470 | 626 | 3.6% |
| | Statewide | 1 | 502 | 1,393 | 7,251 | 9,147 | |
| PA | Baywide | 0 | 206 | 1,238 | 906 | 2,350 | 13.6% |
| | Statewide | 2 | 727 | 2,494 | 2,399 | 5,622 | |
| VA | Baywide | 11 | 75 | 975 | 2,252 | 3,313 | 19.2% |
| | Statewide | 11 | 90 | 1,432 | 2,851 | 4,384 | |
| WV | Baywide | 0 | 3 | 113 | 651 | 767 | 4.4% |
| | Statewide | 0 | 45 | 933 | 2,488 | 3,466 | |
| Total | Bay | 23 | 400 | 4,086 | 12,791 | 17,300 | 100% |
| | States | 40 | 1,449 | 8,227 | 24,908 | 34,624 | |

Source: Phase 5.3 Chesapeake Bay Watershed Model 2009 Scenario
Note: Numbers of permittees are not static, and especially for categories like construction are fluctuating regularly.
* Not including Delaware

Data used to characterize loads from regulated stormwater activities and to represent these sources in the model are available from the jurisdictions' NPDES programs and from EPA Region 3's NPDES permitting, the permitting authority in the District of Columbia and for federal facilities in Delaware. Details related to how loads for MS4s and NPDES-permitted construction and industrial stormwater activities were derived for the Bay TMDL are in Section 7 of the Phase 5 Chesapeake Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

## 4.5.6 Concentrated Animal Feeding Operations

The NPDES program regulates the discharge of pollutants from point sources to waters of the United States. Concentrated Animal Feeding Operations (CAFOs) are included in the definition of point sources in CWA section 502(14). To be considered a CAFO, a facility must first be defined as an AFO.

AFOs are agricultural operations where animals are kept and raised in confined situations. AFOs generally congregate animals, feed, manure, dead animals, and production operations on a small land area. Feed is brought to the animals rather than the animals grazing or otherwise seeking feed in pastures. Such operations are defined as AFOs if animals are confined for 45 or more

days per year in facilities where vegetation and other growth are not present during the normal growing season [40 CFR 122.42(b)(1)].

AFOs that meet the regulatory definition of a CAFO or that are designated as a CAFO are regulated under the NPDES permitting program and are required to seek NPDES permit coverage if they discharge or propose to discharge. The NPDES regulations define AFOs as CAFOs based primarily on the number of animals confined (Table 4-15) (for example, a large dairy CAFO confines 700 or more dairy cattle) [40 CFR 122.23(b)(2), (4), and (6)]. An AFO that is not defined as a CAFO may be designated as a CAFO if it meets certain conditions [40 CFR 122.23(c)].

**Table 4-15. Federal numeric thresholds for small, medium, and large CAFOs**

| Animal sector | Size thresholds (number of animals) | | |
|---|---|---|---|
| | **Large CAFOs** | **Medium CAFOs** | **Small CAFOs** |
| Cattle or cow/calf pairs | 1,000 or more | 300–999 | less than 300 |
| Mature dairy cattle | 700 or more | 200–699 | less than 200 |
| Veal calves | 1,000 or more | 300–999 | less than 300 |
| Swine (weighing over 55 pounds) | 2,500 or more | 750–2,499 | less than 750 |
| Swine (weighing less than 55 pounds) | 10,000 or more | 3,000–9,999 | less than 3,000 |
| Horses | 500 or more | 150–499 | less than 150 |
| Sheep or lambs | 10,000 or more | 3,000–9,999 | less than 3,000 |
| Turkeys | 55,000 or more | 16,500–54,999 | less than 16,500 |
| Laying hens or broilers (liquid manure handling systems) | 30,000 or more | 9,000–29,999 | less than 9,000 |
| Chickens other than laying hens (other than a liquid manure handling systems) | 125,000 or more | 37,500–124,999 | less than 37,500 |
| Laying hens (other than a liquid manure handling systems) | 82,000 or more | 25,000–81,999 | less than 25,000 |
| Ducks (other than a liquid manure handling systems) | 30,000 or more | 10,000–29,999 | less than 10,000 |
| Ducks (liquid manure handling systems) | 5,000 or more | 1,500–4,999 | less than 1,500 |

Source: 40 CFR 122.23(b)

Under federal regulations, NPDES permits for CAFOs require CAFOs to implement the terms of a site-specific nutrient management plan (NMP) that includes a number of critical minimum elements [40 CFR 122.42(e)(1)]. Those requirements limit nitrogen and phosphorus loads from the production area as well as from the land application area, where manure, litter and process wastewater must be applied in accordance with site-specific practices to ensure that nitrogen and phosphorus in the manure will be used appropriately. NPDES permits for all CAFOs must include technology-based effluent limits in accordance with 40 CFR 122.44. Permitted Large CAFOs that land-apply manure, litter or process wastewater must comply with technology-based effluent limitations for land application per the effluent limitations guidelines (ELGs) at 40 CFR 412 (C) and (D). Unpermitted Large CAFOs may not have any discharges except for agricultural stormwater discharges from the land application area.

Agricultural stormwater discharges are the precipitation-related discharges from CAFO land application areas where the CAFO land applies manure, litter or process wastewater in accordance with nutrient management practices "that ensure appropriate agricultural utilization of the nutrients in the manure, litter or process wastewater" applied to the land—i.e., for permitted CAFOs, the terms of an NMP concerning land application [40 CFR 122.23(e)(1)]. State technical standards are used in calculating the technology-based effluent limits in NPDES permits of Large CAFOs. Requirements for land application areas at small and medium CAFOs are based on the best professional judgment of the permit writer, and may also incorporate state technical standards. The agricultural stormwater exemption does not apply to a CAFO's production area. As a nonpoint source, an agricultural stormwater discharge is not subject to NPDES permitting requirements or water quality-based effluent limitations (WQBELs).

Any permit issued to a CAFO of any size must include a requirement to implement an NMP that contains, at a minimum, BMPs that meet the requirements specified in 40 CFR 122.42(e)(1). These include the following:

- Ensuring adequate storage of manure, litter, and process wastewater, including procedures to ensure proper operation and maintenance of the storage facility.

- Managing mortalities to ensure that they are not disposed of in a liquid manure, stormwater, or process wastewater storage or treatment system that is not specifically designed to treat animal mortalities.

- Ensuring that clean water is diverted, as appropriate, from the production area.

- Preventing direct contact of confined animals with waters of the United States.

- Ensuring that chemicals and other contaminants handled on-site are not disposed of in any manure, litter, process wastewater, or stormwater storage or treatment system unless specifically designed to treat such chemicals and other contaminants.

- Identifying appropriate site-specific conservation practices to control runoff of pollutants to waters of the United States.

- Identifying protocols for appropriate testing of manure, litter, process wastewater, and soil.

- Establishing protocols to land apply manure, litter, or process wastewater in accordance with site-specific nutrient management practices that ensure appropriate agricultural utilization of the nutrients in the manure, litter or process wastewater.

- Identifying specific records that will be maintained to document the implementation and management of the minimum elements described above.

EPA and the jurisdictions have estimated the number of state or federal permitted CAFOs in the Chesapeake Bay watershed, in part, on the basis of the jurisdictions' respective final Phase I WIPs (Table 4-16).

**Table 4-16. Estimated number of state or federal permitted CAFOs**

| Jurisdiction | # State or federal permitted CAFOs |
|---|---|
| Delaware[a] | 165 |
| Maryland[a] | 365 |
| New York | 65 |
| Pennsylvania | 325 |
| Virginia | 30 |
| West Virginia | 30 |
| Total | 980 |

Sources:  State data submitted to EPA for the Senate Environment and Public Works Committee Hearing on the Chesapeake Bay on April 20, 2009, and EPA Office of Wastewater Management's latest NPDES CAFO Rule Implementation Status quarterly national CAFO number update. http://www.epa.gov/npdes/pubs/tracksum1Q10.pdf.
Note:
a. The numbers of CAFOs in Maryland and Delaware with permits are estimated according to the number of Notices of Intent (NOIs) received as a result of the EPA February 2009 permit application deadline. The NOIs are being reviewed for permit requirement completeness.

## 4.6   NONPOINT SOURCES

The term *nonpoint source* means any source of water pollution that does not meet the legal definition of point source (see Section 4.5). Nonpoint source pollution generally results from land runoff, precipitation, atmospheric deposition, drainage, seepage, or hydrologic modification. For purposes of the Chesapeake Bay TMDL analysis and modeling, nonpoint sources in the Chesapeake Bay watershed have been evaluated under the following categories:

- Agriculture (manure, biosolids, chemical fertilizer)
- Atmospheric deposition
- Forest lands
- On-site wastewater treatment systems (OSWTSs)
- Nonregulated stormwater runoff
- Oceanic inputs
- Streambank and tidal shoreline erosion
- Tidal resuspension
- Wildlife

For the Bay TMDL, Scenario Builder was used to provide the land use-based scenario inputs to the Bay Watershed Model including forest lands, OSWTSs , nonregulated stormwater runoff, oceanic inputs, streambank and tidal shoreline erosion, tidal resuspension, and wildlife (see Section 5.7). Data sources for agriculture and atmospheric deposition in the Chesapeake Bay watershed are included in the relevant sections below. Scenario Builder provides estimates of nitrogen and phosphorus loads to the land and the area of soil available to be eroded. Loads are input to the Bay Watershed Model to generate modeled estimates of loads delivered to the Bay. Additional information related to Scenario Builder and its application in Bay TMDL development (USEPA 2010d) is at http://archive.chesapeakebay.net/pubs/SB_V22_Final_12_31_2010.pdf.

### 4.6.1    Agriculture

Agricultural lands account for 22 percent of the watershed, making agriculture one of the largest land uses in the area, second only to forested and open wooded areas (69 percent). The Bay watershed has more than 87,000 farm operations and 6.5 million acres of cropland. However, the District of Columbia does not include any agricultural lands.

Farms in the Chesapeake Bay watershed produce more than 50 named commodities. The area's primary crops are pasture, hay, corn, wheat, soybeans, vegetables, and fruits. The eastern part of the region is home to a rapidly expanding nursery and greenhouse industry.

Animal operations account for more than 60 percent of the region's annual farm product sales. In the watershed, the six major types of animal operations are dairy cows, beef cattle, pigs, egg production, broilers, and turkeys. The three major animal production regions in the watershed, according to livestock concentration, are the lower Susquehanna River in Pennsylvania, the Shenandoah Valley in Virginia and West Virginia, and the Delmarva Peninsula in Delaware, Maryland, and Virginia. The Delmarva Peninsula is considered to be one of the country's top poultry producing regions and, according to the 2002 Census, three Bay counties are among the top 20 poultry producing counties in the nation (for either poultry/eggs, broilers, or layers): Sussex County, Delaware; Lancaster County, Pennsylvania; and Wicomico County, Maryland. In addition, at least one Bay county is among the top 20 counties for production of the following farm commodities: turkeys; cattle and calves; milk and other cow dairy products; hogs and pigs; horses and ponies; corn for silage; snap beans; apples; short rotation woody crops; and nursery, greenhouse, floriculture, and sod.

Agriculture is the largest single source of nitrogen, phosphorus, and sediment loading to the Bay through applying fertilizers, tilling croplands, and applying animal manure. Agricultural activities are responsible for approximately 44 percent of nitrogen and phosphorus loads delivered to the Bay and about 65 percent of sediment loads delivered to the Bay (Bay Watershed Model 2009 Scenario). Figure 4-13 compares modeled loads from agricultural lands for 1985 and 2009.

Data sources used to estimate nitrogen, phosphorus, and sediment from agriculture-related sources include information related to livestock production and manure generation, crop production and nutrient management, fertilizer use and application, and implementation of BMPs. EPA in cooperation with the Chesapeake Bay Program's Agricultural Nutrient and Sediment Reduction Workgroup and Modeling Subcommittee relied on the many sources of information to characterize loads related to agriculture that are summarized in Section 2 of the Scenario Builder documentation *Estimates of County-Level Nitrogen and Phosphorus Data for Use in Modeling Pollutant Reduction*(USEPA 2010d). Examples of data sources are the U.S. Department of Agriculture (USDA) Agricultural Census; USDA, state, and university nutrient management standards and handbooks; peer-reviewed journal articles; agricultural conservation data from state agricultural and environmental agencies; county agencies, and nongovernmental organizations; and extensive input from members of the Chesapeake Bay Program's Agricultural Nutrient and Sediment Reduction Workgroup.



Source: Phase 5.3 Chesapeake Bay Watershed Model 1985 and 2009 Scenarios

**Figure 4-13. 1985 and 2009 modeled total nitrogen, phosphorus, and sediment loads from agricultural lands across the Chesapeake Bay watershed.**

## Manure

Animal populations vary across the Bay watershed by animal type and management. Pastures exist in the watershed for dairy and beef heifers, goats, hogs, and in some places even chickens and turkeys. Animal feed BMPs are recognized by the Chesapeake Bay watershed model, and managing manure from production areas can include a suite of BMPs for storage and handling. Land application of manure is an important nitrogen and phosphorus recycling process in agriculture. Because manure is so extensively used as a resource of nitrogen and phosphorus, it is considered as important as inorganic fertilizer and is an important source of nonpoint source pollution. Figure 4-14 and Figure 4-15 provide historical population data of poultry and non-poultry animals in the watershed, respectively.

Annual manure production is calculated as a daily excreted amount per animal equivalent unit (1 animal equivalent unit equals 1,000 lbs live animal weight). Animal units are estimated for counties on the basis of USDA Agricultural Census data. The total amount of manure produced is then distributed among the applicable land uses, which include pasture, AFO, and other row crop land uses. The percentage of time animals spend in pasture (based on state recommendations) is used to estimate the percentage of total manure produced on pasture lands. For example, 50 percent pasture time equates to 50 percent of the total manure production occurring on pasture lands. Manure produced that is associated with time spent confined is considered to be generated on AFO acres. A fraction of that amount, (15–21 percent depending on animal type) is assumed to remain on the AFO acres (i.e., not captured by storage and handling activities), while the rest is redistributed by land application to pasture and row crop lands. The model simulates AFO acres similarly to urban impervious areas.

## Biosolids

Applying biosolids, the nutrient-rich organic materials resulting from treating sewage sludge, as fertilizer to croplands represents another source of nutrients to the Bay. Biosolids typically contain plant nutrients (nitrogen, phosphorus, and potassium), although the amount of nutrients available from biosolids are normally lower than the amounts from most commercial fertilizers (Huddleston and Ronayne 1990). Nitrogen and phosphorus are the most prevalent nutrients found in sewage sludge.



Source: 2007 Agriculture Census

**Figure 4-14. 2007 Chesapeake Bay watershed poultry populations by jurisdiction.**



Source: 2007 Agriculture Census

**Figure 4-15. 2007 Chesapeake Bay watershed livestock populations by jurisdiction.**

Regulations governing use, disposal and application of sewage sludge are in EPA's Sewage Sludge Use or Disposal Regulation (Part 503), which provides a framework for permitting sewage sludge use or disposal. No jurisdictions in EPA Region 3 have applied for program authorization of the federal Part 503. Although all Bay jurisdictions have their own sewage sludge programs in place, only Virginia routinely submits to EPA information regarding land application of biosolids. As a result, information available to characterize biosolids as a source and to represent it in the model is limited.

For model characterization, jurisdiction-specific data on biosolids application were used. Land uses receiving biosolids include crops and pasture/hay, with different monthly proportions based on seasonal growing patterns. Modeled application rates are the same as manure because biosolids are applied to land in the same fashion as manure.

For additional information related to representation of biosolids in the Bay TMDL, see the Phase 5.3 Chesapeake Bay Watershed Model documentation at
http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169

## Chemical Fertilizer

Chemical fertilizer application practices across the watershed can be estimated through commercial sales information. Fertilizer sales data are prepared by the Association of American Plant Food Control Officials on the basis of fertilizer consumption information submitted by state fertilizer control offices. The consumption data include total fertilizer sales or shipments for

farm and non-farm use. Liming materials, peat, potting soils, soil amendments, soil additives, and soil conditioners are excluded. Materials used for the manufacture or blending of reported fertilizer grades or for use in other fertilizers are excluded to avoid duplicate reporting. A review of commercial fertilizer sales records (from 1982 to 2007) showed that in all states, the sales are increasing. The increase can be attributed to both yield increases and increasing application. Removing the yield increases resulted in persistent increasing trends in chemical fertilizer nutrient application (except in Maryland where the trend is flat).

Model estimates of commercial fertilizer loads have been derived by back-calculating load from agricultural lands and determining the proportion of nutrient species applied from commercial fertilizer, manure, and atmospheric deposition.

As phosphorus-based nutrient management plans increase, the reliance on nitrogen fertilizer is expected to increase because less manure will be legally permitted to be applied to agricultural lands. Therefore chemical fertilizers are and will remain a significant potential source of nitrogen and phosphorus to the Bay.

### 4.6.2    Atmospheric Deposition

Air sources contribute about one-third of the total nitrogen loads delivered to the Chesapeake Bay by depositing directly onto the tidal surface waters of Chesapeake Bay and onto the surrounding Bay watershed. Direct deposition to the Bay's tidal surface waters is estimated to be 6 to 8 percent of the total (air and non-air) nitrogen load delivered to the Bay. The nitrogen deposited onto the land surface of the Bay's watershed and subsequently transported to the Bay is estimated to account for 25 to 28 percent of the total nitrogen loadings delivered to the Bay.

Atmospheric loads of nitrogen are from chemical species of oxidized nitrogen, also called NOx, and from reduced forms of nitrogen deposition, also called ammonia ($NH_4^+$). Oxidized forms of nitrogen deposition originate from conditions of high heat and pressure and are formed from inert diatomic atmospheric nitrogen ($N_2$). The principle sources of NOx are industrial-sized boilers such as electric power plants and the internal combustion engines in cars, trucks, locomotives, airplanes, and the like.

Reduced nitrogen, or ammonia, is responsible for approximately one-third of the total nitrogen atmospheric emissions that eventually end up as loads to the Bay. Ammonia sources are predominately agricultural, and ammonia is released into the air by volatilization of ammonia from manures and emissions from ammonia based fertilizers. Minor sources include mobile sources, slip ammonia released as a by-product of emission controls on NOx at power plants, and industrial processes.

Two types of atmospheric deposition—wet and dry—are input to the Bay Watershed and Bay Water Quality Models daily. Wet deposition occurs during precipitation events and contributes to nitrogen loads only during days of rain or snow. Dry deposition occurs continuously and is input at a constant rate daily in Bay Watershed and Bay Water Quality Models.

Because the Bay Watershed and Bay Water Quality Models are mass balance models, all sources of nitrogen and phosphorus inputs to the tidal Bay must be accounted for. Given atmospheric deposition of phosphorus and organic forms of nutrients are minor inputs, the Bay Watershed

and Bay Water Quality Models account for estimated loads of phosphorus and organic nutrients to open surface waters only, on the assumption that all phosphorus and organic nutrients are derived from aeolian or wind processes, which result in no net change in organic nitrogen on terrestrial or land surfaces but result in a net gain when deposited directly on water surfaces.

Organic nitrogen is simulated only as wet deposition as dissolved organic nitrogen because the magnitude of dry deposition of organic nitrogen is not well characterized in the literature. Therefore, the limited dry deposition of organic nitrogen simulated by the Bay Airshed Model is lumped into the oxidized nitrogen atmospheric dry deposition.

Atmospheric deposition monitoring in the Chesapeake watershed is through National Atmospheric Deposition Program (NADP) and AirMon stations throughout the watershed. Measured deposition at these discrete stations is used to extrapolate to all the land and waters of the Chesapeake watershed through a wet deposition regression model developed by Grimm and Lynch (2000, 2005; Lynch and Grimm 2003). Dry deposition data are estimated through the Community Multiscale Air Quality Model (CMAQ) (Dennis et al. 2007; Hameedi et al. 2007) (for more details, see Section 5.4).

### Chesapeake Bay Airshed

The Bay's NOx airshed—the area where emission sources that contribute the most airborne nitrates to the Bay originate—is about 570,000 square miles, or nine times the size of the Bay's watershed (Figure 4-16). Close to 50 percent of the nitrate deposition to the Bay is from air emission sources in Bay watershed jurisdictions. Another 25 percent of the atmospheric deposition load to the Chesapeake watershed is from the remaining area in the airshed. The remaining 25 percent of deposition is from the area outside the Bay airshed. The ammonia airshed is similar to the NOx airshed, but slightly smaller.



Source: Dr. Robin Dennis, EPA/ORD/NERL/AMAD/AEIB

**Figure 4-16. Principle area of NOx emissions (outlined in blue) that contribute nitrogen deposition to the Chesapeake Bay and its watershed (solid blue fill) (the Bay airshed).**

## Atmospheric Deposition Emissions Sources and Trends

Between 1985 and 2005, the simulation period of the Bay Watershed Model, atmospheric deposition loads of nitrate (NOx) in the Chesapeake watershed have decreased by about 30 percent (Figure 4-17). Considerable variability exists across the watershed, however, with the greatest reductions occurring in the northern and western portions (Grimm and Lynch 2000, 2005; Lynch and Grimm 2003). Figure 4-17 shows the trend of estimated average nitrate and ammonia deposition concentrations in the Phase 5 Model from 1984 to 2005. The average annual concentration from 1984 to 2005 was used as an adjustment to smooth out the high- and low-rainfall years, which bring different amounts of deposition load to the watershed depending on the volume of precipitation. Much of the reduction has been from point source air emission reductions, particularly from electric generating units (EGUs) such as electric power plants. Reductions from mobile sources, such as cars and trucks, are another large contributor to the downward trend.



Source: Phase 5.3 Chesapeake Bay Watershed Model.

**Figure 4-17. Trend of estimated average nitrate and ammonia deposition concentrations in the Phase 5 Model domain from 1984 to 2005.**

Table 4-17 shows the estimated portion of deposited NOx loads on the Chesapeake watershed from four sectors including EGUs, mobile sources, industry, and all other sources. From 1990 to 2020, considerable reductions have been made in the power sector. In addition, both on road and off-road mobile sources have ongoing fleet turnover and replacement, which is putting cleaner spark and diesel engines in service, and that is expected to continue beyond 2030. Table 4-17

shows that in 1990, EGUs are the dominant source of NOx; in 2020, mobile sources will be the dominant sources of NOx with EGUs the least contributor of NOx. However Figure 4-17 shows that all sources will be decreasing their NOx emissions, and the total deposition load in 2020 will be less than the 1990 load.

Average ammonia loads over the Phase 5 Chesapeake Bay Watershed Model domain have followed the trend in overall manure loads in the watershed and have remained steady over the 1985 to 2000 simulation period (Figure 4-17). Ammonia deposition is very site-specific and strongly influenced by local emissions. Local and regional trends in manure, such as the rise of poultry animal units in the Eastern Shore and Shenandoah basins and reduction of dairy farms in the northern portions of the watershed in the late 1980s, affect regional ammonia deposition in the Chesapeake watershed.

**Table 4-17. Estimated portion of deposited NOx loads on the Chesapeake watershed from four source sectors—EGUs, mobile sources, industry, and all other sources in 1990 and 2020**

| Source sector | 1990 | 2020 |
|---|---|---|
| Power plants (EGUs) | 40% | 17% |
| Mobile sources (on-road) | 30% | 32% |
| Industry | 8% | 20% |
| Other (off-road-construction; residential, commercial) | 21% | 31% |

Source: Dr. Robin Dennis, EPA/ORD/NERL/AMAD/AEIB

### 4.6.3    Forest Lands

Forested areas represent a significant portion of the Chesapeake Bay watershed (see Figure 2-3), as approximately 70 percent of the watershed is composed of forested and open wooded areas. This land use contributes the lowest loading rate per acre of all the land uses, however. Compared with other major pollutant source sectors in 2009, forest lands in the Bay watershed contributed an estimated 20 percent (49 million pounds per year) of total nitrogen, 15 percent (2.4 million pounds per year) of total phosphorus, and 18 percent (730,000 tons per year) of sediment of the total delivered loads to the Bay from the watershed (Bay Watershed Model 2009 Scenario).

Forest land differs from most land uses in that a significant portion of the loads that come off the land do not originate in the forests. Most of the nitrogen loads come from atmospheric deposition of nitrogen (Campbell 1982; Langland et al. 1995; Ritter and Chirnside 1984; Stevenson et al. 1987; Nixon 1997; Castro et al. 1997; Goodale et al. 2002; Pan et al. 2005; Aber et al. 1989; 2003; Stoddard 1994). Sediment and phosphorus loads originate from poorly managed forest harvesting with unprotected stream crossings and unhealthy forest biota (Riekerk et al. 1988; Clark et al. 2000).

The Bay Watershed Model differentiates between harvested and un-harvested forest lands as distinct land uses. Un-harvested forest lands contributed 1.63 lbs of nitrogen, 0.08 lb of phosphorus, and 0.02 ton of sediment per acre, which is the lowest loading rate of any land use. In contrast, harvested forest contributes 10.30 lbs of nitrogen, 0.47 lb of phosphorus, and 0.19 ton of sediment per acre. The loads from harvested forest can be greatly reduced by using forest

harvesting BMPs. The loads are estimated through model calibration, which estimates loading rate per area on the basis of monitoring stations in forested areas.

For additional information related to the representation of forest lands, see the Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

### 4.6.4    On-site Wastewater Treatment Systems

Onsite Wastewater Treatment Systems (OSWTS), commonly referred to as septic systems, have the potential to deliver nitrogen and phosphorus to surface waters directly because of system failure and malfunction and indirectly through groundwater. Septic systems treat human waste using a collection system that discharges liquid waste into the soil through a series of distribution lines that compose the drain field. In properly functioning (normal) systems, phosphates are adsorbed, or gathered onto the soil surface, and retained by the soil as the effluent percolates through the soil to the shallow, groundwater table. Therefore, functioning systems do not contribute nitrogen and phosphorus loads to surface waters directly. A septic system failure occurs when there is a discharge of waste to the soil surface where it is available for washoff. As a result, failing septic systems can contribute high nitrogen and phosphorus loads to surface waters. Short-circuited systems (those close to streams) and direct discharges to streams also contribute significant nitrogen and phosphorus loads.

OSWTSs represented an estimated 6 percent of the total nitrogen load from the Chesapeake watershed in 2009 (Bay Watershed Model 2009 Scenario). Information on the watershed loads from OSWTSs is generally sparse. Detailed descriptions of data procedures, source information, and assumptions used in estimating those loads are in Palace et al. (1998).

For the Chesapeake Bay Watershed Model, the number of OSWTSs in each modeling segment was estimated by calculating the number of households outside areas served by public sewer. One septic system was assumed to exist for each household. Digital maps of 2009 sewer service areas were provided by 257 of the 403 major wastewater treatment plants in the watershed contacted during a 2009 survey sponsored by EPA. Digital data were also provided by the Maryland Department of Planning for all of Maryland, Fairfax County, and the Washington Council of Governments. In 2008 the CBP Office contacted some local jurisdictions and collected sewer service area data for all three Delaware counties, Albemarle, Arlington, Henrico, Loudoun, and Rockingham counties in Virginia and for James City, Newport News City, Virginia Beach, and Richmond in Virginia. Data were also collected for Perry, Dauphin, Lancaster, Lycoming, and Cumberland counties in Pennsylvania, and for Broome County in New York. For those major wastewater treatment plants that did not provide data and were not included in data supplied by county or state agencies, the extent of their sewer service area was estimated on the basis of population density.

EPA simulated the extent of existing sewer service areas using a thresholded and log-transformed raster data set of year 2000 population density. A population density raster was created using a dasymetric mapping technique with 2000 Census Block Group data and a secondary road density raster map (Claggett and Bisland 2004). A logarithmic transformation was used to normalize the population density data in the surface raster. The standard deviations in the data range were examined to find the optimal threshold for representing sewer service

areas in Maryland because statewide maps of existing sewer service areas were provided by the Maryland Department of Planning. A threshold of 1.5 standard deviations from the mean (> – 0.4177) was chosen and used to reclassify the surface raster into a binary grid. A low-pass filter (ignoring no data) was then used to smooth the data, and the output was converted from a floating point to an integer grid. The resulting integer grid was used to represent potential sewer service areas for wastewater treatment plants that did not submit digital data. Households in the Bay watershed were mapped using a similar dasymetric mapping technique and 2000 Census household data. The resulting raster data set of households was overlaid on the sewer service area map to estimate the number of households outside sewer service areas. The data were scaled from the year 2000 to the year 2009 using published annual county-level population estimates adjusted for changes in average household size. In addition, the data were scaled back through time using county-level population estimates and spatially distributed raster data sets representing 1990 and 2000 Census Block Group data on the total number of households.

Using that methodology, the number of OSWTSs is estimated and the nitrate loads exported to the river from OSWTSs are simulated. Phosphorus loads are assumed to be entirely attenuated by the OSWTSs. Standard engineering assumptions of per capita nitrogen waste and standard attenuation of nitrogen in the septic systems are applied. Overall, the assumption of a load of 4.0 kg/person-year is used at the edge of the OSWTS field, all in the form of nitrate.

Using an average water flow of 75 gallons/person-day for a septic tank (Salvato 1982), a mean value of 3,940 grams of nitrogen/person-year for groundwater septic flow, 4,240 grams/person-year for surface flow of septic effluent, and typical surface/subsurface splits as reported by Maizel et al. (1995), a total nitrogen concentration of about 39 mg/L at the edge of the septic field was calculated. This concentration compares favorably with Salvato (1982) who calculated OSWTS total nitrogen concentrations of 36 mg/L. It is assumed that attenuation of the nitrate loads between the septic system field and the edge-of-river nitrate loads represented in the Bay Watershed Model is due to: (1) attenuation in anaerobic saturated soils with sufficient organic carbon (Robertson et al. 1991; Robertson and Cherry 1992); (2) attenuation by plant uptake (Brown and Thomas 1978); or (3) attenuation in low-order streams before the simulated river reach. Overall, the total attenuation is assumed to be 60 percent (Palace et al. 1998) that is applied to all OSWTS in the Bay watershed except for MD where the zone specific attenuation rates developed by MDE were used. MDE assumes an 80 percent delivery rate (or 20 percent attenuation) in critical areas; a 50 percent delivery rate within 1,000 feet from any perennial surface water; and a 30 percent delivery rate from distances greater than 1,000 feet from any perennial surface water (http://www.mde.state.md.us/assets/document/NutrientCap_Trading_Policy.pdf).

Additional information related to how the number of OSWTSs is estimated and how they are represented in the model is available in the Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169

### 4.6.5    Nonregulated Stormwater Runoff

The sources of nitrogen, phosphorus and sediment from nonregulated stormwater are generally the same as those from regulated stormwater. Sources include residential and commercial application of fertilizer, land disturbance and poorly vegetated surfaces, atmospheric deposition

of nutrients, pet wastes, and developed properties. Together with regulated stormwater, the nitrogen, phosphorus, and sediment loads affect local water quality and habitats and represent a significant proportion of nitrogen, phosphorus, and sediment loads to the Bay. The CBP estimates that, in 2009, urban and suburban development and runoff contributed to 16 percent of the sediment loadings, 15 percent of the phosphorus loadings, and 8 percent of the nitrogen loadings to the Bay (Bay Watershed Model 2009 Scenario).

The regulated sources of stormwater are discussed in the point sources section above (4.5.5). For the purposes of the TMDL, urban and suburban runoff occurring outside the NPDES regulatory purview is considered nonpoint source loading and is a component of the LA. However, note that CWA section 402(p) provides the authority to regulate many of those discharges. If any of the discharges are designated for regulation, they would then be considered part of the WLA. As discussed in Section 8 some of the unregulated sources of stormwater are being shifted from the LA portion to the WLA portion of the TMDL as potential regulated sources to further increase the reasonable assurance that the TMDL reductions will be achieved. Some jurisdictions might have state stormwater regulatory programs and, therefore, could have little to no nonregulated stormwater sources.

For additional details related to how the non-regulated stormwater runoff loads were estimated in the Bay Watershed Model, see Section 7 in the Bay Watershed Model documentation at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

### 4.6.6    Oceanic Inputs

The Chesapeake Bay is an estuary and, by definition, a mixture of fresh and salt water. The relative proportion of ocean water in any region of the Bay can be roughly estimated by its salinity because salt is a perfectly conservative tracer. The salinity of full strength seawater just outside the Chesapeake Bay mouth is about 35 parts per thousand (ppt). At mid-Bay around the where Potomac River enters the mainstem Bay, the salinity drops to about 15 ppt, or a mixture of about half seawater (43 percent) and at the Bay Bridge between Annapolis and Kent Island, Maryland, salinity drops to about 6 ppt or 20 percent seawater. While nitrogen, phosphorus and sediment concentrations are relatively low in ocean water, the large volume of seawater entering the Bay brings considerable nitrogen, phosphorus, and sediment loads to the Bay.

Ocean input loads of nitrogen, phosphorus, and sediment to the Chesapeake Bay are determined by calibration to the three Bay water quality monitoring stations at the mouth of the Chesapeake Bay by using the Curvilinear-grid Hydrodynamic Three-Dimensional model (CH3D Hydrodynamic Model), which has a model grid and domain that extends about 10 km beyond the mouth of the Bay. Ocean boundary concentrations are set monthly in the Chesapeake Bay Water Quality and Sediment Transport Model (Bay Water Quality Model) to best represent the nitrogen, phosphorus, and total suspended solids concentrations of the monitoring stations at the Chesapeake Bay month on an incoming tide.

A previous study of ocean boundary loads found that when accounting for all input loads to the Chesapeake Bay, including atmospheric deposition to tidal waters and ocean inputs, the ocean inputs were significant and accounted for about one-third of the total nitrogen and about half the total phosphorus loads to the Bay (Thomann et al. 1994). Ocean sediment inputs are

predominantly sand and have little influence on light attenuation beyond the Bay mouth and lower mainstem Bay.

Several nutrient budgets of the ocean waters off the Chesapeake, also called the Middle Atlantic Bight, have been made (Fennel et al. 2006; Howarth et al. 1995; Howarth 1998). Howarth (1998) estimates that for the northeast coast of the United States, which includes the discharge of all watersheds from Maine to Virginia draining to the Atlantic, the watershed inputs of nitrogen to coastal waters are 0.27 teragram ($10^{12}$ grams) from rivers and estuaries. Estimated inputs from direct atmospheric deposition to coastal waters are 0.21 teragram, and inputs from deep ocean upwelling are 1.54 teragrams for a total input to the coastal ocean of 2.02 teragrams.

The direct atmospheric deposition loads are roughly equivalent to the watershed loads in the northeast United States. The estimated distribution of 2001 atmospheric deposition loads to North America and adjacent coastal ocean is shown in Figure 4-18. Using the Community Multi-scale Air Quality (CMAQ) Model estimates of atmospheric deposition loads to the coastal ocean under different air scenarios provides a means of adjusting the ocean boundary loads to changes in atmospheric deposition. Appendix L describes how the ocean boundary loads were adjusted to reflect projected changes in nitrogen atmospheric deposition to the coastal ocean and, therefore, coastal ocean nitrogen loads delivered to Chesapeake Bay.



Source: Dr. Robin Dennis, EPA/ORD/NERL/AMAD/AEIB

**Figure 4-18. Estimated 2001 annual total deposition of nitrogen (kg/ha) to North America and adjacent coastal ocean.**

### 4.6.7    Streambank and Tidal Shoreline Erosion

#### Steambank Erosion

Streambank erosion is erosion from the reworking of streams and rivers, either as flow rates change as in the case of increased imperviousness in a watershed (Center for Watershed Protection 2003), because of long-term changes in the landscape (Walter and Merritts 2008; Trimble 1999), or as a natural process of river channel dynamics (Leopold et al. 1995).

In the Chesapeake Bay watershed, the relative amounts of streambank erosion and erosion from the land is difficult to quantify (Gellis et al. 2009) because the water quality monitoring stations measure the total suspended sediment in the free-flowing rivers, which is composed of sediment from both sources. The Bay Watershed Model has estimates of land erosion derived from RUSLE estimates made in the National Resource Inventory (http://www.nrcs.usda.gov/technical/NRI/), which could be used to quantify that source of sediment relative to the scour and erosion simulated in the rivers, but both sources of information are thought to be too crude to estimate the splits in erosion loads on a segment basis. However, on a watershed-wide basis, both sources of information estimate that 70 percent of the sediment delivered to the Bay comes from erosion from land and 30 percent comes from bank erosion. That is consistent with other estimates from research and field studies that find a wide variance of the portions of delivered erosion from land surfaces and bank erosion but could be generalized to about one-third of the erosion as coming from bank erosion (Figure 4-19).



Source: Gellis et al. 2009

**Figure 4-19. Relative estimates of sources of erosion from land sources (crop, forest, or construction) or bank sources banks and ditch beds).**

Because sediment monitoring stations in the watershed collect all the sediment loads passing the station, including both land erosion and bank erosion sources, the stream bank load is accounted for, ultimately, both in the Chesapeake Bay watershed monitoring network and in the Bay Watershed Model, at least as part of the total combination of sediment from land and riverine sources. In the same way, streambank loads are also accounted for in tracking sediment load reductions from stream restoration actions and through reductions of nitrogen, phosphorus, and sediment tracked in the jurisdictions' WIPs.

## Tidal Shoreline Erosion

Tidal shoreline erosion is a combination of the erosion of fastland (or shoreline) and nearshore erosion. Figure 4-20 illustrates the tidal shoreline erosion process. Fastland and nearshore is subtidal and usually unseen. Subtidal erosion can be accelerated when shoreline protection activities such as stone revetment, a facing of stone placed on a bank or bluff to protect a slope, are used. That practice typically cuts off fastland erosion, but the reflected wave energy continues subtidal erosion until the wave energy no longer scours the bottom to the depth of a meter or more.



Source: CBP Sediment Workgroup

**Figure 4-20. Sources of total suspended solids in the Chesapeake including the two components of shoreline erosions, fastland and nearshore erosion.**

Estimates of shoreline erosion were provided for the Bay Water Quality Model. Estimates of the shore recession rate, the elevation of the fastland, and the subtidal erosion rate were used to develop the shoreline erosion estimates. Figure 4-21 demonstrates considerable variation in the sediment load delivered by sediment erosion from segment to segment.

### 4.6.8    Tidal Resuspension

The bottom of the Chesapeake Bay is covered by sediment that has been either carried into the estuary by rivers draining the Bay's extensive watershed; eroded from the Bay's lengthy shoreline; transported up-estuary from the Atlantic Ocean, through the mouth of the Bay; introduced from the atmosphere; or generated by primary productivity (Langland and Cronin 2003). Tidal resuspension is generated by episodic wave or current energy that scours the bottom sediment and resuspends the surficial sediment layers.

Chesapeake Bay TMDL



Source: Chesapeake Bay Water Quality and Sediment Transport Model.

**Figure 4-21. Estimated tidal sediment inputs for 1990 from the Chesapeake Bay watershed and from shore erosion. Shoreline sediment inputs (here labeled bank load) are estimated to be about equal to watershed inputs (here labeled as nonpoint source).**

In the Bay Water Quality Model, a wave resuspension model simulates such episodic events. In some regions of the Bay, resuspended sediment can be one of the most detrimental sediment loads to SAV restoration as shown in results of sediment scoping scenarios run on the Bay Water Quality Model (Table 4-18). The Bay Water Quality Model was run to compare the base scenario of the 2010 Tributary Strategy against model scenarios that individually eliminated watershed loads of total suspended sediment, fall line loads of total suspended sediment, shore erosion loads, sediment resuspension loads, and ocean sediment loads. The model scenarios were run to determine which sediment source was most important. In most of the mainstem Bay, sediment resuspension loads were relatively more detrimental to SAV growth than were other sediment sources.

### 4.6.9 Wildlife

Wildlife sources are rarely, if ever, considered in nitrogen and phosphorus TMDLs because wildlife only cycle nitrogen and phosphorus that already exist in the system. To the extent that wildlife increases the availability of nitrogen and phosphorus for runoff, wildlife nitrogen and phosphorus loads are inherently represented in land use sources. As a specific example, the loads

Chesapeake Bay TMDL

**Table 4-18. Chesapeake Bay Water Quality and Sediment Transport Model -simulated SAV acres under a range of sediment scoping scenarios compared with the 2010 Tributary Strategy scenario**

| CBSEG | SAV acre | No watershed loads % increase over base | SAV acre | No fall line loads % increase over base | SAV acre | No shore erosion loads % increase over base | SAV acre | No resuspension loads % increase over base | SAV acres | No ocean sed loads % increase over base |
|-------|----------|------|----------|------|----------|------|----------|------|----------|------|
| CB1TF | 11,253 | 23% | 11,001 | 20% | 9,751 | 6% | 10,344 | 13% | 9,173 | 0% |
| CB2OH | 212 | 63% | 192 | 47% | 177 | 36% | 269 | 107% | 138 | 6% |
| CB3MH | 609 | 44% | 539 | 28% | 478 | 13% | 704 | 67% | 450 | 7% |
| CB4MH | 1,150 | 30% | 1,039 | 18% | 1,096 | 24% | 1,671 | 89% | 980 | 11% |
| CB5MH | 9,432 | 9% | 9,086 | 5% | 10,341 | 20% | 14,055 | 63% | 9,177 | 6% |
| CB6PH | 825 | 21% | 695 | 2% | 701 | 3% | 980 | 44% | 728 | 7% |
| CB7PH | 14,236 | 4% | 13,798 | 1% | 13,959 | 2% | 14,582 | 7% | 14,162 | 4% |
| CB8PH | 6 | 25% | 5 | 17% | 5 | 5% | 6 | 29% | 5 | 18% |

a. The percentages are the percentage increase in simulated SAV acres over the 2010 Tributary Strategy scenario SAV acres.

from the wooded land incorporate nitrogen and phosphorus loads that are cycled through wildlife. The overall loads from the watershed and each land use type are calibrated to observed data and literature load estimates, which also include loads cycled through wildlife. As a result, no explicit allocation to wildlife is necessary or appropriate in the Bay TMDL.

## 4.6.10    Natural Background

The Bay Airshed Model, Watershed Model, and Bay Water Quality Model all include the loads from natural background conditions because all the Bay models are mass balance models and are calibrated to observed conditions. For example, the atmospheric deposition loads are monitored principally at the NADP sites. The deposition measured at those sites includes NOx from natural sources, which includes lightning, forest fires, and bacterial processes such as nitrification, which oxidizes ammonia ($NH_3$) to $NO_2$ or $NO_3$. Those sources compose about 1 percent of the NOx deposition in the Chesapeake region (USEPA 2010i). Natural background sources of ammonia are easily volatilized from land and water surfaces and are generated from the decay (ammonification) of natural sources of organic nitrogen. Those are likewise a relatively small portion, relative to anthropogenic sources, of the atmospheric loads estimated by the NADP sites.

Natural loads of nitrogen, phosphorus, and sediment from forested land are also part of the monitored load at the free-flowing stream, river, and river input monitoring stations throughout the Chesapeake Bay watershed. Because the loads are part of the total loads to which the Chesapeake Bay Program's mass balance models are calibrated, the natural nitrogen, phosphorus, and sediment loads in the system, while small, are fully accounted for in the Bay TMDL assessment.

The natural background loads can best be estimated by simulating the All Forest scenario, which includes no point source, manure, or fertilizer loads. Atmospheric deposition loads in that scenario are set at estimated pristine levels. The scenario yields delivered nitrogen, phosphorus, and sediment loads that are more than an order of magnitude less than current conditions (see Appendix J).

# SECTION 5.  CHESAPEAKE BAY MONITORING AND MODELING FRAMEWORKS

For purposes of developing the Chesapeake Bay TMDL, data and scenario results from extensive monitoring networks and a series of linked environmental models simulating the nitrogen, phosphorus, and sediment pollutant load sources and the associated water quality and biological responses have been applied to support decision making by EPA and its partner Bay watershed jurisdictions. The suite of models were developed, calibrated, and verified using long-term Bay, watershed, airshed, and land-cover monitoring network observations and published technical and scientific findings.

The suite of Bay and watershed monitoring networks and the Bay modeling framework provide the most accurate and reliable representations of the complex Bay water quality processes currently available. Quality assured monitoring data collected over multiple decades from hundreds of stations provides the most direct measures of Bay and watershed water quality conditions and biological responses. The linked Bay models are valuable tools in synthesizing an enormous amount of data and scientific findings, projecting possible outcomes to a range of management actions, and assessing pollutant load reductions needed to restore Bay water quality. Although models have some inherent uncertainty, the amount of data and resources taken to develop, calibrate, and verify the accuracy of each of the Bay models, minimized the uncertainty of the suite of Bay models.

## 5.1  TECHNICAL MONITORING AND MODELING REQUIREMENTS

The combined Chesapeake Bay monitoring networks and modeling frameworks effectively address all the factors necessary for developing a scientifically sound and reliable TMDL that meets the TMDL regulatory requirements. The factors addressed in and through the various monitoring networks and linked models include the following:

- Regulated point sources and non-regulated nonpoint sources of nitrogen, phosphorus, and sediment are fully considered and evaluated separately in terms of their relative contributions to water quality impairment of the Chesapeake Bay's tidal waters.

- Water quality impairments in the Chesapeake Bay and its tidal tributaries and embayments are temporally and spatially variable and are directly linked to nitrogen, phosphorus, and sediment pollutant loadings.

- Time-variable aspects of land-based best management practices that have a large effect on nitrogen, phosphorus, and sediment loadings and resulting water quality in the Bay are fully simulated.

- All sources of data are gathered using documented methodologies fully consistent across the Bay watershed and the Bay's tidal shorelines and waters helping to ensure equitable allocation of the resultant load reduction responsibility across the seven watershed jurisdictions and multiple pollutant source sectors.

- The Bay modeling framework takes advantage of decades of atmospheric deposition, streamflow, precipitation, water quality, biological resource, and land cover monitoring

data generated through the Bay-wide tidal and basinwide watershed monitoring networks as well as tracking and reporting of the implementation of pollution load reduction best management practices, conservation practices, and technologies for model calibration and verification.

- A wide variety of hydrological conditions, across the decadal-scale model hydrologic periods, have been characterized through decades of Bay watershed and tidal water monitoring to provide reliable simulations in support of management decisions.

- The combined monitoring networks and linked Bay models provide the ability to simulate and assess the critical spatial and temporal variability of the Bay water quality criteria parameters—dissolved oxygen, water clarity, underwater Bay grass acreage, and chlorophyll *a*—as adopted into the four Bay jurisdictions' WQS regulations.

The primary regulatory factor that must be addressed by the combined monitoring networks and linked models is whether the Bay TMDL allocation scenario will attain and maintain the applicable jurisdictions' WQS. To make that assessment, the Bay models must be able to relate the nitrogen, phosphorus, and sediment pollutant loadings from all sources and across all tidal waters to achievement of the four Bay jurisdictions' Chesapeake Bay WQS. A determination that a particular scenario achieves compliance with the applicable water quality criteria within each segment for each of the jurisdictions' WQS requires evaluating the water quality impacts of pollutant loadings on multiple parameters across all seasons over a minimum of 3 years within a 10-year hydrologic period (USEPA 2003a, 2007a). As a result, the full suite of Bay models must provide a time-variable analysis. In addition, to support a determination of reasonable assurance, the Bay modeling framework must also be useful in developing and evaluating action plans for implementation, and confirming those combined implementation actions will yield achievement of Chesapeake Bay WQS (USEPA 2008b, 2009c, 2009d).

## 5.2   BAY MONITORING FRAMEWORK OVERVIEW

In August 1984, the Chesapeake Bay tidal monitoring program was created to achieve three objectives: characterize the baseline water quality conditions; detect trends in water quality indicators; and increase the understanding of ecosystem process and factors affecting Bay water quality and living resources (MD OEP 1987). The long-term Chesapeake Bay and watershed monitoring networks have accomplished many more objectives in the past 26 years, including the following:

- Classifying status and tracking trends in tidal Bay and Bay watershed water quality and living resources response to management actions and other anthropogenic and natural factors

- Supporting a scientific basis for targeting a dual nitrogen/phosphorus load reduction strategy for Bay water quality and habitat health recovery

- Identifying eutrophication as the primary cause of the SAV decline

- Providing sufficient and diverse data supporting scientifically based and peer-reviewed estuarine water quality criteria development to guide restoration targeting and water quality assessments (e.g., CWA section 303(d) listing/delisting decisions)

- Supporting geographic and pollutant source specific targeted implementation for the most cost effective, reduction efficient management actions

- Supporting decision makers' needs for the Bay TMDL process with high-quality data underlying the Chesapeake Bay watershed and tidal water quality, sediment transport, biological resource, and filter feeder models' development, calibration, verification and management application

## 5.2.1    Partnership's Chesapeake Bay Tidal Monitoring Network

Undergoing adaptive changes over the almost three decades as the partnership's management needs and requests have significantly evolved over time (CBP 1989a, 1989b; USEPA 2003a; MRAT 2009), the Chesapeake Bay tidal monitoring network includes the following:

- Tidal water quality monitoring for 26 parameters at over 150 stations distributed over the 92 Chesapeake Bay tidal segments across Delaware, the District of Columbia, Maryland, and Virginia

- Shallow-water monitoring addressing a select set of segments on a rotational basis

- Benthic infaunal community monitoring at fixed and random stations across the tidal waters

- Annual aerial and ground surveys of underwater Bay grasses

- Decadal records of phytoplankton and zooplankton monitoring

- Fisheries independent population monitoring programs and surveys

Each component of the tidal monitoring network has been designed to support the four Bay jurisdictions' tidal water Bay section 303(d) listing decision makings, addressing DO, water clarity, SAV, and chlorophyll *a* criteria attainment assessments and benthic infaunal community-based impairment decisions (USEPA 2003a, 2004a, 2007a, 2007b, 2008a, 2010a).

The Bay tidal monitoring network is funded, operated, and maintained through a longstanding state-federal-university partnership that produced the fundamental monitoring data supporting Bay TMDL development. This data is also utilized in public reporting on the health of the Bay, its tidal rivers, and supporting ecosystem; assessment of achieving the Bay jurisdictions' Chesapeake Bay WQS regulations; evaluation of the effectiveness of actions to reduce nitrogen, phosphorus, and sediment pollution loadings from the surrounding watershed; developing, calibrating, verifying and applying models; and generating and reporting water quality and living resource indicators.

### Chesapeake Bay Water Quality Monitoring

The long-term Chesapeake Bay water quality monitoring program uses a fixed station strategy with sites distributed along the mid-channel waters of the Bay, its tidal tributaries and embayments. The exact number of stations has varied over the 26-year history of the program. A set of 162 stations that have been sampled consistently for the majority of those years is illustrated in Figure 5-1. One or more stations are in each of the 92 Bay segments. Over the 26-year history of the program, sampling frequency has ranged from 20 times per year to the

present 14 cruises annually. Synoptic sampling of all the tidal waters takes 1–2 weeks with the available funding, field staff, and sampling vessel resources.



**Figure 5-1. Tidal Chesapeake Bay water quality monitoring network stations.**

The tidal water quality monitoring program is designed to represent the complexities of the estuary. Every 2–4 weeks, a three-dimensional view is obtained by sampling various depths from the surface to the bottom of the water column at each station, with each of the 92 Bay segments having one or more sampling sites. Sites are sampled at least once each month. Standardized sampling and analytical methods are used to detect low levels of nutrients, chlorophyll *a* and particulates; these methods were approved by EPA in 1986 and are still used today (USEPA 1996).

At each station, vertical profiles of in-situ water quality measurements are made using instrumentation and standard operating procedures approved by the Chesapeake Bay Program's Analytical Methods and Quality Assurance Workgroup (see Section 5.2.3). Measurements are collected at 0.5 m, 1.0 m, 2.0 m, and 3.0 m, and at a maximum of 2-meter intervals from 1.0 m below the surface to 1.0 m above the bottom. Water temperature, DO, conductivity, and pH are recorded at each depth. Photosynthetic Active Radiation (PAR) measurements are made, and Secchi depth measurements are recorded using a Secchi disc.

At stations where stratification provides a pycnocline, as determined by the partnership's approached protocol (USEPA 2004a) discrete samples are collected at 0.5 m below the surface, at 1.5 m above the upper pycnocline, at 1.5 m below the lower pycnocline and at 1.0 m above the bottom. At stations with no identifiable pycnocline as determined by the protocol, discrete samples are collected at 0.5 m below the surface and 1.0 m above the bottom, and at the physical profiling depths which are above one-third and two-thirds the distance between the surface- and bottom-sampling depths. Each of the discrete sample depths corresponds to an in-situ water quality measured profiling depth.

### Chesapeake Bay Shallow-Water Monitoring

For shallow-water tidal habitats, monitoring consists of high-speed, spatially detailed water quality mapping (data collected every 4 seconds) called DATAFLOW, and high-frequency (15-minute measurement intervals) continuous monitoring at fixed sites (CONMON) (USEPA 2007a; MD DNR 2009; VIMS 2009). Both DATAFLOW and CONMON record high-resolution measurements of water temperature, DO concentration, DO saturation, pH, salinity (derived from conductivity), turbidity (used to estimate total suspended solids or TSS), and fluorescence (used to estimate chlorophyll *a*).

CONMON measurements are collected March to November. All sondes (i.e. data measurement devices) are either at constant depth of approximately 1 m below the surface or at a fixed depth from the bottom (0.3 m–0.5 m) depending on depth conditions. In addition to the suite of measurements collected by the CONMON meter, LI-COR sensors measure the light penetration at the site on each visit. A Secchi depth measurement is also collected. As a part of standardized operating procedures to ensure data quality, each CONMON site is serviced biweekly unless water quality readings demonstrate that weekly intervals should be maintained. During each site visit, instruments in the water are calibrated against replacement instruments and a third instrument. Discrete water samples are collected for chlorophyll *a*, turbidity, and TSS calibration. Analyses for a suite of nutrient parameters are also conducted on the discrete water sample. Upon swapping out instruments, the instrument removed from the field is returned to the lab for cleaning and lab calibration before being redeployed.

DATAFLOW is conducted on a subset of the 92 Bay segments each year with monthly measurements from April to October. Measurements are made while traveling in a boat at speeds up to 25 knots. The DATAFLOW system is compact, can fit on a small boat, and allows sampling in shallow water every 45 seconds with the ability to map an entire small tidal tributary or embayment in a day or less. This program complements the long-term fixed-station monitoring by providing data in nearshore, shallow-water habitats critical to SAV where water quality behaves differently from those measured in the mid-channel.

DATAFLOW calibration data are collected at multiple sites to either coordinate with long-term or CONMON monitoring stations, and large signal areas to insure coverage of the data gradient with the calibration. Discrete grab water samples are collected for chlorophyll. In addition, measurements of physical parameters (water temperature, DO, conductivity, pH) and Secchi depth are made, and on PAR to calculate water column light attenuation (Kd). There is extensive quality assurance/quality control (QA/QC) on the data set upon returning from the field.

To date, 65 of the 92 Chesapeake Bay segments have 1 to 3 years of shallow-water monitoring data available for assessment (Figure 5-2).

### Chesapeake Bay Benthos Monitoring

The current Bay-wide benthic monitoring program, initiated in Maryland in 1984 and in Virginia in 1985, now consists of fixed and random site components (Weisberg et al. 1997; Dauer and Llansó 2003; Llansó et al 2003). The fixed site monitoring program has 53 stations traditionally sampled annually in spring and summer to monitor changes over time (trends). All fixed sites in Maryland and Virginia are sampled using three replicate bottom grabs. The probability-based, random strata sampling was initiated in Maryland in 1994. Since 1996, the probability-based sampling program has become the standardized approach in Virginia as well, providing for a Bay-wide regulatory assessment estimating impaired habitat conditions. The impairment assessment relies on approximately 200 sites sampled between July 15 and September 30 each year (Figure 5-3).

### Chesapeake Bay Submerged Aquatic Vegetation Aerial and Ground Surveys

Consistent annual SAV aerial surveys commenced in 1984 and have been completed every year (except 1988) to the present providing detailed mapping of SAV bed coverage, acreage, estimated density, and, in combination with ground survey, species identification (Orth et al. 2010a; VIMS 2009) (Figure 5-4). In 2001 the program increased efficiency and accuracy by scanning aerial photography from digital negatives and orthorectifying (i.e., geometrically correcting) the images using image processing software. SAV beds are categorized visually according to density on the basis of percent cover estimates. SAV beds are generally photographed May through October—lower Bay SAV in May and June, and low salinity and freshwater areas August through October (Figure 5-5) (Orth et al. 2010a; VIMS 2010).



**Figure 5-2. Shallow-water monitoring illustrating segment completion and latest rotation for Maryland.**

Chesapeake Bay TMDL



Source: Dauer and Llansó 2003

**Figure 5-3. 2003-2008 Chesapeake Bay stratified random benthic sampling sites used to estimate habitat impairment through benthic community condition assessment.**



Source: http://www.vims.edu/bio/sav

**Figure 5-4. Flightlines for the annual Chesapeake Bay SAV Aerial Survey.**



**Figure 5-5. Illustration of mapped SAV beds, individual bed coding, bed density estimates, and species identification (from ground surveys).**

## Chesapeake Bay Phytoplankton Monitoring Program

The Chesapeake Bay Monitoring Network has included a Phytoplankton Monitoring Program since its start in 1984. Phytoplankton samples for species enumeration, and water samples for laboratory measurements of phytoplankton primary production are collected at fixed monitoring stations in the mainstem and tidal tributaries of the bay (Marshall et al. 2006; Lacouture 2006).

Monitoring has been performed concurrently with water quality monitoring at as many as 32 stations, however, 27 stations are currently active. Staff from Old Dominion University performed monitoring for the Virginia Department of Environmental Quality and by staff from Morgan State University Estuarine Research Center (formerly the Academy of Natural Sciences Benedict Estuarine Research Center) for the Maryland Department of the Environment/Maryland Department of Natural Resources. Monitoring data are available at http://www.chesapeakebay.net/. Virginia data after 1999 is also available at http://www.chesapeakebay.odu.edu/.

### Chesapeake Bay Zooplankton Monitoring Program

The Chesapeake Bay Monitoring Network included a Zooplankton Monitoring Program from 1984-2002 (Buchanan 1993; Carpenter et al. 2006). Mesozooplankton and microzooplankton samples for species enumeration were collected at up to 36 fixed monitoring stations in the main stem and tidal tributaries of the bay. Microzooplankton sampling was conducted in Virginia only from 1993-2002 and gelatinous zooplankton occurred only in Maryland. Monitoring usually occurred concurrently with water quality monitoring. Staff from Old Dominion University performed monitoring for the Virginia Department of Environmental Quality and by staff from Versar, Inc and Morgan State University Estuarine Research Center (formerly the Academy of Natural Sciences Benedict Estuarine Research Center) for the Maryland Department of the Environment/Maryland Department of Natural Resources. Monitoring funding was briefly reinstated to count archive samples in 2005. Monitoring data is available at http://www.chesapeakebay.net/. Virginia data collected between 1999 and 2002 is also available at http://www.chesapeakebay.odu.edu/.

### Chesapeake Bay Fisheries Monitoring Programs

There are a series of federal, state, and Baywide fisheries monitoring programs and surveys briefly described below.

- **Commercial Landings:** The NOAA National Marine Fisheries Service maintains a database of domestic fishery landings of fish and shellfish beginning with data from 1880, with Chesapeake Bay specific commercial landings data by years, states, and species; by years, states, species, and fishing gears. More information and online data can be found at: http://www.st.nmfs.gov/st1/commercial/.

- **The Blue Crab Winter Dredge Survey**: The survey serves as the only Baywide fishery-independent survey of the blue crab population, provides abundance and relative exploitation estimates, as well as recruitment and female spawning potential indices initiated in 1988 by the Maryland Department of Natural Resources and University of Maryland Chesapeake Biological Laboratory, with the Virginia Institute of Marine Science joining the following year. Data can be obtained from http://www.dnr.state.md.us/fisheries/crab/winter_dredge.html.

- **Maryland Surveys**: The Maryland Department of Natural Resources conducts a series of fisheries surveys including: Potomac River Shad Survey, Maryland American Eel Populations Surveys, Maryland Striped Bass Gill Net Seine Survey, Maryland Upper Bay Trawl Survey, Maryland Shoal Water Trawl Survey, Calvert Cliffs Pot Survey, Maryland Annual Oyster Spat Index and Disease Survey, and the Maryland Oyster Stock Assessment Program. For more information see http://www.dnr.state.md.us/FISHERIES/.

- **Virginia Surveys:** The Virginia Institute of Marine Science conducts a series of fisheries surveys including: Virginia Shad and Herring Gill Net Survey, Virginia American Eel Young of Year Survey, Virginia Striped Bass Monitoring and Tagging Survey, Virginia Shark Long Line Survey, Virginia Striped Bass Young of Year Beach Seine Survey, Virginia Blue Crab Megalopae Monitoring Program, Virginia Juvenile Fish and Blue Crab Trawl Survey, Virginia Spring and Fall Oyster Bar Survey, and the Virginia Oyster Spat Survey. For more information see http://www.vims.edu/research/departments/fisheries/programs/.

## 5.2.2    Partnership's Watershed Monitoring Network

The Chesapeake Bay watershed monitoring network is a network of 85 streamflow gauges and water-quality sampling sites operated across the Bay watershed (CBP 2004a; MRAT 2009) (Figure 5-6). The network is an essential component to reporting, tracking, and modeling stream flow as well as nitrogen, phosphorus, and sediment concentrations and loads across the Chesapeake Bay watershed as it provides the only consistent, coordinated monitoring effort across all seven Chesapeake Bay watershed jurisdictions. Data from the watershed monitoring network sites have been used to develop, calibrate, and verify the Phase 5.3 Chesapeake Bay Watershed Model (USEPA 2010j).

The CBP partnership designed the watershed streamflow and water-quality sampling network in 2004 and signed a MOU in September 2004 to implement the network (Chesapeake Bay Watershed Partners 2004). The watershed monitoring network has undergone multiple scientific reviews since its inception (e.g., STAC 2005a, 2005b; MRAT 2009). After a 2009 review of the monitoring network, the original objectives of the network were modified to reflect a balance between the long-term monitoring goals of CBP partners and the increased need for tracking changes that could result from management actions (restoration) and other changes occurring in the watershed. The new objectives, as adopted by the partnership through the CBP's Management Board (MRAT 2009), are as follows:

1. Measure and assess the status and trends of nitrogen, phosphorus, and sediment concentrations and loads in major tributaries and subwatersheds and selected tributary strategy basins

2. Provide data suitable for the assessment of factors affecting nitrogen, phosphorus, and sediment status and trends from major pollutant source sectors

3. Measure and assess the effects of targeted management and land-use change

4. Improve calibration and verification of the partners' watershed models

5. Support spatial and topical prioritization of pollutant reduction, restoration, and preservation actions

As of 2010, the watershed monitoring network has 85 sites consisting of 67 sites fully implemented (primary) and another 18 sites partially implemented (secondary) (CBP 2010a) (Figure 5-6). All primary sites have the following: (1) continuous U.S. Geological Survey (USGS) streamflow gaging; (2) 20 water chemistry samples collected annually over a range of stream flow conditions (12 base flow and 8 storm flow); (3) nitrogen, phosphorus, and sediment parameter analyses; and (4) collection techniques that ensure representative samples (CBP 2008).

Chesapeake Bay TMDL

At secondary sites, all the requirements for primary sites are met except storm sampling (Figure 5-6). More than 30 of the primary sites are in locations where monitoring has been coordinated for decades, allowing for trend analysis at the locations. Trend analysis has recently become possible on the remaining sites as they accumulate the minimum of 5 continuous years of data.



Source: CBP 2010a

**Figure 5-6. Chesapeake Bay watershed monitoring network.**

The Chesapeake Bay watershed monitoring network is designed to measure the discharge of nitrogen, phosphorus, and sediment loads from 85 sites in watersheds larger than 1,000 square kilometers. Routine samples are collected monthly with additional storm-event samples to obtain a range of discharges and loadings. The seven jurisdictions, the Susquehanna River Basin Commission, and USGS all use the same set of standardized CBP protocols that are based on USGS sampling methods and EPA-approved analytical methods (CBP 2008).

### 5.2.3    Data Quality and Access

The EPA Chesapeake Bay Program Office operates the quality assurance (QA) program that covers all internal and external Chesapeake Bay Program activities that involve the collection, evaluation, and/or use of environmental data on behalf of the partnership. The QA program meets the requirements of EPA Order CIO 2105.0 for EPA programs, i.e., the American National Standard ANSI/ASQC E4-1994. The QA program also satisfies the requirements of the *EPA Information Quality Guidelines*, which describe how EPA organizations meet the Data Quality Act[1] (USEPA 2002b). The CBP Office *Quality Assurance Program Management Plan* describes the QA systems and is reviewed regularly and approved by EPA Region 3 (USEPA 2010k).

The CBP partnership has maintained a research-quality monitoring program for Chesapeake Bay tidal waters since the late 1980s when standardized sampling, analytical, and data management procedures were developed and coordinated with the then Maryland Office of Environmental Programs and the Virginia State Water Control Board. River Input Monitoring Program was then initiated at the major fall lines to measure nutrient and sediment loadings from the watershed's nine largest rivers and integrated into the QA program. Coordinated water quality monitoring was later expanded upstream into the free flowing rivers and streams across the Bay watershed, with seven watershed jurisdictions using comparable protocols (Chesapeake Watershed Partners 2004; CBP 2008).

Each of the partnership's monitoring programs produces a continuous record of high-quality data. As each of the monitoring programs is designed, in part, to detect trends in water quality constituents, therefore, trend analyses require very reproducible data over time collected at the lowest possible limits of detection. Changes in methods, laboratories, instruments, sampling sites, and such, can affect the results, so changes are carefully evaluated and approved to preserve the reproducibility of the data sets over time. Data comparability among watershed jurisdictions is reviewed every 3 months through the Chesapeake Bay Coordinated Split Sample Program (USEPA 1991a). The CBP Office evaluates the accuracy of laboratory data every 3 months by reviewing results of performance evaluation samples, e.g., CBP Blind Audit Samples[2] and USGS Standard Reference Samples.[3]

---

[1] Section 515(a) of the Treasury and General Government Appropriations Act for Fiscal Year 2001, Public Law 106-554; H.R. 5658.

[2] See http://nasl.cbl.umces.edu/.

[3] See http://bqs.usgs.gov/srs/.

All federally funded organizations performing field sampling, laboratory analysis and/or data analysis as part of the Chesapeake Bay tidal and watershed monitoring networks have EPA-approved QA plans and standard operating procedures that conform to the CBP Recommended Guidelines for Sampling and Analysis (USEPA 1996). These guidelines, updated periodically, reviewed and approved by the CBP Analytical Methods and Quality Assurance Workgroup, and then posted on-line, specify sampling and analytical methods, precision and accuracy checks and tolerances, and documentation requirements. The QA documents for individual partner organizations responsible for components of the larger tidal and watershed water quality monitoring networks are on the CBP partnership website at http://www.chesapeakebay.net/qualityassurance_wq.aspx.

The CBP Office conducts routine audits of field and laboratory operations to ensure that the procedures are carried out according to their approved QA plans. Several organizations conduct their own internal field audits or require the use of accredited environmental laboratories.

**Online Chesapeake Bay Monitoring Networks data submission, data access, and quality assurance resources:**

Chesapeake Bay Program Data Hub
http://www.chesapeakebay.net/dataandtools.aspx?menuitem=14872

CBP Water Quality Database
http://www.chesapeakebay.net/data_waterquality.aspx

CBP Map of Mainstem and Tributary Stations
http://archive.chesapeakebay.net/pubs/maps/2004-149.pdf

CBP Online Water Quality Data Dictionary
http://archive.chesapeakebay.net/data/data_dict.cfm?DB_CODE=CBP_WQDB

Guide to Using CBP Water Quality Data
http://archive.chesapeakebay.net/pubs/wqusers.pdf

CBP Recommended Guidelines for Sampling and Analysis
http://www.chesapeakebay.net/committee/analyticalmethodsworkgroup_agencies,institutions,andprojects.aspx?menuitem=16701

CBP Blind Audit Sample Program
http://nasl.cbl.umces.edu/

USGS Standard Reference Samples
http://bqs.usgs.gov/srs

CBPO Quality Assurance Program
http://www.chesapeakebay.net/qualityassurance_wq.aspx

CBP Analytical Methods and Quality Assurance Workgroup
http://www.chesapeakebay.net/committee_analyticalmethodsworkgroup_info.aspx

CBP Data and Information Tracking System
http://archive.chesapeakebay.net/pubs/DAITS_9_21_10.pdf

Partners involved in water quality monitoring are required to submit Quality Assurance Project Plans. Cooperators undergo annual field visits, laboratories cooperative with annual on-site inspections and participate in quarterly multi-laboratory split sample evaluations to assure comparability among laboratories. The split samples are surface samples from a location in the mainstem Chesapeake Bay. Since 1987, within programs of routinely collected data, QA data are submitted for chemically analyzed parameters in the form of field split samples, lab duplicates, and lab-spiked samples. Further blind audits are conducted semi-annually.

Chesapeake Bay TMDL

The Analytical Methods and Quality Assurance Workgroup[4] has been part of the CBP organizational structure since 1988. The workgroup, composed of field sampling team and laboratory managers provides technical peer reviews of data collection and reporting activities to ensure consistency among the sampling and analytical organizations (Figure 5-7). The Workgroup reviews blind audit and coordinated split sample results and identifies potential causes of observed differences. Special studies or corrective actions might be necessary to ensure inter-laboratory agreement. If differences are found to affect subsequent data analyses, the associated bias is quantified and documented in Data and Information Tracking System (DAITS). DAITS is a registry of technical investigations regarding the quality and use of water quality data sets.

### 5.2.4    Data Submission and Quality Assurance

Water quality data are submitted electronically to the CBP Office by the participating data providers (Figure 5-7) according to data submission requirements specified in the federal grant/cooperative agreement assistance award provisions (USEPA 2010b). Agencies collecting data as part of the Chesapeake Bay tidal water quality monitoring program submit data to the Chesapeake Information Management System (CIMS) within 60 days of the end of the month in which the sample was collected. Watershed streamflow and water quality monitoring data are submitted once per year. The Data Upload and Quality Assurance Tool (DUQAT) is an automated online tool available to data submitters who manage the processing of their data before it is included in the database. DUQUAT proceeds through more than 150 format and QA checks, provides a report on errors and outliers and, after formal acceptance by the submitter and CBP data manager, loads the data into the CIMS Water Quality Database. The final report from the QA-checks is archived and available for future reference. The *CIMS Data Upload & Quality Assurance Tool User's Guide*[5] gives directions on how to use the tool and shows the correct table formats (Lane 2004). The database for the Chesapeake Bay watershed monitoring network is being developed and data submittals from the participating partners will be required to pass through a modified version of DUQAT before acceptance into the database.

After a water quality data submission has passed through DUQAT, and within 24 hours after acceptance, the data are added to the Water Quality Database and made available to the public on the CBP Data Hub.[6] The Data Hub interface provides access to several types of data related to the Chesapeake Bay. It provides links to CBP water quality, living resources (benthic, phytoplankton, zooplankton), and wastewater treatment and discharging facilities databases, and external links to partner data sets and databases available on the Data Hub. A data download tool is available for each CBP database that allows for queries based upon user-defined inputs such as geographic region and date range. Each query results in a downloadable, tab- or comma-delimited text file that can be imported to any program (e.g., SAS, Excel, and Access) for further analysis. About 12,000 sampling events comprising 8,000,000 data records are housed in the Water Quality Database from 1984 to present that are available to the public (scientists, data analysts, and private citizens).

---

[4] See http://www.chesapeakebay.net/committee_analyticalmethodsworkgroup_info.aspx.
[5] See http://archive.chesapeakebay.net/pubs/DUQATUsersGuide.pdf.
[6] See http://www.chesapeakebay.net/dataandtools.aspx?menuitem=14872.

Chesapeake Bay TMDL



Source: Chesapeake Bay Program Office

**Figure 5-7. Chesapeake Bay tidal and watershed water quality monitoring networks' participants arrayed by their role in sample collection, laboratory analysis, and/or data reporting.**

Laboratory Abbreviations:
CBL – University of Maryland Chesapeake Biological Laboratory
DCLS – Virginia Department of Consolidated Laboratory Services
DHMH – Maryland Department of Health and Mental Hygiene
DNREC – Delaware Department of Natural Resources and Environmental Quality
DNREC ESL – Delaware Natural Resources Environmental Laboratory Services
Md. DNR – Maryland Department of Natural Resources
NWQL – National Water Quality Laboratory
NYSDEP – New York State Department of Environmental Conservation
ODU – Old Dominion University Water Quality Laboratory
PADEP – Pennsylvania Department of Environmental Protection
SRBC – Susquehanna River Basin Commission
USGS – United States Geological Survey (Md., Pa., Va. & W.Va. Water Science Centers)
Va. DEQ – Virginia Department of Environmental Quality
VIMS – Virginia Institute of Marine Science

December 29, 2010

All required data submissions from the monitoring programs described must meet the data requirements set forth in the *Chesapeake Bay Program Guidance and Policies for Data, Information and Document Outputs Submission* (USEPA 2010b). All living resources data deliverables are sent in a format compliant with Appendix E of the 2000 Users Guide to Living Resources Data when submitted to the CBP (USEPA 2000).

Database documentation and metadata links for the various sampling programs are available for viewing and download. A map of mainstem and tributary monitoring stations[7] is available and helps users query for data in a specific geographic region of the watershed. The *Guide to Using CBP Water Quality Monitoring Data* describes the Chesapeake Bay tidal water quality monitoring program in general and provides detailed information about the existing database (CBP 2010b). The *Water Quality Database Design and Data Dictionary* is a resource that defines the development of the database and provides a detailed description of the tables and data in the database (CBP 2004b). The online version of the Water Quality Data Dictionary provides the up-to-date CIMS and CBP codes used in the Water Quality Database.

### 5.2.5    Monitoring Applications in Chesapeake Bay TMDL Development

Data collected through the Chesapeake Bay tidal and watershed monitoring networks over the last three decades, described above, have been applied in numerous ways, supporting the development of the Bay TMDL:

- Used to develop the original Chesapeake Bay segmentation scheme and its subsequent refinements (USEPA 1983b, 2004b, 2005)

- Used in derivation of the DO, water clarity, SAV restoration acreage, and chlorophyll *a* criteria published by EPA on behalf of the partnership (USEPA 2003a)

- Used in the delineation of the spatial boundaries of the five Chesapeake Bay tidal water designated uses (USEPA 2003d, 2004e, 2010a)

- Used in the original development and ongoing refinement of the Chesapeake Bay water quality criteria assessment procedures (USEPA 2003a, 2004a, 2007a, 2007b, 2008a, 2010a)

- Used by four Bay jurisdictions to assess achievement of their respective Chesapeake Bay WQS regulations and development of their section 303(d) lists (USEPA 2007a)

- Used in the development, calibration, verification and management application of the Phase 5.3 Chesapeake Bay Watershed Model and Chesapeake Bay Water Quality Model (Cerco and Noel 2004; Cerco et al. 2010; USEPA 2010j)

## 5.3    MODELING FRAMEWORK OVERVIEW

Since the early 1980s, the CBP partnership has developed and applied multiple generations of linked environmental models to help evaluate the response of Chesapeake Bay water quality to a multitude of pollutant control management scenarios and programmatic approaches (Figure 5-8).

---

[7] See http://archive.chesapeakebay.net/pubs/maps/2004-149.pdf.



**Figure 5-8. Chesapeake Bay TMDL modeling framework.**

The fourth and fifth generations of some of these environmental models have been applied to support development of the Chesapeake Bay TMDL.

The Chesapeake Bay models are state-of-the-science and played a pivotal role in the development of the Bay TMDL. However, these models are just one of the tools in the TMDL analysis that also includes monitoring and environmental research. The models produce estimates, not perfect forecasts. Hence, they reduce, but do not eliminate, uncertainty in environmental decision making. Used properly, the suite of Bay models provide best estimates for developing nitrogen, phosphorus, and sediment reductions that are most protective of the environment. Ultimately, the Chesapeake Bay TMDL was based on the overall corroboration of the suite of Chesapeake Bay models, the Bay tidal and watershed monitoring networks, and environmental research.

The two major components of the Chesapeake Bay TMDL modeling framework are the Phase 5.3 Chesapeake Bay Watershed Model (Bay Watershed Model) and the Chesapeake Bay Water Quality and Sediment Transport Model (Bay Water Quality Model). Several other models and tools were used to provide critical inputs or to facilitate parameterizing (i.e., selecting the model components and their attributes that best describe the relevant characteristics of the watershed) the Bay Watershed Model to run various management scenarios (Table 5-1).

The models used to develop the Chesapeake Bay TMDL simulate the same 10-year hydrologic period from 1991 to 2000. The models are linked together so that the output of one simulation provides input data for another model (Figure 5-8). For example, the nitrogen outputs from the

Chesapeake Bay Airshed Model affect the nitrogen input from atmospheric deposition to the Bay Watershed Model. The Bay Watershed Model, in turn, transports the total nitrogen, phosphorus, and sediment loads, including the contributions from atmospheric deposition, to the Bay Water Quality Model. The Bay Water Quality Model, in turn, simulates the effects of the nitrogen, phosphorus, and sediment loads generated by the Bay Watershed Model and the effects of direct atmospheric deposition to tidal surface waters on Bay water quality (e.g., DO, water clarity, chlorophyll *a*), exchange of nitrogen, phosphorus, and oxygen with bottom sediment, and living resources (e.g., underwater Bay grasses, algae, microscopic animals, bottom sediment dwelling worms and clams, oysters, and menhaden).

**Table 5-1. Modeling tools supporting development of the Chesapeake Bay TMDL**

| Model | Function |
|---|---|
| Chesapeake Bay Airshed Model | Provides estimates of wet and dry atmospheric deposition to the Bay watershed and Bay water quality models |
| Chesapeake Bay Land Change Model, Version 4 | Provides annual time series of land uses to the Bay Watershed Model as well as projects land uses out to 2030 |
| Chesapeake Bay Spatially Referenced Regressions on Watershed Attributes (SPARROW) Model | Provides a general calibration check on the Bay Watershed Model's land use and riverine loads |
| Chesapeake Bay Scenario Builder | Facilitates the creation of input decks for Bay Watershed Model management scenarios |
| Phase 5.3 Chesapeake Bay Community Watershed Model | Simulates loading and transport of nitrogen, phosphorus, and sediment from pollutant sources throughout the Bay watershed<br><br>Provides estimates of watershed nitrogen, phosphorus, and sediment loads resulting from various management scenarios |
| Chesapeake Bay Water Quality/Sediment Transport Model | Simulates estuarine hydrodynamics, water quality, sediment transport, and key living resources such as algae, microscopic animals, bottom sediment dwelling worms and clams, underwater grasses, and oyster and menhaden filter feeding<br><br>Predicts Bay water quality resulting from various management scenarios<br><br>Ensures allocated loads under the Bay TMDL will meet jurisdictions' Bay water quality standards |
| Chesapeake Bay Criteria Assessment Program | Assesses attainment of the jurisdictions' Bay water quality standards using a unique combination of Bay Water Quality Model management scenario outputs and Bay water quality monitoring data |
| Chesapeake Bay Climate Change Simulation | Uses aspects of downscaled data from a suite of Global Climate Models, the Bay Watershed Model, and the Bay Water Quality Model to simulate climate change effects in the Chesapeake Bay and its watershed |

The following sections provide additional details about each of the Bay models and other decision support tools used in development of the Chesapeake Bay TMDL and the linkages between the various models and tools. For each model/tool, the sections provide a general description of the model and how it was used in developing the Chesapeake Bay TMDL. Links to more detailed, online documentation are provided. Appendix B contains a more extensive list of Bay model related documentation, reports, independent scientific peer reviews, and model scenario inputs and outputs all with links for on-line access.

## 5.4   CHESAPEAKE BAY AIRSHED MODEL

The Chesapeake Bay Airshed Model (Bay Airshed Model) provides estimates of nitrogen deposition resulting from changes in emissions from utility, mobile, and industrial sources because of management actions or growth.

The Bay Airshed Model was used to provide inputs of nitrogen from wet and dry deposition to the Bay Watershed Model and to the Bay Water Quality Model. The Bay Airshed Model is linked to the Bay Watershed Model through atmospheric deposition to land surfaces and free flowing streams and rivers and to the Bay Water Quality Model through direct atmospheric deposition to the tidal surface waters of Chesapeake Bay (USEPA 2010j).

The Bay Airshed Model combines a wet deposition regression model (Figure 5-9) (Grimm and Lynch 2000; 2005), and a continental-scale air quality model of North America called the Community Multiscale Air Quality Model (CMAQ) for estimates of dry deposition (Figure 5-10) (Dennis et al. 2007; Hameedi et al. 2007). Wet deposition occurs during precipitation events and contributes to the loads only during days of rain or snow. Dry deposition occurs continuously and is input at a constant rate every day.

The CMAQ scenarios include the management actions required by the Clean Air Act (CAA) in 2010, 2020, and 2030. The future year scenarios reflect emissions reductions from national control programs for both stationary and mobile sources, including the Clean Air Transport Rule (Replacement for the Clean Air Interstate Rule), the Tier-2 Vehicle Rule, the Nonroad Engine Rule, the Heavy-Duty Diesel Engine Rule, and the Locomotive/Marine Engine Rule (see Section 6.4.1 and Appendix L for more details).

The CMAQ provides monthly constants for dry deposition. It requires a variety of input files that contain information pertaining to the entire North American continent. Those include hourly emissions estimates and meteorological data in every grid cell and a set of pollutant concentrations to initialize the model and to specify concentrations along the modeling domain boundaries. The initial and boundary concentrations were obtained from output of a global chemistry model.

The CMAQ simulation period is for one year, 2002, characterized as an average deposition year. The 2002 CMAQ simulation year was used to provide the monthly dry deposition estimate for each year of Bay model simulation from 1985 to 2010.

Chesapeake Bay TMDL



Source: Grimm and Lynch 2005

**Figure 5-9. Atmospheric deposition monitoring stations used in the Chesapeake Bay airshed nitrogen wet deposition regression model.**

Chesapeake Bay TMDL



Source: USEPA 2010j

**Figure 5-10. The Community Multiscale Air Quality Model's 12 km grid over the Phase 5.3 Chesapeake Bay Watershed Model county segmentation.**

December 29, 2010

The wet deposition regression model provides hourly wet deposition loads to each land-segment on the basis of each land-segment's rainfall. The regression model uses 29 National Atmospheric Deposition Program monitoring stations and 6 AIRMoN stations to form a regression of wetfall deposition across the entire Phase 5 Chesapeake Bay Watershed Model domain over the entire simulation period (see Appendix L).

To account for wet deposition of nitrogen, EPA both developed a specific TMDL load allocation (LA) for the direct nitrogen atmospheric deposition onto the tidal surface waters of Chesapeake Bay and accounted for air deposition of nitrogen to the Bay watershed in the LAs of the watershed-based sources. The Bay TMDL air load allocation reflects the modeled atmospheric nitrogen deposition to the tidal surface waters of the Bay, taking into account the reduction in air emissions expected from sources regulated under existing or planned federal CAA authorized programs (see Section 6.4.1 and Appendix L).

Detailed information related to the Bay Airshed Model and its application in development of the Chesapeake Bay TMDL is available in Section 5 of the Phase 5.3 Chesapeake Bay Watershed Model Report (USEPA 2010j) at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

## 5.5   CHESAPEAKE BAY LAND CHANGE MODEL

The Phase 5.3 Chesapeake Bay Watershed Model makes use of annually changing land use profiles derived from the Chesapeake Bay Land Change Model.

### 5.5.1    Motivations for Developing Future Land Use Estimates

A major challenge facing water resource managers today is how to maintain progress restoring the Chesapeake Bay in the face of continued population and urban development. The Chesapeake Bay Land Change Model (Bay Land Change Model) was developed to help address this management challenge. In conjunction with the Bay Watershed Model, the Bay Land Change Model can be used to assess potential future changes in nitrogen, phosphorus, and sediment loads to the Bay.

### 5.5.2    Scale of Chesapeake Bay Land Change Model Future Land Use Estimates

To meet the data requirements of Bay Watershed Model, the Bay Land Change Model forecasts change at the Bay Watershed Model segment scale. Version 4 of the Bay Land Change Model includes more than 2,000 modeling segments (e.g., polygons) in the Bay watershed and intersecting counties (Figure 5-11). The segments were created on the basis of an intersection of county boundaries, major topographic divides, and a 1:250,000 scale river reach drainage area network. Because the modeling segments are within counties, all data generated at the modeling segment scale can also be provided at the county scale for local review and comment.

Chesapeake Bay TMDL



Source: Irani and Claggett 2010

**Figure 5-11. 2006 Land cover conditions in the Chesapeake Bay watershed and intersecting counties.**

### 5.5.3 Components of Chesapeake Bay Land Change Model Future Land Use Estimates

In support of the CBP management concerns, researchers from USGS, EPA, Shippensburg University, and a private consultant developed the Chesapeake Bay Land Change Model, which combines the strengths of a growth allocation model or GAMe (Reilly 2003), with those of a cellular automata model, SLEUTH (slope, land use, excluded land, urban extent, transportation, and hillshade) (Clarke et al. 1997; Jantz et al. 2003). GAMe projects future urban developed area at the Bay Watershed Model segment scale by fitting total housing unit trends over the 1990s to a Gompertz (exponential S-shaped) Curve that is then used to extrapolate housing trends to the year 2030. County population projections converted to county scale estimates of total housing demand are used to constrain the modeling segment scale forecasts generated using the Gompertz Curve. After the model segment scale forecasts of housing demand are adjusted to match the county scale housing demand totals, they are converted to an estimate of future urban developed area using segment-specific ratios of urban developed land cover area to total housing units.

The proportions of structural development growth occurring on farmland, forest land, sewer, septic, and within existing developed boundaries are determined uniquely for each Bay Watershed Model segment using the SLEUTH growth model, a stochastic cellular automata model customized for application in the Chesapeake Bay watershed by Goetz and Jantz (2006). SLEUTH extrapolates historic rates and patterns of urban developed growth into the future using satellite derived imagery of 1990 and 2000 impervious cover. SLEUTH was calibrated separately in 15 different county clusters in the Bay watershed. Counties were clustered according to shared characteristics of urban developed growth, commuting patterns, and state and ecoregion boundaries. SLEUTH uses a Monte Carlo method to generate multiple simulations of future growth, which are combined to create a probability map of future urban development. The output from SLEUTH is a 30-m resolution probability raster data set that indicates the probability of urban developed growth in the year 2030 with values ranging from 0 to 100 percent.

The patterns of probable growth can vary for each cluster of counties by the coefficients used to calibrate SLEUTH in each cluster. The patterns and levels of probable urban development can also vary within a county by local factors of attraction and repulsion. The factors are represented in a 30-m resolution raster data set referred to as an exclusion layer. Local areas off limits to development can include public lands, conservation easements, rurally zoned lands, steep slopes (greater than 21 percent grade), emergent wetlands, and open water. For the Bay watershed, an exclusion layer was created in a GIS using information on public and protected lands, generalized zoning, and land cover. Values greater than 50 are relatively repulsive to growth with 100 being completely excluded. Values less than 50 are relatively attractive to growth (e.g., areas zoned for moderate or high density growth). The midpoint, 50, is neutral.

The probability output from SLEUTH is overlaid onto a raster land cover data set to determine the relative proportions of land cover classes and sewer areas affected by future growth. For example, if a cell with a 50 percent probability of becoming developed by 2030 overlays a forest cell in the land cover map, 50 percent of that cell is considered forest loss. For each modeling segment, the total acreage of all land cover classes converted to urban developed are summed and divided by the total of urban developed acreage forecasted in the modeling segment. That

process generates relative proportions of future growth by land cover class for each modeling segment. Multiplying those proportions by the acreage of forecasted growth (generated by GAMe) determines how much acreage to subtract or add in future years to the Phase 5.3 Bay Watershed Model 2002 baseline land use classes.

The Bay Land Change Model also includes a Sewer Model to estimate the population on sewer and septic in the years 2000 and 2030. Where local data were not available, a population density raster data set derived from year 2000 Census Block Group data and detailed road vector files were used to represent probable sewered areas in the year 2000. The approach captures 81 percent of Maryland's mapped residential sewered areas on the basis of a one-to-one cell comparison. That approach also compares favorably with survey data in Virginia representing households with sewer service in the 2001 to 2005 period.

Modeled sewered areas in the year 2000 were expanded along existing roads by 300 m to 2,000 m to represent possible expansion of the sewer network through the year 2030. Forecasted population values for each watershed modeling segment were derived by converting the housing demand forecasts into estimates of future population. Future populations on sewer and septic were estimated by overlaying the SLEUTH probability map onto the modeled sewer service areas for 2030 to derive proportions of growth on sewer and septic, which were then multiplied by the forecasted population in each modeling segment. The proportions of growth on sewer and septic were kept constant for all interim year forecasts between 2000 and 2030. The percent change in population within each sewer service area was used to estimate the percent change in flow for all wastewater treatment plants in or close to each service area.

More detailed information on the Chesapeake Bay Land Change Model and its application in the Chesapeake Bay TMDL is available in Section 4 of the Phase 5.3 Chesapeake Bay Watershed Model Report (USEPA 2010j) at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

## 5.6  CHESAPEAKE BAY SPARROW MODEL

The USGS developed a set of spatially referenced regression models to provide additional spatial detail on nutrient sources and transport processes in the Bay watershed. The SPARROW (SPAtially Referenced Regression On Watershed Attributes) model integrates monitoring data with landscape information and uses statistical methods to relate water-quality monitoring data to upstream sources and watershed characteristics that affect the fate and transport of constituents to streams, estuaries, and other receiving waterbodies (Preston et al. 2009). SPARROW is watershed based and designed for use in predicting long-term average values such as concentrations and delivered loads to downstream receiving

**For additional information on Chesapeake Bay SPARROW modeling, see the following resources:**

SPARROW fact sheet
http://pubs.usgs.gov/fs/2009/3019/

National SPARROW home page
http://water.usgs.gov/nawqa/sparrow/

Chesapeake Bay Specific
http://md.water.usgs.gov/publications/wrir-99-4054/html/index.htm
http://md.water.usgs.gov/publications/ofr-2004-1433/
http://chesapeake.usgs.gov/coast/restorationmapper.html

waters. Statistical methods are used to explain in-stream measurements of water quality in relation to upstream sources and watershed properties (e.g., soil characteristics, precipitation, and land cover).

Among its outputs, the SPARROW model can be used to quantify incremental yield or edge-of-field loading, which is the amount (load per area) of total nitrogen, phosphorus, or sediment generated in each reach basin independent of upstream load (Figure 5-12). The Chesapeake Bay SPARROW models provide loading information for three separate periods, the late 1980s, the early 1990s, and the late 1990s (Brakebill et al. 2010; Brakebill and Preston 2004, 2007; Preston and Brakebill 1999). For the Chesapeake Bay watershed modeling and TMDL development effort, EPA used the results of the SPARROW model as a data source for estimating average edge-of-field targets when developing and calibrating the Phase 5.3 Chesapeake Bay Watershed Model (USEPA 2010j).



Source: Brakebill and Preston 2007

**Figure 5-12. An example of the Chesapeake Bay SPARROW Model output showing delivered yields of total nitrogen in the Chesapeake Bay watershed.**

## 5.7   CHESAPEAKE BAY SCENARIO BUILDER

Scenario Builder is a standalone data pre-processor for the Phase 5.3 Chesapeake Bay Watershed Model. It is designed to track the land use-related nutrient processes for the multiple land use-related sources in the Bay watershed and to facilitate parameterization of those sources for watershed model scenarios to be run through the Bay Watershed Model (Figure 5-13). Scenario Builder generates information that is used to simulate loads related to animal production areas, manure storage, application of manure and fertilizers, septic inputs, plant growth/uptake, and best management practice (BMP) implementation. Scenario Builder can handle data at a variety of levels, including land-river segment, river segment, land segment, county, state and basin, tributary strategy basin, or state and can vary by the BMP in question. Scenario Builder is

designed so that users may select an area of one or more counties, the livestock types, and the number of animals, along with a land use using the 25 Watershed Model-HSPF categories and then be able to alter the crop mix that is nested in each of the agricultural land uses along with BMPs.



**Figure 5-13. Scenario Builder conceptual process.**

Scenario Builder estimates the amount of nitrogen and phosphorus load that will be generated by a given land use in the presence of agricultural and other land-based activities and estimates the area of soil available to be eroded. Loads are input to the Bay Watershed Model to generate modeled estimates of loads delivered to the Bay. Additional information related to Scenario Builder and its application in Bay TMDL development (USEPA 2010d) is at http://archive.chesapeakebay.net/pubs/SB_V22_Final_12_31_2010.pdf.

For the Bay TMDL, Scenario Builder was used to provide the land use-based scenario inputs to the Phase 5.3 Chesapeake Bay Watershed Model. The seven watershed jurisdictions will continue using it when implementing their Watershed Implementation Plans to build model scenarios of their actual and future implementation practices that will, in turn, be run through the Bay Watershed Model to track implementation status and project future implementation rates.

## 5.8   PHASE 5.3 CHESAPEAKE BAY WATERSHED MODEL

The Phase 5.3 Chesapeake Bay Watershed Model is an application of the Hydrologic Simulation Program-Fortran (HSPF) (Bicknell et al. 2005). The segmentation scheme divides the Chesapeake Bay watershed into approximately 1,000 segments/subbasins, with the average size about 64 square miles. About 280 monitoring stations throughout the Chesapeake Bay watershed were used for calibration of hydrology, while approximately 200 monitoring stations were used to calibrate water quality, depending on the constituent being calibrated. There are 530 river-segments with simulated reaches that drain to a simulated downstream reach. There are 62 river-segments with simulated reaches that drain directly to the Chesapeake Bay and 379 river-segments adjacent to tidal waters that are without a simulated reach (Figure 5-14).

The Bay Watershed Model simulation period covers 21 years from 1984 to 2005 to take advantage of more recent and expanded monitoring data and information. The expansion of the model period to a 21-year period resulted in a more representative and improved land use inventory for use in model calibration. While the Phase 4.3 Bay Watershed Model and all previous Bay watershed model versions had a constant land use, the Phase 5.3 Bay Watershed Model allows a time series of land use input data to change annually over the 1984 to 2005 simulation period (USEPA 2010j).

As a community model, the Phase 5.3 Bay Watershed Model has open source model code, pre-processors, post-processors, and input data that are freely available to the public (USEPA 2010j). Input data include precipitation information, municipal and industrial wastewater treatment and discharging facilities, atmospheric deposition, and land use (USEPA 2010j). By offering the Bay Watershed Model as a community model, end users—typically TMDL model developers and watershed researchers and implementation plan developers—can use the model independently as is or as a starting point for more detailed, small-scale models (USEPA 2010j). The Phase 5.3 Chesapeake Bay Watershed Model can be downloaded from this ftp site: ftp://ftp.chesapeakebay.net/Modeling/phase5/community/ or the Chesapeake Community Modeling Program's website at http://ches.communitymodeling.org/models/CBPhase5/datalibrary.php.

The Bay Watershed Model simulates the 21-year period (1984–2005) on a one-hour time step (USEPA 2010j). Nutrient inputs from manure, fertilizers, and atmospheric deposition are based on an annual time series using a mass balance of U.S. Census of Agriculture animal populations and crops, records of fertilizer sales, and other data sources. BMPs are incorporated on an annual time step and nutrient and sediment reduction efficiencies are varied by the size of storms. Municipal and industrial wastewater treatment and discharging facilities and onsite wastewater treatment systems' nitrogen, phosphorus, and sediment contributions are also included in the Bay Watershed Model. The following sections provide additional details regarding the underlying data used to develop and calibrate the Bay Watershed Model.

### 5.8.1   Bay Watershed Model Segmentation

In many HSPF applications, the river segmentation and the land segmentation is the same. Each river segment will have a set of land uses that drain to it and it only. In the Phase 5.3 Chesapeake Bay Watershed Model, the segmentation schemes are separate (USEPA 2010j). Land segments are generally county-based because a simulation of a representative acre of each land use type



Source: USEPA 2010j

**Figure 5-14. Segmentation and reach simulation of the Phase 5.3 Chesapeake Bay Watershed Model.**

exists in each county. Some counties in mountainous regions where the rainfall patterns varied significantly have been broken out into several land segments. The segments that result from the intersection of the two segmentation schemes are known as land-river segments (Martucci et al. 2006).

## 5.8.2    Bay Watershed Model Setup

Detailed information related to how the Bay Watershed Model was set up to support development of the Bay TMDL is available in the Phase 5.3 Chesapeake Bay Watershed Model Report (USEPA 2010j). In addition, information related to model representation of land use-related nutrient generating sources is available in the Scenario Builder documentation (USEPA 2010d). The following paragraphs provide a general description of critical data components underlying the Bay Watershed Model.

### Meteorological Data

Meteorological data are critical inputs to the Bay Watershed Model because precipitation is a primary driver of nitrogen, phosphorus, and sediment loadings to the Bay. Approximately 500 daily data and 200 hourly data precipitation monitoring stations were used in development and calibration of the Phase 5.3 Chesapeake Bay Watershed Model (USEPA 2010j). Precipitation is derived from an hourly output regression model of these stations developed by USGS. Meteorological parameters included in the simulation are hourly temperature, solar radiation, wind speed, daily dew point, cloud cover, and potential evapotranspiration. Those parameters were collected from the seven primary meteorological stations in the Chesapeake Bay watershed (USEPA 2010j).

### Withdrawals

Water withdrawals are represented in the Bay Watershed Model as daily amounts from jurisdictions' reported data of monthly or annual withdrawals. Water withdrawals include irrigation use and thermoelectric use, among others. The Bay Watershed Model also takes into account the seasonal cycle of irrigation use. Consumptive uses are modeled as 100 percent removal of the water from the appropriate stream segment, and any resulting wastewater is treated as a separately modeled point source discharge (USEPA 2010j).

### Soils and Sediment

Soil characteristics were obtained from the Natural Resources Conservation Service's Interpretation Records and the National Resources Institute. Sediment delivery from each land use is based on National Resources Institute's estimates of annual edge-of-field sediment loads, as determined by the Revised Universal Soil Loss Equation (USEPA 2010j).

### Land uses

The Phase 5.3 Chesapeake Bay Watershed Model simulates 24 land uses, including 11 types of cropland, 2 types of woodland, 3 types of pasture, 5 types of developed land, and provisions for other special land uses such as surface mines and AFOs (Table 5-2) (USEPA 2010j). Nitrogen and phosphorus in the major pervious land uses of woodland, cropland, hay, pasture, and developed pervious are simulated using the AGCHEM modules in HSPF that fully simulate

forest or crop nutrient cycling, including uptake by plants. The minor pervious land uses, which are harvested forest, land under construction, nurseries, surface mines, and degraded riparian pasture, are simulated through PQUAL, which represents nutrient export through concentration coefficients. Impervious land uses are simulated through the IQUAL modules, which use accumulation and wash-off coefficients to simulate nutrient and sediment export.

The final Phase 5.3 land use is available as a sub-county tabular database for the years 1985, 1987, 1992, 1997, 2002, and 2005 at ftp://ftp.chesapeakebay.net/Modeling/phase5/Phase%205.3%20Calibration/Model%20Input/land _use.zip. The Phase 5.3 model input decks including the land use files above are also linked with a brief explanation from the Phase 5 Model page at http://www.chesapeakebay.net/model_phase5.aspx. The Bay Watershed Model uses a continuous time series of land use interpolated from those years.

The principal databases used to develop the Phase 5.3 Bay Watershed Model, 30-meter land use coverage were the following:

- USGS Chesapeake Bay Land Cover 1984, 1992, 2001 and 2006 Data Series (CBLCD)
- County level U.S. Census of Agriculture 1982, 1987, 1992, 1997, 2002, and 2007 data
- 2001 Impervious Surface Land Cover data developed by the University of Maryland's Regional Earth Science Applications Center (RESAC) (Goetz et al. 2004)
- Ancillary data from the jurisdictions were used to develop the extractive land use cover, including spatial and tabular permitting information
- Construction land use is a percentage of impervious change

Table 5-2 provides a summary of the land use types modeled by the Phase 5.3 Bay Watershed Model, the specific land uses, and a basic description of their derivation. Additional detail is available in Section 4 of the Phase 5.3 Chesapeake Bay Watershed Model report (USEPA 2010j) at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

**Table 5-2. Phase 5.3 Chesapeake Bay Watershed Model land uses**

| Land use type | Land use | Description | Source |
|---|---|---|---|
| Agricultural | Pasture | Based on pastureland areas from the agricultural census | USDA Agricultural Census |
| | Degraded riparian pasture | Unfenced riparian areas where livestock have stream access; represents a portion of the pasture use | A unique area designated by each state as the acres of planned riparian pasture fencing in their Tributary Strategies |
| | Nutrient management pasture | Pasture that is part of a farm plan where crop nutrient management is practiced. Nutrient management pasture is pasture that receives manures that are excess on a farm after all crop nutrient needs are satisfied. | Derived from the pasture land use and state nutrient management BMP tracking data |

| Land use type | Land use | Description | Source |
|---|---|---|---|
| | Alfalfa hay | Alfalfa is a separate hay category because it is a nitrogen-fixing, leguminous crop and receives different nutrient applications than other hay crops | USDA Agricultural Census |
| | Hay-unfertilized | (Wild hay) + (cropland idle) + (cropland in cultivated summer fallow) | USDA Agricultural Census |
| | Hay-fertilized | (Hay-alfalfa, other tame, small grain, wild grass, silage, green chop, act) – (wild hay) – (alfalfa) + (cropland on which all crops failed) | USDA Agricultural Census |
| | Conventional tillage with manure | Wheat, barley, buckwheat, sunflower, corn, sorghum, soybeans and dry beans | USDA Agricultural Census |
| | | | |
| | Conventional tillage without manure | (Cotton) + (tobacco) + (land used for vegetables) + (potatoes, excluding sweet potatoes) + (sweet potatoes) + (berries) + (nursery acres in the open) + (land in orchards) | USDA Agricultural Census |
| | Conservation tillage without manure | Crops typically grown for direct human consumption (such as cotton, tobacco, vegetables, potatoes and berries) and field nurseries | USDA Agricultural Census |
| | Nursery | Container nurseries, which typically have a high density of plants (10–100 plants per square meter) and high rates of nutrient applications | USDA Agricultural Census |
| | Animal Feeding Operations | Percentage of pastureland, based on animal populations from the agricultural census | Derived from the USDA Agricultural Census count of farms and the type and numbers of animals |
| Woodland | Forest, woodlots, and wooded | Includes woodlands, woodlots, wetlands and usually any wooded area of 30 meters by 30 meters remotely sensed by spectral analysis. Predominant land use in watershed. | Largely derived from the land area the was not developed, not in the USDA Agricultural Census, and not water of lakes and rivers |
| | Harvested forest | Estimated at 1% of forest, woodlots, and wooded land use | Derived from the forest, woodlots, and wooded land use |
| Developed | High-density pervious | High-Intensity Pervious Developed (Hp) lands are immediately adjacent to High-Intensity Impervious Developed lands and include mostly small landscaped areas and lands adjacent to developed structures and major roadways. No portions of these lands are impervious | Derived from satellite data and density of road network |

| Land use type | Land use | Description | Source |
|---|---|---|---|
| | High-density impervious | High-Intensity Impervious Developed (Hi) lands contain more than 50% impervious surfaces per quarter-acre (on average) and generally represent impervious surfaces associated with large structures and major roads and include mostly commercial, industrial, and high-density residential land uses, interstates, and other major roads. | Derived from satellite data and density of road network |
| | Low-density pervious | Low Intensity Pervious Developed (Lp) lands are generally associated with Low-Intensity Impervious Developed lands and include residential lawns, golf courses, cemeteries, ball fields, developed parks, and other developed open spaces. Any impervious surfaces associated with these land uses are captured in either the low-intensity or high-intensity impervious developed classes depending on the size of the structure or road. | Derived from satellite data and density of road network |
| | Low-density impervious | Low-Intensity Impervious Developed (Li) lands contain less than 50% impervious surfaces per quarter-acre (on average) and generally represent impervious surfaces associated with small structures and minor roads and include mostly low to medium density residential areas and some sidewalks and driveways. | Derived from satellite data and density of road network |
| | MS4 | Developed land coincident with an area requiring Municipal Separate Storm Sewer System (MS4) permits. | Derived from state regulatory data |
| Minor Land uses | Bare-construction | Based on the difference between the RESAC impervious land estimates of 1990 and 2000. Impervious land, which increased over the 10-year period, was assumed to have transitioned from a bare-construction land use | Derived from a combination of impervious area and construction permits |
| | Extractive-Active and Abandoned Mines | Mines, gravel pits and areas affected by mine-related activities. In Virginia, acres are based on permit information; all others are based on RESAC data | State permitting data |
| | Open Water | Nontidal waters, acreage constant throughout model period | Satellite-derived estimate |

Source: USEPA 2010j

### Agricultural Land Uses

Satellite-derived estimates of cropland and pasture have higher uncertainty in the prediction of the extent of these land cover classes compared to the USDA Agricultural Census data in certain land-river segments, so census data were used to inform and modify the extent of these land uses. County-level total agricultural land use information from the USDA Agricultural Census data were interpolated to the base years of 1990 and 2000. Agricultural land use was distributed to the model segments by the ratio of census agricultural classes for each county, and other land uses were distributed in the remaining model segment area in proportion to their acreage in the county. Annual changes in land use were linearly extrapolated or interpolated from the 1990 and 2000 base years and years covered in the USDA Agricultural Census (1982, 1987, 1992, 1997, 2002, and 2007), resulting in annual sub-county data sets of land use.

The total agricultural area was split into different agricultural land uses, by the average ratio of crops in the USDA agricultural census. Crops were aggregated by similar surface cover characteristics and fertilizer application rates to yield categories with similar nutrient-loading properties.

State agricultural engineers provided fertilizer and manure application timing and rates, crop rotation information, and field operation timing information. Manure application is represented in a time-varying mass balance of manure nutrients, according to animal population and predominant manure handling practices (USEPA 2010j).

Animal waste areas are defined by manure acres, which allows for the simulation of high nutrient content runoff, and are based on the population of different animal types. The manure acres in a given area change based on the number of animals of each type (beef and dairy cattle, swine, laying hens, broilers and turkeys) and the implementation of animal waste management systems. Nutrient export is simulated as a concentration applied to the runoff from the manure acres (USEPA 2010j).

### Urban Land Uses

For urban land representation, high- and low-density development and the proportion of impervious and pervious area were mapped for 1990 and 2000 (USEPA 2010j).

### Other Land Uses

Other land uses represented in the model include construction, which typically has high sediment loading capacity; extractive-active and abandoned mines; and open non-tidal water.

### Future Land Use Estimations

The Chesapeake Bay Land Change Model was developed to help assess potential future changes in nutrient and sediment loads to the Bay resulting from land use changes (see Section 5.5 and Section 10.1).

### 5.8.3    Pollutant Source Representation

The Bay Watershed Model represents various sources of nitrogen, phosphorus, and sediment on the basis of the characteristics of the source and information available for characterizing the source. Point sources such as permitted wastewater and industrial dischargers that generally discharge continuously are represented directly in the Bay Watershed Model using locational data, flow, and discharge characteristics. Other sources, such as septic systems or agricultural activities, are represented in the model through the underlying land use coverage and assumptions related to nitrogen, phosphorus, and sediment production from associated land uses. Those sources can be thought of as land use-related sources because the simulation of their loading characteristics is driven by the land use categories with which they are associated. Several such land use-related sources are subject to National Pollutant Discharge Elimination System (NPDES) permits. An example of such a land use-related source is an municipal separate storm sewer system (MS4) area, which is subject to an NPDES permit and must receive a WLA in the TMDL, but loadings are derived as a function of the modeled land use loading rates for associated land uses (e.g., urban pervious land). The following paragraphs summarize the Bay Watershed Model's representation of the major sources of nitrogen, phosphorus, and sediment to the Bay. Additional minor land use sources are also detailed in the Phase 5.3 Chesapeake Bay Watershed Model Report (USEPA 2010j).

#### Municipal and Industrial Discharges

Municipal and industrial discharges are considered direct inputs to the river reaches. In the Bay Watershed Model, the river segments are simulated as a completely mixed reactor, and all the wastewater discharged loads within a reach are summed for each of the river segments and input as a daily load (USEPA 2010j).

#### Concentrated Animal Feeding Operations (CAFOs)

CAFOs are represented in the model as part of the AFO land use, which represents the production area of livestock operations. The loading is calculated on the basis of animal counts; manure nutrients production rate modified by feed considerations; time spent in pasture out of the production area; volatilization factors; and loss coefficients, which are dependent on storage facility type. The full description of the CAFO and AFO land use loads is available in the Scenario Builder documentation (USEPA 2010d) at http://archive.chesapeakebay.net/pubs/SB_V22_Final_12_31_2010.pdf.

#### Combined Sewer Overflows (CSOs)

CSO loads are not directly simulated by the Bay Watershed Model. CSO loads for the TMDL were developed using estimations of daily CSO flows and nutrient concentrations for the CSO communities in the watershed. For details related to how the CSO loads were calculated, see Section 7 of the Phase 5.3 Chesapeake Bay Watershed Model Report (USEPA 2010j) at http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169.

#### MS4s

The estimated MS4 areas were provided by each of the jurisdictions and represent the current understanding of MS4 areas. While the best and final definition of an MS4 is delineated sewersheds (drainage area served by a sewer system), most jurisdictions could provide only

municipal boundaries as an estimated MS4 area. There might be additional developed land, however, outside the municipal boundaries that also drains to the MS4 area that can be shown by GIS data. The Phase 5.3 Bay Watershed Model uses the GIS data and topographic information to delineate the sewershed, which includes all land in the municipal boundaries and developed land outside the municipal boundaries that drains to the MS4 (USEPA 2010j).

### Septic Loads

Septic system loads are calculated on the basis of U.S. Census Bureau estimates of the number of systems in the watershed and standard assumptions regarding nitrogen waste generation and attenuation. The model simulates nitrate discharges directly to stream and river reaches (USEPA 2010j).

### 5.8.4    Calibration

The Phase 5.3 Bay Watershed Model segments are defined such that segment outlets are in proximity to in-stream flow gauging and water quality monitoring stations to increase the accuracy of model calibration. Calibration involved comparing available streamflow and water quality data for the years 1985 to 2005 to watershed model calibration output for the same period.

To calibrate the model output, various water quality parameters such as simulated streamflows, TSS (sediment), total phosphorus, organic phosphorus, particulate phosphorus, phosphate, total nitrogen, nitrate, total ammonia, and organic nitrogen concentrations and loads, temperature, and DO were compared to the observed data from the in-stream monitoring sites (Figure 5-15). Through the application of an automated calibration process, model parameters were adjusted to optimize the representation of observed in-stream conditions (USEPA 2010j).

The calibrated Bay Watershed Model was run for a 21-year hydrologic period (1985–2005) to simulate loads for various evaluation scenarios. Those loads were linked to the Bay Water Quality Model to test whether a given scenario met the Bay jurisdictions' WQS in the Bay. Modeled loads are reported as the average annual load over the modeled period.

## 5.9    CHESAPEAKE BAY WATER QUALITY AND SEDIMENT TRANSPORT MODEL

The Bay Watershed Model was linked to the Chesapeake Bay Water Quality and Sediment Transport Model (Bay Water Quality Model), which in turn was used to evaluate the impacts on Bay water quality conditions in response to changes in nitrogen, phosphorus, and sediment loading levels.

The Bay Water Quality Model combines a three-dimensional hydrologic transport model (CH3D) with a eutrophication model (CE-QUAL-ICM) to predict water quality conditions in the Bay resulting from changes in loads from the contributing area (Figure 5-16). The hydrodynamic model computes intra-tidal transport using a three-dimensional grid framework of 57,000 cells (Cerco et al. 2010). The sediment transport model computes continuous three-dimensional velocities, surface elevation, vertical viscosity and diffusivity, temperature, salinity, and density using time increments of 5 minutes.

Chesapeake Bay TMDL





Source: USEPA 2010j

**Figure 5-15. Phase 5.3 Chesapeake Bay Watershed Model hydrology (upper panel) and water quality (lower panel) monitoring calibration stations overlaid on the Phase 5.3 Bay Watershed Model's river segments.**



Source: Cerco et al. 2010

**Figure 5-16. The detailed 57,000 cell grid of the Chesapeake Bay Water Quality and Sediment Transport Model.**

The hydrodynamic model was calibrated for the period 1991–2000 and verified against the large amount of observed tidal elevations, currents, and densities available for the Bay.

Computed flows, surface elevations, and vertical diffusivities from the hydrodynamic model were output at 2-hour intervals for use in the water quality model. Boundary conditions were specified at all river inflows, lateral flows, and at the mouth of the Bay.

The eutrophication (water quality) model computes algal biomass, nutrient cycling, and DO, as well as numerous additional constituents and processes using a 15-minute time step (Cerco and Cole 1993; Cerco 2000; Cerco et al. 2002; Cerco and Noel 2004). In addition, the eutrophication model incorporates a predictive sediment diagenesis[8] component, which simulates the chemical and biological processes undergone at the sediment-water interface after sediment are deposited (Di Toro 2001; Cerco and Cole 1994).

Loads to the system include distributed or nonpoint source loads, point source loads, atmospheric loads, bank loads, and wetlands loads. Nonpoint source loads enter the tidal system at tributary fall lines and as runoff below the fall lines. Point source loads are from industries and municipal wastewater treatment plants. Atmospheric loads are deposited directly to the Bay tidal surface waters. Atmospheric loads to the watershed are incorporated in the distributed loads. Bank loads originate with shoreline erosion. Wetland loads are materials created in and exported from wetlands and include exported wetland oxygen demand.

Detailed documentation on the Chesapeake Bay Water Quality and Sediment Transport Model (Cerco and Noel 2004; Cerco et al. 2010) is at http://www.chesapeakebay.net/content/publications/cbp_26167.pdf.

### 5.9.1    Nonpoint Source Loads

Nonpoint source loads to the Bay Water Quality Model are from the Phase 5.3 Bay Watershed Model. Loads are provided daily, routed to surface cells on the model grid. Routing is based on local watershed characteristics and on drainage area contributing to the cell adjacent to the land (USEPA 2010j).

### 5.9.2    Point Source Loads

Wastewater discharged loads to the Bay Water Quality Model were based on reports provided by state and local agencies which, depending on the source, were specified annually or monthly. In the model, loads from individual sources were summed into loads to model surface cells and were provided monthly (USEPA 2010j).

### 5.9.3    Atmospheric Loads

The EPA CBP Office computed the daily atmospheric loads to each Water Quality Model surface cell (USEPA 2010j). Wet deposition loads of ammonium and nitrate were derived from National Atmospheric Deposition Program observations. Dry deposition load was derived from

[8] Predictive sediment diagenesis is a predictive model of how organic material and nutrients in sediment on the Bay floor are processed.

the CMAQ. Deposition loads of organic and inorganic phosphorus were specified on a uniform, constant, areal basis derived from published values.

### 5.9.4    Bank Loads

Bank loads are the solids, carbon, nitrogen, and phosphorus loads contributed to the water column through shoreline erosion. Although erosion is episodic, bank loads can be estimated only as long-term averages by areal surveys. The volume of eroded material is commonly quantified from comparison of topographic maps or aerial photos separated by time scales of years. Consequently, the erosion estimates are averaged over periods of years, but bank loads are input into the Bay Water Quality Model as episodic events as determined by a wave energy submodel. Bank loads were estimated for shoreline and sub-tidal erosion for much of the Chesapeake Bay shoreline on a scale of about every 10 kilometers of shoreline.

### 5.9.5    Wetlands

Wetlands loads are the sources (or sinks) of oxygen and oxygen-demanding material, such as carbon, that is associated with wetlands that fringe the shore of the Bay and tributaries. These loads are invoked primarily as an aid in calibrating tidal tributary dissolved oxygen concentrations. Loads to each cell were computed by multiplying the amount of adjacent wetlands area by the amount of areal carbon export or oxygen consumption. A uniform carbon export of 0.3 grams carbon per meters$^2$ per day was employed, leading to a uniform oxygen demand of 2 gram oxygen per meters$^2$ per day. Segments receiving the largest carbon loads and subject to the greatest oxygen consumption include the mid-portion of the Bay, Tangier Sound, several Eastern Shore tidal tributaries, the tidal middle and lower James River, the tidal fresh York River, and the tidal York River mouth.

### 5.9.6    Model Setup

Within the Bay Water Quality Model, 90 of the 92 Chesapeake Bay segments are fully represented within the 57,000 model cells and fully simulated. Two Bay segments—the Western Branch Patuxent River and the Chesapeake and Delaware Canal—were either not included in the modeled Chesapeake Bay segments or not fully simulated in the Chesapeake Bay Water Quality and Sediment Transport Model. Bay TMDLs were developed for both of these Bay segments using information from the Phase 5.3 Bay Watershed Model, Bay Water Quality Model results from adjoining tidal Bay segments, and other documented sources (see Section 9).

The Western Branch Patuxent River (WBRTF) segment in Maryland (see Table 2-1 and Figure 2-5) was not simulated in the Bay Water Quality Model because of the lack of quality data on the tidal river's bathymetry (Cerco et al. 2010). In June 2000, the Maryland Department of Environment published a BOD TMDL for this tidal river segment to address DO impairments (MDE 2000). Therefore, WBRTF is listed on Category 4a for a BOD TMDL on Maryland's 2008 Integrated Report (see Table 2-1) (MDE 2008). A TMDL for segment WBRTF has been developed on the basis of: (1) Maryland Department of Environment's original BOD TMDL and loading information from the surrounding Phase 5.3 watershed model segments that drain directly into the Western Branch Patuxent River segment; and (2) outputs from the down-tide

Patuxent River segments (PAXTF, PAXOH, PAXMH), which are also listed as impaired (see Table 2-1 and Section 9) (MDE 2008).

The Delaware portion of the Chesapeake and Delaware Canal (C&DOH_DE) is simulated in the Bay Water Quality Model as a boundary condition[9] for the Delaware Bay using constant flow and load (Cerco et al. 2010). The segment is listed as impaired (see Table 2-1) (DE DNREC 2008). A Chesapeake Bay TMDL for segment C&DOH_DE was developed using a combination of loading information from the surrounding Phase 5.3 Bay Watershed Model segments that drain directly into this Bay segment and outputs from the down-tide Chesapeake Bay segments (C&DOH_MD, ELKOH, and CB1TF), which also are listed as impaired (see Table 2-1 and Section 9) (MDE 2008).

## 5.10 CHESAPEAKE BAY CRITERIA ASSESSMENT PROGRAM

Output from the Bay Water Quality Model is used to modify historical water quality monitoring observations from the period 1991–2000 for the purposes of determining Chesapeake Bay WQS attainment under various pollutant load reduction scenarios (for more details on this process, see Section 6.2.2). To perform the necessary procedures on the large amount of data required from both the Bay Water Quality Model and the Chesapeake Bay Water Quality Monitoring Program database, a set of FORTRAN modules was developed. These post-processing modules read output from the Bay Water Quality Model (hourly values for DO; daily values for chlorophyll *a*), perform regression analyses, and apply those regressions to the appropriate historical monitoring data set. Additional FORTRAN modules then perform the same standardized, automated criteria assessment procedures that are used to assess more recent monitoring data for the Bay jurisdictions' section 303(d) listing reports.

The source code for this suite of FORTRAN modules is maintained by the EPA CBP Office's Modeling and Monitoring teams on behalf of the partnership and is accessible at ftp://ftp.chesapeakebay.net/Monitoring/CriteriaAssessment/.

The process by which historical monitoring data are scenario-modified using output from the Bay Water Quality Model is summarized in Section 6.2.2. For a detailed description of the Chesapeake Bay water quality criteria assessment procedures used for generating 303(d) listings, see EPA's *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries–2008 Technical Support for Criteria Assessment Protocols Addendum* (USEPA 2008a) and EPA's *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries: 2010 Technical Support for Criteria Assessment Protocols Addendum* (USEPA 2010a).

## 5.11 CLIMATE CHANGE SIMULATION

The potential effects of future climate change were accounted for in the current Bay TMDL allocations based on a preliminary assessment of climate change impacts on the Chesapeake Bay.

---

[9] Boundary conditions refer to the definition or statement of conditions or phenomena at the boundaries of a model; water levels, flows, and concentrations that are specified at the boundaries of the area being modeled.

Because of well known limitations in the current suite of Bay models to fully simulate the effects of climate change as listed below, EPA and its partners are committed to a more comprehensive assessment in 2017. Effects of climate change already observed in the mid-Atlantic region have been factored in the Bay TMDL through the application of recent records of precipitation, streamflow, and Chesapeake Bay water column temperatures which reflect changes in the regional climate over the past several decades.

A preliminary assessment of climate change impacts on the Chesapeake Bay was conducted, in parallel, using an earlier version of the Phase 5 Bay Watershed Model and tools developed for EPA's BASINS 4 system including the Climate Assessment Tool (see Appendix E for details). Flows and associated nutrient and sediment loads were assessed in all river basins of the Chesapeake Bay with three key climate change scenarios reflecting the range of potential changes in temperature and precipitation in the year 2030. The three key scenarios came from a larger set of 42 climate change scenarios that were evaluated from seven Global Climate Models, two scenarios from the Intergovernmental Panel on Climate Change Special Report on Emissions Scenarios storylines, and three assumptions about precipitation intensity in the largest events. The 42 climate change scenarios were run on the Phase 5 Watershed Model of the Monocacy River watershed, a subbasin of the Potomac River basin in the Piedmont region, using a 2030 estimated land use based on a sophisticated land use model containing socioeconomic estimates of development throughout the watershed.

The results provide an indication of likely precipitation and flow patterns under future potential climate conditions (Linker et al. 2007, 2008) (see Appendix E). Projected temperature increases tend to increase evapotranspiration in the Bay watershed, effectively offsetting increases in precipitation. The preliminary analysis indicated overall decreases in annual stream flow, nitrogen and phosphorus loads. The higher intensity precipitation events yielded estimated increases in annual sediment loads. These preliminary findings support the nitrogen and phosphorus allocations within the Bay TMDL and application of an implicit margin of safety for these two pollutants, recognizing these loads might not increase, even decrease. These same preliminary findings support EPA's decision for an explicit sediment allocation margin of safety, recognizing the potential for increased sediment loads.

EPA and its partners are committed to conducting a more complete analysis of climate change effects on TMDL nitrogen, phosphorus, and sediment loads, which is to be made during the mid-course assessment of Chesapeake Bay TMDL progress in 2017 as called for in Section 203 of the Chesapeake Executive Order 13508 (May 12, 2009) (please see Section 10.5 for more details).

To carry out a more complete analysis of climate change effects, changes will be needed to the current suite of Bay models and tools including:

- Applying the results from the next generation of global climate change models to develop the best available estimates of the effects of climate change on the mid-Atlantic region

- Developing a better means for down-scaling the results from the applicable global climate change models to match the finer segmentation of the Phase 5.3 Chesapeake Bay Watershed Model

- Developing the means to better understand and fully simulate the interactions between increased evapotranspiration and high intensity precipitation events within the Chesapeake Bay Watershed Model

- Building the capacity to simulate the effects of change in tidal water column temperatures on all the existing temperature dependent rates and processes currently simulated with the hydrodynamic, estuarine water quality, sediment transport, living resources and filter feeder component models of the Chesapeake Bay Water Quality and Sediment Transport Model

- Reevaluate the temperature dependent effects on key species and communities (e.g., eelgrass) to ensure the latest scientific understanding has been factored into the suite of Bay models

# SECTION 6. ESTABLISHING THE ALLOCATIONS FOR THE BASIN-JURISDICTIONS

The process that informed EPA's decisions establishing the Chesapeake Bay TMDL involved many stakeholders, most notably, the Bay jurisdiction partners. A four-step process was used for the development of the TMDL. Those steps were

1. EPA defined 19 major river basin and jurisdictional loading allocations—July 1, 2010, for nitrogen and phosphorus; August 13, 2010, for sediment. The methodology that EPA used in defining those allocations is described in detail in this section.

2. Each jurisdiction developed a Phase I Watershed Implementation Plan (WIP) that described how it would achieve the target allocations for nitrogen, phosphorus, and sediment assigned to the jurisdictions and basins in step 1.

3. EPA evaluated the jurisdictions' suballocations and final Phase I WIPs to determine whether they met the jurisdiction-wide and major river basin allocations, included adequate detail to ensure that NPDES permits are consistent with the assumptions and requirements of the WLAs, and provided sufficient reasonable assurance that nonpoint source reductions could be achieved and maintained through credible and enforceable or otherwise binding strategies in jurisdictions that are signatories to the Chesapeake Bay Agreement, and similarly effective strategies in non-signatory jurisdictions. That evaluation and its results are described in detail in Section 8.

On the basis of the results of its evaluation, EPA established an allocation scenario for the final Chesapeake Bay TMDL, including allocations for each of the 92 Bay segments, using suballocations provided in the final Phase I WIPs, alternative EPA backstop allocations, or a combination of the two. Tables showing the 92 Bay segment-specific and sector-specific allocations of the Chesapeake Bay TMDL are in Section 9.

This section describes the method used to derive the basin-jurisdiction allocations described in Step 1 above. The following subsections discuss the specific approaches adopted to address specific technical aspects of the Chesapeake Bay TMDL:

- 6.1-Establishing the overall model parameters

- 6.2-Establishing the nitrogen and phosphorus model parameters

- 6.3-Methodology for establishing the basin-jurisdiction allocations for nitrogen and phosphorus

- 6.4-Establishing the Basin-jurisdiction allocations for nitrogen and phosphorus

- 6.5-Establishing the sediment model parameters

- 6.6-Establishing the basin-jurisdiction allocations for sediment

- 6.7-Basin-jurisdiction allocations to achieve the Bay WQS

- 6.8-Attainment of the District of Columbia pH WQS

The Chesapeake Bay Program partners initiated discussions related to the technical aspects of the Chesapeake Bay TMDL starting at the September 2005 Reevaluation Workshop sponsored by

what would become the partnership's Water Quality Steering Committee (Chesapeake Bay Reevaluation Steering Committee 2005). Over the next 5 years, EPA and its partners, in particular members of the Water Quality Steering Committee (2005–2008) and then the Water Quality Goal Implementation Team (WQGIT) (2009–present) systematically evaluated and agreed on approaches to address multiple technical aspects related to developing the Bay TMDL.

EPA, together with its seven watershed jurisdictional partners, developed and applied approaches and methodologies to address a number of factors in developing the Bay TMDL. A multitude of policy, programmatic, and technical issues were addressed through this collaborative process.

## 6.1    Establishing the Overall Model Parameters

The first step in the process was to establish the key parameters for the models used in developing the TMDL. The model parameters discussed below are those that are common to developing TMDLs that ensure attainment for all three water quality criteria: DO, chlorophyll *a* and submerged aquatic vegetation (SAV)/water clarity. Those key parameters are: (1) the hydrologic period, or the period that is representative of typical conditions for the waterbody; (2) the seasonal variation in water quality conditions and the factors (e.g., temperature, precipitation and wind) that directly affect those conditions; and (3) the development of daily loads for the TMDL.

### 6.1.1    Hydrologic Period

The hydrologic period for modeling purposes is the period that represents the long-term hydrologic conditions for the waterbody. This is important so that the Bay models can simulate local long-term conditions for each area of the Bay watershed and the Bay's tidal waters so that no one area is modeled with a particularly high or low loading, an unrepresentative mix of point and nonpoint sources or extremely high or low river flow. The selection of a representative hydrologic averaging period ensures that the balance between high and low river flows and the resultant point and nonpoint source loadings across the Bay watershed and Bay tidal waters are appropriate. The hydrologic period also provides the temporal boundaries on the model scenario runs from which the critical period is determined (see Section 6.2.1).

To identify the appropriate hydrologic period, EPA analyzed decades of historical stream flow data. It is important when determining representative hydrology to be able to compare various management scenarios through the suite of Bay models. In the course of evaluating options for the TMDL, EPA and its jurisdictional partners ran numerous modeling scenarios through the Bay Watershed and the Bay Water Quality Sediment Transport models with varying levels of management actions (e.g., land use, BMPs, wastewater treatment technologies) held constant against an actual record of rainfall and meteorology to examine how those management actions perform over a realistic distribution of simulated meteorological conditions.

Because of the long history of monitoring throughout the Chesapeake Bay watershed, the CBP partners were in the position of selecting a period for model application representative of typical hydrologic conditions of the 21 contiguous model simulation years—1985 to 2005. Two extreme conditions occurred during the 21-year model simulation period for the Chesapeake Bay models: Tropical Storm Juan in November 1985, and the Susquehanna *Big Melt* of January 1996. In the

Chesapeake Bay region, Tropical Storm Juan was a 100-year storm primarily affecting the Potomac and James River basins. No significant effect on SAV or DO conditions was reported in the aftermath of Tropical Storm Juan. In the case of the Susquehanna Big Melt in January 1996, a warm front brought rain to the winter snow pack in the Susquehanna River basin and caused an ice dam to form in the lower reaches of the river. No significant effects on SAV or DO were reported from that 1996 extreme event, likely because of the time of year when it occurred (late winter).

From the 21-year period, EPA selected a contiguous 10-year hydrologic period because a 10-year period provides enough contrast in different hydrologic regimes to better examine and understand water quality response to management actions over a wide range of wet and dry years. Further, a 10-year period is long enough to be representative of the long-term flow (Appendix F). Finally, a 10-year period is within today's capability of computational resources, particularly for the Chesapeake Bay Water Quality Sediment Transport Model (Bay Water Quality Model), which required high levels of parallel processing for each management scenario. The annualized Bay TMDL allocations are expressed as an average annual load over the 10-year hydrologic period.

EPA then determined which 10-year period to use by examining the statistics of long-term flow relative to each 10-year period at nine USGS gauging stations measuring the discharge of the major rivers flowing to the Bay (Appendix F). All the contiguous 10-year hydrologic periods from 1985 to 2005 appeared to be suitable because quantifiable assessments showed that all the contiguous 10-year periods had relatively similar distributions of river flow.

EPA selected the 10-year hydrologic assessment period from 1991 to 2000 from the 21-year flow record for the following reasons:

- It is one of the 10-year periods that is closest to an integrated metric of long-term flow.

- Each basin has statistics for this period that were particularly representative of the long-term flow.

- It overlaps several years with the previous 2003 tributary strategy allocation assessment period (1985–1994), which facilitated comparisons between the two assessments.

- It incorporates more recent years than the previous 2003 tributary strategy allocation assessment period (1985–1994).

- It overlaps with the Bay Water Quality Transport Model calibration period (1993–2000), which is important for the accuracy of the model predictions.

- It encompasses the 3-year critical period (1993–1995) for the Chesapeake Bay TMDL as explained in Section 6.2.1 below.

More detailed documentation on the determination of the hydrologic period is provided in Appendix F.

## 6.1.2   Seasonal Variation

A TMDL analysis must consider the seasonal variations within the watershed (CWA 303(d)(1)(C); 40 CFR 130.7). The Chesapeake Bay TMDL inherently considers all seasons

through the use of a continuous 10-year simulation period that captures seasonal precipitation on a year-to-year basis throughout the entire watershed. Furthermore, the critical periods selected for this TMDL, being a minimum of 3 consecutive years provide further assurance that the seasonality of the Bay loading and other dynamics are properly addressed in this TMDL. In this way, the TMDL simulations ensure attainment of WQS during all seasons.

### Seasonal Variation in the Jurisdictions' Bay Water Quality Standards

In the case of the Chesapeake Bay TMDL, the Chesapeake Bay WQS adopted by the four tidal Bay jurisdictions are biologically based and designed to be protective of Chesapeake living resources, including full consideration of their unique seasonal-based conditions (see Section 3) (USEPA 2003a, 2003c). To assess the degree of WQS achievement using the Bay Water Quality Model, an overlay of the time and space dimensions are simulated to develop an assessment that is protective of living resources with consideration of all critical periods within the applicable seasonal period (USEPA 2007a).

The same approach of considering the time and space of the critical conditions is applied in the assessment of the WQS achievement with observed monitoring data. Ultimately, the time and space of water quality exceedances are assessed against a reference curve derived from healthy living resource communities to determine the degree of WQS achievement (USEPA 2007a).

### Model Simulation Supporting Seasonal Variation

The suite of Chesapeake Bay Program models being used to establish the Chesapeake Bay TMDL—Bay Airshed, Bay Watershed, Bay Water Quality, Bay Sediment Transport, Bay filter feeders—all simulate the 10-year period and account for all storm events, high flows/low flows, and resultant nitrogen, phosphorus, and sediment loads across all four seasons. The full suite of Chesapeake Bay models operate on at least an hourly time-step and often at finer time-steps for the Bay Airshed Model and the Bay Water Quality Model (see Sections 5.4 and 5.9, respectively). Therefore, through proper operation of the suite of Bay models, the Chesapeake Bay TMDL considers all seasons and within season variations through the use of a continuous 10-year simulation period (see Section 6.1.1).

### Seasonal Variations Known and Addressed through Annual Loads

A key aspect of Chesapeake Bay nitrogen and phosphorus dynamics is that annual loads are the most important determinant of Chesapeake Bay water quality response (USEPA 2004c). Chesapeake Bay physical and biological processes can be viewed as integrating variations in nitrogen, phosphorus, and sediment loads over time. The integration of nitrogen, phosphorus, and sediment loads over time allows for an analysis of loads in the Chesapeake Bay that is minimally influenced by short-term temporal fluctuations. Bay water quality responds to overall loads on a seasonal to annual scale, while showing little response to daily or monthly variations within an annual load.

Numerous Chesapeake Bay studies show that annually based wastewater treatment of nitrogen and phosphorus reductions are sufficient to protect Chesapeake Bay water quality (Linker 2003, 2005). The seasonal aspects of the jurisdictions' Chesapeake Bay WQS are due to the presence and special seasonal needs of the living resources being protected (e.g., spawning), but annual nitrogen, phosphorus, and sediment load reductions are most important to achieve and maintain

the seasonal water quality criteria, some of which protect multiple season designated uses—open-water, shallow-water bay grass, and migratory spawning and nursery (USEPA 2003a, 2003d).

### 6.1.3    Daily Loads

Consistent with the D.C. Circuit Court of Appeals decision in *Friends of the Earth, Inc. v. EPA*, in addition to the annual loading expressions of the pollutants in this TMDL, EPA is also expressing its Chesapeake Bay TMDL in terms of daily time increments (446 F.3d 140 [D.C. Cir. 2006]). Specifically, the Chesapeake Bay TMDL has developed a maximum daily load based on annual and seasonal loads for nitrogen, phosphorus, and sediment for each of the 92 Chesapeake Bay segments. EPA also recognizes that it may be appropriate and necessary to identify non-daily allocations in TMDL development despite the need to also identify daily loads. In an effort to fully understand the physical and chemical dynamics of a waterbody, TMDLs can be developed using methodologies that result in the development of pollutant allocations expressed in monthly, seasonal, or annual periods consistent with the applicable WQS. TMDLs can be developed applying accepted and reasonable methodologies to calculate the most appropriate averaging period for allocations on the basis of factors such as available data, watershed and waterbody characteristics, pollutant loading considerations, applicable WQS, and the TMDL development methodology. Consistent with that policy, the Chesapeake Bay TMDL was developed and is expressed in annual loads. In addition, EPA calculated daily loads to reflect a statistical expression of an annually-based maximum daily load and a seasonally-based maximum daily load. Appendix R of this TMDL includes detailed nitrogen, phosphorus, and sediment annually based maximum daily allocations to achieve applicable WQS. The spreadsheet lists total nitrogen, phosphorus, and sediment loads as delivered to the Chesapeake Bay's tidal waters. Daily load allocations are shown for each of the 92 segments and by sources for WLAs including agriculture (CAFOs), stormwater (MS4s), wastewater (CSO) and wastewater (significant and nonsignificant by NPDES permit); and for LAs including agriculture, forest, nontidal atmospheric deposition, onsite treatment systems, and urban sources.

#### Approach for Expressing the Maximum Daily Loads

The methodology applied to calculate the expression of the maximum daily loads and associated wasteload and load allocations in the Chesapeake Bay TMDL is consistent with the approach contained in EPA's published guidance, *Establishing TMDL "Daily" Loads in Light of the Decision by the U.S. Court of Appeals for the D.C. Circuit in <u>Friends of the Earth, Inc. v. EPA, et al.</u>, No. 05-5015, (April 25, 2006) and Implications for NPDES Permits*, dated November 15, 2006 (USEPA 2006). Additionally, the analytical approach selected in the Bay TMDL is similar to the wide range of technically sound approaches and the guiding principles and assumption described in the technical document *Options for the Expression of Daily Loads in TMDLs* (USEPA 2007c).

#### Computing the Daily Maximum Loads and the Seasonal Daily Maximum Loads

Annually based maximum daily loads are derived for each of the 92 tidal segments and for each of the three pollutants—nitrogen, phosphorus, and sediment—as a direct product of the Chesapeake Bay TMDL and associated modeling. That modeling output serves as the starting point for the annually-based maximum daily load expression and the seasonally-based maximum

daily load expression. Those daily maximum loads are a function of the 10-year continuous simulation produced by the paired Bay Watershed-Bay Water Quality models. The modeling approach allows for the daily maximum load expression to be taken directly from the output of the TMDL itself, assuring a degree of consistency between the daily maximum load calculation and the annual loads necessary to meet applicable WQS included in the final TMDL. That is, the methodology uses the annual allocations derived through the modeling/TMDL analysis, and converts those annual loads to daily maximum loadings.

Both the Chesapeake Bay TMDL annually-based maximum daily load and seasonally based maximum daily load represents the 95th percentile of the distribution to protect against the presence of anomalous outliers. That expression implies a 5 percent probability that an annually-based daily or seasonal-based daily maximum load will exceed the specified value under the TMDL condition. However, during such unlikely events, compliance with the annual loading will assure that applicable WQS will be achieved.

On the basis of probability analysis, a loading that will be achieved 100 percent of the time cannot be calculated. So some percentage probability of attainment must be chosen that is less than 100 percent but high enough that there is comfort that the loading will be achieved. A 95 percent probability is often determined by EPA to be appropriate in environmental matters (like WQS and NPDES permitting) and has also been chosen in this application. The EPA guidance mentioned above provides for much discretion in selecting the percent probability to use in the daily calculation. Because the calculation is for a daily maximum value, it is EPA's professional opinion that, with regard to the Chesapeake Bay TMDL, a 95 percent probability is most appropriate. The steps employed to compute the annually or seasonally based maximum daily load for each segment were as follows:

1. Calculate the annual average loading for each of the 92 Bay segments; that would be the annual loading under the TMDL/allocation condition. Annual allocations are in Section 9 and Appendix Q.

2. Calculate the 95th percentile of the daily loads delivered to each of the 92 Bay segments (using the same loading condition as step 1).

3. Calculate the Annual/Daily Maximum ratio (ADM) for each of the 92 Bay segments by dividing the annual average load by the 95th percentile calculated in Step 2.

4. Calculate a Baywide ADM by computing a load-weighted average of all 92 Bay segments ADM ratios. Table 6-1 provides the annual Baywide ADM.

5. Divide all the annual TMDLs, WLAs, and LAs in each of the 92 Bay segments in the TMDL by the Baywide ADM. Those are the calculated annual-based daily maximum loads found in Appendix R.

6. Using the approach described in steps 1–5 above, calculate a Baywide ADM for each season for each of the 92 Bay segments. Table 6-1 provides the Seasonal Baywide ADM.

7. Divide all the annual TMDLs in each of the 92 tidal segments in the TMDL by Seasonal ADM to calculate the seasonally-based maximum daily load.

**Table 6-1. ADM for calculating daily maximum loads**

|  | Winter | Spring | Summer | Fall | All year |
|---|---|---|---|---|---|
| Total Nitrogen | 123.7 | 80.9 | 337.1 | 210.9 | 123.6 |
| Total Phosphorus | 95.8 | 60.1 | 260.7 | 141.2 | 98.2 |
| Total Suspended Solids | 96.5 | 58.0 | 384.7 | 158.1 | 100.3 |

It should be noted that a statistical expression of a daily load is just that, an expression of the probability that a specific maximum daily load will occur in a given segment for a specific pollutant. The magnitude of the TMDL allocations was established to assure the attainment of all applicable WQS in each of the 92 tidal Bay segments. EPA has provided annually based maximum daily load expressions in Appendix R. Seasonally based maximum daily loads can be calculated by dividing the annual allocations by the seasonal ADMs in Table 6-1. That seasonal expression reflects a temporally variable target because the various pollutant sources (point and nonpoint) vary significantly by month and by season. The annually based daily maximum loads represent the infrequent, maximum inputs into the Chesapeake Bay. The annually based maximum daily load and the seasonally based maximum daily load provide a range of conditions that are acceptable on a daily basis and that will meet overall TMDL allocations and the applicable WQS.

### The Expression of Daily Loads and NPDES Permits

NPDES permit regulations require that effluent limits in permits be expressed as monthly average and either weekly average or daily maximum, unless impracticable. As reflected in EPA's March 3, 2004 Memorandum *Annual Permit Limits for Nitrogen and Phosphorus for Permits Designed to Protect Chesapeake Bay and its tidal tributaries from excess nitrogen and phosphorus loadings under the National Pollutant Discharge Elimination System* and EPA's December 29, 2004 letters to each Chesapeake Bay watershed jurisdiction, which enclosed the *NPDES Permitting Approach for the Discharges of Nitrogen and Phosphorus in the Chesapeake Bay Watershed* it is EPA's best professional judgment that, when developing NPDES permit limits consistent with this TMDL, jurisdictions should consider expressing permit effluent limits for nitrogen and phosphorus as annual loads, instead of expressing the limits as monthly, weekly, or daily limits (USEPA 2004c, 2004d). After consideration of complex modeling of the effect of nitrogen and phosphorus loading to the Bay from individual point source discharges, EPA concluded that the Chesapeake Bay and its tidal tributaries in effect integrate variable point source monthly loads over time, so that as long as a particular annual total load of nitrogen and phosphorus is met, constant or variable intra-annual load variation from individual point sources has no effect on water quality of the main Bay. EPA recommends that because of the characteristics of nitrogen and phosphorus loading and its effect on the water quality of the Bay, the derivation of appropriate daily, weekly, or monthly permit limits is impracticable, and the permit limits expressed in annual loads is appropriate. To protect local water quality, or for other appropriate reasons, the NPDES permitting authority may also express the effluent limits in monthly or daily terms.

## 6.2    Establishing the Nitrogen and Phosphorus Related Model Parameters

### 6.2.1    Critical Conditions

TMDLs are required to identify the loadings necessary to achieve applicable WQS. The allowable loading is often dependent on key environmental factors, most notably wind, rainfall, streamflow, temperature, and sunlight. Because those environmental factors can be highly variable, EPA regulations require that in establishing the TMDL, the critical conditions (mostly environmental conditions as listed above) be identified and employed as the design conditions of the TMDL [40 CFR 130.7(c)(1)].

When TMDLs are developed using supporting watershed models, such as the Chesapeake Bay TMDL, selecting a critical period for model simulation is essential for capturing important ranges of loading/waterbody conditions and providing the necessary information for calculating appropriate TMDL allocations that will meet applicable WQS. Because the WQS applicable to this TMDL are assessed over 3-year periods, the critical period is defined as the 3-year period within the previously selected 1991–2000 hydrologic period (see Section 6.1.1) that meets the above description (USEPA 2003a). Critical conditions for sediment and SAV are discussed in Section 6.5.1 below.

### Critical Conditions for DO

In the Chesapeake Bay, EPA has found that as flow and nitrogen and phosphorus loads increase, DO and water clarity levels decrease (Officer 1984). Therefore, EPA bases the critical period for evaluation of the DO and water clarity WQS on identifying high-flow periods. Those periods were identified using statistical analysis of flow data as described below and in detail in Appendix G.

For the Bay TMDL, EPA conducted an extensive analysis of streamflow of the major tributaries of the Chesapeake Bay as the primary parameter representing critical conditions. In that analysis, it was observed that high streamflow most strongly correlated with the worst DO conditions in the Bay. That is logical because most of the nitrogen and phosphorus loading contributing to low DO in the Bay comes from nonpoint sources, whose source loads are driven by rainfall and correlate well to rainfall and higher streamflows. Additionally, higher freshwater flows generally increase water column stratification, preventing the low-DO bottom waters from being reaerated.

Because future rainfall conditions cannot be predicted, EPA analyzed rainfall from past decades to derive a critical rainfall/streamflow condition that would be used to develop the allowable loadings in the TMDL. The initial analysis concluded that the years 1996–1998 represented the highest streamflow period for the Chesapeake Bay drainage during the 1991–2000 hydrology period. However, it was later discovered that this 3-year period represented an extreme high-flow condition that was inappropriate for the development of the TMDL—the high-flow period would generally occur once every 20 years (Appendix G). After further analysis, EPA selected the second highest flow period of 1993–1995 as the critical period. The 1993–1995 critical period experienced streamflows that historically occurred about once every 10 years, which is much more typical of the return frequency for hydrological conditions employed in developing TMDLs (Appendix G). Thus, while the modeling for the Bay TMDL consists of the entire hydrologic

period of 1991–2000, EPA used the water quality conditions during the 1993–1995 critical period to determine attainment with the Bay jurisdictions' DO WQS.

### Critical Conditions for Chlorophyll *a*

Algae, measured as chlorophyll *a*, responds to a multitude of different environmental factors, parameters, and conditions including the following:

- Nitrogen and phosphorus loads
- Water column temperature
- pH conditions
- Local nitrogen and phosphorus conditions (e.g., fluxes of nitrogen and phosphorus from the bottom sediment)
- River flow influences on dilution of existing algae populations
- River flow, bathymetry, and other factors influencing residence time
- Local weather conditions (e.g., wind, percentage of sunlight)
- Other conditions and parameters not well understood within the current state of the science

Some of those same factors influence DO conditions, while others are unique to algae. As documented in Appendix G, using the same methodology as was used to determine the DO critical period for the entire Chesapeake Bay, EPA conducted a flow analysis to support the selection of a critical period for the tidal James River, which has numeric chlorophyll *a* criteria. EPA based that analysis on the correlation between flow and violations of the numeric chlorophyll *a* water quality criteria. The analysis showed no strong correlation between streamflow and chlorophyll *a* conditions (Appendix G). As a result, EPA assessed numeric chlorophyll *a* attainment using all eight of the 3-year criteria assessment periods (e.g., 1991–1993, 1992–1994) that occur within the hydrologic period of 1991–2000.

## 6.2.2    Assessment Procedures for DO and Chlorophyll a Standards

The Bay Water Quality Model is used to predict water quality conditions for the various loading scenarios explored. It is necessary to compare these model results with the applicable WQS to determine compliance with the standards. This section describes the process by which model results are compared to WQS to determine attainment.

In general, to determine management scenarios that achieved WQS, EPA ran model scenarios representing different nitrogen, phosphorus, and sediment loading conditions using the Bay Watershed Model. EPA then used the resultant model simulated nitrogen, phosphorus, and sediment loadings as input into the Bay Water Quality Model to evaluate the response of critical water quality parameters: specifically DO, SAV, water clarity, and chlorophyll *a*.

To determine whether the different loading scenarios met the Bay DO and chlorophyll *a* WQS, EPA compared the Bay Water Quality Model's simulated tidal water quality response for each variable to the corresponding observed monitoring values collected during the same 1991-2000 hydrological period. In other words, the Bay Water Quality Model was used primarily to estimate the *change* in water quality that would result from various loading scenarios. The

model-simulated change in water quality is then applied to the actual observed calibration monitoring data. In its simplest terms, the following steps were taken to apply the modeling results to predict Bay DO and chlorophyll *a* WQS attainment:

1. Using the 1991 to 2000 hydrologic period, calibrate the Bay Water Quality Model to Bay water quality monitoring data.

2. Run a model simulation for a given loading scenario (usually a management scenario resulting in lower loads relative to the calibration scenario) through the Phase 5.3 Chesapeake Bay Watershed Model (Bay Watershed Model) and Bay Water Quality Model.

3. Determine the model simulated change in water quality from the calibration scenario to the given loading scenario.

4. Apply the change in water quality as predicted by the Bay Water Quality Model to the actual historical water quality monitoring data used for calibration and evaluate attainment on the basis of that scenario-modified data set.

5. If WQS are met, use the allocations for the TMDL. If WQS are not met, reduce and readjust loads to meet WQS.

For a full discussion of the procedure, see Appendix H and the original report titled *A Comparison of Chesapeake Bay Estuary Model Calibration With 1985–1994 Observed Data and Method of Application to Water Quality Criteria* (Linker et al. 2002).

### 6.2.3 Addressing Reduced Sensitivity to Load Reductions at Low Nonattainment Percentages

Mathematical models, including the models used in the Chesapeake Bay TMDL, are not perfect representations of the real world. For that reason, it is important to use professional judgment in the interpretation of those model results. One example of that is, for some segments, the Bay Water Quality Model showed persistent nonattainment at consistently low levels even after the loadings were lowered. After careful analysis, EPA concluded that the low (1 percent) modeled nonattainment levels were more an artifact of the modeling and assessment process, than a representation of actual nonattainment. For that reason, EPA concluded that modeled nonattainment of 1 percent or less was, in fact, attainment with the applicable WQS. The subsection below describes the analysis that EPA conducted to arrive at this conclusion.

The Chesapeake Bay water quality criteria that the jurisdictions adopted into their respective WQS regulations provide for allowable exceedances of each set of DO, water clarity, SAV, and chlorophyll *a* criteria defined through application of a biological or default reference curve (USEPA 2003a). Figure 6-1 depicts that concept in yellow as allowable exceedance of the criterion concentration.

To compare model results with the WQS, EPA analyzes the Bay Water Quality Model results for each scenario and for each modeled segment to determine the percent of time and space that the modeled waster quality results exceed the allowable concentration. For any modeled result where the exceedance in space and time (shown in Figure 6-1 as the area below the red line) exceeds the allowable exceedance (shown in Figure 6-1 as the area below the blue line that is shaded yellow), that segment is considered in nonattainment. The amount of nonattainment is shown in

the figure as the area in white between the red line and the blue line and is displayed in model results as percent of nonattainment for that segment. The amount of nonattainment is reported to the whole number percent.



Source: USEPA 2003a

**Figure 6-1. Graphic comparison of allowable exceedance compared to actual exceedance.**

### Dissolved Oxygen

Figure 6-2 displays Bay Water Quality Model results showing percent nonattainment of the 30-day mean open-water DO criterion for various basinwide loading levels of the Maryland portion of the lower central Chesapeake Bay segment CB5MH_MD.

As can be seen in Figure 6-2, there is a notable improvement in the percent nonattainment as the loads are reduced until approximately 1 percent nonattainment. At a loading level of 191 million pounds per year TN, the 1 percent nonattainment is persistent through consecutive reductions in loading levels and remains consistent until a loading level of 170 million pounds per year TN is reached. While this is one of the more extreme examples of persistent levels of 1 percent nonattainment, this general observation of persistent nonattainment at 1 percent is fairly common to the Bay Water Quality Model DO results (Appendix I).

Clear evidence of small, yet persistent percentage of model projected DO WQS nonattainment over a wide range of reduced nitrogen and phosphorus loads across a wide range of segments and designated uses, all of which are responding to nitrogen and phosphorus load reductions, is documented in Appendix I. Because of those widespread observations, supported by independent validation, and for purposes of developing the Chesapeake Bay TMDL, EPA determined that nonattainment percentages projected by the Bay Water Quality Model rounded to 1 percent

would be considered in attainment for a segment's designated use. For a more detailed discussion, see Appendix I.



**Figure 6-2. Example of DO criteria nonattainment results from a wide range of nitrogen and phosphorus load reduction model scenarios.**

## Chlorophyll *a*

In the case of assessment of the numeric chlorophyll *a* WQS in the tidal James River in Virginia, there was limited evidence of a reduced sensitivity when approaching the criteria values as compared with the suite of DO WQS as described above for across multiple designated uses and segments. However, as illustrated in Figure 6-3, there is a clear pattern of diminishing response to lowered loadings of nitrogen and phosphorus as the graph approaches 1 percent nonattainment. On the basis of that analysis, combined with the pattern that was even more pronounced with DO, it is EPA's professional judgment that modeled levels of 1 percent nonattainment of the numeric chlorophyll *a* WQS is considered in attainment. In developing the James River Basin allocations under the Bay TMDL, the vast majority of the spring and summer season 3-year periods came into full attainment at the established nitrogen and phosphorus allocations of 23.5 million pounds of nitrogen per year and 2.35 million pounds of phosphorus per year (Appendix O). EPA considered 1 percent nonattainment of the applicable segment and season-specific chlorophyll *a* criteria in attainment for only a limited number of segment/season/3-year period combinations given the evidence, though limited, of reduced sensitivity when approaching full attainment of the criteria values (Appendix I).



**Figure 6-3. Example of a James River segment's spring chlorophyll *a* WQS nonattainment results from a wide range of TN loading Chesapeake Bay Water Quality Model scenarios.**

### 6.2.4    *Margin of Safety*

Under EPA's regulations, a TMDL is mathematically expressed as

$$\text{TMDL} = \sum WLA + \sum LA + MOS$$

where

- TMDL is the total maximum daily load for the water segment
- WLA is the wasteload allocation, or the load allocated to point sources
- LA is the load allocation, or the load allocated to nonpoint sources
- MOS is the margin of safety to account for any uncertainties in the supporting data and the model

The margin of safety (MOS) is the portion of the TMDL equation that accounts for any lack of knowledge concerning the relationship between LAs and WLAs and water quality [CWA 303(d)(1)(c) and 40 CFR 130.7(c)(1)]. For example, knowledge is incomplete regarding the exact nature and magnitude of pollutant loads from various sources and the specific impacts of those pollutants on the chemical and biological quality of complex, natural waterbodies. The MOS is intended to account for such uncertainties in a manner that is conservative from the standpoint of environmental protection. On the basis of EPA guidance, the MOS can be achieved through two approaches (USEPA 1999): (1) implicitly incorporate the MOS by using conservative model assumptions to develop allocations; or (2) explicitly specify a portion of the

TMDL as the MOS and use the remainder for allocations. Table 6-2 describes different approaches that can be taken under the explicit and implicit MOS options.

**Table 6-2. Different approaches available under the explicit and implicit MOS types**

| Type of MOS | Available approaches |
|---|---|
| Explicit | • Set numeric targets at more conservative levels than analytical results indicate.<br>• Add a safety factor to pollutant loading estimates.<br>• Do not allocate a portion of available loading capacity; reserve for MOS. |
| Implicit | • Use conservative assumptions in derivation of numeric targets.<br>• Use conservative assumptions when developing numeric model applications.<br>• Use conservative assumptions when analyzing prospective feasibility of practices and restoration activities. |

Source: USEPA 1999

### Implicit Margin of Safety for Nitrogen and Phosphorus

The Chesapeake Bay TMDL analysis is built on a foundation of more than two decades of modeling and assessment in the Chesapeake Bay and decades of Bay tidal waters and watershed monitoring data. The Bay Airshed, Watershed, and Water Quality models are state-of-the-science models, with several key models in their fourth or fifth generation of management applications since the early and mid-1980s. The use of those sophisticated models to develop the Bay TMDL, combined with application of specific conservative assumptions, significantly increases EPA's confidence that the model's predictions of standards attainment are correct and, thereby, supports the use of an implicit MOS for the Chesapeake TMDL.

The Chesapeake Bay TMDL for nitrogen and phosphorus applies an implicit MOS in derivation of the DO and chlorophyll *a*-based nitrogen and phosphorus allocations through the use of numerous conservative assumptions in the modeling framework. The principal set of conservative assumptions used in the determining the actual allocations is as follows.

The basinwide allowable nitrogen and phosphorus loads were determined on the basis of achieving a select set of deep-water and deep-channel DO standards in the mainstem Bay and adjoining embayments—upper (CB3), middle (CB4MH) and lower (CB5MH) central Chesapeake Bay, and lower Potomac River (POTMH_MD). The Bay TMDL calls for nitrogen load reductions upwards of 50 million pounds greater than that necessary to achieve the applicable DO WQS in those four Bay segments compared with many of the remaining 88 Bay segments.

The open-water and deep-water standards adopted by the jurisdictions have DO WQS that apply to a 30-day mean and an instantaneous maximum. The open-water standards also have a 7-day mean and the deep water use has a 1-day mean. Last, the deep channel use has only a deep-channel instantaneous minimum. The Bay TMDL assessed attainment of each of those standards. But, as described in Appendix D and summarized in Section 3.3.3, the 30-day mean was clearly the most restrictive of the standards for the open-water and deep-water use classifications. For that reason, the allocations were based on 30-day mean for open-water and deep-water and instantaneous standards for deep channel. Because the allocations to achieve those standards are

significantly more restrictive than the allocations needed to achieve the other DO standards for the Bay segments, there is an implicit MOS in achieving many of the Bay DO standards.

The DO standards apply year-round. Yet, at the allocated loadings, for the non-summer months of the year, the standards will be readily achieved. Further, as described above, most of the Bay and tributary tidal waters will readily achieve the applicable WQS at the allocated loads because of the conservative assumption described above. So from an aggregate viewpoint, the expected water quality at the allocated loads will readily attain the applicable WQS most of the time and will marginally attain the applicable WQS only about once in 10 years, and only for a small fraction of the summer months, and only for a very small portion of the volume of the Bay and tidal tributary waters.

An assumption of the model is the concentration of nitrogen, phosphorus, and sediment from the ocean waters entering the Bay. This is called a boundary condition. With improvement in pollutant controls, it is expected that the coastal ocean concentration of the pollutants will go down. EPA has conservatively estimated this reduction in coastal ocean water pollutant levels but only for reductions in atmospheric deposition (see Appendix L). EPA has not adjusted this boundary condition for expected land-based reductions. Such significant reductions can be expected from Long Island Sound, Delaware River, and other mid-Atlantic estuaries that all contribute nitrogen and phosphorus loads to Chesapeake Bay via the ocean boundary. Thus the boundary condition in the model for the concentration and, therefore the loading, of nitrogen, phosphorus, and sediment is higher than the concentration likely to exist with the application of coastal, land-based controls.

In addition to the above, the extensive development and refinement of the Bay models provides for excellent confidence in the modeling accuracy and conversely speaks to the need for a minimal (implicit) MOS. The following are some, but not all, of the model attributes that are in Section 5 that demonstrate the robust science behind the modeling network in support of the bay TMDL:

- The models are based on decades of data (1985–2005) used to develop, calibrate, and validate the models.

- A substantial increase in the number of stations was used to calibrate the watershed model to available data.

- The models are in some cases in their fifth generation of refinement, because of extensive input from baywide and national experts in the field.

- The modeling grid for both the Bay Watershed and Bay Water Quality and Sediment Transport models has been refined up to ten times the previous number of modeling segments.

The individual reasons cited above may not be sufficient to singly merit the conclusion that an implicit MOS is appropriate for the nitrogen and phosphorus allocations, but together those reasons provide ample support, in EPA's professional judgment, that an implicit MOS is adequate.

## 6.3   Methodology for Establishing the Basin-Jurisdiction Allocations for Nitrogen and Phosphorus

An early step in the process of developing the Bay TMDL, especially for nitrogen and phosphorus, is to determine the allowable loading from jurisdictions and major basins draining to the Bay. As a result, an equitable approach must be employed to apportion the allowable loading among the jurisdictions. This subsection describes the process EPA ultimately selected for this Bay TMDL.

Nitrogen and phosphorus from sources further upstream within the Chesapeake Bay watershed affect the condition of local receiving waters and affect tidal water quality conditions far downstream, hundreds of miles away in some cases. For example, the middle part of the mainstem Chesapeake Bay is affected by nitrogen and phosphorus from all parts of the Bay watershed. A key objective of the nitrogen and phosphorus allocation methodology was to find a process, based on an equitable distribution of loads for which the basinwide load for nitrogen and phosphorus could be distributed among the basin-jurisdictions. This section describes the specific processes involved in allocating the nitrogen and phosphorus loads necessary to meet the jurisdictions' Chesapeake Bay DO and chlorophyll *a* WQS. While many alternative processes were explored (Appendix K), only the process determined to be appropriate by EPA and agreed upon by five of the seven Bay watershed jurisdictional partners are described here.

### Principles and Guidelines

The nitrogen and phosphorus basin-jurisdiction allocation methodology was developed to be consistent with the following guidelines adopted by the partnership:

- The allocated loads should protect the living resources of the Bay and its tidal tributaries and result in all segments of the Bay mainstem, tidal tributaries, and embayments meeting WQS for DO, chlorophyll *a*, and water clarity.
- Major river basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound-per-pound basis).
- All tracked and reported reductions in nitrogen and phosphorus loads are credited toward achieving final assigned loads.

A number of critical concepts are important in understanding the major river basin by jurisdiction nitrogen and phosphorus allocation methodology. They include the following:

- Accounting for the geographic and source loading influence of individual major river basins on tidal water quality termed relative effectiveness
- Determining the controllable load
- Relating controllable load with relative effectiveness to determine the allocations of the basinwide loads to the basin-jurisdictions

The following subsections further describe the above concepts and how they directly affect the Chesapeake Bay TMDL.

### 6.3.1    Accounting for Relative Effectiveness of the Major River Basins on Tidal Water Quality

Relative effectiveness accounts for the role of geography on nitrogen and phosphorus load changes and, in turn, Bay water quality. Because of various factors such as in-stream transport and nitrogen and phosphorus cycling in the watershed, a given management measure on water quality in the Bay, varies depending on the location of its implementation within the watershed (USEPA 2003b). For example, the same control applied in Williamsport, Pennsylvania, will have less of an effect on Bay DO than one applied in Baltimore, Maryland.

A relative effectiveness assessment evaluates the effects of both estuarine transport (location of discharge/runoff loading to the Bay) and riverine transport (location of the discharge/runoff loading in the watershed). EPA determined the relative effectiveness of each contributing river basin in the overall Bay watershed on DO in several mainstem Bay segments and the lower Potomac River by using the Bay Water Quality Model to run a series of isolation runs and using the Bay Watershed Model to estimate attenuation of load through the watershed.

From the relative estuarine effectiveness analysis, several things are apparent. Northern, major river basins have a greater relative influence than southern major river basins on the central Bay and the lower Potomac River DO levels because of the general circulation patterns of the Chesapeake Bay (up the Eastern Shore, down the Western Shore). Nitrogen and phosphorus from the most southern river basins of the James and York rivers have relatively less influence on mainstem Bay water quality because of their proximity to the mouth of the Bay. Because these southern river basins are on the western shore, the counterclockwise circulation of the lower Bay also tends to transport nitrogen and phosphorus loads from those larger southern river basins out of the Bay mouth. That same counterclockwise circulation tends to sweep loads from the lower Eastern Shore northward.

River basins whose loads discharge directly to the mainstem Bay, like the Susquehanna, tend to have more effect on the mainstem Bay segments than basins with long riverine estuaries (e.g., the Patuxent, Potomac, and Rappahannock rivers). The long riverine estuaries, with longer water residence times, allow nitrogen and phosphorus attenuation (burial and denitrification) before the waters reaching the mainstem Chesapeake Bay. The size of a river basin is uncorrelated to its relative influence, although larger river basins, with larger loads, have a greater absolute effect. The upper tier of relative effect on the three mainstem segments includes the largest river basin (Susquehanna) and the smallest (Eastern Shore Virginia). Their high degree of impact is because they both discharge directly into the Bay, without intervening river estuaries to attenuate loads, and they are both up-current relative to the general Bay circulation pattern.

The estuarine effectiveness is estimated by running a series of Bay Water Quality Model scenarios holding one major river basin at E3 loads and all other major river basins at calibration levels. After considering several metrics to assess the DO benefit from progressive reductions in nitrogen and phosphorus loadings, EPA chose a 25th percentile. The advantage of this metric was that it was based on DO values at the more critical lower end of the range (25th percentile) yet, unlike a percent nonattainment metric, it could also be used for segments that were in attainment under some loading scenarios. For each scenario, the increase in the 25th percentile DO concentration during the summer criteria assessment period in the critical segments CB3MH, CB4MH, and CB5MH for deep-channel and CB3MH, CB4MH, CB5MH, and POTMH for deep-

water was recorded. The 25th percentile was selected as the appropriate metric as indicative of a change in low DO. The riverine effectiveness is calculated as the fraction of load produced in the watershed that is delivered to the estuary. It is estimated as an output of the watershed model. For more details on this method, see Appendix K.

Absolute estuarine effectiveness accounts for the role of both total loads and geography on pollutant load changes to the Bay. The absolute estuarine effectiveness of a contributing river basin, measured separately both above and below the fall line, is the change in 25th percentile DO concentration that results from a single basin changing from calibration conditions to E3. For example, if the 25th percentile DO in the deep water of the lower Potomac River segment POTMH moves from 5 to 5.3 mg/L from a change in loads from calibration to E3 in the Potomac above fall line basin, the absolute estuarine effectiveness is 0.3 mg/L. Comparing the absolute estuarine effectiveness among basins helps to identify which major river basins have the greatest effect on WQS.

Relative estuarine effectiveness is defined as absolute estuarine effectiveness divided by the total load reduction, delivered to tidal waters, necessary to gain that water quality response. For example, if the load reduction in the Potomac above fall line basin was 30 million pounds of pollutant to get a 0.3 mg/L change in DO concentration, the relative estuarine effectiveness is 0.01 mg/L per million pounds. The higher the relative estuarine effectiveness, the less reduction required to achieve the change in status. The relative estuarine effectiveness calculation is an attempt to isolate the effect of geography by normalizing the load on a per-pound basis. Comparing the relative estuarine effectiveness among the major river basins shows the resulting gain in attainment from performing equal pound reductions among the major river basins.

Riverine attenuation also has an effect on overall effectiveness. Loads are naturally attenuated or reduced as they travel through long free-flowing river systems, making edge-of-stream loads in headwater regions less effective on a pound-for-pound basis than edge-of-stream loads that take place nearer tidal waters in the same river basin. The watershed model calculates delivery factors as the fraction of edge-of-stream loads that are delivered to tidal waters. The units of riverine attenuation are delivered pound per edge-of-stream pound.

Multiplying the estuarine relative effectiveness (measured as DO increase per delivered pound reduction) by the riverine delivery factor (measured as delivered pound per edge-of-stream pound) gives the overall relative effectiveness in DO concentration increase per edge-of-stream pound. The relative estuarine effectiveness is the same for nitrogen or phosphorus, while the riverine delivery is different, so the overall relative effectiveness is calculated separately for nitrogen and phosphorus. Table 6-3 gives the overall relative effectiveness for nitrogen and phosphorus for the watershed jurisdictions by major river basin for above and below the fall line.

The relative effectiveness numbers are separate for WWTPs and all other sources. The distinction is made because of the following:

1. There is a wide disparity in the percent loading from WWTPs when comparing one basin to another.

2. On the basis of information in Appendix K, it is EPA's professional judgment that WWTPs can achieve a much higher percent of controllable load than that for other sources.

The difference in relative effectiveness is because of the geographic location of the sources. For example, in the Maryland western shore basin, the majority of the wastewater treatment load is discharged directly to tidal waters, whereas a significant fraction of all other sources are upstream, including areas that are above reservoirs with very low delivery factors.

**Table 6-3. Relative effectiveness (measured as DO concentration per edge-of-stream pound reduced) for nitrogen and phosphorus for watershed jurisdictions by major river basin and above and below the fall line**

| Jurisdiction | Basin | WWTP nitrogen | All other nitrogen | WWTP phosphorus | All other phosphorus |
|---|---|---|---|---|---|
| District of Columbia | Potomac above Fall Line | 6.09 | 6.09 | 3.08 | 3.08 |
| District of Columbia | Potomac below Fall Line | 6.17 | 5.15 | 6.17 | 5.62 |
| Delaware | Lower East Shore | 7.93 | 7.30 | 7.97 | 7.46 |
| Delaware | Middle East Shore | 4.13 | 4.74 | 5.51 | 5.83 |
| Delaware | Upper East Shore | 6.75 | 6.75 | 7.10 | 7.10 |
| Maryland | Lower East Shore | 7.88 | 7.37 | 7.89 | 7.55 |
| Maryland | Middle East Shore | 6.91 | 6.49 | 6.92 | 6.71 |
| Maryland | Patuxent above Fall Line | 1.89 | 1.25 | 1.66 | 1.58 |
| Maryland | Patuxent below Fall Line | 6.38 | 6.20 | 6.38 | 6.10 |
| Maryland | Potomac above Fall Line | 3.32 | 3.25 | 2.99 | 2.99 |
| Maryland | Potomac below Fall Line | 6.17 | 4.86 | 6.12 | 5.75 |
| Maryland | Susquehanna | 9.39 | 8.68 | 9.11 | 8.77 |
| Maryland | Upper East Shore | 7.49 | 7.27 | 7.49 | 7.40 |
| Maryland | West Shore | 7.83 | 4.98 | 7.68 | 6.13 |
| New York | Susquehanna | 5.60 | 4.58 | 4.25 | 4.11 |
| Pennsylvania | Potomac above Fall Line | 2.10 | 1.98 | 3.08 | 3.08 |
| Pennsylvania | Susquehanna | 6.99 | 6.44 | 4.38 | 4.58 |
| Pennsylvania | Upper East Shore | 5.50 | 5.95 | 6.12 | 6.47 |
| Pennsylvania | West Shore | 2.23 | 2.23 | 2.61 | 2.61 |
| Virginia | East Shore VA | 5.72 | 5.72 | 5.72 | 5.72 |
| Virginia | James above Fall Line | 0.23 | 0.25 | 0.33 | 0.31 |
| Virginia | James below Fall Line | 0.79 | 0.61 | 0.79 | 0.70 |
| Virginia | Potomac above Fall Line | 1.45 | 1.97 | 3.08 | 3.08 |
| Virginia | Potomac below Fall Line | 5.54 | 3.54 | 5.49 | 4.62 |
| Virginia | Rappahannock above Fall Line | 1.05 | 0.83 | 2.10 | 2.10 |
| Virginia | Rappahannock below Fall Line | 4.48 | 4.41 | 4.48 | 4.47 |
| Virginia | York above Fall Line | 0.37 | 0.31 | 0.43 | 0.40 |
| Virginia | York below Fall Line | 1.85 | 1.77 | 1.85 | 1.82 |
| West Virginia | James above Fall Line | 0.06 | 0.06 | 0.34 | 0.34 |
| West Virginia | Potomac above Fall Line | 1.34 | 1.72 | 2.12 | 2.89 |

Figure 6-4 illustrates the relative effectiveness scores for nitrogen of the major river basins provided in Table 6-3 in descending order.



Source: Table 6-3

**Figure 6-4. Relative effectiveness for nitrogen for the watershed jurisdictions and major rivers basins, above and below the fall line, in descending order.**

Figure 6-5 and Figure 6-6 provide additional graphical illustration of the relative effectiveness concept for all the basins in the watershed related to nitrogen and phosphorus loading, respectively. The figures illustrate that, on a per-pound basis, a large disparity exists among basin loads on the effect of DO concentrations in the Bay. Generally, the northern and eastern river basins have a greater effect on water quality than do other basins.

### 6.3.2    Determining Controllable Load

Modeling in support of developing the Chesapeake Bay TMDL employs two theoretical scenarios that help to illustrate the load reductions in the context of a controllable load.

The No Action scenario is indicative of a theoretical worst case loading situation in which no controls exist to mitigate nitrogen, phosphorus, and sediment loads from any sources. It is specifically designed to support equity among basin-jurisdiction allocations in that the levels of all control technologies, BMPs, and program implementation are completely removed.

The E3 scenario—everything by everyone everywhere—represents a best-case possible situation, where a certain set of possible BMPs and available control technologies are applied to land, given the human and animal populations, and wastewater treatment facilities are represented at highest technologically achievable levels of treatment regardless of costs. Again, it considers equity among the allocations in that the levels of control technologies, BMPs, and program implementation are the same across the entire watershed.



**Figure 6-5. Relative effectiveness illustrated geographically by subbasins across the Chesapeake Bay watershed for nitrogen.**



Figure 6-6. Relative effectiveness for illustrated geographically by subbasins across the Chesapeake Bay watershed for phosphorus.

The gap between the No Action scenario and the E3 scenario represents the maximum theoretical controllable load reduction that is achievable by fully implementing the control technologies included in E3 scenario. Those and other key reference scenarios are defined and documented in detail in Appendix J.

Each scenario can be run with any given year's land-use representation. The year 2010 was selected as the base year because it represents conditions at the time the Bay TMDL is developed. Thus, the 2010 No Action scenario represents loads resulting from the mix of land uses and point sources present in 2010 with no effective controls on loading, while the 2010 E3 scenario represents the highest technically feasible treatment that could be applied to the mix of all land use-based sources and permitted point sources in 2010 (Table 6-4).

Basinwide, anthropogenic, controllable loads are determined by subtracting the basinwide E3 load from the basinwide No Action load. Calculated *percentage of E3* is used as a comparative tool for assessing the relative level of effort between various loading reduction scenarios.

**Table 6-4. Pollutant sources as defined for the No Action and E3 model scenarios**

| Model source | Scenario | |
|---|---|---|
| | **No Action** | **E3 = Everyone Everything Everywhere** |
| Land uses | No BMPs applied to the land | All possible BMPs applied to land given current human and animal population and land use |
| Wastewater Dischargers | Significant municipal WWTPs<br>Flow = design flows<br>TN = 18 mg/L<br>TP = 3 mg/L<br>BOD = 30 mg/L<br>DO = 4.5 mg/L<br>TSS = 15 mg/L | Significant municipal WWTPs<br>Flow = design flows<br>TN = 3 mg/L<br>TP = 0.1 mg/L<br>BOD = 3 mg/L<br>DO = 6 mg/L<br>TSS = 5 mg/L |
| CSOs | Non-significant municipal WWTPs<br>Flow = existing flows<br>TN = 18 mg/L<br>TP = 3 mg/L<br>BOD = 30 mg/L<br>DO = 4.5 mg/L<br>TSS = 15 mg/L<br><br>Flow = 2003 base condition flow<br>TN = 2003 load estimate<br>TP = 2003 load estimate<br>BOD = 2003 load estimate<br>DO = 2003 load estimate<br>TSS = 2003 load estimate | Non-significant municipal WWTPs<br>Flow = existing flows<br>TN = 8 mg/L<br>TP = 2 mg TP/l<br>BOD = 5 mg/L<br>DO = 5 mg/L<br>TSS = 8 mg/L<br><br>Full storage and treatment of CSOs |
| Atmospheric deposition | 1985 Air Scenario | 2030 Air Scenario, max reductions |

Source: Appendix J
Note: BOD = biological oxygen demand; DO = dissolved oxygen; TN = total nitrogen; TP = total phosphorus; TSS = total suspended solids

### 6.3.3    Relating Relative Impact to Needed Controls (Allocations)

To apply the allocation methodology, loads from each major river basin were divided into two categories—wastewater and all other sources (Figure 6-7). The rationale for such separate accounting is the higher likelihood of achieving greater load reductions for the wastewater sector than for other source sectors (Appendix K). In addition there was a wide disparity between basin and jurisdictions on the fraction of the load coming from the wastewater sector as opposed to other sectors. Therefore, that disparity is addressed by separate accounting for the wastewater sector from the other sectors in the allocation methodology. Wastewater loads included all major and minor municipal, industrial and CSO discharges. Then lines were drawn for each of the two source categories such that the addition of the two lines would equal the basinwide nitrogen and phosphorus loading targets for nitrogen and phosphorus.

Using the general methodology described above, the CBP partners considered many different combinations of wastewater and other sources controls and slopes of the lines on the allocation graph (Appendix K). After discussing the options at length, the following graph specifications were generally accepted by the partners and determined to be appropriate by EPA.

The wastewater line was set first and would be a hockey stick shape with load reductions increasing with relative effectiveness until a maximum percent controllable load was reached.

For nitrogen

- The maximum percent controllable load was 90 percent, corresponding to an effluent concentration of 4.5 mg/L.
- The minimum percent controllable load was 67 percent, corresponding to an effluent concentration of 8 mg/L.

For phosphorus

- The maximum percent controllable load was 96 percent, corresponding to an effluent concentration of 0.22 mg/L.
- The minimum percent controllable load was 85 percent, corresponding to an effluent concentration of 0.54 mg/L.

For both the nitrogen and phosphorus wastewater lines

- Any relative effectiveness that was at least half of the maximum relative effectiveness value was given maximum percent controllable.
- The minimum controllable load value was assigned to a relative effectiveness of zero, and all values of relative effectiveness between zero and half of the maximum value were assigned interpolated percentages (Figure 6-7).

The other sources line was set at a level that was necessary to achieve the basinwide load needed for achieving the DO standards in the middle mainstem Bay and lower tidal Potomac River segments. That line was set at a slope such that there was a 20 percent overall difference from highest controllable load to lowest, ranging from 56 percent of controllable loads for basins with low relative effectiveness to 76 percent of controllable loads for basins with high relative effectiveness for nitrogen (Figure 6-7). The slope was chosen as the most supported by the

jurisdiction partners after exploring many options. The slope provides a balance of enough relief of controls for the less effectiveness basins yet still requires significant controls for all basins.

For each category—wastewater and all other sources—loads are aggregated by major basin and reductions are assigned according to the process detailed above. The graph in Figure 6-7 illustrates the methodology for the total nitrogen target load of 190 million lbs per year.



**Figure 6-7. Allocation methodology example showing the *hockey stick* and straight line reductions approaches, respectively, to wastewater (red line) and all other sources (blue line) for nitrogen.**

## 6.4  Establishing the Basin-Jurisdiction Allocations for Nitrogen and Phosphorus

This subsection describes the application of all the processes described earlier in this section. EPA identified the nitrogen and phosphorus allocations to the basin-jurisdictions in a letter on July 1, 2010, from the EPA Region 3 Administrator to the seven watershed jurisdictions (USEPA 2010f). The allocations to the seven watershed jurisdictions were derived to achieve Chesapeake Bay WQS recently adopted by the four Bay jurisdictions.

The Bay jurisdictions' WQS are described in Section 3.3. The allocations in the letter cited above are the allocations on which the jurisdictions based their draft and final Phase I WIPs. The full process for establishing the nitrogen and phosphorus basin-jurisdiction allocations is described below:

- Established the atmospheric deposition allocations on the basis of addressing the requirements of the CAA to meet existing national air quality standards out through 2020.

- Set the basinwide nitrogen and phosphorus loads on the basis of attaining the applicable DO criteria in those Bay segments (middle Chesapeake Bay mainstem and the lower tidal Potomac River) and designated uses (deep-water and deep-channel) whose water quality

conditions are influenced by major river basins and jurisdictions throughout the Bay watershed.

- Distributed the basinwide nitrogen and phosphorus loads by major river basin and jurisdiction following the methodology developed by the partnership (see Section 6.2).

- Made certain discretionary adjustments to the allocations to New York and West Virginia.

- Allowed for individual jurisdictions to exchange nitrogen and phosphorus loads within and between their major river basins using specific exchange ratios, as long as the exchanges still resulted in attainment of all WQS.

- Identified those individual Bay segments still not attaining their applicable DO/chlorophyll *a* WQS at the allocated basinwide nitrogen and phosphorus loads and addressed the remaining nonattainment segments.

- Derived the final basin-jurisdiction nitrogen and phosphorus allocations to achieve the applicable WQS for DO and chlorophyll *a* in all 92 Bay segments.

Individual jurisdictions further suballocated their major river basin-jurisdiction allocated loads within their Phase I WIPs down to their respective Bay segment watersheds in their jurisdiction. After in-depth review of the final Phase I WIPs and the public comments, EPA made final determinations on the allocations as described in Section 8.

### 6.4.1    Setting the Atmospheric Nitrogen Deposition Allocation

Atmospheric deposition of nitrogen is the major source of nitrogen to the Chesapeake Bay watershed, greater than the other sources of fertilizer, manures, or point sources. For that reason, it is necessary to allocate an allowable loading of nitrogen from air deposition in the Chesapeake Bay TMDL. The nitrogen loadings come from many jurisdictions outside the Chesapeake Bay watershed. Figure 6-8 shows the approximate delineation of the Bay airshed. Seventy-five percent of the nitrogen air deposition loads to the Chesapeake watershed originate from sources within the Bay airshed, with twenty-five percent originating from sources beyond the airshed, and in the largest sense, the source of atmospheric loads to the Chesapeake Bay watershed are global. That is reflected in the Bay Airshed Model, which has a domain of all North America (with boundary conditions to quantify global nitrogen sources). About 50 percent of the oxidized nitrogen (NOx) atmospheric deposition loads to the Chesapeake watershed and tidal Bay come from the seven Bay watershed jurisdictions. For more detailed discussion, see Appendix L.

By including air deposition in the Bay TMDLs LAs, the Bay TMDL accounts for the emission reductions that will be achieved by seven watershed jurisdictions and other states in the larger Bay airshed. If air deposition and expected reductions in nitrogen loading to the Bay were not included in the LAs, other sources would have to reduce nitrogen discharges/runoff even further to meet the nitrogen loading cap. Because CAA regulations and programs will achieve significant decreases in air deposition of nitrogen by 2020, EPA believes the TMDL inclusion of air allocations (and reductions) is based on both the best available information with a strong reasonable assurance that those reductions will occur. The TMDL developed for the Chesapeake Bay will reflect the expected decreases in nitrogen deposition and the 2-year federal milestones will track the progress of CAA regulations and programs.

Chesapeake Bay TMDL



Source: Dr. Robin Dennis, USEPA/ORD/NERL/AMAD/AEIB

**Figure 6-8. Principal areas of nitrogen oxide (blue line) and ammonia (red line) emissions that contribute to nitrogen deposition to the Chesapeake Bay and its watershed (dark blue fill).**

In determining the allowable loading from air deposition, EPA separated the nitrogen atmospheric deposition into two discreet parcels: (1) atmospheric deposition occurring on the land and nontidal waters in the Bay watershed, which is subsequently transported to the Bay; and (2) atmospheric deposition occurring directly onto the Bay tidal surface waters.

The deposition on the land becomes part of the allocated load to the jurisdictions because the atmospheric nitrogen deposited on the land becomes mixed with the nitrogen loadings from the land-based sources and, therefore, becomes indistinguishable from land-based sources. Furthermore, once the nitrogen is deposited on the land, it would be managed and controlled along with other sources of nitrogen that are present on that parcel of land. In contrast, the atmospheric nitrogen deposited directly to tidal surface waters is a direct loading with no land-based management controls and, therefore, needs to be linked directly back to the air sources and air emission controls. For more detailed discussion, see Appendix L.

EPA included an explicit basinwide nitrogen atmospheric deposition allocation in the Bay TMDL and determined it to be 15.7 million pounds per year of nitrogen atmospheric deposition loads direct to Chesapeake Bay tidal tributary and embayment waters (Appendix L) (see Section 9.1). Activities associated with implementation of CAA regulations by EPA and the jurisdictions through 2020 will ensure achievement of that allocation and are already accounted for within the jurisdictions' major river basin nitrogen allocations. Any additional nitrogen reductions realized through more stringent air pollution controls at the jurisdictional level, beyond minimum federal requirements to meet air quality standards, may be credited to the individual jurisdictions through future revisions to the jurisdictions' WIPs, 2-year milestones, and the Chesapeake Bay TMDL tracking and accounting framework (Appendix L).

In determining the amount of air controls to be used as a basis for the Bay TMDL air allocation, EPA relied on current laws and regulations under the CAA. Those requirements, together with national air modeling analysis, provided the resulting allocated air load from direct deposition to the tidal surface waters of the Bay and its tidal tributaries (Appendix L).

The air allocation scenario represents emission reductions from regulations implemented through the CAA authority to meet National Ambient Air Quality Standards for criteria pollutants in 2020. The air allocation scenario includes the following:

- The Clean Air Interstate Rule (CAIR) with second phase and the Clean Air Mercury Rule (CAMR)
- The Regional Haze Rule and guidelines for Best Available Retrofit Technology (BART)
- The On-Road Light Duty Tier 2 Rule
- The Clean Heavy Duty Truck and Bus Rule
- The Clean Air Non-Road Diesel Tier 4 Rule
- The Locomotive and Marine Diesel Rule
- The Non-road Large and Small Spark-Ignition Engines Programs
- The Hospital/Medical Waste Incinerator Regulations

The controls described above were modeled using the Community Multiscale Air Quality (CMAQ) national model, which enabled quantification of deposition direct to the Chesapeake Bay tidal waters to be determined. Information on the CMAQ modeling analysis is at http://www.epa.gov/cair/technical.html. That approach is the basis for the previously mentioned 15.7 million pounds per year as the allocation in the Bay TMDL for air deposition directly to the tidal waters. Appendix L provides a more detailed description of the process for establishing the atmospheric deposition allocations for nitrogen.

### 6.4.2    Determining the Basinwide Nitrogen and Phosphorus Target Load Based on Dissolved Oxygen

With the air allocated loads being set at 15.7 million pounds per year, the next step in the process was to determine the basinwide nitrogen and phosphorus loadings that would cause the mainstem Bay and major tidal river segments—all influenced by nitrogen and phosphorus loads from multiple jurisdictions—to achieve all the applicable DO WQS. Numerical chlorophyll *a* WQS

were not used for this basinwide loading determination because they apply to only the tidal James River and the District of Columbia's tidal waters of the Potomac and the Anacostia rivers and, therefore, are not affected by the other basins in the watershed. The principal Bay segments that were most important for determining the basinwide nitrogen and phosphorus loads were the middle mainstem Bay segments CB3MH, CB4MH, and CB5MH (Maryland and Virginia) and the lower tidal Potomac River segment POTMH_MD because their water quality conditions are influenced by all river basins through the Bay watershed. Therefore, achieving attainment in those segments will necessitate nitrogen and phosphorus reductions from all basins.

The process used for determining the load that will achieve the DO WQS in these segments was to progressively lower the nitrogen and phosphorus loadings simulated in the Bay Water Quality Model and then assess DO WQS attainment for each loading scenario. Numerous iterations of different load scenarios were run until the appropriate nitrogen and phosphorus loadings to achieve WQS could be determined (Appendix M).

Figure 6-9 shows the numerous water quality model runs that were performed at various loading levels and the resulting DO standards attainment results. The water quality measure on the vertical axis is the number of Bay segments that were not attaining the applicable Bay DO WQS. As can be expected, as loadings are lowered throughout the Bay watershed, the number of DO



Note: This graph expands some of the 92 TMDL segments into separate jurisdiction-segments so that the total numbers of open-water, deep-water, and deep-channel designated use segments are 98, 14, and 11, respectively

**Figure 6-9. Chesapeake Bay water quality model simulated DO criteria attainment under various TN and TP loading scenarios.**

WQS non-attaining segments was reduced. At the loading of 190 million pounds per year of nitrogen and 12.7 million pounds per year of phosphorus, and after considering other lines of evidence beyond the Bay Water Quality and Sediment Transport Model, as presented in Appendix N, only one Bay segment was in nonattainment for DO—lower Chester River. For the lower Chester River segment, nonattainment persisted even to extremely low loading levels. Therefore, Maryland adopted, and EPA approved a restoration variance for that segment. The final allocations for the Bay will attain that restoration variance for DO. It should be noted that the critical segments of CB3MH, CB4MH, and CB5MH for deep-channel and CB3MH, CB4MH, CB5MH, and POTMH for deep-water were among the last segments to come into attainment. Watershed-wide reductions will be needed to attain WQS in these segments. Therefore, EPA determined that basinwide nitrogen loadings of 190 million pounds per year and phosphorus loadings of 12.7 million pounds per year were sufficient to attain the main Bay DO standards; as a result, EPA distributed those loadings among the major river basins and jurisdictions in the Chesapeake Bay watershed.

### 6.4.3    Allocating Nitrogen and Phosphorus Loads to Jurisdictions within the Bay Watershed

After more than 2 years of discussion and exploration by EPA and the jurisdictions of many different approaches to allocating allowable loads to each of the jurisdictions and major basins, a consensus could not be reached for an approach for allocating loads to all jurisdictions. With the exception of New York and West Virginia, all the watershed jurisdictions agreed to the method described above for allocating loadings to the major river basins and jurisdictions. EPA then chose to use that method as described above to distribute the loadings based on the equity and near consensus of the jurisdictions. Using that method, EPA calculated the relative effectiveness of each of the major river basins in the Bay watershed and plotted as dots on the lines in Figures 6-10 (for phosphorus) and 6-11 (for nitrogen) to determine the basin-jurisdiction allocation represented by each of the points. On the vertical axis is the percent of controllable load (represented in the graph as No Action Minus E3 load) that would correspond to the allocated load for each basin-jurisdiction. For example, 100 percent represents a loading such that all sources would have all control technologies and practices approved by the partnership installed (E3). The horizontal axis represents the relative effectiveness of each of the basin-jurisdictions, a measure of the impact that a pound of nitrogen and phosphorus has on the DO concentrations in the Chesapeake Bay. EPA first constructed the wastewater (WWTP) line (red line in Figures 6-10 and 6-11) on the basis of the removal efficiencies of established treatment technologies.

EPA then constructed the other sources line (blue line in Figures 6-10 and 6-11) by having a difference of 20 percent of controllable load when comparing facilities/lands in the basin-jurisdiction with the highest relative effectiveness with the facilities/lands in the basin-jurisdiction with the lowest relative effectiveness. As can be seen in Figure 6-10 and Figure 6-11, facilities/lands in those basin-jurisdictions that have the highest effectiveness (or impact on the Bay) on a per-pound basis must install the most controls (the basin-jurisdictions on the right of the graph). While it is too cluttered to show each of the basin-jurisdictions on these graphs, see Table 6-3 to identify the relative effectiveness for each basin and then find that point on these graphs. Because the dots represent the various basin-jurisdictions in the watershed, the percent of controllable load can be converted to the actual allocated load to achieve the Bay DO WQS.



Figure 6-10. Example allocation methodology application for phosphorus.



Figure 6-11. Example allocation methodology application for nitrogen.

Finally, EPA added the allocated load for wastewater (WWTP) to the allocated load for other sources to determine the total allocated load for each basin-jurisdiction. It must be noted that although the graph separates wastewater and other sources, this does not necessarily require the jurisdictions to use that separate wastewater or other sources loading in their WIPs for suballocating the loads.

## 6.4.4    Resolving Dissolved Oxygen and Chlorophyll a Nonattaining Bay Segments

After determining the target basinwide nitrogen and phosphorus allocations and distributing those loads to the major basins and jurisdictions using the methodology illustrated above, EPA identified seven designated-use segments for which the Bay Water Quality Model was predicting nonattainment of the applicable Bay DO WQS (see Table 6-5). Those seven segments out of attainment for the open-water designated use represent less than 1 percent of the total volume of open-water habitats in entire Chesapeake Bay.

The Bay Water Quality Model also predicted nonattainment for numeric chlorophyll *a*. All five Bay segments of the tidal James River in Virginia and the two Bay segments in the District of Columbia (tidal Potomac and Anacostia rivers). On the basis of Bay Water Quality Model runs at the basinwide nitrogen and phosphorus loading of 190 million pounds per year nitrogen and 12.7 million pounds per year phosphorus allocated by major river by jurisdiction the Bay Water Quality Model predicted those seven segments to be in nonattainment of each jurisdiction's respective numeric chlorophyll *a* WQS. This section explores the process by which EPA examined Bay Water Quality Model results showing persistent nonattainment at reduced loading levels and other evidence to make determinations regarding the loadings that would be sufficient to attain the respective WQS for each of the Bay segments.

### Dissolved Oxygen Nonattaining Segments

EPA examined the reasons of persistent nonattainment in these segments. Upon further review of the model results for the non-attaining segments, along with other lines of evidence (including water quality monitoring) and application of best professional judgment, EPA determined that 190 million pounds per year TN and 12.7 million pounds per year TP allocated by major river by jurisdiction would be sufficient for these segments to attain the respective DO criteria (see Appendix N). It was generally found that predicted nonattainment in a Bay segment resulted from two or more of the following factors:

1. Less-than-expected change in DO concentrations from the calibration scenario to a given reduced nitrogen and phosphorus load scenario

2. Poor agreement between model-simulated and historically observed DO concentrations for a particular location and historical period

3. A limited number of unusually or very low DO concentrations that the Bay Water Quality Model predicted were very difficult to bring into attainment of the open-water DO criteria even with dramatically reduced loads

Table 6-5. Chesapeake Bay designated use segments showing percent nonattainment of the applicable Bay DO WQS under the basinwide nitrogen and phosphorus target loadings (million pounds per year)

| CBSEG | 309TN, 19.5TP, 8950TSS '93-'95 | 248TN, 16.6TP, 8110TSS '93-'95 | 200TN, 15TP, 6390TSS '93-'95 | 191TN 14.4TP, 6462 TSS '93-'95 | 190TN, 13TP, 6123TSS '93-'95 | 190TN 12.7TP, 6030TSS '93-'95 | 179TN 12.0TP, 5510TSS '93-'95 | 170TN 11.3TP, 5650TSS '93-'95 | 141TN 8.5TP, 5060TSS '93-'95 | All Forest '93-'95 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Open Water Summer Monthly** | | | | | | | | | | |
| GUNOH | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| MANMH | 1% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 0% |
| ANATF_MD | 39% | 19% | 18% | 12% | 12% | 12% | 11% | 11% | 0% | 0% |
| PMKTF | 11% | 5% | 5% | 5% | 5% | 5% | 5% | 2% | 1% | 1% |
| WBEMH | 11% | 15% | 8% | 8% | 8% | 8% | 8% | 8% | 0% | 0% |
| WICMH | 11% | 11% | 15% | 5% | 5% | 5% | 5% | 5% | 5% | 4% |
| **Deep Water** | | | | | | | | | | |
| MAGMH | 35% | 35% | 16% | 16% | 16% | 3% | 3% | 1% | 1% | 0% |

Source: Appendix M
Notes: GUNOH-Gunpowder River, MANMH-Manokin River, ANATF_MD-Anacostia River, Maryland, PMKTF-Upper Pamunkey River, WBEMH-Western Branch Elizabeth River, WICMH-Wicomico River, and MAGMH-Magothy River.
TN - total nitrogen, TP - total phosphorus, and TSS – total suspended solids.

Chesapeake Bay TMDL

6-33

December 29, 2010

The majority of those segments are in small and relatively narrow regions of the Bay's smallest tidal tributaries. Such conditions constrain the Bay Water Quality Model's ability to effectively integrate multiple drivers of DO concentrations. As a result, the Bay Water Quality Model's ability to simulate the water quality changes in response to dramatically reduced loads was also limited. In such cases, additional lines of evidence were used to determine whether a segment could be expected to achieve the applicable WQS under the reduced nitrogen and phosphorus loads (Appendix N).

EPA evaluated each Bay segment to determine: (1) whether violations of the DO criteria were isolated or widespread; (2) whether nearby Bay segments also exhibited persistent or widespread hypoxia or both; and (3) whether the Bay Water Quality Model predicted sufficient improvements in DO concentrations to achieve DO WQS in nearby deeper, wider segments. Results of the evaluations, documented in detail in Appendix N, are summarized as follows.

Following the comprehensive evaluation of the modeling results, application of the factors described above, and inclusion of alternative lines of evidence, all seven segments were determined to be in attainment of applicable WQS.

Results of the segment-specific evaluations, documented in detail in Appendix N, are summarized as follows.

### Gunpowder River (GUNOH)

Monitored DO concentrations over the 10-year period of 1991–2000 were almost universally well above the 30-day mean open-water criterion of 5 mg/L. A single instance of moderate hypoxia, combined with poor model agreement and an almost complete lack of response by the Bay Water Quality Model to load reductions in the monitored location for the relevant month, resulted in persistent nonattainment across all reduced loading scenarios for the month in question. In contrast, nearby Bay segments—Bush River (BSHOH), Middle River (MIDOH), and upper Chesapeake Bay (CB2OH)—all attained their respective DO WQS when loads were reduced to the target basinwide allocation of 190 million pounds per year TN and 12.7 million pounds per year TP (Appendix N). Given those factors, including the poor predictive performance of the model in the Gunpowder River and 10 years of observed attainment of the DO criteria at relatively high nutrient loadings, EPA finds with a reasonable degree of certainty that target loadings of 190 million pounds per year TN and 12.7 million pounds per year TP will be sufficient for the Gunpowder River segment to attain the DO WQS.

### Manokin (MANMH), Maryland Anacostia (ANATF_MD), West Branch Elizabeth (WBEMH), Pamunkey (PMKTF), and Wicomoco (WICMH) Rivers

Similar to the Gunpowder River segment, few violations of the open-water DO criteria occurred in these five Bay segments, and Bay Water Quality Model simulations did not match well with historically observed water quality conditions. The Bay Water Quality Model often failed to simulate hypoxia for these locations under observed loads; thus, it was also unable to estimate improved DO concentrations when nitrogen and phosphorus loads were reduced. Nearby deeper, wider regions generally attained DO WQS at or before the target basinwide loadings. For more discussion and data, see Appendix N. Given those factors, observed historic attainment with existing criteria at current high nutrient loadings and limited predictive capacity of the model for

those unique segments, EPA finds with a reasonable degree of certainty that target loadings of 190 million pounds per year TN and 12.7 million pounds per year TP will be sufficient for these Bay segments to attain the DO WQS.

### Magothy River (MAGMH)

Summer hypoxic conditions were not uncommon in the Magothy River from 1991 to 2000, particularly when episodes of water column stratification prevented mixing of the bottom waters with more oxygenated surface waters. Maryland adopted (and EPA approved) an episodic deep-water designated use applicable to MAGMH to account for periods of water column stratification (USEPA 2010a). However, some violations of the deep-water DO 30-day mean criterion of 3.0 mg/L persisted even when nitrogen and phosphorus loads were reduced to the target basinwide allocation (Appendix N). Because of the small, embayment nature of the Magothy River, the Bay Water Quality Model was unable to reliably simulate observed conditions in MAGMH or consistently estimate a response of sufficiently improved DO in response to load reductions. However, the deep-water region of the adjacent mainstem segment CB3MH attained its DO WQS well before the target basinwide nitrogen and phosphorus LAs (Appendix N). Given the poor simulation of MAGMH conditions by the Bay Water Quality Model, the significant load reductions already required of the Magothy River basin at the target basinwide LAs, the considerable influence of the mainstem Chesapeake Bay on MAGMH water quality conditions, and the predicted attainment of CB3MH deep-water well before the target basinwide loading, EPA determined that MAGMH can reasonably be expected to attain its DO WQS at the target loadings of 190 million pounds per year TN and 12.7 million pounds per year TP.

## Chlorophyll *a* Nonattaining Segments

### Potomac and Anacostia Rivers in DC

The Bay Water Quality Model projected that the District of Columbia's portions of the Potomac and Anacostia River segments would be in nonattainment of the applicable numeric chlorophyll *a* WQS at the basinwide nitrogen and phosphorus target loads allocated to those two river basins. However, through diagnostic analysis of the modeled chlorophyll *a* simulations for the Potomac and Anacostia rivers in the District of Columbia, EPA determined that the Bay Water Quality Model does not reliably simulate measured chlorophyll *a* levels. Therefore, other lines of evidence (i.e., monitoring data) were weighed more heavily by EPA in the attainment determination (Appendix N). Through further investigation, EPA analyzed recent chlorophyll *a* data for the two segments. The actual monitoring data show that the Potomac River segment is attaining the District's chlorophyll *a* WQS and has been attaining that standard for at least the past 7 years (Figure 6-12). Applying a similar assessment of recent water quality monitoring data to the Anacostia River segment, a 4 percent level of nonattainment was determined (Appendix N).

Because those two segments are at, or near, attainment of the current chlorophyll *a* WQS on the basis of analysis of recent monitoring data and that additional nitrogen and phosphorus loading reductions will occur as a result of the current allocations, EPA has concluded that both of the Bay segments will be in full attainment with the chlorophyll *a* WQS under these nitrogen and phosphorus allocations (Appendix N). Additionally, a TMDL for biochemical oxygen demand



Source: http://www.chesapeakebay.net
Note: The DC station PMS44 is on the tidal Potomac River at the Woodrow Wilson Memorial Bridge (50 meters upstream of the draw span). The MD station TF2.1 is on the tidal Potomac River at Buoy *77* off the mouth of Piscataway Creek.

**Figure 6-12. Potomac River chlorophyll a monitoring data compared with the District's summer seasonal mean chlorophyll *a* water quality criteria.**

and nitrogen and phosphorus was approved by EPA in 2008 for the *Anacostia River Basin Watershed in Montgomery and Prince Georges Counties, Maryland and the District of Columbia* (MDE and DC DOE 2008). That TMDL for the Anacostia River requires significant reductions that, when implemented, will result in attainment of the chlorophyll *a* WQS.

   *James River in Virginia*

Similar to the EPA analysis of attainment of the District of Columbia's chlorophyll *a* criteria using upper tidal Potomac and Anacostia rivers chlorophyll *a* monitoring data, EPA also assessed attainment using chlorophyll *a* monitoring data for the tidal James River. In contrast to the District's tidal Anacostia and Potomac River segments, EPA found that the past and current monitoring data for most of the tidal James River segments showed significant nonattainment of Virginia's chlorophyll *a* WQS. More recently, the *Virginian-Pilot* on August 12, 2010, reported on algal blooms in the southern Bay region including the James River. An example of the comparative analysis of the monitored data for the James as compared to Virginia's segment-season specific chlorophyll *a* criteria is shown in Figure 6-13. EPA, therefore, has concluded that nutrient controls beyond the present controls are needed in the James and EPA continued to rely on the model results in assessing conditions and determining the appropriate allocations of nitrogen and phosphorus.



Source: http://www.chesapeakebay.net

**Figure 6-13. Tidal James River monitoring data for chlorophyll *a* at station TF5.5 (in the upper tidal James River near Hopewell, Virginia) compared to Virginia's James River segment-season specific chlorophyll *a* criteria.**

In general, the Bay Water Quality Model is well-calibrated to the tidal James River and effectively simulates average seasonal conditions in the five tidal segments of the river. The Bay Water Quality Model also consistently estimates improved chlorophyll *a* conditions with increasing nitrogen and phosphorus load reductions. At the same time, however, the model does not simulate individual algal bloom events, which are highly variable and caused by numerous factors, some of which are still not well understood by the scientific community (Appendix O). The chlorophyll *a* WQS adopted in Virginia's regulation to protect the tidal James River were set at numerical limits for spring and summer seasonal averaged conditions, not for addressing individual algal bloom events lasting hours to days. Therefore, EPA's determination of nitrogen and phosphorus loadings required to attain chlorophyll *a* WQS in the tidal James River was based on those years and Bay (James River) segments for which the Bay Water Quality Model reliably simulated the water quality monitoring-based chlorophyll *a* calibration data. EPA used that approach to determine the James River basin allocation of 23.5 million pounds per year TN and 2.35 million pounds per year TP.

However, since the Bay Water Quality Model does not accurately simulate short-frequency, individual bloom events, some segment and season-specific nonattainment remains at the target James River allocation. Nonattainment of the summer chlorophyll *a* WQS persisted in the lower tidal fresh James segment (JMSTFL) for the summer periods of 1995–2000 and in the James River mouth segment (JMSPH) for the 1997–2000 summer periods (Appendix O). The Bay Water Quality Model results for those nonattainment areas were not used to establish the allocations for the James River.

Figure 6-14 shows the number of segments and 3-year periods (segment-periods) in nonattainment of Virginia's James River chlorophyll *a* WQS (out of the simulation period of 1991–2000) for the various load scenarios simulated, using those model results where the model is reliably simulating

the calibration data. From the graph, it can be seen that the James River does not fully attain the chlorophyll *a* WQS until a loading of 23.5 million pounds per year of nitrogen and 2.35 million pounds per year of phosphorus was achieved. EPA set the necessary load allocations for nitrogen and phosphorus at those levels.



**Figure 6-14. James River nonattainment of the chlorophyll *a* WQS at various load scenarios.**

## 6.4.5    Allocation Considerations for the Headwater Jurisdictions (New York and West Virginia)

The methodology described above for distributing the basinwide loading was accepted by all jurisdictions except New York and West Virginia. From an additional Bay Water Quality Model run, EPA determined that small amounts of additional loadings of nitrogen and phosphorus in excess of the 190 million pounds per year TN and 12.7 million pounds per year TP could be allocated and still attain applicable WQS. In the July 1, 2010, letter to the jurisdictions, EPA used its discretionary authority to allocate to New York an additional 750,000 pounds per year of nitrogen (above the allocation calculated for New York using the method used to distribute the basinwide loads of 190 million pounds per year of nitrogen and 12.7 million pounds per year of phosphorus) (USEPA 2010g). With the final TMDL, EPA provided an additional 250,000 pounds per year of nitrogen and 100,000 pounds per year of phosphorus to New York's allocation. In addition, EPA used its discretionary authority to allocate to West Virginia an additional 200,000 pounds per year of phosphorus (above the level allocated to West Virginia using the allocation methodology to distribute the basinwide load of 190 million pounds per year of nitrogen and 12.7 million pounds per year of phosphorus) (USEPA 2010g). EPA, through model analysis, confirmed that those loadings will achieve WQS in the Chesapeake Bay. EPA provided the additional allocations for several reasons, including the following:

- Following the principles and guidelines as expressed in Section 6.3, tributary basins that contribute the most to the Bay water quality problems must do the most to resolve those problems (on a pound-per-pound basis). The headwater jurisdictions of New York and West Virginia contribute small portions of the overall nitrogen and phosphorus delivered to the Bay (5 percent or less) and, therefore, are provided some relief in their allocations.

- The water quality of the Susquehanna River leaving New York appears to be of better quality than that of downstream waters.

- The allocation methodology accommodates to some extent future growth by providing WLAs for wastewater treatment facilities at design flow rather than actual flow, thereby reserving a load for expansion of the facility. Therefore, New York considered the methodology to be biased against Bay watershed jurisdictions that are growing relatively slowly, like New York.

- A cleaner Bay provides greater benefit (in terms of commercial and recreational benefits of a cleaner bay) to the tidal jurisdictions than to the nontidal jurisdictions such as New York and West Virginia.

### 6.4.6    Nitrogen-to-Phosphorus Exchanges

On the basis of recent science regarding the relationship between nitrogen and phosphorus, EPA permitted the jurisdictions to propose the exchange of nitrogen and phosphorus loads within major river basins at a 1:5 ratio for reducing existing allocated phosphorus loads in exchange for increased nitrogen loads; and a 15:1 ratio for reductions in existing allocated nitrogen loads in exchange for increased phosphorus loads. For example, in jurisdiction allocations, for every 1 pound of phosphorus reduced, 5 pounds of nitrogen can be added and for every 15 pounds of nitrogen reduced, 1 pound of phosphorus can be added. This section documents the technical basis for those exchange rates.

Two scientific papers published in recent years specifically address tradeoffs between nitrogen and phosphorus. While those two analyses were completed with earlier versions of the Bay Watershed Model and the Bay Water Quality Model, the results are still meaningful if used to put bounds on the exchanges on a Bay-wide scale.

Wang et al. (2006) published response surface plots for chlorophyll *a* concentrations and anoxic volume days using a matrix of nitrogen and phosphorus load reduction scenarios. The response surface plots were generated by applying equations predicting overall chlorophyll *a* concentrations and anoxic volume days as quadratic functions of the nitrogen and phosphorus fraction of 2000 loading levels. Applying the Bay Watershed Model generated values in these same equations to assess the area around the allocation levels of 187.4 million pounds TN and 12.52 million pounds TP, one can use the derivatives of the original published equations to determine estimated TN:TP exchange relationships.

Figure 6-15 illustrates the TN:TP exchange ratio for different levels of TP based on the Anoxic Volume Days metric. At the allocation level of 12.52 million pounds of TP, the calculated exchange ratio is about 9:1, but the ratio has a good deal of variability. Considering that those are earlier versions of the Bay Watershed and Bay Water Quality models applied to the current reduction percentages, the local exchange ratio can vary depending on the location of the basin

within the Bay. Given the degree of variability in this graph, EPA adopted a conservative approach. Figure 6-16 is the same analysis, except it uses chlorophyll *a* concentration in place of Anoxic Volume Days. The exchange ratios are lower, putting a greater importance on TP overall.



Source: Wang et al. 2006

**Figure 6-15. TN:TP exchanges based on anoxic volume days and varying TP loads.**



Source: Wang and Linker 2009.

**Figure 6-16. TN: TP exchanges based on chlorophyll *a* concentrations and varying TP loads.**

Wang and Linker (2009) documented an application of the earlier Bay models to the deep-water designated use of the upper central Chesapeake Bay segment CB4MH and determined a TN:TP exchange ratio of roughly 5:1 for that region of the mainstem Bay.

Further, the stoichiometric Redfield ratio for algal cell is well established at 16:1 TN:TP. This is the number of nitrogen and phosphorus atoms that approximates the nitrogen needed to make algal proteins and the phosphorus needed to make algal nucleic acids. On a weight basis, which is how one measures nitrogen and phosphorus loads delivered to the Bay, the TN/TP ratio equates to 10:1 TN:TP.

Taking both of those analyses, the two published papers, and EPA's desire to be conservative on these exchanges into account, an asymmetrical exchange ratio of 5:1 TN:TP when allowing more nitrogen loads and lowering the phosphorus load, and a ratio of 15:1 TN:TP when allowing more phosphorus loads and lowering the nitrogen load are applied. All applications of these TN:TP exchanges are confirmed to not affect the attainment of the jurisdictions' Bay WQS through follow-up Bay Water Quality Model scenarios.

### Basin-Jurisdiction Nitrogen and Phosphorus Allocations

After performing all the analyses described above, EPA determined the basin-jurisdiction allocations for nitrogen and phosphorus needed to attain the WQS for DO and chlorophyll *a*. EPA sent a letter to the jurisdictions on July 1, 2010, to inform the jurisdictions of the allocations (USEPA 2010g). The table of those allocations are in Section 6.7. The jurisdictions used the allocations to develop their Phase I WIPs that further suballocate the nitrogen and phosphorus loadings to finer geographic scales and to individual sources or aggregate source sectors.

## 6.5  Establishing the Sediment-Related Model Parameters

In the sampling of particulate material in the streams and rivers of the Chesapeake Bay watershed as well as within the tidal waters, almost all of the measurements are for total suspended solids (TSS). This parameter includes sand, silt, and clay particles of sediment but also includes particulate organics. The Bay Watershed Model is calibrated to the observed TSS values. Since TSS is predominantly sediment, total suspended solids and sediment are often used interchangeably. Throughout the document, most of the references to allocations use the term sediment as that is the pollutant that needs to be reduced, but the formal allocation tables use the term TSS as that's the parameter output from the Bay models and its the parameter causing the aquatic life impairment (e.g., reducing light from reaching SAV).

### 6.5.1    Critical Conditions for Water Clarity and SAV

Submerged aquatic vegetation or SAV responds negatively to the same suite of environmental factors that result in low to no DO conditions—high-flow periods yielding elevated loads of nitrogen, phosphorus, and sediment (Dennison et al. 1993; Kemp 2004). High levels of nitrogen and phosphorus within the estuarine water column results in high level of algae, which block sunlight from reaching the SAV leaves. The same high concentrations of nitrogen and phosphorus also fuel the growth of epiphytes or microscopic plants on the surface of the SAV leaves, also directly blocking sunlight. Sediment suspended in the water column reduces the

amount of sunlight reaching the SAV leaves. Because the critical period for both DO and water clarity/SAV are based on high-flow periods, EPA determined that the same critical period used for DO was appropriate for water clarity/SAV. Therefore, the critical period selected for assessment of the jurisdictions' SAV/water clarity WQS was 1993–1995. Detailed technical documentation is provided in Appendix G.

## 6.5.2    Assessment Procedures for the Clarity and SAV Standards

The Chesapeake Bay SAV restoration acreage in the jurisdictions' WQS are based on achieving SAV acreage goals set forth in state WQS that were based on the highest SAV acreage ever observed over a 40-year to more than 70-year historical record depending on the records available for each basin (USEPA 2003a; 2003d). Bay-wide, the SAV restoration goal is 185,000 acres.

The linked SAV and water clarity WQS are unique in some respects. Rather than covering the entire Bay as the DO WQS does, the SAV-water clarity WQS applies in only a narrow ribbon of shallow water habitat along the shoreline in depths of 2 meters or less. That presents certain challenges for the Chesapeake Bay model simulation and monitoring systems, both of which have long been more oriented toward the open waters of the Chesapeake Bay and its tidal tributaries and embayments. Scientific understanding of the transport, dynamics, and fate of sediment in the shallow waters of the Chesapeake Bay and understanding and simulating all the factors influencing SAV growth continues to develop. Appendix P provides more details of the Chesapeake Bay Water Quality and Sediment Transport Model-based combined SAV-water clarity attainment assessment procedures used in developing the sediment allocations.

The combined SAV/water clarity WQS can be achieved in one of three ways (see Section 3.3.3). First, as SAV acreage is the primary WQS, the WQS can be achieved by the number of SAV acres measured by way of aerial surveys—the method that is primarily used in CWA section 303(d) assessments. Second, the WQS can be achieved by the number of water clarity acres (divided by a factor of 2.5) added to the measured acres of SAV. Third, water clarity criteria attainment can be measured on the basis of the cumulative frequency distribution (CFD) assessment methodology using shallow-water monitoring data.

Although SAV responds to nitrogen, phosphorus, and sediment loads, DO and chlorophyll *a* primarily respond only to nitrogen and phosphorus loads. Because of that hierarchy of WQS response, EPA developed the strategy to achieve WQS by first setting the nitrogen and phosphorus allocation for achieving all the DO and chlorophyll *a* WQS in all 92 segments, and then making any additional sediment reductions where needed to achieve the SAV/water clarity WQS. That strategy is augmented by management actions in the watershed to reduce nitrogen, phosphorus, and sediment loads.

Just as the SAV resource is responsive to nitrogen, phosphorus, and sediment loads, many management actions in the watershed that reduce nitrogen and phosphorus also reduce sediment loads. Examples include conservation tillage, farm plans, riparian buffers, and other key practices. The estimated ancillary sediment reductions resulting from implementation actions necessary to achieve the nitrogen and phosphorus reductions needed to achieve the allocations are estimated to be about 40 percent less than 1985 sediment loads and 25 percent less than

current (2009) load estimates. The sediment reductions associated with the nitrogen and phosphorus controls necessary to achieve the basin-jurisdiction target loads provided on July 1, 2010, are provided in Table 6-6.

**Table 6-6. Tributary strategy scenario and nitrogen and phosphorus-based allocation scenario's total suspended solids loads (millions of pounds) by watershed jurisdiction**

| Jurisdiction | Tributary strategy | Allocation scenario |
|---|---|---|
| Maryland | 1,195 | 1,118 |
| Pennsylvania | 2,004 | 1,891 |
| Virginia | 2,644 | 2,434 |
| District of Columbia | 10 | 10 |
| New York | 310 | 291 |
| West Virginia | 248 | 240 |
| Delaware | 55 | 55 |
| Total | 6,467 | 6,040 |

Using the Bay Water Quality Model, the SAV/water clarity WQS were assessed by starting with measured area of SAV in each Bay segment from the 1993–1995 critical period. On the basis of regressions of SAV versus load, the estimated SAV area, resulting from a particular nitrogen and phosphorus or sediment load reduction, was estimated as described in Appendix P. Then the estimated water clarity acres from the Bay Water Quality Model were added after adjustment by a factor of 2.5 to convert to the water clarity acres to water clarity equivalent SAV acres (Appendix P). Finally the water clarity equivalent SAV acres were added to the regression-estimated SAV acres and compared to the Bay segment-specific SAV WQS.

Note that when assessing attainment using monitoring data, only the SAV acres measurement is generally used because the number of Bay segments assessed with shallow-water clarity data are still limited. When projecting attainment using the Bay Water Quality model, the extrapolated measured SAV acres are added to the model-projected water clarity equivalent SAV acres to determine total SAV acres (Appendix P).

### 6.5.3    Addressing Reduced Sensitivity to Load Reductions at Low Nonattainment Percentages

#### Water Clarity

Only one segment displayed a small, yet persistent percentage of model projected water clarity/SAV criteria nonattainment over a range of reduced nitrogen and phosphorus loads—the Appomattox River segment (APPTF) in Virginia's James River Basin. In the case of that segment, while historical records document observed SAV acres in the 1950s, no observed SAV has been mapped since the early 1970s. That tidal fresh segment (salinities from 0 to 0.5 ppt) did not exhibit a positive response (increased water clarity, increased SAV acreage) to model simulated reductions in nitrogen, phosphorus, and sediment as observed in most other Bay tidal fresh segments. For the reasons unique to that Bay segment, EPA would consider it to be in full attainment of its shallow-water bay grass designated use if a 1 percent nonattainment level is achieved.

### 6.5.4    *Explicit Margin of Safety for Sediment*

In a TMDL, where there is uncertainty, an explicit MOS may be appropriate. In the Bay TMDL, EPA determined that an explicit MOS is appropriate for sediment because the Bay Water Quality Model was overly optimistic in its simulation of SAV acreages and water clarity attainment in the shallows.  Specifically, the Bay Water Quality Model projected that widespread attainment of the SAV/water clarity standards would result at the current (2009) basinwide loading levels of about 8 billion pounds per year. In contrast, however, recent data from the Baywide SAV aerial survey and shallow-water quality monitoring data showed that most Bay segments were not attaining the SAV restoration acreages goals or water clarity criteria. That discrepancy justified the need for an explicit MOS to ensure that the sediment allocations would achieve the Bay jurisdictions' SAV/water clarity WQS.

EPA acknowledges that the science supporting the estuarine modeling simulation of the transport and resuspension for sediment is not as strong as that for nitrogen and phosphorus.[1] It is important to note, however, that many of the conservative assumptions identified in the implicit MOS discussion for nitrogen and phosphorus in Section 6.2.4 also apply to the MOS for sediment. In addition to the conservative assumptions in the modeling and allocation methods, EPA applied an explicit MOS in establishing the sediment allocations.

Since the SAV/water clarity modeling methodology was overly optimistic, and because reducing phosphorus often has the co-benefit of reducing sediment, EPA established sediment allocations on the basis of sediment loads that EPA estimated would result from implementing the phosphorus controls. The basin-jurisdiction allocations initially were expressed as an allocation range reflecting the application of an explicit MOS in order to provide the jurisdictions with some flexibility in preparing their WIPs (USEPA 2010h). That initial allocation range was from 6.1 billion pounds per year to 6.7 billion pounds per year. Using 8 billion pounds per year of sediment as the estimate of the load needed to generally attain at the Baywide SAV/water clarity standards, that allocation range provides a Baywide range for MOS of about 16 to 24 percent.

In the final TMDL, EPA used a singular allocation to the basin-jurisdictions for sediment as opposed to a range. The method used to interpret the WIPs to derive that allocation is described in Section 8. The final Baywide sediment allocation is about 6.5 million pounds per year. So that allocated load yields a Baywide explicit MOS of 19 percent. Of course, the explicit MOS for each of the Bay segments would be expected to be somewhat higher or lower than the Baywide MOS. It is EPA's professional opinion that an explicit Baywide MOS of 19 percent—which is beyond the conservative assumptions identified in the Section 6.2.4 above on the implicit MOS for nitrogen and phosphorus—is appropriate for establishing the sediment allocations.

## 6.6  Establishing the Basin-Jurisdiction Allocations for Sediment

The methodology used for allocating sediment loads to major river basins and jurisdictions for sediment was much different than the methodology used for nitrogen and phosphorus. Because sediment has a localized water quality effect, the immediate subbasin (e.g., the Chester River) is

---

[1] Copies of the Chesapeake Bay Water Quality Sediment Transport Model Review Panel's (convened by the CBP's Scientific and Technical Advisory Committee) reports are at http://www.chesapeakebay.net/committee_msc_projects.aspx?menuitem=16525#peer.

usually the dominant controlling influence on water clarity and SAV growth. Therefore, a methodology is not needed to further suballocate the loading to contributing jurisdictions or neighboring basins. On August 13, 2010, the EPA Region 3 Administrator sent a letter to the jurisdictions identifying the sediment allocations (USEPA 2010g).

### 6.6.1    Methodology for Determining Sediment Allocations

To identify the sediment loads needed to achieve the SAV/water clarity WQS, the following key steps were taken:

- Determine the sediment loading for each Bay segment that would be expected from installing the controls needed to meet the phosphorus allocations but have the co-benefit of reducing sediment (as described above).

- Using the Bay Water Quality Model, determine the number of acres in each segment that would attain the clarity standards for that segment and divide that number by 2.5 to determine the SAV equivalent acres.

- Add the SAV equivalent acres determined above to the expected SAV acreage on the basis of observed acres to determine the total SAV acreage expected under that nitrogen, phosphorus, and sediment loading scenario.

- Compare the expected SAV acres to the SAV goal for that segment to determine attainment with the WQS.

- For the non-attaining segments, go back to step 1.

Of the 92 tidal Bay segments assessed by Maryland, Virginia, Delaware, and the District of Columbia, 26 achieve the respective jurisdiction's SAV/water clarity WQS according to available monitoring data (Appendix P). Twenty segments have mapped SAV acreages meeting the segment-specific SAV restoration acreage in the jurisdiction's WQS (single best year of the past 3 years). Of the 12 water clarity acre assessments that were performed, an additional 6 segments were found to attain the jurisdiction's water clarity criteria on the basis of an analysis of shallow-water monitoring data (Figure 6-17).

However, the Bay Water Quality Model projected widespread attainment at existing loading levels, yet the existing SAV water quality data show SAV/water clarity WQS nonattainment in 66 of 92 segments with only 46 percent of the Bay-wide restoration acreage achieved (Appendix P). The existing state of scientific understanding has resulted in the Bay Water Quality Model being optimistic in its simulation of SAV acreage in the Bay under current (2009) pollutant loads.

### 6.6.2    Addressing Water Clarity/SAV Nonattaining Segments

After applying the sediment loads described above, four segments were initially found to be in nonattainment of the SAV-water clarity WQS. Those segments are the Mattawoman Creek (MATTF), the Gunpowder River (GUNOH), the Appomattox River (APPTF), and the Virginia's portion of the lower Potomac River (POTMH_VA). A detailed assessment of those nonattaining segments are in Appendix N, but a brief review is provided below.



Sources: DC DOE 2008; DE DNREC 2008; MDE 2008; VA DEQ 2008; Appendix Q.

**Figure 6-17. Chesapeake Bay SAV/Water Clarity WQS attainment from monitoring data assessment.**

Mattawoman Creek (MATTF)—Recent aerial surveys have shown a remarkable recovery of the acreage of SAVs in the Mattawoman Creek. In fact, for the years 2006–2009 the acres of observed SAV was higher than the SAV goal. Furthermore, with the implementation of the allocations in this TMDL, further nitrogen, phosphorus, and sediment reductions are expected, which will likely encourage additional SAV growth. So from the observed SAV line of evidence, EPA concludes that the allocated sediment load to Mattawoman Creek will attain the SAV goals.

Gunpowder River (GUNOH)—Similar to the Mattawoman Creek, substantial regrowth of SAV has occurred in the Gunpowder River since 2000. While the SAV goal is not being exceeded consistently, there have been several recent years where the goal is essentially met. On the basis of observed SAV information, combined with the fact that the TMDL allocations will result in additional nitrogen, phosphorous, and sediment reductions, EPA concludes that the allocated sediment load to the Gunpowder River will attain the SAV goals.

### Appomattox River (APPTF)

No reported SAV acres are in the Appomattox River in the recent record. Therefore, attainment in this segment will need to be based on attainment for the clarity WQS alone. On the basis of modeling results at the allocation levels, the clarity levels barely attain applicable WQS. So an overall sediment allocations for the James may not be specific enough to assure attainment of the SAV standards in the Appomattox River. Therefore, while the basin-jurisdiction allocation for sediment for the James has been established, it is important to closely track the regrowth of SAV in the segment and use that information to provide needed updates to the assessment for the segment.

### Virginia's portion of the lower Potomac River (POTMH_VA)

This segment covers the embayments on the Virginia side of the lower tidal Potomac River. The embayments are well isolated from the Potomac River and, therefore, respond primarily to the inputs from the subwatershed and not the Potomac itself. Recent SAV observations for the segment are much improved over the past but still far short of the WQS. Therefore, attainment determinations for the segment rely largely on the clarity attainment. As a reminder, the predicted SAV levels can be calculated as a combination of the measured SAV levels plus acres of clarity attainment (divided by 2.5). If one uses the critical period 1993–1995 SAV observed acreage and combines this acreage with the expected clarity attainment at the allocation loadings, the segment does not attain the SAV goal at the sediment allocation level. Furthermore, at much higher levels of controls (lower loadings), beyond the sediment allocation, the calculated nonattainment for this segment persists. There is simply not enough shallow water habitat in the segment to attain the standard on the basis of water clarity alone. On the other hand, all neighboring Bay segments in the tidal Potomac River are expected to achieve the SAV standards with the implementation of the sediment allocations. Therefore, having limited basis for which to establish a sediment allocation, and in consideration that neighboring Bay segments are expected to attain the SAV standards, EPA retained the sediment allocations for the Potomac basin. However, EPA considers it important, similar to the Appomattox River, to closely track the regrowth of SAV in this segment and use that information to provide needed updates to the assessment for this segment.

## 6.7  Basin-Jurisdiction Allocations to Achieve the Bay WQS

On the basis of all the methods and analyses described above, EPA identified allocations for the major basins within each jurisdiction called the basin-jurisdiction allocations. Those allocations were the beginning point for developing the Bay TMDL and are provided below.

### 6.7.1  Basin-Jurisdiction Allocations Tables

Throughout 2009 up until the summer of 2010, EPA and its watershed jurisdictional partners worked together to develop the major river basin/jurisdiction allocations. From those collaborative efforts, EPA shared an initial set of major river basin/jurisdiction nitrogen and phosphorus target loads on November 3, 2009, on the basis of decisions at the October 23, 2009, PSC meeting (USEPA 2009b). Then, after a 2-day PSC meeting on April 29-30, 2010, EPA shared in a letter to the partners an updated Bay TMDL schedule and further outlined a long-term commitment to an adaptive management approach to the Bay TMDL (USEPA 2010f).

The basin-jurisdiction allocations were based on attaining the adopted (but proposed at the time) amendments to the jurisdictions' Bay WQS. On July 1, 2010, EPA shared the nitrogen and phosphorus allocations (USEPA 2010g) and the sediment allocations on August 13, 2010 (USEPA 2010h). Those were the allocations that jurisdictions used to develop their Phase I WIPs that further suballocate the nitrogen, phosphorus, and sediment loadings to finer geographic scales and to individual sources or aggregate source sectors and EPA used to evaluate those WIPs. By initially expressing the sediment allocations as a range, EPA allowed the jurisdictions some flexibility in developing their Phase I WIPs while assuring with confirmation Water Quality Model runs that all the WQS would be met (Figure 6-18) (USEPA 2010h). The allocations were calculated as delivered loads (the loading that actually reaches tidal waters) and as annual loads. The loads are provided in Tables 6-7 and 6-8. The allocations were further refined through the jurisdictions' WIPs by exchanges of loadings for some basins in Maryland and exchanges of nitrogen to phosphorus or phosphorus to nitrogen within a basin. Those adjusted allocations are provided in Section 8.

### 6.7.2  Correction of the West Virginia Sediment Allocation

The allocation for sediment for West Virginia, listed in Tables 6-7 and 6-8, was corrected subsequent to the distribution of the sediment allocation letter to the jurisdictions on August 13, 2010. Recall that the sediment range of allowable loads was based on the expected sediment loading that would result as a co-benefit to reducing phosphorus. So the sediment range was highly dependent on the phosphorus allocation. The reason the sediment allocation for West Virginia needed to be corrected was that the previous sediment allocation in the EPA letter of August 13, 2010, was not based on the supplemental phosphorus load that was provided to West Virginia. When the full phosphorus allocation for West Virginia is considered, the updated sediment load range for West Virginia was 309–340 million of pounds per year. For the Potomac River in West Virginia, the updated sediment load range is 294–324 million pounds per year. The sediment allocation range for the James River Basin in West Virginia remains unchanged.



Source: USEPA 2010h

**Figure 6-18. Model simulated sediment loads by scenario compared with the range of sediment allocations (billions of pounds per year as total suspended sediment).**

## 6.8 Attainment of the District of Columbia pH Water Quality Standard

After the development of the nitrogen, phosphorus and sediment allocations to achieve the Bay DO, chlorophyll *a*, SAV/water clarity WQS, EPA conducted an analysis to explore whether these allocations were sufficient to remedy the pH impairment in the District of Columbia portion of the Potomac River Estuary. The upper Potomac River Estuary from Key Bridge to Haines Point has been on the District of Columbia's 303(d) list of impaired waters for pH from 1998 to present. EPA believes that the high pH levels are indirectly caused by the relationship between high nitrogen and phosphorus levels and algal growth. Readily available nitrogen and phosphorus in surface waters supports the growth of algae, which can become prolific when nitrogen and phosphorus levels are high. During photosynthesis, algae use carbon dioxide, resulting in high pH conditions (Sawyer et al. 1994). In water, carbon dioxide gas dissolves to form soluble carbon dioxide, which reacts with water to form undissociated carbonic acid. Carbonic acid then dissociates and equilibrates as bicarbonate and carbonate. Generally, as carbon dioxide is used up in photosynthesis, pH rises because of the removal of carbonic acid (Horne and Goldman 1994). It is expected that the high pH levels in this segment of the tidal Potomac River are due to primary productivity (algal growth). Algal growth is fueled by excess nitrogen and phosphorus inputs. On the basis of a reasonable degree of scientific certainty, as further explained below, EPA finds that the reduced nitrogen and phosphorus loads resulting from implementation of the Chesapeake Bay TMDL will also result in decreased algae levels and, thus, meet the District of Columbia pH numeric WQS.

**Table 6-7. Chesapeake Bay watershed nitrogen and phosphorus and sediment allocations by major river basin by jurisdiction to achieve the Chesapeake Bay WQS**

| Basin | Jurisdiction | Nitrogen allocations (million lbs/year) | Phosphorus allocations (million lbs/year) | Sediment allocations (million lbs/year) |
|---|---|---|---|---|
| Susquehanna | New York | 8.48 [b] | 0.62 [b] | 293–322 |
| | Pennsylvania | 71.74 | 2.31 | 1,660–1,826 |
| | Maryland | 1.08 | 0.05 | 60–66 |
| | Total | 81.31 [b] | 2.98 [b] | 2,013–2,214 |
| Eastern Shore | Delaware | 2.95 | 0.26 | 58–64 |
| | Maryland | 9.71 | 1.09 | 166–182 |
| | Pennsylvania | 0.28 | 0.01 | 21–23 |
| | Virginia | 1.21 | 0.16 | 11–12 |
| | Total | 14.15 | 1.53 | 256–281 |
| Western Shore | Maryland | 9.74 | 0.46 | 155–170 |
| | Pennsylvania | 0.02 | 0.001 | 0.37–0.41 |
| | Total | 9.76 | 0.46 | 155–171 |
| Patuxent | Maryland | 2.85 | 0.21 | 82–90 |
| | Total | 2.85 | 0.21 | 82–90 |
| Potomac | Pennsylvania | 4.72 | 0.42 | 221–243 |
| | Maryland | 15.70 | 0.90 | 654–719 |
| | District of Columbia | 2.32 | 0.12 | 10–11 |
| | Virginia | 17.46 | 1.47 | 810–891 |
| | West Virginia | 4.67 | 0.74 | 294–324 [c] |
| | Total | 44.88 | 3.66 | 1,989–2,188 [c] |
| Rappahannock | Virginia | 5.84 | 0.90 | 681–750 |
| | Total | 5.84 | 0.90 | 681–750 |
| York | Virginia | 5.41 | 0.54 | 107–118 |
| | Total | 5.41 | 0.54 | 107–118 |
| James | Virginia | 23.48 | 2.34 | 837–920 |
| | West Virginia | 0.02 | 0.01 | 15–17 |
| | Total | 23.50 | 2.35 | 852–937 |
| Total Basin/Jurisdiction Allocation | | 187.69 | 12.62 | 6,135–6,749 |
| Atmospheric Deposition Allocation[a] | | 15.70 | -- | -- |
| Total Basinwide Allocation | | 203.39 | 12.62 | 6,135–6,749 |

a. Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by federal air regulations through 2020.
b. This allocation to New York does include the additional (beyond the draft) allocation of 250,000 pounds per year of nitrogen and 100,000 pounds per year of phosphorus that EPA added to the New York allocation (see Section 6.4.5)
c. This allocation includes a correction of the sediment allocations to West Virginia to account for the increase in phosphorus allocation provided to West Virginia (see Section 6.7.2)

To support that assumption, continuous monitoring data from the District of Columbia's Department of the Environment long-term monitoring station at the Roosevelt Island Bridge were evaluated. This location falls within the impaired tidal Potomac River segment (POTTF_DC) and is the only location for which continuous data are available for trend analysis. Plots of pH vs. chlorophyll *a* for the period of record indicate a distinct relationship between the two parameters; increased chlorophyll *a* levels are associated with increased levels of pH. That relationship is particularly apparent for April through June of 2010 (Figure 6-19).

**Table 6-8. Chesapeake Bay watershed nitrogen and phosphorus and sediment allocations by jurisdiction by major river basin to achieve the Chesapeake Bay WQS**

| Jurisdiction | Basin | Nitrogen allocations (million lbs/year) | Phosphorus allocations (million lbs/year) | Sediment allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 71.74 | 2.31 | 1,660-1,826 |
| | Potomac | 4.72 | 0.42 | 221-243 |
| | Eastern Shore | 0.28 | 0.01 | 21-23 |
| | Western Shore | 0.02 | 0.001 | 0.37-0.41 |
| | PA Total | 76.77 | 2.74 | 1,903-2,093 |
| Maryland | Susquehanna | 1.08 | 0.05 | 60-66 |
| | Eastern Shore | 9.71 | 1.09 | 166-182 |
| | Western Shore | 9.74 | 0.46 | 155-170 |
| | Patuxent | 2.85 | 0.21 | 82-90 |
| | Potomac | 15.70 | 0.90 | 654-719 |
| | MD Total | 39.09 | 2.72 | 1,116-1,228 |
| Virginia | Eastern Shore | 1.21 | 0.16 | 11-12 |
| | Potomac | 17.46 | 1.47 | 810-891 |
| | Rappahannock | 5.84 | 0.90 | 681-750 |
| | York | 5.41 | 0.54 | 107-118 |
| | James | 23.48 | 2.34 | 837-920 |
| | VA Total | 53.40 | 5.41 | 2,446-2,691 |
| District of Columbia | Potomac | 2.32 | 0.12 | 10-11 |
| | DC Total | 2.32 | 0.12 | 10-11 |
| New York | Susquehanna | 8.48 [b] | 0.62 [b] | 293-322 |
| | NY Total | 8.48 [b] | 0.62 [b] | 293-322 |
| Delaware | Eastern Shore | 2.95 | 0.26 | 58-64 |
| | DE Total | 2.95 | 0.26 | 58-64 |
| West Virginia | Potomac | 4.67 | 0.74 | 294-324 [c] |
| | James | 0.02 | 0.01 | 15-17 |
| | WV Total | 4.68 | 0.75 | 309-341 [c] |
| Total Basin/Jurisdiction Allocation | | 187.69 | 12.62 | 6,135-6,749 |
| Atmospheric Deposition Allocation[a] | | 15.70 | -- | -- |
| Total Basinwide Allocation | | 203.39 | 12.62 | 6,135-6,749 |

a. Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by federal air regulations through 2020.
b. This allocation to New York does include the additional (beyond the draft) allocation of 250,000 pounds per year of nitrogen and 100,000 pounds per year of phosphorus that EPA added to the New York allocation (see Section 6.4.5)
c. This allocation includes a correction of the sediment allocations to West Virginia to account for the increase in phosphorus allocation provided to West Virginia (see Section 6.7.2)

For the most recent 2-year period (September 2008 to November 2010), pH levels at that location have regularly exceeded the maximum criterion level of 8.5; however, they never exceeded 9.0.[2] Those pH levels are similar to those observed at other tidal Potomac River Estuary monitoring stations.

---

[2] In 9VAC25-260-50, Virginia requires that estuarine waters fall within the acceptable pH range of 6.0 to 9.0.

Chesapeake Bay TMDL



**Figure 6-19. District of Columbia's Roosevelt Island station pH versus chlorophyll *a* monitoring data regression.**

It is also important to note that no known wastewater discharges are expected to contribute to high pH levels along this stretch of the Potomac. Only one nonsignificant industrial facility discharges to the tidal Potomac River above this location, the Washington Aqueduct. Flow from the facility is relatively small (13.2 million gallons per day) when compared to the flow rate of the Potomac (about 7 billion gallons per day) in the vicinity. Permit limits for the facility require that pH is between 6.0 and 8.5. Examination of discharge monitoring report (DMR) data from May 2003 to May 2010 for the facility indicates one pH violation on August 31, 2003, for pH of 9.22 at Outfall 004. No other outfalls had violations between May 2003 and February 2006, and pH ranged from 6.5 to 8.0 during that time. A second violation, failure to report DMR data, occurred in May 2010.[3] A second facility, Walter Reed Army Medical Center, discharges approximately 0.09 million gallons per day to the tidal Potomac River via Rock Creek. Because of its upstream location, discharge characteristics (process water from heating and cooling system and rooftop runoff), and small size, it is not a source of high pH waters. Because the next segment upstream is the POTTF_MD, and it is not impaired for pH, no further upstream discharge facilities were evaluated.

Flow and pH data for the most recent 2-year period show that high flows generally do not correspond to pH exceedances. That evidence strongly suggests that nonpoint sources are not a direct cause of the pH exceedances. For those reasons, it is EPA's best professional judgment that pH exceedances are caused by the high nitrogen and phosphorus and resultant algae growth and that the reductions expected to result from implementing the Chesapeake Bay TMDL will also ensure attainment of the pH criterion in this segment of the Potomac.

---

[3] EPA reviewed DMR records from both PCS and ICIS. Actual data were available from the PCS review (2003 to early 2006), whereas the ICIS review (2006 to May 2010) provided information regarding whether a violation occurred and the type of violation.

The Washington Ship Channel is another waterbody segment in the District that was listed as impaired on the District of Columbia's 1998 303(d) list and was part of EPA's Consent Decree. In 2004 the District established, and EPA approved, a TMDL to address the pH impairment that requires phosphorus reductions expressed in annual loads. Since the 2004 Washington Ship Channel TMDL, the District's final 2008 303(d) list and its draft 2010 303(d) both indicate that the Washington Ship Channel's aquatic life use is no longer impaired due to pH. It is EPA's best professional judgment that this supports the conclusion that implementing the Chesapeake Bay TMDL's nitrogen and phosphorus reductions will address the District of Columbia's pH impairments and that implementing the Chesapeake Bay TMDL will continue to protect the Washington Ship Channel from pH impairment. The Chesapeake Bay TMDL supersedes the Washington Ship Channel's 2004 pH TMDL.

# SECTION 7.  REASONABLE ASSURANCE AND ACCOUNTABILITY FRAMEWORK

When the U.S. Environmental Protection Agency (EPA) establishes or approves a total maximum daily load (TMDL) that allocates pollutant loads to both point and nonpoint sources, it determines whether there is reasonable assurance that the load allocations (LAs) will be achieved and water quality standards (WQS) will be attained. EPA does that to be sure that the wasteload allocations (WLAs) and LAs established in the TMDL are not based on overly generous assumptions regarding the amount of nonpoint source pollutant reductions that will occur.

This is necessary because the WLAs for point sources are determined, in part, on the basis of the expected contributions to be made by nonpoint sources to the total pollutant reductions necessary to achieve WQS. If the reductions embodied in LAs are not fully achieved because of a failure to fully implement needed nonpoint source pollution controls, or that the reduction potential of the proposed best management practices (BMPs) was overestimated, the collective reductions from all sources will not result in attainment of WQS. As a result, EPA evaluates whether a TMDL provides reasonable assurance that nonpoint source controls will achieve expected load reductions.

For the Chesapeake Bay TMDL, numerous elements combine to provide that reasonable assurance, of which the primary mechanism is the Accountability Framework described in Section 7.2. Section 8 also describes EPA actions designed to provide additional assurance that the Bay TMDL's allocations are achieved.

## 7.1  REASONABLE ASSURANCE

The Clean Water Act (CWA) section 303(d) requires that a TMDL be "established at a level necessary to implement the applicable water quality standard." Federal regulations define a TMDL as "the sum of the individual WLAs for point sources and LAs for nonpoint sources and natural background" [40 CFR 130.2(i)]. Documenting adequate reasonable assurance increases the probability that regulatory and voluntary mechanisms will be applied such that the pollution reduction levels specified in the TMDL are achieved and, therefore, applicable WQS are attained.

When a TMDL is developed for waters impaired by point sources only, the existence of the National Pollutant Discharge Elimination System (NPDES) regulatory program and the issuance of an NPDES permit provide the reasonable assurance that the WLAs in the TMDL will be achieved. That is because federal regulations implementing the CWA require that effluent limits in permits be consistent with "the assumptions and requirements of any available [WLA]" in an approved TMDL [40 CFR 122.44(d)(1)(vii)(B)].

Where a TMDL is developed for waters impaired by both point and nonpoint sources, in EPA's best professional judgment, determinations of reasonable assurance that the TMDL's LAs will be achieved could include whether practices capable of reducing the specified pollutant load: (1) exist; (2) are technically feasible at a level required to meet allocations; and (3) have a high likelihood of implementation. Where there is a demonstration that nonpoint source load

reductions can and will be achieved, a TMDL writer can determine that reasonable assurance exists and, on the basis of that reasonable assurance, allocate greater loadings to point sources. Without a demonstration of reasonable assurance that relied-upon nonpoint source reductions will occur, the Bay TMDL would have to assign commensurate reductions to the point sources.

### 7.1.1    Overview of the Accountability Framework

For the Chesapeake Bay TMDL, reasonable assurance that nonpoint source load reductions will be achieved is based, in large part, on the new accountability framework EPA is developing for this TMDL, including the Bay jurisdictions' watershed implementation plans (WIPs). This framework incorporates an adaptive management approach that documents implementation actions, assesses progress, and determines the need for alternative management measures based on the feedback of the accountability framework. As discussed below and in the *Strategy for Protecting and Restoring the Chesapeake Bay Watershed* (FLCCB 2010), the goal for installing all controls necessary to achieve the Bay's DO, water clarity, SAV, and chlorophyll *a* criteria is 2025. EPA therefore is making its evaluation of reasonable assurance according to that time horizon. EPA has provided an interim goal that 60 percent of the reductions to achieve applicable WQS occur by no later than 2017. This interim goal ensures that the large portions of necessary reductions, or the more difficult restoration actions, are not left until the later years of the restoration schedule.

Since 2008, EPA Region 3 has communicated its heightened expectations for reasonable assurance in the Chesapeake Bay watershed and its basis for expecting the jurisdictions' WIPs to assist in the demonstration of that reasonable assurance. EPA's September 11, 2008, and November 4, 2009, letters and its April 2, 2010, *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* provide extensive information on what EPA expects the jurisdictions to include in their WIPs to help demonstrate reasonable assurance (USEPA 2008b, 2009c, 2010e), including that the jurisdictions

- Develop WIPs that identify how point and nonpoint sources will reduce nitrogen, phosphorus, and sediment loads sufficient to meet WQS for DO, chlorophyll *a*, SAV, and water clarity in the tidal waters of the Chesapeake Bay and its tidal tributaries

- Commit to set and meet specific 2-year milestones for implementing practices to achieve load reductions

EPA also has stated its intention to take additional federal actions, as determined to be appropriate to ensure implementation of the Bay TMDL, as described in Section 7.2.4 below. One of those potential federal actions is the modification or replacement of the TMDL. Another is the use of EPA's discretionary authority to increase oversight of NPDES permits proposed and issued by the Bay watershed jurisdictions. As discussed in EPA's December 29, 2009, letter, pursuant to EPA-jurisdiction NPDES program agreements, EPA can expand its oversight review of draft permits in the Bay watershed and can object to permits that do not meet CWA requirements, including NPDES effluent limits that are inconsistent with the Bay TMDL's WLAs (USEPA 2009d). EPA also could use its discretionary residual designation authority to increase the number of sources, operations, or communities regulated under the NPDES permit program.

As part of EPA's demonstration of reasonable assurance, EPA evaluated the jurisdictions' final Phase I WIPs to determine whether the jurisdictions both met their target allocations and provided sufficient reasonable assurance. Section 8 describes the results of EPA's evaluation of the jurisdictions' final Phase I WIPs. Section 8 also describes EPA actions designed to provide additional reasonable assurance that applicable WQS in the Chesapeake Bay watershed will be attained and maintained.

In addition to the new Bay-specific accountability framework, reasonable assurance for the Chesapeake Bay TMDL is based on the existence and implementation of numerous existing federal, state, and local programs that provide for both point and nonpoint source controls. While not all these programs provide funding or apply to all sources, together they contribute to EPA's determination that reasonable assurance exists for the Chesapeake Bay TMDL.

### 7.1.2    *Federal Strategy*

President Obama signed Executive Order 13508 on May 12, 2009. That order directs federal agencies to "define environmental goals for the Chesapeake Bay and describe milestones for making progress toward attainment of these goals." The federal agencies fulfilled this order by drafting the *Strategy for Protecting and Restoring the Chesapeake Bay Watershed*, which focused on achieving four essential priorities to restore and maintain a healthy Chesapeake ecosystem: restore clean water; recover habitat; sustain fish and wildlife; and conserve land and increase public access (FLCCB 2010). The *Federal Strategy* articulates 12 key environmental outcomes that will be achieved through federal actions and ongoing state activities. The commitments and actions described in the Federal Strategy and annual federal action plans are a unique and powerful tool to achieve the Bay's water quality goals and provide additional support for reasonable assurance in this TMDL.

The Bay TMDL, along with the jurisdictions' WIPs, are key elements of the strategy because together they provide a set of numeric pollutant reduction targets and implementation plans to guide and assist achievement of the goal to restore clean water. Under the Federal Strategy, EPA is also creating a system to track and report TMDL/WIP reduction goals and 2-year milestones for federal and state agencies (see Section 7.2.3). The tracking system provides additional reasonable assurance that the TMDL's allocations will be met by clearly charting ongoing progress and, if there are shortfalls, informing EPA, the seven Bay watershed jurisdictions, and other stakeholders, including the public, about the need for additional state and federal actions.

USGS, NOAA, and other federal agencies will work with EPA and the jurisdictions to improve the water quality monitoring and tracking of management actions and restoration activities. Part of that effort includes expanding and improving the NOAA Chesapeake Bay Interpretive Buoy System and improving the monitoring of tidal river and upland stream conditions. Many other federal agencies will undertake actions to conserve land, sustain fish and wildlife, and recover habitat.

The strategy also outlines specific tools to promote transparency and accountability in the implementation and coordination of the activities. Those tools include federal 2-year milestones where the federal agencies identify and track their actions toward meeting water quality milestones and other strategy outcomes. Other tools outlined in the strategy include an annual

federal action plan, an annual progress report and providing for an independent evaluation of both federal and state progress on meeting the goals set forth in section 206 of the Executive Order.

### 7.1.3    Funding

The CWA authorizes EPA to provide funding to the Bay watershed jurisdictions through various sources, including but not limited to Chesapeake Bay Implementation grants, Nonpoint Source Control grants, CWA section 106 grants for water pollution control programs, the Clean Water State Revolving Loan Fund, the American Recovery and Reinvestment Act, and various grant programs targeting Chesapeake Bay restoration. The funding will help the jurisdictions meet their pollutant reduction targets.

In addition, significant U.S. Department of Agriculture (USDA) funds and cost share programs are available through the Farm Bill, which recently were increased through the Chesapeake Bay Watershed Initiative. USDA administers the funds and target priority watersheds in the Chesapeake Bay. The Federal Strategy describes how USDA is working with producers to apply new, more effective conservation practices on the highest priority watersheds in the Chesapeake Bay basin. Along with an increase in federal cost share dollars, USDA is bringing an unprecedented focus on targeted efforts in the watersheds that contribute the greatest reductions in nitrogen, phosphorus, and sediment. That will substantially help the jurisdictions to meet their respective LAs in the TMDL, to implement their WIPs, and to achieve their 2-year milestones (FLCCB 2010 pp. 34–45). USDA also is leading efforts to accelerate development of new conservation technologies and is contributing to the system of accountability for tracking and reporting conservation practices. Finally, USDA is working to streamline conservation planning and is sponsoring a number of showcase projects to test and monitor the benefits of a focused outreach on a number of small watersheds (30,000–40,000 acres).

### 7.1.4    Air Emission Reductions.

The reasonable assurance for the reductions in loadings from air deposition is based on the air emission reductions that will occur by regulation under the Clean Air Act (CAA) through 2020. These reductions are discussed in more detail in Section 6.4.1 and Appendix L.

While the federal Bay strategy and associated activities are not a federal TMDL implementation plan and are not directly part of the TMDL, the additional resources, accountability, oversight, and coordination provided by EPA and other federal agencies add to the reasonable assurance that the TMDL allocations will be implemented. Those combined elements, together with the accountability framework described in greater detail below, collectively provide reasonable assurance that the Chesapeake Bay TMDL nitrogen, phosphorus, and sediment allocations will be achieved.

## 7.2   ACCOUNTABILITY FRAMEWORK

The Chesapeake Bay Protection and Restoration Executive Order 13508 directs EPA and other federal agencies to build a new accountability framework that guides water quality restoration of

the Chesapeake Bay. In addition to the federal components described above as set forth in the Federal Strategy, the Chesapeake Bay TMDL accountability framework has four elements:

- The Bay jurisdictions' development of WIPs;

- The Bay jurisdictions' development of 2-year milestones to demonstrate restoration progress;

- EPA's commitment to track and assess the jurisdictions' progress, by way of developing and implementing a Chesapeake Bay TMDL Tracking and Accountability System (BayTAS); and

- EPA's commitment to take appropriate federal actions if the jurisdictions fail to develop sufficient WIPs, effectively implement their WIPs, or fulfill their 2-year milestones.

The accountability framework, including the jurisdictions' WIPs and 2-year milestones, will help ensure implementation of the Chesapeake Bay TMDL but is not itself an approvable part of the TMDL. In its September 11, 2008, letter to the CBP's PSC (USEPA 2008b), EPA outlined the following expectations for each of the Bay watershed jurisdictions as part of the Bay TMDL accountability framework:

1. Identify the controls needed to achieve the allocations identified in the Bay TMDL through revised tributary strategies.

2. Identify the current state and local capacity to achieve the needed controls (i.e., an assessment of current funding programs for point source permitting/treatment upgrades and nonpoint source controls, programmatic capacity, regulations, legislative authorities).

3. Identify the gaps in current programs that must be filled to achieve the needed controls (i.e., additional incentives, state or local regulatory programs, market-based tools, technical or financial assistance, new legislative authorities).

4. A commitment from each jurisdiction to work to systematically fill the identified gaps. As part of this commitment, the jurisdictions would agree to meet specific, iterative, and short-term (1-2 year) milestones demonstrating increased levels of implementation or nitrogen, phosphorus, and sediment load reduction.

5. A commitment to continue efforts underway to expand monitoring, tracking, and reporting directed to assessing the effectiveness of implementation actions and to use the data to drive adaptive decision making and redirect management actions.

6. Agreement that if the jurisdictions do not meet the commitments, additional measures might be necessary.

Letters sent by EPA to the jurisdictions on November 4, 2009, and December 29, 2009, further developed this accountability framework (USEPA 2009c, 2009d). In his July 1, 2010, and August 13, 2010, letters to the jurisdictions setting out the draft nitrogen, phosphorus, and sediment allocations, Regional Administrator Shawn Garvin further communicated key aspects of the accountability framework (USEPA 2010g, 2010h).

## 7.2.1   Watershed Implementation Plans

A major element of EPA's demonstration of reasonable assurance for the Chesapeake Bay TMDL is the development of WIPs by each of the seven Bay watershed jurisdictions. The WIPs have informed, and will continue to inform, EPA's development of the Bay TMDL and its setting of WLAs and LAs. In essence, the WIPs are the roadmap for how the jurisdictions, in partnership with federal and local governments, will achieve and maintain the Chesapeake Bay TMDL nitrogen, phosphorus, and sediment allocations.

EPA's November 4, 2009, letter outlined expectations for the WIPs, including that they address the eight elements summarized in Table 7-1 below.

**Table 7-1. Eight elements of the jurisdictions' Watershed Implementation Plans**

| Element | Description |
|---|---|
| 1. Interim and Final Nitrogen, Phosphorus, and Sediment Target Loads | WIPs are expected to subdivide interim and final target loads by pollutant source sector within each of the 92 areas draining to section 303(d) tidal water segments and identify the amount and location of loads from individual or aggregate point sources and nonpoint source sectors. |
| 2. Current Loading Baseline and Program Capacity | WIPs are expected to include evaluation of current legal, regulatory, programmatic, financial, staffing, and technical capacity to deliver the target loads established in the TMDL. |
| 3. Account for Growth | WIPs are expected to describe procedures for estimating additional loads due to growth and to provide EPA with information to inform additional pollutant load reductions that are at least sufficient to offset the growth and development that is anticipated in the watershed between 2011 and 2025. |
| 4. Gap Analysis | WIPs are expected to identify gaps between current capacity (Element 2) and the capacity needed to fully attain the interim and final nitrogen, phosphorus, and sediment target loads for each of the 92 drainage areas for impaired segments of the Bay TMDL (Element 1). |
| 5. Commitment and Strategy to Fill Gaps | WIPs are expected to include a proposed strategy to systematically fill the gaps identified in Element 4. |
| 6. Tracking and Reporting Protocols | WIPs are expected to describe efforts underway or planned to improve transparent and consistent monitoring, tracking, reporting, and assessment of the effectiveness of implementation actions. |
| 7. Contingencies for Slow or Incomplete Implementation | If the proposed strategies outlined in Element 5 are not implemented, WIPs are expected to provide for alternative measures resulting in equivalent reductions and an indication of what such contingencies might entail. |
| 8. Appendix with Detailed Targets and Schedule | WIPs are expected to include detailed interim and final load targets for each tidal Bay segment drainage area, source sector, and local area (after November 2011) in an appendix, with a reduction schedule comprising the 2-year target loads at the scale of each major basin within a jurisdiction.<br><br>The 2-year target loads allow EPA to assess whether future 2-year milestones are on schedule to meet interim and final water quality goals. |

Source: USEPA 2009c

### Three Phases of Watershed Implementation Plans

The jurisdictions are expected to develop WIPs over three Phases. Draft Phase I WIPs were developed and submitted to EPA on or around September 1, 2010. EPA used them to support the development of specific allocations in the draft Bay TMDL. Draft Phase I WIPs for each of the seven Chesapeake watershed jurisdictions are at www.epa.gov/chesapeakebaytmdl.

The jurisdictions submitted their final Phase I WIPs to EPA on November 29, 2010 (December 3, 2010 for Maryland; December 17, 2010 for New York; Pennsylvania amended December 23, 2010), for consideration in the final Bay TMDL. After working with local partners, the jurisdictions are expected to submit their Phase II WIPs describing actions and controls to be implemented by 2017 to achieve applicable WQS; deadlines for the submission of draft and final Phase II WIPs to EPA are currently June 1, 2011 and November 1, 2011, respectively, but these dates will be revisited in early 2011. Finally, the jurisdictions are expected to submit to EPA by 2017, their Phase III WIPs describing refined actions and controls to be implemented between 2018 and 2025 to achieve applicable WQS.

With submission of the Phase II WIP, the jurisdictions are expected to subdivide the allocations provided in the Bay TMDL at an increasingly finer scale (Table 7-2). During Phases II and III of the WIP process, EPA will consider whether modifications to the Chesapeake Bay TMDL are necessary and appropriate on the basis of developments or changes in the jurisdictions' WIPs.

**Table 7-2. Comparison of elements within the Chesapeake Bay TMDL and Phase I, II, and III WIPs**

| Element | Bay TMDL | Phase I WIP | Phase II WIP | Phase III WIP |
|---|---|---|---|---|
| Individual or Aggregate WLAs and LAs to Tidal Jurisdictions | ✓ | | | |
| Gross WLAs and LAs for Non-Tidal Jurisdictions if those Jurisdictions Submit WIPs that meet EPA Expectations | ✓ | | | |
| WLAs for individual significant point sources, or, where appropriate, aggregate point sources | | ✓ | ✓ | ✓ |
| LAs for nonpoint source sectors | | ✓ | ✓ | ✓ |
| Proposed actions and, to the extent possible, specific controls to achieve point source and nonpoint source target loads | | ✓ | ✓ | ✓ |
| Point source and nonpoint source loads by local area | | | ✓ | ✓ |
| Specific controls and practices to be implemented by 2017 | | To the extent possible | ✓ | |
| Refined point source and nonpoint source loads | | | | ✓ |
| Specific controls and practices to be implemented by 2025 | | | | ✓ |

Source: USEPA 2009c

**Evaluation of Phase I Watershed Implementation Plans**

EPA provided the jurisdictions with a *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* in April 2010 detailing how it would evaluate the adequacy of the jurisdictions' WIPs (USEPA 2010e). EPA also provided continuous feedback and technical support to each jurisdiction on elements of its final Phase I WIP that the jurisdiction submitted informally to EPA.

Upon receiving the jurisdictions' final Phase I WIPs, EPA evaluated the WIPs to determine whether they met EPA's expectations as described in the April 2010 guide and in EPA's November 4, 2009, letter (USEPA 2009c, 2010e). EPA's WIP evaluation process involved a systematic review of the contents of the eight elements of each jurisdiction's final Phase I WIP (see Section 8).

The final Phase I WIPs were to include the Bay jurisdictions' proposed allocations to sources and sectors and a demonstration of reasonable assurance that those proposed allocations will be achieved and maintained. The Chesapeake Bay TMDL incorporates the jurisdictions' proposed allocations where they enable the jurisdictions to meet the overall loadings necessary to meet applicable WQS and where the jurisdictions provided sufficient reasonable assurance.

Where the proposed allocations provided by a jurisdiction in its final Phase I WIP did not meet the overall loadings necessary to meet applicable WQS or where the jurisdiction provided an insufficient demonstration of reasonable assurance, EPA established alternative WLAs and LAs and provided additional reasonable assurance as appropriate. (see Section 7.2.4 and Section 8) (USEPA 2009d).

## 7.2.2    Two-Year Milestones

EPA will measure the jurisdictions' progress toward reaching the TMDL's ultimate nitrogen, phosphorus, and sediment reduction goals against 2-year milestones by which the jurisdictions are expected to identify and commit to implement specific pollutant-reduction controls and actions in each of their successive 2-year milestone periods (USEPA 2009c). The federal government also will be providing 2-year milestones.

Before the start of each milestone period, EPA will evaluate whether the 2-year commitments are sufficient to achieve necessary reductions identified in the jurisdictions' WIPs for the associated 2-year milestone period and whether the jurisdictions have fulfilled their previous milestone commitments. As discussed in Section 7.1, an independent evaluation will be made of progress toward achieving the water quality restoration goal in accordance with section 206 of the Executive Order.

When assessing 2-year milestone commitments, EPA will evaluate whether proposed actions, controls, and practices would result in estimated loads at the jurisdiction scale that meet the jurisdiction's 2-year milestone targets (USEPA 2009c). If EPA determines that a jurisdiction would not achieve the milestone loads identified, EPA may identify which source sectors, basins, and local areas would not achieve reductions on schedule to meet that jurisdiction's interim and final target loads. EPA will then be in a position to decide what appropriate action to take (see Section 7.2.4) (USEPA 2009d).

At the end of a milestone period, EPA expects that model-estimated nitrogen, phosphorus, and sediment loads resulting from reported implementation would be at or below target loads at the jurisdiction scale (Figure 7-1). Note that the 2009 load represented in Figure 7-1 includes nitrogen delivered to the Bay from atmospheric deposition on the watershed. EPA estimates that delivered nitrogen loads will be reduced by 3.4 million pounds by 2025 through implementation of rules and standards under the CAA. The graph in Figure 7-1 does not include the 17.4 million pounds of atmospheric nitrogen deposited directly to tidal waters of the Bay, of which approximately 1.7 million pounds per year will be reduced by 2025 through implementation of rules and standards under the CAA.



Source: USEPA 2009c

**Figure 7-1. Relationship between WIPs and 2-year milestones.**

In comparison to past Bay restoration efforts, the WIPs and 2-year milestones are expected to provide greater specificity regarding source sector and geographic load reduction, more rigorous assurances that load reductions will be achieved, and more detailed and transparent reporting to the public (USEPA 2008b, 2009c, 2010f).

### 7.2.3    Chesapeake Bay TMDL Tracking and Accountability System

To determine whether sufficient progress is being made toward meeting the TMDL allocations and interim milestones, EPA will rely on the jurisdictions to monitor, verify, and report their progress. EPA will use the reported tracking data and the Phase 5.3 Chesapeake Bay Watershed Model along with Chesapeake Bay tidal and watershed water quality monitoring data (including contributions from other federal agencies including NOAA, USGS, USACE, and USDA) to assess the jurisdictions' progress.

While the jurisdictions will continue to report annually to EPA on BMP and other pollution control implementations within their respective jurisdiction, existing tracking and reporting mechanisms must be enhanced to fully measure progress toward meeting the TMDL allocations. As EPA stated in its December 29, 2009, letter, where jurisdictions do not provide verification that reported practices and controls have been properly installed and maintained, EPA may not fully or partially credit these actions in its assessment of annual progress and 2-year milestones (USEPA 2009d).

EPA will track the jurisdictions' progress toward achieving the gap-filling strategies proposed in their WIPs through their 2-year milestone commitments using a transparent Chesapeake Bay TMDL Tracking and Accountability System (BayTAS). EPA is designing BayTAS in consultation with the jurisdictions.

BayTAS is a Web-based system that uses data from EPA and the jurisdictions to

- Track the WLAs and LAs established in the TMDL. Tracking entails storing the loadings values and managing changes in status that may occur to the loadings in the future;

- Enable users to determine progress toward the final TMDL allocations, using progress run data from the Chesapeake Bay Watershed Model;

- Track progress relative to the milestones identified by jurisdictions in their WIPs; and

- Record the baseline nitrogen and phosphorus and sediment control practices reported in the Bay jurisdictions' WIPs and track progress against those baselines.

Executive Order 13508 called for developing such a tracking and accountability system. In addition, implementation of the system is a commitment of EPA under the May 12, 2010, Settlement Agreement between Chesapeake Bay Foundation and EPA, under which EPA committed to begin implementation of a tracking system 30 days after establishment of the final TMDL.

Version 1.0 of BayTAS (and future upgrades) will provide EPA, the Bay watershed jurisdictions, and the public with information about LAs and WLAs established in the Chesapeake Bay TMDL, and the jurisdictions' respective progress toward implementing the strategies outlined in their Phase I WIPs.

EPA expects to refine and adjust BayTAS as the jurisdictions submit their Phase II and Phase III WIPs. As it is refined, BayTAS is expected to enable higher levels of monitoring of jurisdiction pollution-control programs than currently exist, including tracking the implementation of WLAs in NPDES permits; LAs for nonpoint sources; offsets of new or increased loadings of nitrogen, phosphorus, and sediment; and pollutant trades.

One critical system that will facilitate the exchange of information between the jurisdictions and the Bay Watershed Model is the National Environmental Information Exchange Network (NEIEN).[1] NEIEN is a partnership among the jurisdictions and EPA that facilitates exchange of environmental information. Partners in the NEIEN share data efficiently and securely over the Internet.

The jurisdictions have received EPA resources to develop NEIEN schema for reporting nitrogen, phosphorus, and sediment controls on sources other than wastewater treatment plants and began to submit annual implementation data to the Chesapeake Bay Program using the NEIEN format after October 2010 (USEPA 2010b). As the WIP development and evaluation process proceeds, EPA expects that the data-sharing relationships and practices among the jurisdictions and EPA will rely heavily on NEIEN to support the BayTAS. In fact, BMPs may be incorporated into BayTAS only if they are reported through NEIEN.

BayTAS data also will come from different EPA and national systems. Basic facility/permit information will come from EPA's Permit Compliance System (PCS) or the Integrated Compliance Information System (ICIS); DMR data and other information for NPDES permits will be submitted by the jurisdictions as part of an existing grant agreement; BMP implementation status information will come from the National Environmental Information Exchange Network (NEIEN); and the status of loadings information will come from the Chesapeake Bay Watershed Model. As other processes are implemented, BayTAS may incorporate information from additional data sources.

Once BayTAS Version 1.0 becomes operational 30 days from establishment of the TMDL, data flow into BayTAS will be electronic (e.g., via NEIEN) or loaded by the BayTAS operation and maintenance team. This will eliminate the jurisdictions' data entry and other operational requirements for maintaining the system. As noted above, Bay jurisdictions are expected to review information in BayTAS to ensure accuracy and for other needs and to advise the BayTAS team on design over the lifecycle of the system.

### 7.2.4    Federal EPA Actions

In its December 29, 2009, letter to the jurisdictions, EPA listed various federal actions that EPA may take if a jurisdiction fails to demonstrate progress toward meeting required nitrogen, phosphorus, and sediment load reductions (USEPA 2009d). EPA may take action if a jurisdiction fails to do the following:

- Develop and submit Phase I, II, and III WIPs consistent with the expectations and schedule described in EPA's letter of November 4, 2009, and the amended schedule described in EPA's letter of June 11, 2010

- Develop 2-year milestones consistent with the expectations, load reductions, and schedule described in EPA's letter of November 4, 2009, and the amended schedule described in EPA's letter of June 11, 2010

---

[1] http://www.epa.gov/Networkg/info/index.html.

- Achieve each successive set of 2-year milestones and their respective target loads by having appropriate controls in place pursuant to the strategies identified in the jurisdiction's WIP and 2-year milestones

- Develop and propose sufficiently protective NPDES permits consistent with the CWA and the Chesapeake Bay TMDL WLAs

- Develop appropriate mechanisms to ensure that nonpoint source LAs are achieved

Following is the list of potential actions EPA may take to ensure that jurisdictions develop and implement appropriate WIPs, attain appropriate 2-year milestones of progress, and provide timely and complete information to an effective accountability system for monitoring pollutant reductions:

- Expand NPDES permit coverage to unregulated sources: For example, using residual designation authority to increase the number of sources, operations or communities regulated under the NPDES permit program

- NPDES program agreements: Expanding EPA oversight review of draft permits (significant and nonsignificant) in the Bay watershed and objecting to inadequate permits that do not meet the requirements of the CWA (including NPDES effluent limits that are not consistent with the Chesapeake Bay TMDL WLAs)

- Require net improvement offsets: For new or increased loadings, requiring net improvement offsets that do more than merely replace the anticipated new or increased loadings

- Establish finer-scale WLAs and LAs in the Chesapeake Bay TMDL: Establishing more specific allocations in the final December 2010 Chesapeake Bay TMDL than those proposed by the jurisdictions in their Phase I WIPs

- Require additional reductions of loadings from point sources: Revising the final December 2010 Chesapeake Bay TMDL to reallocate additional load reductions from nonpoint to point sources of nitrogen, phosphorus, and sediment pollution, such as wastewater treatment plants

- Increase and target federal enforcement and compliance assurance in the watershed: That could include both air and water sources of nitrogen, phosphorus, and sediment

- Condition or redirect EPA grants: Conditioning or redirecting federal grants; incorporating criteria into future Requests for Proposals based on demonstrated progress in meeting WIPs or in an effort to yield higher nitrogen, phosphorus, or sediment load reductions

- Federal promulgation of local nutrient WQS: Initiating promulgation of federal standards where the jurisdiction's WQS do not contain criteria that protect designated uses locally or downstream

# SECTION 8. WATERSHED IMPLEMENTATION PLAN EVALUATION AND RESULTANT ALLOCATIONS

This section describes the process by which EPA established final basinwide and basin-jurisdiction allocations to replace the target allocations described in Section 6. This section specifically describes the methodology that EPA used to evaluate the jurisdictions' final Phase I WIPs, the results of EPA's evaluation of the final Phase I WIPs, the process EPA used to develop the final allocations, and the resultant final allocations. Segment-specific and sector-specific allocations are provided in Section 9. Links to each jurisdiction's final Phase I WIP are at www.epa.gov/chesapeakebaytmdl.

The overall process of developing the Chesapeake Bay TMDL had four steps:

1. EPA defined 19 major river basin and jurisdictional target allocations, which EPA communicated to the jurisdictions on July 1, 2010 (for nitrogen and phosphorus) and August 13, 2010 (for sediment). The methodology that EPA used in setting these target allocations is described in detail in Section 6.

2. Each jurisdiction developed a Phase I WIP that described how it would achieve the target allocations for nitrogen, phosphorus, and sediment that were assigned in Step 1.

    a. Using data submitted by the jurisdictions as input decks, or spreadsheets that EPA processed through Chesapeake Bay Program's Scenario Builder and the Phase 5.3 Chesapeake Bay Watershed Model, each jurisdiction developed suballocations to assign to individual, significant wastewater treatment plant (WWTP) point sources; aggregate nonsignificant WWTPs, urban stormwater, and CAFO point sources; and nonpoint source sectors draining to each of the 92 segments of the Chesapeake Bay and its tidal tributaries.

    b. Each jurisdiction also developed implementation strategies to achieve the suballocations, as EPA requested in its letters of September 11, 2008, November 4, 2009, and December 29, 2009, as well as the *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans* issued April 2, 2010. Those expectations are further described in Section 7.

    c. The jurisdiction's proposed suballocations and implementation strategies formed the basis of its final Phase I WIP, which the jurisdiction delivered to EPA on November 29, 2010 (December 3, 2010, for Maryland; December 17, 2010, for New York; Pennsylvania amended December 23, 2010).

3. EPA evaluated each jurisdiction's proposed suballocations and implementation strategies in its final Phase I WIP to determine whether the WIP met the jurisdiction-wide and major river basin allocations, included adequate detail to ensure that NPDES permits will be developed that are consistent with the assumptions and requirements of the WLAs, and met EPA's expectations of providing reasonable assurance that nonpoint source reductions would be achieved and maintained through credible and enforceable or otherwise binding strategies in jurisdictions that are signatories to the Chesapeake Bay Agreement, and

similarly effective strategies in non-signatory jurisdictions. That evaluation and its results are described in detail here in Section 8.

4. On the basis of the results of EPA's evaluation of all seven Bay jurisdictions' final Phase I WIPs and refinements EPA made thereto, and supplemented by more than 14,000 comments from the public during a formal public review of the draft TMDL, EPA established an allocation scenario for the final Chesapeake Bay TMDL. This allocation scenario includes allocations at the jurisdiction-wide and basin-wide levels, as well as allocations for each of the 92 Bay segments. Tables showing the segment-specific and sector-specific allocations of the Chesapeake Bay TMDL are in Section 9.

EPA is establishing in this Chesapeake Bay TMDL final allocations that are based on the jurisdictions' final Phase I WIPs wherever possible and supplemented by public comments. Overall, the final Phase I WIPs were significantly improved from the draft Phase I WIPs, with most jurisdictions meeting their target allocations and meeting EPA's expectations of reasonable assurance that those target allocations would be met. These improved Phase I WIPs are a direct result of the cooperative work and leadership by the jurisdictions, each of which worked closely with EPA over the past few months to strengthen its WIP.  As a result of these improvements in the jurisdictions' final Phase I WIPs, EPA significantly reduced the backstop allocations that had been proposed in the draft TMDL for most of the jurisdictions, and, in some cases, completely removed the backstops. As explained in detail in Section 8.4 below, only New York, Pennsylvania, and West Virginia received allocations that differed from those proposed in their final Phase I WIPs.

Six of the seven jurisdictions met their jurisdiction-wide target allocations for nitrogen, phosphorus, and sediment. In the one jurisdiction that did not fully meet its target allocations (New York), the final TMDL established a backstop allocation in the form of additional reductions from wastewater treatment loads beyond those proposed by New York in its final Phase I WIP to meet the jurisdiction-wide and basinwide TMDL allocations.

In addition, five of the seven jurisdictions met EPA's expectations of reasonable assurance in their final Phase I WIPs that they would achieve the load reductions proposed in their final Phase I WIPs. In jurisdictions that did not meet EPA's expectations that the necessary reductions for a particular source sector would be achieved (Pennsylvania urban stormwater, West Virginia agriculture), the final TMDL established backstop adjustments to the sector allocations that shifted a portion of the proposed LA to the WLA in that particular sector. This allocation adjustment recognizes the jurisdictions' already substantial pollutant reduction commitments and signals that future regulatory and/or permitting actions may need to be implemented to achieve the necessary load reductions. This allocation adjustment also provides an additional measure of reasonable assurance that these reductions will be achieved, yet does so in a manner that affords the jurisdictions an appropriate measure of flexibility to decide exactly how the final allocations will be achieved.

EPA will track progress and take any additional federal actions that are necessary to ensure that these reductions are achieved and maintained.  To further ensure that the Bay TMDL is supported by reasonable assurance, EPA is committing to enhanced oversight actions in those jurisdictions whose final Phase I WIP did not fully meet EPA's expectations. As a result of this enhanced oversight, EPA will evaluate, on an ongoing basis, the need for appropriate future

backstop actions and is committed to taking actions consistent with its December 29, 2009, letter as necessary; such necessity may be demonstrated if, for example, the jurisdictions do not demonstrate sufficient progress in the wastewater, urban stormwater, or agriculture sectors in their Phase II WIPs (USEPA 2010d). EPA also is committed to maintaining its ongoing oversight in all seven of the Chesapeake Bay jurisdictions as authorized under the CWA, and, in conjunction with its accountability and tracking system and the series of two-year milestones, is committed to taking additional appropriate federal action consistent with its December 29, 2009, letter to ensure that the jurisdictions successfully implement their TMDL allocations and final Phase I WIPs.

## 8.1   WIP EVALUATION METHODOLOGY

A team of EPA source sector experts, together with the EPA staff assigned to each of the seven watershed jurisdictions, conducted a rigorous, systematic quantitative and qualitative evaluation of each jurisdiction's final Phase I WIP and accompanying input deck. EPA evaluated each final Phase I WIP on the basis of how well the jurisdiction's final Phase I WIP was designed to achieve WQS and meet the TMDL's target allocations. EPA evaluated the final Phase I WIP in light of the expectations articulated in EPA's November 4, 2009 letter and April 2, 2010, *Guide for Evaluation of Phase I Watershed Implementation Plans* (USEPA 2009c, 2010e). EPA also considered whether the jurisdiction addressed key areas for improvement that EPA identified as a result of its review of the jurisdiction's draft Phase I WIP.

In conducting the evaluations, EPA addressed two primary questions:

(1)   Whether the jurisdiction met its target allocations for nitrogen, phosphorus, and sediment—both jurisdiction-wide and in each of the major river basins—to ensure attainment of each of the Chesapeake Bay WQS in all 92 segments of the Bay and its tidal tributaries; and

(2)   Whether the jurisdiction met EPA's expectations for reasonable assurance that it would implement the necessary nitrogen, phosphorus, and sediment reductions, including documentation that nonpoint source controls would be achieved and maintained and permitting programs would result in point source reductions, with emphasis on having practices in place by 2017 to achieve at least 60 percent of the necessary reductions as compared to 2009 loads.

### 8.1.1   *Quantitative Evaluation of the Final Phase I WIPs*

To evaluate the first (quantitative) question and determine whether a jurisdiction met each of its nitrogen and phosphorus target allocations, EPA processed the jurisdiction's input deck by running it through Scenario Builder and the Chesapeake Bay Watershed Model, assuming that other jurisdictions met their target allocations. If the jurisdiction's WIP exceeded any of the target allocations, EPA considered the degree to which it did so and whether adjusting nitrogen and phosphorus allocations using approved ratios as discussed in Section 6 would decrease the exceedances.

EPA determined each jurisdiction's allocation for sediment on the basis of whether and to what extent the jurisdiction met the target allocation range for sediment provided on August 13, 2010 and any modifications that EPA approved as still meeting applicable WQS. EPA ran the BMPs

assumed within the nitrogen and phosphorus backstop allocations through Scenario Builder and the Chesapeake Bay Program Watershed Model. EPA then compared the sediment outputs from that scenario run to the target allocation range for sediment that it communicated to the jurisdictions. Where the reductions proposed in a jurisdiction's WIP surpassed what was needed to meet the target allocation (i.e., came in under the low end of the target range), EPA assigned that jurisdiction the low end of the target allocation range. Where the reductions proposed in a jurisdiction's WIP were insufficient to meet its target allocation (i.e., came in above the high end of the target range), EPA assigned that jurisdiction the high end of the target allocation range. Where a jurisdiction met its target allocation (i.e., fell within the target range), EPA assigned that jurisdiction the allocation that resulted from the practices proposed in its final Phase I WIP.

## 8.1.2    Qualitative Evaluation of the Final Phase I WIPs

To evaluate the second (qualitative) question and determine whether a jurisdiction met EPA's expectations for reasonable assurance through enforceable or otherwise binding commitments or similarly effective strategies to implement necessary controls, EPA evaluated each major pollutant source sector (agriculture, urban stormwater, and wastewater) on a number of criteria, including those factors set out in the April 2, 2010, *Guide for Evaluation of Phase I Watershed Implementation Plans* (USEPA 2010e). EPA determined that a jurisdiction met EPA's expectations for reasonable assurance if it provided, among other things:  a schedule for potential actions, evidence of or commitment to clear permit conditions, a discussion of compliance, no major discrepancies between the type and extent of practices in the WIP narrative and the input deck, contingencies for high risk or highly improbable actions, and proposals for obtaining additional resources. .

After evaluating the two key questions, EPA conducted a jurisdiction-by-jurisdiction analysis to determine whether and, if so, to what degree, to backstop or adjust the allocations proposed by the jurisdiction in its final Phase I WIP. In developing the adjusted or backstop allocations, EPA fully considered the following:

- Whether a jurisdiction met, or to what degree it missed, its target allocations for nitrogen, phosphorus, and sediment.

- Whether and to what extent the jurisdiction met EPA's expectations for reasonable assurance.

- Whether the proposed WLAs in the jurisdiction's final Phase I WIP were consistent with EPA's definition of point source loads and could be achieved through implementation of a permitting program.

- Whether, if necessary, EPA could ensure achievement of the point source reductions through appropriate federal actions under the CWA and other federal authorities, including enhanced program oversight, permit objections, compliance assurance, enforcement actions, and other federal actions as described in EPA's December 29, 2009 letter.

Where EPA determined that a jurisdiction did not meet its target allocations, EPA applied a *backstop allocation*—a change to the allocation to close the numeric gap, such as assigning the jurisdiction a more stringent WWTP allocation reflecting an assumption that future WWTP

effluent limits for nitrogen and/or phosphorus would be made more stringent to meet the TMDL's overall allocation for that jurisdiction.

Where EPA determined that a jurisdiction met its allocation target but did not meet EPA's expectations for reasonable assurance, EPA applied a *backstop adjustment* or *allocation adjustment*—a change to a sector-specific allocation to provide additional assurance that the allocation would be achieved, such as shifting some of a specific sector's loadings from the LA category to the WLA category. This signaled that, depending on the success of the jurisdiction's WIP implementation and the nature of the choices the jurisdiction makes in adapting its implementation strategies, additional future regulatory controls may have to be applied to sources in that sector to attain the sector's overall allocation.

If EPA had determined that a jurisdiction neither met its target allocation nor met EPA's expectations for reasonable assurance, EPA would have applied both backstops.

After applying all backstops that EPA determined were necessary, EPA ran the combination of specific practices and allocations through the Chesapeake Bay Program's Scenario Builder and the Phase 5.3 Chesapeake Bay Watershed Model to ensure that the allocations provided in the final Chesapeake Bay TMDL would result in the attainment of WQS.

## 8.2   WIP EVALUATION RESULTS

Overall, the jurisdictions submitted significantly-improved final Phase I WIPs; most jurisdictions met each of their target allocations jurisdiction-wide and met EPA's expectations for reasonable assurance that they would meet those target allocations. Six of the seven jurisdictions met or came very close to their jurisdiction-wide target allocations for nitrogen, phosphorus, and sediment—only New York did not meet each of its jurisdiction-wide target allocations. In addition, five of the seven jurisdictions met EPA's expectations for reasonable assurance in their final Phase I WIPs that they would achieve the load reductions proposed in their WIPs. Only Pennsylvania urban stormwater and West Virginia agriculture did not meet EPA's expectations for providing reasonable assurance that the sector-specific target allocations would be achieved. These are significant improvements from the draft Phase I WIPs, where six of the seven draft WIPs did not meet their jurisdiction-wide target allocations for all three pollutants and none of the seven draft WIPs fully met EPA's expectations for reasonable assurance that they would meet their respective target allocations.

### 8.2.1   Target Allocation Attainment

Each jurisdiction's final Phase I WIP, with the exception of New York, met its jurisdiction-wide nitrogen, phosphorus, and sediment target allocations. EPA established backstop allocations for WWTP allocations in New York to close the numeric gap between New York's final Phase I WIP and its target allocations.

The results of EPA's analysis of whether each jurisdiction met its jurisdiction-wide and basin-wide target allocations for each pollutant after allowing for any EPA-approved exchanges are shown in Tables 8-1 and 8-2, below. Table 8-1 shows whether and to what degree each jurisdiction met its jurisdiction-wide target allocations for nitrogen, phosphorus, and sediment.

**Table 8-1. Comparison between nitrogen, phosphorus, and sediment jurisdiction-wide allocations and final Phase I Watershed Implementation Plans, in millions of pounds per year**

| | Total nitrogen (TN) | | | Total phosphorus (TP) | | | Total suspended solids (TSS)* | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Target allocation | Final Phase I WIP | Final Phase I WIP % off target | Target allocation | Final Phase I WIP | Final Phase I WIP % off target | Target allocation - low | Target allocation - high | Final Phase I WIP | Final Phase I WIP % off target[a] |
| DC | 2.32 | 2.32 | 0% | 0.12 | 0.12 | 0% | 10.14 | 11.16 | 11.16 | 0% |
| DE | 2.95 | 2.86 | -3% | 0.26 | 0.23 | -12% | 57.82 | 63.61 | 42.89 | -33% |
| MD[b] | 39.09 (39.09) | 39.09 | 0% | 2.72 (2.72) | 2.72 | 0% | 1,116.16 | 1,218.11 (1,227.78) | 1,218.11 | 0% |
| NY[c] | 8.77 (8.23) | 9.25 | 5% | 0.57 (0.52) | 0.57 | 2% | 292.96 | 322.26 | 277.66 | -14% |
| PA | 73.93 (76.77) | 75.56 | 2% | 2.93 (2.74) | 2.98 | 2% | 1,902.51 | 2,092.76 | 1,979.65 | -5% |
| VA[d] | 53.42 (53.40) | 54.43 | 2% | 5.36 (5.41) | 5.48 | 2% | 2,446.14 | 2,690.75 | 2,617.22 | -3% |
| WV[e] | 5.45 (4.68) | 5.45 | 0% | 0.59 (0.75) | 0.59 | -1% | 309.37 (240.68) | 340.30 (264.75) | 302.12 | -11% |
| Total | 185.93 (187.45) | 188.96 | 2% | 12.54 (12.52) | 12.70 | 1% | 6,135.10 (6066.42) | 6,738.94 (6673.06) | 6448.80 | -4% |

\*   As discussed in Section 6, the metric for sediment is Total Suspended Solids.
a.  Calculated on the basis of the high end of the target sediment allocation range.
b.  Maryland target allocations were modified to allow for exchanges of TN, TP, and TSS both within and across basins. Runs of the Chesapeake Bay Water Quality and Sediment Transport Model confirmed that these exchanges still attained applicable WQS. The original target allocations are in parentheses. The final allocations proposed in Maryland's final Phase I WIP are derived using the method outlined in Appendix A of Maryland's final Phase I WIP rather than an input deck that was run through the Chesapeake Bay Program Watershed Model.
c.  New York's nitrogen and phosphorus target allocations were modified to provide New York with additional loads of TN (1,000,000 lbs) and TP (100,000 lbs) based on concerns with the equity of New York's July 1 target allocations (see Section 6.4.5). Target nitrogen and phosphorus allocations were further modified to allow for trading of TN and TP within state basins. The original target allocations are in parentheses.
d.  Virginia target allocations were modified to allow for trading TN and TP within state basins. The original target allocations are in parentheses.
e.  West Virginia Potomac basin target allocations for nitrogen and phosphorus were revised to allow for trading between TN and TP, and the sediment target allocation range was adjusted based on the 200,000 lb increase in the July 1st phosphorus allocation (see Section 6.4.5). The original target allocations are in parentheses.
f.  Where input decks in West Virginia, Virginia, and Pennsylvania did not meet all target allocations, EPA and the jurisdiction came to an agreement on how to close the gap. See Section 8.4 for details regarding these agreements.
g.  In New York, EPA closed the gap via an adjustment to nitrogen and phosphorus allocations using approved ratios as discussed in Section 6 and via a backstop allocation for the wastewater sector as described in Section 8.4.4.
Note: Any discrepancy is due to the rounding of figures.

**Table 8-2. Comparison between the nitrogen, phosphorus, and sediment basin-jurisdiction allocations and final Phase I Watershed Implementation Plans, in million pounds per year**

| Major river basin | Juris-diction | Total nitrogen (TN) | | | Total phosphorus (TP) | | | Total suspended solids (TSS)* | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Target allocation | Final Phase I WIP | Final Phase I WIP % off target | Target ALLOCATION | Final Phase I WIP | Final Phase I WIP % off target | Target allocation - low end | Target allocation - high end | Final Phase I WIP | Final Phase I WIP % off target[a] |
| Potomac | DC | 2.32 | 2.32 | 0% | 0.12 | 0.12 | 0% | 10.14 | 11.16 | 11.16 | 0% |
| Eastern Shore | DE | 2.95 | 2.86 | -3% | 0.26 | 0.23 | -12% | 57.82 | 63.61 | 42.89 | -33% |
| Eastern Shore | MD[b] | 9.71 | 9.71 | 0% | 1.02 (1.09) | 1.02 | 0% | 165.88 | 168.85 (182.41) | 168.85 | 0% |
| Patuxent | MD[b] | 2.86 (2.85) | 2.86 | 0% | 0.24 (0.21) | 0.24 | 0% | 81.93 | 106.30 (90.12) | 106.30 | 0% |
| Potomac | MD[b] | 16.38 (15.70) | 16.38 | 0% | 0.90 | 0.90 | 0% | 653.61 | 680.29 (718.97) | 680.29 | 0% |
| Susquehanna | MD[b] | 1.09 (1.08) | 1.09 | 0% | 0.05 | 0.05 | 0% | 59.85 | 62.84 (65.83) | 62.84 | 0% |
| Western Shore | MD[b] | 9.04 (9.74) | 9.04 | 0% | 0.51 (0.46) | 0.51 | 0% | 154.90 | 199.82 (170.38) | 199.82 | 0% |
| Susquehanna | NY[c] | 8.77 (8.23) | 9.25 | 5% | 0.57 (0.52) | 0.57 | 2%[g] | 292.96 | 322.26 | 277.66 | -14% |
| Eastern Shore | PA | 0.28 | 0.28 | -1%[g] | 0.01 | 0.01 | -13%[g] | 21.14 | 23.25 | 19.11 | -18% |
| Potomac | PA | 4.72 | 4.17 | -12% | 0.42 | 0.35 | -17% | 221.11 | 243.22 | 219.12 | -10% |
| Susquehanna | PA | 68.90 (71.74) | 71.10 | 3% | 2.49 (2.31) | 2.62 | 5% | 1659.89 | 1,825.88 | 1,741.17 | -5% |
| Western Shore | PA | 0.02 | 0.002 | -92% | 0.001 | 0.0002 | -76% | 0.37 | 0.41 | 0.26 | -37% |
| Eastern Shore | VA[d] | 1.31 (1.21) | 1.35 | 3% | 0.14 (0.16) | 0.14 | 0% | 10.91 | 12.00 | 11.31 | -6% |
| James | VA[d] | 23.09 (23.48) | 23.09 | 0% | 2.37 (2.34) | 2.43 | 3% | 836.57 | 920.23 | 948.49 | 3% |
| Potomac | VA[d] | 17.77 (17.46) | 18.24 | 3% | 1.41 (1.47) | 1.41 | 0% | 810.07 | 891.08 | 829.53 | -7% |
| Rappahannock | VA | 5.84 | 6.15 | 5% | 0.90 | 0.94 | 5% | 681.49 | 749.64 | 700.04 | -7% |
| York | VA | 5.41 | 5.61 | 4% | 0.54 | 0.56 | 4% | 107.09 | 117.80 | 127.86 | 9% |
| James | WV | 0.02 (0.02) | 0.03 | 50% | 0.01 (0.01) | 0.01 | 18%[g] | 15.13 | 16.65 | 29.35 | 76% |

| Major river basin | Juris-diction | Total nitrogen (TN) | | | Total phosphorus (TP) | | | Total suspended solids (TSS)* | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Target allocation | Final Phase I WIP | Final Phase I WIP % off target | Target ALLOCATION | Final Phase I WIP | Final Phase I WIP % off target | Target allocation - low end | Target allocation - high end | Final Phase I WIP | Final Phase I WIP % off target[a] |
| Potomac | WV[e] | 5.43 (4.67) | 5.43 | 0% | 0.58 (0.74) | 0.58 | -1% | 294.24 (225.55) | 323.66 (248.11) | 272.77 | -16% |
| TOTAL | ALL | 185.93 (187.45) | 188.96 | 2% | 12.55 (12.52) | 12.70 | 1% | 6,135.10 (6,066.42) | 6,738.94 (6,673.06) | 6,448.80 | -4% |

\* As discussed in Section 6, the metric for sediment is Total Suspended Solids.

a. Calculated on the basis of the high end of the target sediment allocation range.

b. Maryland target allocations were modified to allow for exchanges of TN, TP, and TSS both within and across basins. Runs of the Chesapeake Bay Water Quality and Sediment Transport Model confirmed that these exchanges still attained applicable WQS. The original target allocations are in parentheses. The final allocations proposed in Maryland's final Phase I WIP are derived using the method outlined in Appendix A of Maryland's final Phase I WIP rather than an input deck that was run through the Chesapeake Bay Program Watershed Model.

c. New York's nitrogen and phosphorus target allocations were modified to provide New York with additional loads of TN (1,000,000 lbs) and TP (100,000 lbs) based on concerns with the equity of New York's July 1 target allocations (see Section 6.4.5). Target nitrogen and phosphorus allocations were further modified to allow for trading of TN and TP within state basins. The original target allocations are in parentheses.

d. Virginia target allocations were modified to allow for trading TN and TP within state basins. The original target allocations are in parentheses.

e. West Virginia Potomac basin target allocations for nitrogen and phosphorus were revised to allow for trading between TN and TP, and the sediment target allocation range was adjusted based on the 200,000 lb increase in the July 1st phosphorus allocation (see Section 6.4.5). The original target allocations are in parentheses.

f. Where input decks in West Virginia, Virginia, and Pennsylvania did not meet all target allocations, EPA and the jurisdiction came to an agreement on how to close the gap. See Section 8.4 for details regarding these agreements.

g. In New York, EPA closed the gap via an adjustment to nitrogen and phosphorus allocations using approved ratios as discussed in Section 6 and via a backstop allocation for the wastewater sector as described in Section 8.4.4.

Note: Any discrepancy is due to the rounding of figures.

Table 8-2 shows whether and to what degree each jurisdiction met its basinwide target allocations for nitrogen, phosphorus, and sediment.

These tables show the initial target allocations communicated to the jurisdictions on July 1, 2010 (for nitrogen and phosphorus) and August 13, 2010 (for sediment), which are in parentheses. These tables also show the jurisdictions' adjusted target allocations, which incorporate corrections to allocations for some of the headwater jurisdictions, backstop allocations and adjustments made by EPA, and intra-basin and inter-basin nutrient exchanges requested by the some of the jurisdictions. The combination of these corrections, backstop allocations and adjustments, and nutrient exchanges resulted in all jurisdictions meeting their nitrogen, phosphorus, and sediment target allocations. Further specific information about the corrections, backstop allocations and adjustments, and nutrient exchanges is provided in the footnotes to the tables.

### 8.2.2    Reasonable Assurance

EPA determined that each of the jurisdictions' final Phase I WIPs provided reasonable assurance that met EPA's expectations in each major source sector, with the exception of Pennsylvania urban stormwater and West Virginia agriculture. The jurisdictions' final Phase I WIPs showed many noteworthy improvements regarding reasonable assurance, including the following:

- Commitments to upgrade WWTPs
- Expanded septic system improvements
- Increased accountability for urban stormwater programs
- New enforcement and compliance initiatives for agriculture
- Agreements to extend regulatory coverage for traditional nonpoint sources if needed

Overall, these are significant improvements from the jurisdictions' draft Phase I WIPs, none of which provided reasonable assurance that fully met EPA's expectations.

EPA determined that various levels of EPA oversight and additional potential actions are appropriate for the various jurisdictions as a result of EPA's evaluation of both key aspects of the jurisdictions' final Phase I WIPs as discussed above. All seven jurisdictions will receive an ongoing level of oversight for all sectors that may justify federal actions to address shortfalls. In addition to that ongoing oversight, New York, Pennsylvania, Virginia, and West Virginia will receive an enhanced level of oversight and potential federal actions for certain sectors. Lastly, in addition to those levels of oversight and potential federal actions, New York, Pennsylvania, and West Virginia received in the final TMDL backstop allocations (New York) or backstop adjustments (Pennsylvania urban stormwater and West Virginia agriculture). Further details regarding EPA's assessment of the reasonable assurance provided by each jurisdiction's final Phase I WIP are provided in Section 8.4 below.

## 8.3   ALLOCATION METHODOLOGY

EPA determined each jurisdiction's wasteload and load allocations on the basis of whether the jurisdiction met each of its respective target allocations and whether it met EPA's expectations for reasonable assurance that those allocations would be achieved. EPA relied on the portion(s)

of the jurisdiction's final Phase I WIP that met expectations and supplemented any gaps in the allocations and reasonable assurance with allocation adjustments and determinations of reasonable assurance to achieve the necessary reductions.

### 8.3.1 Backstop Allocation Methodology

EPA established backstop allocations where EPA determined that the final Phase I WIP did not achieve the jurisdiction's basin target allocation for one or more pollutants or where the final Phase I WIP did not meet EPA's expectations for reasonable assurance that the LA reductions would be achieved by the nonpoint sources.

Another enhanced action that EPA took in the nontidal jurisdictions of Pennsylvania and West Virginia was to establish finer-scale individual allocations or aggregate allocations. EPA stated in its November 4 and December 29, 2009, letters to the jurisdictions that it might do so by establishing individual source and aggregate source sector, rather than gross basin-jurisdiction, WLAs and LAs for the nontidal jurisdictions if their Phase I WIPs did not meet EPA's expectations for reasonable assurance (USEPA 2009c, 2009d). With the exception of WWTPs in New York and the James River in Virginia, EPA is establishing individual WLAs for the significant municipal and industrial wastewater discharging facilities and sector-specific aggregate WLAs for urban stormwater, CAFOs, and nonsignificant municipal and industrial wastewater discharging facilities. EPA is establishing the finer-scale allocations to better inform permit writers as they issue and renew NPDES permits consistent with the assumptions and requirements of the Chesapeake Bay TMDL WLAs. Those allocations for the nontidal jurisdictions are at the same scale as those made to the tidal jurisdictions of Delaware, Maryland, Virginia, and the District of Columbia.

As explained more fully in Appendix X, EPA is issuing with this final TMDL an aggregate WLA for the significant facilities in the Virginia portion of the James River basin. EPA also is establishing an aggregate WLA for WWTPs in New York to allow time for the New York State Department of Environmental Conservation to review engineering reports from WWTPs and determine the load reductions expected from each facility. New York has committed to provide information to support individual WLAs for these WWTPs in its Phase II WIPs. EPA understands that New York plans to renew and/or modify WWTP permits after completing its Phase II WIPs, consistent with the applicable TMDL allocations at that time.

### 8.3.2    Backstop Adjustment (Allocation Shift) Methodology

After evaluating the final Phase I WIPs for reasonable assurance, EPA found that the final Phase I WIPs did not fully meet EPA's expectations for reasonable assurance for the urban stormwater sector in Pennsylvania and the agriculture sector in West Virginia. As a result, EPA applied a backstop adjustment to those sectors by shifting a portion of the allocations for those sectors from the LA to the WLA for the respective jurisdiction.

For Pennsylvania urban stormwater, as detailed in Section 8.4.5 below, EPA shifted to the WLA 50 percent of the loading from currently unregulated urban stormwater sources that the WIP included in the LA. Therefore, the Pennsylvania urban stormwater WLAs include both unregulated and NPDES regulated sources. For urban stormwater sources already covered by

NPDES permits, EPA has broad authority to ensure that the necessary controls are included to implement the Bay TMDL.

For West Virginia agriculture, as detailed in Section 8.4.7 below, EPA shifted to the WLA 75 percent of currently unregulated AFOs that the WIP included in the LA. The same rationale described above also applies to EPA's adjustment of allocations in the AFO/CAFO sector. For those CAFO facilities already under NPDES permit coverage, EPA has broad authority to ensure that the necessary controls are included to implement the Bay TMDL.

For both AFOs and urban stormwater point sources, the allocation shift signals that substantially more of these discharges and operations could potentially be subject to NPDES permits as necessary to protect water quality. These conditions could include additional nitrogen, phosphorus, and sediment controls. These sources would only be subject to NPDES permits as issued by the delegated permitting authority or EPA upon designation. It is important to note, however, that EPA may also pursue designation activities based upon considerations other than TMDL and WIP implementation.

EPA has adjusted these allocations on the basis of two assumptions: (1) a percentage of loading from currently unregulated sources may have to be controlled under the NPDES permit program through appropriate designation, rulemaking, and permit issuances; and (2) the aggregate projected load reductions under the adjusted WLA (based on assumed NPDES effluent controls consistent with the WLA) will result in reductions sufficient to meet the jurisdiction's allocations.

In establishing allocations that shift from the LA to the WLA some urban stormwater and AFO/CAFO sources not currently regulated by the NPDES permit program but that could become NPDES-regulated facilities either through residual designation authority or other mechanisms, EPA has acted consistent with EPA guidance, *Establishing Total Maximum Daily Loads (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs*, dated November 22, 2002 (USEPA 2002a) and as revised November 12, 2010. EPA has authority to designate certain nonregulated urban stormwater sources for regulation under the NPDES program. See section 402(p)(2)(E) and (6) and 40 CFR 122.26(a)(9)(i)(C)(D). EPA also has authority to designate AFOs as CAFOs as set forth in 40 CFR 122.23(c).

The inclusion of currently unregulated sources in the WLA does not, by itself, constitute a designation or regulatory action to include such sources in the NPDES program; the source would have to be designated for the source to come under the NPDES program, and the shift in allocations in this TMDL is not an exercise of that designation authority. Instead, it reflects the possibility that such designation may be necessary in the future if the jurisdictions do not otherwise achieve their allocation targets. The TMDL is a watershed pollution budget, not a regulatory determination to change a source's legal status. As with any NPDES permitting or rulemaking decision, applying new controls or designations must be consistent with applicable procedural and substantive requirements, including a recognition of state permitting primacy in jurisdictions authorized to administer the NPDES program.

Furthermore, EPA's residual designation would not be intended to change the NPDES-permitting authorized agency. That is, if EPA were to residually designate an AFO as a CAFO in

an NPDES-delegated state, that CAFO would apply for a state CAFO permit, not a federal CAFO permit, as would any other state facility so long as EPA does not take over the permit or the permitting program.

Some jurisdictions, as described in the jurisdiction-specific subsections below, included in their final Phase I WIPs the shift of a portion or all of the loading of current AFO or urban stormwater facilities not currently regulated under the NPDES permit program from the LA to an aggregate WLA. Jurisdictions did this primarily to provide additional reasonable assurance that the implementation of practices and reductions in pollutants would occur.  By doing this, the jurisdiction indicated that it is prepared to implement the necessary pollutant reductions in those sectors. Like EPA's backstop adjustment, the WIP's inclusion of currently unregulated sources in the WLA by itself does not constitute a designation or regulatory action to include such sources in the NPDES program. The jurisdiction's WIP informs the TMDL, which is a watershed plan, not a regulatory determination to change a source's legal status. As with any NPDES permitting or rulemaking decision, applying new controls or designations must be consistent with applicable procedural and substantive requirements.

EPA believes these load-shifting allocation adjustments, whether done by the jurisdictions or by EPA, are a reasonable way of supplementing reasonable assurance that the allocation targets will be met. These allocations signal that EPA and the jurisdictions will be tracking load reductions in these sectors with a heightened degree of scrutiny and are prepared to take action to increase the extent to which these loads are regulated as necessary. EPA is committed to ensure and track implementation of actions necessary to reduce these sector loads by 2025 consistent with Executive Order 13508 (FLCCB 2010). Additional assurance that these adjusted sector allocations will be met is provided by the public commitments EPA has made in the Federal Strategy and elsewhere, including the May 2010 settlement agreement resolving the Chesapeake Bay Foundation lawsuit.

### 8.3.3 Assumptions Supporting the Allocations

EPA regulations require that NPDES permits be consistent with assumptions and requirements of WLAs. See 40 CFR 122.44(d)(1)(vii)(B). This section summarizes the assumptions that are incorporated into the Chesapeake Bay TMDL allocations.

EPA established WLAs and LAs based in part upon the overall assumption that certain nitrogen, phosphorus, and sediment controls are implemented on a certain percentage of available land. Over time, implementing nitrogen, phosphorus, and sediment controls could involve a combination of (a) different practices; (b) implementation in different locations; or (c) implementation at different implementation rates so long as an equivalent or greater reduction occurs within the portion of the watershed draining to a particular tidal segment of the Chesapeake Bay.

Appendix V includes the percent of available land or sources on which nitrogen, phosphorus, and sediment controls are implemented (percent implementation) that is assumed within the WLAs and LAs for sources other than WWTPs. The Appendix does not include a table for Maryland because final allocations proposed in Maryland's final Phase I WIP are derived using the method

outlined in Appendix A of Maryland's WIP rather than an input deck that was run through the Phase 5.3 Chesapeake Bay Watershed Model.

EPA will continue to track and assess the jurisdictions' annual progress toward meeting the commitments outlined in their respective final Phase I WIPs and 2-year milestone commitments. As outlined in its December 29, 2009, letter to the jurisdictions, EPA may take additional federal actions beyond those listed above as appropriate and consistent with applicable laws and regulations, including the following: conditioning federal grants; promulgating nutrient WQS; objecting to NPDES permits; and discounting pollutant reduction practices that do not meet EPA verification expectations to ensure that the jurisdictions achieve the nitrogen, phosphorus, and sediment reductions identified in their final Phase I WIPs and needed to meet the TMDL allocations (USEPA 2009d) (see Section 7.2.4). In correspondence directed individually to each jurisdiction providing detailed feedback on EPA's evaluation of the final Phase I WIPs (see Appendix B), EPA communicated its intent to consider taking additional federal actions as necessary if EPA determines that the respective jurisdiction's Phase II WIP and 2-year milestones do not meet EPA's expectations for providing reasonable assurance that implementation will occur as described in their plans.

### Nonpoint Sources

The jurisdictions' final Phase I WIPs provided the starting point for EPA's consideration and development of final allocations. EPA assumed for purposes of its evaluation that jurisdictions would implement the practices that will result in the same or greater nitrogen, phosphorus, and sediment controls as provided in their final Phase I WIP scenario input decks and as evaluated by the Chesapeake Bay Scenario Builder and Watershed Model. In the few jurisdictions where final Phase I WIP input decks did not meet the target allocations for each major basin, EPA either applied a backstop allocation to close the numeric gap (New York) or reached agreement with the respective jurisdictions on further nonpoint source reductions to achieve allocations both statewide and in each basin (Pennsylvania, Virginia, West Virginia). Details regarding these backstop allocations and nonpoint source adjustments are provided in Section 8.4.

EPA will assess jurisdictions' progress toward meeting LAs through ongoing program oversight, the Phase II and Phase III WIPs, and the 2-year milestones. EPA also will consider whether to take appropriate federal actions, as detailed in its letter of December 29, 2009 to the jurisdictions, to ensure that adequate progress is made toward achieving and maintaining the nonpoint source load reductions.

### Point Sources—Agriculture

In all jurisdictions, the CAFO WLA includes AFO production areas that are currently or potentially regulated under jurisdictions' CAFO programs. The CAFO WLA assumes that these production areas have 100 percent implementation of waste management, barnyard runoff control, and mortality composting practices and that such practices are required as conditions of CAFO permits. These practices are assumed to result in an approximately 80 percent decrease in nutrient loads from production areas compared to a pre-BMP condition. The draft TMDL assumed that all animals within the WLA receive feed management except cattle on small dairies not currently subject to CAFO permits. By comparison, the CAFO WLA in the final TMDL assumes feed management at rates and nutrient reduction levels proposed by the jurisdictions in

their final Phase I WIPs. Many of the final Phase I WIPs reflected higher rates of feed management than did the draft WIPs.

Jurisdictions can meet the WLA assumptions by (a) applying a different set of practices that are shown to result in equivalent nitrogen, phosphorus, and sediment reductions, or (b) applying a more aggressive performance standard on a smaller percentage of AFO production areas that will result in the nitrogen, phosphorus, and sediment reductions called for within the WLA.

## Point Sources—Urban Stormwater

The Chesapeake Bay TMDL allocations for urban stormwater are based on load reductions proposed by jurisdictions in their final WIPs compared to a 2009 baseline. In the draft TMDL, EPA assumed additional urban stormwater retrofits in the five jurisdictions that received a proposed urban stormwater backstop allocation. In contrast, in the final TMDL, EPA is establishing a backstop adjustment for urban stormwater only in one jurisdiction—Pennsylvania. Further, EPA is not adjusting the urban stormwater load reductions that Pennsylvania proposed in its final Phase I WIP. Specifically, EPA is not assuming additional retrofits. Rather, EPA is establishing a backstop adjustment in Pennsylvania that shifts 50 percent of the unregulated urban stormwater load to the WLA.

Table 8-3 summarizes the per-acre, edge-of-stream nitrogen, phosphorus, and sediment percent reductions compared to 2009 based on urban stormwater WLAs by jurisdiction. EPA can also provide information by county to those jurisdictions that wish to use it in developing permits. NPDES permits issued to these jurisdictions and other regulatory mechanisms should achieve these reductions, over multiple permit cycles as necessary but by no later than 2025—the date by which the Chesapeake Executive Council has committed to have all practices in place necessary to meet water quality goals in the Bay. Jurisdictions have the option of interpreting these allocations as specific measurable requirements, e.g., performance standards or management practices, or of putting the allocations in permits and requiring MS4 operators to develop an implementation plan to achieve the allocation.

**Table 8-3. Percent reductions in edge-of-stream loads to achieve urban stormwater WLAs**

| Jurisdiction | Per-acre edge-of-stream % changes in urban stormwater load from a 2009 baseline* | | |
|---|---|---|---|
| | Nitrogen | Phosphorus | Sediment |
| District of Columbia | 6.6% | 29.6% | 29.6% |
| Delaware | 14.3% | 18.3% | 23.7% |
| Maryland** | 16.9% | 35.7% | 37.5% |
| New York | 11.4% | 0.0% | 0.0% |
| Pennsylvania | 28.9% | 17.7% | 7.0% |
| Virginia | 16.4% | 20.8% | 32.5% |
| West Virginia | 0% | 0% | 0% |

* Edge-of-stream reductions assumed within the urban stormwater WLAs result from differences in BMP implementation rates between 2009 and the final WIP submission.
  ** Maryland's assumed reductions are calculated as the difference between 2009 edge-of-stream loads and Maryland's final edge-of-stream target loads for urban stormwater WLAs. Maryland derived its final loads using the method outlined in Appendix A of Maryland's WIP.

Appendix V includes the percent implementation for nitrogen, phosphorus, and sediment controls that are assumed on urban land uses in 2009 and as proposed in the final Phase I WIP input decks. With the exception of Maryland, edge-of-stream reductions assumed within urban stormwater WLAs are the direct result of the differences in implementation rates between 2009 and the final Phase I WIP submission. However, jurisdictions can meet the WLAs by (a) applying a different set of practices or performance standards that would result in equivalent nitrogen, phosphorus, and sediment reductions, or (b) applying a more aggressive suite of practices or performance standards to a smaller percentage of urban lands or urban stormwater discharges, so long as the total nitrogen, phosphorus, and sediment reduction from urban discharges within the WLA are equal to or greater than the reductions assumed within Table 8-3.

### Point Sources—Wastewater

Federal regulations require that water quality based effluent limits in permits ensure (a) attainment of applicable WQS; and (b) consistency with assumptions and requirements of the TMDL WLAs [40 CFR 122.44(d)(1)(vii)(B)]. Therefore, permits are written with effluent limits necessary to meet applicable WQS and/or consistent with the assumptions and requirements of applicable WLAs. Where authorized and appropriate, such effluent limits may contain a compliance schedule that requires compliance as soon as possible. In the instances where implementation of the final TMDL WLAs for wastewater facilities is staged (e.g., in the James River), permits are written with effluent limits necessary to meet applicable WQS and/or consistent with the assumptions and requirements of applicable WLAs. In those instances as well, where authorized and appropriate, such effluent limits may contain a compliance schedule that requires compliance as soon as possible. The TMDL assumes that all controls will be in place to meet WLAs by 2025. Therefore, any facilities with compliance schedules longer than one year must include interim dates and milestones in their permit fact sheets with the time between milestones not more that one year [40 CFR 122.47(a)(3)].

The WLAs for WWTPs are based on the loads summarized in Table 9-4 for the significant WWTPs in the Chesapeake Bay watershed. Additional information on edge-of-stream discharges from these facilities is provided in Appendices Q and R.

Appendices Q and R also include the WLAs and information on edge-of-stream discharges for facilities that have been aggregated in the final TMDL. For facilities with discharges that are part of an aggregate WLA or are covered by a general permit, the TMDL assumes that the permit contains language to require the establishment of individual schedules for each facility to come into compliance with their individual or aggregate WLAs. Also, for facilities included within an aggregate WLA, the TMDL assumes that permitting authorities will provide justification in the permit fact sheet that the limits assigned to the individual facility are included as part of the aggregate TMDL WLAs. Due to lack of specific information, some nonsignificant discharges covered under an aggregate WLA may be based on default assumptions regarding flow and concentrations. These facilities should provide, at a minimum, nitrogen, phosphorus, and/or TSS monitoring data with their next NPDES permit renewal application. Renewed NPDES permits for these discharges will require monitoring to verify existing loads and to either (1) verify that these loads do not contribute to any exceedance of the WLAs—individual or aggregate (determination of no reasonable potential to contribute to an exceedance of local WQS and/or Bay TMDL WLA); or (2) incorporate an effluent limit consistent with the local WQS and/or Bay

TMDL WLA (where monitoring data shows reasonable potential to contribute to an exceedance of local WQS and/or Bay TMDL WLA).

**Table 8-4. EPA backstop allocations, adjustments, and actions based on assessment of final Phase I WIPs**

| | | No Backstop Allocation | | Backstop Allocations, Adjustments, and/or Actions | |
|---|---|---|---|---|---|
| | | Ongoing Oversight and Actions | Enhanced Oversight and Actions | Backstop Adjustments and Actions | Backstop Allocations and Actions |
| DC | Stormwater | | | | |
| | Wastewater | | | | |
| DE | Agriculture | | | | |
| | Stormwater | | | | |
| | Wastewater | | | | |
| MD | Agriculture | | | | |
| | Stormwater | | | | |
| | Wastewater | | | | |
| NY | Agriculture | | | | |
| | Stormwater | | | | |
| | Wastewater | | | | Reduce wastewater WLA to meet statewide allocation |
| PA | Agriculture | | Possible future backstop adjustments | | |
| | Stormwater | | | Shift 50% stormwater from LA to WLA | |
| | Wastewater | | Individual allocations; Possible future backstop allocations | | |
| VA | Agriculture | | | | |
| | Stormwater | | Possible future backstop adjustments | | |
| | Wastewater | | | | |
| WV | Agriculture | | | Shift 75% AFOs from LA to WLA | |
| | Stormwater | | Possible future backstop adjustments | | |
| | Wastewater | | Individual allocations; Possible future backstop allocations | | |

## 8.4  ALLOCATIONS BY JURISDICTION

On the basis of EPA's evaluations of the three major pollution source sectors combined with EPA's evaluations of whether the jurisdictions met their respective nitrogen, phosphorus, and sediment target allocations as illustrated in Tables 8-1 and 8-2, EPA assigned final allocations according to the assumptions detailed below for each of the seven watershed jurisdictions. Because EPA determined that many of the jurisdictions' final Phase I WIPs met all target allocations and/or met EPA's expectations for reasonable assurance, EPA reduced or eliminated many of the backstop allocations that it had included for those jurisdictions in the September 24, 2010, draft Chesapeake Bay TMDL, where warranted. The allocations for each jurisdiction, and the assumptions and rationale underlying those allocations, are described below.

### 8.4.1  Delaware

Delaware developed a final Phase I WIP input deck with nitrogen, phosphorus, and sediment controls that achieved jurisdiction-wide allocations when run through the Watershed Model. Delaware's final Phase I WIP also met EPA's expectations for reasonable assurance. As a result, EPA based Delaware's final allocations entirely on Delaware's final Phase I WIP. Delaware's final Phase I WIP shifts the urban stormwater load into the WLA, provides stronger agricultural contingencies to enhance reasonable assurance that reduction targets will be met, and improves WWTP performance levels to meet nitrogen allocations.

#### Delaware Allocations

Delaware meets its nitrogen, phosphorus, and sediment allocations in the final TMDL, based on EPA's quantitative and qualitative evaluation of Delaware's final Phase I WIP. Delaware's WIP input deck resulted in jurisdiction-wide loads that are 3 percent under nitrogen, 12 percent under phosphorus, and 33 percent under sediment target allocations. Delaware has agreed to apply the spare pounds back to the nonpoint source agriculture allocation and to refine the implementation measures in its Phase II WIP. Delaware's Bay TMDL jurisdiction-wide allocations are nitrogen 2.95 million pounds per year (mpy); phosphorus 0.26 mpy; and sediment 57.82 mpy.

#### Delaware Agriculture

Delaware's final Phase I WIP showed significant improvements from its draft Phase I WIP in the agriculture sector, including a strong contingency that "Delaware commits to review and evaluate the pace and progress of agriculture BMP implementation at the end of 2013. If needed, Delaware will enact new policy measures and explore mandatory BMP compliance options in a timely manner to ensure that water quality commitments will be met." Delaware's final Phase I WIP also includes greater detail on funding coordination and the implementation of agriculture BMPs. These improvements bolster reasonable assurance that agriculture allocations will be met.

EPA will maintain ongoing oversight of Delaware's agriculture sector to ensure these allocations are achieved and maintained. Specifically, EPA will use its national review of CAFO State Technical Standards in 2011 and beyond as an opportunity to identify any deficiencies in the State Technical Standards for protecting water quality. Through its review of State Technical Standards, EPA also will evaluate whether Delaware's phosphorus management program is sufficient to address phosphorus imbalances and water quality concerns. If deficiencies are

identified that are not addressed or the permit does not include other conditions to achieve nitrogen and phosphorus reductions identified in the WIP, EPA may object to permits on the basis that they are not protective of water quality.

### Delaware Urban Stormwater

Delaware's final Phase I WIP also showed significant improvements in the urban stormwater sector. The WIP used BMPs that address both urban stormwater quality and quantity. The WIP also describes proposed regulatory revisions that, once adopted, will require redevelopment to reduce effective imperviousness by 50 percent and will increase required treatment volume for new development to the level of annualized runoff from the 1-year frequency storm event (about 2.7 inches of rainfall). The initial goal of these regulatory provisions would be to use runoff reduction practices so that effective imperviousness is 0 percent. Delaware's final Phase I WIP further provided detailed strategies to restrict turfgrass fertilizer and documented a variety of funding sources to implement proposed strategies.

As in the draft Phase I WIP, Delaware has shifted the entire urban stormwater load into the WLA. This shift enhances reasonable assurance that nitrogen, phosphorus, and sediment allocations from urban discharges will be achieved and maintained by signaling that many more discharges could potentially be subject to NPDES permits as necessary to protect water quality.

EPA will maintain ongoing oversight of Delaware's urban stormwater sector. In particular, EPA will monitor Delaware's progress in revising its urban stormwater regulations for new development and redevelopment to be consistent with the final Phase I WIP commitments. EPA also will monitor Delaware's efforts to develop a system for tracking inspections and compliance information. Finally, EPA will review the timeline and content of proposed regulations to limit turfgrass fertilizer use and the application of regulatory tools as a contingency should voluntary programs not result in fertilizer reductions on 95 percent of available urban lands.

### Delaware Wastewater

Delaware's final Phase I WIP showed key improvements in the wastewater sector. Most notably, Delaware lowered effluent limits at 3 significant WWTPs to 4 mg/L TN at design flow to meet the nitrogen allocations and committed to hire additional staff for the on-site treatment systems and WWTP programs to manage permits consistent with the Chesapeake Bay TMDL. Delaware also confirmed that all nonsignificant WWTPs are included within the WLA.

EPA will maintain ongoing oversight of Delaware's wastewater program to ensure that the actions detailed in the final Phase I WIP occur and achieve the expected pollutant reductions. EPA also will review NPDES permit conditions to ensure that they are consistent with the assumptions and requirements of the Bay TMDL WLAs.

### Delaware Conclusion

EPA applauds Delaware for its improvements in its Phase I WIP. The TMDL allocations in Delaware are based solely on the final Phase I WIP because Delaware met its target allocations and met EPA's expectations for providing reasonable assurance by identifying practices and implementation strategies to attain applicable WQS. EPA will assess progress through ongoing permit and program oversight and 2-year milestones, and believes that Delaware will succeed.

Although EPA does not anticipate that additional federal actions will be necessary, EPA is prepared to object to permits, target enforcement, condition grants, or adopt other federal actions as detailed in its December 29, 2010 letter, as necessary and appropriate, to support Delaware's ambitious restoration commitment.

## 8.4.2    District of Columbia

The District of Columbia developed a final Phase I WIP that met the interim allocation target of achieving a 60 percent reduction by 2017, and that met the nitrogen, phosphorus, and sediment target allocations by 2025. The District's final Phase I WIP also met EPA's expectations for providing reasonable assurance that those target allocations would be met, although it is contingent in part upon the issuance of a final MS4 permit with performance standards for new development, redevelopment, and retrofits that are similar to those included in the draft permit issued earlier in 2010. As a result, EPA based the District's final allocations entirely on the District's final Phase I WIP.

### District of Columbia Allocations

The District of Columbia meets its nitrogen, phosphorus, and sediment allocations in the final TMDL, based on EPA's quantitative and qualitative evaluation of the District's final Phase I WIP. The District's input deck resulted in loads that are 0 percent over for nitrogen, phosphorus and sediment allocations. The District of Columbia's Bay TMDL jurisdiction-wide allocations are nitrogen 2.32 mpy; phosphorus 0.12 mpy; and sediment 11.16 mpy.

### District of Columbia Urban Stormwater

The District of Columbia's final Phase I WIP showed significant improvements in urban stormwater from its draft Phase I WIP. For example, the District's final WIP incorporates a new urban stormwater volume standard (1.2-inch retention) that is consistent with the District's draft MS4 permit. EPA anticipates that the final MS4 permit will include detailed information on permit conditions, with timelines for implementation, tracking, inspections, and reporting. The District's final Phase I WIP also includes a more detailed list of GSA properties and provides a detailed discussion of the District's enforcement authority regarding federal properties. The WIP also describes a plan for engaging federal facilities in the Phase II WIP, including tracking of federal 2-year milestones.

EPA will maintain ongoing oversight of the District's urban stormwater sector and will continue to work with DDOE to finalize the DC MS4 permit. EPA will assure specific permit conditions and fact sheet language to reflect TMDL expectations (e.g., implementation action timelines, inspection schedule, verification, and tracking). Once the DC MS4 permit is finalized, EPA will continue to work with the District to implement the MS4 permit consistent with meeting 2-year milestones and reporting for the TMDL.

### District of Columbia Wastewater

The District of Columbia's final Phase I WIP also showed significant improvement in the wastewater sector. Not only does the final Phase I WIP include a complete list of non-significant facilities, but EPA and DC agreed upon the inclusion of a growth reserve in the final TMDL. Although the final Phase I WIP and input deck do acknowledge the growth reserve, the final

WLA for Blue Plains is separate and provides loading sufficient for and consistent with the permit limits in the 2010 NPDES permit. If additional capacity is needed beyond the permitted loads, the District has committed to work with other jurisdictions as necessary to adjust the Blue Plains Inter-jurisdictional Municipal Agreement.

EPA will maintain ongoing oversight of the District's wastewater program and will implement the TMDL WLAs through the permits that EPA issues, renews and modifies in the District of Columbia. EPA also will continue to work closely with the District to assure that loads from both significant and nonsignificant sources are consistent with the aggregate WLA. Specifically, the final Phase I WIP proposes that the WLA for Blue Plains be developed based on the annual average flows for outfall 001. However, WLAs for the combined sewer system (CSS) and its associated WWTP in the District of Columbia are based on the limits in the NPDES permit issued by EPA for Blue Plains and the Long Term Control Plan (LTCP) for the CSS system in the District of Columbia. The WLAs assume full implementation of the Blue Plains LTCP.

### District of Columbia Conclusion

EPA applauds the District of Columbia for its improvements in its Phase I WIP. EPA believes that the District of Columbia will achieve and maintain its TMDL allocations based on its final Phase I WIP. EPA commits to issue permits and target enforcement actions to implement TMDL allocations. EPA also will encourage and work with its sister federal agencies to lead by example in reducing nitrogen, phosphorus, and sediment loads into the Potomac and Anacostia rivers.

### 8.4.3    Maryland

Maryland developed a final Phase I WIP input deck with nitrogen, phosphorus, and sediment controls that more than met the interim target allocations by achieving a 70 percent reduction by 2017, and met the nitrogen, phosphorus, and sediment target allocations by 2020. Maryland's final Phase I WIP also met EPA's expectations for providing reasonable assurance that these allocations will be met. As a result, EPA based Maryland's final allocations entirely on Maryland's final Phase I WIP.

### Maryland Allocations

Maryland meets its nitrogen, phosphorus, and sediment allocations for each basin in the final TMDL, based on EPA's quantitative and qualitative evaluation of Maryland's final Phase I WIP. Maryland submitted proposed modifications to its nitrogen, phosphorus, and sediment allocations in each of its five basins. EPA used the Chesapeake Bay Water Quality Model to confirm that these modifications would still attain applicable WQS. Maryland's final Phase I WIP input deck resulted in jurisdiction-wide loads that are 0 percent over modified nitrogen, phosphorus, and sediment allocations. Maryland's Bay TMDL jurisdiction-wide allocations are nitrogen 39.09 mpy; phosphorus 2.72 mpy; and sediment 1218.10 mpy.

### Maryland Agriculture

Maryland's final Phase I WIP showed significant improvements from its draft Phase I WIP in the agriculture sector, including a strong contingency statement that significantly bolsters EPA's reasonable assurance that Maryland will meet its agriculture targets by committing to explore new policy measures and mandatory BMP compliance options. For example, these could include

a regulatory change that cover crops be planted on the highest risk acres. The Maryland final Phase I WIP also provides more detail on phosphorus management, strengthens contingencies, improves coordination with USDA, develops a plan for increasing staff levels, and selects a subset of strategies to implement by 2017.

EPA will maintain ongoing oversight of Maryland's agriculture sector. EPA will use its national review of CAFO State Technical Standards in 2011 as an opportunity to identify any deficiencies in the State Technical Standards for protecting water quality. Through its review of State Technical Standards, EPA also will evaluate whether Maryland's phosphorus management program is sufficient to address phosphorous imbalances and water quality concerns. If deficiencies are identified that are not addressed by Maryland or a CAFO permit does not include other conditions to achieve nitrogen and phosphorus reductions identified in the final Phase I WIP, EPA may object to permits if they are not protective of water quality.

### Maryland Urban Stormwater

Maryland's final Phase I WIP also showed significant improvement in its commitment to urban stormwater management. In the final Phase I WIP, Maryland committed to several actions to ensure reductions, including limits on lawn fertilizer use, use of natural filters such as riparian buffers and stream restoration, and an increase in watershed restoration requirements for MS4s by requiring additional nitrogen, phosphorus, and sediment reductions. The WIP also included a contingency plan whereby if local utilities or other systems of charges are not underway in 2012, Maryland will seek legislation requiring development of local stormwater utilities via a statewide system of fees. The final Phase I WIP also included descriptions of the policy, financing, and tracking mechanisms for implementing urban stormwater retrofit programs.

Maryland also included in its final Phase I WIP specific activities and milestones for urban stormwater program implementation, including the following:

- Renewal of Phase I MS4 permits to require nutrient and sediment reductions equivalent to urban stormwater treatment on 30 percent of the impervious surface that does not have adequate urban stormwater controls.

- Renewal of Phase II MS4 permits to require nutrient and sediment reductions equivalent to urban stormwater treatment on 20 percent of the impervious surface that does not have adequate urban stormwater controls.

- Renewal of State Highway Administration Phase I and Phase II MS4 permits to require nutrient and sediment reductions equivalent to urban stormwater treatment on 30 percent of the impervious surface that does not have adequate controls.

- Regulation of fertilizer applications on 220,000 acres of commercially managed lawns.

While EPA is satisfied overall with Maryland's demonstration of reasonable assurance, EPA will closely track the nitrogen, phosphorus, and sediment reductions expected to result from these urban stormwater retrofits. EPA will maintain ongoing oversight of Maryland's urban stormwater sector and will assess how well Maryland is able to track and quantify outcomes from the retrofits projected in its final Phase I WIP.

## Maryland Wastewater

Maryland's final Phase I WIP also showed significant improvement in the wastewater sector. Maryland committed to identify options to structure the Bay Restoration Fund (BRF) fee in order to fully fund Enhanced Nutrient Removal (ENR) upgrades at 67 public major wastewater treatment plants.  Options include fees based on consumption, income, or other criteria; and, in 2012, to propose an amendment to the BRF statute to change the BRF fee in order to provide funding needed to complete the upgrades.. Maryland's final Phase I WIP also included a contingency that if the BRF statute is not amended, "All funding for ENR projects will be reduced from 100 percent grant to provide partial grant funds for each remaining project. Local governments would be responsible for the balance of the necessary funding. State low interest loan funds would be available to assist."

EPA will maintain ongoing oversight of Maryland's wastewater sector to ensure that the actions detailed in the final Phase I WIP occur and achieve the expected pollutant reductions.

## Maryland Conclusion

EPA applauds Maryland for following up a strong draft with an even stronger final Phase I WIP. Maryland clarifies how its existing programs will implement nitrogen, phosphorus, and sediment reductions ahead of schedule. Both Maryland and EPA are committed to carefully review progress and adopt contingency actions as necessary to achieve and maintain the nitrogen, phosphorus, and sediment reductions.

## 8.4.4    New York

New York developed a final Phase I WIP input deck with nitrogen, phosphorus, and sediment controls that achieved additional reductions from the agricultural and wastewater sectors and achieved jurisdiction-wide allocations for sediment, but did not meet allocations for nitrogen or phosphorus.  In response to New York's concerns regarding the fairness of how EPA distributed the Baywide allocations to jurisdictions, EPA increased New York's nitrogen and phosphorus allocations by a total of 1,000,000 pounds and 100,000 pounds, respectively, and approved New York's exchange of some phosphorus for nitrogen (see Section 6.4.5). New York still did not meet its target allocations for nitrogen and phosphorus, however, despite these increased allocations and nutrient exchanges. As described below, EPA closed the gap with an aggregate WLA backstop allocation that further reduced New York's wastewater load.

## New York Allocations

New York meets its modified nitrogen, phosphorus, and sediment allocations in the final TMDL, based on a combination of EPA's quantitative and qualitative evaluation of New York's final Phase I WIP, EPA's increase of New York's nitrogen and phosphorus allocations, EPA's approval of New York's exchange of some phosphorus for nitrogen, and EPA's establishment of a backstop allocation for wastewater as described in detail below. New York's final Phase I WIP input deck resulted in loads that are 14 percent under its sediment allocation and 5 percent and 2 percent over its modified nitrogen and phosphorus allocations, respectively. EPA closed the gaps between New York's WIP and its nitrogen and phosphorus allocations with an aggregate WLA backstop allocation that further reduced New York's wastewater load. New York's jurisdiction-wide allocations are nitrogen 8.77 mpy; phosphorus 0.57 mpy; and sediment 292.96 mpy.

### New York Agriculture

New York's final Phase I WIP showed significantly more details in the agriculture section to demonstrate reasonable assurance that WIP commitments would be achieved than it did in its draft. New York's final Phase I WIP is built on the strength of New York's Agricultural Environmental Management (AEM) and CAFO programs. For example, AEM captures 95 percent of dairies in the watershed and farms must participate in AEM to get Farm Bill funding, CAFO permits are required at dairies with as few as 200 animal units, and every field covered by a nutrient management plan is tested for phosphorus. The WIP also includes a regulatory requirement for pasture fencing as a contingency action, and outlines specific steps to implement advanced technologies to process dairy manure. New York's final Phase I WIP also describes in-depth strategies that support New York's BMP implementation rates. These strategies are based on analyses of historic rates and cost of practices, realistic estimates of state and federal funding, and the type of agriculture practiced in New York. These strategies met EPA's expectations for reasonable assurance that New York will implement the commitments in its final Phase I WIP.

EPA will maintain ongoing oversight of New York's agriculture sector.  EPA will use its national review of CAFO State Technical Standards in 2011 and beyond as an opportunity to identify any deficiencies in the State Technical Standards for protecting water quality. If deficiencies are identified that are not addressed by the state or the permit does not include other conditions to achieve nitrogen and phosphorus reductions identified in the final Phase I WIP, EPA may object to permits if they are not protective of water quality.

### New York Urban Stormwater

New York's final Phase I WIP showed improvement in the urban stormwater sector by better documenting the strengths of its current program. New York volunteered to shift 50 percent of its urban stormwater load from the LA to the WLA. This change enhances reasonable assurance that nitrogen, phosphorus, and sediment allocations will be achieved and maintained by signaling that substantially more urban stormwater could potentially be subject to NPDES permits issued by New York as necessary to protect water quality. The final Phase I WIP also documented a variety of funding sources to implement proposed strategies, and committed to BMPs that address urban stormwater quality and quantity. In addition, the New York construction general permit imposes volume-based post-construction controls on a significant portion of all construction projects state-wide. New York also finalized legislation limiting the residential use of fertilizer.

EPA will maintain ongoing oversight of New York's urban stormwater sector.  EPA will monitor New York's progress in implementing its urban stormwater program and issuing permits that achieve the nitrogen, phosphorus, and sediment reductions that New York committed to in its final Phase I WIP. EPA also will provide oversight of the urban stormwater permitting program.

### New York Wastewater

In the wastewater sector, New York's final Phase I WIP included a commitment to improve WWTP performance to BNR equivalent performance levels for nitrogen (8 mg/L) and to 0.5 mg/L for phosphorus at design flow. Despite increasing New York's nitrogen and phosphorus allocations, however, New York's WIP did not reduce loads enough to meet the modified

allocations. As a result, EPA applied backstop allocations and actions that further reduce New York's WLA for wastewater to close the numeric gap.

EPA established an aggregate WLA for WWTPs that is calculated using the nitrogen and phosphorus performance levels to which New York committed and that assumed that significant WWTPs are at current flow rather than design flow. As discussed in Section 8.3, EPA allowed for an aggregate WLA for WWTPs in New York to provide time for the New York State Department of Environmental Conservation to review engineering reports from WWTPs and determine the load reductions expected from each facility. New York has committed to provide information to support individual WLAs for these WWTPs in its Phase II WIP. EPA understands that New York plans to renew and/or modify WWTP permits after completing its Phase II WIP, consistent with the applicable TMDL allocations at that time.

### New York Conclusion

EPA values New York's continued commitment to protect its local waters and restore the Chesapeake Bay through strong agricultural and urban stormwater programs as well as commitments to reduce WWTP discharges. EPA has made adjustments to New York's allocations based on concerns with equity (USEPA 2010f). EPA is confident that New York will achieve its agricultural and urban stormwater allocations. EPA applied a backstop allocation to further reduce wastewater loads to enable New York to meet its statewide nitrogen and phosphorus allocations.

### 8.4.5    Pennsylvania

Pennsylvania developed a final Phase I WIP input deck with nitrogen, phosphorus, and sediment controls that met its sediment allocations and came within two percent of jurisdiction-wide nitrogen and phosphorus allocations after allowing for nitrogen to phosphorus exchanges. Pennsylvania's final Phase I WIP resulted in loads below nitrogen, phosphorus, and sediment allocations in the Potomac, Eastern, and Western Shore Basins. EPA will place the spare allocation for these basins back into the agriculture nonpoint source sector. In contrast, after allowing for nitrogen to phosphorus exchanges at EPA-approved ratios to modify the Pennsylvania Susquehanna basin nitrogen and phosphorus allocations, the Commonwealth's final Phase I WIP input deck remained 2 percent over its nitrogen allocation and 2 percent over its phosphorus allocation. EPA and the Commonwealth have reached agreement on further reductions from agricultural and urban stormwater nonpoint sources proportional to the amount of load that they contribute to the Bay to achieve allocations in the Susquehanna in the final TMDL. These further reductions are supported by contingencies included in the final Phase I WIP and EPA's commitment to track progress and take any necessary federal actions to ensure all pollutant reductions are achieved and maintained.

Pennsylvania's final Phase I WIP demonstrated substantially more reasonable assurance that it could achieve and maintain agricultural allocations due to several key improvements. However, as described below, Pennsylvania did not meet EPA's expectations for reasonable assurance that urban stormwater allocations will be achieved and maintained. As described below, EPA closed this reasonable assurance gap with a backstop adjustment for Pennsylvania's urban stormwater load that transfers 50 percent of the urban stormwater load not currently subject to NPDES permits from the LA to the WLA.

## Pennsylvania Allocations

Pennsylvania met its nitrogen, phosphorus, and sediment allocations in each basin in the final TMDL, based on a combination of EPA's quantitative and qualitative evaluation of Pennsylvania's final Phase I WIP, EPA's commitment to enhanced oversight and actions for Pennsylvania agriculture, EPA's approval of nitrogen and phosphorus exchanges, and EPA's establishment of a backstop adjustment for urban stormwater as described in detail below. After adjusting for EPA-approved nitrogen and phosphorus exchanges, Pennsylvania's WIP input deck resulted in statewide loads that are 2 percent over for nitrogen and phosphorus, and 5 percent under for sediment allocations. EPA and the Commonwealth have reached agreement on further reductions from agriculture and urban stormwater nonpoint sources proportional to the amount of load that they contribute to the Bay to achieve allocations in the Susquehanna and, therefore, statewide. These further reductions are supported by the contingencies included in the WIP and EPA's commitment to track progress and take any necessary federal actions to ensure these reductions are achieved and maintained. Pennsylvania's final allocations are nitrogen 73.93 mpy; phosphorus 2.93 mpy; and sediment 1983.78 mpy.

## Pennsylvania Agriculture

Pennsylvania's final Phase I WIP showed significant improvement from the draft Phase I WIP in the agriculture sector. The WIP included detailed strategies for increasing compliance with agricultural regulations and for advancing manure technologies, and aligned Pennsylvania's technical workforce to support WIP priorities. The Pennsylvania final Phase I WIP detailed a specific approach for tracking agricultural conservation by working with EPA, the National Association of Conservation Districts, and other Bay jurisdictions' agricultural agencies to develop verification protocols for crediting non-cost-shared practices in the Chesapeake Bay Watershed Model.

EPA wants Pennsylvania to succeed in achieving these reductions from the agriculture sector. To support the Commonwealth's efforts, EPA will use its national review of CAFO State Technical Standards in 2011 and beyond as an opportunity to identify any deficiencies in the State Technical Standards for protecting water quality. EPA also will evaluate whether Pennsylvania's approach to managing phosphorus is sufficient to address phosphorus imbalances and water quality concerns. EPA will continue to engage Pennsylvania about the ways to phase out the practice of winter spreading of manure, which continues to be allowed in Pennsylvania despite being banned in other jurisdictions. If Pennsylvania does not adequately address these matters or the permit does not include other conditions to achieve the nitrogen and phosphorus reductions identified in its final Phase I WIP, EPA may object to permits if they are not protective of water quality.

EPA also is committed to enhanced oversight and actions for Pennsylvania's agriculture sector. Upon review of the Phase II WIP, EPA will revisit the WLAs for agriculture and WWTPs in the event that Pennsylvania does not make significant progress in the following areas: receiving EPA approval for its CAFO program, demonstrating enhanced compliance assurance with agricultural state regulatory programs, developing more targeted contingency actions, and advancing manure technologies. Specifically, EPA may consider

- More stringent phosphorus limits on WWTPs.

- Shifting a greater portion of Pennsylvania's AFO load from the LA to the WLA. EPA would assume full implementation of practices required under a CAFO permit for AFOs included in the WLA. The shift to the WLA would signal that any of these AFOs could potentially be subject to NPDES permits as necessary to protect water quality. AFOs would only be subject to NPDES permit conditions issued by Pennsylvania upon designation. EPA will consider this step if Pennsylvania does not achieve reductions in agricultural loads as identified in the final Phase I WIP. EPA may also pursue designation activities based upon considerations other than TMDL and WIP implementation.

## Pennsylvania Urban Stormwater

Pennsylvania's final Phase I WIP also showed improvement in the urban stormwater sector. It provided a strong description of Chapter 102 regulations and what Pennsylvania can enforce and regulate to achieve no net change in urban stormwater runoff. The Commonwealth requires a *no net increase* provision to maintain existing hydrology or demonstrate that at least 20 percent of a previously disturbed site has the hydrologic conditions of meadow or better. The WIP also included a commitment from PADEP to add a statewide program to reduce the application of fertilizer on non-agricultural lands.

Despite these improvements, the WIP's urban stormwater discussion continues to have weaknesses. Pennsylvania's final WIP lacked clear strategies to achieve the almost 40 percent reduction in urban loads that the Commonwealth included in its WIP input deck. For example, PADEP continues to assert that the scope of the MS4 program is limited to the conveyance system only, and Pennsylvania's small MS4 permit program does not include construction and post-construction requirements. Further, the requirement for an MS4 to have a TMDL Implementation Plan does not include the Chesapeake Bay TMDL, and there is no supporting documentation to quantify how local TMDL implementation plans will meet Bay targets. In addition, Pennsylvania is assuming high compliance levels, but has not demonstrated a high level of compliance assurance activities nor enhanced the field resources available to support an enforcement presence. Recent EPA activities in this area have illustrated a high level of noncompliance with existing permits.

As a result of the reasonable assurance weaknesses in the urban stormwater sector, EPA applied backstop adjustments and actions to this sector. Specifically, EPA transferred 50 percent of the urban stormwater load that is not currently subject to NPDES permits from the LA to the WLA. This TMDL allocation adjustment increased reasonable assurance that nitrogen, phosphorus, and sediment allocations from urban stormwater discharges will be achieved and maintained by signaling that EPA is prepared to designate any of these discharges as requiring NPDES permits. Urban areas would only be subject to NPDES permit conditions protective of water quality as issued by the Commonwealth upon designation. EPA will consider this step if Pennsylvania does not demonstrate progress toward reductions in urban loads identified in its final Phase I WIP. EPA may also pursue designation activities based on considerations other than TMDL and WIP implementation.

EPA will maintain close oversight of general permits for the Pennsylvania urban stormwater sector (PAG-13, PAG-2) and may object as needed if permits are not protective of WQS and regulations. Upon review of Pennsylvania's Phase II WIP, EPA will revisit the WLAs for WWTPs, including more stringent phosphorus limits, in the event that Pennsylvania does not

reissue PAG-13 and PAG-2 general permits for Phase II MS4s and construction activities that are protective of water quality by achieving the load reductions called for in Pennsylvania's final Phase I WIP.

### Pennsylvania Wastewater

Pennsylvania's final Phase I WIP showed a number of key improvements in the wastewater sector. For example, the WIP provided language on a process for granting 25 lb/yr credit to POTWs for each septic system retired and incorporated into a treatment facility and provided additional language on implementation schedules for significant WWTP upgrades. In addition, the final Phase I WIP and input decks included permit numbers for additional non-significant facilities covered under the PAG-04 and PAG-05 general permits.

EPA committed to enhanced oversight and actions for the Pennsylvania wastewater sector, and established individual WLAs for WWTPs in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the WLA. Provisions of this TMDL allow (under certain circumstances, see Section 10) for modifications of allocations within a basin to support offsets and trading opportunities. Further, as described above, EPA will assess Pennsylvania's near-term urban stormwater and agricultural program progress and determine whether EPA should modify TMDL allocations to assume additional reductions from WWTPs.

### Pennsylvania Conclusion

Pennsylvania's final Phase I WIP articulated a strategy to achieve its TMDL allocations. Pennsylvania's final Phase I WIP contained significantly more detail than the draft Phase I WIP and, with the incorporation of EPA's backstop adjustment and enhanced oversight, met EPA's expectations for reasonable assurance that agricultural reductions can be achieved and maintained. EPA is committed to enhanced oversight to ensure that necessary program enhancements and load reductions are achieved in all sectors and that permits are consistent with TMDL WLAs. Further, EPA applied a backstop adjustment for urban stormwater to signal that substantially more urban stormwater discharges may need to be designated for coverage under the NPDES program and receive NPDES permits from Pennsylvania that EPA deems are protective of water quality.

## 8.4.6    Virginia

As described below, Virginia's final Phase I WIP showed significant improvements from its draft Phase I WIP, including a commitment to implement aggressive, additional WWTP upgrades, a more accountable urban stormwater program, and expanded mandatory agriculture programs if voluntary programs are not successful. EPA is committing to ongoing oversight of the agriculture and wastewater sectors and enhanced oversight of Virginia's urban stormwater sector to ensure that WLAs and LAs are achieved and maintained.

### Virginia Allocations

Virginia met its nitrogen, phosphorus, and sediment allocations for each basin in the final TMDL, based on a combination of EPA's quantitative and qualitative evaluation of Virginia's final Phase I WIP, EPA's approval of Virginia's exchange of some phosphorus for nitrogen, and EPA's commitment to enhanced oversight and actions for Virginia urban stormwater. After

adjusting for EPA-approved nitrogen and phosphorus exchanges, Virginia's WIP input deck resulted in statewide loads that were 2 percent over for nitrogen and phosphorus, and 3 percent under for sediment. Some individual basins, however, were as much as 5 percent over their nitrogen and phosphorus target allocations, or 9 percent over their sediment target allocations. EPA and the Commonwealth have reached agreement on further reductions from agricultural, urban stormwater, and on-site septic system nonpoint sources proportional to the amount of load that they contribute to the Bay to achieve allocations both jurisdiction-wide and in each basin in the final TMDL. These further reductions are supported by the contingencies included in Virginia's final Phase I WIP and EPA's commitment to track progress and take any necessary federal actions to ensure these reductions are achieved and maintained. Virginia's jurisdiction-allocations are nitrogen 53.42 mpy; phosphorus 5.36 mpy; and sediment 2578.90 mpy.

## Virginia Agriculture

Virginia's final Phase I WIP showed a number of improvements in the agriculture sector. For example, Virginia shifted the entire AFO load into the WLA and assumed full implementation of barnyard runoff control, waste management, and mortality composting practices that would be required under a CAFO permit. This change enhanced reasonable assurance that nitrogen, phosphorus, and sediment allocations from animal operations will be achieved and maintained by signaling that any of these facilities could potentially be subject to NPDES permits as necessary to protect water quality. Virginia also committed to evaluating all small AFOs to determine whether they discharge or propose to discharge and should be permitted. Virginia's final Phase I WIP also provided more detail on the type of practices that are likely to be included in Resource Management Plans and mechanisms for promoting these Plans to producers. Virginia committed to pursue state legislation for mandatory actions or programs in the event that the 2-year milestone agricultural reduction targets are not met, and provided assurance that sufficient funding will be available through the 2013 milestone period.

EPA will maintain ongoing oversight of Virginia's agriculture program and will closely track compliance with the agricultural milestone targets to ensure that appropriate contingency actions are pursued as necessary. EPA will use its national review of CAFO State Technical Standards in 2011 and beyond to identify any deficiencies in the State Technical Standards for protecting water quality. Through its review of CAFO State Technical Standards, EPA also will evaluate whether Virginia's phosphorus management program is sufficient to address phosphorus. If deficiencies are identified that are not addressed by the Commonwealth or the permit does not include other conditions to achieve nutrient reductions identified in the WIP, EPA may object to permits if they are not protective of water quality.

## Virginia Urban Stormwater

Virginia's final Phase I WIP also showed improvement in the urban stormwater sector. Virginia revised its WIP target loads to include much more achievable, yet still aggressive, load reductions from the urban sector, committed to implement a Bay-wide and possibly statewide regulatory program to limit fertilizer application on urban lands, and committed to finalize a urban stormwater rule in 2011 that would improve new development and redevelopment performance standards. Virginia also requested individual WLAs for Phase I MS4s to more explicitly demonstrate the amount of urban runoff load that each permitted jurisdiction is expected to achieve.

EPA committed to enhanced oversight and actions regarding Virginia's urban stormwater program. Specifically, if the statewide rule and/or the Phase II WIP do not provide additional assurance regarding how urban stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment reductions proposed in the final Phase I WIP and assumed within the TMDL allocations, EPA may shift a greater portion of Virginia's urban stormwater load from the LA to the WLA. This shift would signal that substantially more urban stormwater could potentially be subject to NPDES permits issued by the Commonwealth as necessary to protect water quality.

As in other Bay jurisdictions, EPA committed to ongoing oversight and actions. This includes potentially objecting to proposed urban stormwater regulations, MS4 permits, construction general permits, and industrial stormwater permits that are not consistent with the Bay TMDL allocations and do not require conditions to reduce nitrogen, phosphorus, and sediment loads to the degree identified in the final Phase I WIP.

## Virginia Wastewater

Virginia's final Phase I WIP showed strong improvement in the wastewater sector. Virginia committed to require WWTP upgrades in the James River Basin sufficient to achieve 100 percent of reductions needed to meet DO-based allocations and 60 percent of reductions needed to meet chlorophyll-*a* based allocations by 2017. Virginia has committed to additional WWTP upgrades to achieve 100 percent of the reductions needed to meet the chlorophyll-*a* based WLAs for WWTPs by 2023, as outlined in the Staged Implementation Approach for Wastewater Treatment Facilities in the Virginia James River Basin, which is found in Appendix X.

EPA will maintain ongoing oversight of Virginia's wastewater program. EPA will review NPDES permit conditions to ensure that they are consistent with the assumptions and requirements of the Bay TMDL WLA. If VADEQ and EPA cannot come to agreement on the language of the Watershed General Permit related to combined sewer systems (CSS) by the time that EPA reviews the Commonwealth's Phase II WIP, EPA may reopen WLAs to ensure that they are reasonable and that compliance can be achieved.

## Virginia Conclusion

Due to substantial improvements between the draft and final Phase I WIP, Virginia now demonstrates that it can achieve and maintain nitrogen, phosphorus, and sediment allocations for all source sectors. As a result, EPA has removed all backstop allocations for Virginia that it had proposed in the draft TMDL. EPA commits to careful oversight to ensure that the valuable commitments detailed in the final Phase I WIP are implemented on schedule, and that permits and programs within the Commonwealth are consistent with assumptions and requirements of the TMDL WLAs. EPA also will carefully assess the Phase II WIP to determine whether EPA should establish a backstop adjustment for urban stormwater that shifts substantially more of the unregulated load to the WLA.

### 8.4.7    West Virginia

West Virginia developed a final Phase I WIP input deck with nitrogen, phosphorus, and sediment controls that met its statewide target allocations when run through the Chesapeake Bay Watershed Model after adjusting for EPA-approved nitrogen and phosphorus exchanges.

West Virginia's final Phase I WIP did not fully meet EPA's expectations for reasonable assurance that agriculture allocations will be achieved, however. EPA closed the reasonable assurance gap with a backstop adjustment for West Virginia's agriculture load that transferred 75 percent of West Virginia's AFO load into the WLA and assumed full implementation of barnyard runoff control, waste management, and mortality composting practices. EPA also committed to enhanced oversight of Virginia's urban stormwater and wastewater sectors to ensure that they achieve and maintain their allocations.

EPA based West Virginia's final allocations on a combination of West Virginia's final Phase I WIP with the above backstop adjustment for animal agriculture and enhanced oversight actions for urban stormwater and wastewater as described below.

#### West Virginia Allocations

West Virginia met its nitrogen, phosphorus, and sediment allocations for each basin in the final TMDL, based on a combination of EPA's quantitative and qualitative evaluation of West Virginia's final Phase I WIP, EPA's commitment to enhanced oversight and actions for West Virginia urban stormwater and wastewater, and EPA's establishment of a backstop adjustment for West Virginia agriculture as described in detail below. After adjusting for EPA-approved nitrogen and phosphorus exchanges, West Virginia's input deck resulted in statewide loads that are 0 percent under nitrogen, 1 percent under phosphorus and 11 percent under sediment allocations.

West Virginia agreed that any *spare allocations* in the Potomac River Basin would go to a LA reserve. Results from the final Phase I WIP input deck exceed nitrogen, phosphorus, and sediment allocations by 51 percent, 18 percent and 76 percent in the West Virginia portion of the James River basin, however. These exceedances are in large part due to an increasing portion of loads in West Virginia reaching the tidal portions of the James River as downstream loads decrease. EPA and West Virginia have reached agreement to fill these gaps by assuming additional reductions from all nonpoint sources proportional to the amount of loads they discharge to the Bay. West Virginia has committed to explore additional opportunities for reducing loads in this basin. EPA will track progress and consider whether to adopt additional federal actions to ensure that reductions are achieved and maintained. Furthermore, EPA will consider the effect of delivery factors when evaluating options for allocating basinwide loads to the major basins and jurisdictions in 2011. West Virginia's jurisdiction-wide allocations are nitrogen 5.45 mpy; phosphorus 0.59 mpy; and sediment 310.88 mpy.

#### West Virginia Agriculture

West Virginia's final Phase I WIP included some improvements. For example, it focused on effective nutrient-reducing practices such as poultry litter transport, targeted Nutrient Management Plans in high nitrogen-loading counties, and stream fencing. West Virginia also has

increased coordination efforts with USDA to support proposed agriculture strategies and implementation.

West Virginia's final Phase I WIP contained a number of weaknesses in the agriculture sector, however. The WIP lacked detailed strategies for how West Virginia will implement nitrogen, phosphorus, and sediment controls on agricultural lands at levels necessary to meet TMDL allocations. The WIP also lacked strong contingencies such as new policies, programs, or mandates in the event that voluntary approaches are not sufficient to meet reduction goals. West Virginia's recently approved CAFO program has not yet had an opportunity to demonstrate a successful track record for AFO outreach and permitting.

To address these reasonable assurance weaknesses, EPA applied backstop adjustments and actions to this sector. Specifically, EPA shifted 75 percent of West Virginia's AFO load into the WLA and assumed full implementation of barnyard runoff control, waste management, and mortality composting practices required under a CAFO permit on these AFOs. This adjustment increased reasonable assurance that nitrogen, phosphorus, and sediment allocations for the agriculture sector will be achieved and maintained by signaling that EPA is prepared to designate any of these AFOs as requiring NPDES permits. The shift signaled that any of these operations could potentially be subject to NPDES permits as necessary to protect water quality. AFOs would only be subject to NPDES permit conditions as issued by West Virginia upon designation. EPA will consider this step if West Virginia does not achieve reductions in agricultural loads as identified in the WIP. EPA also may pursue designation activities based upon considerations other than TMDL and WIP implementation. Based upon EPA's review of the state technical standards, the number of permit applications and permits issued under the new CAFO program, and progress towards developing programs to reduce agricultural loads, EPA will assess in the Phase II WIP whether more stringent WLAs for WWTPs are necessary to ensure that TMDL allocations are achieved.

In addition, EPA committed to ongoing oversight and actions consistent with other Bay jurisdictions. EPA will use its national review of CAFO State Technical Standards in 2011 and beyond as an opportunity to identify any deficiencies in the State Technical Standards for protecting water quality. Through its review of CAFO State Technical Standards, EPA also will evaluate whether West Virginia's phosphorus management program is sufficient to address phosphorus imbalances and water quality concerns. If deficiencies are identified that are not addressed by the state or a permit does not include other conditions to achieve nutrient reductions identified in the WIP, EPA may object to permits if they are not protective of water quality.

### West Virginia Urban Stormwater

West Virginia's final Phase I WIP showed some improvement in the urban stormwater sector. For example, West Virginia clarified contingencies in its final Phase I WIP, including mechanisms to regulate urban stormwater discharges from new development and redevelopment outside of regulated MS4 areas and implementation of retrofits to reduce pollutant loads from existing discharges.

The WIP still has weaknesses in its demonstration of reasonable assurance that urban stormwater allocations will be achieved and maintained, however. As a result, EPA committed to enhanced

oversight and actions of West Virginia's urban stormwater program to ensure implementation. If urban stormwater rules and/or the Phase II WIP do not provide additional assurance regarding how urban stormwater discharges outside of MS4 jurisdictions will achieve nitrogen, phosphorus, and sediment reductions proposed in the final WIP and assumed within the TMDL LAs, EPA may shift a greater portion of West Virginia's urban stormwater load from the LA to the WLA. The shift would signal that substantially more urban stormwater could potentially be subject to NPDES permits issued by West Virginia as necessary to protect water quality. EPA will also monitor any increased discharges above the current baseline, as no reductions from permitted urban stormwater are expected. Finally, as in other Bay jurisdictions, EPA commits to ongoing oversight to ensure that programs and permits are consistent with WIP commitments. If they are not, EPA is prepared to take other federal actions as identified in its December 29, 2009 letter to ensure that TMDL allocations are achieved and maintained.

### West Virginia Wastewater

West Virginia's final Phase I WIP showed improvement in the wastewater sector. For example, it included a commitment for the West Virginia legislature in 2011 to consider mechanisms to enhance financial assistance for POTWs to facilitate prompt compliance with NPDES permit requirements resulting from the Chesapeake Bay TMDL. West Virginia also provided additional information on compliance schedules and limits in the Permit Compliance System, and committed to reevaluate certain wastewater dischargers in its Phase II WIP to determine whether it will be necessary to reallocate loads.

Despite these improvements, however, the WIP does not fully meet EPA's expectations for reasonable assurance. As a result, EPA committed to enhanced oversight and actions for the West Virginia wastewater sector and, consistent with West Virginia's input deck, established individual WLAs for significant WWTPs in the TMDL to ensure that sufficient detail is provided to inform individual permits for sources within the wastewater WLA. Provisions of this TMDL allow (under certain circumstances, see Section 10) for modifications of allocations within a basin to support offsets and trading opportunities. Further, as described above, EPA will assess West Virginia's near-term agriculture program progress and determine whether additional federal actions consistent with EPA's December 29, 2009 letter, such as modifying TMDL allocations to assume additional reductions from WWTPs, are necessary to ensure that TMDL allocations are achieved.

### West Virginia Conclusion

In summary, West Virginia's final Phase I WIP did not meet EPA's expectations for reasonable assurance for the agriculture sector. However, it did include an input deck with nitrogen, phosphorus, and sediment controls that, if implemented, would achieve statewide allocations. EPA wants West Virginia to successfully implement its final Phase I WIP. To fill the remaining reasonable assurance gap, EPA applied a backstop adjustment that shifted a portion of unregulated AFO production area loads into the WLA as a signal that substantially more operations may be subject to NPDES permits to protect water quality. Consistent with its December 29, 2009 letter, EPA is also prepared to take other federal actions as detailed in its December 29, 2010 letter as necessary to ensure that West Virginia succeeds in achieving the load reductions identified in its final Phase I WIP.

## 8.5   ALLOCATION SUMMARY CHART

The final allocations for nitrogen, phosphorus, and sediment listed above also are presented in
Table 8-5 at both the jurisdiction and major river basin scales for each of the jurisdictions. These
allocations are further sub-allocated to the 92 Bay segment watersheds by individual and
aggregate WLAs and LAs in Section 9.

**Table 8-5. Chesapeake Bay watershed nitrogen, phosphorus, and sediment allocations
by jurisdiction and by major river basin, in millions of pounds per year**

| Jurisdiction | Major river basin | Nitrogen allocations (million lbs/year) | Phosphorus allocations (million lbs/year) | Sediment allocations (million lbs/year) |
|---|---|---|---|---|
| Pennsylvania | Susquehanna | 68.90 | 2.49 | 1,741.17 |
| | Potomac | 4.72 | 0.42 | 221.11 |
| | Eastern Shore | 0.28 | 0.01 | 21.14 |
| | Western Shore | 0.02 | 0.00 | 0.37 |
| | **PA Total** | **73.93** | **2.93** | **1,983.78** |
| Maryland | Susquehanna | 1.09 | 0.05 | 62.84 |
| | Eastern Shore | 9.71 | 1.02 | 168.85 |
| | Western Shore | 9.04 | 0.51 | 199.82 |
| | Patuxent | 2.86 | 0.24 | 106.30 |
| | Potomac | 16.38 | 0.90 | 680.29 |
| | **MD Total** | **39.09** | **2.72** | **1,218.10** |
| Virginia | Eastern Shore | 1.31 | 0.14 | 11.31 |
| | Potomac | 17.77 | 1.41 | 829.53 |
| | Rappahannock | 5.84 | 0.90 | 700.04 |
| | York | 5.41 | 0.54 | 117.80 |
| | James | 23.09 | 2.37 | 920.23 |
| | **VA Total** | **53.42** | **5.36** | **2,578.90** |
| District of Columbia | Potomac | 2.32 | 0.12 | 11.16 |
| | **DC Total** | **2.32** | **0.12** | **11.16** |
| New York | Susquehanna | 8.77 | 0.57 | 292.96 |
| | **NY Total** | **8.77** | **0.57** | **292.96** |
| Delaware | Eastern Shore | 2.95 | 0.26 | 57.82 |
| | **DE Total** | **2.95** | **0.26** | **57.82** |
| West Virginia | Potomac | 5.43 | 0.58 | 294.24 |
| | James | 0.02 | 0.01 | 16.65 |
| | **WV Total** | **5.45** | **0.59** | **310.88** |
| **Preliminary Baywide Allocation** | | **185.93** | **12.54** | **6,453.61** |
| **Atmospheric Deposition Allocation[a]** | | **15.7** | **N/A** | **N/A** |
| **Total Baywide Allocation** | | **201.63** | **12.54** | **6,453.61** |

[a] Cap on atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters to be achieved by
federal air regulations through 2020.

Note: These basin-jurisdiction allocations have been modified from the original allocations established by EPA earlier
this summer for the following reasons:
1. New York's allocations for nitrogen and phosphorus have been adjusted;
2. West Virginia's allocation for sediment has been corrected;
3. Maryland's allocations have been adjusted for some jurisdiction-requested basin exchanges;
4. Sever al other jurisdictions requested nutrient exchanges in their final Phase I WIPs

# SECTION 9.  CHESAPEAKE BAY TMDLS

This section presents the segment-specific and sector-specific Chesapeake Bay TMDL allocations for nitrogen, phosphorus, and sediment that resulted from EPA's evaluation of the jurisdictions' final Phase I WIPs as described in Section 8.

The MOS is implicit for the nitrogen and phosphorus allocations, having been built into the suite of decision-making tools, procedures and assumptions described in the previous sections (see Section 6.2.4). In the case of the sediment allocations, the explicit MOS is built directly into the allocations themselves (see Section 6.5.4). Natural background loads are included in the LAs presented in this section and the referenced appendices.

## 9.1   BAY SEGMENT ANNUAL AND DAILY ALLOCATIONS TO MEET WQS

Tables 9-1, 9-2, and 9-3 provide the annual total nitrogen, total phosphorus, and total suspended solids (sediment) allocations, respectively, for the watershed areas draining to each of the 92 Chesapeake Bay segments necessary to meet their applicable WQS. Those allocations are calculated as delivered loads (the loading that actually reaches tidal waters) and as annual loads. These tables are structured by major basin from north to south with western shore first and eastern shore second. The Bay and tidal tributary segments themselves are listed in geographic order from the head of tide down river from north to south. Each of the 92 segments is displayed as white rows while contributing portions of some of the 92 segments are displayed as gray rows. Table 9-4 provides the individual WLAs (annual) for total nitrogen, total phosphorus, and total suspended solids (sediment) for each of the 478 significant permitted dischargers. All WLAs listed in Table 9-4 are calculated as edge-of-stream loads (the loading that reaches a simulated stream segment from a point in that stream's watershed). More detailed LAs and WLAs are provided in Appendix Q for annual TMDLs and in Appendix R for daily TMDLs.

**Table 9-1. Chesapeake Bay TMDL total nitrogen (TN) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TN WLA (lbs/yr) | TN Land Based LA (lbs/yr) | TN AtDep[c] LA (lbs/yr) | TN TMDL (lbs/yr) | TN 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|---|
| CB1TF | NY | Northern Chesapeake Bay | 1,305,533 | 7,466,415 | | 8,771,948 | 10,947,653 |
| CB1TF | PA | Northern Chesapeake Bay | 13,938,796 | 54,965,400 | | 68,904,197 | 101,652,996 |
| CB1TF | MD | Northern Chesapeake Bay | 292,953 | 1,173,509 | | 1,466,462 | 1,943,851 |
| CB1TF | | Northern Chesapeake Bay | 15,537,282 | 63,605,325 | 337,488 | 79,480,095 | 114,544,499 |
| BSHOH | MD | Bush River | 445,589 | 282,015 | 68,092 | 795,696 | 930,895 |
| GUNOH | PA | Gunpowder River | 90 | 19,866 | | 19,957 | 30,135 |
| GUNOH | MD | Gunpowder River | 255,714 | 792,403 | | 1,048,117 | 1,305,958 |
| GUNOH | | Gunpowder River | 255,804 | 812,269 | 73,337 | 1,141,411 | 1,336,092 |
| MIDOH | MD | Middle River | 31,639 | 26,896 | 32,551 | 91,085 | 147,687 |
| BACOH | MD | Back River | 1,700,239 | 23,108 | 25,010 | 1,748,357 | 2,233,080 |
| PATMH | MD | Patapsco River | 3,475,456 | 606,149 | 213,246 | 4,294,851 | 7,602,511 |
| MAGMH | MD | Magothy River | 48,270 | 91,496 | 45,831 | 185,597 | 236,865 |
| SEVMH | MD | Severn River | 244,630 | 114,992 | 64,618 | 424,239 | 445,316 |
| SOUMH | MD | South River | 49,303 | 98,704 | 37,585 | 185,591 | 219,201 |
| RHDMH | MD | Rhode River | 14,888 | 20,632 | 13,683 | 49,203 | 53,329 |
| WSTMH | MD | West River | 5,292 | 22,517 | 18,626 | 46,435 | 39,366 |
| WBRTF | MD | Western Branch Patuxent River | 97,386 | 116,500 | 360 | 214,246 | 239,170 |
| PAXTF | MD | Upper Patuxent River | 1,110,871 | 685,570 | 12,074 | 1,808,516 | 1,768,198 |
| PAXOH | MD | Middle Patuxent River | 11,563 | 267,180 | 28,352 | 307,095 | 359,289 |
| PAXMH | MD | Lower Patuxent River | 27,816 | 456,617 | 148,769 | 633,203 | 627,161 |
| ANATF_MD | MD | Anacostia River, MD | 294,029 | 149,357 | | 443,386 | 507,448 |
| ANATF_MD | DC | Anacostia River, MD | 11,055 | 970 | | 12,026 | 13,640 |
| ANATF_MD | | Anacostia River, MD | 305,084 | 150,327 | 1,124 | 456,535 | 521,088 |
| ANATF_DC | MD | Anacostia River, DC | 39,160 | 6,780 | | 45,940 | 54,823 |
| ANATF_DC | DC | Anacostia River, DC | 41,153 | 17,652 | | 58,805 | 131,992 |
| ANATF_DC | | Anacostia River, DC | 80,313 | 24,432 | 7,248 | 111,993 | 186,815 |
| POTTF_MD | PA | Upper Potomac River, MD | 342,541 | 4,378,072 | | 4,720,613 | 6,228,235 |
| POTTF_MD | MD | Upper Potomac River, MD | 2,634,386 | 9,009,270 | | 11,643,656 | 13,520,999 |
| POTTF_MD | DC | Upper Potomac River, MD | 15,397 | 3,038 | | 18,435 | 202,365 |
| POTTF_MD | VA | Upper Potomac River, MD | 2,189,118 | 9,815,634 | | 12,004,752 | 13,761,560 |

**Table 9-1. Chesapeake Bay TMDL total nitrogen (TN) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TN WLA (lbs/yr) | TN Land Based LA (lbs/yr) | TN AtDep[c] LA (lbs/yr) | TN TMDL (lbs/yr) | TN 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|---|
| POTTF_MD | WV | Upper Potomac River, MD | 472,895 | 4,961,651 | | 5,434,546 | 5,909,347 |
| POTTF_MD | | Upper Potomac River, MD | 5,654,338 | 28,167,664 | 164,918 | 33,986,920 | 39,622,506 |
| POTTF_DC | MD | Upper Potomac River, DC | 2,102,951 | 48,466 | | 2,151,417 | 2,340,588 |
| POTTF_DC | DC | Upper Potomac River, DC | 2,205,248 | 23,829 | | 2,229,078 | 2,507,384 |
| POTTF_DC | VA | Upper Potomac River, DC | 692,389 | 12,535 | | 704,924 | 880,860 |
| POTTF_DC | | Upper Potomac River, DC | 5,000,589 | 84,831 | 34,413 | 5,119,832 | 5,728,832 |
| POTTF_VA | VA | Upper Potomac River, VA | 2,912,791 | 487,502 | 74,213 | 3,474,506 | 3,634,235 |
| PISTF | MD | Piscataway Creek | 426,385 | 88,969 | 6,263 | 521,617 | 463,644 |
| MATTF | MD | Mattawoman Creek | 44,833 | 124,244 | 8,762 | 177,840 | 198,150 |
| POTOH1_MD | MD | Middle Potomac River, MD Mainstem | 2,259 | 46,281 | | 48,540 | 55,152 |
| POTOH1_MD | VA | Middle Potomac River, MD Mainstem | 5,603 | 24,015 | | 29,617 | 33,122 |
| POTOH1_MD | | Middle Potomac River, MD Mainstem | 7,862 | 70,296 | 309,297 | 387,455 | 88,274 |
| POTOH2_MD | MD | Middle Potomac River, MD Nangemoy Creek | 41,351 | 81,080 | 13,562 | 135,993 | 136,802 |
| POTOH3_MD | MD | Middle Potomac River, MD Port Tobacco River | 6,165 | 102,258 | 19,613 | 128,036 | 121,907 |
| POTOH_VA | VA | Middle Potomac River, VA | 144,881 | 366,024 | 36,719 | 547,624 | 569,992 |
| POTMH_MD | MD | Lower Potomac River, MD | 200,139 | 933,683 | | 1,133,822 | 1,370,808 |
| POTMH_MD | VA | Lower Potomac River, MD | 168 | 57,574 | | 57,742 | 78,506 |
| POTMH_MD | | Lower Potomac River, MD | 200,307 | 991,257 | 1,047,100 | 2,238,664 | 1,449,314 |
| POTMH_VA | VA | Lower Potomac River, VA | 127,796 | 877,532 | 81,362 | 1,086,690 | 1,280,940 |
| RPPTF | VA | Upper Rappahannock River | 713,032 | 3,427,258 | 52,969 | 4,193,259 | 4,724,938 |
| RPPOH | VA | Middle Rappahannock River | 438 | 203,619 | 28,473 | 232,530 | 273,194 |
| RPPMH | VA | Lower Rappahannock River | 56,873 | 961,971 | 522,040 | 1,540,883 | 1,353,400 |
| CRRMH | VA | Corrotoman River | 21,563 | 135,107 | 37,232 | 193,902 | 177,281 |
| MPNTF | VA | Upper Mattaponi River | 55,429 | 971,640 | 19,845 | 1,046,913 | 1,268,961 |
| MPNOH | VA | Lower Mattaponi River | 11,425 | 125,500 | 15,545 | 152,470 | 172,806 |
| PMKTF | VA | Upper Pamunkey River | 313,111 | 1,602,061 | 22,674 | 1,937,846 | 2,137,617 |
| PMKOH | VA | Lower Pamunkey River | 301,581 | 64,773 | 16,059 | 382,413 | 311,629 |
| PIAMH | VA | Piankatank River | 32,045 | 313,841 | 72,763 | 418,650 | 394,383 |

**Table 9-1. Chesapeake Bay TMDL total nitrogen (TN) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TN WLA (lbs/yr) | TN Land Based LA (lbs/yr) | TN AtDep[c] LA (lbs/yr) | TN TMDL (lbs/yr) | TN 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|---|
| YRKMH | VA | Middle York River | 15,026 | 333,648 | 164,516 | 513,189 | 428,617 |
| YRKPH | VA | Lower York River | 61,648 | 107,505 | 119,007 | 288,160 | 165,661 |
| MOBPH | VA | Mobjack Bay | 712,032 | 351,903 | 366,485 | 1,430,420 | 1,518,048 |
| JMSTF2 | WV | Upper James River  Upper | 376 | 17,325 | | 17,701 | 23,854 |
| JMSTF2 | VA | Upper James River  Upper | 5,013,858 | 8,298,038 | | 13,311,896 | 15,313,468 |
| JMSTF2 | | Upper James River  Upper | 5,014,234 | 8,315,363 | 178,108 | 13,507,705 | 15,337,322 |
| JMSTF1 | VA | Upper James River  Lower | 2,551,063 | 531,401 | 30,245 | 3,112,709 | 3,440,277 |
| APPTF | VA | Appomattox River | 421,341 | 1,392,078 | 26,741 | 1,840,160 | 2,169,402 |
| CHKOH | VA | Chickahominy River | 46,371 | 300,704 | 37,675 | 384,750 | 407,317 |
| JMSOH | VA | Middle James River | 278,731 | 275,044 | 207,608 | 761,382 | 730,672 |
| JMSMH | VA | Lower James River | 480,063 | 733,761 | 590,001 | 1,803,824 | 1,960,753 |
| JMSPH | VA | Mouth of James River | 1,022,650 | 7,286 | 116,792 | 1,146,728 | 3,346,988 |
| ELIPH | VA | Mouth to mid Elizabeth River | 418,811 | 10,120 | 52,778 | 481,709 | 1,233,036 |
| WBEMH | VA | Western Branch Elizabeth River | 119,709 | 29,560 | 14,005 | 163,274 | 161,521 |
| SBEMH | VA | Southern Branch Elizabeth River | 246,851 | 76,507 | 18,868 | 342,226 | 416,080 |
| EBEMH | VA | Eastern Branch Elizabeth River | 162,243 | 9,662 | 14,810 | 186,716 | 263,580 |
| LAFMH | VA | Lafayette River | 70,367 | 1,941 | 7,274 | 79,582 | 71,296 |
| LYNPH | VA | Lynnhaven River | 409,349 | 25,873 | 5,728 | 440,951 | 1,850,029 |
| NORTF | PA | Northeast River | 1,324 | 33,132 | | 34,456 | 55,984 |
| NORTF | MD | Northeast River | 55,341 | 177,361 | | 232,702 | 253,404 |
| NORTF | | Northeast River | 56,665 | 210,493 | 31,564 | 298,723 | 309,388 |
| ELKOH | PA | Elk River | 39,372 | 210,104 | | 249,476 | 385,703 |
| ELKOH | DE | Elk River | 2,193 | 8,312 | | 10,506 | 12,615 |
| ELKOH | MD | Elk River | 92,717 | 277,145 | | 369,863 | 470,335 |
| ELKOH | | Elk River | 134,283 | 495,562 | 83,506 | 713,351 | 868,653 |
| C&DOH_DE | DE | C&D Canal, DE | 5,787 | 14,830 | | 20,617 | 29,732 |
| C&DOH_DE | MD | C&D Canal, DE | 1 | 105 | | 106 | 193 |
| C&DOH_DE | | C&D Canal, DE | 5,788 | 14,935 | 18,818 | 39,540 | 29,925 |
| C&DOH_MD | DE | C&D Canal, MD | 15,427 | 38,028 | | 53,455 | 72,814 |
| C&DOH_MD | MD | C&D Canal, MD | 10,954 | 37,855 | | 48,808 | 59,686 |

**Table 9-1. Chesapeake Bay TMDL total nitrogen (TN) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TN WLA (lbs/yr) | TN Land Based LA (lbs/yr) | TN AtDep[c] LA (lbs/yr) | TN TMDL (lbs/yr) | TN 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|---|
| C&DOH_MD | | C&D Canal, MD | 26,381 | 75,882 | 10,602 | 112,865 | 132,501 |
| BOHOH | DE | Bohemia River | 5,059 | 31,069 | | 36,128 | 56,121 |
| BOHOH | MD | Bohemia River | 4,676 | 127,984 | | 132,660 | 182,321 |
| BOHOH | | Bohemia River | 9,735 | 159,053 | 34,514 | 203,302 | 238,442 |
| SASOH | DE | Sassafras River | 266 | 25,867 | | 26,133 | 42,936 |
| SASOH | MD | Sassafras River | 6,320 | 253,244 | | 259,563 | 398,175 |
| SASOH | | Sassafras River | 6,585 | 279,111 | 65,635 | 351,331 | 441,111 |
| CHSTF | DE | Upper Chester River | 1,973 | 108,560 | | 110,534 | 162,575 |
| CHSTF | MD | Upper Chester River | 8,590 | 419,379 | | 427,969 | 576,551 |
| CHSTF | | Upper Chester River | 10,563 | 527,939 | 13,240 | 551,742 | 739,126 |
| CHSOH | MD | Middle Chester River | 24,337 | 491,394 | 39,045 | 554,776 | 802,555 |
| CHSMH | MD | Lower Chester River | 48,244 | 426,553 | 214,655 | 689,453 | 633,424 |
| EASMH | MD | Eastern Bay | 33,621 | 553,829 | 309,901 | 897,352 | 795,200 |
| CHOTF | DE | Upper Choptank River | 5,477 | 247,037 | | 252,514 | 376,251 |
| CHOTF | MD | Upper Choptank River | 38,113 | 1,117,792 | | 1,155,905 | 1,479,532 |
| CHOTF | | Upper Choptank River | 43,590 | 1,364,829 | 33,376 | 1,441,796 | 1,855,784 |
| CHOOH | MD | Middle Choptank River | 56,463 | 475,043 | 59,131 | 590,637 | 653,485 |
| CHOMH2 | MD | Mouth of Choptank River | 112,961 | 239,223 | 130,585 | 482,769 | 385,997 |
| CHOMH1 | MD | Lower Choptank River | 8,904 | 282,914 | 257,748 | 549,565 | 380,753 |
| LCHMH | MD | Little Choptank River | 1,454 | 179,887 | 102,495 | 283,836 | 225,829 |
| HNGMH | MD | Honga River | 494 | 46,750 | 96,162 | 143,406 | 59,280 |
| FSBMH | MD | Fishing Bay | 12,125 | 617,858 | 81,039 | 711,023 | 792,951 |
| NANTF_DE | DE | Upper Nanticoke, DE | 320,160 | 1,689,986 | | 2,010,146 | 2,773,808 |
| NANTF_DE | MD | Upper Nanticoke, DE | 210 | 16,295 | | 16,506 | 25,772 |
| NANTF_DE | | Upper Nanticoke, DE | 320,371 | 1,706,282 | 33,839 | 2,060,492 | 2,799,580 |
| NANTF_MD | DE | Upper Nanticoke, MD | 0 | 231 | | 231 | 355 |
| NANTF_MD | MD | Upper Nanticoke, MD | 6,883 | 50,104 | | 56,986 | 67,870 |
| NANTF_MD | | Upper Nanticoke, MD | 6,883 | 50,335 | 39,790 | 97,007 | 68,226 |
| NANOH | DE | Middle Nanticoke River | 6,253 | 322,431 | | 328,684 | 475,395 |
| NANOH | MD | Middle Nanticoke River | 56,861 | 605,179 | | 662,040 | 838,869 |

**Table 9-1. Chesapeake Bay TMDL total nitrogen (TN) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TN WLA (lbs/yr) | TN Land Based LA (lbs/yr) | TN AtDep[c] LA (lbs/yr) | TN TMDL (lbs/yr) | TN 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|---|
| NANOH | | Middle Nanticoke River | 63,114 | 927,610 | 39,025 | 1,029,748 | 1,314,264 |
| NANMH | MD | Lower Nanticoke River | 2,120 | 111,021 | 66,561 | 179,702 | 127,980 |
| WICMH | DE | Wicomico River | 1,926 | 6,610 | | 8,536 | 12,256 |
| WICMH | MD | Wicomico River | 147,286 | 500,869 | | 648,154 | 902,542 |
| WICMH | | Wicomico River | 149,212 | 507,479 | 81,392 | 738,082 | 914,798 |
| MANMH | MD | Manokin River | 42,169 | 211,375 | 88,913 | 342,457 | 249,077 |
| BIGMH | MD | Big Annemessex River | 2,677 | 71,365 | 71,912 | 145,954 | 80,947 |
| POCTF | DE | Upper Pocomoke River | 1,603 | 91,833 | | 93,436 | 132,227 |
| POCTF | MD | Upper Pocomoke River | 39,327 | 767,616 | | 806,943 | 887,951 |
| POCTF | | Upper Pocomoke River | 40,931 | 859,449 | 20,328 | 920,708 | 1,020,178 |
| POCOH_MD | MD | Middle Pocomoke River, MD | 2,353 | 61,218 | 44,935 | 108,506 | 72,356 |
| POCOH_VA | MD | Middle Pocomoke River, VA | 770 | 58,791 | | 59,560 | 69,459 |
| POCOH_VA | VA | Middle Pocomoke River, VA | 3,176 | 131,816 | | 134,992 | 185,664 |
| POCOH_VA | | Middle Pocomoke River, VA | 3,946 | 190,607 | 7,659 | 202,212 | 255,123 |
| POCMH_MD | MD | Lower Pocomoke River, MD | 1,317 | 92,217 | 124,041 | 217,575 | 99,014 |
| POCMH_VA | VA | Lower Pocomoke River, VA | 36,905 | 203,748 | 157,367 | 398,020 | 510,169 |
| TANMH_MD | MD | Tangier Sound, MD | 14,635 | 86,546 | 612,332 | 713,512 | 120,118 |
| TANMH_VA | VA | Tangier Sound, VA | 0 | 5,583 | 307,485 | 313,068 | 5,823 |
| CB2OH | MD | Upper Chesapeake Bay | 22,867 | 252,884 | 434,345 | 710,096 | 404,690 |
| CB3MH | MD | Upper Central Chesapeake Bay | 113,726 | 72,325 | 529,188 | 715,239 | 193,692 |
| CB4MH | MD | Middle Central Chesapeake Bay | 69,854 | 232,568 | 1,188,056 | 1,490,477 | 393,898 |
| CB5MH_MD | MD | Lower Central Chesapeake Bay, MD | 74,462 | 86,384 | 957,593 | 1,118,439 | 208,367 |
| CB5MH_VA | VA | Lower Central Chesapeake Bay, VA | 65,831 | 312,716 | 594,229 | 972,776 | 483,600 |
| CB6PH | VA | Western Lower Chesapeake Bay | 80 | 26,860 | 707,095 | 734,034 | 32,282 |
| CB7PH | VA | Eastern Lower Chesapeake Bay | 52,274 | 874,208 | 1,739,897 | 2,666,379 | 1,301,326 |
| CB8PH | VA | Mouth of Chesapeake Bay | 135,685 | 24,511 | 609,543 | 769,739 | 162,895 |
| All | All | All | 53,358,309 | 132,563,059 | 15,700,000 | 201,621,368 | 249,262,775 |

a. MOS is implicit for nitrogen (see Section 6.2.4)
b. Each of the 92 segments is displayed as white rows while contributing portions of some of the 92 segments are displayed as gray rows.
c. AtDep means atmospheric deposition only for direct deposition to tidal waters.
Note: Any differences between this table and Table 8-5 are due to rounding.

**Table 9-2. Chesapeake Bay TMDL total phosphorus (TP) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TP WLA (lbs/yr) | TP Land Based LA (lbs/yr) | TP TMDL (lbs/yr) | TP 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| CB1TF | NY | Northern Chesapeake Bay | 101,576 | 464,126 | 565,702 | 801,589 |
| CB1TF | PA | Northern Chesapeake Bay | 1,207,756 | 1,287,074 | 2,494,830 | 3,409,157 |
| CB1TF | MD | Northern Chesapeake Bay | 23,108 | 47,626 | 70,734 | 82,274 |
| CB1TF | | Northern Chesapeake Bay | 1,332,440 | 1,798,827 | 3,131,267 | 4,293,020 |
| BSHOH | MD | Bush River | 33,173 | 9,155 | 42,328 | 63,813 |
| GUNOH | PA | Gunpowder River | 18 | 983 | 1,001 | 1,062 |
| GUNOH | MD | Gunpowder River | 17,669 | 20,713 | 38,382 | 58,656 |
| GUNOH | | Gunpowder River | 17,686 | 21,697 | 39,383 | 59,719 |
| MIDOH | MD | Middle River | 3,392 | 440 | 3,832 | 11,819 |
| BACOH | MD | Back River | 95,781 | 788 | 96,569 | 75,530 |
| PATMH | MD | Patapsco River | 212,595 | 14,772 | 227,366 | 397,260 |
| MAGMH | MD | Magothy River | 5,910 | 1,772 | 7,682 | 20,754 |
| SEVMH | MD | Severn River | 23,149 | 3,499 | 26,647 | 50,568 |
| SOUMH | MD | South River | 6,620 | 5,232 | 11,852 | 19,690 |
| RHDMH | MD | Rhode River | 1,339 | 1,962 | 3,301 | 4,354 |
| WSTMH | MD | West River | 960 | 2,123 | 3,083 | 4,227 |
| WBRTF | MD | Western Branch Patuxent River | 15,001 | 6,353 | 21,354 | 26,163 |
| PAXTF | MD | Upper Patuxent River | 98,055 | 41,553 | 139,607 | 150,585 |
| PAXOH | MD | Middle Patuxent River | 3,081 | 20,573 | 23,654 | 31,358 |
| PAXMH | MD | Lower Patuxent River | 16,584 | 30,632 | 47,216 | 63,861 |
| ANATF_MD | MD | Anacostia River, MD | 33,237 | 7,208 | 40,445 | 61,485 |
| ANATF_MD | DC | Anacostia River, MD | 1,433 | 95 | 1,528 | 2,705 |
| ANATF_MD | | Anacostia River, MD | 34,669 | 7,303 | 41,973 | 64,190 |
| ANATF_DC | MD | Anacostia River, DC | 6,384 | 357 | 6,741 | 10,799 |
| ANATF_DC | DC | Anacostia River, DC | 6,845 | 2,283 | 9,129 | 27,387 |
| ANATF_DC | | Anacostia River, DC | 13,229 | 2,641 | 15,870 | 38,186 |
| POTTF_MD | PA | Upper Potomac River, MD | 59,991 | 361,850 | 421,841 | 537,617 |
| POTTF_MD | MD | Upper Potomac River, MD | 194,657 | 379,011 | 573,668 | 696,408 |
| POTTF_MD | DC | Upper Potomac River, MD | 619 | 65 | 685 | 21,433 |

**Table 9-2. Chesapeake Bay TMDL total phosphorus (TP) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TP WLA (lbs/yr) | TP Land Based LA (lbs/yr) | TP TMDL (lbs/yr) | TP 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| POTTF_MD | VA | Upper Potomac River, MD | 208,723 | 780,655 | 989,378 | 1,591,680 |
| POTTF_MD | WV | Upper Potomac River, MD | 63,734 | 519,726 | 583,459 | 819,300 |
| POTTF_MD |  | Upper Potomac River, MD | 527,724 | 2,041,307 | 2,569,031 | 3,666,438 |
| POTTF_DC | MD | Upper Potomac River, DC | 99,835 | 1,511 | 101,347 | 46,383 |
| POTTF_DC | DC | Upper Potomac River, DC | 107,806 | 1,801 | 109,607 | 34,853 |
| POTTF_DC | VA | Upper Potomac River, DC | 36,476 | 397 | 36,873 | 30,368 |
| POTTF_DC |  | Upper Potomac River, DC | 244,117 | 3,710 | 247,827 | 111,604 |
| POTTF_VA | VA | Upper Potomac River, VA | 201,920 | 32,105 | 234,026 | 193,977 |
| PISTF | MD | Piscataway Creek | 26,339 | 5,481 | 31,820 | 25,394 |
| MATTF | MD | Mattawoman Creek | 8,741 | 6,889 | 15,630 | 20,655 |
| POTOH1_MD | MD | Middle Potomac River, MD Mainstem | 592 | 3,603 | 4,195 | 4,415 |
| POTOH1_MD | VA | Middle Potomac River, MD Mainstem | 1,033 | 1,722 | 2,755 | 3,077 |
| POTOH1_MD |  | Middle Potomac River, MD Mainstem | 1,624 | 5,325 | 6,950 | 7,492 |
| POTOH2_MD | MD | Middle Potomac River, MD Nangemoy Creek | 4,809 | 5,234 | 10,043 | 11,413 |
| POTOH3_MD | MD | Middle Potomac River, MD Port Tobacco River | 1,116 | 8,243 | 9,358 | 9,972 |
| POTOH_VA | VA | Middle Potomac River, VA | 14,012 | 23,931 | 37,943 | 38,482 |
| POTMH_MD | MD | Lower Potomac River, MD | 22,450 | 88,603 | 111,053 | 125,786 |
| POTMH_MD | MD | Lower Potomac River, MD | 29 | 5,270 | 5,300 | 7,079 |
| POTMH_MD |  | Lower Potomac River, MD | 22,479 | 93,873 | 116,352 | 132,864 |
| POTMH_VA | VA | Lower Potomac River, VA | 14,146 | 84,514 | 98,660 | 135,581 |
| RPPTF | VA | Upper Rappahannock River | 99,695 | 630,035 | 729,730 | 875,321 |
| RPPOH | VA | Middle Rappahannock River | 51 | 19,923 | 19,974 | 23,141 |
| RPPMH | VA | Lower Rappahannock River | 7,522 | 94,953 | 102,475 | 130,960 |
| CRRMH | VA | Corrotoman River | 2,406 | 11,569 | 13,975 | 16,049 |
| MPNTF | VA | Upper Mattaponi River | 12,270 | 72,110 | 84,380 | 102,834 |
| MPNOH | VA | Lower Mattaponi River | 787 | 11,291 | 12,078 | 15,988 |
| PMKTF | VA | Upper Pamunkey River | 35,785 | 133,955 | 169,740 | 201,331 |
| PMKOH | VA | Lower Pamunkey River | 59,373 | 5,525 | 64,898 | 61,342 |
| PIAMH | VA | Piankatank River | 5,207 | 38,034 | 43,241 | 49,451 |
| YRKMH | VA | Middle York River | 2,736 | 28,149 | 30,885 | 39,514 |

Chesapeake Bay TMDL

**Table 9-2. Chesapeake Bay TMDL total phosphorus (TP) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TP WLA (lbs/yr) | TP Land Based LA (lbs/yr) | TP TMDL (lbs/yr) | TP 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| YRKPH | VA | Lower York River | 7,994 | 7,734 | 15,727 | 16,751 |
| MOBPH | VA | Mobjack Bay | 85,291 | 27,892 | 113,183 | 127,487 |
| JMSTF2 | WV | Upper James River  Upper | 107 | 9,645 | 9,752 | 13,917 |
| JMSTF2 | VA | Upper James River  Upper | 496,605 | 999,919 | 1,496,524 | 1,973,287 |
| JMSTF2 | | Upper James River  Upper | 496,712 | 1,009,564 | 1,506,276 | 1,987,204 |
| JMSTF1 | VA | Upper James River  Lower | 103,556 | 46,904 | 150,460 | 131,562 |
| APPTF | VA | Appomattox River | 46,961 | 130,326 | 177,287 | 241,572 |
| CHKOH | VA | Chickahominy River | 19,822 | 47,781 | 67,603 | 79,799 |
| JMSOH | VA | Middle James River | 19,360 | 19,766 | 39,125 | 74,626 |
| JMSMH | VA | Lower James River | 70,805 | 70,647 | 141,451 | 187,692 |
| JMSPH | VA | Mouth of James River | 82,383 | 330 | 82,712 | 194,769 |
| ELIPH | VA | Mouth to mid Elizabeth River | 23,109 | 579 | 23,689 | 63,685 |
| WBEMH | VA | Western Branch Elizabeth River | 20,931 | 2,153 | 23,083 | 25,012 |
| SBEMH | VA | Southern Branch Elizabeth River | 44,856 | 5,994 | 50,850 | 68,406 |
| EBEMH | VA | Eastern Branch Elizabeth River | 32,418 | 637 | 33,055 | 45,115 |
| LAFMH | VA | Lafayette River | 11,703 | 128 | 11,831 | 13,403 |
| LYNPH | VA | Lynnhaven River | 43,629 | 1,816 | 45,445 | 123,014 |
| NORTF | PA | Northeast River | 141 | 1,439 | 1,580 | 2,214 |
| NORTF | MD | Northeast River | 5,334 | 6,600 | 11,934 | 13,211 |
| NORTF | | Northeast River | 5,475 | 8,039 | 13,515 | 15,425 |
| ELKOH | PA | Elk River | 4,606 | 7,752 | 12,357 | 17,281 |
| ELKOH | DE | Elk River | 317 | 441 | 758 | 911 |
| ELKOH | MD | Elk River | 9,506 | 15,600 | 25,106 | 30,123 |
| ELKOH | | Elk River | 14,428 | 23,793 | 38,221 | 48,315 |
| C&DOH_DE | DE | C&D Canal, DE | 897 | 1,855 | 2,752 | 3,379 |
| C&DOH_DE | MD | C&D Canal, DE | 0 | 13 | 13 | 37 |
| C&DOH_DE | | C&D Canal, DE | 897 | 1,867 | 2,765 | 3,415 |
| C&DOH_MD | DE | C&D Canal, MD | 2,323 | 3,601 | 5,924 | 7,212 |
| C&DOH_MD | MD | C&D Canal, MD | 1,742 | 3,413 | 5,155 | 6,496 |
| C&DOH_MD | | C&D Canal, MD | 4,065 | 7,013 | 11,079 | 13,708 |

**Table 9-2. Chesapeake Bay TMDL total phosphorus (TP) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TP WLA (lbs/yr) | TP Land Based LA (lbs/yr) | TP TMDL (lbs/yr) | TP 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| BOHOH | DE | Bohemia River | 807 | 4,134 | 4,941 | 6,017 |
| BOHOH | MD | Bohemia River | 735 | 13,191 | 13,927 | 20,230 |
| BOHOH | | Bohemia River | 1,543 | 17,326 | 18,868 | 26,246 |
| SASOH | DE | Sassafras River | 42 | 3,629 | 3,671 | 4,469 |
| SASOH | MD | Sassafras River | 1,675 | 28,505 | 30,180 | 36,981 |
| SASOH | | Sassafras River | 1,716 | 32,134 | 33,851 | 41,450 |
| CHSTF | DE | Upper Chester River | 304 | 12,791 | 13,095 | 16,298 |
| CHSTF | MD | Upper Chester River | 1,467 | 45,823 | 47,290 | 52,108 |
| CHSTF | | Upper Chester River | 1,771 | 58,614 | 60,385 | 68,407 |
| CHSOH | MD | Middle Chester River | 4,798 | 54,074 | 58,872 | 67,837 |
| CHSMH | MD | Lower Chester River | 5,961 | 44,742 | 50,703 | 52,278 |
| EASMH | MD | Eastern Bay | 2,630 | 61,927 | 64,557 | 71,988 |
| CHOTF | DE | Upper Choptank River | 1,101 | 31,531 | 32,631 | 41,664 |
| CHOTF | MD | Upper Choptank River | 5,779 | 116,838 | 122,617 | 147,321 |
| CHOTF | | Upper Choptank River | 6,880 | 148,368 | 155,248 | 188,985 |
| CHOOH | MD | Middle Choptank River | 5,145 | 55,704 | 60,850 | 63,666 |
| CHOMH2 | MD | Mouth of Choptank River | 9,873 | 28,001 | 37,874 | 41,658 |
| CHOMH1 | MD | Lower Choptank River | 1,683 | 33,233 | 34,915 | 40,931 |
| LCHMH | MD | Little Choptank River | 229 | 19,780 | 20,008 | 22,960 |
| HNGMH | MD | Honga River | 75 | 4,314 | 4,389 | 6,603 |
| FSBMH | MD | Fishing Bay | 1,440 | 67,261 | 68,701 | 78,173 |
| NANTF_DE | DE | Upper Nanticoke, DE | 25,589 | 128,715 | 154,304 | 181,200 |
| NANTF_DE | MD | Upper Nanticoke, DE | 48 | 1,752 | 1,800 | 2,901 |
| NANTF_DE | | Upper Nanticoke, DE | 25,637 | 130,467 | 156,104 | 184,100 |
| NANTF_MD | DE | Upper Nanticoke, MD | 0 | 18 | 18 | 22 |
| NANTF_MD | MD | Upper Nanticoke, MD | 1,147 | 6,057 | 7,204 | 7,011 |
| NANTF_MD | | Upper Nanticoke, MD | 1,147 | 6,076 | 7,223 | 7,033 |
| NANOH | DE | Middle Nanticoke River | 983 | 33,399 | 34,382 | 42,964 |
| NANOH | MD | Middle Nanticoke River | 7,398 | 67,078 | 74,475 | 84,307 |
| NANOH | | Middle Nanticoke River | 8,381 | 100,477 | 108,858 | 127,271 |

**Table 9-2. Chesapeake Bay TMDL total phosphorus (TP) annual allocations[a] (pounds per year) by Chesapeake Bay segment[b] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TP WLA (lbs/yr) | TP Land Based LA (lbs/yr) | TP TMDL (lbs/yr) | TP 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| NANMH | MD | Lower Nanticoke River | 238 | 9,550 | 9,788 | 11,165 |
| WICMH | DE | Wicomico River | 295 | 496 | 792 | 969 |
| WICMH | MD | Wicomico River | 13,499 | 45,386 | 58,884 | 85,428 |
| WICMH | | Wicomico River | 13,794 | 45,882 | 59,676 | 86,397 |
| MANMH | MD | Manokin River | 6,225 | 22,502 | 28,727 | 25,686 |
| BIGMH | MD | Big Annemessex River | 405 | 7,462 | 7,867 | 8,318 |
| POCTF | DE | Upper Pocomoke River | 326 | 8,212 | 8,538 | 10,255 |
| POCTF | MD | Upper Pocomoke River | 4,437 | 84,571 | 89,007 | 95,447 |
| POCTF | | Upper Pocomoke River | 4,763 | 92,783 | 97,546 | 105,702 |
| POCOH_MD | MD | Middle Pocomoke River, MD | 991 | 6,981 | 7,972 | 8,174 |
| POCOH_VA | MD | Middle Pocomoke River, VA | 234 | 7,255 | 7,490 | 7,781 |
| POCOH_VA | VA | Middle Pocomoke River, VA | 547 | 14,959 | 15,506 | 20,922 |
| POCOH_VA | | Middle Pocomoke River, VA | 782 | 22,214 | 22,996 | 28,703 |
| POCMH_MD | MD | Lower Pocomoke River, MD | 194 | 10,453 | 10,646 | 11,173 |
| POCMH_VA | VA | Lower Pocomoke River, VA | 2,587 | 21,905 | 24,493 | 31,873 |
| TANMH_MD | MD | Tangier Sound, MD | 1,353 | 6,051 | 7,405 | 8,275 |
| TANMH_VA | VA | Tangier Sound, VA | 0 | 492 | 492 | 527 |
| CB2OH | MD | Upper Chesapeake Bay | 3,063 | 25,092 | 28,155 | 34,772 |
| CB3MH | MD | Upper Central Chesapeake Bay | 9,263 | 6,948 | 16,211 | 23,949 |
| CB4MH | MD | Middle Central Chesapeake Bay | 7,487 | 14,191 | 21,678 | 35,651 |
| CB5MH_MD | MD | Lower Central Chesapeake Bay, MD | 5,766 | 6,977 | 12,744 | 28,818 |
| CB5MH_VA | VA | Lower Central Chesapeake Bay, VA | 6,100 | 29,609 | 35,710 | 45,025 |
| CB6PH | VA | Western Lower Chesapeake Bay | 7 | 2,277 | 2,284 | 2,773 |
| CB7PH | VA | Eastern Lower Chesapeake Bay | 5,565 | 96,646 | 102,211 | 140,064 |
| CB8PH | VA | Mouth of Chesapeake Bay | 23,848 | 1,161 | 25,009 | 30,461 |
| All | All | All | 4,512,260 | 8,030,114 | 12,542,374 | 16,462,955 |

a. MOS is implicit for phosphorus (see Section 6.2.4)
b. Each of the 92 segments is displayed as white rows while contributing portions of some of the 92 segments are displayed as gray rows.
Note: Any differences between this table and Table 8-5 are due to rounding.

**Table 9-3. Chesapeake Bay TMDL sediment (TSS)[a] annual allocations[b] (pounds per year) by Chesapeake Bay segment[c] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TSS WLA (lbs/yr) | TSS LA (lbs/yr) | TSS TMDL (lbs/yr) | TSS 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| CB1TF | NY | Northern Chesapeake Bay | 42,014,121 | 250,946,605 | 292,960,727 | 337,266,496 |
| CB1TF | PA | Northern Chesapeake Bay | 152,686,225 | 1,588,480,781 | 1,741,167,006 | 2,286,387,566 |
| CB1TF | MD | Northern Chesapeake Bay | 5,949,689 | 64,361,278 | 70,310,967 | 81,125,570 |
| CB1TF | | Northern Chesapeake Bay | 200,650,035 | 1,903,788,665 | 2,104,438,699 | 2,704,779,632 |
| BSHOH | MD | Bush River | 13,196,649 | 15,973,700 | 29,170,349 | 35,527,626 |
| GUNOH | PA | Gunpowder River | 3,892 | 368,273 | 372,165 | 765,816 |
| GUNOH | MD | Gunpowder River | 9,239,345 | 38,001,024 | 47,240,369 | 58,189,414 |
| GUNOH | | Gunpowder River | 9,243,237 | 38,369,297 | 47,612,534 | 58,955,230 |
| MIDOH | MD | Middle River | 509,743 | 236,484 | 746,227 | 1,576,785 |
| BACOH | MD | Back River | 15,955,266 | 410,195 | 16,365,461 | 9,421,900 |
| PATMH | MD | Patapsco River | 56,849,993 | 31,375,105 | 88,225,098 | 113,667,512 |
| MAGMH | MD | Magothy River | 901,450 | 535,226 | 1,436,676 | 2,101,536 |
| SEVMH | MD | Severn River | 2,991,739 | 935,655 | 3,927,394 | 3,716,445 |
| SOUMH | MD | South River | 1,090,181 | 1,071,766 | 2,161,947 | 3,022,869 |
| RHDMH | MD | Rhode River | 172,442 | 474,811 | 647,253 | 739,818 |
| WSTMH | MD | West River | 118,448 | 634,597 | 753,044 | 998,390 |
| WBRTF | MD | Western Branch Patuxent River | 9,492,711 | 10,104,173 | 19,596,885 | 23,382,999 |
| PAXTF | MD | Upper Patuxent River | 27,928,151 | 40,733,517 | 68,661,668 | 67,673,319 |
| PAXOH | MD | Middle Patuxent River | 501,122 | 7,721,654 | 8,222,777 | 10,784,126 |
| PAXMH | MD | Lower Patuxent River | 853,761 | 8,070,930 | 8,924,690 | 12,133,210 |
| ANATF_MD | MD | Anacostia River, MD | 47,005,706 | 22,921,343 | 69,927,049 | 111,245,825 |
| ANATF_MD | DC | Anacostia River, MD | 317,718 | 21,960 | 339,678 | 609,892 |
| ANATF_MD | | Anacostia River, MD | 47,323,423 | 22,943,303 | 70,266,727 | 111,855,717 |
| ANATF_DC | MD | Anacostia River, DC | 790,954 | 90,167 | 881,121 | 1,620,633 |
| ANATF_DC | DC | Anacostia River, DC | 1,616,149 | 511,485 | 2,127,634 | 4,743,620 |
| ANATF_DC | | Anacostia River, DC | 2,407,104 | 601,651 | 3,008,755 | 6,364,253 |
| POTTF_MD | PA | Upper Potomac River, MD | 7,119,122 | 213,989,662 | 221,108,783 | 309,605,976 |
| POTTF_MD | MD | Upper Potomac River, MD | 65,621,675 | 430,700,804 | 496,322,479 | 549,338,715 |
| POTTF_MD | DC | Upper Potomac River, MD | 446,556 | 47,439 | 493,995 | 18,182,239 |
| POTTF_MD | VA | Upper Potomac River, MD | 52,111,881 | 645,079,928 | 697,191,809 | 955,858,637 |

Table 9-3. Chesapeake Bay TMDL sediment (TSS)[a] annual allocations[b] (pounds per year) by Chesapeake Bay segment[c] to attain Chesapeake Bay WQS

| Segment ID | Jurisdiction | CB 303(d) Segment | TSS WLA (lbs/yr) | TSS LA (lbs/yr) | TSS TMDL (lbs/yr) | TSS 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| POTTF_MD | WV | Upper Potomac River, MD | 4,251,816 | 289,983,789 | 294,235,605 | 349,862,416 |
| POTTF_MD | | Upper Potomac River, MD | 129,551,049 | 1,579,801,621 | 1,709,352,671 | 2,182,847,983 |
| POTTF_DC | MD | Upper Potomac River, DC | 26,116,504 | 6,077,446 | 32,193,949 | 25,474,106 |
| POTTF_DC | DC | Upper Potomac River, DC | 6,290,046 | 1,906,768 | 8,196,814 | 8,467,385 |
| POTTF_DC | VA | Upper Potomac River, DC | 7,990,096 | 348,443 | 8,338,540 | 6,385,015 |
| POTTF_DC | | Upper Potomac River, DC | 40,396,647 | 8,332,657 | 48,729,304 | 40,326,507 |
| POTTF_VA | VA | Upper Potomac River, VA | 73,817,620 | 23,707,878 | 97,525,497 | 101,055,750 |
| PISTF | MD | Piscataway Creek | 4,420,894 | 3,164,315 | 7,585,209 | 6,198,882 |
| MATTF | MD | Mattawoman Creek | 2,164,085 | 3,781,157 | 5,945,242 | 6,897,769 |
| POTOH1_MD | MD | Middle Potomac River, MD Mainstem | 141,182 | 1,503,199 | 1,644,382 | 1,928,927 |
| POTOH1_MD | VA | Middle Potomac River, MD Mainstem | 126,225 | 192,470 | 318,695 | 374,540 |
| POTOH1_MD | | Middle Potomac River, MD Mainstem | 267,408 | 1,695,669 | 1,963,077 | 2,303,467 |
| POTOH2_MD | MD | Middle Potomac River, MD Nangemoy Creek | 517,854 | 1,777,500 | 2,295,354 | 2,662,195 |
| POTOH3_MD | MD | Middle Potomac River, MD Port Tobacco River | 173,198 | 2,851,267 | 3,024,465 | 3,509,912 |
| POTOH_VA | VA | Middle Potomac River, VA | 6,193,677 | 7,882,449 | 14,076,126 | 17,280,595 |
| POTMH_MD | MD | Lower Potomac River, MD | 7,436,553 | 53,034,527 | 60,471,080 | 72,595,650 |
| POTMH_MD | VA | Lower Potomac River, MD | 9,492 | 490,435 | 499,928 | 682,793 |
| POTMH_MD | | Lower Potomac River, MD | 7,446,045 | 53,524,962 | 60,971,007 | 73,278,444 |
| POTMH_VA | VA | Lower Potomac River, VA | 604,405 | 6,899,027 | 7,503,432 | 10,266,702 |
| RPPTF | VA | Upper Rappahannock River | 21,344,146 | 624,671,576 | 646,015,721 | 709,235,879 |
| RPPOH | VA | Middle Rappahannock River | 7,877 | 9,936,097 | 9,943,973 | 1,225,958 |
| RPPMH | VA | Lower Rappahannock River | 904,914 | 37,705,787 | 38,610,700 | 38,050,038 |
| CRRMH | VA | Corrotoman River | 32,486 | 1,064,500 | 1,096,986 | 1,275,873 |
| MPNTF | VA | Upper Mattaponi River | 1,092,098 | 13,603,734 | 14,695,833 | 22,576,525 |
| MPNOH | VA | Lower Mattaponi River | 59,447 | 1,105,563 | 1,165,010 | 1,604,258 |
| PMKTF | VA | Upper Pamunkey River | 6,026,107 | 47,032,619 | 53,058,726 | 84,819,341 |
| PMKOH | VA | Lower Pamunkey River | 13,086,736 | 674,771 | 13,761,507 | 1,518,896 |
| PIAMH | VA | Piankatank River | 803,391 | 9,372,914 | 10,176,305 | 13,746,640 |
| YRKMH | VA | Middle York River | 290,754 | 10,716,330 | 11,007,084 | 4,087,532 |
| YRKPH | VA | Lower York River | 514,729 | 968,271 | 1,483,000 | 2,101,402 |

**Table 9-3. Chesapeake Bay TMDL sediment (TSS)[a] annual allocations[b] (pounds per year) by Chesapeake Bay segment[c] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TSS WLA (lbs/yr) | TSS LA (lbs/yr) | TSS TMDL (lbs/yr) | TSS 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| MOBPH | VA | Mobjack Bay | 8,727,001 | 3,433,596 | 12,160,596 | 14,112,361 |
| JMSTF2 | WV | Upper James River  Upper | 35,199 | 16,609,948 | 16,645,148 | 28,519,899 |
| JMSTF2 | VA | Upper James River  Upper | 67,286,234 | 612,850,612 | 680,136,846 | 1,059,920,428 |
| JMSTF2 | | Upper James River  Upper | 67,321,434 | 629,460,560 | 696,781,994 | 1,088,440,327 |
| JMSTF1 | VA | Upper James River  Lower | 15,607,897 | 24,690,254 | 40,298,151 | 9,015,473 |
| APPTF | VA | Appomattox River | 26,032,004 | 62,293,157 | 88,325,161 | 106,140,533 |
| CHKOH | VA | Chickahominy River | 939,747 | 18,584,599 | 19,524,346 | 4,841,974 |
| JMSOH | VA | Middle James River | 2,999,553 | 20,449,110 | 23,448,664 | 6,690,974 |
| JMSMH | VA | Lower James River | 7,332,882 | 27,529,658 | 34,862,540 | 25,514,847 |
| JMSPH | VA | Mouth of James River | 11,502,783 | 34,350 | 11,537,133 | 6,505,447 |
| ELIPH | VA | Mouth to mid Elizabeth River | 4,694,148 | 52,510 | 4,746,658 | 3,056,281 |
| WBEMH | VA | Western Branch Elizabeth River | 2,006,272 | 147,738 | 2,154,010 | 2,636,798 |
| SBEMH | VA | Southern Branch Elizabeth River | 3,556,563 | 375,463 | 3,932,026 | 4,741,119 |
| EBEMH | VA | Eastern Branch Elizabeth River | 3,356,476 | 24,188 | 3,380,664 | 4,406,458 |
| LAFMH | VA | Lafayette River | 1,977,709 | 12,922 | 1,990,631 | 2,336,093 |
| LYNPH | VA | Lynnhaven River | 7,233,702 | 174,719 | 7,408,420 | 7,882,520 |
| NORTF | PA | Northeast River | 52,337 | 2,078,118 | 2,130,456 | 3,258,381 |
| NORTF | MD | Northeast River | 3,822,591 | 10,695,417 | 14,518,008 | 16,472,012 |
| NORTF | | Northeast River | 3,874,928 | 12,773,535 | 16,648,463 | 19,730,393 |
| ELKOH | PA | Elk River | 950,124 | 18,055,981 | 19,006,105 | 28,398,346 |
| ELKOH | DE | Elk River | 31,854 | 64,385 | 96,239 | 106,497 |
| ELKOH | MD | Elk River | 1,639,790 | 7,052,756 | 8,692,546 | 9,998,038 |
| ELKOH | | Elk River | 2,621,768 | 25,173,121 | 27,794,890 | 38,502,881 |
| C&DOH_DE | DE | C&D Canal, DE | 140,066 | 414,748 | 554,814 | 626,615 |
| C&DOH_DE | MD | C&D Canal, DE | 14 | 4,012 | 4,026 | 4,677 |
| C&DOH_DE | | C&D Canal, DE | 140,079 | 418,760 | 558,840 | 631,292 |
| C&DOH_MD | DE | C&D Canal, MD | 336,975 | 825,087 | 1,162,062 | 1,291,350 |
| C&DOH_MD | MD | C&D Canal, MD | 107,601 | 969,513 | 1,077,114 | 1,258,787 |
| C&DOH_MD | | C&D Canal, MD | 444,576 | 1,794,600 | 2,239,176 | 2,550,137 |
| BOHOH | DE | Bohemia River | 65,521 | 514,661 | 580,182 | 624,140 |

**Table 9-3. Chesapeake Bay TMDL sediment (TSS)[a] annual allocations[b] (pounds per year) by Chesapeake Bay segment[c] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TSS WLA (lbs/yr) | TSS LA (lbs/yr) | TSS TMDL (lbs/yr) | TSS 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| BOHOH | MD | Bohemia River | 64,402 | 3,167,619 | 3,232,020 | 3,777,673 |
| BOHOH | | Bohemia River | 129,923 | 3,682,279 | 3,812,203 | 4,401,813 |
| SASOH | DE | Sassafras River | 5,525 | 642,671 | 648,196 | 684,780 |
| SASOH | MD | Sassafras River | 286,930 | 8,289,784 | 8,576,714 | 10,011,983 |
| SASOH | | Sassafras River | 292,455 | 8,932,455 | 9,224,910 | 10,696,763 |
| CHSTF | DE | Upper Chester River | 93,984 | 2,860,897 | 2,954,881 | 3,357,254 |
| CHSTF | MD | Upper Chester River | 137,542 | 12,094,797 | 12,232,339 | 13,409,995 |
| CHSTF | | Upper Chester River | 231,526 | 14,955,694 | 15,187,220 | 16,767,249 |
| CHSOH | MD | Middle Chester River | 298,598 | 9,332,711 | 9,631,310 | 10,775,054 |
| CHSMH | MD | Lower Chester River | 528,519 | 12,292,064 | 12,820,583 | 14,312,931 |
| EASMH | MD | Eastern Bay | 576,343 | 9,815,207 | 10,391,551 | 11,324,723 |
| CHOTF | DE | Upper Choptank River | 361,498 | 6,182,065 | 6,543,563 | 7,462,694 |
| CHOTF | MD | Upper Choptank River | 1,261,836 | 17,937,463 | 19,199,299 | 20,356,821 |
| CHOTF | | Upper Choptank River | 1,623,334 | 24,119,528 | 25,742,862 | 27,819,515 |
| CHOOH | MD | Middle Choptank River | 558,079 | 4,015,407 | 4,573,486 | 4,510,268 |
| CHOMH2 | MD | Mouth of Choptank River | 966,759 | 2,978,930 | 3,945,688 | 3,789,712 |
| CHOMH1 | MD | Lower Choptank River | 386,256 | 4,567,610 | 4,953,867 | 5,815,588 |
| LCHMH | MD | Little Choptank River | 98,483 | 3,097,933 | 3,196,416 | 3,487,049 |
| HNGMH | MD | Honga River | 10,644 | 531,405 | 542,049 | 646,232 |
| FSBMH | MD | Fishing Bay | 81,663 | 4,576,273 | 4,657,936 | 5,111,822 |
| NANTF_DE | DE | Upper Nanticoke, DE | 10,827,397 | 27,256,751 | 38,084,149 | 42,177,643 |
| NANTF_DE | MD | Upper Nanticoke, DE | 5,894 | 104,157 | 110,051 | 128,452 |
| NANTF_DE | | Upper Nanticoke, DE | 10,833,291 | 27,360,908 | 38,194,199 | 42,306,095 |
| NANTF_MD | DE | Upper Nanticoke, MD | 0 | 680 | 680 | 721 |
| NANTF_MD | MD | Upper Nanticoke, MD | 28,289 | 495,823 | 524,111 | 557,353 |
| NANTF_MD | | Upper Nanticoke, MD | 28,289 | 496,502 | 524,791 | 558,073 |
| NANOH | DE | Middle Nanticoke River | 361,062 | 6,223,525 | 6,584,587 | 7,739,104 |
| NANOH | MD | Middle Nanticoke River | 817,307 | 6,910,025 | 7,727,332 | 8,184,073 |
| NANOH | | Middle Nanticoke River | 1,178,369 | 13,133,549 | 14,311,918 | 15,923,178 |
| NANMH | MD | Lower Nanticoke River | 40,737 | 743,265 | 784,002 | 827,854 |

**Table 9-3. Chesapeake Bay TMDL sediment (TSS)[a] annual allocations[b] (pounds per year) by Chesapeake Bay segment[c] to attain Chesapeake Bay WQS**

| Segment ID | Jurisdiction | CB 303(d) Segment | TSS WLA (lbs/yr) | TSS LA (lbs/yr) | TSS TMDL (lbs/yr) | TSS 2009 Existing (lbs/yr) |
|---|---|---|---|---|---|---|
| WICMH | DE | Wicomico River | 104,196 | 39,998 | 144,195 | 174,874 |
| WICMH | MD | Wicomico River | 1,664,605 | 4,687,746 | 6,352,351 | 7,198,430 |
| WICMH | | Wicomico River | 1,768,802 | 4,727,744 | 6,496,545 | 7,373,305 |
| MANMH | MD | Manokin River | 333,932 | 1,216,362 | 1,550,294 | 1,492,064 |
| BIGMH | MD | Big Annemessex River | 28,574 | 602,203 | 630,777 | 666,385 |
| POCTF | DE | Upper Pocomoke River | 62,520 | 406,956 | 469,476 | 532,895 |
| POCTF | MD | Upper Pocomoke River | 481,873 | 10,323,430 | 10,805,303 | 11,359,483 |
| POCTF | | Upper Pocomoke River | 544,393 | 10,730,387 | 11,274,779 | 11,892,378 |
| POCOH_MD | MD | Middle Pocomoke River, MD | 196,894 | 588,961 | 785,855 | 797,483 |
| POCOH_VA | MD | Middle Pocomoke River, VA | 46,287 | 636,117 | 682,405 | 718,647 |
| POCOH_VA | VA | Middle Pocomoke River, VA | 12,493 | 653,177 | 665,670 | 977,918 |
| POCOH_VA | | Middle Pocomoke River, VA | 58,780 | 1,289,295 | 1,348,075 | 1,696,564 |
| POCMH_MD | MD | Lower Pocomoke River, MD | 55,660 | 1,264,202 | 1,319,862 | 1,370,010 |
| POCMH_VA | VA | Lower Pocomoke River, VA | 65,386 | 1,102,827 | 1,168,213 | 1,610,806 |
| TANMH_MD | MD | Tangier Sound, MD | 189,923 | 415,636 | 605,560 | 679,354 |
| TANMH_VA | VA | Tangier Sound, VA | 18 | 416,465 | 416,483 | 19,960 |
| CB2OH | MD | Upper Chesapeake Bay | 383,801 | 7,474,139 | 7,857,940 | 9,344,169 |
| CB3MH | MD | Upper Central Chesapeake Bay | 1,022,587 | 1,957,395 | 2,979,982 | 2,646,201 |
| CB4MH | MD | Middle Central Chesapeake Bay | 1,058,853 | 3,258,291 | 4,317,144 | 5,413,881 |
| CB5MH_MD | MD | Lower Central Chesapeake Bay, MD | 631,522 | 1,513,513 | 2,145,035 | 2,042,464 |
| CB5MH_VA | VA | Lower Central Chesapeake Bay, VA | 446,801 | 3,626,293 | 4,073,093 | 5,353,666 |
| CB6PH | VA | Western Lower Chesapeake Bay | 453 | 294,130 | 294,582 | 387,639 |
| CB7PH | VA | Eastern Lower Chesapeake Bay | 518,824 | 8,538,667 | 9,057,491 | 13,772,993 |
| CB8PH | VA | Mouth of Chesapeake Bay | 2,787,517 | 64,200 | 2,851,717 | 3,580,118 |
| All | All | All | 898,226,531 | 5,555,386,665 | 6,453,613,196 | 8,090,521,521 |

a. Upon review and after consideration of public comments, EPA has determined that Total Suspended Solids (TSS) is a more appropriate expression of the sediment load than Total Sediment (TSED), which was used in the draft TMDL. As a result, the allocation tables in the draft TMDL that were expressed as TSED have been changed such that they now are expressed as TSS.
b. MOS is implicit and explicit for TSS (see Section 6.5.4)
c. Each of the 92 segments is displayed as white rows while contributing portions of some of the 92 segments are displayed as gray rows.
Note: Any differences between this table and Table 8-5 are due to rounding.

Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| BLUE PLAINS | DC0021199 | DC** | POTTF_DC | 4,689,000 | 203,854 | 8,198,328 |
| INVISTA (DUPONT-SEAFORD) | DE0000035 | DE | NANTF_DE | 171,818 | 0 | 749,208 |
| LAUREL | DE0020125 | DE | NANTF_DE | 8,528 | 2,132 | 31,978 |
| BRIDGEVILLE | DE0020249 | DE | NANTF_DE | 9,746 | 2,436 | 36,547 |
| SEAFORD | DE0020265 | DE | NANTF_DE | 24,364 | 6,091 | 48,729 |
| COX CREEK | MD_COXCRK | MD | PATMH | 231,101 | 3,614 | 193,606 |
| HART MILLER | MD_HARTMI | MD | MIDOH | 0 | 0 | 0 |
| MASONVILLE DMCF | MD_MASNV | MD | PATMH | 231,101 | 3,614 | 193,606 |
| W R GRACE | MD0000311 | MD | PATMH | 310,721 | 1,782 | 334,037 |
| MD & VA MILK PRODUCERS | MD0000469 | MD | PAXTF | 5,431 | 543 | 42,150 |
| ISG SPARROWS POINT (BETHLEHEM STEEL CORP) | MD0001201 | MD | PATMH | 131,420 | 25,400 | 85,863 |
| CONGOLEUM | MD0001384 | MD | PATMH | 4,005 | 160 | 19,324 |
| NEWPAGE | MD0001422 | MD | POTTF_MD | 12,733 | 597 | 124,473 |
| ERACHEM | MD0001775 | MD | PATMH | 13,809 | 58 | 8,352 |
| NSWC-INDIAN HEAD | MD0003158 | MD | MATTF | 1,777 | 727 | 41,937 |
| WINEBRENNER WWTP | MD0003221 | MD | POTTF_MD | 12,182 | 914 | 91,367 |
| CRISFIELD | MD0020001 | MD | TANMH_MD | 12,182 | 914 | 91,367 |
| CHESTERTOWN | MD0020010 | MD | CHSMH | 18,273 | 1,371 | 137,050 |
| INDIAN HEAD | MD0020052 | MD | MATTF | 6,091 | 457 | 45,683 |
| BOONSBORO | MD0020231 | MD | POTTF_MD | 6,100 | 484 | 48,424 |
| FEDERALSBURG | MD0020249 | MD | NANOH | 9,137 | 685 | 68,525 |
| EMMITSBURG | MD0020257 | MD | POTTF_MD | 9,137 | 685 | 68,525 |
| EASTON | MD0020273 | MD | CHOOH | 48,729 | 3,655 | 365,467 |
| CHESAPEAKE BEACH | MD0020281 | MD | CB4MH | 18,273 | 1,371 | 137,050 |
| DENTON | MD0020494 | MD | CHOTF | 9,746 | 731 | 73,093 |
| LA PLATA | MD0020524 | MD | POTOH2_MD | 18,273 | 1,371 | 137,050 |
| DELMAR | MD0020532 | MD | WICMH | 10,355 | 777 | 77,662 |
| PERRYVILLE | MD0020613 | MD | CB1TF | 20,101 | 1,508 | 150,755 |
| PRINCESS ANNE | MD0020656 | MD | MANMH | 11,512 | 1,151 | 115,122 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| TANEYTOWN | MD0020672 | MD | POTTF_MD | 13,400 | 1,005 | 100,503 |
| ELKTON | MD0020681 | MD | ELKOH | 37,156 | 2,787 | 278,669 |
| CENTREVILLE | MD0020834 | MD | CHSMH | 6,091 | 457 | 45,683 |
| BELTSVILLE USDA EAST | MD0020842 | MD | ANATF_MD | 7,553 | 566 | 56,647 |
| FORT DETRICK | MD0020877 | MD | POTTF_MD | 24,364 | 1,827 | 182,734 |
| NSWC-INDIAN HEAD | MD0020885 | MD | POTTF_MD | 6,091 | 457 | 45,683 |
| BRUNSWICK | MD0020958 | MD | POTTF_MD | 17,055 | 1,279 | 127,914 |
| DAMASCUS | MD0020982 | MD | POTTF_MD | 18,273 | 1,371 | 137,050 |
| THURMONT | MD0021121 | MD | POTTF_MD | 12,182 | 914 | 91,367 |
| ABERDEEN PROVING GROUNDS-EDGEWOOD | MD0021229 | MD | BSHOH | 36,547 | 2,741 | 274,100 |
| ABERDEEN PROVING GROUNDS-ABERDEEN | MD0021237 | MD | CB1TF | 34,110 | 2,558 | 255,827 |
| SENECA CREEK | MD0021491 | MD | POTTF_MD | 316,738 | 21,380 | 2,375,537 |
| FREEDOM DISTRICT | MD0021512 | MD | PATMH | 42,638 | 3,198 | 319,784 |
| PISCATAWAY | MD0021539 | MD | PISTF | 365,467 | 16,446 | 2,741,004 |
| BACK RIVER* | MD0021555 | MD | BACOH | 1,583,691 | 79,185 | 11,877,684 |
| BACK RIVER* | MD0021555 | MD | PATMH | 609,112 | 30,456 | 4,568,340 |
| ABERDEEN | MD0021563 | MD | CB1TF | 48,729 | 3,655 | 365,467 |
| SALISBURY | MD0021571 | MD | WICMH | 103,549 | 7,766 | 776,618 |
| CUMBERLAND | MD0021598 | MD | POTTF_MD | 182,734 | 13,705 | 1,370,502 |
| PATAPSCO | MD0021601 | MD | PATMH | 889,304 | 66,698 | 6,669,776 |
| FREDERICK | MD0021610 | MD | POTTF_MD | 97,458 | 7,309 | 730,934 |
| BOWIE | MD0021628 | MD | PAXTF | 40,201 | 3,015 | 301,510 |
| CAMBRIDGE | MD0021636 | MD | CHOMH2 | 98,676 | 7,401 | 740,071 |
| BROADNECK | MD0021644 | MD | CB3MH | 73,093 | 5,482 | 548,201 |
| PATUXENT | MD0021652 | MD | PAXTF | 91,367 | 6,853 | 685,251 |
| COX CREEK | MD0021661 | MD | PATMH | 182,734 | 13,705 | 1,370,502 |
| MARLAY TAYLOR (PINE HILL RUN) | MD0021679 | MD | CB5MH_MD | 73,093 | 5,482 | 548,201 |
| UPPER POTOMAC RIVER COMMISSION | MD0021687 | MD | POTTF_MD | 79,109 | 30,401 | 1,982,660 |
| FORT MEADE | MD0021717 | MD | PAXTF | 54,820 | 4,112 | 411,151 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| PARKWAY | MD0021725 | MD | PAXTF | 91,367 | 6,853 | 685,251 |
| WESTERN BRANCH | MD0021741 | MD | PAXTF | 372,777 | 27,958 | 2,795,824 |
| HAVRE DE GRACE | MD0021750 | MD | CB1TF | 27,715 | 2,079 | 207,859 |
| HAGERSTOWN | MD0021776 | MD | POTTF_MD | 97,458 | 7,309 | 730,934 |
| ANNAPOLIS | MD0021814 | MD | SEVMH | 158,369 | 11,878 | 1,187,768 |
| BALLENGER CREEK | MD0021822 | MD | POTTF_MD | 219,280 | 16,446 | 1,644,602 |
| WESTMINSTER | MD0021831 | MD | POTTF_MD | 60,911 | 4,568 | 456,834 |
| MATTAWOMAN | MD0021865 | MD | POTTF_MD | 243,645 | 10,964 | 1,827,336 |
| HAMPSTEAD | MD0022446 | MD | GUNOH | 10,964 | 822 | 82,230 |
| MOUNT AIRY | MD0022527 | MD | PATMH | 14,619 | 1,096 | 109,640 |
| JOPPATOWNE | MD0022535 | MD | GUNOH | 11,573 | 868 | 86,798 |
| POCOMOKE CITY | MD0022551 | MD | POCTF | 17,908 | 1,343 | 134,309 |
| HURLOCK | MD0022730 | MD | NANOH | 20,101 | 1,508 | 150,755 |
| SNOW HILL | MD0022764 | MD | POCTF | 6,091 | 457 | 45,683 |
| MARLBORO MEADOWS | MD0022781 | MD | PAXTF | 0 | 0 | 0 |
| POOLESVILLE | MD0023001 | MD | POTTF_MD | 9,137 | 685 | 68,525 |
| KENT ISLAND | MD0023485 | MD | CB3MH | 36,547 | 2,741 | 274,100 |
| US NAVAL ACADEMY | MD0023523 | MD | SEVMH | 12,182 | 914 | 91,367 |
| TALBOT COUNTY REGION II | MD0023604 | MD | EASMH | 8,040 | 603 | 60,302 |
| MARYLAND CORRECTIONAL INSTITUTE | MD0023957 | MD | POTTF_MD | 19,492 | 1,462 | 146,187 |
| BROADWATER | MD0024350 | MD | CB4MH | 24,364 | 1,827 | 182,734 |
| LEONARDTOWN | MD0024767 | MD | POTMH_MD | 8,284 | 621 | 62,129 |
| NORTHEAST RIVER | MD0052027 | MD | NORTF | 24,364 | 1,827 | 182,734 |
| FRUITLAND | MD0052990 | MD | WICMH | 9,746 | 731 | 73,093 |
| LITTLE  PATUXENT | MD0055174 | MD | PAXTF | 304,556 | 22,842 | 2,284,170 |
| SOD RUN | MD0056545 | MD | BSHOH | 243,645 | 18,273 | 1,827,336 |
| SWAN POINT | MD0057525 | MD | POTMH_MD | 7,309 | 548 | 54,820 |
| PINEY ORCHARD | MD0059145 | MD | PAXTF | 14,619 | 1,096 | 109,640 |
| GEORGES CREEK | MD0060071 | MD | POTTF_MD | 7,309 | 548 | 54,820 |
| MAYO LARGE COMMUNAL | MD0061794 | MD | RHDMH | 9,989 | 749 | 74,921 |
| MARYLAND CITY | MD0062596 | MD | PAXTF | 30,456 | 2,284 | 228,417 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| DORSEY RUN | MD0063207 | MD | PAXTF | 24,364 | 1,827 | 182,734 |
| CONOCOCHEAGUE | MD0063509 | MD | POTTF_MD | 49,947 | 3,746 | 374,604 |
| CELANESE | MD0063878 | MD | POTTF_MD | 24,364 | 1,827 | 182,734 |
| ALLEN FAMILY FOODS | MD0067857 | MD | CHOTF | 4,500 | 370 | 62,091 |
| WISE FOODS INC | PA0007498 | PA | CB1TF | 19,957 | 898 | 14,375 |
| EMPIRE KOSHER POULTRY-MIFFLINT | PA0007552 | PA | CB1TF | 21,928 | 740 | 53,602 |
| POPE & TALBOT WIS INC. | PA0007919 | PA | CB1TF | 40,569 | 1,941 | 45,318 |
| GOLD MILLS DYEHOUSE | PA0008231 | PA | CB1TF | 5,723 | 198 | 48,729 |
| APPLETON PAPER SPRINGMILL | PA0008265 | PA | CB1TF | 61,666 | 7,367 | 117,924 |
| MERCK & COMPANY | PA0008419 | PA | CB1TF | 44,497 | 11,748 | 289,937 |
| PPL MONTOUR LLC | PA0008443 | PA | CB1TF | 72,749 | 1,200 | 191,748 |
| NATIONAL GYPSUM COMPANY-MILTON PLANT | PA0008591 | PA | CB1TF | 2,213 | 106 | 7,553 |
| P-H GLATFELTER COMPANY | PA0008869 | PA | CB1TF | 117,588 | 6,821 | 701,697 |
| PROCTOR & GAMBLE PAPER PRODUCTS | PA0008885 | PA | CB1TF | 100,360 | 5,441 | 188,094 |
| OSRAM SYLVANIA PRODUCTS, INC. | PA0009024 | PA | CB1TF | 600,515 | 1,577 | 26,801 |
| CONSOLIDATED RAIL CORPORATION-ENOLA | PA0009229 | PA | CB1TF | 2,539 | 93 | 12,182 |
| HEINZ PET FOODS | PA0009270 | PA | CB1TF | 30,639 | 1,449 | 16,349 |
| MOTTS INC | PA0009326 | PA | CB1TF | 18,645 | 729 | 25,339 |
| USFW-LAMAR NATIONAL FISH HATCHERY | PA0009857 | PA | CB1TF | 60,138 | 1,919 | 147,356 |
| PAPETTI'S ACQUISTION INC (QUAKER STATE FARMS) | PA0009911 | PA | CB1TF | 8,104 | 532 | 7,188 |
| PENNSYLVANIA FISH & BOAT COMMISSION-BENNER SPRINGS | PA0010553 | PA | CB1TF | 110,347 | 2,285 | 224,543 |
| PENNSYLVANIA FISH & BOAT COMMISSION-PLEASANT GAP | PA0010561 | PA | CB1TF | 55,049 | 1,591 | 134,200 |
| BLOSSBURG | PA0020036 | PA | CB1TF | 7,306 | 974 | 9,746 |
| MOUNT UNION BOROUGH | PA0020214 | PA | CB1TF | 17,351 | 2,314 | 23,146 |
| ROARING SPRING BOROUGH | PA0020249 | PA | CB1TF | 12,785 | 1,705 | 17,055 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| MILTON MUNICIPAL AUTHORITY | PA0020273 | PA | CB1TF | 80,040 | 8,329 | 83,326 |
| LITITZ SEWAGE AUTHORITY | PA0020320 | PA | CB1TF | 70,319 | 9,376 | 93,802 |
| KULPMONT-MARION HEIGHTS JT MUN | PA0020338 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| BELLEFONTE BOROUGH | PA0020486 | PA | CB1TF | 58,812 | 7,842 | 78,453 |
| MCCONNELLSBURG STP | PA0020508 | PA | POTTF_MD | 10,959 | 1,461 | 14,619 |
| NORTHUMBERLAND BOROUGH | PA0020567 | PA | CB1TF | 20,548 | 2,740 | 27,410 |
| MIDDLEBURG MUN AUTH | PA0020583 | PA | CB1TF | 8,219 | 1,096 | 10,964 |
| WAYNESBORO BOROUGH | PA0020621 | PA | POTTF_MD | 29,223 | 3,896 | 38,983 |
| MIDDLETOWN | PA0020664 | PA | CB1TF | 40,182 | 5,358 | 53,601 |
| MONTGOMERY BOROUGH | PA0020699 | PA | CB1TF | 15,525 | 2,070 | 20,710 |
| WHITE DEER TOWNSHIP | PA0020800 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| GLEN ROCK SEW AUTH | PA0020818 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| DOVER TOWNSHIP SEWER AUTHORITY | PA0020826 | PA | CB1TF | 146,117 | 19,482 | 194,914 |
| FRANKLIN COUNTY AUTHORITY-GREENCASTLE | PA0020834 | PA | POTTF_MD | 17,351 | 2,314 | 19,491 |
| MECHANICSBURG BOROUGH MUNICIPAL | PA0020885 | PA | CB1TF | 38,565 | 5,065 | 50,678 |
| MANHEIM BOROUGH AUTHORITY | PA0020893 | PA | CB1TF | 21,847 | 2,776 | 27,775 |
| PINE GROVE BOROUGH AUTHORITY | PA0020915 | PA | CB1TF | 27,397 | 3,653 | 36,546 |
| NEW OXFORD MUNICIPAL FACILITY | PA0020923 | PA | CB1TF | 35,057 | 4,354 | 43,563 |
| MOUNT JOY | PA0021067 | PA | CB1TF | 27,945 | 3,726 | 37,277 |
| LITTLESTOWN BOROUGH | PA0021229 | PA | POTTF_MD | 18,265 | 2,435 | 24,364 |
| NEWPORT BORO MUN AUTH | PA0021237 | PA | CB1TF | 7,306 | 974 | 9,746 |
| DUNCANNON BORO | PA0021245 | PA | CB1TF | 13,516 | 1,802 | 18,030 |
| WILLIAMSBURG BOROUGH | PA0021539 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| GETTYSBURG MUNICIPAL AUTHORITY | PA0021563 | PA | POTTF_MD | 44,748 | 5,966 | 59,692 |
| MARYSVILLE MUNICIPAL AUTHORITY | PA0021571 | PA | CB1TF | 22,831 | 3,044 | 30,455 |
| DOVER BORO | PA0021644 | PA | CB1TF | 7,306 | 974 | 9,746 |
| WELLSBORO MUNICIPAL AUTHORITY | PA0021687 | PA | CB1TF | 46,029 | 4,871 | 48,729 |
| MARIETTA-DONEGAL JOINT AUTHORITY | PA0021717 | PA | CB1TF | 13,698 | 1,826 | 18,273 |
| ANNVILLE TOWNSHIP | PA0021806 | PA | CB1TF | 13,698 | 1,826 | 18,273 |

Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| MANSFIELD BOROUGH | PA0021814 | PA | CB1TF | 23,744 | 3,166 | 31,675 |
| ADAMSTOWN BORO AUTH OF LANCAST | PA0021865 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| WESTFIELD BORO | PA0021881 | PA | CB1TF | 8,402 | 1,120 | 11,208 |
| NEW HOLLAND BOROUGH AUTHORITY | PA0021890 | PA | CB1TF | 24,475 | 3,263 | 32,648 |
| BEDFORD BOROUGH MUNICIPAL AUTHORITY | PA0022209 | PA | CB1TF | 27,397 | 3,653 | 36,546 |
| MILLERSBURG BOROUGH AUTHORITY | PA0022535 | PA | CB1TF | 18,265 | 2,435 | 24,364 |
| ELIZABETHTOWN BOROUGH | PA0023108 | PA | CB1TF | 82,191 | 10,959 | 109,639 |
| HASTINGS AREA SA | PA0023141 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| MT. HOLLY SPRINGS BOROUGH AUTHORITY | PA0023183 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| BERWICK MUNICIPAL AUTHORITY | PA0023248 | PA | CB1TF | 92,198 | 8,913 | 89,173 |
| TWIN BOROUGHS SANITARY AUTHORITY | PA0023264 | PA | CB1TF | 16,438 | 2,192 | 21,928 |
| WRIGHTSVILLE BORO MUN AUTH | PA0023442 | PA | CB1TF | 7,306 | 974 | 9,746 |
| DANVILLE MUNICIPAL AUTHORITY | PA0023531 | PA | CB1TF | 66,118 | 8,816 | 88,199 |
| ASHLAND MUNICIPAL AUTHORITY | PA0023558 | PA | CB1TF | 23,744 | 3,166 | 31,674 |
| TRI-BORO MUNICIPAL AUTHORITY | PA0023736 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| NORTHEASTERN YORK COUNTRY | PA0023744 | PA | CB1TF | 46,535 | 4,627 | 41,419 |
| HIGHSPIRE | PA0024040 | PA | CB1TF | 36,529 | 4,871 | 48,729 |
| CUMBERLAND TWP AUTH (NORTH PLANT) | PA0024139 | PA | POTTF_MD | 9,132 | 1,218 | 12,182 |
| CUMBERLAND TWP MUN AUTH | PA0024147 | PA | POTTF_MD | 11,872 | 1,583 | 15,837 |
| PENNFIELD FARMS INC (BC NATURAL CHICKEN LLC) | PA0024228 | PA | CB1TF | 18,982 | 766 | 14,619 |
| PALMYRA BOROUGH AUTHORITY | PA0024287 | PA | CB1TF | 25,936 | 3,458 | 34,597 |
| MUNCY BOROUGH MUNICIPAL AUTHORITY | PA0024325 | PA | CB1TF | 25,570 | 3,409 | 34,110 |
| NORTH MIDDLETON AUTH | PA0024384 | PA | CB1TF | 22,020 | 2,253 | 22,537 |
| MT. CARMEL MUNICIPAL SEWAGE AUTHORITY | PA0024406 | PA | CB1TF | 41,095 | 5,479 | 54,816 |
| DILLSBURG BOROUGH AUTHORITY | PA0024431 | PA | CB1TF | 31,345 | 3,726 | 37,277 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| UNION TWP STP | PA0024708 | PA | CB1TF | 11,872 | 1,583 | 15,837 |
| CURWENSVILLE MUNICIPAL AUTHORITY | PA0024759 | PA | CB1TF | 13,698 | 1,826 | 18,273 |
| UPPER ALLEN TOWNSHIP | PA0024902 | PA | CB1TF | 20,091 | 2,679 | 26,801 |
| SAXTON BORO MUN AUTH | PA0025381 | PA | CB1TF | 7,306 | 974 | 9,746 |
| LOCK HAVEN | PA0025933 | PA | CB1TF | 90,192 | 9,132 | 91,366 |
| CHAMBERSBURG BOROUGH | PA0026051 | PA | POTTF_MD | 124,199 | 16,560 | 165,677 |
| CARLISLE BOROUGH | PA0026077 | PA | CB1TF | 134,277 | 17,047 | 170,550 |
| WYOMING VALLEY | PA0026107 | PA | CB1TF | 584,467 | 77,929 | 779,657 |
| COLUMBIA | PA0026123 | PA | CB1TF | 36,529 | 4,871 | 48,729 |
| HUNTINGDON BOROUGH | PA0026191 | PA | CB1TF | 73,058 | 9,741 | 97,457 |
| UNIVERSITY AREA JOINT AUTHORITY | PA0026239 | PA | CB1TF | 164,381 | 21,918 | 219,279 |
| YORK CITY | PA0026263 | PA | CB1TF | 474,880 | 63,317 | 633,471 |
| LEWISTOWN BOROUGH | PA0026280 | PA | CB1TF | 51,470 | 6,863 | 68,659 |
| CLEARFIELD | PA0026310 | PA | CB1TF | 82,191 | 10,959 | 109,639 |
| LOWER LACKAWANNA VALLEY | PA0026361 | PA | CB1TF | 109,588 | 14,612 | 146,186 |
| LEMOYNE BOROUGH MUNICIPAL AUTHORITY | PA0026441 | PA | CB1TF | 46,270 | 5,784 | 50,873 |
| DERRY TOWNSHIP MUNICIPAL AUTHORITY | PA0026484 | PA | CB1TF | 91,668 | 12,225 | 122,309 |
| SCRANTON SEWER AUTHORITY | PA0026492 | PA | CB1TF | 365,292 | 48,706 | 487,286 |
| SUNBURY CITY MUNICIPAL AUTHORITY | PA0026557 | PA | CB1TF | 76,711 | 10,228 | 102,330 |
| MILLERSVILLE BOROUGH | PA0026620 | PA | CB1TF | 33,790 | 4,505 | 45,074 |
| NEW CUMBERLAND BOROUGH AUTHORITY | PA0026654 | PA | CB1TF | 22,831 | 3,044 | 30,455 |
| TYRONE BOROUGH SEWER AUTHORITY | PA0026727 | PA | CB1TF | 166,231 | 21,918 | 219,279 |
| SWATARA TOWNSHIP | PA0026735 | PA | CB1TF | 115,367 | 15,342 | 153,495 |
| LANCASTER CITY | PA0026743 | PA | CB1TF | 620,248 | 77,318 | 77,318 |
| SPRINGETTSBURY TOWNSHIP | PA0026808 | PA | CB1TF | 273,969 | 36,529 | 365,464 |
| HANOVER BOROUGH | PA0026875 | PA | CB1TF | 83,441 | 10,959 | 109,639 |
| GREATER HAZELTON | PA0026921 | PA | CB1TF | 216,739 | 27,092 | 216,842 |
| ALTOONA CITY AUTHORITY-EAST | PA0027014 | PA | CB1TF | 146,117 | 19,482 | 194,914 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| ALTOONA CITY AUTHORITY-WEST | PA0027022 | PA | CB1TF | 164,381 | 21,918 | 219,279 |
| WILLIAMSPORT SANITARY AUTHORITY-WEST | PA0027049 | PA | CB1TF | 77,547 | 9,564 | 95,508 |
| WILLIAMSPORT SANITARY AUTHORITY-CENTRAL | PA0027057 | PA | CB1TF | 153,423 | 20,456 | 204,660 |
| LACKAWANNA RIVER BASIN SEWER AUTHORITY | PA0027065 | PA | CB1TF | 109,587 | 14,612 | 146,186 |
| LACKAWANNA RIVER BASIN SEWER AUTHORITY | PA0027081 | PA | CB1TF | 12,786 | 1,705 | 17,055 |
| LACKAWANNA RIVER BASIN SEWER AUTHORITY | PA0027090 | PA | CB1TF | 127,852 | 17,047 | 170,550 |
| BLOOMSBURG MUNICIPAL AUTHORITY | PA0027171 | PA | CB1TF | 78,855 | 10,447 | 104,523 |
| LOWER ALLEN TOWNSHIP AUTHORITY | PA0027189 | PA | CB1TF | 114,354 | 15,221 | 152,277 |
| HARRISBURG SEWERAGE AUTHORITY | PA0027197 | PA | CB1TF | 688,575 | 91,810 | 918,533 |
| LEBANON CITY AUTHORITY | PA0027316 | PA | CB1TF | 146,117 | 19,482 | 194,914 |
| SHAMOKIN-COAL TOWNSHIP JOINT SANITARY AUTHORITY | PA0027324 | PA | CB1TF | 127,852 | 17,047 | 170,550 |
| EPHRATA BOROUGH WWTP | PA0027405 | PA | CB1TF | 79,049 | 9,881 | 92,584 |
| PINE CREEK MUNICIPAL AUTHORITY | PA0027553 | PA | CB1TF | 23,744 | 3,166 | 31,674 |
| BROWN TOWNSHIP MUNICIPAL AUTHORITY | PA0028088 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| FT INDIANTOWN GAP | PA0028142 | PA | CB1TF | 24,353 | 3,044 | 24,364 |
| TROY BORO | PA0028266 | PA | CB1TF | 7,306 | 974 | 9,746 |
| MARTINSBURG | PA0028347 | PA | CB1TF | 12,785 | 1,705 | 17,055 |
| MIFFLINBURG BOROUGH MUNICIPAL | PA0028461 | PA | CB1TF | 25,570 | 3,409 | 34,110 |
| CLARKS SUMMIT-SOUTH ABINGTON JOINT AUTHORITY | PA0028576 | PA | CB1TF | 45,662 | 6,088 | 60,911 |
| EMPORIUM BOROUGH (MID-CAMERON AUTHORITY) | PA0028631 | PA | CB1TF | 17,100 | 2,140 | 24,364 |
| JERSEY SHORE BOROUGH | PA0028665 | PA | CB1TF | 19,178 | 2,557 | 25,582 |
| GALLITZIN BORO | PA0028673 | PA | CB1TF | 7,306 | 974 | 9,746 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| KELLY TOWNSHIP MUNICIPAL AUTHORITY | PA0028681 | PA | CB1TF | 68,492 | 9,132 | 91,366 |
| RALPHO TWP MUN AUTH | PA0028738 | PA | CB1TF | 13,132 | 1,751 | 17,518 |
| QUARRYVILLE STP | PA0028886 | PA | CB1TF | 7,306 | 974 | 9,746 |
| GREENFIELD TWP MUN AUTH | PA0029106 | PA | CB1TF | 14,612 | 1,948 | 19,491 |
| SOUTH MOUNTAIN RESTORATION CEN | PA0029297 | PA | POTTF_MD | 9,132 | 1,218 | 12,182 |
| PA DEPT OF PUBLIC WELFARE | PA0029432 | PA | CB1TF | 10,959 | 1,461 | 9,624 |
| DALLAS SCI | PA0030139 | PA | CB1TF | 9,741 | 1,218 | 10,964 |
| FRANKLIN COUNTY GENERAL AUTH (SOUTH PATROL RD) | PA0030597 | PA | POTTF_MD | 9,132 | 1,218 | 12,182 |
| SHIPPENSBURG BOROUGH AUTHORITY | PA0030643 | PA | CB1TF | 60,273 | 8,036 | 80,402 |
| GRANVILLE TWP | PA0032051 | PA | CB1TF | 15,196 | 1,899 | 12,182 |
| DCNR-BALD EAGLE STATE PARK | PA0032492 | PA | CB1TF | 8,219 | 1,096 | 10,964 |
| LOGAN TOWNSHIP-GREENWOOD AREA | PA0032557 | PA | CB1TF | 12,785 | 1,705 | 17,055 |
| DUNCANSVILLE | PA0032883 | PA | CB1TF | 22,228 | 2,963 | 29,651 |
| TOWANDA MUNICIPAL AUTHORITY | PA0034576 | PA | CB1TF | 21,187 | 2,825 | 28,263 |
| TYSON FOODS | PA0035092 | PA | CB1TF | 27,397 | 559 | 36,547 |
| FARMER'S PRIDE INC | PA0035157 | PA | CB1TF | 16,438 | 1,370 | 21,928 |
| STEWARTSTOWN BOROUGH | PA0036269 | PA | CB1TF | 13,516 | 1,802 | 18,030 |
| GALETON BORO AUTH | PA0036820 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| PFBC HUNTSDALE | PA0037141 | PA | CB1TF | 53,512 | 2,804 | 336,230 |
| PENN TOWNSHIP | PA0037150 | PA | CB1TF | 81,811 | 10,228 | 102,330 |
| EVERETT BORO AREA MA | PA0037711 | PA | CB1TF | 15,890 | 2,119 | 21,197 |
| MOSHANNON VALLEY JOINT SANITARY AUTHORITY | PA0037966 | PA | CB1TF | 31,634 | 4,218 | 42,199 |
| DEFENSE DISTRIBUTION DEPOT SUSQUEHANNA | PA0038385 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| EAST PENNSBORO SOUTH TREATMENT PLANT | PA0038415 | PA | CB1TF | 67,579 | 9,011 | 90,148 |
| SUSQUEHANNA AQUACULTURE INC | PA0038598 | PA | CB1TF | 54,007 | 3,530 | 161,293 |
| BURNHAM BOROUGH | PA0038920 | PA | CB1TF | 11,689 | 1,559 | 15,593 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| PENNSYLVANIA FISH & BOAT COMMISSION-BELLEFONTE | PA0040835 | PA | CB1TF | 78,988 | 2,636 | 74,799 |
| LANCASTER AREA SEWER AUTHORITY | PA0042269 | PA | CB1TF | 273,969 | 36,529 | 365,464 |
| TREMONT MUNICIPAL AUTHORITY | PA0042951 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| NEW FREEDOM WTP | PA0043257 | PA | CB1TF | 42,009 | 5,601 | 56,038 |
| HOLLIDAYSBURG REGIONAL | PA0043273 | PA | CB1TF | 109,587 | 14,612 | 146,186 |
| LYKENS BOROUGH | PA0043575 | PA | CB1TF | 7,488 | 998 | 9,989 |
| VALLEY JOINT SEW AUTH | PA0043681 | PA | CB1TF | 41,095 | 5,479 | 54,820 |
| WESTERN CLINTON COUNTY MUNICIPAL AUTHORITY | PA0043893 | PA | CB1TF | 16,438 | 2,192 | 21,928 |
| PENNSYLVANIA FISH & BOAT COMMISSION-UPPER SPRING | PA0044032 | PA | CB1TF | 7,000 | 50 | 14,034 |
| SOUTH MIDDLETON TOWNSHIP MUNICIPAL AUTHORITY | PA0044113 | PA | CB1TF | 29,322 | 3,653 | 36,546 |
| LEWISBURG AREA JOINT SANITARY AUTHORITY/COLLEGE P | PA0044661 | PA | CB1TF | 44,200 | 5,893 | 58,962 |
| HANOVER FOODS CORP | PA0044741 | PA | CB1TF | 26,385 | 979 | 15,666 |
| MOUNTAINTOP AREA | PA0045985 | PA | CB1TF | 75,981 | 10,131 | 101,355 |
| PORTER TOWER JOINT MUNICIPAL AUTHORITY | PA0046272 | PA | CB1TF | 7,854 | 1,047 | 10,477 |
| ST. JOHNS | PA0046388 | PA | CB1TF | 40,182 | 5,357 | 53,601 |
| REPUBLIC SERVICES OF PA LLC | PA0046680 | PA | CB1TF | 40,803 | 131 | 12,182 |
| CAN-DO INC | PA0060046 | PA | CB1TF | 18,265 | 2,435 | 24,364 |
| SHICKSHINNY BORO SA | PA0060135 | PA | CB1TF | 8,219 | 1,096 | 10,964 |
| MONTROSE MA | PA0060801 | PA | CB1TF | 14,977 | 1,997 | 19,979 |
| ABINGTON TWP SUPERVISORS | PA0061034 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| LITTLE WASHINGTON WW CO | PA0061590 | PA | CB1TF | 24,073 | 3,210 | 32,112 |
| SCHUYLKILL CO MA | PA0062201 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| FRACKVILLE AREA MA | PA0062219 | PA | CB1TF | 25,570 | 3,409 | 34,110 |
| KBM REGIONAL AUTH (NEW) | PA0064025 | PA | CB1TF | 13,637 | 1,705 | 17,055 |
| MAHANOY CITY | PA0070041 | PA | CB1TF | 25,205 | 3,361 | 33,623 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| SHENANDOAH MUNICIPAL SEWAGE AUTHORITY | PA0070386 | PA | CB1TF | 36,529 | 4,871 | 48,729 |
| CAERNARVON TWP STP | PA0070424 | PA | CB1TF | 12,785 | 1,705 | 17,055 |
| WASHINGTON TOWNSHIP MUNICIPAL | PA0080225 | PA | POTTF_MD | 35,433 | 4,724 | 47,267 |
| HAMPDEN TOWNSHIP SEWER AUTHORITY | PA0080314 | PA | CB1TF | 101,997 | 12,359 | 117,436 |
| NORTHERN LANCASTER CO AUTH | PA0080438 | PA | CB1TF | 8,219 | 1,096 | 10,964 |
| ANTRIM TOWNSHIP | PA0080519 | PA | POTTF_MD | 21,918 | 2,922 | 29,237 |
| NORTHERN LEBANON CO AUTH | PA0080748 | PA | CB1TF | 7,306 | 974 | 9,746 |
| ST THOMAS TWP MUN AUTH | PA0081001 | PA | POTTF_MD | 7,306 | 974 | 9,746 |
| SALISBURY TWP | PA0081574 | PA | CB1TF | 13,150 | 1,643 | 14,131 |
| EASTERN YORK COUNTY SEWER AUTH | PA0081591 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| FAIRVIEW TOWNSHIP | PA0081868 | PA | CB1TF | 13,333 | 1,778 | 17,786 |
| WEST EARL SEW AUTH | PA0081949 | PA | CB1TF | 8,219 | 1,096 | 10,964 |
| DERRY TWP MUN AUTH - SOUTHWEST | PA0082392 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| FAIRVIEW TOWNSHIP | PA0082589 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| NEWBERRY TWP | PA0083011 | PA | CB1TF | 23,744 | 3,166 | 31,674 |
| SILVER SPRING TOWNSHIP | PA0083593 | PA | CB1TF | 21,918 | 2,922 | 29,237 |
| NORTHWESTERN LANCASTER CNTY AUTH | PA0084026 | PA | CB1TF | 14,612 | 1,827 | 15,837 |
| CONEWAGO TWP SEW AUTH | PA0084425 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| WEST HANOVER | PA0085511 | PA | CB1TF | 16,496 | 1,900 | 1,900 |
| SPRINGFIELD TWP SEW AUTH - HOL | PA0086860 | PA | CB1TF | 12,785 | 1,704 | 17,055 |
| EPHRATA BORO AUTH #2 | PA0087181 | PA | CB1TF | 54,550 | 6,818 | 56,038 |
| CHESTNUT RIDGE AREA JMA | PA0087661 | PA | CB1TF | 12,877 | 1,717 | 17,177 |
| NEW MORGAN STP | PA0088048 | PA | CB1TF | 9,132 | 1,218 | 12,182 |
| LOWER PAXTON WET WEATHER STP | PA0088633 | PA | CB1TF | 45,662 | 6,088 | 60,911 |
| FREEDOM TOWNSHIP WATER&SEWER AUTHORITY | PA0110361 | PA | CB1TF | 10,959 | 1,461 | 14,619 |
| PATTON BORO STP | PA0110469 | PA | CB1TF | 9,863 | 1,315 | 13,157 |
| FURMAN FOODS | PA0110540 | PA | CB1TF | 45,450 | 1,624 | 5,847 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| EASTERN SNYDER COUNTY REGIONAL AUTH | PA0110582 | PA | CB1TF | 51,141 | 6,819 | 68,220 |
| MID-CENTRE COUNTY AUTH | PA0110965 | PA | CB1TF | 18,265 | 2,435 | 24,364 |
| TAYLOR PACKING CO INC | PA0111759 | PA | CB1TF | 14,612 | 1,218 | 19,492 |
| PENNSYLVANIA FISH & BOAT COMMISSION-TYPLERSVILLE | PA0112127 | PA | CB1TF | 63,339 | 2,382 | 316,738 |
| ELKLAND MUNICIPAL AUTHORITY | PA0113298 | PA | CB1TF | 10,277 | 1,285 | 13,400 |
| GREGG TOWNSHIP | PA0114821 | PA | CB1TF | 23,013 | 3,068 | 30,699 |
| HUGHESVILLE-WOLF TWP JOINT SEW | PA0114961 | PA | CB1TF | 12,329 | 1,644 | 16,446 |
| WEST BRANCH SA | PA0205869 | PA | CB1TF | 16,438 | 2,192 | 21,928 |
| LYCOMING CO WATER & SEWER AUTH | PA0209228 | PA | CB1TF | 27,397 | 3,653 | 36,546 |
| NORTH CODORUS TWP | PA0247391 | PA | CB1TF | 13,394 | 1,674 | 13,400 |
| PILGRIM'S PRIDE - ALMA | VA0001961 | VA | POTTF_MD | 18,273 | 914 | 61,028 |
| DUPONT-WAYNESBORO | VA0002160 | VA | POTTF_MD | 78,941 | 1,009 | 88,330 |
| MERCK & COMPANY INC.-STONEWALL PLANT-ELKTON | VA0002178 | VA | POTTF_MD | 43,835 | 4,384 | 2,168,100 |
| PILGRIMS PRIDE-HINTON | VA0002313 | VA | POTTF_MD | 27,410 | 1,371 | 66,649 |
| GIANT REFINERY-YORKTOWN | VA0003018 | VA | MOBPH | 167,128 | 17,689 | 160,600 |
| SMURFIT STONE | VA0003115 | VA | PMKOH | 259,177 | 56,038 | 13,030,500 |
| OMEGA PROTEIN INC | VA0003867 | VA | CB5MH_VA | 21,213 | 1,591 | 352,836 |
| TYSON FOODS, INC.-TEMPERANCEVILLE | VA0004049 | VA | POCMH_VA | 22,842 | 1,142 | 60,955 |
| STRASBURG | VA0020311 | VA | POTTF_MD | 11,939 | 895 | 89,539 |
| VINT HILL FARMS STATION WWTP | VA0020460 | VA | POTTF_VA | 11,573 | 868 | 86,798 |
| BERRYVILLE | VA0020532 | VA | POTTF_MD | 8,528 | 640 | 63,957 |
| KILMARNOCK | VA0020788 | VA | CB5MH_VA | 6,091 | 457 | 45,683 |
| NAVAL SURFACE WARFARE CENTER-DAHLGREN | VA0021067 | VA | POTMH_VA | 6,578 | 658 | 65,784 |
| GORDONSVILLE | VA0021105 | VA | PMKTF | 17,177 | 1,145 | 85,885 |
| WARRENTON | VA0021172 | VA | RPPTF | 30,456 | 2,284 | 228,417 |
| ONANCOCK | VA0021253 | VA | CB7PH | 9,137 | 685 | 68,525 |
| CAPE CHARLES | VA0021288 | VA | CB7PH | 6,091 | 457 | 45,683 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| ORANGE | VA0021385 | VA | RPPTF | 36,547 | 2,741 | 274,100 |
| WEYERS CAVE STP | VA0022349 | VA | POTTF_MD | 6,091 | 457 | 45,683 |
| PURCELLVILLE | VA0022802 | VA | POTTF_MD | 18,273 | 1,371 | 137,050 |
| NEW MARKET STP | VA0022853 | VA | POTTF_MD | 6,091 | 457 | 45,683 |
| HAYNESVILLE CORRECTIONAL CENTER | VA0023469 | VA | RPPMH | 2,802 | 210 | 21,014 |
| DALE CITY #8 | VA0024678 | VA | POTTF_VA | 42,029 | 2,522 | 420,287 |
| DALE CITY #1 | VA0024724 | VA | POTTF_VA | 42,029 | 2,522 | 420,287 |
| MASSANUTTEN PUBLIC SERVICE STP | VA0024732 | VA | POTTF_MD | 18,273 | 1,371 | 137,050 |
| ASHLAND | VA0024899 | VA | PMKTF | 36,547 | 2,436 | 182,734 |
| UPPER OCCOQUAN SEWAGE AUTHORITY | VA0024988 | VA | POTTF_VA | 1,315,682 | 16,446 | 4,933,807 |
| H.L. MOONEY | VA0025101 | VA | POTTF_VA | 219,280 | 13,157 | 2,192,803 |
| FREDERICKSBURG | VA0025127 | VA | RPPTF | 54,820 | 4,112 | 411,151 |
| ARLINGTON | VA0025143 | VA | POTTF_VA | 365,467 | 21,928 | 3,654,672 |
| WAYNESBORO | VA0025151 | VA | POTTF_MD | 48,729 | 3,655 | 365,467 |
| ALEXANDRIA | VA0025160 | VA | POTTF_VA | 500,690 | 29,932 | 4,988,627 |
| FISHERSVILLE | VA0025291 | VA | POTTF_MD | 48,729 | 3,655 | 365,467 |
| NOMAN M. COLE JR. POLLUTION CONTROL PLANT | VA0025364 | VA | POTTF_VA | 612,158 | 36,729 | 6,121,576 |
| MASSAPONAX | VA0025658 | VA | RPPTF | 97,458 | 7,309 | 730,934 |
| ROUND HILL WWTP | VA0026212 | VA | POTTF_MD | 9,137 | 685 | 68,525 |
| URBANNA | VA0026263 | VA | RPPMH | 1,218 | 91 | 9,137 |
| COLONIAL BEACH | VA0026409 | VA | POTMH_VA | 18,273 | 1,827 | 182,734 |
| MT JACKSON STP | VA0026441 | VA | POTTF_MD | 8,528 | 640 | 63,957 |
| WOODSTOCK | VA0026468 | VA | POTTF_MD | 24,364 | 1,827 | 182,734 |
| DAHLGREN (DAHLGREN SANITARY DISTRICT) | VA0026514 | VA | POTMH_VA | 9,137 | 914 | 91,367 |
| WARSAW | VA0026891 | VA | RPPMH | 3,655 | 274 | 27,410 |
| SHORE HOSPITAL | VA0027537 | VA | CB7PH | 1,218 | 91 | 9,137 |
| QUANTICO-MAINSIDE | VA0028363 | VA | POTOH_VA | 20,101 | 1,206 | 201,007 |
| STONEY CREEK STP | VA0028380 | VA | POTTF_MD | 7,309 | 548 | 54,820 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| MATHEWS COURTHOUSE | VA0028819 | VA | MOBPH | 1,827 | 122 | 9,137 |
| DOSWELL | VA0029521 | VA | PMKTF | 18,273 | 1,218 | 91,367 |
| MARSHALL WWTP | VA0031763 | VA | RPPTF | 7,797 | 585 | 58,475 |
| FORT A.P. HILL (WILCOX CAMP SITE) | VA0032034 | VA | RPPTF | 6,457 | 484 | 48,424 |
| HARRISONBURG-ROCKINGHAM (NORTH RIVER REGIONAL) | VA0060640 | VA | POTTF_MD | 253,391 | 19,004 | 1,900,429 |
| REEDVILLE | VA0060712 | VA | CB5MH_VA | 2,436 | 183 | 18,273 |
| AQUIA | VA0060968 | VA | POTOH_VA | 73,093 | 4,386 | 730,934 |
| CULPEPER | VA0061590 | VA | RPPTF | 73,093 | 5,482 | 548,201 |
| LURAY | VA0062642 | VA | POTTF_MD | 19,492 | 1,462 | 146,187 |
| FRONT ROYAL | VA0062812 | VA | POTTF_MD | 48,729 | 3,655 | 365,467 |
| MIDDLE RIVER | VA0064793 | VA | POTTF_MD | 82,839 | 6,213 | 621,294 |
| FWSA OPEQUON | VA0065552 | VA | POTTF_MD | 121,851 | 11,512 | 1,151,222 |
| STUARTS DRAFT | VA0066877 | VA | POTTF_MD | 48,729 | 3,655 | 365,467 |
| TANGIER ISLAND | VA0067423 | VA | POCMH_VA | 1,218 | 91 | 9,137 |
| FMC | VA0068110 | VA | RPPTF | 65,784 | 4,934 | 493,381 |
| PURKINS CORNER STP | VA0070106 | VA | POTMH_VA | 1,096 | 110 | 10,964 |
| TAPPAHANNOCK | VA0071471 | VA | RPPMH | 9,746 | 731 | 73,093 |
| MONTROSS - WESTMORELAND | VA0072729 | VA | RPPMH | 1,584 | 119 | 11,878 |
| COORS SHENANDOAH BREWERY | VA0073245 | VA | POTTF_MD | 54,820 | 4,112 | 184,690 |
| CAROLINE COUNTY REGIONAL | VA0073504 | VA | MPNTF | 9,137 | 609 | 45,683 |
| PARKINS MILL | VA0075191 | VA | POTTF_MD | 60,911 | 4,568 | 456,834 |
| WEST POINT | VA0075434 | VA | MPNOH | 10,964 | 731 | 54,820 |
| LITTLE FALLS RUN | VA0076392 | VA | RPPTF | 97,458 | 7,309 | 730,934 |
| REMINGTON REGIONAL | VA0076805 | VA | RPPTF | 30,456 | 2,284 | 228,417 |
| GEORGE'S CHICKEN INC | VA0077402 | VA | POTTF_MD | 31,065 | 1,553 | 104,390 |
| BEAR ISLAND PAPER CO. | VA0077763 | VA | PMKTF | 47,328 | 10,233 | 383,741 |
| SOUTH WALES STP | VA0080527 | VA | RPPTF | 10,964 | 822 | 82,230 |
| HRSD-YORK | VA0081311 | VA | MOBPH | 274,100 | 18,273 | 1,370,502 |
| WILDERNESS SHORES | VA0083411 | VA | RPPTF | 15,228 | 1,142 | 114,209 |
| OAKLAND PARK STP | VA0086789 | VA | POTOH_VA | 1,706 | 128 | 12,791 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| PARHAM LANDING WWTP | VA0088331 | VA | PMKOH | 36,547 | 2,436 | 182,734 |
| HAYMOUNT STP | VA0089125 | VA | RPPTF | 11,695 | 877 | 87,712 |
| HOPYARD FARMS STP | VA0089338 | VA | RPPTF | 6,091 | 457 | 45,683 |
| TOTOPOTOMOY | VA0089915 | VA | PMKTF | 182,734 | 12,182 | 913,668 |
| MOUNTAIN RUN STP | VA0090212 | VA | RPPTF | 0 | 0 | 0 |
| SIL MRRS | VA0090263 | VA | POTTF_MD | 23,390 | 1,754 | 175,424 |
| NORTH FORK REGIONAL WWTP | VA0090328 | VA | POTTF_MD | 9,137 | 685 | 68,525 |
| RAPIDAN STP | VA0090948 | VA | RPPTF | 7,309 | 548 | 54,820 |
| BROAD RUN WRF | VA0091383 | VA | POTTF_MD | 134,005 | 3,350 | 1,005,035 |
| FAIRVIEW BEACH | VA0092134 | VA | POTOH_VA | 1,827 | 183 | 18,273 |
| LEESBURG | VA0092282 | VA | POTTF_MD | 121,822 | 9,137 | 913,668 |
| PILGRIM'S PRIDE | WV0005495 | WV | POTTF_MD | 13,096 | 1,310 | 13,096 |
| VIRGINIA ELECTRIC & POWER | WV0005525 | WV | POTTF_MD | 0 | 0 | 0 |
| LEETOWN SCIENCE CENTER | WV0005649 | WV | POTTF_MD | 18,273 | 1,827 | 18,273 |
| MOOREFIELD | WV0020150 | WV | POTTF_MD | 9,137 | 914 | 9,137 |
| ROMNEY | WV0020699 | WV | POTTF_MD | 7,614 | 761 | 7,614 |
| PETERSBURG | WV0021792 | WV | POTTF_MD | 20,558 | 2,056 | 20,558 |
| CHARLES TOWN | WV0022349 | WV | POTTF_MD | 26,649 | 2,665 | 26,649 |
| MARTINSBURG | WV0023167 | WV | POTTF_MD | 45,683 | 4,568 | 45,683 |
| KEYSER | WV0024392 | WV | POTTF_MD | 36,547 | 3,655 | 36,547 |
| SHEPHERDSTOWN | WV0024775 | WV | POTTF_MD | 6,091 | 609 | 6,091 |
| WARM SPRINGS PSD | WV0027707 | WV | POTTF_MD | 26,496 | 2,650 | 26,496 |
| FORT ASHBY PSD | WV0041521 | WV | POTTF_MD | 7,614 | 761 | 7,614 |
| HESTER INDUSTRIES, INC. | WV0047236 | WV | POTTF_MD | 7,614 | 761 | 7,614 |
| BERKELEY COUNTY PSSD*** | WV0082759 | WV | POTTF_MD | 89,844 | 8,984 | 89,844 |
| REEDS CREEK HATCHERY | WV0111821 | WV | POTTF_MD | 26,298 | 2,630 | 26,298 |
| SPRING RUN HATCHERY | WV0112500 | WV | POTTF_MD | 65,480 | 6,548 | 65,480 |
| THE CONSERVATION FUND FRESHWATER INST | WV0116149 | WV | POTTF_MD | 15,380 | 1,538 | 15,380 |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| NY Significant WWTP Aggregate | Including 28 NPDES listed below | NY | CB1TF | 1,545,956 | 104,612 | 3,185,071 |
| KRAFT FOODS, INC. | NY0004189 | NY | CB1TF | | | |
| KRAFT FOODS GLOBAL | NY0004308 | NY | CB1TF | | | |
| ADDISON (V) | NY0020320 | NY | CB1TF | | | |
| HAMILTON (V) | NY0020672 | NY | CB1TF | | | |
| GREENE (V) WWTP | NY0021407 | NY | CB1TF | | | |
| NORWICH | NY0021423 | NY | CB1TF | | | |
| BATH (V) | NY0021431 | NY | CB1TF | | | |
| SHERBURNE (V) WWTP | NY0021466 | NY | CB1TF | | | |
| ALFRED (V) | NY0022357 | NY | CB1TF | | | |
| OWEGO (T) #1 | NY0022730 | NY | CB1TF | | | |
| CANISTEO (V) STP | NY0023248 | NY | CB1TF | | | |
| COOPERSTOWN | NY0023591 | NY | CB1TF | | | |
| HORNELL (C) | NY0023647 | NY | CB1TF | | | |
| ERWIN (T) | NY0023906 | NY | CB1TF | | | |
| BINGHAMTON-JOHNSON CITY JOINT BOROUGH | NY0024414 | NY | CB1TF | | | |
| PAINTED POST (V) | NY0025712 | NY | CB1TF | | | |
| CORNING (C) | NY0025721 | NY | CB1TF | | | |
| OWEGO #2 | NY0025798 | NY | CB1TF | | | |
| CORTLAND (C) | NY0027561 | NY | CB1TF | | | |
| ENDICOTT (V) | NY0027669 | NY | CB1TF | | | |
| OWEGO (V) | NY0029262 | NY | CB1TF | | | |
| SIDNEY (V) | NY0029271 | NY | CB1TF | | | |
| WAVERLY (V) | NY0031089 | NY | CB1TF | | | |
| ONEONTA (C) | NY0031151 | NY | CB1TF | | | |
| RICHFIELD SPRINGS (V) | NY0031411 | NY | CB1TF | | | |
| ELMIRA / CHEMUNG CO. SD #2 | NY0035742 | NY | CB1TF | | | |
| LAKE STREET/CHEMUNG COUNTY SD #1 | NY0036986 | NY | CB1TF | | | |
| CHENANGO NORTHGATE WWTP | NY0213781 | NY | CB1TF | | | |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| VA James River Significant PS Aggregate | Including 39 NPDES listed below | VA | | 8,968,864 | 545,558 | 79,804,603 |
| R.J. REYNOLDS (BROWN & WILLIAMSON) | VA0002780 | VA | JMSTF2 | | | |
| GEORGIA PACIFIC CORPORATION | VA0003026 | VA | JMSTF2 | | | |
| JH MILES | VA0003263 | VA | JMSPH | | | |
| WESTVACO CORPORATION-COVINGTON HALL | VA0003646 | VA | JMSTF2 | | | |
| BWXT | VA0003697 | VA | JMSTF2 | | | |
| TYSON FOODS, INC. | VA0004031 | VA | CHKOH | | | |
| DOMINION VIRGINIA POWER-CHESTERFIELD | VA0004146 | VA | JMSTF2 | | | |
| DUPONT-SPRUANCE | VA0004669 | VA | JMSTF2 | | | |
| LEES COMMERCIAL CARPET | VA0004677 | VA | JMSTF2 | | | |
| HONEYWELL | VA0005291 | VA | JMSTF1 | | | |
| GREIF BROS CORP-RIVERVILLE | VA0006408 | VA | JMSTF2 | | | |
| CREWE STP | VA0020303 | VA | APPTF | | | |
| DOC Powhatan CC | VA0020699 | VA | JMSTF2 | | | |
| BUENA VISTA | VA0020991 | VA | JMSTF2 | | | |
| CLIFTON FORGE | VA0022772 | VA | JMSTF2 | | | |
| LAKE MONTICELLO STP | VA0024945 | VA | JMSTF2 | | | |
| LYNCHBURG | VA0024970 | VA | JMSTF2 | | | |
| FALLING CREEK | VA0024996 | VA | JMSTF2 | | | |
| SOUTH CENTRAL | VA0025437 | VA | APPTF | | | |
| MOORES CREEK-RIVANNA AUTHORITY | VA0025518 | VA | JMSTF2 | | | |
| COVINGTON | VA0025542 | VA | JMSTF2 | | | |
| PHILLIP MORRIS-PARK 500 | VA0026557 | VA | JMSTF1 | | | |
| LOW MOOR | VA0027979 | VA | JMSTF2 | | | |
| AMHERST TOWN STP | VA0031321 | VA | JMSTF2 | | | |
| PROCTORS CREEK | VA0060194 | VA | JMSTF2 | | | |
| RICHMOND | VA0063177 | VA | JMSTF2 | | | |
| HENRICO COUNTY | VA0063690 | VA | JMSTF2 | | | |

**Table 9-4. Edge of Stream (EOS) WLAs (Annual) for the 478 significant permitted dischargers to meet TMDLs to attain the Chesapeake Bay WQS**

| Permit Name | NPDES ID | Jurisdiction | Segment ID | TN EOS WLA (lbs/yr) | TP EOS WLA (lbs/yr) | TSS EOS WLA (lbs/yr) |
|---|---|---|---|---|---|---|
| HOPEWELL | VA0066630 | VA | JMSTF1 | | | |
| HRSD-ARMY BASE | VA0081230 | VA | JMSPH | | | |
| HRSD-BOAT HARBOR | VA0081256 | VA | JMSPH | | | |
| HRSD-CHESAPEAKE/ELIZABETH | VA0081264 | VA | LYNPH | | | |
| HRSD-JAMES RIVER | VA0081272 | VA | JMSMH | | | |
| HRSD-VIP | VA0081281 | VA | ELIPH | | | |
| HRSD-NANSEMOND | VA0081299 | VA | JMSPH | | | |
| HRSD-WILLIAMSBURG | VA0081302 | VA | JMSOH | | | |
| FARMVILLE | VA0083135 | VA | APPTF | | | |
| LEXINGTON-ROCKBRIDGE REGIONAL STP | VA0088161 | VA | JMSTF2 | | | |
| CHICKAHOMINY | VA0088480 | VA | CHKOH | | | |
| ALLEGHANY CO. LOWER JACKSON | VA0090671 | VA | JMSTF2 | | | |

\* Back River WWTP discharges into two segments BACOH and PATMH
\*\* Blue Plains treats wastewater from DC, MD and VA, but is listed once in this table as a plant located in DC
\*\*\* BERKELEY COUNTY PSSD WV0082759 includes four facilities under the same permit.
Note: Gray shading indicates significant permitted dischargers that are part of a larger aggregate WLA.

# SECTION 10. IMPLEMENTATION AND ADAPTIVE MANAGEMENT

## 10.1 FUTURE GROWTH

As an assumption of the Chesapeake Bay TMDL, EPA expects Chesapeake Bay jurisdictions to account for and manage new or increased loadings of nitrogen, phosphorus, and sediment.

### 10.1.1 Designating Target Loads for New or Increased Sources

Where the TMDL does not provide a specific allocation to accommodate new or increased loadings of nitrogen, phosphorus, or sediment, a jurisdiction may accommodate such new or increased loadings only through a mechanism allowing for quantifiable and accountable offsets of the new or increased load in an amount necessary to implement the TMDL and applicable WQS in the Chesapeake Bay and its tidal tributaries. Therefore, the Chesapeake Bay TMDL assumes, and EPA expects, that the jurisdictions will accommodate new or increased loadings of nitrogen, phosphorus, or sediment that do not have a specific allocation in the TMDL with appropriate offsets supported by credible and transparent offset programs subject to EPA oversight.

### 10.1.2 Offset Programs

EPA expects that new or increased loadings of nitrogen, phosphorus, and sediment in the Chesapeake Bay watershed that are not specifically accounted for in the TMDL's WLA or LA will be offset by loading reductions and credits generated by other sources under programs that are consistent with the definitions and common elements described in Appendix S. These definitions and common elements are important to ensure that offsets are achieved through reliable pollution controls and that the goals of the Chesapeake Bay TMDL are met.

EPA expects the jurisdictions to develop offset programs that are credible, transparent, consistent with the definitions and common elements set out in Appendix S, and subject to EPA and public oversight. Any such offsets are expected to account for the entire delivered nitrogen, phosphorus, or sediment load after accounting for location of the sources, delivery factors affecting pollutant fate and transport, equivalency of pollutants, and the certainty of any such reductions. In addition, such offsets may not cause an exceedance of local WQS or local TMDLs. The offsets are to be in addition to reductions already needed to meet the allocations in the TMDL and must be consistent with applicable federal and state laws and regulations.

For nonpoint sources, this assumption and expectation is based on the fact that any new or increased nonpoint source loadings not accounted for in the TMDL's LA will have to be offset by appropriate reductions from other sources if the TMDL's pollutant loading cap and applicable WQS are to be met. For permitted point sources, the assumption and expectation also is based on the statutory and regulatory requirements that effluent limits for any such discharges be derived from and comply with all applicable WQS and be consistent with the assumptions and

requirements of any available WLAs [CWA sections 301(b)(1)(C), 303(d); 40 CFR 122.44(d)(1)(vii)(A) & (B)].

In addition, CWA section 117(g) authorizes EPA to ensure that management plans are developed and implementation is begun to achieve and maintain the Bay's nutrient goals. If jurisdictions authorize new or increased loadings without a specific TMDL allocation, an offset is a necessary component of any management plan designed to meet those goals. Accordingly, the Bay TMDL assumes that new point source dischargers, without an allocation in the TMDL (or in other words, with a zero allocation), will find offsets large enough to compensate for their entire loading. The TMDL similarly assumes that point source dischargers that increase pollution loading will find offsets large enough to compensate for the entire increase in their loading and to meet their Water Quality Based Effluent Limit (WQBEL) consistent with the WLA in the TMDL. In the case of new or increased loading from sources other than permitted point source dischargers, jurisdictions are expected to estimate loadings and ensure offsets that fully compensate for this estimated increase in pollutant load.

Although EPA assumes that there can legitimately be some flexibility in the design and content of Bay jurisdiction offset programs, EPA encourages and expects that the jurisdictions will generally develop and implement programs for offsetting new and increased loadings consistent with the definitions and common elements described in detail in Appendix S. EPA also encourages and expects jurisdictions with existing trading programs that address new or increased loadings (such as several jurisdictions have), to ensure that their programs address new or increased loads consistent with the definitions and common elements in Appendix S.

### 10.1.3   Additional Offset Program Features

The jurisdictions also may consider using the following features to build their offset programs for new or increased loadings of nitrogen, phosphorus, and sediment:

*Net Improvement Offsets:* For purposes of the Bay TMDL, this means an offset at a ratio greater than merely accounting for the entire new or increased load. The jurisdiction's offset program would need to provide the authority and procedures for invoking such a provision. This tool might be considered as a means to accelerate load reductions where a jurisdiction is not on a schedule to ensure that nitrogen, phosphorus, and sediment controls are in place by 2017 and 2025 to meet interim and final target loads, respectively. This may be determined based on an EPA evaluation of a jurisdiction's progress on its WIP and 2-year milestones, as discussed in EPA's December 29, 2009 letter (USEPA 2009d). Net improvement offsets also might be considered, in the case of permitted point sources, to offset new or increased loads from nonpoint sources or from point sources not expected to be permitted.

*Aggregated Programmatic Credits:* For purposes of the Bay TMDL, this means defining a programmatic solution for over-control of nitrogen, phosphorus or sediment beyond the basic WIP strategies to achieve the TMDL allocation. In essence, it is an aggregation of credits from reductions by a class or subclass of sources where such reductions have been achieved by the jurisdiction or another duly authorized body. The jurisdiction may consider making such credits available to offset new or increased loadings. In some circumstances, such class reductions also

could be applied as a reallocation of loadings under the TMDL. Such reallocation may require modification of the TMDL.

*Reserve-Offset Hybrid:* For purposes of the Bay TMDL, this applies where a jurisdiction reserves a portion of its allocations for future growth and, once that allocation is depleted, uses an offset program as described herein.

### 10.1.4   EPA's Oversight Role of Jurisdictions' Offset Programs

EPA encourages jurisdictions to consult with EPA throughout the development of their offset programs to facilitate alignment with the CWA and the Bay TMDL. EPA has various oversight responsibilities under the CWA, MOUs for authorization of jurisdictions' NPDES programs, and the TMDL/Executive Order 13508, including approval of revisions to WQS, review of NPDES permits, and provisions for reviewing and making recommendations regarding revisions to a jurisdiction's water quality management plans through the continuing planning process.

EPA intends to maintain regular oversight of jurisdictions' offset programs through periodic audits and evaluations. EPA will report its findings to the respective jurisdiction. EPA's first such review of jurisdictional offset and trading programs will take place in calendar year 2011. EPA expects that the findings of this evaluation will inform offset and trading provisions included in the jurisdictions' Phase II WIPs. Such oversight generally will be conducted on a programmatic basis, not an individual offset basis. EPA reserves its authority, however, to review any individual offset (including an NPDES permit containing an offset) and to comment on, object to, or issue the permit as needed if EPA determines that the offset is not consistent with the Clean Water Act or EPA's regulations. When questions or concerns arise, EPA will use its oversight authorities to ensure that offset programs are fully consistent with the CWA and its implementing regulations. EPA recognizes the value of implementing a strategy for offsets that, wherever possible, is consistent among the jurisdictions to increase credibility, scalability, and broader regional implementation such as interstate trading.

## 10.2  WATER QUALITY TRADING

EPA recognizes that a number of Bay jurisdictions already are implementing water quality trading programs. EPA supports implementation of the Bay TMDL through such programs, as long as they are established and implemented in a manner consistent with the CWA, its implementing regulations, and EPA's 2003 *Water Quality Trading Policy*[1] (USEPA 2003e) and 2007 *Water Quality Trading Toolkit for NPDES Permit Writers*[2] (USEPA 2007d). An assumption of this TMDL is that trades may occur between sources contributing pollutant loadings to the same or different Bay segments, provided such trades do not cause or contribute to an exceedance of WQS in either receiving segment or anywhere else in the Bay watershed. EPA does not support any trading activity that would delay or weaken implementation of the Bay TMDL, that is inconsistent with the assumptions and requirements of the TMDL, or that would cause the combined point source and nonpoint source loadings covered by a trade to exceed the applicable loading cap established by the TMDL.

---

[1] See http://www.epa.gov/owow/watershed/trading/finalpolicy2003.pdf.
[2] See http://www.epa.gov/owow/watershed/trading/WQTToolkit.html.

In Section 10.1, EPA explains how Bay jurisdictions may accommodate new or increased loadings of nitrogen, phosphorus, and sediment either through a specific TMDL allocation or by offsetting those loadings with quantifiable and accountable reductions necessary to implement applicable WQS in the Bay and its tidal tributaries. In Appendix S, EPA discusses a number of definitions and common elements that EPA encourages and expects the jurisdictions to include and implement in their offset programs. EPA believes the definitions and common elements in Appendix S also constitute important components of trading programs in the Chesapeake Bay watershed. EPA anticipates using these Appendix S definitions and elements in reviewing jurisdictions' trading programs.

## 10.3  FUTURE MODIFICATIONS TO THE CHESAPEAKE BAY TMDL

EPA has established the Chesapeake Bay TMDL, including its component WLAs, LAs, and margin of safety, based on the Bay and tidal tributaries' applicable WQS and the totality of the information available to it concerning Bay Watershed water quality and hydrology, present and anticipated pollutant sources and loadings, and jurisdiction-submitted implementation plans. In establishing the TMDL and making determinations about reasonable assurance, EPA has also relied on facts and assumptions regarding its own ability to ensure and successfully track TMDL implementation through the two-year milestone process and the application, if necessary, of appropriate federal actions. As a result, EPA believes this TMDL is an appropriate and effective framework for the point source and nonpoint source-focused implementation activities that the jurisdictions, EPA, and the other Bay watershed stakeholders must take to meet the Bay's nitrogen, phosphorus, and sediment reduction goals.

EPA recognizes, however, that neither the world at large nor the Bay watershed is static. In a dynamic environment like the Bay watershed, during the next 15 years change is inevitable. It may be possible to accommodate some of those changes within the existing TMDL framework without the need to revise it in whole, or in part. For example, EPA's permitting regulations at 122.44(d)(1)(vii)(B) require that permit WQBELs be "consistent with the assumptions and requirements of any available wasteload allocation for the discharge" contained in the TMDL. As the EPA Environmental Appeals Board has recognized, "WLAs are not permit limits *per se*; rather they still require translation into permit limits." *In re City of Moscow*, NPDES Appeal No. 00-10 (July 27, 2001). In providing such translation, the EAB said that "[w]hile the governing regulations require consistency, they do not require that the permit limitations that will finally be adopted in a final NPDES permit be identical to any of the WLAs that may be provided in a TMDL." Id. Accordingly, depending on the facts of a particular situation, it may be possible for the jurisdictions to write a permit limit that is consistent with (but not identical to) a given WLA without revising that WLA (either increasing or decreasing a specific WLA), provided the permit limit is consistent with the operative "assumptions " (e.g., about the applicable WQS, ambient water quality conditions, the sum of the delivered point source loads, hydrology, implementation strategies , the sufficiency of reasonable assurance) that informed the decision to establish that particular WLA.

There might, however, be circumstances in which the permit authority is not comfortable with, or the CWA would not allow, the degree to which a permit limit might deviate from a WLA in the TMDL such that one or more WLAs and LAs in the Bay TMDL would need to be revised. Or, fundamental assumptions like the nature and stringency of the applicable WQS or a

jurisdiction's legal authority might change. In these cases, it might be appropriate for EPA to revise the Bay TMDL (or portions of it). EPA would consider a request by the jurisdictions to propose such a revision to the TMDL following appropriate notice and comment. Alternatively, a jurisdiction could propose to revise a portion(s) of the Bay TMDL that applies within its boundaries (including, but not limited to specific WLAs and LAs) and submit those revisions to EPA for approval. If EPA approved any such jurisdiction-submitted revisions, those revisions would replace their respective parts in the EPA-established Bay TMDL framework. In approving any such jurisdiction-submitted revisions (or in making its own revisions) EPA would ensure that the revisions themselves met all the statutory and regulatory requirements for TMDL approval and did not result in any component of the original TMDL not meeting applicable WQS.

Based on possible updates to the model and on jurisdictions' WIPs, EPA will consider revising the Chesapeake Bay TMDL, if appropriate, in 2012 and 2017. EPA will also consider revising the TMDL based on other new or additional information provided by the jurisdictions. All revision requests from jurisdictions should be coordinated with EPA to fit within EPA's planned revision time frame.

## 10.4  FEDERAL FACILITIES AND LANDS

Federal lands account for approximately 5.3 percent of the Chesapeake Bay watershed. The federal sector is like other sectors in that EPA expects federal land owners to be responsible for achieving LAs and WLAs through actions, programs, and policies that will reduce the release of nitrogen, phosphorous, and sediment (CWA section 313, 33 U.S.C. 1323).

EPA expects federal agencies with property in the watershed to provide leadership and work with the seven Bay watershed jurisdictions in implementing their Phase I WIPs. Federal agencies have provided information on the spatial boundaries and land use types for facilities in the watershed. EPA used that information to model current pollutant loads from federal facilities and has provided the estimated loads to the jurisdictions. The Federal Strategy also requires federal agencies with property in the Bay watershed to work with the jurisdictions in developing their WIPs by identifying pollutant reductions from point and nonpoint sources associated with federal lands and committing to actions, programs, policies, and resources necessary to reduce nitrogen, phosphorus, and sediment by specific dates.

In their final Phase I WIPs, jurisdictions have established load reduction goals for sectors contributing nitrogen, phosphorus, and sediment loads to the Chesapeake Bay. The TMDL allocations are based almost wholly upon these load reductions; federal lands and installations are expected to contribute to these load reductions. In the Phase II WIPs, the jurisdictions are expected to further distribute LA and WLA allocations among local level target areas such as counties. These more local targets also could include federal facilities. EPA also expects that federal agencies will cooperate with Bay jurisdictions and provide them with information on federal agency actions, programs, policies, and resources necessary to achieve federal facility-specific load reduction targets in jurisdictions' Phase II WIPs.

Like the Bay jurisdictions, federal agencies are expected to create 2-year milestones detailing specific implementation actions to achieve federal lands' and facilities' share of load reductions.

These federal milestones also should support the implementation of jurisdictions' WIPs and two-year milestones through commitments to comply with permit conditions and provide coordination, funding, and technical assistance, as appropriate. The milestones will be the basis for tracking progress and providing transparency on federal sector performance related to agency TMDL responsibilities in the watershed.

Federal facility-specific target loads are expected to be included in the jurisdictions' Phase II WIPs in 2011 via one of two approaches: (a) jurisdictions could establish explicit load reduction expectations for federal facilities as part of the Phase II WIP process; or (b) on the basis of broad load reduction goals established by the jurisdiction, individual federal facilities/installations could develop Federal Facility Implementation Plans (FFIPs), which would explain to the jurisdiction how the facility would achieve needed load reductions in nitrogen, phosphorus, and sediment. The FFIPs would be expected to address, at a minimum, the following in targeting and achieving load reductions:

- Assess properties to determine the feasibility of installing urban retrofit practices and implementing nonstructural control measures that reduce volume and improve quality of stormwater runoff.

- Align cost-effective, urban stormwater retrofits and erosion repairs with the Bay TMDL allocations and jurisdictions' 2-year milestones.

- Assess and implement appropriate nonstructural practices to control stormwater discharges from developed areas and to reduce, prevent, or control erosion from unpaved roads, trails, and ditches.

- Consider the full spectrum of nitrogen, phosphorus, and sediment sources at a facility or installation to assess the ideal approach to achieve the needed nitrogen, phosphorus, and sediment reduction.

In addition, section 501 of Executive Order 13508 and the subsequent Executive Order Federal Strategy (FLCCB 2010) direct each federal agency with land, facilities or installation management responsibilities affecting 10 or more acres in the Bay watershed to implement section 502 guidance on federal land management. Pursuant to section 502 of the Executive Order, EPA issued on May 12, 2010, the Guidance for Federal Land Management in the Chesapeake Bay Watershed (EPA May 12, 2010), EPA 841-R-10-002 (section 502 guidance). EPA's objective in developing the section 502 guidance was to provide information and data on appropriate, proven, and cost-effective tools and practices for implementation on federal lands and at federal facilities.

The section 502 guidance includes chapters addressing agriculture, urban and suburban areas (including turf), forestry, riparian area management, decentralized wastewater treatment systems, and hydromodification. Each chapter contains one or more implementation measures that provide the framework for the chapter. They are intended to convey the actions that will help ensure that the broad goals of the Chesapeake Bay Executive Order are achieved. Each chapter also includes information on practices that can be used to achieve the goals; information on the effectiveness and costs of the practices; where relevant, cost savings or other economic/societal benefits (in addition to the pollutant reduction benefits) that derive from the implementation goals or practices; and copious references to other documents that provide additional information. Federal agencies are expected to incorporate the section 502 guidance as part of

their overall strategy to meet the loading reductions that the jurisdictions in their Phase II WIPs assign to them.

In addition, the Executive Order Federal Strategy calls for federal agencies to adopt an agency-specific policy to ensure implementation of the stormwater requirements in section 438 of the Energy Independence and Security Act (EISA) for new development and redevelopment activities consistent with guidance developed by EPA. Section 438 of EISA requires federal agencies to maintain or restore the predevelopment hydrology (the runoff volume, rate, temperature, and duration of flow that typically existed on the site before human-induced land disturbance occurred) of any project with a footprint that exceeds 5,000 square feet. The agency-specific policy should include mechanisms for producing an annual internal agency action plan and progress report. Implementation of the agency-specific policy is to begin in 2011. The results of each federal agency's actions to comply with section 438 of EISA will be published as part of the annual progress report issued under the direction of the Executive Order discussed above.

## 10.5  FACTORING IN EFFECTS FROM CONTINUED CLIMATE CHANGE

EPA accounted for the potential effects of future climate change in the current Bay TMDL allocations based on a preliminary assessment of climate change impacts on the Chesapeake Bay (see Section 5.11 and Appendix E). There are well-known limitations in the current suite of Bay models to fully simulate the effects of climate change as cited in Section 5.11.

EPA and its partners are committed to conducting a more complete analysis of climate change effects on nitrogen, phosphorus, and sediment loads and allocations  in time for the mid-course assessment of Chesapeake Bay TMDL progress in 2017 as called for in Section 203 of the Chesapeake Executive Order 13508 (May 12, 2009), accessible at http://executiveorder.chesapeakebay.net/EO/file.axd?file=2009%2f8%2fChesapeake+Executive+Order.pdf. To do that will require building the capacity to quantify the impacts of climate change at the scale of the Bay TMDL—92 Bay segments and their surrounding watersheds at the scale of the Phase II Watershed Implementation Plans' target loads—and incorporate that information into the full suite of Bay models and other decision support tools.

EPA has committed to take an adaptive management approach to the Bay TMDL and incorporate new scientific understanding of the effects of climate change into the Bay TMDL, in this case during the mid-course assessment.

## 10.6  SEDIMENT BEHIND THE SUSQUEHANNA RIVER DAMS

The dams along the lower Susquehanna River are a significant factor influencing nitrogen, phosphorus, and sediment loads to the Bay because they retain large quantities of sediment and phosphorus, and some nitrogen, in their reservoirs (Appendix T). The three major dams along the lower Susquehanna River are the Safe Harbor Dam, Holtwood Dam, and Conowingo Dam. In developing the TMDL, EPA considered the impact of these dams on the pollutant loads to the Bay and how those loads will change when the dams no longer function to trap nitrogen, phosphorus, and sediment.

The Bay TMDL incorporates the current sediment-trapping capacity of the Conowingo Dam at 55 percent, with nitrogen and phosphorus trapping capacity at 2 percent and 40 percent, respectively. That allows the sediment, nitrogen, and phosphorus allocations to the jurisdictions to reflect the actual input to the Bay. If future monitoring shows a change in trapping capacity in the Conowingo Dam, the 2-year milestone delivered load reductions could be adjusted accordingly. The adjusted loads may be compared to the 2-year milestone commitments to ensure that each jurisdiction is meeting its obligations. For example, if there were a reduction in the sediment-trapping capacity in the reservoir, an upland jurisdiction might need to increase its sediment-reduction efforts to meet the allocations it has been assigned in the Bay TMDL. The jurisdictions' sediment allocation would not necessarily change, but the jurisdictions might need to increase the level of effort in reducing sediment to account for the loss of trapping capacity in the reservoir. Changes in the sediment-trapping capacity are not expected to alter the amount of sediment that the Bay is able to assimilate and, therefore, are not expected to change the allocations in this Bay TMDL.

For the purposes of the Chesapeake Bay TMDL, EPA and the partners assumed the current trapping efficiencies will continue. If future monitoring shows that trapping efficiencies are reduced, Pennsylvania, New York, and Maryland's respective 2-year milestone delivered loads could be adjusted accordingly. Therefore it is imperative that those jurisdictions work together to develop an implementation strategy for addressing the sediment, nitrogen, and phosphorus behind the Conowingo Dam through their respective WIPs, so that they are prepared if the trapping efficiencies decrease.

## 10.7  FILTER FEEDERS

Filter feeders play an important role in the uptake of nitrogen and phosphorus from the Chesapeake Bay and have the potential significantly improve water quality if present in large numbers (Appendix U). The organisms of interest for their ability to improve water quality are the native Eastern oyster, *Crassostrea virginica*, and menhaden fish, *Brevoortia tyrannus*. Each market-sized oyster contains about 0.5 gram of nitrogen and 0.16 gram of phosphorus. Menhaden fish are another filter feeding organism in the Chesapeake Bay. The Chesapeake Bay TMDL incorporates the effects of filter feeders.

EPA is basing the TMDL on the current assimilative capacity of filter feeders at existing populations built into the calibration of the oyster filter feeding submodel of the Chesapeake Bay Water Quality and Sediment Transport Model. Potential future population changes are not accounted for in the Bay TMDL. If future monitoring data indicate an increase in the filter feeder population, the appropriate jurisdiction's 2-year milestone delivered load reductions can be adjusted accordingly. Similarly if reductions in future filter feeder populations are observed that result in reduced nutrient assimilation, the 2-year milestone delivered load reductions can be adjusted to account for the change. The adjusted loads will be compared to the 2-year milestone commitments to ensure that each jurisdiction is meeting its obligations.

# SECTION 11.  PUBLIC PARTICIPATION

EPA and the Bay jurisdictions have benefitted from a comprehensive effort to exchange information with key stakeholders and the broader public on the Chesapeake Bay TMDL.

The Bay TMDL has been the subject of public discussion and close interaction between EPA and the seven watershed jurisdictions since 2005. Activities to further public involvement in the Bay TMDL will continue in 2011 and beyond as the TMDL is implemented.

The concentrated outreach period of 2009 and 2010 leading up to the establishment of the TMDL is of particular focus in this section. That 2-year effort featured hundreds of meetings with interested groups; two extensive rounds of public meetings, stakeholder sessions, and media interviews throughout the watershed; a dedicated EPA website; a series of monthly interactive webinars accessed online by more than 2,500 people; three notices published in the *Federal Register*; and a close working relationship with Chesapeake Bay Program committees representing citizens, local governments, and the scientific community.

The states and the District of Columbia have also involved stakeholders and the broader public in the development of their Watershed Implementation Plans, which informed the Bay TMDL.

## 11.1  Stakeholder and Local Government Outreach and Involvement

EPA has made a concerted effort over the past years to involve a variety of stakeholders, including local governments, in the development of the Chesapeake Bay TMDL. This subsection describes some of the more significant aspects of that effort.

### 11.1.1   Open Collaboration with Stakeholders

EPA has taken extra efforts to reach out to groups and sectors that will be particularly affected by the Bay TMDL. Since 2008, EPA principals involved in developing the Bay TMDL have attended nearly 400 meetings with a wide range of groups throughout the watershed to give and receive information about the TMDL. A list of those meetings is provided in Appendix C.

During the course of months-long outreach campaigns in the fall of 2009 and 2010, EPA teams conducted nearly 100 separate meetings and briefings with key stakeholder groups to share sector-specific information and address sector-focused questions. Those groups included farmers and producers, homebuilders and developers, municipal wastewater authorities, local elected officials, conservation groups, and environmental advocacy organizations. The outreach generated key insights and perspectives.

### 11.1.2   Outreach to Local Governments and Elected Officials

EPA and the watershed jurisdictions have made a special effort to involve local governments in the Bay TMDL process to better understand how the TMDL can best be tailored to local scales for implementation. EPA and the jurisdictions will have more targeted discussions with local officials starting in 2011 as the Phase II Watershed Implementation Plans from the states and the

District offer a finer scale commitment to meeting the pollution reduction allocations. EPA has and is willing to use the scientific ability in the TMDL to identify pollution sources and impacts on a relatively local level.

### 11.1.3   Local Pilots

EPA provided $300,000 in technical assistance for a series of pilot projects to help the jurisdictions engage local partners as part of their Watershed Implementation plan Process. Local governments, conservation districts, watershed groups and others were eligible for a share of the assistance. The projects are demonstrating how local needs, priorities, and existing restoration efforts can be incorporated in the implementation plans. EPA awarded funds to the following communities and watersheds:

District of Columbia
Maryland: Anne Arundel and Caroline counties
New York: Chemung River watershed
Pennsylvania: Conewago Creek watershed
Virginia: Prince William County and Rivanna River basin
West Virginia: Berkeley, Jefferson, and Morgan counties
Information on the pilot projects is at
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/WIPPilotProjectSummary_82010.pdf.

## 11.2  Public Outreach

EPA's extensive outreach efforts included public meetings, webinars, and a dedicated website that facilitated a continuing dialogue between EPA, the seven watershed jurisdictions, and key stakeholders on the Chesapeake Bay TMDL for nitrogen, phosphorus, and sediment.

### 11.2.1   Public Meetings

Two rounds of public meetings in each of the watershed jurisdictions were a centerpiece of EPA's outreach efforts.

#### November–December 2009 Public Meetings

EPA and its jurisdiction partners sponsored 16 public meetings in the fall of 2009 to share information on the forthcoming Bay TMDL. A number of the public meetings were broadcast to a live, online audience via webinar. More than 2,000 people participated in the meetings, including 1,815 in person and 263 online via webinar at six of the locations. There was also a kickoff public meeting in Richmond, Virginia, in October 2009 that drew a combined live and online audience of more than 400 people.

The 2009 public meetings were held in

Martinsburg, West Virginia, November 4*
Moorefield, West Virginia, November 5
Washington, D.C., November 16*
Ashley, Pennsylvania, November 17
Williamsport, Pennsylvania, November 18

State College, Pennsylvania, November 19
Lancaster, Pennsylvania, November 23*
Binghamton, New York, December 1*
Baltimore, Maryland, December 8*
Laurel, Delaware, December 10*
Wye Mills, Maryland, December 11
Falls Church, Virginia, December 14
Chesapeake, Virginia, December 15
Williamsburg, Virginia, December 15
Penn Laird, Virginia, December 16
Fredericksburg, Virginia, December 17
* Meeting also was broadcast online via webinar. The largest live audiences were in Penn Laird,
Virginia (205), and Lancaster, Pennsylvania (196).

## September-November 2010 Public Meetings

The draft Chesapeake Bay TMDL was issued on September 24, 2010, commencing a 45-day
public comment period. During that comment period, a total of 18 public meetings were held in
all seven watershed jurisdictions. As in 2009, one of the meetings in each jurisdiction was
broadcast online via webinar to a broader audience. The times, specific locations, directions, and
parking information were posted on the Bay TMDL website:
http://www.epa.gov/chesapeakebaytmdl.

EPA and the respective jurisdictions each made presentations during the public meetings. Those
presentations were posted on the Bay TMDL website as they happened. They can be found on
the site as part of a summary of the 2010 public meetings.

Nearly 2,800 people participated in the meetings, including 2,311 in person (estimated based on
sign-in sheets and headcounts) and 477 online via webinar.

The meetings and attendance figures were as follows:

Washington, D.C., September 29* (29 in person, 74 online)
Harrisonburg, Virginia, October 4 (330)
Annandale, Virginia, October 5 (135)
Richmond, Virginia, October 6 (250)
Webinar, October 7 (9 in person, 160 online)
Hampton, Virginia, October 7 (165)
Georgetown, Delaware, October 11* (90 in person, 16 online)
Easton, Maryland, October 12 (111)
Annapolis, Maryland, October 13 (200)
Hagerstown, Maryland, October 14* (60 in person, 65 online)
Lancaster, Pennsylvania, October 18 (200)
State College, Pennsylvania, October 19 (101)
Williamsport, Pennsylvania, October 20* (80 in person, 101 online)
Ashley, Pennsylvania, October 21 (40)
Elmira, New York, October 26 (120)
Binghamton, New York, October 27* (120 in person, 42 online)

Martinsburg, West Virginia, November 3 (100)
Romney, West Virginia, November 4* (171 in person, 19 online)
* Meeting also broadcast online via webinar. Webinar registration links were available on the Bay TMDL website listed above.

## 11.2.2  *Webinars to Expand Audiences*

EPA Region 3 was one of the first regional offices to acquire capacity to host large webinars. The system was obtained specifically to broadcast a representative number of the 2009 fall public meetings to online audiences, thus expanding the ability for the public to hear and participate in the meetings. Webinars were broadcast about monthly and were incorporated in a number of the fall 2010 public meetings—one in each jurisdiction.

### Monthly Webinars

EPA sponsored monthly webinars in 2010 to keep the public up to date on Bay TMDL developments. The seven webinars drew a collective audience of 2,587 participants. The regularly scheduled webinars represent one of EPA's Open Government flagship initiatives for public outreach. A substantial portion of each webinar was reserved for informal questions and answers.

The monthly webinars were advertised widely using stakeholder and jurisdiction lists of hundreds of people and organizations that have expressed an interest in the Bay TMDL. The registration links for the webinars were published prominently on the Bay TMDL website.

The monthly webinars were held on

| February 25, 2010 | TMDL Update 1 | 529 participants |
| March 25, 2010 | TMDL Update 2 | 379 participants |
| May 17, 2010 | TMDL Update 3 | 294 participants |
| June 7, 2010 | TMDL Update 4 | 288 participants |
| July 8, 2010 | TMDL Update 5 | 383 participants |
| August 9, 2010 | TMDL Update 6 | 385 participants |
| September 28, 2010 | TMDL Update 7 | 329 participants |

### Webinars Tailored to Specific Stakeholder Communities

In addition to the monthly webinars, EPA sponsored two webinars to review detailed modeling and other technical information with representatives of the agriculture and development communities.

The webinars were held on

| March 22, 2010 | Webinar for the Agriculture Community | 218 participants |
| May 6, 2010 | Webinar for the Development Community | 84 participants |

### 11.2.3   Chesapeake Bay TMDL Website

EPA established a website for the Chesapeake Bay TMDL in August 2009. The address is http://www.epa.gov/chesapeakebaytmdl.

The site continues to include the latest news and information on the Bay TMDL, along with fact sheets, questions and answers, presentations, and other features. The site has consistently been one of the most popular in EPA Region 3 according to access numbers.

In addition, the Chesapeake Bay Program partnership's website (www.chesapeakebay.net) has contained detailed information involving Bay TMDL proceedings, including scientific data, PowerPoint presentations, and other items used in the process.

### 11.2.4   Public Notices

#### Federal Register Notices

EPA has issued two notices in the *Federal Register* regarding the Chesapeake Bay TMDL to ensure that the public has full advance notification of major events. The notices include a September 17, 2009, announcement (USEPA 2009a) of the public meetings and a September 22, 2010 announcement (USEPA 2010c) of the public review and comment period. EPA issued a third notice to announce establishment of the final Chesapeake Bay TMDL.

#### Newspaper Notices

EPA has issued notices in regional and local newspapers regarding the Chesapeake Bay TMDL to ensure that the public throughout the watershed has full advance notification of major events.

## 11.3   Responses to Public Comments

The Draft Chesapeake Bay TMDL was available for public comment from September 24, 2010, to November 8, 2010. Comments were accepted electronically via Docket ID No. EPA-R03-OW-2010-0736 at www.regulations.gov, by mail, and by hand delivery. A link to review and comment on the Bay TMDL was provided through the Bay TMDL website.

EPA received more than 14,000 comments on the Bay TMDL, including more than 700 detailed comment letters. More than 90 percent of the comments, including many similar submissions, were in favor of the TMDL. Comments came from many different sources, including individual citizens, industry, local government, environmental organizations, and academia.

A team of EPA specialists reviewed and responded to all written comments submitted during the public comment period and the comments were considered, as appropriate, in the establishment of the final Bay TMDL. Responses to the comments are included in Appendix W in the final Bay TMDL document.

## 11.4  Interaction with States, D.C. on Watershed Implementation Plans

EPA provided considerable assistance to the six watershed states and the District of Columbia in the development of their draft and final WIPs. In addition to financial and technical assistance, EPA held numerous meetings and conference calls with each of the jurisdictions to provide input and guidance and to reiterate expectations for the WIPs. A listing of those conference calls and meetings are included in Appendix C in this document.

# SECTION 12.  REFERENCES

Aber, J.D., K.J. Nadelhoffer, P. Steudler, and J.M. Melillo. 1989. Nitrogen saturation in northern forest ecosystems. Bioscience 39(6):378-386.

American Canoe Association, Inc., et al. v U.S. Environmental Protection Agency , et al., Civil Action No. 98-979-A, (E.D. Va. June 11, 1999).

American Littoral Society, et al. v EPA, et al., No. 96-330 (D. Del.).

Batiuk, R.A., R. Orth, K. Moore, J.C. Stevenson, W. Dennison, L. Staver, V. Carter, N.B. Rybicki, R. Hickman, S. Kollar, and S. Bieber. 1992. *Chesapeake Bay Submerged Aquatic Vegetation Habitat Requirements and Restoration Targets: A Technical Synthesis.* CBP/TRS 83/92. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

Batiuk, R.A., P. Bergstrom, M. Kemp, E. Koch, L. Murray, J.C. Stevenson, R. Bartleson, V. Carter, N.B. Rybicki, J.M. Landwehr, C. Gallegos, L. Karrh, M. Naylor, D. Wilcox, K., A. Moore, S. Ailstock, and M. Teichberg. 2000. *Chesapeake Bay Submerged Aquatic Vegetation Water Quality and Habitat-Based Requirements and Restoration Targets: A Second Technical Synthesis.* CBP/TRS 245/00 EPA 903-R-00-014. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

Batiuk, R.A., D.L. Breitburg, R.J. Diaz, T.M. Cronin, D.H. Secor, and G. Thursby. 2009. Derivation of habitat-specific dissolved oxygen criteria for Chesapeake Bay and its tidal tributaries. *Journal of Experimental Marine Biology and Ecology* 381:S204–S215.

Bicknell, B.R., J.C. Imhoff, J.L. Kittle Jr., T.H. Jobes, and A.S. Donigian Jr. 2005. Hydrological Simulation Program—FORTRAN. User's Manual for Release 12.2. U.S. Environmental Protection Agency Ecosystem Research Division, Athens, GA, and U.S. Geological Survey, Office of Surface Water, Reston, VA.

Brakebill, J.W., S.W. Ator, and G.E. Schwarz. 2010. Sources of suspended-sediment flux in streams of the Chesapeake Bay Watershed: A Regional Application of the SPARROW Model. *JAWRA* 46(4):757–776.

Brakebill, J.W., and S.D. Preston. 2007. Factors affecting the distribution and transport of nutrients. In *Synthesis of U.S. Geological Survey Science for the Chesapeake Bay Ecosystem and Implications for Environmental Management* ed. Phillips. U.S. Geological Survey Circular 1316, 63p.

Brakebill, J., and S. Preston. 2004. Digital Data Used to Relate Nutrient Inputs to Water Quality in the Chesapeake Bay Watershed, Version 3.0. USGS Open-File Report 2004-1433. U.S. Geological Survey, Reston, VA.

Brown, K.W. and J.C. Thomas. 1978. Uptake of Nitrogen by Grass from Septic Fields in Three soils. *Agronomy Journal* 70(6):1037-1040.

Buchanan, C., ed. 1993. Development of Zooplankton Community Environmental Indicators for Chesapeake Bay. ICPRB Report 93-2. Prepared for U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD, and Maryland Department of the Environment, Baltimore, MD.

Campbell, K.L. 1982. Nutrient transport from North Florida agricultural fields and watersheds. Ed. Baldwin, L. B.; Bottcher, A. B. IFAS Conference on Nonpoint Pollution Control Technology, Gainsville, FL.

Carpenter, K., J.M. Johnson, and C. Buchanan. 2006. An index of biotic integrity based on the summer polyhaline zooplankton community of the Chesapeake Bay. *Marine Environmental Research* 62(3):165-180.

Castro, M. S., K.N. Eshleman, R.P. Morgan II, S.W. Seagle, R.H. Gardner, and L.F. Pitelka. 1997. Nitrogen dynamics in forested watersheds of the Chesapeake Bay. STAC Report Number: 97-3. Edgewater, MD.

Center for Watershed Protection. 2003. *Impacts of Impervious Cover on Aquatic Systems.* Center for Watershed Protection, Ellicott City, MD.

Cerco, C., and T. Cole. 1993. Three-dimensional eutrophication model of Chesapeake Bay. *Journal of Environmental Engineering* 119(6):1006-1025.

Cerco, C.F., and T. Cole. 1994. *Three-Dimensional Eutrophication Model of Chesapeake Bay*. Technical Report EL-94-4. U.S. Army Corps of Engineers Waterways Experiment Station, Vicksburg, MS.

Cerco, C. 2000. Phytoplankton kinetics in the Chesapeake Bay model. *Water Quality and Ecosystem Modeling* 1:5-49.

Cerco, C., B. Johnson, and H. Wang. 2002. *Tributary refinements to the Chesapeake Bay model*. ERDC TR-02-4. U.S. Army Engineer Corps of Engineers Research and Development Center, Vicksburg, MS.

Cerco, C.F. and M.R. Noel. 2004. *The 2002 Chesapeake Bay Eutrophication Model.* EPA 903-R-04-004. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Cerco, C., S.C. Kim, and M.R. Noel. 2010. The 2010 Chesapeake Bay Eutrophication Model. A Report to the US Environmental Protection Agency and to the US Army Corps of Engineer Baltimore District. US Army Engineer Research and Development Center, Vicksburg, MD.

Chesapeake Bay Partnership. 1983. *The Chesapeake Bay Agreement of 1983*. Chesapeake Bay Partnership, Washington, DC.

CBP (Chesapeake Bay Program). 1987. *Habitat Requirements for Chesapeake Bay Living Resources.* U.S. Environmental Protection Agency, Chesapeake Bay Program, Chesapeake Bay Living Resources Task Force, Annapolis, MD.

CBP (Chesapeake Bay Program). 1989a. *Chesapeake Bay Monitoring Program Atlas-Volume 1: Water Quality and Other Physiochemical Monitoring Programs*. CBP/TRS 34/89. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

CBP (Chesapeake Bay Program). 1989b. *Chesapeake Bay Monitoring Program Atlas-Volume II: Biological and Living Resource Monitoring Programs*. CBP/TRS 35/89. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

CBP (Chesapeake Bay Program). 1997. *Chesapeake Bay Nutrient Reduction Progress and Future Directions—Nutrient Reevaluation Summary Report*. CBP/TRS 189/97. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

CBP (Chesapeake Bay Program). 1998. *Chesapeake Bay Watershed Model Application and Calculation of Nutrient and Sediment Loadings – Appendix F: Phase IV Chesapeake Bay Watershed Model Point Source Load.* U.S. Environmental Protection Agency, Chesapeake Bay Program, Nutrient Subcommittee, Annapolis, MD.

CBP (Chesapeake Bay Program). 1999. *Process for Integrating the Cooperative and Statutory Programs of the Chesapeake Bay and its Tributaries—Continuing the Watershed Partnership to Restore the Chesapeake Bay.* U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

CBP (Chesapeake Bay Program). 2004a. *Establishing a Chesapeake Bay Nontidal Watershed Water-Quality Network*. U.S. Environmental Protection Agency, Chesapeake Bay Program. Annapolis, MD.

CBP (Chesapeake Bay Program). 2004b. *Water Quality Database, Database Design and Data Dictionary.* January 2004. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

CBP (Chesapeake Bay Program). 2008. *Nontidal Water Quality Monitoring. November 2008. Chapter V of Recommended Guidelines for Sampling and Analysis in the Chesapeake Bay Monitoring Program, Revision 1-Draft*. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, Maryland.

CBP (Chesapeake Bay Program). 2009. *Chesapeake Bay Program Governance—Managing the Partnership for a Restored and Protected Watershed and Bay*. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

CBP (Chesapeake Bay Program). 2010a. *Chesapeake Bay Nontidal Water-Quality Sampling Progress Report, Calendar Year 2009*. U.S. Environmental Protection Agency, Chesapeake Bay Program. Annapolis, MD.

CBP (Chesapeake Bay Program). 2010b. *Guide to Using the Chesapeake Bay Program Water Quality Monitoring Data*. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD.

CBP PSC (Chesapeake Bay Program Principals' Staff Committee). 2007. October 1, 2007 Meeting Summary of the Chesapeake Bay Program Principals' Staff Committee, Annapolis Friends Meeting House, Annapolis, MD.

Chesapeake Bay Reevaluation Steering Committee. 2005. Chesapeake Bay Program 2007 Reevaluation Workshop, Lancaster, PA, September 21–22, 2005. Summary of Issues, Actions and Decisions. Chesapeake Bay Reevaluation Steering Committee, Annapolis, MD.

Chesapeake Bay Watershed Partners. 2000. *Memorandum of Understanding among the State of Delaware, the District of Columbia, the State of Maryland, the State of New York, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, the State of West Virginia, and the United States Environmental Protection Agency Regarding Cooperative Efforts for the Protection of the Chesapeake Bay and Its Rivers*. Chesapeake Bay Watershed Partners, Annapolis, MD.

Chesapeake Bay Watershed Partners. 2004. *Memorandum of Understanding among the State of Delaware, the District of Columbia, the State of Maryland, the State of New York, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, the State of West Virginia, the Interstate Commission on the Potomac River Basin, the Susquehanna River Basin Commission, the Metropolitan Washington Council of Governments, the United States Environmental Protection Agency, the United States Geological Survey and the Chesapeake Bay Commission regarding Cooperative Efforts for Monitoring and Assessing Water Quality in the Streams and Rivers of the Chesapeake Bay Watershed*. September 23, 2004. Chesapeake Bay Watershed Partners, Annapolis, MD.

CEC (Chesapeake Executive Council). 1987. *Chesapeake Bay Agreement*. Chesapeake Bay Program, Annapolis, MD.

CEC (Chesapeake Executive Council). 1992. *Chesapeake Bay Agreement—1992 Amendments*. Chesapeake Bay Program, Annapolis, MD.

CEC (Chesapeake Executive Council). 1997. Directive No. 97-1 Basinwide Nutrient Reduction Progress and Future Direction. Chesapeake Bay Program, Annapolis, MD.

CEC (Chesapeake Executive Council). 2000. Chesapeake 2000. Chesapeake Bay Program, Annapolis, MD.

CEC (Chesapeake Executive Council). 2003. Directive No. 03-02 Meeting the Nutrient and Sediment Reduction Goals. Chesapeake Bay Program, Annapolis, MD.

CEC (Chesapeake Executive Council). 2005. Directive No. 04-02 Meeting the Nutrient and Sediment Reduction Goals—Next Steps. Chesapeake Bay Program, Annapolis, MD.

Claggett, P.R., and C. Bisland. 2004. Assessing the vulnerability of forests and farmlands to development in the Chesapeake Bay Watershed, in *Proceedings of the IASTED International Conference on Environmental Modeling and Simulation,* November 22–24, 2004, St. Thomas, U.S. Virgin Islands.

Clark, G.M., D.K. Mueller, and M.A Mast. 2000. Nutrient concentrations and yields in undeveloped stream basins of the United States. *Journal of the American Water Resources Association* 36(4):849–860.

Clarke, K.C., S. Hoppen , and L. Gaydos. 1997. A self-modifying cellular automaton model of historical urbanization in the San Francisco Bay area. *Environment and Planning B.- Planning and Design* 24:247–261.

Curtin, P.D., G.S. Brush, and G.W. Fisher. 2001. *Discovering the Chesapeake*. Johns Hopkins University Press, Baltimore, MD.

Dauer, D.M. and R.J. Llansó. 2003. Spatial scales and probability based sampling in determining levels of benthic community degradation in the Chesapeake Bay. *Environmental Monitoring and Assessment* 81:175-186.

DC DOE (District of Columbia Department of the Environment). 2008. *Integrated Report.* District of Columbia Department of the Environment, Washington, DC.

DC DOH (District of Columbia Department of Health). 1998 303(d) List. District of Columbia Department of Health, Washington, DC.

DE DNREC (Delaware Department of Natural Resources and Environmental Control). 1996. *State of Delaware 1996 Clean Water Act Section 303(d) List of Waters*. Delaware Department of Natural Resources and Environmental Control, Dover, DE.

DE DNREC (Delaware Department of Natural Resources and Environmental Control). 1998. *Total Maximum Daily Load (TMDL) Analysis for Nanticoke River and Broad Creek Delaware*. Delaware Department of Natural Resources and Environmental Control, Dover, DE.

DE DNREC (Delaware Department of Natural Resources and Environmental Control). 2008. *State of Delaware 2008 Combined Watershed Assessment Report (305(b)) and Determination for the Clean Water Act Section 303(d) List of Waters Needing TMDLs*. Delaware Department of Natural Resources and Environmental Control, Dover, DE.

Dennis, R., R. Haeuber, T. Blett., J. Cosby, C. Driscoll, J. Sickles, and J. Johnson. 2007. Sulfur and nitrogen deposition on ecosystems in the United States. *Journal of the Air and Waste Management Association.* December 2007.

Dennison, W.C., R.J. Orth, K.A. Moore, J.C. Stevenson, V. Carter, S. Kollar, P.W. Bergstrom, and R.A. Batiuk. 1993. Assessing water quality with submersed aquatic vegetation habitat requirements as barometers of Chesapeake Bay health. *Bioscience* 43(2):86–94.

Di Toro, D.M. 2001. *Sediment Flux Modeling*. Wiley-Interscience, New York, NY.

Fennel, K., J. Wilkin, J. Levin, J. Moisan, J. O'Reilly, and D. Haidvogel. 2006. Nitrogen cycling in the Middle Atlantic Bight: Results from a three dimensional model for the North Atlantic nitrogen budget *Global Biogeochemical Cycles* 20(GB3007).

FLCCB (Federal Leadership Committee for the Chesapeake Bay). 2010. *Strategy for Protecting and Restoring the Chesapeake Bay Watershed.* Pursuant to Executive Order 13508. Federal Leadership Committee for the Chesapeake Bay, Washington, DC.

Funderburk, S.L., S.J. Jordan, J.A. Mihursky, and D.R. Riley (eds). 1991. *Habitat Requirements for Chesapeake Bay Living Resources, 1991 Second Edition*. Living Resources Subcommittee, Chesapeake Bay Program, Annapolis, MD.

Gallegos, C.L. 2001. Calculating optical water quality targets to restore and protect submersed aquatic vegetation: overcoming problems in partitioning the diffuse attenuation coefficient for photosynthetically active radiation. *Estuaries* 24 (3):381–397.

Gellis, A.C., C.R. Hupp, M.J. Pavich, J.M. Landwehr, W.S.L. Banks, B.E. Hubbard, M.J. Langland, J.C. Ritchie, and J.M. Reuter. 2009. *Sources, Transport, and Storage of Sediment at Selected Sites in the Chesapeake Bay Watershed.* Scientific Investigations Report 2008–5186. U.S. Geological Survey, Reston, VA.

Goetz, S.J., C.A. Jantz, S.D. Prince., A.J Smith, D. Varlyguin, and R. Wright. 2004. Integrated analysis of ecosystem interactions with land use change: The Chesapeake Bay watershed. In *Ecosystems and Land Use Change*, ed. R.S. DeFries, G.P. Asner, and R.A. Houghton, pp 263-275. American Geophysical Union, Geophysical Monograph Series, Washington, DC.

Goetz, S.J., and C.A. Jantz. 2006. *Modeling the Rates and Spatial Patterns of Future Land Cover Change in the Chesapeake Bay Watershed*. CB-973009-01. Final Report to the Chesapeake Bay Program, Chesapeake Bay Program Assistance Agreement, Annapolis, MD.

Goodale, C.L.; K. Lajtha, K.J. Nadelhoffer, E.W. Boyer, and N.A. Jaworski. 2002. Forest nitrogen sinks in large eastern U.S. watersheds: estimates from forest inventory and an ecosystem model. *Biogeochemistry* 57(58):39-266.

Grimm, J.W., and J.A. Lynch. 2000. *Enhanced wet deposition estimates for the Chesapeake Bay watershed using modeled precipitation inputs*. CBWP-MANTA-AD-99-2. Maryland Department of Natural Resource Chesapeake Bay and Tidewater Programs, Annapolis, MD.

Grimm, J.W., and J.A. Lynch. 2005. Improved daily precipitation nitrate and ammonium concentration models for the Chesapeake Bay Watershed. *Environmental Pollution* 135(2005):445–455.

Hameedi, J., H. Paerl, M. Kennish, and D. Whitall. 2007. Nitrogen deposition in U.S. coastal bays and estuaries. *Journal of the Air and Waste Management Association*. December 2007.

Horne, Alexander J., and C.R. Goldman. 1994. *Limnology*. Second edition. McGraw-Hill, Inc. Edited by Kathi M. Prancan and John M. Morriss.

Howarth, R.W., G. Billen, D. Swaney, A. Townsend, N. Jaworski, K. Lajtha, J.A. Downing, E.R. Elmgren, N. Caraco, T. Jordan, F. Berendse, J. Freney, V. Kudeyarov, P. Murdoch, H. Zhao-liang, and H. Zhu. 1995. Regional nitrogen budgets and riverine N & P fluxes for the drainages to the North Atlantic Ocean: Natural and human influences. *Biogeochemistry* 35(1):75-139.

Howarth, R.W. 1998. An assessment of human influences on fluxes of nitrogen from the terrestrial landscape to the estuaries and continental shelves of the North Atlantic Ocean. *Nutrient Cycling in Agroecosystems* 52:213-223.

Huddleston, J.H., and M.P Ronayne. 1990. *Guide to Soil Suitability and Site Selection for Beneficial Use of Sewage Sludge*. Manual 8. PB95-159596. Oregon State University Extension Service, Corvallis, and U.S. Environmental Protection Agency, Office of Water. Washington, DC.

Irani, F.M. and P.R. Claggett. 2010. *Chesapeake Bay Watershed Land Cover Change Data Series: U.S. Geological Data Series 505*. U.S. Geological Survey, Reston, VA.

Jantz, C.A., J.S. Goetz, and M.K. Shelley. Using the SLEUTH urban growth model to simulate the impacts of future policy scenarios on urban land use in the Baltimore–Washington metropolitan area. *Environment and Planning B.-Planning and Design* 31(2):251-271.

Jordan, S.J., C. Stenger, M. Olson, R. Batiuk, and K. Mountford. 1992. *Chesapeake Bay dissolved oxygen goal for restoration of living resource habitats: A synthesis of living resource requirements with guidelines for their use in evaluating model results and monitoring information*. CBP/TRS 88/93. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Kemp, W.M., R.A. Batiuk, R. Bartleson, P. Bergstrom, V. Carter, C.L. Gallegos, W. Hunley, L. Karrh, E. Koch, J.M. Landwehr, K.A. Moore, L. Murray, M. Naylor, N.B. Rybicki, J.C. Stevenson, and D.J. Wilcox. 2004. Habitat requirements for submerged aquatic vegetation in Chesapeake Bay: Water quality, light regime and physical-chemical factors. *Estuaries* 27(3):363–377.

Kemp, W.M., W.R. Boynton, J.E. Adolf, D.F. Boesch, W.C. Boicourt, G. Brush, J.C. Cornwell, T.R. Fisher, P.M. Glibert, J.D. Hagy, L.W. Harding, E.D. Houde, D.G. Kimmel, W.D. Miller, R.I.E. Newell, M.R. Roman, E.M. Smith, and J.C. Stevenson. 2005. Eutrophication of Chesapeake Bay: Historical trends and ecological interactions. *Marine Ecology Progress Series* 303:1–29.

Kingman Park Civic Association, et al. v. U.S. Environmental Protection Agency, et al., Case No. 98CV00758 (D.D.C. June 13, 2000).

Lacouture, R.V., C. Buchanan, J.M. Johnson, and H.G. Marshall. 2006. Phytoplankton index of biotic integrity for Chesapeake Bay and its tidal tributaries. *Estuaries and Coast* 29(4):598-616.

Lane, M. 2004. *CIMS Data Upload and Quality Assurance Tool: Data User's Guide*. August 2002. Prepared for Region 3 Chesapeake Bay Program Office, Annapolis, MD, by Veridyne, Inc., Broomall, PA.

Langland, M.J., P.I. Lietman, and S. Hoffman. 1995. Synthesis of Nutrient and Sediment Data for Watersheds within the Chesapeake Bay Drainage Basin: USGS in cooperation with EPA Water Resources Investigations Report 95-4233. Lemoyne, PA.

Langland, M., and T. Cronin, 2003. *A Summary Report of Sediment Processes in Chesapeake Bay and Watershed*. USGS Water-Resources Investigations Report 03-4123. U.S. Geological Survey, New Cumberland, PA.

Leopold, L.B.; M.G. Wolman, and J.P. Miller. 1995. *Fluvial Processes in Geomorphology*. Dover Publications. ISBN 0-486-68588-8.

Linker, L.C. 2003. *A Comparison of Estimated Water Quality Effects of Monthly and Annual Based Load Point Source Load Reductions*. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Linker, L.C. 2005. *Labile and Refractory Organic Nitrogen in Chesapeake Bay Wastewater Treatment Plants: Measurement and Model Simulation*. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Linker, L.C., G.W. Shenk, P. Wang, C. Cerco, A. Butt, P. Tango, and R. Savage. 2002. A *Comparison of Chesapeake Bay Estuary Model Calibration with 1985–1994 Observed Data and Method of Application to Water Quality Criteria*. Chesapeake Bay Program Modeling Subcommittee Report. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Linker, L.C., T. Johnson, J. Kittle Jr., G.W. Shenk. 2007. *Evaluating 2030 Climate Change in the Chesapeake Watershed*. American Water Research Association Annual Conference, November 12-15, 2007, Albuquerque, NM.

Linker, L.C., G.W. Shenk, P. Wang, and R. Batiuk, 2008. Chapter 3: Integration of Modeling, Research, and Monitoring in the Chesapeake Bay Program. In *Management of Water Quality and Irrigation Techniques*, ed. J.Albiac and A. Dinar. Earthscan. London, U.K.

Llansó, R.J., D.M. Dauer, J.H. Vølstad, and L.S. Scott. 2003. Application of the benthic index of biotic integrity to environmental monitoring in Chesapeake Bay. *Environmental Monitoring and Assessment* 81:163-174.

Lynch, J.A., and J.W. Grimm. 2003. *Improved Daily Nitrate and Ammonium Concentration Models for the Chesapeake Bay Watershed*. Prepared for U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Maizel, M., G. Muehlbach, P. Baynham, J. Zoerker, D. Monds, T. Iivari, P Welle, J. Robbin, and J. Wiles. 1995. *The Potential for Nutrient Loadings from Septic Systems to Ground and Surface Water Resources and the Chesapeake Bay*. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Marshall, H.G., R. Lacouture, C. Buchanan, and J. Johnson. 2006. Phytoplankton assemblages associated with water quality and salinity in Chesapeake Bay, U.S.A. *Estuarine, Coastal, and Shelf Science* 69:10–18.

Martucci, S.K., J.L. Krstolic, J.P. Raffensperger, and K.J. Hopkins. 2006. *Development of Land Segmentation, Stream-Reach Network, and Watersheds in Support of Hydrologic Simulation Program-Fortran (HSPF) Modeling, Chesapeake Bay Watershed, and Adjacent Parts of Maryland, Delaware, and Virginia*. U.S. Geological Survey, Reston, VA.

MD DNR (Maryland Department of Natural Resources). 2009. *Quality Assurance Project Plan for the Maryland DNR Chesapeake Bay Shallow Water Monitoring Program for the period July 1, 2009—June 30, 2010*. Maryland Department of Natural Resources, Annapolis, MD.

MDE (Maryland Department of the Environment). 1998, as amended 2004. Memorandum of Understanding between the State of Maryland and the United States Environmental Protection Agency, Region 3, regarding Sections 303(d) and 303(e) of the Clean Water Act. Maryland Department of the Environment, Baltimore, MD.

MDE (Maryland Department of the Environment). 2000. TMDL of Biochemical Oxygen Demand (BOD) for the Western Branch of the Patuxent River, Prince George's County, MD(Approved on June 6, 2000). Maryland Department of the Environment, Baltimore, MD.

MDE (Maryland Department of the Environment). 2004. September 2, 2004, Letter Revising Memorandum of Understanding between the State of Maryland and the United States Environmental Protection Agency, Region 3. Maryland Department of the Environment, Baltimore, MD.

MDE (Maryland Department of the Environment). 2008. *Integrated List*. Maryland Department of the Environment, Baltimore, MD.

MDE and DC DOE (Maryland Department of the Environment and District of Columbia Department of the Environment). 2008. Total Maximum Daily Loads of Nutrients/Biochemical Oxygen Demand for the Anacostia River Basin, Montgomery and Prince George's Counties, Maryland and the District of Columbia. EPA approved June 5, 2008.

MD OEP (Maryland Office of Environmental Protection). 1987. *Monitoring for Management Actions: Chesapeake Bay Water Quality Monitoring Program—First Biennial Report*. Maryland Department of the Environment, Baltimore, MD.

MRAT (Monitoring Re-Alignment Action Team). 2009. *Monitoring Re-Alignment Action Team: Final Report to the CBP Management Board*. October 27, 2009. Chesapeake Bay Program, Annapolis, Maryland.

Nixon, S.W. 1997. Prehistoric nutrient inputs and productivity in Narragansett Bay. *Estuaries* 20(2):253-261.

NMFS (National Marine Fisheries Service). 2003. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries. National Marine Fisheries Service Endangered Species Act Biological Opinion*. F/NER/2003/00961. Northeast Region, Gloucester, MA.

Officer, C.B., R.B. Biggs, J.L. Taft, L.E. Cronin, M.A. Tyler, and W.R. Boynton. 1984. Chesapeake Bay Anoxia: Origin, development and significance. *Science* 223(4631):22-27.

Orth, R.J., and K.A. Moore. 1983. Chesapeake Bay: An unprecedented decline in submerged aquatic vegetation. *Science* 222(4619):51–53.

Orth, R.J., D.J. Wilcox, J.R. Whiting, L.S. Nagey, A. Owens, and A. Kenne. 2010a. *2009 Distribution of Submerged Aquatic Vegetation in the Chesapeake Bay and Coastal Bays*. VIMS Special Scientific Report Number 152. Grant No. CB97377401-0. Prepared for U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Orth, R.J., M.R. Williams, S.R. Marion, D.J. Wilcox, T.J.B. Carruthers, K.A. Moore, W.M. Kemp, W.C. Dennison, N. Rybicki, P. Bergstrom, and R.A. Batiuk. 2010b. Long-Term Trends in Submersed Aquatic Vegetation (SAV) in Chesapeake Bay, USA, Related to Water Quality. *Estuaries and Coasts* 33:1144–1163.

Palace, M., J. Hannawald, L. Linker, G. Shenk, J. Storrick, and M. Clipper. 1998. Appendix H: tracking best management practice nutrient reductions in the Chesapeake Bay Program. In: *Chesapeake Bay Watershed Model application and calculation of nutrient and sediment loadings*. EPA 903-R-98-009, CBP/TRS 201/98. Chesapeake Bay Program Office, Annapolis, MD.

Pan, Y., R. Birdsey, J. Hom, and K. McCullough. 2005. *Forest Productivity and Effects of Nitrogen Deposition on Water Quality*. USDA Forest Service, Northwestern Area, Global Change Research.

Preston, S.D., R.B. Alexander, M.D. Woodside, and P.A. Hamilton 2009. SPARROW MODELING—Enhancing Understanding of the Nation's Water Quality. Fact Sheet 2009–3019. U.S. Geological Survey Reston, VA.

Preston, S.D., and J.W. Brakebill. 1999. *Application of spatially referenced regression modeling for the evaluation of total nitrogen in the Chesapeake Bay watershed*. U.S. Geological Survey Water-Resources Investigations Report 99-4054, Baltimore, MD.

Reilly, J. 2003, The New Jersey (USA) Growth Allocation Model: Development, evaluation and extension. In *Planning Support Systems in Practice, Advances in Spatial Science Series*, ed. S. Geertman and J. Stillwell, pp.373-389. Springer, Berlin.

Riekerk, H., D.G. Neary, and W.T. Swank. 1988. The magnitude of upland siliculture nonpoint source pollution in the South. In *Conference on the Forested Wetlands of the Southern United States, Asheville, NC,* ed. D.D. Hook and L. Russ, pp: 8-18. U.S. Department of Agriculture, Forest Service, Southeastern Forest Experiment Station.

Ritter, W.F., and A.E.M Chirnside. 1984. Impact of land use on groundwater quality in Southern Delaware. *Groundwater* 22(1):38–47.

Robertson, W.D., J.A. Cherry, and E.A. Suclicky. 1991. Ground-water contamination from two small septic systems on sand aquifers. *Groundwater* 29:82–92.

Robertson, W.D., and J.A.Cherry. 1992. Hydrogeology of an unconfined sand aquifer and its effect on the behaviour of nitrogen from a large-flux septic system. *Applied Hydrogeology* 1:32-44.

Rountree, H., W. Clark, and K. Mountford. 2007. *John Smith's Chesapeake Voyages 1607–1609*. University of Virginia Press, Charlottesville, VA.

Salvato, J.A. 1982. *Environmental Engineering and Sanitation*. 3rd ed. Wiley-Interscience, New York, NY.

Sawyer, C.N., P.L. McCarty, and G.F. Parkin. 1994. *Chemistry for Environmental Engineering*, 4th ed. McGraw-Hill, Inc. edited by B.J. Clark and John M. Morriss.

Secretary Robert Perciasepe. 1992. Nutrient Reevaluation Load Allocations. October 14, 1992, Memorandum to the Principals' Staff Committee Members. Maryland Department of the Environment, Baltimore, MD.

Secretary Tayloe Murphy. 2003. Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals. April 25, 2003, Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariat, Richmond, VA.

Smith, D.E., M. Leffler, and G. Mackiernan, eds. 1992. *Oxygen Dynamics in the Chesapeake Bay: A Synthesis of Recent Research.* Maryland and Virginia Sea Grant College Program, College Park, MD.

STAC (Scientific and Technical Advisory Committee). 2005a. *Assessing Progress and Effectiveness through Monitoring Rivers and Streams.* Report to the Task Force on Analysis of Non-tidal Water Quality Modeling Results. STAC Publication 05-005. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD.

STAC (Scientific and Technical Advisory Committee). 2005b. *Recommendations for Refinement of a Spatially Representative Non-tidal Water Quality Monitoring Network for the Chesapeake Bay Watershed.* Report to the Task Force on Non-tidal Water Quality Monitoring Network Design. STAC Publication 05-006. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD.

STAC (Scientific and Technical Advisory Committee). 2006. *The Cumulative Frequency Diagram Method for Determining Water Quality Attainment: Report of the Chesapeake Bay Program STAC Panel to Review Chesapeake Bay Analytical Tools*. STAC Publication 06-003. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD.

STAC (Scientific and Technical Advisory Committee). 2009. *Application of reference curves in dissolved oxygen criteria assessment. STAC Review and Recommendations for the Chesapeake Bay Program.* STAC Publication 09-005. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD.

Stevenson, J.C., R. Brinsfield, and K. Staver. 1987. Surface runoff and groundwater impacts from agricultural activities in the Chesapeake region. In *Proceedings of the U.S. Committee on Irrigation and Drainage, Regional Meeting*, Washington, DC, ed. L. Stevens,.

Stoddard, J.L., ed. 1994. Long-term changes in watershed retention of nitrogen: Its causes and aquatic consequences. In *Environmental Chemistry of Lakes and Reservoirs*, ed. L.A. Baker, ACS Advances in Chemistry Series No. 237. American Chemical Society, Washington, DC.

Tetra Tech, Inc. 1999. *Improving Point Source Loadings Data for Reporting National Water Quality Indicators, Final Report*. Prepared for U.S. Environmental Protection Agency, Office of Wastewater Management (Contract #68-C-0014, Work Assignment 1-31), by Tetra Tech, Inc., Fairfax, VA.

Trimble, S.W. 1999. Decreased rates of alluvial storage in the Coon Creek Basin, Wisconsin, 1975–1993. *Science* 285:1244–1246.

USEPA (U.S. Environmental Protection Agency). 1982. *Chesapeake Bay Program Technical Studies: A Synthesis*. U.S. Environmental Protection Agency, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 1983a. *Chesapeake Bay: A Framework for Action*. U.S. Environmental Protection Agency, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 1983b. *Chesapeake Bay: A Framework for Action—Appendices*. U.S. Environmental Protection Agency, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 1983c. *Chesapeake Bay: A Profile of Environmental Change*. U.S. Environmental Protection Agency, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 1983d. *Chesapeake Bay Program: Findings and Recommendations*. U.S. Environmental Protection Agency, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 1991a. *Chesapeake Bay Coordinated Split Sample Program Implementation Guidelines.*. CBP/TRS 58/91. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 1991b. *Guidance for Water Quality-Based Decisions: The TMDL Process.* EPA 440/4-91-001. U.S. Environmental Protection Agency, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 1996. *Recommended Guidelines for Sampling and Analysis in the Chesapeake Bay Monitoring Program.* August 1996. EPA 903-R-96-006. CBP/TRS 148/96. Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 1999. *Draft Guidance for Water Quality-Based Decisions: The TMDL Process. (Second Edition).* EPA 844-D-99-001. U.S. Environmental Protection Agency, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2000. *Users Guide to Chesapeake Bay Program Biological and Living Resources Monitoring Data.* U.S. Environmental Protection Agency,Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2002a. *Establishing Total Maximum Daily Loads (TMDL) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs.* November 22, 2002. U.S. Environmental Protection Agency Office of Water, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2002b. *Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility, and Integrity, of Information Disseminated by the Environmental Protection Agency.* DOC EPA/260R-02-008. U.S. Environmental Protection Agency Office of Environmental Information, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2003a. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries.* EPA 903-R-03-002. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2003b. *Biological Evaluation for the Issuance of Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries.* U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2003c. *Setting and Allocating the Chesapeake Bay Basin Nutrient and Sediment Loads, the Collaborative Process, Technical Tools and Innovative Approaches.* U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2003d. *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability.* EPA 903-R-03-004. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2003e. *Water Quality Trading Policy.* January 13, 2003. U.S. Environmental Protection Agency, Office of Water, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2004a. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries. 2004 Addendum.* EPA 903-R-03-002. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2004b. *Chesapeake Bay Program Analytical Segmentation Scheme: Revisions, Decisions and Rationales 1983–2003*. EPA 903-R-04-008. CBP/TRS 268/04. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2004c. Memorandum from James Hanlon to Jon Capacasa, March 3, 2004. Annual Permit Limits for Nitrogen and Phosphorus for Permits Designed to Protect Chesapeake Bay and its Tidal Tributaries from Excess Nutrient Loading under the National Pollutant Discharge Elimination System. U.S. Environmental Protection Agency, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2004d. *NPDES Permitting Approach for Discharges of Nutrients in the Chesapeake Bay Watershed—December 2004*. U.S. Environmental Protection Agency, Region 3, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 2004e. *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability–2004 Addendum*. EPA 903-R-04-006. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2005. *Chesapeake Bay Program Analytical Segmentation Scheme: Revisions, Decisions and Rationales 1983-2003. 2005 Addendum*. EPA 903-R-05-004. CBP/TRS 278-06. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2006. *Establishing TMDL "Daily" Loads in Light of the Decision by the U.S. Court of Appeals for the D.C. Circuit in Friends of the Earth, Inc. v. EPA, et al., No.05-5015, (April 25, 2006) and Implications for NPDES permits*. Memorandum from Benjamin Grumbles, Assistant Administrator, Office of Water. U.S. Environmental Protection Agency, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2007a. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries—2007 Addendum*. EPA 903-R-07-003. CBP/TRS 285-07. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2007b. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries. 2007 Chlorophyll Criteria Addendum*. EPA 903-R-07-005 CBP/TRS 288/07. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2007c. *Options for the Expressing Daily Loads in TMDLs*. U.S. Environmental Protection Agency, Office of Wetlands, Oceans, and Watersheds. Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2007d. *Water Quality Trading Toolkit for Permit Writers.* 833-R-07-004. U.S. Environmental Protection Agency, Office of Wastewater Management, Water Permits Division, Washington, DC.

USEPA (U.S. Environmental Protection Agency). 2008a. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries–2008 Technical Support for Criteria Assessment Protocols Addendum.* EPA 903-R-08-001. CBP/TRS 290-08. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2008b. September 11, 2008, Letter from Region 3 Administrator Donald Welsh to Secretary John Griffin, Maryland Department of the Environment.

USEPA (U.S. Environmental Protection Agency). 2009a. Clean Water Act Section 303(d): Preliminary Notice of Total Maximum Daily Load (TMDL) Development for the Chesapeake Bay. U.S. Environmental Protection Agency, Region 3, Water Protection Division. *Federal Register.* September 17, 2009, 74:47794.

USEPA (U.S. Environmental Protection Agency). 2009b. Letter from Region 3, Acting Administrator William C. Early to Secretary L. Preston Bryant, Virginia Department of Natural Resources, November 3, 2009.

USEPA (U.S. Environmental Protection Agency). 2009c. Letter from Region 3, Acting Administrator William C. Early to Secretary L. Preston Bryant, Virginia Department of Natural Resources, November 4, 2009.

USEPA (U.S. Environmental Protection Agency). 2009d. Letter from Region 3 Administrator Shawn M. Garvin to Secretary L. Preston Bryant, Virginia Department of Natural Resources, December 29, 2009.

USEPA (U.S. Environmental Protection Agency). 2010a. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries: 2010 Technical Support for Criteria Assessment Protocols Addendum.* May 2010. EPA 903-R-10-002. CBP/TRS 301-10. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2010b. *Chesapeake Bay Program Grant and Cooperative Guidance.* U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2010c. Clean Water Act Section 303(d): Notice for the public review of the Draft Total Maximum Daily Load (TMDL) for the Chesapeake Bay. U.S. Environmental Protection Agency, Region 3, Water Protection Division. Federal Register. September 22, 2010, 75: 57776-57778.

USEPA (U.S. Environmental Protection Agency). 2010d. *Estimates of County Level Nitrogen and Phosphorus Data for Use in Modeling Pollutant Reductions. December 2010.* U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2010e. *Guide for EPA's Evaluation of Phase I Watershed Implementation Plans.* U.S. Environmental Protection Agency, Region 3, Philadelphia, PA.

USEPA (U.S. Environmental Protection Agency). 2010f. Letter from Region 3 Administrator Shawn M. Garvin to the Chesapeake Bay Program Principals' Staff Committee Members, June 11, 2010.

USEPA (U.S. Environmental Protection Agency). 2010g. Letter from Region 3 Administrator Shawn M. Garvin to the Chesapeake Bay Program Principals' Staff Committee Members, July 1, 2010.

USEPA (U.S. Environmental Protection Agency). 2010h. Letter from Region 3 Administrator Shawn M. Garvin to the Chesapeake Bay Program Principals' Staff Committee Members, August 13, 2010.

USEPA (U.S. Environmental Protection Agency). 2010i. *Our Nation's Air: Status and Trends Through 2008.* EPA-454/R-09-002. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, North Carolina.

USEPA (U.S. Environmental Protection Agency). 2010j. *Phase 5.3 Chesapeake Bay Watershed Model Documentation.* U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

USEPA (U.S. Environmental Protection Agency). 2010k. *Quality Management Plan for the Chesapeake Bay Program Office. September 2010.* U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.

VADEQ (Virginia Department of Environmental Quality). 2004. *James River Alternatives Analysis.* Addendum #4. Virginia Department of Environmental Quality, Richmond, VA.

VADEQ (Virginia Department of Environmental Quality). 1998. 303(d) List. Virginia Department of Environmental Quality, Richmond, VA.

VADEQ (Virginia Department of Environmental Quality). 2008. Integrated Report. Virginia Department of Environmental Quality, Richmond, VA.

VIMS (Virginia Institute of Marine Science). 2009. *Quality Assurance Project Plan for the Rappahannock, Corrotoman and York Rivers & Potomac River Virginia Embayment Shallow Water Monitoring (for the Period: January 1, 2009 through December 31, 2009.* Prepared for U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD, by Virginia Institute of Marine Science, Gloucester Point, VA.

VIMS (Virginia Institute of Marine Science). 2010. *Quality Assurance Project Plan for the 2010 Submerged Aquatic Vegetation Distribution and Abundance Survey of Chesapeake Bay, Its Tributaries, and the Delmarva Coastal Bays.* Prepared for U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD, by Virginia Institute of Marine Science, Gloucester Point, VA.

Walter, R.C., and D.J. Merritts, 2008. Natural Streams and the Legacy of Water-Powered Mills. *Science* 319(5861):299–304.

Wang, P., and L.C. Linker. 2009. Assessment of Nitrogen and Phosphorus Control Trade-Offs Using a Water Quality Model with a Response Surface Method. *Journal of Water Resources Planning and Management* 135(3):171–177.

Wang, P., L.C. Linker, R.A. Batiuk, and C.F. Cerco. 2006. Surface Analysis of Chesapeake Bay Water Quality Response to Different Nutrient and Sediment Loads. *Journal of Environmental Engineering* 132(3):377–383.

Weisberg, S.B., J.A. Ranasinghe, D.M. Dauer, L.C. Schaffner, R.J. Diaz, and J.B. Frithsen. 1997. An estuarine benthic index of biotic integrity (B-IBI) for Chesapeake Bay. *Estuaries* 20(1):149–158.

# SECTION 13.  GLOSSARY

**Airshed.** A geographic area delineating the relative location of air emission sources contributing to the atmospheric deposition to a down-wind watershed.

**Allocations.** Best estimates of current and future pollutant loads (both nonpoint and point sources) entering a water body. Pollutant load estimates can range from reasonably accurate measurements to gross estimates and the techniques used for predicting specific loads.

**Ammonia.** An inorganic nitrogen compound. In water, ammonia levels in excess of the recommended limits may harm aquatic life.

**Assimilative Capacity.** The capacity of a natural body of water to receive wastewaters or toxic materials without deleterious effects and without damage to aquatic life or humans who consume the water.

**Bay Segment.** Subunits of the Chesapeake Bay estuary that were derived on the basis of specific selection criteria related to factors such as jurisdictional boundaries and other water quality, physical, geographic, and habitat related characteristics. The Chesapeake Bay and its tidal tributaries and embayments are divided into 92 segments.

**Best Management Practices.** Methods that have been determined to be the most effective, practical means of preventing or reducing pollution from non-point sources.

**Bloom.** A proliferation of algae or higher aquatic plants (or both) in a body of water; often related to pollution, especially when pollutants accelerate growth. Blooms are often the result of excessive levels of nutrients—generally nitrogen and phosphorus—in water.

**Boundary Conditions.** The definition or statement of conditions or phenomena at the boundaries of a model; water levels, flows, and concentrations that are specified at the boundaries of the area being modeled.

**Chlorophyll *a*.** A photosynthetic pigment that is found in green plants. The concentration of chlorophyll *a* is used as an indicator of water quality.

**Critical Condition.** Critical conditions are represented by the combination of loading, waterbody conditions, and other environmental conditions that result in impairment and violation of water quality standards. Critical conditions for an individual TMDL typically depend on applicable water quality standards, characteristics of the observed impairments, source type and behavior, pollutant, and waterbody type.

**Critical Period.** A period during which hydrologic, temperature, environmental, flow, and other such environmental conditions result in a waterbody being most sensitive to an identified impairment (e.g., summer low flow, winter high flow).

**Delist.** To remove an impaired waterbody from the Section 303(d) Impaired Waters List.

**Delivered Load.** The amount of a pollutant delivered to the tidal waters of the Chesapeake Bay or its tidal tributaries from an upstream point of discharge/runoff after accounting for permanent reductions in pollutant loads due to natural in-stream processes in nontidal rivers.

**Edge-of-Stream Load.** The amount of a pollutant reaching a simulated stream segment from a point in that stream's watershed.

**Effluent.** Wastewater, either treated or untreated, that flows out of a treatment plant, sewer, or industrial outfall. Generally refers to wastes or waters containing pollutants discharged into surface waters.

**Eutrophication.** The slow aging process during which a lake, estuary, or bay evolves into a bog or marsh and eventually disappears. During the later stages of eutrophication the water body is choked by abundant plant life due to higher levels of nutritive compounds such as nitrogen and phosphorus. Human activities can accelerate the process.

**Existing Flow.** The average flow volume discharged from a facility based on monitored data.

**Facility Design Flow.** The maximum flow volume for which a facility is designed and permitted to operate at.

**Failing Septic System.** Septic systems in which the drain field has failed such that effluent that is supposed to percolate into the soil, rises to the surface and pools on the surface where it can run into streams or rivers.

**Impaired Waters.** Waters with chronic or recurring monitored violations of the applicable numeric or narrative water quality standards.

**Load Allocation.** The portion of the TMDL allocated to existing or future nonpoint sources and natural background.

**Loading Capacity**. The greatest pollutant loading a waterbody can receive without exceeding water quality standards.

**Mainstem Bay.** The Chesapeake Bay, from Havre de Grace, Maryland to the Virginia Capes, without the tidal tributaries and embayments included.

**Margin of Safety.** An accounting of uncertainty about the relationship between pollutant loads and receiving water quality. The margin of safety can be provided implicitly through analytical assumptions or explicitly by reserving a portion of loading capacity.

**Mesohaline.** Salinity regime with >5-18 parts per thousand salinity.

**Mixing Zone.** A limited area or volume of a receiving water body where the initial dilution occurs and a permitted or authorized discharge occurs. Mixing zones are supposed to dilute or reduce pollutant concentrations below applicable water quality standards such that the applicable criteria in the standards are met at the edge of the mixing zone.

**Model.** A system of mathematical expressions that describe and represent the physical world or some aspect therein. In the Bay TMDL, models are used to describe both hydrologic and water quality processes as well as estimate the load of a specific pollutant to a water body and make predictions about how the load would change as remediation methods (e.g. scenarios) are implemented.

**National Pollutant Discharge Elimination System** (NPDES) permit program is authorized by the Clean Water Act and works to control water pollution by regulating point sources that discharge pollutants into waters of the United States. Industrial, municipal, and other facilities must obtain permits for any discharge into waters of the United States. In most cases, the NPDES permit program is administered by authorized states or EPA.

**Nonpoint Source.** Any source of water pollution that does not meet the legal definition of *point source*. Nonpoint source pollution generally results from land runoff, precipitation, atmospheric deposition, drainage, seepage, or hydrologic modification.

**Nonsignificant Discharge Facility.** A municipal or industrial wastewater discharge facility that is not defined as *a significant discharge facility* by the jurisdiction in which it is permitted. In general but not always, nonsignificant municipal facilities have design flows less than 0.4 million gallons per day (Virginia and Maryland thresholds are slightly different). Nonsignificant industrial facilities discharge less than 3,800 pounds per year total phosphorus and less than 27,000 pounds per year total nitrogen.

**Oligohaline.** Salinity regime with >0.5-5 parts per thousand salinity.

**Point Source.** Any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, vessel or other floating craft from which pollutants are or may be discharged.

**Pollutant Source Sector.** Category of related sources of nutrient and sediment loads identified for purposes of quantifying load allocations. Examples include agriculture, wastewater, forest, urban runoff.

**Polyhaline.** Salinity regime with 0-0.5 parts per thousand salinity.

**Pycnocline.** The depth in the water column where there is an abrupt change in density, temperature, and salinity. A pycnocline often forms in the Chesapeake Bay and its tidal tributaries when the lighter, warmer, and fresher water coming downstream from the spring rains overlays the denser, colder, and saltier water of the salt wedge bringing water upstream from the ocean.

**Residence Time.** Length of time that a pollutant remains with a section of a stream or river. Residence time is determined by streamflow and volume of the body in question.

**Riparian**. Referring to the areas adjacent to rivers and streams with a differing density, diversity, and productivity of plant and animal species relative to nearby uplands.

**Runoff.** That part of precipitation, snow melt, or irrigation water that runs off the land into streams or other surface-water. It can carry pollutants from the air and land into receiving waters.

**Section 303(d).** A section of the Clean Water Act that requires periodic identification of waters that do not or are not expected to meet applicable water quality standards and the establishment of TMDLs for such waters.

**Sediment.** Soil, sand, and minerals washed from the land into water, usually after rain or snow melt.

**Segment Watershed.** Watershed area draining into one of the 92 Chesapeake Bay segments.

**Significant Discharge Facility.** A municipal or industrial wastewater facility defined as such by the jurisdiction in which it is permitted. Significant facilities are distinguished from nonsignificant facilities on the basis of flow for municipals and loads for industrials. In general but not always, significant municipal facilities have flows larger than 0.4 million gallons per day, and significant industrial facilities discharge loads larger than 3,800 pounds per year of total phosphorus and 27,000 pounds per year of total nitrogen.

**Simulation Period.** A period used to run the model scenario simulation, selected to ensure that the simulated rainfall, meteorological, and environmental time series used to drive the watershed simulation such that it accurately simulates the critical conditions.

**Suspended Solids.** Small particles of solid pollutants that float on the surface of, or are suspended in, sewage or other liquids. They resist removal by conventional means.

**Tidal Fresh.** Salinity regime with 0-0.5 parts per thousand salinity.

**Total Maximum Daily Load.** Specifies the maximum amount of a pollutant that a waterbody can receive and still meet applicable water quality standards. It is the sum of the allocations for point sources (called wasteloads) and allocations for nonpoint sources (called loads) and natural background with a margin of safety (CWA section 303(d)(1)(c)). The TMDL can be described by the following equation:

$$TMDL = LC = \Sigma WLA + \Sigma LA + MOS$$

**Turbidity.** A measure of the cloudy condition in water due to suspended solids or organic matter.

**Wasteload Allocation.** The portion of the TMDL allocated to existing, potential or future point sources.

**Water Clarity Acre.** An acre of shallow-water bay grass designated-use bottom habitat, located anywhere between the 2-meter depth contour and the adjacent shoreline inclusively, which has been observed to achieve the applicable salinity-regime-specific water clarity criteria.

**Watershed.** An area of land from which all water drains to a common point.

# SECTION 14.  ABBREVIATIONS

| | |
|---|---|
| µg/L | microgram per liter |
| ADM | annual/daily maximum ratio |
| AEU | animal equivalent units |
| AFO | animal feeding operation |
| ASMFC | Atlantic States Marine Fisheries Commission |
| BART | best available retrofit technology |
| BayTAS | Chesapeake Bay TMDL Tracking and Accountability System |
| BMP | best management practice |
| BOD | biological oxygen demand |
| CAA | Clean Air Act |
| CAC | Citizen's Advisory Committee |
| CAFO | concentrated animal feeding operation |
| CAMR | Clean Air Mercury Rule |
| CBLCD | Chesapeake Bay land cover data |
| CBP | Chesapeake Bay Program |
| CEC | Chesapeake Executive Council |
| CFD | cumulative frequency distribution |
| CFR | *Code of Federal Regulations* |
| CIMS | Chesapeake Information Management System |
| CMAQ | Community Multi-scale Air Quality model |
| COE | U.S. Army Corps of Engineers |
| COMAR | Code of Maryland |
| CONMON | continuous monitoring |
| CSO | combined sewer overflow |
| CSS | combined sewer system |
| CWA | Clean Water Act |
| DAITS | Data and Information Tracking System |
| DC | District of Columbia |
| DC WASA | District of Columbia Water and Sewer Authority |
| DE | Delaware |
| DE DNREC | Delaware Department of Natural Resources and Environmental Control |
| DMR | discharge monitoring report |
| DO | dissolved oxygen |
| DUQAT | Data Upload and Quality Assurance Tool |
| E3 | everything by everyone everywhere |
| EGU | electric generating unit |
| EISA | Energy Independence and Security Act |
| ELG | effluent limit guidelines |
| EO | Executive Order |
| EPA | U.S. Environmental Protection Agency |
| FFIP | federal facility implementation plan |
| FR | *Federal Register* |
| GIS | geographic information system |
| ICIS | Integrated Compliance Information System |

| | |
|---|---|
| Kd | light attenuation coefficient |
| LA | load allocation |
| lbs | pounds |
| LC | loading capacity |
| LGAC | Local Governments Advisory Committee |
| Ln | natural log |
| LOESS | locally weighted scatter plot smoother |
| LTCP | Long-Term Control Plan |
| m | meter |
| MAWP | Mid-Atlantic Water Program |
| MD | Maryland |
| MDE | Maryland Department of the Environment |
| mgd | million gallons per day |
| mg/L | milligrams per liter |
| MOS | margin of safety |
| MOU | memorandum of understanding |
| MRAT | Monitoring Realignment Action Team |
| MS4 | Municipal Separate Storm Sewer System |
| NADP | National Atmospheric Deposition Program |
| NAS | National Agricultural Statistics |
| NEIEN | National Environmental Information Exchange Network |
| $NH_3$ | ammonia |
| $NH_4+$ | ammonium |
| NMFS | National Marine Fisheries Service |
| NMP | nutrient management plan |
| $NO_2$ | nitrite |
| $NO_3$ | nitrate |
| NOI | notice of intent |
| NOx | nitrogen oxides |
| NOAA | National Oceanic and Atmospheric Administration |
| NPDES | National Pollutant Discharge Elimination System |
| NRCS | Natural Resources Conservation Service |
| NY | New York |
| OSWTS | on-site wastewater treatment system |
| PA | Pennsylvania |
| PA DEP | Pennsylvania Department of Environmental Protection |
| PAR | photosynthetically active radiation |
| PCS | Permit Compliance System |
| PLW | percent light through water |
| POTW | publicly owned treatment works |
| PSC | Principals' Staff Committee |
| ppt | parts per thousand (salinity) |
| QA | quality assurance |
| QA/QC | quality assurance/quality control |
| RDA | Residual Designation Authority |
| RESAC | University of Maryland's Regional Earth Science Applications Center |

| | |
|---|---|
| SAV | submerged aquatic vegetation |
| SCR | selective catalytic reduction |
| SIP | state implementation plan |
| SNCR | selective non-catalytic reduction |
| SPARROW | Spatially Referenced Regressions on Watershed Attributes |
| SSO | sanitary sewer overflow |
| STAC | Scientific and Technical Advisory Committee |
| TMDL | total maximum daily load |
| TN | total nitrogen |
| TP | total phosphorus |
| TSS | total suspended solids |
| USC | Upper Susquehanna Coalition |
| U.S.C. | *United States Code* |
| USDA | U.S. Department of Agriculture |
| USGS | U.S. Geological Survey |
| VA | Virginia |
| VA DEQ | Virginia Department of Environmental Quality |
| VA DCR | Virginia Department of Conservation and Recreation |
| WIP | watershed implementation plan |
| WLA | wasteload allocation |
| WQBELs | water quality-based effluent limits |
| WQGIT | Water Quality Group Implementation Team |
| WQS | water quality standards |
| WV | West Virginia |
| WV DEP | West Virginia Department of Environmental Protection |
| WWTP | wastewater treatment plant |
| yr | year |
| z | depth |

**Appendix A.**
**Chesapeake Bay TMDL Contributors**

The Chesapeake Bay TMDL resulted from the collaborative expertise, input, and feedback of many individuals. Advice, technical information and guidance was provided by the multitude of Chesapeake Bay Program partnering agencies and institutions, local governments, nongovernmental organizations, businesses, many other involved stakeholders, and the general public. Their individual and collective contributions are acknowledged here.

Following are full member rosters, as of June 2010, of the various Chesapeake Bay Program partnership's teams, workgroups, and committees who worked collaboratively in support of the Chesapeake Bay TMDL.

## Water Quality Goal Implementation Team

**(Includes formal members—six watershed states, the District of Columbia, Chesapeake Bay Commission, two river basin commissions, and EPA—and actively involved stakeholder representatives)**

Robert Koroncai - Co-chair, U.S. Environmental Protection Agency (EPA) Region 3
Dave Hansen - Co-chair, University of Delaware
Frank Coale - Chair, Agricultural Workgroup, University of Maryland
Normand Goulet - Chair, Urban Stormwater Workgroup, Northern Virginia Regional Planning Commission
Jeffrey Halka - Chair, Sediment Workgroup, Maryland Geological Survey
Rebecca Hanmer - Chair, Forestry Workgroup, EPA Retired
Bill Keeling - Chair, Watershed Technical Workgroup, Virginia Department of Conservation and Recreation
Tanya Spano - Chair, Wastewater Treatment Workgroup, Metropolitan Washington Council of Governments
Katherine Antos - Goal Team Coordinator, EPA Region 3
Rachel Streusand - Team Staff, Chesapeake Research Consortium
Rich Batiuk - EPA Region 3
Steve Bieber - Metropolitan Washington Council of Governments
Joel Blomquist - U.S. Geological Survey
Patricia Buckley - Pennsylvania Department of Environmental Protection
Collin Burrell - District of Columbia Department of the Environment
Monir Chowdhury - District of Columbia Department of the Environment
Lee Currey - Maryland Department of the Environment
James Davis-Martin - Virginia Department of Conservation and Recreation
Chris Day - EPA Region 3
Rachel Diamond - Pennsylvania Department of Environmental Protection
Ron Entringer - New York State Department of Environmental Conservation
Richard Eskin - Maryland Department of the Environment
Krista Grigg - U.S. Navy
Mike Haire - EPA Office of Water
Carlton Haywood - Interstate Commission on the Potomac River Basin

Dave Heicher - Susquehanna River Basin Commission
Rick Hill - Virginia Department of Conservation and Recreation
Beth Horsey - Maryland Department of Agriculture
William Hunley - Hampton Roads Sanitation District
Ruth Izraeli - EPA Region 2
John Kennedy - Virginia Department of Environmental Quality
Teresa Koon - West Virginia Department of Environmental Protection
Felix Locicero - EPA Region 2
Charles Martin - Virginia Department of Environmental Quality
Beth McGee - Chesapeake Bay Foundation
Bruce Michael - Maryland Department of Natural Resources
Matt Monroe - West Virginia Department of Agriculture
Dave Montali - West Virginia Department of Environmental Protection
Russell Morgan - U.S. Department of Agriculture, Natural Resources Conservation Service
Kenn Pattison - Pennsylvania Department of Environmental Protection
Russ Perkinson - Virginia Department of Conservation and Recreation
Alan Pollock - Virginia Department of Environmental Quality
Chris Pomeroy - AquaLaw, PLC
Marel Raub - Chesapeake Bay Commission
John Rhoderick - Maryland Department of Agriculture
John Schneider - Delaware Department of Natural Resources and Environmental Control
Mohsin Siddique - District of Columbia Water and Sewer Authority
Jennifer Sincock - EPA Region 3
Randolph Sovic - West Virginia Department of Environmental Protection
Ann Swanson - Chesapeake Bay Commission
Jennifer Volk - Delaware Department of Natural Resources and Environmental Control

## Agriculture Workgroup

Frank Coale - Chair, University of Maryland
John Bricker - Vice Chair, U.S. Department of Agriculture, Natural Resources Conservation
        Service
Mark Dubin - Coordinator, University of Maryland
Victoria Kilbert - Staff, Chesapeake Research Consortium
Bill Angstadt - Delaware–Maryland Agribusiness Association
Jim Baird - American Farmland Trust
Tom Basden - West Virginia University
Hobey Bauhan - Virginia Poultry Association
Doug Beegle - Pennsylvania State University
Troy Bishop - Madison County Soil and Water Conservation District
Kenneth Bounds - Mid-Atlantic Farm Credit
Betsy Bowles - Virginia Department of Environmental Quality
Chris Brosch - University of Maryland-College Park
Suzan Bulbulkaya - Chesapeake Bay Commission
Valerie Connelly - Maryland Farm Bureau
Renato Cuizon - Maryland Department of Agriculture
Jim Curatolo - Upper Susquehanna Coalition

Jason Dalrymple - West Virginia Department of Agriculture
Mark Davis - Delaware Department of Agriculture
Don Fiesta - Pennsylvania Department of Environmental Protection
Suzy Friedman - Center for Conservation Incentives at Environmental Defense
Doug Goodlander - Pennsylvania State Conservation Commission
Mark Goodson - U.S. Department of Agriculture, Natural Resources Conservation Service
Beth Horsey - Maryland Department of Agriculture
Tom Juengst - Pennsylvania Department of Environmental Protection
Quirine Ketterings - Cornell University
Teresa Koon - West Virginia Department of Environmental Protection
Katie Kyger Frazier - Virginia Agribusiness Council
Sarah Lane - University of Maryland
Chris Lawrence - U.S. Department of Agriculture, Natural Resources Conservation Service
Jacqueline Lendrum - New York State Department of Environmental Conservation
Bud Malone - University of Delaware
Susan Marquart - Pennsylvania Association of Conservation Districts
Robert McAfee - U.S. Department of Agriculture, Natural Resources Conservation Service
Eileen McLellan - Environmental Defense Fund
Don McNutt - Lancaster County Conservation District
Matt Mullin - Chesapeake Bay Commission
Joel Myers - Pennsylvania No-Till Alliance
Jennifer Nelson - Delaware Department of Natural Resources and Environmental Control
Doug Parker - University of Maryland
Molly Payne Pugh - Virginia Grain Producers Producers Association
Tim Pilkowski - U.S. Department of Agriculture, Natural Resources Conservation Service
Marel Raub - Chesapeake Bay Commission
Herb Reed - University of Maryland Cooperative Extension
Christina Richmond - West Virginia Department of Agriculture
Aaron Ristow - Cortland County Soil and Water Conservation District
William Rohrer - Delaware Department of Agriculture
Paul Salon - U.S. Department of Agriculture, Natural Resources Conservation Service
Bill Satterfield - Delmarva Poultry Industry, Inc.
Tim Sexton - Virginia Department of Conservation and Recreation
Kelly Shenk - EPA Region 3
Tom Simpson - Watershed Stewardship, Inc.
Wilmer Stoneman - Virginia Farm Bureau
Pat Stuntz - Keith Campbell Foundation for the Environment
John Timmons - Delaware Pork Producers Association
Les Vough - University of Maryland
Chad Wentz - U.S. Department of Agriculture, Natural Resources Conservation Service
Isaac Wolford - U.S. Department of Agriculture, Natural Resources Conservation Service
Hank Zygmunt - EPA Region 3

## Forestry Workgroup

Rebecca Hamner - Chair, EPA Retired
Sally Claggett - Coordinator, U.S. Forest Service
Rachel Streusand - Staff, Chesapeake Research Consortium
Alice Baird - Virginia Department of Conservation and Recreation
Robert Corletta - District of Columbia Department of Transportation
Tracey Coulter - Pennsylvania Department of Conservation and Natural Resources
Tim Culbreth - Maryland Department of Natural Resources
Dean Cumbia - Virginia Department of Forestry
Matthew Ehrhart - Chesapeake Bay Foundation
Rob Farrell - Virginia Department of Forestry
Robert Feldt - Maryland Department of Natural Resources Forest Service
Anne Hairston-Strang - Maryland Department of Natural Resources Forest Service
Craig Highfield - Alliance for the Chesapeake Bay
Brian LeCouteur - Metropolitan Washington Council of Governments
Becca Madsen - U.S. Forest Service
Rich Mason - U.S. Fish and Wildlife Service
Derrick McDonald - Pennsylvania Department of Environmental Protection
Jim McElfish - Environmental Law Institute
Heather Montgomery - Potomac Conservancy
Gary Moore - Virginia Department of Conservation and Recreation
Judy Okay - U.S. Forest Service
Matt Poirot - Virginia Department of Forestry
James Remuzzi - Sustainable Solutions, LLC
Frank Rodgers - Cacapon Institute - West Virginia
Kelly Shenk - EPA Region 3
Gary Speiran - U.S. Geological Survey
Eric Sprague - Pinchot Institute
Karen Sykes - U.S. Forest Service
Al Todd - U.S. Forest Service
Don VanHassent - Maryland Department of Natural Resources
Brad Williams - Virginia Department of Forestry
Diane Wilson - Pennsylvania Department of Environmental Protection
Faren Wolter - Piedmont Environmental Council

## Sediment Workgroup

Jeffrey Halka - Chair, Maryland Geological Survey
Lewis Linker - Coordinator, EPA Region 3
Victoria Kilbert, Staff, Chesapeake Research Consortium
Joe Berg - Biohabitats
Grace Brush - Johns Hopkins University
Thomas Cronin - U.S. Geological Survey
Lee Currey - Maryland Department of the Environment
Jason Ericson - Virginia Department of Conservation and Recreation
Allen Gellis - U.S. Geological Survey

Julie Herman - Virginia Institute of Marine Science
Timothy Karikari - District of Columbia Department of the Environment
Mike Langland - U.S. Geological Survey
Doug Levin - National Oceanic and Atmospheric Administration
Audra Luscher - Maryland Department of Natural Resources
Kevin McGonigal - Susquehanna River Basin Commission
Erik Michelsen - South River Federation
Laurie Olah - West Virginia Department of Agriculture
Cindy Palinkas - University of Maryland Center for Environmental Science
Kenn Pattison - Pennsylvania Department of Environmental Protection
Scott Phillips - U.S. Geological Survey
Larry Sanford - University of Maryland Center for Environmental Science
Sean Smith - Maryland Department of Natural Resources
Chris Spaur - U.S. Army Corps of Engineers
Jeff Trulick - U.S. Army Corps of Engineers
Jennifer Volk - Delaware Department of Natural Resources and Environmental Control
David Wilson - Maryland Eastern Shore RC&D Office Natural Resources Conservation Service

## Urban and Suburban Stormwater Workgroup

Normand Goulet - Chair, Northern Virginia Regional Planning Commission
Jenny Molloy - Coordinator, EPA Region 3
Rachel Streusand - Staff, Chesapeake Research Consortium
Meg Andrews - Maryland Department of Transportation
Marc Aveni - Virginia Department of Conservation and Recreation
Joseph Battiata - Williamsburg Environmental Group, Inc.
Ron Bowen - Anne Arundel County Department of Public Works
Leslie Burks - U.S. Department of Agriculture, Natural Resources Conservation Service
Walter Caldwell - District of Columbia Department of the Environment
Jen Campagnini - Delaware Department of Natural Resources and Environmental Control
Eric Capps - Virginia Department of Conservation and Recreation
John Carlock - Hampton Roads Planning District Commission
R. Scott Christie - Pennsylvania Department of Transportation
Kim Coble - Chesapeake Bay Foundation
Larry Coffman - LNSB, LLLP Stormwater Services Group
Meosotis Curtis - Montgomery County Department of Environmental Protection
Andrew Dinsmore - EPA Region 3
Paula Estornell - EPA Region 3
Peter Freehafer - New York Department of Environmental Conservation
Bruce Gilmore - Chesapeake Bay Foundation
Robert Goo - EPA Office of Water
Ted Graham - Metropolitan Washington Council of Governments
Lisa Grippo - U.S. Navy
Lee Hill - Virginia Department of Conservation and Recreation
Timothy Karikari - District of Columbia Department of the Environment
Beth Krumrine - Delaware Department of Natural Resources and Environmental Control
Ken Murin - Pennsylvania Department of Environmental Protection

Ken Pensyl - Maryland Department of the Environment
Karuna Pujara - Maryland State Highway Administration
Mary Searing - Anne Arundel County Department of Public Works
Kelly Shenk - EPA Region 3
Bill Stack - Baltimore City Department of Public Works
Steve Stewart - Baltimore County Department of Environmental Protection and Resource
          Management
Dennis Stum - Pennsylvania Department of Environmental Protection
Burt Tuxford - Virginia Department of Environmental Quality
Mary Lynn Wilhere - Alliance for the Chesapeake Bay
Sherry Wilkins - West Virginia Department of Environmental Protection

## Wastewater Treatment Workgroup

Tanya Spano - Chair, Metropolitan Washington Council of Governments
Ning Zhou - Coordinator, Virginia Polytechnic Institute and State University
Victoria Kilbert - Staff, Chesapeake Research Consortium
Allan Brockenbrough - Virginia Department of Environmental Quality
Art Buehler - Virginia Department of Environmental Quality
Peter Freehafer - New York Department of Environmental Conservation
Patricia Gleason - EPA Region 3
Anthony Hummel - Delaware Department of Natural Resources and Environmental Control
Maureen Krudner - EPA Region 2
Marya Levelev - Maryland Department of the Environment
Lee McDonnell - Pennsylvania Department of Environmental Protection
Randolph Sovic - West Virginia Department of Environmental Protection
Edwal Stone - Maryland Department of the Environment
John Wetherell - Pennsylvania Department of Environmental Protection

## Watershed Technical Workgroup

Bill Keeling - Chair (former), Virginia Department of Conservation and Recreation
Jing Wu -Coordinator, University of Maryland Center for Environmental Science
Rachel Streusand - Staff, Chesapeake Research Consortium
Mark Bennett - U.S. Geological Survey
Sheila Besse - District of Columbia Department of the Environment
Lee Currey - Maryland Department of the Environment
Peter Freehafer - New York Department of Environmental Conservation
Normand Goulet - Northern Virginia Regional Commission
Ted Graham - Metropolitan Washington Council of Governments
Alana Hartman - West Virginia Department of Environmental Protection
Beth Horsey - Maryland Department of Agriculture
Lewis Linker - EPA Region 3
Kenn Pattison - Pennsylvania Department of Environmental Protection
Robin Pellicano - Maryland Department of the Environment
Diana Reynolds - Maryland Department of Natural Resources
Gary Shenk - EPA Region 3

Kelly Shenk - EPA Region 3
Tom Simpson - Watershed Stewardship, Inc.
Helen Stewart - Maryland Department of Natural Resources
Jeff Sweeney - University of Maryland
Jennifer Volk - Delaware Department of Natural Resources and Environmental Control


## Nutrient Subcommittee (Former)

Dave Hansen - Chair, University of Delaware
Rich Batiuk - Subcommittee Coordinator, EPA Region 3
Steve Bieber - Metropolitan Washington Council of Governments
Collin Burrell - District of Columbia Department of the Environment
Sally Claggett - U.S. Forest Service
Mark Dubin - University of Maryland
Ron Entringer - New York Department of Environmental Conservation
Normand Goulet - Northern Virginia Regional Commission
Jeffrey Halka - Maryland Geological Survey
Dean Hively - U.S. Department of Agriculture, Agricultural Research Service
Beth Horsey - Maryland Department of Agriculture
Bill Keeling - Virginia Department of Conservation and Recreation
David Kindig - Virginia Department of Conservation and Recreation
Mike Langland - U.S. Geological Survey
Marya Levelev - Maryland Department of the Environment
Matt Monroe - West Virginia Department of Agriculture
Gene Odato - Pennsylvania Department of Conservation and Natural Resources
Reggie Parrish - EPA Region 3
Kenn Pattison - Pennsylvania Department of Environmental Protection
Russ Perkinson - Virginia Department of Conservation and Recreation
Steele Phillips - Farmer, Dorchester County, Maryland, Retired
William Rohrer - Delaware Department of Agriculture
Fred Samadani - Maryland Department of Agriculture
Kelly Shenk - EPA Region 3
Tom Simpson - University of Maryland
Randolph Sovic - West Virginia Department of Environmental Protection
Tanya Spano - Metropolitan Washington Council of Governments
Helen Stewart - Maryland Department of Natural Resources
Jeff Sweeney - University of Maryland
Don VanHassent - Maryland Department of Natural Resources
Jennifer Volk - Delaware Department of Natural Resources and Environmental Control


## Scientific and Technical Analysis and Reporting Team

Bill Dennison - Chair, University of Maryland Center for Environmental Science
Mark Bennett - Vice Chair, U.S. Geological Survey
Peter Tango - Coordinator, U.S. Geological Survey
Michael Barnes - Staff, Chesapeake Research Consortium
Aaron Gorka - Staff, Chesapeake Research Consortium

Brian Burch - EPA Region 3
Mike Land - National Park Service
Lewis Linker - EPA Region 3
John Wolf - U.S. Geological Survey


## Criteria Assessments and Procedures Workgroup

Peter Tango - Chair, U.S. Geological Survey
Cheryl Atkinson - EPA Region 3
Harry Augustine - Virginia Department of Environmental Quality
Mark Barath - EPA Region 3
Tom Barron - Pennsylvania Department of Environmental Protection
Stephen Cioccia - Virginia Department of Environmental Quality
Richard Eskin - Maryland Department of the Environment
Sherm Garrison - Maryland Department of Natural Resources
Darryl Glover - Virginia Department of Environmental Quality
Rick Hoffman - Virginia Department of Environmental Quality
Jackie Johnson - Interstate Commission on the Potomac River Basin
Jeni Keisman - University of Maryland Center for Environmental Science
Larry Merrill - EPA Region 3
Bruce Michael - Maryland Department of Natural Resources
Ken Moore - Virginia Institute of Marine Science
Shah Nawaz - District of Columbia Department of the Environment
Jennifer Palmore - Virginia Department of Environmental Quality
Tom Parham - Maryland Department of Natural Resources
Elgin Perry - Statistics Consultant
Charlie Poukish - Maryland Department of the Environment
Tish Robertson - Virginia Department of Environmental Quality
Matt Rowe - Maryland Department of the Environment
John Schneider - Delaware Department of Natural Resources and Environmental Control
Gary Shenk - EPA Region 3
Donald Smith - Virginia Department of Environmental Quality
Scott Stoner - New York State Department of Environmental Conservation
Matt Stover - Maryland Department of the Environment
Bryant Thomas - Virginia Department of Environmental Quality
Mark Trice - Maryland Department of Natural Resources
David Wolanski - Delaware Department of Natural Resources and Environmental Control


## Modeling Workgroup

Lewis Linker - Chair, EPA Region 3
Mark Bennett - U.S. Geological Survey
Steve Bieber - Metropolitan Washington Council of Governments
Bill Brown - Pennsylvania Department of Environmental Protection
Arthur Butt - Virginia Department of Environmental Quality
Carl Cerco - U.S. Army Corps of Engineers, ERDC
Monir Chowdhury - District of Columbia Department of the Environment

Lee Currey - Maryland Department of the Environment
Robin Dennis - EPA/National Oceanic and Atmospheric Administration
Bill Keeling - Virginia Department of Conservation and Recreation
Ross Mandel - Interstate Commission on the Potomac River Basin
Kenn Pattison - Pennsylvania Department of Environmental Protection
Gary Shenk - EPA Region 3
Helen Stewart - Maryland Department of Natural Resources
Peter Tango - U.S. Geological Survey
Harry Wang - Virginia Institute of Marine Science

## Nontidal Water Quality Workgroup

Scott Phillips - Chair, U.S. Geological Survey
Katie Foreman - Coordinator, University of Maryland Center for Environmental Science
Aaron Gorka - Staff, Chesapeake Research Consortium
Joel Blomquist - U.S. Geological Survey
Dan Boward - Maryland Department of Natural Resources
John Brakebill - U.S. Geological Survey
Emery Cleaves - Maryland Geological Survey
Ron Entringer - New York Department of Environmental Conservation
Richard Eskin - Maryland Department of the Environment
Peter Freehafer - New York Department of Environmental Conservation
George Harman - Maryland Department of the Environment
Carlton Haywood - Interstate Commission on the Potomac River Basin
Rick Hoffman - Virginia Department of Environmental Quality
Ken Hyer - U.S. Geological Survey
Ron Klauda - Maryland Department of Natural Resources
Mike Langland - U.S. Geological Survey
Mary Ellen Ley - U.S. Geological Survey
Mike Mallonee - Interstate Commission on the Potomac River Basin
Kevin McGonigal - Susquehanna River Basin Commission
Larry Merrill - EPA Region 3
Bruce Michael - Maryland Department of Natural Resources
Hassan Mirsajadi - Delaware Department of Natural Resources and Environmental Control
Matt Monroe - West Virginia Department of Agriculture
Douglas Moyer - U.S. Geological Survey
Charley Poukish - Maryland Department of the Environment
William Romano - Maryland Department of Natural Resources
Gary Shenk - EPA Region 3
Peter Tango - U.S. Geological Survey

## Tidal Monitoring and Analysis Workgroup

Walter Boynton - Chair, University of Maryland Center for Environmental Science
Jeni Keisman - Coordinator, University of Maryland Center for Environmental Science
Aaron Gorka - Staff, Chesapeake Research Consortium
Eva Bailey - University of Maryland Center for Environmental Science

Peter Bergstrom - National Oceanic and Atmospheric Administration
Claire Buchanan - Interstate Commission on the Potomac River Basin
Ben Cole - Maryland Department of Natural Resources
Daniel Dauer - Old Dominion University
Bill Dennison - University of Maryland Center for Environmental Science
Rebecca Golden - Maryland Department of Natural Resources
Carlton Haywood - Interstate Commission on the Potomac River Basin
Rick Hoffman - Virginia Department of Environmental Quality
William Hunley - Hampton Roads Sanitation District
Renee Karrh - Maryland Department of Natural Resources
Michael Koterba - U.S. Geological Survey/National Oceanic and Atmospheric Administration;
Rich Lacouture - Morgan State University
Jurate Landwehr - U.S. Geological Survey
Mary Ellen Ley - U.S. Geological Survey
Roberto Llanso - Versar, Inc.
Bruce Michael - Maryland Department of Natural Resources
Elgin Perry - Statistics Consultant
William Romano - Maryland Department of Natural Resources
Peter Tango - U.S. Geological Survey
Mark Trice - Maryland Department of Natural Resources
Caroline Wicks - National Oceanic and Atmospheric Administration, University of Maryland
        Center for Environmental Science Partnership

## Monitoring and Analysis Subcommittee (Former)

Carlton Haywood - Chair, Interstate Commission on the Potomac River Basin
Peter Tango - Coordinator, U.S. Geological Survey
Katie Foreman - Staff, University of Maryland Center for Environmental Science
Jacob Goodwin - Staff, Chesapeake Research Consortium
Joseph Beaman - Maryland Department of the Environment
Peter Bergstrom - National Oceanic and Atmospheric Administration
Steve Bieber - Metropolitan Washington Council of Governments
Claire Buchanan - Interstate Commission on the Potomac River Basin
Brian Burch - EPA Region 3
Bob Campbell - National Park Service
Bill Dennison - University of Maryland Center for Environmental Science
Mike Fritz - EPA Region 3
Rick Hoffman - Virginia Department of Environmental Quality
Kate Hopkins - University of Maryland Center for Environmental Science
David Jasinski - University of Maryland Center for Environmental Science
Jackie Johnson - Interstate Commission on the Potomac River Basin
Jeni Keisman - University of Maryland Center for Environmental Science
Margaret Kerchner - National Oceanic and Atmospheric Administration
Mary Ellen Ley - U.S. Geological Survey
Lewis Linker - EPA Region 3
Ben Longstaff - National Oceanic and Atmospheric Administration, University of Maryland
        Center for Environmental Science Partnership

Mike Mallonee - Interstate Commission on the Potomac River Basin
Margaret McBride - National Oceanic and Atmospheric Administration
Bruce Michael - Maryland Department of Natural Resources
Hassan Mirsajadi - Delaware Department of Natural Resources and Environmental Control
Matt Monroe - West Virginia Department of Agriculture
Derek Orner - National Oceanic and Atmospheric Administration
Scott Phillips - U.S. Geological Survey
Gary Shenk - EPA Region 3
Richard Shertzer - Pennsylvania Department of Environmental Protection
John Sherwell - Maryland Department of Natural Resources
Nita Sylvester - EPA Region 3
Bob Wood - National Oceanic and Atmospheric Administration, Cooperative Oxford Laboratory

## Management Board

James Edward - Chair, EPA Region 3
Carin Bisland - Coordinator, EPA Region 3
Kristin Foringer - Staff, Chesapeake Research Consortium
Russell Baxter - Virginia Depart of Environmental Quality
Patricia Buckley - Pennsylvania Department of Environmental Protection
Sally Claggett - U.S. Forest Service
Frank Dawson - Maryland Department of Natural Resources
Jim Elliott - Hunton & Williams, Citizen Advisory Committee
Peter Freehafer - New York Department of Environmental Conservation
James Geiger - U.S. Fish and Wildlife Service
Jennifer Guerrero - U.S. Department of Defense
Amy Guise - U.S. Army Corps Engineers
Jon Hall - U.S. Department of Agriculture, Natural Resources Conservation Service
Hamid Karimi - District of Columbia Department of the Environment
Mary Ann Lisanti - Harford County Council, Local Government Advisory Committee
John Maounis - National Park Service
Jennifer Pauer - West Virginia Department of Environmental Protection
Scott Phillips - U.S. Geological Survey
Peyton Robertson - National Oceanic and Atmospheric Administration
John Schneider - Delaware Department of Natural Resources and Environmental Control
Ann Swanson - Chesapeake Bay Commission
Denice Wardrop - Pennsylvania State University, Scientific and Technical Advisory Committee

## Principals' Staff Committee

Shawn Garvin - Chair, EPA Region 3
Carin Bisland - Coordinator, EPA Region 3
Kristin Foringer - Staff, Chesapeake Research Consortium
David Anderson - U.S. Army Corps of Engineers, Baltimore District
Doug Domenech - Virginia Secretary of Natural Resources
Gus Douglas - West Virginia Department of Agriculture
James Edward - EPA Region 3

Carl Garrison - Virginia Department of Forestry
Alexander Grannis - New York State Department of Environmental Conservation
John Griffin - Maryland Department of Natural Resources
Richard Hall - Maryland Department of Planning
Buddy Hance - Maryland Department of Agriculture
John Hanger - Pennsylvania Department of Environmental Protection
Todd Haymore - Virginia Secretary of Agriculture and Forestry
Randy Huffman - West Virginia Department of Environmental Protection
David Johnson - Virginia Department of Conservation and Recreation
Leonard Jordan - U.S. Department of Agriculture, Natural Resources Conservation Service
Beverley K. Swaim-Staley - Maryland Department of Transportation
Edwin Kee - Delaware Department of Agriculture
Teresa Koon - West Virginia Department of Environmental Protection
Pat Montanio - National Oceanic and Atmospheric Administration
Marvin Moriarty - U.S. Fish and Wildlife Service
Collin O'Mara - Delaware Department of Natural Resources and Environmental Control
David Paylor - Virginia Department of Environmental Quality
Christine Porter - U.S. Department of Defense
John Quigley - Pennsylvania Department of Conservation and Natural Resources
Russell Redding - Pennsylvania Department of Agriculture
Dennis Reidenbach - National Park Service
David Russ - U.S. Geological Survey
Ann Swanson - Chesapeake Bay Commission
Christohpe Tulou - District of Columbia Department of the Environment
Shari Wilson - Maryland Department of the Environment

## Scientific And Technical Advisory Committee

Denice Wardrop - STAC Chair, Pennsylvania State University
Christopher Pyke - STAC Vice Chair, U.S. Green Building Council
Kevin Sellner - STAC Executive Secretary, Chesapeake Research Consortium
Liz Van Dolah - Staff, Chesapeake Research Consortium

*District of Columbia*
Ted Graham - Metropolitan Washington Council of Governments

*Maryland*
Bill Dennison - University of Maryland, Center for Environmental Science
Russ Brinsfield - University of Maryland, Wye Research Center

*Pennsylvania*
Raymond Najjar - Pennsylvania State University

*Virginia*
Kirk Havens - Virginia Institute of Marine Science
Charlie Bott - Hampton Roads Sanitation District

*Delaware*
David Hansen - University of Delaware

*New York*
Robert Howarth - Cornell University
Weixing Zhu - State University of New York–Binghamton

*West Virginia*
Jeffery Skousen - West Virginia University
Louis McDonald - West Virginia University

*At-large Appointees*
Charles Abdalla - Pennsylvania State University
Paul Bukaveckas - Virginia Commonwealth University
Donna Marie Bikovic - Virginia Institute of Marine Science
Paul Bukaveckas - Virginia Commonwealth University
Randy Chambers - College of William and Mary
Carl Friedrichs - Virginia Institute of Marine Science
Marjy Friedrichs - Virginia Institute of Marine Science
Cindy Gilmour - Smithsonian Environmental Research Center
Doug Lipton - University of Maryland
Mark Luckenbach - Virginia Institute of Marine Science
Margaret Mulholland - Old Dominion University
Michael Paolisso - University of Maryland
Vikram Pattarkine - PEACE USA
James Pease - Virginia Polytechnic Institute and State University
John Randolph - Virginia Polytechnic Institute and State University
David Sample - Virginia Polytechnic Institute and State University
David Secor - University of Maryland Center for Environmental Science
Lisa Wainger - University of Maryland Center for Environmental Science
Don Weller - Smithsonian Environmental Research Center
Claire Welty - University of Maryland Baltimore County

*Federal Agency Appointees*
Kurt Gottschalk - U.S. Department of Agriculture
Susan Julius - EPA Office of Research and Development
Robert Hirsch - U.S. Geological Survey
Ali Sadeghi - U.S. Department of Agriculture, Agricultural Research Service

## Local Government Advisory Committee

Mary Ann Lisanti - Chair, Harford County Council
Sally Thomas - Vice Chair, Albermarle County Board of Supervisors
Rick Keister - Coordinator, Alliance for the Chesapeake Bay
Diane Davis - District of Columbia Department of the Environment
Sheila Finlayson - City of Annapolis
Richard Gray - City of Lancaster
Penny Gross - Fairfax County Board of Supervisors
Adriana Hochberg - City Government - District of Columbia
Doug Hoke - York County
Gerald Hyland - Fairfax County Board of Supervisors

Mary Labert - McAdoo Borough
Stephen Mallette - Accomack County Board of Supervisors
Craig Moe - City of Laurel
Kelly Porter - Seat Pleasant City Council
Susan Roltsch - County of Prince William
Ann Simonetti - Marysville Borough
John V. Thomas - Hampden Township
Tommy Wells - Council of the District of Columbia
Jeff Wheeland - Lycoming County
James Wheeler - Pennsylvania State Association of Township Supervisors
Robert Willey - Town of Easton
Bruce Williams - City of Takoma Park

## Citizen's Advisory Committee

Jim Elliott - Chair, Hunton & Williams
Nikki Tinsley - Vice Chair, NT, Inc.
Jessica Blackburn - Coordinator, Alliance for the Chesapeake Bay
Bill Achor - Cargill, Inc.
Nancy Alexander - Merge Computer Group
Jess Cadwallender - Greener Oil Company
Nina Beth Cardin - Chesapeake Covenant Community
John Dawes - Foundation for Pennsylvania Watersheds
Robert Etgen - Eastern Shore Land Conservancy
Christina Everett - Chesapeake Bay Foundation
Eileen Filler-Corn - Albers & Company
Victor Funk - Pennsylvania Department of Environmental Protection, Retired
Rebecca Hanmer - EPA, Retired
Verna Harrison - The Keith Campbell Foundation for the Environment
Stella Koch - Audubon Naturalist Society
Patricia Levin - Franklin & Marshall College
Bill Martin - U.S. Patent Office, Retired
Betsy Quant - Canoe Susquehanna
Jeremy Rothwell - Young Delegate Mentor
Charlie Stek - Senator Paul Sarbanes Staff, Retired
Charles Sydnor - Enterprise Community Partners
Neil Wilkie - Davidson Capital Group

## Tetra Tech, Inc.

Many dedicated people at Tetra Tech, Inc. provided assistance to EPA and the jurisdictions in developing the Chesapeake Bay TMDL and the Phase I WIPs including but not limited to the following: Clint Boschen, Kimberly Brewer, Krista Carlson, Jim Collins, Melissa DeSantis, Mustafa Faizullabhoy, Martin Hurd, Lisa Koehler, Jessica Koenig, Jon Ludwig, Kelly Meadows, Jennifer McDonnell, Elsa Mittelholtz, Aileen Molloy, Andrew Parker, Teresa Rafi, Vladislav Royzman, Mark Sievers, Jeff Strong, Barry Tonning, and Peter Von Lowe.

**Appendix B.**
**Index of Documents Supporting the Chesapeake Bay TMDL**

This index of documents (with URL links for direct electronic access) includes materials EPA and its seven watershed jurisdictional partners relied upon during development of the Chesapeake Bay TMDL. These documents include but are not limited to data, analyses, computer programs, computer model code, scientific/technical references used or cited in the main Bay TMDL document, correspondence, agreements, directives, strategies, plans, independent peer reviews, workshop proceedings, and other supporting materials. Access to advance briefing materials, presentations, issue papers, and summaries of relevant partnership meetings and conference calls related to development of the Bay TMDL are fully cataloged in Appendix C.

The listed documents are organized by subcategories by date of publication to assist the reader in locating documents of interest. For each listed document, full reference citation (in the case of a formal publication) and URL address for direct web-based electronic access to the document are provided. In the case of reference to data, the data repository and the URL address for direct electric access to the data are provided. Some of the individual documents are listed in multiple categories to aid the readers to get access the correct documents.

The ultimate objective of this appendix is to ensure direct public access to the full array of data, documentation, models, tools, and computer programming that supported development of the Chesapeake Bay TMDL.

## Chesapeake Bay Program Research Phase (1975–1982) Synthesis and Recommendations Documents

U.S. Environmental Protection Agency. 1983. Chesapeake Bay: A Framework for Action. U.S. Environmental Protection Agency, Philadelphia, PA. September 1983. http://www.chesapeakebay.net/content/publications/cbp_12405.pdf

U.S. Environmental Protection Agency. 1983. Chesapeake Bay: A Framework for Action—Appendices. U.S. Environmental Protection Agency, Philadelphia, PA. http://www.chesapeakebay.net/content/publications/cbp_13262.pdf

U.S. Environmental Protection Agency. 1983. Chesapeake Bay: A Profile of Environmental Change. U.S. Environmental Protection Agency, Philadelphia, PA. http://www.chesapeakebay.net/content/publications/cbp_13260.pdf

U.S. Environmental Protection Agency. 1983. Chesapeake Bay Program: Findings and Recommendations. U.S. Environmental Protection Agency, Philadelphia, PA. http://www.chesapeakebay.net/content/publications/cbp_13278.pdf

U.S. Environmental Protection Agency. 1982. Chesapeake Bay Program Technical Studies: A Synthesis. U.S. Environmental Protection Agency, Washington, DC. http://www.chesapeakebay.net/content/publications/cbp_13280.pdf

# Chesapeake Bay Agreements, Directives, Memoranda of Understanding Relevant to Bay Water Quality

Chesapeake Executive Council. 2006. Resolution to Enhance the Role and Voice of Agriculture in the Chesapeake Bay Partnership. September 22, 2006. Annapolis, Maryland.
http://archive.chesapeakebay.net/pressrelease/2006_ec_Agriculture_Resolution.pdf

Chesapeake Executive Council. 2006. Memorandum of Understanding among Chesapeake Executive Council, Headwater State Jurisdictions and Members of the Lawn Care Product Manufacturing Industry Regarding the Healthy Lawns and Clean Water Initiative: Reducing Nutrient Losses from Lawn Through a Public-Private Stewardship Partnership. September 22, 2006. Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_12605.pdf

Chesapeake Executive Council. 2006. Chesapeake Executive Council Directive No. 06-1 Protecting the Forests of the Chesapeake Watershed. September 22, 2006. Annapolis, Maryland. 2006.
http://www.chesapeakebay.net/content/publications/cbp_12604.pdf

Chesapeake Executive Council. 2005. Adoption Statement—Reducing Animal Manure and Poultry Litter Pollution in the Chesapeake Bay Watershed. Annapolis, Maryland. November 29, 2005.
http://archive.chesapeakebay.net/info/pressreleases/ec2005/doc-manure_adopt_statement_11-28.pdf

Chesapeake Executive Council. 2005. Chesapeake Watershed Education Agreement. Annapolis, Maryland. 2005.
http://www.chesapeakebay.net/content/publications/cbp_27902.pdf

Chesapeake Executive Council. 2005. Chesapeake Executive Council Directive No. 04-3 Building New Partnerships and New Markets for Agricultural Animal Manure and Poultry Litter in the Chesapeake Bay Watershed. Annapolis, Maryland. January 10, 2005.
http://www.chesapeakebay.net/content/publications/cbp_12590.pdf

Chesapeake Executive Council. 2005. Chesapeake Executive Council Directive No. 04-2 Meeting the Nutrient and Sediment Reduction Goals—Next Steps. Annapolis, Maryland. January 10, 2005. http://www.chesapeakebay.net/content/publications/cbp_12588.pdf

Chesapeake Executive Council. 2005. Chesapeake Executive Council Directive No. 04-1 Funding the Restoration of the Chesapeake Bay Watershed. Annapolis, Maryland. 2005.
http://www.chesapeakebay.net/content/publications/cbp_12586.pdf

Chesapeake Executive Council. 2003. Chesapeake Executive Council Directive No. 03-1 Expanded Riparian Forest Buffer Goals. Annapolis, Maryland. 2003.
http://www.chesapeakebay.net/content/publications/cbp_12610.pdf

Chesapeake Executive Council. 2003. Chesapeake Executive Council Directive No. 03-2 Meeting the Nutrient and Sediment Reduction Goals. Annapolis, Maryland. 2003.
http://www.chesapeakebay.net/content/publications/cbp_12611.pdf

Secretary Tayloe Murphy. 2003. "Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals." Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariat, Richmond, Virginia. April 25, 2003.
http://www.chesapeakebay.net/content/publications/cbp_28933.pdf

Chesapeake Executive Council. 2002. Resolution to Enhance the Role of the United States Department of Agriculture in the Chesapeake Bay Partnership. Annapolis, Maryland. 2002.
http://www.chesapeakebay.net/content/publications/cbp_12574.pdf

Chesapeake Executive Council. 2002. Acceptance Statement for the 2002 Chesapeake Bay Local Government Participation Action Plan. Annapolis, Maryland. 2002.
http://archive.chesapeakebay.net/info/pressreleases/ec2002/lgac_acceptance_statement_final.pdf

Chesapeake Executive Council. 2001. Chesapeake Executive Council Directive No. 01-1 Managing Storm Waters on State, Federal and District-owned Lands and Facilities. Annapolis, Maryland. 2001.
http://www.chesapeakebay.net/content/publications/cbp_12105.pdf

Chesapeake Executive Council and Headwater States Governors. 2000. *Memorandum Among the State of Delaware, the District of Columbia, the State of Maryland, the State of New York, the Commonwealth of Pennsylvania, the Commonwealth of Virginia, the State of West Virginia, and the United States Environmental Protection Agency Regarding the Cooperative Efforts for the Protection of the Chesapeake Bay and Its Rivers.* Chesapeake Bay Program Office, Annapolis, Maryland.
http://www.chesapeakebay.net/pubs/waterqualitycriteria/DOC_wq_finalmou.pdf

Chesapeake Executive Council. 2000. *Chesapeake 2000.* Chesapeake Bay Program, Annapolis, Maryland.
http://www.chesapeakebay.net/pubs/chesapeake2000agreement.pdf

Chesapeake Executive Council. 1998. Chesapeake Executive Council Directive No. 98-2 Chesapeake 2000. Annapolis, Maryland. 1998.
http://www.chesapeakebay.net/content/publications/cbp_12109.pdf

Chesapeake Executive Council. 1998. Chesapeake Executive Council Directive No. 98-3 Accelerating Bay Restoration Through Implementation of Innovative Technologies. Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_12463.pdf

Chesapeake Executive Council. 1998. Chesapeake Executive Council Directive No. 98-4 Interstate Animal Waste Distribution and Use Technology. Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_12465.pdf

Chesapeake Executive Council: Adoption Statement—Community Watershed Initiative. Annapolis, Maryland. 1998.
http://www.chesapeakebay.net/content/publications/cbp_12467.pdf

Chesapeake Executive Council. 1997. Directive 97-1—Baywide Nutrient Reduction Progress and Future Directions. Chesapeake Executive Council, Annapolis, MD. 1997. http://www.chesapeakebay.net/content/publications/cbp_12471.pdf

Chesapeake Executive Council. 1997. Chesapeake Executive Council Directive No. 97-2 Wetlands Protection and Restoration Goals. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_12473.pdf

Chesapeake Executive Council. 1997. Chesapeake Executive Council Directive No. 97-3 Community Watershed Initiative. Annapolis, Maryland. 1997. http://www.chesapeakebay.net

Chesapeake Executive Council. 1996. Adoption Statement—Strategy for Increasing Basin-wide Public Access to Chesapeake Bay Information. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_12485.pdf

Chesapeake Executive Council. 1996. Adoption Statement—Local Government Participation Action Plan. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_13407.pdf

Chesapeake Executive Council: Chesapeake Executive Council Directive 95-1—Local Government Partnership Initiative. Annapolis, Maryland. 1995. http://www.chesapeakebay.net/content/publications/cbp_12489.pdf

Chesapeake Executive Council. 1995. Adoption Statement on Riparian Forest Buffers. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_13403.pdf

Chesapeake Executive Council. 1995. Adoption Statement on Land, Growth, and Stewardship. Annapolis, Maryland. 1995. http://www.chesapeakebay.net/content/publications/cbp_12482.pdf

Chesapeake Executive Council. 1994. Chesapeake Executive Council Directive 94-2— Reciprocal Agricultural Certification Program. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_12494.pdf

Chesapeake Executive Council. 1994. Chesapeake Executive Council Directive 94-3— Framework for Habitat Restoration. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_12497.pdf

Chesapeake Executive Council. 1993. Chesapeake Executive Council Directive 93-5— Agricultural Nonpoint Source Initiative. Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_12455.pdf

Chesapeake Executive Council. 1993. Directive 93-3—Adoption Statement on Submerged Aquatic Vegetation. Chesapeake Executive Council, Annapolis, MD. http://www.chesapeakebay.net/content/publications/cbp_12503.pdf

Chesapeake Executive Council. 1993. Directive 93-1—Joint Tributary Strategy Statement. Chesapeake Executive Council, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_12501.pdf

Chesapeake Executive Council. 1992. *Amendments to the Chesapeake bay Agreement*. Chesapeake Bay Program, Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_12507.pdf

Chesapeake Executive Council. 1987. *Chesapeake Bay Agreement*. Chesapeake Bay Program, Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_12510.pdf

Chesapeake Bay Partnership. 1983. *The Chesapeake Bay Agreement of 1983*. Chesapeake Bay Partnership, Washington, DC. 1983.
http://www.chesapeakebay.net/content/publications/cbp_12512.pdf

## Federal Agency Partnership Documents

Chesapeake Bay Federal Partners. 2007. Resolution to Enhance Federal Cooperative Conservation in the Chesapeake Bay Program. Annapolis, Maryland. October 7, 2005.
http://www.chesapeakebay.net/content/publications/cbp_12089.pdf

Chesapeake Bay Federal Partners. 1998. Federal Agencies' Chesapeake Ecosystem Unified Plan. Annapolis, Maryland. November 5, 1998.
http://www.chesapeakebay.net/content/publications/cbp_12078.pdf

Memorandum of Agreement Between the U.S. Fish and Wildlife Service, State College, Pennsylvania, the Alliance for Chesapeake Bay, and the U.S. Environmental Protection Agency, Region III. June 5, 1996.
http://www.chesapeakebay.net/content/publications/cbp_12550.pdf

Chesapeake Bay Program: Federal Agencies Agreement on Ecosystem Management in the Chesapeake Bay. Annapolis, Maryland. July 14, 1994.
http://www.chesapeakebay.net/content/publications/cbp_12453.pdf

Chesapeake Executive Council: Memorandum of Agreement Between the United States Department of Agriculture and the Chesapeake Bay Executive Council. Annapolis, Maryland. January 25, 1994.
http://www.chesapeakebay.net/content/publications/cbp_12525.pdf

## Presidential Chesapeake Bay Executive Order

Federal Leadership Committee for the Chesapeake Bay. 2010. Fiscal Year 2011 Action Plan: Executive Order 13508 Strategy for Protecting and Restoring the Chesapeake Bay Watershed. September 30, 2010.
http://executiveorder.chesapeakebay.net/file.axd?file=2010%2f9%2fChesapeake+EO+Action+Plan+FY2011.pdf

U.S. Environmental Protection Agency. 2010. Guidance for Federal Land Management in the Chesapeake Bay Watershed. EPA841-R-10-002. May 12, 2010.
http://www.epa.gov/owow_keep/NPS/chesbay502/pdf/chesbay_guidance-all.pdf

Federal Leadership Committee for the Chesapeake Bay. 2010. Strategy for Protecting and Restoring the Chesapeake Bay Watershed. May 12, 2010.
http://executiveorder.chesapeakebay.net/file.axd?file=2010%2f5%2fChesapeake+EO+Strategy%20.pdf

U.S. Environmental Protection Agency. 2009. The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay: A Revised Report Fulfilling Section 202a of Executive Order 13508. November 24, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202a+Water+Quality+Report.pdf

U.S. Department of Agriculture. 2009. Focusing Resources to Restore and Protect the Chesapeake Bay and its Tributary Waters: Executive Order 13508, Section 202b Report. November 24, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202b+Targeting+Resources+Report.pdf

U.S. Department of Defense. 2009. Storm Water Management at Federal Facilities & on Federal Lands in the Chesapeake Bay Watershed: A Revised Report Fulfilling Section 202(c) of Executive Order 13508. November 23, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202c+Federal+Stormwater+Report.pdf

U.S. Department of the Interior. 2009. Landscape Conservation & Public Access in the Chesapeake Bay Region: A Revised Report Fulfilling Section 202(e) of Executive Order 13508. November 23, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202e+Access+%26+Landscapes+Report.pdf

U.S. Department of Interior and U.S. Department of Commerce. 2009. Strengthening Science and Decision Support for Ecosystem Management in the Chesapeake Bay and its Watershed: A Revised Report Fulfilling Section 202f of Executive Order 13508. November 23, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202f+Scientific+Support+Report.pdf

U.S. Department of the Interior and U.S. Department of Commerce. 2009. Habitat and Research Activities to Protect and Restore Chesapeake Bay Living Resources and Water Quality: A Revised Report Fulfilling Section 202g of Executive Order 13508. November 23, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202g+Habitat+%26+Living+Resource+Report.pdf

Executive Order 13508: Chesapeake Bay Protection and Restoration. May 12, 2009.
http://executiveorder.chesapeakebay.net/BlogEngine.Web/file.axd?file=2009%2f8%2fChesapeake+Executive+Order.pdf

Section 203: Strategy for Protecting and Restoring the Chesapeake Bay. Executive Order 13508: Chesapeake Bay Protection and Restoration. May 12, 2009. Page 3. http://executiveorder.chesapeakebay.net/EO/file.axd?file=2009%2f8%2fChesapeake+Executive +Order.pdf

The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay: A Draft Report Fulfilling Section 202a of Executive Order 13508. http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f9%2f202(a)+Water+Quality+Dra ft+Report.pdf

## Chesapeake Action Plan

U.S. Environmental Protection Agency. 2008. *Strengthening the Management, Coordination, and Accountability of the Chesapeake Bay Program: Report to Congress*. CBP/TRS-292-08. Region 3, Chesapeake Bay Program Office, Annapolis, MD. July 2008. http://cap.chesapeakebay.net/docs/EPA_Chesapeake_Bay_CAP.pdf

## Chesapeake Bay Program Authorizing Legislation

Clean Water Act. 1972. http://epw.senate.gov/water.pdf

Clean Water Act Section 117: Chesapeake Bay. Page 26. http://epw.senate.gov/water.pdf

## Chesapeake Bay Program Organizational Structure

Chesapeake Bay Program: *Chesapeake Bay Program Governance—Managing the Partnership for a Restored and Protected Watershed and Bay*. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD. 2009. http://archive.chesapeakebay.net/pubs/calendar/_03-13-09_Handout_4_10155.pdf

## Chesapeake Bay TMDL and Related Chesapeake Bay Program Partnership Websites

Chesapeake Bay TMDL website: http://www.epa.gov/chesapeakebaytmdl

Chesapeake Bay Program partnership website: http://www.chesapeakebay.net

Executive Order website: http://executiveorder.chesapeakebay.net

ChesapeakeStat website: http://stat.chesapeakebay.net

## Chesapeake Bay Water Quality Criteria Related Documents

U.S. Environmental Protection Agency. 2010. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries: 2010 Technical Support for Criteria Assessment Protocols Addendum*. May 2010. EPA 903-R-

10-002. CBP/TRS 301-10. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_51366.pdf

Chesapeake Bay Program. 2010. Chesapeake Bay water quality criteria assessment procedures computer programming code. Chesapeake Bay Program Office, Annapolis, MD.
ftp://ftp.chesapeakebay.net/Monitoring/CriteriaAssessment/

Scientific and Technical Advisory Committee. 2009. *Application of reference curves in dissolved oxygen criteria assessment. STAC Review and Recommendations for the Chesapeake Bay Program.* STAC Publication 09-005. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD. 2009.
http://www.chesapeake.org/stac/Pubs/biorefcurvesreview.pdf

Scientific and Technical Advisory Committee. 2009. Rationale Supporting Application of a Reference Curve for Assessment of the Chesapeake Bay Deep Channel Dissolved Oxygen Criterion: Briefing Document for the CBP Scientific and Technical Advisory Committee's Peer Review Team. August 6, 2009. http://www.chesapeakebay.net

Chesapeake Bay Program. 2009. CBP Response To the June 19, 2009 Technical Memorandum Submitted by Malcolm Pirnie on behalf of V/MAMWA. July 16, 2009.
http://www.chesapeakebay.net

Scientific and Technical Advisory Committee. 2009. Application of Reference Curves for Dissolved Oxygen Criteria Assessment: Chesapeake Bay Program Office Review and Recommendations: Briefing Document for the CBP Scientific and Technical Advisory Committee's Peer Review Team. July 2, 2009. http://www.chesapeakebay.net

Keisman, Jeni: 2009. Revisiting the Chesapeake Bay Water Quality Criteria Biological Reference Curves: Briefing for the CBP Scientific and Technical Advisory Committee Review Team. July 2, 2009. http://www.chesapeakebay.net

Bell, Clifton. 2009. Review of CFD and Reference Curve Revisions. Malcolm Pirnie. June 19, 2009. http://www.chesapeakebay.net

Virginia and Maryland Association of Municipal Wastewater Agencies, Inc. 2009. Review of Reference Curve Issues. June 19, 2009. http://www.chesapeakebay.net

Scientific and Technical Advisory Committee. 2008. Assessing the Feasibility of Developing a Four-Dimensional (4-D) Interpolator for Use in Impaired Waters Listing Assessment. December 2008. http://www.chesapeake.org/stac/Pubs/4dreport.pdf

U.S. Environmental Protection Agency: *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries–2008 Technical Support for Criteria Assessment Protocols Addendum*. EPA 903-R-08-001. CBP/TRS 290-08. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD. 2008.
http://www.chesapeakebay.net/content/publications/cbp_47637.pdf

Colligan, M.A. 2007. Addendum to Chesapeake Bay Regional Criteria (NOAA confirmation of concurrence of the 2007 Bay criteria addendum). National Oceanic and Atmospheric Administration, National Marine Fisheries Service, Gloucester, MA. September 5, 2007. http://www.chesapeakebay.net

Lape, J. 2007. Re: U.S. EPA Region III Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries –2007 Addendum. Memorandum. Chesapeake Bay Program Office, Annapolis, MD. August 20, 2007. http://www.chesapeakebay.net

U.S. Environmental Protection Agency. 2007. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries– 2007 Addendum*. EPA 903-R-07-003. CBP/TRS 285-07. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_27849.pdf

U.S. Environmental Protection Agency. 2007. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries– 2007 Chlorophyll a Criteria Addendum*. EPA 903-R-07-005. CBP/TRS 288-07. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_20138.pdf

Scientific and Technical Advisory Committee. 2006. The Cumulative Frequency Diagram Method for Determining Water Quality Attainment: Report of the Chesapeake Bay Program STAC Panel to Review Chesapeake Bay Analytical Tools. STAC Publication 06-003. Chesapeake Bay Program Scientific and Technical Advisory Committee. Chesapeake Research Consortium, Edgewater, MD. 2006. http://www.chesapeake.org/stac/Pubs/CFD_STAC_Final.pdf

U.S. Environmental Protection Agency. 2004. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries– 2004 Addendum*. EPA 903-R-04-005. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. 2004. http://www.chesapeakebay.net/content/publications/cbp_13268.pdf

Virginia Department of Environmental Quality. 2004. *James River Alternatives Analysis*. Addendum #4. Virginia Department of Environmental Quality, Richmond, VA. http://www.chesapeakebay.net

National Marine Fisheries Service. 2003. *National Marine Fisheries Service Endangered Species Act Biological Opinion--Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries–2007 Chlorophyll a Criteria Addendum.* F/NER/2003/00961. National Marine Fisheries Service, Northeast Region, Gloucester, Massachusetts. 2003. http://www.nero.noaa.gov/prot_res/section7/EPA-signedBOs/ChesapeakeBay2004-signedBO.pdf

U.S. Environmental Protection Agency. 2003. *Biological Evaluation for the Issuance of Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and its Tidal Tributaries.* Region 3 Chesapeake Bay Program Office, Annapolis, Maryland.
http://www.chesapeakebay.net/content/publications/cbp_28935.pdf

U.S. Environmental Protection Agency. 2003. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries.* EPA 903-R-03-002. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. 2003.
http://www.chesapeakebay.net/content/publications/cbp_13142.pdf

Scientific and Technical Advisory Committee. 2002. Review of DRAFT Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity, and Chlorophyll a for the Chesapeake Bay and Tidal Tributaries. July 2002.
http://www.chesapeake.org/stac/Pubs/FinalCriteriaReviewReport.pdf

Linker, L., G. Shenk, P. Wang, C. Cerco, A. Butt, P. Tango, and R. Savage. 2002. *A Comparison of Chesapeake Bay Estuary Model Calibration with 1985–1994 Observed Data and Method of Application to Water Quality Criteria.* Chesapeake Bay Program Modeling Subcommittee Report. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13134.pdf

Chesapeake Bay Program Interpolator Code. 2000. Interpolator - Chesapeake Bay and Tidal Tributary River Interpolator Tool. April 2000.
http://archive.chesapeakebay.net/cims/interpolator.pdf

Batiuk, R.A., P. Bergstrom, M. Kemp, E. Koch, L. Murray, J.C. Stevenson, R. Bartleson, V. Carter, N.B. Rybicki, J.M. Landwehr, C. Gallegos, L. Karrh, M. Naylor, D. Wilcox, K., A. Moore, S. Ailstock, and M. Teichberg. 2000. *Chesapeake Bay Submerged Aquatic Vegetation Water Quality and Habitat-Based Requirements and Restoration Targets: A Second Technical Synthesis.* EPA 903-R-00-014. CBP/TRS 245/00. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD. 2000.
http://www.chesapeakebay.net/content/publications/cbp_13051.pdf

Jordan, S.J., C. Stenger, M. Olson, R. Batiuk, and K. Mountford. 1992. *Chesapeake Bay dissolved oxygen goal for restoration of living resource habitats: A synthesis of living resource requirements with guidelines for their use in evaluating model results and monitoring information*. CBP/TRS 88-93. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD. 1992.
http://www.chesapeakebay.net/content/publications/cbp_12299.pdf

Batiuk, R.A., R. Orth, K. Moore, J.C. Stevenson, W. Dennison, L. Staver, V. Carter, N.B. Rybicki, R. Hickman, S. Kollar, and S. Bieber. 1992. *Chesapeake Bay Submerged Aquatic Vegetation Habitat Requirements and Restoration Targets: A Technical Synthesis.* CBP/TRS 83/92. U.S. Environmental Protection Agency Chesapeake Bay Program, Annapolis, MD. 1992.
http://www.chesapeakebay.net

Funderburk, S.L., S.J. Jordan, J.A. Mihursky, and D.R. Riley (eds): *Habitat Requirements for Chesapeake Bay Living Resources, 1991 Second Edition*. Living Resources Subcommittee, Chesapeake Bay Program, Annapolis, MD. 1991. http://www.chesapeakebay.net

Chesapeake Bay Program. 1987. *Habitat Requirements for Chesapeake Bay Living Resources*. U.S. Environmental Protection Agency, Chesapeake Bay Program, Chesapeake Bay Living Resources Task Force, Annapolis, MD. 1987.
http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000WBYD.txt

## Chesapeake Bay Segmentation Scheme

U.S. Environmental Protection Agency. 2008. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries– 2008 Technical Support for Criteria Assessment Protocols Addendum*. EPA 903-R-08-001. CBP/TRS 290-08. U.S. Environmental Protection Agency, Region 3, Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_47637.pdf

Chesapeake Bay Program. 2005. *Chesapeake Bay Program Analytical Segmentation Schemes: Revision, decisions and rationales, 1983-2003—2005 Addendum*. EPA 903-R-05-004. CBP/TRS 278/06. Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13378.pdf

Chesapeake Bay Program. 2004. *Chesapeake Bay Program Analytical Segmentation Schemes: Revision, decisions and rationales, 1983-2003*. EPA 903-R-04-008. CBP/TRS 268/04. Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13272.pdf

U.S. Environmental Protection Agency. 1983. Chesapeake Bay: A Framework for Action— Appendices. U.S. Environmental Protection Agency, Philadelphia, PA.
http://www.chesapeakebay.net/content/publications/cbp_13262.pdf

## Chesapeake Bay Designated Uses and Use Attainability

U.S. Environmental Protection Agency. 2010. *Ambient Water Quality Criteria for Dissolved Oxygen, Water Clarity and Chlorophyll a for the Chesapeake Bay and Its Tidal Tributaries: 2010 Technical Support for Criteria Assessment Protocols Addendum*. EPA 903-R-10-002. CBP/TRS 301-10. U.S. Environmental Protection Agency, Region 3 Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_51366.pd

U.S. Environmental Protection Agency. 2004. *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability–2004 Addendum*. EPA 903-R-04-006. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. 2004.
http://www.chesapeakebay.net/content/publications/cbp_13270.pdf

U.S. Environmental Protection Agency: *Technical Support Document for Identification of Chesapeake Bay Designated Uses and Attainability*. EPA 903-R-03-004. Region 3 Chesapeake

Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13218.pdf

## Jurisdictions' Chesapeake Bay Water Quality Standards Regulations

Maryland: Code of Maryland Title 26 Subtitle 08, Chapter 2.
http://www.epa.gov/waterscience/standards/wqslibrary/dsd.state.md/md-ch2-quality-20051130.pdf.us/comar/subtitle_chapters/26_Chapters.htm

Virginia: Code of Virginia 9 62.1-44.15 3a; VAC 25-260 Virginia WQS
http://www.deq.virginia.gov/wqs/

Delaware: 7 Delaware Code Section 6010; 7 Delaware Administrative Code 7401.
http://www.epa.gov/waterscience/standards/wqslibrary/de/de_3_wqs.pdf

District of Columbia DC Municipal Regulations Title 21, Chapter 11.
http://www.epa.gov/waterscience/standards/wqslibrary/dc/dc_3_register.pdf

## Jurisdictions' Chesapeake Bay Tidal Waters 1996/1998 303(d) Lists

Delaware Department of Natural Resources and Environmental Control: 1996 303(d) Lists for the Chesapeake Bay and Tidal Tributaries.
http://www.dnrec.state.de.us/DNREC2000/Library/Water/303(d)list.pdf

Delaware Department of Natural Resources and Environmental Control: 1998 303(d) Lists for the Chesapeake Bay and Tidal Tributaries.
http://www.dnrec.state.de.us/DNREC2000/Library/Water/303(d)list.pdf

District of Columbia Department of Environment. 1998. List of Water Bodies Required to Be Listed Under 303(d) of the Clean Water Act. September 28, 1998.
http://www.epa.gov/chesapeakebaytmdl/

Maryland Department of Environment: 1998 Additions to Maryland's 303(d) List.
http://www.mde.state.md.us/programs/ResearchCenter/ReportsandPublications/WaterPublications/Documents/www.mde.state.md.us/assets/document/water/303dlist_1998add.pdf

Maryland's 1996 and 1998 303(d) Lists.
http://www.mde.state.md.us/programs/Water/TMDL/Integrated303dReports/Documents/www.mde.state.md.us/assets/document/1996_1998list.pdf

Virginia Department of Environmental Quality. 1998. Impaired Waters: 1998 303(d) Total Maximum Daily Load Priority List. http://www.epa.gov/chesapeakebaytmdl/

## Jurisdictions' Chesapeake Bay Tidal Waters 2008 303(d) Lists

Delaware Division of Water Quality: Watershed Assessment Section 305(b) and 303(d) Reports.
http://www.wr.dnrec.delaware.gov/Information/OtherInfo/Pages/WatershedAssessment305band303dReports.aspx

District of Columbia Department of the Environment. Methodology for the Development of the 2008 Section 303(d) List and the 2008 Section 303(d) List of Impaired District of Columbia Waters. March 31, 2008.
http://ddoe.dc.gov/ddoe/lib/ddoe/information2/public.notices/08_Draft_Sect.303(d).pdf

Maryland Department of Environment: Maryland's 2008 Integrated Report.
http://www.mde.state.md.us/programs/Water/TMDL/Integrated303dReports/Pages/programs/waterprograms/tmdl/maryland%20303%20dlist/2008_final_303d_list.aspx

Virginia Department of Environmental Quality: Final 2008 305(b)/303(d) Water Quality Assessment Integrated Report.
http://www.deq.state.va.us/wqa/ir2008.html

## Criteria Assessments Supporting the Jurisdictions' Bay Tidal Waters 2008 303(d) Lists

Chesapeake Bay Program Interpolator Code. 2000. Interpolator - Chesapeake Bay and Tidal Tributary River Interpolator Tool. April 2000.
http://archive.chesapeakebay.net/cims/interpolator.pdf

Chesapeake Bay Program. 2010. Chesapeake Bay water quality criteria assessment procedures computer programming code. Chesapeake Bay Program Office, Annapolis, MD.
ftp://ftp.chesapeakebay.net/Monitoring/CriteriaAssessment/

## Chesapeake Bay Lawsuits, Settlements and Consent Decrees

Fowler, et al, v. EPA: Settlement Agreement. January 5, 2009.
http://www.cbf.org/Document.Doc?id=512

Decision On Petition For Rulemaking To Address Nutrient Pollution From Significant Point Sources In The Chesapeake Bay Watershed. June 13, 2005. Chesapeake Bay Foundation Petition and U.S. Environmental Agency Response.
http://www.epa.gov/ow/cbfpetition/petition.pdf

Welsh, D.L. 2004. Letter to Kendle P. Philbrick Re: Re: Memorandum of Understanding Between the State of Maryland and the United States Environmental Protection Agency, Region III, Regarding Sections 303(d) and 303(e) of the Clean Water Act. U.S. EPA Region 3, Philadelphia, PA. November 1, 2004. http://www.epa.gov/chesapeakebaytmdl/

Philbrick, K.P. 2004.Letter to Donald S. Welsh Re: Memorandum of Understanding Between the State of Maryland and the United States Environmental Protection Agency, Region III, Regarding Sections 303(d) and 303(e) of the Clean Water Act. Maryland Department of the Environment, Baltimore, MD. September 2, 2004. http://www.epa.gov/chesapeakebaytmdl/

U.S. District Court: Consent Decree: District of Columbia v. U.S. Environmental Protection Agency. C.A. No. 1:98CV00758. June 13, 2000. http://www.epa.gov/chesapeakebaytmdl/

U.S. District Court for the Eastern District of Virginia: American Canoe Association and the American Littoral Society v. U.S. Environmental Protection Agency. C.A. No. 98-979-A. June 11, 1999. http://www.epa.gov/chesapeakebaytmdl/

Memorandum of Understanding Between the State of Maryland and the U.S. Environmental Protection Agency, Region III, Regarding Section 303(d) and 303(e) of the Clean Water Act. 1998. http://www.epa.gov/chesapeakebaytmdl/

U.S. District Court: Consent Decree: Delaware v. U.S. Environmental Protection Agency. C.A. No. 98-591 (SLR). August 4, 1997. http://www.epa.gov/chesapeakebaytmdl/

## Chesapeake Bay Cap Load Allocations

U.S. Environmental Protection Agency. 2010. Letter from Region 3 Administrator Shawn M. Garvin to the Chesapeake Bay Program Principals' Staff Committee Members, August 13, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/Ches_Bay_Sediment_Letter.PDF

U.S. Environmental Protection Agency. 2010. Letter from Region 3 Administrator Shawn M. Garvin to the Chesapeake Bay Program Principals' Staff Committee Members, July 1, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/HonorableShariTWilson-701122302-0001.pdf

U.S. Environmental Protection Agency. 2009. Letter from Region 3, Acting Administrator William C. Early to Secretary L. Preston Bryant, Virginia Department of Natural Resources, November 3, 2009. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/tmdl_implementation_letter_110409.pdf

Murphy, W. T. 2003. *Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals*. April 25, 2003, Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariate, Richmond, Virginia. http://www.chesapeakebay.net/content/publications/cbp_28933.pdf

U.S. Environmental Protection Agency. 2003. *Setting and Allocating the Chesapeake Bay Basin Nutrient and Sediment Loads: The Collaborative Process, Technical Tools and Innovative Approaches.* EPA 903-R-03-007. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. 2003. http://www.chesapeakebay.net/content/publications/cbp_19713.pdf

Chesapeake Bay Program. 1997. *Chesapeake Bay Nutrient Reduction Progress and Future Directions—Nutrient Reevaluation Summary Report*. October 1997. CBP/TRS 189/97. U.S. Environmental Protection Agency, Chesapeake Bay Program, Annapolis, MD. http://www.chesapeakebay.net/content/publications/cbp_12305.pdf

Perciasepe, R. 1992. Nutrient Reevaluation Load Allocations. Memorandum to the Principals' Staff Committee Members. Maryland Department of the Environment, Baltimore, MD. October 14, 1992. http://www.chesapeakebay.net

## Chesapeake Bay Sediment Cap Load Allocations

Scientific and Technical Advisory Committee. 2007. *An Introduction to Sedimentsheds: Sediment and Its Relationship to Chesapeake Bay Water Clarity*. STAC Workshop Report, January 30-31, 2007, Annapolis, Maryland. STAC Publication 07-002. 2007. http://www.chesapeakebay.net/content/publications/cbp_13374.pdf

Chesapeake Bay Program Sediment Workgroup. 2007. An Introduction to Sedimentshed: Sediment and Its Relationship to Chesapeake Bay Water Clarity. CBP-TRS-286-07. Chesapeake Bay Program, Annapolis, Maryland. http://www.chesapeakebay.net/content/publications/cbp_13372.pdf

Scientific and Technical Advisory Committee. 2009. Tidal Sediments Mini-Workshop. Annapolis, Maryland. May 28-29, 2009. http://www.chesapeake.org/stac/tidalsediment.html

Scientific and Technical Advisory Committee Workshop. 2007. An Introduction to Sedimentsheds: Sediment and its Relationship to Chesapeake Bay Water Clarity. January 30-31, 2007, Annapolis, MD. http://www.chesapeake.org/stac/sedworkshop.html

Scientific and Technical Advisory Committee Workshop. 2006. Quantifying the Role of Stream Restoration in Achieving Nutrient and Sediment Reductions. November 14, 2006, Laurel, MD. http://www.chesapeake.org/stac/StreamBMPWorkshop.html

Chesapeake Bay Program. 2006. Best Management Practices for Sediment Control and Water Clarity Enhancement. Chesapeake Bay Program Nutrient Subcommittee's Sediment Workgroup, Annapolis, MD. http://www.chesapeakebay.net/content/publications/cbp_13369.pdfUSGS

U.S. Geological Survey. 2003. A Summary Report of Sediment Processes in Chesapeake Bay and Watershed: Water-Resources Investigations Report 03-4123. http://www.mgs.md.gov/coastal/pub/wrir03-4123.pdf

Scientific and Technical Advisory Committee. 2005. Workshop: Urban Stormwater Sediment: Sources, Impacts and Control. April 29, 2005, Washington, DC. http://www.chesapeake.org/stac/USWorkshop.html

## Chesapeake Bay Atmospheric Deposition Loads

Science and Technical Advisory Committee. 2009. Workshop on Atmospheric Deposition of Nitrogen. STAC Publication 09-001. http://www.chesapeake.org/stac/Pubs/atmosphericnitrogen.report.pdf

Scientific and Technical Advisory Committee. 2007. Workshop: Atmospheric Deposition of Nitrogen: Estimating local emission sources, near-field deposition, and fate on the landscape. May 30, 2007. State University of New York, Binghamton, NY. http://www.chesapeake.org/stac/AtmosphericNDepositionWorkshop.html

## Chesapeake Bay TMDL Critical Period

Tetra Tech. 2010. Assessing the Critical Period for the Development of the Chesapeake Bay TMDL. Fairfax, Virginia. September 22, 2010. http://www.chesapeakebay.net

Tetra Tech. 2009. Methods to Determine Critical Period. Fairfax, Virginia. September 23, 2009. http://www.chesapeakebay.net

Chesapeake Bay Program: Response To the June 19, 2009 Technical Memorandum Submitted by Malcolm Pirnie on behalf of V/MAMWA. July 16, 2009. http://www.chesapeakebay.net

Bell, Clifton (Malcolm Pirnie): Review of CFD and Reference Curve Revisions. June 19, 2009. http://www.chesapeakebay.net

## Chesapeake Bay TMDL Nitrogen/Phosphorus Exchanges

Wang, P. and Lewis C. Linker. 2009. Assessment of Nitrogen and Phosphorus Control Trade-Offs Using a Water Quality Model with a Response Surface Method. *Journal of Water Resources Planning and Management*, 135(3):171-177.
http://cedb.asce.org/cgi/WWWdisplay.cgi?170852

Wang P, L Linker, D Jasinski, WC Dennison, G Shenk, R Batiuk. 2006. Forecast of Summer Anoxia in the Chesapeake Bay. In: Spaulding ML (ed) Estuarine and Coastal Modeling: Proceedings of the Ninth International Conference on Estuarine and Coastal Modeling held in Charleston, South Carolina, from October 31 to November 2, 2005. American Society of Civil Engineers. http://www.chesapeakebay.net

Wang P, R Batiuk, L Linker, G Shenk. 2001. Assessment of best management practices for improvement of dissolved oxygen in Chesapeake Bay estuary. *Water Science and Technology*. 44(7):173-80. http://www.chesapeakebay.net

## Chesapeake Bay Program Best Management Practices

U.S. EPA. 2010. Estimates of County-Level Nitrogen and Phosphorus Data For Use In Modeling Pollutant Reduction: Documentation For Scenario Builder Version 2.2. December 2010. CBP/TRS 903R100004 Bin # 304.
http://archive.chesapeakebay.net/pubs/SB_V22_Final_12_31_2010.pdf

Chesapeake Bay Program. 2010. Protocol for the Development, Review, and Approval of Loading and Effectiveness Estimates for Nutrient and Sediment Controls in the Chesapeake Bay Watershed Model. Chesapeake Bay Program Water Quality Goal Implementation Team, March 15, 2010, Annapolis, MD.
http://archive.chesapeakebay.net/pubs/Nutrient-Sediment_Control_Review_Protocol.pdf

Simpson, T. and S. Weammert. 2009. Developing Best Management Practice Definitions and Effectiveness Estimates for Nitrogen, Phosphorus and Sediment in the Chesapeake Bay Watershed: Final Report. December 2009, Chesapeake Bay Program, Annapolis, MD.
http://archive.chesapeakebay.net/pubs/BMP_ASSESSMENT_REPORT.pdf

Scientific and Technical Advisory Committee. 2008. Requested Review of Procedures of the UMD/MAWP Best Management Practice Project: Year 2. STAC BMP Efficiencies Task Group October 20, 2008. STAC Publication 08-005.
http://www.chesapeake.org/stac/Pubs/bmpreviewyear2.pdf

Scientific and Technical Advisory Committee. 2008. Workshop: Chesapeake Bay Cover Crop Enhancement Conference. December 18-19, 2008.
http://www.chesapeake.org/stac/ccec.html

Scientific and Technical Advisory Committee. 2007. Requested Review of Procedures for the MAWQ/UMD Best Management Practice Project. STAC BMP Efficiencies Task Group, July 19, 2007. http://www.chesapeake.org/stac/Pubs/BMP%20Efficiencies%20Report%202007.pdf

Scientific and Technical Advisory Committee. 2007. Workshop: Understanding Fertilizer Sales and Reporting Information. May 1, 2007. Frederick, MD.
http://www.chesapeake.org/stac/fertilizerdataworkshop.html

Scientific and Technical Advisory Committee. 2007. Workshop: Quantifying the Role of Wetlands in Achieving Nutrient and Sediment Reductions in Chesapeake Bay. April 4, 2007, Annapolis, MD.
http://www.chesapeake.org/stac/Workshops/WetlandsBMPAgenda.pdf

Chesapeake Bay Program. 2006. Best Management Practices for Sediment Control and Water Clarity Enhancement. Chesapeake Bay Program, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13369.pdf

Scientific and Technical Advisory Committee. 2009. Developing a Protocol for Development and Review of Reduction Efficiencies for Best Management Practices: Test Case of Pasture Management. Workshop. Laurel, Maryland. October 27-28, 2009.
http://www.chesapeake.org/stac/pasturemgt.html

Scientific and Technical Advisory Committee Workshop: Urban Tree Canopy. May 24, 2004. Annapolis, Maryland. STAC Publication 04-005.
http://www.chesapeakebay.net/pubs/UTCReport.pdf

Scientific and Technical Advisory Committee Workshop. 2003. Innovation in Agricultural Conservation in Chesapeake Bay: Evaluating Progress and Addressing Future Challenges. May 5-6, 2003, Beltsville, MD.
http://www.chesapeake.org/stac/InnovativeAg.html

Scientific and Technical Advisory Committee Workshop: Non-nutritive Feed Issues in Chicken Production: Workshop Report. Easton, Maryland. October 2, 2001.
http://www.chesapeake.org/stac/Pubs/AgReport.PDF

## Chesapeake Bay Model Documentation and Independent Scientific Peer Reviews

U.S. Environmental Protection Agency. 2010. Chesapeake Bay Phase 5.3 Community Watershed Model. EPA 903S10002 - CBP/TRS-303-10. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis MD. http://www.chesapeakebay.net/phase5.htm

U.S. EPA. 2010. Estimates of County-Level Nitrogen and Phosphorus Data For Use In Modeling Pollutant Reduction: Documentation For Scenario Builder Version 2.2. December 2010. EPA CBP/TRS 903R100004 Bin # 304, Annapolis, MD.
http://archive.chesapeakebay.net/pubs/SB_V22_Final_12_31_2010.pdf

Scientific and Technical Advisory Committee. 2010. Review of Land-Use and Land Cover Dataset and Methodology. September 2010.
http://www.chesapeake.org/stac/Pubs/landuserev3.pdf

Scientific and Technical Advisory Committee. 2010. STAC Review of the Water Clarity and SAV Components of the Chesapeake Bay Program Water Quality and Sediment Transport Model, March 9-10, 2010. March 2010.
http://www.chesapeake.org/stac/Pubs/savclarityreview.pdf

Chesapeake Bay Program. 2009. Response of the Modeling Subcommittee to the Second STAC Review of the Phase 5 Community Watershed Model. Annapolis, MD. January 28, 2009.
http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/Response_Chesapeake_Bay_Watershed_Modeling_Review_1-09.pdf

Preston, S.D., Alexander, R.B., Woodside, M.D., and Hamilton, P.A. 2009. SPARROW Modeling—Enhancing Understanding of the Nation's Water Quality. U.S. Geological Survey Fact Sheet 2009-3019, 6 p.
http://pubs.usgs.gov/fs/2009/3019/

Chesapeake Bay Program. 2008. Chesapeake Bay Land Change Modeling Technical Review. November 25, 2008. Annapolis, MD.
http://www.chesapeake.org/stac/Pubs/cblcm_report.pdf

Metropolitan Washington Council of Governments. 2008. The Chesapeake Bay Land Change Model. April 2008. Washington, DC.
http://www.mwcog.org/uploads/committee-documents/bV5fVl9Y20080422092127.pdf

Scientific and Technical Advisory Committee. 2008. Chesapeake Bay Watershed Model Phase V Review. STAC Publication 08-003. February 20, 2008.
http://www.chesapeake.org/stac/Pubs/2ndPhaseVReportFinal.pdf

Chesapeake Bay Program. 2008. Chesapeake Bay Airshed. February 7, 2008. Annapolis, MD.
http://www.chesapeakebay.net/content/maps/cbp_17028.pdf

National Oceanic and Atmospheric Administration. 2007. NOAA Atmospheric Sciences Modeling Division: Response to the Third Peer Review of the CMAQ Model. April 30, 2007.

http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/cmaq/CMAQ_Third_Review_Final_Report-Response.pdf

Aiyyer, A., D. Cohan, A. Russell, W. Stockwell, S. Tanrikulu, W. Vizuete, and J. Wilczak. 2007. Final Report: Third Peer Review of the CMAQ Model. February 20, 2007. http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/cmaq/CMAQ_Third_Review_Final_Report.pdf

Brakebill, J.W., and Preston, S.D. 2007. Factors Affecting the Distribution and Transport of Nutrients *in* Phillips, 2007, Synthesis of U.S. Geological Survey Science for the Chesapeake Bay Ecosystem and Implications for Environmental Management. U.S. Geological Survey Circular 1316, 63p. http://pubs.usgs.gov/circ/circ1316/html/circ1316chap3.html

Chesapeake Bay Program. 2007. Request for A Second STAC Review of the Chesapeake Bay Program Phase 5 Community Watershed Model. 2007. Annapolis, MD. http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/Questions_Posed_Watershed_Model_Reviewers_2008.pdf

U.S. Environmental Protection Agency: Peer Review Handbook, 3rd Edition. EPA/100/B-06/002. May 2006. http://www.epa.gov/peerreview/pdfs/Peer%20Review%20HandbookMay06.pdf

Scientific and Technical Advisory Committee. 2006. Workshop: Modeling in the Chesapeake Bay Program: 2010 and Beyond. January 17-18, 2006, Annapolis, MD. http://www.chesapeake.org/stac/2010Modeling.html

Chesapeake Bay Program Modeling Subcommittee. 2005. Response to the 2005 STAC Watershed Model Review. December 1, 2005. Annapolis, MD. http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/Response_Chesapeake_Bay_Watershed_Modeling_Effort_Review%20-%202005.pdf

Scientific and Technical Advisory Committee: Review of the Chesapeake Bay Watershed Modeling Effort. June 2005. http://www.chesapeake.org/stac/Pubs/STACp5ModReviewRep.pdf

National Oceanic and Atmospheric Administration. 2005. NOAA Atmospheric Sciences Modeling Division: Response to the Second Peer Review of the CMAQ Model. 31 August 2005. http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/cmaq/CMAQ_Scd_Peer_Rev_July_5-Response.pdf

Amar, P., D. Chock, A. Hansen, M. Moran, A. Russell, D. Steyn, and W. Stockwell. 2005. Final Report: Second Peer Review of the CMAQ Model. July 2005. http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/cmaq/CMAQ_Scd_Peer_Rev_July_5.pdf

Cerco, C.F. and M.R. Noel. 2005. Assessing a Ten-Fold Increase in the Chesapeake Bay Native Oyster Population: A Report to the EPA Chesapeake Bay Program. July 2005. www.chesapeakebay.net/content/publications/cbp_13358.pdf

Scientific and Technical Advisory Committee. 2005. Review of the Chesapeake Bay Watershed Modeling Effort. June 2005.
http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/Review_of_the_Chesapeake_Bay_Watershed_Modeling_Effort_2005.pdf

Chesapeake Bay Program. 2005. Watershed Model Phase 5 Peer Review Group: Model Review Questions Posed. May, 2005. Annapolis, MD.
http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/Questions_Posed_to_the_Watershed_Mode_%20Reviewers.pdf

Scientific and Technical Advisory Committee Workshop: Understanding the "Lag Times" Affecting the Improvement of Water Quality in Chesapeake Bay. May 19-20, 2004, Annapolis, MD.
http://www.chesapeake.org/stac/LagTimeWorkshop.html

Cerco CF, MR Noel (U.S. Environmental Protection Agency): The 2002 Chesapeake Bay Eutrophication Model. July 2004. EPA 903-R-04-004.
http://www.chesapeakebay.net/content/publications/cbp_26167.pdf

Scientific and Technical Advisory Committee. 2004. Workshop: Coupling Water Quality and Upper Tropic Level Modeling for Chesapeake Bay. January 8-9, 2004, Annapolis, MD.
http://www.chesapeake.org/stac/ModelCouplingWorkshop.html

Chesapeake Bay Program. 2003. Final Report Summary: December 2003 Peer Review of the CMAQ Model. August 2004.
http://archive.chesapeakebay.net/pubs/subcommittee/mdsc/cmaq/final_report_001.pdf

Kalin, L. and M.M. Hantush. 2003. Evaluation of Sediment Transport Models and Comparative Application of Two Watershed Models. EPA/600/R-03/139. September 2003.
http://www.epa.gov/nrmrl/pubs/600r03139/600r03139.pdf

Linker, L., G. Shenk, P. Wang, C. Cerco, A. Butt, P. Tango, and R. Savage. 2002. *A Comparison of Chesapeake Bay Estuary Model Calibration with 1985–1994 Observed Data and Method of Application to Water Quality Criteria.* Chesapeake Bay Program Modeling Subcommittee Report. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.
http://www.chesapeakebay.net/content/publications/cbp_13134.pdf

Scientific and Technical Advisory Committee. 2002. Workshop: Suspension Feeders: A Workshop to Assess What We Know, Don't Know, and Need to Know to Determine Their Effects on Water Quality. March 18-19, 2002, Lithicum, MD.
http://www.chesapeake.org/stac/filterfeeders.html

Scientific and Technical Advisory Committee: Review of the Chesapeake Bay Water Quality Model. February 2000.
http://www.chesapeake.org/stac/Pubs/Model_Report.pdf

Linker, Lewis C., Gary W. Shenk, R.L. Dennis, and J.L. Sweeney. 1999. Cross-Media Models for the Chesapeake Bay Watershed and Airshed. November, 1999. http://www.chesapeakebay.net/modsc.htm.

Chesapeake Bay Program: CBP Watershed Model Scenario Output Database, Phase 4.3. http://www.chesapeakebay.net/data_modeling.aspx

Chesapeake Bay Program: Chesapeake Bay Water Quality and Sediment Transport Model. http://www.chesapeakebay.net/committee_msc_projects.aspx?menuitem=16525#stm

Chesapeake Bay Program: Questions Posed to the Reviewers of the Simulation of SAV and Clarity in Shallow Waters. http://archive.chesapeakebay.net/pubs/Questions_Posed_the_SAV-Clarity_Reviewers_11-09.doc

## Chesapeake Bay Models Source Code, Calibration Results, and Databases Documentation

Phase 5.3 Chesapeake Bay Watershed Model Source Code via the Chesapeake Community Modeling Program Website http://ches.communitymodeling.org/models/CBPhase5/datalibrary.php

Scenario Builder Documentation, Source Code, and Database ftp://ftp.chesapeakebay.net/Modeling/ScenarioBuilder/Scenario Builder/

Chesapeake Bay Phase 5.3 Watershed Model Scenario Inputs and Outputs ftp://ftp.chesapeakebay.net/Modeling/phase5/Phase53_Loads-Acres-BMPs/

Phase 5.3 Chesapeake Bay Watershed Model Calibration Results ftp://ftp.chesapeakebay.net/Modeling/phase5/Phase%205.3%20Calibration/Calibration_pdf/all_validation.pdf.

## Chesapeake Bay Land Use Data Documentation and Access

Chesapeake Bay Program. 2010. Chesapeake Bay Land Cover Data (CBLCD) Series. ftp://ftp.chesapeakebay.net/Gis/CBLCD_Series/

Scientific and Technical Advisory Committee. 2010. Review of Land-Use and Land Cover Dataset and Methodology. September 2010. http://www.chesapeake.org/stac/Pubs/landuserev3.pdf

Scientific and Technical Advisory Committee. 2010. Chesapeake Bay Land Change Model Review. November 2008. http://www.chesapeake.org/stac/Pubs/cblcm_report.pdf

Scientific and Technical Advisory Committee Workshop: Kick-off Session for Developing Land Use Projections and Alternative Future Scenarios for the Phase 5 Model. http://www.chesapeake.org/stac/workshop.html

Scientific and Technical Advisory Committee. 2005. Workshop: Integrated Land Use and Watershed Management. March 7, 2005, Annapolis, MD.
http://www.chesapeake.org/stac/IWLUPWorkshop.html

## Chesapeake Bay Monitoring Program Documentation

Chesapeake Bay Program: *Chesapeake Bay Nontidal Water-Quality Sampling Progress Report, Calendar Year 2009*. 10 p. 2010.
http://archive.chesapeakebay.net/pubs/subcommittee/msc/ntwqwg/FY09_Nontidal_Network_Summary.pdf

Monitoring Re-Alignment Action Team. 2009. Recommendations to improve coordinated nontidal monitoring, assessment and communication activities in support of the Chesapeake Bay restoration: A report addressing STAC recommendations for monitoring reallocation.
http://www.chesapeakebay.net/content/publications/cbp_52993.pdf

Scientific and Technical Advisory Committee. 2009. Development and Implementation of a Process for Establishing Chesapeake Bay Program's Monitoring Program Priorities and Objectives. March 2009.
http://www.chesapeake.org/stac/Pubs/STACReviewPrioritiesFinal3-09.pdf

Chesapeake Bay Program. 2008. Nontidal Water Quality Monitoring. November 2008. Chapter V of Recommended Guidelines for Sampling and Analysis in the Chesapeake Bay Monitoring Program, Revision 1-Draft.
http://archive.chesapeakebay.net/pubs/subcommittee/msc/amqawg/Chapter%205%20Nov%2008%20Final.pdf

Scientific and Technical Advisory Committee. 2009. Workshop: Developing "Comparable" Small Watershed Monitoring and Assessment Protocols. April 23-24, 2009.
http://www.chesapeake.org/stac/smallwtrshdmonitoring.html

Scientific and Technical Advisory Committee. 2007. Workshop: Evaluating the Design and Implementation of the Chesapeake Bay Shallow Water Monitoring Program. November 30-December 1, 2007, Annapolis, MD.
http://www.chesapeake.org/stac/SWMWorkshop.html

Scientific and Technical Advisory Committee Workshop. 2007. Developing Environmental Indicators for Assessing the Health of the Chesapeake Bay Watershed. February 20, 2007, Annapolis, MD.
http://www.chesapeake.org/stac/indicatorsworkshop.html

Scientific and Technical Advisory Committee Workshop. 2007. Thresholds and Non-Linear Trajectories in Recovery of Eutrophic Coastal Ecosystems. February 14-15, 2007, Annapolis, MD.
http://www.chesapeake.org/stac/thresholds.html

Scientific and Technical Advisory Committee. 2006. Chesapeake Bay Program Scientific and Technical Assessment Committee Monitoring, Assessment, and Indicator Review Subcommittee

Meeting Report. September 2006.
http://www.chesapeake.org/stac/Pubs/STACIndicatorReview9-12-06.pdf

Scientific and Technical Advisory Committee. 2005. Recommendations for Refinement of a
Spatially Representative Non-tidal Water Quality Monitoring Network for the Chesapeake Bay
Watershed. STAC Publication 05-006. August 2005.
http://www.chesapeake.org/stac/Pubs/NTMonNetworkRep.pdf

Scientific and Technical Advisory Committee. 2005. Final report of the Chesapeake Bay
Scientific and Technical Advisory Committee's workshop: Evaluating the Design and
Implementation of the Chesapeake Bay Shallow Water Monitoring Program. STAC Publication
05-003. May 1, 2005.
http://www.chesapeakebay.net/content/publications/cbp_13286.pdf

Scientific and Technical Advisory Committee. 2005. Assessing Progress and Effectiveness
through Monitoring Rivers and Streams. Report to the Task Force on Analysis of Non-tidal
Water Quality Modeling Results. STAC Publication 05-005.
http://archive.chesapeakebay.net/pubs/subcommittee/msc/ntwqwg/NTWQM_stac_Report.pdf

Scientific and Technical Advisory Committee. 2005. Recommendations for Refinement of a
Spatially Representative Non-tidal Water Quality Monitoring Network for the Chesapeake Bay
Watershed. Report to the Task Force on Analysis of Non-tidal Water Quality Modeling Results.
STAC Publication 05-006.
http://www.chesapeake.org/stac/Pubs/NTMonNetworkRep.pdf

Scientific and Technical Advisory Committee. 2004. Design of a Monitoring Network for
Chesapeake Bay and its Tidal Tributaries. November 22, 2004.
http://www.chesapeake.org/stac/SWMMaterials/DraftDesignReport.pdf

Chesapeake Bay Program. 2004. Establishing a Chesapeake Bay Nontidal Watershed Water-
Quality Network. 28 p.
http://archive.chesapeakebay.net/pubs/subcommittee/msc/ntwqwg/Nontidal_Monitoring_Report.pdf

Scientific and Technical Advisory Committee Workshop: Present Status and Future Trends in
Estuarine Monitoring Using Remote Sensing Technology: Satellite, Airborne, In-Situ.
Annapolis, Maryland. January 7-8, 2002.
http://www.chesapeake.org/stac/Pubs/Remote%20Sensing-revised.pdf

Scientific and Technical Advisory Committee. 2000. Technical Review of the Chesapeake Bay
Program's Basinwide Monitoring Program. December 2000.
http://www.chesapeake.org/stac/Pubs/STAC-MonitoringStrategy.pdf

Chesapeake Bay Program. 1996. Chesapeake Bay Basinwide Monitoring Strategy: From
Airsheds To Living Resource Populations. November 1996.
http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2001831Y.txt

Chesapeake Bay Program. 1989. Chesapeake Bay Monitoring Program Atlas-Volume 1: Water Quality and Other Physiochemical Monitoring Programs. CBP/TRS 34/89. Annapolis, MD. http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000VWBC.txt

Chesapeake Bay Program. 1989. Chesapeake Bay Monitoring Program Atlas-Volume II: Biological and Living Resource Monitoring Programs. CBP/TRS 35/89. Annapolis, MD. http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000VW22.txt

## Chesapeake Bay Quality Assurance Program Documentation

U.S. Environmental Protection Agency. 2010. Quality Management Plan for the Chesapeake Bay Program Office. Region 3 Chesapeake Bay Program Office. October 2010. http://archive.chesapeakebay.net/pubs/quality_assurance/CBPO_QMP_2010_final.pdf

Chesapeake Bay Program. 2010. Data Analysis Issues Tracking System. http://archive.chesapeakebay.net/pubs/DAITS_9_21_10.pdf

Small, Tamara D., Melissa R. Ide, Jennifer M. Keesee (NOAA National Estuarine Research Reserve). 2010. NERRS Centralized Data Management Operations Manual. Version 6.3. February 2010. http://cdmo.baruch.sc.edu/documents/manual.pdf

Michael, Bruce, Mark Trice, Ben Cole, and Matt Hall (Maryland Department of Natural Resources). 2009. Quality Assurance Project Plan for the Maryland DNR Chesapeake Bay Shallow Water Monitoring Program for the period July 1, 2009 – June 30, 2010. July 2009. http://mddnr.chesapeakebay.net/eyesonthebay/documents/MdDNR_SWM_QAPP_2009final.pdf

College of William and Mary, School of Marine Science. 2009. Quality Assurance Project Plan for the Rappahannock, Corrotoman and York Rivers & Potomac River Virginia Embayments Shallow Water Monitoring (For the Period: January 1, 2009 through December 31, 2009). 2009. http://archive.chesapeakebay.net/pubs/quality_assurance/VIMS_2009_RappPotYork_QAPP_Final_All_Edits.pdf

U. S. Environmental Protection Agency. 2005. Quality Assurance Management Plan for the Chesapeake Bay Program Office, Annapolis, MD. June 2005. http://www.epa.gov/region3/esc/qa/pdf/qmp-chesbay.pdf.

Chesapeake Bay Program. 1996. Recommended Guidelines for Sampling and Analyses in the Chesapeake Bay Monitoring Program. CBP/TRS 148/96, EPA 903-R-96-006. August 1996. www.chesapeakebay.net/content/publications/cbp_13101.pdf

## Chesapeake Bay Program Blind Audits and Coordinated Split Sample Programs

Zimmerman, Carl and Carolyn Keefe. 2010. Chesapeake Bay Program Blind Audit: Fiscal Year 2010 Final Report. May 2010. http://archive.chesapeakebay.net/pubs/2010_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2009. Chesapeake Bay Program Blind Audit: Fiscal Year 2009 Final Report. July 2009.
http://archive.chesapeakebay.net/pubs/2009_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2008. Chesapeake Bay Program Blind Audit: Fiscal Year 2008 Final Report. June 2008.
http://archive.chesapeakebay.net/pubs/2008_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2007. Chesapeake Bay Program Blind Audit: Fiscal Year 2007 Final Report. June 2007.
http://archive.chesapeakebay.net/pubs/2007_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2006. Chesapeake Bay Program Blind Audit: Fiscal Year 2006 Final Report. August 2006.
http://archive.chesapeakebay.net/pubs/2006_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2005. Chesapeake Bay Program Blind Audit: Fiscal Year 2005 Final Report. June 2005.
http://archive.chesapeakebay.net/pubs/2005_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe. 2004. Chesapeake Bay Program Blind Audit: Fiscal Year 2004 Final Report. June 2004.
http://archive.chesapeakebay.net/pubs/2004_Blind_Audit_Report.pdf

Zimmerman, Carl and Carolyn Keefe: Chesapeake Bay Program Blind Audit: Fiscal Year 2003 Final Report. July 7, 2003.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-BlindAudit2003.pdf

Zimmerman, Carl and Carolyn Keefe. 2003. Chesapeake Bay Program Blind Audit: 2002 Final Report. February 28, 2003.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-BlindAuditText20023.pdf

Chesapeake Bay Program. 2003. Chesapeake Bay Program Mainstem Coordinated Split Sample Program Report, May 2001 to May 2002. January, 2003.
http://archive.chesapeakebay.net/pubs/subcommittee/msc/amqawg/doc-MainsplitSum01-02.pdf

Zimmerman, Carl and Carolyn Keefe. 2002. Chesapeake Bay Program Blind Audit: 2001 Final Report. November 2002.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-blind_audit_2001.pdf

Chesapeake Bay Program. 2002. Procedures for Sampling and Analyzing Mainstream and Tributary Coordinated Split Samples. February 25, 2002.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-cssp-procedures.pdf

Interstate Commission on the Potomac River Basin. 2000. The 1998 - 1999 Split Sample Study for Chesapeake Bay Program Phytoplankton, Microzooplankton and Mesozooplankton Monitoring. June 8, 2000.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-PhytoMicroSplit06-00.pdf

Interstate Commission on the Potomac River Basin. 2000. Split Sampling Study for the Maryland and Virginia Mesozooplankton Monitoring Programs: Final Report. ICPRB Report 00-3. June 2000.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-Mesosplitreport06-00.pdf

Chesapeake Bay Program. 1999. Chesapeake Bay Program Mainstem Coordinated Split Sample Program Report 1994-1998. EPA-903-R-99-024.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-cssp9498.pdf

Zimmerman, Carl and Carolyn Keefe. 1998. Chesapeake Bay Program Blind Audit Nutrient Results. November 20, 1998.
http://archive.chesapeakebay.net/pubs/quality_assurance/doc-1998BlindAudit.PDF

## Analytical Methods Comparison Studies

Salley, Betty A. 1995. A Comparison of Preservation Techniques for Dissolved Nutrient Analyses. March 1995. Virginia Institute of Marine Science, Gloucester Point, VA.
http://archive.chesapeakebay.net/pubs/quality_assurance/A%20Comparison%20of%20Preservation%20Techniques.pdf

Salley, Betty A. and Kevin Curling. 1984. Comparison Study of Five Instruments Measuring Dissolved Organic Carbon for the Chesapeake Bay Monitoring Program. December 8, 1994. Virginia Institute of Marine Science, Gloucester Point, VA.
http://archive.chesapeakebay.net/pubs/quality_assurance/Comparison%20Study%20of%20Five%20Instruments.pdf

Salley, Betty, Kevin Curling, Bruce Neilson. 1992. A Comparison of Two Methods of Measuring Dissolved Organic Carbon. Virginia Institute of Marine Science, Gloucester Point, VA.
http://archive.chesapeakebay.net/pubs/quality_assurance/Comparison%20of%20Two%20Methods%20of%20Measuring%20Dissolved%20Organic%20Carbon.pdf

Zimmerman, Carl F. 1990. Estuarine Nutrient Analyses: A Comparison of Sample Handling Techniques and the Analyses of Carbon, Nitrogen, Phosphorus and Chlorophyll a. University of Maryland Center for Estuarine and Environmental Studies, Chesapeake Biological Laboratory, Solomons, MD.
http://archive.chesapeakebay.net/pubs/quality_assurance/Estuarine%20Nutrient%20Analyses.pdf

Chesapeake Bay Program. 1987. Nitrogen and Phosphorous Determinations in Estuarine Waters: A Comparison of Methods Used in Chesapeake Bay Monitoring. CBP/TRS/7/87. August 1987.
http://archive.chesapeakebay.net/pubs/quality_assurance/Nitrogen%20Phosphorus%20Determinations%20in%20Estuarine%20Waters.pdf

Salley, Betty A., Julie G. Bradshaw, Bruce J. Neilson. 1986. Results of Comparative Studies of Preservation Techniques for Nutrient Analysis on Water Samples. September 24, 1986. Virginia Institute of Marine Science, Gloucester Point, VA.
http://archive.chesapeakebay.net/pubs/quality_assurance/Nutrient%20Analysis%20on%20Water%20Samples.pdf

Chesapeake Bay Program. 1986. Methodological Comparisons for Nitrogen and Chlorophyll Determinations in Estuarine Water Samples. 1986.
http://archive.chesapeakebay.net/pubs/quality_assurance/Methodological%20Comparisons%20fo%20Nitrogen_Chlorophyll.pdf

## Chesapeake Bay Water Quality and Biological Resource Monitoring Data Access

Chesapeake Bay Program: Chesapeake Bay Program Data Hub
http://www.chesapeakebay.net/dataandtools.aspx?menuitem=14872

Chesapeake Bay Program: CBP Water Quality Database (1984-present).
http://www.chesapeakebay.net/data_waterquality.aspx

Chesapeake Bay Program: Living Resources Data Sets.
http://archive.chesapeakebay.net/data/historicaldb/livingresourcesmain.htm

Chesapeake Bay Program: Map of Mainstem and Tributary Stations.
http://archive.chesapeakebay.net/pubs/maps/2004-149.pdf

Chesapeake Bay Program: Online Water Quality Data Dictionary.
http://archive.chesapeakebay.net/data/data_dict.cfm?DB_CODE=CBP_WQDB

Chesapeake Bay Program. 1993. Guide to Using Chesapeake Bay Program Water Quality Monitoring. CBP/TRS 78/92. March 1993. http://archive.chesapeakebay.net/pubs/wquser.pdf

## Chesapeake Bay Health and Restoration Assessment

Chesapeake Bay Program. 2010. Chesapeake Bay Health and Restoration Assessment 2009: A Report to the Citizens of the Bay Region. April 2010.
http://www.chesapeakebay.net/content/publications/cbp_50513.pdf

Chesapeake Bay Program. 2009. Chesapeake Bay Health and Restoration Assessment 2008: A Report to the Citizens of the Bay Region. March 2009.
http://www.chesapeakebay.net/content/publications/cbp_46582.pdf

Chesapeake Bay Program. 2008. Chesapeake Bay Health and Restoration Assessment 2007: A Report to the Citizens of the Bay Region. March 2008. CBP/TRS-291-08. EPA-903-R-08-002.
http://www.chesapeakebay.net/content/publications/cbp_26038.pdf

Chesapeake Bay Program. 2007. Chesapeake Bay 2006 Health& Restoration Assessment Part One: Ecosystem Health. A Report to the Citizens of the Bay Region. CBP/TRS/283/07. EPA 903 R-07-001.
http://www.chesapeakebay.net/content/publications/cbp_15548.pdf

Chesapeake Bay Program. 2006. Chesapeake Bay 2006 Health& Restoration Assessment Part Two: Restoration Efforts. A Report to the Citizens of the Bay Region. CBP/TRS/284/07. EPA

903 R-07-002. 2006.
http://www.chesapeakebay.net/content/publications/cbp_12894.pdf

## Chesapeake Bay Climate Change Assessments

U.S. Environmental Protection Agency. 2009. Decision Rationale Total Maximum Daily Load of Sediment in the Upper Monocacy River Watershed Frederick and Carroll Counties, Maryland. December 3, 2009.
http://www.epa.gov/reg3wapd/tmdl/MD_TMDLs/MonocacyRiver/UpperMonocacySedAL_DR.pdf

U.S. Environmental Protection Agency. 2009. Decision Rationale Total Maximum Daily Load Sediment in the Lower Monocacy River Watershed Frederick, Carroll, and Montgomery Counties Maryland. March 17, 2009.
http://www.epa.gov/reg3wapd/tmdl/MD_TMDLs/MonocacyRiver/LowerMonocacySedAL_DR.pdf

U.S. Department of Commerce and U.S. Department of the Interior. 2009. Responding to Climate Change in the Chesapeake Bay Watershed: A Draft Report Fulfilling Section 202(d) of Executive Order 13508. November 19, 2009.
http://executiveorder.chesapeakebay.net/file.axd?file=2009%2f11%2f202d+Climate+Change+Report.pdf

Scientific and Technical Advisory Committee Workshop. 2009. Monitoring Progress in Addressing Climate Change across the Chesapeake Bay Watershed. May 22, 2009. Columbia, Maryland. http://www.chesapeake.org/stac/workshop.html

Virginia Governor's Commission on Climate Change: Final Report: A Climate Change Action Plan. December 15, 2008.
http://www.deq.state.va.us/export/sites/default/info/documents/climate/CCC_Final_Report-Final_12152008.pdf

Science and Technical Advisory Committee. 2008. Climate Change and the Chesapeake Bay State-of-the-Science Review and Recommendations. STAC Publication 08-004. September 2008. http://www.chesapeake.org/stac/Pubs/climchangereport.pdf

The Maryland Climate Change Commission: Climate Action Plan. August 27, 2008.
http://www.mdclimatechange.us/

## Chesapeake Bay Economic/Cost Effectiveness Evaluation

Chesapeake Bay Foundation. 2010. The Economic Argument for Cleaning Up the Bay and Its Rivers. November 2010.
http://www.cbf.org/Document.Doc?id=591

Chesapeake Bay Commission. 2004. Cost Effective Strategies for the Bay: 6 Smart Investments for Nutrient and Sediment Reduction. December 2004. Annapolis, MD.
http://www.chesbay.state.va.us/Publications/cost%20effective.pdf

U.S. Environmental Protection Agency. 2004. Economic Analyses of Nutrient and Sediment Reduction Actions to Restore Chesapeake Bay Water Quality. Region 3 Chesapeake Bay Program Office, Annapolis, Maryland. 2004. http://www.chesapeakebay.net/ecoanalyses.htm

Chesapeake Bay Watershed Blue Ribbon Finance Panel. 2004. Saving a National Treasure: Financing the Cleanup of the Chesapeake Bay. http://archive.chesapeakebay.net/pubs/blueribbon/Blue_Ribbon_fullreport.pdf

Chesapeake Bay Commission. 2003. The Cost of a Clean Bay: Assessing Funding Needs Throughout the Watershed. January 2003. Annapolis, MD. http://www.chesbay.state.va.us/Publications/C2Kfunding.pdf

## Chesapeake Bay NPDES Permitting

U.S. Environmental Protection Agency. 2010. *Urban Stormwater Approach for the Mid-Atlantic Region and Chesapeake Bay Watershed*. U.S. Environmental Protection Agency, Region 3, Philadelphia, PA. 2010. http://www.epa.gov/chesapeakebaytmdl/

Linker, L.C. 2005. Labile and Refractory Organic Nitrogen in Chesapeake Bay Wastewater Treatment Plants: Measurement and Model Simulation. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD. http://www.chesapeakebay.net

U.S. Environmental Protection Agency. 2004. NPDES Permitting Approach for Discharges of Nutrients in the Chesapeake Bay Watershed—December 2004. U.S. Environmental Protection Agency, Region 3, Philadelphia, PA. 2004. http://www.chesapeakebay.net/content/publications/cbp_28937.pdf

U.S. Environmental Protection Agency. 2004. Memorandum from James Hanlon to Jon Capacasa, March 3, 2004. Annual Permit Limits for Nitrogen and Phosphorus for Permits Designed to Protect Chesapeake Bay and its tidal tributaries from Excess Nutrient Loading under the National Pollutant Discharge Elimination System. U.S. Environmental Protection Agency, Washington, DC. http://www.epa.gov/reg3wapd/npdes/pdf/ches_bay_nutrients_hanlon.pdf

Linker, Lewis C. 2003. A Comparison of Estimated Water Quality Effects of Monthly and Annual Based Load Point Source Load Reductions. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD. http://nsgd.gso.uri.edu/riu/riuc04001/pdffiles/papers/21334.pdf

## Chesapeake Bay Wastewater Treatment Facilities

Science and Technical Advisory Committee. 2007. Bioavailability of Organic Nitrogen from Treated Wastewater. February 2007. STAC Publication 07-001. http://www.chesapeake.org/stac/Pubs/OrganicNitrogenReport.pdf

Scientific and Technical Advisory Committee Workshop: Maximizing the Dual Benefits of Advanced Wastewater Treatment Plant Processes: Reducing Nutrients and Emerging

Contaminants. Washington, DC. May 12-13, 2008.
http://www.chesapeake.org/stac/edcworkshop.html

Scientific and Technical Advisory Committee Workshop: Technical and Economical Feasibility of Nutrient Removal Limits of Treatment. Herndon, Virginia. May 20-21, 2003.
http://www.chesapeake.org/stac/workshop.html

## Chesapeake Bay Onsite Waste Treatment Systems

CH2M Hill: Anne Arundel County Onsite Sewage Disposal Systems.
http://www.chesapeakebay.net

Vandivort, Tamara and Clement Solomon (West Virginia University): WRI-71: Performance Evaluation of Advanced Onsite Wastewater Treatment Options: Final Report. Assistance ID Number: CB-97327301-0. April 14, 2010. http://www.chesapeakebay.net

WEFTEC 2008 Workshop: Demonstrated Processes for Limit of Technology Nutrient Removal - Achievable Limits and Statistical Reliability. Workshop at WEFTEC 2008, Chicago, October 18, 2008.
http://www.werf.org/AM/Template.cfm?Section=Home&Template=/CM/ContentDisplay.cfm&ContentID=11812

University of Maryland Environmental Finance Center: Community Financing for Septic System Management in the Inland Bays Watershed A White Paper Report. January 29, 2008.
http://www.efc.umd.edu/pdf/DE_Septic_Report.pdf

## EPA Published TMDL Related Guidance

Hanlon, J.A. and D. Keehner. 2010. Revisions to the November 22, 2002 Memorandum: Establishing Total Maximum Daily Load (TDML) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs. November 12, 2010. U.S. Environmental Protection Agency, Washington, DC.
http://www.epa.gov/chesapeakebaytmdl

U.S. Environmental Protection Agency. 2007. Options for Expressing Daily Loads in TMDLs. June 22, 2007. Office of Wetlands, Oceans & Watersheds, Washington, DC.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/upload/2007_06_26_tmdl_draft_daily_loads_tech-2.pdf

Grumbles, B.H. 2006. Memorandum-Establishing TMDL *Daily Loads* in Light of the Decisions by the U.S. Court of Appeals for the D.C. Circuit in *Friends of the Earth, Inc. v. EPA, et al.* No. 05-5015, (April 25, 2006) and Implications for NPDES Permits. November 15, 2006.
http://www.fedcenter.gov/_kd/go.cfm?destination=ShowItem&Item_ID=6204

Wayland, R.H. and J. Hanlon. 2002. Memorandum: Establishing Total Maximum Daily Load (TDML) Wasteload Allocations (WLAs) for Storm Water Sources and NPDES Permit Requirements Based on Those WLAs. November 22, 2002. U.S. Environmental Protection

Agency, Washington, DC.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/upload/final-wwtmdl.pdf

Suffin, C.H. 2002. Memorandum: EPA Review of 202 Section 303(d) Lists and Guidelines for Reviewing TMDLs under Existing Regulations issues in 1992. May 20, 2002. U.S. Environmental Protection Agency, Washington, DC.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/csmemo.cfm

U.S. Environmental Protection Agency. 2002. Guidelines for Reviewing TMDLs under Existing Regulations Issues in 1992. May 20, 2002.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/final52002.cfm

U.S. Environmental Protection Agency. 2001. Protocol for Developing Pathogen TMDLs: First Edition. EPA 841-R-00-002.
http://www.epa.gov/owow/tmdl/pathogen_all.pdf

U.S. Environmental Protection Agency. 1999. Draft Guidance for Water-Quality Based Decisions: the TMDL Process. EPA 841-D-99-001.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/propguid_Guidance.cfm

The National Advisory Council for Environmental Policy and Technology. 1998. Report of the Federal Advisory Committee on the Total Maximum Daily Load (TMDL) Program. EPA 100-R-98-006. July 1998.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/upload/2004_12_14_tmdl_faca_facaall.pdf

U.S. Environmental Protection Agency: Report of the Federal Advisory Committee on the Total Maximum Daily Load (TMDL) Program. 1998. EPA 100-R-98-006. June 1998.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/upload/2004_12_14_tmdl_faca_facaall.pdf

Perciasepe, R. 1997. Memorandum: New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs). August 8, 1997. U.S. Environmental Protection Agency, Washington, DC.
http://water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/ratepace.cfm

U.S. Environmental Protection Agency. 1992. Guidelines for Reviewing TMDLs under Existing Regulations Issues in 1992. U.S. Environmental Protection Agency, Washington, DC.
http://www.epa.gov/owow/tmdl/guidance/final52002.html

U.S. Environmental Protection Agency. 1999. U.S. EPA Protocol for Developing Sediment TMDLs-First Edition. 841 B-99-004. October 1999.U.S. Environmental Protection Agency, Washington, DC.
http://www.epa.gov/owow/tmdl/sediment/pdf/sediment.pdf

U.S. Environmental Protection Agency. 1999. U.S. EPA Protocol for Developing Nutrient TMDLs-First Edition. 841 B-99-007. November 1999. U.S. Environmental Protection Agency, Washington, DC.
http://www.epa.gov/owow/tmdl/nutrient/pdf/nutrient.pdf

## Chesapeake Bay TMDL Related Correspondence

Jackson, L.P. 2010. Response to Virginia Governor Robert McDonnell. July 15, 2010.
http://www.epa.gov/chesapeakebaytmdl

McDonnell, R.F.: Letter to EPA Administrator Lisa P. Jackson. June 15, 2010.
http://www.deq.state.va.us/export/sites/default/tmdl/pptpdf/bay61510govltrepa.pdf

Garvin, Shawn M.: EPA letter to the Principals' Staff Committee. December 29, 2009.
http://www.epa.gov/region03/chesapeake/bay_letter_1209.pdf

Garvin, Shawn M.: EPA letter to Principals' Staff Committee: Schedule for TMDL
Implementation. June 11, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/TMDLScheduleLetter.pdf

Early, William C.: EPA letter to the Principals' Staff Committee. November 4, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/tmdl_implementation_letter_110409.pdf

Early, William C.: EPA letter to the Principals' Staff Committee. November 3, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/Bay_TMDL_Loads_Letter.pdf

Welsh, Donald S.: EPA letter to the Principals' Staff Committee. September 11, 2008.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/EPARegionIIIlettertoPSC091108.pdf

## Other TMDL Related Documentation

Freedman, Paul L. 2003. Navigating the TMDL Process: Evaluation and Improvements. October
2003. Water Environment Research Foundation
http://www.werf.org

Committee to Assess the Scientific Basis of the Total Maximum Daily Load Approach to Water
Pollution Reduction. 2001. Assessing the TMDL Approach to Water Quality Management.
Water Science and Technology Board, and National Resource Council. The National Academies
Press, Washington, DC.
http://www.nas.org

## Draft Chesapeake Bay TMDL Document

U.S. Environmental Protection Agency: September 24, 2010 Draft Chesapeake Bay TMDL
Document.
http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/drafttmdlexec.html

## Chesapeake Bay States' Tributary Strategies and Related Implementation Plans

Delaware Tributary Strategy
http://www.chesapeakebay.net/wqctributaryde.htm

Delaware Department of Natural Resources and Environmental Control. 2000. Pollution Control Plans. Introducing Our Pollution Control Strategies. Dover, DE.
http://www.dnrec.state.de.us/water2000/sections/watershed/ws/pcs.htm

District of Columbia Tributary Strategy
http://www.chesapeakebay.net/pubs/waterqualitycriteria/doc-DC_Tributary_Strategy_2004_public_version_071204.pdf

Maryland Tributary Strategy
http://www.dnr.state.md.us/bay/tribstrat/

New York Tributary Strategy
http://www.chesapeakebay.net/wqctributaryny.htm

Pennsylvania Tributary Strategy
http://www.dep.state.pa.us/hosting/pawatersheds/chesapeakebay/docs/TribStrategy.pdf

Bryant, L. Preston. 2009. Chesapeake Bay and Virginia Waters Clean-Up Plan: Progress Report. December 2009. Richmond, VA.
http://leg2.state.va.us/dls/h&sdocs.nsf/By+Year/RD4712009/$file/RD471.pdf

Commonwealth of Virginia. 2005. Chesapeake Bay Nutrient and Sediment Reduction Tributary Strategy. January 2005. Richmond, VA.
http://archive.chesapeakebay.net/pubs/VA%20ts_statewide_All%202005.pdf

Virginia Tributary Strategy
http://www.naturalresources.virginia.gov/Initiatives/TributaryStrategies/FinalizedTribStrats/ts_statewide_All.pdf

Virginia Department of Environmental Quality. 1999. Commonwealth of Virginia – Tributary Restoration Strategy for the Rappahannock River and Northern Neck Coastal Basins. Virginia Department of Environmental Quality, Richmond, VA.
http://www.deq.state.va.us/pdf/strategies/rapp.pdf

West Virginia Tributary Strategy
http://www.wvnet.org/

## Chesapeake Bay Watershed States' Final Phase I Watershed Implementation Plans

Delaware
http://www.wr.dnrec.delaware.gov/Information/WatershedInfo/Documents/Chesapeake%20Phase%201%20WIP/DE_PHASE1_WIPwAppendices_11292010.pdf

District of Columbia
http://ddoe.dc.gov/ddoe/frames.asp?doc=/ddoe/lib/ddoe/tmdl/Final_District_of_Coliumbia_WIP_Bay_TMDL.pdf

Maryland
http://www.mde.state.md.us/programs/Water/TMDL/TMDLHome/Pages/Final_Bay_WIP_2010.aspx

New York
http://www.dec.ny.gov/docs/water_pdf/cbaystratfinal.pdf

Pennsylvania
http://files.dep.state.pa.us/Water/Chesapeake%20Bay%20Program/ChesapeakePortalFiles/WIPs/Chesapeake%20Bay%20WIP%20%20November%2029,%202010.pdf

Virginia: Commonwealth of Virginia: Chesapeake Bay TMDL: Phase I Watershed Implementation Plan Revision of the Chesapeake Bay Nutrient and Sediment Reduction Tributary Strategy. November 29, 2010.
http://www.dcr.virginia.gov/soil_and_water/documents/vatmdlwip.pdf
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/finalWIPS/VirginiaWIPPortfolioNov292010.pdf

West Virginia: http://www.wvca.us/bay/tmdl.cfm


## Chesapeake Bay Watershed Implementation Plans Related Documentation

U.S. Environmental Protection Agency: 2010. Evaluation of Final WIPs. December 29, 2010.
http://www.epa.gov/chesapeakebaytmdl

U.S. Environmental Protection Agency: 2010. Evaluation of Draft WIPs. September 24, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/WIPEVALUATIONS/PortfolioOfDraftWIPs.pdf

U.S. Environmental Protection Agency. 2010. Guide for EPA's Evaluation of Phase I Watershed Implementation Plans. U.S. Environmental Protection Agency, Region 3, Philadelphia, PA.
http://archive.chesapeakebay.net/pubs/Guide_for_EPA_WIP_Evaluation_4-2-10.pdf

U.S. Environmental Protection Agency. 2009. Letter from Region 3 Administrator Shawn M. Garvin to Secretary L. Preston Bryant, Virginia Department of Natural Resources, December 29, 2009.
http://www.epa.gov/region03/chesapeake/bay_letter_1209.pdf

U.S. Environmental Protection Agency. 2009. Letter from Region 3, Acting Administrator William C. Early to Secretary L. Preston Bryant, Virginia Department of Natural Resources, November 4, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/tmdl_implementation_letter_110409.pdf

U.S. Environmental Protection Agency. 2010. Correspondence: November 12 WIP Submissions Follow-Up Emails from EPA Senior Management to Bay Jurisdictions.
http://www.epa.gov/chesapeakebaytmdl

U.S. Environmental Protection Agency. 2010. Correspondence: November Post-Closure Meeting Follow-Up Emails from EPA Senior Management to Bay Jurisdictions. http://www.epa.gov/chesapeakebaytmdl

U.S. Environmental Protection Agency. 2010. Correspondence: October/November Pre-Closure Meeting Emails from EPA Senior Managers to Bay Jurisdictions. http://www.epa.gov/chesapeakebaytmdl

U.S. Environmental Protection Agency. 2010. Correspondence: September/October Emails from EPA Senior Managers to Bay Jurisdictions: Discussion of follow up actions from initial staff-level WIP meetings. http://www.epa.gov/chesapeakebaytmdl

Scientific and Technical Advisory Committee Workshop. 2010. Exemplary Strategies to Protect and Restore Urban Watersheds: Preparing for the Chesapeake Bay TMDL and Watershed Implementation Plans. http://www.chesapeake.org/stac/stormwater.html

## Two-year Milestones

Chesapeake Bay Program: 2011 Milestones for Reducing Nitrogen and Phosphorus. 2010. http://archive.chesapeakebay.net/pressrelease/EC_2009_allmilestones.pdf

## Monthly Bay TMDL Webinars

Draft Chesapeake Bay TMDL: Restoring Streams, Creeks, Rivers and Chesapeake Bay. September 28, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/DraftTMDLPresentationWEBINAR92810FINAL_corrected.pdf

District of Columbia Department of Environment. 2010. Update on the District of Columbia's WIP for the Chesapeake Bay TMDL. August 19th, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/WIPwebinarcomp2.pdf

Chesapeake Bay TMDL Restoring Local Waters and the Chesapeake Bay. No. 6 in Webinar Series. August 19, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/Webinar6-gksDraft-rev2.pdf

Chesapeake Bay TMDL: Restoring Local Waters and the Chesapeake Bay. No. 5 in Webinar Series. July 8, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/BayTMDLWebinar_Update5_070810.pdf

Chesapeake Bay TMDL: Restoring Local Waters and the Chesapeake Bay. No. 4 in Webinar Series. June 7, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/TMDLWebinar_060710_Update4_final.pdf

Chesapeake Bay TMDL: Restoring Local Waters and the Chesapeake Bay. No. 3 in Webinar Series. May 17, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/TMDLWebinar_051710_Update3_final.pdf

Chesapeake Bay TMDL: Restoring Local Waters and the Chesapeake Bay. No. 2 in Webinar Series. March 25, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/TMDLWebinar325Final.pdf

Chesapeake Bay TMDL and Bay Models Webinar: A Guide to Better Understanding and How to Get Involved for the Bay Watershed Agricultural Community. March 22, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/AgBayTMDLWebinarPresentationFinal3_22_2010.pdf

Chesapeake Bay TMDL: Restoring Local Waters and the Chesapeake Bay. No. 1 in Webinar Series. February 25, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/CBTMDLwebinar2-25-10-final-final.ppt

## 2009 Public Meetings

Fredericksburg, VA Chesapeake Bay TMDL Public Meeting Summary. December 17, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Fredericksburg.pdf

Penn Laird, VA Chesapeake Bay TMDL Public Meeting Summary. December 16, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/PennLaird.pdf

Chesapeake, VA Chesapeake Bay TMDL Public Meeting Summary. December 15, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Chesapeake.pdf

Williamsburg, VA Chesapeake Bay TMDL Public Meeting Summary. December 15, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Williamsburg.pdf

Falls Church, VA Chesapeake Bay TMDL Public Meeting Summary. December 14, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/FallsChurch.pdf

Wye Mills, MD Chesapeake Bay TMDL Public Meeting Summary. December 11, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/WyeMills.pdf

Laurel, DE Chesapeake Bay TMDL Public Meeting Summary. December 10, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Delaware.pdf

Volk, Jennifer: Delaware's Efforts to Improve Water Quality in the Chesapeake. December 10, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/DE_CBPTMDL_121009a.pdf

Baltimore, MD Chesapeake Bay TMDL Public Meeting Summary. December 8, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Baltimore.pdf

Eskin, Richard A.: Understanding and Moving to Implementation of the Bay TMDL: WIPs and Milestones. December 8, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/BayTMDLPublicMeetingMD_120809Eskinfinal.pdf

Binghamton, NY Chesapeake Bay TMDL Public Meeting Summary. December 1, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Binghamton.pdf

New York Next Steps and Watershed Implementation Plans Susquehanna and Chemung River
Basins. December 1, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/FinalNewYorkRAE12_1_09.pdf

Challenges of Nutrient Reduction in the Upper Susquehanna River Basin. December 1, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/ChesapeakeBayTMDLPresentationPP97Dec120
09.pdf

Virginia Department of Conservation and Recreation: Virginia Virginia's Approach s to
Developing the Chesapeake Bay TMDL Watershed Implementation Plan. December 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/BayTMDLDecMeetings12809_VA.pdf

Lancaster, PA Chesapeake Bay TMDL Public Meeting Summary. November 23, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Lancaster.pdf

State College, PA Chesapeake Bay TMDL Public Meeting Summary. November 19, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/StateCollege.pdf

Williamsport, PA Chesapeake Bay TMDL Public Meeting Summary. November 18, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Williamsport.pdf

Wilkes Barre, PA Chesapeake Bay TMDL Public Meeting Summary. November 17, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/WilkesBarre.pdf

Washington, DC Chesapeake Bay TMDL Public Meeting Summary. November 16, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/WashingtonDC.pdf

Martinsburg, West Virginia Chesapeake Bay TMDL Public Meeting Summary. November 4,
2009. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/2009mtgsummaries/Martinsburg.pdf

Introducing the Chesapeake TMDL Process to Virginia. October 2, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/Bay_TMDL_Webinar_Collated_10-02-
09_v1.pdf

The Chesapeake Bay TMDL: Plotting the path to restored Bay water quality. August 4, 2009.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/Webcast_Aug42009_v3.pdf

## 2010 Public Meetings

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL:
Restoring West Virginia's Waterways and Chesapeake Bay. Romney, WV. November 4, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/WVRomneyEPAPresentati
on_Nov4.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring
West Virginia's Waterways and Chesapeake Bay. Martinsburg, WV. November 3, 2010.

http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/WVMartinsburgEPAPresentation_Nov3.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring New York's Waterways and Chesapeake Bay. Binghamton, NY. October 27, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/NYElmiraEPAPresentation10_25_2010.pdf

New York Department of Environmental Conservation. 2010. Draft New York State Watershed Implementation Plan For Chesapeake Bay Total Maximum Daily Load. October 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/NYDraftCBayPlan.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring New York's Waterways and Chesapeake Bay. Elmira, NY. October 26, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/NYElmiraEPAPresentation10_25_2010.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Pennsylvania's Waterways and Chesapeake Bay. Ashley, PA. October 21, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/TMDL_PA_ASHLEY.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Pennsylvania's Waterways and Chesapeake Bay. Williamsport, PA. October 20, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/TMDL_PA_WILLIAMSPORT.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Pennsylvania's Waterways and Chesapeake Bay. State College, PA. October 19, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/TMDL_PA_STATE_COLLEGE.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Pennsylvania's Waterways and Chesapeake Bay. Lancaster, PA. October 18, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/TMDL_PA_LANCASTER.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Maryland's waterways and the Chesapeake Bay. Hagerstown, MD. October 14, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/MDHagerstownEPAPresentation.pdf

State of Maryland. 2010. Chesapeake Bay TMDL Watershed Implementation Plan. Annapolis, Maryland. October 13, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/PublicMeetingPresentationMD_annapolisWIP2010.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Maryland's waterways and the Chesapeake Bay. Annapolis, MD. October 13, 2010.

http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/MDAnnapolisEPAPresentation.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Maryland's waterways and the Chesapeake Bay. Easton, MD. October 12, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/MDEastonEPAPresentation.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Delaware's waterways and the Chesapeake Bay. Georgetown, DE. October 11, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/DEGeorgetownEPAPresentation_revised.pdf

State of Delaware. 2010. Delaware's Role in Restoring the Chesapeake Bay and its Waterways. Dover, Delaware. 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/DEChesapeakeWIP_101110.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Virginia's waterways and the Chesapeake Bay. Hampton, VA. October 7, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/VAHamptonEPAPresentation.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Virginia's waterways and the Chesapeake Bay. Richmond, VA. October 6, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/VARichmondEPAPresentation.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Virginia's waterways and the Chesapeake Bay. Annandale VA. October 5, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/VAAnnandaleEPApresentation.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL: Restoring Virginia's waterways and the Chesapeake Bay. Harrisonburg, VA. October 4, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/VAHarrisonburgEPApresentation.pdf

Commonwealth of Virginia. 2010. Draft Chesapeake Bay TMDL Watershed Implementation Plan. Richmond, Virginia. 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/pubmtgagendas2010/PublicMeetingPresentationVA_WIP2010.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft CHESAPEAKE BAY TMDL: Restoring the District District's waterways s and Chesapeake Bay. Public Meeting: District of Columbia. September 29, 2010. http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/dcpublicmeetingrakmods.pdf

D.C. Draft Phase 1 WIP. September 29, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/DCZoomeeting9_29.pdf

U.S. Environmental Protection Agency Region III. 2010. Draft Chesapeake Bay TMDL:
Restoring Streams, Creeks, Rivers and Chesapeake Bay. September 28, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/DraftTMDLPresentationWEBINAR92810FINA
L_corrected.pdf

Chesapeake Bay Draft TMDL: Overview of the Draft TMDL and WIP Evaluations. September
24, 2010.
http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/BayDraftTMDLBriefingSlides92410Calls3.pdf

## Federal Register Notices

Federal Register Notice: Clean Water Act Section 303(d): Notice for the public review of the
Draft Total Maximum Daily Load for the Chesapeake Bay. September 22, 2010.
http://www.federalregister.gov/articles/2010/09/22/2010-23678/clean-water-act-section-303d-
notice-for-the-public-review-of-the-draft-total-maximum-daily-load-tmdl

Federal Register Notice: Clean Water Act Section 303(d): Preliminary Notice of Total Maximum
Daily Load (TMDL) Development for the Chesapeake Bay. September 17, 2009.
http://www.federalregister.gov/articles/2009/09/17/E9-22410/clean-water-act-section-303d-
preliminary-notice-of-total-maximum-daily-load-tmdl-development-for-the

## Compliance and Enforcement

U.S. Environmental Protection Agency. Chesapeake Bay Compliance and Enforcement Strategy.
http://www.epa.gov/oecaerth/civil/initiatives/chesapeakebay.html

## Independent Programmatic Reviews

Chesapeake Bay Program. 2010. Chesapeake Bay Program Independent Evaluation.
http://www.chesapeakebay.net/content/publications/cbp_51032.pdf

U.S. EPA Office of Inspector General. 2008. EPA Needs to Better Report Chesapeake Bay
Challenges: A Summary Report, 08-P-0199, July 2008. Washington, DC.
http://www.epa.gov/oig/reports/2008/20080714-08-P-0199.pdf

Government Accountability Office. 2008. Chesapeake Bay Program, Recent Actions Are
Positive Steps Toward More Effectively Guiding the Restoration Effort, GAO-08-1033T, July
2008; Washington, DC.
http://www.gao.gov/new.items/d081033t.pdf

U.S. EPA Office of Inspector General. 2008. Despite Progress, EPA Needs to Improve Oversight
of Wastewater Upgrades in the Chesapeake Bay Watershed, 08-P-0049, January 2008.
Washington, DC.
http://www.epa.gov/oig/reports/2008/20080108-08-P-0049.pdf

U.S. EPA Office of Inspector General. 2007. Development Growth Outpacing Progress in Watershed Efforts to Restore the Chesapeake Bay, 2007-P-00031, September 2007. Washington, DC.
http://www.epa.gov/oig/reports/2007/20070910-2007-P-00031.pdf

U.S. EPA Office of Inspector General. 2007. Federal Facilities in Chesapeake Bay Watershed Generally Comply With Major Clean Water Act Permits, 2007-P-00032, September 2007. Washington, DC.
http://www.epa.gov/oig/reports/2007/20070905-2007-P-00032.pdf

U.S. EPA Office of Inspector General. 2007. EPA Relying on Existing Clean Air Act Requirements to Reduce Air Deposition to the Chesapeake Bay and Its Watershed, 2007-P-00009, February 2007. Washington, DC.
http://www.epa.gov/oig/reports/2007/20070228-2007-P-00009.pdf

Office of Management and Budget. 2006. Program Assessment and Rating Tool (PART), Program Assessment, Chesapeake Bay Program, November 2006. Washington, DC.
http://www.whitehouse.gov/omb/expectmore/detail/10004302.2006.html

U.S. EPA Office of Inspector General and USDA OIGs. 2006. Saving the Chesapeake Bay Watershed Requires Better Coordination of Environmental and Agricultural Resources, 2007-P-00004, November 2006. Washington, DC.
http://www.epa.gov/oig/reports/2007/20061120-2007-P-00004.pdf

U.S. EPA Office of Inspector General. 2006. EPA Grants Supported Restoring the Chesapeake Bay, 2006-P-00032, September 6, 2006. Washington, DC.
http://www.epa.gov/oig/reports/2006/20060906-2006-P-00032_glance.pdf

Government Accountability Office. 2005. Chesapeake Bay Program: Improved Strategies Are Needed to Better Assess, Report, and Manage Restoration Progress, GAO-06-96, October 28, 2005.
http://www.gao.gov/highlights/d0696high.pdf