## RECORD NO. 13-4079

### In The
# United States Court of Appeals
### For The Third Circuit

**AMERICAN FARM BUREAU FEDERATION; PENNSYLVANIA FARM BUREAU; THE FERTILIZER INSTITUTE; U.S. POULTRY & EGG ASSOCIATION; NATIONAL PORK PRODUCERS COUNCIL; NATIONAL CORN GROWERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS,**

*Plaintiffs – Appellants*,

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

*Defendants – Appellees*.

**CHESAPEAKE BAY FOUNDATION; CITIZENS FOR PENNSYLVANIAS FUTURE; DEFENDERS OF WILDLIFE; JEFFERSON COUNTY PUBLIC SERVICE DISTRICT; MIDSHORE RIVERKEEPER CONSERVANCY; NATIONAL WILDLIFE FEDERATION; VIRGINA ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES, INC; MARYLAND ASSOCIATION OF MUNICIPAL WASTEWATER AGENCIES; NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES; PENNSYLVANIA MUNICIPAL AUTHORITIES ASSOCIATION,**

*Intervenors – Appellees*.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

———————————

**JOINT APPENDIX
VOLUME V OF V
(Pages 1527 – 1759)**

———————————

(Counsel listed inside cover)

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# RECORD NO. 13-4079

Kirsten L. Nathanson
Richard E. Schwartz
David Y. Chung
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
(202) 624-2887

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Amanda J. Lavis
Robert J. Tribeck
RHOADS & SINON LLP
One South Market Square, 12th Floor
Post Office Box 1146
Harrisburg, Pennsylvania  17108
(717) 233-5731

*Counsel for American Farm Bureau Federation;*
*Pennsylvania Farm Bureau; Fertilizer Institute;*
*U.S. Poultry & Egg Association;*
*National Pork Producers Council;*
*National Corn Growers Association; and*
*National Association of Home Builders*

Marc B. Kaplin
Gregg I. Adelman
William D. Auxer
KAPLIN, STEWART, MELOFF, REITER & STEIN
910 Harvest Drive
Post Office Box 3037
Blue Bell, Pennsylvania  19422
(610) 941-2666

*Counsel for National Association of Home Builders*

Stephen R. Cerutti, II
OFFICE OF UNITED STATES ATTORNEY
220 Federal Building and Courthouse
228 Walnut Street
Post Office Box 11754
Harrisburg, Pennsylvania  17108
(717) 221-4482

*Counsel for Environmental Protection Agency*

John D. Gunter, II
UNITED STATES DEPARTMENT OF JUSTICE
Environment & Natural Resources Division
Post Office Box 7415
Washington, D.C.  20044
(202) 514-3785

*Counsel for Environmental Protection Agency*

Kent E. Hanson
UNITED STATES DEPARTMENT OF JUSTICE
Environmental Defense Section
Land and Natural Resources Division
Post Office Box 23986
Washington, D.C.  20026
(202) 514-2327

*Counsel for Environmental Protection Agency*

Jon A. Mueller
THE CHESAPEAKE BAY FOUNDATION
6 Herndon Avenue
Annapolis, Maryland  21403
(443) 482-2162

*Counsel for Chesapeake Bay Foundation;*
*Citizens for Pennsylvanias Future; Defenders of*
*Wildlife; Jefferson County Public Service District;*
*Midshore Riverkeeper Conservancy; and*
*National Wildlife Federation*

Christopher D. Pomeroy
AQUALAW
6 South 5th Street
Richmond, Virginia  23219
(804) 716-9021

*Counsel for Virgina Association of*
*Municipal Wastewater Agencies, Inc.;*
*Maryland Association of Municipal*
*Wastewater Agencies; and*
*National Association of Clean Water Agencies*

Steven A. Hahn
HAMBURG, RUBIN, MULLIN, MAXWELL & LUPIN
375 Morris Road
Post Office Box 1479
Lansdale, Pennsylvania  19446
(215) 661-0400

*Counsel for Pennsylvania Municipal Authorities Association*

## <u>TABLE OF CONTENTS</u>

| Document Description | JA No. |
|---|---|
| **VOLUME I** | |
| Notice of Appeal.<br>    filed October 7, 2013.<br><br>(ECF No. 153) | 1 |
| Memorandum Opinion.<br>    filed September 13, 2013.<br><br>(ECF No. 150) | 5 |
| Judgment.<br>    filed September 17, 2013.<br><br>(ECF No. 151) | 104 |

**TABLE OF CONTENTS**

| Document Description | JA No. |
|---|---|
| **VOLUME II** | |
| Civil Docket for Case #1:11-cv-00067-SHR. | 106 |
| Chesapeake Bay Partnership. The Chesapeake Bay Agreement of 1983. Washington, DC.<br>    dated December 9, 1983.<br><br>(AR0005488-AR0005489) | 135 |
| Chesapeake Executive Council. Chesapeake Bay Agreement. Annapolis, MD.<br>    dated December 15, 1987.<br><br>(AR0005481-AR0005487) | 137 |
| EPA Guidance for Water Quality-based Decisions, the TMDL Process.<br>    dated April 1991.<br><br>(ECF No. 100, Exhibit N) | 144 |
| Chesapeake Executive Council. Amendments to the Chesapeake Bay Agreement. Annapolis, MD.<br>    dated August 12, 1992.<br><br>(AR0005478-AR0005480) | 206 |
| Chesapeake Executive Council. Chesapeake Executive Council Directive No. 93  1 Joint Tributary Strategy Statement. Annapolis, MD.<br>    dated December 27, 1993.<br><br>(AR0005476-AR0005477) | 209 |
| Memorandum of Understanding Between the State of Maryland and the U.S. Environmental Protection Agency, Region III, Regarding Section 303(d) and 303(e) of the Clean Water Act.<br>    dated 1998.<br><br>(AR0012622-AR0012636) | 211 |

| Document Description | JA No. |
|---|---|
| U.S. District Court for the Eastern District of Virginia: Consent Decree: American Canoe Association and the American Littoral Society v. U.S. Environmental Protection Agency. C.A. No. 98-979-A.<br>    dated June 11, 1999.<br><br>(AR0012527-12538, AR0012556, AR0012566, AR0012599-AR0012607) | 226 |
| Chesapeake Executive Council. Chesapeake 2000. Chesapeake Bay Program, Annapolis, MD.<br>    dated June 28, 2000.<br><br>(AR0005417-AR0005429) | 249 |
| Sutfin, C.H. Memorandum: EPA Review of 202 Section 303(d) Lists and Guidelines for Reviewing TMDLs under Existing Regulations issues in 1992.<br>    dated May 20, 2002.<br><br>(AR0022597-AR0022605) | 262 |
| Secretary Tayloe Murphy. "Summary of Decisions Regarding Nutrient and Sediment Load Allocations and New Submerged Aquatic Vegetation (SAV) Restoration Goals." Memorandum to the Principals' Staff Committee members and representatives of the Chesapeake Bay headwater states. Virginia Office of the Governor, Natural Resources Secretariat, Richmond, VA.<br>    dated April 25, 2003.<br><br>(AR0005397-AR0005405) | 271 |
| Chesapeak Executive Council:  Chesapeak Executive Council Directive No. 03-2 Meeting the Nutrient and Sediment Reduction Goals. Annapolis, MD.<br>    dated December 9, 2003.<br><br>(AR0005395-AR0005396) | 280 |

| Document Description | JA No. |
|---|---|
| Virginia Exchange Compliance Plan, and Exhibit B, Comparison of Significant Dischargers in the Potomac-Shenandoah Watershed, Summary of TMDL Appendix Q.<br>    dated July 31, 2007.<br><br>(ECF 122, Ex. A) | 282 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated October 1, 2007.<br><br>(ECF No. 100, Exhibit F) | 295 |
| Scientific and Technical Advisory Committee. Chesapeake Bay Watershed Model Phase V Review. STAC Publication 08-003.<br>    dated February 20, 2008.<br><br>(AR0015010-AR0015022) | 300 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br>    dated June 18, 2008 (Draft dated August 22, 2008).<br><br>(ECF No. 110, Exhibit A) | 313 |
| Excerpt from Welsh, D.S., Regional Administrator:  Region 3 Letter to Maryland Secretary of Natural Resources John Griffin.<br>    dated September 11, 2008.<br><br>(AR0023296-AR0023299) | 323 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Agenda and Summary.<br>    dated October 23, 2009.<br><br>(ECF No. 100, Exhibits H and I) | 327 |
| Early, William C.: EPA letter to the Principals' Staff Committee.<br>    dated November 3, 2009.<br><br>(AR0023289-AR0023293) | 340 |

| Document Description | JA No. |
|---|---|
| TMDL meeting.<br><br>    dated December 14, 2009.<br><br>(AR0027828-AR0027866) | 345 |
| TMDL meeting.<br><br>    dated December 15, 2009.<br><br>(AR0027754-AR0027788) | 384 |
| TMDL meeting.<br><br>    dated December 15, 2009.<br><br>(AR0027789-AR0027827) | 419 |
| TMDL meeting.<br><br>    dated December 16, 2009.<br><br>(AR0027710-AR0027753) | 458 |
| TMDL meeting.<br><br>    dated December 17, 2009.<br><br>(AR0027670-AR0027709) | 502 |
| Chesapeake Bay Partnership, Principals' Staff Committee. Meeting Summary.<br><br>    dated April 28-29, 2010.<br><br>(ECF No. 100, Exhibit J) | 542 |
| McDonnell, R.F.: Letter to EPA Administrator Lisa P. Jackson.<br><br>    dated June 15, 2010.<br><br>(AR0023269-AR0023272) | 557 |
| Excerpts from U.S. Environmental Protection Agency Region III. Presentation.  "Update on the Bay TMDL and What's Just Around the Corner."<br><br>    dated September 9, 2010.<br><br>(AR0032981, AR0032994-AR0032996) | 561 |

| Document Description | JA No. |
|---|---|
| Excerpts from U.S. Environmental Protection Agency: Draft Chesapeake Bay TMDL Document.<br>     dated September 24, 2010.<br><br>(AR0023773-AR0023783, AR0023980-AR0023991, AR0024022-AR0024054) | 565 |
| Excerpts from U.S. Environmental Protection Agency Region III. Draft Chesapeake Bay TMDL: Restoring the District District's waterways and Chesapeake Bay. Public Meeting: District of Columbia.<br>     dated September 29, 2010.<br><br>(AR0029336, AR0029358-AR0029360) | 621 |
| Excerpts from Natural Resources Conservation Service. "Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region."<br>     dated October 2010.<br><br>(AR0032818, AR0032832-AR0032837) | 625 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME III** | |
| TMDL meeting.<br>    dated October 2010.<br><br>(AR0029320-AR0029335) | 632 |
| TMDL meeting.<br>    dated October 4, 2010.<br><br>(AR0029270-AR0029319) | 648 |
| TMDL meeting.<br>    dated October 5, 2010.<br><br>(AR0029119-AR0029167) | 698 |
| TMDL meeting.<br>    dated October 5, 2010.<br><br>(AR0029218-AR0029269) | 747 |
| TMDL meeting.<br>    dated October 6, 2010.<br><br>(AR0029168-AR0029217) | 799 |
| Excerpts from Chesapeake Bay Partnership, Principals' Staff Committee.  Meeting Summary.<br>    dated October 21, 2010.<br><br>(AR0000436) | 849 |
| Excerpts from Virginia Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>    dated November 4, 2010.<br><br>(AR0036755, AR0036801-03, AR0038002, AR0038005, AR0038007, AR0038012, AR0038031-37, AR0038048-49) | 859 |

| Document Description | JA No. |
|---|---|
| Summary of Meetings and Attendees Compiled from TMDL Appendix C, Table C-2, AR0000422-56.<br>    dated November 4, 2010.<br><br>(ECF 105, Ex. E) | 877 |
| Duncansville Municipal Authority Water & Sewer. Comment Letter.<br>    dated November 5, 2010.<br><br>(AR0030500-AR0030502) | 882 |
| Pennsylvania Municipal Authorities Association. Comment Letter.<br>    dated November 5, 2010.<br><br>(AR0031047-AR0031049) | 885 |
| Excerpts from Maryland Association of Municipal Wastewater Agencies, Inc.  Comment Letter.<br>    dated November 5, 2010<br><br>(AR0031179-82, AR0031187-88) | 888 |
| Virginia Agribusiness Council – Suggested Bay TMDL Talking Points.<br>    dated November 8, 2010.<br><br>(AR0030010-AR0030013) | 894 |
| Excerpts from New York Department of Environmental Conservation.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0031947-AR0031951) | 898 |
| West Virginia Department of Environmental Protection and West Virginia Department of Agriculture.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032100-AR0032101) | 903 |

| Document Description | JA No. |
|---|---|
| Pennsylvania Department of Environmental Protection and Department of Agriculture.  Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032667-AR0032670) | 905 |
| Maryland State Builders Association. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0032686-AR0032687) | 909 |
| Public Comment letter.<br>    dated November 8, 2010.<br><br>(AR0032705-AR0032731) | 911 |
| Excerpts from Comments on the Draft Chesapeake Bay TMDL by Agricultural Realtors Association, et al.<br>    dated November 8, 2010.<br><br>(AR0032758, AR0032767-AR0032772) | 938 |
| Excerpt from County of Lycoming, Pennsylvania. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033175-AR0033176) | 945 |
| Excerpt from National Association of Clean Water Agencies. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0035411-AR0035415) | 947 |
| Excerpts from Southern Tier Chesapeake Bay TMDL Commenting Coalition, Comment Letter.<br>dated November 8, 2010.<br><br>(AR0035941-AR0035944) | 952 |

| Document Description | JA No. |
|---|---|
| Excerpts from National Association of Home Builders. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033704, AR0033720-AR0033721) | 956 |
| National Association of Conservation Districts. Comment Letter.<br>    dated November 8, 2010.<br><br>(AR0033741-AR0033743) | 959 |
| Excerpts from District of Columbia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0025422-AR0025424, AR0025431-AR0025432, AR0025444-AR0025446, AR0025448, AR0025458, AR0025518-AR0025524) | 962 |
| Excerpts from Pennsylvania Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026393-AR0026414, AR0026416-AR0026422, AR0026443-AR0026444, AR0026451-AR0026460) | 979 |
| Excerpts from Commonwealth of Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026672, AR0026674-AR0026675, AR0026680-AR0026687, AR0026696-AR0026706, AR0026710-AR0026714, AR0026750, AR0026798, AR0026807-AR0026811) | 1020 |

| Document Description | JA No. |
|---|---|
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated November 29, 2010.<br><br>(AR0026813, AR0026815-AR0026816, AR0026818-AR0026822, AR0026828-AR0026830, AR0026833, AR0026835, AR0026837-AR0026838, AR0026840-AR0026842, AR0026847, AR0026855, AR0026867-AR0026869) | 1055 |
| Excerpts from Maryland Chesapeake Bay TMDL Phase I Watershed Implementation Plan.<br>    dated December 3, 2010<br><br>(AR0025525, AR0025528-AR0025530, AR0025532-AR0025534, AR0025601-AR0025604, AR0025606, AR0025607, AR0025609-10, AR0025698-25701, AR0025787-AR0025789, AR0025791-AR0025795) | 1078 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME IV** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Sections 1-14.<br>    dated December 29, 2010.<br><br>(AR0000001-AR0000366) | 1106 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix A.<br>    dated December 29, 2010.<br><br>(AR0000367-AR0000380) | 1472 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix B.<br>    dated December 29, 2010.<br><br>(AR0000381-AR0000421) | 1486 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME V** | |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix C.     dated December 29, 2010.<br><br>(AR0000422-AR0000454) | 1527 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix K.     dated December 29, 2010.<br><br>(AR0000529-AR0000536) | 1560 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix L.     dated December 29, 2010.<br><br>(AR0000537-AR0000564) | 1568 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q.     dated December 29, 2010.<br><br>(AR0000616) | 1596 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R.     dated December 29, 2010.<br><br>(AR0000618) | 1597 |
| Excerpts from Responses to Comments on Chesapeake Bay Total Maximum Daily Load.     dated December 29, 2010.<br><br>(AR0000639, AR0000921-AR0000933, AR0002057, AR0003701) | 1598 |

| Document Description | JA No. |
|---|---|
| Complaint, filed by American Farm Bureau Federation and Pennsylvania Farm Bureau. <br>     dated January 10, 2011. <br><br> (ECF No. 1) | 1627 |
| Amended Complaint, filed by American Farm Bureau Federation, Pennsylvania Farm Bureau,  The Fertilizer Institute, National Pork Producers Council, National Corn Growers Association, National Chicken Council, U.S. Poultry & Egg Association, and National Turkey Federation. <br>     dated April 4, 2011. <br><br> (ECF No. 16) | 1671 |
| Complaint, filed by National Association of Home Builders. <br> dated June 27, 2011. <br><br> (Case #1:11-cv-01213-SHR, ECF No. 1) | 1709 |
| Excerpts from Transcript of Proceedings; Oral Argument. *AFBF v. EPA*, M.D. Pa. No. 1:11-cv-00067. <br>     on October 4, 2012. <br><br> (Pages 89-92) | 1754 |

## TABLE OF CONTENTS

| Document Description | JA No. |
|---|---|
| **VOLUME VI (to be filed via CD)** | |
| West Virginia Chesapeake Bay TMDL Phase I Watershed Implementation Plan; Excel spreadsheets.<br>    dated November 29, 2010.<br><br>(AR0026929-AR0026930<br>AR0026932-AR0026935) | 1760 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix Q (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000617) | 1766 |
| Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment; Appendix R (Excel spreadsheets)<br>    dated December 29, 2010.<br><br>(AR0000619) | 1767 |

**Appendix C.**
**Record of Chesapeake Bay TMDL Related Chesapeake Bay Program Committee, Team and Workgroup and Partner/Stakeholder Meetings**

This appendix presents the dates of Chesapeake Bay Program (CBP) committee, team, and workgroup meetings since 2005 where the Chesapeake Bay TMDL or a directly related topic was on the agenda (Table C-1). A URL is provided to access the Chesapeake Bay Program website's calendar of events and each meeting's respective agenda, advance briefing materials, presentations or meeting summary.

This appendix also documents the record of Chesapeake Bay Program committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (Table C-2). The abbreviations used in Table C-2 are explained in Tables C-3 (EPA staff names) and C-4 (organizations).

**Table C-1. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda**

| Date | Group | URL |
|---|---|---|
| January 10, 2005 | Executive Council | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5851&DefaultView=all&RequestDate=01/17/2005 |
| January 11, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5937&DefaultView=all&RequestDate=01/17/2005 |
| January 12, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5858&DefaultView=all&RequestDate=01/17/2005 |
| January 25, 2005 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5802&DefaultView=all&RequestDate=01/17/2005 |
| February 15, 2005 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5749&DefaultView=all&RequestDate=02/17/2005 |
| February 17, 2005 | Implementation Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5507&DefaultView=all&RequestDate=02/17/2005 |
| February 22, 2005 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5755&DefaultView=all&RequestDate=02/17/2005 |
| February 23, 2005 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5721&DefaultView=all&RequestDate=02/17/2005 |
| April 4, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5932&DefaultView=all&RequestDate=04/17/2005 |
| April 5, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5933&DefaultView=all&RequestDate=04/17/2005 |
| April 28, 2005 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5803&DefaultView=all&RequestDate=04/17/2005 |
| May 3, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5934&DefaultView=all&RequestDate=05/17/2005 |
| May 5, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6366&DefaultView=all&RequestDate=05/17/2005 |
| June 7, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5935&DefaultView=all&RequestDate=06/17/2005 |
| June 21, 2005 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5756&DefaultView=all&RequestDate=06/17/2005 |
| June 22, 2005 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6371&DefaultView=all&RequestDate=06/17/2005 |
| July 12, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5976&DefaultView=all&RequestDate=07/17/2005 |
| July 13, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5977&DefaultView=all&RequestDate=07/17/2005 |
| July 14, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6363&DefaultView=all&RequestDate=07/17/2005 |
| July 21, 2005 | Implementation Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5512&DefaultView=all&RequestDate=07/17/2005 |
| July 21, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6393&DefaultView=all&RequestDate=07/17/2005 |
| July 28, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6480&DefaultView=all&RequestDate=07/17/2005 |
| August 3, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6483&DefaultView=all&RequestDate=08/17/2005 |
| August 18, 2005 | Water-Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6527&DefaultView=all&RequestDate=08/17/2005 |
| August 24, 2005 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5728&DefaultView=all&RequestDate=08/17/2005 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| September 13-14, 2005 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/MeetInfo/Sept05Mins.pdf |
| September 28, 2005 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5729&DefaultView=all&RequestDate=09/17/2005 |
| October 3, 2005 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6619&DefaultView=all&RequestDate=10/17/2005 |
| October 11, 2005 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5980&DefaultView=all&RequestDate=10/17/2005 |
| October 13, 2005 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5672&DefaultView=all&RequestDate=10/17/2005 |
| October 26, 2005 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5730&DefaultView=all&RequestDate=10/17/2005 |
| October 27, 2005 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5806&DefaultView=all&RequestDate=10/17/2005 |
| November 21, 2005 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6844&DefaultView=all&RequestDate=11/17/2005 |
| December 7, 2005 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=5950&DefaultView=all&RequestDate=12/17/2005 |
| December 13-14, 2005 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/MeetInfo/Dec05Mins.pdf |
| December 19, 2005 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6845&DefaultView=all&RequestDate=12/17/2005 |
| December 21, 2005 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6957&DefaultView=all&RequestDate=12/17/2005 |
| January 9, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6934&DefaultView=all&RequestDate=01/17/2006 |
| January 19, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6832&DefaultView=all&RequestDate=01/17/2006 |
| January 23, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6935&DefaultView=all&RequestDate=01/17/2006 |
| January 24-25, 2006 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6940&DefaultView=all&RequestDate=01/17/2006 |
| February 23, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6985&DefaultView=all&RequestDate=02/21/2006 |
| February 27, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6936&DefaultView=all&RequestDate=02/17/2006 |
| March 14-15, 2006 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/MeetInfo/Mar06Mins.pdf |
| March 20, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6937&DefaultView=all&RequestDate=03/17/2006 |
| April 4-5, 2006 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7065&DefaultView=all&RequestDate=4/17/2006 |
| April 17, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6938&DefaultView=all&RequestDate=04/01/2006 |

Appendix C – Chesapeake Bay TMDL

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| April 25, 2006 | Water Quality Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7293&DefaultView=all&RequestDate=04/21/2006 |
| April 27, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6986&DefaultView=all&RequestDate=04/21/2006 |
| May 16, 2006 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7072&DefaultView=all&RequestDate=05/21/2006 |
| May 22, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7290&DefaultView=all&RequestDate=05/21/2006 |
| May 24, 2006 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6848&DefaultView=all&RequestDate=05/21/2006 |
| June 7-8, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7081&DefaultView=all&RequestDate=06/21/2006 |
| June 29, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6987&DefaultView=all&RequestDate=06/21/2006 |
| July 18-19, 2006 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7066&DefaultView=all&RequestDate=07/21/2006 |
| July 27, 2006 | Water Quality Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7453&DefaultView=all&RequestDate=07/21/2006 |
| August 21, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7455&DefaultView=all&RequestDate=08/21/2006 |
| August 28, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7569&DefaultView=all&RequestDate=08/21/2006 |
| August 30, 2006 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7450&DefaultView=all&RequestDate=08/01/2006 |
| September 6, 2006 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7460&DefaultView=all&RequestDate=09/01/2006 |
| September 18, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7456&DefaultView=all&RequestDate=09/01/2006 |
| September 27, 2006 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6896&DefaultView=all&RequestDate=09/01/2006 |
| October 2, 2006 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6776&DefaultView=all&RequestDate=10/01/2006 |
| October 16, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7457&DefaultView=all&RequestDate=10/01/2006 |
| October 17-18, 2006 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7067&DefaultView=all&RequestDate=10/01/2006 |
| October 26, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6988&DefaultView=all&RequestDate=10/21/2006 |
| November 2, 2006 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6777&DefaultView=all&RequestDate=11/01/2006 |
| November 6, 2006 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6777&DefaultView=all&RequestDate=11/01/2006 |
| November 14-15, 2006 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7684&DefaultView=all&RequestDate=11/01/2006 |
| December 12, 2006 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6989&DefaultView=all&RequestDate=12/01/2006 |
| December 13, 2006 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=6763&DefaultView=all&RequestDate=12/21/2006 |
| January 9-10, 2007 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7849&DefaultView=all&RequestDate=01/01/2007 |

C-4

December 29, 2010

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| January 16, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8083&DefaultView=all&RequestDate=01/01/2007 |
| March 1, 2007 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8045&DefaultView=all&RequestDate=03/01/2007 |
| March 5, 2007 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7819&DefaultView=all&RequestDate=03/01/2007 |
| March 6-7, 2007 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/MeetInfo/March07Minutes.pdf |
| March 8, 2007 | Agricultural Nutrient Reduction Workshop | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7896&DefaultView=all&RequestDate=03/11/2007 |
| March 26, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8087&DefaultView=all&RequestDate=03/01/2007 |
| March 30, 2007 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8269&DefaultView=all&RequestDate=03/18/2007 |
| April 3-4, 2007 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8028&DefaultView=all&RequestDate=04/18/2007 |
| June 4, 2007 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=7823&DefaultView=all&RequestDate=06/18/2007 |
| June 6, 2007 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8255&DefaultView=all&RequestDate=06/18/2007 |
| June 12-13, 2007 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/MeetInfo/Jun07Minutes.pdf |
| June 20-21, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8501&DefaultView=all&RequestDate=06/18/2007 |
| July 10-11, 2007 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8678&DefaultView=all&RequestDate=07/18/2007 |
| July 23, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8823&DefaultView=all&RequestDate=07/18/2007 |
| July 24, 2007 | Wastewater Treatment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8813&DefaultView=all&RequestDate=07/18/2007 |
| August 6, 2007 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8816&DefaultView=all&RequestDate=08/18/2007 |
| August 27, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8824&DefaultView=all&RequestDate=08/18/2007 |
| September 11, 2007 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/meetings |
| September 17, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8825&DefaultView=all&RequestDate=09/18/2007 |
| October 1, 2007 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9029&DefaultView=all&RequestDate=10/18/2007 |
| October 9, 2007 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9034&DefaultView=all&RequestDate=10/18/2007 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|---|---|---|
| October 15, 2007 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8030&DefaultView=all&RequestDate=10/18/2007 |
| October 15, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8826&DefaultView=all&RequestDate=10/18/2007 |
| October 25, 2007 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9098&DefaultView=all&RequestDate=10/18/2007 |
| November 16, 2007 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9194&DefaultView=all&RequestDate=11/18/2007 |
| November 19, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8827&DefaultView=all&RequestDate=11/18/2007 |
| December 11-12, 2007 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/December2007quarterly.html |
| December 17, 2007 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9246&DefaultView=all&RequestDate=12/18/2007 |
| December 17, 2007 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=8829&DefaultView=all&RequestDate=12/18/2007 |
| December 18, 2007 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9212&DefaultView=all&RequestDate=12/18/2007 |
| January 8, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9046&DefaultView=all&RequestDate=01/18/2008 |
| January 10, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9301&DefaultView=all&RequestDate=01/18/2008 |
| January 22, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9043&DefaultView=all&RequestDate=01/18/2008 |
| January 23, 2008 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9159&DefaultView=all&RequestDate=01/18/2008 |
| January 24, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9302&DefaultView=all&RequestDate=01/18/2008 |
| January 31, 2008 | Wastewater Treatment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9296&DefaultView=all&RequestDate=01/18/2008 |
| February 7, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9356&DefaultView=all&RequestDate=02/18/2008 |
| February 28, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9369&DefaultView=all&RequestDate=02/18/2008 |
| March 5, 2008 | Wastewater Treatment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9374&DefaultView=all&RequestDate=03/18/2008 |
| March 13, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9370&DefaultView=all&RequestDate=03/18/2008 |
| March 17, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9377&DefaultView=all&RequestDate=03/18/2008 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| March 19, 2008 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9413&DefaultView=all&RequestDate=03/18/2008 |
| March 25-26, 2008 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/march2008quarterly.html |
| March 26, 2008 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9161&DefaultView=all&RequestDate=03/18/2008 |
| March 27, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9422&DefaultView=all&RequestDate=03/18/2008 |
| April 8, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9414&DefaultView=all&RequestDate=04/18/2008 |
| April 10, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9471&DefaultView=all&RequestDate=04/18/2008 |
| April 22-23, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9376&DefaultView=all&RequestDate=04/18/2008 |
| April 28-29, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9316&DefaultView=all&RequestDate=04/18/2008 |
| May 19, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9486&DefaultView=all&RequestDate=05/20/2008 |
| May 27, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9537&DefaultView=all&RequestDate=05/20/2008 |
| June 2, 2008 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9155&DefaultView=all&RequestDate=06/20/2008 |
| June 3, 2008 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/june2008quarterly.html |
| June 5, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9538&DefaultView=all&RequestDate=06/20/2008 |
| June 18-19, 2008 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9553&DefaultView=all&RequestDate=06/20/2008 |
| June 19, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9539&DefaultView=all&RequestDate=06/20/2008 |
| June 24, 2008 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9233&DefaultView=all&RequestDate=06/20/2008 |
| July 2, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9048&DefaultView=all&RequestDate=07/20/2008 |
| July 3, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9540&DefaultView=all&RequestDate=07/20/2008 |
| July 14, 2008 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9639&DefaultView=all&RequestDate=07/20/2008 |
| July 17, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9541&DefaultView=all&RequestDate=07/20/2008 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| July 21, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9534&DefaultView=all&RequestDate=07/20/2008 |
| July 23, 2008 | Reasonable Assurance Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9734&DefaultView=all&RequestDate=07/20/2008 |
| August 4, 2008 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9725&DefaultView=all&RequestDate=08/20/2008 |
| August 6, 2008 | Reasonable Assurance Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9735&DefaultView=all&RequestDate=08/20/2008 |
| August 14, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9543&DefaultView=all&RequestDate=08/20/2008 |
| August 19, 2008 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9619&DefaultView=all&RequestDate=08/20/2008 |
| August 19, 2008 | Reasonable Assurance Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9736&DefaultView=all&RequestDate=08/20/2008 |
| August 21-22, 2008 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9299&DefaultView=all&RequestDate=08/20/2008 |
| September 8-9, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9721&DefaultView=all&RequestDate=09/20/2008 |
| September 12, 2008 | Reasonable Assurance Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9733&DefaultView=all&RequestDate=09/20/2008 |
| September 16-17, 2008 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/september2008quarterly.html |
| September 18, 2008 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9728&DefaultView=all&RequestDate=09/20/2008 |
| September 22, 2008 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9784&DefaultView=all&RequestDate=09/20/2008 |
| September 25, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9546&DefaultView=all&RequestDate=09/20/2008 |
| September 29, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9536&DefaultView=all&RequestDate=09/20/2008 |
| October 6, 2008 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9157&DefaultView=all&RequestDate=10/20/2008 |
| October 9, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9547&DefaultView=all&RequestDate=10/20/2008 |
| October 20, 2008 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9780&DefaultView=all&RequestDate=10/20/2008 |
| October 20, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9773&DefaultView=all&RequestDate=10/20/2008 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| October 22, 2008 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9168&DefaultView=all&RequestDate=10/20/2008 |
| October 23, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9548&DefaultView=all&RequestDate=10/20/2008 |
| October 30, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9775&DefaultView=all&RequestDate=10/20/2008 |
| October 31, 2008 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9865&DefaultView=all&RequestDate=10/20/2008 |
| November 6-7, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9795&DefaultView=all&RequestDate=11/20/2008 |
| November 19, 2008 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9922&DefaultView=all&RequestDate=11/20/2008 |
| November 20, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9777&DefaultView=all&RequestDate=11/28/2008 |
| November 20, 2008 | Chesapeake Executive Council | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9923&DefaultView=all&RequestDate=11/20/2008 |
| November 21, 2008 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9800&DefaultView=all&RequestDate=11/28/2008 |
| November 26, 2008 | Wastewater Treatment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9916&DefaultView=all&RequestDate=11/28/2008 |
| December 4, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9778&DefaultView=all&RequestDate=12/28/2008 |
| December 8, 2008 | Tributary Strategy Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9158&DefaultView=all&RequestDate=12/28/2008 |
| December 9-10, 2008 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/december08quarterly.html |
| December 11, 2008 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9226&DefaultView=all&RequestDate=12/28/2008 |
| December 11, 2008 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9981&DefaultView=all&RequestDate=12/28/2008 |
| December 15, 2008 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9774&DefaultView=all&RequestDate=12/28/2008 |
| December 18, 2008 | Chesapeake Action Plan Partners Meeting | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9211&DefaultView=all&RequestDate=12/19/2008 |
| December 18, 2008 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9779&DefaultView=all&RequestDate=12/28/2008 |
| January 6-7, 2009 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9964&DefaultView=all&RequestDate=01/28/2009 |
| January 8, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9895&DefaultView=all&RequestDate=01/28/2009 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| January 12, 2009 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9901&DefaultView=all&RequestDate=01/28/2009 |
| January 13, 2009 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9980&DefaultView=all&RequestDate=01/28/2009 |
| January 13, 2009 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10020&DefaultView=all&RequestDate=01/28/2009 |
| January 14, 2009 | Wastewater Treatment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10091&DefaultView=all&RequestDate=01/28/2009 |
| January 15, 2009 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9983&DefaultView=all&RequestDate=01/11/2009 |
| January 22, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9896&DefaultView=all&RequestDate=01/28/2009 |
| January 26, 2009 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9903&DefaultView=all&RequestDate=01/28/2009 |
| February 2, 2009 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9913&DefaultView=all&RequestDate=02/28/2009 |
| February 5, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9897&DefaultView=all&RequestDate=02/28/2009 |
| February 9, 2009 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9904&DefaultView=all&RequestDate=02/28/2009 |
| February 17, 2009 | Agricultural Nutrient Reduction Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9984&DefaultView=all&RequestDate=02/28/2009 |
| February 17, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10119&DefaultView=all&RequestDate=02/28/2009 |
| February 18, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10149&DefaultView=all&RequestDate=02/28/2009 |
| February 19-20, 2009 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9867&DefaultView=all&RequestDate=02/28/2009 |
| February 23, 2009 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9920&DefaultView=all&RequestDate=02/28/2009 |
| February 24, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9955&DefaultView=all&RequestDate=02/28/2009 |
| February 25, 2009 | Nutrient Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9817&DefaultView=all&RequestDate=02/28/2009 |
| February 26, 2009 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9872&DefaultView=all&RequestDate=02/28/2009 |
| March 9, 2009 | Water Quality Steering Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9921&DefaultView=all&RequestDate=03/30/2009 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| March 10-11, 2009 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/march09quarterly.html |
| March 16, 2009 | Water Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10153&DefaultView=all&RequestDate=03/30/2009 |
| April 6, 2009 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9914&DefaultView=all&RequestDate=04/30/2009 |
| April 6, 2009 | Water Quality Steering | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10096&DefaultView=all&RequestDate=04/30/2009 |
| April 7-8, 2009 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9965&DefaultView=all&RequestDate=04/30/2009 |
| April 15-16, 2009 | Water Quality Steering | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10097&DefaultView=all&RequestDate=04/30/2009 |
| April 16-17, 2009 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9868&DefaultView=all&RequestDate=04/30/2009 |
| April 20-21, 2009 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10103&DefaultView=all&RequestDate=04/30/2009 |
| April 23-24, 2009 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9991&DefaultView=all&RequestDate=04/30/2009 |
| April 24, 2009 | Water Quality Criteria Assessment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10238&DefaultView=all&RequestDate=04/11/2009 |
| May 18, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10241&DefaultView=all&RequestDate=05/30/2009 |
| June 1, 2009 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9915&DefaultView=all&RequestDate=06/30/2009 |
| June 9, 2009 | Wastewater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10305&DefaultView=all&RequestDate=06/30/2009 |
| June 9, 2009 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10319&DefaultView=all&RequestDate=06/11/2009 |
| June 16, 2009 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/june09quarterly.html |
| June 22, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10242&DefaultView=all&RequestDate=06/30/2009 |
| June 23, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10335&DefaultView=all&RequestDate=06/30/2009 |
| July 6, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10345&DefaultView=all&RequestDate=07/30/2009 |
| July 8, 2009 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9966&DefaultView=all&RequestDate=07/30/2009 |
| July 20, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10243&DefaultView=all&RequestDate=07/30/2009 |
| July 22, 2009 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10348&DefaultView=all&RequestDate=07/30/2009 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| August 24, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10403&DefaultView=all&RequestDate=08/30/2009 |
| September 3, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10406&DefaultView=all&RequestDate=09/30/2009 |
| September 8-9, 2009 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/sept09quarterly.html |
| September 9, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10244&DefaultView=all&RequestDate=09/30/2009 |
| September 10, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10402&DefaultView=all&RequestDate=08/30/2009 |
| September 14, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10458&DefaultView=all&RequestDate=09/30/2009 |
| September 15, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10408&DefaultView=all&RequestDate=09/30/2009 |
| September 17-18, 2009 | Citizens Advisory Committee/Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?eventdetails=9874 |
| September 19, 2009 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10193&DefaultView=all&RequestDate=08/30/2009 |
| September 21, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10412&DefaultView=all&RequestDate=09/30/2009 |
| September 29-30, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10404&DefaultView=all&RequestDate=09/30/2009 |
| October 5, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10491&DefaultView=all&RequestDate=10/31/2009 |
| October 6-7, 2009 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9967&DefaultView=all&RequestDate=10/31/2009 |
| October 8, 2009 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10476&DefaultView=all&RequestDate=10/31/2009 |
| October 9, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10492&DefaultView=all&RequestDate=10/31/2009 |
| October 19, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10245&DefaultView=all&RequestDate=10/31/2009 |
| October 22, 2009 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10526&DefaultView=all&RequestDate=10/26/2009 |
| October 23, 2009 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10431&DefaultView=all&RequestDate=10/26/2009 |
| October 27, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9959&DefaultView=all&RequestDate=10/26/2009 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|---|---|---|
| November 2, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10527&DefaultView=all&RequestDate=11/26/2009 |
| November 5-6, 2009 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9871&DefaultView=all&RequestDate=11/26/2009 |
| November 18, 2009 | Wastewater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10547&DefaultView=all&RequestDate=11/26/2009 |
| November 20, 2009 | CAP-TMDL Tech call | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10554&DefaultView=all&RequestDate=11/26/2009 |
| November 30, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10558&DefaultView=all&RequestDate=11/26/2009 |
| December 8-9, 2009 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/dec09quarterly.html |
| December 14, 2009 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10572&DefaultView=all&RequestDate=12/26/2009 |
| December 15, 2009 | Nonpoint BMP Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10573&DefaultView=all&RequestDate=12/26/2009 |
| December 18, 2009 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10537&DefaultView=all&RequestDate=12/26/2009 |
| December 18, 2009 | Urban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=9962&DefaultView=all&RequestDate=12/26/2009 |
| January 11, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10248&DefaultView=all&RequestDate=01/26/2010 |
| February 1, 2010 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10589&DefaultView=all&RequestDate=02/26/2010 |
| February 5, 2010 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?eventdetails=10636 |
| February 12, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10249&DefaultView=all&RequestDate=02/26/2010 |
| February 17, 2010 | Reevaluation Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10113&DefaultView=all&RequestDate=02/28/2009 |
| March 11, 2010 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10555&DefaultView=all&RequestDate=03/26/2010 |
| March 15, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10251&DefaultView=all&RequestDate=03/26/2010 |
| March 23, 2010 | Management Board | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10619&DefaultView=all&RequestDate=03/26/2010 |
| March 29, 2010 | Agriculture Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10714&DefaultView=all&RequestDate=03/26/2010 |
| March 29, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10679&DefaultView=all&RequestDate=03/26/2010 |
| March 31-April 1, 2010 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10657&DefaultView=all&RequestDate=04/26/2010 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|---|---|---|
| April 5-6, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10559&DefaultView=all&RequestDate=04/26/2010 |
| April 7, 2010 | Forestry Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10715&DefaultView=all&RequestDate=04/26/2010 |
| April 8, 2010 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10556&DefaultView=all&RequestDate=04/26/2010 |
| April 12, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10736&DefaultView=all&RequestDate=04/26/2010 |
| April 19, 2010 | Management Board | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10620&DefaultView=all&RequestDate=04/26/2010 |
| April 19, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10738&DefaultView=all&RequestDate=04/26/2010 |
| April 21, 2010 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10590&DefaultView=all&RequestDate=04/26/2010 |
| April 22, 2010 | Wastewater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10746&DefaultView=all&RequestDate=04/26/2010 |
| April 22-24, 2010 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?eventdetails=10637 |
| April 26, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10737&DefaultView=all&RequestDate=04/26/2010 |
| April 27, 2010 | Agriculture Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10747&DefaultView=all&RequestDate=04/26/2010 |
| April 28, 2010 | Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10775&DefaultView=all&RequestDate=04/26/2010 |
| April 29-30, 2010 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10740&DefaultView=all&RequestDate=04/26/2010 |
| May 3, 2010 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10609&DefaultView=all&RequestDate=05/26/2010 |
| May 5, 2010 | Forestry Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10778&DefaultView=all&RequestDate=05/26/2010 |
| May 10, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10776&DefaultView=all&RequestDate=05/26/2010 |
| May 17, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10252&DefaultView=all&RequestDate=05/26/2010 |
| May 21, 2010 | CB Atmospheric Deposition Meeting | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10859&DefaultView=all&RequestDate=05/26/2010 |
| May 24, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10851&DefaultView=all&RequestDate=05/26/2010 |
| May 26, 2010 | Urban/Suburban Stormwater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10858&DefaultView=all&RequestDate=05/26/2010 |
| May 27, 2010 | Agriculture Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10862&DefaultView=all&RequestDate=05/26/2010 |
| June 1, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10850&DefaultView=all&RequestDate=06/26/2010 |

**Table C-2. Record of CBP Office committee, team, and workgroup meetings/conference calls where the Chesapeake Bay TMDL or a directly related topic was on the meeting/conference call agenda (continued)**

| Date | Group | URL |
|------|-------|-----|
| June 7, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10852&DefaultView=all&RequestDate=06/26/2010 |
| June 8-9, 2010 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/june10quarterly.html |
| June 17, 2010 | Management Board | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10866&DefaultView=all&RequestDate=06/26/2010 |
| June 21, 2010 | Wastewater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10879&DefaultView=all&RequestDate=06/26/2010 |
| July 6, 2010 | Water Quality GIT | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10933&DefaultView=all&RequestDate=07/26/2010 |
| July 12, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10929&DefaultView=all&RequestDate=07/26/2010 |
| July 13, 2010 | Modeling Subcommittee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10658&DefaultView=all&RequestDate=07/26/2010 |
| July 15-16, 2010 | Citizen Advisory Meeting | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10562&DefaultView=all&RequestDate=07/26/2010 |
| July 20, 2010 | Management Board | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10929&DefaultView=all&RequestDate=07/26/2010 |
| July 21, 2010 | Wastewater Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10941&DefaultView=all&RequestDate=07/26/2010 |
| July 22, 2010 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10939&DefaultView=all&RequestDate=07/26/2010 |
| August 5-6, 2010 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?eventdetails=10861 |
| August 16, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10936&DefaultView=all&RequestDate=08/20/2010 |
| September 13, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10937&DefaultView=all&RequestDate=09/20/2010 |
| October 13, 2010 | Sediment Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=11023&DefaultView=all&RequestDate=10/20/2010 |
| October 21, 2010 | Principals' Staff Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=11035&DefaultView=all&RequestDate=10/20/2010 |
| October 25, 2010 | Water Quality Goal Implementation Team | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10254&DefaultView=all&RequestDate=10/20/2010 |
| November 4, 2010 | Point Source Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=11080&DefaultView=all&RequestDate=11/20/2010 |
| November 18-19, 2010 | Citizens Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=10557&DefaultView=all&RequestDate=11/20/2010 |
| December 3, 2010 | Local Government Advisory Committee | http://archive.chesapeakebay.net/calendar.cfm?eventdetails=10986 |
| December 1, 2010 | Watershed Technical Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=11111&DefaultView=all&RequestDate=12/20/2010 |
| December 9, 2010 | Analytical Methods and Quality Assurance Workgroup | http://archive.chesapeakebay.net/calendar.cfm?EventDetails=11113&DefaultView=all&RequestDate=12/20/2010 |
| December 14-15, 2010 | Scientific and Technical Advisory Committee | http://www.chesapeake.org/stac/dec10quarterly.html |

**Table C-3. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| January 9, 2008 | VA DEQ | Richmond, VA | RB |
| January 10, 2008 | DE DNREC | Dover, DE | RB |
| January 15, 2008 | WVDEP, WVDA, WVCA | Charleston, WV | RB |
| January 18, 2008 | PA DEP | Harrisburg, PA | RB |
| January 23, 2008 | CBP STAC | Annapolis, MD | RB, LL |
| February 21, 2008 | CBP CAC | Annapolis, MD | RB |
| March 10, 2008 | Bay Funders Network | Washington, D.C. | RB |
| March 19, 2008 | CBP PSC | Annapolis, MD | RB |
| March 21, 2008 | Chesapeake Bay Foundation | Annapolis, MD | RB |
| March 28, 2008 | MDE | Baltimore, MD | RB, JS |
| April 10, 2008 | CBP RTWG | Annapolis, MD | RB, JS |
| April 11, 2008 | PA DEP | Williamsport, PA | RB, BK |
| April 22-23, 2008 | CBP WQSC | Fairfield, PA | BK, RB, JS, etc. |
| May 3, 2008 | CBP STAC | Annapolis, MD | RB |
| June 6, 2008 | EPA HQs briefing with Ben Grumbles | Washington, D.C. | BK, JS, JC, DW, etc. |
| June 16, 2008 | Chesapeake Bay Foundation | Annapolis, MD | DE, BK, RB, JS |
| June 19, 2008 | CBP PSC | Montross, VA | RB |
| August 19, 2008 | Reasonable Assurance Action Team | Annapolis, MD | CD, JS |
| August 21, 2008 | CBP LGAC | Annandale, VA | RB |
| August 26, 2008 | Congressional Staff Bay Briefing and Boat Tour | Edgewater, MD | RB |
| September 17, 2008 | CBP STAC | Ashburn, VA | JS |
| September 18, 2008 | CBP USWG | Annapolis, MD | JS, AD, RP, KA |
| September 29, 2008 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| October 7, 2008 | PA Public Television | State College, PA | RB |
| October 17, 2008 | Society of Environmental Journalists | Roanoke, VA | RB |
| October 20, 2008 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| October 24, 2008 | MDE and MDNR | Baltimore, MD | BK, RB, KA, JS |
| October 30, 2009 | CBP RTWG | Rockville, MD | RB, JS |
| November 6-7, 2008 | CBP WQSC | Shepherdstown, WV | BK, RB, KA, JS, etc. |
| November 18, 2008 | Harrisburg Homebuilders | Harrisburg, PA | BK |
| November 19, 2008 | Susquehanna River Basin Commission | Harrisburg, PA | RB |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| November 20, 2008 | CBP Executive Council | Washington, D.C. | RB |
| December 15, 2008 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| January 6, 2009 | VA DEQ, DCR | Richmond, VA | RB, BK |
| January 6, 2009 | CBP Modeling Subcommittee | Annapolis, MD | LL, JS |
| January 12, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| January 23, 2009 | PA Chamber of Commerce | Harrisburg, PA | BK |
| January 26, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| February 4, 2009 | NYSDEC | Albany, NY | RB, BK |
| February 7, 2009 | MD Tributary Teams Annual Meeting | Baltimore, MD | RB |
| February 9, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| February 11, 2009 | Metropolitan Washington Council of Governments | Washington, D.C. | BK, RB, JS |
| February 11, 2009 | DC DOE | Washington, D.C. | BK, RB, JS |
| February 13, 2009 | PA DEP | Harrisburg, PA | BK |
| February 19, 2009 | Chesapeake Bay Foundation | Philadelphia, PA | RB, BK, CD |
| February 20, 2009 | CBP CAC | Annapolis, MD | RB |
| February 23, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| February 26, 2009 | CBP LGAC | Annapolis, MD | RB |
| February 27, 2009 | DE DNREC | Dover, DE | BK, RB, JS |
| March 5, 2009 | PA Chesapeake Bay Advisory Committee | Harrisburg, PA | BK |
| March 9, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| March 12, 2009 | WV DEP | Charleston, WV | RB |
| March 18, 2009 | MDNR | Annapolis, MD | RB |
| March 23, 2009 | Senator Brubaker (PA) | Harrisburg, PA | BK |
| March 24, 2009 | CBP LGAC | Washington, D.C. | RB |
| April 1, 2009 | VA Environmental Forum | Lexington, VA | BK |
| April 6, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| April 7, 2009 | CBP Modeling Subcommittee | Annapolis, MD | LL, JS |
| April 14-15, 2009 | CBP WQSC | Lancaster, PA | BK, RB, KA, JS, etc. |
| April 20, 2009 | CBP PSC | Montross, VA | BK, RB, KA, etc. |
| April 30, 2009 | Bay TMDL/Stormwater Webinar | Charlottesville, VA | AD, JS |
| May 8, 2009 | Chesapeake Bay Commission | Washington, D.C. | BK |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| May 12, 2009 | CBP Executive Council | Mount Vernon, VA | BK, RB, etc. |
| May 13, 2009 | TMDL/NPS/WQS States Meeting | Martinsburg, WV | JS |
| May 15, 2009 | Bay Funders Network | Washington, D.C. | RB |
| May 18, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| May 20, 2009 | Senator Brubaker (PA) | Lancaster, PA | BK |
| May 21, 2009 | NPDES States Meeting | Gettysburg, PA | JS |
| May 28-29, 2009 | CBP STAC | Annapolis, MD | RB |
| June 1, 2009 | Bay Executive Order Meeting | Arlington, VA | BK |
| June 9, 2009 | Harrisburg Chamber of Commerce | Harrisburg, PA | BK |
| June 16, 2009 | CBP STAC | Annapolis, MD | RB |
| June 22, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| July 1, 2009 | WEF 2009 Nutrient Removal Conference | Washington, D.C. | BK |
| July 6, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| July 7, 2009 | Municipal Water Quality Meeting | Washington, D.C. | BK |
| July 9, 2009 | PA DEP - Executive Order | Harrisburg, PA | BK |
| July 9, 2009 | Metropolitan Washington Council of Governments Water Resources Technical Committee | Washington, D.C. | KA |
| July 10, 2009 | PA Transportation and Agricultural Group (Legacy Sediments) | Lancaster, PA | BK, JS |
| July 20, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| July 22, 2009 | CBP PSC | Washington, D.C. | BK, RB, KA |
| August 4, 2009 | USDA NRCS | Annapolis, MD | BK, RB, KA, JS, SH |
| August 4, 2009 | Environmental Defense Fund | Annapolis, MD | BK, RB, KA, JS, SH |
| August 4, 2009 | CBP LGAC webinar | Annapolis, MD | BK, RB |
| August 6, 2009 | Hampton Roads Planning District Commission | Chesapeake, VA | KA |
| August 10, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| August 11, 2009 | Chesapeake Bay Commission | Annapolis, MD | BK |
| August 12, 2009 | Maryland Association of Counties | Ocean City, MD | BK |
| August 20, 2009 | Lancaster Chamber of Commerce | Lancaster, PA | JS |
| August 24, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| August 25, 2009 | Congressional Staff Bay Briefing and Boat Tour | Mason Neck, VA | RB |
| August 27, 2009 | VA House of Delegates Natural Resources Committee - Chesapeake Bay Subcommittee | Gloucester, VA | RB |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| August 27, 2009 | U.S. Department of Defense Chesapeake Quality Management Board | Aberdeen Proving Ground, MD | KA |
| September 3, 2009 | PA Chesapeake Bay Advisory Committee | Harrisburg, PA | BK |
| September 8-9, 2009 | CBP STAC | Annapolis, MD | RB |
| September 9, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| September 9, 2009 | Chesapeake Bay Commission | Williamsburg, VA | BK |
| September 10, 2009 | Metropolitan Washington Council of Governments Water Resources Technical Committee | Washington, D.C. | RB |
| September 14, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| September 17-18, 2009 | CBP LGAC & CAC | Lancaster, PA | KA, RB |
| September 21, 2009 | CBP WQSC | Conference Call | BK, RB, KA, JS, etc. |
| September 23, 2009 | Susquehanna River Basin Commission Water Quality Advisory Committee | Harrisburg, PA | RB |
| September 29-30, 2009 | CBP WQSC | Lancaster, PA | BK, RB, KA, etc. |
| October 2, 2009 | Bay TMDL Public Meeting & Webinar | Richmond, VA | BK, RB |
| October 5, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| October 5, 2009 | Mid-Atlantic Regional Air Management Association, Inc. | Towson, MD | RB |
| October 9, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| October 9-10, 2009 | Chesapeake Watershed Forum | Shepherdstown, WV | BK |
| October 16, 2009 | Pennsylvania State Senate/House members | Harrisburg, PA | RB |
| October 19, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| October 21, 2009 | Lancaster County Agriculture Forum | Bird-in-Hand, PA | JS, KZ |
| October 22, 2009 | Regulatory Update: Water Pollution Controls | Richmond, VA | RP |
| October 23, 2009 | CBP PSC | Washington, D.C. | BK, RB, KA |
| October 27, 2009 | USGS Chesapeake Bay Science Workshop | Shepherdstown, WV | RB |
| October 28, 2009 | Anne Arundel County, MD | Annapolis, MD | RB, KS |
| November 2, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| November 2, 2009 | National TMDL Conference | Washington, D.C. | JS |
| November 4, 2009 | WV Region 9, local officials for planning, stormwater, wastewater, and economic development | Martinsburg, WV | BK, RB, JS, etc. |
| November 4, 2009 | Eastern Panhandle Home Builders Association | Martinsburg, WV | BK, RB, JS, etc. |
| November 4, 2009 | Bay TMDL Public Meeting & Webinar | Martinsburg, WV | BK, RB, JS, etc. |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| November 5, 2009 | WV environmental and watershed groups at Freshwater Institute | Shepherdstown, WV | BK, RB, JS, etc. |
| November 5, 2009 | Planning and utility directors at USDA offices | Martinsburg, WV | BK, RB, JS, etc. |
| November 5, 2009 | Agricultural representatives at the WV Department of Agriculture | Moorefield, WV | BK, RB, JS, etc. |
| November 5, 2009 | Bay TMDL Public Meeting | Moorefield, WV | BK, RB, JS |
| November 6, 2009 | CBP CAC | Washington, D.C. | RB |
| November 16, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| November 16, 2009 | Bay TMDL Public Meeting & Webinar | Washington, D.C. | BK, KA, JS |
| November 17, 2009 | Bay TMDL Public Meeting | Wilkes-Barre, PA | BK, RB, JS |
| November 18, 2009 | Pennsylvania Builders Association | Lemoyne, PA | BK, RB, JS |
| November 18, 2009 | Environmental/conservation groups at Chesapeake Bay Foundation office | Harrisburg, PA | BK, RB, JS |
| November 18, 2009 | Pennsylvania Municipal Authority Association | Wormleysburg, PA | BK, RB, JS |
| November 18, 2009 | Bay TMDL Public Meeting | Williamsport, PA | BK, RB, JS |
| November 19, 2009 | Lycoming County officials | Williamsport, PA | BK, RB, JS |
| November 19, 2009 | NRCS State Technical Committee meeting | State College, PA | BK, RB, JS |
| November 19, 2009 | Bay TMDL Public Meeting | State College, PA | BK, RB, JS |
| November 23, 2009 | MDE, DNR, MDA, MDP Meeting on Bay TMDL and WIPs for Counties and Conservation Districts | Baltimore, MD | KA |
| November 23, 2009 | Lancaster County government officials | Lancaster, PA | BK, RB, JS, SH |
| November 23, 2009 | Bay TMDL Public Meeting & Webinar | Lancaster, PA | BK, RB, JS |
| November 30, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| December 1, 2009 | Bay TMDL Public Meeting & Webinar | Binghamton, NY | BK, KA, TD |
| December 1, 2009 | NY wastewater treatment operators | Binghamton, NY | BK, KA, TD |
| December 2, 2009 | Rappahannock River Basin Comm. | Richmond, VA | RB |
| December 2, 2009 | Upper Susquehanna Coalition | Owego, NY | BK, KA, TD |
| December 4, 2009 | Water Resources Planning in MD: Hosted by CBF, MACo, MD Municipal League | Annapolis, MD | KA |
| December 4, 2009 | CBP LGAC | Annapolis, MD | RB |
| December 8, 2009 | CBP STAC | Annapolis, MD | RB |
| December 8, 2009 | PA Chesapeake Bay Advisory Committee | Harrisburg, PA | BK |
| December 8, 2009 | Bay TMDL Public Meeting & Webinar | Baltimore, MD | BK, RB, JS |
| December 9, 2009 | Rappahannock River Symposium | Fredericksburg, VA | BK |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| December 10, 2009 | Delaware and Maryland Homebuilders | Grasonville, MD | BK, KA, JS |
| December 10, 2009 | Seaford, DE local officials and wastewater treatment plant operators | Seaford, DE | BK, KA, JS |
| December 10, 2009 | Delaware and Maryland agricultural representatives at Delaware Poultry Industry office | Georgetown, DE | BK, KA, JS, HZ |
| December 10, 2009 | Bay TMDL Public Meeting & Webinar | Laurel, DE | BK, KA, JS |
| December 11, 2009 | Maryland and Delaware environmental/watershed/conservation groups | Annapolis, MD | BK, RB, JS, HZ |
| December 11, 2009 | Bay TMDL Public Meeting | Wye Mills, MD | BK, RB, JS |
| December 14, 2009 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| December 14, 2009 | Virginia environmental/watershed/conservation groups at CBF office | Richmond, VA | BK, RB, TD |
| December 14, 2009 | Prince William County staff, planning commissioners, Board members, nonprofit conservation groups, Northern Virginia Industry | Prince William, VA | BK, RB, TD |
| December 14, 2009 | Bay TMDL Public Meeting | Falls Church, VA | BK, RB, TD |
| December 15, 2009 | Bay TMDL Public Meeting | Chesapeake, VA | BK, RB, TD |
| December 15, 2009 | Virginia Farm Bureau and other agricultural organizations | Williamsburg, VA | BK, RB, TD |
| December 15, 2009 | Bay TMDL Public Meeting | Williamsburg, VA | BK, RB, TD |
| December 16, 2009 | National Academy of Sciences | Washington, D.C. | BK, RB, TD |
| December 16, 2009 | Waste Solutions Forum steering committee meeting | Harrisonburg, VA | BK, RB, TD |
| December 16, 2009 | Bay TMDL Public Meeting | Penn Laird, VA | BK, RB, TD |
| December 16, 2009 | Region 3 State Nonpoint Source Managers Meeting | Frederick, MD | KA |
| December 17, 2009 | Homebuilders Association of Virginia | Richmond, VA | BK, RB, TD |
| December 17, 2009 | VA Watershed Implementation Plan stakeholder group | Richmond, VA | BK, RB, TD |
| December 17, 2009 | Rivanna River Basin Commission - Local government officials and environmental groups | Charlottesville, VA | BK, RB, TD |
| December 17, 2009 | Bay TMDL Public Meeting | Fredericksburg, VA | BK, RB, TD |
| December 18, 2009 | George Washington Regional Commission | Fredericksburg, VA | RB, TD |
| December 18, 2009 | VAMWA | Fredericksburg, VA | RB, TD |
| January 7, 2010 | Maryland Association of Counties | Cambridge, MD | KA |
| January 8, 2010 | World Resources Institute | Washington, D.C. | RB, PG |
| January 10-12, 2010 | Choose Clean Water Conference | Washington, D.C. | BK, RB |
| January 11, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| January 12, 2010 | VA General Assembly Joint Commission on Administrative Rules | Richmond, VA | RB |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| January 20, 2010 | VA House of Delegates Natural Resources, Chesapeake Bay, and Agriculture Committee/Senate Natural Resources, Conservation and Agriculture Committee | Richmond, VA | RB |
| January 20, 2010 | Symposium on Integrated Modeling and Analysis to Support the Management and Restoration of Large Aquatic Ecosystems | Washington, D.C. | MH, LL, GS |
| January 29, 2010 | American Academy of Environmental Engineering | Washington, D.C. | RB |
| February 2, 2010 | CBP Modeling Subcommittee | Annapolis, MD | LL |
| February 5, 2010 | CBP LGAC | Annapolis, MD | JL |
| February 9, 2010 | MDE Meeting on Bay TMDL and WIPs | Baltimore, MD | KA |
| February 12, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| February 18, 2010 | Virginia Polytechnic Institute and State University | Blacksburg, VA | RB |
| February 19, 2010 | Waste Solutions Forum steering committee meeting | Charlottesville, VA | RB |
| February 22, 2010 | University of Maryland | College Park, MD | RB |
| February 23, 2010 | Chesapeake Bay Commission | Annapolis, MD | BK, RB |
| February 24, 2010 | MDE and MDNR meeting on WIP | Baltimore, MD | MF |
| February 25, 2010 | Bay TMDL Monthly Webinar | Webinar | RB, BK, TD |
| March 1, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| March 3, 2010 | Maryland Association of Counties | Annapolis, MD | KA |
| March 3, 2010 | Conewago Watershed Advisory Team Meeting webinar | Webinar | KA |
| March 4, 2010 | Pennsylvania General Assembly Legislators Retreat | Bedford Springs, PA | RB |
| March 4, 2010 | WIP Pilots with Anne Arundel and Caroline Counties | Annapolis, MD | MF |
| March 6, 2010 | Public engagement with Tributary Teams | Annapolis, MD | MF and JL |
| March 9, 2010 | PA Senate Ag & Rural Affairs and Environmental Resources & Energy Committees | Harrisburg, PA | BK |
| March 9-10, 2010 | CBP STAC | Annapolis, MD | RB, LL, GS |
| March 11, 2010 | CBP CAC | Annapolis, MD | RB |
| March 12, 2010 | Metropolitan Council of Governments | Washington, D.C. | KA |
| March 13, 2010 | State of Our Watersheds Conference | Baltimore, MD | JL |
| March 15, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| March 17, 2010 | PA Senate Ag & Rural Affairs and Environmental Resources & Energy Committees | Harrisburg, PA | BK, JC |
| March 22, 2010 | Bay TMDL Webinar for the Agricultural Community | Washington, D.C. | RB, BK, etc |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| March 25, 2010 | WIP Pilot with Anne Arundel County | Annapolis, MD | MF |
| March 25, 2010 | Bay TMDL Monthly Webinar | Webinar | RB, BK, TD |
| March 25, 2010 | PA Association of Environmental Professionals - Eastern & Central Divisions | Fort Washington, PA | BK |
| March 29, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| March 29 -30, 2010 | Farm Pilot Project Coordination (FPPC) Regional Summit | Annapolis, MD | MD |
| March 31, 2010 | PA WIP Stakeholder meeting | Harrisburg, PA | SH, BK |
| March 31 - April 1, 2010 | CBP Modeling Subcommittee | Annapolis, MD | LL, GS, etc |
| April 5-6, 2010 | CBP WQGIT | Gettysburg, PA | BK, RB, JS, etc. |
| April 7, 2010 | WIP Pilot with Anne Arundel County | Annapolis, MD | MF |
| April 7, 2010 | VA Environmental Forum | Lexington, VA | BK |
| April 9, 2010 | USDA/EPA Chesapeake Bay Models Meeting | Annapolis, MD | BK, LL, GS, etc |
| April 9, 2010 | Draft Chesapeake Bay Federal Land Management Guidance Document  (Section 502 Guidance) | Webinar | KA |
| April 12, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| April 19, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| April 23, 2010 | CBP LGAC | Washington, D.C. | JS |
| April 26, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| April 27, 2010 | WIP Pilot with Anne Arundel County | Annapolis, MD | MF |
| May 3-5, 2010 | American Planning Association (Virginia Chapter) Conference | Norfolk | KA |
| May 3, 2010 | PA Chesapeake Bay Advisory Committee | Harrisburg, PA | SH |
| May 6, 2010 | American Planning Association (DE/MD Chapter) Conference | Dover, DE | KA |
| May 6, 2010 | Bay TMDL Webinar for the Homebuilders/Developers Community | Annapolis, MD | BK, RB, etc. |
| May 6, 2010 | PA Chesapeake Bay WIP Urban/Suburban/Rural Workgroup | Harrisburg, PA | SH |
| May 7, 2010 | Choose Clean Water Coalition Roundtable | Washington, D.C. | JeffC |
| May 10, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| May 10, 2010 | PA Chesapeake Bay WIP Agriculture Workgroup | Harrisburg, PA | SH |
| May 11, 2010 | PA Water Resources Advisory Committee | Harrisburg, PA | SH |
| May 11-13, 2010 | Region 3 NPS/TMDL/WQM/WQS/NPDES Annual Meeting | Gettysburg, PA | JS |
| May 12, 2010 | Positive Growth Alliance - DE congressional meeting | Conference Call | BK, JM |
| May 13, 2010 | WIP Pilot with Caroline County | Denton, MD | MF |
| May 13, 2010 | LGAC/STAC Stormwater Meeting | Washington, D.C. | BK |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| May 13, 2010 | PA Chesapeake Bay WIP Management Team | Harrisburg, PA | SH |
| May 13, 2010 | ASIWPCA Watershed Ad Hoc Committee | Conference Call | BK |
| May 14, 2010 | Western Maryland Local Government Exchange | Hagerstown, MD | KA or MF |
| May 17, 2010 | Bay TMDL Webinar | Webinar | BK, RB, etc. |
| May 17, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| May 24, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| May 25, 2010 | USDA/EPA meeting on Nutrient Trading Tool/Comet-VR and Chesapeake Bay Watershed Model | Washington, D.C. | RB |
| May 25, 2010 | PA Chesapeake Bay WIP Management Team | Harrisburg, PA | SH |
| June 1, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| June 2, 2010 | VA Association of Counties Environmental Policy Committee | Charlottesville, VA | RB or KA |
| June 3, 2010 | CBP Executive Council | Baltimore, MD | SG |
| June 7, 2010 | Bay TMDL Webinar | Webinar | BK, RB, etc. |
| June 7, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| June 8-9, 2010 | CBP STAC | Kent Island, MD | RB |
| June 10, 2010 | WIP Pilot with Anne Arundel County | Annapolis, MD | MF |
| June 10, 2010 | Rappahannock Nutrient Cooperative Business Advisory Council | Fredericksburg, VA | KA |
| June 10, 2010 | LEAD Maryland Panel | Solomons, MD | MF |
| June 11, 2010 | Tidal States Call with MDNR, MDE, VADEQ, VADCR, and DC DoE | Conference Call | BK, RB |
| June 14, 2010 | CBP WQGIT: co-regulators only | Conference Call | BK, RB, KA, JS, etc. |
| June 15, 2010 | EPA Region 3 State/Interstate Water Directors Meeting | Stauton, VA | RB, MM, TD |
| June 15, 2010 | VA Stakeholders Advisory Group | Richmond, VA | KA, Jeff C |
| June 15, 2010 | MD Public Meeting on WIP | Hagerstown, MD | MF |
| June 16, 2010 | Center for Watershed Protection Watershed Treatment Model | Webinar | Staff |
| June 16, 2010 | Tri-County Council for Southern Maryland | Waldorf, MD | KA |
| June 17, 2010 | Beyond Water Quality in the Chesapeake Bay: Lowering Barriers to Achieving Multiple Environmental Goals, | Washington, D.C. | KA |
| June 17, 2010 | CBP Management Board | Annapolis, MD | RB |
| June 18, 2010 | MD Public Meeting on WIP | Baltimore, MD | MF |
| June 21, 2010 | TMDL Seminar for USDA Undersecretary | Washington, D.C. | BK |
| June 23, 2010 | MD Public Meeting on WIP | Denton, MD | MF |
| July 6, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| July 8, 2010 | Bay TMDL Webinar | Webinar | BK, RB, etc. |
| July 9, 2010 | WIP Pilot with Anne Arundel County | Annapolis, MD | MF |
| July 12, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| July 12, 2010 | NYSDEC, NYSDA, USDA, USC meeting on WIP | NY | RI |
| July 13, 2010 | CBP Modeling Subcommittee | Annapolis, MD | LL |
| July 14, 2010 | PA DEP meeting on WIP | Harrisburg, PA | KS, SH |
| July 19, 2010 | USDA Leadership Conference | Washington, D.C. | RB |
| July 20, 2010 | CBP Management Board | Annapolis, MD | BK |
| July 20, 2010 | MDE and MDNR meeting on WIP | Baltimore, MD | MF, KA, |
| July 20, 2010 | Virginia Legislature - House Agriculture, Natural Resrouces and Chesapeake Committee | Richmond, VA | JeffC |
| July 21, 2010 | Industry Coffee with EPA HQs | Washington, D.C. | BK |
| July 26, 2010 | CBP WQGIT: co-regulators only | Conference Call | BK, RB, KA, JS, etc. |
| July 29, 2010 | WIP Pilot discussion with Anne Arundel County | Annapolis, MD | MF |
| July 30, 2010 | Metropolitan Washington Council of Governments Water Resources Technical Committee | Washington, D.C. | JE |
| July 30, 2010 | WIP Pilot with Caroline County | Denton, MD | MF |
| August 4, 2010 | PA DEP meeting on WIP | Harrisburg, PA | SH |
| August 5, 2010 | PA DEP meeting on WIP | Harrisburg, PA | SH |
| August 9, 2010 | CBP WQGIT: co-regulators only | Conference Call | BK, RB, KA, JS, etc. |
| August 10, 2010 | MDE meeting on stormwater/WIP | Conference Call | MF, JM |
| August 11, 2010 | PA DEP meeting on WIP | Harrisburg, PA | SH |
| August 11, 2010 | VA DEQ/DCR WIP discussion | Richmond, VA | JeffC, KA, AC, MD, JM, etc. |
| August 11, 2010 | Patuxent River Commission, Tributary Team for the Patuxent River | Annapolis, MD | MF |
| August 16, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| August 18, 2010 | MDE and MDNR meeting on WIP | Annapolis, MD | KA, MF. KS |
| August 19, 2010 | Bay TMDL Webinar | Webinar | BK, RB, etc. |
| August 19, 2010 | DE DNREC meeting on WIP | Annapolis, MD | KA, KS, MD |
| August 23, 2010 | CBP WQGIT: co-regulators only | Conference Call | BK, RB, KA, JS, etc. |
| August 24, 2010 | VA DCR and DEQ meeting on WIP | Richmond, VA | KA, MD |
| August 25, 2010 | Annual Army Chesapeake Bay Meeting | Fort A.P. Hill, VA | GS |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| August 26, 2010 | MDE, DNR, MDA meeting on input decks/WIP | Annapolis, MD | MF, MD |
| August 26, 2010 | WIP Pilot discussion with Anne Arundel County | Annapolis, MD | MF |
| August 26, 2010 | Congressional Staff Bay Briefing and Boat Tour | Annapolis, MD | RB, JE, TL, JeffC |
| September 8, 2010 | National Academy of Sciences - Independent Evaluator Panel | Washington, D.C. | JeffC, RB, JW |
| September 13, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| September 14-15, 2010 | CBP STAC | Annapolis, MD | RB, RW |
| September 15, 2010 | Council on Environmental Quality/Chesapeake Bay Federal Leadship Committee | Washington, D.C. | RB, JE, CB |
| September 15, 2010 | Sierra Club "Healling Our Waters" Public Forum | Hampton, VA | JeffC |
| September 16, 2010 | WIP Pilots with Caroline County | Denton, MD | MF |
| September 18, 2010 | Virginia Environmental Assembly | Virginia Beach, VA | JeffC |
| September 20, 2010 | EPA conference call with WV to discuss high-level comments on draft WIP | Conference Call | RW, LE, KA, etc. |
| September 21, 2010 | EPA meeting with MD to discuss high-level comments on draft WIP | Annapolis, MD | JE, MF |
| September 21, 2010 | EPA conference call with PA to discuss high-level comments on draft WIP | Conference Call | BK, JC, KA, GwenS |
| September 21, 2010 | EPA conference call with DE to discuss high-level comments on draft WIP | Conference Call | SG, JC, KA |
| September 22, 2010 | CBP Management Board | Annapolis, MD | JE, RW, CB, JeffC |
| September 22, 2010 | Virginia Water Environment Association | Hampton, VA | JeffC |
| September 23, 2010 | EPA conference call with VA to discuss high-level comments on draft WIP | Conference Call | JeffC, AC, KA |
| September 23, 2010 | EPA conference call with DC to discuss high-level comments on draft WIP | Conference Call | JC, RP, KA |
| September 23, 2010 | Congressional Briefings for Environmental and Agriculture Committees | Washington, D.C. | JeffC |
| September 24, 2010 | Bay TMDL Briefing for Environmental/Fishing Community | Conference Call | JeffC |
| September 24, 2010 | CBP Advisory Committees | Conference Call | JE |
| September 28, 2010 | Bay TMDL Webinar | Webinar | BK, RB, etc. |
| September 28, 2010 | PA WIP Management Stakeholder Team meeting | Harrisburg, PA | BK, SH, GwenS |
| September 29, 2010 | Bay TMDL Public Meeting & Webinar | Washington, D.C. | BK, RB, JS, LM, PG, SH, JimC, TL, GwenS |
| September 29, 2010 | Metropolitan Washington Council of Governments | Washington, D.C. | BK, RB, LM, JS, RP, TL |
| September 30, 2010 | EPA Federal Advisory Committee on Agriculture | Washington, D.C. | RB |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| September 30, 2010 | EPA meeting with DE to discuss detailed comments on draft WIP | Dover, DE | SG, KA, PG, KS, MD |
| September 30, 2010 | PA Agriculture Stakeholder Workgroup meeting | Harrisburg, PA | SH, GwenS, MD, KS |
| September 30, 2010 | EPA conference call with WV to discuss detailed comments on draft WIP | Conference Call | LE, KA, JM, BT, EM |
| October 4, 2010 | EPA meeting with MD to discuss detailed comments on draft WIP | Annapolis, MD | JE, MF, KA, etc. |
| October 4, 2010 | Virginia agriculture stakeholders | Harrisonburg, VA | RB, BK, LM, PG, TL, JeffC |
| October 4, 2010 | Virginia environmental groups/stakeholders | Harrisonburg, VA | RB, BK, LM, PG, TL, JeffC |
| October 4, 2010 | Bay TMDL Public Meeting | Harrisonburg, VA | RB, BK, LM, PG, TL, JeffC |
| October 5, 2010 | PA WIP Point Source Stakeholder Workgroup Meeting | Harrisburg, PA | SH, GwenS |
| October 5, 2010 | Virginia environmental groups/stakeholders | Fairfax, VA | RB, BK, LM, PG, TL, JeffC |
| October 5, 2010 | Virginia local government stakeholders | Fairfax, VA | RB, BK, LM, PG, TL, JeffC |
| October 5, 2010 | Virginia developers and homebuilders | Fairfax, VA | RB, BK, LM, PG, TL, JeffC |
| October 5, 2010 | Bay TMDL Public Meeting | Annandale, VA | RB, BK, LM, PG, TL, JeffC |
| October 6, 2010 | Virginia wastewater treatment operators | Richmond, VA | RB, BK, LM, GwenS, GB, JeffC |
| October 6, 2010 | Virginia developers and homebuilders | Richmond, VA | RB, BK, LM, GwenS, GB, JeffC |
| October 6, 2010 | Virginia State Legislators | Richmond, VA | RB, BK, LM, GwenS, GB, JeffC |
| October 6, 2010 | Bay TMDL Public Meeting | Richmond, VA | RB, BK, LM, GS, GB, JeffC |
| October 7, 2010 | EPA meeting with PA to discuss detailed comments on draft WIP | Harrisburg, PA | KA, SH, KS, MD, JM, etc. |
| October 7, 2010 | EPA meeting with VA to discuss detailed comments on draft WIP | | AC, JeffC |
| October 7, 2010 | Virginia environmental groups/stakeholders | Richmond, VA | RB, BK, LM, GwenS, GB, JeffC |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| October 7, 2010 | Hampton Roads Planning District Commission | Chesapeake, VA | RB, BK, LM, GwenS, GB, JeffC |
| October 7, 2010 | Bay TMDL Public Meeting & Webinar | Webinar | RB, BK, LM, GwenS, GB, JeffC |
| October 7, 2010 | Bay TMDL Public Meeting | Hampton, VA | RB, BK, LM, GwenS, GB, JeffC |
| October 11, 2010 | Delaware agriculture stakeholders | Georgetown, DE | RB, BK, LM, GwenS, TL |
| October 11, 2010 | Delaware local government stakeholders | Seaford, DE | RB, BK, LM, GwenS, TL |
| October 11, 2010 | Delaware developers and homebuilders | Seaford, DE | RB, BK, LM, GwenS, TL |
| October 11, 2010 | Bay TMDL Public Meeting & Webinar | Georgetown, DE | RB, BK, LM, GwenS, TL |
| October 12, 2010 | PA WIP Stormwater Stakeholder Meeting | Harrisburg, PA | SH, JM, EM |
| October 12, 2010 | Maryland environmental groups/stakeholders | Easton, MD | RB, BK, LM, GwenS, TL |
| October 12, 2010 | Bay TMDL Public Meeting | Easton, MD | RB, BK, LM, GwenS, TL |
| October 12, 2010 | Chesapeake Bay Stormwater Listening Session | Richmond, VA | RH, JM, KW |
| October 13, 2010 | EPA Call with NY to discuss detailed comments on draft WIP | Conference Call | RI, KA |
| October 13, 2010 | Maryland developers and homebuilders | Annapolis, MD | RB, BK, LM, JS |
| October 13, 2010 | Maryland State Legislators | Annapolis, MD | RB, BK, LM, JS, CF |
| October 13, 2010 | Bay TMDL Public Meeting | Annapolis, MD | RB, BK, LM, JS, TL |
| October 14, 2010 | EPA conference call with PA to discuss stormwater - WIP | Conference Call | JC, KA, SH, JM, EM |
| October 14, 2010 | EPA conference call with MD, DC, and VA to discuss Blue Plains | Conference Call | RP, MF, BT |
| October 14, 2010 | Maryland local government stakeholders | Annapolis, MD | RB, BK, LM, JS |
| October 14, 2010 | Maryland agriculture stakeholders | Frederick, MD | RB, BK, LM, JS, TL |
| October 14, 2010 | Bay TMDL Public Meeting & Webinar | Hagerstown, MD | RB, BK, LM, JS, TL |
| October 14, 2010 | Chesapeake Bay Stormwater Listening Session | Washington, D.C. | RH, JM, KW |
| October 15, 2010 | EPA weekly call with VA to discuss WIP | Conference Call | JeffC, AC, KA, KD, NZ, JeffS |
| October 18, 2010 | EPA call with WV to discuss offsets/growth/trading in WIP | Conference Call | RW, KevinD |
| October 18, 2010 | Pennsylvania local government stakeholders | Lancaster, PA | RB, BK, SH, TD |
| October 18, 2010 | Pennsylvania agriculture stakeholders | Lancaster, PA | RB, BK, SH, TD |
| October 18, 2010 | Bay TMDL Public Meeting | Lancaster, PA | RB, BK, SH, TD |
| October 18, 2010 | Pennsylvania legislative delegation | Harrisburg, PA | RB, BK, SH, TD, JC |
| October 18, 2010 | Chesapeake-Bay Focused EMS conference for Federal Facilities | Greenbelt, MD | Staff |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|------|---------|----------|----------------|
| October 19, 2010 | Pennsylvania Municipal Authority Association | Harrisburg, PA | RB, BK, SH, TD, LM |
| October 19, 2010 | Pennsylvania environmental groups/stakeholders | Harrisburg, PA | RB, BK, SH, TD, LM |
| October 19, 2010 | Bay TMDL Public Meeting & Webinar | State College, PA | RB, BK, SH, TD, LM |
| October 19, 2010 | Pennsylvania agriculture stakeholders | State College, PA | RB, BK, SH, TD, LM |
| October 19, 2010 | Chesapeake Bay Stormwater Listening Session | Baltimore, MD | RH, JM, KW |
| October 20, 2010 | EPA conference call with MD to discuss stormwater - WIP | Conference Call | MF, JM |
| October 20, 2010 | EPA meeting with DC to discuss detailed comments on draft WIP | Washington, D.C. | RP, JM, BT |
| October 20, 2010 | EPA conference call with NY to discuss agriculture - WIP | Conference Call | RI, KS, MD, KA |
| October 20, 2010 | Richmond, VA Mayor's Office | Richmond, VA | JeffC |
| October 20, 2010 | Pennsylvania Builders Association | Williamsport, PA | RB, BK, SH, TD, LM |
| October 20, 2010 | Lycoming County officials | Williamsport, PA | RB, BK, SH, TD, LM |
| October 20, 2010 | Bay TMDL Public Meeting | Williamsport, PA | RB, BK, SH, TD, LM |
| October 21, 2010 | Bay TMDL Public Meeting | Ashley, PA | RB, BK, SH, TD, LM |
| October 21, 2010 | Chesapeake Bay Stormwater Listening Session | Salisbury, MD | RH, JM, KW |
| October 21, 2010 | CBP PSC | Baltimore, MD | JE, RW, CB, GS |
| October 22, 2010 | EPA weekly call with VA to discuss WIP | Conference Call | JeffC, AC, KA |
| October 25, 2010 | EPA conference call with NY to discuss wastewater - WIP | Conference Call | RI, BT, KA |
| October 25, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| October 26, 2010 | EPA call with MD to discuss trading/offsets/growth | Conference Call | RW, KevinD, MF |
| October 26, 2010 | EPA meeting with VA to discuss agriculture - WIP | Richmond, VA | JeffC, AC, KS, MD |
| October 26, 2010 | OMB/CEQ TMDL Briefing | Washington, D.C. | CF, KA, JE |
| October 26, 2010 | Bay Model Briefing for Senators Warner and Webb staff | Washington, D.C. | JeffC, GS, LK |
| October 26, 2010 | New York wastewater treatment operators | Elmira, NY | RB, BK, PG, DS |
| October 26, 2010 | Bay TMDL Public Meeting | Elmira, NY | RB, BK, PG, DS |
| October 26, 2010 | Chesapeake Bay Stormwater Listening Session | Lancaster, PA | RH, JM, KW |
| October 27, 2010 | Virginia Water Commission | Richmond, VA | JeffC |
| October 27, 2010 | Chemung County Stormwater Coalition | Horseheads, NY | RB, BK, PG, DS |
| October 27, 2010 | Upper Susquehanna Coalition | Apalachin, NY | RB, BK, PG, DS |
| October 27, 2010 | New York Farm Bureau | Apalachin, NY | RB, BK, PG, DS |
| October 27, 2010 | Bay TMDL Public Meeting & Webinar | Binghamton, NY | RB, BK, PG, DS |
| October 29, 2010 | EPA meeting with VA to discuss detailed comments on draft WIP | Annapolis, MD | JeffC, AC, KA, etc. |
| November 1, 2010 | Sierra Club TMDL/WIP Forum | Virginia Beach, VA | JeffC |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| November 1, 2010 | EPA conference call with NY to discuss stormwater - WIP | Conference Call | RI, JM, KA |
| November 2, 2010 | EPA conference call with PA on non-cost share BMPs | Conference Call | SH, KS, KA, MD |
| November 3, 2010 | EPA "closure" meeting with PA on final WIP | Harrisburg, PA | JC, KA, SH, KS |
| November 3, 2010 | EPA conference call with DE to discuss trading/offsets/growth - WIP | Conference Call | RW, KevinD, PG |
| November 3, 2010 | EPA "closure" conference call with DC to discuss final WIP | Conference Call | JC, RP, KA |
| November 3, 2010 | West Virginia environmental groups/stakeholders | Shepherdstown, WV | RB, BK, JS, JG, GB |
| November 3, 2010 | West Virginia developers and homebuilders | Martinsburg, WV | RB, BK, JS, JG, GB |
| November 3, 2010 | West Virginia local government stakeholders | Martinsburg, WV | RB, BK, JS, JG, GB |
| November 3, 2010 | Bay TMDL Public Meeting | Martinsburg, WV | RB, BK, JS, JG, GB |
| November 4, 2010 | Chesapeake Bay Commission | Montross, VA | JeffC |
| November 4, 2010 | EPA weekly conference call with VA to discuss final WIP | Conference Call | JeffC, AC, KA, KS |
| November 4, 2010 | West Virginia agriculture stakeholders | Romney, WV | RB, BK, JS, JG, GB, RW |
| November 4, 2010 | West Virginia local government stakeholders | Romney, WV | RB, BK, JS, JG, GB, RW |
| November 4, 2010 | West Virginia developers and homebuilders | Romney, WV | RB, BK, JS, JG, GB, RW |
| November 4, 2010 | Bay TMDL Public Meeting & Webinar | Romney, WV | RB, BK, JS, JG, GB, RW |
| November 5, 2010 | EPA "closure" conference call with WV to discuss final WIP | Conference Call | RW, LE, KA |
| November 8, 2010 | Virginia Association of Counties Annual Conference | Hot Springs, VA | JeffC |
| November 8, 2010 | EPA "closure" meeting with MD to discuss final WIP | Annapolis, MD | JE, MF, KA, etc. |
| November 8, 2010 | EPA conference call with PA on non-cost share BMPs | Conference Call | KS, MD, SH, JS |
| November 9, 2010 | PA Chesapeake Bay WIP Urban/Suburban/Rural Workgroup | Harrisburg, PA | SH, LP, LO; JS called in |
| November 9, 2010 | PA Chesapeake Bay WIP Agriculture Workgroup | Harrisburg, PA | SH, LP, MD |
| November 10, 2010 | EPA weekly conference call with VA to discuss final WIP | Conference Call | JeffC, AC, KA |
| November 10, 2010 | EPA "closure" meeting with DE to discuss final WIP | Dover, DE | SG, PG, KA |
| November 10, 2010 | EPA "closure" conference call with NY to discuss final WIP | Conference Call | RI, KA, etc. |
| November 10, 2010 | EPA conference call with PA on non-cost share BMPs | Conference Call | KS, MD, SH, JS |
| November 12-13, 2010 | 2010 Watershed Forum | Shepherdstown, WV | Staff |
| November 16, 2010 | CBP WQGIT | Conference Call | BK, RB, KA, JS, etc. |
| November 16, 2010 | PA Chesapeake Bay WIP Wastewater workgroup | Harrisburg, PA | SH, BT, NZ, LP all called in |
| November 18, 2010 | CBP CAC | Washington, D.C. | RB, JE |
| November 18, 2010 | EPA conference call with PA on non-cost share BMPs | Conference Call | KS |
| November 19, 2010 | EPA "closure" meeting with VA to discuss final WIP | Washington, D.C. | JeffC, KA, AC, RW, KS |

**Table C-4. Record of CBP committee/workgroup and stakeholder meetings since 2008 where the Chesapeake Bay TMDL was a principal topic of the meeting (continued)**

| Date | Meeting | Location | EPA/CBPO staff |
|---|---|---|---|
| November 23, 2010 | EPA conference call with PA on non-cost share BMPs | Conference Call | MD |
| November 24, 2010 | EPA discussion with PA on closing the gap | conference call | SH, MD, KA, CB |
| December 3, 2010 | CBP LGAC | Annapolis, MD | RB, CB |
| December 14, 2010 | CBP STAC | Annapolis, MD | RB, RW |

**Table C-5. EPA staff name abbreviations key**

| EPA staff abbreviation | Name |
|---|---|
| AC | Ann Carkcuff |
| AD | Andrew Dinsmore |
| BK | Bob Koroncai |
| BT | Brian Trulear |
| CB | Carin Bisland |
| CD | Chris Day |
| CF | Chuck Fox |
| DE | Diana Esher |
| DM | Dave McGuigan |
| DS | David Sternberg |
| DW | Don Welsh |
| EM | Evelyn MacKnight |
| GB | Greg Barranco |
| GS | Gary Shenk |
| GwenS | Gwen Supplee |
| HZ | Hank Zygmunt |
| JC | Jon Capacasa |
| JE | Jim Edward |
| JeffC | Jeff Corbin |
| JeffS | Jeff Sweeney |
| JimC | Jim Curtin |
| JG | Jessica Greathouse |
| JL | Jeff Lape |
| JM | Jenny Molloy |

| EPA staff abbreviation | Name |
|---|---|
| JS | Jennifer Sincock |
| JW | Julie Winters |
| KA | Katherine Antos |
| KD | Kevin DeBell |
| KS | Kelly Shenk |
| KW | Kevin Weiss |
| KZ | Kyle Zieba |
| LK | LaRonda Koffi |
| LL | Lewis Linker |
| LM | Linda Miller |
| LO | Liz Ottinger |
| LP | Lucinda Power |
| MD | Mark Dubin |
| MF | Mike Fritz |
| MH | Mike Haire |
| PG | Peter Gold |
| RB | Rich Batiuk |
| RH | Rachel Herbert |
| RI | Ruth Izraeli |
| RP | Reggie Parrish |
| RW | Rob Wood |
| SG | Shawn Garvin |
| SH | Suzanne Hall Trevena |
| TD | Thomas Damm |
| TL | Travis Loop |

**Table C-4. Organization abbreviations key**

| Abbreviations | Organization |
|---|---|
| ASWIPCA | Association of States Interstate Water Pollution Control Administrators |
| CAC | Citizens Advisory Committee |
| CBP | Chesapeake Bay Program |
| DC DOE | District of Columbia Department of Environment |
| DE DNREC | Delaware Department of Natural Resources and Environmental Control |
| EPA | Environmental Protection Agency |
| HQ | Headquarters |
| LGAC | Local Government Advisory Committee |
| MDA | Maryland Department of Agriculture |
| MDE | Maryland Department of Environment |
| MDNR | Maryland Department of Natural Resources |
| MDP | Maryland Department of Planning |
| NPDES | National Pollutant Discharge Elimination System |
| NRCS | National Resources Conservation Service |
| NYSDA | New York State Department of Agriculture |
| NYSDEC | New York State Department of Environmental Conservation |
| PA DEP | Pennsylvania Department of Environmental Protection |
| PSC | Principles' Staff Committee |
| RTWG | Re-evaluation Technical Workgroup |
| STAC | Scientific and Technical Advisory Committee |
| USC | Upper Susquehanna Coalition |
| USDA | United States Department of Agriculture |
| USGS | United States Geological Survey |
| USWG | Urban Stormwater Workgroup |
| VA DCR | Virginia Department of Conservation and Recreation |
| VA DEQ | Virginia Department of Environmental Quality |
| VAMWA | Virginia Municipal Wastewater Authorities |
| WEF | Water Environmental Federation |
| WQGIT | Water Quality Goal Implementation Team |
| WQM | Water Quality Monitoring |
| WQS | Water Quality Standards |
| WQSC | Water Quality Steering Committee |
| WVCA | West Virginia Conservation Agency |
| WVDA | West Virginia Department of Agriculture |
| WVDEP | West Virginia Department of Environmental Protection |

**Appendix K.**
**Allocation Methodology to Relate Relative Impact to Needed Controls**

## Introduction

The nutrient allocation procedures agreed to by five of the seven Bay watershed partners and followed by EPA are described in Section 6.4 of the main document. The reader should be familiar with Section 6.4 before reading this appendix. The goal of this appendix is to expand the options that were considered before selecting the final procedures and to provide rationale for the final decisions. Unless otherwise noted, the information presented in this appendix is based on the Phase 5.3 Chesapeake Bay Watershed Model and is the same information that was used to inform the decisions in the spring and summer of 2009 using the Phase 5.2 Chesapeake Bay Watershed Model, which had known limitations. Many of the values given in this appendix will be different from the final version as these decisions were not revisited with Phase 5.3 Bay Watershed Model.

## Relative Effectiveness Options

Section 6.3.1 of the main document is a discussion of the relative effectiveness of major basins in improving dissolved oxygen in the critical areas of the tidal waters of the Chesapeake.

Relative effectiveness is a combination of riverine effectiveness, also known as a delivery factor, which is expressed as

- pounds of reduction reaching tidal waters/pounds of reduction to the local river and estuarine effectiveness, which is expressed as
- improvement in dissolved oxygen/pounds of reduction reaching tidal waters Multiplying the two together gives
- improvement in dissolved oxygen/pounds of reduction to the local river

### Riverine Effectiveness Options

No options were considered in calculating riverine delivery factors. The principles of calculating delivery factors in the Chesapeake Bay Program watershed models are long-standing and have been approved several times by Chesapeake Bay Program workgroups and subcommittees. These principles were also reviewed in the Chesapeake Bay Program's Scientific and Technical Advisory Committee sponsored independent scientific peer reviews of the Phase 5 Chesapeake Bay Watershed Model in 2007 and 2009. Nitrogen delivery factors are calculated for each river segment. Nitrogen levels are lowered naturally in river systems through denitrification, providing a long-run removal of nitrogen. Phosphorus and sediment do not undergo a similar process to denitrification and do not have long-run removal mechanisms other than delivery through the river system and burial. Burial is offset by scour, both of which are episodic in nature. That does not hold true in reservoir systems, where burial is much more significant and is not offset by scour to a great degree. Because of the lack of spatially and temporally detailed phosphorus and sediment data that would be needed to precisely calibrate scour and burial on the segment scale, the calculation of delivery factors for phosphorus and sediment is closed around reservoirs rather

than segment by segment. That is, all segments upstream of a reservoir or an entrance to the tidal system and downstream of other reservoirs receive the same riverine delivery factor.

## *Geographic Grouping of Estuarine Effectiveness*

The estuarine effectiveness is calculated by comparing the dissolved oxygen simulated in the Bay of the calibration run to the dissolved oxygen simulated in the Bay when a given watershed area has reduced loads relative to the calibration loads. The effectiveness for that given area is then calculated by dividing the improvement in dissolved oxygen by the reduction delivered loads. A choice has to be made regarding the geographic areas to test.

Each area along the estuary would theoretically have a different estuarine effectiveness, but there are limitations to what can be effectively calculated. If the area tested has a low total load and, therefore, a small change in going to a reduced load, the estuarine model might not be able to resolve the change in dissolved oxygen. Tested areas must be aggregated up to a reasonably large load to be able to record the change. Also, the estuarine model takes a few days to complete a run, and it would be time-prohibitive to make 100 or so more runs.

There is no difference in estuarine effectiveness between loads in the same nontidal watershed. Loads from areas just west of Washington, DC, would have the same estuarine effectiveness as loads from West Virginia because they enter the tidal waters at the same point, although they would have different overall effectiveness scores because of the differences in their riverine effectiveness. Therefore, the head of tide of large river systems is a natural place to define a discrete watershed. The estuarine portion of major river systems like the Potomac and Rappahannock would have significantly different effects on the critical area for dissolved oxygen and also have large enough loads to resolve these differences, so those areas are another reasonable place to lump geographically. The Eastern Shore is not amenable to simple rules like this because there are no large nontidal river systems connected to large estuarine river systems. There are, however significant differences in estuarine effectiveness between the northernmost and southernmost portions of the Eastern Shore. The Eastern Shore was therefore divided in to four sections.

The final geographic breakout, as a balance between the desire to calculate a different effectiveness where a distinction exists and the limiting factors of computer run time and the ability of the estuarine model to resolve the oxygen effect of small differences in loading are

| | | |
|---|---|---|
| Susquehanna | Rapp Above Fall Line | Upper East Shore |
| West Shore | Rapp Below Fall Line | Middle East Shore |
| Patuxent Above Fall Line | York Above Fall Line | Lower East Shore |
| Patuxent Below Fall Line | York Below Fall Line | East Shore VA |
| Potomac Above Fall Line | James Above Fall Line | |
| Potomac Below Fall Line | James Below Fall Line | |

To be clear, the allocation calculations are split between those geographic areas within jurisdictions, resulting in 30 different spatial units. The allocations, however, are expressed on the jurisdiction and major river basin scale. That is, there is a calculation of Maryland Potomac above and below the fall line, but the allocation is expressed only as Maryland Potomac.

## *Choice of the Critical Designated Uses and Segments for Calculating Relative Effectiveness*

To estimate the estuarine effectiveness, the change in dissolved oxygen must be calculated for a relevant area of the Chesapeake Bay. The most persistent areas of dissolved oxygen violations are in the mainstem of the Chesapeake Bay from roughly the Bay Bridge between Annapolis and Kent Island, Maryland, south to the mouth of the Potomac River and also the lower tidal Potomac River. The deep-water and deep-channel designated uses are impaired at a higher rate than the open-water designates use and also better integrators of baywide rather than local loads.

The deep-water and deep-channel designated uses of CB3MH, CB4MH, and CB5MH and the deep-water designated use of POTMH_MD were selected as the most appropriate grouping to use in calculating estuarine relative effectiveness for the following reasons:

1. These segments and designated uses had high levels of impairment
2. They are centrally located
3. They represent a large group of segments and a large volume of the Bay
4. Deep-water and deep-channel designated uses are good geographic integrators

Further tests of other combinations showed that the estuarine effectiveness was not particularly sensitive to the addition or subtraction of any given designated use.

## *Metric for Relative Effectiveness*

To estimate the change in dissolved oxygen an appropriate metric of dissolved oxygen must be calculated that is sensitive to load changes across a wide array of segments, designated uses, and impairment levels and is relevant to the assessment of dissolved oxygen criteria. Three metrics were investigated:

1. Percent nonattainment.
2. Average dissolved oxygen during the summer assessment period
3. 25th percentile (quartile) of dissolved oxygen during the summer assessment period

Three criteria were applied in determining which of these make the best metric

1. Relevance to attainment of dissolved oxygen standards
2. Broad applicability to designated uses and water quality segments
3. Linearity of response—does the first pound have the same effect as the last?

Percent nonattainment is clearly the most relevant metric to standards attainment, although other measures of dissolved oxygen are certainly also relevant. The quartile is more relevant than the average in that EPA is estimating increases in the lower values of oxygen.

Percent nonattainment is applicable only to areas that are not in attainment in the calibration and do not come into attainment when simulating a reduction in any single basin, which is a considerable limitation. Average dissolved oxygen is not an appropriate measure for many open-water segments. An impaired open-water segment might have average dissolved oxygen near saturation but experience large swings between super saturation and low oxygen. A load reduction might not change the average but improve the water quality by reducing the variability

of oxygen levels and the frequency of low values. The quartile is applicable to all segments and all designated uses.

Linearity of response is a crucial component. If a metric responded much more to the first pound of reduction than to the last, smaller basins would be estimated to have a greater pound-for-pound influence than larger basins. To determine the linearity of the response to the three candidate metrics, a run was made with the Susquehanna at half the level of reduction normally used to calculate estuarine effectiveness. In general, across multiple segments and designated uses, the response for all three metrics was mostly linear. There was not a significant difference between the metrics on this count.

The average was judged to be not suitable because of its limited applicability. The percent nonattainment was judged to be slightly more relevant than the quartile, but the quartile was selected as the appropriate metric because of its universal applicability.

## Level of Effort Options

Section 6.3 of the main document describes the expression of level of effort as between the two extreme scenarios of No Action scenario and E3. Selection of those two scenarios is an expression of the third principle under Section 6.3 that all previous reductions are credited toward achieving the allocations.

### Atmospheric Deposition

The atmospheric deposition options and rationale for choosing the air allocation is documented in Section 6.4.1. The method of incorporation is to hold atmospheric deposition constant through the bookend scenarios of No Action and E3, and through all the prospective management scenarios unless specific actions are called for in state plans that go beyond the federal levels. One example of states going beyond the federal level is that the E3 has atmospheric deposition set to a level that incorporates reduced agricultural emissions and other possible state actions. That allows the jurisdictions to be responsible strictly for the reductions that they can control and not for federal actions on atmospheric deposition.

### Scenario Options

The E3 scenario was selected as the appropriate lower end of loading rather than other candidate scenarios such as the Current Programs, Maximum Feasible, or All Forest. Current Programs could be used as the lower end and an assessment made of how far efforts had to increase beyond current programs, but doing so would violate the expression of equity described above because jurisdictions that had already achieved significant reductions would have to do proportionately more than jurisdictions that have not. Maximum Feasible would be a similar expression as E3 and would meet the equity provision, but it was judged to be much more subjective and, therefore, inferior to E3 as a metric. The All Forest scenario would be an expression of anthropogenic, rather than controllable loads. The All Forest was used in the 2003 goal setting. Basing the allocation method on E3 recognizes that various sources have different possible levels of reduction. An allocation based on anthropogenic load could require levels of reduction beyond E3. For example, if an allocation required all loads to go 60 percent of the way toward All

Forest, certain theoretical land uses that can achieve only a 50 percent reduction at E3 would not be able to achieve the allocations, while wastewater treatment plants would be able to achieve a much larger than 60 percent reduction from No Action. Those distortions would increase at smaller scales as sources become more dominant locally.

The No Action scenario was chosen as the upper end to follow the principle of accounting for previous reductions. Using a starting point that incorporated management practices or higher levels of treatment would give a disadvantage to jurisdictions that had implemented the actions.

## Allocation Method Options

Section 6.3.1 describes the method used to relate relative effectiveness to reduction effort. With that basic outline there is an infinite number of ways to define the allocation and still meet water quality standards. The major decisions to be made are the number of lines that represent different source categories and the shapes of those lines. The options were discussed in the Chesapeake Bay Program's Water Quality Goal Implementation Team (WQGIT) and the Principals' Staff Committee, and agreement was reached between EPA and five of the seven jurisdictional partners.

### Number of Allocation Lines

During the allocation process, the WQGIT recognized that different source categories had different abilities to make progress toward an E3 level of implementation. Figure K-1 is a plot of implementation progress through 2009 plotted on the same vertical axis as the allocation charts, percent of E3 from No Action.



**Figure K-1. 2009 implementation by sector.**

The 2009 implementation represents the choices that the jurisdictions have made to date, presumably taking into account the same types of criteria that will be used to make decisions on restoration spending in the future.

There is a clear separation between the sources in that jurisdictions have chosen to set wastewater treatment plants at a level closer to E3, relative to No Action, than either agriculture

or developed land. There is also a separation between agriculture and developed land, but it is not as large as the separation between wastewater treatment plants and all other sources. With that information, the decision was made to use two lines, one for wastewater treatment plants and one or all other sources.

### *Shape of the Allocation Lines*

Several allocation line shapes were discussed with the three main shapes being

1. Straight: This is the most straightforward expression of the allocation principle stated under section 6.3 that areas with a greater pound for pound effect on water quality should do more.

2. Hockey Stick: It was recognized that a natural maximum existed for some sources, particularly with waste water treatment where a given technology could reach a concentration that could be expressed as a percentage from No Action to E3. A hockey stick line has a maximum for watershed areas in the range of relative effectiveness and slopes down for lower levels of relative effectiveness.

3. Z-curve: Similar to the hockey stick but also recognizing that a natural minimum also might exist. Again, related to wastewater treatment plants, a given technology producing a known concentration can be seen as a minimum technology that should be implemented.

As reported in more detail in Section 6.3.3 the wastewater line was set first in a hockey stick shape such that the upper 50 percent of the relative effectiveness values were at a maximum attainment percentage, according to a given concentration and the rest sloped off to a minimum value also based on a concentration. The straight line for all other sources was set such that a zero relative effectiveness would have a 20 percent lower value on the percent controllable axis than the area with the maximum relative effectiveness value. The intercept for all other sources was set such that the water quality standards were attained. Figure K-2, which is also Figure 6-7 in the main document, is the implementation of this method for nitrogen.

To make the above decision, the partnership was presented with several options for constructing the lines. Basin-jurisdiction loads were calculated for each option.

Table K-1 is a sample of options that were explored using the Phase 5.2 Chesapeake Bay Watershed Model. Several more options were generated before the final decision was made.



Figure K-2. Allocation methodology example showing the hockey stick and straight line reductions approaches, respectively, to wastewater (red line) and all other sources (blue line).

**Table K-1: Initial options presented to the Chesapeake Bay Program's Water Quality Goal Implementation Team on September 30, 2009**

| | Lines | 2 | 2 | 2 | 2 | 2 | | | | |
| | WWTP rule | 3-8 mg/l | 3-8 mg/l | 3-8 mg/l HS | 3-8 mg/l HS | 3-8 mg/l Z | | | | |
| | Other Load Rule | 20% | 10% | 20% | 10% | 20% | **Largest** | | | |
| | DO goal | 200 | 200 | 200 | 200 | 200 | **Difference** | 2010 Noact | E3 load | TS load |
| DC Potm | | 2.82 | 2.82 | 2.37 | 2.37 | 2.37 | 16% | 9.68 | 1.53 | 2.12 |
| DE Esh | | 5.12 | 5.21 | 5.25 | 5.34 | 5.21 | 4% | 9.28 | 3.45 | 6.43 |
| MD Esh | | 12.54 | 12.76 | 12.81 | 13.03 | 12.70 | 4% | 23.94 | 8.25 | 13.84 |
| MD Patux | | 3.26 | 3.25 | 3.15 | 3.13 | 3.27 | 4% | 6.57 | 2.15 | 3.17 |
| MD Potm | | 14.73 | 14.52 | 14.10 | 13.89 | 14.29 | 6% | 30.31 | 9.65 | 14.66 |
| MD Susq | | 0.81 | 0.83 | 0.83 | 0.85 | 0.82 | 4% | 1.35 | 0.61 | 0.97 |
| MD Wsh | | 10.18 | 10.15 | 10.15 | 10.11 | 10.12 | 1% | 36.50 | 6.15 | 9.49 |
| NY Susq | | 10.54 | 10.41 | 10.54 | 10.41 | 10.55 | 1% | 16.36 | 7.78 | 8.68 |
| PA Potm | | 4.76 | 4.58 | 4.83 | 4.65 | 4.83 | 5% | 7.08 | 3.12 | 4.31 |
| PA Susq | | 67.96 | 68.59 | 68.81 | 69.44 | 68.37 | 2% | 121.19 | 49.23 | 68.86 |
| VA Esh | | 1.60 | 1.59 | 1.61 | 1.61 | 1.60 | 1% | 3.25 | 0.88 | 1.67 |
| VA James | | 28.84 | 28.14 | 28.49 | 27.78 | 29.58 | 6% | 52.63 | 15.80 | 28.85 |
| VA Potm | | 16.85 | 16.47 | 16.09 | 15.72 | 16.50 | 7% | 33.05 | 10.72 | 15.81 |
| VA Rap | | 6.54 | 6.37 | 6.49 | 6.32 | 6.60 | 4% | 10.61 | 4.33 | 6.49 |
| VA York | | 6.55 | 6.32 | 6.53 | 6.30 | 6.72 | 6% | 10.54 | 4.05 | 6.48 |
| WV Potm | | 5.65 | 5.44 | 5.71 | 5.50 | 5.73 | 5% | 8.32 | 3.76 | 5.69 |
| Total | | **198.77** | **197.46** | **197.76** | **196.45** | **199.27** | 1% | **380.66** | **131.45** | **197.53** |

## Calculation of Equivalent Allocation Options

For any given level of water quality, an infinite number of lines can be drawn on the allocation plots like Figure K-2. To calculate an equivalent line to an existing line, it is necessary to meet the condition of

$$\sum \left( DeliveredLoad \right) \times \left( EstuarineDelivery \right) = C$$

or the sum of all delivered loads for each state/basin/fall-line combination times its estuarine delivery factor must equal a constant for the family of lines that meets the same water quality.

Expanding the delivered load term to create an equation between relative effectiveness and delivered load gives

$$\sum \left( E3_i + \left( NoBMP_i - E3_i \right) \left( 1 - mX_i - b \right) \right) EstuarineDelivery_i = C$$

where

| | |
|---|---|
| $X_i$ | is the relative effectiveness |
| $E3_i$ and $NoBMP_i$ | are the loads for that state/basin/fall-line/sector for the two scenarios |
| $m$ and $b$ | are the slope and intercept of the line and the only unknowns |

Given a slope or an intercept, the above equation can be solved numerically for the other parameter of the line. This equation was implemented in MS Excel for multiple lines with enforced maximum and minimum to accommodate the decisions above.

**Appendix L.**
**Setting the Chesapeake Bay Atmospheric Nitrogen Deposition Allocations**

## Atmospheric Deposition Nitrogen Inputs Compared to Other Nitrogen Sources

Atmospheric deposition of nitrogen is the highest nitrogen input load in the Chesapeake watershed (Figure L-1). Other nutrient input loads are fertilizer, manures, point sources, and septic systems. Over the 1985 to 2005 Chesapeake Bay model simulation period, the Chesapeake watershed average atmospheric deposition loads of nitrogen have been declining, particularly those of oxidized nitrogen.



**Figure L-1. 20-year (1985–2005) time series of atmospheric, fertilizer, manure, and wastewater treatment plant nitrogen input loads to the Chesapeake Bay Water Quality and Sediment Transport Model.**

## Atmospheric Deposition Inputs

Atmospheric loads of nitrogen are from chemical species of oxidized nitrogen, also called NOx, and from reduced forms of nitrogen deposition, also called ammonia (NH3). Oxidized forms of nitrogen deposition originate from conditions of high heat and pressure and are formed from eutrophically inert diatomic atmospheric nitrogen. The principle sources of NOx are air emissions from industrial-sized boilers such as electric power plants and internal combustion engines in cars, trucks, locomotives, airplanes, and the like.

Reduced nitrogen, or ammonia, is responsible for approximately one-third of the total nitrogen emissions that eventually end up as loads to the Bay. Ammonia sources are predominately agricultural, and ammonia is released into the air by volatilization of ammonia from manures and emissions from ammonia based fertilizers. Minor sources include mobile sources, slip ammonia released as a by-product of emission controls on NOx at power plants and industrial processes.

Two types of deposition are differentiated and both are tracked through the Chesapeake models and atmospheric deposition monitoring networks as input daily. The first is wet deposition, which occurs during precipitation events and contributes only to nitrogen loads during days of rain or snow. The other is dry deposition, which occurs continuously and is input at a constant rate daily into the Bay Watershed and Bay Water Quality models.

Because the Bay Watershed and Bay Water Quality models are mass balance models, all sources of nutrient inputs to the tidal Bay have to be accounted for including phosphorus and organic forms of nutrients. For phosphorus and organic nutrients, the models estimate loads to open water only, on the assumption that all phosphorus and organic nutrients are derived from aeolian or wind processes that result in no net change in organic nitrogen on terrestrial surfaces but result in a net gain when deposited on water surfaces.

Organic nitrogen is represented as wet fall only, i.e., dissolved organic nitrogen (DON). The magnitude of dry fall organic nitrogen is not well characterized in the literature, but the latest Community Multiscale Air Quality (CMAQ) model simulations with updated chemical mechanisms do include peroxyacyl nitrates (PAN, $CH_3COOONO_2$) and an organic nitrate group (NTR). The NTR represents several organic nitrates that are produced from ozone photochemistry. Both of these species are relatively small in magnitude and both are biologically labile. Therefore, the dryfall PAN and NTR are lumped into the oxidized nitrogen atmospheric deposition dryfall inputs. Table L-5 shows the estimated atmospheric deposition loads to the Bay's tidal surface waters of the different nutrient species.

Air sources contribute about a third of the total nitrogen loads delivered to the Chesapeake Bay by depositing directly onto the Bay's tidal surface waters and onto the surrounding Bay watershed. Direct nitrogen atmospheric deposition to the Bay's tidal surface waters is estimated to be 6 to 8 percent of the total (air and non-air) nitrogen load delivered to the Bay. The atmospheric nitrogen deposited onto the watershed and subsequently transported to the Bay is estimated to account for 25 to 28 percent of the total nitrogen loadings to the Bay.

## Atmospheric Deposition Input Trends

Between 1985 and 2005, the simulation period of the Phase 5.3 Bay Watershed Model, atmospheric deposition loads of nitrate have tended to decrease overall in the Chesapeake Bay watershed. Over that 20-year period, nitrate loads have decreased by about 30 percent (Figure L-2); however, considerable variability exists across the Bay watershed, with the greatest reductions occurring in the northern and western portions. In Figure L-2, the average annual concentration is used as an adjustment to smooth out the high and low rainfall years, which bring different amounts of deposition load to the Bay watershed, primarily from the volume of precipitation. Use of the dissolved inorganic nitrogen (DIN), nitrate ($NO_3$), and ammonia ($NH_3$) concentrations provides a reasonable estimate of the trend in atmospheric deposition.



**Figure L-2. Trend of estimated average NO₃, NH₃ and DIN deposition concentrations input to the Phase 5.3 Chesapeake Bay Watershed Model.**

Much of the reduction has been due to point source air emission reductions, particularly from electric generating units (EGUs) as shown in Figure L-3. More rapid declines in air emissions are expected between 2008 to 2010 as the Clean Air Transport Rule (previously the Clean Air Interstate Rule [CAIR] controls on power plant emissions and the air quality standards for ozone and particulate matter come into enforcement deadlines by 2010 (Figure L-3). Further reductions are expected with the reduced ozone air quality standard announced in August 2010. Reductions from mobile sources are another large contributor to the downward trend. Reductions from mobile sources will continue past the year 2020 as large off-road diesel and marine diesel fleets are replaced.

Table L-1 shows the estimated portion of deposited $NO_x$ loads on the Chesapeake Bay watershed from four sectors including EGUs, mobile sources, industry, and all other sources. From 1990 to 2010, considerable reductions have been made in the electrical generation sector. In addition, both on road and off-road mobile sources have ongoing fleet turnover and replacement, which is putting cleaner spark and diesel engines in service; that is expected to continue beyond 2020. Note that some NOx sources like mobile sources seem to increase in percentage relative to other sources like EGUs. Both sources are actually decreasing and the total projected deposition load in 2020 is less than 1990, however, EGU emission reductions are relatively more than mobile reductions.

Average ammonia atmospheric deposition loads over the Chesapeake Bay watershed have followed the trend in overall manure loads in the watershed and have remained steady over the 1985 to 2005 simulation period (Figure L-2). Ammonia deposition is very site specific and strongly influenced by local emissions. Local and regional trends in manure, such as the rise of poultry animal units in the Eastern Shore and Shenandoah, and dairy's diminishment in the northern portions of the watershed in the late 1980s, affect regional ammonia deposition in the Bay watershed.



Figure L-3. Estimated nationwide emissions of NOx and SO₂ from EGUs since 1980 and estimated emissions to 2020.

Table L-1. Estimated portion of atmospherically deposited NOx loads on the Chesapeake watershed from four sectors including EGUs, mobile sources, industry, and all other sources in 1990 and projected out to 2020

| Sectors | 1990 | 2020 (Preliminary) |
|---|---|---|
| Power Plants (EGUs) | 40% | 17% |
| Mobile Sources (on-road) | 30% | 32% |
| Industry | 8% | 20% |
| Other (off-road construction; residential & commercial) | 21% | 31% |

The Bay's NOx airshed—the area where emission sources that contribute the most airborne nitrates to the Bay originate—is about 570,000 square miles, or seven times the size of the Bay's watershed. The ammonia airshed is slightly smaller (Figure L-4). Close to 50 percent of the NOx deposition to the Bay is from air emission sources located in the seven Bay watershed jurisdictions. Another 25 percent of the atmospheric deposition load to the Chesapeake Bay watershed is from the remaining area in the airshed and the remaining 25 percent of deposition is from the area outside the airshed. The ammonia airshed is similar to the NOx airshed, but slightly smaller (Figure L-4).

## CBP Airshed Model

The Chesapeake Bay Airshed Model is a combination of a regression model of wet deposition (Grimm and Lynch 2005) and a continental-scale air quality model of North America called the CMAQ for estimates of dry deposition (Dennis et al. 2007; Hameedi et al. 2007). The Bay Airshed Model is represented in Figure L-5.



Source: Chesapeake Bay Program Office

**Figure L-4. The oxidized nitrogen airshed (blue line) is the principle area of NO$_X$ emissions that contribute nitrogen deposition to the Chesapeake Bay and its watershed. The reduced nitrogen airshed (red line) of ammonia deposition is slightly smaller.**



**Figure L-5. The Chesapeake Bay Airshed Model is a combination of a regression model of wet deposition and the Community Multi-scale Air Quality Model of dry deposition.**

The regression and deterministic airshed models that provide atmospheric deposition input estimates, have gone through a series of refinements with increasingly sophisticated models of both applied over time (Linker et al. 2000; Grimm and Lynch 2000, 2005; Lynch and Grimm 2003). The amount and timing of the wet atmospheric deposition input in the Phase 5.3 Bay Watershed Model is hourly, and is related to the timing and amount of hourly rainfall in the Phase 5.3 Bay Watershed Model precipitation input data. The dry deposition estimates are monthly constants that are input daily and are based on the CMAQ model (Dennis et al. 2007; Hameedi et al. 2007).

## Wet Deposition Regression Model

Wet deposition is simulated using a regression model developed by Grimm and Lynch (2000, 2005; Lynch and Grimm 2003). The regression model provides hourly wet deposition loads to each land segment on the basis of each land segment's rainfall. The regression model uses 29 National Atmospheric Deposition Program (NADP) monitoring stations and 6 AIRMoN stations to form a regression of wetfall deposition in the entire Chesapeake Bay watershed over the entire simulation period (Figure L-6).



**Figure L-6. Atmospheric deposition monitoring stations used in developing the wet deposition regression model.**

To improve the accuracy of the regression estimates over previous regression analyses (Linker et al. 2000) a number of improvements in the sampling and representation of spatial and temporal patterns of land use activities and intensities and of emission levels were made. Also, detailed meteorological data were assimilated into the regression model to identify contributing emission source areas and to estimate the impact of the contributions on daily deposition rates on a per-event basis.

This version of the regression model included nine additional NADP/NTN sites in the regression estimates (DE99, MD07, MD08, MD15, MD99, PA47, VA10, VA27, VA98, and VA99) that were placed in operation in and around the Chesapeake Bay watershed since 2001, providing a comprehensive representation of agricultural influences.

Refinements also involved developing a more accurate and comprehensive representation of the spatial and temporal distribution and intensity of livestock production and other agricultural activities across the Bay watershed. An improved accounting of livestock production activities was achieved by combining county- and watershed unit-specific livestock production statistics with high-resolution (30 meters) land use data from the USGS's National Land Cover Database (NLCD). Estimates of local ammonia emissions from fertilizers and manure applications to croplands were also assimilated into the model using EPA inventories and high resolution NLCD to identify likely cropland areas. Last, localized estimates for $NH_3$ and $NO_x$ emissions for the Phase 5 Chesapeake Bay Watershed Model domain and surrounding states were developed by combining facility and county-specific emissions reports from the EPA's National Emissions Inventory (NEI) database with the NLCD classifications.

For each day of rain, wetfall atmospheric deposition is estimated by the regression that has the general form

$Log10(c) = b_o + b_1 log10(ppt) + \sum b_{2s} season + b_3 v_3 + \ldots + b_n v_n + e$

where

$c$ = daily wet-fall ionic concentration (mg/L)
$b_o$ = intercept
$ppt$ = daily precipitation volume (inches)
$b_1$ = coefficient for precipitation term
$season$ = vector of 5 binary indicator variables encoding the 6 bi-monthly seasons
$b_{2s}$ = vector of 5 coefficients for season terms
$v_3 \ldots V_n$ = additional predictors selected through stepwise regression

o   National Land Cover Data (NLCD)
   ▪ Within proximities of 0.8, 1.6, 3.2, 8.0, and 16.1 km of each NADP/NTN site: open water, forested, residential, industrial/transportation, croplands, and vegetated wetlands
o   Local emission levels of ammonia and nitrous oxides from EPA National Emission Trends (NET)
   ▪ County emission totals 1985-2005
   ▪ County containing each NADP/NTN monitoring site and for the nearest three counties

$b_3 \ldots b_n$ = coefficients corresponding to $v_3 \ldots V_n$

The daily precipitation nitrate and ammonium concentration models were developed using a linear least-squares regression approach and single-event precipitation chemistry data from the 29 NADP/NTN sites and six AIRMoN stations in Figure L-6. The most significant variables in both models included precipitation volume, the number of days since the last event, seasonality, latitude, and the proportion of land within 8 km covered by forests or devoted to transportation and industry. (Local and regional ammonia and nitrogen oxides emissions were not as well correlated as land cover.) The abilities of these variables to predict wet deposition arise primarily from their relationship to either (1) the spatial and temporal distribution of emissions of ammonium and nitrate precursors from sources within or upwind of the Bay watershed; or (2) the chronology and characteristics of precipitation events. Modeled concentrations compared very well with event chemistry data collected at six NADP/AIRMoN sites within the Chesapeake Bay watershed. Wet deposition estimates were also consistent with observed deposition at selected sites.

Volume, duration, and frequency of precipitation events have obvious roles in determining wet deposition rates. However, these parameters alone do not completely describe all of the characteristics of a precipitation event. In particular the intersection of a precipitation event and a volume of air with a particular history is also important in determining wet deposition flux, so the interactions between storm trajectories and emission sources were also incorporated into the wet deposition regression model.

Using metrological data from the National Center for Environmental Prediction's North American Regional Reanalysis (NARR), components were added to daily ammonium and nitrate wet deposition models that predict the rate at which emissions from area and point sources are emitted, dispersed, and transported to specific deposition locations. Surface and upper-level vertical and horizontal air movement data from the NARR allowed estimates of the extent to which emissions were transported and mixed into surface and upper-level atmospheric layers; and, thereby, enabled construction more realistic multilevel air mass trajectories with which to predict the movement of emissions from multiple source locations to deposition points of interest.

## Dry Deposition - Community Multi-scale Air Quality Model (CMAQ)

The CMAQ Model is a fully developed air simulation of North American (Dennis et al. 2007; Hameedi et al. 2007). The CMAQ model simulates atmospheric deposition to the Chesapeake Bay watershed (indirect deposition) and tidal Bay (direct deposition) for every hour of every day for the representative year. A variety of input files are needed that contain information pertaining to the modeling domain which is all North America. Those include hourly emissions estimates and meteorological data in every grid cell and a set of pollutant concentrations to initialize the model and to specify concentrations along the modeling domain boundaries. The initial and boundary concentrations were obtained from output of a global chemistry model.

The CMAQ model simulation period is for one year, 2002, because 2002 is characterized as an average precipitation year and, therefore, an average deposition year. The 2002 CMAQ simulation year was used to provide the monthly dry deposition estimate for all years of the 1985 to 2005 Phase 5.3 Bay Watershed Model simulation. Phase 5.3 Bay Watershed Model dry deposition input estimates are derived from the CMAQ model as monthly average inputs expressed as a daily load.

An adjustment for the 20-year trend in atmospheric deposition loads was applied by using the trend developed in the wet deposition regression model, and assuming the dry deposition trend to be the same as the wet in the separate nitrate and ammonia estimates. Figure L-7 shows the 12-km grid used to provide better resolution of the Phase 5 Chesapeake Bay Watershed Model's atmospheric deposition loads. The improved spatial resolution of direct atmospheric deposition of loads to tidal surface waters and the atmospheric deposition of loads to the watershed adjacent to tidal waters from metropolitan and mobile sources was an important improvement (STAC 2007).



**Figure L-7. The CMAQ model's 12-km grid over the Phase 5 Chesapeake Bay Watershed Model domain.**

## Organic Nitrogen Deposition

The Phase 5.3 Bay Watershed Model accounts for estimated loads of atmospheric organic nitrogen to the open water land use on the assumption that all organic nitrogen is derived from aeolian or wind processes that result in no net change in organic nitrogen on terrestrial surfaces but do result in a net gain when deposited on water surfaces. Organic nitrogen is represented as wet fall only, i.e., DON. The magnitude of dry fall organic nitrogen is unknown.

## Dryfall Organic Nitrogen Deposition

The dryfall organic nitrogen is likely to be sorbed onto large and small particles or even to be particles themselves, like pollen. Such dryfall organic carbon species can be involved in long-range transport, such as the pollens and organic nitrates found on the dust coming over from Africa, but EPA does not have a good estimate of the fraction of the dry deposition that these particles compose.

Also, the latest CMAQ simulations with updated chemical mechanisms include peroxyacyl nitrates (PAN, $CH_3COOONO_2$) and an NTR. The NTR represents several organic nitrates that are produced from ozone photochemistry. Both of these species are relatively small in magnitude, and both are biologically labile. Therefore, the dryfall PAN and NTR are lumped into the oxidized nitrogen atmospheric deposition dryfall inputs.

## Wetfall Organic Nitrogen Deposition

In the 1992 Phase 2 version of the Chesapeake Bay Watershed Model, organic nitrogen was assumed to be about 670 micrograms per liter (µg/L) (as nitrogen) based on data summarized by Smullen et al. (1982). The data showed considerable seasonal variability. The organic nitrogen load was constant in all watershed model segments. An equivalent annual load was used in the tributary model with application of the seasonal variability suggested by Smullen et al. (1982).

Organic nitrogen measurements from Bermuda are calculated at about 100 µg/L (as nitrogen) (Knap et al. 1986). Moper and Zita (1987) reported an average DON concentration from the western Atlantic and Gulf of Mexico of about 100 µg/L (as nitrogen). That is consistent with the reported range from the North Sea and northeast Atlantic of between 90 µg/L to 120 µg/L (Scudlark and Church 1993). Scudlark et al. (1996) reported an annual volume-weighted average DON concentration in the mid-Atlantic coastal areas to be about 130 µg/L (as nitrogen). Measurements in this study are consistent with the interannual variation (maximum in spring) reported by Smullen et al. (1982).

A later study identified methodological problems with some of the previous studies and suggests the wet deposition of organic nitrogen in the Chesapeake watershed would be closer to 50 µg/L on an annual average basis (Keene et al. 2002). This study also documented the highest concentrations of organic nitrogen in the spring.

On the basis of Keene et al. (2002), a value of 50 µg/L (as nitrogen) was selected as representative of an average annual wet deposition concentration to the watershed and tidal waters with the seasonal loading pattern suggested by Smullen (1982) and Scudlark et al. (1996). That applies an average concentration of 40 µg/L from July to March in rainfall and an average

concentration of 80 µg/L from April to June. The load of organic nitrogen would depend on the precipitation in a particular land segment, but assuming 40 inches of precipitation, the load would be on the order of 0.4 lb/ac-yr.

## Total Atmospheric Deposition Inputs of Nitrogen from Wet and Dry Deposition

The annual rate of total atmospheric deposition to Phase 5 land segments is shown in Figure L-8 and Table L-2.

**Table L-2. Annual average atmospheric deposition of reduced DIN, oxidized DIN and total DIN on land segments in the entire Phase 5.3 Chesapeake Bay watershed model**

| Land Segment | NH4 | NO3 | Total DIN |
|---|---|---|---|
| A10001 | 2.50 | 3.21 | 5.71 |
| A10003 | 1.68 | 2.87 | 4.55 |
| A10005 | 5.62 | 4.55 | 10.16 |
| A11001 | 0.24 | 0.44 | 0.68 |
| A24001 | 0.41 | 1.37 | 1.78 |
| A24003 | 1.02 | 2.99 | 4.01 |
| A24005 | 2.02 | 4.42 | 6.44 |
| A24009 | 0.40 | 1.29 | 1.69 |
| A24011 | 1.60 | 1.64 | 3.25 |
| C51071 | 0.17 | 0.53 | 0.69 |
| C51165 | 0.45 | 0.28 | 0.72 |
| Total | 264.07 | 556.59 | 820.66 |

## Organic and Inorganic Phosphorus Deposition

The Phase 5.3 Bay Watershed Model accounts for estimated loads of atmospheric organic and inorganic phosphorus to the open water land use on the assumption that, like organic nitrogen, the load is derived from aeolian or wind processes that result in no net change in organic nitrogen on terrestrial surfaces but do result in a net gain when deposited on water surfaces. Following Smullen (1982), annual loads of organic and inorganic phosphorus are set at 47 µg/L and 16 µg/L, respectively. Seasonally, those loads are treated in the same way as organic nitrogen, assuming that organic phosphorus will follow a pattern similar to organic nitrogen and that an aeolian source of inorganic phosphorus might well increase during the bare ground of spring agricultural practices. Accordingly, organic and inorganic phosphorus concentrations are set at 74 µg/L and 25 µg/L, respectively, from April to June, and at half those concentrations for the other nine months of the year.



**Figure L-8. Annual average DIN atmospheric deposition on land segments in the entire Phase 5.3 Chesapeake Bay Watershed Model domain.**

## CMAQ Airshed Scenarios

The CMAQ model also provides estimates of nitrogen deposition resulting from changes in emissions from utility, mobile, and industrial sources due to management actions or growth. For the CMAQ model the base deposition year is 2002 and scenarios include the management actions required by the Clean Air Act in 2010, 2020, and 2030. The future year scenarios reflect emissions reductions from national control programs for both stationary and mobile sources, including the CAIR, the Tier-2 Vehicle Rule, the Nonroad Engine Rule, the Heavy-Duty Diesel Engine Rule, and the Locomotive/Marine Engine Rule. Although CAIR has been remanded to EPA, it will remain in place pending a rulemaking to replace it. It is unclear how the replacement rule will compare to the remanded rule. However, EPA anticipates that NOx emissions reductions close to those originally projected will occur.

To develop a Bay watershed model scenario using one of the CMAQ model air scenarios below, a monthly factor is determined by the CMAQ model by comparing the CMAQ model's atmospheric deposition loads in the scenario year to the CMAQ 2002 base year. The CMAQ scenario factor is then used to adjust the base atmospheric deposition conditions in the Phase 5.3 Bay Watershed Model over the 1991 to 2000 scenario years.

## CMAQ 2010 Scenario

The 2010 Scenario represents emission reductions from regulations implemented through the Clean Air Act authority to meet National Ambient Air Quality standards for criteria pollutants in 2010. This includes National, Regional and available State Implementation Plans (SIPs) for NOx reductions. Other components of the 2010 Scenario include Tier 1 vehicle emission standards reaching high penetration in the vehicle fleet for on-road light duty mobile sources along with Tier 2 vehicle emission standards that were fully phased in by the 2006 model year and will begin to show an impact in 2010. For EGUs the 2010 controls assume that the NOx SIP call, NOx Budget Trading Program, and the CAIR program that regulates the ozone season NOx are all in place and that the CAIR program is designed for annual NOx reductions to match the ozone season reductions under the 2010 CAIR first phase conditions.

## CMAQ 2020 Scenario

The 2020 Scenario has all components of the 2010 Scenario and includes the Clean Air Mercury Rule (CAMR), the Best Available Retrofit Technology (BART) used for reducing regional haze and the off-road diesel and heavy-duty diesel regulations. The 2020 scenario represents emission reductions from regulations implemented through the Clean Air Act authority to meet National Ambient Air Quality standards for criteria pollutants in 2020. Those include:

- On-Road mobile sources: For on-road light duty mobile sources, this includes Tier 2 vehicle emissions standards and the Gasoline Sulfur Program that affects SUVs pickups, and vans, which are now subject to same national emission standards as cars.

- On-Road Heavy Duty Diesel Rule – Tier 4: New emission standards on diesel engines starting with the 2010 model year for NOx, plus some diesel engine retrofits.

- Clean Air Non-Road Diesel Rule: Off-road diesel engine vehicle rule, commercial marine diesels, and locomotive diesels (phased in by 2014) require controls on new engines. Off-road large spark ignition engine rules affect recreational vehicles (marine and land-based).

- EGUs: CAIR second phase in place (in coordination with earlier NOx SIP call); Regional Haze Rule and guidelines for BART for reducing regional haze; CAMR all in place.

- Non-EGUs: Solid Waste Rules (Hospital/Medical Waste Incinerator Regulations).

## CMAQ 2020 Maximum Feasible Scenario

The 2020 Maximum Feasible scenario includes additional aggressive EGU, industry, and mobile source controls. Emissions projections were developed that represented incremental improvements and control options (beyond 2020 CAIR) that might be available to states to meet a more stringent ozone standard. The more stringent standard is due to a reconsideration of the national ambient air quality standards for ozone that were promulgated in 2008 along with a review of the secondary national ambient air quality standards for oxides of nitrogen and sulfur. The new ozone standard was proposed in 2010 of between 0.070 ppm and 0.060 ppm. EPA now expects that the ozone standards will be final by the end of July 2011. The 2020 Maximum Feasible Scenario was designed to meet a 0.070 ppm ozone standard, which is less than the 0.075 ppm ozone standard in place since 2008.

Incremental control measures for five sectors were developed:

- EGUs: lower ozone season nested emission caps in OTC states; targeting use of maximum controls for coal fired power plants in or near non-attainment areas.

- Non-EGU point sources: new supplemental controls, such as low NOx burners, plus increased control measure efficiencies on planned controls and step up of controls to maximum efficiency measures, e.g., replacing SNCRs (Selective Non-Catalytic Reduction) with SCRs (Selective Catalytic Reduction) control technology.

- Area (nonpoint area) sources: switching to natural gas and low sulfur fuel.

- On-Road mobile sources: increased penetration of diesel retrofits and continuous. Inspection and maintenance using remote onboard diagnostic systems.

- Non-Road mobile sources: increased penetration of diesel retrofits and engine rebuilds.

- Reduced NOx emissions from marine vessels in coastal shipping lanes.

The 2020 Maximum Feasible Scenario also includes a reduction of ammonia deposition of 15 percent from estimated ammonia emission programs in the Bay watershed jurisdictions. Estimates of up to about 30 percent ammonia emission reductions from manures can be achieved through rapid incorporation of manures in to soils at the time of application, biofilters on poultry houses, and other management practices (Mark Dubin 2009, personal communication). From a state and sector analysis of NOx emissions and deposition, an estimated 50 percent of emissions from Bay states becomes deposition to the Chesapeake Bay watershed, along with a further 50 percent of the ammonia deposition load coming from outside the Bay watershed. Assuming that only 50 percent of the emissions are from watershed sources, a 30 percent reduction of emissions results in an estimated 15 percent decrease in wet and dry ammonia deposition for the Maximum

Feasible Scenario from ammonia emission control management practices in the Bay watershed jurisdictions.

## CMAQ 2030 Scenario

The 2030 scenario is in some areas a further decrease in emissions beyond the 2020 Maximum Feasible Scenario due to continuing fleet replacement of heavy diesels, off road diesels, and mobile sources of all types. These emission decreases are offset by continued growth in the Chesapeake Bay region. The emissions projections assume continued stringent controls are in place, such as:

- Tier 2 vehicle emissions standards fully penetrated in the fleet.
- Heavy Duty Diesel vehicle fleet fully replaced with newer heavy-duty vehicle that comply with new standards.
- On-Road mobile sources: Increased penetration of diesel retrofits maintained.
- Non-Road mobile sources capped at 2020 Maximum Feasible Scenario levels.
- EGUs and Non-EGUs emissions capped at 2020 Maximum Feasible Scenario levels.
- Area sources emissions capped at 2020 Maximum Feasible Scenario levels, assuming energy efficiency and control efficiencies keep up with growth.
- Marine Vessels: Further reductions in NOx emissions from marine vessels in coastal shipping lanes.

## Atmospheric Deposition Loads to the Watershed and Tidal Bay

Nitrogen loads atmospherically deposited to the Chesapeake Bay watershed by jurisdiction and by nitrogen species of wet and dry deposition for key scenarios are tabulated in Table L-3. Table L-4 lists the loads delivered to the Bay from the key scenarios, in millions of pounds, using the Phase 5.2-August 2009 version of the Chesapeake Bay Watershed Model.

All the scenarios in Table L-4 use the 2002 scenario as a base year. The point sources, human and animal populations, septic system loads and so on, are the same 2002 levels in all these scenarios. Only the atmospheric deposition changes. The 1985 CMAQ scenario uses the trend of atmospheric deposition described in Figure L-2, and the same trend was used for the 2002 atmospheric deposition in the 2002 scenario. The scenarios of 2010, 2020, 2020 Maximum Feasible, and 2030 used estimated atmospheric deposition loads from the CMAQ model.

## Atmospheric Deposition of Nitrogen to the Tidal Chesapeake Bay

The regression and CMAQ models provide estimates of direct atmospheric deposition to the Bay's tidal surface waters. Table L-5 lists the estimates of direct atmospheric deposition to the Bay's tidal surfaces for seven key scenarios.

Two key factors in the relative increase in the estimated reduced nitrogen deposition over time are the downward pressure on oxidized nitrogen emissions and the lack of controls on ammonia emissions. It is notable that changes in atmospheric chemistry of $SO_X$ and $NO_X$ in the seven key

**Table L-3. Atmospheric deposition loads of nitrogen (millions of pounds as nitrogen) to the Chesapeake watershed for key scenarios by jurisdiction**

| | STATE | | | | | | | Chesapeake |
|---|---|---|---|---|---|---|---|---|
| Total Nitrogen | DE | DC | MD | NY | PA | WV | VA | Watershed |
| *1985 Scenario* | 7.8 | 0.8 | 97.4 | 53.7 | 221.7 | 30.6 | 179.8 | 591.8 |
| *1985-2000 Calibration* | 7.1 | 0.7 | 84.0 | 46.0 | 192.2 | 26.2 | 159.3 | 515.4 |
| *2002 Scenario* | 6.5 | 0.6 | 73.0 | 39.5 | 167.3 | 22.5 | 142.3 | 451.6 |
| *2010 Scenario* | 6.3 | 0.5 | 59.6 | 30.6 | 133.3 | 17.2 | 112.8 | 360.2 |
| *2020 Scenario* | 6.6 | 0.4 | 54.6 | 26.2 | 117.6 | 15.3 | 99.9 | 320.6 |
| *2020 Maximum Feasible* | 6.5 | 0.4 | 51.9 | 24.8 | 111.2 | 14.5 | 95.0 | 304.3 |
| *2030 Scenario* | 7.4 | 0.4 | 56.9 | 26.1 | 121.4 | 15.4 | 100.0 | 327.6 |
| **Dry NOx Deposition** | | | | | | | | |
| *1985 Scenario* | 3.1 | 0.5 | 51.0 | 23.1 | 102.1 | 15.7 | 97.5 | 293.0 |
| *1985-2000 Calibration* | 2.6 | 0.4 | 42.2 | 19.2 | 84.9 | 13.1 | 83.2 | 245.4 |
| *2002 Scenario* | 2.2 | 0.3 | 35.2 | 16.2 | 71.3 | 10.9 | 71.8 | 207.8 |
| *2010 Scenario* | 1.6 | 0.2 | 23.1 | 10.8 | 46.2 | 6.7 | 46.7 | 135.4 |
| *2020 Scenario* | 1.3 | 0.1 | 16.6 | 7.9 | 32.5 | 4.8 | 33.3 | 96.5 |
| *2020 Maximum Feasible* | 1.1 | 0.1 | 14.3 | 6.9 | 28.2 | 4.2 | 29.6 | 84.5 |
| *2030 Scenario* | 1.0 | 0.1 | 13.7 | 6.7 | 27.0 | 4.1 | 28.9 | 81.6 |
| **Dry NH$_3$ Deposition** | | | | | | | | |
| *1985 Scenario* | 2.1 | 0.1 | 12.2 | 5.0 | 25.3 | 2.9 | 18.2 | 65.8 |
| *1985-2000 Calibration* | 2.2 | 0.1 | 12.1 | 4.7 | 25.3 | 2.8 | 18.5 | 65.7 |
| *2002 Scenario* | 2.3 | 0.1 | 12.1 | 4.5 | 25.4 | 2.8 | 18.7 | 65.7 |
| *2010 Scenario* | 3.0 | 0.1 | 15.8 | 5.3 | 32.0 | 3.7 | 24.8 | 84.7 |
| *2020 Scenario* | 3.7 | 0.1 | 18.7 | 5.6 | 36.5 | 4.4 | 29.2 | 98.3 |
| *2020 Maximum Feasible* | 3.9 | 0.1 | 19.4 | 5.8 | 37.2 | 4.5 | 29.8 | 100.7 |
| *2030 Scenario* | 4.8 | 0.1 | 23.9 | 6.6 | 45.5 | 5.2 | 34.0 | 120.3 |
| **Wet NOx Deposition** | | | | | | | | |
| *1985 Scenario* | 1.6 | 0.1 | 22.2 | 17.0 | 63.4 | 8.1 | 42.0 | 154.4 |
| *1985-2000 Calibration* | 1.3 | 0.1 | 17.9 | 13.9 | 51.7 | 6.6 | 35.4 | 126.9 |
| *2002 Scenario* | 1.1 | 0.1 | 14.1 | 11.0 | 40.9 | 5.2 | 29.4 | 101.8 |
| *2010 Scenario* | 0.7 | 0.1 | 9.4 | 7.3 | 26.7 | 3.4 | 19.6 | 67.2 |
| *2020 Scenario* | 0.6 | 0.0 | 7.2 | 5.3 | 19.3 | 2.5 | 14.7 | 49.6 |
| *2020 Maximum Feasible* | 0.5 | 0.0 | 6.4 | 4.7 | 16.9 | 2.2 | 13.3 | 44.1 |
| *2030 Scenario* | 0.5 | 0.0 | 6.2 | 4.6 | 16.7 | 2.2 | 13.0 | 43.3 |
| **Wet NH$_3$ Deposition** | | | | | | | | |
| *1985 Scenario* | 0.9 | 0.1 | 12.0 | 8.7 | 30.9 | 3.9 | 22.0 | 78.6 |
| *1985-2000 Calibration* | 1.0 | 0.1 | 11.8 | 8.2 | 30.3 | 3.7 | 22.3 | 77.4 |
| *2002 Scenario* | 1.0 | 0.1 | 11.7 | 7.8 | 29.7 | 3.6 | 22.5 | 76.4 |
| *2010 Scenario* | 1.0 | 0.1 | 11.3 | 7.3 | 28.3 | 3.5 | 21.7 | 73.0 |
| *2020 Scenario* | 1.0 | 0.1 | 12.0 | 7.4 | 29.2 | 3.6 | 22.7 | 76.1 |
| *2020 Maximum Feasible* | 1.0 | 0.1 | 11.8 | 7.4 | 28.9 | 3.6 | 22.4 | 75.1 |
| *2030 Scenario* | 1.1 | 0.1 | 13.0 | 8.1 | 32.2 | 3.9 | 24.1 | 82.4 |

Source: Phase 5.2-August 2009 Version of the Chesapeake Bay Watershed Model
Note: This table does not include the 15 percent decrease in wet and dry ammonia deposition for the Maximum Feasible scenario due to ammonia emission.

scenarios also affect ammonia dry deposition. In the scenarios with decreased SO$_X$ and NO$_X$ emissions, the dry deposition of ammonia increases, even though the total nitrogen deposition is decreasing. The interplay of how decreased SO$_X$ and NO$_X$ emissions affect an increase of NH$_3$ dry deposition is seen in Figure L-9.

**Table L-4. Total nitrogen delivered to the Bay (millions pounds per year) from the nine major river basins under different key CMAQ atmospheric deposition scenarios.**

| Basins | CMAQ Atmo. Deposition 1985 Scenario | CMAQ Atmo. Deposition 2002 Scenario | CMAQ Atmo. Deposition 2010 Scenario | CMAQ Atmo. Deposition 2020 Scenario | CMAQ Atmo. Deposition 2020 Maximum Feasible Scenario | CMAQ Atmo. Deposition 2030 Scenario |
|---|---|---|---|---|---|---|
| Susquehanna | 160.4 | 148.1 | 141.4 | 138.7 | 137.6 | 139.3 |
| West Shore | 15.7 | 15.3 | 15.07 | 15.0 | 14.9 | 15.0 |
| Potomac | 77.0 | 72.2 | 69.4 | 68.3 | 67.9 | 68.6 |
| Patuxent | 4.8 | 4.5 | 4.4 | 4.3 | 4.3 | 4.3 |
| Rappahannock | 11.0 | 9.8 | 10.0 | 9.8 | 9.8 | 9.8 |
| James | 37.9 | 36.7 | 35.6 | 35.2 | 35. | 35.1 |
| York | 9.3 | 8.9 | 8.6 | 8.4 | 8.4 | 8.4 |
| East Shore MD-DE | 31.6 | 29.8 | 29.2 | 29.2 | 29.1 | 29.7 |
| East Shore VA | 3.0 | 2.9 | 2.8 | 2.8 | 2.8 | 2.8 |
| Total | 350.7 | 328.1 | 316.5 | 311.7 | 309.7 | 313.0 |

Note: All the scenarios were applied to a 2002 Base condition of land use, BMPs, and point source discharges in order to show the relative effect of changing atmospheric deposition.

**Table L-5. Direct atmospheric deposition loads of nitrogen (millions of pounds as nitrogen) to Chesapeake Bay's tidal surface waters for seven key scenarios**

| Scenario | Wet NOx Deposition | Dry NOx Deposition | Wet NH3 Deposition | Dry NH3 Deposition | Total Inorganic Nitrogen Deposition | Wet Organic Nitrogen Deposition | Total Nitrogen Deposition | Wet PO4 Deposition | Wet Organic Phosphorus Deposition | Total Phosphorus Deposition |
|---|---|---|---|---|---|---|---|---|---|---|
| 1985 Scenario | 6.57 | 13.15 | 3.34 | 1.97 | 25.03 | 1.05 | 26.08 | 0.33 | 0.98 | 1.31 |
| 2002 Scenario | 4.81 | 10.04 | 3.57 | 2.12 | 20.54 | 1.05 | 21.59 | 0.33 | 0.98 | 1.31 |
| 2010 Scenario | 3.27 | 6.85 | 3.49 | 2.76 | 16.37 | 1.05 | 17.42 | 0.33 | 0.98 | 1.31 |
| 2020 Scenario | 2.56 | 5.11 | 3.72 | 3.24 | 14.63 | 1.05 | 15.68 | 0.33 | 0.98 | 1.31 |
| 2020 Maximum Feasible Scenario | 2.30 | 4.48 | 3.64 | 3.41 | 13.83 | 1.05 | 14.88 | 0.33 | 0.98 | 1.31 |
| 2020 Max Feas w/ 15% NH4 Drop | 2.30 | 4.48 | 3.09 | 2.90 | 12.77 | 1.05 | 13.82 | 0.33 | 0.98 | 1.31 |
| 2030 Scenario | 2.22 | 4.30 | 3.96 | 4.08 | 14.56 | 1.05 | 15.61 | 0.33 | 0.98 | 1.31 |

Note: This table includes two entries for the Maximum Feasible Scenario. The 2020 Max Fes w/15% NH4 Drop scenario includes the 15% decrease in wet and dry ammonia deposition for the Maximum Feasible Scenario due to ammonia emission control management practices in the Bay watershed jurisdictions described in CMAQ 2020 Maximum Feasible Scenario; the 2020 Maximum Feasible Scenario does not.



**Figure L-9. Decreased SO$_X$ and NO$_X$ emissions cause increased NH$_3$ dry deposition.**

How the percentage of ammonia, or reduced atmospheric deposition, to total nitrogen deposition is changing can be seen in Table L-5. For the 1985 Scenario, the percent ammonia deposition compared to the total DIN deposition was estimated to be 21 percent. For the 2010 and 2030 scenarios, the percentage of ammonia deposition to the tidal Chesapeake was estimated to increase to 38 percent for the 2010 scenario and 55 percent for the 2030 scenario. The respective estimated ammonia deposition on the watershed for these same three scenarios—1985, 2010, and 2030—are 24 percent, 44 percent, and 64 percent.

## Atmospheric Deposition of Nitrogen to the Coastal Ocean

The CMAQ Model allows us to estimate atmospheric deposition loads to the coastal ocean at the mouth of the Chesapeake Bay, which contributes to the coastal ocean nutrient budgets made by others (Fennel et al. 2006; Howarth et al. 1995; Howarth 1998). The estimated distribution of 2001 atmospheric deposition loads to North America and adjacent coastal ocean is shown in Figure L-10. Howarth (1998) reported that atmospheric deposition loads are roughly equivalent to watershed loads in the northeast United States (Maine to Virginia). Howarth (1998) estimated that the watershed inputs of nitrogen to the northeast coastal waters to be 0.27 teragram. Inputs from direct atmospheric deposition to coastal waters are 0.21 teragram, and inputs from deep ocean upwelling are 1.54 teragrams, for a total input to the coastal ocean of 2.02 teragrams (Howarth 1998).



**Figure L-10. Estimated 2001 annual total deposition of nitrogen (kg-N/ha) to North America and adjacent coastal ocean based on outputs from the CMAQ Air Quality Model, 36 km x 36 km grid.**

That has implications for the fixed-ocean boundary condition used in the Chesapeake Bay Water Quality Sediment Transport Model. Atmospheric deposition total nitrogen loads to the coastal ocean are estimated to be about 6.63 kg/ha in the Base Case 2002 scenario (Table L-6). That correlates to 43.8 million kilograms of total nitrogen deposition to a region of the ocean that can exchange waters with the Chesapeake (Table L-6). In the case of the 2020 Maximum Feasible scenario, the nitrogen atmospheric deposition to the same region is estimated to be 29.4 million pounds, a reduction of 32 percent. If that same reduction is extrapolated to the coastal ocean, the direct atmospheric inputs to the coastal ocean would decrease to 0.14 teragram. Assuming the watershed loads discharged to the ocean and the deep upwelling pelagic loads are constant, that would give a combined watershed, direct deposition, and uncontrollable deep upwelling load of 1.95 teragrams, a decrease of 3 percent relative to the estimated current ocean boundary condition. Table L-6 lists the estimated reductions of the ocean boundary for the five key CMAQ scenarios.

**Table L-6. Atmospheric deposition loads of nitrogen (kg per hectare) to the coastal water area shown in Figure L-11 for key scenarios**

| Scenario | Dry deposition | Wet deposition | Total deposition |
|---|---|---|---|
| Base 2002 Scenario | 3.32 | 3.31 | 6.63 |
| 2010 Scenario | 2.59 | 2.68 | 5.27 |
| 2020 Scenario | 2.26 | 2.49 | 4.75 |
| 2020 Maximum Feasible | 2.10 | 2.35 | 4.45 |
| 2030 Scenario | 2.13 | 2.40 | 4.53 |

To determine CMAQ estimates of atmospheric deposition to the coastal ocean region affecting nitrogen loads through the ocean boundary EPA assigned boundaries as shown in Figure L-11 that correspond to the proximate region of the coastal ocean exchanging waters with the Chesapeake Bay. The boundary is adjacent to the shore, and is inside, or west, of the Gulf Stream. To account for the prevailing north to south current along the coast, the coastal ocean boundary includes more of the coastal waters north of the Chesapeake Bay mouth.

Estimated atmospheric deposition loads to the coastal waters are listed in Table L- 7 for key scenarios. The loads to the coastal ocean in kilograms per hectare for the CMAQ Base 2002 scenario are shown in Figure L-12. Table L-8 lists the relative reduction of atmospheric deposition of nitrogen in coastal waters versus the Base Calibration scenario.



**Figure L-11. Boundaries of the coastal ocean region used to adjust the ocean boundary conditions in the Chesapeake Bay WQSTM.**

**Table L-7. Total atmospheric deposition loads of nitrogen (millions of kg) to coastal waters for key scenarios**

| Scenario | Dry deposition | Wet deposition | Total deposition |
|---|---|---|---|
| Base 2002 Scenario | 21.90 | 21.89 | 43.80 |
| 2010 Scenario | 17.12 | 17.71 | 34.82 |
| 2020 Scenario | 14.94 | 16.45 | 31.39 |
| 2020 Maximum Feasible | 13.87 | 15.50 | 29.37 |
| 2030 Scenario | 14.06 | 15.88 | 29.95 |



**Figure L-12. Nitrogen atmospheric deposition loads (kg/ha) to the coastal ocean region for the Base 2002 scenario.**

**Table L-8. Adjustment of the ocean boundary load for all nitrogen species for key CMAQ Model scenarios' deposition to coastal waters adjacent to the Chesapeake Bay mouth**

| Scenario | % Reduction of ocean boundary |
|---|---|
| Base 2002 Scenario | 0% |
| 2010 Scenario | 2.1% |
| 2020 Scenario | 2.9% |
| 2020 Maximum Feasible | 3.5% |
| 2030 Scenario | 3.3% |

### *Adjustment of Ocean Boundary Concentrations in the WQSTM from Reductions in Atmospheric Deposition to Coastal Waters and Internal Bay Load Changes*

Ocean boundary concentrations of the Bay Water Quality and Sediment Transport Model state-variables are set based on monthly observations at the Bay mouth water quality monitoring stations. The exchange of materials at the Bay mouth/ocean boundary follows the two layer flows of the estuary. Net outflow occurs predominantly at the upper and southern boundaries with the ebb tides, while net inflow occurs predominantly at the lower and northern boundaries. The ocean boundary values govern the inflowing flux of ocean nutrients and sediment to the Bay. Specifically, adjustments are made to the ocean boundary conditions to adjust for changes in loads in the Chesapeake and for changes in atmospheric deposition.

### *Adjustment of Nutrient Boundary Conditions Due to Load Reductions in the Chesapeake*

Previous versions of the Bay Water Quality Model (8k grid version) found that a 90 percent reduction in nitrogen load from the watershed produced a 10 percent reduction in inflowing nitrogen concentration at the Bay mouth. Likewise, a 90 percent phosphorus load reduction produced a 5 percent reduction in inflowing phosphorus.

Accordingly, for each load reduction scenario, the percent reduction (or increase) of total nitrogen and total phosphorus loads in the entire Bay versus the Base Calibration scenario is calculated

TN reduction = 100 × (TN Base Calibration scenario – TN scenario) / TN Base Calibration scenario

TP reduction = 100 × (TP Base Calibration scenario – TP scenario) / TP Base Calibration scenario

EPA further calculates the following factors:

TN Factor = 1 – 0.1 × TN reduction/90

TP Factor = 1 – 0.05 × TP reduction/90

EPA then uses the TN factor and TP factor to multiply the Base Calibration ocean boundary concentrations of all the nitrogen and phosphorus nutrient species in each boundary cell, with the only exception of the cells in the southern boundary, because the southern Bay cells have predominantly outflows. No adjustments are made to ocean boundary sediment because it responds do different dynamics, and the source of the ocean input is primarily from courser particles entrained in the southbound long-shore current.

### *Adjustment of Nutrient Boundary Conditions from Atmospheric Deposition Load Reductions in the Coastal Shelf*

If a load reduction scenario involves reducing nitrogen load from the atmosphere, a further adjustment in the boundary conditions is done. A reduction of nitrogen atmospheric deposition on the coastal ocean adjacent to the Chesapeake Bay causes reductions of nitrogen concentrations in the shelf waters and thereby, reduction to inputs of nitrogen to the Bay.

For example, with the 2020 Clean-Air scenario, the reduction of atmospheric deposition of nitrogen versus the Base Calibration scenario in the shelf waters is 0.029 (Table L-8). In that case, the ocean boundary TN factor is further reduced by the third term on the right-hand side of the following equation:

$$TN \text{ Factor} = 1 - 0.1 \times TN \text{ reduction}/90 - 0.029 \times 26/32$$

In the above formula, the 0.029 is multiplied with a ratio of 26 to 32. That is based on the average salinity at the boundary to be 26 ppt, and the average salinity of shelf waters to be 32 ppt. The ratio of 26 to 32 represents the ratio of the incoming ocean water over the sum of the incoming water and the freshwater going out the boundary (i.e., the mixing water at the boundary).

## Allocation of Atmospheric Deposition of Nitrogen to Tidal Waters

In determining the allowable loading from air deposition, EPA separated the nitrogen deposition into two discreet parcels: (1) deposition occurring on the land and non-tidal waters which is subsequently transported to the Bay, also called indirect deposition; and (2) atmospheric deposition occurring directly onto the Bay's tidal surface waters also called direct deposition (Figure L-13).

The deposition on the land becomes part of the allocated load to the jurisdictions because the air deposition on the land becomes mixed with the nitrogen loadings from the land based sources and, therefore, becomes indistinguishable from land based sources. Furthermore, once the nitrogen is deposited on the land, it would be managed and controlled along with other sources of nitrogen that are present on that parcel of land. That is also called the referenced allocation as Clean Air Act mandates nationwide reductions, as estimated in the CMAQ 2020 scenario, are required to reduce the air deposition to the watershed and are assumed to be in place as the Bay watershed jurisdictions finalize and implement their Watershed Implementation Plans to reduce nitrogen loads further with land-based Best Management Practices (BMPs). In contrast, the nitrogen deposition directly to the Bay's tidal surface waters is a direct loading with no land-based management controls and, therefore, needs to be linked directly back to the air sources and air controls as EPA's allocation of atmospheric nitrogen deposition.



**Figure L-13. EPA's reference allocation of nitrogen atmospheric deposition to the Bay watershed and the allocation of nitrogen atmospheric deposition direct to Bay's tidal surface waters.**

EPA included an explicit basinwide nitrogen allocation, which was determined to be 15.7 million pounds of atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters. Activities associated with implementation of federal Clean Air Act regulations by EPA and the jurisdictions through 2020 will ensure achievement of this allocation. This nitrogen atmospheric deposition allocation is already accounted for within the jurisdiction and major river basin nitrogen allocations. Any additional nitrogen reductions realized through more stringent air pollution controls at the jurisdictional level, beyond federal requirements to meet air quality standards, may be credited to the individual jurisdictions through future revisions to the jurisdictions' Watershed Implementation Plans, 2-year milestones, and the Chesapeake Bay TMDL tracking and accounting framework.

In determining the amount of air controls to be used as a basis for the air allocation, EPA relied on current laws and regulations under the Clean Air Act. These requirements, together with national air modeling analysis, provided the resulting allocated load to air from direct deposition to the tidal waters of the Bay and its tidal tributaries.

The air allocation scenario represents emission reductions due to regulations implemented through the Clean Air Act authority to meet National Ambient Air Quality Standards for criteria pollutants in 2020. The air allocation scenario includes:

- The CAMR.

- The BART used for reducing regional haze, and the off-road diesel and heavy duty diesel regulations.

- On-Road mobile sources: For On-Road Light Duty Mobile Sources this includes Tier 2 vehicle emissions standards and the Gasoline Sulfur Program, which affects SUVs pickups, and vans, which are now subject to same national emission standards as cars.

- On-Road Heavy Duty Diesel Rule – Tier 4: New emission standards on diesel engines starting with the 2010 model year for NOx, plus some diesel engine retrofits.

- Clean Air Non-Road Diesel Rule: Off-road diesel engine vehicle rule, commercial marine diesels, and locomotive diesels (phased in by 2014) require controls on new engines.

- EGUs: CAIR second phase in place (in coordination with earlier NOx SIP call).

- Non-EGUs: Solid Waste Rules (Hospital and Medical Waste Incinerator Regulations).

The controls described above were modeled using the national air models (CMAQ) and the amount of deposition direct to the Chesapeake Bay's tidal surface waters was determined. On the basis of the air allocation scenario as described above, the nitrogen deposition direct to tidal surface waters is 15.7 million pounds per year. Therefore, the air allocation for the Chesapeake Bay TMDL is 15.7 million pounds per year of nitrogen.

EPA anticipates that the loading cap of 15.7 million pounds of atmospheric deposition loads direct to Chesapeake Bay and tidal tributary surface waters will be achieved through implementation of federal Clean Air Act regulations by EPA and the states through 2020. Projected reductions in atmospheric deposition loads to the surrounding watershed over this same period are already accounted for within the individual jurisdiction and major river basin nitrogen load allocations. Any additional nitrogen reductions realized through more stringent air pollution controls at the jurisdiction level, beyond minimum federal requirements, as for example in ammonia deposition reductions, may be credited to the individual jurisdictions through future revisions to the jurisdictions' Watershed Implementation Plans, 2-year milestones and the Bay TMDL tracking and accounting framework.

## Crediting the States with Additional Air Controls

As mentioned above, it is possible, that individual or statewide air emission reductions, beyond those used to derive the air deposition allocation may be achieved by a state. In this case, for the purpose of evaluating the 2-year milestone progress, the state can be credited with the reductions that would result for its portion of the Chesapeake Bay watershed. EPA will use the following

steps to determine, with the state, the amount of nitrogen credit to apply to air emission controls that go beyond the air allocation scenario described above.

**1) Determine whether the emission source for which the state is seeking credit already assessed credit for reductions in the State's State Implementation Plan (SIP) for achieving the State's air quality standards)**

All of the Chesapeake Bay Watershed states are in nonattainment of current air quality standards. When new air quality standards for ozone are complete in July 2011, the gap between current air quality conditions and air quality standard achievement is expected to grow. Since the Chesapeake Bay Program tracks the SIP management actions in an ongoing series of scenarios designed to track expanded SIP implementation in the watershed and credit these additional air reductions in the two-year milestones, the inclusion of air emissions reductions that are already captured in the SIP will double count the reduction. Examples of air reductions that are not in the SIPs are reductions in any ammonia emissions and reductions in NOx emissions that are not needed for air quality standard achievement.

**2) Determine whether the emission reduction is a state-wide emission or point source**

Currently only a state-wide source emission reduction can be applied in the Phase I Watershed Implementation Plans. As modeling capacity to handle air to water trading develops, the capability to handle the specificity of latitude and longitude of point source emissions that are being reduced will be applied in the Chesapeake models.

**3) Determine if the emission controls will impact NOx and/or $NH_3$ emission**

There are situations in some air management actions where, for example, a NOx point source emission is reduced, which in turn reduces the ammonia slip emissions (ammonia slip occurs with NOx control technologies). States might be provided additional credit if both are reduced.

**4) Determine the annual average emission reduction**

Estimates are needed of the emission reduction on an annual average basis, and whether the emission reduction occurs year round or is seasonal. Estimates of current emissions, which serve as a baseline for the reduction, are also needed.

It should be noted that the reduction in nitrogen loads to the Bay can be orders of magnitude less than the actual reduction in air emissions. Operationally, the emission reductions could be discounted by the following:

1. Discounting the mass of $NO_2$ measured in air programs to the "as N" units used in water programs and in the WIP

2. Discounting for what is deposited within the State from the emissions reduced based on a CMAQ State and sector analysis (also, the reduced deposition in other States will be calculated if operationally possible)

3. Discounting for estimated attenuation from the land

4. Discounting for estimated attenuation in the rivers.

# References

Dennis, R., R. Haeuber, T. Blett, J. Cosby, C. Driscoll, J. Sickles, and J. Johnson. 2007. Sulfur and nitrogen deposition on ecosystems in the United States. *Journal of the Air and Waste Management Association.* December 2007.

Fennel, Katja; Wilkin, John; Levin, Julia; Moisan, John; O'Reilly, John; Haidvogel, Dale, 2006. Nitrogen cycling in the Middle Atlantic Bight: Results from a three dimensional model for the North Atlantic nitrogen budget *Global Biogeochemical Cycles* Vol. 20  GB3007, 14 PP., 2006 doi:10.1029/2005GB002456.

Grimm, J.W., and J.A. Lynch. 2000. *Enhanced wet deposition estimates for the Chesapeake Bay watershed using modeled precipitation inputs*. DNR Chesapeake Bay and Tidewater Programs CBWP-MANTA-AD-99-2.

Grimm, J.W., and J.A. Lynch. 2005. Improved daily precipitation nitrate and ammonium concentration models for the Chesapeake Bay Watershed. *Environmental Pollution* 135(2005):445–455.

Hameedi, J., H. Paerl, M. Kennish, and D. Whitall. 2007. Nitrogen deposition in U.S. coastal bays and estuaries. *Journal of the Air and Waste Management Association.* December 2007.

Howarth, R.W. 1998. An assessment of human influences on fluxes of nitrogen from the terrestrial landscape to the estuaries and continental shelves of the North Atlantic Ocean: *Nutrient Cycling in Agroecosystems* 52:213–223.

Howarth, R.W., G. Billen, D. Swaney, A. Townsend, N. Jaworski, K. Lajtha, J.A. Downing, E.R. Elmgren, N. Caraco, T. Jordan, F. Berendse, J. Freney, V. Kudeyarov, P. Murdoch, Zhao-liang, HZhu. 1995. Regional nitrogen budgets and riverine N & P fluxes for the drainages to the North Atlantic Ocean: Natural and human influences. *Biogeochemistry* 35(1):75–139.

Keene W.C.1; Montag J.A.; Maben J.R.; Southwell M.; Leonard J.; Church T.M.; Moody J.L.; Galloway J.N., 2002.  Organic nitrogen in precipitation over Eastern North America. *Atmospheric Environment* 36:28, September 2002, pp. 4529-4540.

Knap, A., T. Jickells, et al. 1986. "Significance of atmospheric-derived fixed nitrogen on productivity of the Sargasso Sea." *Nature* 320(March 13): 158-160.

Linker, L.C., G.W. Shenk, R.L. Dennis, and J.S. Sweeney. 2000. Cross-Media Models of the Chesapeake Bay Watershed and Airshed: *Water Quality and Ecosystem Modeling* 1(1-4):91–122.

Lynch, J.A., and J.W. Grimm. 2003. *Improved Daily Nitrate and Ammonium Concentration Models for the Chesapeake Bay Watershed*. U.S. Environmental Protection Agency, Chesapeake Bay Program Office, Annapolis, MD.

Mopper, Kenneth; Zita, Rob G. 1987. Free amino acids in marine rains: Evidence for oxidation and potential role in nitrogen cycling. *Nature* 325(15)**:**246-249.

STAC (Scientific and Technical Advisory Committee). 2007. Workshop on Atmospheric Deposition of Nitrogen: Estimating Local Emission Sources, Near-field Deposition, and Fate on the Landscape. May 30, 2007 SUNY Binghamton, Binghamton, New York.

Scudlark, J. R. and T. M. Church. 1993. Atmospheric input of inorganic nitrogen to Delaware Bay. *Estuaries* 16(4):747-754.

Scudlark, J.R., K.M. Russel, et al. 1996. *Dissolved Organic Nitrogen in Precipitation: Collection, Analysis, and Atmospheric Flux.* Prepared for Maryland Department of Natural Resources, Annapolis, MD.

Smullen, J.T., J.L. Taft, and J. Macknis. 1982. *Nutrient and sediment loads to the tidal Chesapeake Bay System.* In *U.S. EPA Chesapeake Bay Program Technical Studies: A Synthesis.* Chesapeake Bay Program Office, Annapolis, MD.

### Appendix Q. Detailed Annual Chesapeake Bay TMDL WLAs and LAs

Appendix Q is an allocation spreadsheet (Appendix Q_Annual TMDLs_final.xls) that contains components of the Chesapeake Bay TMDLs that were developed for total nitrogen (TN), total phosphorus (TP), and total suspended solids (TSS) (sediment). Detailed source allocations of successful TMDL scenarios are provided as wasteload allocations (WLAs) for individual and aggregate point sources and load allocations (LAs) for specific nonpoint source sectors. The TMDL components and supporting information are presented in tabular format in separate pages of the allocation spreadsheet. Each page is formatted so that the user may select from one of the pull-down menus in the table header to view specific details regarding a particular stream or pollutant source. Appendix Q is comprised of the following tables:

- Introduction – The Introduction provides a description of each of the tables included in the allocation spreadsheet.
- Watershed Map and Major Basins – This table presents a listing of the 92 impaired segments with the corresponding Jurisdiction, CB Segment Name, and Major Basin. Additionally, two figures are provided showing the location of the 92 impaired segments and also the location of the major river basins in the Chesapeake Bay watershed.
- Annual TMDLs_92 Segments – This table contains the components of the TMDL equation for the 92 impaired segments for TN, TP, and TSS, in average annual terms. Nitrogen and phosphorus have an implicit margin of safety (MOS) while sediment has both an implicit and explicit MOS.
- Annual Individual WLAs – This table contains individual WLAs for the 478 significant point sources permitted to discharge throughout the Chesapeake Bay watershed as well as 10 MS4 point sources permitted to discharge in Virginia. Individual WLAs are presented as edge of stream (EOS) and delivered load for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS.
- Annual Aggregate WLAs – This table contains aggregate WLAs for specific permitted sectors that discharge throughout the Chesapeake Bay watershed. Aggregate WLAs are presented as delivered load for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS. Additionally, aggregate WLAs are presented as EOS load for wastewater aggregates for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS.
- Annual Land Based LAs – This table contains detailed Land Based LAs for specific nonpoint source sectors: agriculture, forest, nontidal atmospheric deposition, onsite septic, and urban. Land Based LAs are presented as delivered load for each of the 92 impaired segments by jurisdiction and by nonpoint source sector for TN, TP, and TSS.
- NPDES Permit Inventory – This table contains the NPDES permit inventory for all permits addressed in the Chesapeake Bay TMDL. Each permit is listed by jurisdiction, facility name, NPDES permit number, significant or nonsignificant, discharge type, SIC Code, SIC Description, Location by County, Receiving Water, Major Model River Basin, Bay Segment, Land River Segment, Number Land River Segment, WIP defined flow, latitude, and longitude.
- NPDES Permit Inventory Notes – This table provides notes containing additional information for certain permits listed in the NPDES Permit Inventory tab.

AR0000616

## Appendix R. Chesapeake Bay TMDL Daily WLAs and LAs

Appendix R is an allocation spreadsheet (Appendix R_Daily TMDLs_final.xls) that contains components of the Chesapeake Bay TMDLs that were developed for total nitrogen (TN), total phosphorus (TP), and total suspended solids (TSS) (sediment). Detailed source allocations of successful TMDL scenarios are provided as wasteload allocations (WLAs) for individual and aggregate point sources and load allocations (LAs) for specific nonpoint source sectors. The TMDL components and supporting information are presented in tabular format in separate pages of the allocation spreadsheet. Each page is formatted so that the user may select from one of the pull-down menus in the table header to view specific details regarding a particular stream or pollutant source. Appendix R is comprised of the following tables:

- Introduction – The Introduction provides a description of each of the tables included in the allocation spreadsheet.
- Watershed Map and Major Basins – This table presents a listing of the 92 impaired segments with the corresponding Jurisdiction, CB Segment Name, and Major Basin. Additionally, two figures are provided showing the location of the 92 impaired segments and also the location of the major river basins in the Chesapeake Bay watershed.
- Daily TMDLs_92 Segments – This table contains the components of the TMDL equation for the 92 impaired segments for TN, TP, and TSS, in daily loads. Nitrogen and phosphorus have an implicit margin of safety (MOS) while sediment has both an implicit and explicit MOS.
- Daily Individual WLAs – This table contains daily individual WLAs for the 478 significant point sources permitted to discharge throughout the Chesapeake Bay watershed as well as 10 MS4 point sources permitted to discharge in Virginia. Individual WLAs are presented as edge of stream (EOS) and delivered load for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS.
- Daily Aggregate WLAs – This table contains daily aggregate WLAs for specific permitted sectors that discharge throughout the Chesapeake Bay watershed. Aggregate WLAs are presented as delivered load for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS. Additionally, aggregate WLAs are presented as EOS load for wastewater aggregates for each of the 92 impaired segments by NPDES permit number for TN, TP, and TSS.
- Daily Land Based LAs – This table contains daily Land Based LAs for specific nonpoint source sectors: agriculture, forest, nontidal atmospheric deposition, onsite septic, and urban. Land Based LAs are presented as delivered load for each of the 92 impaired segments by jurisdiction and by nonpoint source sector for TN, TP, and TSS.
- NPDES Permit Inventory – This table contains the NPDES permit inventory for all permits addressed in the Chesapeake Bay TMDL. Each permit is listed by jurisdiction, facility name, NPDES permit number, significant or nonsignificant, discharge type, SIC Code, SIC Description, Location by County, Receiving Water, Major Model River Basin, Bay Segment, Land River Segment, Number Land River Segment, WIP defined flow, latitude, and longitude.
- NPDES Permit Inventory Notes – This table provides notes containing additional information for certain permits listed in the NPDES Permit Inventory tab.

AR0000618

**Response to Public Comments**

**Chesapeake Bay TMDL for Nitrogen, Phosphorus and Sediment**

**December 29, 2010**

**Docket #: EPA-R03-OW-2010-0736**

AR0000639

subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.") [FN31]

Federal law clearly gives Virginia the authority to develop its own requirements and programs, so long as they are not less stringent than those established under the Act.[FN32] Because EPA has no statutory authority to establish WIPs, it is impossible for Virginia's Draft WIP to be less stringent.

For these reasons, Virginia should have the discretion to establish its own WIP, without EPA passing judgment and usurping what is rightfully the state's role in this process.

[FN30] Section 303(d) of the Clean Water Act mandates that states must prepare TMDLs for impaired waters, and authorizes EPA to approve or disapprove the loadings. If EPA chooses to disapprove, it has the authority to develop loadings on its own accord ("If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such state and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.") 33 U.S.C. §1313. Section 303(e) specifically gives the State the authority and responsibility to develop a "continuing planning process" for addressing navigable waters. A part of this planning process is TMDLs (again, TMDL implementation plans are not mentioned). Nowhere in the text of Section 303(d) or (e) is EPA permitted to pass judgment on state implementation plans.

[FN31] 33 U.S.C. 1370.

[FN32] Virginia law (Chesapeake Bay and Virginia Waters Clean-Up and Oversight Act) includes a provision for the development of a Bay clean-up plan. Va. Code 62.1-44.117.

**Response**

EPA Response to Legal Comments Regarding the Chesapeake Bay TMDL

EPA received a number of comments that raise legal issues in connection with EPA's establishment of the Chesapeake Bay TMDL. Identical (or very similar) issues were raised by a number of different commenters. In hopes of providing a more readable and understandable response to these legal comments, EPA has developed this consolidated response, rather than responding "piecemeal" to all the individual comments raising legal issues. In addition, readers are referred to those sections of the draft and final TMDL discussing TMDL's and the CWA and the Bay TMDL's legal framework.

AR0000921

A.  Comments regarding EPA authority to establish the TMDL and its allocations

1.  While some commenters appeared to concede that EPA had authority to establish the Bay TMDL at least for waters covered by the Virginia, D.C., and Delaware consent decrees, other commenters challenged EPA authority to establish the Bay TMDL for any of the Bay's waters.

Response:  As discussed in the draft and final TMDLs, EPA is establishing the Chesapeake Bay TMDL pursuant to a number of existing authorities, including the CWA and its implementing regulations, judicial consent decrees requiring EPA to address certain impaired Chesapeake Bay and tidal tributary waters, a settlement agreement resolving litigation brought by the Chesapeake Bay Foundation, the current Chesapeake Bay Agreement, and Executive Order 13508. In establishing the Bay TMDL, EPA has acted pursuant to the consensus direction of the Chesapeake Executive Council's PSC and in partnership with each of the seven Chesapeake Bay watershed jurisdictions.

The CWA provides EPA with ample authority to establish the Chesapeake Bay TMDL. CWA section 117(g)(1) provides that [t]he Administrator, in coordination with other members of the [CEC], shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain [among other things] the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed [and] the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem.  Because it establishes the Bay and tidal tributaries' nutrient and sediment loading and allocation targets, the Chesapeake Bay TMDL is such a management plan. In addition, the Bay TMDL's loading and allocation targets both inform and are informed by, a larger set of federal and state management plans being developed for the Bay, including the jurisdiction WIPs and the May 2010 Bay strategy.

CWA section 303(d) requires jurisdictions to establish and submit TMDLs to EPA for review. Under certain circumstances, EPA also has the authority to establish TMDLs. The circumstances of this TMDL do not necessarily identify the outer bounds of EPA's authority. However, where impaired waters have been identified on jurisdictions' section 303(d) lists for many years, where the states in question have decided not to establish their own TMDLs for those waters, where EPA is establishing a TMDL for those waters at the direction of, and in cooperation with, the jurisdictions in question, and where those waters are part of an interrelated and interstate water system like the Chesapeake Bay that is impaired by pollutant loadings from sources in seven different jurisdictions, CWA section 303(d) authorizes EPA authority to establish that TMDL.
Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517 (9th Cir. 1995); Scott v. City of Hammond, 741 F.2d 992 (7th Cir. 1984); American Canoe Ass'n. v EPA, 54 F.Supp.2d 621 (E.D.Va. 1999).

On May 12, 2009, President Barack Obama signed Executive Order 13508—Chesapeake Bay Protection and Restoration. The Executive Order's overarching goal is to protect and restore the health, heritage, natural resources, and social and economic value of the Nation's largest estuarine ecosystem and the natural sustainability of its watershed.   The Executive Order says the federal government should lead this effort and acknowledges that progress in restoring the Bay will depend on the support of state and local governments. To that end, the Executive Order directs the lead federal agencies, including EPA, to work in close collaboration with their state partners. To protect and restore the Chesapeake Bay and its tidal tributaries, the President directed EPA to "make full use of its authorities under the [CWA]." In establishing the Bay TMDL, EPA is doing no more—or less—than making full use of its CWA authorities to lead a collaborative and effective federal and state effort to meet the Bay's nutrient and sediment goals.

AR0000922

In addition, as discussed in the TMDL itself, a number of consent decrees, MOUs, and settlement agreements provide additional authority and support for EPA's decision to establish the Chesapeake Bay TMDL addressing certain waters identified as impaired on the Maryland, Virginia, and District of Columbia's 1998 section 303(d) lists and on the Delaware 1996 section 303(d) list. EPA is establishing the Chesapeake Bay TMDL consistent with those consent decrees, MOUs, and settlement agreements. It is immaterial whether Virginia was a party to the litigation that resulted in the Virginia consent decree. The decree represents a judicially-enforceable obligation that EPA must fulfill if necessary, as is the case here.

2. One commenter said that EPA had inappropriately relied on Dioxin/Organochlorine Center v. Clarke, 57 F3d 1517 (9th Cir. 1995), Scott v. City of Hammond, 741 F.2d 992 (7th Cir. 1984) and American Canoe Ass'n v. EPA, 54 F.Supp.2d 621 (E.D.Va. 1999) as support for including Bay TMDL allocations for New York. The commenter said those cases were inapposite because (1) New York (and presumably the other Bay headwaters States) did not have impaired waters addressed by the Bay TMDL and (2) the Bay TMDL (and its headwaters allocations) was based on Bay-State water quality standards and not on water quality standards adopted by New York (and the other headwaters jurisdictions) that already accounted for how local conditions affected the downstream Bay impairments.

Response: It is true that none of the cited cases had a need (based on their facts) to expressly address the issue of whether EPA has the authority to establish allocations for upstream States (and sources) in a TMDL for an interstate waterbody whose impairments are caused, in significant part, by pollutants originating in upstream states. The fact that the cited cases did not specifically address the out-of-State allocation issue does not make EPA's reliance on them "inappropriate." Indeed, all three cases clearly support the proposition that EPA has authority to establish this watershed TMDL for the 92 impaired Bay segments on the four Bay States' 303(d) lists. That being the case, it follows logically that – in establishing a TMDL for these 92 segments – EPA also must have authority to establish allocations within the entire Bay watershed at levels necessary to implement the water quality standards "applicable" to those 92 segments. If EPA does not have such authority, it is limited to establishing a TMDL for the 92 Bay segments that either (1) makes no allocations to (or assumptions about reductions from) the headwaters States and, instead, allocates or assumes reductions only from VA, MD, DC, and DE and places the burden on those States alone to meet the Bay's water quality standards; or (2) assumes (but does not allocate) reductions from the three headwaters States and makes allocations to VA, MD, DC, and DE at a level consistent with the assumed headwater State reductions. In the context of this TMDL and this interstate waterbody – where a significant portion of the nutrient and sediment loads originate in the headwaters States - EPA believes it is unreasonable to read the CWA as constraining its authority to make allocations only to the four tidal Bay jurisdictions. EPA also believes it is unreasonable to interpret the CWA as forcing EPA to establish TMDL allocations for the tidal bay jurisdictions that rely only on unspecified and unsupported "assumed" reductions from the headwaters States. In light of the CWA's goals and objectives, EPA believes this to be an unnecessarily narrow reading of the Act and – based on past history - one not likely to result in attainment of the Bay's applicable water quality standards.

3. One commenter says that EPA did not follow the CWA's "statutory scheme" for setting the TMDL's allocations for New York because it based those allocations on water quality standards applicable to the tidal Chesapeake and not on New York's own water quality standards.

Response: EPA did establish New York's (and other headwater States') allocations consistent with CWA authority. EPA established the Chesapeake Bay TMDL to address 92 impaired segments of the Bay and its tidal tributaries within the boundaries of

AR0000923

Virginia, DC, Maryland, and Delaware. Section 303(d) requires that the Bay TMDL be established at a "level necessary to implement the applicable water quality standards . . ." For the Bay TMDL, the applicable water quality standards are those standards established by Virginia, DC, Maryland, and Delaware (and approved by EPA) for the 92 impaired tidal Bay segments. Pursuant to EPA's regulations (130.2(i)), a TMDL is defined as the sum of its wasteload allocations and load allocations. Accordingly, EPA was required by the CWA and its regulations to establish the TMDL's allocations (including allocations for headwater States like New York) consistent with implementing water quality standards applicable to the tidal Bay waters. This is what EPA did.

As a legal matter, EPA is authorized to consider downstream water quality standards (including those in other states), when establishing or approving a TMDL. The U.S. Supreme Court in Arkansas v. Oklahoma, 503 U.S. 91 (1992), held that EPA has the authority to impose NPDES permit limitations and conditions based on downstream water standards. At issue in that case was EPA's issuance of an NPDES permit to an Arkansas facility that imposed conditions derived from the downstream state's water quality standards. Noting that "the statute clearly does not limit the EPA's authority to mandate such compliance," the Court held, "The regulations relied on by the EPA were a perfectly reasonable exercise of the Agency's statutory discretion. The application of state water quality standards in the interstate context is wholly consistent with the Act's broad purpose 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' 33 U.S.C. § 1251(a). Moreover, as noted above, § 301(b)(1)(C) expressly identifies the achievement of state water quality standards as one of the Act's central objectives.
The Agency's regulations conditioning NPDES permits are a well-tailored means of achieving this goal." The regulations considered by the court, 40 C.F.R. § 122.4(d), provide, "No permit shall be issued . . . [w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States."

The principle articulated by the Supreme Court in the NPDES permitting context applies with equal force to TMDLs, which are an important tool for implementing section 301(b)(1)(C) with respect to point source discharges. As the Supreme Court held, EPA as the permitting authority is authorized to consider water quality standards in downstream segments (including those in other states) when establishing NPDES permit limitations and conditions for sources whose discharges ultimately flow to the downstream segments. For sources discharging to waters flowing into the Chesapeake Bay, those permit limitations would be derived from the TMDL for the Chesapeake Bay. See 40 C.F.R. § 122.44(d)(1)(vii)(B). Therefore, it follows that EPA is authorized to establish or approve TMDLs for impaired Bay waters with wasteload allocations and load allocations for upstream sources that take into account the downstream water quality standards that the TMDL is designed to meet.

4. One commenter seemed to suggest that EPA did not have authority "to establish a Bay TMDL for New York" because (1) New York had not failed to submit an appropriate TMDL and (2) EPA had not first required New York to revise its State water quality standards.

Response: EPA disagrees with the comment and its underlying assumption that any Bay-related TMDL allocations affecting nutrient and sediment pollutant loadings originating in New York (or the other headwater States) must be established by those headwaters States and based solely on their own State water quality standards. In the 38 years since passage of the CWA, none of the Bay headwaters States (New York, Pennsylvania, and West Virginia) has established or submitted a TMDL to EPA that allocates nutrient or sediment loadings in their jurisdictions at a level necessary to implement water quality standards in the Bay or its tidal tributaries. Moreover, the headwaters States requested and collaborated with EPA in the establishment of this Bay TMDL and its allocations. Accordingly, EPA has acted within its authority under CWA 303(d) to establish allocations to the headwater

AR0000924

States in the Bay TMDL consistent with the need to implement tidal Bay water quality standards.

Nor was it necessary for EPA to first require that the headwaters States revise their own water quality standards to "take into consideration" the applicable tidal Bay water quality standards and "ensure" that their "upstream" standards provide for "downstream" standards attainment. EPA is establishing the Bay TMDL to implement the tidal Bay standards, not the headwater States' own "upstream" standards. (Reductions made to achieve the Bay TMDL are expected to improve the local water quality of the nontidal receiving waters. ) The fact that a headwater State's standards may not already be stringent enough per 131.10(b) to ensure implementation of the tidal Bay standards does not constrain EPA's ability and authority under 303(d) to establish Bay TMDL allocations that are fully protective of the applicable downstream tidal Bay standards. To interpret CWA 303(c) and (d) otherwise would turn the Act on its head by subjecting a TMDL's ability to protect its targeted waters (and their "applicable" water quality standards) to limitations contained in upstream water quality standards. Likewise, under the framework of the Bay TMDL, EPA need not establish TMDLs or allocations for specific waters on New York's 303(d) list because they are not meeting local water quality standards. The purpose of this TMDL is to achieve the applicable standards for the 92 impaired Bay segments. New York is free to develop TMDLs for waters with local impairments outside the context of this TMDL on an appropriate schedule.

5. A number of commenters said that that – rather than "usurping" the States' roles – EPA should work "collaboratively" with them and recognize their "environmental stewardship."

Response: EPA believes the record of EPA's actions in establishing this TMDL clearly demonstrates that EPA has used a collaborative process to arrive at the final TMDL, one that has recognized and encouraged the environmental stewardship of all the watershed States, without whose full cooperation restoration of the Bay will be not occur.

6. One commenter said EPA was attempting to expand its CWA authority by referencing a TMDL-establishment MOU with Maryland, the 2010 settlement agreement resolving Fowler v. EPA, and the Chesapeake Bay Executive Order.

Response: EPA agrees that its settlement agreement resolving Fowler v. EPA and the Executive Order do not expand its CWA authority to establish the Bay TMDL. EPA never said they did. Rather, EPA said it was establishing the Bay TMDL by December 31, 2010 to meet a commitment it made in the settlement agreement to act by that date. Regarding the Maryland MOU, EPA referenced that document (signed in 1998; revised in 2004) in the draft TMDL because Maryland's commitments in that MOU were key to EPA victory (twice) in lawsuits alleging that Maryland was in default of its CWA TMDL obligations. Without Maryland's MOU commitments (and actions), it is possible the court might have found Maryland in default and ordered establishment of TMDLs via an EPA backstop on a schedule similar to the Virginia consent decree. If that had happened, EPA's authority to establish TMDL for Maryland's impaired Bay waters would be as clear as it is for Virginia. While it is true that an MOU cannot by itself enlarge Congressionally-bestowed powers, under these circumstances the existence of the Maryland MOU in the context of the two Maryland TMDL lawsuits explains why it is reasonable for EPA to establish within the Bay TMDL – and with Maryland's full agreement – "backstop" TMDLs for Maryland's impaired Bay waters.

B. Comments regarding the Watershed Implementation Plans (WIPs)

1. Some commenters said that implementation plans associated with the TMDL are not part of the TMDL itself and, thus, not subject to EPA approval. More specifically, some commenters claim that EPA's "rejection" of Virginia's draft WIP is "legally

AR0000925

objectionable" because the CWA does not give EPA the authority to review and/or approve WIPs, or to direct their specific terms.

Response: EPA agrees with the commenters that the CWA does not require or authorize EPA to "approve" or "disapprove" jurisdictions' WIPs. And EPA has not done that here. Nor did EPA direct their specific terms. Instead, EPA identified expectations and a guide for the contours of the WIPs, and asked the jurisdictions to submit WIPs to support their recommendations for the decision by EPA in making its TMDL allocation decisions for various pollutant loading sectors. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' recommended allocation scenarios. Where those WIPs were determined to provide adequate reasonable assurance and met the respective jurisdictions pollutant cap loading, EPA used all (or those parts found adequate) as the basis for its TMDL allocations for that jurisdiction. Where portions of the WIPs did not provide such assurances, as the CWA requires, EPA establishes the backstop allocations in an appropriate manner so the resulting TMDL allocations are established at a level necessary to implement applicable water quality standards.

2. Some commenters said EPA did not have authority to establish a 2025 compliance deadline in the Bay TMDL.

Response: CWA section 117(g) requires that EPA "ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. Pursuant to that authority, and to support the TMDL EPA is establishing pursuant to section 303(d), EPA asked the Bay jurisdictions to develop and submit WIPs that provided for 60% implementation by 2017 and 100% implementation by 2025. In light of the decades-long history of not meeting these goals, a two-phase implementation framework is reasonable. EPA recognizes that there is much work to be done to restore the Bay; hence the final implementation target extending to 2025. In light of the Bay's importance, the delays so far in reaching those targets, and EPA's belief that this job can be done in the projected time, the staged 2017/2025 implementation framework is both lawful and reasonable. That being said, the TMDL by itself is not a self implementing mechanism and does not contain an implementation plan. That plan, or rather plans, are set forth in the State WIPs, the two year milestones, and other federal actions – components of the broader Chesapeake Bay Restoration Accountability Framework discussed in TMDL section 1.2.2 and 7.2.

C. Comments regarding "Reasonable Assurance"

1. One commenter asserts that "reasonable assurance "is a concept that does not originate in either the CWA or EPA regulations" and that EPA "created" the concept of reasonable assurance in 1997 guidance. The commenter goes on to assert that a TMDL is a "number" and "[n]othing in the statute gives EPA the authority to judge how that number is assigned or divided."

Response: EPA disagrees that "reasonable assurance "is a concept that does not originate in either the CWA or EPA regulations" and that EPA "created" the concept of reasonable assurance in 1997 guidance.

In the first place, EPA explained the concept of reasonable assurance as early as its initial TMDL guidance in April 1991, not 1997. The concept has been further explained in subsequent guidance documents.

More importantly, the commenter is incorrect in asserting that a TMDL is merely a "number" and "[n]othing in the statute gives EPA the authority to judge how that number is assigned or divided." A TMDL not just is a number. Rather, it is a collection of

AR0000926

numbers representing WLAs and LAs assigned to various pollutant sources, all of which must add up to a "total" loading of pollutants consistent with meeting applicable water quality standards. TMDL = WLA(s) + LA(s) + MOS. When approving (or in the case of the Bay TMDL) establishing a TMDL, EPA has an obligation to ensure that the sum of the WLAs and the LAs adds up to a "total" number that will implement the applicable water quality standards. This is where "reasonable assurance" comes in.

While neither the CWA nor EPA's regulations expressly mention the phrase "reasonable assurance," the congruent requirements of CWA 303(d)(1)(C) and 301(b)(1)(C) implicitly require it. Section 303(d)(1)(C) requires that a TMDL be "established at a level necessary to implement the applicable water quality standards . . ." See also 40 C.F.R. 130.7(c)(1). A TMDL calculates the maximum amount of pollutant loadings that a waterbody can receive and still meet water quality standards, sometimes referred to as assimilative capacity. For waterbodies with both point and nonpoint sources of pollutants, a TMDL writer must decide how to apportion loadings between point and nonpoint sources subject to the TMDL. Section 303(d)(1)(C) requires that the point source-nonpoint source allocation split be "at a level necessary to implement the applicable water quality standards." Without a demonstration in the TMDL's record of "reasonable assurance" that the chosen nonpoint source load allocations will in fact be met, there is no assurance that the TMDL equation will not add up to a sum that exceeds a level necessary to implement the applicable water quality standards.

Section 301(b)(1)(C) and EPA's permitting regulations provide additional support for reading a "reasonable assurance" requirement into a TMDL. Section 301(b)(1)(C) requires that point source permits have effluent limits as stringent as necessary to meet water quality standards. EPA's permitting regulations echo that requirement and, in addition, require that permits include effluent limits "consistent with the assumptions and requirements of any available wasteload allocation for the discharge" approved by EPA. 40 CFR 122.44(d)(1)(vii)(A) & (B). For WLAs to serve as a basis for a WQBEL, they must themselves be stringent enough so that (in conjunction with the waterbody's other loadings) they meet water quality standards. In the absence of reasonable assurance that a TMDL's LAs will in fact be met, the TMDL's WLAs cannot serve as an effective permitting guide. That can happen, however, if (1) the TMDL's combined nonpoint source load allocations and point source wasteload allocations do not exceed the water quality standard-based loading capacity and (2) there is "reasonable assurance" that the load allocation will be achieved. Such a demonstration ensures that an effluent limitation that is "consistent" with a TMDL's wasteload allocation pursuant to 122.44 (d)(1)(vii)(B) will also meas water quality standards as required by CWA 301(b)(1)(C) and 122.44 (d)(1)(vii)(A).

D. Comments regarding TMDL's "Backstop allocations"

1. Some commenters said EPA should "delay adoption of the TMDL and backstops for at least one year" because (1) there is no legal authority for the urban/suburban retrofits necessary to implement the TMDL and (2) such measures would be far more expensive and cost-effective than POTW upgrades or agricultural BMPs.

Response: EPA disagrees with the commenter's assertion about lack of CWA legal authority for urban/suburban stormwater controls necessary to implement the Bay TMDL. Moreover, these arguments do not support delaying the TMDL. It is important that EPA establish the Bay TMDL as soon as possible. The TMDL is an important element in Bay restoration, and the Bay's waters have been impaired and restoration delayed for many years. EPA afforded the Bay jurisdictions two opportunities (draft Phase I WIPs and final Phase II WIPs) to describe the mix of implementation measures (informed by cost and other considerations) they intend to pursue in order to meet the TMDL's nutrient and sediment targets. EPA has taken the jurisdiction's WIPs into account in

AR0000927

establishing allocations in the TMDL. Because this is EPA's TMDL, the CWA requires that EPA establish nutrient and sediment allocations at a level necessary to implement applicable water quality standards. To the extent EPA backstop assumptions serve as a basis for the TMDL's final allocations, those assumptions would have been necessitated by inadequacies in the jurisdictions' WIPs. That being the case, EPA would have been obligated to make allocations stringent enough to meet applicable standards sooner or later based, in part, on such assumptions. EPA has reasonably decided to establish the Bay TMDL and its allocations sooner rather than later. For further information on retrofits please see response to comment number 0232.1.001.004

E. Comments regarding James River allocations

1. Some commenters said it was not EPA's responsibility under the Virginia or D.C. consent decrees to establish a TMDL to meet the James River's 2005 chlorophyll standards.

Response: EPA disagrees. The Virginia consent decree requires EPA to establish a TMDL at a level necessary to implement the applicable water quality standards for "each water and pollutant identified in Attachment A and C" of the decree if Virginia has not done so by a date certain. The James River's tidal tributaries are identified on Attachment A (Part 2) of the 1999 Virginia consent decree as impaired by "nutrients," with specific focus on "aquatic life concerns." It is immaterial that Virginia did not establish a numeric chlorophyll standard for those segments until 2005. The numeric chlorophyll a criteria adopted by Virginia specific to the James is to provide additional protection to aquatic life uses from the harmful effects of excess nutrients. These numeric criteria reinforce and support the restoration of those portions of the James River identified on the 1998 303(d) listing for impaired aquatic life uses. At the time EPA established this TMDL, the segments remained listed and impaired, and the 2005 chlorophyll standard was an "applicable" water quality standard for purposes of section 303(d)(1)(C). Accordingly, the 1999 Virginia consent decree requires that EPA establish a TMDL for those segments at a level that implements the applicable chlorophyll standard.

2. Some commenters said the James River has "very little impact" on the main stem and dead zone of the Bay and achievement of the proposed James River nutrient allocations "will not improve the Bay water quality." EPA provides responses to that comment elsewhere in this document.

3. Some commentators said the James River chlorophyll standard "lacks a sound scientific foundation."
Response: EPA approved this submission of revised James River numeric chlorophyll a criteria (WQS) by Virginia in 2005 as effective and applicable water quality standards (WQS) for purposes of the CWA. On that basis EPA disagrees with this comment. This comment is outside the scope of the TMDL, since the CWA requires TMDLs to be established to "applicable" WQS, and the numeric chlorophyll a criteria are such standards. See above response. EPA suggests the commenter review the 2005 submission by Virginia and EPA's approval if the commenter has further questions.

F. Comments re length of comment period and modeling information

1. Many commenters requested EPA to extend the TMDL's 45-day comment period.

AR0000928

Response:  It is true EPA declined to extend the TMDL's 45-day comment period.  To do so would have made it impossible for EPA to establish the Bay TMDL by December 31, 2010.  EPA places a very high value on meeting its public commitment to establish the TMDL by that date.  EPA does not want to break faith with the States who requested it or the public who expects it. Moreover, EPA is acting pursuant to Executive Order 13508 to "make full use of its authorities" to protect the Bay, as well as a promise EPA made in a May 2010 settlement agreement resolving Fowler v. EPA.  While EPA could have attempted to negotiate an extension of the Fowler agreement date, EPA believes that - under all the circumstances of this TMDL, including the considerable transparency of the process to date and EPA's considerable efforts to engage in public outreach – its efforts were better spent finishing work on the TMDL in order to avoid any further delays in implementing EPA's and States' 27-plus year old commitment to restore the Bay's water quality.

EPA agrees that its settlement agreement resolving Fowler v. EPA and the Executive Order do not expand its CWA authority to establish the Bay TMDL. EPA never said they did.  Rather, EPA said it was establishing the Bay TMDL by December 31, 2010 to meet a commitment it made in the settlement agreement to act by that date

2.  Some commenters stated that EPA did not make information on Scenario Builder model available and requested EPA to make more modeling-related information available.

Response: EPA disagrees that it had not made information on Scenario Builder and other essential models available.  For example EPA posted scenario builder information that was used for all of the calibration model inputs (the same thing as SB output) except for the acres of BMPs, which was calculated outside of SB in March 2010 at:

ftp://ftp.chesapeakebay.net/modeling/phase5/Phase%205.3%20Calibration/Model%20Input/

In addition the following information on the Watershed Model calibration was posted on the following websites spring of 2010:

 - http://www.chesapeakebay.net/phase5.htm : Scroll down to Phase 5.3 Watershed Model Output Data and Phase 5.3 Watershed Model Input Data
- http://ftp.chesapeakebay.net/Modeling/phase5/Phase%205.3%20Calibration/

This information was also available through links provided in Section 5 of the draft TMDL, which was released for a 45-day public comment period on September 24th. Further, the Watershed Model code and calibration data, as well as the Scenario Builder documentation, were linked to our website before the draft TMDL was released.

The Scenario Builder programming codes are available for download at:
- http://ftp.chesapeakebay.net/modeling/ScenarioBuilder/ScenarioBuilderSource/

In response to requests for more specific SB information, EPA also made additional information available in November 2010 as discussed in emails  from EPA James Curtin to several persons including Susan Bodine dated November 2, 2010. EPA believes it has made sufficient information available for the public to reasonably and intelligently comment on the Bay TMDL..  For a more detailed response on modeling, please see response to comment number 379.1.001.006.

AR0000929

G.  Comments regarding CWA 117(g)

1.  A number of commenters questioned EPA's reliance on CWA section 117(g) in support of its authority to establish the Bay TMDL and headwater State allocations.

Response:  EPA disagrees with commenters who believe section 117(g) does not provide additional authority for EPA to establish the Bay TMDL.

Specifically, EPA disagrees with the comment that the term "management plans," as used in section 117(g), may not be interpreted to include the Bay TMDL.  EPA notes that Congress did not include within section 117(g) a definition of the term "management plans."  Accordingly, there is room for reasonable interpretation of its meaning. Webster's defines a "plan" as a "goal; aim," or, alternatively, "an orderly arrangement of parts of an overall design or objective."  Defined this way, a section 117(g) Chesapeake Bay "management plan" may reasonably be interpreted to include its goal, aim, or objective – in this case, the Bay TMDL and its allocations.

In section 117(g) Congress directed EPA, in coordination with the signatories to the Chesapeake Bay Agreement, to "ensure that management plans are developed and implementation is begun to achieve and maintain, among other things (1) the "nutrient goals" of the Bay agreement "for nitrogen and phosphorus entering the Chesapeake Bay and its watershed" and (2) "the water quality requirements necessary to restore living resources in the Chesapeake Bay."  In this context it is reasonable for EPA to interpret the term "management plans" as used in section 117(g) to include, not only an identification of the actions proposed to be taken by EPA and the other signatories, but also the section 303(d)-based identification of the numerically-expressed  "nutrient goals" and "water quality requirements" [nitrogen, phosphorus, and sediment allocations] that would inform those actions. The fact that Congress may have used similar terms in wholly different contexts, e.g., "management program" in section 319, "management plan" in section 320, "areawide waste treatment management plan" in section 208, does not mean that – for the purposes of interpreting and implementing section 117(g) - EPA may not interpret the section 117(g) term "management plans" to include that part of the plan that identifies its target or goal.

EPA also disagrees with the comment that EPA may not allocate pollutant reductions to New York because it was not a signatory to the Bay Agreement but only a "voluntary partner."  Even if section 117(g) were not part of the CWA, section 303(d) gives EPA all the authority it needs to establish this TMDL.  Section 117(g) merely underscores that authority as well as specifically directing EPA to take such actions to further restore Bay water quality.  While it is true that New York (as well as West Virginia and Delaware) did not sign the 2000 Bay Agreement, those States subsequently (in 2000 and 2002) signed a MOU with EPA and the other four Bay watershed jurisdictions in which they agreed to work cooperatively to meet the Bay Agreement's goals by 2010 so the Bay's impaired waters could be removed from the States' section 303(d) lists. Moreover, in 2007 New York, West Virginia and Delaware reached consensus with the signatory jurisdictions that EPA should establish the Bay TMDL on behalf of them all.  By signing the MOU, joining the consensus that EPA should establish this TMDL, and participating with EPA in the development of the TMDL and their own WIPs, New York and the other non-signatory States have made themselves functionally and - for the TMDL's purposes - legally equivalent to the signatory States regarding their Bay TMDL status.

2.  Some commenters said that Congress did not "provide authority to EPA to achieve the goals set in section 117" of the CWA and

AR0000930

that regulation and enforcement is "directly in the hands of each signatory." Others said Congress did not provide EPA in 117(g) with "regulatory authority" to achieve those goals, or authority to "approve, disapprove, or change the state WIPs."

Response: CWA section 117(g) requires that EPA "ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. EPA is not sure what the commenter means by saying that Congress did not provide EPA with authority ("regulatory," or otherwise) to achieve the goals of CWA section 117(g). EPA has ample authority in the CWA (see e.g., sections 301, 303(c) and (d), 402, 319 and other provisions) to achieve the water quality goals of section 117(g). In addition, section 117(g) expressly directs (and impliedly authorizes) EPA "to ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. That direction and authorization – even if it arguably does not provide EPA with any "additional" regulatory authorities – surely does not constrain use of authorities provided elsewhere in the Act. EPA has not asserted that section 117(g) gave it authority to "approve, disapprove, or change the state WIPs," and EPA has not done so. EPA has exercised the leadership role accorded to it by section 117(g) in a responsible and appropriate way by working collaboratively with the Bay jurisdictions to ensure that their WIPs are of sufficiently high quality to achieve the Bay's water quality goals.

H.  Comments regarding CWA 510

1.  Some commenters said EPA's disapproval of State WIPs, establishment of replacement WIPs, or establishment of the Bay TMDL is inconsistent with state primacy under CWA section 510.

Response:  EPA disagrees with this comment. In the first place, EPA has not "disapproved" any State WIPs or established a replacement WIP for a State. Instead, EPA asked the jurisdictions to submit WIPs to support their recommendations for EPA's TMDL allocation decisions for various pollutant loading sectors. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' allocations. Where the WIPs did not provide such assurances, the CWA required EPA to adjust the allocations in an appropriate manner so they are established at a level necessary to implement applicable water quality standards. CWA section 510 preserves a State's right to adopt its own standards or limitations regarding discharges of pollutants, except that States may not be "less stringent" than applicable federal requirements. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' recommended allocations scenario. Where those WIPs were determined to provide adequate reasonable assurance and met the respective jurisdictions' pollutant cap loading, EPA used all (or those portions found adequate) as the basis for its TMDL allocations for that jurisdiction. Where portions of the WIPs did not provide such assurances, as the CWA requires, EPA makes backstop allocations in an appropriate manner so the resulting TMDL allocations are established at a level necessary to implement applicable water quality standards. In so doing, EPA did not act in contravention of Section 510 because nothing in section 510 precludes EPA from establishing a TMDL at a level necessary to implement the applicable State-adopted and EPA-approved water quality standards.

2.  Some commenters allege that EPA's establishment of the Bay TMDL is an impermissible intrusion into State authority and an exercise in State "compulsion" in violation of the 10th Amendment and principles of federalism.

Response:  EPA disagrees. Taken as a whole, the record of EPA's and the Bay jurisdictions' activities over the past decade demonstrates that EPA has established he Bay TMDL in collaborative partnership with the Bay jurisdictions and not through compulsion of them. EPA is under legal obligation to establish the Bay TMDL for certain waters in Virginia, DC, and Delaware.

AR0000931

Each of those jurisdictions has collaborated with EPA in establishing the TMDL. In a similar manner, Maryland (pursuant to its MOU), and the headwaters states of New York, Pennsylvania, and West Virginia have also collaborated with EPA, the Chesapeake Executive Council and the PSC in developing the Bay watershed TMDL. EPA has neither impermissibly intruded into State authority nor compelled the jurisdictions in violation of the 10th Amendment or principles of federalism. Indeed, EPA has invited the jurisdictions to take the lead in developing WIPs for their own States designed to inform EPA's TMDL allocations decisions and thereafter implement the TMDL's loading targets. In doing so, EPA demonstrated its respect for our federal system and the priority of the States to determine how the TMDL will be implemented.

While it is true that EPA on a number of occasions provided the jurisdictions with its "expectations" regarding their implementation efforts, EPA died not "compel" any particular outcomes. The jurisdictions' discretion was bounded only by the statutory requirement that their implementation proposals provide EPA with sufficient "reasonable assurance" that the TMDL allocations are established at a level necessary to implement the applicable Bay-wide water quality standards. To the extent a jurisdiction's WIP did not do that, EPA was compelled by the CWA to establish allocations in the TMDL to meet standards. While some of those allocations may have been based on assumptions about additional implementation and oversight by EPA, that is nothing more (under the circumstances) than the federal-state scheme established by the Act contemplates and requires. This approach is fully consistent with CWA, the Constitution, and principles of federalism. It is also consistent with the Ninth Circuit's 2002 decision in Pronsolino v. Nastri, 291 F.3d 1123. As in Pronsolino, EPA recognizes that implementation of the Bay TMDL is primarily a state responsibility. Here – as in Pronsolino - EPA did not require or include implementation plans "within the TMDL." EPA asked for them – in part pursuant to section 117(g) – to inform and support the allocation setting process. As with the Garcia River TMDL, the Bay TMDL "serves as an informational tool for the creation of the state's implementation plan." It is not a substitute for it.

Nor is it the case that assumptions about future EPA regulatory or NPDES oversight authority that support any EPA allocation decisions "commandeer" State legislative processes in violation of the 10th Amendment to the Constitution. During the TMDL development process, EPA invited the jurisdictions to make the difficult legal, policy, and budgetary choices necessary to implement the pollution reductions needed to meet applicable Bay water quality standards. The Chesapeake Bay Commission (CBC), a member of the Chesapeake Executive Council, represents the legislatures of the three signatory states. The CBC has been an active participant in this process. The States have also made such hard choices in their WIPs. If EPA believes some of those measures are insufficient in the aggregate to meet those standards, it must establish TMDL allocations that it believes ("reasonable assurance") can, and will, meet standards. The Bay jurisdictions have choices and discretion regarding how to implement their WIPs in service of the TMDL. EPA has not – and will not - "commandeer" their legislative and administrative processes. However, EPA does reserve the right to exercise its own federal authorities and prerogatives in an appropriate manner (either through rulemaking, enforcement, NPDES oversight, or other means) to ensure that the TMDL's and CWA's goals are met. In relying on assumptions about potential future federal actions, EPA is not "prejudging" the outcome of future rulemakings or other actions. The exact scope and design of any such rulemakings must of necessity await the conclusion of the APA rulemaking process, including the opportunity for public comment, or in the case of a designation process, as provided by the CWA and its implementing regulations. However, in assessing and providing "reasonable assurance" to support the TMDL's allocations, it is appropriate for EPA to make allocations based on certain assumptions about what "backstop" actions are available to it in the event the jurisdictions' WIPs (or their implementation) are not sufficiently robust to meet the Bay's water quality standards.

H. Miscellaneous Legal Issues

AR0000932

1. One commenter asked whether EPA considered how the TMDL might impact environmental justice, especially with regard to its impacts within densely populated watersheds.

Response: EPA believes the Bay TMDL and Bay restoration in general is fully consistent with its broader efforts to promote environmental justice. Around the watershed there are many disadvantaged and minority communities whose lives and livelihoods are closely tied to a healthy Bay: as a source of employment, recreation, food, and quality of life. EPA recognizes that restoring Bay water quality will not be cheap and that the costs may have to be borne broadly. However, on balance, EPA believes restoring Bay water quality is fully consistent with environmental justice principles.

2. Some commenters assert that the high estimated costs of stormwater retrofits "approach" a "taking" without compensation prohibited by State and the U.S. Constitution.

Response: EPA disagrees. EPA's Bay TMDL is not a federal or state regulation, and its wasteload and load allocations do not as a matter of law effect an unconstitutional "taking" of private property. Nor is the TMDL a permit that requires a private property owner to retrofit his or her property. The TMDL and its allocations are, instead, a reasonable and lawful exercise of EPA's authority under CWA 303(d) to establish pollutant loading targets that guide the jurisdictions' and EPA's efforts to implement measures designed to implement the Bay's water quality standards. See also response to Comment number 0232.1.001.004 for more discussion of the takings issue.

3. On commenter [0533.1.001.001] questioned whether EPA's TMDL is based on data EPA collected from survey's of communities, wastewater treatment plants, and other regulated entities without the proper OMB clearance.

Response: EPA disagrees. While EPA used information from a great number of sources, to the best of EPA's knowledge, EPA used the OMB clearance numbers associated with general TMDL development and establishment as authorized. For some information, EPA relied on responses from entitles already required to submit information under such instruments as NPDES permits and/or other federal requirements.

# Comment ID 0293.1.001.026

**Author Name:** Pomeroy Christopher

**Organization:** Virginia Municipal Stormwater Association, Inc. (VAMSA)

The American Canoe and Kingman Park Consent Decrees Do Not Address Virginia Chlorophyll-a

EPA continues to assert in it must complete the Bay TMDL by 2011 (the December, 2010 deadline is a self-imposed acceleration) because of two consent decrees issued in the late 1990/early 2000 timeframe, American Canoe Association, Inc. v. EPA, Civil Action No. 98-99-A (E.D. Va. 1999) [FN43] and Kingman Park Civic Association v. EPA, Case No. 1:98CV00758 (E.D. Va. 2000). Draft TMDL at 1-14 - 1-16.

VAMSA submits that EPA's obligations to develop a TMDL by May, 2011 do not extend to establishing loadings on the

subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.") [FN31]

Federal law clearly gives Virginia the authority to develop its own requirements and programs, so long as they are not less stringent than those established under the Act.[FN32] Because EPA has no statutory authority to establish WIPs, it is impossible for Virginia's Draft WIP to be less stringent.

For these reasons, Virginia should have the discretion to establish its own WIP, without EPA passing judgment and usurping what is rightfully the state's role in this process.

[FN30] Section 303(d) of the Clean Water Act mandates that states must prepare TMDLs for impaired waters, and authorizes EPA to approve or disapprove the loadings. If EPA chooses to disapprove, it has the authority to develop loadings on its own accord ("If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such state and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.") 33 U.S.C. §1313. Section 303(e) specifically gives the State the authority and responsibility to develop a "continuing planning process" for addressing navigable waters. A part of this planning process is TMDLs (again, TMDL implementation plans are not mentioned). Nowhere in the text of Section 303(d) or (e) is EPA permitted to pass judgment on state implementation plans.

[FN31] 33 U.S.C. 1370.

[FN32] Virginia law (Chesapeake Bay and Virginia Waters Clean-Up and Oversight Act) includes a provision for the development of a Bay clean-up plan. Va. Code 62.1-44.117.

**Response**

EPA Response to Legal Comments Regarding the Chesapeake Bay TMDL

EPA received a number of comments that raise legal issues in connection with EPA's establishment of the Chesapeake Bay TMDL. Identical (or very similar) issues were raised by a number of different commenters. In hopes of providing a more readable and understandable response to these legal comments, EPA has developed this consolidated response, rather than responding "piecemeal" to all the individual comments raising legal issues. In addition, readers are referred to those sections of the draft and final TMDL discussing TMDL's and the CWA and the Bay TMDL's legal framework.

AR0000921

A. Comments regarding EPA authority to establish the TMDL and its allocations

1. While some commenters appeared to concede that EPA had authority to establish the Bay TMDL at least for waters covered by the Virginia, D.C., and Delaware consent decrees, other commenters challenged EPA authority to establish the Bay TMDL for any of the Bay's waters.

Response: As discussed in the draft and final TMDLs, EPA is establishing the Chesapeake Bay TMDL pursuant to a number of existing authorities, including the CWA and its implementing regulations, judicial consent decrees requiring EPA to address certain impaired Chesapeake Bay and tidal tributary waters, a settlement agreement resolving litigation brought by the Chesapeake Bay Foundation, the current Chesapeake Bay Agreement, and Executive Order 13508. In establishing the Bay TMDL, EPA has acted pursuant to the consensus direction of the Chesapeake Executive Council's PSC and in partnership with each of the seven Chesapeake Bay watershed jurisdictions.

The CWA provides EPA with ample authority to establish the Chesapeake Bay TMDL. CWA section 117(g)(1) provides that [t]he Administrator, in coordination with other members of the [CEC], shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement to achieve and maintain [among other things] the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed [and] the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem. Because it establishes the Bay and tidal tributaries' nutrient and sediment loading and allocation targets, the Chesapeake Bay TMDL is such a management plan. In addition, the Bay TMDL's loading and allocation targets both inform and are informed by, a larger set of federal and state management plans being developed for the Bay, including the jurisdiction WIPs and the May 2010 Bay strategy.

CWA section 303(d) requires jurisdictions to establish and submit TMDLs to EPA for review. Under certain circumstances, EPA also has the authority to establish TMDLs. The circumstances of this TMDL do not necessarily identify the outer bounds of EPA's authority. However, where impaired waters have been identified on jurisdictions' section 303(d) lists for many years, where the states in question have decided not to establish their own TMDLs for those waters, where EPA is establishing a TMDL for those waters at the direction of, and in cooperation with, the jurisdictions in question, and where those waters are part of an interrelated and interstate water system like the Chesapeake Bay that is impaired by pollutant loadings from sources in seven different jurisdictions, CWA section 303(d) authorizes EPA authority to establish that TMDL.
Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517 (9th Cir. 1995); Scott v. City of Hammond, 741 F.2d 992 (7th Cir. 1984); American Canoe Ass'n. v EPA, 54 F.Supp.2d 621 (E.D.Va. 1999).

On May 12, 2009, President Barack Obama signed Executive Order 13508—Chesapeake Bay Protection and Restoration. The Executive Order's overarching goal is to protect and restore the health, heritage, natural resources, and social and economic value of the Nation's largest estuarine ecosystem and the natural sustainability of its watershed. The Executive Order says the federal government should lead this effort and acknowledges that progress in restoring the Bay will depend on the support of state and local governments. To that end, the Executive Order directs the lead federal agencies, including EPA, to work in close collaboration with their state partners. To protect and restore the Chesapeake Bay and its tidal tributaries, the President directed EPA to "make full use of its authorities under the [CWA]." In establishing the Bay TMDL, EPA is doing no more—or less—than making full use of its CWA authorities to lead a collaborative and effective federal and state effort to meet the Bay's nutrient and sediment goals.

AR0000922

In addition, as discussed in the TMDL itself, a number of consent decrees, MOUs, and settlement agreements provide additional authority and support for EPA's decision to establish the Chesapeake Bay TMDL addressing certain waters identified as impaired on the Maryland, Virginia, and District of Columbia's 1998 section 303(d) lists and on the Delaware 1996 section 303(d) list. EPA is establishing the Chesapeake Bay TMDL consistent with those consent decrees, MOUs, and settlement agreements. It is immaterial whether Virginia was a party to the litigation that resulted in the Virginia consent decree. The decree represents a judicially-enforceable obligation that EPA must fulfill if necessary, as is the case here.

2. One commenter said that EPA had inappropriately relied on Dioxin/Organochlorine Center v. Clarke, 57 F3d 1517 (9th Cir. 1995), Scott v. City of Hammond, 741 F.2d 992 (7th Cir. 1984) and American Canoe Ass'n v. EPA, 54 F.Supp.2d 621 (E.D.Va. 1999) as support for including Bay TMDL allocations for New York. The commenter said those cases were inapposite because (1) New York (and presumably the other Bay headwaters States) did not have impaired waters addressed by the Bay TMDL and (2) the Bay TMDL (and its headwaters allocations) was based on Bay-State water quality standards and not on water quality standards adopted by New York (and the other headwaters jurisdictions) that already accounted for how local conditions affected the downstream Bay impairments.

Response: It is true that none of the cited cases had a need (based on their facts) to expressly address the issue of whether EPA has the authority to establish allocations for upstream States (and sources) in a TMDL for an interstate waterbody whose impairments are caused, in significant part, by pollutants originating in upstream states. The fact that the cited cases did not specifically address the out-of-State allocation issue does not make EPA's reliance on them "inappropriate." Indeed, all three cases clearly support the proposition that EPA has authority to establish this watershed TMDL for the 92 impaired Bay segments on the four Bay States' 303(d) lists. That being the case, it follows logically that – in establishing a TMDL for these 92 segments – EPA also must have authority to establish allocations within the entire Bay watershed at levels necessary to implement the water quality standards "applicable" to those 92 segments. If EPA does not have such authority, it is limited to establishing a TMDL for the 92 Bay segments that either (1) makes no allocations to (or assumptions about reductions from) the headwaters States and, instead, allocates or assumes reductions only from VA, MD, DC, and DE and places the burden on those States alone to meet the Bay's water quality standards; or (2) assumes (but does not allocate) reductions from the three headwaters States and makes allocations to VA, MD, DC, and DE at a level consistent with the assumed headwater State reductions. In the context of this TMDL and this interstate waterbody – where a significant portion of the nutrient and sediment loads originate in the headwaters States - EPA believes it is unreasonable to read the CWA as constraining its authority to make allocations only to the four tidal Bay jurisdictions. EPA also believes it is unreasonable to interpret the CWA as forcing EPA to establish TMDL allocations for the tidal bay jurisdictions that rely only on unspecified and unsupported "assumed" reductions from the headwaters States. In light of the CWA's goals and objectives, EPA believes this to be an unnecessarily narrow reading of the Act and – based on past history - one not likely to result in attainment of the Bay's applicable water quality standards.

3. One commenter says that EPA did not follow the CWA's "statutory scheme" for setting the TMDL's allocations for New York because it based those allocations on water quality standards applicable to the tidal Chesapeake and not on New York's own water quality standards.

Response: EPA did establish New York's (and other headwater States') allocations consistent with CWA authority. EPA established the Chesapeake Bay TMDL to address 92 impaired segments of the Bay and its tidal tributaries within the boundaries of

AR0000923

Virginia, DC, Maryland, and Delaware. Section 303(d) requires that the Bay TMDL be established at a "level necessary to implement the applicable water quality standards . . ." For the Bay TMDL, the applicable water quality standards are those standards established by Virginia, DC, Maryland, and Delaware (and approved by EPA) for the 92 impaired tidal Bay segments. Pursuant to EPA's regulations (130.2(i)), a TMDL is defined as the sum of its wasteload allocations and load allocations. Accordingly, EPA was required by the CWA and its regulations to establish the TMDL's allocations (including allocations for headwater States like New York) consistent with implementing water quality standards applicable to the tidal Bay waters. This is what EPA did.

As a legal matter, EPA is authorized to consider downstream water quality standards (including those in other states), when establishing or approving a TMDL. The U.S. Supreme Court in *Arkansas v. Oklahoma*, 503 U.S. 91 (1992), held that EPA has the authority to impose NPDES permit limitations and conditions based on downstream water standards. At issue in that case was EPA's issuance of an NPDES permit to an Arkansas facility that imposed conditions derived from the downstream state's water quality standards. Noting that "the statute clearly does not limit the EPA's authority to mandate such compliance," the Court held, "The regulations relied on by the EPA were a perfectly reasonable exercise of the Agency's statutory discretion. The application of state water quality standards in the interstate context is wholly consistent with the Act's broad purpose 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.' 33 U.S.C. § 1251(a). Moreover, as noted above, § 301(b)(1)(C) expressly identifies the achievement of state water quality standards as one of the Act's central objectives. The Agency's regulations conditioning NPDES permits are a well-tailored means of achieving this goal." The regulations considered by the court, 40 C.F.R. § 122.4(d), provide, "No permit shall be issued . . . [w]hen the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected States."

The principle articulated by the Supreme Court in the NPDES permitting context applies with equal force to TMDLs, which are an important tool for implementing section 301(b)(1)(C) with respect to point source discharges. As the Supreme Court held, EPA as the permitting authority is authorized to consider water quality standards in downstream segments (including those in other states) when establishing NPDES permit limitations and conditions for sources whose discharges ultimately flow to the downstream segments. For sources discharging to waters flowing into the Chesapeake Bay, those permit limitations would be derived from the TMDL for the Chesapeake Bay. See 40 C.F.R. § 122.44(d)(1)(vii)(B). Therefore, it follows that EPA is authorized to establish or approve TMDLs for impaired Bay waters with wasteload allocations and load allocations for upstream sources that take into account the downstream water quality standards that the TMDL is designed to meet.

4. One commenter seemed to suggest that EPA did not have authority "to establish a Bay TMDL for New York" because (1) New York had not failed to submit an appropriate TMDL and (2) EPA had not first required New York to revise its State water quality standards.

Response: EPA disagrees with the comment and its underlying assumption that any Bay-related TMDL allocations affecting nutrient and sediment pollutant loadings originating in New York (or the other headwater States) must be established by those headwaters States and based solely on their own State water quality standards. In the 38 years since passage of the CWA, none of the Bay headwaters States (New York, Pennsylvania, and West Virginia) has established or submitted a TMDL to EPA that allocates nutrient or sediment loadings in their jurisdictions at a level necessary to implement water quality standards in the Bay or its tidal tributaries. Moreover, the headwaters States requested and collaborated with EPA in the establishment of this Bay TMDL and its allocations. Accordingly, EPA has acted within its authority under CWA 303(d) to establish allocations to the headwater

AR0000924

States in the Bay TMDL consistent with the need to implement tidal Bay water quality standards.

Nor was it necessary for EPA to first require that the headwaters States revise their own water quality standards to "take into consideration" the applicable tidal Bay water quality standards and "ensure" that their "upstream" standards provide for "downstream" standards attainment. EPA is establishing the Bay TMDL to implement the tidal Bay standards, not the headwater States' own "upstream" standards. (Reductions made to achieve the Bay TMDL are expected to improve the local water quality of the nontidal receiving waters. ) The fact that a headwater State's standards may not already be stringent enough per 131.10(b) to ensure implementation of the tidal Bay standards does not constrain EPA's ability and authority under 303(d) to establish Bay TMDL allocations that are fully protective of the applicable downstream tidal Bay standards. To interpret CWA 303(c) and (d) otherwise would turn the Act on its head by subjecting a TMDL's ability to protect its targeted waters (and their "applicable" water quality standards) to limitations contained in upstream water quality standards. Likewise, under the framework of the Bay TMDL, EPA need not establish TMDLs or allocations for specific waters on New York's 303(d) list because they are not meeting local water quality standards. The purpose of this TMDL is to achieve the applicable standards for the 92 impaired Bay segments. New York is free to develop TMDLs for waters with local impairments outside the context of this TMDL on an appropriate schedule.

5.  A number of commenters said that that – rather than "usurping" the States' roles – EPA should work "collaboratively" with them and recognize their "environmental stewardship."

Response: EPA believes the record of EPA's actions in establishing this TMDL clearly demonstrates that EPA has used a collaborative process to arrive at the final TMDL, one that has recognized and encouraged the environmental stewardship of all the watershed States, without whose full cooperation restoration of the Bay will be not occur.

6.  One commenter said EPA was attempting to expand its CWA authority by referencing a TMDL-establishment MOU with Maryland, the 2010 settlement agreement resolving Fowler v. EPA, and the Chesapeake Bay Executive Order.

Response: EPA agrees that its settlement agreement resolving Fowler v. EPA and the Executive Order do not expand its CWA authority to establish the Bay TMDL. EPA never said they did. Rather, EPA said it was establishing the Bay TMDL by December 31, 2010 to meet a commitment it made in the settlement agreement to act by that date. Regarding the Maryland MOU, EPA referenced that document (signed in 1998; revised in 2004) in the draft TMDL because Maryland's commitments in that MOU were key to EPA victory (twice) in lawsuits alleging that Maryland was in default of its CWA TMDL obligations. Without Maryland's MOU commitments (and actions), it is possible the court might have found Maryland in default and ordered establishment of TMDLs via an EPA backstop on a schedule similar to the Virginia consent decree. If that had happened, EPA's authority to establish TMDL's for Maryland's impaired Bay waters would be as clear as it is for Virginia. While it is true that an MOU cannot by itself enlarge Congressionally-bestowed powers, under these circumstances the existence of the Maryland MOU in the context of the two Maryland TMDL lawsuits explains why it is reasonable for EPA to establish within the Bay TMDL – and with Maryland's full agreement – "backstop" TMDLs for Maryland's impaired Bay waters.

B. Comments regarding the Watershed Implementation Plans (WIPs)

1.  Some commenters said that implementation plans associated with the TMDL are not part of the TMDL itself and, thus, not subject to EPA approval. More specifically, some commenters claim that EPA's "rejection" of Virginia's draft WIP is "legally

AR0000925

objectionable" because the CWA does not give EPA the authority to review and/or approve WIPs, or to direct their specific terms.

Response: EPA agrees with the commenters that the CWA does not require or authorize EPA to "approve" or "disapprove" jurisdictions' WIPs. And EPA has not done that here. Nor did EPA direct their specific terms. Instead, EPA identified expectations and a guide for the contours of the WIPs, and asked the jurisdictions to submit WIPs to support their recommendations for the decision by EPA in making its TMDL allocation decisions for various pollutant loading sectors. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' recommended allocation scenarios. Where those WIPs were determined to provide adequate reasonable assurance and met the respective jurisdictions pollutant cap loading, EPA used all (or those parts found adequate) as the basis for its TMDL allocations for that jurisdiction. Where portions of the WIPs did not provide such assurances, as the CWA requires, EPA establishes the backstop allocations in an appropriate manner so the resulting TMDL allocations are established at a level necessary to implement applicable water quality standards.

2. Some commenters said EPA did not have authority to establish a 2025 compliance deadline in the Bay TMDL.

Response: CWA section 117(g) requires that EPA "ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. Pursuant to that authority, and to support the TMDL EPA is establishing pursuant to section 303(d), EPA asked the Bay jurisdictions to develop and submit WIPs that provided for 60% implementation by 2017 and 100% implementation by 2025. In light of the decades-long history of not meeting these goals, a two-phase implementation framework is reasonable. EPA recognizes that there is much work to be done to restore the Bay; hence the final implementation target extending to 2025. In light of the Bay's importance, the delays so far in reaching those targets, and EPA's belief that this job can be done in the projected time, the staged 2017/2025 implementation framework is both lawful and reasonable. That being said, the TMDL by itself is not a self implementing mechanism and does not contain an implementation plan. That plan, or rather plans, are set forth in the State WIPs, the two year milestones, and other federal actions – components of the broader Chesapeake Bay Restoration Accountability Framework discussed in TMDL section 1.2.2 and 7.2.

C. Comments regarding "Reasonable Assurance"

1. One commenter asserts that "reasonable assurance "is a concept that does not originate in either the CWA or EPA regulations" and that EPA "created" the concept of reasonable assurance in 1997 guidance. The commenter goes on to assert that a TMDL is a "number" and "[n]othing in the statute gives EPA the authority to judge how that number is assigned or divided."

Response: EPA disagrees that "reasonable assurance "is a concept that does not originate in either the CWA or EPA regulations" and that EPA "created" the concept of reasonable assurance in 1997 guidance.

In the first place, EPA explained the concept of reasonable assurance as early as its initial TMDL guidance in April 1991, not 1997. The concept has been further explained in subsequent guidance documents.

More importantly, the commenter is incorrect in asserting that a TMDL is merely a "number" and "[n]othing in the statute gives EPA the authority to judge how that number is assigned or divided." A TMDL not just is a number. Rather, it is a collection of

AR0000926

numbers representing WLAs and LAs assigned to various pollutant sources, all of which must add up to a "total" loading of pollutants consistent with meeting applicable water quality standards. TMDL = WLA(s) + LA(s) + MOS. When approving (or in the case of the Bay TMDL) establishing a TMDL, EPA has an obligation to ensure that the sum of the WLAs and the LAs adds up to a "total" number that will implement the applicable water quality standards. This is where "reasonable assurance" comes in.

While neither the CWA nor EPA's regulations expressly mention the phrase "reasonable assurance," the congruent requirements of CWA 303(d)(1)(C) and 301(b)(1)(C) implicitly require it. Section 303(d)(1)(C) requires that a TMDL be "established at a level necessary to implement the applicable water quality standards . . ." See also 40 C.F.R. 130.7(c)(1). A TMDL calculates the maximum amount of pollutant loadings that a waterbody can receive and still meet water quality standards, sometimes referred to as assimilative capacity. For waterbodies with both point and nonpoint sources of pollutants, a TMDL writer must decide how to apportion loadings between point and nonpoint sources subject to the TMDL. Section 303(d)(1)(C) requires that the point source-nonpoint source allocation split be "at a level necessary to implement the applicable water quality standards." Without a demonstration in the TMDL's record of "reasonable assurance" that the chosen nonpoint source load allocations will in fact be met, there is no assurance that the TMDL equation will not add up to a sum that exceeds a level necessary to implement the applicable water quality standards.

Section 301(b)(1)(C) and EPA's permitting regulations provide additional support for reading a "reasonable assurance" requirement into a TMDL. Section 301(b)(1)(C) requires that point source permits have effluent limits as stringent as necessary to meet water quality standards. EPA's permitting regulations echo that requirement and, in addition, require that permits include effluent limits "consistent with the assumptions and requirements of any available wasteload allocation for the discharge" approved by EPA. 40 CFR 122.44(d)(1)(vii)(A) & (B). For WLAs to serve as a basis for a WQBEL, they must themselves be stringent enough so that (in conjunction with the waterbody's other loadings) they meet water quality standards. In the absence of reasonable assurance that a TMDL's LAs will in fact be met, the TMDL's WLAs cannot serve as an effective permitting guide. That can happen, however, if (1) the TMDL's combined nonpoint source load allocations and point source wasteload allocations do not exceed the water quality standard-based loading capacity and (2) there is "reasonable assurance" that the load allocation will be achieved. Such a demonstration ensures that an effluent limitation that is "consistent" with a TMDL's wasteload allocation pursuant to 122.44 (d)(1)(vii)(B) will also mees water quality standards as required by CWA 301(b)(1)(C) and 122.44 (d)(1)(vii)(A).

D.  Comments regarding TMDL's "Backstop allocations"

1.  Some commenters said EPA should "delay adoption of the TMDL and backstops for at least one year" because (1) there is no legal authority for the urban/suburban retrofits necessary to implement the TMDL and (2) such measures would be far more expensive and cost-effective than POTW upgrades or agricultural BMPs.

Response:  EPA disagrees with the commenter's assertion about lack of CWA legal authority for urban/suburban stormwater controls necessary to implement the Bay TMDL. Moreover, these arguments do not support delaying the TMDL. It is important that EPA establish the Bay TMDL as soon as possible. The TMDL is an important element in Bay restoration, and the Bay's waters have been impaired and restoration delayed for many years. EPA afforded the Bay jurisdictions two opportunities (draft Phase I WIPs and final Phase II WIPs) to describe the mix of implementation measures (informed by cost and other considerations) they intend to pursue in order to meet the TMDL's nutrient and sediment targets. EPA has taken the jurisdiction's WIPs into account in

AR0000927

establishing allocations in the TMDL. Because this is EPA's TMDL, the CWA requires that EPA establish nutrient and sediment allocations at a level necessary to implement applicable water quality standards. To the extent EPA backstop assumptions serve as a basis for the TMDL's final allocations, those assumptions would have been necessitated by inadequacies in the jurisdictions' WIPs. That being the case, EPA would have been obligated to make allocations stringent enough to meet applicable standards sooner or later based, in part, on such assumptions. EPA has reasonably decided to establish the Bay TMDL and its allocations sooner rather than later. For further information on retrofits please see response to comment number 0232.1.001.004

E. Comments regarding James River allocations

1. Some commenters said it was not EPA's responsibility under the Virginia or D.C. consent decrees to establish a TMDL to meet the James River's 2005 chlorophyll standards.

Response: EPA disagrees. The Virginia consent decree requires EPA to establish a TMDL at a level necessary to implement the applicable water quality standards for "each water and pollutant identified in Attachment A and C" of the decree if Virginia has not done so by a date certain. The James River's tidal tributaries are identified on Attachment A (Part 2) of the 1999 Virginia consent decree as impaired by "nutrients," with specific focus on "aquatic life concerns." It is immaterial that Virginia did not establish a numeric chlorophyll standard for those segments until 2005. The numeric chlorophyll a criteria adopted by Virginia specific to the James is to provide additional protection to aquatic life uses from the harmful effects of excess nutrients. These numeric criteria reinforce and support the restoration of those portions of the James River identified on the 1998 303(d) listing for impaired aquatic life uses. At the time EPA established this TMDL, the segments remained listed and impaired, and the 2005 chlorophyll standard was an "applicable" water quality standard for purposes of section 303(d)(1)(C). Accordingly, the 1999 Virginia consent decree requires that EPA establish a TMDL for those segments at a level that implements the applicable chlorophyll standard.

2. Some commenters said the James River has "very little impact" on the main stem and dead zone of the Bay and achievement of the proposed James River nutrient allocations "will not improve the Bay water quality." EPA provides responses to that comment elsewhere in this document.

3. Some commentators said the James River chlorophyll standard "lacks a sound scientific foundation."
Response: EPA approved this submission of revised James River numeric chlorophyll a criteria (WQS) by Virginia in 2005 as effective and applicable water quality standards (WQS) for purposes of the CWA. On that basis EPA disagrees with this comment. This comment is outside the scope of the TMDL, since the CWA requires TMDLs to be established to "applicable" WQS, and the numeric chlorophyll a criteria are such standards. See above response. EPA suggests the commenter review the 2005 submission by Virginia and EPA's approval if the commenter has further questions.

F. Comments re length of comment period and modeling information

1. Many commenters requested EPA to extend the TMDL's 45-day comment period.

AR0000928

Response: It is true EPA declined to extend the TMDL's 45-day comment period. To do so would have made it impossible for EPA to establish the Bay TMDL by December 31, 2010. EPA places a very high value on meeting its public commitment to establish the TMDL by that date. EPA does not want to break faith with the States who requested it or the public who expects it. Moreover, EPA is acting pursuant to Executive Order 13508 to "make full use of its authorities" to protect the Bay, as well as a promise EPA made in a May 2010 settlement agreement resolving Fowler v. EPA. While EPA could have attempted to negotiate an extension of the Fowler agreement date, EPA believes that - under all the circumstances of this TMDL, including the considerable transparency of the process to date and EPA's considerable efforts to engage in public outreach – its efforts were better spent finishing work on the TMDL in order to avoid any further delays in implementing EPA's and States' 27-plus year old commitment to restore the Bay's water quality.

EPA agrees that its settlement agreement resolving Fowler v. EPA and the Executive Order do not expand its CWA authority to establish the Bay TMDL. EPA never said they did. Rather, EPA said it was establishing the Bay TMDL by December 31, 2010 to meet a commitment it made in the settlement agreement to act by that date

2. Some commenters stated that EPA did not make information on Scenario Builder model available and requested EPA to make more modeling-related information available.

Response: EPA disagrees that it had not made information on Scenario Builder and other essential models available. For example EPA posted scenario builder information that was used for all of the calibration model inputs (the same thing as SB output) except for the acres of BMPs, which was calculated outside of SB in March 2010 at:

ftp://ftp.chesapeakebay.net/modeling/phase5/Phase%205.3%20Calibration/Model%20Input/

In addition the following information on the Watershed Model calibration was posted on the following websites spring of 2010:

 - http://www.chesapeakebay.net/phase5.htm : Scroll down to Phase 5.3 Watershed Model Output Data and Phase 5.3 Watershed Model Input Data
- http://ftp.chesapeakebay.net/Modeling/phase5/Phase%205.3%20Calibration/

This information was also available through links provided in Section 5 of the draft TMDL, which was released for a 45-day public comment period on September 24th. Further, the Watershed Model code and calibration data, as well as the Scenario Builder documentation, were linked to our website before the draft TMDL was released.

The Scenario Builder programming codes are available for download at:
- http://ftp.chesapeakebay.net/modeling/ScenarioBuilder/ScenarioBuilderSource/

In response to requests for more specific SB information, EPA also made additional information available in November 2010 as discussed in emails from EPA James Curtin to several persons including Susan Bodine dated November 2, 2010. EPA believes it has made sufficient information available for the public to reasonably and intelligently comment on the Bay TMDL.. For a more detailed response on modeling, please see response to comment number 379.1.001.006.

AR0000929

G.  Comments regarding CWA 117(g)

1.  A number of commenters questioned EPA's reliance on CWA section 117(g) in support of its authority to establish the Bay TMDL and headwater State allocations.

Response:  EPA disagrees with commenters who believe section 117(g) does not provide additional authority for EPA to establish the Bay TMDL.

Specifically, EPA disagrees with the comment that the term "management plans," as used in section 117(g), may not be interpreted to include the Bay TMDL.  EPA notes that Congress did not include within section 117(g) a definition of the term "management plans."  Accordingly, there is room for reasonable interpretation of its meaning.  Webster's defines a "plan" as a "goal; aim," or, alternatively, "an orderly arrangement of parts of an overall design or objective."  Defined this way, a section 117(g) Chesapeake Bay "management plan" may reasonably be interpreted to include its goal, aim, or objective – in this case, the Bay TMDL and its allocations.

In section 117(g) Congress directed EPA, in coordination with the signatories to the Chesapeake Bay Agreement, to "ensure that management plans are developed and implementation is begun to achieve and maintain, among other things (1) the "nutrient goals" of the Bay agreement "for nitrogen and phosphorus entering the Chesapeake Bay and its watershed" and (2) "the water quality requirements necessary to restore living resources in the Chesapeake Bay."  In this context it is reasonable for EPA to interpret the term "management plans" as used in section 117(g) to include, not only an identification of the actions proposed to be taken by EPA and the other signatories, but also the section 303(d)-based identification of the numerically-expressed  "nutrient goals" and "water quality requirements" [nitrogen, phosphorus, and sediment allocations] that would inform those actions. The fact that Congress may have used similar terms in wholly different contexts, e.g., "management program" in section 319, "management plan" in section 320, "areawide waste treatment management plan" in section 208, does not mean that – for the purposes of interpreting and implementing section 117(g) - EPA may not interpret the section 117(g) term "management plans" to include that part of the plan that identifies its target or goal.

EPA also disagrees with the comment that EPA may not allocate pollutant reductions to New York because it was not a signatory to the Bay Agreement but only a "voluntary partner."  Even if section 117(g) were not part of the CWA, section 303(d) gives EPA all the authority it needs to establish this TMDL.  Section 117(g) merely underscores that authority as well as specifically directing EPA to take such actions to further restore Bay water quality.  While it is true that New York (as well as West Virginia and Delaware) did not sign the 2000 Bay Agreement, those States subsequently (in 2000 and 2002) signed a MOU with EPA and the other four Bay watershed jurisdictions in which they agreed to work cooperatively to meet the Bay Agreement's goals by 2010 so the Bay's impaired waters could be removed from the States' section 303(d) lists. Moreover, in 2007 New York, West Virginia and Delaware reached consensus with the signatory jurisdictions that EPA should establish the Bay TMDL on behalf of them all.  By signing the MOU, joining the consensus that EPA should establish this TMDL, and participating with EPA in the development of the TMDL and their own WIPs, New York and the other non-signatory States have made themselves functionally and - for the TMDL's purposes - legally equivalent to the signatory States regarding their Bay TMDL status.

2.  Some commenters said that Congress did not "provide authority to EPA to achieve the goals set in section 117" of the CWA and

AR0000930

that regulation and enforcement is "directly in the hands of each signatory." Others said Congress did not provide EPA in 117(g) with "regulatory authority" to achieve those goals, or authority to "approve, disapprove, or change the state WIPs."

Response: CWA section 117(g) requires that EPA "ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. EPA is not sure what the commenter means by saying that Congress did not provide EPA with authority ("regulatory," or otherwise) to achieve the goals of CWA section 117(g). EPA has ample authority in the CWA (see e.g., sections 301, 303(c) and (d), 402, 319 and other provisions) to achieve the water quality goals of section 117(g). In addition, section 117(g) expressly directs (and impliedly authorizes) EPA "to ensure that management plans are developed and implementation is begun" to meet the Bay's nutrient goals and water quality requirements. That direction and authorization – even if it arguably does not provide EPA with any "additional" regulatory authorities – surely does not constrain use of authorities provided elsewhere in the Act. EPA has not asserted that section 117(g) gave it authority to "approve, disapprove, or change the state WIPs," and EPA has not done so. EPA has exercised the leadership role accorded to it by section 117(g) in a responsible and appropriate way by working collaboratively with the Bay jurisdictions to ensure that their WIPs are of sufficiently high quality to achieve the Bay's water quality goals.

H. Comments regarding CWA 510

1. Some commenters said EPA's disapproval of State WIPs, establishment of replacement WIPs, or establishment of the Bay TMDL is inconsistent with state primacy under CWA section 510.

Response: EPA disagrees with this comment. In the first place, EPA has not "disapproved" any State WIPs or established a replacement WIP for a State. Instead, EPA asked the jurisdictions to submit WIPs to support their recommendations for EPA's TMDL allocation decisions for various pollutant loading sectors. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' allocations. Where the WIPs did not provide such assurances, the CWA required EPA to adjust the allocations in an appropriate manner so they are established at a level necessary to implement applicable water quality standards. CWA section 510 preserves a State's right to adopt its own standards or limitations regarding discharges of pollutants, except that States may not be "less stringent" than applicable federal requirements. EPA reviewed the WIPs to determine if they provide adequate "reasonable assurance" to support the jurisdictions' recommended allocations scenario. Where those WIPs were determined to provide adequate reasonable assurance and met the respective jurisdictions' pollutant cap loading, EPA used all (or those portions found adequate) as the basis for its TMDL allocations for that jurisdiction. Where portions of the WIPs did not provide such assurances, as the CWA requires, EPA makes backstop allocations in an appropriate manner so the resulting TMDL allocations are established at a level necessary to implement applicable water quality standards. In so doing, EPA did not act in contravention of Section 510 because nothing in section 510 precludes EPA from establishing a TMDL at a level necessary to implement the applicable State-adopted and EPA-approved water quality standards.

2. Some commenters allege that EPA's establishment of the Bay TMDL is an impermissible intrusion into State authority and an exercise in State "compulsion" in violation of the 10th Amendment and principles of federalism.

Response: EPA disagrees. Taken as a whole, the record of EPA's and the Bay jurisdictions' activities over the past decade demonstrates that EPA has established he Bay TMDL in collaborative partnership with the Bay jurisdictions and not through compulsion of them. EPA is under legal obligation to establish the Bay TMDL for certain waters in Virginia, DC, and Delaware.

AR0000931

Each of those jurisdictions has collaborated with EPA in establishing the TMDL. In a similar manner, Maryland (pursuant to its MOU) and the headwaters states of New York, Pennsylvania, and West Virginia have also collaborated with EPA, the Chesapeake Executive Council and the PSC in developing the Bay watershed TMDL. EPA has neither impermissibly intruded into State authority nor compelled the jurisdictions in violation of the 10th Amendment or principles of federalism. Indeed, EPA has invited the jurisdictions to take the lead in developing WIPs for their own States designed to inform EPA's TMDL allocations decisions and thereafter implement the TMDL's loading targets. In doing so, EPA demonstrated its respect for our federal system and the priority of the States to determine how the TMDL will be implemented.

While it is true that EPA on a number of occasions provided the jurisdictions with its "expectations" regarding their implementation efforts, EPA died not "compel" any particular outcomes. The jurisdictions' discretion was bounded only by the statutory requirement that their implementation proposals provide EPA with sufficient "reasonable assurance" that the TMDL allocations are established at a level necessary to implement the applicable Bay-wide water quality standards. To the extent a jurisdiction's WIP did not do that, EPA was compelled by the CWA to establish allocations in the TMDL to meet standards. While some of those allocations may have been based on assumptions about additional implementation and oversight by EPA, that is nothing more (under the circumstances) than the federal-state scheme established by the Act contemplates and requires. This approach is fully consistent with CWA, the Constitution, and principles of federalism. It is also consistent with the Ninth Circuit's 2002 decision in Pronsolino v. Nastri, 291 F.3d 1123. As in Pronsolino, EPA recognizes that implementation of the Bay TMDL is primarily a state responsibility. Here – as in Pronsolino - EPA did notrequire or include implementation plans "within the TMDL." EPA asked for them – in part pursuant to section 117(g) – to inform and support the allocation setting process. As with the Garcia River TMDL, the Bay TMDL "serves as an informational tool for the creation of the state's implementation plan." It is not a substitute for it.

Nor is it the case that assumptions about future EPA regulatory or NPDES oversight authority that support any EPA allocation decisions "commandeer" State legislative processes in violation of the 10th Amendment to the Constitution. During the TMDL development process, EPA invited the jurisdictions to make the difficult legal, policy, and budgetary choices necessary to implement the pollution reductions needed to meet applicable Bay water quality standards. The Chesapeake Bay Commission (CBC), a member of the Chesapeake Executive Council, represents the legislatures of the three signatory states. The CBC has been an active participant in this process. The States have also made such hard choices in their WIPs. If EPA believes some of those measures are insufficient in the aggregate to meet those standards, it must establish TMDL allocations that it believes ("reasonable assurance") can, and will, meet standards. The Bay jurisdictions have choices and discretion regarding how to implement their WIPs in service of the TMDL. EPA has not – and will not - "commandeer" their legislative and administrative processes. However, EPA does reserve the right to exercise its own federal authorities and prerogatives in an appropriate manner (either through rulemaking, enforcement, NPDES oversight, or other means) to ensure that the TMDL's and CWA's goals are met. In relying on assumptions about potential future federal actions, EPA is not "prejudging" the outcome of future rulemakings or other actions. The exact scope and design of any such rulemakings must of necessity await the conclusion of the APA rulemaking process, including the opportunity for public comment, or in the case of a designation process, as provided by the CWA and its implementing regulations. However, in assessing and providing "reasonable assurance" to support the TMDL's allocations, it is appropriate for EPA to make allocations based on certain assumptions about what "backstop" actions are available to it in the event the jurisdictions' WIPs (or their implementation) are not sufficiently robust to meet the Bay's water quality standards.

H.  Miscellaneous Legal Issues

1. One commenter asked whether EPA considered how the TMDL might impact environmental justice, especially with regard to its impacts within densely populated watersheds.

Response: EPA believes the Bay TMDL and Bay restoration in general is fully consistent with its broader efforts to promote environmental justice. Around the watershed there are many disadvantaged and minority communities whose lives and livelihoods are closely tied to a healthy Bay: as a source of employment, recreation, food, and quality of life. EPA recognizes that restoring Bay water quality will not be cheap and that the costs may have to be borne broadly. However, on balance, EPA believes restoring Bay water quality is fully consistent with environmental justice principles.

2. Some commenters assert that the high estimated costs of stormwater retrofits "approach" a "taking" without compensation prohibited by State and the U.S. Constitution.

Response: EPA disagrees. EPA's Bay TMDL is not a federal or state regulation, and its wasteload and load allocations do not as a matter of law effect an unconstitutional "taking" of private property. Nor is the TMDL a permit that requires a private property owner to retrofit his or her property. The TMDL and its allocations are, instead, a reasonable and lawful exercise of EPA's authority under CWA 303(d) to establish pollutant loading targets that guide the jurisdictions' and EPA's efforts to implement measures designed to implement the Bay's water quality standards. See also response to Comment number 0232.1.001.004 for more discussion of the takings issue.

3. On commenter [0533.1.001.001] questioned whether EPA's TMDL is based on data EPA collected from survey's of communities, wastewater treatment plants, and other regulated entities without the proper OMB clearance.

Response: EPA disagrees. While EPA used information from a great number of sources, to the best of EPA's knowledge, EPA used the OMB clearance numbers associated with general TMDL development and establishment as authorized. For some information, EPA relied on responses from entitles already required to submit information under such instruments as NPDES permits and/or other federal requirements.

# Comment ID 0293.1.001.026

**Author Name:** Pomeroy Christopher

**Organization:** Virginia Municipal Stormwater Association, Inc. (VAMSA)

The American Canoe and Kingman Park Consent Decrees Do Not Address Virginia Chlorophyll-a

EPA continues to assert in it must complete the Bay TMDL by 2011 (the December, 2010 deadline is a self-imposed acceleration) because of two consent decrees issued in the late 1990/early 2000 timeframe, American Canoe Association, Inc. v. EPA, Civil Action No. 98-99-A (E.D. Va. 1999) [FN43] and Kingman Park Civic Association v. EPA, Case No. 1:98CV00758 (E.D. Va. 2000). Draft TMDL at 1-14 - 1-16.

VAMSA submits that EPA's obligations to develop a TMDL by May, 2011 do not extend to establishing loadings on the

AR0000933

**Response to Public Comments**

**Chesapeake Bay TMDL for Nitrogen, Phosphorus and Sediment**

**December 29, 2010**

**Docket #: EPA-R03-OW-2010-0736**

**Part II**

AR0002057

**Response**

Please see the response to comment 0265.1.001.017.

# Comment ID 0510.1.001.010

**Author Name:** Haterius Stephen

**Organization:** National Association of State Departments of Agriculture (NASDA)

Adding implementation measures has only added to the complexity of the Draft TMDL. The Draft TMDL consists not only of the 370 pages of the Draft TMDL document, but also the 1672 pages of the 22 appendices, as well as the technical analysis and modeling information that is referenced throughout the Draft TMDL. We have not attempted to quantify the volume of that supporting information.

Despite its acknowledgement that the Draft TMDL is the most complex ever attempted, EPA is allowing only 45 days for public comment. Forty-five days is insufficient under the APA to provide for meaningful public comment. In its October 22, 2010, letter to Congressman Goodlatte and Congressman Holden, EPA bases its refusal to extend the comment period on the deadlines that the administration has imposed on itself through Executive Order 13508 and through a settlement agreement with Chesapeake Bay Foundation even though these are self-imposed deadlines.

**Response**

Please see the responses to comments 0060.1.001.001 and 0062.1.001.004.

# Comment ID 0737.001.002

**Author Name:** Comment Anonymous

**Organization:** Lower Allen Township Authority

Objective - EPA should provide in the TMDL a year in which the Bay water quality will be improved following full implementation of the TMDL.

**Response**

There is a lag time between the implementation of management practices and benefits to water quality. EPA can not provide a date when water quality standards will be achieved; however, we anticipate full implementation of the TMDL by 2025.

# Comment ID 0745.001.002

AR0003701

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

_____

| | |
|---|---|
| **AMERICAN FARM BUREAU FEDERATION,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **PENNSYLVANIA FARM BUREAU,** ) | |
| ) | |
| **Plaintiffs,** ) | **Case No. _____** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES ENVIRONMENTAL** ) | |
| **PROTECTION AGENCY,** ) | |
| ) | |
| **Defendant.** ) | |

_____

## COMPLAINT

Plaintiffs American Farm Bureau Federation and Pennsylvania Farm Bureau

(collectively, "Farm Plaintiffs") bring this action seeking declaratory and

injunctive relief against Defendant United States Environmental Protection Agency

("EPA") and allege as follows:

## INTRODUCTION

1.     Farm Plaintiffs challenge the final action of Defendant EPA in promulgating the Final Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment, signed by the EPA Regions II and III Regional Administrators on December 29, 2010 ("Final TMDL").  *See* 76 Fed. Reg. 549 (Jan. 5, 2011) (notice of availability of the Final TMDL); *available at* http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/tmdlexec.html.  Although the lawful purpose of the Final TMDL is informational – to identify the maximum amount of nitrogen, phosphorus, and sediment that would achieve water quality standards in the Chesapeake Bay – this EPA action does much more.  The Final TMDL assigns contributions of these substances to local waters among farms, cities, and businesses, as well as residential, agricultural, and undeveloped lands throughout the vast Chesapeake Bay watershed – in Virginia, West Virginia, Maryland, Delaware, Pennsylvania, New York, and the District of Columbia (collectively the "watershed jurisdictions") – a 64,000-square-mile area with a population of almost 17 million people.

2.     EPA used an unprecedented process to micromanage waterways from Virginia to New York through the assignment of highly specific pollutant loads. That process unlawfully circumvented the Clean Water Act procedures that give primary authority to the states to protect water quality.  The Clean Water Act

grants primary authority to the states to establish (a) water quality standards, then (b) (for waters that do not meet those standards) "total maximum daily loads" ("TMDLs") representing the levels of pollutants the water body can receive and achieve those standards, and finally (c) a planning process to work toward achieving standards through practicable management practices for "nonpoint" sources and through individual discharge limits for point sources.

3.      The Final TMDL is fatally flawed in four critical respects: (a) the "allocation" of pollutant loads among sources in a TMDL exceeds EPA's authority under the Clean Water Act; (b) the assigned pollutant loads are based on erroneous information; (c) the erroneous information used to derive the assigned pollutant loads was fed into computer models that are unsuitable for deriving such loads – even with *accurate* information; and (d) during the comment period the public did not have access to the information it needed to comment effectively on the modeling results and the assumptions in the Final TMDL.

4.      For each of the reasons, this Court should declare that the assigned pollutant loads are not legally enforceable, and it should vacate the Final TMDL.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, and under the Administrative Procedure Act, 5 U.S.C. § 702, providing for judicial review of

final agency action.  The Court can grant declaratory and injunctive relief under 28

U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and

under 5 U.S.C. §§ 701-706 for violations of the Administrative Procedure Act and

the Clean Water Act.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)

because EPA is an agency of the United States, Plaintiff Pennsylvania Farm

Bureau resides in this district, and Farm Plaintiffs' members affected by the Final

TMDL reside in this judicial district.

## PARTIES

7.    Plaintiff American Farm Bureau Federation is a voluntary general

farm organization formed in 1919 to protect, promote, and represent the business,

economic, social, and educational interests of American farmers.  The American

Farm Bureau Federation represents more than 6.2 million member families through

member organizations in all fifty states and Puerto Rico, including each of the six

states in the Chesapeake Bay watershed.  These member organizations include the

Pennsylvania Farm Bureau.  Many of the American Farm Bureau Federation

member families own and operate farms that produce the row crops, livestock, and

poultry that provide safe and affordable food for Americans and a growing global

population.

8.    Some of these farms are located within the 64,000-square-mile Chesapeake Bay watershed.   Some of these farms are livestock or poultry operations that hold (or will be required to obtain) individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into these waters.[1]   The terms and conditions of those permits will be improperly and adversely affected by the Final TMDL, and new permits will be more difficult to obtain as a result of the Final TMDL.   As a result, the American Farm Bureau Federation member families are significantly and adversely affected by EPA's action, which will limit their ability to obtain Section 402 permitting for new or expanded operations and will require more stringent permit limitations for nitrogen, phosphorus, and sediment.

9.    In addition, some of American Farm Bureau Federation's member families operate farms (livestock, poultry, or row crop production) that are not currently regulated under the Clean Water Act, but are subject to regulatory requirements for nutrients under state law, or participate in nutrient management programs supported by the state departments of agriculture or by the U.S. Department of Agriculture, or undertake voluntary action to control runoff of

---

[1] The Clean Water Act and EPA rules generally prohibit discharges from livestock and poultry operations that qualify as "concentrated animal feeding operations" or "CAFOs," with the exception of discharges caused by certain extreme rainfall and authorized under a Section 402 permit.  Most terms and conditions of such permits are designed to prevent any discharge from occurring.

-1631-

nutrients and sediments without participating in or reporting to a formal state or federal program. These farms will be directly and adversely affected by the Final TMDL, which assigns pollutant loadings both for regulated "point sources" and for unregulated "nonpoint source" operations.

10.    During the public comment period for the challenged action, the American Farm Bureau Federation provided detailed comments on EPA's Draft Chesapeake Bay Total Maximum Daily Load ("Draft TMDL").

11.    Pennsylvania Farm Bureau is a general farm organization that has provided legislative support, information, and services to Pennsylvania's farmers and rural families since 1950. Some of the Pennsylvania Farm Bureau members have farms located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above. The Pennsylvania Farm Bureau also provided comments to EPA on the Draft TMDL.

12.    Defendant EPA is the federal agency charged with the administration and enforcement of the Clean Water Act, in accordance with the specific delegations of authority from Congress contained in that statute. EPA is headquartered in Washington, D.C.

## STATUTORY AND REGULATORY FRAMEWORK

13.    Total maximum daily loads ("TMDLs") are one element of a detailed statutory and regulatory framework under the Clean Water Act, which prescribes the following series of actions that are described in greater detail below: (i) establishment of water quality standards by the states under Section 303(c); (ii) identification by the states of certain waters that are not meeting water quality standards under Section 303(d) (commonly called "impaired" waters); (iii) calculation by the states of a total maximum daily pollutant load – a TMDL – for such impaired waters under Section 303(d); and (iv) a "continuous planning process" to generate plans for implementation of water quality standards by the states through a variety of regulatory and non-regulatory actions.  Implementation actions include incorporation of assigned pollutant loads into individual Clean Water Act discharge permits, typically issued by the states under state permit programs approved by EPA, and which regulate pollutant discharges to such impaired waters from regulated point sources.  Federal involvement in the above scheme is extremely limited, with statutory authority for EPA to act directly only in the form of federal disapproval of or objection to state action or inaction, and with no authority at all for EPA to develop a state's planning process or implementation plans.

### A.    Overview of Clean Water Act Regulation

14.    The Clean Water Act divides sources of pollutants to waterways into two major categories: "point sources" and "nonpoint sources." "Point source" is defined at 33 U.S.C. § 1362 to mean "any discernible, confined, and discrete conveyance including . . . any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." The term also includes those livestock and poultry operations that qualify under EPA regulations as a "concentrated animal feeding operation." Congress specifically excluded "agricultural stormwater discharges and return flows from irrigated agriculture" from the definition of point source. *Id.*

15.    All pollutant discharges to waters of the United States from a point source are prohibited under the Clean Water Act unless otherwise authorized under several sections of the Act. One primary way in which discharges are authorized is under a Section 402 permit, known as a National Pollutant Discharge Elimination System ("NPDES") permit.[2] *Id.* § 1342. The NPDES permitting system imposes limits on such discharges based on the application of technology, or the need to achieve water quality standards, whichever is more stringent. *Id.* §§ 1311(b), 1312. States assume primary responsibility for administration and enforcement of

---

[2]   Many non-industrial "stormwater" discharges are authorized under Section 402 even without a permit, unless EPA or the state permitting agency "designates" such a discharge for permitting. *See* 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(a)(1)(v).

the NPDES permitting program following EPA approval of a state's proposed program. *Id.* §§ 1342(b), 1342(c)(1). EPA retains authority, in specified circumstances, to object to a particular NPDES permit that authorizes discharges to waters within the statute's jurisdiction. *Id.* § 1342(d); 40 C.F.R. § 123.44.

16.    Nonpoint sources are not defined at 33 U.S.C. § 1362 and are not regulated under the NPDES program. Indeed, the Clean Water Act does not provide any federal authority to regulate nonpoint sources of pollutants.

### B.    Development of Water Quality Standards

17.    Consistent with express congressional policy, the Clean Water Act recognizes, preserves, and protects "the primary responsibilities and rights of *States* to prevent, reduce, and eliminate pollution [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b) (emphasis added). In accordance with that policy, the Clean Water Act places primary authority with each state to develop and implement water quality standards, consisting of designated uses and water quality criteria, for its water bodies. *Id.* § 1313(c)(2)(A).

18.    Each state must designate one or more uses for its water bodies, and develop water quality criteria for each water body necessary to protect these designated uses, taking into account the water bodies' use and value for public water supplies, propagation of fish and wildlife, recreational, agricultural, and

industrial purposes, use for navigation, and other purposes. *Id.* § 1313(c)(2)(A); 40 C.F.R. §§ 131.10 and 131.11. These criteria can be expressed for a pollutant as specific numeric quantities or as general narrative statements, but in either case, must be based on "sound scientific rationale." 40 C.F.R. § 131.11(a). The standards adopted by the states are subject to EPA review and approval to ensure that they are consistent with Clean Water Act requirements. 33 U.S.C. § 1313(c)(3)-(4).

19.    The Clean Water Act and EPA regulations allow for changes to water quality standards when current standards are found to be unattainable or are attainable only through controls that would cause substantial and widespread economic and social impacts. EPA regulations provide for states to perform a "use attainability analysis" prior to changing a waterway's designated use and the resulting water quality standards. 40 C.F.R. §131.10(g). Such an analysis allows policy makers to consider the human, economic, and social consequences of the controls necessary to attain a designated use.

### C.    Development of TMDLs for Impaired Waters

20.    Section 303(d) directs each state (i) to identify those waters within its boundaries for which technology-based Section 402 permit limitations are not stringent enough to implement the applicable water quality standards and (ii) to establish a priority ranking of these waters, taking into account the severity of the

pollution and the waters' designated uses.  33 U.S.C. § 1313(d)(1)(A).  The state

must establish a TMDL for each listed water (commonly referred to as "impaired"

waters) for pollutants identified by EPA as suitable for such calculation.  *Id.*

§ 1313(d)(1)(C).  This "total" maximum daily load is established "at a level

necessary to implement the applicable water quality standards," accounting for

seasonal variations and a margin of safety.  *Id.*

21.    A TMDL is a calculation – a number (or the sum of multiple

numbers), which, as EPA acknowledges, is meant to be an "informational tool[]."

Final TMDL at 1-15 (quoting *Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir.

2002)).    Under EPA regulations, a TMDL is the sum of both "wasteload

allocations" ("WLAs") – the portions of a receiving water loading capacity

allocated to each of its existing or future point sources of pollution – and "load

allocations" ("LAs") – the loading capacity portions attributed to the water body's

"existing or future nonpoint sources of pollution or to natural background sources."

40 C.F.R. § 130.2.

22.    Like water quality standards, the listing of impaired waters and the

establishment of TMDLs for those waters are subject to EPA review and approval.

33 U.S.C. § 1313(d)(2).  If EPA disapproves of a TMDL submitted by a state, or if

a state fails to establish a required TMDL, EPA has "backstop" authority to

establish a TMDL.  The calculations used to establish TMDLs must be subject to public review.  40 C.F.R. § 130.7(c)(1)(ii).

### D.    Implementation of TMDLs

23.    In keeping with congressional policy to preserve and protect the primary responsibilities and rights of each state over its planning for the development and use of its land and water resources, and in contrast to EPA's express authority for the review and approval of state water quality standards and TMDLs, the Clean Water Act does not provide EPA with authority over the *implementation* of TMDLs.  How, when, and indeed whether a TMDL is ultimately achieved, including any imposition of enforceable pollutant load allocations among sources and sectors within a state, is placed exclusively in the hands of each state.  State implementation plans are not part of the TMDL, are not required to be submitted to EPA, are not subject to EPA approval, and are not subject to unilateral modification by EPA.

24.    The only statutory provision that addresses TMDL implementation provides that each state shall "have a continuing *planning process*" ("CPP") consistent with the statute, which is subject to EPA review and approval.  33 U.S.C. § 1313(e)(1)-(2).  This provision further states that EPA "*shall approve* any [CPP] submitted . . . which *will result in plans* for all navigable waters within [the] state, which include . . . [TMDLs and] adequate implementation, including

schedules of compliance, for revised or new water quality standards." *Id.*§ 1313(e)(3). The Clean Water Act provides the sole remedy for a state's failure to have an approved planning process: EPA shall not approve a state permitting program (under CWA Section 402) for any State which does not have an approved CPP. *Id.* § 1313(e)(2).

25. For states that have an approved CPP, this creates a framework for TMDL implementaion. Once EPA either approves a TMDL submitted by a state, or itself establishes a TMDL, the state must incorporate the TMDL into its current CPP. *Id.* § 1313(d)(2).

26. In contrast with EPA's express authority to directly establish water quality standards or TMDLs under certain circumstances, the Clean Water Act does not provide EPA with authority to *itself* prepare a TMDL implementation plan (or a CPP), even where a state fails to do so. EPA has no authority to cross the line between identifying *total pollutant levels* necessary to meet water quality standards and *specifying implementation requirements*, such as how that total should be allocated among sources. In addition, nothing in the Clean Water Act or EPA's regulations authorizes EPA to demand "reasonable assurances" that the state will achieve sufficient load reductions to meet the TMDL.

E.    **Addressing Impairment Caused by Nonpoint Sources**

27.    Nonpoint sources are addressed in Clean Water Act Section 319, 33 U.S.C. § 1329, which was added to the Act in 1987 to require nonpoint source management programs for water quality impairment caused by these sources. Under Section 319, states must identify waters not meeting water quality standards due to nonpoint sources, prepare and submit plans to reduce nonpoint source pollution to the extent practicable, and then may receive federal grant money for implementation projects.

28.    Nonpoint sources are also referenced in Clean Water Act Section 208, 33 U.S.C. § 1288, which directs states to develop area wide waste treatment plans that include "a process to (i) identify, if appropriate, agriculturally and silviculturally related nonpoint sources of pollution, including return flows from irrigated agriculture, and their cumulative effects, runoff from manure disposal areas, and from land used for livestock and crop production, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources." 33 U.S.C. § 1288(b)(2)(F).

29.    There is no federal implementation role for EPA in either Section 208 or 319 for nonpoint sources, which include runoff from manure disposal areas and land used for livestock and crop production. In particular, there is no "backstop"

authority for EPA to prepare plans or programs for nonpoint source control in the event that states fail to act or fail to adopt programs that meet with EPA approval.

## FACTUAL BACKGROUND

### A.    Chesapeake Bay Program and Tributary Strategies

30.    The Chesapeake Bay Program was established as a voluntary partnership in the 1980s.  It comprises the seven watershed jurisdictions (six states and the District of Columbia), federal agencies including EPA, the United States Departments of Agriculture, Commerce, Defense, and Transportation, and other agencies, as well as academic and other partners.  Each of the Chesapeake Bay Program partners has agreed to use its own resources to implement projects and activities that advance restoration of the Chesapeake Bay.

31.    In 2000, the seven watershed jurisdictions signed the Chesapeake 2000 Agreement, which established a series of commitments, including a goal of correcting nutrient and sediment related water quality problems by 2010.  EPA issued new water quality criteria for the Chesapeake Bay in 2003.  The watershed jurisdictions cooperatively allocated pollutant loadings among the watershed jurisdictions in April 2003.

32.    The seven watershed jurisdictions then adopted new water quality standards incorporating EPA's criteria and developed the Chesapeake Bay Tributary Strategies from 2004-2006, outlining by river basin their planned implementation activities to reduce nitrogen, phosphorus, and sediment levels in

the Chesapeake Bay and to achieve basin-wide cap loads agreed to by the jurisdictions. The cap loads were intended to be equivalent to the reductions required in a TMDL, and progress made towards reaching those cap loads was to be reported on a regular basis. These Tributary Strategies provided a framework for accelerating the protection and restoration of the Bay and were making progress to achieve those goals without a TMDL from EPA.

33. In 2007, the watershed jurisdictions changed the goal of achieving water quality standards by 2010 to a goal of implementing measures to achieve standards by 2025, and continued implementation of their Tributary Strategies to achieve this new goal. Current efforts are producing improvements in the water quality and overall health of the Chesapeake Bay. According to the Chesapeake Bay Program's assessment of the Bay and its watershed for 2009, the overall health of the Bay achieved a 6% improvement from 2008. *See* http://www.chesapeakebay.net/content/publications/cbp_50513.pdf, at 3. For example, the adult blue crab population in 2009 achieved its highest level since 1993, increasing to 223 million. Nearly 3,000 acres of oyster reefs have received habitat restoration treatments through 2009, which surpassed the Chesapeake Bay Program's goals. In addition, the Bay's bottom-dwelling species achieved a 15% gain in overall health from 2008 to 2009.

### B.    Success of Bay Watershed Agricultural Community in Reducing Pollution to the Bay

34.    Farmers in the Chesapeake Bay watershed have made major contributions to protecting the Bay through improved farmland practices in recent years, and these efforts continue to expand and strengthen.  These contributions include consistent improvement in nitrogen use efficiencies, as well as increased adoption and continuous improvement of best management practices ("BMPs") that are reducing runoff.

35.    The Natural Resources Conservation Service of the U.S. Department of Agriculture released the review draft of a report in October 2010 that evaluated the conservation and natural resource performance of the agricultural community in the Chesapeake Bay region.  *See* Natural Resource Conservation Service, Assessment of the Effects of Conservation Practices on Cultivated Cropland in the Chesapeake Bay Region (October 2010) ("NRCS 2010") (available at http://www.regulations.gov/#!documentDetail;D=EPA-R03-OW-2010-0736-0482.2).  It found that farmers have adopted a wealth of conservation practices on the region's 4.38 million acres of cropland that have dramatically reduced the nitrogen, phosphorus, and sediment loads to the Bay and the streams and rivers in its watershed.

36.    The Natural Resource Conservation Service found that farmers were actively implementing erosion control practices on about 96% of the cropland

17

acres in production in the watershed over the 2003 to 2006 period.  These practices

included various forms of erosion control involving no-till or minimum tillage, and

structural and vegetation management practices like contour farming, grass

waterways, and filter strips.  As a result of these and other nutrient management

practices, the Natural Resource Conservation Service found that sediment

contributions from cultivated cropland to the region's rivers and streams are being

reduced by 64%, nitrogen by 36%, and phosphorus by 43%, and that these

practices are responsible for reducing total loads of sediment, nitrogen, and

phosphorus delivered to the Bay from all sources by 14%, 15%, and 15%.  NRCS

2010 at 9-10.

37.    EPA's own data show that since 1985 the agricultural community has

dramatically reduced loading to the Chesapeake Bay for nitrogen (by over 27%),

for phosphorus (by over 21%), and for sediment (by over 24%).  *See* EPA

Presentation at Draft TMDL Public Meeting, at 23-25 (Sept. 29, 2010) (*available*

*at* http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/dcpublicmeetingrakmods.pdf).

**C.    Development of a Federal TMDL – Usurping State
       Implementation**

38.    Despite what it acknowledges have been "extensive restoration efforts

during the past 25 years," EPA found it necessary to set a federal TMDL – a

"historic and comprehensive 'pollution diet' with rigorous accountability measures

to initiate sweeping actions to restore clean water" in the Chesapeake Bay

watershed.  Final TMDL at ES-1.  EPA set an arbitrary deadline of December 31,

2010, for completion of the Chesapeake Bay TMDL.  This deadline required

development of the TMDL before EPA's methods and models were ready to

provide scientifically sound support.  It also severely limited the time in which the

public could review and provide meaningful comments on the Draft TMDL and

the incomplete modeling on which it was based, as well as the time in which EPA

could absorb and respond to those comments before issuing the Final TMDL.

Moreover, because EPA ultimately demanded that the states submit draft

implementation plans and revise those plans to EPA's liking *before* establishment

of the Final TMDL, this schedule severely constrained the time in which states

could prepare their implementation plans.

39.    EPA originally assured the watershed jurisdictions that they would be

responsible for implementation of its TMDL, including allocating load reduction

responsibilities, at their discretion, consistent with the Clean Water Act.  However,

EPA has instead imposed what it calls an "accountability framework" on the states

and individual sources within the watershed.  EPA required states to submit to the

agency their draft Watershed Implementation Plans ("WIPs") before the TMDL

was even proposed, reversing the sequence for TMDL development and

implementation planning provided for in the Clean Water Act and EPA's

regulations.  EPA then used the state WIPs to develop the assumptions that were

incorporated into the models used to establish the TMDL.  According to EPA, these WIPs "played a central role in shaping the TMDL." *Id.* at ES-1.

40.    EPA "conducted an intense evaluation" of the draft state WIPs, "comparing the submissions with EPA expectations." *Id.* at ES-9.  EPA essentially disapproved the WIPs as submitted by all the states, concluding that the pollution controls identified in many of them were insufficient or that all of the draft WIPs failed to provide sufficient "reasonable assurance" that the identified pollution controls would be implemented to achieve nutrient and sediment reduction targets. As a result, the agency included "backstop measures" in the Draft TMDL, in excess of its authority under the Clean Water Act.

41.    The unlawful backstop measures in the Draft TMDL were accompanied by threats of retaliatory actions by EPA to coerce watershed jurisdictions into revising their implementation plans to EPA's satisfaction.  For example, the threats included use of "residual designation" authorities to regulate sources in a state that are currently unregulated, such as smaller livestock and poultry operations, in direct contravention of EPA regulations at 40 C.F.R. § 122.23(c)(1).  That regulation requires specific determinations before EPA or a state can designate any unregulated animal feeding operation as a regulated "concentrated animal feeding operation."

42.    EPA also threatened to take other actions to coerce the watershed jurisdictions into adopting EPA's preferred implementation plans.  For example, EPA threatened to object to state-issued permits, even though disagreement with a state WIP is not one of the grounds specified for objections in EPA's regulations. *See* 40 C.F.R. § 123.44.  EPA further threatened to require "net improvement offsets" for new or increasing discharges.  But such a requirement by definition would require individual sources to over-control beyond what is needed to avoid causing or contributing to a violation of water quality standards – the only basis on which EPA could properly object to a permit.  Moreover, EPA threatened (a) to promulgate federal numeric nutrient standards, even where not necessary under the Clean Water Act, (b) to require unreasonable additional point source reductions, (c) to engage in increased federal enforcement activity, and (d) to withhold grant money to states for reasons not intended by Congress, all because it did not agree with a state-submitted WIP.

43.    Each of the jurisdictions revised their WIPs in an effort to avoid the threatened backstop measures in the Draft TMDL.  *See generally* Final TMDL at Section 8.  For example, in response to EPA's demands, Pennsylvania and Virginia "voluntarily" amended their WIPs to include changes in the regulatory status of livestock and poultry operations.  *See id.* at 8-25 (Pennsylvania), 8-28 (Virginia). Among those threatened backstops that remain in the Final TMDL is a purported

change in the assumed regulatory status of 75% of the West Virginia livestock and poultry farms in the watershed. *See id.* at 8-31. In addition to those changes that are specific to the agricultural community, EPA left in place backstop measures affecting other sectors in New York and Pennsylvania. *See id.* at 8-22, 8-26.

44.    Through this WIP revision process, which formed the basis for the Final TMDL, EPA has effectively overridden state implementation decisions. In doing so, EPA impermissibly crossed the line between establishing an informational tool authorized by the Clean Water Act and mandating a regulatory framework that Congress plainly did *not* authorize.

45.    EPA's encroachment into state authority over TMDL implementation was not limited to the WIP revision process. EPA has established fine-scale pollutant loading allocations in the Final TMDL, including allocations to individual farms and businesses hundreds of miles upstream that do not discharge directly into the Bay or its tidal waters. *See id.* at Appendices Q, R. EPA assigned specific loadings despite its recognition that "there are limitless combinations of loadings." Draft TMDL at 6-18.[3] In doing so, EPA has effectively foreclosed future implementation options of the individual jurisdictions.

---

[3] The sections and appendices of the Draft TMDL are available as "Supporting & Related Material" posted on September 24, 2010, Docket ID EPA-R03-OW-2010-0376 (*available at*

46.    EPA's assigned pollutant loads are not geared toward achieving the water quality standards in the upstream waterways themselves, but are instead tailored to meet the water quality standards in the distant Chesapeake Bay, hundreds of miles away.    EPA lacks statutory or regulatory authority to craft a TMDL that distributes pollutant loads among sources at distant upstream waters in order to meet a downstream water quality standard.

### D.    Development of a Federal TMDL – Use of Flawed Model Networks

47.    The fundamental purpose of the Final TMDL is to establish maximum pollutant loading to the Chesapeake Bay at a level necessary to meet applicable water quality standards.    The water quality standards addressed by the Final TMDL are expressed in terms of dissolved oxygen, water clarity, and chlorophyll-*a* (used as a surrogate for algae).    The standards were established to protect and restore fish, other aquatic life (like oysters), and rooted aquatic plants (referred to in the Final TMDL as submerged aquatic vegetation).

48.    The conditions that affect those water quality parameters include (among other factors) rainfall, stream flow, tidal influence, groundwater, wind, temperature, and sunlight.    EPA has determined that nitrogen, phosphorus, and sediment loadings also influence the concentration of dissolved oxygen and

---

http://www.regulations.gov/#!docketDetail;dct=SR;rpp=100;so=DESC;sb=posted Date;po=0;D=EPA-R03-OW-2010-0736).

chlorophyll-*a* in the Bay. Those loadings also influence water clarity, which in turn affects the growth of submerged aquatic vegetation. In fact, nitrogen and phosphorus are essential to plant growth and are critical to maintaining a healthy Bay ecosystem.

49.    EPA does not know how much nitrogen, phosphorus, and sediment are actually being added to the Chesapeake Bay on a daily, monthly, or even annual basis. And when those pollutants get to the Bay, EPA does not know precisely how they influence clarity, the growth of aquatic submerged vegetation, or the concentration of dissolved oxygen and chlorophyll-*a*. Instead, EPA had to estimate the loading of these pollutants and their impact on water quality through the use of computer modeling techniques that attempt to simulate real-world conditions.

50.    EPA developed a complicated network of interrelated models to try to accomplish that objective. The Final TMDL is based almost entirely on computer simulations, although EPA never adequately defined the level of uncertainty associated with its computer modeling. EPA's simulations are so interdependent that a fundamental flaw in one model can undermine the accuracy and validity of the entire network. As discussed below, that is precisely what has happened here – EPA's Final TMDL is fundamentally flawed because the models upon which it is based contain numerous errors and compounding uncertainties.

24

51.    EPA began its modeling exercise by establishing a simulated "baseline" condition of the Bay, including the sources of pollutant loadings, volume, and concentration of nitrogen, phosphorus, and sediment in the watershed, tidal tributaries, and mainstem Chesapeake Bay.

52.    To do that, EPA made a series of assumptions involving: land use in the entire 41 million acre watershed; background water quality concentrations in the various tributaries and streams; direct and indirect sources of the critical pollutants; existing control measures and the effectiveness of those controls; air to surface water deposition; groundwater and surface water interactions; tidal influence; and a host of other factors.

53.    EPA then estimated how pollutants were conveyed throughout the watershed, from land and air to streams and rivers, estimating along the way how much settled to the bottom, how much was taken up or trapped by aquatic or wetland vegetation, and how much was converted through biological and chemical processes.    It then estimated what concentrations enter the Bay and its tidal tributaries from thousands of entry points and how those concentrations affect water quality under a variety of environmental conditions.

54.    To establish the TMDL, EPA then assumed what load reductions would be necessary to achieve the established water quality standards, again, without knowing precisely how the targeted pollutants actually influence

attainment of those standards. EPA made a series of assumptions about how the states planned to reduce and control the pollutants at various sources in the future. Finally, EPA again modeled the fate and transport of pollutants throughout the entire watershed, this time based on the presumed future management techniques employed by the states, with the added challenge of projecting land use changes years into the future. Through this process, EPA estimated the current pollutant loading to the Bay, the impact on water quality standards and how much reduction was necessary to meet those standards, and then, based on those projections, allocated future individual pollutant loading limitations to thousands of sources and source categories, in many cases hundreds of miles from the Bay.

55.    EPA developed the followings series of computer models and tools to facilitate the development of the Final TMDL. First, it used a "Scenario Builder" model to estimate nutrient and sediment runoff from land based on assumptions about current and future management scenarios. The estimates from Scenario Builder were fed into a "Watershed Model" that simulated the loading and movement of nutrients and sediment from various sources in the watershed and calculated how much of those pollutants would reach the Bay. Next, that estimate was fed into a "Water Quality Model" that estimated the water quality, sediment transport, and changes to living resources (algae, submerged aquatic vegetation, and filter feeders) in the Bay that would result from the nutrient and sediment load

estimated by the Watershed Model.  Finally, the estimate from the Water Quality Model was fed into an "Assessment Program" to estimate whether water quality standards in the Bay would be attained based on the future controls and management scenarios established by the upstream models.

56.    EPA also developed: an airshed model to simulate air-to-water nitrogen deposition in the Bay; a future land use model to predict land use changes over the next thirty years; and a climate change model to assess future impacts to the Bay watershed based on potential climate variability in the future.  Each of these additional models fed information into the three core models (Scenario Builder, Watershed Model, and Water Quality Model) to make estimates about the Chesapeake Bay ecosystem.

57.    As with any modeling program, fundamental flaws in the inputs and assumptions will generate fundamental flaws in the results.  This is particularly true where, as here, the various models are "linked together so that the output of one simulation provides input data for another model."  Final TMDL at 5-19.  Thus problems in one model are carried over to another, and even minor errors in one can have profound effects on another downstream model.  This is precisely what has happened in EPA's Final TMDL, where multiple and compounding errors in EPA's models undermined the allocations established in the Final TMDL.

58.     For example, EPA estimated that 2,585,300 tons of sediment delivered to the Bay in 2009 (the baseline load year used in the Final TMDL) came from agriculture.   Final TMDL at 4-30.   This estimate is nearly *triple* that estimated by the U.S. Department of Agriculture Natural Resource Conservation Service in its October 2010 draft report regarding the effectiveness of conservation practices on cultivated cropland in the Chesapeake Bay region.   EPA also estimated that 7.3 million pounds of phosphorus loaded to the Bay in 2009 came from agriculture.   *Id*.   This is 1.8 million pounds (roughly 25%) *greater* than the phosphorus load estimated by the Natural Resource Conservation Service.

59.     The agencies also differ significantly in their estimates regarding the amount of acreage dedicated to agricultural use within the watershed and how the various crops are accounted for.   EPA assigned 9.0 million acres to agriculture in its Watershed Model simulation that calculated the sediment, phosphorus, and sediment loads reported above.   The Natural Resource Conservation Service attributed 12.12 million acres to agriculture in its estimates.   That difference (3.12 million acres) represents a land area more than *twice* the size of the State of Delaware and the District of Columbia combined.   Such differences fundamentally change the assumptions regarding the amount of nutrients and sediment entering the watershed and greatly change the simulations in all three of the linked main models (Scenario Builder, Watershed Model, and Water Quality Model) and the

results of those simulations.  These differences undermine the allocations in the Final TMDL, particularly because EPA has failed to explain why its estimates of areas and loads related to agricultural land use are valid in light of the dramatically different estimates produced by the federal agency with the most knowledge and expertise about agriculture in the United States.

60.    EPA has also failed to accept input from the agricultural community regarding key assumptions related to fertilizer utilization and manure management, among other factors.  For example, the Agriculture Work Group, a part of the Chesapeake Bay Program's Water Quality Goal Implementation Team, warned EPA about errors in the way EPA's Watershed Model handles manure and nutrient application rates – in particular, by assuming that no excess manure is transferred out of the watershed, and that manure is applied at non-agronomic rates (beyond the level at which crops uptake nutrients).  Both assumptions are patently wrong, but EPA has not corrected the deficiencies in the Final TMDL modeling framework.    Moreover, at a December 11, 2009 public meeting, EPA acknowledged that its loading numbers for agriculture were based on "mis-information" about fertilizer application rates, yet those mistakes were not rectified.

61.    The Watershed Model also relies on inaccurate assumptions regarding agricultural runoff.  It inexplicably assumes that 15 to 21% of all manure at animal

feeding operations is left on impervious surfaces and managed so improperly that it runs off directly into Bay tributaries. *See* Final TMDL at 4-31. In other words, the Watershed Model treats hundreds of tons of animal manure at animal feeding operations like storm water flowing from impervious areas in cities, a totally implausible assumption for which EPA provides no support. EPA's modeling also includes inaccurate assumptions regarding the rate of implementation of agricultural best management practices ("BMPs"). EPA admits that only BMPs that are associated with cost-share programs are included in those assumptions, grossly underestimating current BMP implementation throughout the watershed.

62.    Finally, the assumptions used in Scenario Builder to model soil loss and therefore sediment loadings in the Bay system are inaccurate. Empirical research has shown that the model used by EPA to estimate soil loss may produce results that are off by as much as 100%. *See* Boomer et al., USLE-Based Empirical Models Fail to Predict Sediment Discharges, J. Environ. Qual. 37:79–89 (2008).

63.    Aside from using bad assumptions and flawed input data, the models themselves are unreliable. For example, when EPA's Watershed Model was independently tested, it produced different results when identical input data was run on different compilers, with variability as high as 36%. In other words, simply changing the machine changed the result. The model also mistakenly predicted

that in some cases the number of stream and bay segments failing water quality standards would *increase* as pollutant loads *decrease*.

64.    EPA was also unable to get its models to predict that water quality standards would *ever* be achieved in certain segments, no matter what inputs EPA used.  The modeling results simulated a persistent 1% nonattainment of dissolved oxygen or chlorophyll-*a* criteria for a number of water segments in the Bay no matter what assumptions are made.  Rather than acknowledge that its models were flawed, EPA redefined the meaning of "attainment" for those particular circumstances.  *See* Final TMDL at 6-10- 6-12.  EPA did not, apparently, fully evaluate the assumptions in the network of models in assessing the re-definition of attainment.  For example, EPA could have evaluated whether there were other management actions (such as slight increases in levels of menhaden, a species of fish, and oysters) that could bring these segments into attainment.

65.    EPA's approach not only defies common sense, but it runs counter to the fundamental principles of environmental modeling, which requires careful calibration and validation.  "Calibration" tests the model to ensure that it is performing as intended.  "Validation" compares the model simulations to real-world results to ensure that the model is performing accurately.

66.    Multiple scientific reviews of EPA's models have pointed to the lack of calibration as a concern.  In fact, the chair of the National Research Council

committee tasked with evaluating Chesapeake Bay TMDL implementation asked EPA at a September 9, 2010 meeting why EPA had not followed the recommendations regarding model calibration raised in previous peer reviews.

67.    Part of the calibration problem is lack of data.  EPA attempted to calibrate the Watershed Model, for example, using monitoring data from only 200 sampling stations located sporadically throughout the approximately 1,000 stream and bay segments (each covering, on average, 64 square miles) subject to the Final TMDL.  *See* Final TMDL, at 5-30.  EPA also calibrated the Watershed Model using data from *another model* (the "SPARROW Model").  *See id.* at 5-28. Limitations on available data also inhibits EPA's ability to verify the overall model results.

68.    EPA's modeling network is only useful if it accurately reflects the reality it purports to represent.  EPA's network fails that test.  As a threshold matter, EPA is using the Watershed Model to establish pollutant load allocations on a scale far more precise than the model can validly predict.  The lowest level of segmentation possible in the model is the "local watershed scale" (66 square miles), but as multiple peer reviewers have pointed out, the Watershed Model is only designed for full watershed or major tributary scale analysis, and that it would be "inappropriate to use the existing . . . subwatershed data sets for local-scale modeling applications."  Chesapeake Bay Program, Scientific and Technical

Advisory Committee, Chesapeake Bay Watershed Model Phase V Review

(February 20, 2008), at 6 (available at

http://www.chesapeake.org/stac/Pubs/2ndPhaseVReportFinal.pdf).

69.    EPA itself has admitted that its Watershed Model is flawed and

unfinished, and that it plans to make changes to the model in 2011 so that it can

change its assumptions regarding both nutrient management and the extent of

impervious surfaces in the watershed.  *See* Letter from Shawn Garvin, Regional

Administrator EPA Region III, to Principal's Staff Committee, at 2 (June 11, 2010)

(available at

http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/TMDLScheduleLetter.pdf).  In

fact, on January 6, 2011, Mr. Gavin informed a meeting of state officials that EPA

intends to redo certain aspects of its pollutant runoff modeling for agriculture and

low-density development.  And on January 11, 2011, EPA intends to discuss

planned changes in the next version of Scenario Builder.  The fact that EPA is

already planning to redo its models underscores the fact that the Final TMDL is

based on inappropriate and incomplete information.

**E.    Development of a Federal TMDL – Inadequate Public Review and Comment**

70.    EPA's Draft TMDL was released for a 45-day public comment period

on September 24, 2010.  75 Fed. Reg. 57,776 (Sept. 22, 2010) (Docket No. EPA-

R03-OW-2010-0736).    Even though the Chesapeake Bay TMDL is the most

complex TMDL ever attempted – it is, in fact, 552 separate TMDLs – EPA provided only 45 days for public review and comment on the TMDLs and the models from which they are built.  The Draft TMDL consisted not only of the two sets of wasteload and load allocations each for nitrogen, phosphorus, and sediment for 92 water body segments, it also consisted of the detailed implementation instructions directed at the watershed jurisdictions.  All told, EPA presented for a mere 45-day review the 370 pages of the Draft TMDL document itself, 1,672 pages of 22 appendices, as well as the technical analysis and modeling information that is referenced throughout the Draft TMDL.

71.    Plaintiff American Farm Bureau Federation, along with numerous other organizations and commentors, the Governor of Virginia, two Congressmen, and more than 20 local governments, requested EPA to delay the TMDL and provide additional time to comment.  EPA denied all requests.

72.    But worse than its failure to provide sufficient time for meaningful public review and comment on the Draft TMDL, EPA failed to provide the information necessary to provide meaningful comments during that period.

73.    Only six days before the end of the brief 45-day comment period, on November 2, 2010, EPA staff provided to a limited number of recipients, in an e-mail communication, internet links to the scenario data and scenario results.  These data and results are the inputs and outputs of the "Scenario Builder" model that

EPA relied on to determine the assumptions under which its overall modeling network predicts that water quality standards will be met and which it incorporated into the TMDL.  In other words, these are the inputs and outputs that determined some of the key assumptions for the Final TMDL.   In addition, the final documentation for Scenario Builder that EPA made available in conjunction with the release of the Final TMDL is dated December 2010, well after the close of the public comment period.  *See* Final TMDL at 4-28.

74.    The links to the scenario data and scenario results were not made available in the administrative record for the Draft TMDL or on EPA's website for the Draft TMDL.  Thus, most of the public was unable to review and comment on this critical model.   Even if this information had been made available more broadly, six days is clearly insufficient to review the code for the Scenario Builder model and the inputs to and outputs from the model that were used to develop the Final TMDL.   No one outside EPA has had the opportunity to evaluate the Scenario Builder model by running it themselves.

75.    Of equal significance is EPA's failure to provide adequate notice of and an opportunity for comment on the Watershed Model.  EPA provides a link to a website containing information on the Watershed Model in the Final TMDL.  *See* Final TMDL at 4-32.  That website confirms that the model *was still changing after the close of the comment period* on the TMDL. *See*

http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169. Indeed, that website openly declares that the "documentation will be finalized by December 2010," and, in fact, portions of the modeling documentation were not posted on the website until December 31, 2010. Moreover, the website "warn[s]" users of the draft documentation it contains that the "information is *preliminary, subject to change, and unsubstantiated by full and final reviews.*" *Id.* (emphasis added).

76.    EPA also did not provide the public the opportunity to review and comment on many of the other documents relied on to develop the Final TMDL before issuing it. EPA instead attempted to incorporate by reference a significant number of documents that "EPA and its seven watershed jurisdictions relied upon" in developing the Final TMDL, indicating only that access to this information "[would] be provided." *See* Draft TMDL at Appendix B.

77.    Because the significant policy choices embodied in the TMDL are based primarily on models, and not on actual data, and those models are based on assumptions, it was essential that the those assumptions, as well as any other information relied on by the agency, be subject to meaningful public review and comment, but they were not.

### F.    EPA's Final TMDL for the Chesapeake Bay Watershed

78.    EPA issued the Final Chesapeake Bay TMDL on December 29, 2010. *See* http://www.epa.gov/chesapeakebaytmdl/. It addresses the restoration of

aquatic life designated uses for the Bay, its tidal tributaries, and embayments, and is the "largest and most complex thus far" of the 40,000 TMDLs completed to date across the United States. Final TMDL at ES-3. The Final TMDL is in fact a combination of TMDLs, including daily and annual allocations for three pollutants for 92 individual water body segments in the Chesapeake Bay. The Final TMDL sets limits for the Bay watershed of 185.9 million pounds of nitrogen, 1.2 million pounds of phosphorus, and 6.45 billion pounds of sediment per year, which amounts to a 25% reduction in nitrogen, a 24% reduction in phosphorus, and a 20% reduction in sediment, intended to meet state water quality standards for dissolved oxygen, water clarity, and chlorophyll-*a*. These limits have been applied throughout the watershed based on the computer models discussed above. EPA's Final TMDL also assigns pollutant loads specifically for the agricultural sector within each water segment and jurisdiction, and pollutant loads for individual sources, including those in the broader watershed far upstream from the 92 tidal waterways themselves. These detailed and specific pollutant loads are set forth in Section 9 of the Final TMDL and in the extensive spreadsheets appended thereto. *See* Final TMDL at Appendices Q and R.

79.    The nitrogen limit for the Chesapeake Bay basin as a whole was driven by the need to achieve the dissolved oxygen standards in four deep channels in the main stem of the Bay and the lower Potomac River, resulting in a 50 million

pound reduction in nitrogen loading that would not be necessary for the other 88 waterways feeding the Bay. *See* Final TMDL at 6-14.

80.    EPA performed no analysis of the costs of compliance with the Final TMDL and its multitudinal assigned pollutant loads that span the entire Mid-Atlantic Region, nor did EPA analyze the cumulative impact of such costs on the regulated community and society at large, as compared to the benefits of achieving dissolved oxygen water quality standards in the depths of four Bay water channels.

81.    The Final Chesapeake Bay TMDL implements EPA's specific statutory "backstop" authority to issue TMDLs with respect to two TMDLs in the District of Columbia and 23 in Virginia. For all other states and water segments, EPA has not waited for the action by the states contemplated by the Clean Water Act before issuing the Final TMDL.

82.    Even if EPA had authority to develop TMDLs for the 92 impaired segments of the Bay and its tidal waters in Maryland, Virginia, Delaware, and the District of Columbia, EPA cannot, acting in a backstop capacity, exercise authority that is not given to these jurisdictions under Clean Water Act Section 303(d). Section 303(d) does not grant any of these jurisdictions the authority to assign pollutant loadings to sources outside of their jurisdictions. The Clean Water Act also does not give this authority directly to EPA. Accordingly, EPA has no

authority to establish or enforce any pollutant loadings in the Chesapeake Bay

TMDL for sources in Pennsylvania, West Virginia, and New York.

**G.    Significant Impacts of EPA's Final TMDL on Farm Plaintiffs' Members**

83.    EPA's Final TMDL will have a significant adverse impact on Farm

Plaintiffs' members.  As a result of EPA's inaccurate modeling, EPA assumes that

specific changes in the operations of agricultural sources are necessary to achieve

water quality standards in the Bay and its tidal tributaries.  EPA incorporates

assumptions regarding those specific operational changes into its assigned

pollutant loadings for agriculture.  *See* Final TMDL at Appendix V.  EPA intends

to force agricultural sources to adopt those changes through the permits held by

regulated agricultural sources.  *See* Final TMDL, at 8-12.  EPA also intends to

convert unregulated agricultural sources into regulated sources if they do not

change their operations.  Finally, EPA intends to take actions against states if the

practices assumed by EPA in the TMDL do not occur.  *See* Final TMDL, at 8-13;

*see also*

http://www.epa.gov/reg3wapd/pdf/pdf_chesbay/FinalWIPEvaluations/PortfolioofE

PAWIPEvaluations.pdf (EPA evaluations of the state WIPs including additional

actions to be taken by EPA if agricultural loads identified in the WIPs are not

achieved).

## FIRST CLAIM FOR RELIEF

### EPA's Final TMDL Is Arbitrary and Capricious

84.    Paragraphs 1-83 are realleged and incorporated by reference.

85.    EPA's assigned pollutant loadings in the TMDL are based on models that used erroneous assumptions so the Final TMDL's pollutant load reductions are not justified by the evidence in the record.

86.    EPA's models were not properly calibrated or validated, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

87.    EPA's models are not capable of assigning valid pollutant loadings to individual sources, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

88.    For these reasons, EPA's Final TMDL is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706.

## SECOND CLAIM FOR RELIEF

### EPA Failed to Provide for Public Notice and Comment Required by the APA

89.    Paragraphs 1-88 are realleged and incorporated by reference.

90.    Under the Administrative Procedure Act, an agency that intends to promulgate a rule or regulation must first provide the public with notice of, and an opportunity to comment on, a proposed version of the rule.  *See* 5 U.S.C. § 553.

Such notice and opportunity to comment must include the data upon which the agency relies.

91.    EPA's Final TMDL was issued in violation of 5 U.S.C. § 553 in that EPA failed to provide the public with a meaningful opportunity to comment on the Draft TMDL and to participate in this regulatory proceeding.    EPA failed to provide the public with sufficient access to the models and other information on which it relied to develop the Final TMDL, and some of the most vital information that EPA relied upon continued to change even after the close of the brief comment period.

<u>THIRD CLAIM FOR RELIEF</u>

**EPA's Final TMDL Violates the Clean Water Act and EPA Regulations**

92.    Paragraphs 1-91 are realleged and incorporated by reference.

93.    EPA's Final TMDL is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, or in excess of statutory jurisdiction, authority, or limitation in violation of 5 U.S.C. § 706 because EPA has exceeded its delegated authority under the Clean Water Act and otherwise violated the Act and its own regulations, as described in further detail below.

94.    EPA exceeded its authority under Section 303(d)(2) of the Act, 33 U.S.C. § 1313(d)(2), which limits EPA's authority to establish a federal TMDL to instances of state action or inaction that is contrary to the Clean Water Act.

95.    EPA exceeded its statutory authority when it established individual and aggregate pollutant loadings.  If EPA has statutory authority to establish federal TMDLs for the Chesapeake Bay, that authority is limited to establishing a single TMDL for each constituent for each water body segment addressed by the Final TMDL.  As evidenced by Table 8-5 and Appendices Q and R in the Final TMDL, EPA went much further and assigned hundreds of pollutant load allocations across the entire watershed from Virginia to New York.    The assignment of these pollutant loads unlawfully usurps the states' primary Clean Water Act authority to implement the Final TMDL within their own borders.

96.    Further, EPA exceeded its statutory authority under 33 U.S.C. § 1313(d) and violated its own regulations when it assigned pollutant loads aimed to achieve *the Bay's* water quality standards to point sources and nonpoint sources that discharge or send runoff to *other waterways that have their own water quality standards* and are far upstream of the Bay and its tidal segments.  EPA's overreaching is unlawful.

97.    The Final TMDL also violates EPA's implementing regulations by, *inter alia,* (i) failing to comply with 40 C.F.R. § 130.7(c)(1)(ii), which requires that calculations used to establish TMDLs be subject to public review; and (ii) encompassing nonpoint sources within point source wasteload allocations in contravention of the regulatory distinction in 40 C.F.R. § 130.2.

## FOURTH CLAIM FOR RELIEF

### EPA's Final TMDL is *ultra vires*

98.    Paragraphs 1-97 are realleged and incorporated by reference.

99.    To the extent not specifically alleged above, the Final TMDL is in excess of delegated statutory authority under the Clean Water Act and therefore is *ultra vires*, for the reasons set forth in ¶¶ 94-96, *supra*.  Accordingly, and irrespective of federal court jurisdiction under any other statute, the Final TMDL is unlawful and should be set aside as *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE, Farm Plaintiffs respectfully request this Court to enter judgment in their favor, and:

1. Declare that the Final TMDL is contrary to federal law, including the Clean Water Act, or is otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or is *ultra vires*;

2. Declare that EPA violated the APA in issuing the Final TMDL without following APA procedures;

3. Vacate the Final TMDL;

4. Enjoin and restrain Defendant, its agents, employees, successors, and all persons acting in concert or participating with it from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the Final TMDL; and

5.  Grant Farm Plaintiffs such other relief as may be necessary and appropriate

or as the Court deems just and proper.

Respectfully submitted,

Dated: January 10, 2010          By:  /s/ Robert J. Tribeck
                                      Robert J. Tribeck
                                      PA I.D. No. 74486
                                      RHOADS & SINON LLP
                                      One South Market Square
                                      P. O. Box 1146
                                      Harrisburg, PA  17108-1146
                                      (717) 233-5731

                                      Richard E. Schwartz *(Pro Hac Vice)*
                                      Kirsten L. Nathanson *(Pro Hac Vice)*
                                      David P. Ross
                                      CROWELL & MORING LLP
                                      1001 Pennsylvania Avenue, N.W.
                                      Washington, DC 20004
                                      (202) 624-2500

                                      *Attorneys for Plaintiffs*
                                      *American Farm Bureau Federation*
                                      *and Pennsylvania Farm Bureau*

Of Counsel:

Ellen Steen
Danielle Quist
AMERICAN FARM BUREAU FEDERATION
600 Maryland Avenue, S.W.
Suite 1000W
Washington, DC  20024
(202) 406-3600

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **AMERICAN FARM BUREAU FEDERATION, PENNSYLVANIA FARM BUREAU, THE FERTILIZER INSTITUTE, NATIONAL PORK PRODUCERS COUNCIL, NATIONAL CORN GROWERS ASSOCIATION, NATIONAL CHICKEN COUNCIL, U.S. POULTRY & EGG ASSOCIATION, and NATIONAL TURKEY FEDERATION,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Plaintiffs,** ) | **Case No. 11-cv-00067-SHR** |
| ) | |
| **v.** ) | |
| ) | |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** )<br>) | |
| ) | |
| **Defendant.** ) | |
| )<br>)<br>) | |

## FIRST AMENDED COMPLAINT

Plaintiffs American Farm Bureau Federation, Pennsylvania Farm Bureau,

The Fertilizer Institute, National Pork Producers Council, National Corn Growers

811910.2

Association, National Chicken Council, U.S. Poultry & Egg Association, and National Turkey Federation (collectively, "Plaintiffs") bring this action seeking declaratory and injunctive relief against Defendant United States Environmental Protection Agency ("EPA") and allege as follows:

## INTRODUCTION

1.    Plaintiffs challenge EPA's final action of promulgating the Final Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment, signed by the EPA Regions II and III Regional Administrators on December 29, 2010 ("Final TMDL").  *See* 76 Fed. Reg. 549 (Jan. 5, 2011) (notice of availability of the Final TMDL); *available at* http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/tmdlexec.html.  Although the lawful purpose of the Final TMDL is informational – to identify the maximum amount of nitrogen, phosphorus, and sediment that would achieve water quality standards in the Chesapeake Bay – this EPA action is not limited to this lawful purpose.  The Final TMDL assigns contributions of these substances to local waters among farms, cities, and businesses, as well as residential, agricultural, and undeveloped lands throughout the vast Chesapeake Bay watershed – in Virginia, West Virginia, Maryland, Delaware, Pennsylvania, New York, and the District of Columbia (collectively the "watershed jurisdictions") – a 64,000-square-mile area with a population of almost 17 million people.

2.     EPA used an unprecedented process to micromanage waterways from Virginia to New York through the assignment of highly specific pollutant loads. That process unlawfully circumvented the Clean Water Act procedures that give primary authority to the states to protect water quality.  States can do so by establishing (a) water quality standards, then (b) (for waters that do not meet those standards) "total maximum daily loads" ("TMDLs") representing the levels of pollutants the water body can receive and still achieve those standards, and finally (c) a planning process to work toward achieving standards through practicable management practices for "nonpoint" sources and through individual permits limiting discharges from point sources.

3.     The Final TMDL is fatally flawed in several critical respects.  First, EPA has exceeded its authority under the Clean Water Act by (a) allocating pollutant loads among sources in a TMDL, (b) basing those allocations on the wrong water quality standards, and (c) using extra-statutory mechanisms to impose those load allocations.  Second, the assigned pollutant allocations are based on erroneous information, particularly with respect to agriculture, which was fed into computer models that are unsuitable for deriving such load allocations – even with *accurate* information.  Finally, during the comment period, the public did not receive adequate access to the information needed to comment effectively on the modeling results and the assumptions in the Final TMDL.

3

4.     For each of the reasons, this Court should declare that the assigned pollutant loads are not legally enforceable, and it should vacate the Final TMDL.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, and under the Administrative Procedure Act, 5 U.S.C. § 702, providing for judicial review of final agency action.  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and under 5 U.S.C. §§ 701-706 for violations of the Administrative Procedure Act and the Clean Water Act.

6.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because EPA is an agency of the United States, Plaintiff Pennsylvania Farm Bureau resides in this district, and certain of Plaintiffs' members affected by the Final TMDL reside in this judicial district.

## PARTIES

7.     Plaintiff American Farm Bureau Federation is a voluntary general farm organization formed in 1919 to protect, promote, and represent the business, economic, social, and educational interests of American farmers.  The American Farm Bureau Federation represents more than 6.2 million member families through member organizations in all fifty states and Puerto Rico.  These member

4

organizations include the Pennsylvania Farm Bureau.  Many of the American Farm Bureau Federation member families own and operate farms that produce the row crops, livestock, and poultry that provide safe and affordable food for Americans and a growing global population.

8.    Some of these farms are located within the 64,000-square-mile Chesapeake Bay watershed and are livestock or poultry operations that hold (or will be required to obtain) individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into these waters.[1]   The terms and conditions of those permits will be improperly and adversely affected by the Final TMDL, and new permits will be more difficult to obtain as a result of the Final TMDL.  As a result, the American Farm Bureau Federation member families are significantly and adversely affected by EPA's action, which will limit their ability to obtain Section 402 permitting for new or expanded operations and will require more stringent permit limitations for nitrogen, phosphorus, and sediment.

---

[1]   The Clean Water Act and EPA rules generally prohibit discharges from livestock and poultry operations that qualify as "concentrated animal feeding operations" or "CAFOs," with the exception of discharges caused by certain extreme rainfall and authorized under a Section 402 permit.  Most terms and conditions of such permits are designed to prevent any discharge from occurring.

9.    In addition, some of American Farm Bureau Federation's member families operate farms (livestock, poultry, or row crop production) that are not currently regulated under the Clean Water Act, but are subject to regulatory requirements for nutrients under state law, or participate in nutrient management programs supported by the state departments of agriculture or by the U.S. Department of Agriculture, or undertake voluntary action to control runoff of nutrients and sediments without participating in or reporting to a formal state or federal program.  These farms will be directly and adversely affected by the Final TMDL, which assigns pollutant loadings both for regulated "point sources" and for unregulated "nonpoint source" operations.

10.    During the public comment period for the challenged action, the American Farm Bureau Federation provided detailed comments on EPA's Draft Chesapeake Bay Total Maximum Daily Load ("Draft TMDL").

11.    Plaintiff Pennsylvania Farm Bureau is a general farm organization that has provided legislative support, information, and services to Pennsylvania's farmers and rural families since 1950.  Some of the Pennsylvania Farm Bureau members have farms located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above.  The Pennsylvania Farm Bureau also provided comments to EPA on the Draft TMDL.

6

12.    Plaintiff The Fertilizer Institute represents the nation's fertilizer industry including producers, importers, retailers, wholesalers and companies that provides services to the fertilizer industry.    Many of The Fertilizer Institute's members hold permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source or stormwater discharges into the Chesapeake Bay watershed that would be affected by the TMDL developed by EPA.    The Fertilizer Institute members may also be negatively impacted by EPA or states imposing strict controls on fertilizer use in agricultural, urban, or suburban settings, which may result in reduced fertilizer sales and reduced crop yields for producers. During the public comment period for the challenged action, The Fertilizer Institute provided detailed comments to EPA on the Draft TMDL.

13.    Plaintiff National Pork Producers Council is a non-profit trade association representing the interests of pork producers throughout the United States.    National Pork Producers Council serves as an advocate for reasonable legislation and regulations, develops revenue and market opportunities, and protects the livelihood of the nation's 67,000 pork producers, which it represents through forty-three affiliated state associations.    Its mission includes representing pork producers in administrative and judicial proceedings involving national regulations and other government actions that affect the production of pork in the United States.    Some of the National Pork Producers Council members are located

within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above.  During the public comment period for the challenged action, National Pork Producers Council provided detailed comments to EPA on the Draft TMDL.

14.    National Corn Growers Association is a non-profit trade association that represents 35,000 corn farmers nationwide and the interests of more than 300,000 growers who contribute through corn checkoff programs in their states. National Corn Growers Association and its 48 affiliated state associations and checkoff organizations work together to create and increase opportunities for their members and their industry.  National Corn Growers Association represents its members' concerns in national legislative, judicial and regulatory agencies' decisions affecting agriculture.  Some of the National Corn Growers Association members are located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above.  During the public comment period for the challenged action, National Corn Growers Association provided detailed comments to EPA on the Draft TMDL.

15.    Plaintiff National Chicken Council is a non-profit trade association representing companies that produce and process over ninety-five percent of the broiler/fryer chickens marketed in the United States.  National Chicken Council

8

-1678-

promotes the production, marketing and consumption of safe, wholesome and nutritious chicken products both domestically and internationally. National Chicken Council advocates on behalf of its members with regard to the development and implementation of federal and state programs and regulations that affect the chicken industry. Some of the National Chicken Council members are located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above. During the public comment period for the challenged action, National Chicken Council provided detailed comments to EPA on the Draft TMDL.

16.    Plaintiff U.S. Poultry & Egg Association is a non-profit trade association and the world's largest poultry organization, whose membership includes producers of broilers, turkeys, ducks, eggs and breeding stock, as well as allied companies. U.S. Poultry & Egg Association focuses on research and education, as well as communications to keep members of the poultry industry current on important issues. Some of the U.S. Poultry & Egg Association members are located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above. During the public comment period for the challenged

action, U.S. Poultry & Egg Association provided detailed comments to EPA on the Draft TMDL.

17.    Plaintiff National Turkey Federation is a non-profit trade association that serves as the national advocate for all segments of the turkey industry, conducting activities that increase demand for its members' products by protecting and enhancing their ability to profitably provide wholesome, high-quality, nutritious products.  National Turkey Federation represents growers, processors, hatchers, breeders, distributors, allied services and state associations.  In addition to providing other services, National Turkey Federation represents its members' interests in legislative and regulatory affairs.  Some of the National Turkey Federation members are located within the Chesapeake Bay watershed and will be subject to the same Clean Water Act permitting and regulatory impact from the Final TMDL as described in ¶¶ 8-9 above.  During the public comment period for the challenged action, National Turkey Federation provided detailed comments to EPA on the Draft TMDL.

18.    Defendant EPA is the federal agency charged with the administration and enforcement of the Clean Water Act, in accordance with the specific delegations of authority from Congress contained in that statute.  EPA is headquartered in Washington, D.C.

## STATUTORY AND REGULATORY FRAMEWORK

19.    Total maximum daily loads ("TMDLs") are one element of a detailed statutory and regulatory framework under the Clean Water Act, which prescribes the following series of actions that are described in greater detail below: (i) establishment of water quality standards by the states under Section 303(c); (ii) identification by the states of certain waters that are not meeting water quality standards under Section 303(d) (commonly called "impaired" waters); (iii) calculation by the states of a total maximum daily pollutant load – a TMDL – for such impaired waters under Section 303(d); and (iv) a "continuous planning process" under Section 303(e) to generate plans for implementation of water quality standards by the states.

20.    Federal involvement in the above scheme is extremely limited.  EPA has statutory authority to act directly by disapproving or objecting to state action or inaction; EPA has no authority to develop a state's planning process or implementation plans.

### A.    Overview of Clean Water Act Regulation

21.    The Clean Water Act divides sources of pollutants to waterways into two major categories: "point sources" and "nonpoint sources."  "Point source" is defined at 33 U.S.C. § 1362(14) to mean "any discernible, confined, and discrete conveyance including . . . any pipe, ditch, channel, tunnel, [or] conduit . . . from

11

which pollutants are or may be discharged." The term also includes those livestock and poultry operations that qualify under EPA regulations as a "concentrated animal feeding operation." Congress specifically excluded "agricultural stormwater discharges and return flows from irrigated agriculture" from the definition of point source. *Id.*

22.    All pollutant discharges from a point source to waters of the United States[2] are prohibited under the Clean Water Act unless otherwise authorized under several sections of the Act. One primary way in which discharges are authorized is under a Section 402 permit, known as a National Pollutant Discharge Elimination System ("NPDES") permit.[3] *Id.* § 1342. The NPDES permitting system imposes limits on such discharges based on the application of technology, or the need to achieve water quality standards, whichever is more stringent. *Id.* §§ 1311(b), 1312.

23.    States assume primary responsibility for administration and enforcement of the NPDES permitting program following EPA approval of a

---

[2]    The Clean Water Act focuses on "navigable waters", defined by statute as "waters of the United States." 33 U.S.C. § 1362(7). References herein to "waters" are to such "waters of the United States" within the scope of the Act's jurisdiction.

[3]    Many non-industrial "stormwater" discharges are authorized under Section 402 even without a permit, unless EPA or the state permitting agency "designates" such a discharge for permitting. *See* 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(a)(1)(v).

-1682-

state's proposed program.  *Id.* §§ 1342(b), 1342(c)(1).  Among other things, state NPDES programs must allow for downstream states whose waters may be affected by the issuance of a permit to submit written recommendations concerning the permit application to the permitting state and to EPA.  *Id.* § 1342(b)(3), (5).  If the permitting state rejects any such recommendations, it must explain its reasons for doing so in writing.  *Id.*

24.    EPA retains authority, in specified circumstances, to object to a particular NPDES permit that authorizes discharges to waters.  *Id.* § 1342(d); 40 C.F.R. § 123.44.  For example, EPA may object to the issuance of a permit by an upstream state if EPA determines that discharges under the permit will cause or contribute or have the reasonable potential to cause or contribute to an excursion of any state water quality standard.  33 U.S.C. §§ 1311(b)(1)(C), 1342(d)(2); 40 C.F.R. §§ 122.4(a) and (d), 122.44(d)(1)(i), and 123.44(c).

25.    Nonpoint sources are not defined in the Clean Water Act, but are generally viewed as any source of water pollution other than a point source discharge.  Nonpoint source pollution is not regulated under the NPDES program.  Indeed, the Act does not provide any federal authority to regulate nonpoint source pollution.

### B.   Development of Water Quality Standards

26.   The Clean Water Act expressly recognizes, preserves, and protects "the primary responsibilities and rights of *States* to prevent, reduce, and eliminate pollution [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b) (emphasis added).  The Act also bars any interpretation of its provisions that would "impair [] or in any manner affect[] any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States[,]" except as otherwise "expressly provided" by the statute.  *Id.* § 1370(2).

27.   The Clean Water Act places primary authority with *each state* to develop water quality standards, consisting of designated uses and water quality criteria, for its water bodies.  *Id.* § 1313(c)(2)(A).  Each state must designate one or more uses for its water bodies and develop water quality criteria for each water body necessary to protect these uses, taking into account the water bodies' use and value for public water supplies, propagation of fish and wildlife, recreational, agricultural, and industrial purposes, use for navigation, and other purposes.  *Id.* § 1313(c)(2)(A); 40 C.F.R. §§ 131.10 and 131.11.  These criteria can be expressed as specific numeric quantities or as general narrative statements, but in either case, must be based on "sound scientific rationale."  40 C.F.R. § 131.11(a).  State standards are subject to EPA review and approval to ensure that they are consistent with Clean Water Act requirements.  33 U.S.C. § 1313(c)(3)-(4).

C.    **Development of TMDLs for Listed Waters**

28.    Section 303(d) directs each state (i) to identify those waters "within its boundaries" for which technology-based Section 402 permit limitations are not stringent enough to implement the water quality standards "applicable to such waters" and (ii) to establish a priority ranking of these waters, taking into account the severity of the pollution and the waters' designated uses.    33 U.S.C. § 1313(d)(1)(A).    The state must establish a TMDL for each listed water (commonly referred to as "impaired" waters) for pollutants identified by EPA as suitable for such calculation.    *Id.* § 1313(d)(1)(C).    This "total" maximum daily load is established "at a level necessary to implement the applicable water quality standards," accounting for seasonal variations and a margin of safety.    *Id.*

29.    A TMDL is a calculation – a number, which, as EPA acknowledges, is meant to be an "informational tool."    Final TMDL at 1-15.    EPA regulations define a TMDL as the "sum" of both "wasteload allocations" ("WLAs") – the portions of a receiving water loading capacity allocated to each of its existing or future *point* sources of pollution – and "load allocations" ("LAs") – the loading capacity portions attributed to the water body's "existing or future *nonpoint* sources of pollution or to natural background sources."    40 C.F.R. § 130.2 (emphasis added).    The calculations used to establish TMDLs must be subject to

15

public review.  *Id.* § 130.7(c)(1)(ii).  The Clean Water Act does not authorize EPA-imposed "allocations" of a TMDL among pollution sources.

30.    Like water quality standards, the listing of waters and the establishment of TMDLs for those waters are subject to EPA review and approval. 33 U.S.C. § 1313(d)(2).  If EPA disapproves a TMDL submitted by a state, or if a state fails to establish a required TMDL, EPA must establish, within 30 days, a TMDL at a level necessary "to implement the water quality standards applicable to such waters."  *Id.*  This "backstop" authority does not allow EPA to establish a TMDL at a level *lower* than necessary to implement the water body's water quality standards.

### D.    Implementation of TMDLs

31.    In keeping with congressional policy to preserve and protect the primary responsibilities and rights of each state over its planning for the development and use of its land and water resources, the Clean Water Act does not give EPA authority over TMDL *implementation*.  Only states can determine how a TMDL is ultimately achieved, including any allocations of pollutant loading.[4] State implementation plans are not part of a TMDL, are not required to be

---

[4]    EPA's only regulatory authority concerning the implementation of TMDLs is the agency's oversight authority over NPDES permitting for point source discharges, including water quality-based permit limits "required to implement any applicable water quality standard."  33 U.S.C. §1311(b)(1)(C).

submitted to EPA, are not subject to EPA approval, and are not subject to unilateral establishment or modification by EPA.

32.    In contrast with EPA's authority to directly establish water quality standards or TMDLs under certain circumstances, the Clean Water Act does not authorize EPA to *itself* prepare a TMDL implementation plan, even where a state fails to do so.  EPA has no authority to cross the line between identifying *total pollutant levels* necessary to meet water quality standards and specifying *implementation measures*.  Thus, nothing in the Clean Water Act or EPA's regulations authorizes EPA to demand "reasonable assurance" that the state's implementation plan will be carried out or that it will achieve sufficient load reductions to meet the TMDL.

### E.    Addressing Impairment Caused by Nonpoint Sources

33.    Nonpoint sources are addressed in Clean Water Act Section 319, 33 U.S.C. § 1329, which was added to the Act in 1987 to require management programs for water quality impairment caused by nonpoint sources.  Nonpoint sources are also referenced in Clean Water Act Section 208, 33 U.S.C. § 1288, which directs states to develop areawide waste treatment plans that include a process to identify agriculturally and silviculturally related nonpoint sources of pollution and set forth procedures and methods to control such sources.  33 U.S.C. § 1288(b)(2)(F).

34.    There is no federal implementation role for EPA in either Section 208 or 319 for nonpoint sources, which include runoff from land used for livestock and crop production.

## FACTUAL BACKGROUND

A.    **Chesapeake Bay Program and Tributary Strategies**

35.    The Chesapeake Bay Program was established as a voluntary partnership in the 1980s.  The original Chesapeake Bay Agreement was signed in December 1983 by the Commonwealths of Virginia and Pennsylvania, the State of Maryland, the District of Columbia, and EPA.  When the agreement was amended in 1987, the Chesapeake Bay Commission, representing the legislatures of Maryland, Virginia and Pennsylvania, also signed the Agreement.  The Agreement was last amended in June 2000.  The States of New York, Delaware, and West Virginia are not signatories to the Chesapeake Bay Agreement, but are partners.  As partners, these jurisdictions signed a memorandum of understanding agreeing to work cooperatively to achieve agreed upon nutrient and sediment reduction targets.

36.    EPA issued new water quality criteria for the Chesapeake Bay in 2003.  The watershed jurisdictions cooperatively allocated pollutant loadings among the watershed jurisdictions in April 2003.

37.    Maryland, Virginia, the District of Columbia, and Delaware then adopted new water quality standards for the tidal waters of the Chesapeake Bay incorporating EPA's criteria.

18

-1688-

38.   In 2007, the watershed jurisdictions changed the goal of achieving water quality standards by 2010 to a goal of implementing measures to achieve standards by 2025 using and implementing "Tributary Strategies" the states had developed to achieve this new goal.

39.   These efforts have and will continue to improve water quality in the Chesapeake Bay.   In fact, the overall health of the Bay achieved a 6% improvement from 2008 to 2009, according to a recent EPA Chesapeake Bay Program assessment.

**B.**   **Success of Bay Watershed Agricultural Community in Reducing Pollution to the Bay**

40.   Farmers in the Chesapeake Bay watershed have made major contributions to protecting the Bay through improved farmland practices in recent years, and these efforts continue to expand and strengthen.   These contributions include consistent improvement in nitrogen use efficiencies, as well as increased adoption and continuous improvement of best management practices ("BMPs") that are reducing runoff.

41.   The Natural Resources Conservation Service of the U.S. Department of Agriculture recently found that farmers have adopted a wealth of conservation practices on the Chesapeake Bay region's 4.4 million acres of cropland, including actively implementing erosion control practices on about 96% of the cropland acres in production in the watershed over the 2003 to 2006 period.   These and

other critical nutrient management practices have dramatically reduced the nitrogen, phosphorus, and sediment loads to the Chesapeake Bay and the streams and rivers in its watershed.

42.    In fact, EPA's own data show that since 1985 the agricultural community has significantly reduced loading to the Chesapeake Bay for nitrogen (by over 27%), for phosphorus (by over 21%), and for sediment (by over 24%).

### C.    Development of the Final TMDL – Usurping State Authority

43.    Despite what it acknowledges have been "extensive restoration efforts during the past 25 years," EPA found it necessary to set a federal "TMDL" for the Chesapeake Bay.  Although it is called a "TMDL", EPA's action did not simply set a "total" maximum load for Bay waters.  Instead, EPA's "TMDL" established a far-reaching regulatory scheme for the implementation of water quality standards in the Bay through a "historic and comprehensive 'pollution diet' with rigorous accountability measures to initiate sweeping actions to restore clean water" in the entire Chesapeake Bay watershed.  Final TMDL at ES-1.

44.    EPA set an arbitrary deadline of December 31, 2010 for establishment of the Final TMDL.  This deadline required development of the Final TMDL before EPA's methods and models were ready to provide scientifically sound support.  It also severely limited the time in which the public could review and provide meaningful comments on the Draft TMDL and the incomplete modeling

on which it was based, as well as the time in which EPA could absorb and respond to those comments before issuing the Final TMDL.

45.    EPA imposed what it calls an "accountability framework" on the states and individual sources within the watershed as part of the extra-statutory process that produced the Final TMDL. EPA required states to submit to the agency Watershed Implementation Plans ("WIPs") before the Draft TMDL was even proposed, reversing the sequence for proper TMDL development and implementation planning provided for in the Clean Water Act and EPA's regulations. EPA then used the state WIPs to develop the "assumptions" that were incorporated into the models used to establish the Final TMDL.

46.    EPA essentially disapproved the WIPs as submitted by all the states, concluding that the pollution controls identified in many of them were insufficient and that none of the draft WIPs provided "reasonable assurance" that the identified pollution controls would be implemented to achieve nutrient and sediment reduction targets.

47.    Based on its disapproval of the draft state WIPs, EPA included "backstop measures" in the Draft TMDL, in excess of its authority under the Clean Water Act. In response to the unlawful backstop measures in the Draft TMDL and accompanying threats of retaliatory actions by EPA, watershed jurisdictions revised their implementation plans to EPA's satisfaction. For example, the threats

21

included use of "residual designation" authorities to regulate sources in a state that are currently unregulated, such as smaller livestock and poultry operations, in direct contravention of EPA regulations at 40 C.F.R. § 122.23(c)(1).

48.    EPA also threatened to take other actions to coerce the watershed jurisdictions into adopting EPA's preferred implementation measures.    For example, EPA threatened to object to state-issued permits, even though disagreement with a state WIP is not one of the grounds specified for objections in EPA's regulations.    *See* 40 C.F.R. § 123.44.    Moreover, EPA threatened to (a) promulgate federal numeric nutrient standards, even where not necessary under the Clean Water Act, (b) require unreasonable additional point source reductions, (c) engage in increased federal enforcement activity, and (d) withhold grant money to states for reasons not intended by Congress, all because it did not agree with a state's WIP.

49.    Each of the jurisdictions revised their WIPs to avoid the threatened backstop measures in the Draft TMDL.    *See generally* Final TMDL at Section 8. EPA, however, left certain backstop measures in place.    *See id.* at 8-22, 8-26.

50.    Through this WIP revision process, EPA has effectively overridden state implementation decisions.    EPA impermissibly crossed the line between establishing an informational tool authorized by the Clean Water Act and

mandating implementation measures in a way that Congress plainly did *not* authorize.

51.    EPA's encroachment into state authority over TMDL implementation was not limited to the development of implementation plans.  EPA established fine-scale pollutant loading allocations in the Final TMDL, distributing pollutant loading among numerous source categories and even among individual sources throughout the watershed.  *See id.* at Appendices Q, R.  EPA assigned specific allocations among sources despite its recognition that "there are limitless combinations of loadings."  Draft TMDL at 6-18.[5]  In doing so, EPA has effectively foreclosed future implementation options of the individual jurisdictions.  EPA lacks statutory authority to distribute pollutant load allocations among sources in the guise of establishing a "total" maximum daily load.

52.    Many of the pollutant load allocations established by EPA affect farms and businesses hundreds of miles upstream that do not discharge into the Bay or its tidal waters.  Many of the waters that receive discharges or runoff from these sources are *achieving* their water quality standards.

---

[5]    The sections and appendices of the Draft TMDL are available as "Supporting & Related Material" at http://www.regulations.gov/#!docketDetail;dct=SR;rpp=100; so=DESC;sb=postedDate;po=0;D=EPA-R03-OW-2010-0736) (posted September 24, 2010, Docket ID EPA-R03-OW-2010-0376).

53.    Simply put, EPA lacks statutory authority to impose pollutant load allocations.  The only mechanisms available to EPA under the Clean Water Act to address the impacts of discharges upstream of a listed water is to object to NPDES permits issued by the upstream state(s) or to object to state water quality standards if upstream states promulgate standards that do not protect downstream waters.

**D.    Development of the Final TMDL – Use of Flawed Model Networks**

54.    The fundamental purpose of the Final TMDL is to establish maximum pollutant loading to the Chesapeake Bay at a level necessary to meet applicable water quality standards.  The water quality standards addressed by the Final TMDL are expressed in terms of dissolved oxygen, water clarity, and chlorophyll-*a* (used as a surrogate for algae).  The standards were established by the States of Maryland and Delaware, the Commonwealth of Virginia, and the District of Columbia to protect and restore fish, other aquatic life (like oysters), and rooted aquatic plants (referred to in the Final TMDL as submerged aquatic vegetation) in the tidal waters of the Chesapeake Bay.

55.    The conditions that affect those water quality parameters include (among other factors) rainfall, stream flow, tidal influence, groundwater, wind, temperature, and sunlight.  EPA has determined that nitrogen and phosphorus (which are essential to plant growth) and sediment loadings also influence the concentration of dissolved oxygen and chlorophyll-*a* in the Bay.  Those loadings

24

also influence water clarity, which in turn affects the growth of submerged aquatic vegetation.

56.    EPA does not know precisely how much nitrogen, phosphorus, and sediment are actually being added to the Chesapeake Bay on a daily, monthly, or even annual basis.  And when those pollutants reach the Bay, EPA does not know precisely how they influence clarity, the growth of aquatic submerged vegetation, or the concentration of dissolved oxygen and chlorophyll-*a*.  Instead, EPA had to estimate the loading of these pollutants and their impact on water quality with computer modeling techniques that attempt to simulate real-world conditions.

57.    EPA developed a complicated network of interrelated models to try to accomplish that objective.  In fact, the Final TMDL is based almost entirely on computer modeling and simulations, a process that yields inherent uncertainty at every step.  EPA's simulations are so interdependent that a fundamental flaw in one model can undermine the accuracy and validity of the entire network.  That is exactly what has happened here – EPA's Final TMDL is fundamentally flawed because the models upon which it is based contain numerous errors and compounding uncertainties, which are particularly pronounced with respect to the models' treatment of loading from agriculture.

58.    Among other flaws, EPA's models rely on inaccurate assumptions regarding agricultural runoff.  The Bay models treat hundreds of tons of animal

25

manure at animal feeding operations like storm water flowing from impervious areas in cities, an implausible assumption for which EPA provides no support. EPA's modeling also includes inaccurate assumptions regarding the rate of implementation of agricultural best management practices ("BMPs"). EPA admits that it only assumed implementation of BMPs that are associated with cost-share programs, resulting in a gross underestimation of current BMP implementation throughout the watershed. These errors are compounded by the fact that EPA inaccurately modeled soil loss and sediment loadings in the Bay system.

59.     Aside from using bad assumptions and flawed input data, the models themselves are unreliable. For example, EPA was unable to get its models to predict that water quality standards would *ever* be achieved in certain segments, no matter what inputs EPA used. EPA's models also predicted that in some cases the number of stream and bay segments failing water quality standards would *increase* as pollutant loads *decrease*. And perhaps most importantly, EPA used its Watershed Model to establish pollutant load allocations for the Final TMDL on a scale far more precise than the model can validly predict.

60.     These errors evidence improper modeling techniques. For example, EPA's methodology for the Final TMDL violated one of the most fundamental principles of environmental modeling, which requires careful calibration to ensure that the models perform as intended. Multiple scientific reviews of EPA's models

highlighted the lack of calibration as a concern – without adequate calibration, the

public cannot be certain that the models will accurately reflect the reality they

purport to represent.

61.    Based on what is known about how EPA has treated agriculture in its

modeling network, it is clear that the models do not in fact represent reality.   In

fact, EPA has recently admitted that its Watershed Model is flawed and unfinished

in ways that directly affect its treatment of agriculture.   The agency plans to change

the model in 2011 so that it can alter its assumptions regarding nutrient

management and the extent of impervious surfaces in the watershed.   The Final

TMDL, however, is enforceable final agency action.

### E.    Development of the Final TMDL – Inadequate Public Review and Comment

62.    EPA's Draft TMDL was released for a 45-day public comment period

on September 24, 2010.   75 Fed. Reg. 57,776 (Sept. 22, 2010) (Docket No. EPA-

R03-OW-2010-0736).    Even though the Chesapeake Bay TMDL is the most

complex TMDL ever attempted, EPA provided only 45 days for public review and

comment on the TMDLs and the underlying models.   The Draft TMDL consisted

not only of the two sets of wasteload allocations ("WLAs") and load allocations

("LAs") for nitrogen, phosphorus, and sediment for 92 water body segments, it

also consisted of detailed implementation instructions directed at the watershed

jurisdictions.   All told, EPA presented for a mere 45-day review the 370 pages of

27

the Draft TMDL document itself, 1,672 pages of 22 appendices, and poorly organized and incomplete technical support material that is referenced throughout the Draft TMDL.

63.    Plaintiffs, along with numerous other organizations and members of the public, the Governor of Virginia, members of Congress, and more than 20 local governments, requested EPA to delay the TMDL and provide additional time to comment.  EPA denied all requests.

64.    But worse than its failure to provide sufficient time for meaningful public review and comment on the Draft TMDL, EPA withheld information necessary to provide meaningful comments during that period.

65.    Only six days before the end of the comment period, on November 2, 2010, EPA staff provided to a limited number of recipients, in an e-mail communication, internet links to modeling data and results.  These data and results are the inputs and outputs of the "Scenario Builder" model that EPA relied on to determine many of the assumptions – particularly those involving agricultural land use activities and practices – under which its overall modeling network predicts that water quality standards will be met.  In other words, these are the inputs and outputs that determined some of the key assumptions for the Final TMDL.  In addition, the final documentation for Scenario Builder that EPA made available in

conjunction with the release of the Final TMDL is dated December 2010, well after the close of the public comment period.  *See* Final TMDL at 4-28.

66.    The links to the scenario data, scenario results, and the code for Scenario Builder were not made available in the administrative record for the Draft TMDL or on EPA's website for the Draft TMDL.  Thus, most of the public was unable to review and comment on this critical model and its assumptions about agricultural land and practices.

67.    Of equal significance is EPA's failure to provide adequate notice of and an opportunity for comment on the Watershed Model.  EPA provides a link to a website (http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169) containing information on the Watershed Model in the Final TMDL.  That website "warn[s]" users of the draft documentation it contains that the "information is preliminary, subject to change, and unsubstantiated by full and final reviews."

68.    EPA also did not allow the public to review and comment on many of the other documents it relied on to develop the Final TMDL before issuing it.  EPA instead incorporated by reference a significant number of documents that "EPA and its seven watershed jurisdictions relied upon" in developing the Final TMDL, indicating only that access to this information "[would] be provided."

69.    Because the significant policy choices embodied in the TMDL are based primarily on models, not actual data, and those models are based on

29

assumptions, it was essential that those assumptions, as well as any other information relied on by the agency, be subject to meaningful public review and comment, but they were not.

### F.    EPA's Final "TMDL" for the Chesapeake Bay Watershed

70.    EPA issued the Final Chesapeake Bay TMDL on December 29, 2010. *See* http://www.epa.gov/chesapeakebaytmdl/.    It addresses the restoration of aquatic life designated uses for the Bay, its tidal tributaries, and embayments, and is the "largest and most complex thus far" of the 40,000 TMDLs completed to date across the United States.    Final TMDL at ES-3.    The Final TMDL is in fact a combination of TMDLs, including daily and annual allocations for three pollutants for 92 individual water body segments in the Chesapeake Bay.    The Final TMDL sets limits for the Bay watershed of 185.9 million pounds of nitrogen, 1.2 million pounds of phosphorus, and 6.45 billion pounds of sediment per year, which amounts to a 25% reduction in nitrogen, a 24% reduction in phosphorus, and a 20% reduction in sediment, intended to meet state water quality standards for dissolved oxygen, water clarity, and chlorophyll-*a*.

71.    Rather than stop with the establishment of total maximum loads for the Bay, EPA allocated these loads throughout the watershed based on the computer models discussed above.    EPA's Final TMDL also assigns pollutant loads specifically for the agricultural sector within each water segment and

jurisdiction, and pollutant loads for individual sources, including those in the broader watershed far upstream from the 92 tidal waterways themselves. These detailed pollutant loads are set forth in Section 9 of the Final TMDL and in the spreadsheets appended thereto. *See* Final TMDL at Appendices Q and R.

72.    The nitrogen limit for the Chesapeake Bay basin as a whole was driven by the need to avoid occasional seasonal exceedances of the dissolved oxygen standards in the deep water and deep channels in four segments in the main stem of the Bay and the lower Potomac River, resulting in a 50 million pound reduction in nitrogen loading that would not be necessary for the other 88 segments of the Bay. *See* Final TMDL at 6-14.

73.    EPA performed no analysis of the costs of compliance with the Final TMDL and its multiplicity of assigned pollutant loads that span the entire Mid-Atlantic Region, nor did EPA analyze the cumulative impact of such costs on the regulated community and society at large, as compared to the benefits of achieving dissolved oxygen water quality standards in the depths of four Bay deep-water and deep-channel segments.

74.    The Final Chesapeake Bay TMDL implements EPA's specific statutory "backstop" authority to issue TMDLs with respect to two TMDLs in the District of Columbia and 23 in Virginia. For all other states and water segments,

EPA has not waited for the action by the states contemplated by the Clean Water Act before issuing the Final TMDL.

### G.   Significant Impacts of the Final TMDL on Plaintiffs' Members

75.   EPA's Final TMDL will have a significant adverse impact on Plaintiffs' members.  As a result of its inaccurate modeling, EPA assumes that specific changes in the operations of agricultural sources are necessary to achieve water quality standards in the Bay and its tidal tributaries.  EPA incorporates assumptions regarding those specific operational changes into its assigned pollutant loadings for agriculture.  *See* Final TMDL at Appendix V.  EPA intends to force agricultural sources to adopt those changes through the permits held by regulated agricultural sources.  *See id.* at 8-12.  EPA also intends to convert unregulated agricultural sources into regulated sources if they do not change their operations.  Finally, EPA has threatened to take actions against states if the practices assumed by EPA in the TMDL do not occur.  *See id.* at 8-13.

### FIRST CLAIM FOR RELIEF

### EPA's Final TMDL Violates the Clean Water Act and EPA Regulations

76.   Paragraphs 1-75 are realleged and incorporated by reference.

77.   EPA's Final TMDL exceeds EPA's statutory authority under the Clean Water Act and otherwise violated the Act and its own regulations in multiple aspects, including those described in further detail below.

78.    EPA exceeded its authority under Section 303(d)(2) of the Act, 33 U.S.C. § 1313(d)(2), which limits EPA's authority to establish a federal TMDL to instances of state action or inaction that is contrary to the Clean Water Act.

79.    EPA exceeded its statutory authority under Section 303(d) of the Act, 33 U.S.C. § 1313(d), which does not authorize EPA to develop a TMDL for waterways that are not listed as impaired.

80.    EPA exceeded its statutory authority when it established pollutant loading allocations for individual sources and categories of sources.  EPA assigned hundreds of pollutant load allocations across the entire watershed from Virginia to New York.  The assignment of these pollutant loads unlawfully usurps the states' primary Clean Water Act authority.

81.    EPA exceeded its statutory authority under 33 U.S.C. §§ 1313(d) and 1370 and violated its own regulations when it assigned pollutant load allocations to upstream water segments that are outside of the Chesapeake Bay.   Such allocations, which are not based on the upstream segments' water quality standards, bypass the Clean Water Act's structure (based on state-level procedures) for protecting water quality.

82.    EPA exceeded its statutory authority by demanding that there be "reasonable assurance" that: (i) the pollutant allocations in the TMDL will be achieved; and (ii) water quality standards will be attained.  *See* Final TMDL at 7-1.

EPA has no authority to force implementation of TMDLs or achievement of water quality standards on a federal timeline. Indeed, Congress left those matters within the exclusive authority of the states under 33 U.S.C. §§ 1288, 1313(e), and 1329. EPA's "reasonable assurance" requirement unlawfully encroaches upon the states' authority to control nonpoint source pollution, to develop TMDL implementation plans in accordance with their continuing planning processes, and to take social and economic consequences into account in determining how and when to implement water quality standards.

83.    The Final TMDL also violates EPA's implementing regulations by, *inter alia,* (i) failing to comply with 40 C.F.R. § 130.7(c)(1)(ii), which requires that calculations used to establish TMDLs be subject to public review; (ii) encompassing nonpoint sources within point source wasteload allocations in contravention of the regulatory distinction in 40 C.F.R. § 130.2; and (iii) assigning load allocations to water segments when 40 C.F.R. § 130.2 provides that such allocations only be assigned to pollution sources.

### SECOND CLAIM FOR RELIEF
#### EPA's Final TMDL Is Arbitrary and Capricious

84.    Paragraphs 1-83 are realleged and incorporated by reference.

85.    EPA's assigned pollutant loadings in the TMDL are based on models that used erroneous assumptions so the Final TMDL's pollutant load reductions are not justified by the evidence in the record.

86.    EPA's models were not properly calibrated, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

87.    EPA's models are not capable of assigning valid pollutant loadings to individual sources, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

88.    For these reasons, EPA's Final TMDL is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706.

## THIRD CLAIM FOR RELIEF

### EPA Failed to Provide for Public Notice and Comment Required by the Administrative Procedure Act

89.    Paragraphs 1-88 are realleged and incorporated by reference.

90.    Under the Administrative Procedure Act, an agency that intends to promulgate a rule or regulation must first provide the public with notice of, and an opportunity to comment on, a proposed version of the rule.  *See* 5 U.S.C. § 553. Such notice and opportunity to comment must include the data upon which the agency relies.

91.    EPA's Final TMDL was issued in violation of 5 U.S.C. § 553 in that EPA failed to provide the public with a meaningful opportunity to comment on the Draft TMDL and to participate in this regulatory proceeding.  EPA failed to provide the public with sufficient access to the models and other information on

which it relied to develop the Final TMDL, and some of the most vital information that EPA relied upon continued to change even after the close of the brief comment period.

## FOURTH CLAIM FOR RELIEF

### EPA's Final TMDL is *ultra vires*

92.   Paragraphs 1-91 are realleged and incorporated by reference.

93.   To the extent not specifically alleged above, the Final TMDL is in excess of delegated statutory authority under the Clean Water Act and therefore is *ultra vires*, for the reasons set forth in ¶¶ 77-83, *supra*.   Accordingly, and irrespective of federal court jurisdiction under any other statute, the Final TMDL is unlawful and should be set aside as *ultra vires*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor, and:

1.   Declare that the Final TMDL is contrary to federal law, including the Clean Water Act, or is otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or is *ultra vires*;

2.   Declare that EPA violated the Administrative Procedure Act in issuing the Final TMDL without following Administrative Procedure Act procedures;

3.   Vacate the Final TMDL;

4. Enjoin and restrain Defendant, its agents, employees, successors, and all

   persons acting in concert or participating with it from enforcing, applying, or

   implementing (or requiring others to enforce, apply, or implement) the Final

   TMDL; and

5. Grant Plaintiffs such other relief as may be necessary and appropriate or as

   the Court deems just and proper.

Respectfully submitted,

Dated: April 4, 2011                By:  /s/ Robert J. Tribeck
                                         Robert J. Tribeck
                                         PA I.D. No. 74486
                                         Amanda J. Lavis
                                         PA I.D. No. 308956
                                         RHOADS & SINON LLP
                                         One South Market Square, 12th Flr.
                                         Harrisburg, PA  17108-1146
                                         (717) 233-5731

                                         Richard E. Schwartz *(Pro Hac Vice)*
                                         Kirsten L. Nathanson *(Pro Hac Vice)*
                                         David P. Ross
                                         CROWELL & MORING LLP
                                         1001 Pennsylvania Avenue, N.W.
                                         Washington, DC 20004
                                         (202) 624-2500

Of Counsel:                         *Attorneys for Plaintiffs American Farm*
                                    *Bureau Federation, Pennsylvania Farm*
Ellen Steen                         *Bureau, The Fertilizer Institute, National*
Danielle Quist                      *Pork Producers Council, National Corn*
AMERICAN FARM BUREAU FEDERATION     *Growers Association, National Chicken*
600 Maryland Avenue, S.W.           *Council, U.S. Poultry & Egg Association,*
Suite 1000W                         *and National Turkey Federation*
Washington, DC  20024
(202) 406-3600

37

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2011 a true and correct copy of the foregoing document was electronically filed and served on the following in accordance with the Rules of the United States District Court for the Middle District of Pennsylvania:

> Stephen R. Cerutti, II, Assistant US Atty
> United States Attorney's Office
> Middle District of Pennsylvania
> 228 Walnut Street, Suite 220
> P.O. Box 11754
> Harrisburg PA  17108-1754
>
> Kent E. Hanson
> Environmental Defense Section
> Environmental & Natural Resources Div.
> US Department of Justice
> P.O. Box 23986
> Washington DC  20026-3986

/s/ *Robert J. Tribeck*

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. *1:11-cv-1213*

**FILED**
**SCRANTON**

JUN 2 4 2011

Per_____
DEPUTY CLERK

## COMPLAINT

Plaintiff, the National Association of Home Builders ("NAHB"), brings this action seeking declaratory and injunctive relief against Defendant United States Environmental Protection Agency ("EPA") and alleges as follows:

### INTRODUCTION

1.    Plaintiff challenges EPA's final action of promulgating the Final Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus and Sediment, signed by the EPA Region III Regional Administrator on December 29, 2010 ("Final TMDL"). *See* 76 Fed. Reg. 549 (Jan. 5, 2011) (notice of availability of the Final TMDL); *available at*

http://www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/tmdlexec.html.  Although the lawful purpose of the Final TMDL is informational – to identify the maximum amount of nitrogen, phosphorus, and sediment that would achieve water quality standards in 92 tidal water bodies in the Chesapeake Bay – this EPA action is not limited to this lawful purpose.  The Final TMDL assigns contributions of these substances to local waters among cities and businesses, as well as residential, agricultural, and undeveloped lands throughout the vast Chesapeake Bay watershed – in Virginia, West Virginia, Maryland, Delaware, Pennsylvania, New York, and the District of Columbia (collectively the "watershed jurisdictions") – a 64,000-square-mile area with a population of almost 17 million people.

2.    EPA used an unprecedented process to micromanage waterways from Virginia to New York through the assignment of highly specific pollutant loads. That process unlawfully circumvented the Clean Water Act procedures that give primary authority to the states to protect water quality.  States can do so by establishing:  (a) water quality standards; then (b) (for waters that do not meet those standards) "total maximum daily loads" ("TMDLs") representing the levels of pollutants the water body can receive and still achieve those standards; and finally (c) a planning process to work toward achieving standards through individual permits limiting discharges from point sources and practicable management practices for nonpoint sources.

2

3.    The Final TMDL is fatally flawed in several critical respects.  First, EPA has exceeded its authority under the Clean Water Act by: (a) allocating pollutant loads among sources in a TMDL; (b) basing those allocations on the wrong water quality standards; and (c) using extra-statutory mechanisms to impose those load allocations.  Second, the assigned pollutant allocations are based on erroneous information, particularly as it relates to residential and light commercial development, which was fed into computer models that are unsuitable for deriving such load allocations – even with *accurate* information.  Finally, during the comment period, the public did not receive adequate time or access to the information needed to comment effectively on the modeling results and the assumptions in the Final TMDL.

4.    For each of the reasons, this Court should declare that the assigned pollutant loads are not legally enforceable, and it should vacate the Final TMDL.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, and under the Administrative Procedure Act, 5 U.S.C. § 702, providing for judicial review of final agency action. The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and

3

under 5 U.S.C. §§ 701-706 for violations of the Administrative Procedure Act and the Clean Water Act.

6.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because EPA is an agency of the United States and certain of Plaintiff's members affected by the Final TMDL reside in this judicial district.

## PARTIES

7.    Plaintiff, the National Association Home Builders, is a Washington, D.C.-based trade association whose mission is to enhance the climate for housing and the building industry.  Known as "the voice of the housing industry," NAHB represents more than 160,000 members involved in home building, remodeling, multifamily housing construction, property management, subcontracting, design, housing finance, building product manufacturing, and other aspects of residential and light commercial construction.  Founded in 1942, NAHB is affiliated with over 800 state and local home builders associations in all 50 states, the District of Columbia, and Puerto Rico.  In the watershed jurisdictions, NAHB represents approximately 16,000 members in those six states and the District of Columbia.

8.    According to the Bureau of Labor Statistics, home builders and residential subcontractors employ over 2.1 million people.  NAHB's builder members will construct about 80 percent of the new housing projected for 2011.

4

9.     Through its advocacy function on behalf of the nation's home builders, NAHB represents its members in legal, regulatory, and legislative matters affecting the use and development of their land.   It is germane to NAHB's organizational purpose to ensure that its members can use their property to the fullest extent allowed by law so that they may build and supply housing for all people throughout the United States, regardless of income level, race, or nationality.

10.     Because of the nature of their work, most of NAHB's builder and developer members must obtain and operate under National Pollutant Discharge Elimination System ("NPDES") permits issued under the Clean Water Act ("CWA") to control stormwater discharges from their construction sites.   The Chesapeake Bay TMDL's requirements will be incorporated into stormwater permits issued for homebuilding projects in the Chesapeake Bay watershed.

11.     As a matter of organizational policy, NAHB's members have directed the association's staff to advocate that: (i) all federal, state, and local water quality programs should be focused, flexible, and founded on sound science; (ii) any total maximum daily loads must consider the relative contribution of stormwater discharges from construction sites among all contributing sources and ensure that any permit limitations are reasonable and cost-effective; and (iii) all water

5

programs take into account site-specific conditions and are appropriately tailored to environmental risk from residential construction.

12.    Members have identified the regulation of the Chesapeake Bay watershed – in the intrusive manner undertaken by EPA – as a source of controversy and directed NAHB staff to ensure that EPA properly regulates the Chesapeake Bay within the scope of its Clean Water Act authority, based upon sound science, reflective of the relative contribution of stormwater discharges from construction sites, and developed with meaningful participation by NAHB's members, and the general public. This suit is intended to implement NAHB's policies.

13.    Independent of this litigation, NAHB has expended significant resources to ensure that its members, and the government agencies that regulate their construction activities, understand and faithfully implement the goals and requirements of the Clean Water Act, including limits on EPA's authority under the Clean Water Act. Toward that end, NAHB has devoted staff and monetary resources to conduct research under the Clean Water Act, including research that specifically addresses the proper regulatory jurisdiction of EPA; sponsor and deliver educational programs to assist members with Clean Water Act compliance; draft regulatory comments to ensure that EPA's exercise of authority is consistent with what Congress intended in enacting the Clean Water Act, including comments

6

related to the Chesapeake Bay TMDL; prepare legislative language and supporting documents for discussion on Capitol Hill addressing the restoration of the Chesapeake Bay; and prepare and distribute publications, for the media and public at large, regarding the Chesapeake Bay.

14.    During the public comment period for the challenged action, NAHB provided detailed comments on EPA's Draft Chesapeake Bay Total Maximum Daily Load ("Draft TMDL"). *See* EPA-R03-OW-2010-0736-0571.

15.    Additionally, there are many current and potential residential and light commercial developments located within the 64,000-square-mile Chesapeake Bay watershed that hold (or will be required to obtain) individual or general permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source discharges into these waters. The terms and conditions of those permits, as discussed further below, will be improperly and adversely affected by the Final TMDL, and new permits will be more difficult to obtain as a result of the Final TMDL. As a result, NAHB's members are significantly and adversely affected by EPA's action, which will limit their ability to obtain Section 402 permits for new, redeveloped, and retrofitted residential or light commercial construction and will require more stringent permit limitations for nitrogen, phosphorus, and sediment.

16.    Many NAHB members hold permits issued pursuant to Clean Water Act Section 402, 33 U.S.C. § 1342, for point source or stormwater discharges into

7

the Chesapeake Bay watershed that would be affected by the TMDL developed by EPA. As discussed in NAHB's comments, home builders are already regulated under stringent federal, state, and local programs, and therefore, NAHB's members will be negatively impacted by the additional control measures that will result from the TMDL.

17.    Defendant EPA is the federal agency charged with the administration and enforcement of the Clean Water Act, in accordance with the specific delegations of authority from Congress contained in that statute.   EPA is headquartered in Washington, D.C.

## STATUTORY AND REGULATORY FRAMEWORK

18.    Total maximum daily loads ("TMDLs") are one element of a detailed statutory and regulatory framework under the Clean Water Act, which prescribes a series of actions that are described in greater detail below: (i) establishment of water quality standards by the states under Section 303(c); (ii) identification by the states of certain waters that are not meeting water quality standards under Section 303(d) (commonly called "impaired" waters); (iii) calculation by the states of a total maximum daily pollutant load – a TMDL – for such impaired waters under Section 303(d); and (iv) a "continuous planning process" under Section 303(e) to generate plans for implementation of water quality standards by the states.

8

19.    Federal involvement in the above scheme is extremely limited. EPA has statutory authority to act directly by disapproving or objecting to state action or inaction; EPA has no authority to develop a state's planning process or implementation plans.

## A.    Overview of Clean Water Act Regulation

20.    The Clean Water Act divides sources of pollutants into two major categories: "point sources" and "nonpoint sources." "Point source" is defined at 33 U.S.C. § 1362(14) to mean "any discernible, confined, and discrete conveyance including . . . any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."    Residential and light commercial construction sites are generally regulated under the Clean Water Act because the sites discharge pollutants from point sources, such as ditches and pipes. The term "nonpoint source" is not defined in the Act.

21.    All pollutant discharges from a point source to waters of the United States[1] are prohibited under the Clean Water Act unless otherwise authorized under several sections of the Act. One way in which discharges are authorized is under a Section 402 permit, known as a National Pollutant Discharge Elimination System

---

[1] The Clean Water Act focuses on "navigable waters," defined by statute as "waters of the United States." 33 U.S.C. § 1362(7). References herein to "waters" are to such "waters of the United States" within the scope of the Act's jurisdiction.

("NPDES") permit.[2] *Id.* § 1342. The NPDES permitting system imposes limits on such discharges based on the application of technology, or the need to achieve water quality standards, whichever is more stringent. *Id.* §§ 1311(b), 1312.

22.    States assume primary responsibility for administration and enforcement of the NPDES permitting program following EPA approval of a state's proposed program. *Id.* §§ 1342(b), 1342(c)(1). Among other things, state NPDES programs must allow for downstream states whose waters may be affected by the issuance of a permit to submit written recommendations concerning the permit application to the permitting state and to EPA. *Id.* § 1342(b)(3), (5). If the permitting state rejects any such recommendations, it must explain its reasons for doing so in writing. *Id.* § 1342(b)(5).

23.    EPA retains authority, in specified circumstances, to object to a particular NPDES permit that authorizes discharges to waters. *Id.* § 1342(d); 40 C.F.R. § 123.44. For example, EPA may object to the issuance of a permit by an upstream state if EPA determines that discharges under the permit will cause or contribute or have the reasonable potential to cause or contribute to an excursion of any state water quality standard. 33 U.S.C. §§ 1311(b)(1)(C), 1342(d)(2); 40 C.F.R. §§ 122.4(a) and (d), 122.44(d)(1)(i), and 123.44(c).

---

[2] Many non-industrial "stormwater" discharges are authorized under Section 402 even without a permit, unless EPA or the state permitting agency "designates" such a discharge for permitting. *See* 33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(a)(1)(v).

10

**B.    Overview of Clean Water Act Regulation of the Construction and Development Industry.**

24.    Many of NAHB's members engaged in residential or light commercial construction in the Chesapeake Bay watershed are currently regulated by existing federal, state, and local stormwater control programs.  For example, an NPDES permit is required for stormwater discharges associated with construction activity (*e.g.,* clearing, grading, and excavation) that will disturb one or more acres of land on either a single lot or as part of a larger common plan for development or sale.  33 U.S.C. § 1342(p); 40 C.F.R. § 122.26(a)(1)(ii), (b)(14)(x), (b)(15).  The NPDES permit program for stormwater discharges addresses at least 97.5% of the annual construction acreage in the United States and imposes permitting obligations on over 5,000 municipalities, which also regulate stormwater discharges from construction activities.  69 Fed. Reg. 22,472, 22,473 (Apr. 26, 2004).

25.    There are two types of NPDES stormwater construction permits that NAHB's members may seek: general permits and individual permits.  Most discharges from construction activity are authorized under general permits – EPA's construction general permit (in the few jurisdictions in which EPA is the permitting authority)[3] and state construction general permits.    40 C.F.R.

---

[3] EPA is the NPDES permitting authority in four states (*i.e.,* Idaho, Massachusetts, New Hampshire, and New Mexico), the District of Columbia, Puerto Rico, all

11

§§ 122.28(a)(2)(i), 123.25(a)(11) (allowing general permits to cover groups of similar dischargers under one permit). Typically, general permits require the use of erosion and sediment controls and pollution prevention measures (*i.e.,* best management practices ("BMPs")) to minimize, control, or prevent stormwater and wastewater discharges[4] from construction activities.[5] 40 C.F.R. § 122.44.

26.    Control measures in NPDES permits are reflected in a stormwater pollution prevention plan that must be maintained onsite and that includes detailed maps of the construction site's drainage patterns, discharge points, discharge control locations, control measure descriptions, and inspection and reporting procedures. *See* Developing Your Stormwater Pollution Prevention Plan: A Guide for Construction Sites (EPA 833-R-06-004, May 2007), *available at* http://www.epa.gov/npdes/pubs/sw_swppp_guide.pdf.

---

other U.S. territories except the Virgin Islands, federal facilities in four states (*i.e.,* Colorado, Delaware, Vermont, and Washington), most Indian lands, and a few other designated activities in specific states. EPA's current construction general permit became effective on June 30, 2008, and EPA recently released a draft permit for public comment. 73 Fed. Reg. 40,338 (July 14, 2008); 76 Fed. Reg. 22,882 (Apr. 25, 2011).

[4] Other wastewater discharges from construction sites might result from wastes, such as discarded building materials, concrete truck washout, chemicals, litter, and other materials that could be exposed to stormwater.

[5] BMPs could include water handling practices (*e.g.,* dikes, check dams, and swales), sediment barriers (*e.g.,* sediment basins, sediment traps, straw bale dikes, silt fences, and fabric filters), land grading and stabilization, vegetative stabilization, riparian buffers, dewatering requirements, and many others.

12

27.    State construction general permits often include specific conditions to address features that are of particular concern to that state, such as soil types, topographic or climatic characteristics, or other factors.   74 Fed. Reg. at 62,996, 63,000 (Dec. 1, 2009).

28.    Individual NPDES permits for construction activities are rare, but may be required in narrow circumstances.   40 C.F.R. § 122.28(b)(3).

29.    Additionally, in December 2009, EPA issued an effluent limitation guideline (ELG) and a new source performance standard (NSPS) for the construction and development industry that imposed additional numeric and non-numeric limits on stormwater discharges from the construction activities.   40 C.F.R. Part 450.   The new ELG applies to all construction activities required to obtain an NPDES permit and the NSPS applies to all new sources as of February 1, 2010.   *Id.* § 450.10.   Non-numeric requirements include erosion and sediment controls,[6] soil stabilization requirements, dewatering obligations, pollution prevention measures, surface outlets, and prohibitions on certain wastewater discharges.   *Id.* § 450.21.

---

[6] The ELG's erosion and sediment controls require efforts to control stormwater volume and velocity; minimize exposed soil; minimize flows from steep slopes; address the amount, frequency, intensity and duration of precipitation and the nature of the resulting runoff;  install and maintain surface water buffers; minimize soil compaction; and preserve topsoil. 40 C.F.R. § 450.21(a).

30.    The numeric limitation component prohibits stormwater discharges with an average daily turbidity that exceeds 280 nephelometric turbidity units – a measure of cloudiness.[7] *Id.* §§ 450.22(a), 450.24. These terms will be incorporated in new NPDES permits and are reflected in EPA's recent draft construction general permit.[8] 76 Fed. Reg. at 22,886.

31.    In addition to these federal requirements, builders also are regulated under municipal stormwater management programs developed by municipalities to comply with their NPDES permit obligations for municipal separate stormwater systems ("MS4s").    40 C.F.R. §§ 122.26(d)(2)(iv)(D), 122.34(b)(4).    MS4s regulated under the Clean Water Act include large and medium MS4s that serve populations over 100,000 and small MS4s that serve urbanized areas.    33 U.S.C. § 1342(p)(2); 40 C.F.R. §§ 122.26(b)(4), (7) and 122.32.

32.    The municipal stormwater management programs require construction activities to follow procedures for site planning reflecting water quality impacts,

---

[7] As a result of litigation and two administrative petitions, EPA issued a direct final stay of the numeric limit pending the Agency's reexamination of its calculations supporting the numeric effluent limitation. 75 Fed. Reg. 68,215 (Nov. 5, 2010). EPA plans to issue a new numeric limit by early 2012. *Wisconsin Builders Association, et al. v. EPA*, EPA's Unopposed Motion for Partial Vacature of the Final Rule, Remand of the Record, to Vacate Briefing Schedule, and to Hold Case in Abeyance, No. 09-4113 (7th Cir. Aug. 13, 2010).

[8] EPA's draft construction general permit includes placeholders for terms related to the numeric effluent limit. 76 Fed. Reg. at 22,886.

14

BMPs (such as erosion and sediment controls), procedures for inspections and enforcement that consider the construction activity, topography, soil characteristics, and receiving water quality, and educational and training measures. 40 C.F.R. §§ 122.26(d)(2)(iv)(D), 122.34(b)(4).   To assist municipalities in regulating stormwater discharges from construction sites, EPA has issued a long series of guidance documents on local stormwater programs.  *See, e.g.,* National Menu of Stormwater BMPs, *available at* http://cfpub.epa.gov/npdes/stormwater/menuofbmps/ (last updated Jan. 9, 2008); Measurable Goals Guidance for Phase II MS4s, *available at* http://cfpub.epa.gov/npdes/stormwater/measurablegoals/index.cfm (last updated Oct. 30, 2007); Stormwater Phase II Compliance Assistance Guide, (EPA 833-R-00-002, March 2000), http://www.epa.gov/npdes/pubs/comguide.pdf; Stormwater Phase II Final Rule Fact Sheet Series, *available at* http://cfpub.epa.gov/npdes/stormwater/swfinal.cfm (last updated Mar. 17, 2008).

33.    Additionally, many of the watershed jurisdictions impose a wide variety of control requirements on construction activities, many of which are above and beyond federal requirements and include state-of-the-art stormwater management practices.  For example, Maryland imposes erosion and sediment control requirements for stormwater discharges associated with construction activities that will disturb 5,000 or more square feet of land, as opposed to federal

15

NDPES permitting requirements that trigger at the disturbance of one or more acres. MD. CODE REGS. 26.17.01.05(A); *supra* ¶ 24.

34.    Before EPA finalized the Bay TMDL, stormwater discharges from construction activities have been stringently regulated under federal, state, and local water pollution control and prevention programs.[9]

### C.    Development of Water Quality Standards

35.    The Clean Water Act expressly recognizes, preserves, and protects "the primary responsibilities and rights of *States* to prevent, reduce, and eliminate pollution [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b) (emphasis added). The Act also bars any interpretation of its provisions that would "impair[] or in any manner affect[] any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States[,]" except as otherwise "expressly provided" by the statute. *Id.* § 1370(2).

---

[9] Beyond these requirements, EPA also is developing a new national rule to reduce stormwater discharges from new development and redevelopment by requiring sites to retain stormwater on-site through infiltration, evapotranspiration, or reuse. 74 Fed. Reg. 68,617, 68,621 (Dec. 28, 2009).    EPA is also contemplating additional stormwater requirements specifically for the watershed jurisdictions, such as designating additional sources for regulation, imposing additional Chesapeake Bay-only MS4 provisions, requiring retrofits of stormwater management controls for existing development, and applying specific performance standards to discharges from new and redevelopment within the watershed. 75 Fed. Reg. 62,358, 62,361-62 (Oct. 8, 2010).

16

36.    The Clean Water Act places primary authority with *each state* to develop water quality standards, consisting of designated uses and water quality criteria, for its water bodies. *Id.* § 1313(c)(2)(A). Each state must designate one or more uses for its water bodies and develop water quality criteria for each water body necessary to protect these uses, taking into account the water bodies' use and value for public water supplies, propagation of fish and wildlife, recreational, agricultural, and industrial purposes, use for navigation, and other purposes. *Id.* § 1313(c)(2)(A); 40 C.F.R. §§ 131.10 and 131.11. These criteria can be expressed as specific numeric quantities or as general narrative statements, but in either case, must be based on "sound scientific rationale." 40 C.F.R. § 131.11(a), (b). State standards are subject to EPA review and approval to ensure that they are consistent with Clean Water Act requirements. 33 U.S.C. § 1313(c)(3)-(4).

**D.    Development of TMDLs for Listed Waters**

37.    CWA Section 303(d) directs each state to: (i) identify those waters "within its boundaries" for which effluent limitations are not stringent enough to implement the water quality standards "applicable to such waters;" and (ii) establish a priority ranking of these waters, taking into account the severity of the pollution and the waters' designated uses. 33 U.S.C. § 1313(d)(1)(A). The state must establish a TMDL for each listed water (commonly referred to as "impaired" waters) for pollutants identified by EPA as suitable for such

17

calculation. *Id.* § 1313(d)(1)(C). This "total" maximum daily load is established "at a level necessary to implement the applicable water quality standards," accounting for seasonal variations and a margin of safety. *Id.*

38.    A TMDL is a calculation – a number, which, as EPA acknowledges, is meant to be an "informational tool[]." Final TMDL at 1-15. EPA regulations define a TMDL as the "sum" of both "wasteload allocations" ("WLAs") – the portions of a receiving water loading capacity allocated to each of its existing or future point sources of pollution – and "load allocations" ("LAs") – the loading capacity portions attributed to the water body's "existing or future nonpoint sources of pollution or to natural background sources." 40 C.F.R. § 130.2(g)-(i). The calculations used to establish TMDLs must be subject to public review. *Id.* § 130.7(c)(1)(ii).    The Clean Water Act does not authorize EPA-imposed "allocations" of a TMDL among pollution sources.

39.    Like water quality standards, the listing of waters and the establishment of TMDLs for those waters are subject to EPA review and approval. 33 U.S.C. § 1313(d)(2). If EPA disapproves a TMDL submitted by a state, or if a state fails to establish a required TMDL, EPA must establish, within 30 days, a TMDL at a level necessary "to implement the water quality standards applicable to such waters." *Id.* This "backstop" authority does not allow EPA to establish a

18

TMDL at a level *lower* than necessary to implement the water body's water quality standards.

### E.    Implementation of TMDLs

40.    In keeping with congressional policy to preserve and protect the primary responsibilities and rights of each state over its planning for the development and use of its land and water resources, the Clean Water Act does not give EPA authority over TMDL *implementation*. Only states can determine how a TMDL is ultimately achieved, including any allocations of pollutant loading.[10] State implementation plans are not part of a TMDL, are not required to be submitted to EPA, are not subject to EPA approval, and are not subject to unilateral establishment or modification by EPA.

41.    In contrast with EPA's authority to directly establish water quality standards or TMDLs under certain circumstances, the Clean Water Act does not authorize EPA to *itself* prepare a TMDL implementation plan, even where a state fails to do so. EPA has no authority to cross the line between identifying *total pollutant levels* necessary to meet water quality standards and specifying *implementation measures*. Thus, nothing in the Clean Water Act or EPA's

---

[10] EPA's only regulatory authority concerning the implementation of TMDLs is the agency's oversight authority over NPDES permitting for point source discharges, including water quality-based permit limits "required to implement any applicable water quality standard." 33 U.S.C. §1311(b)(1)(C).

19

regulations authorizes EPA to demand "reasonable assurance" that the state's implementation plan will be carried out or that it will achieve sufficient load reductions to meet the TMDL.

## FACTUAL BACKGROUND

### A.    Chesapeake Bay Program and Tributary Strategies

42.    The Chesapeake Bay Program was established as a voluntary partnership in the 1980s.  The original Chesapeake Bay Agreement was signed in December 1983 by the Commonwealths of Virginia and Pennsylvania, the State of Maryland, the District of Columbia, and EPA.  When the agreement was amended in 1987, the Chesapeake Bay Commission, representing the legislatures of Maryland, Virginia, and Pennsylvania, also signed the Agreement.  The Agreement was last amended in June 2000.  The States of New York, Delaware, and West Virginia are partners, but not signatories, to the Chesapeake Bay Agreement.  As partners, these jurisdictions signed a memorandum of understanding agreeing to work cooperatively to achieve agreed upon nutrient and sediment reduction targets.

43.    EPA issued new water quality criteria for the Chesapeake Bay in 2003.  The watershed jurisdictions cooperatively allocated pollutant loadings among the watershed jurisdictions in April 2003.

44.    Maryland, Virginia, the District of Columbia, and Delaware then adopted new water quality standards for the tidal waters of the Chesapeake Bay incorporating EPA's criteria.

20

45.    In 2007, the watershed jurisdictions changed the goal of achieving water quality standards by 2010 to a goal of implementing measures to achieve standards by 2025 using and implementing "Tributary Strategies" the states had developed to achieve this new goal.

46.    These efforts have and will continue to improve water quality in the Chesapeake Bay.    In fact, the overall health of the Bay achieved a 6% improvement from 2008 to 2009, according to a recent EPA Chesapeake Bay Program assessment.

**B.**    **Success of the Residential and Light Commercial Development Community in Reducing Pollution to the Bay**

47.    Since EPA and states began issuing NPDES permits for stormwater discharges from construction activities in the early 1990s, home builders in the Chesapeake Bay watershed have made major contributions to protecting the Bay through long-standing and continually improving stormwater discharge control programs for the construction and development industry.    These contributions include consistent improvement in stormwater pollution prevention plans, erosion and sediment control measures, use of flocculants and other sediment-settling chemicals, reductions in the amount of impervious surfaces and the use of other low impact development strategies on new home construction sites, environmental site design practices, and other BMPs that reduce runoff from construction sites.

21

48.   EPA's own data show that sediment loads to the Bay have decreased by more than 1.69 billion pounds per year since 1985, even though population and economic growth has spurred residential and light commercial development in the Chesapeake Bay.  Final TMDL at 6-49.

**C.    Development of the Final TMDL – Usurping State Authority**

49.   On September 22, 2010, EPA proposed the Chesapeake Bay TMDL – the largest and most complex TMDL ever promulgated – to achieve reductions in nitrogen, phosphorus, and sediment discharges throughout a 64,000-square-mile watershed covering the District of Columbia and sections of six states.  The Final TMDL is composed of smaller TMDLs for 92 tidal segments in the Chesapeake Bay watershed and are intended to address water quality standards for dissolved oxygen, water clarity, underwater Bay grasses (*i.e.,* submerged aquatic vegetation), and chlorophyll-*a* (an indicator for algal blooms).  75 Fed. Reg. 57,776, 57,776-78 (Sept. 22, 2010).

50.   Despite what it acknowledges have been "extensive restoration efforts during the past 25 years," EPA decided to set a federal "TMDL" for the Chesapeake Bay.  Although EPA has labeled it a "TMDL," EPA's action did not simply set a "total" maximum load for Bay waters.  Instead, the "TMDL" established a far-reaching regulatory scheme for the implementation of water quality standards in the Bay through a "historic and comprehensive 'pollution diet'

22

with rigorous accountability measures to initiate sweeping actions to restore clean water" in the entire Chesapeake Bay watershed. Final TMDL at ES-1. Even EPA acknowledges that "[t]he Chesapeake Bay TMDL is unique because of the extensive measures EPA and the jurisdictions [under EPA's mandate] have adopted to ensure accountability for reducing pollution and meeting deadlines for progress." *Id.* at ES-8.

51.    EPA set an arbitrary deadline of December 31, 2010 for establishment of the Final TMDL. This deadline required development of the Final TMDL before EPA's methods and models were ready to provide scientifically sound support. It also severely limited the time in which the public could review and provide meaningful comments on the Draft TMDL and the incomplete modeling on which it was based, as well as the time in which EPA could absorb and respond to those comments before issuing the Final TMDL.

52.    EPA imposed what it calls an "accountability framework" on the states and individual sources within the watershed as part of the extra-statutory process that produced the Final TMDL. EPA required states to submit to the agency Watershed Implementation Plans ("WIPs") before the Draft TMDL was even proposed, reversing the sequence for proper TMDL development and implementation planning provided for in the Clean Water Act and EPA's

23

regulations. EPA then used the state WIPs to develop the "assumptions" that were incorporated into the models used to establish the Final TMDL.

53.    EPA essentially disapproved the WIPs submitted by each state, concluding that the pollution controls identified in many of them were insufficient and that none of the draft WIPs provided "reasonable assurance" that the identified pollution controls would be implemented to achieve nutrient and sediment reduction targets.

54.    Based on its disapproval of the draft state WIPs, EPA included "backstop measures" in the Draft TMDL, in excess of its authority under the Clean Water Act. In response to the unlawful backstop measures in the Draft TMDL and accompanying threats of retaliatory actions by EPA, watershed jurisdictions revised their implementation plans to EPA's satisfaction. For example, the threats included requiring net improvement offsets for new or increased loadings, such as sediment and nutrient loads from new residential construction (which could virtually halt new home construction in the Bay watershed).

55.    EPA also threatened to take other actions to coerce the watershed jurisdictions into adopting EPA's preferred implementation measures. For example, EPA threatened to object to state-issued permits, even though disagreement with a state WIP is not one of the grounds specified for objections in EPA's regulations. *See* 40 C.F.R. § 123.44. Moreover, EPA threatened to:

24

(a) require unreasonable additional point source reductions; (b) engage in increased federal enforcement activity; (c) promulgate federal numeric nutrient standards, even where not necessary under the Clean Water Act; and (d) withhold grant money to states for reasons not intended by Congress, all because it did not agree with a state's WIP. *See, e.g.,* Final TMDL at 7-12.

56.    Each of the jurisdictions revised its WIPs to avoid the threatened backstop measures in the Draft TMDL. *See generally id.* Section 8. But EPA left certain backstop measures in place. *See, e.g., id.* 8-22, 8-26.

57.    Through this WIP revision process, EPA has effectively overridden state implementation decisions. EPA impermissibly crossed the line between establishing an informational tool authorized by the Clean Water Act and mandating implementation measures in a way that Congress plainly did *not* authorize.

58.    EPA's encroachment into state authority over TMDL implementation was not limited to the development of implementation plans. EPA established fine-scale pollutant loading allocations in the Final TMDL, distributing pollutant loading among numerous source categories and even among individual sources throughout the watershed. *See id.* at Appendices Q, R. EPA assigned specific allocations among sources despite its recognition that "[t]here are limitless

combinations of loadings." Draft TMDL at 6-18.[11]   In doing so, EPA has effectively foreclosed future implementation options of the individual jurisdictions and limited future residential development.   EPA lacks statutory authority to distribute pollutant load allocations among sources in the guise of establishing a "total" maximum daily load.

59.    Many of the pollutant load allocations established by EPA affect residential and light commercial construction and other businesses hundreds of miles upstream that do not discharge into the Bay or its tidal waters. Many of the waters that receive discharges or runoff from these sources are *achieving* their water quality standards.

60.    Simply put, EPA lacks statutory authority to impose pollutant load allocations. The only mechanisms available to EPA under the Clean Water Act to address the impacts of discharges upstream of a listed water is to object to NPDES permits issued by the upstream state(s) or to object to state water quality standards if upstream states promulgate standards that do not protect downstream waters.

---

[11] The sections and appendices of the Draft TMDL are available as "Supporting & Related Material" at http://www.regulations.gov/#!docketDetail;dct=SR;rpp=100; so=DESC;sb=postedDate;po=0;D=EPA-R03-OW-2010-0736) (posted September 24, 2010, Docket ID EPA-R03-OW-2010-0376).

26

**D.    Development of the Final TMDL – Use of Flawed Model Networks**

61.    The fundamental purpose of the Final TMDL is to establish maximum pollutant loading to the Chesapeake Bay at a level necessary to meet applicable water quality standards.  The water quality standards addressed by the Final TMDL are expressed in terms of water clarity, dissolved oxygen, and chlorophyll-*a* (used as a surrogate for algae).  The standards were established by the States of Maryland and Delaware, the Commonwealth of Virginia, and the District of Columbia to protect and restore fish, other aquatic life (like oysters), and rooted aquatic plants (referred to in the Final TMDL as submerged aquatic vegetation) in the tidal waters of the Chesapeake Bay.

62.    The natural conditions that affect those water quality parameters include (among other factors) rainfall, stream flow, tidal influence, groundwater, wind, temperature, and sunlight.  EPA has determined that nitrogen and phosphorus (which are essential to plant growth) and sediment loadings also influence the concentration of dissolved oxygen and chlorophyll-*a* in the Bay.  Those loadings also influence water clarity, which in turn affects the growth of submerged aquatic vegetation.

63.    EPA does not know precisely how much nitrogen, phosphorus, and sediment are actually being added to the Chesapeake Bay on a daily, monthly, or even annual basis.  And when those pollutants reach the Bay, EPA does not know

27

precisely how they influence clarity, the growth of submerged aquatic vegetation, or the concentration of dissolved oxygen and chlorophyll-*a*. Instead, EPA had to estimate the loadings of these pollutants and their impact on water quality with computer modeling techniques that attempt to simulate real-world conditions.

64.    EPA developed a complicated network of interrelated models to try to accomplish that objective. In fact, the Final TMDL is based almost entirely on computer modeling and simulations, a process that yields inherent uncertainty at every step. EPA's simulations are so interdependent that a fundamental flaw in one model can undermine the accuracy and validity of the entire network. That is exactly what has happened here – EPA's Final TMDL is fundamentally flawed because the models upon which it is based contain numerous errors and compounding uncertainties, which are particularly pronounced with respect to the models' treatment of loadings from residential and light commercial construction.

65.    Among other flaws, EPA's models rely on inaccurate assumptions regarding impervious surfaces, land uses, "acceptable" stormwater runoff controls, and the pollutant removal efficiencies of "acceptable" BMPs for construction activities – all of which impacts EPA's assumptions on pollutant loadings.[12]

---

[12] *See, e.g.,* Toward Modeling and Analysis Tools For the 2017 Mid-Course Reevaluation at 7 (June 13, 2011), *available at* http://archive.chesapeakebay.net/pubs/calendar/47043_06-13-11_Presentation_2_11267.pdf ("June 2011 Mid-Course Reevaluation

66.    For example, the Bay Models have incorrectly estimated the amount of existing impervious surfaces in the Bay watershed. EPA also significantly overestimated the amount that impervious surfaces will increase as a result of new residential construction or redevelopment. These miscalculations will impact the estimated loadings from urban and suburban runoff and residential construction, and EPA's promise to correct these miscalculations in the future is no substitute for rulemaking based on sound science and reasoned decision-making.

67.    EPA's assumptions regarding the various land uses in the watershed jurisdictions are also incorrect. In fact, EPA's modeling specialist recently discussed plans to revise the model to improve land use estimates, particularly with regard to urban runoff and nutrient management, and then calibrate EPA's network of models before the Phase III WIPs are due to EPA in 2017. *See, e.g.,* Update on Phase 5.3.2 Watershed Model Calibration (May 23, 2011), *available at* http://archive.chesapeakebay.net/pubs/calendar/47043_05-23-11_Presentation_3_11279.pdf ("May 2011 Calibration Presentation"); June 2011 Mid-Course Reevaluation Presentation at 5 (noting that the network of models

---

Presentation") (noting that "issues related to inputs, land uses, BMPs, etc[., including issues] of model theory, structure, and calibration" will be addressed at a later date).

29

would not be fully calibrated and operational until "at least one year in advance of the Phase III WIPs"). This process will alter the EPA's loadings in the TMDL.

68.    EPA's assumptions regarding the available BMPs and the BMPs' pollutant removal efficiencies are also incorrect. For instance, it appears that EPA averaged removal efficiencies throughout the entire watershed, rather than factor in the BMPs required by state and local regulations in the Bay watershed jurisdictions. This is important because each state's pollutant loadings and allocations will not reflect actual state and local conditions – an important characteristic of any TMDL.

69.    Similarly, EPA significantly overestimated sediment loads from construction activities that incorporate erosion and sediment controls. EPA estimated that erosion and sediment controls reduce total sediment loads by only 40%.    *See* Chesapeake Bay Phase 5.3 Community Watershed Model in Preparation    at    6-50    (Dec.    2010),    *available    at* ftp://ftp.chesapeakebay.net/modeling/P5Documentation/SECTION_6.pdf. However, as EPA's own data show, when properly installed and maintained, erosion and sediment controls may decrease sediment loads by 85-95%.[13]  As a

---

[13] *See, e.g.,* T. Schueler, J. Lugbill, Performance of Current Sediment Control Measures at Maryland Construction Sites (1990); 74 Fed. Reg. at 63,011 ("[m]anaging stormwater flows on the site can be *highly effective* at reducing erosion.") (emphasis added); U.S. EPA, Development Document for Final Effluent

30

result, EPA has underestimated the average effectiveness of erosion and soil controls and therefore has overestimated sediment discharges from construction activities in the Bay watershed.

70.    Additionally, the Bay Models' assumptions regarding nitrogen, phosphorus, and sediment loadings from residential development are imprecise, because they were conducted on a regional, rather than local, scale. As discussed above, residential construction is regulated by state and local stormwater programs – in addition to federal programs – and these localized measures are not reflected in the Bay Models.

71.    The Bay Models also fail to accurately and consistently track and account for BMP use and effectiveness in the Chesapeake Bay watershed. There are also certain BMPs that are not reflected in the Models. EPA's reliance on this erroneous and incomplete data to estimate current and future nutrient and sediment loads into the Bay has resulted in a flawed TMDL.

72.    Beyond EPA's failure to account for differences in local requirements, EPA also has not accurately modeled sediment loadings for each of the 92 listed

---

Guidelines and Standards for the Construction and Development Category at 10-7 (Nov. 2009), *available at* http://water.epa.gov/scitech/wastetech/guide/construction/upload/2009_12_8_guide_construction_files_chapters.pdf (certain sediment controls for construction activities are up to 90% effective in removing sediment; sediment traps, sediment basins, silt fences, and check dams can remove approximately "60 percent of the sediment . . . produced at the site").

31

water bodies, because the models do not accurately account for sediments that are naturally generated in the Bay. EPA has not considered whether local riparian conditions justify different treatment in the modeling given that some sections of the Bay generate sediment naturally (*i.e.,* biogenic sediment), receive sediment from ocean currents (as happens near the mouth of the Bay), or receive resuspended sediment from tidal movements of the "salt wedge" against the Bay bottom (as occurs in the middle reaches of the Bay). In fact, "EPA acknowledges that the science supporting estuarine modeling simulation of the transport and resuspension for sediment is not as strong as that for nitrogen and phosphorus." Final TMDL at 6-44. As a result, EPA's assumptions for pollutant loads from residential and light commercial development are inaccurate.

73.    Also problematic for the home building industry is that EPA did not release the sediment allocations until August 13, 2010, over a month after it released the nitrogen and phosphorus allocations. Even then, EPA acknowledged that its assumptions regarding sediment loadings were not final and that it planned to fine-tune the models after issuing the Final TMDL. *See, e.g.,* Letter from Shawn Garvin, Regional Administrator, EPA Region III, to Principals' Staff Committee at 3 (Jun. 11, 2010) ("Garvin June 2010 Letter") (noting EPA's plans to revise the Watershed Model to modify the nutrient and sediment allocations in 2011, after the

Final TMDL is released).  In other words, EPA has always been aware of the flaws in its modeling, but issued the Final TMDL in spite of these flaws.

74.    Aside from using bad assumptions and flawed input data, the models themselves are unreliable.  For example, EPA was unable to get its models to predict that water quality standards would *ever* be achieved in certain segments, no matter what inputs EPA used.  EPA's models also predicted that in some cases the number of stream and bay segments failing water quality standards would *increase* as pollutant loads *decrease*.  And perhaps most importantly, EPA used its Watershed Model to establish pollutant load allocations for the Final TMDL on a scale far more precise than the model can validly predict.

75.    These errors evidence improper modeling techniques.  For example, EPA's methodology for the Final TMDL violated one of the most fundamental principles of environmental modeling, which requires careful calibration to ensure that the models perform as intended.  Multiple scientific reviews of EPA's models highlighted the lack of calibration as a concern – without adequate calibration, the public cannot be certain that the models will accurately reflect the reality they purport to represent.

76.    Based on what is known about how EPA has treated pollutant loadings, impervious surfaces, land uses, "acceptable" stormwater runoff controls, the pollutant removal efficiencies of "acceptable" BMPs for construction activities

33

in its modeling network, and other assumptions, it is clear that the models do not in fact represent reality. In fact, EPA has recently admitted that its Watershed Model is flawed and unfinished in ways that directly affect its treatment of urban and suburban runoff, including from residential construction.[14]    The agency plans to change the model again in 2011 so that it can alter its assumptions regarding suburban and urban runoff and the extent of impervious surfaces in the watershed. The Final TMDL, however, is enforceable final agency action.

**E.**    **Development of the Final TMDL – Inadequate Public Review and Comment**

77.    EPA's Draft TMDL was released for a 45-day public comment period on September 24, 2010.  75 Fed. Reg. 57,776 (Sept. 22, 2010) (Docket No. EPA-R03-OW-2010-0736).    Even though the Chesapeake Bay TMDL is the most complex and costly TMDL ever attempted, EPA provided only 45 days for public review and comment on the TMDLs and the underlying models.  The Draft TMDLs included two sets of wasteload allocations ("WLA") and load allocations ("LA") for three pollutants (*i.e.,* nitrogen, phosphorous, and sediment) for 92 impaired waterbodies in the 64,000-square-mile watershed that includes six states

---

[14] *See, e.g.,* May 2011 Calibration Presentation; Garvin June 2010 Letter at 2 (acknowledging that state WIPS must be revised during Phase II of the TMDL program after EPA revises "the watershed model to address nutrient management effectiveness and suburban land characteristics," and revised again for Phase III of the TMDL).

34

and the District of Columbia, and also consisted of detailed implementation instructions. All told, EPA presented for a mere 45-day review the 552 individual loads (*i.e.,* allowing 1.96 hours of review time per WLA and LA), 370 pages of the Draft TMDL document itself, 1,672 pages of 22 appendices, and poorly organized and incomplete technical support material that is referenced throughout the Draft TMDL.

78.    Plaintiff, along with numerous other organizations and members of the public, the Governor of Virginia, members of Congress, and more than 20 local governments, requested EPA to delay the TMDL and provide additional time to comment. EPA denied all requests.

79.    But worse than its failure to provide sufficient time for meaningful public review and comment on the Draft TMDL, EPA withheld information necessary to provide meaningful comments during that period.

80.    Only six days before the end of the comment period, on November 2, 2010, EPA staff provided to a limited number of recipients, in an e-mail communication, internet links to modeling data and results. These data and results are the inputs and outputs of the "Scenario Builder" model that EPA relied on to determine many of the assumptions under which its overall modeling network predicts that water quality standards will be met. In other words, these are the inputs and outputs that determined some of the key assumptions for the Final

TMDL. In addition, the final documentation for Scenario Builder that EPA made available in conjunction with the release of the Final TMDL is dated December 2010, well after the close of the public comment period. *See* Final TMDL at 4-28.

81. The links to the scenario data, scenario results, and the code for Scenario Builder were not made available in the administrative record for the Draft TMDL or on EPA's website for the Draft TMDL. Thus, most of the public was unable to review and comment on this critical model and its assumptions about residential and light commercial construction, such as pollutant loadings, impervious surface area, land uses, "acceptable" stormwater runoff controls, and the pollutant removal efficiencies of "acceptable" BMPs for construction activities.

82. Of equal significance is EPA's failure to provide adequate notice of and an opportunity for comment on the Watershed Model. EPA provides a link to a website (http://www.chesapeakebay.net/model_phase5.aspx?menuitem=26169) containing information on the Watershed Model in the Final TMDL. That website "warn[s]" users of the draft documentation it contains that the "information is preliminary, subject to change, and unsubstantiated by full and final reviews."

83. EPA also did not allow the public to review and comment on many of the other documents it relied on to develop the Final TMDL before issuing it. EPA instead incorporated by reference a significant number of documents that "EPA and its seven watershed jurisdictions relied upon" in developing the Final TMDL,

36

indicating only that access to this information "[would] be provided." Draft TMDL at B-1.

84.    Particularly problematic for the home building industry, EPA did not allow the public to review and comment on the full range of EPA's performance assumptions for BMPs or its list of the "acceptable" BMPs that must be used for compliance with the TMDL. Extra-record resources on EPA's assumptions for BMPs include an incomplete list of BMPs that EPA deemed "acceptable," but the assumptions are not accurate or complete.

85.    Because the significant policy choices embodied in the TMDL are based primarily on models, not actual data, and those models are based on assumptions, it was essential that those assumptions, as well as any other information relied on by the agency, be subject to meaningful public review and comment, but they were not.

**F.    EPA's Final "TMDL" for the Chesapeake Bay Watershed**

86.    EPA issued the Final Chesapeake Bay TMDL on December 29, 2010. *See* http://www.epa.gov/chesapeakebaytmdl/. It addresses the restoration of aquatic life designated uses for the Bay, its tidal tributaries, and embayments, and is the "largest and most complex thus far" of the 40,000 TMDLs completed to date across the United States. Final TMDL at ES-3. The Final TMDL is in fact a combination of TMDLs, including daily and annual allocations for three pollutants

37

for 92 individual water body segments in the Chesapeake Bay. The Final TMDL sets limits for the Bay watershed of 6.45 billion pounds of sediment, 185.9 million pounds of nitrogen, and 1.2 million pounds of phosphorus per year, which amounts to a 20% reduction in sediment, a 25% reduction in nitrogen, and a 24% reduction in phosphorus, intended to meet state water quality standards for water clarity, dissolved oxygen, and chlorophyll-*a*. Final TMDL at ES-1.

87.    Rather than stop with the establishment of total maximum loads for the Bay, EPA allocated these loads throughout the watershed based on the computer models discussed above. EPA's Final TMDL also assigns pollutant loads that impact the residential and light commercial construction sector, such as individual allocations to municipalities and treatment plants, within each water segment and jurisdiction, and pollutant loads for individual sources, including those in the broader watershed far upstream from the 92 tidal waterways themselves. These detailed pollutant loads are set forth in Section 9 of the Final TMDL and in the spreadsheets appended thereto. *See* Final TMDL at Appendices Q and R.

88.    The sediment limit for the Chesapeake Bay basin as a whole was driven by the need to address submerged aquatic vegetation and water clarity. Sediment suspended in water decreases water clarity and the amount of sunlight that reaches submerged aquatic vegetation. *See id.* at 6-41, 6-42. However, EPA

38

noted that it could not accurately model submerged aquatic vegetation acreages or water clarity attainment in certain sections of the Bay, so it attempted to address these uncertainties with an explicit margin of safety. *Id.* at 6-44.

89.     Before finalizing the TMDL, EPA performed no analysis of the costs of compliance with the Final TMDL and its multiplicity of assigned pollutant loads that span the entire Mid-Atlantic Region, nor did EPA analyze the cumulative impact of such costs on the regulated community and society at large, as compared to the benefits of achieving water clarity and dissolved oxygen water quality standards in the depths of four Bay deep-water and deep-channel segments.

90.     The Final Chesapeake Bay TMDL implements EPA's specific statutory "backstop" authority to issue TMDLs with respect to two TMDLs in the District of Columbia and twenty-three in Virginia. For all other states and water segments, EPA has not waited for the action by the states contemplated by the Clean Water Act before issuing the Final TMDL.

G.     **Significant Impacts of the Final TMDL on Plaintiff's Members**

91.     EPA's Final TMDL will have a significant adverse impact on Plaintiff's members. As a result of its inaccurate modeling, EPA assumes that specific changes in the operations of residential and light commercial construction sources are necessary to achieve water quality standards in the Bay and its tidal tributaries. EPA incorporates assumptions regarding those specific operational

39

changes into its assigned pollutant loadings for urban and suburban stormwater management practices. EPA intends to force new residential construction to adopt those changes by incorporating additional control measures into permits and through other mechanisms like offsets for new development. *See* Final TMDL at 8-9, 8-10, 10-1, 10-2, 10-3.

92.    EPA's plans for other stormwater sources will also impact the residential construction industry. For example, MS4 operators must develop implementation plans to meet allocations, and, as discussed above, these plans will inevitably impact the home building industry. *Id.* at 8-14. Additionally, EPA is forcing wastewater treatment plants to upgrade facilities and other urban stormwater retrofits at a large price tag, the cost of which will likely be passed on to local governments and the regulated community, including the home building industry. *See id.* at 8-9, 8-14.

93.    Beyond forcing additional controls on sources currently subject to the Act, EPA has threatened to impose restrictions on certain urban stormwater sources that are not currently regulated by the NPDES permit program by designating new sources subject to the Act under its residual designation authority. *See id.* at 8-11. Finally, EPA has threatened to take actions against states if the practices assumed by EPA in the TMDL do not occur. *See id.* at 8-13.

## FIRST CLAIM FOR RELIEF

### EPA's Final TMDL Violates the Clean Water Act and EPA Regulations

94.    Paragraphs 1-93 are realleged and incorporated by reference.

95.    EPA's Final TMDL exceeds EPA's statutory authority under the Clean Water Act and otherwise violated the Act and its own regulations in multiple aspects, including those described in further detail below.

96.    EPA exceeded its authority under Section 303(d)(2) of the Act, 33 U.S.C. § 1313(d)(2), which limits EPA's authority to establish a federal TMDL to instances of state action or inaction that is contrary to the Clean Water Act.

97.    EPA exceeded its statutory authority under Section 303(d) of the Act, 33 U.S.C. § 1313(d), which does not authorize EPA to develop a TMDL for waterways that are not listed as impaired.

98.    EPA exceeded its statutory authority when it established pollutant loading allocations for individual sources and categories of sources. EPA assigned hundreds of pollutant load allocations across the entire watershed from Virginia to New York. The assignment of these pollutant loads unlawfully usurps the states' primary Clean Water Act authority.

99.    EPA exceeded its statutory authority under 33 U.S.C. §§ 1313(d) and 1370 and violated its own regulations when it assigned pollutant load allocations to upstream water segments that are outside of the Chesapeake Bay.    Such allocations, which are not based on the upstream segments' water quality

41

standards, bypass the Clean Water Act's structure (based on state-level procedures) for protecting water quality.

100. EPA exceeded its statutory authority by demanding that there be "reasonable assurance" that: (i) the pollutant allocations in the TMDL will be achieved; and (ii) water quality standards will be attained. *See* Final TMDL at 7-1. EPA has no authority to force implementation of TMDLs or achievement of water quality standards on a federal timeline. Indeed, Congress left those matters within the exclusive authority of the states under 33 U.S.C. § 1313(e). EPA's "reasonable assurance" requirement unlawfully encroaches upon the states' authority to develop TMDL implementation plans in accordance with their continuing planning processes and to take social and economic consequences into account in determining how and when to implement water quality standards.

101. The Final TMDL also violates EPA's implementing regulations by, *inter alia*, failing to comply with 40 C.F.R. § 130.7(c)(1)(ii), which requires that calculations used to establish TMDLs be subject to public review.

## SECOND CLAIM FOR RELIEF
### EPA's Final TMDL Is Arbitrary and Capricious

102. Paragraphs 1-101 are realleged and incorporated by reference.

103. EPA's assigned pollutant loadings in the TMDL are based on models that used erroneous assumptions so the Final TMDL's pollutant load reductions are not justified by the evidence in the record.

42

104.  EPA's models were not properly calibrated, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

105.  EPA's models are not capable of assigning valid pollutant loadings to individual sources, so the Final TMDL's assigned pollutant loadings are not justified by the evidence in the record.

106.  For these reasons, EPA's Final TMDL is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in violation of 5 U.S.C. § 706.

### THIRD CLAIM FOR RELIEF

**EPA Failed to Provide for Public Notice and Comment Required by the Administrative Procedure Act**

107.  Paragraphs 1-106 are realleged and incorporated by reference.

108.  Under the Administrative Procedure Act, an agency that intends to promulgate a rule or regulation must first provide the public with notice of, and an opportunity to comment on, a proposed version of the rule.  *See* 5 U.S.C. § 553. Such notice and opportunity to comment must include the data upon which the agency relies.

109.  EPA's Final TMDL was issued in violation of 5 U.S.C. § 553 in that EPA failed to provide the public with a meaningful opportunity to comment on the Draft TMDL and to participate in this regulatory proceeding.  EPA failed to provide the public with sufficient access to the models and other information on

43

which it relied to develop the Final TMDL, and some of the most vital information that EPA relied upon continued to change even after the close of the brief comment period.

### FOURTH CLAIM FOR RELIEF
#### EPA's Final TMDL is *ultra vires*

110.    Paragraphs 1-109 are realleged and incorporated by reference.

111.    To the extent not specifically alleged above, the Final TMDL is in excess of delegated statutory authority under the Clean Water Act and therefore is *ultra vires*, for the reasons set forth in ¶¶ 95-101, *supra*.   Accordingly, and irrespective of federal court jurisdiction under any other statute, the Final TMDL is unlawful and should be set aside as *ultra vires*.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in its favor, and:

1. Declare that the Final TMDL is contrary to federal law, including the Clean Water Act, or is otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or is *ultra vires*;

2. Declare that EPA violated the Administrative Procedure Act in issuing the Final TMDL without following Administrative Procedure Act procedures;

3. Vacate the Final TMDL;

4. Enjoin and restrain Defendant, its agents, employees, successors, and all persons acting in concert or participating with it from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the Final TMDL; and

5. Grant Plaintiff such other relief as may be necessary and appropriate or as the Court deems just and proper.

Dated: June 24, 2011

Respectfully submitted,

By: _____
Michael P. Coughlin
(PA I.D. No. 43793)
KAPLIN    STEWART    MELOFF
REITER & STEIN
Union Meeting Corporate Center
910 Harvest Drive, Suite 200
P.O. Box 3037
Blue Bell, PA 19422
(610) 260-6000
*Attorneys for Plaintiff National Association of Home Builders*

Of counsel:

Thomas J. Ward
Holli J. Feichko
Jeffrey B. Augello
NATIONAL ASSOCIATION
  OF HOME BUILDERS
1201 15th Street, NW
Washington, DC 20005
(800) 369-5242

45

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2             HARRISBURG DIVISION

3

4  AMERICAN FARM BUREAU FEDERATION,   :   CASE NO.
   ET AL                             :
5                                     :   1:11-CV-0067
           v.                         :
6                                     :
   UNITED STATES ENVIRONMENTAL        :
7  PROTECTION AGENCY, ET AL           :

8

9

10             TRANSCRIPT OF PROCEEDINGS
                   ORAL ARGUMENT

11

12

13        BEFORE:        HON. SYLVIA H. RAMBO

14        DATE:          October 4, 2012
                         9:30 a.m.

15

16        PLACE:         Courtroom No. 1, 9th Floor
                         Federal Building
17                       Harrisburg, Pennsylvania

18        BY:            Wendy C. Yinger, RMR, CRR
                         U.S. Official Court Reporter

19

20

   APPEARANCES:
21

   RICHARD E. SCHWARTZ, ESQUIRE
22 KIRSTEN L. NATHANSON, ESQUIRE
   DAVID P. ROSS, ESQUIRE
23 DAVID CHUNG, ESQUIRE
        For the Plaintiffs
24

   KENT E. HANSON, ESQUIRE
25      For Defendant United States Environmental Protection Agency

```
                                                        2

 1

 2  APPEARANCES (CONTINUED):

 3  JON A. MUELLER, ESQUIRE
    RICHARD A. PARRISH, ESQUIRE
 4      For Intervening Defendants- Chesapeake Bay Foundation Group

 5  CHRISTOPHER POMEROY, ESQUIRE
        For Intervening Defendants - Municipal Water Associations
 6
    STEVEN A. HANN, ESQUIRE
 7      For Intervening Defendants - PA Municipal Authorities Assoc

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  there were no secrets here.  I mean, participants could have

2  commented on the TMDL in a much shorter period of time than 45

3  days.

4           But in terms of the issues here, it was all

5  available, and these people were, you know, the public was

6  notified, not only notified of meetings, but a great deal of

7  outreach was done by EPA both before and during the public

8  comment period to respond to their questions, to, you know,

9  give them background on the TMDL, and to assist them in making

10  their public comments.

11           THE COURT:  I'm sorry.  I interrupted you.  You

12  wanted to consult with counsel?

13           MR. HANSON:  Thank you.  So I think I'll return to

14  the fundamental legal issue here.

15           THE COURT:  Go ahead.

16           MR. HANSON:  When Mr. Schwartz concluded, he

17  mentioned, summarized his points with regard to whether the

18  TMDL was illegal.  He said there are four reasons.  One, that

19  it can only -- a TMDL can only have a load, one big number for

20  nitrogen, for phosphorus in this case.  And as we've discussed,

21  the Pronsolino and Anacostia Riverkeeper cases tell us not only

22  the legal analysis but the practical reasons why that doesn't

23  work.

24           The argument again on to justify that was backwards

25  argument.  It wasn't that EPA TMDL's by statute are required to

90

1   be different from state issued TMDL's.  It was that because

2   TMDL's are incorporated in the state plans under 303(e) and

3   state plans go into much more detail about implementation,

4   therefore the TMDL cannot have load allocations and waste load

5   allocations.  And that backwards analysis is simply wrong.

6         If Congress had thought that the TMDL process, as

7   outlined, intruded on the states, they could have said, TMDL,

8   EPA TMDL's specifically cannot address certain issues.  And

9   more importantly, the presence of the use of waste load

10  allocations and load allocations has been reviewed by the

11  courts and said that EPA's interpretation of this is entitled

12  to chevron deference, the regulation that proscribes us, and

13  it's a reasonable interpretation of the statute, and that as a

14  result, they have had no problem with TMDL's, including WLA's

15  and LA's.

16        Their next arguments really are almost part and

17  parcel of one another, that TMDL is implementation.  As we've

18  discussed, that has simply not been the case.  It's part of

19  planning.  It's part of a planning process outlined by statute

20  that's reenforced not only under 303(d), but many other

21  statutory elements that I recited earlier.

22        That it intrudes on land use decisions.  The other

23  thing, you know, we've talked about this and why it does not,

24  as a practical matter, and why this is certainly a process that

25  was anticipated by the statute and does not violate any

91

1  provision of the statute such as Section 101 or 510.  But the

2  other thing that the Pronsolino court pointed out was that the

3  states are free to ignore TMDL's.

4        Now this kind of winds us back into the coercion

5  argument a little bit.  But the states can go their own way to

6  achieve water quality standards.  So the load allocations, if

7  they choose to, they can say, we don't want to go with the load

8  allocation that's included in the TMDL.  There may be

9  repercussions to that.  Indeed, there would be repercussions to

10  that, but the repercussions that are authorized by law.

11        One is that, as Pronsolino pointed out, EPA may

12  withhold grants that it issues to assist the state to deal with

13  non-point source, including implementation of best management

14  practices for non-point sources.  But those grants are an

15  incentive provided for by Congress to encourage states to take

16  certain activities.

17        THE COURT:  Carrot and stick?

18        MR. HANSON:  The carrot and stick Pronsolino talks

19  about.  So withholding an incentive is not coercion.  And in

20  addition, EPA is required by the law to ensure not only first

21  nationwide, but under 117 with regard to the Chesapeake Bay,

22  ensure that management plans are taken and implementation begun

23  with regard to achieving water quality standards.  And if the

24  states don't do the job, because this is a partnership, but if

25  one partner is not doing what is necessary to achieve water

92

1  quality standards, EPA is left to use the tools available to it

2  in order to achieve those water quality standards.

3       And that is, they need to see if they can use their

4  authorities with regard to point sources in order to achieve

5  those water quality standards.  That again may result in an

6  outcome that point sources might not like and even the states

7  might not like, but they have an option.  And that option is to

8  do more with regard to non-point sources.

9       Ultimately, EPA can't compel them to do any

10  particular thing with regard to non-point sources; to impose

11  any kind of particular pollution controls, for example, or

12  management practices.  It can only use the tools that it's

13  required by Congress to use in order to achieve water quality

14  standards.

15       I might bring up a point I missed.  It was suggested

16  that the watershed model was used to set waste load allocations

17  for point sources.  That's just incorrect.  The watershed model

18  was used to help the states set load allocations in the WIP

19  process.  But the states decided what the waste load

20  allocations should be for particular point sources based upon

21  the monitoring data and the information they had about those

22  particular sources.

23       For non-point sources, we have some monitoring data,

24  but it's very generic, if you will.  For point sources, they

25  monitor at the discharge.  And so we know how much is being