No. 13-4079

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,

*Plaintiffs-Appellants*,

v.

ENVIRONMENTAL PROTECTION AGENCY,

*Defendant-Appellee*.

On Appeal from the United States District Court
For the Middle District of Pennsylvania (No. 11-cv-67-SHR)

**BRIEF OF THE STATES OF KANSAS, INDIANA, MISSOURI, ALABAMA, ALASKA, ARKANSAS, FLORIDA, GEORGIA, KENTUCKY, LOUISIANA, MICHIGAN, MONTANA, NEBRASKA, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TEXAS, UTAH, WEST VIRGINIA, AND WYOMING AS *AMICI CURIAE* IN SUPPORT OF REVERSAL**

CHRIS KOSTER
Missouri Attorney General
James R. Layton
Solicitor General

GREGORY F. ZOELLER
Indiana Attorney General
Thomas M. Fisher
Solicitor General

DEREK SCHMIDT
Kansas Attorney General
Jeffrey A. Chanay
Deputy Attorney General
Bryan C. Clark
Assistant Solicitor General
*Counsel of Record*
Memorial Building
120 SW 10th, 2nd Floor
Topeka, Kansas 66612
(785) 296-2215

*Counsel for Amici Curiae*

[Additional Counsel Listed On Inside Cover]

## ADDITIONAL COUNSEL

LUTHER STRANGE, Attorney General of Alabama

MICHAEL C. GERAGHTY, Attorney General of Alaska

DUSTIN M. MCDANIEL, Attorney General of Arkansas

PAMELA JO BONDI, Attorney General of Florida

SAMUEL S. OLENS, Attorney General of Georgia

JACK CONWAY, Attorney General of Kentucky

JAMES D. "BUDDY" CALDWELL, Attorney General of Louisiana

BILL SCHUETTE, Attorney General of Michigan

TIMOTHY C. FOX, Attorney General of Montana

JON BRUNING, Attorney General of Nebraska

WAYNE STENEHJEM, Attorney General of North Dakota

E. SCOTT PRUITT, Attorney General of Oklahoma

ALAN WILSON, Attorney General of South Carolina

MARTY J. JACKLEY, Attorney General of South Dakota

GREGG ABBOTT, Attorney General of Texas

SEAN D. REYES, Attorney General of Utah

PATRICK MORRISEY, Attorney General of West Virginia

PETER K. MICHAEL, Attorney General of Wyoming

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF *AMICI CURIAE*............................................1

SUMMARY OF ARGUMENT .............................................................2

ARGUMENT ...............................................................................5

    I.    Congress Enacted The Clean Water Act As A Cooperative State-Federal Program, Preserving State Prerogatives.................................5

    II.    The CWA Unambiguously Limits EPA's TMDL Authority To Setting "The *Total* Maximum Daily Load" For Certain Pollutants In Impaired Waters.....................................................................8

    III.    Even If The CWA Is Ambiguous As To EPA's TMDL Authority, EPA's Interpretation Of The CWA Exceeds Any Permissible Construction Of The Statute. ...................................................14

        A.    The Chesapeake Bay TMDL Violates The Text, Policy, And Structure Of The CWA. .........................................15

        B.    EPA's Overreach In The Chesapeake Bay TMDL Infringes States' Traditional Rights The CWA Intended To Protect. ....................................................17

        C.    The Chesapeake Bay TMDL Is Not Just An "Informational Tool" And No State Acquiescence Can Give EPA Authority The CWA Has Withheld. ................21

    IV.    The Court Should Reject EPA's Assertion Of Broad TMDL Authority Because It Raises Serious Tenth Amendment Concerns..22

    V.    The Court Should Reject EPA's Assertion Of Broad TMDL Authority Because It Requires A Clear Statement From Congress, Which Congress Did Not Provide.......................................................28

CONCLUSION................................................................................31

i

**CERTIFICATE OF COMPLIANCE** ..................................................................32

**CERTIFICATE OF SERVICE** ..........................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anacostia Riverkeeper, Inc. v. Jackson*,
   798 F. Supp. 2d 214 (D.D.C. 2011).................................................................9, 12

*Atascadero State Hosp. v. Scanlon*,
   473 U.S. 234 (1985)............................................................................................28

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984).......................................................................................8, 14

*Defenders of Wildlife v. Envtl. Protection Agency*,
   415 F.3d 1121 (10th Cir. 1995) ......................................................................9, 10

*Dioxin/Organochlorine Ctr. v. Clarke*,
   57 F.3d 1517 (9th Cir. 1995) .............................................................................11

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
   485 U.S. 568 (1988)............................................................................................22

*Fed. Energy Regulatory Comm'n v. Mississippi*,
   456 U.S. 742 (1982)............................................................................................17

*Friends of the Earth, Inc. v. Envtl. Protection Agency*,
   446 F.3d 140 (D.C. Cir. 2006)............................................................................13

*Gregory v. Ashcroft*,
   501 U.S. 457 (1991)...................................................................................... 23, 28

iii

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,

    452 U.S. 264 (1981)............................................................................25

*Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*,

    448 U.S. 607 (1980)............................................................................30

*Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*,

    284 F.3d 442 (3d Cir. 2002) ....................................................... 17, 24

*Nat'l Fed'n of Indep. Businesses v. Sebelius*,

    132 S. Ct. 2566 (2012).......................................................................27

*New York v. United States*,

    505 U.S. 144 (1992)......................................................... 13, 25, 26, 27

*Printz v. United States*,

    521 U.S. 898 (1997).....................................................................7, 23

*Pronsolino v. Nastri*,

    291 F.3d 1123 (9th Cir. 2002) .................................................. *passim*

*Pub. Citizen v. U.S. Dep't of Justice*,

    491 U.S. 440 (1989)...........................................................................22

*Rapanos v. United States*,

    547 U.S. 715 (2006).................................................................. *passim*

*Rumsfeld v. Padilla*,

    542 U.S. 426 (2004)...........................................................................12

iv

*Sierra Club v. Meiburg*,

    296 F.3d 1021 (11th Cir. 2002) ............................................................... 9, 10, 16


*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,

    531 U.S. 159 (2001) ....................................................................... *passim*

*South Dakota v. Dole*,

    483 U.S. 203 (1987) ............................................................................ 26

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. X ............................................................................ 23

