No. 13-4079

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

AMERICAN FARM BUREAU FEDERATION, *et al.*,

*Plaintiffs-Appellants*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Defendant-Appellee*.

---

On Appeal from the United States District Court For the Middle District of
Pennsylvania, No. 1:11-cv-00067 (Hon. Sylvia H. Rambo)

---

**BRIEF OF CAMBRIA COUNTY, PENNSYLVANIA; CLEARFIELD
COUNTY, PENNSYLVANIA; LANCASTER COUNTY, PENNSYLVANIA;
PERRY COUNTY, PENNSYLVANIA; TIOGA COUNTY,
PENNSYLVANIA; HARDY COUNTY, WEST VIRGINIA; PENDLETON
COUNTY, WEST VIRGINIA; AND NEW CASTLE COUNTY, DELAWARE
AS *AMICI CURIAE* IN SUPPORT OF REVERSAL**

---

Brooks M. Smith
TROUTMAN SANDERS, LLP
1001 Haxall Point
Richmond, VA 23218
(804) 697-1414

Maria V. Souder
TROUTMAN SANDERS, LLP
600 Peachtree St., NE, Suite 5200
Atlanta, GA 30308
(404) 885-3339

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................................................ ii

**TABLE OF ABBREVIATIONS** ................................................................. iii

**RULE 29(a) STATEMENT** ..........................................................................1

**RULE 29(c)(5) STATEMENT** ....................................................................1

**SUMMARY OF ARGUMENT** ....................................................................2

**IDENTITY AND INTEREST OF *AMICI CURIAE*** ................................3

**ARGUMENT** ............................................................................................15

**CONCLUSION** .........................................................................................19

**CERTIFICATION OF BAR MEMBERSHIP** ...........................................21

**CERTIFICATE OF COMPLIANCE** ........................................................22

**CERTIFICATE OF SERVICE** .................................................................23

# TABLE OF AUTHORITIES

## CASES

*Hess v. Port Auth. Trans-Hudson Corp.*,

   513 U.S. 30 (1994) .................................................................................16

*FERC v. Mississippi*,

   456 U.S. 742 (1982) ...............................................................................16

*Schad v. Borough of Mount Ephraim*,

   452 U.S. 61 (1981) .................................................................................16

## STATUTES

33 U.S.C. § 1370(d) ....................................................................................1

33 U.S.C. § 1313(d)(1)(C) .......................................................................14

33 U.S.C. § 1251(b). ................................................................................15

33 U.S.C. § 1370. .....................................................................................15

## <u>TABLE OF ABBREVIATIONS</u>

Bay TMDL                    Chesapeake Bay Total Maximum Daily Load

for Nitrogen, Phosphorus, and Sediment

(Dec. 29, 2010)

CWA                        Clean Water Act, 33 U.S.C. § 1251 *et seq.*

EPA                        U.S. Environmental Protection Agency

LA                         Load Allocation

TMDL                       Total Maximum Daily Load

TSS                        Total Suspended Solids

WIP                        Watershed Implementation Plan

WLA                        Wasteload Allocation

## RULE 29(a) STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a) *Amici curiae* may file a brief if the brief states that all parties have consented to its filing. All parties have affirmed as follows:

Appellants American Farm Bureau Federation; Pennsylvania Farm Bureau; Fertilizer Institute; U.S. Poultry & Egg Association; National Pork Producers Council; National Corn Growers Association; and National Association of Home Builders consent to the filing.

Appellee U.S. Environmental Protection Agency does not oppose the filing.

Intevenors Chesapeake Bay Foundation; Citizens for Pennsylvania's Future; Defenders of Wildlife; Jefferson County Public Service District; Midshore Riverkeeper Conservancy; and National Wildlife Federation Virginia Association of Municipal Wastewater Agencies, Inc.; Maryland Association of Municipal Wastewater Agencies; National Association of Clean Water Agencies; and Pennsylvania Municipal Authorities Association do not oppose the filing.

