No. 13-4079

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

AMERICAN FARM BUREAU FEDERATION, et al.,
*Plaintiff-Appellants*,

*v.*

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,
*Defendant-Appellee*

On Appeal from the U.S. District Court for the Middle District of Pennsylvania,
No. 1:11-cv-00067 (Hon. Sylvia H. Rambo)

**U.S. ENVIRONMENTAL PROTECTION AGENCY'S
RESPONSE BRIEF**

ROBERT G. DREHER
 Acting Assistant Attorney General

KENT E. HANSON
J. DAVID GUNTER II
U.S. Department of Justice
Environment & Natural Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-3785

Of Counsel:
JAMES CURTIN
CHRISTOPHER DAY
KELLY GABLE
U.S. Environmental Protection
 Agency

April 2, 2014

# TABLE OF CONTENTS

INTRODUCTION ...............................................................................................1

STATEMENT OF JURISDICTION ...............................................................2

STATEMENT OF THE ISSUES.......................................................................2

RELATED CASES................................................................................................3

STATEMENT OF THE CASE...........................................................................3

LEGAL BACKGROUND AND STATEMENT OF FACTS ........................4

    I.     STATUTORY AND REGULATORY BACKGROUND...........................................5

          A.    Point and nonpoint sources of pollution ..........................................5

          B.    Water quality standards and TMDLs..................................................7

          C.    The Chesapeake Bay Program ...........................................................11

    II.    FACTORS LEADING TO THE DEVELOPMENT OF THE BAY TMDL ...........12

          A.    The complex problem of impairment.................................................13

          B.    A history of federal-State cooperation................................................14

          C.    EPA's legal obligations under the Act ..............................................15

    III.    THE BAY TMDL ......................................................................................16

          A.    Why the Bay TMDL includes allocations.........................................18

          B.    How the Bay TMDL's allocations were developed ........................20

          C.    How the States will implement the TMDL.......................................22

      D.     The role of "reasonable assurance"....................................................25

    IV.    DISTRICT COURT PROCEEDINGS ........................................................28

STANDARD OF REVIEW ............................................................................29

SUMMARY OF ARGUMENT.......................................................................30

ARGUMENT ...................................................................................................31

    I.     UNDER *CHEVRON*, THE COURT MUST ALLOW EPA TO FILL THE GAPS
         THAT CONGRESS LEFT IN THE ACT...........................................................31

    II.    THE ACT GRANTS EPA BROAD AUTHORITY TO ESTABLISH THE BAY
         TMDL.............................................................................................................35

    III.   THE PLAIN LANGUAGE OF THE ACT DOES NOT PROHIBIT EPA FROM
         INCLUDING ALLOCATIONS IN A TMDL.........................................................39

    IV.   THE BAY TMDL IS CONSISTENT WITH THE ACT'S STRUCTURE OF
         COOPERATIVE FEDERALISM .........................................................................43

        A.     EPA's role as a backstop for State authority ...................................43

        B.     State's authority to regulate nonpoint sources.................................46

        C.     EPA's role in the Chesapeake Bay Program....................................50

    V.    THE BAY TMDL REFLECTS A PERMISSIBLE CONSTRUCTION OF THE
         ACT .................................................................................................................51

CONCLUSION ...............................................................................................58

CERTIFICATES

# TABLE OF AUTHORITIES

**CASES:**

*Abraham v. St. Croix Renaissance Group,*
   719 F.3d 270 (3d Cir. 2013) ...................................................................54

*American Iron & Steel Inst. v. EPA,*
   526 F.2d 1027 (3d Cir. 1975) ................................................................35

*American Train Dispatchers Ass'n v. ICC,*
   54 F.3d 842 (D.C. Cir. 1995) ................................................................40

*Arkansas v. Oklahoma,*
   503 U.S. 91 (1992) ..............................................................5, 8, 47, 52

*Babbitt v. Sweet Home Chapter of Communities for Greater Oregon,*
   515 U.S. 687 (1995) ........................................................................32-34

*Chemical Mfr's Ass'n v. NRDC,*
   470 U.S. 116 (1985) ............................................................................34

*Chevron, U.S.A. Inc. v. NRDC,*
   467 U.S. 837 (1984) ....................................30- 33, 35, 37, 42, 43, 48, 51-52, 57, 58

*City of Arlington v. FCC,*
   133 S.Ct. 1868 (2013) .....................................................................33, 36

*Delaware Dep't of Natural Res. v. U.S. Army Corps of Eng'rs,*
   685 F.3d 259 (3d Cir. 2012) ...........................................................29, 34

*Dioxin/Organochlorine Ctr. v. Clarke,*
   57 F.3d 1517 (9th Cir. 1995) ................................................................37

*E.I. DuPont de Nemours & Co. v. Train,*
   430 U.S. 112 (1977) ......................................................................41, 42

*Entergy Corp. v. Riverkeeper, Inc.*,
   556 U.S. 208 (2009) ...................................................................................38

*Friends of the Earth v. EPA*,
   446 F.3d 140 (D.C. Cir. 2006) ...............................................................39

*Kingman Park Civic Ass'n v. EPA*,
   84 F. Supp. 2d 1 (D.D.C. 1999)................................................................16

*Louisiana Forestry Ass'n v. Sec' of Labor*,
   2014 WL 444157 (3d Cir. 2014) .............................................................33

*Mississippi Comm'n on Nat. Res. v. Costle*,
   625 F.2d 1269 (5th Cir. 1980) .................................................................44

*Municipal Auth. of Borough of St. Mary's v. EPA*,
   945 F.2d 67 (3d Cir. 1991).........................................................................5

*National Cable & Telecomms. Assoc. v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ...................................................................................58

*Nuveen Mun. Trust v. Withumsmith Brown, P.C.*,
   692 F.3d 283 (3d Cir. 2012) .....................................................................53

*Oregon Natural Desert Ass'n v. U.S. Forest Service*,
   550 F.3d 778 (9th Cir. 2008) ...................................................................49

*Pronsolino v. Nastri*,
   291 F.3d 112 (9th Cir. 2002) ................................. 5, 7, 10, 19, 37, 44, 45

*Public Utility District No. 1 v. Washington Dep't of Ecology*,
   511 U.S. 700 (1994) .....................................................................................5

*Shanty Town Associates Ltd. Partnership v. EPA*,
   843 F.2d 782 (4th Cir. 1988) ............................................................. 48, 49

*Sierra Club v. Meiburg*,
   296 F.3d 1021 (11th Cir. 2002)........................................ 5, 6, 8, 10, 11, 46

*SNR Roulements, Inc. v. United States,*
    402 F.3d 1358 (Fed. Cir. 2005) ...................................................................40

*SWANCC v. U.S. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ...................................................................................53

*U.S. Steel Group v. United States,*
    225 F.3d 1284 (Fed. Cir. 2000) ...................................................................40

*United States v. Haggar Apparel Co.,*
    526 U.S. 380 (1999) ...................................................................................54

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) .............................................................................. 32, 33

*United States v. Pozsgai,*
    999 F.2d 719 (3d Cir. 1993) ................................................... 33, 34, 35, 37

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ...................................................................................37

*United States. v. Geiser,*
    527 F.3d 288 (3d Cir. 2008) ................................................................. 32, 51

*Zuni Pub. School Dist. v. Dep't of Educ.,*
    550 U.S. 81 (2007) ............................................................................32, 34, 51

**STATUTES:**

Administrative Procedure Act:
    5 U.S.C. § 706 .............................................................................................3

Clean Water Act, 33 U.S.C. § 1251 *et seq.* ("the Act")

    33 U.S.C. § 1251 ...............................................................................3, 4, 5, 47

    33 U.S.C. § 1251(a) ............................................................................... 43, 52

33 U.S.C. § 1251(b) ........................................................................46, 52, 56

33 U.S.C. § 1251(d) ........................................................................36, 38, 47

33 U.S.C. § 1251(g) ................................................................................56

33 U.S.C. § 1267 ("Section 117")

     33 U.S.C. § 1267 ............................................................................12

     33 U.S.C. § 1267(b) ...................................................................50, 56

     33 U.S.C. § 1267(g) ............................................12-16, 37, 38, 50, 51, 56

33 U.S.C. § 1281 ...............................................................................47, 48

33 U.S.C. § 1288 ...................................................................................47

33 U.S.C. § 1311(b) .................................................................................6

33 U.S.C. § 1313 ("Section 303")

     33 U.S.C. § 1313 ...........................................................................5, 7

     33 U.S.C. § 1313(a) ..........................................................................44

     33 U.S.C. § 1313(b) ............................................................................7

     33 U.S.C. § 1313(c) .........................................................7, 8, 36, 44, 47

     33 U.S.C. § 1313(d)(1)(C) ..........................8, 16, 25, 31, 36, 39-40, 44, 45

     33 U.S.C. § 1313(d)(2) ....................................................9, 24, 44, 45, 47

     33 U.S.C. § 1313(d)(3) .......................................................................41

     33 U.S.C. § 1313(e) .......................................................................47, 48

33 U.S.C. § 1319(a) ................................................................................43

33 U.S.C. § 1329 ................................................................ 6, 7, 47, 48, 50

33 U.S.C. § 1342(a)(1) ............................................................. 6, 43, 48

33 U.S.C. § 1344(h)-(j) ...................................................................... 43

33 U.S.C. § 1361(a) ................................................................... 9, 36, 37

33 U.S.C. § 1362 ....................................................................... 5, 6, 36

33 U.S.C. § 1370 .................................................................... 43, 46, 47

Pub. L. No. 100-4, § 103, 101 Stat 10 (1987) ...................................... 12

Pub. L. No. 106-457, 114 Stat. 1957 (2000) ....................................... 12

## RULES AND REGULATIONS:

40 C.F.R. § 122.4(d) ........................................................................ 8, 19

40 C.F.R. § 122.44(d) ............................................................... 10, 11, 23

40 C.F.R. Part 130

40 C.F.R. § 130.2(g), (h) .............................................................. 9, 18

40 C.F.R. § 130.2(i) .................................................. 9, 10, 18, 25-27, 46

40 C.F.R. § 130.2(j) ............................................................................ 8

40 C.F.R. § 130.3 ............................................................................... 7

40 C.F.R. § 130.7 ............................................................................... 9

40 C.F.R. Part 131

40 C.F.R. § 131.2, § 130.3 .................................................................. 7

40 C.F.R. § 131.4(a) ...................................................................................47

40 C.F.R. § 131.10-12 .................................................................................7

40 C.F.R. § 131.10(b) .................................................................................7

40 C.F.R. § 131.20-21 .............................................................................7, 8

40 C.F.R. § 131.22 .....................................................................................8

50 Fed. Reg. 1774 (Jan. 11, 1985) ........................................................ 10, 37

65 Fed. Reg. 43,486 (July 13, 2000) ...........................................................54

68 Fed. Reg. 13,608 (March 19, 2003).........................................................54

## LEGISLATIVE HISTORY:

H.R. Rep. No. 106-995 (2000).....................................................................12

S. Rep. No. 92-414 (1971) ..........................................................................53

S. Rep. No. 95-370 (1977) .....................................................................47, 54

S. Rep. No. 106-181 (1999) ........................................................................55

## MISCELLANEOUS:

www.epa.gov/reg3wapd/tmdl/ChesapeakeBay/EnsuringResults.html?tab2=1&
tab1=2 ..................................................................................................25

# GLOSSARY

<u>Abbreviations used in this brief:</u>

| | |
|---|---|
| CWA or Act | Clean Water Act |
| EPA | U.S. Environmental Protection Agency |
| ESJA | EPA's Supplemental Joint Appendix |
| JA | Joint Appendix |
| NPDES | National Permit Discharge Elimination System |
| TMDL | Total Maximum Daily Load |
| WIP | Watershed Implementation Plan |

<u>Abbreviations not used in this brief, but commonly found in the record:</u>

| | |
|---|---|
| CBP | Chesapeake Bay Program |
| LA | Load Allocation |
| PSC | Principals' Staff Committee (of the Chesapeake Bay Program) |
| WLA | Wasteload Allocation |
| WQS | Water Quality Standard |

The Clean Water Act protects the Nation's waters through a system of cooperative federalism. The States have significant responsibility within that system. EPA does also, as Congress gave it both the duty to ensure that States meet their responsibilities and the authority necessary to play that role effectively.

