ORAL ARGUMENT NOT YET SCHEDULED

**No. 13-4079**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

**AMERICAN FARM BUREAU FEDERATION, et al.,**
*Plaintiff-Appellants,*

*v.*

**UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,**
*Defendant-Appellee*

---

On Appeal from the U.S. District Court for the Middle District of Pennsylvania,
No. 1:11-cv-00067 (Hon. Sylvia H. Rambo)

---

**U.S. ENVIRONMENTAL PROTECTION AGENCY'S
SUPPLEMENTAL JOINT APPENDIX**

---

ROBERT G. DREHER
 Acting Assistant Attorney General

KENT E. HANSON
Of Counsel:                  J. DAVID GUNTER II
JAMES CURTIN                 U.S. Department of Justice
CHRISTOPHER DAY              Environment & Natural Res. Div.
KELLY GABLE                  P.O. Box 7415
U.S. Environmental Protection    Washington, DC 20044
    Agency                   (202) 514-3785

April 2, 2014

## INDEX TO U.S. ENVIRONMENTAL PROTECTION AGENCY'S SUPPLEMENTAL JOINT APPENDIX

### Administrative Record Documents

| Page | Document | AR No. |
|------|----------|--------|
| 1 | Chesapeake Bay Program Governance: Managing the Partnership for a Restored and Protected Watershed and Bay, Feb. 27, 2009 (excerpt) | 7167–79 |
| 14 | State of the Chesapeake Bay Program: Summary Report to the Chesapeake Executive Council, May 12, 2009 | JA1544 (incorporated by reference) |
| 24 | The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay, Sept. 9, 2009 (excerpt) | 6961–78 |
| 42 | EPA Letter re: Expectations for Watershed Implementation Plans, Nov. 4, 2009 (excerpt) | 12683–88 |
| 48 | West Virginia E-mail re: Agreement on EPA plan, Dec. 14, 2010 | 27210–13 |
| 52 | EPA Response to Public Comments, Dec. 29, 2010 (excerpt) | 639–643, 1903–09 |

# Chesapeake Bay Program Governance

# Managing the Partnership for a Restored and Protected Watershed and Bay

# Interim Final February 27, 2009

**Important Note**
This is a work in progress.  This document is intended to be a working description of the
governance (structure, roles, responsibilities and operations) of the Chesapeake Bay
Program to implement the reorganization approved by the Principal Staffs' Committee on
September 22, 2008.

*1.Context and Purpose* ...................................................................................... *5*

**1.1. Purpose of the Document** ........................................................................ **5**

**1.2. Brief Historical Review** ............................................................................ **5**

**1.3. Vision for the New Organization** ............................................................. **7**

**1.4. The Evolving Organization Chart** ........................................................... **8**

**1.5. Dynamic and Adaptive Nature of Governance** ...................................... **8**

1.5.1. *Adaptive Management Model and Benefits* ............................................... 9
1.5.2. *Scope of Adaptive Management Relative to Program Governance* ........... 10
1.5.3. *Organizational Responsibilities for Adaptive Management* ..................... 11

**1.6. Background on the Chesapeake Action Plan and its Relationship to the Organization** ........................................................................................................ **11**

**1.7. Decision-Making in the Chesapeake Bay Program** .............................. **12**

**1.8. Organization of this Document** .............................................................. **13**

*2. Transition Team* ...................................................................................... *13*

**2.1. Role** .............................................................................................................. **13**

**2.2. Members** ...................................................................................................... **14**

**2.3. Proposed Timeline** ..................................................................................... **15**

**2.4. Facilitation and Training Support** ........................................................... **17**

**2.5. Ratification by the Program Partnership** ............................................... **17**

*3. Chesapeake Bay Program Governance* .................................................. *17*

**3.1. Chesapeake Executive Council** ................................................................ **17**
3.1.1. EC *Mission* ............................................................................................... 17
3.1.2. EC *Key Functions and Responsibilities* ................................................... 17
3.1.3. EC *Leadership and Membership* ............................................................... 18
3.1.4. EC *Operations* .......................................................................................... 19
3.1.5. EC *Key Issues and Questions to be Resolved* .......................................... 19

**3.2. Principals' Staff Committee** .................................................................... **20**
3.2.1. PSC *Mission* .............................................................................................. 20
3.2.2. PSC *Key Functions and Responsibilities* ................................................. 20
3.2.3. PSC *Leadership and Membership* ............................................................. 20
3.2.4. PSC *Operations* ........................................................................................ 21
3.2.5. PSC *Key Issues and Questions to be Resolved* ........................................ 23

**3.3. Management Board** .................................................................................... **23**
3.3.1. MB *Mission* ............................................................................................... 23
3.3.2 MB *Key Functions and Responsibilities* ................................................... 23
3.3.3. MB *Leadership and Membership* .............................................................. 24
3.3.4. MB *Operations* .......................................................................................... 25
3.3.5. MB *Key Issues and Questions to be Resolved* ......................................... 26

**3.4. Goal Implementation Teams** ................................................................... **27**
3.4.1. Generic Description of Goal Implementation Teams .................................. 27
3.4.1.1. GIT *Mission* ........................................................................................... 27

3.4.1.2. GIT *Key Functions and Responsibilities* ........................................................ 30
3.4.1.3. GIT *Leadership & Membership* ........................................ **Error! Bookmark not defined.**
3.4.1.4. GIT *Operations* .......................................................................................... 31
3.4.1.5. GIT *Key Issues and Questions to be Resolved* ............................................. 33
3.4.2. *Protect and Restore Fisheries* ..................................................................... 33
3.4.2.1. *Mission* ....................................................................................................... 33
3.4.2.2.*Key Functions and Responsibilities* .......................................................... 33
3.4.2.3.*Operations* .................................................................................................. 33
3.4.3. *Protect and Restore Vital Habitats* ............................................................. 33
3.4.3.1. *Mission* ....................................................................................................... 33
3.4.3.2. *Key Functions and Responsibilities* .......................................................... 34
3.4.3.3.*Operations* .................................................................................................. 34
3.4.4. *Protect and Restore Water Quality* ............................................................. 34
3.4.4.1.*Mission* ........................................................................................................ 34
3.4.4.2.*Key Functions and Responsibilities* .......................................................... 34
3.4.4.3. *Operations* .................................................................................................. 35
3.4.5. *Maintain Healthy Watersheds* ...................................................................... 35
3.4.5.1. *Mission* ....................................................................................................... 35
3.4.5.2. *Key Functions and Responsibilities* .......................................................... 35
3.4.5.3. *Operations* .................................................................................................. 36
3.4.6. *Foster Chesapeake Stewardship* ................................................................... 36
3.4.6.1. *Mission* ....................................................................................................... 36
3.4.6.2. *Key Functions and Responsibilities* .......................................................... 36
3.4.6.3. *Operations* .................................................................................................. 36
3.4.6.4. *Key Issues and Questions to be Resolved* ........................... **Error! Bookmark not defined.**
3.4.7. *Enhancing Partnering, Leadership and Management* ................................ 37
3.4.7.1. *Mission* ....................................................................................................... 37
3.4.7.2. *Key Functions and Responsibilities* .......................................................... 37
3.4.7.3. *Operations* .................................................................................................. 37
3.4.7.4. *Key Issues and Questions to be Resolved* ................................................. 37
3.4.8. *Implementation Workgroups* ........................................................................ 38

**3.5. Technical and Support Services** ...................................................................... **38**
3.5.1. TSS *Mission* ...................................................................................................... 38
3.5.2. TSS *Key Functions and Responsibilities* ...................................................... 38
3.5.3. TSS *Leadership and Membership* ................................................................. 38
3.5.4. TSS *Operations* ................................................................................................ 39
3.5.5. TSS *Key Issues and Questions to be Resolved* ............................................ 39

**3.6. Action Teams** ....................................................................................................... **39**
3.6.1. *Mission* .............................................................................................................. 39
3.6.2. *Key Functions and Responsibilities* .............................................................. 39
3.6.3. *Leadership & Membership* ............................................................................. 40
3.6.4. *Operations* ........................................................................................................ 40
3.6.5. *Key Questions & Issues to be Resolved* ....................................................... 40

**3.7. Advisory Committees** ........................................................................................ **40**
3.7.1. *Generic Description of Advisory Committees* .............................................. 40
3.7.1.1. *Mission* ....................................................................................................... 40
3.7.1.2. *Key Functions and Responsibilities* .......................................................... 40
3.7.1.3. *Leadership & Membership* ........................................................................ 41
3.7.1.4. *Key Issues or Questions to be Resolved* .................................................... 41
3.7.1.5. *Key Issues or Questions to be Resolved* .................................................... 41
3.7.2. *Local Government Advisory Committee* ...................................................... 41
3.7.2.1. LGAC *Mission* ........................................................................................... 41
3.7.2.2. LGAC *Key Functions and Responsibilities* ............................................. 41
3.7.2.3. LGAC *Leadership and Membership* .......................................................... 42

3.7.2.4. LGAC *Operations* ........................................................................................ 42
3.7.2.5.LGAC *Key Issues or Questions to be Resolved* ........................................... 42
3.7.3. *Citizens Advisory Committee* ............................................................................ 42
3.7.3.1. CAC *Mission* ............................................................................................... 42
3.7.3.2. CAC *Key Functions and Responsibilities* .................................................... 42
3.7.3.3. CAC *Leadership & Membership* .................................................................. 43
3.7.3.4. CAC *Operations* ........................................................................................... 43
3.7.3.5. CAC *Key Issues or Questions to be Resolved* ............................................. 43
3.7.4. *Science and Technical Advisory Committee* .................................................... 43
3.7.4.1. STAC *Mission* ............................................................................................. 43
3.7.4.2. STAC *Key Functions and Responsibilities* ................................................. 43
3.7.4.3. STAC *Leadership & Membership* ................................................................ 43
3.7.4.4. STAC *Operations* ........................................................................................ 43
3.7.4.5. STAC *Key Issues and Questions to be Resolved* ....................................... 43

**3.8.** *Independent Evaluator* ........................................................................................ **43**
3.8.1. *Mission* ............................................................................................................ 43
3.8.2. *Key Function and Responsibilities* .................................................................. 44
3.8.3. *Leadership and Direction* ................................................................................ 44
3.8.4. *Operations* ....................................................................................................... 44

**4. Communication and Outreach** ................................................................................. **44**

**4.1.** *Communication to the Partnership* ..................................................................... **44**

**4.2.** *Integration to the CBP Website* .......................................................................... **45**

**5. Implementation, Ongoing Revision and Adaptation** ............................................... **45**

**6. Frequently Asked Questions** .................................................................................... **45**

*Appendices* ..................................................................................................................... **45**

*References* ...................................................................................................................... **56**


*Figure 1* ............................................................................................................................5
*Figure 2* ............................................................................................................................7
*Figure 3* ............................................................................................................................8
*Figure 4* ............................................................................................................................9

CBP Governance Document  Interim Final – February 27, 2009

1. **Context and Purpose**
    1.1. Purpose of the Document
        This document describes the organizational function and governance for the Chesapeake Bay Program (CBP).  This working draft document is expected to evolve dramatically as the CBP builds out the organization's structure and functions.

    1.2. Brief Historical Review
        The CBP marked its 25th Anniversary in December 2008.  The CBP is a partnership of federal, state, and non-government organizations that come together to apply their collective resources and authorities to restore and protect the Chesapeake Bay.  For purposes of this document, the term "CBP" means the collective partnership.  For the past 25 years, the CBP has been well served by a robust organizational structure that has guided the important work of the Program.  Figure 1 shows the organization of the CBP that had evolved over the years.

        Figure 1- CBP Organization (prior to 2009)



        Beginning in August 2006, the CBP began a process to explore reorganizing to face the future challenges of the restoration effort and accelerate implementation. There was also a recognition that the CBP needed to embrace an "adaptive management" approach to respond better to changing conditions and better information.

        Two major reviews of the CBP structure had been undertaken.  First, a series of over fifty stakeholder interviews and approximately sixty surveys were completed from August through October 2006 to prepare for initial planning of the reorganization.  Key stakeholders interviewed and surveyed included state

5

**ESJA 05**

agencies, academics, non-profits, federal partners, subcommittee and advisory committees, contractors, and others.

A parallel effort was led by the Keith Campbell Foundation.  The Foundation convened a series of meetings from September 2006 to January 2007.  The meeting participants shared a wealth of Bay-related experience and knowledge in policy, science, communications, advocacy, philanthropy, and all levels of government.  The result was a report that outlined operating principles and offered concepts for a framework aimed at accelerating implementation of Bay restoration.

At the May 23, 2007 Principals' Staff Committee (PSC) meeting, the Chair, Secretary Griffin, directed the formation of an ad hoc Reorganization Workgroup to develop new organizational options for the CBP, considering these previous efforts.  A group, led by Frank Dawson and Diana Esher, and comprised of federal and state partners, advisory committee chairs, and other stakeholders, reviewed the previous efforts and discussed reorganization options and procedures.

The ad hoc Reorganization Workgroup put forth a proposed structure to the PSC in June 2008.  At that meeting, the PSC asked the ad hoc Reorganization Workgroup to provide more detail on how the new structure would operate and delineate the roles and membership of each individual structure.  The ad hoc Reorganization Workgroup created a document that described the functions, roles, and membership of each box in the organization and shared that document with the Reorganization workgroup and Subcommittee Chairs in August and early September, 2008.  The reorganization structure was refined based on the feedback from these two groups.  The CBP organization chart and an outline of roles, functions and membership were presented to the PSC at their September 22, 2008 meeting.  The PSC approved the basic structure of the reorganization, which is shown in Figure 2.

Following approval of the organization structure on September 22, a Transition Team was commissioned to more fully describe the governance and implementation of the new organization.

**ESJA 06**

CBP Governance Document  Interim Final – February 27, 2009

Figure 2- CBP Organization Chart Approved by the PSC on September 22, 2008



1.3.  <u>Vision for the New Organization</u>

As the Bay Program partners continue to refine, describe and implement the governance of this new organization, we are guided by the following principles. The new organization should:

- Simplify the organizational structure
- Align, coordinate and integrate partner actions and resources with Bay restoration priorities and desired  outcomes to the greatest extent possible without infringing on the sovereign budget and programmatic authorities of partner organizations.
- Focus and foster implementation of policies and management actions to achieve desired environmental outcomes and results
- Address partner needs and ensure management processes provide valuable services to partners
- Improve access and active involvement of a broader spectrum of interests including federal agencies and non-government organizations
- Improve internal and external communications including to the interested public on the work and progress of the restoration effort
- Clarify roles and responsibilities of the organization's components
- Promote and adopt the principles of adaptive management that provides a framework to plan, implement, assess and adjust actions needed to improve the operation of the CBP and conditions of the Bay ecosystem.
- Promote efficient and effective use of partners' valuable time, including inter-program communications
- Emphasize short term, action oriented, outcome driven interdisciplinary teams to address critical issues
- Ensure accountability and transparency
- Promote independent evaluation of progress and performance in meeting milestones

**ESJA 07**

CBP Governance Document  Interim Final – February 27, 2009

- Re-energize the partnership and refresh partner commitments
- Build upon the current strengths and past successes of the CBP

1.4. The Evolving Organization Chart

Figure 2 above shows the organization structure as approved by the PSC on September 22, 2008.  As the CBP continues to frame and better describe the structure and governance of the Program, we are exploring possible ways to better depict and describe the new organization.  Figure 3 shows a working version of the organization chart with proposed changes for consideration by the partners.  This organization chart is expected to continue to evolve.

Figure 3 – Working Version of the New CBP Organization



1.5. Dynamic and Adaptive Nature of Governance

The structure and governance of the program will change and evolve over time as a result of CBP's application of adaptive management.  As stated in the Chesapeake Bay Action Plan (CAP), the CBP is following an adaptive management system to better plan, align and assess partner activities and resources to meet CBP goals.  The CBP adaptive management system provides a framework that organizes the strategic activities and resources of the partnership while using performance data and decision-support tools to optimize implementation.

The adaptive management system will foster both (1) continual improvement of CBP's organizational performance and (2) improved ecosystem management by

**ESJA 08**

allowing adjustments based on the relations between management actions and progress toward CBP goals.  Following the adaptive approach, the partnership will likely learn that there are features of the organizational structure and governance that require modification following the transition described in this document.  This will require some further changes to structure and governance in the future, which will be coordinated by the Management Board (MB).  The functional assignments provided in this document for the Goal Implementation Teams (GITs) are a starting point and it is expected that the GITs will make recommendations to the MB for changes to functional assignments that will improve the effectiveness and efficiency of strategy implementation.