## STATUTES

33 U.S.C. § 1251 ................................................................... *passim*

33 U.S.C. § 1288 ................................................................. 10, 11, 16, 26

33 U.S.C. § 1311 ............................................................................ 9, 16

33 U.S.C. § 1313 ................................................................... *passim*

33 U.S.C. § 1329 ................................................................. 6, 10, 11

33 U.S.C. § 1342 ................................................................. 5, 9, 16

33 U.S.C. § 1362 ............................................................................ 8

## REGULATIONS

40 C.F.R. § 130.2 ................................................................. 11, 14

65 Fed. Reg. 135, 43,591 (July 13, 2000).................................................30

67 Fed. Reg. 249, 79020 .........................................................................30

68 Fed. Reg. 53, 13,608 ..........................................................................30

## OTHER AUTHORITIES

Chesapeake Bay Watershed Blue Ribbon Finance Panel, *Saving a National Treasure: Financing the Cleanup of the Chesapeake Bay*, at 8 (Oct. 2004), *available at* http://www.chesapeakebay.net/content/publications/cbp_12881.pdf (last visited Jan. 30, 2014) ..............................................................................19

Federal Water Pollution Control Act Amendments, Pub. L. No. 92-500...............16

Mississippi-Atchafalaya River Basin (MARB), Mississippi River Gulf of Mexico Watershed Nutrient Task Force, http://water.epa.gov/type/watersheds/named/msbasin/marb.cfm...........................20

Pub. L. 106-246, 114 Stat. 511, 567 .......................................................30

Terry J. Satterlee, et al., *Nutrients in the Heartland: Regulatory & Legal Issues Surrounding the Mighty Mississippi*, Natural Resources & Environment, Vol. 27, No. 4, Spring 2013, *available at* http://www.shb.com/newsevents/2013/NutrientsintheHeartland.pdf.....................20

The Federalist No. 39.................................................................................23

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The District Court's decision approving the Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorous, and Sediment (TMDL) defies the limits of the Clean Water Act and strips States of their traditional right to make the land-use decisions necessary to comply with federal water quality standards. Instead of setting the aggregate amount of certain pollutants allowed in impaired waters, the Environmental Protection Agency (EPA) used the Chesapeake Bay TMDL to micromanage sources of pollution that by tradition—and by statute—have been beyond EPA's reach. As a result, this case has far-reaching implications for States across the country. If this TMDL is left to stand, other watersheds, including the Mississippi River Basin (which spans 31 States from Canada to the Gulf Coast), could be next.

*Amici curiae* are a geographically diverse group of 21 States—Kansas, Indiana, Missouri, Alabama, Alaska, Arkansas, Florida, Georgia, Kentucky, Louisiana, Michigan, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and Wyoming—with a common interest in protecting their quintessential State prerogatives.[1] *Amici* States have a strong interest in preserving and protecting their natural resources and long-held right to manage the lands within their boundaries. *Amici* States submit this

---

[1] Fed. R. App. P 29(a) authorizes States to "file an amicus-curiae brief without the consent of the parties or leave of court."

1

brief to emphasize the importance of maintaining their role in regulating land-use within their borders, and to highlight the practical and constitutional consequences of EPA's expansive interpretation of its authority. *Amici* States agree that the TMDL should be invalidated because it exceeds EPA's authority, disregards the CWA's framework of cooperative federalism, and raises serious Tenth Amendment concerns.

## SUMMARY OF ARGUMENT

The Chesapeake Bay TMDL is the culmination of EPA's decade-long attempt to control exactly how States achieve federal water quality requirements under the CWA, and marks the beginning of the end of meaningful State participation in water pollution regulation. The CWA does not give EPA this power. In fact, it expressly protects States from this kind of federal government intrusion by adopting a general policy of cooperative federalism and specific statutory limitations on EPA authority. EPA's untenable interpretation of its authority under the CWA has unlawfully usurped States' traditional authority over land-use management decisions. Its actions have profound consequences for every State and cannot be squared with the CWA.

In EPA's view, the Chesapeake Bay TMDL does not encroach on States' traditional authority because TMDLs are simply "informational tools" and because this TMDL was developed with the States' cooperation. Although TMDLs have

2

traditionally been used as informational tools, this TMDL is different—it goes beyond providing regulators with information about aggregate pollution levels required to maintain water quality standards and imposes specific allocations for specific sources of pollution. These specific allocations, which EPA enforces through arbitrary timelines, "reasonable assurance" requirements, and coercive "backstop" measures, strip States of their traditional right to decide how to achieve federal water quality requirements. To say that the Chesapeake Bay States voluntarily surrendered their traditional authority to regulate water pollution and land use dramatically understates EPA's coercive tactics in developing the TMDL. It also misses the point—the CWA does not authorize EPA to develop the type of TMDL it did, and no acquiescence by any State can give it the authority it lacks.

EPA makes little effort to square the Chesapeake Bay TMDL, which includes *sub*total allocations for specific *sources* of pollution, with the CWA, which authorizes EPA to establish "the *total* maximum daily load" for certain *pollutants* in impaired waters. This language is unambiguous; it does not authorize this TMDL. What makes this TMDL particularly offensive to the CWA and to States' rights is EPA's attempt to regulate sources of pollution that it has no authority to regulate under the CWA. EPA can create incentives for States to control nonpoint sources, but it cannot mandate how States choose to do so.

3

Moreover, it regulates "upstream" States whose borders do not even reach the Chesapeake Bay. Such regulation is beyond EPA's authority.