## RULE 29(c)(5) STATEMENT

No party's counsel authored this brief in whole or in part; no party and no party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the a*mici curiae* or their members contributed money that was intended to fund preparing or submitting this brief.

1

## SUMMARY OF ARGUMENT

This appeal addresses the extent of EPA's authority to establish TMDLs under Section 303(d) of the CWA. TMDLs serve an incredibly important function under the Act as an information tool for identifying how much pollutant load a waterbody can assimilate and still meet water quality standards. But TMDLs must be viewed in the context of the balance of power that Congress struck between the federal government, on the one hand, the state and local governments, on the other. This guiding principle of "cooperative federalism" imposes very real and very important restrictions on how far EPA can go in dictating, through a TMDL, the development and use of land and water resources at the state and local level. In this particular case, *Amici* respectfully submit that EPA went too far.

Instead of simply establishing the "total load" of nutrients and sediment for the Chesapeake Bay and then deferring to state and local governments to determine how best to allocate and implement their respective shares of this total load, EPA usurped the state and local function. Far beyond establishing the total load, EPA parsed that load to specific source sectors and hundreds of individual sources throughout the watershed, demanded that the affected states provide "reasonable assurance" that those individually allocated loads would be achieved, and then imposed deadlines for implementing the practices necessary to achieve them.

For *Amici*, EPA's intrusion into the state and local function presents peculiarly adverse consequences, chief among them, federalizing local land use decisions and forcing fundamental changes to the character and use of local land. *Amici* respectfully submit that the district court erred in its decision affirming EPA's TMDL, and we urge this Court to reverse that decision and restore the proper balance of authority between EPA and state and local governments.

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici curiae* are counties that are directly affected and aggrieved by the Bay TMDL, and by EPA's intrusion into local land use decisions. *Amici* include Cambria County, Pennsylvania; Clearfield County, Pennsylvania; Lancaster County, Pennsylvania; Perry County, Pennsylvania; Tioga County, Pennsylvania; Hardy County, West Virginia; Pendleton County, West Virginia; and New Castle County, Delaware. *Amici* believe that they have a unique perspective on the impacts of EPA's Bay TMDL, a perspective that is vital to this Court's understanding of the case and the significance of EPA's intrusion into areas that Congress intentionally reserved to state and local governments.

When EPA developed the Bay TMDL, it capped nutrient and sediment loadings not just from hundreds of individual point sources and categories of point sources, but also from land-based nonpoint sources such as agricultural lands, forest lands, onsite septic systems, and non-regulated urban areas. As noted in the

3

Introduction to Appendix Q to the Bay TMDL, the TMDL includes "detailed Land Based load allocations (LAs) for specific nonpoint source sectors: agriculture, forest, nontidal atmospheric deposition, onsite septic, and urban. Land Based LAs are presented as delivered load for each of the 92 impaired segments by jurisdiction and by nonpoint source sector for nitrogen, phosphorus, and sediment." *See* JA1596. These "detailed Land Based load allocations" lock in the TMDL implementation decisions for each state by locking in the reductions imposed on each sector in each county in the watershed.

For example, Hardy County West Virginia is in the watershed for the water segment identified in the TMDL as "Upper Potomac River-MD," also referred to as "POTTF_MD." JA1596, JA1766. The TMDL caps the amount of nitrogen that can be delivered to this water segment from the parts of West Virginia that are in the watershed for the Maryland portion of the Upper Potomac River at 2,223,783.557 pounds a year from runoff from agricultural sources, 2,086,731.674 pounds a year from runoff from forest sources, 288,212.7214 pounds a year from septic systems (referred to as "onsite" in the TMDL), and 236,181.9848 pounds from runoff from urban areas. *Id.* By dictating the allowable loading for each of these sources, EPA has effectively locked in local land use decisions that local governments traditionally would have had exclusive authority to make. Neither

4

the state nor Hardy County has any flexibility to decide what sector can best afford the cost of making the needed reductions in pollutant loads.