The Chesapeake Bay TMDL is an outstanding example of cooperative federalism. The Bay TMDL is a pollution budget, developed through the longstanding Chesapeake Bay Program Partnership, that has the potential to restore the chronically degraded waters of one of America's most important ecosystems. Each of the Bay States will play a part in that effort based almost entirely on its own proposal, supported by the knowledge that the other States are also doing their fair share to reach a common solution. EPA helped the States set their water quality goals, coordinated the development of State proposals to meet those goals, and established the overall interstate plan in the Bay TMDL. It also outlined how it would use its other tools under the Act, if necessary, to bring that plan to fruition.

In Plaintiffs' vision of cooperative federalism, this cooperation is irrelevant. But detailed, cooperative water quality planning is not the same as coercing the States or controlling their land use decisions. Using the TMDL as a guide, the Bay States must still make their own decisions about how to reduce pollution so that the Chesapeake Bay can attain water quality standards. This is a model of cooperative federalism in action. This Court should therefore affirm the judgment of the district court and uphold the Bay TMDL.

# STATEMENT OF JURISDICTION

EPA agrees with the basis for jurisdiction stated in Plaintiffs' opening brief.

# STATEMENT OF THE ISSUES

The Clean Water Act provides that, under certain circumstances, EPA may establish a Total Maximum Daily Load ("TMDL") to achieve water quality standards for a body of water.  Here, EPA worked with the seven Bay States[1] to establish the Bay TMDL.

The Bay TMDL includes "allocations" that identify a load for specific sectors and sources that is consistent with Bay water quality standards.  The States largely proposed these allocations and supported them with "reasonable assurance" of implementation.  **Does the Act prohibit EPA from establishing these allocations as part of the Bay TMDL?**

EPA also determined that there was "reasonable assurance" to believe that the TMDL would achieve water quality standards.  It made this determination based, in part, on the States' plans to implement various pollutant control measures by their mutually agreed target dates of 2017 and 2025.  **Does the Act prohibit EPA from considering "reasonable assurance" and relying on target implementation dates?**

---

[1]    Delaware, Maryland, New York, Pennsylvania, Virginia, West Virginia, and the District of Columbia each contain part of the Bay watershed.  The term "State" in this brief includes the District of Columbia.

2

**RELATED CASES**

EPA is not aware of any related cases within the meaning of Local Rule 28.1(a)(2).

**STATEMENT OF THE CASE**

This case concerns the "Chesapeake Bay Total Maximum Daily Load for Nitrogen, Phosphorus, and Sediment," established by EPA on December 29, 2010. In that action, EPA established a nitrogen load, a phosphorus load, and a sediment load for each of the 92 Bay "segments" – a total of 276 total maximum daily loads. Collectively, those 276 TMDLs are the "Bay TMDL." *See* JA 1106 *et seq.*

Plaintiffs sought review of the Bay TMDL under the Administrative Procedure Act, 5 U.S.C. § 706, and the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, in the U.S. District Court for the Middle District of Pennsylvania. On September 13, 2013, the district court granted summary judgment for EPA on the merits. *See American Farm Bureau Federation v. EPA*, No. 1:11-cv-67 (Docket # 150) (JA 103).

## LEGAL BACKGROUND AND STATEMENT OF FACTS [2]

The Chesapeake Bay is so familiar to residents of the mid-Atlantic region that it is easy to forget its size and complexity.  The Bay is "North America's largest and most diverse estuary . . . a resource of extraordinary productivity, worthy of the highest levels of protection and restoration."  Chesapeake 2000 Agreement (JA 249).  Over two hundred miles long, it encompasses more than 11,000 miles of shoreline.  Ten thousand streams and rivers, including 50 major tributaries, drain a watershed of 64,000 square miles into the Bay.  *See* TMDL at 2-1 (JA 1173).  It produces more than 500 million pounds of seafood per year, and its estimated economic value exceeds a trillion dollars.  *See* "The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay" at 5 (Sept. 9, 2009) (ESJA 32).

The pollutants produced in the watershed have severely degraded the water quality of the Bay.  A healthy Bay would be "fairly clear, have enough oxygen, contain the proper amount of algae, and be free from chemical contamination."  *Id.* at 8 (ESJA 35).  Instead, excess nitrogen, phosphorus, and sediment pollutants from agriculture, urban and suburban runoff, wastewater, and atmospheric deposition have

---

[2]     In addition to the facts presented here, the district court's opinion provides more information about essential topics such as the problem of Chesapeake Bay water quality, *see* Op. at 10-12 (JA 14-16); past efforts to coordinate Bay water quality management, *see id.* at 12-18 (JA 16-22); and the history of TMDL litigation in Bay tributaries, *see id.* at 23-27 (JA 27-31).

4

led to "murky water and algae blooms, which block sunlight from reaching bay

grasses and create low levels of oxygen for aquatic life." *Id.*

## I.    STATUTORY AND REGULATORY BACKGROUND

"Interstate waters have been a font of controversy since the founding of the

Nation." *Arkansas v. Oklahoma*, 503 U.S. 91, 98 (1992). The Clean Water Act

"establishes distinct roles for the Federal and State governments" to address water

quality in waters of the United States. *Public Utility District No. 1 v. Washington Dep't of

Ecology*, 511 U.S. 700, 704 (1994); *see also Municipal Auth. of Borough of St. Mary's v. EPA*,

945 F.2d 67, 68 (3d Cir. 1991). This case shows how those roles interact and overlap

under Section 303 of the Clean Water Act, 33 U.S.C. § 1313, in the context of a

complex interstate water quality issue. In addition to the discussion of Section 303

below, the Court may find particularly useful the background that other Courts of

Appeals have provided in *Sierra Club v. Meiburg*, 296 F.3d 1021, 1024-26 (11th Cir.

2002); and *Pronsolino v. Nastri*, 291 F.3d 1123, 1126-29 (9th Cir. 2002).

### A.    Point and nonpoint sources of pollution

The Act generally divides sources of water pollutants into two categories: point

sources and nonpoint sources. "Point sources" are "discernible, confined and

discrete conveyances," such as outflow pipes and channels, which "discharge"

pollutants into waters of the United States. 33 U.S.C. § 1362(12), (14). The Act gives

EPA considerable authority over point sources. For example, EPA establishes

technology-based limits on the discharge of pollutants, *id.* § 1311(b), which are then incorporated into National Permit Discharge Elimination System ("NPDES") permits. *See id.* § 1342(a)(1); *see generally Meiburg*, 296 F.3d at 1024-25. Although the Act gives EPA the initial authority to issue permits, it also authorizes States to administer an NPDES program with EPA's approval. 33 U.S.C. § 1342(b). Even under a State-administered permit program, EPA retains the discretion to object to permits that will not meet the requirements of the Act. *Id.* § 1342(d)(2). In that event, the State must revise the permit to resolve EPA's objection, or EPA may issue the permit itself.[3]

All other sources of pollutants are considered "nonpoint sources," a category that may include "runoff from farmlands, mining activity, housing construction projects, roads, and so on." *Meiburg*, 296 F.3d at 1025. EPA's role is generally not to control pollutants from nonpoint sources directly, but it has influence over nonpoint sources through oversight and assistance to the States. States must submit to EPA a "management program for controlling pollution added from nonpoint sources to navigable waters within the State," including best management practices or state regulatory programs, for EPA's approval. 33 U.S.C. § 1329(b)(1)-(2). EPA may

---

[3]    Except for the District of Columbia, each of the Bay States administers the NPDES permit program. In the District, EPA retains direct authority over NPDES permits.

provide technical assistance or grants to assist the State in developing or

implementing its program. *Id.* § 1329(e)-(f), (h). *See generally Pronsolino*, 291 F.3d at

1127.

**B.      Water quality standards and TMDLs**

Section 303 of the Act, 33 U.S.C. § 1313, establishes the system of water quality

standards and TMDLs. There is no distinction between point and nonpoint sources

"with regard to the basic purpose" of Section 303, "the eventual attainment of state-

defined water quality standards." *Pronsolino*, 291 F.3d at 1137. Section 303 establishes

a "carrot-and-stick" approach in which EPA and the States collectively determine the

appropriate water quality for the State's waters and make a plan to achieve that water

quality. *Id.* at 1127.

Each State must set its own water quality standards based on EPA's

regulations. *See* 33 U.S.C. § 1313(b)-(c); 40 C.F.R. parts 130, 131. Each "segment" of

a water body has its own water quality standards, including that water's designated

uses and criteria to protect those uses, and "tak[ing] into consideration the water

quality standards of downstream waters." *See* 40 C.F.R. § 131.10(b); *see generally id.*

§§ 131.2-.3, 131.10-.12. The States submit water quality standards to EPA, and EPA

approves those standards if they are sufficient, among other criteria, to "protect the

public health or welfare." 33 U.S.C. § 1313(c)(2)(A), (C); 40 C.F.R. §§ 130.3, 131.20-

21.  If a State does not submit approvable water quality standards, EPA may promulgate standards.  33 U.S.C. § 1313(c); 40 C.F.R. § 131.22.

For many waters – including, critically, the Chesapeake Bay – much of the pollutant load comes from sources upstream.  States that issue NPDES permits must ensure that pollutant discharges are consistent not only with local water quality standards, but also with the water quality standards of "all affected States."  40 C.F.R. § 122.4(d); *see Arkansas*, 503 U.S. at 105-07 (upholding this regulation as a reasonable exercise of EPA's statutory discretion).

Once a water quality standard is in place, the Act seeks to ensure that the State and EPA cooperate to implement it.  Each State must prepare a list, the "Section 303(d) list," of waters for which technology-based permit controls alone are insufficient to meet the applicable water quality standards.  33 U.S.C. § 1313(d)(1)(A).  This may occur, for example, where there are significant nonpoint sources of pollution.  *See Meiburg*, 296 F.3d at 1025.  These are known as "water quality limited segments," *see* 40 C.F.R. § 130.2(j), or colloquially, "impaired" waters.

For each water on its 303(d) list, the State is required to establish a "total maximum daily load," which identifies the maximum daily load of a pollutant from all sources (both point and nonpoint) that will allow the State to "implement the applicable water quality standards with seasonal variations and a margin of safety."  33 U.S.C. § 1313(d)(1)(C).  The State must submit its TMDL to EPA for approval, and if

it cannot approve the TMDL, then EPA must establish one. *Id.* § 1313(d)(2). Pursuant to the Act, *see* 33 U.S.C. § 1361(a), EPA has filled in the details of Section 303's TMDL requirement through both regulation and guidance. *See* 40 C.F.R. §§ 130.2(e)-(i), 130.7; "The TMDL Process" (1991) (JA 144-205) (the "TMDL Guidance"). These standards apply to all TMDLs, whether established by the States or by EPA.