1.5.1.  *Adaptive Management Model and Benefits*

The CBP, including the organization structure, must be nimble enough to adapt and respond to changing conditions and feedback from a variety of sources.  This ability to change is broadly referred to as adaptive management and occurs at every level of the organization.  In order to understand the full aspects of a comprehensive management system and the role of adaptive management, we have used the work of Kaplan and Norton (2008) as a basis and reference for the governance of the CBP organization.  This management model helped inform the nature of the CAP and the development of the activity database and the management dashboards as key tools to foster coordination and improved management of the CBP.

The program-level adaptive management system model is based on Kaplan and Norton's (2008) five-stage model as modified to fit CBP's specific needs and operations.  The initial version of CBP's management system is shown in Figure 4.  The model has been further refined to reflect the unique operational governance of the CBP and to reflect ecological adaptive-management principles.

The adaptive management system benefits the governance of the program through integrated strategic planning and alignment of partner activities along with constant feedback of progress in meeting goals.  The management system provides the basis for creating a repeatable cycle of program management that promotes efficiency because the organizational units understand what is expected in terms of the time frame for setting goals, planning operations, executing strategy, monitoring performance and refining strategies.  The system also provides opportunities to better assess the relation between implementation actions and improvements in ecosystem conditions so that time-critical adjustments to strategies and actions can be made.  Finally, the system will help CBP partners recognize changes in external conditions so that they may reorient or revise portions of the planned activities based on new information.  These features will provide new tools to the MB and other organizational units for effective and efficient management of the program.

**ESJA 09**

CBP Governance Document  Interim Final – February 27, 2009

Figure 4 - CBP adaptive management system based on the Kaplan and Norton (2008) model



### 1.5.2.  <u>*Scope of Adaptive Management Relative to Program Governance*</u>

While adaptive management occurs at multiple levels and in different forms within and among CBP partner agencies, the organizational goal is for there to be one program-level system that provides a consistent operational framework for the program and integrates partner resource management decisions.  The CBP adaptive management system relies on the desire of the individual partners to more effectively implement their activities and to harness and focus the collective power of the CBP partners for the good of the Bay.

The cycle of active strategy development, planning, implementation and evaluation described in Figure 4 is to be applied to all areas of CBP activity, so that the organization itself, not only individual partners or partners engaged in on-the-ground implementation, will learn and change based on the outputs of the adaptive management process.  The adaptive management system is applied proactively by the organization through strategic planning processes and it is the basis for responding to external evaluations and needed corrective actions.  Successful implementation relies on each organizational unit to understand its responsibilities, be accountable, and stay on schedule with the system cycle.

CBP Governance Document  Interim Final – February 27, 2009

1.5.3. *Organizational Responsibilities for Adaptive Management*

Within the structure of the CBP, the organizational units have unique roles in contributing to the program's adaptive management system.  The MB has the principal responsibility for maintaining the system with significant support from the GIT for Partnering, Leadership and Management.  The table below provides a macro-level description of the essential functions of the organizational units as they relate to the execution of strategy, which is coordinated through the adaptive management system.

---

**Essential Strategic Program Functions at Organizational Levels**

Executive Council – Establishes vision

Principals' Staff Committee – Translates vision

Management Board – Prioritizes (aligns partner resources)

Goal Implementation Teams – Develop and execute strategies (continually improve alignment)

Implementation Workgroups – Coordinate actions and measure progress for discrete priority area

Technical Support and Services – Monitoring, modeling, and assessment to support strategies

Advisory Committees – Integrate critical perspectives to enhance strategies

Action Teams – Quickly address implementation challenges

Independent Evaluator – Provides independent assessment and feedback on specific issues

---

Section 3.0 of this document provides greater detail on the individual functions and responsibilities related to the adaptive management system for the various organizational units.

1.6. Background on the Chesapeake Action Plan and its Relationship to the Organization

In July 2008, the CBP prepared the "Chesapeake Action Plan" (CAP) in response to the 2005 GAO Report and 2008 congressional appropriations guidance.  The CAP will provide the critical information (e.g. partner actions and resources) reflecting the work of the organization.  A few examples help illustrate the power of the CAP to inform the organization and business of the CBP.

CBP Governance Document  Interim Final – February 27, 2009

- Goal Strategies – The CAP includes explicit goal strategy documents that inform the priorities of each of the six GITs.  These represent an important starting point for the MB and each GIT to affirm strategy and key priorities.  The MB and GITs will continue to plan specific actions to carry out the strategies using CAP tools.

- Activity Integration Plan – The CAP includes the database of partner actions and resources.  This database will provide critical information to each GIT to understand the current partner activities so work plans can be developed to align partner activities and resources to address strategic priorities.

- Dashboards – These will be the management and measurement tools for the program.  Each GIT will build on these as the means to communicate strategies and report progress toward implementation and environmental goals.

- Adaptive-Management- The CAP includes an adaptive-management framework to plan, implement, assess and adjust strategies and actions needed to improve the operation of the Program and conditions of the Bay ecosystem.  The adaptive management framework will assist the MB and GITs to conduct regular reviews of progress toward implementation and environmental goals and make needed adjustments.

1.7. <u>Decision-Making in the Chesapeake Bay Program</u>
Over the 25-year history of the CBP, the partners have signed nearly 100 agreements, directives, resolutions, adoption statements and other documents that create cooperative action to restore and protect various aspects of the watershed and Bay.  This complex and challenging endeavor has routinely relied upon collaborative decision-making and "consensus" (all parties can live with the decision) among the partners has been, and remains, a goal.

There are, however, situations in which consensus is  inappropriate or in which consensus is not necessary for progress to be made.  Four potential decision models may be appropriate, given the issue/situation: 1) Consensus, 2) Unilateral (one partner decides), 3) Champion (partners make different decisions/approaches with independent evaluation and accountability), and 4) Voting.

- Consensus is an appropriate decision model where it is necessary to reach agreement among all the Partners.

- Unilateral decisions may be made when a partner is obligated to fulfill a sovereign obligation or authority, or when a Partner does not participate in a consensus decision because the issue is not relevant to that partner.

CBP Governance Document  Interim Final – February 27, 2009

- Champion was introduces at the 2007 Executive Council (EC) meeting, in the interest of fostering leadership and innovation.  A champion is one partner that agrees to try new and different approaches and strategies, without the burdens of having to reach consensus from some or all partners.  Champions keep partners informed of their progress and report on the results and lessons learned.  It is hoped that other partners will learn and adapt new approaches based on the lessons learned by the champions.  The concept of champions took on another important dimension at the June 2008 PSC meeting when the partners agreed that implementation actions could be different among States, but all would be assessed by fair and consistent metrics.
- Voting is not appropriate to impose a majority decision on equal and unwilling partners, but may be useful to get a sense of the group (i.e. polling) to obtain closure on minor administrative matters.

Whatever approach is used to make decisions, it is important that members of the organizational group understand exactly what the process is and that they feel included in the process.  Finally, when decisions are made, the approach used should be recorded in meeting minutes along with the outcome of decision.

1.8. <u>Organization of this Document</u>
This document is intended to be the single text that captures the critical information about the CBP organization.  This document is expected to be very dynamic and constantly changing to reflect the deliberations of the partnership and the mutual understanding of how the organization is structured and functions, in keeping with the vision described in Section 1.3.

Section 1.0 has provided some critical context for the CBP organization- past and present.

Section 2.0 describes the role and responsibilities of the Transition Team to more fully develop the governance of the CBP, which are and will be captured in this document.

Section 3.0 is the core of the document and describes the governance of the Program (roles, responsibilities, members, operations).

Section 4.0 describes communication considerations for the new organization.

Section 5.0 describes how CBP intends to implement this new organization.

2. **Transition Team**
2.1. <u>Role</u>
Although a new organizational structure has been approved by the PSC, much work remains to provide the important details of the new organization and how it

**ESJA 13**

**2009** STATE OF THE
# CHESAPEAKE BAY PROGRAM
*Summary Report to the Chesapeake Executive Council*
May 12, 2009

Chesapeake Bay Program
*A Watershed Partnership*

## DIRECTOR'S MESSAGE TO THE CHESAPEAKE EXECUTIVE COUNCIL

On behalf of the entire Program and Partnership, thank you for your leadership of our collective efforts to restore the Chesapeake Bay and her Watershed.

This "State of the Program" Report provides the context for the important work that lies ahead. It summarizes our progress, provides a sobering account of the health of this natural treasure, and frames both the challenges and opportunities.

This is a time of optimism. Bold ideas, new leadership and commitments to action give us confidence we can meet the goals of a vibrant Bay and watershed.

We know the task will not be easy. We must act boldly, learn from the innovative steps of different partners, and enlist the active engagement of local governments, watershed organizations, the private sector and the 16.8 million citizens in the watershed.

Today, the Chesapeake Bay Program Partners have developed aggressive two-year milestones. The milestones and the corresponding actions, reflect Federal and State programs and resources and will accelerate progress to reduce nutrient and sediment pollution . . . the principle cause of water quality problems throughout the Watershed and Bay. These two-year milestones will help to hold ourselves accountable for near term progress.

We are also encouraged by the prospects of our efforts to set new pollution caps (aka Total Maximum Daily Load or TMDL) and implementation plans throughout the watershed by the end of 2010.

Despite the good work of the "two year milestones," the up-coming TMDL and efforts to enhance performance, transparency and accountability, we still project a significant "gap" between our current progress and the goals for a restored Chesapeake Bay. This gap will need to be addressed by new tools, strategies, authorities and resources that involve all constituents of the Watershed.

Here at Mount Vernon we are reminded that a daunting challenge with a noble purpose can be met when our leaders are committed, our strategies sound and our execution unyielding.

In the words of Thomas Friedman, author of *Hot, Flat and Crowded*, "we have exactly enough time (to restore the Chesapeake Bay and Watershed) . . . starting right now!"

—Jeff Lape, *Director, Chesapeake Bay Program*

## Our Watershed and Bay—At a Glance

### 1. The Chesapeake Bay is a national treasure.

- The Chesapeake Bay is one of the most extraordinary places in America. This unique estuary is the largest in the nation.

- The Chesapeake Bay's land to water ratio is 14:1, which is the greatest of any major water body in the world. This means that what happens on the land has a profound effect on the water.

- The 64,000 square mile watershed (see Figure 1) has tremendous ecological, historic, cultural, economic and recreational value to the region and economy with an estimated value in excess of $1 trillion.

- The Bay Watershed is home to almost 17 million people. About 150,000 people move to the area each year.

- Protecting the Chesapeake Bay begins with protecting the 100,000 streams and rivers that flow into it. Eighty percent of the freshwater comes from the Susquehanna (48%), Potomac (19%) and James (14%) Rivers.



*Figure 1. Chesapeake Bay watershed.*

## Bay and Watershed Health—Water Quality, Habitats, and Fisheries

### 1. Despite important work that has stemmed human impacts to a significant degree, the health of the Bay is still poor and unacceptable.

- The *Bay Barometer*— the Bay Program's annual Health and Restoration Assessment—was released on March 19, 2009 and affirms that the Bay remains severely degraded, although some parts of the watershed have healthy tributaries. For the first time, the *Bay Barometer* features a single index for health (38 out of 100) and a single index for restoration progress (61 out of 100)—with 100 being a "restored Bay."

- The health assessment is based on extensive monitoring data and tracks progress for discrete ecosystem measures and 13 restoration measures (see Figure 3).



HEALTH 38%     RESTORATION 61%

*Figure 2. Health and Restoration Indices.*

ESJA 14

**2. The difference between restoration progress (61%) and the health of the ecosystem (38%) reflects the "lag time" between implementation of restoration measures and the ecosystem's response and recovery.**

- Our scientists can determine what measures we need to have in place and the expected environmental benefit (e.g., pounds of pollutants that will be reduced) that is likely to lead to a restored Bay ecosystem. But, they cannot predict how long it will take for the ecosystem to respond to the implementation measures.

**3. Independent reports by a number of other groups assessing the health of the Bay and various tributaries and small watersheds affirm the degraded state of the Bay and many of its tributaries (see Figure 4).**

- The University of Maryland, Center for Environmental Science issued their annual Report Card on April 2, 2009 and gave the Bay's health a C-.

- The Chesapeake Bay Foundation issued their State of the Bay Report on April 15, 2009 and ranked the Bay's health and restoration at 28—the same as last year.

- The network of RiverKeepers has been giving their individual rivers a grade—the Patuxent River (D-), the Severn River (C-) and the Chester River (D) as just a few examples.

## Examples of Actions to Improve Water Quality, Restore Vital Habitats, and Protect Fisheries

**1. The Bay Program Partners take important actions to restore the Bay and its watershed. "Champions" continue to pursue innovation and implementation. Some examples of recent and upcoming progress and success include:**

- Blue crab harvest restrictions put in place last year by Maryland and Virginia already seem to be paying dividends. The most recent survey found 43 percent more blue crabs in the Bay this past winter than a year earlier.

- The Natural Resources Conservation Service (NRCS) is working with the U.S. Geological Survey (USGS), the U.S. Environmental Protection Agency (EPA), and the States to target delivery of an additional $23 million in new Farm Bill money this year.

- Virginia, as a champion for agriculture, has established a partnership initiative to keep livestock out of streams (see Figure 5).



**Water Quality**

| | |
|---|---|
| Dissolved Oxygen | 16% |
| Mid-Channel Clarity | 14% |
| Chlorophyll a | 27% |
| Chemical Contaminants | 28% |

21% OF GOALS REACHED

**Habitat & Lower Food Web**

| | |
|---|---|
| Bay Grasses | 42% |
| Phytoplankton | 53% |
| Bottom Habitat | 42% |
| Tidal Wetlands | Not quantified in relation to a goal |

45% OF GOALS REACHED

**Fish & Shellfish**

| | |
|---|---|
| Blue Crab | 60% |
| Oyster | 9% |
| Striped Bass | 100% |
| Shad | 23% |
| Juvenile Menhaden | Not quantified in relation to a goal |

48% OF GOALS REACHED

Data and methods: www.chesapeakebay.net/status_bayhealth.aspx

*Figure 3. Chesapeake Bay Measures of Health Progress (2008)*



*Figure 4. Several reports all reach the same conclusion—the health of the Bay and its tributaries remains degraded.*



*Figure 5. Before and after fencing cattle out of this stream.*

ESJA 15

- Maryland has enacted a new law requiring homeowners to use new nitrogen-reducing technology when replacing or installing new septic systems within 1,000 feet of tidal waters in Maryland.
- New York Governor David Paterson submitted a bill to the legislature to virtually eliminate phosphorus in dishwasher detergent and residentially applied fertilizer.
- The City of Annapolis, Maryland, has banned the sale and use of fertilizer containing phosphorus.
- The Upper Susquehanna Coalition, a local watershed coalition in New York and Pennsylvania, restored 175 acres of non-tidal wetlands on private lands.
- Next month, EPA and the National Fish and Wildlife Foundation will be announcing the issuance of $12.8 million in grants for innovative nutrient and sediment reduction projects in all seven jurisdictions throughout the Bay watershed.
- The Chesapeake Bay Commission and Pennsylvania reconvened the Biofuels Advisory Panel to review the State Action Plans and assist with implementation. The Panel will call on the jurisdictions to focus on the immediate opportunities (e.g., winter cover crop biofuels, best management practices implementation, on-farm use of biofuels and communications). The Panel will also develop a biofuels production goal; develop agricultural and forest residue removal guidelines for invasive species; and evaluate the potential for sustainable feedstock production within the watershed.

## Advisory Committees Provide Critical Advice and Feedback

1. **The Citizen's Advisory Committee (CAC), chaired by Jim Elliott (PA), played a critical role in making the case for an external evaluator to independently assess the performance of the Bay Program. CAC was also instrumental in the creation of a new NGO Coalition that will promote advocacy for Bay-related legislation and local level citizen education/involvement and on-the-ground implementation.**

2. **The Local Government Advisory Committee (LGAC), chaired by Councilman Tommy Wells (DC), has championed the establishment of two circuit rider pilot programs to enhance local government engagement. LGAC is also pressing for active local government involvement in the upcoming Bay TMDL effort.**

3. **The Scientific and Technical Advisory Committee (STAC), chaired by Doug Lipton (University of Maryland), presented its _Climate Change and the Chesapeake Bay_ report last fall and recommends the Bay Program develop a Climate Change Action Plan that recognizes the multiple benefits to the Bay ecosystem by taking action against climate change. STAC is also looking at thresholds and tipping points for Bay restoration activities and resource response.**

## TMDL Development and State Implementation Strategies

1. **EPA and the states have a legal obligation to prepare a "Total Maximum Daily Load" (TMDL) and have agreed to accelerate completion by the end of 2010.**
   - The Bay TMDL—actually a series of up to 92 smaller TMDLs addressing each impaired Bay segment—was prompted by the inability to meet 2010 restoration goals.