To justify its actions, EPA primarily points to its own regulations. But of course EPA cannot give itself authority by regulation that Congress has not given by statute. Even if the CWA's TMDL requirement is ambiguous, EPA's expansive interpretation of its authority is contrary to the Act's cooperative federalism framework and exceeds any permissible construction of the statute. The Chesapeake Bay TMDL should be invalidated because it exceeds EPA's authority under the CWA.

Moreover, any ambiguity in the statute dooms EPA's position because its encroachment onto traditional State authority requires clear and manifest authorization from Congress. The TMDL's detailed allocations, backed by threats of deeper and more direct intrusion on State land-use regulation, invade quintessential State prerogatives and coerce States to regulate according to EPA's instructions. To avoid the difficult constitutional issues EPA's action raises, the Court should adopt *Amici* States' straightforward interpretation of the TMDL statute and invalidate the Chesapeake Bay TMDL.

## ARGUMENT

I.  **Congress Enacted The Clean Water Act As A Cooperative State-Federal Program, Preserving State Prerogatives.**

Congress, conscious of the delicate balance between state and federal interests involved in regulating water pollution, structured the CWA on a framework of cooperative federalism.  It gave the federal government, through EPA, substantial but circumscribed authority to set and achieve water quality standards through cooperation with States.  For example, the CWA first requires States to set water quality standards, list impaired waters, and establish TMDLs. *See generally* 33 U.S.C. § 1313.  But if EPA determines that a State's action (or inaction) is inconsistent with the Act, it can step in and set its own standards, including establishing "the *total* maximum daily load" for certain pollutants in impaired waters.  *See generally id.*

Congress also recognized the risk of federal encroachment onto traditional State prerogatives like local land-use management.  It guarded against such invasions by choosing its words carefully: Congress gave EPA ultimate control over water pollution permits for discrete sources of pollution ("point sources") like a pipe that discharges pollutants, *see* 33 U.S.C. § 1342, and created grants for developing implementation plans that limit all other sources of pollution ("nonpoint sources") like sediment runoff from agricultural fields, construction or other earth-moving activities, or natural background sources of pollution, *see id.*

5

§ 1329(h). But Congress withheld from EPA authority to regulate nonpoint sources. *See generally id.* § 1313. It also withheld authority to dictate or trump States' implementation plans. *See id.* § 1313(e). The text draws clear boundaries: EPA can set "the *total* maximum daily load" if a State's TMDL is inadequate, but the State gets to decide how to achieve it. Although EPA can use point-source permit programs to influence States' decisions, it has no similar authority to regulate nonpoint sources.

Perhaps recognizing EPA's willingness to push the limits of its authority, *cf. Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality opinion), Congress further safeguarded States' rights by expressly stating its "policy . . . to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). In light of this policy, Congress intentionally left regulation of nonpoint sources and implementation plans to States for good reason: regulation of nonpoint sources falls squarely within States' traditional authority to regulate land-use within their borders. Under the CWA, States—which are far more attuned to local needs than EPA—retain exclusive authority to manage local resources to control nonpoint sources and implement water quality standards.

6

The Chesapeake Bay TMDL, which invades States' traditional control over land-use management, violates both the express terms of the CWA and Congress's intent to preserve the very state rights EPA has trampled.  But the District Court ignored the text of the CWA and gave short shrift to its policy of preserving States' rights.  Instead, the District Court framed the question as whether the "level of detail" in the TMDL "unlawfully crosses the line into TMDL implementation," which the CWA leaves to States.  Joint Appendix ("JA") 57-58.  Without the text or congressional policy as guides, the District Court sat as a policymaker and drew the line where it saw fit.  This approach is unprincipled and not enforceable.  *See Printz v. United States*, 521 U.S. 898, 927 (1997) (plurality) (doubting that the Court will be able to police the line "between 'policymaking' and mere 'implementation'").  And it leads to confounding results, allowing the District Court to find that what Congress expressly withheld from EPA with one hand (*i.e.*, authority to regulate nonpoint sources), it surreptitiously granted EPA with the other.

As explained more fully below, the Chesapeake Bay TMDL exceeds EPA's authority and raises serious constitutional concerns.

**II.    The CWA Unambiguously Limits EPA's TMDL Authority To Setting "The *Total* Maximum Daily Load" For Certain Pollutants In Impaired Waters.**

The first step in deciding whether the Chesapeake Bay TMDL exceeds EPA's authority is to determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress's "intent . . . is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. The District Court did not squarely address the plain language of the CWA. *See* JA 50-52. This in itself was error. The CWA unambiguously limits EPA's TMDL authority to setting a single aggregate load amount for certain pollutants in impaired waters. *See* 33 U.S.C. § 1313(d). The Chesapeake Bay TMDL, which consists of hundreds of nonpoint source pollutant allocations and hundreds more point source allocations far exceeds EPA's limited authority.

The CWA's framework for addressing water pollution clarifies the proper and properly limited role of a TMDL. The CWA starts by targeting sources of pollution, which it breaks down into two categories: point sources and nonpoint sources. Point sources are "any discernible, confined and discrete conveyance[s] . . . from which pollutants are or may be discharged," such as a pipe or tunnel. 33 U.S.C. § 1362(14). Nonpoint sources include "non-discrete sources" such as

8

"sediment run-off" from agriculture, timber harvesting, construction, and erosion. *Defenders of Wildlife v. Envtl. Protection Agency*, 415 F.3d 1121, 1124 (10th Cir. 2005); *Pronsolino v. Nastri*, 291 F.3d 1123, 1126 (9th Cir. 2002); *see also* 33 U.S.C. § 1329(h).