EPA argues that the TMDL allocations were based on the draft Watershed Implementation Plan (WIP)[1] put forth by each state.  However, the record shows that the state' draft plans were developed under unreasonably short time frames and with incomplete information.  *See,e.g.*, JA903; JA905; JA898; *and* Pennsylvania Final Phase I WIP Cover Letter (Nov. 29, 2010).  Because EPA has incorporated those draft plans into the TMDL itself, West Virginia, Pennsylvania, Delaware and other states, as well as the affected local governments no longer have the option to implement the TMDL in ways that take into account local costs and impacts, and improved information.  For example, states and local governments cannot choose to implement the TMDL in a way that would relieve their citizens from the cost of upgrading their home septic systems or reduce the burden on farmers, and instead seek increased reductions from urban runoff or some other source sector.  States and local governments no longer have the option of taking into account improvements in farming that were not captured in EPA's models and reallocate responsibility for load reductions.  EPA made these implementation decisions through the Bay TMDL, and States must now impose

---

[1] Watershed Implementation Plans detail how and when the six Bay states and the District of Columbia will meet pollution allocations.  Bay TMDL, Executive Summary, 1 (2010).

them on *Amici*, and as well as every other county in the Chesapeake Bay

watershed, or convince EPA to amend the federal TMDL.

Based on the allocations EPA imposed in the Bay TMDL, states are forced

to sub-divide, on a local level, the reductions that will be required to meet the

allocations. *See* JA1007; *see generally* Pennsylvania Draft County Level Planning

Targets For Chesapeake Bay Phase II WIPs. These sub-divided loads are reflected

in county "planning targets" for each pollutant. *Id.* Of paramount concern is that

these planning targets encompass not just regulated point sources but also

unregulated land-based nonpoint sources such as agricultural lands, forest lands,

onsite septic systems, and non-regulated urban areas. *Id.* In other words, EPA has

compelled the states to implement planning targets at the county level for both

point and nonpoint sources, even though EPA has no authority over the latter and

considerably limited authority over the former (at least in the TMDL context).

*Amici* offer the following examples to highlight the peculiar impacts they

have suffered – and will continue to suffer – as a result of being locked into the

Bay TMDL's federal land use scheme.

As a general matter, in Pennsylania, *Amici* Cambria County, Clearfield

County, Lancaster County, Perry County, and Tioga County have been burdened

by the point and nonpoint source allocations assigned by EPA and, in turn, forced

onto the state through the EPA-controlled WIP process. In the agricultural sector,

6

erosion and sediment control plans are required for Animal Heavy Use Areas, and

additional vegetative cover is required for fields within 100 feet of a stream.

Pennsylvania WIP, 63 (2011).  In addition, different land uses must be curtailed as

the buffer requirements are implemented, and agricultural production will be

further limited by the manure-related restrictions.  *Id.* at 64.  Still on the horizon is

EPA's threat, in Section 8 of the Bay TMDL, that it will "revisit the Wasteload

Allocations (WLAs) [essentially all point sources] for agriculture and Wastewater

Treatment Plants in the event that Pennsylvania does not make significant progress

in the following areas: receiving EPA approval for its CAFO program,

demonstrating enhanced compliance assurance with agricultural state regulatory

programs, developing more targeted contingency actions, and advancing manure

technologies."  JA1391.  In other words, in addition to locking in land use

decisions at the local level through the EPA-controlled WIP, EPA has reserved the

right to further erode local decision-making if the state fails to meet EPA's desired

targets.

In more specific detail, Cambria County, Pennsylvania covers 693 square

miles and has a population of approximately 140,000.  The County is largely rural

with small municipalities and a single metropolitan area surrounding the city of

Johnstown.  Approximately one third of the County is in the Chesapeake Bay

watershed.  The portion within this watershed is best characterized as entirely

rural, containing only small towns and primarily used for agriculture and forestry. The County faces impacts primarily to its agricultural and municipal wastewater treatment sectors from the Bay TMDL.