A TMDL is more than just a single number. Each water segment has a "loading capacity" that expresses the amount of a pollutant it can receive and still meet water quality standards. By regulation, a TMDL includes not only that loading capacity, but three additional components. "Wasteload allocations" are the portion of that capacity that is allocated to point sources, and "load allocations" are the portion of that capacity that is allocated to nonpoint sources (and natural background pollution). These allocations may be as specific as technical capabilities allow, ranging from "gross allotments" to "reasonably accurate estimates," even for a single source. These two elements, plus a margin of safety, constitute the TMDL. *See generally* 40 C.F.R. § 130.2(g)-(i).

Expressing the total load in this way has several purposes. "Although section 303(d)(2) of the Act does not specifically mention [allocations]," EPA acknowledged in promulgating its TMDL regulations, "it is impossible to evaluate whether a TMDL is technically sound and whether it will be able to achieve standards without

9

evaluating component [allocations] and how these loads were calculated."  "Water

Quality Planning and Management," 50 Fed. Reg. 1774, 1775 (Jan. 11, 1985).  Equally

important, TMDLs are "informational tools that allow the states to proceed from the

identification of waters requiring additional planning to the required plans."  *Pronsolino*,

291 F.3d at 1129.  Allocations are essential to this purpose, as it may be necessary for

States to control sources throughout a watershed to implement the TMDL.  By

expressing the TMDL in terms of its constituent wasteload allocations and load

allocations, it is possible to create a plan that addresses all sources together – for

example, by making the allocations for some sources less stringent in order to account

for controls on other sources.  *See* 40 C.F.R. § 130.2(i) ("the TMDL process allows for

nonpoint source control tradeoffs"); *see* TMDL Guidance at 20 (JA 167).

   As "informational tools," TMDLs do not directly impose controls or pollutant

limits.  Instead, a TMDL (with its constituent allocations) is best understood as a plan

that is implemented only through further action.  For example, NPDES permits for

point sources must incorporate any limits necessary to achieve water quality standards,

consistent with "the assumptions and requirements of any available wasteload

allocation."  40 C.F.R. § 122.44(d).  "The theory is that individual-discharge permits

will be adjusted and other measures taken [for nonpoint sources] so that the sum of

that pollutant in the waterbody is reduced to the level specified by the TMDL."

*Meiburg*, 296 F.3d at 1025.  *See generally* TMDL Guidance at 21-24 (JA 168-71)

(explaining and illustrating the process of establishing and implementing TMDLs). This process is designed to create "a mechanism for integrating the management of both the point and nonpoint pollution sources that together may contribute to a waterbody's impairment." *Id.* at 1 (JA 150).  In evaluating a TMDL, EPA seeks "assurances that nonpoint source control measures will achieve expected load reductions" sufficient to implement the overall TMDL.  TMDL Guidance at 22 (JA 169).  This helps ensure that allocations for both point and nonpoint sources are, in practice, likely to be achieved.  *See infra* pp. 25-28 (discussing "reasonable assurances").

## C.    The Chesapeake Bay Program

Since 1983 several of the Chesapeake watershed States have entered into the Chesapeake Bay Agreements, forming the Chesapeake Bay Program (or "Partnership") and establishing goals and objectives for Bay restoration efforts.  *See* 1983 Agreement (JA 135); 1987 Agreement (JA 137); 2000 Agreement (JA 249); TMDL at 1-11 (JA 1163).  The Partnership is headed by the Chesapeake Executive Council, which includes the governors of several Bay watershed States, the mayor of

11

the District of Columbia, the EPA Administrator, and the chair of the Chesapeake

Bay Commission.[4]

In 1987, Congress added Section 117 to the Act, 33 U.S.C. § 1267, ratifying the

Partnership and establishing EPA's Chesapeake Bay Program Office to support it

through grants and studies. *See* Pub. L. No. 100-4, § 103, 101 Stat. 10 (1987).

Congress acted again in the Chesapeake Bay Restoration Act of 2000, Pub. L. No.

106-457, 114 Stat. 1957 (2000), recognizing the importance of the Bay and noting that

it was "targeted for restoration as a single ecosystem." *See* H.R. Rep. No. 106-995, at

36-37 (2000). At that time, Congress directed EPA to "ensure that [State]

management plans are developed" to implement the Chesapeake Bay Agreement and

that "implementation is begun." 33 U.S.C. § 1267(g).

## II.    FACTORS LEADING TO THE DEVELOPMENT OF THE BAY TMDL

On its face, Section 303 of the Act establishes a system of water quality

standards and TMDLs for all of the Nation's diverse waters, from small streams to

vast estuaries. The States and EPA must therefore develop TMDLs within that

system that are appropriate to the context of specific problems. Several factors

---

[4]    The Chesapeake Bay Agreements are signed by Maryland, Pennsylvania, Virginia, and the District of Columbia. The other three Bay watershed states joined the Partnership's water quality efforts in 2002 and continue to have "full input status on all water quality-related matters." *See* TMDL at 1-6, 1-12 (JA 1158, 1164).

specific to the Bay shaped how the Partnership made its choices in developing the Bay TMDL.

### A.    The complex problem of impairment

The Partnership has agreed on water quality standards for the tidal Bay waters, which the respective tidal Bay States have adopted.  *See id.* at 3-4 (JA 1191).  The Partnership also agreed to divide the Bay into 92 segments.  Eighty-nine of those segments are listed on the States' Section 303(d) lists as impaired for at least some designated uses and water quality criteria due to excess nitrogen, phosphorus, or sediment.  TMDL at 2-7 to 2-15 (JA 1179-87).

Determining the cause of these impairments, including the contribution of particular sources and sectors, is a significant technical challenge.  The effect of nitrogen and phosphorus on the Bay depends in part on where those pollutants enter the watershed.  *Id.* at 6-16 to 6-17 (JA 1317-18).  Pollutants concentrate in the Bay because its surface area is small in comparison to the watershed that it drains.  *See id.* at 2-1 (JA 1173).  If a pollutant impairs the Bay, it must be addressed in the Bay TMDL, even if it does not impair water quality where it enters the watershed.  For example, Pennsylvania (through the Susquehanna River) accounts for almost half of the total nitrogen delivered to the Bay, even though Pennsylvania contains no Bay segments.  *See id.* at 4-1, 4-6 (JA 1213, 1218).  All seven States in the Bay watershed contribute to the impairment of its segments.  *See id.* at 4-1 to 4-7 (JA 1213-19).

13

Nonpoint source agriculture is the single largest source of nitrogen, phosphorus, and sediment pollution that reaches the Bay, accounting in 2009 for 44% of nitrogen and phosphorus and 65% of sediment. TMDL at 4-29 (JA 1241). Overall, more than half of the nitrogen and almost all the sediment load in the Bay comes from sources that are not currently regulated under federal law. *See* "2009 State of the Chesapeake Bay Program" at 5 (JA 1544, ESJA 18). This increases the need for coordination among the States. Other sources, such as atmospheric deposition of nitrogen and the natural influence of ocean water and erosion, are also significant. *Id.* at 4-33, 4-39 (JA 1245, 1251).

Complex modeling is often required to understand the sources of water quality impairment (both within a State and downstream) and how to reduce pollutant loads to achieve water quality standards. Particularly in the case of the Bay, this task cannot efficiently be done by each State. Section 5 of the TMDL discusses the Partnership's technical modeling. *See* JA 1257-1301. Although some aspects of that modeling were at issue in the district court, *see* Op. at 90-97 (JA 94-101), Plaintiffs do not raise those claims on appeal.

### B.    A history of federal-State cooperation

Each of the Bay States has long understood that cooperation would be essential in deciding how to achieve sufficient pollutant reductions within the watershed to restore the Bay. Both the Bay TMDL and the district court's opinion provide more

detail on the steps that EPA and the Bay States took between 1983 and 2010, including the Chesapeake Agreements, to strengthen their joint efforts. *See* TMDL at 1-3 to 1-11 (JA 1155-63); Op. at 10-16 (JA 14-20).

The Program partners took a key step in 2003, when they agreed upon "pollutant cap load allocations" to express a maximum annual amount of nitrogen, phosphorus, and sediment that was consistent with "the needs of the plants and animals that call the Chesapeake home." "Summary of Decisions" (JA 271). Significantly, the group agreed to distribute those caps among the major Bay tributary basins. *Id.* at 1-7 (JA 1159). *See generally id.*; TMDL at 1-6 to 1-7 (JA 1158-59). Using the 2003 total annual loads as a starting point, each of the Bay States then developed a Tributary Strategy to reduce its respective share of the pollutant load. TMDL at 1-7 (JA 1159). These Tributary Strategies included specific control elements, such as best management practices for nonpoint sources. Later, the Partnership agreed that in developing the TMDL, it would credit the States for their prior accomplishments in reducing pollutant loads, including the successful elements of the Tributary Strategies. *See* TMDL at 6-16 (JA 1317).

## C.    EPA's legal obligations under the Act

Plaintiffs suggest that the Bay TMDL was unnecessary because the Tributary Strategies alone would have achieved annual pollutant loads similar to the TMDL. *See* Pl. Br. 5-7. Although EPA disagrees with this assertion based on the modeling

conducted for the TMDL, *see* TMDL at 6-29 (JA 1330), it is irrelevant because those Strategies did not satisfy the legal requirements of a TMDL for each Bay segment. *See id.* at 6-5 (JA 1306).

The inclusion of most of the Bay segments on the States' Section 303(d) lists triggers the States' duty to develop TMDLs. *See* 33 U.S.C. § 1313(d)(1)(C); TMDL at 1-16 to 1-17, 2-10 to 2-15 (JA 1168-69, 1182-87). Some courts have held that where a State consistently fails to do so, that obligation can shift to EPA. *See Kingman Park Civic Ass'n v. EPA*, 84 F. Supp. 2d 1, 5 (D.D.C. 1999) (collecting cases). A series of consent decrees and settlement agreements covering Chesapeake Bay segments in Virginia, the District of Columbia, and Delaware have placed EPA under a legal obligation to establish certain TMDLs in the absence of State action, including the Bay TMDL. TMDL at 1-17, 1-20 (JA 1169, 1172); *see* Op. at 23-26 (JA 27-30). Here, the Bay watershed States decided not to submit TMDLs for EPA's approval, but instead agreed that they would jointly develop the Bay TMDL with EPA, and that EPA would establish it. TMDL at 1-9, 1-16 (JA 1161, 1168).

## III.    THE BAY TMDL

The Bay TMDL is the next step in this history. Before establishing the Bay TMDL in December 2010, EPA guided the Partnership in a comprehensive process that allowed each of the Bay States substantial control over fundamental decisions. *See* TMDL at 1-11 to 1-15 (Chesapeake Bay Program), 6-1 to 6-2 (methodology

16

overview) (JA 1163-67, 1302-03).  The process for each of these steps was highly open and transparent to the Bay States, other stakeholders, and the public.  The Partnership workgroups and committees that developed the TMDL and its allocations uniformly contained representatives of all seven Bay States and, in many cases, representatives of interested industries or source sectors (including the same sectors that Plaintiffs represent).  *See* TMDL at 1-13, A-1 to A-14 (JA 1165, 1472-85); *see also* TMDL Appendix C (listing hundreds of meetings open to these participants, and hundreds more with the public or with particular stakeholders with an interest in Bay water quality).  All decisions were submitted to and ratified by the Principals' Staff Committee, which included cabinet-level representatives from each State.  *See id.* at 1-13 (JA 1165), *see also, e.g.*, October 2010 meeting summary (JA 849-51).  Although this process required compromise, the Partnership has consistently sought consensus – that is, a decision that "all parties can live with."  Chesapeake Bay Program Governance at 12 (ESJA 12).