2. **The TMDL is a "diet plan" for the Bay to reduce nitrogen, phosphorus and sediments and meet water quality standards for the Bay.**
   - The Bay TMDL will identify the total pollution caps—essentially the nutrient and sediment diet—necessary to meet states' Chesapeake Bay water quality standards (dissolved oxygen, water clarity, and chlorophyll _a_).
   - Nutrient and sediment budgets will be allocated by major river basin to all jurisdictions in the watershed—six states and the District of Columbia.
   - States will need to develop state implementation plans (e.g., tributary strategies) to show how the TMDL will be implemented. EPA and the States have clear authorities to address loads from point sources (e.g., wastewater treatment plants). Controls on nonpoint sources are very limited.

3. **The TMDL development process will be intense through 2010 and beyond.**
   - The major milestones in the TMDL process include:
     – EPA and States agree on watershed pollution loads and allocations—August 2009
     – Public outreach, including with local governments—Summer 2009
     – States develop revised tributary strategies/implementation plans—September 2009 to May 2010

– Public notice of draft TMDL in the Federal Register—June 2010
– Public comment on draft TMDL and draft state implementation plans—June to September 2010
– Final TMDL established by EPA—December 2010
– Consent decree deadline (May 1, 2011).

**4. The quality of the science and the model have been substantially enhanced in the last few years.**



- The level of detail and precision of the model has been greatly enhanced by the underlying science and continues to be refined based on extensive peer review and model calibration (see Figure 6).

Phase 4 Watershed Model     Phase 5 Watershed Model

- The state implementation plans can use the latest science to distribute allocations locally and to specific sources, thus improving the ability to target restoration actions.

*Figure 6. Model refinement has led to better information throughout the watershed.*

**5. While the total budget caps are expected to be similar to those set in 2003, the new watershed model indicates it will take considerably more effort to meet them.**

- Preliminary projections show that the total watershed-wide caps on loads of nitrogen and phosphorus needed to achieve the Bay water quality standards may be relatively close to those set in 2003.
- However, better information on sources, average flows and pollution reduction capabilities, indicates it will take considerably more effort to reach those similar nutrient caps.

**6. We expect a sizeable "gap" between where we are and where we need to be. State implementation plans will need to be revised and enhanced to achieve the allocations developed as part of the TMDL.**

- There will likely be sizable gaps between the loading reductions from the states' current tributary strategies and those that will be needed to meet water quality standards.
- Success will require unprecedented cooperation and commitment and greater involvement of the public. Current tools, programs, authorities and resources are inadequate to achieve the needed reductions of nutrients and sediments.

**7. As restoration progress is made under the TMDL, segments of the Bay will begin to cascade into attainment with water quality standards. There will be a lag time in most instances between actions taken and Bay response (see Figure 7).**

- Partners will begin to see tidal segments come into attainment as pollution reduction actions happen across the watershed.
- Our scientific projections can provide a sense of which segments will respond earlier than others.
- In most instances, there will be a natural lag time before the Bay responds to reduced pollution levels.



**(A)**



**(B)**



**(C)**

*Figure 7. Preliminary model projections for attainment of deep-water dissolved oxygen water quality standards under (A) 1985 loads, (B) late1990–early 2000 loads and (C) the 2003 basinwide cap loads for nutrients. The model indicates that some segments begin to meet attainment of water quality standards (B) consistent with current monitoring of impaired tidal waters followed by standards attainment projected to be within 1% in the red colored segments under the 2003 cap loads (C) using the current set of models and assessment tools.*

## Two-Year Milestones

**1. At the direction of the Executive Council, the Partners are setting two-year milestones for achieving explicit nutrient and sediment reductions.**

- The jurisdictions have a common template for the milestones, including:
  - Explicit load reductions by source
  - Funding sources
  - Quantification of any shortfalls and contingencies to close the gaps.

## Key Sources of Nutrients and Sediments

**1. The predominant sources of nutrients and sediments are well understood (see Figure 8).**

- For nitrogen, the principle sources are agriculture, wastewater treatment plants, air deposition, and polluted stormwater from developed areas.
- Phosphorus is mainly the result of agriculture, wastewater and stormwater from development.
- Agriculture and stormwater from development are the predominant sources of sediments.
- Hatched areas in Figure 8 indicate the sources of nitrogen and phosphorus that are currently regulated by Federal law.

.

**2. In the case of municipal stormwater point sources, while only 17% of the watershed is covered by State/Federal stormwater permits, they do cover about 66% of the impervious surfaces (see Figure 9).**



**Figure 8.** *Relative responsibility for pollution loads to the Bay.\**
*\*Loads from watershed. Does not include loads from direct deposition to tidal waters, tidal shoreline erosion or the ocean. Wastewater loads based on measured discharges; the rest are based on an average-hydrology year.*

**Figure 9.** *Impervious surface within MS4 Areas.*

## Important Progress Made to Enhance Performance, Transparency and Accountability

**1. The new Bay Program organization structure is aligned with the explicit goals and environmental outcomes of the Program (see Figure 10).**

- This provides a clear focus on the goals and outcomes that we are trying to achieve and facilitates strategic program shifts when needed.
- Goal Implementation Teams are led by diverse representation of Federal, State and NGO Partners.
- The new structure is integrated and aligned with the Chesapeake Action Plan.

**2. The Chesapeake Action Plan (CAP) is the means to coordinate Partner actions and resources and track and monitor performance.**

- The CAP includes a partner accessible database of actions and resources by all six states, D.C., a dozen Federal agencies, and others; sortable by goals, geography, etc., which fosters coordination, collaboration and transparency.



*Figure 10.* New organizational structure of the Chesapeake Bay Program.

- The CAP includes management dashboards (see Figure 11 for sample) that clearly show progress toward meeting explicit goals. Somewhat modeled on Maryland's BayStat, they show current and expected (annual) progress and summaries of actions and resources.
- With the CAP we can see trends in actions and funding from a multitude of views (e.g., goals, geography, partner, etc.) (see Figure 12).

**4. The Bay Program, largely through EPA, continues to respond to and implement over 20 recommendations resulting from program evaluations by the Government Accountability Office, the Office of Management and Budget and six EPA Inspector General reports.**



*Figure 11.* Sample dashboard.



*Figure 12.* 2007–2009 CAP Funding by Goal.

### 2007–2009 CAP Funding by Goal

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Fisheries | $28,815,922 | $18,634,327 | $12,478,163 |
| Habitats | $47,958,302 | $48,504,793 | $26,217,737 |
| Water Quality | $938,467,530 | $357,872,597 | $684,089,648 |
| Watersheds | $125,155,841 | $140,575,456 | $59,492,231 |
| Stewardship | $18,579,717 | $24,556,054 | $15,409,623 |
| Leadership & Mgt | $23,612,052 | $25,339,316 | $24,556,194 |

## New Federal Assistance Will Help to Accelerate Implementation

**1. New *Farm Bill Funds*—The 2008 Farm Bill allocated $188 million in mandatory spending for agricultural conservation practices in the Chesapeake Bay watershed portion of the six Bay states.**

- Under the strong partnership of the Bay Program, EPA, USGS and the States collaborated with NRCS in prioritizing nutrient reduction practices and targeting agricultural conservation practices in areas with the greatest benefits for water quality.

| In January, USDA announced the release of the first year (FY2009) of funding ($23 million) for its Chesapeake Bay Watershed Initiative: | | The rest of the Farm Bill money will be allocated over the next three years: |
|---|---|---|
| • Delaware — $1,278,263 | • Pennsylvania — $6,747,749 | • FY2010 — $43 million |
| • Maryland — $5,143,305 | • Virginia —      $6,976,161 | • FY2011 — $72 million |
| • New York — $1,403,356 | • West Virginia — $1,451,165. | • FY2012 — $50 million. |

**2. *American Recovery and Reinvestment Act* is already benefiting the Bay watershed.**

- The economic recovery plan signed by President Obama on February 17 provides tremendous funding opportunities to advance restoration in the Chesapeake Bay watershed. From wastewater treatment plant upgrades to habitat restoration and green infrastructure projects, the American Recovery and Reinvestment Act of 2009 offers funding from a variety of Federal agencies with great potential to benefit the Bay and power the economic recovery. A central website, www.recovery.gov, has been established for information on the Recovery Act, and some agencies have their own specific sites—the Bay Program also maintains a web page on the Act (http://www.chesapeakebay.net/recoveryinvest.aspx?menuitem=34712).

## Congress Contemplates Changes to Chesapeake Bay Program and Related Programs

- The 111th Congress has begun action to consider reauthorization of the Chesapeake Bay Program—Section 117 of the Clean Water Act. For example:
  – Congressman Robert Wittman (R-VA) introduced his bill to promote greater accountability through a Federal cross cut budget and use of adaptive management which was successfully offered as an amendment to H.R. 1262, the Water Quality Investment Act of 2009 which passed the House on March 12 and was referred to the Senate.
  – On April 20, the Senate Subcommittee on Water and Wildlife of the Committee on Environment and Public Works held a field hearing in Annapolis chaired by Senator Ben Cardin (D-MD).
  – On April 23, the Maryland Congressional Delegation, chaired by Senator Barbara Mikulski, held a meeting to focus on Chesapeake Bay issues, including Bay Program reauthorization.
- Congressman John Sarbanes (D-MD) introduced legislation to reauthorize the Chesapeake Bay Office of the National Oceanic and Atmospheric Administration.
- Senator Cardin and Congressman Sarbanes introduced legislation to reauthorize the Chesapeake Bay Gateways and Watertrails Network.

## Status of the Chesapeake Bay Foundation Lawsuit

- On January 5, 2009, the Chesapeake Bay Foundation (CBF), joined by other plaintiffs, including retired state and local politicians, filed suit against EPA in U.S. District Court. The suit focuses on three general claims:
  – EPA failed to comply with its Clean Water Act duty to restore the Bay.
  – The Administrative Procedures Act requires EPA to carry out its mission in a timely way.
  – The Chesapeake Bay Program partnership is a federal/interstate compact which makes its signed agreements legally binding.
- EPA and DOJ have conducted preliminary but constructive meetings with CBF to discuss the litigation and possibility of settlement. Discussions are continuing.

## Climate Change and the Bay

- The Chesapeake Bay Program's Scientific and Technical Advisory Committee report, *Climate Change and the Chesapeake Bay: State-of-the-Science Review and Recommendations*, released last year, describes the impacts of climate change during the next century:

  – Sea level rise, increased coastal flooding and submergence of wetlands

  – Elevating water temperatures will promote growth of harmful algae, loss of underwater grasses and poorer habitat for native fish and shellfish

  – More erratic climate and weather conditions.

- The report recommends that the Program factor climate change into current and future restoration efforts and develop a Baywide Climate Change Action Plan, since near term Bay restoration actions can also help address the longer term impacts of climate change.

- A recently released EPA report, *Coastal Sensitivity to Sea-Level Rise: A Focus on the Mid-Atlantic Region*, shows that many areas around the Bay's shoreline are already witnessing the effects of sea level rise and that vulnerable tidal marshes may erode more rapidly over the next century because of climate change.

## The Challenges and Opportunities for a Clean Watershed and Bay

The November 2008 State of the Program Report identified the spectrum of stressors and challenges that impact the Watershed and Bay. All recognize that innovation, advances in technology, changes in behaviors and practices, new tools, expanded use of existing authorities, development of new authorities, and resources are among the suite of approaches that we will need to address these challenges. Below are some examples of the scope of the challenges we face along with some examples of how different partners are addressing these challenges.



### Agriculture

***Context:*** Agriculture, primarily animal operations and row crop production, constitute the single largest source of nutrients and sediments to the Bay. Concentrated Animal Feeding Operations (CAFOs) are considered point sources and subject to Federal and State permits, but the remainder of agriculture is largely considered "nonpoint source." Innovative and voluntary programs (e.g., cost share funding) are used to promote the adoption and implementation of agricultural conservation practices to ensure that water quality impacts are minimized. Despite widespread financial and technical assistance, farmer participation remains below the necessary levels to meet water quality goals. Progress on some conservation practices in the watershed as of 2007 are:

- Nutrient management plans implemented on 50% of agricultural acres
- Conservation tillage practices implemented to reduce erosion on 50% of crop fields
- Conservation plans implemented to minimize water quality impacts on 40% of agricultural acres
- Management practices, such as rotational grazing and stream bank fencing have been implemented on 30% of livestock pastures.

***New Paradigm:*** Through the 2008 Farm Bill, the U.S. Department of Agriculture is focusing new financial resources to priority agricultural watersheds that contribute significant nutrient loads to the Bay. The Commonwealth of Virginia is emphasizing the implementation of five of the most effective priority agricultural conservation practices (nutrient management, conservation tillage, cover crops, riparian buffers, livestock stream exclusion) that will achieve the greatest value for water quality.



### Concentrated Animal Feeding Operations

***Context:*** CAFOs are large animal production operations that can generate animal waste equivalent to the human waste produced by a small city. CAFOs are point sources and subject to Federal and State permitting to ensure that animal waste is effectively managed.

***New Paradigm:*** A recent rulemaking by EPA has prompted nearly 800 additional operations in the watershed to seek coverage under Federal or State permits, thus assuring that these facilities will be required to develop and implement nutrient management plans to properly manage animal waste. With a longstanding desire for greater regulatory control, New York regulates CAFOs down to 1/5 the size as that covered by Federal regulations.



### Septic Systems

*Context:* There are an estimated 2.3 million onsite septic systems that provide basic wastewater treatment in the watershed. These systems can be effective, however, they are not intended to remove nitrogen. In fact, septic systems transport about 5% of the nitrogen load to the Bay. Technology advances exist to upgrade existing and new systems for nitrogen removal.

*New Paradigm:* Maryland has enacted a new law requiring homeowners to use new nitrogen-reducing technology when replacing or installing new septic systems within 1,000 feet of tidal waters in Maryland.



### Sewage from Vessels

*Context:* A Federally-designated no discharge zone (NDZ) is a water body into which the discharge of sewage from all vessels is prohibited. Under Section 312 of the Clean Water Act, vessels with U.S. Coast Guard approved marine sanitation devices (heads) are allowed to discharge treated sewage in areas not formally designated as an NDZ. States can apply to EPA for NDZ designations. There are currently two NDZs in Chesapeake Bay (Lynnhaven River, VA and Herring Bay, MD) and one pending (Deltaville, VA). Combined, these NDZs make up 0.3% of the tidal Chesapeake.

*New Paradigm:* Delegate Albert Pollard (VA) introduced a Bill in the Virginia Assembly to designate all tidal creeks in VA as NDZs—after EPA approval.



### Air Deposition of Nitrogen

*Context:* Approximately 28 percent of the nitrogen loading to the Chesapeake Bay is from atmospheric deposition. While some is from natural sources, the primary sources are related to burning of fuels (motor vehicles, electric utilities and other industrial, commercial and residential sources).

*New Paradigm:* EPA is considering the extent that a new Clean Air Interstate Rule and other air rules could foster increased reductions in nitrogen reductions in the Bay.



### Menhaden

*Context:* Atlantic menhaden are a vital link in the Bay's food chain. It is a prime forage species for striped bass, and also performs a critical function as a filter feeder by consuming excess amounts of phytoplankton.

*New Paradigm:* There have been discussions among some parties about further restricting the commercial harvest of menhaden for industrial use. A single mature menhaden (about a foot long) can filter approximately four gallons of water per minute, 240 gallons per hour or 5,760 gallons of Bay water per day. A 1967 study published in *Estuaries*, calculated that "if all of the menhaden landed in Chesapeake Bay in one season were present in the Bay at one time, they could filter all of the water in the Virginia portion of the Bay and its tributaries in 24 hours."



### Stormwater from Development

*Context:* Stormwater runoff from new and existing development is the only source of nutrients and sediments that is actually increasing because of more roads, roof tops, parking lots and other impervious surfaces that transport nutrients and sediments to streams and rivers.

*New Paradigm:* Section 438 of the Energy Independence and Security Act creates an obligation for Federal agencies to "maintain or restore, to the maximum extent technically feasible the predevelopment hydrology of the property with regard to the temperature, rate, volume, and duration of flow." This represents a huge opportunity to apply aggressive new stormwater management practices. At the same time, EPA's Chesapeake Bay Program Office is promoting "no runoff development" as a challenge opportunity.



### Phosphorus from Homes

*Context:* Residents of the watershed contribute phosphorus to the watershed in two ways: through the use of traditional dishwasher detergent, which contains an average of 4-6% phosphorus; and through the application of residential lawn fertilizer.

*New Paradigm:* Governor Paterson submitted a bill to the New York State Legislature to virtually eliminate phosphorus in dishwasher detergent and residentially applied fertilizer.

### Greening our Practices Around the Home

*Context:* The 16.8 million residents of the watershed all contribute to the nutrient load to the Bay.