Through the National Pollutant Discharge Elimination System (NPDES), EPA has ultimate authority for regulating pollution from point sources. *See* 33 U.S.C. §§ 1311(a), 1342. NPDES is a CWA permit program that requires individual entities responsible for covered point sources to receive permits to discharge pollutants from those sources. *See id.*; *Sierra Club v. Meiburg*, 296 F.3d 1021, 1024 (11th Cir. 2002); *Anacostia Riverkeeper, Inc. v. Jackson*, 798 F. Supp. 2d 210, 214 (D.D.C. 2011). EPA often delegates administration of the NPDES program to the States, *Meiburg*, 296 F.3d at 1024 n.2, but EPA has the final word on approving or disapproving permits, 33 U.S.C. § 1342(d)(2).

Unlike point source pollutants, the CWA reserves to States exclusive authority to regulate nonpoint sources. *See Meiburg*, 296 F.3d at 1021; *Pronsolino*, 291 F.3d at 1128. In part because many nonpoint sources involve land-use activities—which States have traditionally overseen—the CWA addresses those sources through non-regulatory, incentive-based programs designed to promote practicable control measures to minimize nonpoint source pollution. For example, the CWA creates grant programs to encourage States to create "nonpoint

9

source management programs" that "reduce, to the maximum extent practicable, the level of pollution resulting from" nonpoint sources, 33 U.S.C. § 1329(a)(1)(C), (g), and "areawide waste treatment management plans" for "appropriate" areas, 33 U.S.C. § 1288(a)(2), (f). Importantly, *States* are solely responsible for these programs.

In addition to these programs, the CWA created a water quality program designed to address both point and nonpoint sources. *See generally* 33 U.S.C. § 1313. Under the water quality program, States must set water quality standards, list impaired waters, and calculate TMDLs for waters within their boundaries. 33 U.S.C. § 1313(a)-(d). At each of these steps, EPA has a "backstop" role: if EPA finds a State's determination is inconsistent with the CWA, EPA may disapprove the State determination and override it by establishing its own water quality standard, list of impaired waters, and TMDL. *Id.* § 1313(a)(3)(C), (c)(3), (d)(2). But that is where EPA's involvement ends; only States have authority to turn the aspirations of a TMDL into an effective plan for achieving water quality standards. *Meiburg*, 296 F.3d at 1031 (noting the CWA "puts the responsibility for implementation of TMDLs on the states"); *Pronsolino*, 291 F.3d at 1128 (stating "the CWA leaves to the states the responsibility of developing plans to achieve water quality standards"); *see also Defenders of Wildlife* 415 F.3d at 1124 ("Unlike point source pollution, EPA lacks the authority to control non-point source

discharges through a permitting process."). EPA may attempt to influence States' implementation plans through grants, *see* 33 U.S.C. §§ 1288(f), 1329(g), but that is all. It cannot micromanage States' regulation of nonpoint sources. And it has no "backstop" authority to establish its own nonpoint source management plans. *See id.* § 1313(e)(2).

The CWA strikes this balance between state and federal authority to preserve and protect States' rights. *See id.* § 1251(b). The Chesapeake Bay TMDL, however, far exceeds EPA's authority under the CWA and encroaches on authority the Act left to States. Under the CWA, EPA may establish "the *total maximum daily load*" for certain pollutants in impaired waters. 33 U.S.C. § 1313(d)(1)(C) (emphasis added); *see id.* § 1313(d)(2). "Such *load*" must be "established at a *level* necessary to implement . . . water quality standards." *Id.* § 1313(d)(1)(C) (emphasis added). EPA's own regulations define "load" as an "*amount* of matter . . . introduced into a receiving water." 40 C.F.R. § 130.2(e) (emphasis added). So EPA can set at a certain "level," "the total" "load," *i.e.*, "amount," of specified pollutants that an impaired water receives. In other words, a "'TMDL defines the specified maximum amount of a pollutant which can be discharged or "loaded" into the waters at issue *from all combined sources*.'" *Pronsolino*, 291 F.3d at 1127-28 (quoting *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1520 (9th Cir. 1995)) (emphasis added); *see also Anacostia*

11

*Riverkeeper*, 798 F. Supp. 2d at 213 (citing 33 U.S.C. § 1313(d)(1)(C)) ("TMDLs . . . specify the *absolute amount* of *particular pollutants* the entire water body can take on while still satisfying all water quality standards.") (emphasis added).  The use of the definite article "the," *see Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004); *Rapanos*, 547 U.S. at 732, and the singular tense of each of the operative terms, confirms this interpretation.

The Chesapeake Bay TMDL goes far beyond specifying the maximum pollutant load from all combined sources.  It sets numerous annual and daily allocations for nonpoint source sectors including "agriculture, forest, nontidal atmospheric deposition, onsite septic, and urban" within each watershed State.  *See* JA 1597, 1767.  EPA reinforced these detailed pollutant allocations by imposing arbitrary timelines for achieving the allocations, requiring reasonable assurance that States will achieve them, and coercing States to enforce the allocations by threatening even more intrusive (and equally unlawful) "backstop" measures.  *See, e.g.*, JA 1355-57 (requiring "reasonable assurances"); JA 1396-97 (threatening to reclassify animal feeding operations from unregulated nonpoint sources to regulated point sources).  EPA's "tortured argument" that the terms "total," "load," and "level"—all in the singular form—must mean something other than a single aggregate limit on particular pollutants for impaired waters is as meritless as its

12

failed argument that the term "'daily' means something other than daily." *Friends of the Earth, Inc. v. Envtl. Protection Agency*, 446 F.3d 140, 146 (D.C. Cir. 2006).