Clearfield County, Pennsylvania is 1,145 square miles in size and has 81,642 residents. The County is primarily rural (81% of total lands are undeveloped) with most of the limited, developed lands being dedicated to agricultural production, resource production and extraction, and residential and commercial activities. Ninety percent of Cambria County drains into the Chesapeake Bay. Most of the county's rural land uses are subject to the Bay TMDL and will be affected by EPA's allocation of loading within and among these land uses. As a result of the reductions compelled by the Bay TMDL, the County will be forced to make changes in these land uses (e.g., taking agricultural lands out of production, limiting resource production activities, and perhaps even banning some development activities). In addition to the County's land-based nonpoint sources, fourteen municipal sewage authorities operate within the County and will be subject to the cost and burden of reductions needed to meet the regulatory WLAs in the Bay TMDL.

Lancaster County, Pennsylvania has a population of approximately 525,000 residents. The County has over 400,000 thousand acres of productive farmland, including dairy, poultry, and swine farms, of which 100,000 acres is in agricultural

preserve. Even though the County is still a rural agricultural county, it continues to grow by approximately 3,000 to 4,000 people per year and is thus "urbanizing" in many respects with sewage treatment plants, boroughs, townships, and Lancaster City. The County will be forced to bear the brunt of the agricultural requirements under the Bay TMDL because it is so farmland intensive. Furthermore, the County was assigned a nitrogen planning target of 10,643,511 pounds (35% reduction); a phosphorus planning target of 674,136 pounds (27% reduction); and a TSS planning target of 296,419,462 pounds (39% reduction). Pennsylvania Draft County Level Planning Targets For Chesapeake Bay Phase II WIPs, 128 (2012).

Perry County, Pennsylvania is 554 square miles (355,038 acres) with agricultural lands accounting for nearly one-third of the County's total area, and forest lands accounting for much of the remainder. The County's population according to the 2010 U.S. Census is 45,969. Ninety-nine percent of Perry County's total land area drains into the Chesapeake Bay. Even more notable is that all of the privately owned properties with the County drain toward the Bay. The County has been assigned a nitrogen planning target of 2,603,366 pounds (30% reduction); a phosphorus planning target of 55,321 pounds (31% reduction); and a TSS planning target of 43,561,917 pounds (27% reduction). Pennsylvania Draft County Level Planning Targets For Chesapeake Bay Phase II WIPs, 168 (2012). The County has determined that between 1,302 to 7,420 acres would have to be

taken out of agricultural production because of these reductions and new buffer requirements under the Bay TMDL.  The impact of these EPA-imposed obligations will be felt by the County in lost tax revenues, directly affecting local schools and other core municipal services.

Tioga County, Pennsylvania is 1,137 square miles (727,800 acres) and supports a population of 42,577.  The County is rural with a primary focus on agriculture.  Croplands occupy over 18% of total lands.  All of Tioga County drains into the Chesapeake Bay Watershed.  The County has been assigned a nitrogen planning target of 736,892 pounds (21% reduction); a phosphorus planning target of 65,627 pounds (29% reduction); and a TSS planning target of 34,370,809 pounds (27% reduction).  Pennsylvania Draft County Level Planning Targets For Chesapeake Bay Phase II WIPs, 203 (2012).  Furthermore, with the added demands on agriculture, Tioga County will be faced with additional riparian buffers and an obligation to shore-up creek banks with trees, thus further limiting the amount of land authorized for agricultural production.  The County has experienced recent land and economic development in the energy industry sector.  Of particular concern is that the Bay TMDL will impose additional federal burdens on this sector without regard to the state's primary authority over its water resources and the County's primary authority over local land use.