Two main concepts related to the TMDL are at issue in this case:  The pollutant allocations that the TMDL has established to enable the Bay to achieve its water quality standards, and the forward-looking accountability framework, including target implementation dates, that support EPA's determination of "reasonable assurance" that those allocations can achieve water quality standards.  A detailed

17

description of these elements of the TMDL is necessary here, in part to correct Plaintiffs' mischaracterizations of EPA's action.

### A.    Why the Bay TMDL includes allocations

By definition, a TMDL contains an overall load limit for each pollutant for each water segment. *See* 40 C.F.R. § 130.2(i). The Bay TMDL contains 276 such numbers: a nitrogen, phosphorus, and sediment load for each of the 92 tidal Bay water segments. *See* TMDL at 9-2 to 9-16 (JA 1401-15) (white rows indicate Bay segments; "TMDL" column indicates a total annual load for each pollutant). Plaintiffs do not challenge these loads.

Also by definition, a TMDL includes wasteload allocations for point sources and load allocations for nonpoint sources that contribute to the pollutant load for the water segment. *See* 40 C.F.R. § 130.2(g)-(h); TMDL at 9-12 (JA 1411) (white rows). Where a segment receives pollutants from more than one of the Bay States, the allocations are sub-divided by State. *See id.* (gray rows). The aggregate wasteload allocations and load allocations presented in Section 9 of the TMDL are, in turn, the sum of a more detailed allocation among 479 significant point sources and ten different point and nonpoint source categories (including, in some cases, a "reserve" allocation giving a State more flexibility). *See* JA 1596, 1766 (annual allocations subdivided by Bay segment).

18

The allocations are the key elements that make the TMDL useful as an "informational tool" for EPA and State decisionmaking. *Pronsolino*, 291 F.3d at 1129. Each State must ensure that its individual decisions, each of which may affect only a tiny fraction of the overall pollutant load from all States and sources, are consistent with water quality standards in all 92 interrelated Bay segments. Allocations simplify this task by identifying a pollutant load for each state-specific source or sector that is designed to be consistent with water quality standards in all of those segments. For example, an NPDES permit writer may ensure that a permit is consistent with the wasteload allocation calculated in the TMDL, instead of having to analyze whether the permit is consistent with a total load limit for each of the 92 Bay segments. *See id.* at 9-17 (JA 1416).

Even more importantly, the TMDL's allocations facilitate individual decisions by showing State and EPA decisionmakers the big picture. In order to determine that an NPDES permit will "ensure compliance with the applicable water quality requirements of all affected States," 40 C.F.R. § 122.4(d), a permit writer must have some rational basis to predict what pollutant controls may be implemented at *other* point and nonpoint sources that contribute to the impairment of water quality. The allocations in a TMDL provide that basis, because its "[wasteload allocations] for point sources are determined, in part, on the basis of the expected contributions to be made by nonpoint sources to the total pollutant reductions necessary to achieve

19

[water quality standards]." TMDL at 7-1 (JA 1355). The larger and more complex the watershed, the more this kind of large-scale planning is needed to inform myriad small-scale decisions.

### B.    How the Bay TMDL's allocations were developed

The Bay TMDL allocations are based on agreements that the Partnership reached over several years on key principles – for example, that the river basins contributing the most to the Bay's water quality problems should do the most to resolve those problems. *Id.* at 1-5 to 1-9, 6-16 (JA 1157-61, 1317); "Summary of Decisions" (JA 271-72). Based on those principles, EPA calculated the relative effect that the existing pollutant load from each of the major Bay tributaries makes to water quality in the Bay. TMDL at 6-17 to 6-20 (JA 1318-21). EPA then identified a target pollutant load for each of those tributaries (and their respective States) that would be sufficient to meet Bay water quality standards. *See id.* Tables 6-7 and 6-8 (JA 1351-52). EPA's model was similar to the one the Partnership had used to adopt the 2003 basin and jurisdiction allocations, but it included much more detailed data and sophisticated modeling. The resulting river basin and jurisdiction allocations were similar to the load caps that the States had previously accepted and used in their Tributary Strategy planning. *See* TMDL Tables 6-7, 6-8 (JA 1351-52); "Summary of Decisions" Tables 1-2 (JA 276-77).

20

Next, each of the seven Bay States developed a Phase I "Watershed Implementation Plan," or "WIP," to divide their target loads among significant point sources, other groups of point sources, and nonpoint source sectors such as agriculture. *See id.* at 8-1 (JA 1367). These WIPs also addressed implementation, including "a description of authorities, actions, and, to the extent possible, control measures that will be implemented to achieve these point source and nonpoint source target loads and TMDL allocations." EPA Expectations Letter (Nov. 4, 2009) at 4 (ESJA 45); *see also* TMDL at 7-2 (JA 1356). The States solicited their own public input on the Phase I WIPs, including proposed allocations and possible pollutant controls. *See, e.g.*, District WIP at 3 (JA 964); Pennsylvania WIP at 19-21 (JA 1001-03); Virginia public meeting presentations (JA 632-97). The variety in the WIPs demonstrates that each State had flexibility to focus on particular sectors, strategies, and controls that it deemed most effective. *See, e.g.*, Maryland WIP at ES-3 (JA 1081) (describing nutrient management plans and septic system initiatives); Pennsylvania WIP at 5 (JA 988) (describing new technologies and a nutrient trading program). EPA commented on the States' draft WIPs, working with each State to resolve potential problems.

If EPA found that a State's WIP provided a "reasonable assurance" that its proposed allocations would be adequate to achieve water quality standards in the Bay and that it had the ability to achieve those allocations, EPA adopted them in the Bay

21

TMDL. *See infra* pp. 25-28 (explaining "reasonable assurance" in this context). Based on this process, the final Bay TMDL allocations for Delaware, Maryland, Virginia and the District of Columbia were based entirely on the choices that those States had made in their WIPs. *Id.* at 8-2 (JA 1368). New York, Pennsylvania, and West Virginia each submitted a WIP that either exceeded the target allocation or did not provide "reasonable assurance" that the target allocation would be met. *Id.* As a result, the EPA partially departed from these States' proposals in establishing the final TMDL allocations – for example, by re-categorizing some load allocations as wasteload allocations. *Id.* at 7-8, 8-26 (JA 1362, 1392).

### C.      How the States will implement the TMDL

The establishment of the TMDL is only one step in a larger planning process. The States themselves are deciding how to implement the pollutant load reductions necessary to improve water quality. Although the Bay TMDL's allocations are essential information to have for this process, they do not bind the States or sources. They do not establish enforceable "pollutant limits" for sources and sectors, *see* Pl. Br. at 2, 9; they do not "dictate" land use requirements or "control" state and local economic development planning, *id.* at 12; they do not "establish [a] plan for implementation," *id.* at 19; and they do not "set control measures" for nonpoint sources, *id.* at 20. Through these characterizations, Plaintiffs' Statement of Facts wrongly equates the detailed planning undertaken for the TMDL with federal control

22

of land use.  Allocations, which describe *how much* pollutant a particular segment can bear from a source or group of sources, are not control measures, which prescribe *how* those sources must achieve that load.  The States' Phase I WIPs showed that their proposed allocations were realistic by identifying control measures that were consistent with state law and existing land uses, but the Bay TMDL includes only the allocations.  It does not (and cannot) require the particular measures that the States proposed to meet those allocations.

The TMDL describes expansive allocation categories, such as "agriculture" and "forestry," but choices within those categories are left to the States.  The Bay States may also write NPDES permit limits that do not directly incorporate the Bay TMDL's wasteload allocations for specific point sources.  EPA's regulations require only that permits be "consistent with the assumptions and requirements" of the wasteload allocation.  40 C.F.R. § 122.44(d)(1)(vii)(B); TMDL at 10-4 (JA 1437); *see* Op. at 64-69 (JA 68-73).

Moreover, a State may redistribute allocations where it can show that its overall pollution control choices will accomplish the same goal.  *See* TMDL Guidance at 16 (JA 164) (indicating that after allocations are established, "[v]arious pollution allocation schemes . . . can be employed by States to optimize alternative point and non-point source management strategies"); Guidelines at 3-4 (JA 266-67) (allowing States to redistribute WLAs during the NPDES permit process as long as "the total

23

WLA in the TMDL will be achieved").  This is true even where EPA established a

"backstop" allocation that differed from a State's proposed Phase I WIP allocations.

For example, although West Virginia's *amicus* brief claims that the Bay TMDL

"coerce[s] States to regulate according to EPA's instructions," States Br. at 4, West

Virginia understood at the time of the TMDL that it "will be initially afforded an

opportunity to implement the TMDL as we prescribed in the [Phase I] WIP."  E-mail

of Dec. 14, 2010 (ESJA 49).  West Virginia specifically identified its Phase II WIP as

an opportunity to transfer part of an allocation from the Potomac River watershed to

the James River watershed.  *Id.*

In the Bay TMDL, EPA expressly noted that "[i]t may be possible to

accommodate some . . . changes within the existing TMDL framework without the

need to revise it in whole, or in part."  TMDL at 10-4 (JA 1437).  It is true that formal

revisions to the Bay TMDL, like revisions to any TMDL, require EPA's approval.  *See*

Pl. Br. at 10; 33 U.S.C. § 1313(d)(2).  But EPA acknowledged that the Bay watershed

is a "dynamic environment," and outlined when a State might adjust allocations within

the existing TMDL and when it should propose a TMDL revision instead.  TMDL at

10-4 to 10-5 (JA 1437-38).  Each State has the opportunity in its Phase II WIP to

"further divide nonpoint source load allocations and any aggregate point source

wasteload allocations . . . among smaller geographic areas, or facilities or sources."

Expectations Letter at 4 (ESJA 45).[5]

### D.   The role of "reasonable assurance"

A TMDL must be set "at a level necessary to implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). Since at least 1991, EPA has applied this statutory requirement, in part, using the concept of "reasonable assurance." *See* TMDL Guidance at 15 (JA 163); Guidelines at 4 (JA 267); Response to Comments at 1237 (ESJA 62). In order to establish or approve a TMDL, EPA "determines whether there is reasonable assurance that the load allocations will be achieved and water quality standards will be attained." TMDL at 7-1 (JA 1355). This "reasonable assurance" is necessary because TMDL wasteload allocations and NPDES permit limits for point sources require assumptions about load reductions from nonpoint sources. Without a "reasonable assurance" that nonpoint load allocations "will be achieved," the TMDL or permit writer would have to plan for more stringent reductions from point sources. *See* TMDL at 7-1 to 7-2 (JA 1355-56); *see also* 40 C.F.R. § 130.2(i) ("If . . . nonpoint source pollution controls make more stringent load allocations practicable, then wasteload allocations can be made less stringent.").

---

[5]   Although the administrative record here indicates only how EPA expected the Phase II WIP process to work at the time of the TMDL, EPA has since concluded that each State's Phase II WIPs is consistent with the TMDL and with the Partnership's implementation goals. *See* http://www.epa.gov/reg3wapd/tmdl/ ChesapeakeBay/EnsuringResults.html?tab2=1&tab1=2 (accessed April 2, 2014).