*New Paradigm:* In concert with the this year's *Bay Barometer*, the Bay Program has suggested that residents of the watershed can take explicit steps to reduce their impact on the Bay by adopting practices such as:

- Planting native trees and shrubs
- Not fertilizing lawns
- Installing rain barrels and rain gardens
- Volunteering for a watershed group
- Picking up after your pet
- Driving less
- Using less energy.



**Chesapeake Bay Program**

*A Watershed Partnership*

www.chesapeakebay.net

# The Next Generation of Tools and Actions to Restore Water Quality in the Chesapeake Bay

## A Draft Report Fulfilling Section 202a of Executive Order 13508

September 9, 2009
U.S. Environmental Protection Agency



# Disclaimer

This draft document is EPA's current draft report under section 202(a) of Executive Order 13508 making recommendations to the Federal Leadership Committee (FLC) for a strategy to define the next generation of tools and actions to restore water quality in the Chesapeake Bay and describe the changes to be made to regulations, programs, and policies to implement these actions. EPA intends to release this draft document to the public concurrently with its submission to the FLC. After the FLC has considered this draft, along with the other draft reports prepared pursuant to the Executive Order, it will prepare a draft strategy to restore the Bay and publish it in the *Federal Register* for public comment. The current draft report includes preliminary recommendations which may change as the draft strategy is developed. This draft document is not a final agency action subject to judicial review. Nor is this draft document a rule. Nothing in this draft document is meant to, or in fact does, affect the substantive or legal rights of third parties or bind EPA.

Cover photo(s) courtesy of Jane Thomas/IAN, UMCES

# Contents

Executive Summary ................................................................................................................... 1

Introduction ............................................................................................................................. 5

   Background .......................................................................................................................... 5

      Importance of the Bay ...................................................................................................... 5

      History and Progress of Prior Recovery Efforts ............................................................. 5

      Need for Further Action ................................................................................................... 6

   Executive Order Directive for this Report and its Integration into a Coordinated Strategy for Protecting and Restoring the Bay ....................................................................................... 6

   State Consultation and Outreach ......................................................................................... 8

   The Water Quality Challenge: Nutrients and Sediment ...................................................... 8

      Agriculture ........................................................................................................................ 9

      Urban and Suburban Lands .............................................................................................. 9

      Wastewater ........................................................................................................................ 9

      Air Pollution ................................................................................................................... 10

      Reducing Pollution ......................................................................................................... 10

   Current Legal and Policy Framework ................................................................................ 12

      Ongoing Efforts to Develop a Bay TMDL for Nutrients and Sediment ........................ 12

      Chesapeake Executive Council 2025 Goal and 2-year Milestones ................................ 13

      Section 117(g) of the CWA ............................................................................................ 14

Part I: Creation of a New Accountability Framework to Guide State, Local, and Federal Efforts to Restore the Bay ....................................................................................................... 15

   State Accountability ........................................................................................................... 15

   EPA (Federal) Accountability ............................................................................................ 19

Part II: New Rulemakings and Actions ................................................................................. 20

   Stormwater ......................................................................................................................... 20

      Background and Current Control Strategies ................................................................... 20

      What EPA Could Do in the Chesapeake Bay Watershed .............................................. 23

   Concentrated Animal Feeding Operations (CAFOs) ......................................................... 24

      Background on Animal Feeding Operations ................................................................... 24

      What EPA Could Do in the Chesapeake Bay Watershed .............................................. 26

   New or Expanded Sources of Nutrient and/or Sediment Pollution .................................. 27

   EPA Actions under CWA Section 319 and CZARA Section 6217 .................................... 28

   Publicly Owned Treatment Works (POTWs)/ Industrial Wastewater Discharge Facilities ..... 29

      Background on POTW/Industrial Wastewater Discharge Facilities ................................ 29

      What EPA Could Do in the Chesapeake Bay Watershed .............................................. 31

Onsite (Septic) Systems ...........................................................................................................32

    Background on Onsite Systems and Current Control Strategies...........................................32

    What EPA Could Do in the Chesapeake Bay Watershed .......................................................33

Atmospheric Deposition of Nitrogen .......................................................................................34

    Background on Atmospheric Deposition of Nitrogen............................................................34

    What EPA Could Do in the Chesapeake Bay Watershed .......................................................36

EPA Action to Improve Compliance..........................................................................................37

EPA Actions to Reduce Toxic Pollution in the Bay.................................................................39

Timing of EPA Actions.................................................................................................................40

EPA Actions to Hold Itself Accountable....................................................................................40

Part III: Enhanced Partnership for "Healthy Bay – Thriving Agriculture" Initiative..................41

Appendix 1: Draft Chesapeake Bay Compliance and Enforcement Strategy...............................A-1

**ESJA 27**

# Executive Summary

The Chesapeake Bay and its watershed are an ecosystem and resource of enormous economic, social, and environmental significance. Yet the Bay is imperiled by decades of human activities that have burdened its streams, rivers, and estuary with excessive pollution, destroyed vital habitat for aquatic life and waterfowl, and dramatically reduced commercial and recreational fisheries.

In order to restore the Chesapeake Bay watershed to health, bold action is needed. In May 2009 the six watershed states, the District of Columbia, and the federal government agreed that by no later than 2025 they would have completed implementing the measures necessary to restore water quality in the Chesapeake Bay watershed. As part of the President's commitment to federal leadership in this effort, EPA intends to adopt an accountability framework to ensure that these measures are identified, committed to, implemented, and reported to the public.

The key to restoring water quality in the Chesapeake Bay watershed is to achieve significant reductions in nitrogen, phosphorous, and sediment loads. In 2008, total estimated nitrogen and phosphorus loads from the watershed to the Bay were 311 million pounds and 19 million pounds, respectively. To meet water quality goals for the Bay, nitrogen and phosphorus loads will have to be reduced by 44 percent and 27 percent respectively, despite expected population increases of 30 percent between 2000 and 2030.[1]

Achieving these loading reductions will require significant reductions in: runoff from urban and suburban lands and farmland; discharges of nutrient pollution from municipal and industrial wastewater facilities; leaching to surface waters from onsite (septic) systems; and atmospheric deposition of nitrogen to the Bay and its watershed. EPA intends to work with the six watershed states, the District of Columbia, federal partners, local governments, and other parties to put in place a comprehensive, transparent, and accountable set of commitments and actions that, together, ensure that the technologies and management practices needed to restore Bay water quality are implemented by no later than 2025.

Section 202(a) of the President's Executive Order, Chesapeake Bay Protection and Restoration, directs EPA to prepare a report on the next generation of tools and actions for restoring the Bay under existing legislative authorities. This draft report identifies the pollution control strategies and actions EPA recommends to protect and restore Bay water quality and reflects consultation with state agencies and input from other stakeholders.

EPA's 202(a) strategy has three principal components:

1. **Create a new accountability program to guide federal and state efforts to restore the Bay.** In December 2010, EPA will establish a Total Maximum Daily Load (TMDL) for the Chesapeake Bay.[2] Under the TMDL process, EPA intends to provide the watershed states and the District of Columbia with draft loading reduction targets for nitrogen and phosphorus for each major river basin in the fall of 2009. EPA expects that the seven jurisdictions will use these draft loading targets to further subdivide and allocate the needed reductions among point and nonpoint

---

[1] As of early September 2009, estimates of the sediment reductions needed are being recalculated using newly available models.

[2] The section "Current Policy and Legal Framework," below, provides more information on TMDLs and the Bay TMDL in particular.

**ESJA 28**

sources of nutrient and sediment pollution. Using that information, EPA intends to establish waste load and load allocations for those sources in the Bay TMDL.

Because the Bay TMDL will allocate pollutant reductions to both point and nonpoint sources to meet the Bay's water quality standards, EPA expects the six watershed states and the District of Columbia to provide EPA with documented "reasonable assurance" that nonpoint source loading reductions will be achieved as a condition for reflecting such reductions in the Bay TMDL. Pursuant to section 117(g) of the Clean Water Act (CWA) and other authorities, EPA would build on the forthcoming Bay TMDL and announce its "expectations" for Clean Water Accountability Program commitments by the six watershed states and the District of Columbia to achieve the pollutant reductions needed to restore the Bay. In brief, EPA would expect the six watershed states and the District of Columbia to commit to establish and implement:

- Clean Water Accountability Programs that (1) achieve the pollutant reductions needed from all sources through regulations, permits, or enforceable agreements, and (2) include commitments to dates by which any necessary regulations or other instruments would be established and implemented [3]

- A series of 2-year milestones detailing near-term actions and loading reduction targets to evaluate progress toward water quality goals

While more than two decades of voluntary, cost share, and regulatory efforts to reduce nutrient and sediment pollution from point and nonpoint sources to the Chesapeake Bay watershed have made some important progress, that progress has not been sufficient and is not likely to be sufficient to ensure restoration of the Bay in a reasonable period of time. Limited public funds further constrain agencies' ability to restore water quality at all levels of government. EPA believes that the watershed jurisdictions need to take strong action to assure the public that nutrient and sediment problems in the Bay will be reduced and controlled in the face of continued population growth and development of the watershed. EPA believes state adoption of enforceable or similarly accountable pollution control programs will reduce pollutant loadings to a degree far greater than EPA and the Bay watershed jurisdictions have been able to accomplish to date.

Along with its "expectations," EPA would identify a number of potential actions ("consequences") EPA may take in the event that jurisdictions do not commit to establish and implement Clean Water Accountability Programs or do not achieve their 2-year milestones. These "consequences" may include, but are not limited to:

- Revising the draft or final pollutant WLAs in the Bay TMDL to assign more stringent pollutant reduction responsibilities to point sources of nutrient and sediment pollution

- Objecting to state-issued CWA National Pollutant Discharge Elimination System (NPDES) permits

---

[3] EPA would not expect states that did not sign the Chesapeake 2000 Agreement but have committed to the water quality goals through a Memorandum of Understanding (Delaware, New York and West Virginia) to commit to establish and implement Clean Water Accountability Programs based on regulations, permits or enforceable agreements if they commit to an alternative program or programs that EPA can be assured will result in necessary loading reductions and demonstrate progress toward these goals through 2-year milestones.

- Acting to limit or prohibit new or expanded discharges of nutrients and sediments

- Withholding, conditioning, or reallocating federal grant funds

- Taking other actions as appropriate

EPA would hold itself accountable by adopting 2-year federal milestones for completing the actions described in item 2) below. EPA also would work with its federal partners, the six Bay watershed states, and the District of Columbia to control wastewater discharges and prevent runoff from federal facilities and lands, and account for these actions using federal 2-year milestones or a similarly transparent process.

2. **New rulemakings/actions under the CWA, the CAA, and other authorities.** To lead by example, EPA would initiate several actions to establish transparent accountability and set strong performance standards for restoring the Bay.

EPA would initiate rulemaking under the CWA to reduce nutrient and sediment pollution in the Chesapeake Bay watershed from the following sources, unless states strengthen their pollution control programs to achieve similar or greater reductions that EPA would achieve through rulemaking:

- Concentrated animal feeding operations (CAFOs): Expand the universe of regulated operations and set new minimum performance standards for permits, including regulating the land application of animal manure

- Stormwater: Expand the jurisdiction of the regulatory MS4 program to include high-growth areas and establish stringent minimum performance standards within permits consistent with Bay water quality goals

- New or expanding sources of nutrients and/or sediment: Ensure that any new or expanding discharges are offset by reductions from other sources at levels that account for scientific uncertainty and are in addition to existing commitments necessary to achieve Bay water quality goals

- Other pollutant sources as EPA deems necessary

EPA would propose and finalize its rulemakings as expeditiously as possible. The rules would be developed pursuant to authority provided in Sections 117 and 402 of the CWA and other relevant statutory provisions.

EPA would implement a Chesapeake Bay compliance and enforcement strategy that focuses on four key sectors — stormwater, CAFOs, municipal and industrial wastewater facilities, and stationary and mobile air sources.

EPA would ensure advanced nutrient removal technologies are installed by the 483 municipal and industrial wastewater dischargers that, collectively, discharge about 90 percent of the total municipal/industrial wastewater flow to the Bay, as necessary to meet these facilities' water quality-based permit limits. EPA would take action to ensure these technology upgrades stay on schedule, including objecting to draft permits as appropriate.

To assist the states in their management of pollution from onsite systems, EPA would develop a model state program for reducing discharges from onsite (septic) systems and set clear expectations that the jurisdictions commit to achieve Bay TMDL onsite system load allocations through enforceable or similarly effective programs.

EPA would fully implement its current nitrogen emission control programs and establish air deposition allocations as part of the load allocations for the Chesapeake Bay and tributary TMDLs. EPA would analyze whether additional reductions are needed to meet the air allocation targets.

The Executive Order directs Agencies to consult with the Federal Leadership Committee and, to the extent practicable and authorized under existing authorities, begin implementing core elements of their protection and restoration programs and strategies as soon as possible and prior to release of a final strategy. While EPA develops new regulations and programs, the Agency will also take action using a range of existing authorities to reduce nutrient and sediment pollution to the Bay.

EPA would account for, and track progress on, all of its rulemakings, actions, and their subsequent pollution reductions by adopting federal 2-year milestones.

3. **An enhanced partnership between USDA and EPA to implement a "Healthy Bay – Thriving Agriculture" Initiative.** Meeting the challenges in the Bay would require federal agencies to commit and coordinate resources on a scale that matches the scope of the environmental and agricultural issues in the region. EPA has a unique opportunity to undertake with USDA several new and ambitious efforts that build and expand upon the strong working relationships that have been reinforced in the development of the Chesapeake Bay Watershed Initiative. There are several key areas that could result in significant improvements for the Bay and farming communities:

   - Development and implementation of an intensive and strategic effort to expand the use of key conservation practices in the high priority watersheds in the Bay

   - Coordination on the development with other federal and state partners of next generation nutrient management planning tools

   - Establishment of centerpiece projects in each of the Bay states to demonstrate benefits of significant and innovative conservation approaches to addressing key issues in the region

   - Implementation of a targeted, collaborative initiative using USDA and EPA funds to support development of critically needed tools and technologies that can create new market and revenue streams that support the adoption of conservation measures

Through the alignment of resources and continued work with federal, state, and local partners, the collaboration of EPA and USDA would accelerate the wider adoption of conservation practices and support innovative efforts to address some of the most pressing challenges to meeting water quality and agricultural goals in the Bay.

# Introduction

## Background

### Importance of the Bay

The Chesapeake Bay is one of the most extraordinary places in America. This unique estuary is the largest in the nation and third largest in the world. Its 64,000-square-mile watershed spans parts of six states – Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia – and the entire District of Columbia. The Bay and its watershed have remarkable ecological, economic, recreational, historic, and cultural value to the region.

Economists have estimated the Bay's value at more than $1 trillion, and its bounty includes over 500 million pounds of seafood per year.

Supporting more than 3,600 species of plants, fish, and other animals, the Chesapeake is home to 29 species of waterfowl and is a major resting ground along the Atlantic Flyway.

### History and Progress of Prior Recovery Efforts

Since 1983, a state-federal Chesapeake Bay Program has coordinated and conducted Chesapeake Bay watershed restoration efforts.

Bay Program partners include the U.S. Environmental Protection Agency (EPA); the U.S. Department of Agriculture (USDA); the states of Delaware, Maryland, New York, Pennsylvania, Virginia, and West Virginia; the District of Columbia; the Chesapeake Bay Commission, a tri-state legislative body; and advisory groups of citizens, scientists, and local government officials. The restoration effort has also involved numerous other federal agencies, including the National Oceanic and Atmospheric Administration (NOAA), National Park Service, U.S. Army Corps of Engineers (USACE), U.S. Department of Defense, U.S. Fish and Wildlife Service, U.S. Forest Service, and U.S. Geological Survey.

The Chesapeake Executive Council, comprised of the Governors of the Chesapeake Bay states, the Mayor of the District of Columbia, the chairperson of the Chesapeake Bay Commission, and the Administrator of EPA, leads the partnership.

The partnership has been guided by a series of agreements, including Chesapeake 2000 that established goals for the health of the Bay and commitments to adopt restoration measures to return the ecosystem to a healthy state. The Bay Program has developed unparalleled watershed science and cooperative efforts, and pioneered cleanup strategies that have resulted in measureable gains in reducing the flow of pollutants into the Bay and improving aquatic habitat for the Bay's living resources – all in the face of rapidly growing population in the watershed.

Yet despite so much important work, the health of the Bay is still severely degraded and unacceptable. The Bay continues to have poor water quality, degraded habitats and low populations of many species of fish and shellfish. Based on these three areas, the overall health of the Bay in 2008 averaged 38 percent, with 100 percent representing a fully restored ecosystem. Water quality is only at 21 percent of goals, primarily because of pollution from excess nitrogen, phosphorus, and sediment entering the water. The main sources of these pollutants are agriculture, urban and suburban runoff, wastewater, and airborne contaminants.