EPA's purported authority to regulate "upstream" States, that is, States whose borders do not reach the Chesapeake Bay, even more egregiously defies the CWA's unambiguous language. The CWA provides that "[e]ach State shall establish . . . the total maximum daily load," 33 U.S.C. § 1313(d)(1)(C), for impaired "waters *within its boundaries*," *id.* § 1313(d)(1)(A) (emphasis added). If EPA disapproves a State's identification of impaired waters and establishment of the TMDL, it may step in and "identify such waters *in such State* and establish *such loads* for *such waters* as he determines necessary to implement the [applicable] water quality standards," which the State must then incorporate into its planning process. *Id.* § 1313(d)(2) (emphasis added). EPA has no authority to impose a TMDL on a State for waters not within its boundaries. Yet here, EPA has imposed the Chesapeake Bay TMDL on three States—New York, Pennsylvania, and West Virginia—whose boundaries do not reach the Chesapeake Bay.

To reach upstream States, EPA relied on a novel interpretation of its regulations that define "wasteload allocation" and "load allocation" for purposes of setting the TMDL. EPA regulations define "wasteload allocation (WLA)" as "[t]he portion of a receiving water's loading capacity that is allocated to one of its

13

existing or future point sources of pollution."  40 C.F.R. § 130.2(h).  They define

"load allocation (LA)" as "[t]he portion of a receiving water's loading capacity that

is attributed either to one of its existing or future nonpoint sources of pollution or

to natural background sources."  *Id.* § 130.2(g).  EPA argued, and the District

Court agreed, that the references to "its" point and nonpoint sources give EPA

authority to regulate *all* watershed sources—both tidal and upstream.  JA 75-78.

The unambiguous language in Section 1313(d), which limits TMDLs to waters

within a State's boundaries, squarely precludes this interpretation.

       The Chesapeake Bay TMDL violates the unambiguous phrase, "the *total*

maximum daily load," and should be invalidated.

## III.    Even If The CWA Is Ambiguous As To EPA's TMDL Authority, EPA's Interpretation Of The CWA Exceeds Any Permissible Construction Of The Statute.

       Even if there is some ambiguity in the CWA with regard to EPA's authority

to establish the Chesapeake Bay TMDL, EPA's ability to exploit that ambiguity is

limited to "a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.

By interpreting "the *total* maximum daily load," 33 U.S.C. § 1313(d)(1)(C), (d)(2)

(emphasis added), to mean countless subtotal maximum loads, EPA has gone too

far.  Indeed, EPA has "stretched the term[s] . . . beyond parody," *Rapanos*, 547

U.S. at 734 (plurality).  It also has defied the stated policy of Congress to preserve

States' rights in the CWA.

14

**A.    The Chesapeake Bay TMDL Violates The Text, Policy, And Structure Of The CWA.**

The District Court's approval of the Chesapeake Bay TMDL violates the text, policy, and structure of the CWA.   As discussed above, the statutory requirement of establishing "the *total* maximum daily load" simply cannot bear the expansive meaning EPA has given it.  This is not a situation where EPA has filled a gap in a statute with a plausible interpretation of it.  Rather EPA has tried to rewrite the statute to give itself authority that Congress withheld.  It argues that authority to set "the *total* maximum daily load" for certain pollutants in impaired waters actually confers authority to set *hundreds* or *thousands* of *sub*-total load*s* attributable to specific *sources*.  *See EPA's Memorandum In Support Of EPA's Cross-Motion For Summary Judgment* (Dkt. 110) at 14-15; *see also* JA 1767 (setting hundreds of land-based LAs).  EPA's interpretation of its TMDL authority cannot be squared with the plain language of the CWA.

The express policy of the CWA to preserve States' authority to establish and implement water quality goals and land use policies confirms that EPA's interpretation of its authority exceeds any permissible construction of the statute. The CWA states:

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water

resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b). This policy and the TMDL provisions of the CWA were enacted together in the Federal Water Pollution Control Act Amendments, Pub. L. No. 92-500, §§ 101(b), 303(d)(1)(C), 86 Stat. 816, 816, 848-49 (1972), and they are mutually reinforcing. The TMDL provisions expressly limit EPA's authority to setting "the *total* maximum daily load," 33 U.S.C. § 1313(d)(1)(C), (d)(2) (emphasis added), and leaves to States the authority to achieve the goal, particularly with respect to nonpoint sources, *see Meiburg*, 296 F.3d at 1031; *Pronsolino*, 291 F.3d at 1128; *see also Defenders of Wildlife* 415 F.3d at 1124; *see generally* 33 U.S.C. §§ 1288, 1313. The statement of policy reinforces that Congress purposely circumscribed EPA's authority to "recognize, preserve, and protect the primary responsibilities and rights of States." *Id.* § 1251(b).

The structure of the CWA reflects this policy. While giving EPA ultimate authority to regulate point sources through the NPDES permit program, *id.* §§ 1311(a), 1342, the CWA limits EPA's authority to regulate nonpoint sources— leaving to States the power to decide how to manage those sources through State-led programs, *see Meiburg*, 296 F.3d at 1031; *Pronsolino*, 291 F.3d at 1128. The Chesapeake Bay TMDL all but obliterates the point/nonpoint source distinction by asserting ultimate control over nonpoint sources. The TMDL does this by imposing federal pollutant limits for nonpoint sources, mandating that States

16

achieve those limits, and even setting a federal timeline for the implementation of pollution controls to achieve those limits.

### B.    EPA's Overreach In The Chesapeake Bay TMDL Infringes States' Traditional Rights The CWA Intended To Protect.

By allocating a specific pollutant load to hundreds of nonpoint sources, EPA has intruded on States' traditional authority to manage nonpoint sources of pollution to achieve federal water quality standards. For example, the Chesapeake Bay TMDL includes nearly 700 allocations for agricultural, forestry, urban, and other nonpoint sources. *See* JA 1597, 1767. These allocations dictate the amount of pollution that each of the Chesapeake Bay's 92 impaired segments can receive from each of the nonpoint sources. *See id.* Such detailed allocations displace the "quintessential state and local power" to determine how best to manage the lands within their borders to comply with federal water quality regulations. *Rapanos*, 547 U.S. at 738 (plurality opinion); *see also Fed. Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 768 n.30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity."); *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 451 (3d Cir. 2002) ("[T]he tradition in American law [is] that land use decisions are quintessentially local in nature). By setting allocations for particular types or parcels of land low enough, EPA could require state and local governments to limit or prohibit the use of

17

fertilizer on agricultural lands, stop production on lands used for agriculture or forestry, halt construction or development, or rezone certain lands altogether.