Like the affected *Amici* in Pennsylvania, *Amici* Hardy County and Pendleton County in West Virginia have been burdened by the Bay TMDL and their state's EPA-controlled WIP. In West Virginia, EPA determined that even though the state's final Phase I WIP included some improvements in the agriculture sector (for example, poultry litter transport, targeted Nutrient Management Plans in high nitrogen-loading counties, and stream fencing), those improvements were not enough to meet EPA's approval standards. JA1396-98. EPA claimed that the WIP still contained a number of weaknesses and thus EPA applied backstop adjustments to this sector. *Id.* Specifically, EPA shifted 75% of West Virginia's Animal Feeding Operation load into the WLA and assumed full implementation of barnyard runoff control, waste management, and mortality composting practices. JA1397. Similarly, in the wastewater sector, EPA acknowledged several improvements with the final WIP, including a commitment by the West Virginia legislature to help facilitate compliance with certain permit requirements resulting from the Bay TMDL. JA 1398. Nevertheless, EPA went on to conclude that "despite these improvements . . . the WIP does not fully meet EPA's expectations for reasonable assurance." *Id.* Thus, EPA exercised "enhanced" oversight and actions for the West Virginia wastewater sector and established individual WLAs for certain Wastewater Treatment Plants. *Id.*

In more specific detail, Hardy County, West Virginia spans 373,120 acres; and has 13,866 residents.  About one third of the land is farm and cropland and all of Hardy County drains into the Chesapeake Bay watershed.  It is anticipated that a significant amount of Hardy County farmland will have to be removed from production due to its proximity to waterways and the resulting impacts of the Bay TMDL on local land use.

Pendleton County, West Virginia is 698 square miles with a population of 7,695.  All of Pendleton County drains into the Chesapeake Bay watershed.  The county has approximately 540 family-owned farms for a combined total acreage of 170,000 acres or 38.2% of the county land area.   It is anticipated that a significant amount of Pendleton County farmland will have to be removed from production due to its proximity to waterways and the resulting impacts of the Bay TMDL on local land use.   The County is comprised of extensive mountainous terrain, thus much of the farmland, and certainly the most productive land, is river bottom land. Land that is taken out of farm production will need to be re-classified and likely will reduce the County's property tax revenues.  Of particular significance is the impact of the Bay TMDL on the value of a farm's production.  The average value of agricultural products sold per farm is currently $135,553, whereas the average total farm production expense per farm is $89,721.  When productive farmland is taken out of service to meet the Bay TMDL, the value of agricultural products sold

will be decreased – narrowing the margin between profits and losses for multiple farm families. Additionally, Pendleton County has a very limited industrial base. Consequently, people who would be displaced from farming would have little to no opportunity to replace their loss. Pendleton County also has sewage treatment facilities and residential septic systems, all of which will be directly impacted by the Bay TMDL.

Last but not least, in Delaware, *Amici* New Castle County joins in support of its farming community. Although Delaware's Final Phase I WIP met EPA's approval, EPA stated that it planned to maintain ongoing oversight of Delaware's agriculture sector, wastewater sector, and urban stormwater sector. JA1383-84. Based on figures obtained from the U.S. Census Bureau, the 2012 population of New Castle County was estimated to be 546,076. The County is comprised of 426 square miles of which approximately 30% is used for agricultural activities. Even though only ten percent of the County drains into the Chesapeake Bay watershed, the agricultural section of the County has the potential to be significantly impacted by the Bay TMDL. The County remains mindful, however, that the right to regulate land, buildings, and/or structures used for agricultural purposes lies with the State of Delaware.

Not only did EPA seize the local land use function in counties affected by the Bay TMDL, EPA also largely ignored or overlooked the progress that many of

13

these counties have been making to improve water quality in the Chesapeake Bay.

Farmers and developers, in collaboration with the counties, have been

implementing water quality protection measures within the Bay watershed for a

number of years.  In Perry County, Pennsylvania for example, the local

conservation district has been successful over the past several years in getting

farmers to employ best management practices to protect stream banks along creeks

that drain to the Chesapeake Bay.  Similarly, farmers in Lancaster County,

Pennsylvania have been and continue to employ best management practices to

limit their impacts on water quality.   These voluntary efforts have produced

significant results.  According to EPA's own figures, the agricultural community

reduced loading to the Chesapeake Bay for nitrogen (by over 27%), phosphorus

(by over 21%), and sediment (by over 24%) from 1985 to 2009.  *See* JA622-24.