In its TMDL document, EPA determined that the Bay TMDL is supported by appropriate "reasonable assurance" for two key reasons. *See generally* TMDL Section 7 (JA 1355). First, it asked the States to provide "reasonable assurance" that the proposed allocations in their Phase I WIPs would actually meet the target river basin and jurisdictional allocations for each pollutant. *Id.* at 8-3 (JA 1369). Contrary to Plaintiffs' assertion, EPA did not "approve, disapprove, or prescribe" the content of the WIPs. Pl. Br. at 37; Response to Comments at 269, 274 (JA 1604, 1609). Instead, the WIPs were "a mechanism for the States . . . to provide information for EPA to consider" in establishing the TMDL's allocations. Expectations Letter at 3 (ESJA 44). EPA used the existing "reasonable assurance" concept to explain how it would decide whether the States' proposed allocations would be appropriate for the final TMDL. *See* TMDL at 7-8 (JA 1362). If the State's final WIP provided the necessary "reasonable assurance" that its proposed allocations were adequate and could realistically be implemented, then EPA simply used those allocations, and the WIP itself formed part of the administrative record to support EPA's own "reasonable assurance" determination. *Id.* at 8-4 (JA 1370). If not, EPA established the allocations that it considered necessary for a valid TMDL, and supported its choice with other appropriate "reasonable assurance." *See* TMDL at 7-8 (JA 1362).

Second, EPA supported its determination of "reasonable assurance" by describing its commitment to monitor the States' progress in attaining the pollutant

reductions identified in the TMDL. *Id.* at 7-10 to 7-11 (JA 1364-65). The target dates of 2017 and 2025, mutually agreed by the Partnership, have been and will continue to be part of that monitoring program. *See id.* at 1-9, 7-2, 7-5 to 7-9 (JA 1161, 1356, 1359-63).[6] If this process shows that the Bay TMDL may not be sufficient to achieve water quality standards – due to a failure of State implementation or for any other reason – EPA may consider how it can accomplish that goal using its other authorities under the Act. *Id.* at 7-2, 7-10 to 7-12 (JA 1356, 1364-66). For example, it could "expand[] EPA oversight review of draft permits," "[r]equire additional reductions of loadings from point sources," or "[c]ondition or redirect federal grants." TMDL at 7-12 (JA 1366).

The foregoing discussion makes clear that, in their Statement of Facts, Plaintiffs incorrectly characterize the role of "reasonable assurance" in the TMDL. Plaintiffs state that "EPA required that States provide 'reasonable assurance'" that their Phase I WIP allocations "will be achieved," and set "deadlines" for the States to do so "backed by specific threats of future EPA action." Pl. Br. at 11; *see also id.* at 36-37. This characterization erroneously combines two distinct concepts. First, EPA itself determined that there is "reasonable assurance" that the TMDL's allocations

---

[6]    EPA also committed to take into account whether the States are meeting their own proposed "2-year milestones" for implementation progress. *See* TMDL at 7-5 (JA 1359). Plaintiffs do not challenge the 2-year milestones here, but only the target dates of 2017 and 2025. *See* Pl. Br. at 11.

"will be achieved."  It did so based in part upon the States' assurances in their Phase I

WIPs, but it did not "require" such assurances; it only used them to evaluate the

States' own proposals.  Second, and separately, EPA supported its "reasonable

assurance" determination with a plan to monitor States' implementation progress

using the Partnership's target dates.  If necessary, that monitoring may lead EPA to

take further actions under the Act, but the TMDL itself does not require or authorize

those actions, is not a permit or regulation, and does not contain any automatic

triggers.  Rather, EPA's statutory discretion to take certain actions in the future was

one basis for its conclusion, at the time it established the TMDL, of "reasonable

assurance" that the TMDL would meet the requirements of the Act.

## IV.    DISTRICT COURT PROCEEDINGS

Plaintiffs challenged the Bay TMDL in district court, raising a host of issues.

In a thorough, detailed opinion, the district court granted summary judgment for

EPA.  *See* Op. at 1 (JA 5).

The district court rejected Plaintiffs' argument that EPA is without authority to

establish detailed allocations, holding that "the statutory provisions at issue are

precisely the type that Congress intended to leave to EPA for interpretation."  Op. at

47 (JA 51); *see generally id.* at 43-60 (JA 47-64).  Moreover, EPA's decision to allocate

TMDLs between wasteload allocations and load allocations is "entirely reasonable,

and consistent with the Congress's goals."  *Id.* at 52 (JA 56).  The court also

28

recognized the necessary role of the allocations in centrally coordinating the "states, permit writers, and other groups" that affect Bay water quality. *Id.* at 55 (JA 59). Finally, it found that EPA's role was consistent with the principle of cooperative federalism in the Act, particularly because "most of the individual allocations were provided by the state, not EPA." *Id.* at 59-60 (JA 63-64).

The district court also rejected Plaintiffs' challenge to the "reasonable assurance" aspects of the TMDL, *see id.* at 61-64 (JA 65-68), which are "an attempt by EPA to clarify the basis on which the proposed allocations are judged." *Id.* at 62 (JA 66). Similarly, the court upheld EPA's decision to adopt the Partnership's target dates for TMDL implementation. *Id.* at 69 (JA 73).

Ultimately, the district court correctly held that "the framework established by the Bay Partnership in developing the Bay TMDL is consistent with the provisions of the CWA and APA," and that EPA's role was "critical to coordinating the Bay Jurisdictions' effort." *Id.* at 98 (JA 102).

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*, applying the standard of review for agency action. *See Delaware Dep't of Natural Res. v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 269 (3d Cir. 2012). Because Plaintiffs' challenge is based on an issue of statutory construction, that standard of review is established by *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984). *See* Pl. Br at 28.

29

## SUMMARY OF ARGUMENT

Plaintiffs make two principal arguments against the Bay TMDL's allocations, EPA's "reasonable assurance" determination, and the target implementation dates. They claim that "Section 303(d) plainly does not authorize them, and the 'relevant statutory context' confirms that EPA has overreached." Pl. Br. at 30. These arguments are incorrect.

Under *Chevron*, the Court asks whether Congress itself decided "the precise question at issue," or whether it explicitly or implicitly delegated that question to the agency. 467 U.S. at 843. The plain language of the Act, and its structure and context, show that Congress gave EPA broad authority to interpret and effectuate the CWA, including Section 303. Given that broad authority, the question for this Court is whether the Act also unambiguously demonstrates Congress's intent to prohibit the aspects of the TMDL that Plaintiffs dispute.

Plaintiffs cannot show that this is the case. The Act requires a "total maximum daily load" for the Bay, but instead of defining TMDLs or establishing criteria for EPA to evaluate them, the Act leaves that task to EPA. In its longstanding regulations, EPA has interpreted a "total maximum daily load" to include allocations, which are necessary to evaluate whether the TMDL can "implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). As a matter of agency guidance

and practice, it has also supported those decisions with an administrative record that includes "reasonable assurance" determinations.

The Act's structure of cooperative federalism allows these practices. Although the Act gives EPA more authority over point sources than nonpoint sources, a TMDL must account for both. Here, rather than unilaterally imposing a TMDL on the Bay States, EPA coordinated their own ongoing efforts to solve the serious, multi-jurisdictional pollution problem in the Chesapeake Bay watershed. This is the process that Congress intended, and the Bay TMDL represents a permissible use of the tools that Congress gave EPA for that purpose.

## ARGUMENT

### I.    UNDER *CHEVRON*, THE COURT MUST ALLOW EPA TO FILL THE GAPS THAT CONGRESS LEFT IN THE ACT.

Plaintiffs' claim is that certain aspects of the Bay TMDL are outside the scope of EPA's authority under the Clean Water Act. The parties agree that this is a question of statutory interpretation that the Court should consider under the two-step *Chevron* standard.

The first question – "*Chevron* step one" – is whether "the intent of Congress is clear" on "the precise question at issue," *Chevron*, 467 U.S. at 842-43, or whether Congress instead left an ambiguity in the statute. Where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to

31

elucidate a specific provision of the statute by regulation." *Id.* at 843-44.  This

delegation may also be implicit, based on "the agency's generally conferred authority

to resolve a particular statutory ambiguity." *United States v. Mead Corp.*, 533 U.S. 218,

229 (2001).  The question at *Chevron* step one, therefore, is not how the enacting

Congress *would have* resolved an issue, but whether the enacting Congress *actually did*

resolve that issue, thus foreclosing the agency's authority.

The Court may employ "traditional tools of statutory construction" to decide

whether "Congress had an intention on the precise question at issue." *Chevron*, 467

U.S. at 844 n.9.  This does *not*, however, include a consideration of legislative history.

*See United States. v. Geiser*, 527 F.3d 288, 294 (3d Cir. 2008) ("legislative history should

not be considered at *Chevron* step one").  Instead, the Court applies the rules of

statutory construction to "the plain and literal language of the statute." *Id.* (quoting

*Zuni Pub. School Dist. v. Dep't of Educ.*, 550 U.S. 81, 93 (2007)).

Additionally, at *Chevron* step one, the court must narrowly identify the "precise

question at issue," particularly where the agency has acted pursuant to a general

authority to implement a statute through regulation.  For example, in *Chevron* itself,

the Court recognized EPA's broad authority to implement the Clean Air Act, and

found that Congress had no "specific intention on the applicability of the bubble

concept" to stationary sources.  467 U.S. at 845, 862.  *See also Babbitt v. Sweet Home

Chapter of Communities for Greater Oregon*, 515 U.S. 687, 697 (1995) (whether the word

"harm" in the Endangered Species Act requires "direct application of force");
*Louisiana Forestry Ass'n v. Sec'y of Labor*, 2014 WL 444157, *12 (3d Cir. 2014) (whether
the statute addresses the "precise question" of what constitutes "consultation"); *United States v. Pozsgai*, 999 F.2d 719, 728 (3d Cir. 1993) (whether the term "water" may
include "wetlands").  As a threshold matter, the Court must determine whether EPA
actually has done what Plaintiffs claim is contrary to the Act.  *See Louisiana Forestry*,
2014 WL 444157, at *13; *see supra* pp. 22-23, 27-28 (describing why the TMDL does
not have the effect Plaintiffs claim).

If Congress has declined to balance conflicting policies itself, and has instead
delegated that task to the agency, the court proceeds to "*Chevron* step two."  Agency
action reviewed at *Chevron* step two is "binding in the courts unless procedurally
defective, arbitrary or capricious in substance, or manifestly contrary to the statute."
*Mead*, 533 U.S. at 227 (quoting *Chevron*, 467 U.S. at 844); *see also City of Arlington v. FCC*, 133 S.Ct. 1868 (2013).[7]  The Court is not a forum to wage "a specific policy
battle which was ultimately lost in the agency."  *Pozsgai*, 999 F.2d at 730 (quoting
*Chevron*, 467 U.S. at 864).  Instead, the agency has broad authority to interpret the
statute to achieve the goals that Congress established.  Review under *Chevron* step two

---

[7]    The district court rejected Plaintiffs' claims that the Bay TMDL is procedurally
defective and arbitrary and capricious, *see* Op. at 76-97 (JA 80-101).  Plaintiffs have
dropped those claims for this appeal, which presents only the question whether the
TMDL is "manifestly contrary to the statute."

is particularly deferential where Congress has entrusted to the agency the administration of a complex or technical statute. *See, e.g.*, *Babbitt*, 515 U.S. at 703-04. The Clean Water Act is just such a statute. *See, e.g., Delaware*, 685 F.3d at 283-84; *Pozsgai*, 999 F.2d at 729.