**ESJA 32**

## Need for Further Action

The Bay Program's Executive Council has acknowledged that the 2010 restoration goals called for in the Chesapeake 2000 agreement will not be met. Among other shortfalls, current efforts to reduce nutrient and sediment pollution are not sufficient to meet the Bay's water quality goals. In May 2009, the Executive Council set a new deadline to have all restoration measures in place no later than 2025, paced by a series of 2-year milestones.

To restore the Chesapeake Bay and its watershed, many more measures must be put in place to reduce pollution, restore habitats, manage fisheries, protect watersheds, and foster stewardship. It will take a determined and concerted effort – a new dynamic – to advance from a Bay that is meeting only a fraction of its health goals to one that is fulfilling its promise as one of the world's most productive and valuable estuaries.

## *Executive Order Directive for this Report and its Integration into a Coordinated Strategy for Protecting and Restoring the Bay*

On May 12, 2009, President Obama signed Executive Order 13508—*Chesapeake Bay Protection and Restoration*—to protect and restore the health, heritage, natural resources, and social and economic value of the Nation's largest estuary system: the Chesapeake Bay.

In the preamble to this Order, the President stated a number of findings, including the following:

- Despite significant efforts by federal, state, and local governments, the Bay is not meeting existing water quality standards or the "fishable and swimmable" goals of the Clean Water Act (CWA).

- The current level and scope of pollution control programs for the Bay are not likely to restore the Bay for many years.

- The pollutants that are largely responsible for pollution of the Chesapeake Bay are nutrients, in the form of nitrogen and phosphorus, and sediment. These pollutants come from many sources, including sewage treatment plants, city streets, development sites, agricultural operations, and deposition from the air onto the waters of the Chesapeake Bay and the lands of the watershed.

- Restoring the Bay will require a renewed commitment to controlling pollution from all sources as well as protecting and restoring habitat and living resources, conserving lands, and improving management of natural resources, all of which contribute to improved water quality and ecosystem health.

- The federal government should lead the effort. Executive departments and agencies, working in collaboration, can use their expertise and resources to contribute significantly to improving the health of the Chesapeake Bay. Progress in restoring the Chesapeake Bay also will depend on the support of state and local governments, the enterprise of the private sector, and the stewardship provided to the Chesapeake Bay by all the people who make this region their home.

Section 202 of the Executive Order directs federal departments and agencies to draft seven reports that address key challenges to protecting and restoring the Bay within 120 days (by September 9, 2009). Section 202(a) directs EPA to draft a report that makes recommendations

for the next generation of tools and actions that will be used to restore the Bay, as well as changes to regulations, programs, and policies for implementing these actions.

In drafting this report, section 301 of the Order directs EPA to consult with appropriate state agencies on how to maximize the agency's use of authorities under the CWA to protect and restore the Bay. The Order directs EPA to consider appropriate revisions to guidance and regulations and identify pollution control strategies and actions under EPA's existing authorities that do the following:

a) Establish a clear path to meeting, as expeditiously as practicable, water quality and environmental restoration goals for the Chesapeake Bay

b) Are based on sound science and reflect adaptive management principles

c) Are performance oriented and publicly accountable

d) Apply innovative and cost-effective pollution control measures

e) Can be replicated in efforts to protect other bodies of water, where appropriate

f) Build on the strengths and expertise of federal, state, and local governments, the private sector, and citizen organizations

Section 302 of the Executive Order requires that the strategies and actions identified by the EPA Administrator in preparation of the section 202(a) report include the following elements (to the extent permitted by law):

a) CWA tools, including strengthening existing permit programs and extending coverage where appropriate

b) New, minimum standards of performance where appropriate, including the following:

   i. A schedule for the implementation of key actions in cooperation with states, local governments, and others

   ii. Watershed-based frameworks that assign pollution reduction responsibilities to pollution sources and maximize the reliability and cost-effectiveness of pollution reduction programs

   iii. A compliance and enforcement strategy

Section 203 of the Order directs a Federal Leadership Committee, chaired by EPA Administrator Jackson, to review the seven draft reports submitted under section 202 of the Order, including EPA's section 202(a) report, and suggest appropriate revisions to the reports. The Committee will integrate these reports and prepare a draft strategy for coordinated implementation of existing programs and projects to guide efforts to protect and restore the Bay that, to the extent permitted by law:

a) Defines environmental goals for the Chesapeake Bay and describe milestones for making progress toward attainment of these goals

b) Identifies key measureable indicators of environmental condition and changes that are critical to effective Federal leadership

c) Describes the specific programs and strategies to be implemented, including the programs and strategies described in draft reports developed under section 202 of this Order

d) Identifies the mechanisms that will assure that governmental and other activities, including data collection and distribution, are coordinated and effective, relying on existing mechanisms where appropriate

e) Describes a process for the implementation of adaptive management principles, including a periodic evaluation of protection and restoration activities

Within 180 days (by November 8, 2009), the Committee will publish the draft strategy for public comment and the agencies will release their final section 202 reports. Within 1 year, the Committee will publish a final strategy. To the extent practicable and permitted under existing authority, agencies may begin implementing core elements of their restoration and protection programs, in consultation with the Committee, as soon as possible and prior to release of the final strategy.

In preparing the reports under section 202 and the strategy under section 203, the Order directs agencies and the Committee to consult extensively with Chesapeake Bay states and the District of Columbia. The goal of this collaboration is to ensure that federal actions to protect and restore the Bay are coordinated with the actions of state and local agencies, and utilize the resources, authorities, and expertise of all levels of government (federal, state, and local) in the most efficient manner to benefit the Chesapeake Bay.

### *State Consultation and Outreach*

While drafting this draft report, EPA staff met with officials from each of the six Chesapeake Bay watershed states and the District of Columbia and met with the Principals Staff Committee of the Chesapeake Executive Council. EPA held three formal listening sessions, one with developers and homebuilders, one with the agricultural community, and one with local governments. EPA staff attended numerous public meetings to speak and answer questions.

### *The Water Quality Challenge: Nutrients and Sediment*

Water quality is a critical measure of the Chesapeake Bay's health. For the Bay to be healthy and productive, the water must be safe for people and support aquatic life, such as fish, crabs, and oysters. The water should be fairly clear, have enough oxygen, contain the proper amount of algae, and be free from chemical contamination.

Excess nitrogen, phosphorus, and sediment lead to murky water and algae blooms, which block sunlight from reaching bay grasses and create low levels of oxygen for aquatic life. In 2008, water quality was again very poor, meeting only 21 percent of the goals established in the *Chesapeake 2000* agreement (see Figure 1).



**Figure 1. Water Quality (Percent of Pollution Reduction Goal Met in 2008)**

The main sources of nutrient and sediment pollution are agriculture, urban and suburban runoff, wastewater, and atmospheric deposition (Figure 2).



**Note:** Does not include loads from tidal shoreline erosion or the ocean. Urban/suburban runoff loads due to atmospheric deposition are included under atmospheric deposition loads. Wastewater loads based on measured discharges; other loads are based on an average hydrology year using the Chesapeake Bay Program Airshed Model and Watershed Model Phase 4.3 (CBPO, 2009).

**Figure 2. Relative Responsibility for Pollution Loads to the Bay**

## Agriculture

Agriculture covers about 25 percent of the watershed, representing the largest intensively managed land use. There are an estimated 87,000 farms covering about 8.5 million acres. Agriculture is the number one source of nutrient and sediment pollution to the Bay. While significant efforts and progress have been made, improperly applied fertilizers and pesticides still flow into creeks, streams, and rivers, which carry excess nitrogen, phosphorus, and chemicals into the Chesapeake Bay. Tilling cropland and irrigating fields can cause major erosion. Additionally, the nutrients and bacteria found in animal manure can seep into groundwater and run off into waterways.

## Urban and Suburban Lands

Human development, ranging from small subdivisions to large cities, is a major source of pollution for the Chesapeake. There are about 17 million people living in the Chesapeake Bay watershed. In fact, because of the region's continued population growth and related construction, runoff from urban and suburban lands is the one of the sources of pollution that is increasing. These areas are covered by impervious surfaces (such as roads, rooftops, and parking lots) that do not let water penetrate. As a result, water runs off into waterways instead of filtering into the ground. This runoff carries pollutants including lawn fertilizer, pet waste, chemicals, and trash.

## Wastewater

There is a tremendous volume of sewage that must be treated in the watershed. The pollution reduction technologies used in the past by the region's 483 major municipal and industrial wastewater treatment plants did not remove enough pollution, particularly nitrogen and phosphorus. Upgrading these facilities is now underway, so they can remove more pollution from the water,

but this effort will take time and is very expensive. As population in the Bay watershed increases, there will be a need for additional advanced wastewater treatment to keep wastewater loads from increasing.

Loads from septic systems, which release nitrogen that can eventually end up in the water, are also increasing.

## Air Pollution

When pollution is released into the air, it eventually falls onto land and water. Even larger than the Chesapeake Bay's watershed is the Bay's airshed (Figure 3), which is defined as the area containing the air emission sources contributing 75 percent of the nitrogen deposited from the air to the Bay and its watershed. Defined in this manner, the Chesapeake Bay airshed is about 570,000 square miles, or seven times the size of the watershed. Nitrogen and chemical contaminants (such as mercury and poly-chlorinated biphenyls (PCBs)) from air pollution contribute to poor water quality in the region. Air pollution is generated by a variety of sources, including power plants, industrial facilities, farming operations and automobiles and other gas-powered vehicles. About 21-28 percent of nitrogen loading to the Bay comes from non-agricultural atmospheric deposition, more than from all municipal and industrial wastewater treatment plants.



**Figure 3. Chesapeake Bay Airshed**

## Reducing Pollution

The EPA Chesapeake Bay Program Office estimates that the maximum amount of nutrients the Chesapeake Bay can receive from the watershed and still meet water quality standards is approximately 175 million pounds of nitrogen and 14.1 million pounds of phosphorous annually. (The Chesapeake Bay receives an additional 17 million pounds of nitrogen loads through direct atmospheric deposition to the Bay's tidal waters.)

Recent work with the Chesapeake Bay Watershed Model shows that reducing loads to levels needed to meet the states' Bay water quality standards will be more difficult than previously thought. Despite all the progress made to date, achieving target loads of 175 million pounds of nitrogen and 14.1 million pounds of phosphorus will require a further 44 percent reduction in nitrogen loads and a further 27 percent reduction in phosphorus loads from estimated 2008 levels (Figures 4 and 5). (The Chesapeake Bay Program Office has not yet run updated scenarios for sediment.)

**ESJA 37**

The Chesapeake Executive Council has committed to implement all controls necessary to restore the Bay's water quality by no later than 2025. Restoring water quality in the Chesapeake Bay watershed will require significantly more widespread implementation of pollution reduction practices by all categories of sources of nutrient and sediment pollution to the Bay.

Reducing pollution will become an even greater challenge as population and development in the Bay watershed increase. The population is expected to increase by almost 30 percent between 2000 and 2030, thereby increasing wastewater and septic system loads. If current trends continue, impervious cover could increase 60 percent by 2030, leading to greater stormwater runoff. Pollution from agricultural may not decrease as fewer acres are in cultivation because the density of animals may increase. All of this means that programs to achieve the states' Bay water quality standards must account for growth as well as address existing loads.



*    1985 loads based on Chesapeake Bay Program Watershed Model Phase 5.1 Scenario; 2008 and Target loads are estimated. Jurisdictions would include in their Clean Water Accountability Program commitments to meeting the source sector loading targets that comprise basinwide nutrient caps. For comparison, full implementation of Tributary Strategies developed by states and DC to meet 2003 allocations would result in 244 million lbs N and 16 million lbs P delivered to the Bay annually.

**   Atmospheric deposition to tidal waters is a direct input to the Water Quality and Sediment Transport Model and is not included in the Watershed Model sources illustrated here. The Watershed Model accounts for loads from atmospheric deposition to the watershed based on where they are deposited. Decreases in atmospheric deposition contribute to reductions in loads from forest, agriculture and developed land, and direct deposition to non-tidal waters.

**Figure 4. Estimated Nitrogen Loads Delivered to the Chesapeake Bay**



Figure 5. Estimated Phosphorus Loads Delivered to the Chesapeake Bay

## Current Legal and Policy Framework

This section contains legal and policy background information that is useful for understanding key elements of EPA's section 202(a) Report and, in particular, how EPA intends to use its existing CWA authorities to set new expectations for states to control discharges of nutrient and sediment sources to the Bay.

### Ongoing Efforts to Develop a Bay TMDL for Nutrients and Sediment

Because the water quality goals set forth in the *Chesapeake 2000* Agreement will not be met by 2010, and because impaired segments of the Bay remain on the states' CWA section 303(d) lists, EPA is establishing a federal Total Maximum Daily Load (TMDL) for nutrients and sediment for the Chesapeake Bay and its tidal tributaries. As described in section 303(d) of the CWA, a TMDL identifies the pollutant loading reductions needed for a waterbody to meet applicable water quality standards. The Bay TMDL, which will be the largest watershed TMDL to date, will account for all nutrient and sediment loadings to the Bay and its tidal tributaries from within the 64,000 square mile Bay watershed. That watershed includes parts of six states (New York, Pennsylvania, West Virginia, Maryland, Delaware and Virginia) and the District of Columbia. The Bay TMDL is scheduled to be completed in December 2010.

EPA Region 3, the lead agency for the Bay TMDL, is working with EPA Region 2 and modeling and water quality experts at the Chesapeake Bay Program Office to develop the Bay TMDL. EPA has directly engaged the six watershed states and the District of Columbia in the process through the Chesapeake Bay Program's committee structure.

Under the TMDL process, EPA intends to provide the six watershed states and the District of Columbia with draft loading reduction targets for nitrogen and phosphorus for each major river basin in the fall of 2009. EPA expects that the seven jurisdictions will use these draft loading targets to further subdivide and allocate the needed reductions among point and nonpoint sources of nutrient and sediment pollution. Using that information, EPA intends to establish waste load and load allocations for those sources in the Bay TMDL.

Because the Bay TMDL will allocate pollutant reductions to both point and nonpoint sources to meet the Bay's water quality standards, EPA expects the six watershed states and the District of Columbia to provide EPA with documented "reasonable assurance" that nonpoint source loading reductions will be achieved as a condition for reflecting such reductions in the Bay TMDL. EPA's expectations for "reasonable assurance" include the following:

1. Identification of the reductions needed to achieve the allocations identified in the proposed TMDL.

2. Identification of the current state and local capacity to achieve the needed reductions (i.e., an assessment of current point source permitting/treatment upgrade funding programs and nonpoint source control funding, programmatic capacity, regulations, legislative authorities, participation and compliance rates).

3. Identification of the gaps in current programs to achieve the needed controls (additional incentives, state or local regulatory programs, market-based tools, technical or financial assistance, new legislative authorities, etc.).

4. A commitment from each state and the District to work to systematically fill the identified gaps to build the program capacity needed to achieve the needed controls. As part of this commitment, the states and the District would agree to meet specific, iterative, and short-term (2-year) milestones demonstrating increased levels of implementation and/or nutrient and sediment load reductions.

5. A commitment to continue efforts underway to expand monitoring, tracking, and reporting directed towards assessing the effectiveness of implementation actions and use these data to drive accountability and adaptive decision-making, and redirect management actions.

6. An agreement that if jurisdictions do not meet these commitments, additional measures will be necessary.

Ultimately, because EPA- or state-issued permits under the CWA must include effluent limitations necessary to achieve the states' Bay water quality standards, if nonpoint sources do not accomplish the loading reductions identified as necessary in the Bay TMDL, more stringent effluent limits in CWA permits for point sources may be necessary.

## Chesapeake Executive Council 2025 Goal and 2-year Milestones

A second component of the policy and legal framework is the May 2009 commitment of the Chesapeake Bay watershed's six state governors and the mayor of the District of Columbia to

ensure that all needed pollution reduction controls and best management practices needed to restore Bay water quality are in place no later than 2025. The Governors and the Mayor also agreed to a process under which the states and the District of Columbia committed to make program modifications and achieve interim targets for reducing pollutant loadings to the Bay in a series of "2-year milestones."

## Section 117(g) of the CWA

A third component of the policy and legal framework is section 117 of the CWA which includes provisions specific to the Chesapeake Bay and its watershed. In particular, Congress added section 117(g) in 2000 which, among other provisions, states "The Administrator, in coordination with other members of the Chesapeake Executive Council, shall ensure that management plans are developed and implementation is begun by signatories [EPA, Maryland, Virginia, Pennsylvania, District of Columbia, and the Chesapeake Bay Commission] to the Chesapeake Bay Agreement to achieve and maintain –

> (A) the nutrient goals of the Chesapeake Bay Agreement for the quantity of nitrogen and phosphorus entering the Chesapeake Bay and its watershed;

> (B) the water quality requirements necessary to restore living resources in the Chesapeake Bay ecosystem; . . . . ." section 117 (g)(1).