In *Pronsolino v. Nastri*, the Ninth Circuit indicated that a TMDL would raise federalism concerns if it were to "specify the load of pollutants that may be received from particular parcels of land or describe what measures the state should take to implement the TMDL." 291 F.3d at 1140. The Chesapeake Bay does both: through specific allocations it prescribes the pollutant load certain lands can contribute to the Bay, and through "reasonable assurances," continued planning process requirements, and timelines, it dictates how States must achieve the TMDL.

Although the District Court tried to draw a line between detailed TMDL allocations and TMDL implementation, *see* JA 57-58, there is no enforceable limiting principle that would prevent EPA from imposing even more specific limitations on how specific parcels of land or portions thereof can be used. *Cf.* JA 1366 (threatening more specific allocations for point and nonpoint sources). Thus EPA claims a limitless power to dictate local land-use decisions. The CWA gives EPA no such authority.

In addition to the federalism costs, the Chesapeake Bay TMDL imposes significant economic burdens on the States. The Chesapeake Bay TMDL will cost tens of billions of dollars to implement. *See* Chesapeake Bay Watershed Blue

Ribbon Finance Panel, *Saving a National Treasure: Financing the Cleanup of the Chesapeake Bay*, at 8 (Oct. 2004), *available at* http://www.chesapeakebay.net/ content/publications/cbp_12881.pdf (last visited Jan. 30, 2014). Once it is implemented, States will bear the additional financial burden that comes with losing the flexibility to decide how to make the best economic use of their lands and still achieve federal water quality standards. Inherent in any allocation of pollution limits is a delicate balance of local priorities, local benefits, and local burdens. The dynamics of local economies demand that pollution control implementation plans be placed in the hands of State authorities with knowledge of those dynamics, including seasonal adjustments, and a direct interest in responding appropriately. In developing the TMDL, EPA deliberately ignored the economic burden it would have on Chesapeake Bay States. *See* 76 Fed. Reg. 549 (Jan. 5, 2011). But States cannot ignore these very real costs, which underscores the importance of leaving States' traditional authority over land-use regulations intact.

The District Court's approval of the Chesapeake Bay TMDL also opens the door for EPA to dictate land-use management decisions across the country. The Mississippi River Basin, for example, spans 31 States from Canada to the Gulf of Mexico. It is the third-largest drainage basin in the world, which covers more than 1,245,000 square miles—41 percent of the contiguous United States—from New York to Montana. Mississippi-Atchafalaya River Basin (MARB), Mississippi

River      Gulf      of      Mexico      Watershed      Nutrient      Task      Force,

http://water.epa.gov/type/watersheds/named/msbasin/marb.cfm.

The authority EPA claims in this case would allow it to make land-use

decisions for "cropland and pasture" that "produces half the nation's corn,

41 percent of the nation's soybean exports, and one-third of all the nation's hog

and pig sales." Terry J. Satterlee, et al., *Nutrients in the Heartland: Regulatory &*

*Legal Issues Surrounding the Mighty Mississippi*, Natural Resources &

Environment,      Vol.      27,      No.      4,      Spring      2013,      *available      at*

http://www.shb.com/newsevents/2013/NutrientsintheHeartland.pdf (describing the

breadth of the Mississippi River Basin).  It could control—and potentially

debilitate—an important part of the United States' economy, all under the auspices

of setting "the total maximum daily load" for pollutants entering the Mississippi

River.  This would turn the traditional state-federal relationship on its head.  The

CWA does not permit this result.  Indeed it explicitly sought to avoid such federal

aggrandizement at the expense of States' traditional authority.

EPA attempts to obscure the far-reaching implications of its claim to

exceedingly broad TMDL authority by arguing that the Chesapeake Bay TMDL is

not binding and that the watershed States' acquiescence in EPA's expansion of its

authority legitimizes its overreach.  Both conclusions are wrong.

20

**C.    The Chesapeake Bay TMDL Is Not Just An "Informational Tool" And No State Acquiescence Can Give EPA Authority The CWA Has Withheld.**

EPA contends that TMDLs are nonbinding "informational tools" that help ensure water quality standards are met.  But that is not entirely true in general, and it is not true at all of this TMDL.  The CWA requires States to incorporate TMDLs into their planning processes, which lay out how States plan to achieve water quality standards.  33 U.S.C. § 1313(d)(2).  Under EPA's interpretation of its TMDL authority, it can impose allocations on specific sources thereby requiring States to take EPA's chosen concrete, on-the-ground measures to achieve water quality standards.

Moreover, EPA made its allocations in the Chesapeake Bay TMDL mandatory by requiring "reasonable assurances" that States will implement the TMDL's specific allocations on a specific timeline, *see* JA 1355-57, and by threatening even more intrusive (and equally unauthorized) "backstop" measures, *see* JA 1396-97.  This coercion leaves States with no choice: States must conform their land use and water quality policies to EPA's allocations and timeline to avoid even more restrictive (and unlawful) EPA action later.  But as discussed above, EPA has no authority to regulate nonpoint sources or to require States to achieve water quality standards on a particular timeline.  These threats alone violate the CWA's careful balance of State and federal power.  EPA's claim to such authority

rests on an impermissible construction of the CWA, and no acquiescence by Chesapeake Bay watershed States can give EPA authority the CWA withholds.

## IV. The Court Should Reject EPA's Assertion Of Broad TMDL Authority Because It Raises Serious Tenth Amendment Concerns.