Even so, *Amici* Counties have experienced great frustration because the models

used by EPA to measure pollutant loadings into the Bay and calculate the Bay

TMDL failed to fully account for these reductions.  As a point of illustration, the

Natural Resources Conservation Service of the U.S. Department of Agriculture just

released the Conservation Effects Assessment Project Report in December 2013,

confirming that considerably more agricultural best management practices are

implemented on farms in the Bay watershed than EPA knew about or accounted

14

for in the Bay TMDL.   Impacts of Conservation Adoption on Cultivated Acres of

Cropland in the Chesapeake Bay Region, 2003-06 to 2011, 1-6 (2013).

## ARGUMENT

*Amici* incorporate by reference the CWA framework presented by Plaintiffs-

Appellants American Farm Bureau Federation *et al.*  As this framework makes

clear, EPA's TMDL authority is limited.  In the case of the Bay TMDL, EPA

exceeded this authority.  Instead of simply setting the "total load" as provided in

Section 303(d)(1)(C) of the CWA, EPA usurped the authority of state and local

governments by allocating and assigning pollutant loads to specific source sectors

and individual sources throughout the watershed.   *See* JA 1596.  The Bay TMDL

now consists of hundreds of different pollutant allocations, not just for regulated

point sources and categories of point sources, but also for land-based nonpoint

sources such as agricultural lands, forest lands, onsite septic systems and

unregulated urban areas.  *See generally* JA1367-99; *see also* JA1596.  Not content

to stop there, EPA demanded that the affected states provide "reasonable

assurance" that the allocated loads would be achieved, and imposed additional

backstops wherever EPA deemed that a state's WIP was not sufficient to meet

EPA's targets and deadlines.  *See* JA1367-99.  And last but not least, EPA imposed

a schedule on states to implement the practices necessary to meet EPA's targets,

15

even though nothing in the CWA provides EPA with authority over state implementation of TMDLs. *Id.*

*Amici* respectfully submit that EPA's action conflicts with the bedrock principle of cooperative federalism that underlies the CWA. Importantly, Congress gave states the "primary responsibility and rights" to address water pollution and "plan the development and use … of [their] land and water resources." 33 U.S.C. § 1251(b). And while Congress did give EPA specific powers and authorities, as well, Congress made clear that it was reserving to states all other rights and jurisdiction over their waters. Id. § 1370.

As a very real and very relevant example of this balancing and division of authority, state and local governments have exclusive authority over "nonpoint sources" of pollution. By contrast to "point sources" (such as piped discharges from industrial and municipal wastewater plants), "nonpoint sources" include diffuse runoff from farming, harvesting and other land-based activities. EPA and states each share in the regulation of point sources. But only states and local governments have authority over nonpoint sources. This distinction is especially critical in the context of the Chesapeake Bay, where the sources and causes of impairment include both point sources and nonpoint sources. EPA may have the authority to account for all of these sources in establishing the "total load," but it is without power or authority to parse the load among point and nonpoint sources,

16

lock states into EPA's individually allocated loads (including those for nonpoint sources), or impose deadlines for meeting them. Each of these actions is properly reserved to state and local governments, in keeping with Congress' direction and a league of case decisions on point.

In simplest terms, courts have regularly and uniformly affirmed local authority over local land use decisions.  *See, e.g., Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44 (1994) ("regulation of land use [is] a function traditionally performed by local governments"); *FERC v. Mississippi*, 456 U.S. 742, 768 n.30 (1982) ("regulation of land use is perhaps the quintessential state activity"); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981) ("The power of local governments to zone and control land use is undoubtedly broad . . . . [C]ourts generally have emphasized the breadth of municipal power to control land use[.]").

EPA intruded on this local authority by setting annual and daily pollutant allocations for both point sources and nonpoint sources (*see* JA1400-33; JA1596, JA1766); by demanding assurances from states by way of their WIPs, objecting to those that EPA deemed to be deficient and threatening federal "backstops" in situations where states failed to abide by EPA's objections (*see* JA565, JA572-74); and demanding that all pollution control measures necessary to achieve EPA's allocations must be in place by 2025 (*see* JA1106).