The Bay TMDL should be upheld at *Chevron* step two as a reasonable exercise of EPA's authority because Congress did not decide the "precise question at issue" here. The Act imposes some minimum requirements for a TMDL, *see infra* p. 39; but the details of a TMDL's form and contents were left for EPA to elaborate. Plaintiffs generally do not dispute that EPA must interpret Section 303; they claim only that specific aspects of the TMDL are outside EPA's authority.

In similar circumstances involving broad delegations of authority, courts have framed the *Chevron* step one question as whether Congress unambiguously "sought to foreclose" the agency's statutory interpretation. *Zuni*, 550 U.S. at 94. In *Zuni Public School District*, for example, the Supreme Court first considered whether the agency's interpretation was reasonable in light of the statute's "background and basic purposes," and then considered the effect of the "plain language of the statute." *Id.* at 89, 94. *See also Chemical Mfr's Ass'n v. NRDC*, 470 U.S. 116, 129 (1985) (finding no "congressional intent to forbid" EPA's interpretation of the CWA); *Babbitt*, 515 U.S. at 696-98, 703 (considering the reasonableness of the agency's interpretation, then holding that "Congress did not unambiguously manifest its intent to adopt

34

respondents' view"); *Pozsgai*, 999 F.3d at 730 (holding that the plain language of the CWA "pose[s] no statutory obstacle to the [agency] regulation").  As the argument below will show, this case has the same structure:  Congress broadly delegated authority to EPA, and it did not foreclose the particular way that EPA exercised that authority.

## II.    THE ACT GRANTS EPA BROAD AUTHORITY TO ESTABLISH THE BAY TMDL.

Although it establishes a system of cooperative federalism, the Act "fail[s] to create clear boundaries for the authority of the states and the EPA." *American Iron & Steel Inst. v. EPA* 526 F.2d 1027, 1074 (3d Cir. 1975) (Adams, J., concurring).  Prior to *Chevron*, this ambiguity required a reviewing court "to infer legislative intent from the disparate provisions of this complex legislation." *Id.*  Under *Chevron*, however, EPA must interpret the ambiguous state-federal boundary in the first instance, and the Court should override that interpretation only if "Congress has chosen to define precisely the statutory meaning and has left no implicit or explicit gap for the agency to fill." *Pozsgai*, 999 F.2d at 728.  Describing this rule, the Supreme Court has observed that "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington*, 133 S.Ct. at 1868.  "Capacious" aptly describes the discretion that Congress granted to EPA in the Act.

35

Plaintiffs contend that under the Clean Water Act, EPA may not take any action unless Congress "expressly provide[s]" for that action, and focus on the "absence of any textual authority" for the disputed aspects of the Bay TMDL.  Pl. Br. at 35.  The Act, however, says the opposite:  "Except as expressly provided" in the Act, the Administrator of EPA "shall administer this chapter."  33 U.S.C. § 1251(d). To accomplish this directive, Congress gave EPA the authority "to prescribe such regulations as are necessary to carry out [its] functions under this chapter."  *Id.* § 1361(a).

Section 303 creates "functions" that are encompassed within this grant of authority.  That section provides that EPA must review State water quality standards for approval, but it does not establish any approval criteria other than consistency with the applicable requirements of the Act.  *Id.* § 1313(c)(3).  The same is true for EPA's review and approval of State TMDLs; Congress essentially required only that they "implement the applicable water quality standards with seasonal variations and a margin of safety."  *Id.* § 1313(d)(1)(C).  Although Congress defined many of the Act's terms, *id.* § 1362, it did not define "water quality standard," "total maximum daily load," "margin of safety," or any of the other key terms in Section 303.  Implicitly through the silence and ambiguity of Section 303, and explicitly in 33 U.S.C. § 1361(a), Congress clearly intended that EPA interpret these requirements.

EPA has relied on that authority to promulgate regulations implementing

Section 303. *See* 50 Fed. Reg. at 1779. EPA's Clean Water Act regulations have

consistently been accorded deference under *Chevron* step two as an exercise of EPA's

delegated authority under the Act. *See, e.g.*, *Arkansas*, 503 U.S. at 107 (deferring to

EPA's "substantial statutory discretion" to enforce water quality standards through

the NPDES program); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 134

(1985) (deferring to EPA's definition of "waters"); *Pozsgai*, 999 F.2d at 729-30 (same);

*Pronsolino*, 291 F.3d at 1134 ("Congress entrusted to the EPA the responsibility of

approving or disapproving § 303(d)(1) lists, bestowing upon it the discretion that

comes with such responsibility"); *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517,

1527-28 (9th Cir. 1995) (recognizing EPA's "broad authority to develop long-range,

area-wide programs to alleviate and eliminate existing pollution").

Finally, Congress again spoke "in capacious terms" in Section 117 of the Act,

*see supra* pp. 11-12, envisioning a particularly active role for EPA in coordinating State

and federal efforts to protect the Bay. Section 117 directs EPA "to ensure that

management plans are developed and implementation is begun by signatories to the

Chesapeake Bay agreement." 33 U.S.C. § 1267(g)(1). EPA interprets the phrase

"management plans," which is not defined in the Act, to include the WIPs that the

States will use to implement the TMDL. *See* Expectations Letter at 2 (ESJA 43). *See*

*also infra* p. 55 (legislative history of Section 117).

37

Plaintiffs claim that Section 117 should be interpreted as *limiting* EPA's discretion due to its lack of "express authorization" to include certain elements within a TMDL. *See* Pl. Br. at 46. In *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 223 (2009), the Supreme Court did note that "sometimes" a statutory omission is significant. But in *Entergy* itself, the Court interpreted the lack of an express authorization to consider cost-benefit analysis in a section of the CWA as "nothing more than a refusal to tie the agency's hands." *Id.* at 222. The same interpretation of the CWA should apply here, where EPA is carrying out Congress's directive to administer a complex regulatory structure. *See* 33 U.S.C. § 1251(d).

Based on these provisions, EPA had broad authority to establish the Bay TMDL in the manner that it considered necessary to "achieve and maintain" the applicable water quality standards. 33 U.S.C. § 1267(g)(1). This is the context for the two "precise questions at issue" in this case: First, did Congress unambiguously prohibit EPA from establishing a Bay TMDL that included allocations, based in part on the States' own "reasonable assurance" that they could implement those allocations? And second, did Congress unambiguously prohibit EPA from making its own "reasonable assurance" determination based, in part, on a commitment to monitor the States' implementation program and target dates and take further action if necessary?

**III.    THE PLAIN LANGUAGE OF THE ACT DOES NOT PROHIBIT EPA FROM INCLUDING ALLOCATIONS IN A TMDL.**

Plaintiffs' principal "plain language" argument pertains only to the issue of allocations. They claim that, by authorizing EPA to establish a "total load" set at a "level" necessary to implement water quality standards, Congress authorized EPA to specify one number and nothing else. *See* Pl. Br. at 35-36.

The term "total maximum daily load" is not defined in the Act, and it is not a common term with a self-evident meaning. The language of the Act does foreclose some potential ways that EPA might interpret the phrase "total maximum daily load" – for example, the D.C. Circuit has held that EPA must express a TMDL as a daily value and not only as a seasonal or annual value. *Friends of the Earth v. EPA*, 446 F.3d 140, 144 (D.C. Cir. 2006). But the Act also makes clear that a "total maximum daily load" should be defined in relation to water quality standards, *see* 33 U.S.C. § 1313(d)(1)(C), which may be expressed as seasonal uses or criteria. Thus, while EPA *must* include daily values in the TMDL, it *may* also include seasonal and annual values in a TMDL, because those values are a useful step in showing that the TMDL fulfills its purpose. *See* TMDL at 6-5, Appendix Q (JA 1306, 1596, 1766). The Act does not expressly require this, but it also does not prohibit it. Similarly, a TMDL *must* include a "total" load of each pollutant for each Bay segment, but nothing in the Act prohibits EPA from requiring additional detail in the TMDL to show how, in its

implementation, the total load can reasonably be expected to "implement the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C).[8]

The Act is similarly ambiguous about the criteria that EPA should apply to determine whether a particular TMDL will implement the applicable water quality standards. Plaintiffs claim that EPA violated the plain language of Section 303(d) when it requested "reasonable assurance" to support the allocations that the States proposed in their Phase I WIPs, because "nothing in Section 303(d) authorizes EPA to . . . judge [the] likelihood of success" of a State's proposed implementation. Pl. Br. at 37. This is incorrect: Section 303(d) explicitly provides that EPA cannot approve a TMDL unless it is "established at a level necessary to *implement* the applicable water quality standards." 33 U.S.C. § 1313(d)(1)(C). EPA has concluded that wasteload allocations and load allocations are essential to this task of evaluation. *See supra* pp. 9-11. Furthermore, by explicitly giving EPA the authority to establish a TMDL in some circumstances, the Act implicitly allows EPA to gather and rely upon the information necessary to do so. Nothing in the plain language of Section 303 prohibits EPA from requesting information from the States (including "reasonable assurance") about how

---

[8]    In the context of other statutes, Courts of Appeals have held that the word "total" in a statute or regulation is an ambiguous term that requires interpretation. *See SNR Roulements, Inc. v. United States*, 402 F.3d 1358, 1361-62 (Fed. Cir. 2005); *U.S. Steel Group v. United States*, 225 F.3d 1284, 1288-89 (Fed. Cir. 2000); *American Train Dispatchers Ass'n v. ICC*, 54 F.3d 842, 848-49 (D.C. Cir. 1995).

they might implement particular TMDL requirements, so that EPA may develop an administrative record to support its own allocations. This is not an unlawful expansion of EPA's authority, *see* Pl. Br. at 31, but rather how EPA has determined that it should administer the Act's broad mandates.

Section 303(d)(3), which addresses State development of "information[al]" TMDLs for waters that are already meeting water quality standards, does not undermine this reasoning. *See* Pl. Br. at 38 (citing 33 U.S.C. § 1313(d)(3)). That provision anticipates that TMDLs may help permitting authorities evaluate, for example, new sources or changing water quality conditions. This is fully consistent with the concept that TMDLs should include allocations, which may be just as useful in a TMDL established under Section 303(d)(3) as in one for impaired waters under Section 303(d)(2). Ultimately, however, both subsections are silent on this issue.

Plaintiffs also suggest that TMDL allocations are unnecessary because, even if the lack of allocations may lead permit writers to set permit limits in the aggregate that would exceed a single, total load number, EPA could always object to those permits. Pl. Br. at 55 & n.20. But EPA's authority to object to permits does not imply that it has no authority to act in any other way. In *E.I. DuPont de Nemours & Co. v. Train*, 430 U.S. 112, 127-28, 133 (1977), the Supreme Court held that the Act implicitly gave EPA authority to establish effluent limitations for point sources by regulation, rather than exclusively through its action on thousands of individual permits. The Court

41

held that the permit-by-permit method would be impracticable, and that Congress would not "have failed so conspicuously to provide EPA with the authority needed to achieve the statutory goals." 430 U.S. at 132-33. The same is true here, given the thousands of sources of nitrogen, phosphorus, and sediment in the Bay watershed.

Finally, Plaintiffs argue not only that the Bay TMDL's allocations are unlawful, but that EPA's 1985 regulations, which define a TMDL to include load allocations and wasteload allocations, are contrary to the Act. *Id.* at 55-56; *see also* States Br. at 8-13. Pursuant to those regulations, EPA has approved approximately 61,000 State-established TMDLs across the country, and has itself established approximately 7,000 more. About 30,000 of those TMDLs contain both wasteload allocations and load allocations. Plaintiffs do not (and cannot, after almost thirty years) directly challenge EPA's regulations. However, if this Court were to hold that the Bay TMDL is inconsistent with the Act because it included allocations, that holding would call into question the validity of many existing TMDLs, with serious consequences for the regulatory administration of Section 303. The *Chevron* standard demands a clear statement of Congressional intent before the Court may take this step – and the Act contains no such statement.