Section 117(g) provides a legal framework for ensuring that the signatory jurisdictions develop and begin implementing management plans that achieve the nutrient and sediment loading reductions needed to restore the Bay.

The other three states in the Chesapeake Bay watershed – New York, Delaware, and West Virginia – have formally committed to achieve the nutrient and sediment reduction targets necessary to achieve the goals of the *Chesapeake 2000* Agreement by signing a Memorandum of Understanding with the signatories in 2000 (DE, NY) and 2002 (WV). These states have since signed several Chesapeake Executive Council directives making additional Bay water quality restoration commitments, including adoption of jurisdiction-specific 2-year water quality milestones described above.



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

NOV - 4 2009

The Honorable L. Preston Bryant, Jr.
Secretary of Natural Resources
Patrick Henry Building
1111 East Broad Street
Richmond, Virginia 23219

Dear Secretary Bryant:

The purpose of this letter is to provide the Chesapeake Bay Program's Principals' Staff Committee with the U.S. Environmental Protection Agency's [1] expectations for the Watershed Implementation Plans, which the six watershed States and the District of Columbia will submit in support of the development of the draft and final Chesapeake Bay Total Maximum Daily Load (Bay TMDL).

## Background and Overview of Watershed Implementation Plans

As you are aware, EPA is establishing a federal TMDL for the tidal segments of the Chesapeake Bay and its tidal tributaries and embayments that are listed as impaired or segments that deliver pollutant loads to segments listed as impaired under Section 303(d) of the Clean Water Act (CWA) due to excess nutrients and sediment. The scope of this TMDL includes nutrient and sediment loads delivered to the Bay from all sources throughout the watershed as well as atmospheric deposition of nitrogen to the watershed and tidal waters from air emission sources within and outside the watershed. The Bay TMDL will satisfy the requirements of both the 1999 Virginia and 2000 District of Columbia consent decrees as well as Maryland's request that EPA develop TMDLs by May 2011 for Bay and tidal tributary waters listed on the Virginia, District of Columbia, and Maryland 303(d) lists due to impairments caused by nutrients and sediment.

Over the past 15 months, the Chesapeake Executive Council, Principals' Staff Committee, EPA, and the President of the United States have all expressed a need for acceleration of our progress toward restoration of Chesapeake Bay, a sharper emphasis on explicit actions, and greater transparency and accountability in these efforts. The Watershed Implementation Plans (Plans) are a key element of this new era of ecosystem restoration, greater transparency and accountability, and improved performance. The Plans, developed by each of

---

[1] These expectations were jointly developed by the U.S. Environmental Protection Agency's Region III Water Protection Division and Chesapeake Bay Program Office, EPA Region II, and the EPA Headquarters' Office of Water.

1

**ESJA 42**

the six watershed States and the District of Columbia (District) pursuant to Section 117(g)(1) of the CWA, will provide a roadmap for how the States and the District, in partnership with federal and local governments, will achieve and maintain the Bay TMDL nitrogen, phosphorus, and sediment allocations necessary to meet the States' and the District's Bay water quality standards. In combination with the two-year milestones and follow-up progress reports to the public, these Plans also fulfill the heightened expectation within *Executive Order 13508: Chesapeake Bay Protection and Restoration* to create a new accountability framework that guides local, state, and federal water quality restoration efforts.

EPA expects the jurisdictions' Watershed Implementation Plans to identify a schedule for accomplishing reductions in nutrient and sediment loads needed to attain water quality standards. EPA also expects Plans to include dates for enhancing programs and implementing key actions to achieve these reductions, with all such actions to be implemented as soon as possible and by no later than 2025. These actions could include adopting new regulatory authorities, improving compliance with existing regulations, securing additional resources for cost-share programs, and issuing National Pollutant Discharge Elimination System (NPDES) permits with more stringent effluent limits.

Consistent with EPA's September 11, 2008 letter to the Principals' Staff Committee and *Executive Order 13508*, EPA has heightened expectations that all of the Bay jurisdictions will achieve and maintain nutrient and sediment reductions necessary to meet the Bay's water quality standards, including offsetting any new or increased loads from population growth and land use changes anticipated in the coming decades. Among these expectations is that all of the Bay jurisdictions develop Watershed Implementation Plans designed to accomplish those goals by implementing the point and nonpoint source pollutant allocations in the Chesapeake Bay TMDL. EPA's expectations for development of these Plans are uniform for all Bay jurisdictions, except in one respect. EPA expects the signatories to the *Chesapeake 2000* agreement, i.e., Maryland, Virginia, Pennsylvania, and the District of Columbia, to develop Plans to achieve needed nutrient and sediment reductions whose control actions are based on regulations, permits or otherwise enforceable agreements that apply to all major sources of these pollutants, including nonpoint sources. EPA does not necessarily expect Delaware, New York, and West Virginia to base all control actions identified in their Plans on such regulations, permits, or enforceable agreements, but nevertheless strongly encourages them to do so. This difference in expectations reflects, in part, the jurisdictions' different status as signatories (or not) of the *Chesapeake 2000* agreement and the implications of that status for EPA's expectations pursuant to CWA Section 117(g). Section 117(g)(1) provides that EPA, in coordination with the other members of the Chesapeake Executive Council, "shall ensure that management plans are developed and implementation is begun by signatories to the Chesapeake Bay Agreement . . ." Nonetheless, consistent with previous TMDL guidance, EPA expects that Plans and follow-up actions in the non-signatory States will also result in the necessary loading reductions. All States, including Delaware, New York, and West Virginia, are expected to demonstrate progress through two-year milestones. These expectations are further discussed in Enclosure B.

**ESJA 43**

**Purpose of Watershed Implementation Plans in the TMDL Development Process**

The Watershed Implementation Plans fulfill several crucial components of the Bay TMDL implementation framework described in EPA's September 11, 2008 letter to the Principals' Staff Committee. These Plans contribute directly to a fair and transparent wasteload and load allocation process. As illustrated in Figure 1, EPA put forward nutrient target loads for the eight major basins within each of the six watershed States and the District on November 4, 2009 based on recommendations from the Principals' Staff Committee. EPA will develop and propose a similar set of sediment target loads for major basins next Spring.

Figure 1. Overview of Watershed Implementation Plan and TMDL Development Process



Schedule based on completion of the Bay TMDL by December 31, 2010.

EPA recognizes that the level of detail it expects the States and the District to include in the Watershed Implementation Plans will take time to develop and has divided the Watershed Implementation Plan development process into three distinct phases. For the Phase I Watershed Implementation Plans, EPA expects the States and the District to divide the basin nutrient and sediment target loads among nonpoint source sectors and individual permitted sources within the area draining to each of the 92 303(d) segments.[2] The Phase I Plans provide a mechanism for the States and the District, engaging with local partners, to provide information for EPA to consider when it establishes wasteload allocations for point sources and load allocations for nonpoint sources within each of the 92 303(d) segments of the Bay and its tidal tributaries and embayments. The eight major basins that together comprise the Chesapeake Bay watershed and

---

[2] Where data limitations exist, EPA may allow States and the District to aggregate loads from permitted facilities.

the 303(d) segment drainage areas within each basin are illustrated in Figure A1 and listed in Table A1 of Enclosure A. These allocations will include a margin of safety and will collectively comprise the Bay TMDL.

EPA expects Phase I Watershed Implementation Plans to include a description of the authorities, actions, and, to the extent possible, control measures that will be implemented to achieve these point source and nonpoint source target loads and TMDL allocations. EPA also expects the Phase I Plans to include information for permit writers to issue permits for point sources that are consistent with wasteload allocations. This information is particularly important for non-tidal States (Pennsylvania, New York, and West Virginia) that wish to receive a gross wasteload allocation in the Bay TMDL. EPA will only establish a gross wasteload allocation in these States if their Plans contain enough detail to inform individual permits for sources within the wasteload allocation. For the tidal jurisdictions (Maryland, Virginia, Delaware, and the District of Columbia), EPA expects to establish individual wasteload allocations for all significant point sources to the extent possible. Enclosure B provides additional information on the details that EPA expects within the Watershed Implementation Plans to support the Bay TMDL. EPA requests that States and the District submit preliminary and draft Phase I Plans by June 1 and August 1, 2010, respectively, to inform the draft Bay TMDL. EPA expects States and the District to revise and submit final Phase I Plans by November 1, 2010, to support the final Bay TMDL that EPA will establish in December 2010.

EPA expects States and the District to develop Phase II Watershed Implementation Plans, to be submitted in draft and final by June 1, 2011, and November 1, 2011, respectively, that further divide nonpoint source load allocations and any aggregate point source wasteload allocations (e.g., for nonsignificant facilities) among smaller geographic areas, or facilities or sources where appropriate. This targeting of nutrient and sediment loads to a finer scale will help local decision-makers, including municipal governments, conservation districts, and watershed associations, better understand their contribution to and responsibilities for reducing pollutant loads. EPA encourages States to work closely with local elected decision-makers, local agency staff, and other local partners as they develop these more specific nutrient and sediment target loads. EPA does not expect these locality-specific target loads until after the TMDL is established to allow additional time for meaningful engagement with local partners. Enclosure B includes suggested considerations for selecting an appropriate scale for local targets. EPA also expects States and the District to work with local partners and identify within their Phase II Plans specific controls and practices that will be implemented by no later than 2017 to meet interim water quality goals.

Finally, EPA expects that States and the District will work with local partners to submit Phase III Watershed Implementation Plans in 2017 with refined actions and controls that will be implemented between 2018 and 2025 to achieve water quality standards. Enclosure D provides a schedule summarizing when the Agency expects States and the District to submit each phase of their Watershed Implementation Plans.

As the following Enclosures emphasize, the Watershed Implementation Plans are part of a broader, ongoing accountability framework. EPA will assess progress toward fulfilling the

4

pollution reduction targets identified in the Plans, meeting the Bay TMDL allocations, and achieving the Chesapeake Executive Council's goal that all pollution control measures necessary for a restored Bay be in place as soon as possible but by no later than 2025 through implementation of the States' and the District's two-year milestones. EPA expects that the States and the District will identify and commit to implement specific pollutant reduction controls and actions in each of their successive two-year milestones. Prior to the start of each milestone period, EPA will evaluate whether these two-year commitments are sufficient to achieve the pollutant reduction identified in the Plans at the end of each two-year milestone period and whether the States and the District have fulfilled their milestone commitments. EPA expects that the Watershed Implementation Plans and two-year milestones will contain greater source sector and geographic load reduction specificity, more rigorous assurances that load reductions will be achieved, and more detailed and transparent reporting to the public than past Bay restoration efforts. EPA expects this new accountability framework, including development of the initial Phase I Watershed Implementation Plans prior to the establishment of the Bay TMDL and jurisdictions' commitment to update Plans and adopt two-year milestones, will demonstrate greater assurance to EPA that the TMDL point and nonpoint source allocations can and will be achieved and maintained.

The Virginia and District of Columbia consent decrees require that EPA establish the Bay TMDL by May 1, 2011. EPA expects to complete the Bay TMDL by December 31, 2010. In order to establish a final TMDL by December 2010, EPA must propose a draft TMDL, including wasteload and load allocations for each of the 92 tidal Bay segments and tributaries, by August 2010, followed by a 60-day public comment period. For EPA to review and incorporate information in the Plans into its proposed TMDL, EPA must receive preliminary Phase I Plans by June 1, 2010. EPA will evaluate these Plans and work with the States and District to make any necessary changes prior to proposing the draft Bay TMDL. The States and the District will submit updated, draft Plans by August 1, 2010, that will be published for public comment along with the draft Bay TMDL. EPA would expect the States and the District to complete any revisions to their Plans by November 1, 2010 in order for EPA to incorporate any changes in the Plans into the final Bay TMDL by December 31, 2010. EPA recognizes that these Watershed Implementation Plans will be refined and gain specificity in Phases II and III.

## EPA Commitments

If any State or the District does not submit a Watershed Implementation Plan to EPA as part of the Bay TMDL development process, or submits a Plan that does not meet EPA's expectations, EPA may take any, or all, of a variety of actions or "consequences" it will identify and discuss in a separate letter to be sent to the Chesapeake Bay Program Principals' Staff Committee later this Fall. Likewise, if any State or the District does not submit or fulfill its two-year milestones for nutrient and sediment reductions, EPA may take any of a number of actions or consequences to be identified in that letter. Consequences may include but are not limited to: revising the Bay TMDL wasteload allocations to assign more stringent pollutant reduction responsibilities to point sources of nutrient and sediment pollution; objecting to state-issued CWA NPDES permits; acting to limit or prohibit new or expanded discharges of nutrients and sediments; and/or withholding, conditioning, or reallocating federal grant funds.

5

EPA recognizes and applauds the substantial efforts the States and District are prepared to take to enhance their program capacity and meet the TMDL's nutrient and sediment reduction targets. Leading by example, EPA and its federal partners are prepared to meet similar expectations and be fully accountable and transparent to the public. As proposed in the draft *Executive Order 13508* recommendations released on September 10, 2009, EPA will assume responsibility for the Bay TMDL's load allocations for atmospheric deposition of nitrogen to the Bay watershed and tidal waters by establishing federal standards and working with jurisdictions to comply with these standards. Specifically, EPA will: 1) analyze reductions of nitrogen from atmospheric sources that could be achieved, known as controllable loads; 2) establish separate load allocations to tidal waters; 3) build quantitative assumptions into load allocations in the watershed that a portion of necessary reductions will be achieved through compliance with federal standards and regulatory actions to further reduce atmospheric deposition; 4) work with States to implement the federal regulations and encourage additional voluntary programs; and 5) set specific commitments and track progress through EPA's own set of two-year milestones. Likewise, EPA will expect federal facilities to meet performance standards for enhanced stormwater management that will be reflected within the Bay TMDL wasteload and load allocations. EPA or the NPDES permitting authority will track progress toward meeting enhanced stormwater management by federal facilities through its two-year milestones.

**Enclosures**

Enclosure A describes the degree of spatial resolution of the Bay TMDL wasteload and load allocations. Enclosure B discusses EPA's expectations for the development of the Watershed Implementation Plans. Enclosure C distinguishes the Plans and future two-year milestones from past tributary strategies and milestone commitments. Enclosure D provides EPA's schedule for the development of the Bay TMDL, separate phases of the Watershed Implementation Plans, and two-year milestones.

If you have any questions, please contact Mr. Jon M. Capacasa, Director, Water Protection Division, at (215) 814-5422 or Mr. Robert Koroncai, Chesapeake Bay TMDL Manager, at (215) 814-5730.

Sincerely,

William C. Early
Acting Regional Administrator

cc:
Chesapeake Bay Program Principals' Staff Committee Members
Peter Silva, Assistant Administrator, Office of Water, U.S. Environmental Protection Agency
J. Charles Fox, Senior Advisor to the Administrator, U.S. Environmental Protection Agency
George Pavlou, Acting Regional Administrator, Region II, U.S. Environmental Protection
   Agency

6

**ESJA 47**



**Re: Fw: Summary of Our Call Today on WV WIP Review** 
**Katherine Antos**  to:  Robert Wood                                    12/21/2010 01:59 PM
Cc:  Leo Essenthier, Lucinda Power, Kelly Gable, Christopher Day

Thx!

Katherine Wallace Antos
Chesapeake Bay Program Office
U.S. Environmental Protection Agency
410 Severn Ave., Suite 112
Annapolis, MD  21403

(410) 295-1358

| Robert Wood | Katherine, Leo and Lucinda: Wanted to be sure... | 12/21/2010 01:54:04 PM |
|---|---|---|

| From: | Robert Wood/DC/USEPA/US |
|---|---|
| To: | Katherine Antos/CBP/USEPA/US@EPA, Leo Essenthier/R3/USEPA/US@EPA, Lucinda Power/DC/USEPA/US@EPA |
| Date: | 12/21/2010 01:54 PM |
| Subject: | Fw: Summary of Our Call Today on WV WIP Review |

Katherine, Leo and Lucinda:

Wanted to be sure you have a copy of this email from WV documenting their decisions on assigning gap and surplus in WV.

Rob

_____
Acting Deputy Director
Chesapeake Bay Program Office
410-267-5702

410 Severn Avenue Suite 109
Annapolis, Maryland 21403
wood.robert@epa.gov

----- Forwarded by Robert Wood/DC/USEPA/US on 12/21/2010 01:51 PM -----

| From: | "Montali, David A" <David.A.Montali@wv.gov> |
|---|---|
| To: | Robert Wood/DC/USEPA/US@EPA |
| Cc: | "Koon, Teresa M" <Teresa.M.Koon@wv.gov>, "Mandirola, Scott G" <Scott.G.Mandirola@wv.gov>, <btabb@ag.state.wv.us>, "Hannah, Steve" <shannah@ag.state.wv.us>, "Matt Monroe" <mmonroe@ag.state.wv.us> |
| Date: | 12/14/2010 04:41 PM |
| Subject: | RE: Summary of Our Call Today on WV WIP Review |

Rob,

Thanks for the preview of EPA's WV WIP review.