Even if the CWA arguably permits EPA's expansive interpretation of its authority, the Court should nevertheless reject such a broad view of the statute because it raises serious Tenth Amendment concerns. The principle of "constitutional avoidance," has "long been an axiom of statutory interpretation." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 466 (1989). It provides that where an "otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.'" *Id.* (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). Here, EPA's interpretation of the CWA's TMDL provision suffers from two serious flaws—it is plainly contrary to Congress' intent and it "presses the envelope of constitutional validity," *Rapanos*, 547 U.S. at 738 (plurality opinion). The States' and Appellants' statutory interpretation avoids both problems.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. It reflects the

system of "'dual sovereignty'" the Constitution established, *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)), and the CWA intended to preserve through cooperative federalism, *see* 33 U.S.C. § 1251(b).  Although "States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.'"  *Printz*, 521 at 918-19 (quoting The Federalist No. 39 (J. Madison)).  States "remain independent and autonomous within their proper sphere of authority," *id.* at 928; the "Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs," *id.* at 925.

Under the CWA's TMDL provisions, EPA claims the power to assign daily pollution limitations on specific point and nonpoint sources, including land used for agriculture, forestry, and urban centers.  *See* JA 1597, 1767.  The CWA gives EPA's TMDL "operational force," *Pronsolino*, 291 F.3d at 1128 (9th Cir. 2002), by requiring States to incorporate them into their continuing planning processes, 33 U.S.C. § 1313(e).  And if that were not enough, to make sure States do exactly as EPA says, the Chesapeake Bay TMDL requires States to give "reasonable assurances" that they will implement EPA's TMDL allocations.  JA 1355-57.  If EPA is unsatisfied with States' assurances, it has claimed the power to further tighten its allocations.  *See* JA 1396-97.

23

The result: EPA claims it can not only set the water quality goals within each State, but it can also require each State to accomplish the goal in the way EPA prescribes. For example, as EPA reads the CWA, it could require States to limit or prohibit agricultural activity, forestry, or construction on particular land to meet EPA's allocation for that area simply by incorporating sector and source-specific allocations into its TMDLs.

This authority that EPA claims for itself pushes the limits of Congress's power to regulate interstate commerce. *See Rapanos*, 547 U.S. at 738 (plurality opinion) (finding that EPA's attempt to regulate "wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters" under the CWA pushed constitutional limits of Congress's Commerce Clause power); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173-74 (2001) ("*SWANCC*") (finding EPA's attempt to regulate an abandoned sand and gravel pit under the CWA "invoke[d] the outer limits of Congress' power"). And it unlawfully invades States' traditional right to manage the land within their borders. *See Rapanos*, 547 U.S. at 738 (plurality opinion); *see also Fed. Energy Regulatory Comm'n*, 456 U.S. at 768 n.30; *Lapid-Laurel*, 284 F.3d at 451. To avoid these kinds of constitutional concerns, the Supreme Court has previously rejected similarly broad interpretations of EPA authority. S*ee, e.g.*,

*Rapanos*, 547 U.S. 715; *SWANCC*, 531 U.S. 159.  This Court should reject EPA's attempt to overreach here.

By requiring States to regulate land use as EPA prescribes through specific nonpoint source allocations, the Chesapeake Bay TMDL raises additional constitutional questions.  The "Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 163 (1992).  And it does not allow EPA to require the States to govern according to EPA's instructions here.

Even where Congress has authority under the Constitution to pass a particular law, for example under the Commerce Clause, it cannot "regulate state governments' regulation of interstate commerce." *New York*, 505 U.S. at 166.  Congress "may not . . . 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981)).

This does not mean that Congress "lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices." *Id.* at 166.  For example, Congress may encourage States to take certain actions by attaching conditions on the receipt of federal funds.  *See South Dakota v. Dole*, 483 U.S. 483

U.S. 203 (1987). The CWA employs this tool in the form of grants to encourage States to develop management plans to address nonpoint sources of pollution, which EPA has no authority to regulate. *See* 33 U.S.C. § 1288(f); *Pronsolino*, 291 F.3d at 1128-29. Apparently dissatisfied with that tool, EPA used the Chesapeake Bay TMDL to compel States to regulate nonpoint sources according to EPA's detailed instructions.

The Tenth Amendment also does not rule out functioning cooperative federalism "where Congress has the authority to regulate" and "offer[s] States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York*, 505 U.S. at 167. But it does prohibit the federal government from "employ[ing] state governments as regulatory agencies." *Id.* at 163. Here, EPA does not claim authority to regulate nonpoint sources directly—that would too blatantly contravene the CWA. Instead it conscripts States to regulate nonpoint sources according to EPA specifications under the guise of broad TMDL authority.

*Amici* States' and Appellants' interpretation of EPA's TMDL authority avoids these Tenth Amendment concerns. For purposes of the Tenth Amendment, the difference between setting a maximum load for certain pollutants in impaired waters and the detailed allocations in the Chesapeake Bay TMDL is significant. Setting a total maximum load for certain pollutants simply sets a target and gives

States discretion to figure out how to meet it.  The Chesapeake Bay TMDL, however, not only sets the target but also tells States how they have to meet it.

This strikes at the heart of States' traditional authority to manage the land within their borders and could devastate State economies.  If EPA follows through, it could start requiring States to zone specific parcels of land to permit or prohibit certain uses—all without any political accountability or vested interest in the State's welfare.  *See New York*, 505 U.S. at 169; *see also Nat'l Fed'n of Indep. Businesses v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) ("*NFIB*") ("Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system.").[2]  This is the kind of "gun to the head" and "economic dragooning" that the federal government cannot use to coerce States to implement its policy choices.  *Id.* at 2604-05.  That Chesapeake Bay watershed States may have acquiesced in EPA's extreme overreach does not validate its actions.  *New York*, 505 U.S. at 182 ("Where Congress exceeds its authority relative to the States, . . . the departure from the constitutional plan cannot be ratified by the 'consent' of state officials.").