17

As described in the Identity and Interest section above, this intrusion by EPA is by no means theoretical or abstract to *Amici*. To the contrary, EPA's actions have the effect of locking in local land use decisions within each of *Amici's* jurisdictions to the point of assigning specific loading caps to specific land uses, thereby forcing the Counties to curtail or even prohibit certain land uses in order to achieve the reductions compelled by EPA. The Bay TMDL essentially dictates which lands may be used for farming or development, which other lands must be "retired" out of productive use (e.g., to make room for EPA's required riparian buffers), how much fertilizer a farmer may apply to his working lands, and how state and local governments must allocate the burden of pollutant reductions between different source sectors, and even between individual fields, factories and sewage treatment plants. Respectfully, these actions are not EPA's to make. They are properly reserved to state and local governments, including *Amici*. Only with primary state and local control over how TMDLs are parsed and implemented will the balance of "cooperative federalism" envisioned by Congress work. And only with primary state and local control will the incredibly important and incredibly complicated decisions about land use, economic development, taxation, and more fundamentally, the character and fabric of local land, be made with an informed, enlightened and judicious eye.

## CONCLUSION

EPA exceeded its authority when it established the Bay TMDL, intruding on the powers of state and local government.  The effect of EPA's intrusion is particularly pronounced at the local level, where *Amici* Counties have effectively been locked into a federal land use scheme.  This federal scheme will change the character and use of local lands, all without any meaningful control by the local governments in the best position to decide how best to allocate pollutant loads and balance the equities between different, competing land uses.  *Amici* appreciate the value of TMDLs as an information tool under the CWA, but for this tool to meet Congress's guiding principle of cooperative federalism, EPA's role necessarily must be limited to establishing the "total load," and state and local governments must be given their full authority to allocate and implement this total load.  EPA usurped the state and local function in this particular proceeding, thus upsetting the balance of "cooperative federalism" envisioned by Congress.  For these reasons, *Amici* urge this Court to reverse the District Court's decision and restore the proper balance of authority between EPA and state and local governments.

Dated: February 3, 2014                    Respectfully submitted,

                                                               /s/ Brooks M. Smith
                                                               Brooks M. Smith
                                                               Virginia State Bar #40171
                                                               TROUTMAN SANDERS, LLP
                                                               1001 Haxall Point,
                                                               Richmond, VA  23218

(804) 697-1414

Maria V. Souder
TROUTMAN SANDERS, LLP
Georgia State Bar #352757
600 Peachtree St., NE, Suite 5200
Atlanta, GA 30308
(404) 885-3339

*Counsel for Amici Curiae*

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rule 28.3(d), undersigned counsel certifies that he is a member of the bar of the United States Court of Appeals for the Third Circuit.


/s/ Brooks M. Smith
Brooks M. Smith

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitations of Fed. R. App. P.

   32(a)(7)(B)(i) and Fed. R. App. P. 29(d) because this brief contains 4,231

   words, excluding the parts of the brief exempted by Fed. R. App. P.

   32(a)(7)(B)(iii), as calculated by the word-counting function of Microsoft Word

   2007.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)

   and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief

   has been prepared in a proportionally-spaced typeface using Microsoft Word

   2007 in 14-point Times New Roman font.

3. This brief has been scanned for viruses using Symantec Endpoint Protection,

   (Version 11.06005.562) and is free of viruses.

4. The hardcopies of this brief submitted to the Court are exact copies of the

   version submitted electronically.

DATED: February 03, 2014              /s/ Brooks M. Smith_____
                                      Brooks M. Smith

                                      *Counsel for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2014, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Third Circuit via the CM/ECF filing system, which will send notice of such filing to all registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Seven (7) copies of the foregoing will be sent to the Office of the Clerk of Court via FedEx.

/s/ Brooks M. Smith
Brooks M. Smith
TROUTMAN SANDERS, LLP
1001 Haxall Point,
Richmond, VA  23218
(804) 697-1414

*Counsel for Amici Curiae*