**IV.    THE BAY TMDL IS CONSISTENT WITH THE ACT'S STRUCTURE OF COOPERATIVE FEDERALISM.**

The structure and context of a statute can also reveal that Congress considered the "precise question at issue" for purposes of *Chevron* step one review.  Here, the Act's scheme of cooperative federalism is a structural feature relevant to its interpretation.  But that structure does not demonstrate that Congress intended to prohibit the disputed features of the Bay TMDL.  The principal structural feature of the Act is not "state primacy," *see* Pl. Br. at 46, but the joint federal-State system to "restore and maintain" water quality in the United States.  33 U.S.C. § 1251(a).

**A.    EPA's role as a backstop for State authority**

Throughout the Act, Congress delegated responsibility to the States, but gave EPA the explicit authority to ensure that the States are meeting that responsibility. *See, e.g.*, 33 U.S.C. § 1319(a) (giving States the first opportunity to enforce permit conditions, and giving EPA that authority if the State "has not commenced appropriate enforcement action" within 30 days); *id.* § 1342(b)-(d) (EPA's authority to object to State permits or even withdraw approval of a State's permit program); *id.* § 1344(h)-(j) (same); *id.* § 1370 (giving States the right to set and enforce pollutant limits only if those limits are no less stringent than limits set under the CWA); *see also id.* § 1251(d).

43

Section 303, with its "carrot-and-stick to attaining acceptable water quality,"
contains multiple layers of this dual regulatory system. *Pronsolino*, 291 F.3d at 1127.
States may set their own water quality standards, but if those standards will not meet
the requirements of the Act, then EPA steps in. *Id.* § 1313(a), (c). States must then
identify impaired waters and establish adequate TMDLs, covering both point and
nonpoint sources, and if they do not, then EPA has that authority. *Id.* § 1313(d).
Thus, it is only partially true that "how and when to achieve water quality goals . . . is
for the states to decide." Pl Br. 55. States have an *opportunity* to decide those issues in
the first instance. The "carrot" is that EPA must approve the States' lawful choices –
and even help pay for them. But if the States do not meet their obligations, then
Congress gave EPA the stick.[9]

EPA recognizes the States' hard work and collaboration through the
Chesapeake Bay Program Partnership, but they did not establish a TMDL. Instead,
through the States' own choices, that duty fell on EPA. It does not raise a federalism
concern for EPA to require a State to include allocations in its TMDLs, and if a State
does not establish a valid TMDL, then EPA must fulfill that same requirement in its

---

[9]     Plaintiffs also cite *Mississippi Comm'n on Nat. Res. v. Costle*, 625 F.2d 1269, 1272
(5th Cir. 1980), for the proposition that "Congress gave the States primary authority
to set water quality standards." Pl. Br. at 22. That quote describes federal law prior to
1972, when Congress enacted Section 303 to increase federal authority over water
quality standards. *See* 625 F.2d at 1272; *see infra* pp. 53-54.

place. This symmetry is evident in the language of the Act, which provides in Section 303(d)(2) that EPA shall establish "such loads" as the States would otherwise have established under Section 303(d)(1)(c). *See* 33 U.S.C. § 1313(d)(1)(C), (d)(2). It also reflects the overall structural pattern of State and federal responsibility that the Act establishes. Indeed, if federalism placed limits on EPA-established TMDLs that were not relevant to State-established TMDLs, the Act would create a perverse incentive for States to ignore their Section 303 duties. There is no reason to believe that Congress intended that result.

EPA's authority to establish allocations in the Bay TMDL also fits comfortably within the framework of cooperative federalism because the Bay States *actually did* develop most of those allocations through their Phase I WIPs. Plaintiffs claim that only the States can decide "to impose th[e] burdens" of regulation. Pl. Br. at 29. In this case, the States did so. They agreed what the total pollutant loads should be, by major river basin and jurisdiction, and told EPA how they proposed to adjust their own policies and allocate loads to achieve those caps. As Plaintiffs admit, "EPA took the allocations from the state plans and established them as part of the Bay TMDL." Pl. Br. at 10. This process did not "strip state and local governments of core powers over the character of their communities." Pl. Br. at 35. Like the TMDL that the Ninth Circuit upheld in *Pronsolino*, the Bay TMDL itself "does not specify the load of pollutants that may be received from particular parcels of land or describe what

45

measures the state should take to implement the TMDL." 291 F.3d at 1140. The Bay

States have since had the opportunity to refine the TMDL's allocations further

through their Phase II WIPs, with local government input, and to choose the control

measures that are necessary to implement them. *See generally supra* pp. 22-25.

In order to attack the Bay TMDL's allocations, Plaintiffs argue that a TMDL

may not include "implementation plans." Pl. Br. at 19 (citing *Meiburg*, 296 F.3d at

1030 n.10). But the Eleventh Circuit in *Meiburg* reached that conclusion by noting

that "implementation plans" are not part of the regulatory definition of a TMDL. *See*

296 F.3d at 1030 n.9 (quoting 40 C.F.R. § 130.2(i)). Allocations, in contrast, are part

of that definition, which applies regardless of whether a State or EPA establishes the

TMDL.

## B.    States' authority to regulate nonpoint sources

Because Section 303 unequivocally establishes EPA as the States' backstop in

the TMDL process, Plaintiffs rely primarily on other aspects of the Act to show that

the Act's federalism balance tilts more sharply to the States. *See* Pl. Br. at 39-40.

None of these provisions shows that Congress considered the precise issues of

whether EPA could establish allocations in a TMDL or make a "reasonable

assurance" determination.

First, Plaintiffs rely on the Act's general provisions recognizing State authority

over State waters. *See id.* (citing 33 U.S.C. §§ 1251(b), 1370). The relevance of these

provisions is limited. For example, 33 U.S.C. § 1370 recognizes each State's "right or jurisdiction" over its waters "except as expressly provided" in the Act, but the Act expressly provides for EPA generally to promulgate regulations, and specifically to establish TMDLs. *See id.* §§ 1361(a), 1313(d)(2); *see also Arkansas*, 503 U.S. at 106-07.[10] The broad statement of policy in 33 U.S.C. § 1251 is also not instructive on the precise question at issue here: Although it recognizes the "primary *responsibility* and right of States" to reduce pollutants and plan development (emphasis added), it also gives EPA the authority to "administer this chapter," providing that the States may "consult with the Administrator in the exercise of his authority." *Id.* § 1251(b), (d).

Second, Plaintiffs rely on the Act's provisions that give States the primary authority over nonpoint source pollution, omitting the kind of direct federal authority that exists for point source NPDES permits. *See* Pl. Br. at 40 (citing 33 U.S.C. §§ 1288, 1313(e), 1329). The grant program in 33 U.S.C. § 1288 is irrelevant here, as it is part of the program for wastewater treatment in subchapter II of the Act. *See* 33 U.S.C. §§ 1281, 1288. EPA's authority to define and establish TMDLs, in contrast, is part of the program for achievement of water quality goals in subchapter III, which strikes a different balance between EPA and the States. *See supra* pp. 43-45.

---

[10]    Legislative history of 33 U.S.C. § 1370, relevant at *Chevron* step two, shows that Congress's intent was to preserve "rights to *quantities* of water that have been established by any State." H.R. Rep. No. 95-830, at 52 (1977) (emphasis added); *see also* 40 C.F.R. § 131.4(a).

In the subchapter III provisions concerning nonpoint sources, the Act does provide a role for EPA in State planning.  Under Section 303(e), States must have a "continuing planning process" that demonstrates that their point and nonpoint control strategies will implement water quality standards and TMDLs.  33 U.S.C. § 1313(e).  EPA must directly approve or disapprove each State's continuing planning processes, and the consequences of disapproval may include loss of State control over permitting programs, *id.* §§ 1313(e)(2), 1342(c)(3).  Similarly, States must submit to EPA a "management program for controlling pollution . . . from nonpoint sources." *See* 33 U.S.C. § 1329(b).  EPA may disapprove this program if it is "not adequate" to reduce pollution or if implementation is "not sufficiently expeditious," with consequences for the State's eligibility for federal grants.  *Id.* § 1329(d).  Within the structure of the Act, these provisions show that Congress believed some federal oversight of nonpoint source pollution was consistent with the Act's cooperative federalism.

The Fourth Circuit has directly rejected, on *Chevron* step one grounds, the argument that the Act's treatment of nonpoint sources demonstrates a Congressional intent to preclude any EPA authority over those sources.  In *Shanty Town Associates Ltd. Partnership v. EPA*, 843 F.2d 782, 791 (4th Cir. 1988), the court acknowledged that the Act contains "no mechanism for *direct* federal regulation of nonpoint source pollution," but it believed that this was a response to "practical difficulties" in

48

implementation of federal nonpoint source controls. *Id.* at 791. Despite the necessity

of direct State control over nonpoint sources, the court described the States' role

within cooperative federalism as "agents for the implementation of federal water

pollution control policy." *Id.* at 792. It therefore upheld EPA's authority to

vigorously use the tools of the Act (such as its grant-making authority) to assert

indirect influence over nonpoint source pollution. *See also Oregon Natural Desert Ass'n*

*v. U.S. Forest Service*, 550 F.3d 778, 780 (9th Cir. 2008).

The accountability framework described in the TMDL refers to both the direct

and indirect tools that the Act provides to influence States' control of nonpoint

source pollution, including permit oversight, grant approval, and the establishment of

TMDLs. *See* TMDL at 7-12 (JA 1366). Plaintiffs concede that EPA has the authority

to object to proposed permits and to determine grant eligibility based on States'

nonpoint source management programs. *See* Pl. Br. at 18, 21. That authority will

remain even if the Court holds that EPA may not make a "reasonable assurance"

determination or if it vacates the target dates. Thus, the TMDL does not purport to

authorize potential future actions, but only relies upon EPA's existing authority in

order to support EPA's "reasonable assurance" determination. And if EPA does take

further actions, there is no reason to assume that they will be "unlawful," *see* States Br.

at 21, because they would be authorized by the Act and subject to its provisions for

judicial review.

49

### C.    EPA's role in the Chesapeake Bay Program

Section 117 of the Act sharpens the contours of cooperative federalism specifically in the context of the Chesapeake Bay.  When Congress passed Section 117 in 1987 and amended it in 2000, it knew that the Bay posed a serious multi-jurisdictional problem; that several States were working with EPA in the Chesapeake Bay Program Partnership; and that EPA defined a TMDL to include wasteload allocations and load allocations.  Legislating against that background, Congress directed EPA to continue the Partnership, 33 U.S.C. 1267(b); to "implement and coordinate" any necessary data collection, research, and modeling, *id.*; to assist the signatories to the Chesapeake Bay Agreement "in developing and implementing specific action plans," *id.*; and to "ensure" that the States develop and implement "management plans . . . to achieve and maintain" the water quality goals of the Agreement, *id.* § 1267(g); *see also id.* § 1329(b)(1) (describing "management plans for controlling pollution . . . from nonpoint sources").