**ESJA 48**

After yesterday's call, we understood that the effect of the LA to WLA AFO shift was to signal EPA's future intent to designate additional CAFOs (and/or MS4s) if WIP implementation is not fully accomplished and, further, that it does not involve additional AFO BMPs and associated pollutant reductions over and above the level of effort portrayed in our final scenario and our WIP. This is described in your summary in the 3rd and 5th paragraphs under " LA to WLA Shifts for AFOs and Urban Stormwater". But the 4th paragraph appears to contradict this. Please clarify.

WV does not wish to take ownership of the shifts. Characterization by EPA as "minor backstops" is ok. The most important point is that WV will be initially afforded an opportunity to implement the TMDL as we prescribed in the WIP and that the backstops would only have impacts if sufficient progress is not achieved.

We agree that the Potomac P and sediment surpluses should be retained in the Potomac for now. But our true preference would be to transfer a portion of this surplus to the James watershed as necessary to cover gaps (as described on pages 13 and 14 of the WIP). If EPA will not allow transfer now, this will be an action item for us in Phase 2. We will coordinate with EPA and VA as necessary to ensure that the transfer won't jeopardize attainment of criteria in James River and transfer the amount needed after consideration of the positive impacts that would result from implementing existing WV TMDLs in the James watershed. We would also suggest that EPA not describe James gaps in percentage terms as they are unnecessarily inflammatory. Keep in mind that transfer of approximately half of the 1% P Potomac surplus (3519 #P/yr) would resolve James N & P gaps, as would transfer of less than 25% (6173 tons/yr) of the Potomac sediment surplus.

Your summary correctly indicates our agreement to prescribe James watershed reductions to the general category of nonpoint sources.

We have shared your email and discussed with the cc'd WVDA representatives who generally concur with our responses.

Thanks again,

Scott and Dave

-----Original Message-----
From: Wood.Robert@epamail.epa.gov [mailto:Wood.Robert@epamail.epa.gov]
Sent: Monday, December 13, 2010 7:41 PM
To: Mandirola, Scott G; Montali, David A; Koon, Teresa M
Cc: Hartman, Alana C; Antos.Katherine@epamail.epa.gov;
Essenthier.Leo@epamail.epa.gov; Capacasa.Jon@epamail.epa.gov;
Edward.James@epamail.epa.gov; Corbin.Jeffrey@epamail.epa.gov;
Koroncai.Robert@epamail.epa.gov
Subject: Summary of Our Call Today on WV WIP Review


Scott, Dave and Teresa,

Thanks for your time today to discuss EPA's review of WV's final Phase I WIP. I want to summarize the outcome of our discussion and invite you to add any points I may have missed, and if you concur with my summary, please respond to say so.

LA to WLA Shifts for AFOs and Urban Stormwater

**ESJA 49**

As we discussed, upon review of the WV Phase I WIP, EPA noted many improvements to WV's final Phase I WIP. However, we still have some concerns about WV's reasonable assurance that programs necessary to reduce nonpoint source loadings from the animal feeding operation (AFO) and urban stormwater sectors to the levels envisioned in WV's WIP will be sufficiently implemented. As a result of these concerns, we propose to shift 75% of the animal feeding operation (AFO) loads and 50% of the urban stormwater loads that your WIP currently includes in the load allocation (LA) category over to the wasteload allocation (WLA) category.

As you may recall, in the draft WIP EPA shifted 100% of AFO loads over to the WLA, and 50% of the urban stormwater loads over to the WLA. Due in part to improvements in your WIP, we are proposing to back off the AFO shift to 75%. And unlike the draft TMDL, the shift of 50% of urban stormwater loads to the WLA does not assume that regulated stormwater would reduce loads by assuming more retrofit requirements than what was proposed in the WIP.

These proposed LA to WLA shifts are not an indication that EPA is intends to designate 75% of AFOs or 50% of urban lands as requiring NPDES permits. Rather, this shift signals that EPA is prepared to designate sources where necessary to ensure that nutrient and sediment controls identified in WV's WIP are implemented. Our hope is that the implementation rates envisioned in WV's WIP through voluntary programs will indeed be implemented on pace with two-year milestones and that relatively few NPDES designations will be necessary by EPA or the State. We are committed to working with WV to make your strategy's work for reducing nutrient and sediment loads to local waters and to the Bay. The LA to WLA shifts are, however a signal that EPA is prepared to make such NPDES designations where necessary to implement the TMDL.

Under this LA to WLA shift, the TMDL would assume AFO practices on the ground that would be consistent with NPDES permit conditions (eg, full treatment train of waste management, barnyard runoff control, and mortality composting). WV already assumes most of these practices at very high implementation rates in their WIPs, and the LA to WLA shift for AFOs is necessary in EPA's view to help ensure these rates are achieved. Also, EPA would assume the same levels of feed management as the state proposed in its WIP.

In summary, EPA is not proposing to require additional NPDES controls on agriculture or urban lands at this time. Unless and until such designations are made, reductions the WIP calls on AFO and unregulated urban stormwater sources to achieve would continue to be managed by the state as unregulated sources.

Based on our call today, I am confident you understand why EPA is proposing these shifts and that these shifts can be described by EPA either as minor backstops of the WV WIP, or if WV wishes to request such shifts through email addendum to the Phase I WIP, EPA would consider these shifts part of the State's WIP and would characterize them as such. Please be aware that other jurisdictions have proposed these shifts themselves as a way to bolster reasonable assurance that urban and agricultural allocations will be achieved and maintained, rather than having EPA make these changes.

Please let me know as soon as possible whether you would prefer for EPA to consider the LA to WLA shifts described here to be minor backstops or, shifts requested by WV through an email addendum to your WIP.

**ESJA 50**

Spare Allocation of Phosphorus in the WV Potomac Basin

We also discussed the fact that the WV Phase I WIP results in an
approximate 1% spare allocation of P in the Potomac Basin or about 6,300
pounds per year.  Based on our discussion, I understand that you would
prefer that this spare allocation be held in reserve for the Potomac
Basin so that if appropriate WV could propose to allocate this load to
another sector or perhaps even another basin (James), in Phase II or
after.

Please confirm that this accurately reflects your request.

Remaining Nutrient and Sediment Gap in the WV James Basin

Finally, we discussed the fact that the WV Phase I WIP results in TN, TP
and TSS loadings in the WV James that exceed WV James allocations by
50%, 18% and 74% respectively.  Based on our discussion I understand
that you would prefer to assign the additional load reductions to close
these gaps to the general category of nonpoint source.  In the TMDL
tables, we will do this by proportionally reducing NPS agriculture,
septic and urban loads.

Please confirm that this accurately reflects your request.

In closing, thank you again for taking the time to discuss these matters
with me today.  I am most interested in your prompt response by COB
tomorrow (Tuesday) so that EPA may finalize the TMDL allocation tables.
Did I accurately characterize your requests for assigning the surplus
and gaps?  Would you prefer EPA characterize the LA to WLA shifts for
AFOs and unregulated urban stormwater as minor backstops or as an
addendum to WV's WIP?

Sincerely,

Rob Wood

_____
Acting Deputy Director
Chesapeake Bay Program Office
410-267-5702

410 Severn Avenue Suite 109
Annapolis, Maryland 21403
wood.robert@epa.gov

**ESJA 51**

**Response to Public Comments**

**Chesapeake Bay TMDL for Nitrogen, Phosphorus and Sediment**

**December 29, 2010**

**Docket #: EPA-R03-OW-2010-0736**

## Table of Contents

Introduction ....................................................................................................................... v

  A. Methodology EPA Used to Sort and Code Public Comment Letters .................................... vi

  B. Components of a Coded Comment Letter........................................................................... vii

    Comment Letters with No Attachments ............................................................................. vii

    Comment Letters with Attachments .................................................................................. vii

  C. Locating Comments and EPA's Response in the Final Document ....................................... viii

    TABLE 1 - Issue Categories.............................................................................................. viii

  D. Duplicates and Attachments............................................................................................. xiv

    Duplicates........................................................................................................................ xiv

    Attachments .................................................................................................................... xiv

    Graphs, Figures, Tables and Pictures ............................................................................... xiv


Chapter 1 – Comments and Responses

Part 1

    1. General Opposition................................................................................................... 1-59

    2. General Support .................................................................................................... 60-173

    3. History of the TMDL & Background ...................................................................... 174-184

    4. Legal Comments.................................................................................................. 185-369

    5. Watershed Listing and Impairment Description..................................................... 370-379

    6. Water Quality Standards. .................................................................................... 380-435

    7. Sources of Nutrients and Sediments .................................................................... 436-598

    8. Chesapeake Bay Program Models....................................................................... 599-1079

    9. Criteria Assessment Program.......................................................................... 1080-1084

    10. Climate Change Simulation .......................................................................... 1085-1098

    11. Critical Conditions........................................................................................ 1099-1101

    12. Seasonal Variation. ..................................................................................... 1102-1102

13. Margin of Safety ...................................................................................................1103-1118

14. Temporary Reserve ..............................................................................................1119-1119

15. Daily Loads ...........................................................................................................1120-1129

16. Allocation Methodology .........................................................................................1130-1218

17. Adjustment Agreements ........................................................................................1219-1221

18. Reasonable Assurance. ........................................................................................1222-1291

19. Accountability Framework .....................................................................................1292-1384

Part 2

20. WIPs .....................................................................................................................1385-1799

21. TMDL Allocations .................................................................................................1800-2064

22. WLA .....................................................................................................................2065-2176

23. LA ........................................................................................................................2177-2217

24. TMDL Costs and Funding......................................................................................2218-2565

25. Water Quality Data and Monitoring .......................................................................2566-2617

26. Future Growth.......................................................................................................2618-2649

27. Trading to Meet WLAs and LAs.............................................................................2650-2738

28. Revising the TMDL ...............................................................................................2739-2752

29. Federal Facilities and Lands..................................................................................2753-2756

30. Sediments behind Susquehanna River Dams........................................................2757-2763

31. Filter Feeders........................................................................................................2764-2788

32. Public Involvement ...............................................................................................2789-2890

33. Miscellaneous Comments .....................................................................................2891-2934

34. TMDL Timeline .....................................................................................................2935-3005

35. TMDL Schedule ....................................................................................................3006-3013

36. Appendix A. ..........................................................................................................3014-3014

37. Appendix B ...........................................................................................................3015-3015

38. Appendix C ...........................................................................................................3016-3016

39. Appendix D ...........................................................................................................3017-3017

40. Appendix E ...........................................................................................................3018-3018

**ESJA 54**

41. Appendix F........................................................................................................3019-3019

42. Appendix G. ......................................................................................................3020-3020

43. Appendix H .......................................................................................................3021-3021

44. Appendix I..........................................................................................................3022-3022

45. Appendix J..........................................................................................................3023-3023

46. Appendix K ........................................................................................................3024-3024

47. Appendix L..........................................................................................................3025-3025

48. Appendix M. .......................................................................................................3026-3026

49. Appendix N .........................................................................................................3027-3027

50. Appendix O .........................................................................................................3028-3028

51. Appendix P .........................................................................................................3029-3029

52. Appendix Q. ........................................................................................................3030-3034

53. Appendix R .........................................................................................................3035-3035

54. Appendix S .........................................................................................................3036-3040

55. Appendix T..........................................................................................................3041-3041

56. Appendix U .........................................................................................................3042-3042

57. Appendix V .........................................................................................................3043-3043

58. Appendix W. .......................................................................................................3044-3044

59. Appendix General/Miscellaneous ......................................................................3045-3045

60. Mass Campaign Letters......................................................................................3046-3070

Attachment 1

Figure 1: Potomac Tidal Fresh Chl *a* Monitoring Data.........................................................A1-1

Figure 2: Surface Chlorophyll a. ...........................................................................................A1-2

Equation 1: Mathematical equations in the section Chesapeake Bay Water Quality Model Calibration
........................................................................................................................................A1-2

Table 1: Chlorophyll Summary Statistics for James River (Chesapeake Bay Water Quality Model Calibration ...........................................................................................................................A1-3

Figure 3: JMSMH Summer 1997-1999 .................................................................................A1-3

**ESJA 55**

Equation 2: Mathematical equations from the Lack of Criteria for Acceptance of Model Predictions Poor Chlorophyll a Calibration section ................................................................................................. A1-4

Table 2: Chlorophyll Summary Statistics for James River (Lack of Criteria for Acceptance of Model Predictions Poor Chlorophyll a Calibration). .................................................................................... A1-4

notes approvingly the general concept of milestones and encourages EPA to consider how the two-year milestone process could be used by all Bay States to demonstrate reasonable further progress.

Fourth, EPA's "reasonable assurance" proposal and related backstops unreasonably shift responsibility of various nonpoint sources to different people who will then pay more to make up for the now-sanctioned inactivity of other sources. This is fundamentally unfair and unjustifiable.

Fifth, EPA has inappropriately rejected Virginia's recommended expansion of the existing nutrient trading system to include additional source sectors. Given Virginia's exceptional track record of establishing large-scale trading program with high accountability, EPA's quick rejection of Virginia's concept is unwarranted.

**Response**

Thank you for your comment. Please see the response to comment number 0230.1.001.026.

# Comment ID 0230.1.001.026

**Author Name:** Henifin Edward

**Organization:** Hampton Roads Sanitation District (HRSD)

III. EPA's UNPROMULGATED "REASONABLE ASSURANCE" REGULATION DOES NOT SUPPORT EPA'S PROPOSED DISAPPROVAL OF THE WIP AND IMPOSITION OF "BACKSTOP" ALLOCATIONS

As noted above, EPA's decision to reduce POTW WLAs is based upon its view that Virginia's Draft WIP provided less than adequate reasonable assurance that its plan would achieve desired reductions. EPA's position on reasonable assurance is untenable for four reasons.

First, EPA's view of reasonable assurance in this TMDL is unprecedented at the federal or state level. EPA has written and/or approved thousands of TMDLs for impaired waters across the United States. Because the phrase "reasonable assurance" is undefined in either the Clean Water Act or in regulations or in guidance,[FN23] EPA's approach to reasonable assurance has ranged from liberal to more conservative.[FN24]

As examples, EPA's Paxton Creek Watershed TMDL (nutrients, sediment), Goose Creek Watershed TMDL (nutrients), Sawmill Run TMDL (nutrients), and Southampton Creek Watershed TMDL (nutrients and sediment) all contain weak reasonable assurance provisions that fail to link the identified BMPs to implementation programs. In addition, these TMDLs suggest that BMP implementation should only "eventually" meet load allocation reductions goals.[FN25] EPA has approved many TMDLs, including the Anacostia River Basin Watershed TMDL (sediment, TSS), the Anacostia River Basin Watershed TMDL (BOD, nutrients) and the Tidal Potomac River TMDL (PCBs), which lack schedules for reductions and consequences for failure to meet load allocations. To suggest that EPA's Draft TMDL, with its state WIPs, and implementation schedule and consequences, provides less reasonable assurance than these TMDLs is nonsensical.[FN26]

Furthermore, what EPA has done in its Draft TMDL is really to promulgate a new rule—i.e., a new regulatory definition of "reasonable assurance"—without following proper regulatory procedure. EPA appears to be attempting a "do-over" of its previously unsuccessful rulemaking in the early part of the decade. On July 13, 2000, EPA published a final rule, which would have incorporated a definition of reasonable assurance into 40 C.F.R. Part 130.[FN27] However, Congress, states, industrial and agricultural groups, and environmental organizations opposed the rule; and, EPA withdrew it in 2003.[FN28] Although EPA may be frustrated by an inability to define "reasonable assurance" in its regulations, there is no justification for defining as it as a part of this TMDL without allowing for public participation and comment.

EPA's Draft TMDL is inconsistent with earlier statements it has made on this subject. For example, in September, 2008, Region III responded to a letter from Maryland's Secretary of Natural Resources John Griffin.[FN29] In response to a question regarding reasonable assurance, EPA stated that:

EPA Regions II and III, our partner states and the District are committed to accelerating restoration of the Chesapeake Bay and its tributaries, and EPA Region III believes that reasonable assurance provisions in the Bay TMDL will provide one mechanism to increase the likelihood that actions are taken to reduce nutrient and sediment loads. However, EPA Region III does not believe that implementation of the Bay TMDL depends solely on reasonable assurance or any other single TMDL element. Rather, EPA Region III is committed to working with the States and the District to develop and execute a broader implementation framework that draws on elements in the TMDL itself (including reasonable assurance), as well as additional implementation-related information that will accompany the TMDL.[FN30]

As the discussion above makes clear, EPA's "new" strict definition of "reasonable assurance" in the Draft TMDL is unjustified based upon prior practice. Virginia's Draft WIP is more than adequate to establish "reasonable assurance" pursuant to years of EPA prior practice. EPA's proposed negative finding and associated backstops are uneven and discriminatory against Virginia and its point sources, and obviously arbitrary and capricious under the standards that EPA has defined by its own prior acts.