Because the Chesapeake Bay TMDL raises these serious constitutional questions, the Court should adopt *Amici* States' and Appellants' narrow

---

[2]  Although *NFIB* addresses commandeering and coercion in the context of limitations on Congress's power under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, the principles on which it relies are equally applicable here.

construction of "the *total* maximum daily load," which avoids them.  *See, e.g.*, *Rapanos*, 547 U.S. at 738 (plurality opinion); *SWANCC*, 531 U.S. at 174.  Indeed, it is for these very reasons that the assertion of such broad authority requires a clear authorization from Congress, which the CWA does not provide.

## V.    The Court Should Reject EPA's Assertion Of Broad TMDL Authority Because It Requires A Clear Statement From Congress, Which Congress Did Not Provide.

To guard against "needlessly reach[ing] constitutional issues," the Supreme Court has adopted various "clear statement" rules.  *SWANCC*, 531 U.S. at 172-73. For example, if Congress intends to "alter the 'usual constitutional balance of federal and state powers,'" as the Chesapeake Bay TMDL does, it "must make its intention to do so 'unmistakably clear in the language of the statute.'"  *Gregory*, 501 U.S. at 460-61 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).  This clear statement rule recognizes that States "retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere."  *Gregory*, 501 U.S. at 461.  It also stems from the "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority."  *SWANCC*, 531 U.S. at 172-73.

Far from clearly authorizing EPA to invade States' traditional authority to regulate land use within their borders, Congress intended to "recognize, preserve,

and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources." 33 U.S.C. § 1251(b). Yet the Chesapeake Bay TMDL "'result[s] in a significant impingement of the States' traditional and primary power over land and water use.'" *Rapanos*, 547 U.S. at 738 (plurality opinion) (quoting *SWANCC*, 531 U.S. at 174). The broad authority EPA has asserted, particularly over nonpoint sources of pollution, empower it to "function as a *de facto* regulator of immense stretches of intrastate land—an authority the agency has shown its willingness to exercise with the scope of discretion that would befit a local zoning board." *Id.* EPA's substantial "'intrusion into traditional state authority'" requires a "clear and manifest statement from Congress," *id.*, which is utterly absent here.

The CWA says nothing about setting sub-total maximum load levels for specific nonpoint sources. And the words "the *total* maximum daily load," even if ambiguous, fall far short of providing the clear statement required. Indeed, any ambiguity in the language disfavors EPA's interpretation of the statute because the authority it claims requires clear congressional authorization.

If anything, Congress has clearly rejected EPA's attempt to redefine its TMDL authority. In July 2000, EPA sought to codify its expansive interpretation of its TMDL authority through the normal process—a published, final rule. The

29

TMDL Final Rule included specific sector and source allocations, reasonable assurance requirements, and mandatory implementation plans subject to EPA approval. 65 Fed. Reg. 135, 43,591 (July 13, 2000). Congress opposed the Final Rule and prohibited EPA from using funds to finalize or implement it. Pub. L. 106-246, 114 Stat. 511, 567. Before it took effect, EPA withdrew the Final Rule due to opposition from all sides. 68 Fed. Reg. 53, 13,608; 67 Fed. Reg. 249, 79020.

In light of the text, policy, and structure of the CWA, the Court should "read the statute as written to avoid the significant constitutional and federalism questions raised by [EPA's] interpretation." *SWANCC*, 531 U.S. at 174. These federalism concerns are magnified where, as here, unelected agency officials take an exceedingly broad view of their power and use it to corner States into regulating for them. *See SWANCC*, 531 U.S. at 173 (noting that concern about needlessly reaching constitutional issues "is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power"); *cf. Indus. Union Dept., AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in judgment) (stating Congress should make the "hard choices" when it "wishes to legislate in an area which it has not previously sought to enter," *e.g.*, regulating nonpoint sources of pollution).

The Court should reject EPA's attempt to expand its authority at the expense of States' traditional control over land management decisions without a clear statement from Congress. Limiting EPA's authority to simply setting "the *total maximum daily load*" would both give effect to Congress's intent and also avoid the difficult constitutional questions the Chesapeake Bay TMDL raises.

## CONCLUSION

For the reasons stated above, *Amici* States urge the Court to reverse the District Court's decision and invalidate the Chesapeake Bay TMDL.

Dated: February 3, 2014                  Respectfully submitted,

CHRIS KOSTER                             DEREK SCHMIDT
Missouri Attorney General                Kansas Attorney General
James R. Layton
Solicitor General                        /s/ Bryan C. Clark
                                         Jeffrey A. Chanay
GREGORY F. ZOELLER                       Deputy Attorney General
Indiana Attorney General                 Bryan C. Clark
Thomas M. Fisher                         Assistant Solicitor General
Solicitor General                            *Counsel of Record*
                                         Memorial Building
                                         120 SW 10th, 2nd Floor
                                         Topeka, Kansas 66612
                                         Telephone: (785) 296-2215
                                         E-mail:  jeff.chanay@ksag.org
                                                  bryan.clark@ksag.org

                                         *Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. App. P. 29(d) because it contains 6,841 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting function of Microsoft Word 2007.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface—14-point Times New Roman— using Microsoft Word 2007.

3. This brief has been scanned for viruses using Sophos Endpoint Security and Control (version 10.3), and no viruses were detected.

4. The hardcopies of this brief submitted to the Court this day are exact copies of the version submitted electronically.

5. Under Local Rule 46.1, Bryan C. Clark is a member in good standing of the bar for the United States Court of Appeals for the Third Circuit.


DATED: February, 3, 2014                         /s/ Bryan C. Clark

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that on this 3rd day of February, 2014, the foregoing Brief Of Amici States In Support of Reversal was filed electronically with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system.  I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.  I also certify that I caused seven paper copies to be delivered by Federal Express to the Clerk's Office.


DATED: February, 3, 2014                          /s/ Bryan C. Clark_____