Section 117 unambiguously shows that EPA's leadership role in the development and implementation of the Bay TMDL is fully consistent with Congress's intent.  Plaintiffs characterize this process as "EPA arm-twisting," pointing out that some jurisdictions objected to some specifics of EPA's draft plans.  Pl. Br. at 10, 53; *see* Counties Br. at 5.  That is not surprising, given the number and complexity of the competing interests at stake in the Bay TMDL.  Overall, however, these issues

were worked out through the consensus decisionmaking of the Partnership. All of the States ultimately agreed to the Bay TMDL and have been implementing it in accordance with the TMDL's accountability framework.[11]

In sum, the structure of cooperative federalism in the Act does not demonstrate that EPA exceeded its authority by including allocations in the TMDL or by making clear it would ensure that the TMDL would be effective.

## V.    THE BAY TMDL REFLECTS A PERMISSIBLE CONSTRUCTION OF THE ACT.

Because neither the text nor the structure of the Act answers the precise question at issue – whether Congress intended to prohibit EPA from including allocations in the TMDL or making a "reasonable assurance" determination – the Court should proceed to *Chevron* step two. At this step, the Court should uphold the Bay TMDL as consistent with the Act's "background and basic purposes," including its legislative history. *Zuni*, 550 U.S. at 90-91; *see Chevron*, 467 U.S. at 848-53; *Geiser*, 527 F.3d at 293-94.

Plaintiffs' arguments that the Bay TMDL represents an unreasonable interpretation of the Act, *see* Pl. Br. at 47-56, are primarily based on the same points as

---

[11]    Although West Virginia has joined a brief that calls the Bay TMDL "the beginning of the end of meaningful State participation in water pollution regulation," States Br. at 2, that assertion is fundamentally inconsistent with its active and constructive participation in the entire Bay TMDL process. *See, e.g.*, West Virginia WIP at 6 (JA 1058); E-mail of Dec. 14, 2010 (ESJA 48-51); October 23, 2009 meeting summary at 7 (JA 335).

their *Chevron* step one arguments.  EPA's responses above show not only how the Act leaves gaps for EPA to fill, but also why EPA's interpretations are reasonable.  *See supra* pp. 39-41 (answering textual arguments at Pl. Br. 48-49); *supra* pp. 45-46, 49 (answering argument at Pl. Br. 49-50 that the Bay TMDL gives EPA control over local land use); *supra* pp. 47-49 (answering Pl. Br. 51-52 about nonpoint sources); *supra* pp. 37-38, 50-51 (answering Pl. Br. 52-54 about collaboration); *supra* pp. 39-42 (answering Pl. Br. 54-56 about the validity of EPA's TMDL definition).

The "basic purposes" of the Act reinforce these points.  The Supreme Court, at *Chevron* step two, has noted that "achievement of state water quality standards" is "one of the Act's central objectives."  *Arkansas*, 503 U.S. at 106.  While Plaintiffs concentrate on the "rights of States" in 33 U.S.C. § 1251(b), the first sentence of the Act proclaims its objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Chesapeake Bay is among the most important of the "Nation's waters," but a huge watershed (which includes thousands of point and nonpoint sources) has prevented it from attaining "water quality which provides for the protection and propagation of fish, shellfish, and wildlife."  *Id.* § 1251(a)(2).  EPA's expert judgment, supported by all seven of the Bay States, is that the Bay TMDL is essential to meeting this goal.  In particular, the allocations and accountability framework provide a basis for the States to believe that,

if each does its part, their collective effort will achieve Chesapeake Bay water quality standards.[12]

The legislative history of the Act supports the conclusion that Congress sought federal action where State action alone would be ineffective. Prior to 1972, federal legislation was based on the principle that "[t]he States shall lead the national effort to prevent, control, and abate water pollution." S. Rep. No. 92-414 at 1 (1971). But the States were "lagging" in setting water quality standards, and EPA had little authority to enforce them. *Id.* at 4-5, 8. The 1972 amendments to the Act that establish EPA oversight of State programs, including Section 303 and the NPDES permit system, arose out of Congress's desire to "restore the balance of Federal-state effort." *Id.* at 8. As discussed above, Congress allowed States to act in the first instance, but gave EPA additional authority to use when necessary to achieve the Act's goals. The Act does not "anticipate all circumstances in which [this] general policy must be given specific effect," but relies upon EPA to "use its discretion to determine how best to

---

[12]    The interstate nature of the pollution at issue here demonstrates why there is no Tenth Amendment issue in this case. *See* States Br. at 22-29. Unlike the "nonnavigable, isolated, intrastate waters" at issue in *SWANCC v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172 (2001), this case concerns traditional interstate navigable waters. Congress clearly has the power to address pollution in such waters under the Interstate Commerce Clause, and the only question in this case is the degree to which the CWA delegates that power to EPA. In any event, Plaintiffs have not raised this issue, and the Court therefore should not address it. *See Nuveen Mun. Trust v. Withumsmith Brown, P.C.*, 692 F.3d 283, 300 n.10 (3d Cir. 2012).

implement the policy in those cases not covered by the statute's specific terms." *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392-93 (1999). Here, the collaborative process of the Chesapeake Bay Program provided a way to implement this general policy of federalism in a particularly difficult case.

Plaintiffs offer a Senate report from 1977, five years after Section 303 was passed, to support their claim that "control" of nonpoint sources "was specifically reserved to State and local governments." S. Rep. No. 95-370, at 8-9 (1977). This type of "post-enactment legislative history" is not entitled to any weight, *see, e.g.*, *Abraham v. St. Croix Renaissance Group*, 719 F.3d 270, 279 n.8 (3d Cir. 2013), but even if it were, it says nothing about TMDL allocations. Under the Bay TMDL process, States helped develop those allocations, and will continue to determine the appropriate means of "control" to meet them. *See supra* pp. 20-25, 45-46.

Plaintiffs suggest that Congress specifically blocked EPA from interpreting Section 303(d) to include evaluation of "reasonable assurances." Pl. Br. at 37, 59. In 2000, EPA promulgated a rule that made wide-ranging changes to its CWA regulations. Among dozens of other changes, EPA required "reasonable assurances" as a condition for approval of TMDLs. *See* 65 Fed. Reg. 43,486, 43,597-600 (July 13, 2000). In an appropriations rider, Congress prevented EPA from implementing the entire rule during one fiscal year, and EPA (under a different Administrator) ultimately withdrew the rule. *See* 68 Fed. Reg. 13,608, 13,609 (March 19, 2003). This

54

legislative and regulatory history does not show that Congress addressed the "precise question" of whether EPA may make a "reasonable assurance" determination for its own TMDL.

Within the Act as a whole, which shows EPA's general authority to establish TMDLs, Section 117 emphasizes EPA's role in the specific context of the Bay. Plaintiffs cite a 2000 House report stating that Section 117(g) did not confer any "additional regulatory authorities" on EPA. *See* Pl. Br. at 47 (citing H.R. Rep. No. 106-550, at 3 (2000)). This statement, in the context of the broad mission that Section 117 establishes for EPA, suggests that Congress believed it had *already* given EPA sufficient regulatory authorities in the Act to carry out that mission. For example, Congress knew when it passed Section 117(g) that EPA interpreted the Section 303(d) phrase "total maximum daily load" to include load allocations and wasteload allocations, regardless of whether a State or EPA established that TMDL. Moreover, the Senate report described Congress's vision of the Section 117(g) process as "a collaborative process between the signatories to the Agreement, the Executive Council, and the EPA." S. Rep. No. 106-181, at 4 (1999).

The very aspects of the TMDL that Plaintiffs challenge here arose directly out of that collaborative process, including the allocations that the States proposed in their WIPs and the target implementation dates that they mutually adopted. Within the Partnership framework, EPA and the States agreed that 60% of the WIPs'

pollution control activities would be implemented by 2017, with 100% implemented by 2025. In the context of the Bay States' decades-long efforts to restore the Bay, recognized and supported in Section 117, the selection and announcement of interim and final target dates for TMDL implementation was fully consistent with Congress's specific command in section 117(g) that the Administrator "shall ensure that management plans are developed and implementation is begun" to achieve and maintain the Bay's nutrient goals. 33 U.S.C. § 1267(g)(1).

Although Plaintiffs purport to defend cooperative federalism in this case, they contend that State cooperation and agreement is irrelevant to whether EPA acted reasonably. *See* Pl. Br. at 52-53. This is because, "if EPA's interpretation is permitted to stand," EPA may establish allocations in some future TMDL without regard to cooperation. *See id.* at 31-32, 53-54. This Court need not go so far. While Section 303 gives EPA sufficient authority to establish the TMDL, the Act also envisions substantial cooperation between EPA and the States, both in general and with respect to the Bay. *See* 33 U.S.C. §§1251(b), (g), 1267(b). The substantial federal-State cooperation that led to the Bay TMDL shows that EPA acted reasonably, under *Chevron* step two, in light of these related provisions. The district court granted summary judgment on that basis, and this Court need not define the theoretical limits of EPA's authority in order to affirm.

56

Based on *Chevron* step two criteria, it is Plaintiffs who offer an unreasonable interpretation of the Act. In their view, a TMDL is limited to a single number, without any guide to how permit writers or States might achieve that load. In the context of the Bay, seven different States would have to set pollutant loads for their sources consistent with that single number – actually, consistent with 276 different "single numbers," given three pollutants and 92 Bay segments – with no assurance that the other States are using the same assumptions or implementing effective controls. Meanwhile, if the States worked at cross-purposes, EPA's only direct tool to control pollution would be to intervene regularly in the States' NPDES programs, imposing source-by-source limits so that total pollution from point and nonpoint sources would satisfy the TMDL.[13] Compared to the collaborative template of allocations in the Bay TMDL, such a process would be less efficient in administration, would be less effective in achieving water quality standards, would treat sources less equitably, and could require more frequent federal intervention in the States' own regulatory programs.

---

[13]    In this scenario, if nonpoint sources fail to control their loads, point sources would disproportionately bear the burden of reducing pollutant loads to implement water quality standards. That helps explain why point sources (represented by intervenors) are joining EPA, conservation groups, and the States in opposing the interpretation advanced by the nonpoint source Plaintiffs.

If that were Congress's unambiguous intent, then this appeal would end at *Chevron* step one. But the battle before the Court is one that "was never waged in the Congress." *Chevron*, 467 U.S. at 864. The question of how to develop a TMDL, particularly the largest and most technically difficult TMDL that has ever been established under the Act, requires the kind of "difficult policy choices that agencies are better equipped to make than courts." *National Cable & Telecomms. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005). EPA made those difficult policy choices here in collaboration with its Bay Partners and in the full light of a transparent and public process.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

ROBERT G. DREHER
 Acting Assistant Attorney General


/s/ *David Gunter*
KENT E. HANSON
J. DAVID GUNTER II
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-3785

Of Counsel:
JAMES CURTIN
CHRISTOPHER DAY
KELLY GABLE
U.S. Environmental Protection Agency

April 2, 2014
DJ # 90-5-1-4-19034

# CERTIFICATES

I, David Gunter, certify that:

(1)     I will cause the foregoing Response Brief to be served on all counsel via the Third Circuit's electronic case filing system on April 2, 2014.  To my knowledge, counsel for all parties are registered to receive electronic service.

(2)     Before it is submitted to the Court, the electronic file containing this Response Brief will be checked for computer viruses using Microsoft Forefront Client Security on April 2, 2014.

(3)     I will cause the requisite paper copies of this Response Brief to be sent to the Court within five days of April 2, 2014.  The paper copies will be identical to the electronic file.

(4)     The foregoing Response Brief contains 13,962 words, exclusive of front matter and certificates, as counted by the "word count" feature of Microsoft Word.  This brief is printed in a proportionally-spaced, 14-point Garamond font.

*/s/ David Gunter*