Second, it is not clear that EPA has adequately factored in the Bay States' two-year milestones into its reasonable assurance determination. This is directly contrary to EPA's statements in 2008 that the two-year milestones would be part of the criteria considered by EPA "as part of its reasonable assurance and implementation framework…"[FN31] These two-year milestones should be a sufficient backstop to the WIPs to establish adequate reasonable assurance. The Chesapeake Bay Executive Council decided in 2008 that each of the Bay States would provide a set of target reductions and associated management efforts by which EPA could judge progress towards ultimate clean-up goals every two years.[FN32] EPA followed up on the Executive Council's actions by issuing a letter in December, 2009 promising "consequences" for those Bay States who fall short of those two-year milestones. Although HRSD disagrees with the concept of "consequences," EPA has not explained in its Draft TMDL why this additional accountability is inadequate for "reasonable assurance" purposes.

In a larger sense, the two-year milestones are also pieces of a larger 15 year plan (based upon an implementation period that runs from 2011 to 2025). The two-year milestones provide EPA with an opportunity to perform a regular "check-up" to determine whether the Bay States are accomplishing the goals they have set. The program itself also allows for adjustments over the full implementation period. EPA's reasonable assurance is assured by the process. Simply put, we will have the opportunity to manage this program as time goes by. EPA's view that reasonable assurance must established in absolute terms today is short-sighted and unreasonable.

Third, as a result of EPA's "reasonable assurance" decision, POTWs are bearing the weight of additional pounds of nutrients unrelated to their facilities or discharges. This shifting of responsibility onto the shoulders of point sources from non-point sources is fundamentally unfair and unjustifiable.[FN33] Increasing the burden on point sources is unreasonable given that EPA has acknowledged "the large scale public investments (estimated at over $4 billion) that are now being carried out throughout the watershed to upgrade and reduce nutrient discharge from point sources" such as POTWs.[FN34] Requiring POTWs and other point sources to make additional costly upgrades to compensate for non-point source pollution contravenes EPA's earlier assertion that "EPA considers requiring further point source upgrades to the limits of technology as an option of last resort." [FN35]

Fourth, and lastly, EPA has inappropriately rejected Virginia's approach to reasonable assurance—i.e., expansion of the existing nutrient trading system to include additional source sectors. As a general matter, EPA should have provided due deference to Virginia's Draft WIP. And, with regard to this issue, EPA should have allowed Virginia to move forward with its plan to develop an expanded trading program. As explained below, Virginia has a stellar track-record with regard to market-based trading, having established a very successful PS trading program. Virginia has earned the right to show how it could expand that program in a way that would provide reasonable assurance of needed reductions.

For these reasons above, HRSD objects to EPA's determination to reject Virginia's Draft WIP and develop a "backstop" based upon reasonable assurance grounds. This error must be corrected before EPA issues its final TMDL. For the above reasons, EPA's position on "reasonable assurance" is unreasonable and arbitrary and capricious.

HRSD's position is further supported by the fact that EPA has no authority pursuant to the Clean Water Act to review and/or approve or disapprove Virginia's Draft WIP. EPA's decision to do so, and its proposal to override Virginia's WIP is unlawful.  HRSD does not dispute that TMDL implementation planning is important for moving clean-up programs ahead after TMDL adoption and for illustrating its NPS reduction plans. However, because WIPs are not derived from CWA section 303(d) authority, [FN36] the details of these plans are not subject to EPA approval or control. EPA's decision in its Draft TMDL to create "backstops"—requirements that in effect revise the Virginia's Draft WIP—are not supported by federal law.

In addition to acting without specific authorization from federal law, EPA's actions are also inconsistent with state primacy granted by Section 510 of the Act:

Except as expressly provided in this Act, nothing in this Act shall (1) preclude or deny the right of any state or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.") [FN37]

Federal law clearly gives Virginia the authority to develop its own requirements and programs, so long as they are not less stringent than those established under the Act. [FN38] Because EPA has no statutory authority to establish WIPs, it

is impossible for Virginia's Draft WIP to be less stringent.

For these reasons, Virginia should have the discretion to establish its own WIP, without EPA passing judgment and usurping what is rightfully the state's role in this process.

[FN23] EPA guidance merely "define[s] when reasonable assurance must be demonstrated but not really what it is." Reasonable Assurance Workgroup Findings and Options, Principals' Staff Committee Meeting, Washington, D.C., at 13 (Sept. 22, 2008) (attached hereto as Appendix 14).

[FN24] In 2008, EPA's CBPO's Principal's Staff Committee established the "Reasonable Assurance Workgroup." Part of the Workgroup's charge was to develop recommendations for how "reasonable assurance" would be used for purposes of developing the Bay TMDL. Some of the materials prepared by this Workgroup (attached hereto as Appendix 14) confirm that not only is "reasonable assurance" undefined in federal law, but that EPA has previously based TMDLs on a number of different views on reasonable assurance (e.g., EPA has approved a "[b]road spectrum of acceptable reasonable assurance demonstrations in 30,000 TMDLs approved by EPA.").

[FN25] See Chesapeake Bay Program Principals' Staff Committee's Reasonable Assurance Workgroup, July 23, 2008 Conference Call, Attachment B, Appendix 1, Examples of Reasonable Assurance: Best Practices from EPA-Approved and Published TMDLs and Suggestions from other Sources, at 9-10.

[FN26] VAMWA hereby incorporates by reference all of the TMDLs EPA has written or approved and all supporting materials. These materials should be publicly available and located in EPA's files. A list of those TMDLs, although not entirely complete, is available at the following link: http://mail.aqualaw.com/exchweb/bin/redir.asp?URL=http://iaspub.epa.gov/waters10/text_search.tmdl_search_form

[FN27] Revisions to the Water Quality Planning and Management Regulation and Revisions to the National Pollutant Discharge Elimination System Program in Support of Revisions to the Water Quality Planning and Management Regulation, 65 Fed. Reg. 43,586 (July 13, 2000) (attached as Appendix 15).

[FN28] Withdrawal of Revisions to the Water Quality Planning and Management Regulation and Revisions to the National Pollutant Discharge Elimination System Program in Support of Revisions to the Water Quality Planning and Management Regulation 68 Fed. Reg. 13,608, 13,609 (March 19, 2003) (attached as Appendix 16).

[FN29] This letter is referenced in Section II above, and is attached as Appendix 11.
[FN30] Letter from EPA Region III to Secretary John Griffin, Enc. A at p. 2. EPA's decision to reduce wastewater allocations because of their perceived lack of reasonable assurance is also inconsistent with statements made by EPA's CBPO last spring. See April 20-21, 2009 Presentation from B. Koroncai to PSC (Chesapeake Bay Water Quality Big Picture) at slide 13 ("Wastewater discharge load requirements will continue to be set at the discretion of states.") (attached hereto as Appendix 17).

[FN31] Letter from EPA Region III to Secretary John Griffin, Enc. A at p. 2.

[FN32] The first set of two-year milestones are attached hereto as Appendix 18.

[FN33] VAMWA agrees with statements made on this point by Virginia Governor Bob McDonnell. In a June 15, 2010 letter to EPA Administrator Lisa P. Jackson (attached hereto as Appendix 19), Governor McDonnell states that "Any regulatory consequences need to be targeted to the source sector lagging behind, and not on others that are working diligently to keep in compliance with state and federal mandates."

[FN34] Letter from EPA Region III to Secretary John Griffin, Enc. A at p. 4.

[FN35] Id.

[FN36] Section 303(d) of the Clean Water Act mandates that states must prepare TMDLs for impaired waters, and authorizes EPA to approve or disapprove the loadings. If EPA chooses to disapprove, it has the authority to develop loadings on its own accord ("If the Administrator disapproves such identification and load, he shall not later than thirty days after the date of such disapproval identify such waters in such state and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters and upon such identification and establishment the State shall incorporate them into its current plan under subsection (e) of this section.") 33 U.S.C. §1313. Section 303(e) specifically gives the State the authority and responsibility to develop a "continuing planning process" for addressing navigable waters. A part of this planning process is TMDLs (again, TMDL implementation plans are not mentioned). Nowhere in the text of Section 303(d) or (e) is EPA permitted to pass judgment on state implementation plans.

[FN37] 33 U.S.C. 1370.

[FN38] Virginia law (Chesapeake Bay and Virginia Waters Clean-Up and Oversight Act) includes a provision for the development of a Bay clean-up plan. Va. Code 62.1-44.117.


**Response**

EPA respectfully disagrees each of the comment's main points.

First, EPA believes that its position on reasonable assurance is neither unreasonable nor arbitrary and capricious. As was expressed in EPA's letter to Secretary John Griffin of Maryland's Department of Natural Resources, EPA believes that the successful implementation of the Bay TMDL depends not only on proposed pollutant reduction measures supported by reasonable assurance, but also on a broader implementation framework that draws on elements in the TMDL itself (including reasonable assurance), as well as additional implementation-related information that will accompany the TMDL.  Neither the TMDL, nor the reasonable assurance component thereof, is a federal rule or regulation.

While the term "reasonable assurance" does not expressly appear in the Clean Water Act or in EPA's TMDL regulations, it has consistently appeared in EPA's TMDL guidance since 1991.  Furthermore, EPA believes that the requirement that the Bay TMDL include reasonable assurance is consistent with EPA's guidance document entitled "New Policies for Establishing and Implementing Total Maximum Daily Loads (TMDLs) -1997."  In that document, it was stated that "in watersheds impaired by a blend of point and nonpoint sources, and where any wasteload load allocation to a point source is increased based on an assumption

that loads from nonpoint sources will be reduced, the State must provide "reasonable assurances" that the nonpoint source load allocations will in fact be achieved." Chesapeake Bay water quality has been, and continues to be, impaired by both point and nonpoint sources of nitrogen, phosphorus, and sediment.

The implicit requirement for reasonable assurance in TMDLs flows legally and logically from the following two statutory and regulatory provisions: Section 303(d)(1)(C) of the Clean Water Act and 40 C.F.R. section 122.44(d)(1)(vii)(A)&(B). The requirement for TMDLs to be supported by reasonable assurance is fundamental to their design and purpose. The most basic TMDL requirement is that they be "established at a level necessary to implement the applicable water quality standards." This requirement applies not just to the total load constituting the water body's assimilative capacity, but also to the components (individually and collectively) of the TMDL equation: TMDL = wasteload allocations (WLAs) + load allocations (LAs) + margin of safety. A WLA cannot be established at a level necessary for the TMDL to meet applicable water quality standards unless the TMDL's LAs and other WLAs are also established at water quality standard-implementing levels. It is the implied requirement for "reasonable assurance" that those WLA and LA levels will be met that (1) keeps the TMDL equation "honest" and (2) gives TMDLs their value and legitimacy as water quality planning and implementation tools.

To the extent that the comment includes a substantive comment on a jurisdiction's draft Phase I Watershed Implementation Plan, EPA notes that the WIPs submitted by each jurisdiction are part of the accountability framework outlined in the Chesapeake Bay Protection and Restoration Executive Order 13508. The WIPs help ensure implementation of the Chesapeake Bay Total Maximum Daily Load (TMDL) but are not an approvable part of the TMDL. Because this public comment period is specific to EPA's Chesapeake Bay TMDL, specific comments on each jurisdiction's WIP should be directed to the appropriate jurisdiction for consideration. EPA has forwarded this comment to the appropriate jurisdiction for consideration as part of its WIP. For information on the results of EPA's evaluation of the jurisdictions' final Phase I WIPs, see Section 8 of the final TMDL.

Second, the comment also raises a concern regarding the role of the two-year milestones and how this process could "provide EPA with an opportunity to perform a regular "check-up" to determine whether the Bay States are accomplishing the goals they have set. EPA has considered the Bay jurisdictions' proposed two-year milestones, as well as the overall accountability framework of which the two-year milestones are one part, into its assessments of the Bay jurisdictions' respective Phase I Watershed Implementation Plans. EPA agrees that "the two-year milestones are also pieces of a larger 15 year plan (based upon an implementation period that runs from 2011 to 2025). The two-year milestones provide EPA with an opportunity to perform a regular 'check-up' to determine whether the Bay States are accomplishing the goals they have set." EPA is not requiring that reasonable assurance be established in absolute (i.e., rigid or inflexible) terms, and disagrees with the commenter's assertion to the contrary. Instead, EPA understands the reasonable assurance for the Bay TMDL as being flexible and adaptive, with the potential for adjustments in the allocations based on the jurisdictions' success (or lack thereof) in implementing their WIPs. EPA also has explained, in Section 7 of the Chesapeake Bay TMDL, why federal actions, which are part of the accountability framework, are a key component of reasonable assurance for the Bay TMDL.

Third, the comment argues that the TMDL places an unfair burden on point sources. EPA understands the concern for the reductions that point sources will need to make. EPA believes that adequate reasonable assurance for the Bay TMDL can take many forms; the certainty and the ability to control various pollutant sectors is not uniform. EPA endorses, where possible, an equitable sharing of the responsibility for cleanup that applies to all sectors, and a realistic recognition that this effort will require unprecedented levels of federal, state, and local resources to be successful. In assessing the adequacy of reasonable assurance,

however, it is important to assess the probability and certainty of implementing the technologies and practices. EPA expected the jurisdictions to document in their WIPs that the proposed point and nonpoint source technologies and practices are enforceable and achievable; certain point source approaches are well-established, cost-effective, and likely to be applied. For further response to this issue, see the response to comment number 0067.1.001.009. For a description of the reductions being required from point sources in each jurisdiction, see Section 8 of the Bay TMDL.

Fourth, the comment states that, "EPA has inappropriately rejected Virginia's approach to reasonable assurance—i.e., expansion of the existing nutrient trading system to include additional source sectors" and argues that the TMDL is inconsistent with the concept of state primacy as included in section 501 of the Clean Water Act. Related to this is the comment's statement that EPA has no authority under the Clean Water Act to review and/or approve the draft Phase I Watershed Implementation Plans. EPA respectfully disagrees with the implication that it is usurping the state's role; EPA has been working in a cooperative and collaborative manner with all seven of the Bay jurisdictions to establish the Bay TMDL. EPA agrees that the Clean Water Act does not require or authorize EPA to "approve" or "disapprove" the jurisdictions' WIPs. EPA has not done so here; instead, EPA identified expectations and a guide for the contours of the WIPs and asked the jurisdictions to submit WIPs to support their recommendations for EPA's TMDL allocation decisions for various pollutant loading sectors. EPA reviewed the WIPs to determine if they provided adequate reasonable assurance to support the jurisdictions' recommended allocation scenario. Where EPA determined that those WIPs provided adequate reasonable assurance and met the jurisdictions' respective pollutant cap loadings, EPA used all (or those parts found adequate) as the basis for its TMDL allocations for that jurisdiction.

# Comment ID 0249.1.001.004

**Author Name:** Mixell John

**Organization:** Fort Littleton Wastewater

EPA cannot provide "Reasonable Assurance" that placing significantly lower limits on point sources (with many industrial point sources below the limit of technology) will be implemented and successful.

Just because EPA has placed severely low nitrogen and phosphorus limits for point sources into the model and the model results show that Pennsylvania's allocations for nutrients can be met, does not provide "Reasonable Assurance" that this approach will be successful. Just because EPA can place these low limits in NPDES permits, does not mean that there is "Reasonable Assurance" that this approach will be successful.

**Response**

Thank you for your comment. Please see the response to comment numbers 0217.1.001.005 and 0230.1.001.026.

# Comment ID 0253.1.001.012

**Author Name:** Hazelett Virgil

# CERTIFICATES

I, David Gunter, certify that:

(1) I caused the foregoing Supplemental Joint Appendix to be served on all
counsel via the Third Circuit's electronic case filing system on April 2, 2014.

(2) The electronic file submitted to the Court via its electronic filing system was
checked for computer viruses using Microsoft Forefront Client Security on
April 2, 2014.

(3) This Supplemental Joint Appendix was not created from the documents in
EPA's administrative record for the Bay TMDL that are stamped with
"AR" numbers, but it was created from identical documents downloaded
from EPA's web site and other publicly available web sites, and the pages
correspond to the "AR" pages listed in the Table of Contents.


/s/ *David Gunter*